Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

62. As of April, 2018, the deficiency on the SunTrust Note was $374,282.18.  Sun Trust

Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

63.  As of April, 2018, Len remained the sole obligor on the SunTrust Note.

**RESPONSE:**

64.  The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust

Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7, 152:3 - 153:10.  See SunTrust Deed of

Trust, dated April 16, 2007, Exhibit A to SunTrust Motion for Relief from Stay ("SunTrust

Motion"), filed in Case No. 18-2662 on November 2, 2018 (D-79-1), Exhibit 15.

**RESPONSE:**


65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant

asset was the Property.

**RESPONSE:**

66.  At all relevant times, Len worked only part time and had limited income and assets.

**RESPONSE:**

67.  At all times following the transfer in 2010, Len was insolvent. His liabilities

exceeded his assets and his income was insufficient to pay his obligations, including the Sun

Trust Deed of Trust Note payments.

**RESPONSE:**

-13-

68. Len did not have sufficient funds to pay his attorneys in the Superior Court litigation. He lives "paycheck to paycheck." L Salas Trans. 76:20 - 77:2

**RESPONSE:**

69. At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans. 61:1 - 63:2.

**RESPONSE:**

70. In 2016, Len's income was a total of $15,151. L Salas Statement of Financial Affairs, filed April 18, 2018 in Case No. 18-2662, (D-1), Exhibit 16, p 38.

**RESPONSE:**

71. In 2017 Len's total income was $30,408. Exhibit 16, p. 38.

**RESPONSE:**

72. In 2018, through April 17, 2018 Len's total income was $6,720. Exhibit 16, p. 38.

**RESPONSE:**

73. During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them. See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

**RESPONSE:**

74. Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of

-14-

counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, filed April 27, 2018 in Case No. 18-2662, D-10, at page 3 of 10.

**RESPONSE:**


75. On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41. Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

**RESPONSE:**


76. Len received no income, payments or property from Max in 2007 or 2010. L Salas Mtg Trans., 4/1/19, Exhibit 5, 5:22 - 7:15.

**RESPONSE:**


77. Len repeatedly attempted to get Max to remove Len's name from the Property after 2010. L Salas Depo. Testimony, Exhibit 13, 70:18 - 74:16

**RESPONSE:**


78. Mr. Salas told his counsel, Mr. Albert and his associate, Mr. Cox, in 2018, what Max did with the Quitclaim Deed and left it up to his counsel to obtain the original from Mr. Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

-15-

**RESPONSE:**

79.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13.

**RESPONSE:**

80.  In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed,

executed on July 6, 2010, as follows:

"Q And I believe you said, but I want to
clarify this, that between the time of 2012,
roughly, and I realize you said, I think, a year
or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came** in **my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind**
I **don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.**
He didn't live in the District, he
never- he didn't live in the house, and I- so
**that's the only logical reason** I **could make that
he would be involved, that it was never done. And
until that point, I did not even know that it had
not been done.** I **assumed at some point that he
came up with the money and did it. But he didn't,**

-16-

**as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the District of Columbia, Case No. 18-00260, August 8, 2018, excerpts attached hereto as Exhibit 8, ("R Salas Trans"), 65:21 - 66:21 (emphasis in original).[2]

    **RESPONSE:**


    81. The Plaintiffs Judgments are now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy.  M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries  D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries  D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and D-222 (Final Decree).

    **RESPONSE:**


    82.  Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

    **RESPONSE:**


    83.  On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max.  This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property.  A copy of Ron's email, dated

---

    [2]Mr. Albert was acting as counsel for Max Salas in his bankruptcy and attended the deposition on behalf of Max.  Ron Salas appeared without counsel.

June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022.

**RESPONSE:**

84.  These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Debtor's Responses to Movants' First Set Request for Production of Documents, served on August 6, 2018, in Case No. 18-260, Exhibit 21.

**RESPONSE:**

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

**RESPONSE:**

86.  Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Number: LenSalas000017.

**RESPONSE:**

87.  On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein.  In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..."  Exhibit 7, Bates Number LenSalas000016.

**RESPONSE:**

88.  In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are

**two different** requests.  One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supllied) Exhibit 7, Bates Number LenSalas000023.

**RESPONSE:**


89.  On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon."  Exhibit ___ , Bates Number LenSalas000029.

**RESPONSE:**


90.  Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust.  M Salas Trans. 65:1-15.

**RESPONSE:**


91.  Max also testified that he does not recall any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18.

**RESPONSE:**


92.  When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

> **Q.  Have you contacted Ms. Boileau or**
> Mr. Goldstein to determine if they
> have a copy of any deed that might
> have been created?
>
> **A.  I did try to contact them.  I
> did try to contact them actually
> recently.  And I -- but I didn't -- I
> mean, they were trying -- they
> were -- no.  I mean, we worked on**

-19-

> **something and then they said it couldn't go
> any further and depends on what you
> were going to do. So I don't -- I guess --
> I can't guess. I don't know.**

M Salas Trans. 73:13-23

    **RESPONSE:**

    93.  Only Max Salas had an original of the Quitclaim Deed after July 6, 2010 and Max does not know where the original is or when he last had it.  Exhibit 10, M Salas Trans. 73:13-23, 77:20 - 82:23.

    **RESPONSE:**

    94.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 19, 42:18 - 43:2.

    **RESPONSE:**

    95.  Len Salas is not aware of the location of any of the wet ink signature originals of the July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas Trans."), 15:4-9.  Len testified in his deposition that he provided an original"wet ink" original of the Quitclaim Deed, or a copy,  to his lawyer on the eve of the Superior Court trial which resulted in the judgment against Len and his father. L Salas Trans, 16:6-24, 19:11-25 - 21:18.  Regardless,

-20-

Len testified that the document he produced on the eve of the Superior Court trial, which

commenced on March 26, 2018, was kept in his possession at all known times between July,

2010 and March, 2018.  Id. Len's wife, Kendra, testified that she "had a pdf of it (the July, 2010

Quitclaim Deed) and that she thought it was the same as what Len had " I thought it was the

same thing as what Len had, but I'm not sure."  K Rowe Trans. 30:13-20.

**RESPONSE:**


96.  Ron Salas stated that he was unaware the Quitclaim Deed had not been recorded

until he found out that Len had been sued in the Superior Court (in October, 2015. Transcript

of the Deposition of Ron Salas, August 8, 2018, Exhibit 8, 65:21 - 66:21

**RESPONSE:**


97.  Ron Salas was unaware of the requirements of Quitclaim Deeds in D.C. Ron Salas's

testimony, Exhibit 12, at pp.227-28.

**RESPONSE:**


98.  Ron stated he was unaware whether the trust documents he created were valid under

D.C. law in August, 2018. Ron Salas's testimony, Exhibit 12, 243:8-15.

**RESPONSE:**

99.      The only deed referenced by Max or his counsel, allegedly entitling Max to an

ownership interest in the Property, is the 2010 Quitclaim Deed.  No other deed has been

proffered, or even mentioned by the Salas family or by Max, specifically.

-21-

**RESPONSE:**


100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15 Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee filed objections to the Plaintiffs' claims filed in Len's bankruptcy.

**RESPONSE:**


101. In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.

On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least $1,035,000 approx) per his consistent promise that he would pay that amount and his consistent assertion that he was responsible for payment of the SunTrust Note which was, at all relevant times, in Len's name.

**RESPONSE:**


102. The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries ("D- ") D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and 222

-22-

(Final Decree).

**RESPONSE:**

103.  Len was solely obligated on the Sun Trust Deed of Trust on the Property which, according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018. M Salas Schedules, Case No. 18-260 (D-12), p. 19 of 37, attached as Exhibit __ .

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed. Transcript of Confirmation Hearing in Case No. 18-02662, December 13, 2018 at pp. 68-69, excerpts attached as Exhibit 4.  See also, Transcript of the Chapter 7 Meeting of Creditors of Len Salas, April 1, 2019 (L Salas Mtg. Trans.), Exhibit 5, 5:22 - 7:15.

**RESPONSE:**

104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office.  He does recall that Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

105.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed. Exemption Trans. Vol 3, 58:9-13

**RESPONSE:**

-23-

106.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments.  D.C. Code § 15-501 (a)(14). These conversations took place in early 2018.  Exemption Trans. Vol. 3, Exhibit 6, 121:3 - 122:9; Albert-R Salas eMails, 2/14 - 3/7/18, Exhibit 19.

**RESPONSE:**

107.  Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

**RESPONSE:**

108.  Mr. Albert confirmed that no original was found after 2010 at the Exemption Hearing through Ron Salas' "rebuttal" testimony on August 24, 2018. Rebuttal Testimony of Ron Salas, at the Exemption Evidentiary Hearing, August 24, 2018. Exemption Trans., Vol 3, 4:10 - 5:16.  See also, Exemption Trans. 5:19 - 6:3, 7:18 - 12:8, 13:17 - 15:24

**RESPONSE:**

108.  At the time of Ron Salas' conversation with Mr. Albert regarding copies of the trust documents, Ron Salas understood that Mr. Albert was representing Max regarding a potential

-24-

bankruptcy filing after the Superior Court trial.  Exemption Trans. 12:12 - 13:14

**RESPONSE:**

109. Max Salas valued the Property at $2.5 Million on his schedules in or about May 2018, and the Property was appraised for approximately $2.4 Million in or about August 2019. Stip. No. 50.

**RESPONSE:**

110.  Pursuant to an order of this Court dated June 12, 2019, the trustee in this case was authorized to sell the estate's interest in the Trustee's avoidance and recovery rights under 11 U.S.C. §§ 544 through 551.  Stip. No. 47

**RESPONSE:**

111.   On July 23, 2019, the trustee in Len Salas' case held an auction sale to sell the bankruptcy estate's interest in the avoidance and recovery actions pursuant to 11 U.S.C. §§ 544 through 553. Stip. No. 48

**RESPONSE:**

112. The Plaintiffs were the successful bidders at the Trustee's auction sale. Stip No. 49

**RESPONSE:**

113.  The D.C. Bankruptcy Court made no final determination of the effect of the trustee's

-25-

avoiding powers asserting that effect was up to Len Salas' bankruptcy estate. Stip. No. 44

 **RESPONSE:**


114. No deed was recorded naming Max Salas as trustee or owner of the Property prior to Len Salas' bankruptcy filing. Stip. No. 45

 **RESPONSE:**


115. Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed related to the Property as of June 6, 2022. Stip. No. 46

 **RESPONSE:**


116. From the time of the Fire until February or March 2018, no one resided in the Property. Stip. No. 35.

 **RESPONSE:**


117. During that time, and until November 2019, no payments were made on the SunTrust Loan with the exception of one payment made by Max Salas from the insurance proceeds he received as a result of the fire damage. Stip No. 36

 **RESPONSE:**


118. According to the schedules filed in Max Salas' bankruptcy, as of the commencement of his bankruptcy case, in April, 2018, the only lien creditors were the IRS

-26-

($6,768.66 claim) and SunTrust Mortgage ($1,030,825.86). Stip. No. 37

    **RESPONSE:**


    119. The balance of the SunTrust Loan as of October 26, 2018 was $1,141,021.14. Stip.

No. 38

    **RESPONSE:**


    120.  Max Salas has been making the required payments on the Property since

November 2019, as of June 22, 2020. Stip. No. 39.

    **RESPONSE:**


    121. At all relevant times, Len Salas had limited income and assets, other than the

Property. Stip. No. 28.

    **RESPONSE:**


    122. Max Salas intended to record the Quitclaim Deed in 2010 but had no money to

pay the required recording and transfer taxes. Stip. No. 29.

    **RESPONSE:**


    123. The Quitclaim Deed has never been recorded.  Stip. No. 30

    **RESPONSE:**

124.  As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had any intent to use or record it.  Emails dated June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**


125. While in Colorado, Len Salas and Max Salas executed a trust agreement which Ron Salas prepared using a Colorado form even though the purported trust property, the Property, was located in D.C. Stip. No. 25.

**RESPONSE:**


126. The Defendant's Second Amended Disclosure Statement and Third Amended Plan of Reorganization, as confirmed by the D.C. bankruptcy court, recognize that the Plaintiffs are the owners of, and have the right to pursue, the avoidance actions which are alleged in the Complaint, as amended. Exhibit 2, Complaint Exhibit B.

**RESPONSE:**


Respectfully submitted,

BUTCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

-28-

By: /s/ Philip J. McNutt
     Philip J. McNutt
     11921 Freedom Drive, Ste 584
     Reston, VA 20190
     703-904-4380
     202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

41

1  believe the owner to be a trust known as 1610 Salas
2  Trust; is that correct?
3      A    That may be what it says, but that's not
4  what I know.
5      Q    Then in your similar answer to
6  interrogatory 3 in the Brekelmans set, you contend
7  some other person is the owner of the property in
8  question and you believe that to be the trust known
9  as 1610 Salas Trust?
10     A    Are you asking are these two different
11 answers to the same question?
12     Q    I am asking if I have correctly
13 identified your sworn answer to those two questions.
14     A    My smart answer?
15     Q    Sworn.
16     A    Oh, my sworn.  Are you asking if that's
17 the same question and I have answered different
18 ways?
19         MR. BARNES:  No, he's not he's asking if
20 that was your answer to both of those questions.
21     A    The answer is here and I signed it.  If
22 it means something that I thought it meant at the

42

1  time, I can tell you that nobody owns that property
2  but me.
3      Q    You are not the legal owner of the
4  property, are you?
5      A    Yes, I am, sir.
6      Q    Are you identified in any record in the
7  District of Columbia as the owner of the property?
8      A    I don't know but I know I own it.
9      Q    Are you identified on any document of any
10 governmental authority identifying you as the owner
11 of the property?
12     A    I don't know that, sir, but I know I own
13 it.
14     Q    You know that the records identify your
15 son Len Salas as the owner; isn't that true?
16     A    I don't know that, sir, but I now own
17 it.
18     Q    Who is the 1610 Salas Trust?  What is it?
19     A    I don't know -- I mean it's a trust
20 that -- there's a trust called CLR, CLR Trust, it's
21 our trust.
22     Q    You say our trust.  Who is "our"?  Whose

43

1  trust is it?
2      A    I believe it's my son's and mine.
3      Q    I'm going to come to CLR in a minute
4  that's not what the answer says, and I'm going to
5  ask you what is the 1610 Salas Trust.  Why did you
6  identify it here?
7      A    Okay.  So because when people paid their
8  rent, they made the rent out to CLR --
9      Q    I didn't ask you who CLR is, sir.  I am
10 going to come to that.
11     A    Do you understand did I just tell you CLR
12 Trust?
13     Q    But both answers identify 1610 Salas
14 Trust so I'm asking you is there such an entity.
15     A    So this is wrong.
16     Q    There is no 1610 Salas Trust?
17     A    There is a 1610 Trust doing business as
18 CLR.
19     Q    When was the trust created?
20     A    I don't recall.
21     Q    Who created the trust?  In other words,
22 who is the seller who transferred the properties to

44

1  the trustee?
2      A    I don't know the answer to who is the
3  trustee.
4      Q    That is the person who was holding the
5  property for the beneficiary?
6      A    I believe I am, but I'm not sure.
7      Q    Who is the beneficiary of the trust
8  that's the person for whose benefit the property is
9  being held?
10     A    Isn't that the same question?
11     Q    No.  I asked you who was the trustee that
12 is the person holding the property for the benefit
13 of a beneficiary and you said you thought it was you
14 but you are not sure, correct?
15     A    So what's the other question?
16     Q    The other question is who is the
17 beneficiary, for whose benefit is the property being
18 held?
19     A    I mean I don't know.  I mean I know what
20 I think but I don't know.
21     Q    What do you think?
22     A    I think it's my property.

Case 3:23-cv-00987   Document 37-27   Filed 10/04/23   Page 18 of 532 PageID #: 606

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| In re: | ) |
| | ) |
| | )   Case No. 18-00260 |
| MAX E. SALAS, | )   Chapter 11 |
| | ) |
| Debtor. | ) |

_____

**SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF
REORGANIZATION DATED DECEMBER 5, 2019**

COMES NOW Max E. Salas, the Debtor and Debtor-in-Possession ("Debtor"), and

hereby presents this Disclosure Statement pursuant to the provisions of Chapter 11 of Title 11 of

the United States Code.

## I. **INTRODUCTION**

The Debtor provides this Disclosure Statement in order to disclose the information

believed to be material for creditors to arrive at a reasonably informed decision in exercising the

right to vote on acceptance of the Plan of Reorganization Under Chapter 11 of the United States

Bankruptcy Code Proposed by the Debtor (the "Plan").

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED**

**BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE**

**STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE**

**ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE NOT CONTAINED IN**

**THIS STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR AND**

**SHOULD BE REPORTED TO THE OFFICE OF THE UNITED STATE TRUSTEE.**

**INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN**

DB02/804722 0002/6981750.2
CORE/3502869.0005/156430962.1

**SUBJECT TO A CERTIFIED AUDIT.  CONSEQUENTLY, THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.**

## II.  <u>VOTING ON THE PLAN AND CONFIRMATION</u>

Voting on acceptance or rejection of the Plan is governed by provisions of the Bankruptcy Code.  Each voting creditor will be supplied with an Official Ballot, in a form prescribed by the Bankruptcy Rules.  Creditors may vote to accept or reject the Plan by filing a completed ballot with counsel for the Debtor, within the time prescribed for voting.  A class of creditors will be considered to have accepted the Plan (i) if it is accepted by creditors holding at least two-thirds in amount and more than one half in number of the allowed claims of such class that have voted, or (ii) if the class is unimpaired within the meaning of the Bankruptcy Code.

The Bankruptcy Court will conduct a hearing and rule on confirmation of the Plan in accordance with the Bankruptcy Code at the United States Bankruptcy Court for the District of Columbia, Bankruptcy Court's Courtroom, United States Courthouse, 3rd and Constitution Avenues, NW, Washington, DC 20001.  You will receive a separate notice of that hearing.

## III.  <u>CONFIRMATION UNDER ALTERNATE STANDARDS</u>

If all requirements for confirmation of the Plan under the Bankruptcy Code are otherwise satisfied, the Debtor will ask the Bankruptcy Court to confirm the Plan without the unanimous acceptance of classes of creditors assuming the Court finds that the Plan does not discriminate unfairly against, and is fair and equitable (within the meaning of the Bankruptcy Code) with respect to, any class of holders of claims that has or is deemed to have rejected the Plan.

## IV.  HISTORY AND BACKGROUND OF THE DEBTOR
## AND REASONS FOR FILING BANKRUPTCY

The debtor in this case is an individual residing in the District of Columbia at 1610 Riggs Place, NW, Washington, DC 20009 (the "Property"). During the night of June 3, 2015, a fire occurred at the Property. Tragically, two roomers living in the main part of the home, Nina Brekelmans and Michael Patrick McLoughlin, were not able to escape and died in the blaze. As a result of the fire, the Property was nearly completely destroyed. Max Salas was also present at the time of the fire, where, along with his visiting grandson, he was forced to jump from the second story of the building. As a result, Max sustained serious injuries including burns and a broken ankle that required hospitalization for a period of six weeks. Following his release from the hospital Max further was in convalescence as a result of his injuries and due to an infection he contracted, was required to receive drip antibiotics for three months and was heavily sedated during this time. During this time, Max lived at an apartment provided to him through the insurance policy he had previously obtained in his name for the Property.

On October 20, 2015, the parents of Nina Brekelmans and Michael Patrick Mcloughlin initiated wrongful death actions against both Max Salas and Len Salas in D.C. Superior Court as Case Numbers 2015 CA 008054 B and 2015 CA 008061 B (the "Superior Court Litigation"). One of the Debtor's sons, Len Salas, was included in the action due his appearing as the last recorded interest in the Property with the D.C. Recorder of Deeds. The two cases brought by each family were later consolidated into a single action.

Following a jury verdict at the trial against Len and Max, Len, as record owner of the Property, was found jointly liable with Max to the McLoughlin Estate and the Brekelmans Estate (together, the "Judgment Creditors") in the respective amounts of $7.7 million and $7.5 million

Case 3:23-cv-00987   Document 7-2   Filed 10/04/23   Page 21 of 532 PageID #: 609

504

(together, the "D.C. Superior Court Judgments"). These judgments prompted Max Salas and Len Salas to each file a Chapter 11 bankruptcy case on April 18, 2018. Len Salas's bankruptcy case was later converted to chapter 7 and is currently pending before the United States Bankruptcy Court for the Middle District of Tennessee as Case No. 3:18-bk-02662 (the "Len Salas Bankruptcy Case").

## V.    SIGNIFICANT EVENTS DURING THE DEBTOR'S CHAPTER 11 CASE

A.    Confirmation of the Debtor's Ownership Interest in the Property and Ability to Claim the District of Columbia's Homestead Exemption for the Property

Max Salas's status as sole legal and equitable owner of the Property had previously been called into question through the course of the Superior Court Litigation based on the fact that DC Land Records displays Len Salas as possessing the last recoded deeded interest in the Property. Questions concerning who possessed the proper ownership interest in the Property were further complicated by the existence of a Trust Agreement previously signed by Len Salas and Max Salas and a Quitclaim Deed that was not recorded with the DC Recorder of Deeds. With the bankruptcy, Debtor claimed full ownership of the Property and claimed an exemption in this interest in the Property pursuant to the District of Columbia's homestead exemption found in D.C. Code § 15-501(a)(14). The Debtor's claim to ownership of the Property and to the homestead exemption were objected to by the Judgment Creditors. Following a three-day trial on the matter, on September 25, 2018, the Bankruptcy Court issued a fifty-nine page opinion (the "Homestead Opinion") [ECF Dkt. No. 108]  detailing Max Salas's history with the Property. The Homestead Opinion confirmed that Max Salas possessed the full legal and equitable interest to the Property and overruled the Judgment Creditors' objection to the Debtor's claim of the

homestead exemption in the Property. A copy of the Homestead Opinion, which details Max

Salas's full ownership history of the Property is attached to this Disclosure Statement for

reference as Exhibit A.

The Judgment Creditors timely appealed the Homestead Opinion and that appeal is

currently pending before the United States District Court for the District of Columbia as Case

No. 1:18-cv-02318-KBJ (the "Homestead Appeal"). Although the Homestead Opinion is on

appeal, no stay has been issued concerning the Homestead Opinion and it currently remains an

enforceable order of the Court.

B.      Judgment Creditors Purchase of Avoidance Claims from the Len Salas Bankruptcy Estate

The Len Salas Bankruptcy Case was converted to chapter 7 on December 26, 2018, and a

chapter 7 trustee has been appointed to that case. Following the conversion, another of Debtor's

sons, Ron Salas, sought to purchase any potential avoidance rights concerning transfer of the

property from Len Salas to Max Salas described in the Homestead Opinion in order to help his

father with reducing further contingencies and uncertainties in his bankruptcy case concerning

the Property. Following an auction conducted by the trustee in the Len Salas Bankruptcy Case,

the Judgment Creditors purchased "each and every claim and recovery action to which the

Trustee or the [Len Salas bankruptcy] estate may have under the provisions of 11 U.S.C. § § 544

through 553, as applicable, related to" the Property for the purchase price of $156,000.00. As

evidenced by a *Trustee's Report of Sale* filed by the Trustee in the Len Salas Bankruptcy Case on

August 14, 2019 and a *Sale of Estate Property Free and Clear of Liens and Interests* attached to

that report, Payment was delivered by the Judgment Creditors and their purchase of the

avoidance actions from the Len Salas bankruptcy estate was competed on July 31, 2019. To date,

no avoidance actions have yet been initiated by the Judgment Creditors based on these claims,

although on October 11, 2019, the Judgment Creditors did file a Motion for Relief from the

Automatic Stay in the Debtor's bankruptcy case seeking authority to file such claim. [ECF Dkt.

No. 252]. This motion is currently pending before the Court and is scheduled for hearing on

November 14, 2019.

C.      Debtor Obtaining a Conditional Certificate of Occupancy and Licensing to Rent Rooms
        at the Property through Short-Tem Rentals

        Following the issuance of the Homestead Opinion, the Debtor was able to secure a

Certificate of Occupancy and licensing to begin renting rooms at the Property though the short-

term rental site, Airbnb. A copy of the Debtor's Certificate of Occupancy and associated

licensing is attached as Exhibit B. Debtor's Certificate of Occupancy in his name is conditioned

upon Debtor's continued status as owner of the Property and would be revoked should that status

be overturned through an adverse ruling in the Homestead Appeal or through an adverse ruling

in a potential avoidance action that could be brought by the Judgment Creditors based on their

purchase of those claims from the trustee in the Len Salas Bankruptcy Case. Since beginning to

rent the rooms on a short-term basis through Airbnb beginning in April 2019, the Debtor has

earned $62,041.42 in rental payouts for the period of April 1, 2019 through September 30, 2019.

Additionally, the Debtor has secured a lease for the basement unit at the property for the monthly

rental amount of $4,500.00.

D.      Fusion Contracting Default Judgment

        On February 8, 2019, the Debtor filed a Complaint initiating Adversary Proceeding No.

19-10002 against Fusion Contracting Group, LLC (the "Fusion Adversary Proceeding") based on

breach contract claims stemming from unfinished and faulty work performed by a contractor

contracted to perform renovation work to the Property after the fire that occurred in 2015. Following a default by the defendant in that action, Judgment for the Debtor was entered on July 30, 2019, in the amount of $79,287.17 in damages and attorney's fees, with post-judgment interest on that judgment award as provide by 28 U.S.C. § 1961. The Debtor has not yet performed any post-judgment discovery regarding the Fusion Judgment and makes no representations regarding its collectability.

E.      Deed of Trust Stipulation for Plan Treatment & New Funding for the Plan

Through the Plan the Debtor is seeking approval of a Stipulation Regarding Plan Treatment reached between the Debtor and U.S. Bank/Select Portfolio Servicing for the existing Deed of Trust on the Property. Under the terms of the proposed agreement, the Debtor will assume payments of $8,329.19 per month toward the Deed of Trust for the Property as adequate protection until Plan confirmation. Following approval of confirmation of the Plan, the Debtor shall make payments following re-amortization by U.S. Bank following Confirmation based on an approximate balance of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037. The full stipulation between the Debtor and U.S. Bank, subject to approval of the Bankruptcy Court of the Debtor's Plan, is attached hereto as Exhibit C.

In addition to the agreement reached between the Debtor and U.S. Bank/Select Portfolio Servicing, the Debtor will deliver all non-exempt assets, primarily consisting of the Fusion Judgment, towards funding of the Plan. Debtor additionally, will provide $225,000.00 in additional new value into the Plan, in funds guaranteed and secured by funds contained in the Debtor's exempt retirement account.

F.     Post-Petition Employment of Professionals

The Debtor has been represented in this Chapter 11 proceeding by Stinson LLP as his general bankruptcy counsel, Phillip G. Young, Jr. of Thompson Burton, PLLC as local counsel for representation in the Len Salas Bankruptcy Case[1], and Justin Fasano and Janet Nesse of McNamee Hosea as conflicts counsel for matters concerning U.S. Bank. The Debtor's accountant is Arthur Lander, CPA PC.  The Debtor will continue to use these professionals post-confirmation as necessary until the bankruptcy case is closed.

## VI.  OVERVIEW OF ASSETS AND MAJOR CLAIMS

The Debtor's primary Asset, as declared in the Homestead Opinion, is the real property located at 1610 Riggs Place, NW, Washington, DC 20009 and serves both as the primary residence of the Debtor and source of rental income through the renting of rooms through short-term rental site Airbnb. Debtor has scheduled the value of this property on his Schedules as $2.5 million. The recent appraised value of the real property is $2.45 million. Although not specifically a secured claim of the Debtor, the Property is subject to a Note and Deed of Trust made by Len Salas originally in favor of U.S. Bank National Association as Trustee for the holders of Bank of America Funding Corporation Mortgage pass-Through Certificates, Series 2007-6 and originally serviced by SunTrust Mortgage, Inc. On April 8, 2019, Select Portfolio Servicing, Inc. filed a Transfer of Claim Other than for Security in the Len Salas Bankruptcy Case indicating that they now serve as servicer on the Note and Deed of Trust on the Property.

---

[1] The Debtor has also employed Roderick K. Barnes of Rollins, Smalkin, Richards & Mackie, LLC ("Barnes") as special counsel for matters concerning the Superior Court Litigation. Payment to Barnes is covered by the insurance policy the debtor possessed at the time of the Property fire and no attorney fees are expected to be owed from debtor's bankruptcy estate.

This claim is treated as Class 3 in the Plan. The Debtor has negotiated with U.S. Bank/Select Portfolio Servicing and has arrived at terms for adequate protection payments to U.S. Bank while confirmation of the debtor's plan is sought and for modification of the secured loan upon approval of the plan, pursuant to the Stipulation for Plan Treatment attached as Exhibit C. Debtor's interest in the property has been fully exempted pursuant to the Homestead Opinion and DC Code § 15-501(a)(14).

From Debtor's exempt Property he generates rental income through the leasing of the basement unit at the Property, and through short-term rentals of two individual room in the Property through the web/rental service Airbnb. These rental monies received are themselves exempt as fruits of the Debtor's exempt asset and are further detailed in the income projection attached as Exhibit D. Airbnb records of demonstrating the rental history for the Property is attached as Exhibit E.

A second significant asset of the estate includes the recently entered Judgment against Fusion Contracting Group, LLC in the amount of $79,287.17. The likely collectability of the Fusion Judgment is unknown at this time.

Although not an asset of the estate, the Debtor possesses an exempt retirement account. From this exempt account, the Debtor is proposing in his plan to offer $225,000 to further fund his Plan through funds backed by this exempt retirement account. Debtor plans to accomplish this either by receiving a loan 100 percent guaranteed and secured by the exempt retirement assets, or a direct withdrawal from his retirement account of these funds for delivery into a Plan Fund for distribution to claimants. Debtor's exempt retirement account contains funds of approximately $500,000 and is sufficient to cover direct withdrawal of the proposed $225,000,

and any additional tax labilities incurred based on a withdrawal of the this amount, and any payments toward extended tax payments under the Plan if necessary.

Other significant claims of the estate include those of the Judgment Creditors in the respective amounts of $7.5 million (Brekelmans) and $7.7 million (McLoughlin). The Debtor listed these claims as disputed in his bankruptcy Schedules based on the fact that the Debtor had timely filed appeals of each judgment and on the fact that the judgements were not based on final orders of the Superior Court pursuant to D.C. Sup. Ct. R. Civ. P Rule 54(b). Nevertheless, the Debtor has provided for treatment of the Judgment Creditor claims within the Plan.

Based on the findings of fact stated in the Homestead Opinion, the District of Columbia filed a Proof of Claim asserting a $83,960.42 associated with unpaid transfer and recordation taxes associated with transfer of the Property from Len Salas to Max Salas in 2010, including $34,832.19 in recordation and transfer taxes due based on the transfer of the property occurring in July 6, 2010 and which is listed as a secured by the Property, a non-filing penalty of $8,708.05 (25%) (unsecured), and interest on the supposed deficiency in the amount of $40,420.18 (claimed as secured).

Debtor's Plan contains definitions, a procedure for claims objections and a provision for post-confirmation jurisdiction. Readers should refer to the Plan for a complete discussion of these provisions.

## VII.  SUMMARY OF THE PLAN

### A.  Classification and Treatment of Claims Under the Plan:

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN.  THIS SUMMARY SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES.  CREDITORS ARE URGED

TO READ THE ENTIRE PLAN.  A COPY OF THE PLAN IS BEING SENT TO YOU WITH THIS DISCLOSURE STATEMENT.  THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY AND BETWEEN THE DEBTOR AND ITS CREDITORS.  ALL CREDITORS WILL BE BOUND BY THE PLAN.

## 1.    Classification - Summary

The following is a designation of each Class of Claims and Interests under the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Class or Classes.  Each "Class" (e.g., Class 2A versus Class 2B and Class 2A versus Class 2B) is separate and distinct from all other Classes for all purposes.

## 2.    Classification - Specifics

Claims and Interests are classified for all purposes, including voting, confirmation and distribution pursuant to the Plan, as follows:

| | |
|---|---|
| **Class 1:** | All administrative claims including for professional fees, United States Trustee Quarterly fees and administrative taxes.  This class consists of fees and expenses for Stinson LLP, fees and expenses for Thompson Burton PLLC, fees and expenses for McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.,  fees and expenses of Art Lander CPA PC, any other professional fees that may be incurred by the Debtor, and the United States Trustee's quarterly fees. (Unimpaired). |
| **Class 2**: | All Priority Claims including those arising pursuant to Bankruptcy Code Section 507(a)(8). (Impaired). |
| **Class 3:** | U.S. Bank National Association/ Select Portfolio Servicing, Inc. Secured Claim against Property (Impaired). |

**Class 4**:          Allowed Secured Claim of IRS (Impaired).

**Class 5:**          District of Columbia Transfer & Recordation Tax Claim (Claim 5)
                      (Impaired)

**Class 6**:          Unsecured Claims of Judgment Creditors (Claim No. 3 –
                      McLoughlin; Claim No. 4 - Brekelmans) (Impaired).

**Class 7:**          All Remaining Allowed Unsecured Non-Priority Claims.
                      (Impaired).

**Class 8**:          Allowed Unsecured Penalty Claim of the District of Columbia
                      (Impaired).

**Class 9**:          Paid Hyundai Lease Titling Trust Lease claim (Unimpaired)

**Class 10:**         Contribution Claim of Len Salas listed on Schedules associated
                      with U.S. Bank/SPS Arrearages (Unimpaired)

## 3.    Treatment of Claims and Interests

### A.    Administrative Claims

#### 1.    Class 1 Administrative Claims

The Debtor shall assume and pay to each holder of an Allowed Administrative Claim, on

account of the Administrative Claim and in full satisfaction thereof, Cash equal to the allowed

amount of such Administrative Claim, unless the holder agrees or shall have agreed to other less

favorable treatment of such Claim. Debtor anticipates that some form of agreement concerning

payment of fees will need to be reached with his legal counsel and accountant in order to

preserve desired amounts for payment to additional creditors. Administrative Claims are

expected to exceed $175,000, but payment of Administrative Claims from the Plan Fund shall

not exceed and be capped at $175,000.

#### 2.    Statutory Fees and Continuing Duties to the Office of the United
              States Trustee

All fees payable pursuant to 28 U.S.C. § 1930, shall be paid by the Debtor in Cash in an amount equal to the amount of such Administrative Claim.

Until such time as the case is closed, dismissed or converted, the Debtor shall continue to report its disbursements each calendar quarter to the U.S. Trustee and shall timely pay all fees due under 28 U.S.C. § 1930(a)(6).

3.     <u>Treatment and Payment of Administrative Claims</u>.

After the Effective Date, all professional or others requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 503(b) and 1103 for services rendered before the Effective Date shall file an application for final allowance of compensation and reimbursement of expenses. Applications need not be filed with respect to fees and expenses previously applied for by Court approved professionals (including applications previously approved by and/or previously paid pursuant to an order of the Court). Fees and expenses of professionals shall be paid in Cash in full (a) immediately before the Effective Date, to the extent allowed by the Court as of such date (such payments to be made by the Debtor) or as agreed by the Parties if a lesser amount, but not to exceed an aggregate amount of $175,000.00 from the Plan Fund, and (b) on or before the tenth (10th) day after entry of an order allowing any such fees and expenses, to the extent such fees and expenses were not allowed as of the Effective Date, or upon such payment schedule as agreed between the Parties.

B.     <u>Class 2:  Priority Claims</u>

The only known Priority Claim consists of a certain portion of the claim filed by the Internal Revenue Service in the amount of $13,196.78 (Claim 2-2). Unless the applicable taxing agency or any other priority claim holders that may be established agree to less favorable

Case 3:23-cv-00987    Document 7-2    Filed 10/04/23    Page 31 of 532 PageID #: 619

514

treatment, each holder of an Allowed Priority Claim to the extent their claim is allowable and

entitled to priority under Bankruptcy Code section 507(a), shall be paid by the Debtor in regular

monthly installment payments totaling the full amount of the claim plus interest pursuant to 11

U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan

and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to

generate sufficient funds from his future rental income from the Property and other monthly

income received, Debtor will deliver payment on the Class 2 claims from funds held in his

exempt retirement account if necessary. This class is impaired.

      C.    <u>Class 3: U.S. Bank National Association/ Select Portfolio Servicing, Inc.
Secured Claim against Property</u>

     Class 3 consists of the secured lien currently in the name on Len Salas possessed by U.S.

Bank National Association/ Select Portfolio Servicing, Inc. and secured by the Property (the U.S.

Bank Claim).  Based on Debtor's ownership in the Property established through the Homestead

Opinion, the Debtor has entered into a Stipulation for Plan Treatment with U.S. Bank National

Association/ Select Portfolio Servicing, Inc. to establish terms for Debtor's payment toward the

US Bank Claim and address current arrearages owed. Full terms of the U.S. Bank Stipulation for

Plan Treatment are attached as Exhibit C. Under the stipulation, beginning November 1, 2019,

the Debtor is to begin making adequate protection payments on the U.S. Bank Claim in the

amount of $8,329.19 per month until approval of the U.S. Bank agreement through confirmation

of the Plan and the Plan's Effective Date, after which time the Debtor shall make payments

following re-amortization by U.S. Bank following Confirmation based on an approximate

balance of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month

amortization schedule, with all amounts due upon the maturity date May 1, 2037. U.S. Bank's

claim is an *in rem* claim attaching to the Property, and the Debtor shall not be liability under the underlying Deed of Trust and Note hall be limited to Debtor's interest in the Property, with no personal liability. Debtor further intends to seek a refund of vacant real property taxes previously erroneously assessed against the Debtor and paid pre-petition by U.S. Bank (at the time serviced through SunTrust Bank) to the District of Columbia. If the Debtor were to be successful in receiving a refund of tax payments previously paid, they are to be delivered in full to U.S. Bank/SPS for payment of the existing escrow balance on the U.S. Bank Claim. This class is impaired.

> D.    Class 4: Allowed Secured Claim of IRS.

Class 4 consists of the Allowed Secured Claim of the IRS consisting of that $6,768.66 portion of the claim they have filed in the Case (Claim 2-2). Unless the holder of this claim agrees to less favorable treatment, to the extent the claim is allowed, payment on Class 4 claims, is to be paid by the Debtor in regular monthly installment payments totaling the full amount of the claim plus interest pursuant to 11 U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to generate sufficient funds from his future rental income from the Property and other monthly income received, Debtor will deliver payment on the Class 4 claims from funds held in his exempt retirement account if necessary. The IRS shall retain its lien until paid in full. This class is Impaired.

> E.    Class 5: District of Columbia Transfer & Recordation Tax Claim

Class 5 consists of that portion claimed as owing for Transfer & Recordation Taxes and Interest on Deficiency in the amount of $75,252.37 claimed on Claim 5 filed by the District of

Columbia. The District has claimed this amount associated with the August 4, 2010 date of

transfer from Len Salas to Max Salas described in the Homestead Opinion. The Debtor believes

the District is not entitled to claim this amount due to the fact that no deed was recorded at that

time and any future recording confirming of Max Salas's ownership in the Property is to be

enacted through this Plan and exempt from such taxes pursuant to 11 U.S.C. § 1146(a). Debtor

intends to object to the District's Claim prior to Confirmation of the Plan. Nevertheless, payment

to the District, to the extent their claim is allowable, is to be paid by the Debtor in regular

monthly installment payments totaling the full amount of the claim beginning on the first day of

the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11

U.S.C. § 1129(a)(9)(C). Class 5 is impaired.

     F.     Class 6: Allowed Unsecured Claims of Judgment Creditors (Claim No. 3 –
          McLoughlin; Claim No. 4 - Brekelmans)

Class 6 consists of the two claims of the Judgment Creditors in the total amount of $15.2

million (Claim No. 3 – McLoughlin $7.7 million; Claim No. 4 – Brekelmans; $7.5 million).

Debtor's plan provides that payment on the Class 6 Claims will be made pro-rata, along with the

Class 7 remaining allowed unsecured non-priority claims, from a Plan Fund funded by the

minimal amounts of the existing non-exempt assets of the Debtor consisting of non-exempt cash

assets existing in Debtor's DIP account at the time of Confirmation, plus an additional influx of

$225,000 of funds secured by Debtor's exempt retirement account. Administrative Claims are

expected to exceed $175,000, but payment from the Plan Fund towards Administrative Claims

shall be capped at $175,000, leaving at least $50,000 of remaining funds from the additional

$225,000 cash infusion for distribution to Class 6 and Class 7 Claims. The Plan further provides

assignment of any uncollected amounts of the Fusion Judgment on the Effective Date jointly to

both Judgment Creditors. The Debtor will not oppose efforts and provide reasonable assistance

to the Judgment Creditors' efforts to collect available Insurance Proceeds from Encompass

associated with their judgments. Upon receipt of discharge, the Debtor will take steps to

withdraw his appeal of the Judgment Creditor Judgments in the DC Superior Court to further

resolve that issue. Judgment Creditor Claims are being given separate Class treatment based on

the fact that they may also collect on the amounts owed to them from available Insurance

Proceeds (See Motion for Relief from Stay Order; ECF Dkt. No. 74), and based on the fact that

they possess the right to prosecute the Tennessee Avoidance Actions regarding the Property

purchased from the Len Salas Bankruptcy Case.  The Class 6 and Class 7 claims listed on

Debtor's Schedules have been valued at $15,239,769.40, 99.7% percent ($15.2 million) of which

is possessed by the Judgment Creditors. It is anticipated therefore that 99.7% percent of

distributions from the Plan Fund will be distributed to Class 6 Claims.

The payment will be made thirty (30) days after the later of (i) the payment of all

Administrative Claims; and (ii) the Effective Date. This Class is Impaired.

G.    Class 7:  Remaining Allowed Unsecured Non-Priority Claims.

All Class 7 Claims, consisting of all remaining allowed unsecured non-priority claims

will receive a one-time pro-rata distribution following the Effective Date from remaining

amounts in the Plan Fund following payment to those possessing claims of a higher priority.

Administrative Claims are expected to exceed $175,000, but payment from the Plan Fund

towards Administrative Claims shall be capped at $175,000, leaving at least $50,000 of

remaining funds from the additional $225,000 cash infusion for distribution towards other

creditors. The Class 6 and Class 7 claims listed on Debtor's Schedules have been valued at

$15,239,769.40, 0.3% percent ($39,769.40) of which is possessed by the Class 7 Claimants. It is anticipated therefore that 0.3% percent of distributions from the Plan Fund will be distributed to Class 7 Claims. The payment will be made thirty (30) days after the later of (i) the payment of Administrative Claims from the Plan Fund; and (ii) the Effective Date. This class is impaired.

      H.    <u>Class 8:  Allowed Unsecured Penalty Claim of the District of Columbia</u>

Class 8 consists of that portion of the Claim filed by the District of Columbia in the amount of $8,708.05 representing a non-filing penalty associated with other aspects of Claim 5, to the extent such claim is an allowed unsecured penalty claim. Assuming funds remain available in the Plan Fund, Class 8 claims will receive a one-time pro-rata distribution following the Effective Date from remaining amounts in the Plan Fund following payment to those possessing claims of a higher priority. However, based on the large amount of claims in Class 6 and Class 7, no distribution is expected to be made on Class 8 claims. To the extent a payment is made, the payment will be made thirty (30) days after the later of (i) the payment of all higher priority Claims to be made from the Plan Fund; and (ii) the Effective Date.  This class is impaired.

      I.    <u>Class 9:  Allowed Paid Hyundai Lease Titling Trust Lease Claim</u>

Class 9 consists of the lease claim filed by Hyundai Titling Trust filed on May 3, 2018 as Claim 1 associated with the lease of a vehicle by the Debtor at the time of the Petition Date. Following the Petition Date, Debtor continued to make lease payments due for the vehicle until the lease terminated in January 2019. No further payments are owed under the Hyundai lease and the Debtor has surrendered the Vehicle. No further payments are therefore contemplated for this claim. This class has been paid in full and is unimpaired.

      J.    <u>Class 10:  Contribution Claim of Len Salas listed on Schedules associated with U.S. Bank/SPS Arrearages (Unimpaired)</u>

Class 10 consists of the claim of Len Salas listed on the Debtor's Schedule E/F at 4.14 in the amount of $428,614.90. This claim solely represents arrearages existing on the U.S. Bank/SPS Claim existing on the Petition Date. Because the deed of trust and underlying note for the Property were in the name of Len Salas, but the Debtor was responsible for making payments for the Property pursuant to his ownership interest later established in the Homestead Opinion, the Debtor included this claim to Len Salas representing amounts ultimately owed as arrearages for the lien on the Property. Len Salas having received his discharge and the Debtor having reached agreement with U.S. Bank/SPS regarding the U.S. Bank Claim described in the Stipulation for Plan Treatment, no further treatment or payment to Len Salas (for forwarding to U.S. Bank) is warranted by the Debtor and will not occur under Debtor's Plan. Class 10 is Unimpaired.

### 4.  Means of Funding the Plan.

Debtor's Plan seeks modification of the existing secured debt on the Property through the Stipulation for Plan Treatment with U.S. Bank. All continuing payments under the Plan, including pre- and post-confirmation monthly payments to U.S. Bank per the Stipulation for Plan Treatment, and for the Extended Tax Payments are expected to be derived wholly from the Debtor's future exempt earnings consisting of monthly deposits from social security, disability payments, and Airbnb and other rental earnings from the Property. A Projection of the Debtor's future income generated from these exempt sources is attached as Exhibit D. Further with respect to the Extended Tax Payments of the IRS, if Debtor's future income is insufficient to make these payments, Debtor will make payment on these claims from funds held in his exempt retirement account if necessary.  The Debtor will further submit all available non-exempt assets for the

benefit of creditors under the Plan at the time of Confirmation consisting of the Fusion Judgment and existing non-exempt cash assets existing in Debtor's DIP account at the time of Confirmation, but not including any value associated with the non-exempt portion of Debtor's home furnishings, equipment, or clothes. The non-exempt portion of such home furnishings, equipment, and clothes are believed to be *de minimus*, especially when compared to the additional exempt Plan funding being supplied by the Debtor and the cost of ascertaining value of the exempt portion. With the exception of the Fusion Judgment, further non-exempt assets of the Debtor are expected to be minimal.

Following delivery of the existing non-exempt assets, the Plan will be further funded through delivery of $225,000 towards the Plan Fund from either a loan to be received by the Debtor for funds 100% secured by the Debtor's exempt retirement account, or if the Debtor was unable to receive such a loan, from delivery of $225,000 directly withdrawn from this exempt account by the Debtor within forty-five (45) days after Confirmation. Direct withdrawal of funds from Debtor's account will cause the Debtor to incur additional tax consequences, making a loan preferable. Nevertheless, Debtor's retirement account contains sufficient funds to cover tax liability associated with a withdrawal of these funds. From this new value, payment towards Administrative Claims from the Plan Fund would be capped at $175,000, allowing for payment of at least $50,000 from the new value added into the Plan Fund for distribution to other claimants. It is assumed that confirmation of the Debtor's Plan would require cramdown of the Judgment Creditor's claims pursuant to 11 U.S.C. § 1129(b).

### 5. Executory Contracts and Unexpired Leases.

The Plan proposes to assume all unexpired leases and executory contracts that have not previously been rejected in this bankruptcy case. Debtor's Plan further proposes that it shall have no effect on the post-petition lease of the Debtor's vehicle approved by the Court at ECF Dkt. Entry 159, and the post-petition tenant lease entered into by the Debtor for the renting of the basement unit at the Property.

### 6.  Pending Litigation.

 Debtor intends to object to the claim of the District of Columbia that asserts Debtor owes transfer and recordation taxes, penalties, and interests associated with the creation of the 2010 Quitclaim Deed from Len Salas for the Property and cited in the Homestead Opinion. Debtor further intends to seek a refund of vacant real property taxes previously erroneously assessed against the Debtor and paid pre-petition by U.S. Bank for the Deed of Trust for the Property (at the time serviced through SunTrust Bank). Any refunded tax payments would be delivered to US Bank/SPS to reduce the a outstanding escrow balance on the Property account associated with the previous payment.  Other pending litigation includes the appeal of the Homestead Opinion, which has been fully briefed for the United State District Court for the District of Columbia, as well as avoidance action litigation to be brought by the Judgment Creditors in the U.S. Bankruptcy Court for the Middle District of Tennessee following the Judgment Creditors' purchase of those claims from the Len Salas Bankruptcy Estate (the "Tennessee Avoidance Actions"). Other pending litigation includes the outstanding appeal of the Judgment Creditor Judgments in the DC Superior Court brought by the Debtor prior to filing bankruptcy. This appeal is currently stayed and would be withdrawn/dismissed by the Debtor upon discharge of debts owed to the Judgement Creditors contemplated in the Plan. Additional litigation may also

Case 3:23-cv-00987   Document 7-2   Filed 10/04/23   Page 39 of 532 PageID #: 627

522

be brought to resolve the additional action against 1610 Riggs Place Trust contemplated

previously by the Superior Court and/or an action to reduce the judgments in favor of the

Judgment Creditors to final judgments pursuant to DC Superior Court Rule of Civil Procedure

Rule 54(b). *See Order on Motion to Lift Automatic Stay With Respect to Finalization of Superior*

*Court Judgments and Judgment Creditors' Recovery of Insurance Proceeds,* ECF Dkt. NO. 74.

With Plan Confirmation, the Debtor would not oppose steps taken by the Judgment Creditors to

resolve these issues or to claim insurance proceeds available under Debtor's Encompass

Insurance Policy.

### 7. Confirmation Order as Recordable Order Conveying Property to Max Salas.

The Plan provides that, upon Confirmation, the Confirmation Order, or a separate order

as needed, shall contain terms that will constitute an Order conveying the Property to Max Salas

based on the ownership interest of the Debtor to the Property established through the Homestead

Opinion and that such order may be recorded with the land records of the District of Columbia in

lieu of a deed. If the District of Columbia shall later refuse to honor the Confirmation Order as a

document properly conveying the Property to the Debtor, the Debtor reserves the right to obtain

an appropriate deed to th Property signed by the trustee in the Len Salas Bankruptcy Case, or if

such trustee refuses, to seek the appointment of an escrow agent in Debtor's Bankruptcy Case to

sign such deed for recording purposes.

### 8. Recordation and Other Taxes Covered by Section 1146(a).

Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of an

instrument of transfer under the Plan (including the proposed recordation of the Confirmation

Order or other Order as necessary to confirm Debtor's interest in the Property pursuant to the

Homestead Opinion) will not be subject to any stamp tax, real estate transfer, mortgage

recording, or any other similar tax.

      **9.   Discharge Following Distribution on the Effective Date of the Plan
Pursuant to 11 U.S.C. § 1141(d)(5)(B).**

Debtor's Plan provides for a discharge of debts upon the Effective Date of the Plan and

distribution of funds from the Plan Fund. Because Debtor's Plan provides for payment of tax

debts through April 2023, payments under the Plan will not be completed until that time. Cause

is warranted to grant a discharge of debts instead upon the Effective Date pursuant to 11 U.S.C.

1141(d)(5)(B), because unsecured creditors are to receive distribution of funds from the Plan

Fund at that time, which will be of a greater value than they would receive if the estate were to

be liquidated under chapter 7. Additionally, following the required monthly payments to U.S.

Bank and for the extended tax payments, Debtor is unlikely to have any additional disposable

income for distribution to his other creditors following the initial distributions of the Plan Fund.

Finally, cause is warranted to grant the Debtor a discharge upon the Effective Date of the Plan

instead of upon completion of all payments because doing so will allow the Debtor to take steps

(and the Debtor will take such steps) to withdraw the appeal of the Judgment Creditor Judgments

in the DC Superior Court to further resolve that issue.

## VIII.  <u>CHAPTER 7 LIQUIDATION ANALYSIS</u>

A comparison of the amounts to be paid under the Plan and the amounts that would be

available for distribution to creditors in the event of a liquidation under Chapter 7 indicates that

the Plan is fair and equitable and in the best interest of the creditors. The Homestead Opinion has

confirmed that the Debtor's primary asset is fully exempt pursuant to D.C. Code § 15-501(a)(14)

and any sale of the Property in Chapter 7 would not generate funds for payment to the estate

creditors. The Debtor maintains that income generated from the Property (including all Airbnb

and other rental income) is similarly exempt as income generated from an exempt asset. At least

two creditors (the Judgment Creditors) have questioned whether it is clear that such business

income derived from renting of parts of the Property may be treated as exempt. The Court has

not issued a ruling on this issue in this case. The Debtor possesses no other assets, other than the

Fusion Judgment, likely to generate any significant value to the estate. The Debtor is not aware

of any recovery or avoidance actions and does not believe any such actions exist. In addition, a

Chapter 7 trustee would hire his own attorneys and would charge a commission on any

distributions he did realize. Here, the Debtor is offering to use his exempt Property to fund a Plan

of Reorganization, which after reaching agreement with the primary secured lienholder for the

Property regarding continued payments for the Property, offers anticipated amounts of $225,000

in new value for payment towards the Debtor's creditors and claimants. For these reasons, a

conversion to Chapter 7 would not necessarily result in a greater distribution to unsecured and

penalty claimants and would result in delay of the creditor distributions.

## IX.  POTENTIAL RECOVERIES FROM VOIDABLE TRANSFERS

The Debtor has not fully analyzed the potential recoveries from voidable transfers, but

does not believe any voidable transfers exist that would be beneficial to pursue. The Debtor does

not anticipate pursuing any avoidance actions.

## X.  TAX CONSEQUENCES OF PLAN

To the extent creditors have written off any accounts receivable on their tax returns,

ordinary income may be recognized from any distributions received under this Plan.

THE DISCUSSION OF FEDERAL INCOME TAX CONSEQUENCES SET OUT HEREIN IS LIMITED TO THE GENERAL TAX CONSEQUENCES AFFECTING CREDITORS AS A RESULT OF THE DISCHARGE OF INDEBTEDNESS WITHOUT PAYMENT UNDER THE PLAN.  THE TAX CONSEQUENCES APPLICABLE TO A CREDITOR WILL BE ENTIRELY DEPENDENT UPON THE TAX STATUS OF THAT ENTITY OR INDIVIDUAL.  EACH CREDITOR SHOULD CONSULT THEIR OWN TAX ADVISOR TO DETERMINE THE TREATMENT AFFORDED THEIR RESPECTIVE CLAIMS BY THE PLAN UNDER FEDERAL TAX LAW, THE TAX LAW OF THE VARIOUS STATES AND LOCAL JURISDICTIONS OF THE UNITED STATES AND THE LAW OF FOREIGN JURISDICTIONS.

BECAUSE OF CONTINUAL CHANGES BY THE CONGRESS, THE TREASURY DEPARTMENT, AND THE COURTS WITH RESPECT TO THE TAX LAWS, NO ASSURANCES CAN BE GIVEN REGARDING INTERPRETATIONS OF THE TAX LAWS, REPRESENTATIONS WITH RESPECT THERETO OR ANY OTHER MATTER ASSOCIATED THEREWITH.

NO STATEMENT IN THIS DISCLOSURE STATEMENT IS TO BE CONSTRUED AS TAX ADVICE OR LEGAL ADVICE TO ANY CREDITOR.  THE DEBTOR AND ITS COUNSEL AND ACCOUNTANTS ASSUME NO RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES A CREDITOR MAY SUSTAIN AS A RESULT OF THE TREATMENT AFFORDED THEIR CLAIM UNDER THE PLAN.

## XI. RISK FACTORS/FEASIBILITY

While there are risk factors with certain individual aspects of the Debtor's Plan, including securing a loan backed by the Debtor's retirement funds for proposed Plan funding, the Debtor believes that his Plan provides for adequate contingency measures in each instance and that the Plan overall provides minimal risk factors or feasibility issues. Other risk factors include the potential that Debtor's interest in the Property will be overturned either though reversal of the Homestead Opinion on appeal or through loss of a potential avoidance action that may be brought by the Judgment Creditors based on the claims they have purchased from the Len Salas Bankruptcy Case. Reversal of the Debtor's claim to ownership in the Property would affect Debtor's ability to make his continuing payments for tax payments extended under the Plan (which would not be discharged) and for the secured loan for the Property (which would remain as an *in rem* lien on the Property), but would not likely affect other aspects of payment to Debtor's other creditors from the additional Plan funding supplied by the Debtor. The Debtor and his counsel have reviewed the merits of both of these litigation risks associated with the Debtor's ownership in in the Property being lost and believe that they will prevail both on the Appeal and in any potential avoidance action that could be brought through the Tennessee Avoidance Actions. Because Debtor's Airbnb income is subject to market forces, there is also the risk that he will not be as successful generating income from this source for payments under the U.S. Bank Stipulation for Plan Treatment and the Extended Tax Payments. In this instance, however, U.S. Bank would be protected by the default provisions under the Stipulation for Plan Treatment. Tax claimants are similarly protected because their debts are not subject to discharge. For these reasons, therefore, the Debtor submits that there is minimal risk under this Chapter 11 Plan.

527

## XII.  <u>CONCLUSION</u>

For all the reasons described above, the Debtor urges you to vote to accept the Plan of

Reorganization.  Any questions regarding this Disclosure Statement may be directed to the

undersigned.


Dated: December 5, 2019          By:    /s/ Max E. Salas
                                        Max E. Salas, Debtor and Debtor-In-Possession



                                        /s/ Joshua W. Cox
                                        Marc E. Albert, No. 345181
                                        Joshua W. Cox, No. 1033283
                                        STINSON LLP
                                        1775 Pennsylvania Ave., N.W., Suite 800
                                        Washington, DC 20006
                                        Tel. (202) 785-3020
                                        Fax (202) 572-9999
                                        marc.albert@stinson.com
                                        joshua.cox@stinson.com
                                        *Attorneys for*
                                        *Max E. Salas, Appellee and Debtor and Debtor-In-*
                                        *Possession*

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

## RE: Trust
1 message

**Stanley Goldstein** <SGoldstein@capitoltitle.com>                    Wed, Jun 22, 2011 at 8:50 AM
To: "MaxSalas@aol.com" <MaxSalas@aol.com>
Cc: "lensalas77@gmail.com" <lensalas77@gmail.com>, "ronsalas@salaslegal.com" <ronsalas@salaslegal.com>, Lynne
Boileau <LBoileau@capitoltitle.com>

Max-

By copy of this email, I am sending your email to Lynne Boileau, Esq. who will contact you.

Thanks,

Stan

**From:** MaxSalas@aol.com [MaxSalas@aol.com]
**Sent:** Tuesday, June 21, 2011 12:05 PM
**To:** Stanley Goldstein
**Cc:** lensalas77@gmail.com; ronsalas@salaslegal.com
**Subject:** Fwd: Trust

I sent it to the wrong e mail before

> From: MaxSalas@aol.com
> To: s.goldstein@capitoltitle.com
> CC: lensalas77@gmail.com, ronsalas@salaslegal.com
> Sent: 6/21/2011 11:51:54 A.M. Eastern Daylight Time
> Subj: Fwd: Trust
>
> Stan-
>
> As per our conversation I am sending you the e-mail from my son prepared to documents Ron also my other
> son, Len is the gentleman who will quick claim deed to the trust.
> I am the trustee other information for the documents can be requested from Ron Salas , who was copied on this
> e-mail.  Please let me know what you need me next.  I will also send you over a in a different e-mail.  Tax
> identification for the trust,
>
> At the end of the day.  We need to have done is have Lenny sign a quick claim deed into the trust, which has
> been extend lives by my son, Ron, in Colorado
>
> Hope this is not too confusing
>
> Thank you,
> sincerely yours,
>
> Max Salas
>
> > From: ronsalas@salaslegal.com
> > To: MaxSalas@aol.com, lensalas77@gmail.com
> > Sent: 6/17/2011 2:45:54 P.M. Eastern Daylight Time
> > Subj: Trust
> >
> > Gentlemen –

LenSalas000016

https://mail.google.com/mail/u/0?ik=3a2af57981&view=pt&search=all&permthid=thread-f%3A1371890096260205858%7Cmsg-f%3A13723246618130...    529

The 1610 Riggs Property Trust has been registered with the State of Colorado and the IRS. The attached document is the Trust's EIN. The number is to be used as the Trust's "Social Security Number". A bank account should be opened using this number. The name and number should also be used to finance the property. Please note that Income Taxes on the Trust must be filed annually.

The next step is for someone in DC to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward  and will need to be signed by at least the grantor, Len. In some "states" both parties may need to sign so check with the drafter of the deed. The deed will then need to be filed with the District/City. Let me know if you have any other questions.

By the way Happy Birthday, Len and Happy Father's Day, Dad.

Ron

Ron Salas, Esq.

5205 S. College Ave, Suite B

Fort Collins, CO 80525

Phone (970) 232-3330

Fax (877) 667-2860

ronsalas@salaslegal.com

www.thesalaslawfirm.com



**CONFIDENTIALITY NOTICE:** This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

Lucas000018

 **Gmail**                                              **Len Salas <lensalas77@gmail.com>**

## Re: trust #

1 message

---

**maxsalas@aol.com** <maxsalas@aol.com>                    Wed, Jun 22, 2011 at 3:19 PM
To: Len Salas <lensalas77@gmail.com>

   NO

   Max Salas 202  271 2800

   ----- Reply message -----
   From: "Len Salas" <lensalas77@gmail.com>
   Date: Wed, Jun 22, 2011 3:47 pm
   Subject: trust #
   To: "maxsalas@aol.com" <maxsalas@aol.com>

   Yeah, I saw that. But that is not what I asked. I asked if you used this EIN # to set up a bank acct with a bank either BB&T
   or bank of america or Suntrust.

   Sent from my iPhone

   On Jun 22, 2011, at 12:09 PM, "maxsalas@aol.com" <maxsalas@aol.com> wrote:

       I sent you a copy of the email yesterday

       Max Salas 202  271 2800

       ----- Reply message -----
       From: "Len Salas" <lensalas77@gmail.com>
       Date: Wed, Jun 22, 2011 10:58 am
       Subject: trust #
       To: "MaxSalas@aol.com" <MaxSalas@aol.com>

       Have you contacted a bank to set up an acct for the trust?

       Sent from my iPhone

       On Jun 21, 2011, at 12:04 PM, MaxSalas@aol.com wrote:

          please see the attached,

          <EINNumber trust.pdf>

   =

 **Gmail**                                              **Len Salas <lensalas77@gmail.com>**

## trust paper work
1 message

**Max Salas** <m.salas@cornet.com>                              Tue, Jan 17, 2012 at 5:02 PM
To: "ljboileau@goldsteinandlevey.com" <ljboileau@goldsteinandlevy.com>
Cc: Ron Salas <ronsalas@salaslegal.com>, Len Salas <lensalas77@gmail.com>

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901




**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology, Inc.**

https://mail.google.com/mail/u/0?ik=3a2af57981&view=pt&search=all&permthid=thread-f%3A1391294038862628030%7Cmsg-f%3A13912940388626…    533

**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

---



**trust information.pdf**
8801K

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

---

## trust paper work
1 message

---

**Max Salas** <m.salas@cornet.com>
Tue, Jan 17, 2012 at 5:23 PM
To: "ljboileau@goldsteinandlevey.com" <ljboileau@goldsteinandlevy.com>
Cc: Ron Salas <ronsalas@salaslegal.com>, Len Salas <lensalas77@gmail.com>

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901




**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology , Inc**

Case 3.23-cv-00987    Document 7-2    Filed 10/04/23    Page 52 of 532 PageID #: 640

**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

---

 **trust information.pdf**
8801K

L-Salas000026
536

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

___

## Re: trust paper work
1 message

___

**Len Salas** <lensalas77@gmail.com>                    Fri, Feb 24, 2012 at 7:22 PM
To: Max Salas <m.salas@cornet.com>

Where are we on this?

Len Salas
lensalas77@gmail.com
202-246-4901 (mobile)

On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,

As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.

Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.

There are two different requests:

One is to get Lenny's name off of the property. (want to do this asap)

The second request is to refinance the property under the name of the trust.

Please feel free to contact either Ron or Len for any clarification.

Ron phone # is  970 214 6356

Len phone  # is 202 246 4901

**Max Salas,**

**Senior VP Corporate Development**

**Cornet Technology , Inc.**

**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

## Re: trust paper work
1 message

**Maxs** <m.salas@cornet.com>                          Fri, Feb 24, 2012 at 9:04 PM
To: Len Salas <lensalas77@gmail.com>

Still working on this ..,,Iam in Miami will be back soon

Max Salas 202-271-2800

On Feb 24, 2012, at 8:22 PM, Len Salas <lensalas77@gmail.com> wrote:

Where are we on this?

Len Salas
lensalas77@gmail.com
202-246-4901 (mobile)

On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,

As per our conversation, today please find the trust paper work information.  If you
need additional information let me know what need.  I have copied both my sons on
this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.

Len Salas was also copied on this e-mail is who quit claimed the property over to the
trust.

There are two different requests:

One is to get Lenny's name off of the property. (want to do this asap)

The second request is to refinance the property under the name of the trust.

Please feel free to contact either Ron or Len for any clarification.

Ron phone # is  970 214 6356

Len phone  # is 202 246 4901


**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology , Inc.**


**6800 Versar Center  , Suite 216**


**Springfield** Virginia 22151


**Direct phone 703-658-6163**


**Mobile phone 202-271-2800**


**M.Salas@cornet.com**

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

## RE: trust paper work
1 message

**Max Salas** <m.salas@cornet.com>                                    Mon, Feb 27, 2012 at 10:08 AM
To: Len Salas <lensalas77@gmail.com>

Len,

can you send over the original e-mail I will check with Lynn again and try to move this thing along.
Thanks

Max Salas,

Senior VP Corporate Development

Cornet Technology , Inc.

6800 Versar Center  , Suite 216

Springfield Virginia 22151

Direct phone 703-658-6163

Mobile phone 202-271-2800

M.Salas@cornet.com

**From:** Len Salas [mailto:lensalas77@gmail.com]
**Sent:** Friday, February 24, 2012 8:23 PM
**To:** Max Salas
**Subject:** Re: trust paper work

Where are we on this?

Len Salas
lensalas77@gmail.com

L Salas000031

https://mail.google.com/mail/u/0?ik=3a2af57981&view=pt&search=all&permthid=thread-f%3A1391294038862628030%7Cmsg-f%3A13949824090517…     54/1

202-246-4901 (mobile)


On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901




**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology , Inc.**


**6800 Versar Center  , Suite 216**

Salas000032

**Springfield** Virginia 22151


**Direct phone 703-658-6163**


**Mobile phone 202-271-2800**


**M.Salas@cornet.com**

Salas000033

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

# Getting house changed over into trust name
1 message

---

**Max** <maxsalas@aol.com>                                    Mon, Feb 27, 2012 at 7:42 PM
To: "lboileau@capitoltitle.com" <lboileau@capitoltitle.com>
Cc: Len Salas <lensalas77@gmail.com>, Ron Salas <ronsalas@salaslegal.com>

Hi Lynn, about a month and a half back I sent you information  in reference to documents of the house 1610 Riggs. NW

please let me know when it be convenient for you.

My son and I are anxious and would like to close on this as soon as possible please let us know what the next that are from our side

We look forward to working with you what are the next steps?

Thanking you in advance

Sincerely yours

Max Salas 202-271-2800

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number (if known) | 18-00260 |

☐ Check if this is an amended filing

## Official Form 106Sum
## Summary of Your Assets and Liabilities and Certain Statistical Information    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.

**Part 1:    Summarize Your Assets**

|  |  | Your assets Value of what you own |
|---|---|---|
| 1. | **Schedule A/B: Property** (Official Form 106A/B) | |
| | 1a. Copy line 55, Total real estate, from Schedule A/B.............................................................. | $ 2,500,000.00 |
| | 1b. Copy line 62, Total personal property, from Schedule A/B........................................................ | 578,729.01 |
| | 1c. Copy line 63, Total of all property on Schedule A/B.................................................................... | $ 3,078,729.01 |

**Part 2:    Summarize Your Liabilities**

|  |  | Your liabilities Amount you owe |
|---|---|---|
| 2. | *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D) | |
| | 2a. Copy the total you listed in Column A, *Amount of claim*, at the bottom of the last page of Part 1 of *Schedule D...* | $ 1,037,592.78 |
| 3. | *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F) | |
| | 3a. Copy  the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F*................................. | $ 7,429.09 |
| | 3b. Copy  the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F*............................ | 15,667,684.30 |
| | **Your total liabilities** | $ 16,712,706.17 |

**Part 3:    Summarize Your Income and Expenses**

|  |  | |
|---|---|---|
| 4. | *Schedule I: Your Income* (Official Form 106I) | |
| | Copy your combined monthly income from line 12 of *Schedule I*................................................................ | $ 3,269.98 |
| 5. | *Schedule J: Your Expenses* (Official Form 106J) | |
| | Copy your monthly expenses from line 22c of *Schedule J*....................................................................... | 16,851.76 |

**Part 4:    Answer These Questions for Administrative and Statistical Records**

6. **Are you filing for bankruptcy under Chapters 7, 11, or 13?**

☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

■ Yes

7. **What kind of debt do you have?**

☐ **Your debts are primarily consumer debts.** *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9 for statistical purposes. 28 U.S.C. § 159.

■ **Your debts are not primarily consumer debts.** You have nothing to report on this part of the form. *Check this box* and submit this form to the court with your other schedules.

Official Form 106Sum          Summary of Your Assets and Liabilities and Certain Statistical Information          page 1 of 2

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                                    Case number *(if known)*    **18-00260**

8.  **From the *Statement of Your Current Monthly Income*:** Copy your total current monthly income from Official Form
    122A-1 Line 11; **OR**, Form 122B Line 11; **OR**, Form 122C-1 Line 14.          $ _____

9.  **Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:**

| From Part 4 on *Schedule E/F*, copy the following: | Total claim |
|---|---|
| 9a. Domestic support obligations (Copy line 6a.) | $ _____ 0.00 |
| 9b. Taxes and certain other debts you owe the government. (Copy line 6b.) | $ _____ 7,429.09 |
| 9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.) | $ _____ 0.00 |
| 9d. Student loans. (Copy line 6f.) | $ _____ 0.00 |
| 9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.) | $ _____ 0.00 |
| 9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.) | +$ _____ 0.00 |

9g. **Total.** Add lines 9a through 9f.          $ _____ 7,429.09

**Fill in this information to identify your case and this filing:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse, if filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | 18-00260 |

☐ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:** Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

**1. Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☑ Yes. Where is the property?

| 1.1 | | |
|---|---|---|

**1610 Riggs Place, NW**
Street address, if available, or other description

**Washington**          **DC**          **20009-0000**
City                              State          ZIP Code

County

**What is the property?** Check all that apply

☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**
**trust collapsed on creation through merger to convey property to debtor**
**DC Records displays owner as Len Salas**
**Contains furnished basement that is possible to be rented as a seperate unit, but which debtor currently is using as part of personal residence with remainder of property**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| $2,500,000.00 | $2,500,000.00 |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**Owner**

☐ Check if this is community property (see instructions)

**2. Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here..........................................................................=>**

| $2,500,000.00 |
|---|

**Part 2:** Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

| Debtor 1 | **Max E. Salas** | Case number *(if known)* | **18-00260** |

**3. Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

- [x] No
- [ ] Yes

**4. Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

- [x] No
- [ ] Yes

**5** Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here............................................................=>    | **$0.00** |

**Part 3:**   **Describe Your Personal and Household Items**

| Do you own or have any legal or equitable interest in any of the following items? | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |
|---|---|

**6. Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware

- [ ] No
- [x] Yes. Describe.....

| **See Attached List** | $14,000.00 |

| **Previously damaged and restored personal property being held in storage by Columbia Restoration **See attached list for property description** | $2,000.00 |

**7. Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games

- [ ] No
- [x] Yes. Describe.....

| **HP Laptop 18 in.** **MacBook Pro 13 in.** **IPad 10 In.** **IPhone 6** | $200.00 |

**8. Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles

- [x] No
- [ ] Yes. Describe.....

**9. Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments

- [ ] No
- [x] Yes. Describe.....

| **1 set Taylor-Made Golf Clubs and Bag** **1 set Titelist Golf Clubs and Bag** | $300.00 |

| **1 Precor home treadmill** | $1,500.00 |

Debtor 1    **Max E. Salas**                                    Case number *(if known)*    **18-00260**

10. **Firearms**
*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
- ☑ No
- ☐ Yes.  Describe.....

11. **Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
- ☐ No
- ☑ Yes.  Describe.....

| | |
|---|---|
| **11 suits, 2 tuxedos, 7 pairs of shoes, and 15-20 business shirts, 7-8 pairs of pants, various golf wearing apparel and other wearing apparel.** | $500.00 |

12. **Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
- ☐ No
- ☑ Yes.  Describe.....

| | |
|---|---|
| **Timex watch** | $25.00 |

| | |
|---|---|
| **Gold costume jewelry ring** | $20.00 |

13. **Non-farm animals**
*Examples:* Dogs, cats, birds, horses
- ☑ No
- ☐ Yes.  Describe.....

14. **Any other personal and household items you did not already list, including any health aids you did not list**
- ☐ No
- ☑ Yes.  Give specific information.....

| | |
|---|---|
| **Hearing aides** | $300.00 |

| | |
|---|---|
| **Framed Family Pictures** | $100.00 |

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** ............................................................................

| |
|---|
| $18,945.00 |

**Part 4:**   Describe Your Financial Assets

Do you own or have any legal or equitable interest in any of the following?

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

16. **Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
- ☐ No
- ☑ Yes...................................................................................................

| | |
|---|---|
| **Cash on hand** | $200.00 |

17. **Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
- ☐ No
- ☑ Yes.......................      Institution name:

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                              Best Case Bankruptcy

| | | | |
|---|---|---|---|
| 17.1. | **Checking** | **Bank of America Core checking account** | $1,779.24 |
| 17.2. | **Checking** | **Bank of America Interest Checking (in name of 1610 Riggs Property Trust, Max Salas Trtee)** | $334.96 |
| 17.3. | **Other financial account** | **BB&T bank account x5086 (CLR, Inc.)** | $29,624.97 |
| 17.4. | **Other financial account** | **BB&T bank account x1095 (CLR, Inc. - Construction Account)** | $39.68 |
| 17.5. | **Other financial account** | **BB&T bank account (1610 Riggs Property Trust)** | $6,429.44 |

18. **Bonds, mutual funds, or publicly traded stocks**
   *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
   ☑ No
   ☐ Yes..................        Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
   ☑ No
   ☐ Yes.  Give specific information about them..................
                     Name of entity:                              % of ownership:

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
   *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
   *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
   ☑ No
   ☐ Yes. Give specific information about them
                     Issuer name:

21. **Retirement or pension accounts**
   *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
   ☐ No
   ☑ Yes. List each account separately.
                     Type of account:          Institution name:

   | | | |
   |---|---|---|
   | **401(k)** | **T. Rowe Price/Cornet, Inc. 401(k)** | $505,435.72 |

22. **Security deposits and prepayments**
   Your share of all unused deposits you have made so that you may continue service or use from a company
   *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
   ☑ No
   ☐ Yes. ....................        Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
   ☑ No
   ☐ Yes.............        Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
   26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
   ☑ No
   ☐ Yes.............        Institution name and description. Separately file the records of any interests. 11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
   ☐ No
   ☑ Yes.  Give specific information about them...

| | |
|---|---|
| Interest in 1610 Riggs Property Trust - Establishes Debtor as sole-trustee and sole-beneficiary Trust terminated through merger to grant ownership of trust property to debtor | **$0.00** |

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
    *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
    ☑ No
    ☐ Yes.  Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
    *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
    ☑ No
    ☐ Yes.  Give specific information about them...

| Money or property owed to you? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

28. **Tax refunds owed to you**
    ☑ No
    ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
    *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
    ☑ No
    ☐ Yes. Give specific information......

30. **Other amounts someone owes you**
    *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else
    ☑ No
    ☐ Yes.  Give specific information..

31. **Interests in insurance policies**
    *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
    ☐ No
    ☑ Yes. Name the insurance company of each policy and list its value.

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| **Interest in Life Insurance Policy through employer Cornet Technology, Inc. Interest to terminate upon full retirement on May 3, 2018 $0.00 refund value** | **Ron Salas** | **$0.00** |
| **Interest in health, vision, and dental insurance policies through employer Cornet Technology, Inc. $0.00 cash value** | | **$0.00** |
| **Interest in Casualty Insurance - Progressive $0.00 cash value** | | **$0.00** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

32. **Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.

☑ No
☐ Yes. Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue

☐ No
☑ Yes. Describe each claim.........

| | |
|---|---|
| **Potential claim against Encompass Insurance for unpaid insurance funds due under policy** | Unknown |
| **Contract claim against Fusion Contracting Group for deficient and unperformed renovation work** | Unknown |

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**

☑ No
☐ Yes. Describe each claim.........

35. **Any financial assets you did not already list**

☑ No
☐ Yes. Give specific information..

36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here.................................................................................................

| |
|---|
| **$543,844.01** |

**Part 5:**    Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

37. **Do you own or have any legal or equitable interest in any business-related property?**

☑ No. Go to Part 6.
☐ Yes. Go to line 38.

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

38. **Accounts receivable or commissions you already earned**

☑ No
☐ Yes. Describe.....

39. **Office equipment, furnishings, and supplies**
*Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices

☑ No
☐ Yes. Describe.....

40. **Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**

☑ No
☐ Yes. Describe.....

41. **Inventory**

☑ No
☐ Yes. Describe.....

42. **Interests in partnerships or joint ventures**

☐ No
☑ Yes. Give specific information about them...................

Name of entity:                                        % of ownership:

---

| | | |
|---|---|---|
| **1610 Riggs Property Trust a/k/a CLR, Inc.** **(Collapsing trust with full ownership vesting in** **Max Salas of all trust property)** | **100%** % | **Unknown** |

**43. Customer lists, mailing lists, or other compilations**

☑ No.

☐ Do your lists include personally identifiable information (as defined in 11 U.S.C. § 101(41A))?

☑ No
☐ Yes. Describe.....

**44. Any business-related property you did not already list**

☑ No
☐ Yes. Give specific information.........

**45.** Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached for Part 5. Write that number here.................................................................................................... | **$0.00**

**Part 6:** Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.
If you own or have an interest in farmland, list it in Part 1.

**46. Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**

☑ No. Go to Part 7.
☐ Yes.  Go to line 47.

**Part 7:** Describe All Property You Own or Have an Interest in That You Did Not List Above

**53. Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership

☐ No
☑ Yes. Give specific information.........

| | |
|---|---|
| Washington Nationals MLB season tickets | $10,000.00 |
| Washington Wizards NBA season basketball tickets | $5,940.00 |
| Policy holder for potential insurance payout to third parties for liability from 2015 house fire - Encompass Insurance | Unknown |

**54.** Add the dollar value of all of your entries from Part 7. Write that number here  ..................................... | **$15,940.00**

| Debtor 1 | **Max E. Salas** | Case number *(if known)* | **18-00260** |

| Part 8: | List the Totals of Each Part of this Form |

| | | | |
|---|---|---|---|
| 55. | **Part 1: Total real estate, line 2** ......................................................................................... | | **$2,500,000.00** |
| 56. | **Part 2: Total vehicles, line 5** | $0.00 | |
| 57. | **Part 3: Total personal and household items, line 15** | $18,945.00 | |
| 58. | **Part 4: Total financial assets, line 36** | $543,844.01 | |
| 59. | **Part 5: Total business-related property, line 45** | $0.00 | |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | $0.00 | |
| 61. | **Part 7: Total other property not listed, line 54** | + $15,940.00 | |
| 62. | **Total personal property.** Add lines 56 through 61... | $578,729.01 | Copy personal property total | **$578,729.01** |
| 63. | **Total of all property on Schedule A/B.** Add line 55 + line 62 | | **$3,078,729.01** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                          Best Case Bankruptcy

Max E. Salas
18-00260

6. Home Furnishings

FIRST FLOOR:

Front Living Room

1 Living Room Sofa
2 Swivel Chairs
1 8x10 Rug
1 Lucite Table
2 Green 29" Lamps
1 Round Coffee Table
1 Large Art Work Giclee
1 64 inch Flatscreen Samsung TV

Dining Room

2 Dining Banquettes
1 Dining Room Table
3 Lucite Counter Stools
1 Bar Tray/Table Credenza

Media Room/TV Entertainment

2 Blue Leather Chairs
1 7x7 Navy Rug
1 Chrome Bar Cart
1 Media Credenza
1 64 inch Flatscreen Samsung TV

SECOND FLOOR

Front Bedroom

1 King Size Bed
1 King Size Mattress and Box Spring
1 Double Dresser
1 Night Stand
1 Brass Floor Mirror
1 50 inch Samsung TV

Office/Study

1 36 inch Old File Cabinet Mahogany

1 36 inch Old Mahogany Credenza
1 24 inch Coffee Table
1 Desk
1 HP 4500 Printer
1 HP 1600 Black-and-White Printer
1 24 inch Samsung monitor
1 Desk Lamp
1 40 inch Flatscreen Television Samsung

THIRD FLOOR

Upstairs Front Bedroom

1 Queen Size Metal Bed
1 Queen Size Ikea Mattresses
2 Grey and Beige Club Chairs
1 8x10 Low Shag Rug
1 Grey Lamb Ottoman
1   50 inch Samsung TV

Upstairs Rear Bedroom

1 queen upholstered bed
1 Queen Size IKEA Mattress
1 Brown/Tan Chair
1 Coffee Table
1 and Table
1 White Lamp
1 46 inch Samsung Flatscreen Television


BASEMENT

Front Basement Room

1 50 inch Flatscreen Television
1 Queen Size Murphy Bed with Mattress and Box Springs

Back Basement Room

1 40 inch Flatscreen Television
1 Queen Size Bed with mattress and Box Springs

OTHER
Household dishes, glasses, and silverware

**Property held in storage at Columbia Restoration listed on the following three (3) pages:

Job Name: **Salas**     Date: 7/17/2015

| Tag # | Room | Item | Description | C/N | RTN | Tech Init. |
|---|---|---|---|---|---|---|
| 1 | Backroom | Box packed | Books/VHS | | | D.W. |
| 2 | Backroom | Box packed | Books/VHS | | | D.W. |
| 3 | Backroom | Box packed | CD books VHS | | | D.W. |
| 4 | Backroom | Box packed | CD paper cards (desk) | | | C.K. |
| 5 | Backroom | Box packed | Books/VHS | | | |
| 6 | Backroom | Box packed | DVD books | | | |
| 7 | Backroom | Box packed | books tobacco case | | | |
| 8 | Backroom | Box packed | DVD books | | | |
| 9 | Backroom | Box packed | cars pins | | | |
| 10 | Backroom | Box packed | tobacco box papers | | | |
| 11 | Backroom | Box packed | VHS/CD | | | |
| 12 | Backroom | Box packed | books cigar boxes | | | D.W. |
| 13 | Backroom | Box packed | shoe cleaning kit books | | | |
| 14 | Backroom | Box packed | books, CD's dups cords | | | |
| 15 | Backroom | Box packed | papers | | | C.K. |
| 16 | Backroom | Box packed | papers | | | D.W. |
| 17 | Backroom | Box packed | fax CDs papers desk | | | C.K. |
| 18 | Backroom | Box packed | pics papers | | | D.W. |
| 19 | Backroom | Box packed | cigars books CDs | | | D.W. |
| 20 | Backroom | Box packed | surround sound cords | | | D.W. |
| 21 | Backroom | Box packed | cigars tobacco | | | C.K. |
| 22 | Backroom | Box packed | CDs | | | D.W. |
| 23 | Backroom | Box packed | golf pins cigar box | | | D.W. |
| 24 | Backroom | Box packed | basketballs footballs | | | D.W. |
| 25 | Backroom | Box packed | cigar boxes | | | C.K. |
| 26 | Backroom | Box packed | misc. | | | D.W. |
| 27 | Backroom | Box packed | pics | | | D.W. |

Case 18-00260   Doc 12   Filed 05/02/18   Entered 05/02/18 15:25:50   Desc Main Document   Page 13 of 37

Case 18-00260 Doc 12 Filed 05/02/18 Entered 05/02/18 15:25:50 Desc Main
Document Page 14 of 37

| Tag # | Room | Item | Description | Condition | C/N | RTN |
|-------|------|------|-------------|-----------|-----|-----|
| 100 | Backroom | table | 4 piece end table set, made to be like book covers on it | covered in dust & debris. Further evaluation needed after dust/debris removed | | |
| 101 | Backroom | bookcase | tall bookcase/dresser 5.5' tall, wooden | completely covered with soot, dust & dirt. Can not evaluate condition until cleaned, can see some rub marks and scratches through dirt. | | |
| 102 | Backroom | art | 30 x 20 picture frame with 2 women showing their bottoms | covered in dust/debris. Further evaluation needed after dust/debris removed | | |
| 103 | Backroom | art | 6' x 2' frame of Marilyn Monroe | frame discolored from cigar smoke, cardboard is bowed, covered in soot/debris. Further evaluation needed after dust/debris removed but overall poor condition | | |
| 104 | Backroom | sports equipment | 12 piece golf set | all of the clubs are covered in soot & debris, leather case covered in dust/debris, looks old & worn, smoke patches all over. Further evaluation needed after dust/debris removed | | |
| 105 | Backroom | art | 20 x 40 picture frame of actual tobacco leaf | covered in dust/debris. Further evaluation needed after dust/debris removed | | |
| 106 | Backroom | stereo equipment | Bose speaker of some sort | covered in dust & debris. Further evaluation needed after dust/debris removed | | |
| 107 | Backroom | art | 46" picture frame Samsung | scratches and scrapes all over. Covered in dust & debris. Further evaluation needed after dust/debris removed | | |
| 109 | Backroom | chair | wooden kitchen with beige upholstered seat | covered in dust/debris. Upholstery is discolored. Further evaluation needed after dust/debris removed | | |
| 110 | Backroom | case | wooden tobacco case | covered in dust/debris/smear marks. Further evaluation needed after dust/debris removed | | |
| 111 | Backroom | art | 12 x 30 glass frame of golf ornaments | covered in dust & debris, frame has rub marks, scratches and scrapes all over | | |
| 112 | Backroom | art | 10 x 12 picture frame with Hillary Clinton shaking a man's hand | covered in dust/debris. Further evaluation needed after dust/debris removed | | |
| 113 | Backroom | sports equipment | 15 piece golf set & upholstered holder | very worn, covered in dust/debris all over. Further evaluation needed after dust/debris removed | | |
| 114 | Backroom | lamp | fold down metal lamp | covered in dust & debris. Further evaluation needed after dust/debris removed | | |
| 115 | Backroom | heater | small heater Westpoint | covered in dust & debris, rub marks on front, some glue spots on front, additional evaluation needed after dust/debris removed | | |

558

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 116 | Backroom | chair | maroon leather sofa chair | totally worn top to bottom, covered in dust/debris/paint markings, worn all over, scratches/scapes all over | | | | | | | | | | | | | | | | |
| 120 | Backroom | hutch | top hutch for desk, wooden, brown | scratches & rub marks all over front, covered in dust and debris, additional evaluation needed after dust/debris removed | | | | | | | | | | | | | | | | |
| 121 | Backroom | desk | desk (goes with #120) | top has rub marks, scratches, scrapes, dents, dings, water marks, top is destroyed, bottom looks wilted, covered in dust/debris. Additional evaluation needed after dust/debris removed | | | | | | | | | | | | | | | | |
| 122 | Backroom | sofa | Sofa, burgundy leather | scratches, scrapes, tears to sofa all over, very worn, poor condition, covered in dust/debris | | | | | | | | | | | | | | | | |
| 135 | Backroom | fax machine | fax machine Hewlett-Packard | very old, so much smoke around has been discolored. Further evaluation needed after dust/debris removed | | | | | | | | | | | | | | | | |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | 18-00260 |
| (if known) | |

☐ Check if this is an
   amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt                                  4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

**Part 1:**   Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ■ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | | Specific laws that allow exemption |
|---|---|---|---|---|
| **1610 Riggs Place, NW Washington, DC 20009**<br>**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**<br>**trust collapsed on creation through merger to convey property to debtor DC Records displays owner as Len Salas**<br>**Contains**<br>Line from *Schedule A/B*: **1.1** | $2,500,000.00 | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | | **D.C. Code Ann. § 15-501(a)(14)** |
| **\*\*See Attached List\*\***<br>Line from *Schedule A/B*: **6.1** | $14,000.00 | ■ $8,621.00<br>☐ 100% of fair market value, up to any applicable statutory limit | | **D.C. Code Ann. § 15-501(a)(2)** |
| **Previously damaged and restored personal property being held in storage by Columbia Restoration \*\*See attached list for property description\*\***<br>Line from *Schedule A/B*: **6.2** | $2,000.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | | **D.C. Code Ann. § 15-501(a)(2)** |

Official Form 106C                    **Schedule C: The Property You Claim as Exempt**                    page 1 of 3

Debtor 1    **Max E. Salas**    Case number (if known)    **18-00260**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own — Copy the value from *Schedule A/B* | Amount of the exemption you claim — *Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **HP Laptop 18 in.**<br>**MacBook Pro 13 in.**<br>**IPad 10 In.**<br>**IPhone 6**<br>Line from *Schedule A/B*: **7.1** | $200.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |
| **1 set Taylor-Made Golf Clubs and Bag**<br>**1 set Titelist Golf Clubs and Bag**<br>Line from *Schedule A/B*: **9.1** | $300.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **1 Precor home treadmill**<br>Line from *Schedule A/B*: **9.2** | $1,500.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |
| **11 suits, 2 tuxedos, 7 pairs of shoes, and 15-20 business shirts, 7-8 pairs of pants, various golf wearing apparell and other wearing apparell.**<br>Line from *Schedule A/B*: **11.1** | $500.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |
| **Timex watch**<br>Line from *Schedule A/B*: **12.1** | $25.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **Gold costume jewelry ring**<br>Line from *Schedule A/B*: **12.2** | $20.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **Hearing aides**<br>Line from *Schedule A/B*: **14.1** | $300.00 | ■ $300.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(6)** |
| **Framed Family Pictures**<br>Line from *Schedule A/B*: **14.2** | $100.00 | ■ $100.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(8)** |
| **Cash on hand**<br>Line from *Schedule A/B*: **16.1** | $200.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **Checking: Bank of America Core checking account**<br>Line from *Schedule A/B*: **17.1** | $1,779.24 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **Checking: Bank of America Interest Checking**<br>**(in name of 1610 Riggs Property Trust, Max Salas Trtee)**<br>Line from *Schedule A/B*: **17.2** | $334.96 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |

Debtor 1    **Max E. Salas**

Case number (if known)    **18-00260**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Other financial account: BB&T bank account x5086 (CLR, Inc.)**<br>Line from *Schedule A/B*: **17.3** | $29,624.97 | ■ $842.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **Other financial account: BB&T bank account x1095 (CLR, Inc. - Construction Account)**<br>Line from *Schedule A/B*: **17.4** | $39.68 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **Other financial account: BB&T bank account (1610 Riggs Property Trust)**<br>Line from *Schedule A/B*: **17.5** | $6,429.44 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(3)** |
| **401(k): T. Rowe Price/Cornet, Inc. 401(k)**<br>Line from *Schedule A/B*: **21.1** | $505,435.72 | ☐<br>■ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(9)** |

3. **Are you claiming a homestead exemption of more than $160,375?**
(Subject to adjustment on 4/01/19 and every 3 years after that for cases filed on or after the date of adjustment.)

☐ No

■ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

    ■ No

    ☐ Yes

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name     Middle Name     Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name     Middle Name     Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number (if known) | 18-00260 |

☐ Check if this is an amended filing

## Official Form 106D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

■ Yes. Fill in all of the information below.

### Part 1: List All Secured Claims

**2. List all secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | Column A<br>Amount of claim<br>Do not deduct the<br>value of collateral. | Column B<br>Value of collateral<br>that supports this<br>claim | Column C<br>Unsecured<br>portion<br>If any |
|---|---|---|---|---|
| **2.1** Internal Revenue Service | Describe the property that secures the claim: | $6,766.92 | Unknown | $0.00 |

Creditor's Name

**Cental Insolvency Operation
PO Box 7346
Philadelphia, PA
19101-7346**

Number, Street, City, State & Zip Code

**Describe the property that secures the claim:**

**All property**

**As of the date you file, the claim is:** Check that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
■ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset)  **IRS Tax Lien**

**Who owes the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
■ Check if this claim relates to a community debt

Date debt was incurred **2009, 2010, 2011**    Last 4 digits of account number **2714**

| | | | | |
|---|---|---|---|---|
| **2.2** SunTrust Mortgage, Inc. | Describe the property that secures the claim: | $1,030,825.86 | $2,500,000.00 | $0.00 |

Creditor's Name

**ATTN: Client Services - RVW 30
P.O. Box 26149
Richmond, VA
23260-6149**

Number, Street, City, State & Zip Code

**Describe the property that secures the claim:**

**1610 Riggs Place, NW Washington, DC 20009
Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed
trust collapsed on creation through merger to convey property to debtor
DC Records displays owner as Len**

**As of the date you file, the claim is:** Check that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)

**Who owes the debt?** Check one.

☐ Debtor 1 only
☐ Debtor 2 only

---

Official Form 106D    **Schedule D: Creditors Who Have Claims Secured by Property**    page 1 of 2

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

Debtor 1  **Max E. Salas**
_____    Case number (if know)  __18-00260__
First Name      Middle Name      Last Name

☐ Debtor 1 and Debtor 2 only          ☐ Statutory lien (such as tax lien, mechanic's lien)
■ At least one of the debtors and another    ☐ Judgment lien from a lawsuit
☐ Check if this claim relates to a        ■ Other (including a right to offset)    **Deed of Trust and Note held in name of Len Salas. Debtor**
    community debt                                **not personally liable**

Date debt was incurred  __2007__        Last 4 digits of account number  __9438__

| | |
|---|---|
| Add the dollar value of your entries in Column A on this page. Write that number here: | **$1,037,592.78** |
| If this is the last page of your form, add the dollar value totals from all pages. Write that number here: | **$1,037,592.78** |

**Part 2:**  **List Others to Be Notified for a Debt That You Already Listed**

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name        Middle Name        Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name        Middle Name        Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | 18-00260 |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 106E/F
## Schedule E/F: Creditors Who Have Unsecured Claims          12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY claims and Part 2 for creditors with NONPRIORITY claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Property (Official Form 106A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G). Do not include any creditors with partially secured claims that are listed in Schedule D: Creditors Who Have Claims Secured by Property. If more space is needed, copy the Part you need, fill it out, number the entries in the boxes on the left. Attach the Continuation Page to this page. If you have no information to report in a Part, do not file that Part. On the top of any additional pages, write your name and case number (if known).

### Part 1:    List All of Your PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims against you?**
   ☐ No. Go to Part 2.
   ☐ Yes.

2. **List all of your priority unsecured claims.** If a creditor has more than one priority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. If a claim has both priority and nonpriority amounts, list that claim here and show both priority and nonpriority amounts. As much as possible, list the claims in alphabetical order according to the creditor's name. If you have more than two priority unsecured claims, fill out the Continuation Page of Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.

   (For an explanation of each type of claim, see the instructions for this form in the instruction booklet.)

| | | Total claim | Priority amount | Nonpriority amount |
|---|---|---|---|---|
| **2.1** | **Internal Revenue Service** <br> Priority Creditor's Name | Last 4 digits of account number _____ | $2,881.09 | $2,881.09 | $0.00 |
| | **Cental Insolvency Operation** <br> **PO Box 7346** <br> **Philadelphia, PA 19101-7346** <br> Number Street City State Zip Code | When was the debt incurred?   2016 | | | |

Who incurred the debt? Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**
■ No
☐ Yes

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Type of PRIORITY unsecured claim:
☐ Domestic support obligations
■ Taxes and certain other debts you owe the government
☐ Claims for death or personal injury while you were intoxicated
☐ Other. Specify _____

**Federal income taxes owed 2016**

---

565

Debtor 1  **Max E. Salas**

Case number (if know)    **18-00260**

| 2.2 | **Internal Revenue Service** | Last 4 digits of account number ___ ___ ___ ___ | **$4,548.00** | **$4,548.00** | **$0.00** |
|---|---|---|---|---|---|

Priority Creditor's Name

**Cental Insolvency Operation
PO Box 7346
Philadelphia, PA 19101-7346**

Number Street City State Zip Code

When was the debt incurred?    **2015**

**Who incurred the debt?** Check one.

- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another
- ☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

- ☐ No
- ■ Yes

**As of the date you file, the claim is:** Check all that apply

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Type of PRIORITY unsecured claim:**

- ☐ Domestic support obligations
- ■ Taxes and certain other debts you owe the government
- ☐ Claims for death or personal injury while you were intoxicated
- ☐ Other. Specify _____

**Federal taxes 2015**

---

| **Part 2:** | **List All of Your NONPRIORITY Unsecured Claims** |
|---|---|

3. **Do any creditors have nonpriority unsecured claims against you?**

☐ No. You have nothing to report in this part. Submit this form to the court with your other schedules.

■ Yes.

4. **List all of your nonpriority unsecured claims in the alphabetical order of the creditor who holds each claim.** If a creditor has more than one nonpriority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. Do not list claims already included in Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.If you have more than three nonpriority unsecured claims fill out the Continuation Page of Part 2.

| | | | **Total claim** |
|---|---|---|---|
| 4.1 | **All American Ambulance** | Last 4 digits of account number **3887** | **$60.00** |

Nonpriority Creditor's Name

**c/o Creditor Claims of America
PO Box 7579
Silver Spring, MD 20907-7579**

Number Street City State Zip Code

When was the debt incurred?    _____

**Who incurred the debt?** Check one.

- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another
- ☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

- ■ No
- ☐ Yes

**As of the date you file, the claim is:** Check all that apply

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Type of NONPRIORITY unsecured claim:**

- ☐ Student loans
- ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
- ☐ Debts to pension or profit-sharing plans, and other similar debts
- ■ Other. Specify  **Unpaid medical debt**

---

Debtor 1    **Max E. Salas**

Case number (if know)    **18-00260**

---

| 4.2 | **Barclaycard - Frontier Airline** | Last 4 digits of account number | **6086** | **$5,646.95** |
|---|---|---|---|---|

Nonpriority Creditor's Name

**Card Services**
**P.O. Box 13337**
**Philadelphia, PA 00191-0733**

Number Street City State Zip Code

**Who incurred the debt?** Check one.

When was the debt incurred?    **2018**

**As of the date you file, the claim is:** Check all that apply

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a  community debt**

**Is the claim subject to offset?**

☑ No
☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
☑ Other. Specify    **Credit card purchases**

---

| 4.3 | **Capitol Hill Dental Group** | Last 4 digits of account number | | **$3,018.00** |
|---|---|---|---|---|

Nonpriority Creditor's Name

**412 First Street SE**
**Washington, DC 20003**

Number Street City State Zip Code

**Who incurred the debt?** Check one.

When was the debt incurred?    **2017**

**As of the date you file, the claim is:** Check all that apply

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a  community debt**

**Is the claim subject to offset?**

☑ No
☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
☑ Other. Specify    **Medical debt - dental**

---

| 4.4 | **Columbia Restoration** | Last 4 digits of account number | | **Unknown** |
|---|---|---|---|---|

Nonpriority Creditor's Name

**8017 Dorsey Run Road**
**Suite F**
**Jessup, MD 20794**

Number Street City State Zip Code

**Who incurred the debt?** Check one.

When was the debt incurred?

**As of the date you file, the claim is:** Check all that apply

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a  community debt**

**Is the claim subject to offset?**

☑ No
☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

☑ Other. Specify    **Unpaid storage fees for cleaned/restored property held at premises (June 2017 to present)**

---

Debtor 1  **Max E. Salas** _____    Case number (if know)    **18-00260**

| 4.5 | **Estate of Nina Brekelmans** | Last 4 digits of account number _____ | $7,500,000.00 |

Nonpriority Creditor's Name

**c/o Nicolaas & Gail Brekelmans**
**PO Box 311**
**#031105664**
**Mendham, NJ 07945**

When was the debt incurred?    **April 11, 2018**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

☐ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

■ At least one of the debtors and another

■ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No

☐ Yes

**As of the date you file, the claim is: Check all that apply**

☐ Contingent

☐ Unliquidated

■ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify    **Judgment - wrongful death and survival action**
**Judgment docket instead of Judgment document filed with DC Recorder of Deeds - No lien due due to improper recording of judgment before bankruptcy. Judgment on appeal.**

---

| 4.6 | **Estate of Patrick McLoughlin** | Last 4 digits of account number _____ | $7,700,000.00 |

Nonpriority Creditor's Name

**c/o Michael McLoughlin, Jr.**
**& Martha Johnson**
**43576 Ridge Court**
**Leonardtown, MD 20650**

When was the debt incurred?    **April 11, 2018**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

☐ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

■ At least one of the debtors and another

■ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No

☐ Yes

**As of the date you file, the claim is: Check all that apply**

☐ Contingent

☐ Unliquidated

■ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify    **Judgment - wrongful death and survival action**
**Judgment docket instead of Judgment document filed with DC Recorder of Deeds - No lien due to improper recording of judgment before bankruptcy. Judgment on appeal.**

---

Debtor 1    **Max E. Salas**

Case number (if know)    **18-00260**

---

| 4.7 | **GW University Hospital** | Last 4 digits of account number | **2942** | $104.01 |

Nonpriority Creditor's Name
**900 23rd Street, NW**
**Washington, DC 20037**

When was the debt incurred?    **6/8/2017**

Number Street City State Zip Code

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

Is the claim subject to offset?

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ No
☐ Yes

■ Other. Specify    **Unpaid medical debt**

---

| 4.8 | **Hangar Prothetics Orthotics** | Last 4 digits of account number | **7644** | $93.00 |

Nonpriority Creditor's Name
**c/o TEK-Collect, Inc.**
**871 Park St.**
**Columbua, OH 43215-1441**

When was the debt incurred?    **2016**

Number Street City State Zip Code

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

Is the claim subject to offset?

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ No
☐ Yes

■ Other. Specify    **Unpaid medical debt**

---

| 4.9 | **Hear.com** | Last 4 digits of account number | **5459** | $5,000.00 |

Nonpriority Creditor's Name
**396 Alhambra Circle #S-700**
**Coral Gables, FL 33134**

When was the debt incurred?    **August 16, 2017**

Number Street City State Zip Code

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

Is the claim subject to offset?

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ No
☐ Yes

■ Other. Specify    **Medical debt - hearing aides**

---

Case 3:23-cv-00987     Document 7-2     Filed 10/04/23     Page 86 of 532 PageID #: 674

569

Debtor 1    **Max E. Salas**

Case number (if know)    **18-00260**

| 4.10 | | | |
|---|---|---|---|
| **Hybrid American Construction Company** | | Last 4 digits of account number | **$4,200.00** |
| Nonpriority Creditor's Name | | | |
| **1108 Exodus Drive** | | When was the debt incurred? **2018** | |
| **Gaithersburg, MD 20882** | | | |

Number Street City State Zip Code

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only

☐ Debtor 2 only

☐ Contingent

☐ Debtor 1 and Debtor 2 only

☐ Unliquidated

☐ At least one of the debtors and another

☐ Disputed

☐ **Check if this claim is for a community debt**

Type of NONPRIORITY unsecured claim:

Is the claim subject to offset?

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

■ No

☐ Debts to pension or profit-sharing plans, and other similar debts

☐ Yes

■ Other. Specify **Potential claim for contractor for unstarted roofing repair to property**

---

| 4.11 | | | |
|---|---|---|---|
| **JP Recovery Services** | | Last 4 digits of account number **7760** | **$57.58** |
| Nonpriority Creditor's Name | | | |
| **PO Box 16749** | | When was the debt incurred? | |
| **Rocky River, OH 44116-0749** | | | |

Number Street City State Zip Code

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only

☐ Debtor 2 only

☐ Contingent

☐ Debtor 1 and Debtor 2 only

☐ Unliquidated

☐ At least one of the debtors and another

☐ Disputed

☐ **Check if this claim is for a community debt**

Type of NONPRIORITY unsecured claim:

Is the claim subject to offset?

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

■ No

☐ Debts to pension or profit-sharing plans, and other similar debts

☐ Yes

■ Other. Specify

---

| 4.12 | | | |
|---|---|---|---|
| **Kia Motors Finance Company** | | Last 4 digits of account number | **Unknown** |
| Nonpriority Creditor's Name | | | |
| **10550 Talbert Ave.** | | When was the debt incurred? | |
| **Fountain Valley, CA 92708** | | | |

Number Street City State Zip Code

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only

☐ Debtor 2 only

☐ Contingent

☐ Debtor 1 and Debtor 2 only

☐ Unliquidated

☐ At least one of the debtors and another

☐ Disputed

☐ **Check if this claim is for a community debt**

Type of NONPRIORITY unsecured claim:

Is the claim subject to offset?

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

■ No

☐ Debts to pension or profit-sharing plans, and other similar debts

☐ Yes

■ Other. Specify **Potential claim under auto lease agreement. Debtor is current under agreement.**

Debtor 1   **Max E. Salas**                                            Case number (if know)   **18-00260**

| 4.1 3 | **Len Salas** | | Last 4 digits of account number | | $428,614.90 |

Nonpriority Creditor's Name

**1018 Vince Court**
**Mufreesboro, TN 37128**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No

☐ Yes

**When was the debt incurred?** _____

**As of the date you file, the claim is:** Check all that apply

■ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

**Claim for unpaid mortgage payments for note and Deed of Trust held by Len Salas with SunTrust but owed by Debtor due to**
■ Other. Specify **ownership interest in property**

---

| 4.1 4 | **Marty Sullivan, Esq.** | | Last 4 digits of account number | | $4,000.00 |

Nonpriority Creditor's Name

**1909 M St., NW**
**Suite 200**
**Washington, DC 20007**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**When was the debt incurred?**   **Dec 2017**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify   **Legal fees - land use attorney**

---

| 4.1 5 | **MediCredit, Inc.** | | Last 4 digits of account number   **2827;8331;0 809** | | $60.00 |

Nonpriority Creditor's Name

**PO Box 1629**
**Maryland Heights, MO 63043-0629**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**When was the debt incurred?**   **2014**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify   **Unpaid medical debt**

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

Debtor 1   **Max E. Salas**                                                    Case number (if know)   **18-00260**

---

| 4.1 6 | **T. Rowe Price** | Last 4 digits of account number | **6030** | **$9,629.86** |

Nonpriority Creditor's Name
**Attn: Cornet Inc.**
**6800 Versar Center, Ste 216**
**Springfield, VA 22151-4177**
Number Street City State Zip Code

When was the debt incurred?   **2/21/2014**

As of the date you file, the claim is: Check all that apply

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a  community debt**

Is the claim subject to offset?
☐ No
■ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **Tax deferred loan from 401(k)**

---

| 4.1 7 | **Washington Nationals** | Last 4 digits of account number | | **Unknown** |

Nonpriority Creditor's Name
**1500 South Capital Street, SE**
**Washington, DC 20003**
Number Street City State Zip Code

When was the debt incurred?

As of the date you file, the claim is: Check all that apply

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a  community debt**

Is the claim subject to offset?
■ No
☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **Potential obligation for future ticket purchases**

---

| 4.1 8 | **Washington Redskins** | Last 4 digits of account number | **1998** | **$7,200.00** |

Nonpriority Creditor's Name
**21300 Redskins Park Dr.**
**Ashburn, VA 20147**
Number Street City State Zip Code

When was the debt incurred?

As of the date you file, the claim is: Check all that apply

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a  community debt**

Is the claim subject to offset?
■ No
☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **Claim for NFL season tickets x2**

---

Debtor 1  **Max E. Salas**                                                                    Case number *(if know)*   **18-00260**

| 4.19 | **Wizards Monumental Sports** | | Last 4 digits of account number | | | **Unknown** |

Nonpriority Creditor's Name
**& Entertainment**
**601 F Street, NW**
**3rd Floor**
**Washington, DC 20004**
Number Street City State Zip Code

**Who incurred the debt?** Check one.

- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another
- ☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

- ■ No
- ☐ Yes

When was the debt incurred?

**As of the date you file, the claim is:** Check all that apply

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Type of NONPRIORITY unsecured claim:**

- ☐ Student loans
- ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
- ☐ Debts to pension or profit-sharing plans, and other similar debts
- ■ Other. Specify **Potential obligation for future ticket purchases**

---

**Part 3:    List Others to Be Notified About a Debt That You Already Listed**

5. Use this page only if you have others to be notified about your bankruptcy, for a debt that you already listed in Parts 1 or 2. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the original creditor in Parts 1 or 2, then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Parts 1 or 2, list the additional creditors here. If you do not have additional persons to be notified for any debts in Parts 1 or 2, do not fill out or submit this page.

Name and Address
**Georgetown University Hospital**
**c/o Financial Reporting**
**8020 Corporate Drive**
**Notingham, MD 21236**

On which entry in Part 1 or Part 2 did you list the original creditor?
Line **4.15** of *(Check one)*:
☐ Part 1: Creditors with Priority Unsecured Claims
■ Part 2: Creditors with Nonpriority Unsecured Claims

Last 4 digits of account number

Name and Address
**Patrick M. Regan, Esq.**
**Regan Zambri & Long, PLLC**
**1919 M Sreet, NW**
**Suite 350**
**Washington, DC 20036**

On which entry in Part 1 or Part 2 did you list the original creditor?
Line **4.5** of *(Check one)*:
☐ Part 1: Creditors with Priority Unsecured Claims
■ Part 2: Creditors with Nonpriority Unsecured Claims

Last 4 digits of account number

Name and Address
**Richard A. Bussey, Esq.**
**Stein Mitchell Cipollone Beato**
**1100 Connecticutt Ave., NW**
**Suite 1100**
**Washington, DC 20036**

On which entry in Part 1 or Part 2 did you list the original creditor?
Line **4.6** of *(Check one)*:
☐ Part 1: Creditors with Priority Unsecured Claims
■ Part 2: Creditors with Nonpriority Unsecured Claims

Last 4 digits of account number

---

**Part 4:    Add the Amounts for Each Type of Unsecured Claim**

6. **Total the amounts of certain types of unsecured claims. This information is for statistical reporting purposes only. 28 U.S.C. §159. Add the amounts for each type of unsecured claim.**

| | | | | Total Claim |
|---|---|---|---|---|
| **Total claims from Part 1** | 6a. | **Domestic support obligations** | 6a. | $ 0.00 |
| | 6b. | **Taxes and certain other debts you owe the government** | 6b. | $ 7,429.09 |
| | 6c. | **Claims for death or personal injury while you were intoxicated** | 6c. | $ 0.00 |
| | 6d. | **Other.** Add all other priority unsecured claims. Write that amount here. | 6d. | $ 0.00 |
| | 6e. | **Total Priority.** Add lines 6a through 6d. | 6e. | $ 7,429.09 |

Total Claim

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                                    Best Case Bankruptcy

573

Debtor 1    **Max E. Salas**

Case number (if know)    **18-00260**

| | | | | |
|---|---|---|---|---|
| **Total claims from Part 2** | 6f. | **Student loans** | 6f. | $ 0.00 |
| | 6g. | **Obligations arising out of a separation agreement or divorce that you did not report as priority claims** | 6g. | $ 0.00 |
| | 6h. | **Debts to pension or profit-sharing plans, and other similar debts** | 6h. | $ 0.00 |
| | 6i. | **Other.** Add all other nonpriority unsecured claims. Write that amount here. | 6i. | $ 15,667,684.30 |
| | 6j. | **Total Nonpriority.** Add lines 6f through 6i. | 6j. | $ 15,667,684.30 |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name                Middle Name                Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name                Middle Name                Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | **18-00260** |
| (if known) | |

☐ Check if this is an
amended filing

# Official Form 106G
# Schedule G: Executory Contracts and Unexpired Leases                    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the additional page, fill it out, number the entries, and attach it to this page. On the top of any additional pages, write your name and case number (if known).

1.   **Do you have any executory contracts or unexpired leases?**
     ☐ No. Check this box and file this form with the court with your other schedules.  You have nothing else to report on this form.
     ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B:Property* (Official Form 106 A/B).

2.   **List separately each person or company with whom you have the contract or lease. Then state what each contract or lease is for (for example, rent, vehicle lease, cell phone).** See the instructions for this form in the instruction booklet for more examples of executory contracts and unexpired leases.

| | Person or company with whom you have the contract or lease<br>Name, Number, Street, City, State and ZIP Code | State what the contract or lease is for |
|---|---|---|
| 2.1 | **Hybrid American Construction Company**<br>**1108 Exodus Drive**<br>**Gaithersburg, MD 20882** | **Contract for unstarted  roofing work for Property -**<br>**$4,200.00** |
| 2.2 | **Kia Motors Finance Company**<br>**10550 Talbert Ave.**<br>**Fountain Valley, CA 92708-6031** | **Auto lease** |
| 2.3 | **Washington Nationals**<br>**1500 South Capital Street, SE**<br>**Washington, DC 20003** | **Contract for purchase of Washington Nationals season**<br>**tickets** |
| 2.4 | **Washington Redskins**<br>**21300 Redskins Park Dr.**<br>**Ashburn, VA 20147** | **Contract for purchase of Washington Redskins NFL**<br>**season tickets** |
| 2.5 | **Wizards Monumental Sports**<br>**& Entertainment**<br>**601 F Street, NW**<br>**3rd Floor**<br>**Washington, DC 20004** | **Contract for purchase of Washington Wizards NBA**<br>**season tickets** |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name    Middle Name    Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | **18-00260** |
| (if known) | |

☐ Check if this is an
   amended filing

Official Form 106H
# Schedule H: Your Codebtors
12/15

Codebtors are people or entities who are also liable for any debts you may have. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, and number the entries in the boxes on the left. Attach the Additional Page to this page. On the top of any Additional Pages, write your name and case number (if known). Answer every question.

**1. Do you have any codebtors?** (If you are filing a joint case, do not list either spouse as a codebtor.)

☐ No
■ Yes

**2. Within the last 8 years, have you lived in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, and Wisconsin.)

■ No. Go to line 3.
☐ Yes. Did your spouse, former spouse, or legal equivalent live with you at the time?

**3. In Column 1, list all of your codebtors.** Do not include your spouse as a codebtor if your spouse is filing with you. List the person shown in line 2 again as a codebtor only if that person is a guarantor or cosigner. Make sure you have listed the creditor on Schedule D (Official Form 106D), Schedule E/F (Official Form 106E/F), or Schedule G (Official Form 106G). Use Schedule D, Schedule E/F, or Schedule G to fill out Column 2.

| Column 1: **Your codebtor**<br>Name, Number, Street, City, State and ZIP Code | Column 2: **The creditor to whom you owe the debt**<br>Check all schedules that apply: |
|---|---|
| 3.1  **Len Salas**<br>**1018 Vince Ct.**<br>**Mufreesboro, TN 37128** | ☐ Schedule D, line _____<br>■ Schedule E/F, line ____**4.5**____<br>☐ Schedule G _____<br>**Estate of Nina Brekelmans** |
| 3.2  **Len Salas**<br>**1018 Vince Ct.**<br>**Mufreesboro, TN 37128** | ☐ Schedule D, line _____<br>■ Schedule E/F, line ____**4.6**____<br>☐ Schedule G _____<br>**Estate of Patrick McLoughlin** |
| 3.3  **Len Salas**<br>**1018 Vince Court**<br>**Mufreesboro, TN 37128**<br>**Deed of Trust and Note held in name of Len Salas** | ■ Schedule D, line ____**2.2**____<br>☐ Schedule E/F, line _____<br>☐ Schedule G _____<br>**SunTrust Mortgage, Inc.** |

Fill in this information to identify your case:

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number (If known) | **18-00260** |

Check if this is:

☐ An amended filing
☐ A supplement showing postpetition chapter 13 income as of the following date:

_____
MM / DD/ YYYY

## Official Form 106I
## Schedule I: Your Income                                                12/15

Be as complete and accurate as possible. If two married people are filing together (Debtor 1 and Debtor 2), both are equally responsible for supplying correct information. If you are married and not filing jointly, and your spouse is living with you, include information about your spouse. If you are separated and your spouse is not filing with you, do not include information about your spouse. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:    Describe Employment

1. **Fill in your employment information.**

    If you have more than one job, attach a separate page with information about additional employers.

    Include part-time, seasonal, or self-employed work.

    Occupation may include student or homemaker, if it applies.

| | | Debtor 1 | Debtor 2 or non-filing spouse |
|---|---|---|---|
| Employment status | | ■ Employed<br>☐ Not employed | ☐ Employed<br>☐ Not employed |
| Occupation | | VP, Bus. Development - retired | |
| Employer's name | | Cornet Technology, Inc. | |
| Employer's address | | 6800 Versar Center, Suite 216<br>Springfield, VA 22151 | |
| How long employed there? | | | |

### Part 2:    Give Details About Monthly Income

**Estimate monthly income as of the date you file this form.** If you have nothing to report for any line, write $0 in the space. Include your non-filing spouse unless you are separated.

If you or your non-filing spouse have more than one employer, combine the information for all employers for that person on the lines below. If you need more space, attach a separate sheet to this form.

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 2. | **List monthly gross wages, salary, and commissions** (before all payroll deductions). If not paid monthly, calculate what the monthly wage would be. | 2. | $ 1,333.37 | $ N/A |
| 3. | **Estimate and list monthly overtime pay.** | 3. | +$ 0.00 | +$ N/A |
| 4. | **Calculate gross Income.** Add line 2 + line 3. | 4. | $ 1,333.37 | $ N/A |

Official Form 106I    Case 3:23-cv-00987    Document 7-2    Schedule I: Your Income    Filed 10/04/23    Page 94 of 532 PageID #: 682    page 1

577

Debtor 1   **Max E. Salas**                                                      Case number *(if known)*   **18-00260**

|  |  | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|

**Copy line 4 here** ................................................. 4. | $ **1,333.37** | $ **N/A**

5. **List all payroll deductions:**

| | | | | |
|---|---|---|---|---|
| 5a. | **Tax, Medicare, and Social Security deductions** | 5a. | $ **131.78** | $ **N/A** |
| 5b. | **Mandatory contributions for retirement plans** | 5b. | $ **133.34** | $ **N/A** |
| 5c. | **Voluntary contributions for retirement plans** | 5c. | $ **0.00** | $ **N/A** |
| 5d. | **Required repayments of retirement fund loans** | 5d. | $ **0.00** | $ **N/A** |
| 5e. | **Insurance** | 5e. | $ **187.27** | $ **N/A** |
| 5f. | **Domestic support obligations** | 5f. | $ **0.00** | $ **N/A** |
| 5g. | **Union dues** | 5g. | $ **0.00** | $ **N/A** |
| 5h. | **Other deductions.** Specify: _____ | 5h.+ | $ **0.00** | + $ **N/A** |

6. **Add the payroll deductions.** Add lines 5a+5b+5c+5d+5e+5f+5g+5h. | 6. | $ **452.39** | $ **N/A**

7. **Calculate total monthly take-home pay.** Subtract line 6 from line 4. | 7. | $ **880.98** | $ **N/A**

8. **List all other income regularly received:**

8a. **Net income from rental property and from operating a business, profession, or farm**
Attach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income. | 8a. | $ **0.00** | $ **N/A**

8b. **Interest and dividends** | 8b. | $ **0.00** | $ **N/A**

8c. **Family support payments that you, a non-filing spouse, or a dependent regularly receive**
Include alimony, spousal support, child support, maintenance, divorce settlement, and property settlement. | 8c. | $ **0.00** | $ **N/A**

8d. **Unemployment compensation** | 8d. | $ **0.00** | $ **N/A**

8e. **Social Security** | 8e. | $ **2,389.00** | $ **N/A**

8f. **Other government assistance that you regularly receive**
Include cash assistance and the value (if known) of any non-cash assistance that you receive, such as food stamps (benefits under the Supplemental Nutrition Assistance Program) or housing subsidies.
Specify: _____ | 8f. | $ **0.00** | $ **N/A**

8g. **Pension or retirement income** | 8g. | $ **0.00** | $ **N/A**

8h. **Other monthly income.** Specify: _____ | 8h.+ | $ **0.00** | + $ **N/A**

9. **Add all other income.** Add lines 8a+8b+8c+8d+8e+8f+8g+8h. | 9. | $ **2,389.00** | $ **N/A**

10. **Calculate monthly income.** Add line 7 + line 9. | 10. | $ **3,269.98** | + $ **N/A** | = | $ **3,269.98**
Add the entries in line 10 for Debtor 1 and Debtor 2 or non-filing spouse.

11. **State all other regular contributions to the expenses that you list in** *Schedule J.*
Include contributions from an unmarried partner, members of your household, your dependents, your roommates, and other friends or relatives.
Do not include any amounts already included in lines 2-10 or amounts that are not available to pay expenses listed in *Schedule J.*
Specify: _____ | 11. | +$ **0.00**

12. **Add the amount in the last column of line 10 to the amount in line 11.** The result is the combined monthly income. Write that amount on the *Summary of Schedules* and *Statistical Summary of Certain Liabilities* and Related *Data,* if it applies | 12. | $ **3,269.98**

**Combined monthly income**

13. **Do you expect an increase or decrease within the year after you file this form?**
☐ No.
☑ Yes. Explain: | **Payments from Cornet Technology, Inc. to cover insurance expenses and 401(k) loan repayment will cease following May 3, 2018.**

**Income may increase due to potential freelance consulting work.**

Fill in this information to identify your case:

Debtor 1    **Max E. Salas**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   DISTRICT OF DISTRICT OF COLUMBIA

Case number   **18-00260**
(If known)

Check if this is:

☐ An amended filing
☐ A supplement showing postpetition chapter 13 expenses as of the following date:

_____
MM / DD / YYYY

## Official Form 106J
# Schedule J: Your Expenses

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:   Describe Your Household

1. **Is this a joint case?**

   ■ No. Go to line 2.
   ☐ Yes. **Does Debtor 2 live in a separate household?**

       ☐ No
       ☐ Yes. Debtor 2 must file Official Form 106J-2, *Expenses for Separate Household* of Debtor 2.

2. **Do you have dependents?**   ■ No

   Do not list Debtor 1 and Debtor 2.    ☐ Yes. Fill out this information for each dependent..............

   Do not state the dependents names.

   | | Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
   |---|---|---|---|
   | | _____ | _____ | ☐ No ☐ Yes |
   | | _____ | _____ | ☐ No ☐ Yes |
   | | _____ | _____ | ☐ No ☐ Yes |
   | | _____ | _____ | ☐ No ☐ Yes |

3. **Do your expenses include expenses of people other than yourself and your dependents?**   ■ No   ☐ Yes

### Part 2:   Estimate Your Ongoing Monthly Expenses

Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental *Schedule J*, check the box at the top of the form and fill in the applicable date.

Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on *Schedule I: Your Income* (Official Form 106I.)

| | Your expenses |
|---|---|

4. **The rental or home ownership expenses for your residence.** Include first mortgage payments and any rent for the ground or lot.    4. $   6,800.00

   If not included in line 4:

   | | | |
   |---|---|---|
   | 4a. | Real estate taxes | 4a. $   0.00 |
   | 4b. | Property, homeowner's, or renter's insurance | 4b. $   725.00 |
   | 4c. | Home maintenance, repair, and upkeep expenses | 4c. $   2,000.00 |
   | 4d. | Homeowner's association or condominium dues | 4d. $   0.00 |

5. **Additional mortgage payments for your residence,** such as home equity loans    5. $   0.00

| Debtor 1 | **Max E. Salas** | Case number (if known) | **18-00260** |

| 6. | **Utilities:** | | | |
|---|---|---|---|---|
| | 6a. | Electricity, heat, natural gas | 6a. $ | **200.00** |
| | 6b. | Water, sewer, garbage collection | 6b. $ | **180.00** |
| | 6c. | Telephone, cell phone, Internet, satellite, and cable services | 6c. $ | **250.00** |
| | 6d. | Other. Specify: | 6d. $ | **0.00** |
| 7. | **Food and housekeeping supplies** | | 7. $ | **1,050.00** |
| 8. | **Childcare and children's education costs** | | 8. $ | **0.00** |
| 9. | **Clothing, laundry, and dry cleaning** | | 9. $ | **680.00** |
| 10. | **Personal care products and services** | | 10. $ | **300.00** |
| 11. | **Medical and dental expenses** | | 11. $ | **50.00** |
| 12. | **Transportation.** Include gas, maintenance, bus or train fare. | | | |
| | Do not include car payments. | | 12. $ | **290.00** |
| 13. | **Entertainment, clubs, recreation, newspapers, magazines, and books** | | 13. $ | **3,000.00** |
| 14. | **Charitable contributions and religious donations** | | 14. $ | **200.00** |
| 15. | **Insurance.** | | | |
| | Do not include insurance deducted from your pay or included in lines 4 or 20. | | | |
| | 15a. | Life insurance | 15a. $ | **0.00** |
| | 15b. | Health insurance | 15b. $ | **0.00** |
| | 15c. | Vehicle insurance | 15c. $ | **227.83** |
| | 15d. | Other insurance. Specify:  **Casualty** | 15d. $ | **346.47** |
| 16. | **Taxes.** Do not include taxes deducted from your pay or included in lines 4 or 20. | | | |
| | Specify: | | 16. $ | **0.00** |
| 17. | **Installment or lease payments:** | | | |
| | 17a. | Car payments for Vehicle 1 | 17a. $ | **552.46** |
| | 17b. | Car payments for Vehicle 2 | 17b. $ | **0.00** |
| | 17c. | Other. Specify: | 17c. $ | **0.00** |
| | 17d. | Other. Specify: | 17d. $ | **0.00** |
| 18. | **Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5, *Schedule I, Your Income* (Official Form 106I).** | | 18. $ | **0.00** |
| 19. | **Other payments you make to support others who do not live with you.** | | | |
| | Specify: | | 19. | |
| 20. | **Other real property expenses not included in lines 4 or 5 of this form or on *Schedule I: Your Income.*** | | | |
| | 20a. | Mortgages on other property | 20a. $ | **0.00** |
| | 20b. | Real estate taxes | 20b. $ | **0.00** |
| | 20c. | Property, homeowner's, or renter's insurance | 20c. $ | **0.00** |
| | 20d. | Maintenance, repair, and upkeep expenses | 20d. $ | **0.00** |
| | 20e. | Homeowner's association or condominium dues | 20e. $ | **0.00** |
| 21. | **Other:** Specify: | | 21. +$ | **0.00** |

| 22. | **Calculate your monthly expenses** | | | |
|---|---|---|---|---|
| | 22a. Add lines 4 through 21. | | $ | **16,851.76** |
| | 22b. Copy line 22 (monthly expenses for Debtor 2), if any, from Official Form 106J-2 | | $ | |
| | 22c. Add line 22a and 22b.  The result is your monthly expenses. | | $ | **16,851.76** |

| 23. | **Calculate your monthly net income.** | | | |
|---|---|---|---|---|
| | 23a. Copy line 12 *(your combined monthly income)* from Schedule I. | | 23a. $ | **3,269.98** |
| | 23b. Copy your monthly expenses from line 22c above. | | 23b. -$ | **16,851.76** |
| | 23c. Subtract your monthly expenses from your monthly income. The result is your *monthly net income.* | | 23c. $ | **-13,581.78** |

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**
For example, do you expect to finish paying for your car loan within the year or do you expect your mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

☐ No.

☒ Yes.    | Explain here: **Expected decreases to expenses due to budgeting efforts to be undertaken  by debtor.** |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number (if known) | **18-00260** |

☐ Check if this is an amended filing

Official Form 106Dec

# Declaration About an Individual Debtor's Schedules

12/15

If two married people are filing together, both are equally responsible for supplying correct information.

You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**Sign Below**

**Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?**

☑ No

☐ Yes. Name of person _____          Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119)

**Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.**

| X **/s/ Max E. Salas** | X _____ |
|---|---|
| **Max E. Salas** | Signature of Debtor 2 |
| Signature of Debtor 1 | |
| Date **May 2, 2018** | Date _____ |

Official Form 106Dec          Declaration About an Individual Debtor's Schedules

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                                   Case number (*if known*)    **18-00260**

7.  Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?
    *Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations
    of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for
    a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and
    alimony.

    ☐  No
    ■  Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|
| **Len Salas<br>1018 Vince Court<br>Mufreesboro, TN 37128** | **4/6/2017, 5/3/2017, 12/11/2017, 2/27/2018, 4/5/2018** | **$1,656.66** | **Unknown** | **Reimbursement of travel an other expenses associated with Superior Court trials.** |

8.  Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?
    Include payments on debts guaranteed or cosigned by an insider.

    ☐  No
    ■  Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment<br>Include creditor's name |
|---|---|---|---|---|
| **Len Salas<br>1018 Vince Court<br>Mufreesboro, TN 37128** | **3/26/2018** | **$2,000.00** | **Unknown** | **Payment of attorney fees associated with DC Superior Court Cases<br>Paid to:<br>Michael C. Forster, Esq.<br>Forster Law Firm<br>2007 Vermont Ave., NW<br>Washington, DC 20001** |

**Part 4:**    Identify Legal Actions, Repossessions, and Foreclosures

9.  Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?
    List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody
    modifications, and contract disputes.

    ☐  No
    ■  Yes. Fill in the details.

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Michael McLoughlin, Jr. et al. v. Len Salas, et al.<br>2015 CA 0008054 B** | **wrongful death and survival actions** | **DC Superior Court<br>500 Indiana Ave., NW<br>Washington, DC 20001** | ☐ Pending<br>■ On appeal<br>☐ Concluded |
| **Nina Brekelmans, et al. v. Len Salas, et al.<br>2015 CA 0008061 B** | **wrongful death and survival actions** | **DC Superior Court<br>500 Indiana Ave., NW<br>Washington, DC 20001** | ☐ Pending<br>■ On appeal<br>☐ Concluded |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                          Best Case Bankruptcy

Debtor 1    **Max E. Salas**    Case number (*if known*)    **18-00260**

---

**24. Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|
| | | | |

**25. Have you notified any governmental unit of any release of hazardous material?**

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|
| | | | |

**26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

■ No
☐ Yes. Fill in the details.

| Case Title<br>Case Number | Court or agency<br>Name<br>**Address** (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|
| | | | |

**Part 11:**  Give Details About Your Business or Connections to Any Business

**27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**

■ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

☐ A partner in a partnership

☐ An officer, director, or managing executive of a corporation

☐ An owner of at least 5% of the voting or equity securities of a corporation

☐ No. None of the above applies.  Go to Part 12.

■ Yes. Check all that apply above and fill in the details below for each business.

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br><br>Name of accountant or bookkeeper | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| **CLR Inc.**<br>**1610 Riggs Place, NW**<br>**Washington, DC 20009** | **Revoked DC Corporatin with interests reverting to Debtor.**<br>**Name of business used by debtor following revocation.** | **EIN:**    **52-2080620**<br><br>**From-To**   **1995 - 2009** |

**28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.**

■ No
☐ Yes. Fill in the details below.

| Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|
| | |

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### Nashville, Tennessee

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor-in-possession | : | |

---

| | |
|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS, et al | : |
| | : |
| In their capacity as authorized representatives of the Estate of Len Salas | : |
| | : |
| Plaintiffs | |
| | |
| v. | : Adversary Proceeding No. 3:20-ap-90027 |
| | |
| MAX SALAS | : |
| | |
| Defendant | : |

---

## AMENDED RESPONSES TO REQUESTS
## FOR ADMISSIONS TO THE DEFENDANT

Comes Now, Defendant, Max Salas ("Defendant"), and for his Amended Responses to Requests for Admissions to the Defendant (the "Discovery")[1], states as follows:

### GENERAL OBJECTIONS

1.      Defendant's Responses to the Discovery shall not constitute a waiver of his objections as to admissibility.

2.      Defendant objects to the Discovery to the extent it exceeds the scope of permissible discovery.

---

[1] . . . . . produced pursuant to the Court's Order granting in part and denying in part Plaintiffs' Motion to Compel Written Answers to Discovery and Production of Documents (Doc. 67) (the "Discovery Order").

584

3. Defendant objects to the Discovery to the extent that the information sought is protected from discovery by the attorney-client privilege or the attorney work-product doctrine.

4. Defendant objects to the Discovery to the extent that the information and documents sought are not in his possession, custody or control.

5. Defendant objects to the Discovery to the extent that the information sought is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6. Defendant objects to the Discovery to the extent that the information sought is equally available to Plaintiff as to Defendant.

7. Defendant objects to the definitions and instructions to the extent Plaintiff seeks to impose any requirement in excess of those imposed by the Federal Rules of Civil Procedure. Additionally, Defendant is not required by the Federal Rules of Civil Procedure to adopt, follow or utilize Plaintiff's definitions and instructions, and Defendant's Responses are based upon the governing provisions of the applicable Rules, laws and the ordinary and usual meaning of the words used, except as otherwise noted in the Responses.

8. Defendant reserves the right to supplement his Responses to the Discovery based upon subsequently acquired information as permitted by the Federal Rules of Civil Procedure.

## REQUESTS FOR ADMISSION

1. That the Defendant does not have the original Quitclaim Deed allegedly created in July, 2010.
   **Response:** Admitted.

2. That the Defendant is unaware of the location of the original Quitclaim Deed.
   **Response:** Denied. Ron Salas has an original copy.

3. That the Defendant did not attempt to record the Quitclaim Deed after 2010.
   **Response:** Admitted.

4. That the Defendant is unaware that the original Quitclaim Deed exists.
   **Response:** Denied. Ron Salas has an original copy.

Defendant to refinance the D.C. Property.
>      **Response:** Admitted.

6.  That the Defendant tried to obtain refinancing after July, 2010 but was unsuccessful in doing so.
>      **Response:** Admitted.

7.  That the Defendant made no attempts to refinance the D.C. Property after 2012.
>      **Response:** Denied.

8.  That all D.C. notices regarding the Property, after 2007, were addressed to Len Salas as owner of the Property.
>      **Response:** Admitted.

9.  That the Defendant did not want the Property in his name after 2010 so that he could avoid any tax or other obligations in his name.
>      **Response:** Denied.  Titling the Property in Len Salas' name had nothing to do with tax obligations or any other obligations.

10.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
>      **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

11.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid D.C. property taxes owed against the Property.
>      **Response:** Denied.  Property taxes were paid from 2008 – 2018.

12.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid local utilities' obligations owed against the Property.
>      **Response:** Denied.  Utilities were paid from 2008-2018.

13.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid fines for violations of D.C. ordinances against the Property.
>      **Response:** Denied.  Defendant is aware of no unpaid fines from 2008-2018.

14.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
>      **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

15,  That the Defendant was aware, in 2016 that his son Ron Salas and his son Len Salas, both had, or should have had, copies of the 2010 Quitclaim Deed.
>      **Response:** Denied.  Defendant was unaware in 2016 that Ron Salas or Len Salas

16. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.
   **Response:** Admitted.

17. That Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation.
   **Response:** Admitted.

18. That Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note.
   **Response:** Admitted.

19. That Max Salas did not notify Sun Trust or the D.C. government that he was an obligor under the Sun Trust Deed of Trust.
   **Response:** Denied. Max Salas notified SunTrust that he was obligated under the Deed of Trust.

20. That Max Salas did not notify D.C. or any taxing authority that he was the owner of the DC Property.
   **Response:** Denied. Max Salas has recorded the DC Bankruptcy Court order which declares him the owner. Max Salas also filed a homestead exemption with the Register of Deeds in 2012.

21. That the document attached as Exhibit B to the Amended Complaint filed herein is a true and correct copy of the Order Confirming Debtor's Third Amended Plan of Reorganization and The Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020.
   **Response:** Admitted.

22. That the transcript of your testimony in the bankruptcy case of Len Salas, Case No. 3:18-bk-02662 "the Len Salas Case"), dated December 12, 2018 is a true and correct copy of your testimony on December 12, 2018 in Nashville, Tennessee.
   **Response:** Admitted.

23. That you were present at all times, during the hearing on the attempted confirmation of the Debtor's proposed Chapter 11 Plan, the Len Salas Case, on December 12 and 13, 2018.
   **Response:** Admitted.

24. That you were represented by counsel at that hearing, including Mr. Cox, Mr. Albert and Mr. Young.
   **Response:** Admitted.

25. That on or about July 6, 2010 you visited your son, Ron, at his residence in Colorado along with your son, Len, and his wife.
   **Response:** Admitted.

26. That all lease payments for rental income from the rental of all or part of the DC Property from the period May, 2007 through April, 2018 were deposited into an account in the

**Response:** Denied as stated. Some, but not all, lease payments for rental income from the DC Property from May 2007 through Aprils 2018 were deposited into a CLR Trust bank account.

27. That there was no active bank account in the name of "CLR" other than the CLR Trust during the period between July, 2010 and April, 2018.
**Response:** Defendant can neither admit nor deny this Request as he does not understand the question as stated.

28. That you did not provide copies of bank statements, canceled checks, or other bank records related to any bank account on which you were a signatory, or in which you deposited funds as part of your document production to the Plaintiffs in the matter of their objection to your claim of exemption in the Salas Bankruptcy.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

29. That as of June 1, 2015 you had a copy of the signed Quitclaim Deed in your possession.
**Response:** Admitted.

30. That on and after July 6, 2010 you were aware that you had received the only signed, original Quitclaim Deed.
**Response:** Denied. Defendant later became aware that other signed, original copies of the Quitclaim Deed existed.

31. That the sole purpose of the Quitclaim Deed was to allow you the opportunity to refinance the Property so that your son would no longer have Deed of Trust obligation to Sun Trust Bank, or any other lender associated with the Property.
**Response:** Denied. Another purpose of the Quitclaim Deed was to secure a mortgage with a lower interest rate than the SunTrust Deed of Trust carried.

32. That the source of the funds to be used by your son, Ron, to purchase the Trustee's Avoiding and Recovery Powers from Mr. Gigandet in the L Salas Bankruptcy was funds owned and controlled by you.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

33. That all at times after commencement of the Superior Court Litigation you were aware of the existence of the Quitclaim Deed and the Riggs Property Trust.
**Response:** Denied.

34. That, at all times after commencement of the Superior Court Litigation you were aware that your sons, Ron and Len, had copies of the Quitclaim Deed.
**Response:** Denied.

35. That your son, Ron Salas, a Colorado lawyer was aware of the pendency of the Superior Court Litigation almost immediately after its commencement in 2015.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

36.  That your son, Ron, was aware that the only reason your other son, Len, was a defendant in the Superior Court Litigation is because he was the titled owner of the Property.

**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Defendant further objects on the grounds that the Request seeks information from Defendant regarding the mental impressions of a third party.

37.   You were aware, prior to 2016, that the only reason your son, Len, was a Defendant in the Superior Court Litigation was because he was the titled owner of the Property.

**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

38.  That your son, Len, was physically present at your deposition in the Superior Court Litigation held on February 24, 2016.

**Response:**  Admitted.

39.  That you were physically present at Len's deposition in the Superior Court Litigation held on March 9, 2016.

**Response:**  Admitted.

40. That you were unaware of the possibility that the Property could be exempted in a bankruptcy proceeding by you until after you spoke to Mr. Marc Albert in early 2018.

**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Defendant further objects on the grounds that the Request seeks information that is protected by the attorney-client privilege.

41.  That you have not contacted Ms. Sylvia Jones regarding the location or existence of the original Quitclaim Deed since June, 2015.

**Response:**  Admitted.

42.  That you have not contacted Stan Goldstein or Capitol Title regarding the location or existence of the original Quitclaim Deed since June, 2015.

**Response:**  Denied.

43.  That you made no payments against the Sun Trust Deed of Trust Note during the period June 1, 2015 through October, 2019.

**Response:**  Denied.

44.  That the Note balance as of April, 2007 totaled approximately $870,000.

**Response:**  Admitted.

45.  That the Note balance as of June, 2010 totaled more than $870,000.

**Response:**  Defendant is without sufficient knowledge to admit or deny this Request.

46.  That the Note balance as of July, 2010 totaled more than $870,000.

**Response:**  Defendant is without sufficient knowledge to admit or deny this Request.

than $1,030,825.86.

      **Response:** Admitted.

    48, That the Note balance as of October 23, 2019 was $1,208,720.40.

      **Response:** Admitted.

    49. That the Proof of Claim filed by the Internal Revenue Service ("the IRS Claim") in your bankruptcy case on December 16, 2018 (C-2-1) is a true and correct copy of the IRS claim which was allowed under your Confirmed Plan.

      **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

    50. That you did not object to the IRS Claim and it remains an allowed secured and priority claim allowed in the Salas Bankruptcy.

      **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

    51. That from the period 2008 through May, 2015 you rented multiple rooms at the Property, from time to time.

      **Response:** Admitted.

    52. That from the period 2008 through 2018 you did not declare the income from the rentals of rooms at the Property as income on your Federal or D.C. Income Tax Returns.

      **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

    53. That from 2008 through the present, all notices from the District of Columbia and all tax forms related to the Property were addressed to Len Salas.

      **Response:** Defendant objects to this Request on the grounds that it is duplicative.

    54. That the Complaint is made by the Plaintiffs on behalf of the bankruptcy estate of Len Salas.

      **Response:** Admitted.

    55. That Salas had no communications with the Trustee concerning the Quitclaim Deed or the Riggs Property Trust until sometime after March, 2019.

      **Response:** Denied. Defendant's first communications with the Trustee concerning the Quitclaim Deed and the Riggs Property Trust occurred in December 2018.

    56. That neither Salas nor Len produced a copy of the Quitclaim Deed or the Riggs Property Trust in their document production as part of the Superior Court Litigation.

      **Response:** Admitted.

    57. That neither Salas nor Len provided the original or a copy of the Quitclaim Deed or Riggs Property Trust to Plaintiffs or their counsel (in the Superior Court Litigation) until after February 15, 2018.

      **Response:** While Defendant cannot admit to an exact date, Defendant admits that it was sometime after this general timeframe.

58. That the intent of the attempted Quitclaim Deed in July, 2010 was to remove Len Salas from any liability related to the DC Property.
**Response:** Defendant denies that this was the only reason for the Quitclaim Deed, as explained in other responses herein.

59. That the intent of the Riggs Property Trust was to avoid having the property in the name of Max Salas.
**Response:** Admitted, but the transfer to the trust was only done to aid in refinancing the note.

60. That the intent of the Riggs Property Trust was to avoid income tax liability of, or by, Max Salas.
**Response:** Denied.

61. That Salas was unaware he could exempt his alleged interest in the DC Property until after 2017.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

62. That Salas did not attempt to locate a copy of the Quitclaim Deed or Riggs Property Trust until 2018.
**Response:** Admitted.

63. That Salas was unaware of any assets owned or controlled by Len over the value of $25,000 in July, 2010.
**Response:** Admitted, because Defendant had little knowledge of Len Salas' assets in July 2010.

64. That Salas had more than one conversation with Len after 2010 about removing Len from the title to the DC Property.
**Response:** Admitted.

65. That Salas had more than one conversation with Len after 2010 about eliminating Len as an obligor on obligation(s) secured by the DC Property.
**Response:** Admitted.

Respectfully submitted,

/s/ Phillip G. Young
Phillip G. Young (TN 021087)
THOMPSON BURTON, PLLC
6100 TOWER CIRCLE, SUITE 200
FRANKLIN, TENNESSEE 37067
(615)-465-6008
phillip@thompsonburton.com

*Attorneys for Defendant*

**Cox, Joshua W.**

| | |
|---|---|
| **From:** | Ron Salas <ronsalas@salaslegal.com> |
| **Sent:** | Wednesday, February 14, 2018 3:48 PM |
| **To:** | Albert, Marc |
| **Cc:** | maxsalas@aol.com; m.salas1953@gmail.com |
| **Subject:** | Signed Trust |
| **Attachments:** | Trust Doc.pdf |

My apologies for the delay. I have the originals.

Regards,
Ron

Ron Salas, Esq.

ronsalas@salaslegal.com
Office (970) 232.3330
Fax (877) 667-2860

**Fort Collins**
323 W Drake Road, Suite 116
Fort Collins, CO 80526

**Greeley**
4290 West 10th Street, Suite 110
Greeley, CO 80634

www.thesalaslawfirm.com

**CONFIDENTIALITY NOTICE:** This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

 Virus-free. www.avg.com

**Cox, Joshua W.**

| | |
|---|---|
| **From:** | Albert, Marc |
| **Sent:** | Wednesday, March 07, 2018 11:11 AM |
| **To:** | 'Rod R. Barnes' |
| **Cc:** | 'Max Salas' |
| **Subject:** | RE: Signed Trust |

Sorry I meant Ron Salas.

**From:** Cox, Joshua W.
**Sent:** Wednesday, March 07, 2018 11:04 AM
**To:** Albert, Marc
**Subject:** RE: Signed Trust

I think you meant Ron Salas.

Joshua W. Cox
Attorney
Washington
202.728.3023
x63023

**From:** Albert, Marc
**Sent:** Wednesday, March 07, 2018 11:03 AM
**To:** Rod R. Barnes; Max Salas
**Cc:** Cox, Joshua W.
**Subject:** FW: Signed Trust

Clarification. I spoke to Ron Barnes this morning. He indicated he misspoke in his email. He gave the originals to his father so they could be recorded in DC. He only retained a copy of the signed documents.

Marc E. Albert
Partner
Washington
202.728.3020
x63020

**From:** Ron Salas [mailto:ronsalas@salaslegal.com]
**Sent:** Wednesday, February 14, 2018 3:48 PM
**To:** Albert, Marc
**Cc:** maxsalas@aol.com; m.salas1953@gmail.com
**Subject:** Signed Trust

My apologies for the delay. I have the originals.

Regards,
Ron

Ron Salas, Esq.

ronsalas@salaslegal.com
Office (970) 232.3330
Fax (877) 667-2860

**Fort Collins**
323 W Drake Road, Suite 116
Fort Collins, CO 80526

**Greeley**
4290 West 10th Street, Suite 110
Greeley, CO 80634

www.thesalaslawfirm.com

**CONFIDENTIALITY NOTICE**: This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

 Virus-free. www.avg.com

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

```
IN RE:                     .     Case No. 18-00260-smt
                           .
MAX E. SALAS,              .
                           .     Washington, D.C.
              Debtor.      .     August 22, 2018
                           .
. . . . . . . . . . . . . . .
```

TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 1 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT

APPEARANCES:

For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020

For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380

Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

---

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

00x 000060
595

TABLE OF CONTENTS

OPENING STATEMENTS:                                    PAGE:
By Mr. McNutt                                          10
By Mr. Albert                                          27


WITNESSES:                                             PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt                       37

LEN SALAS
Direct examination by Mr. Albert                       98
Cross-examination by Mr. McNutt                        116
Redirect examination by Mr. Albert                     187
Recross-examination by Mr. McNutt                      199

RON SALAS
Direct examination by Mr. Albert                       206
Cross-examination by Mr. McNutt                        219
Redirect examination by Mr. Albert                     245

EXHIBITS:                                     MARKED: RECEIVED:

DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)               *        9
B.  4/16/07 deed of trust                        *        9
    (L.Salas/SunTrust) with 7/8/15
    Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement           *        9
D.  7/6/10 L.King journal entries                *        9
E.  Encomass insurance policy                    *        9
F.  1610 lease documents                         *        9
G   Email chain beginning 2/14/18                *        --
    R.Salas to insurance counsel
H.  3/19/18 emergency motion for                 *        9
    summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules *             9
J.  M.Salas Answer to Interrogatories            *        9
    (Brekelmans case)
K.  M.Salas Answer to Interrogatories            *        9
    (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|

CREDITOR'S
1.  Trial Transcript, 3/26/18, pp.1-19  *  8
2.  Joint pretrial statement, 7/18/17  *  8
3.  Pretrial order, 12/29/17  *  8
4.  Amended joint pretrial statement,  *  8
    2/15/18
5.  McLoughlin Complaint, 10/20/15  *  8
6.  Brekelmans Complaint, 10/20/15  *  8
7.  L. Salas Answer (Brekelmans Complaint) *  8
    11/13/15
8.  L. Salas Answer (McLoughlin Complaint) *  8
    11/13/15
9.  M.Salas Answer (McLoughlin Complaint)  *  8
10. M.Salas Answer (Brekelmans Complaint)  *  8
11. Memorandum in support of L.Salas  *  8
    motion to dismiss
12. M.Salas Answer to Interrogatories  *  8
    Case 15-CA-8061 B
13. L.Salas Answer to Interrogatories  *  8
    Case 15-CA-8061 B
14. M.Salas Deposition Transcript  *  --
    dated 2/14/16
15. L.Salas Deposition, 3/9/16  *  54
    pages 117-120
16. 4/27/95 deed (Wilhelm/Bruff)  *  8
17. 4/16/07 deed (Bruff/M.Salas)  *  8
18. 4/16/07 deed (M.Salas/L.Salas)  *  8
19. Deed of trust (L.Salas/Sun Mortgage)  *  8
20. Property request report for  *  8
    1610 Riggs Place Northwest
21. D.C. notice of infraction  *  8
22. DCRA notice of immediate abatement  *  8
23. Memorandum in Support of L. Salas'  *  8
    Emergency Motion for Summary Judgment
24  8/10/18 R.Salas deposition excerpts  *  --
25. Lease, 10/1/14 - Tamasco  *  8
26. Lease, 6/2/14 (first page)  *  8
27. Lease, 17th of 2014 to Brekelmans  *  8
28. Lease, 8/17/14 to Brekelmans  *  8
29. Lease, 11/1/14 to Mecham  *  8

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S (continued) | | |
| 30. Irrevocable Trust, 7/6/10 | * | 8 |
| 31. Cornet letter, 5/19/17 | * | 8 |
| 32. Debtor's report, excerpts, 4/5/18 | * | 8 |
| 33. Debtor's report, excerpts, 6/8 | * | 8 |
| 34. Excerpts, L.Salas, first Meeting of creditors, 5/24/18 | * | -- |
| 35. M.Salas Answers to Interrogatories, 8/6/18 | * | 8 |
| 36. Debtor's schedules A/B, C-J, 5/2/18 | * | 8 |
| 37. Debtor's responses, 8/6/18 | * | 8 |
| 38. Debtor's statement of financial affairs(D-13), 5/2/18 | * | 8 |
| 39. Debtor's amended statement of financial affairs(D-50), 6/27/18 | * | 8 |
| 40. Debtor's amended petition | * | 8 |
| 41. R.Salas email (trust documents) | 231 | -- |

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of "(unintelligible)" in this transcript are due to the audio recording levels being turned up too high, or individuals speaking outside of the vocal capture range of the microphone.

QBx 000063

1  she signed it back over to me, right?

2       Q.   I'm sorry?

3       A.   She -- what do you mean?  Can you ask the question

4  -- what does convey mean for sure?

5            I'm -- she signed it back over to me?

6       Q.   Did you understand that she signed the property

7  back over to you, in your words, in April of 2007?

8       A.   Yes.

9       Q.   All right.

10           And the purpose of that was to allow you to live

11  in the property and to also obtain funds to pay her as part

12  of the divorce settlement, correct?

13      A.   Well, I lived in the property since 1995 when we

14  bought the property together.

15      Q.   I understand that, but what was the purpose -- let

16  me try it this way.

17           In April 2007 you conveyed the property to your

18  son, correct?

19      A.   What do you mean by convey?  Can you tell me that?

20      Q.   Did you sign a deed --

21      A.   Yes.

22      Q.   -- of the property to your son Len?

23      A.   Yes.

24      Q.   Okay.

25           And the purpose of that was so that he could

1   obtain a deed of trust on the property to pay your ex-wife,

2   correct?

3       A.  Well, I signed it over to him so we could get a

4   loan to pay my ex-wife for her half of the settlement in

5   the divorce.

6       Q.  Okay.

7       And you son agreed to do that, correct?

8       A.  Yes.

9       Q.  All right.

10       And when you say "we obtained a loan," were you on

11  the loan?

12       A.  I promised my son that I would pay for the loan,

13  yes.

14       Q.  Is that in writing?

15       A.  I promised my -- I know it was my word to my son.

16       Q.  What was that -- that wasn't my question.  My

17  question is was that promise in writing?

18       A.  No.

19       Q.  Okay.

20       Now, at the time in 2007 there was a deed of trust

21  taken out on the property through SunTrust Mortgage,

22  correct?

23       A.  Yes, sir.

24       Q.  And that deed of trust and the loan was taken out

25  by your son Len Salas, correct?

1      A.   Yes, sir.

2      Q.   And he was the only person obligated on that loan,

3 correct?

4      A.   Technically, yes.  Yes, sir.

5      Q.   Technically, legally on paper, all of that,

6 correct?

7      A.   Well, I promised him that he wouldn't have to pay

8 for the loan, that I would pay for the loan.

9      Q.   I understand, but who was responsible for paying

10 the loan according to the loan documents as you understood

11 them?

12      A.   I was responsible for paying the loan.

13      Q.   Under the loan documents as you understood them

14 you were responsible to make the payments on the loan?

15      A.   Yes.  I've made every payment on every -- on that

16 loan since 1995 to today.

17      Q.   Did you sign the promissory note to SunTrust?

18      A.   I didn't sign a promissory note to SunTrust.

19      Q.   Okay.

20           Now, during the course of -- let's go back to the

21 period subsequent to 2007 when these deeds transferring the

22 property from Ms. Bruff to you, and from you to your son,

23 were created.  Do you remember that timeframe?

24      A.   Yes, sir.

25      Q.   All right.

1         And it's true that shortly after that timeframe

2    your son started asking you to undertake to get him off of

3    the deed to the property, is that correct?

4         A.   Yes.

5         Q.   And that was something that he was consistently

6    asking you to do even through 2018, correct?

7         A.   Yes, every opportunity he could every -- yes.  He

8    wanted off the loan.

9         Q.   Okay.

10        And what efforts did you undertake to get him off

11   the loan between, well, let's start with the period between

12   2007 and July of 2010?

13        And the reason I'm using July of 2010 is because

14   that was the month in which the alleged trust -- and I'm

15   saying alleged trust, you might believe it's a trust I

16   understand, was created in Colorado -- during that period

17   of time, how many times would you say your son contacted

18   you with respect to getting his name off the property, the

19   Riggs Place Property?

20        A.   So let me make sure I understand your question.

21   From 2010 to 2007 -- from 2007 to 2010, three years?

22        Q.   Yes, sir.

23        A.   I would say at least three times or four times a

24   year, so that would be twelve times.

25        Q.   Okay.

1          Now, did your son talk to you about taking his

2    name off the deed after July of 2010?

3         A.   Yes.  Well -- yes.  No, he -- he talked to me

4    about taking his name off the loan.

5         Q.   Did he talk to you about taking his name off the

6    property?

7         A.   No, he'd already taken his name off the property.

8         Q.   When did he do that?

9         A.   He signed it over to me, he signed it over to my

10   trust on 2010, July 6th of 2010.

11        Q.   So after July of 2010 it's your position that your

12   son was no longer on the property, no longer an owner of

13   the property, is that correct?

14        A.   That's correct, sir.

15        Q.   Okay.

16             Now, during the course of the Superior Court

17   litigation in the District of Columbia, there were

18   depositions taken of you and your son in 2016.  Do you

19   remember that?

20        A.   Repeat the question, please.

21        Q.   Yes.

22             Do you remember the depositions that were taken of

23   you and your son in the Superior Court case, and when I say

24   Superior Court case I'm talking about the personal injury

25   and wrongful death litigation --

```
1            THE COURT:

2            BY MR. McNUTT:

3       Q.   Let me refer you to page 113 of the same

4   deposition, Mr. Salas.

5            MR. ALBERT:  Judge, did he -- you took the whole

6   transcript into evidence, right?

7            THE COURT:  I took pages 117 through 120.

8            MR. ALBERT:  Not the whole thing.  Okay.

9            THE COURT:  Into evidence.

10           BY MR. McNUTT:

11      Q.   Are you with me, Mr. Salas?  Page 113?

12      A.   Yes, sir.

13      Q.   All right.

14           Starting on line 7 of page 113, the question,

15   again I believe this is Mr. Curnonni?

16      A.   Yes, sir.

17      Q.        "Did you, after you got the mortgage

18           in the years prior to the fire, did you

19           ever have a discussion with your father

20           with regards to transferring ownership of

21           the property to him?"

22           Did I read that correctly?

23      A.   Yes, sir.

24      Q.   And his answer is, "Yes," on line 11, correct?

25      A.   Yes, sir.
```

1  think it's supposed to mean:

2          "Why did your wife want to transfer

3     ownership?

4          Answer:  Because she didn't want that

5     in my name.  Same thing for the reason I

6     guess."

7     That was your answer, correct?

8  A.  Uh-huh.  For the --

9  Q.  All right.

10     Would you turn then to page 116?  That's

11  on the same typed page, but transcript page 116.

12  A.  Yes, I have it.

13  Q.  All right.

14     Starting on line 13, the question is:

15          "How many conversations did you have

16     with your father about potentially

17     transferring ownership of the building to

18     him?

19          Answer:  Multiple.

20          Question:  When was the last time you

21     had such a conversation prior to the fire?

22          Answer:  That spring since we were in

23     that summer."

24     Did I read that correctly?

25  A.  You read it correctly, yes.

1      Q.   All right.

2           So in 2015, five years after you executed the

3  trust documents and five years after you believe that you

4  deeded the property to your father, you're still asking the

5  father to transfer ownership of the property to him?

6      A.   The mortgage is what I was talking about.

7      Q.   It doesn't say mortgage here, does it?

8      A.   Yeah, but that's what I was referring to.

9      Q.   Well, you were referring to ownership in the

10 property, weren't you?

11     A.   No, because it said the mortgage because I said I

12 want to buy my house.  The reason I couldn't buy my, well,

13 the house that I live in that was currently my wife's, is

14 because I couldn't because of my credit that was on the

15 1610 Riggs Place.  So I couldn't buy, I quote/unquote

16 "couldn't buy" my house or have my house, my name on my

17 house because my credit wasn't good enough to get, to have

18 two houses.

19     Q.   Okay, let's try this again.

20          If you look on page 113, please?

21     A.   Uh-huh.

22     Q.   The question is, starting in line 8:

23              "Did you ever have a discussion with

24              your father with regards to transferring

25              ownership of the property to him?"

1          And your answer was:

2               "Yes."

3     A.    Where does --

4     Q.    It doesn't ask you --

5     A.    -- it say that?

6     Q.    -- about a mortgage.  It asks about transferring

7 ownership of the property, right?

8     A.    Line 7, "Do you...did you do...you got the

9 mortgage in the years..."  So I thought when he said

10 mortgage, I assumed he was talking about the mortgage.

11 Line 7 on page 13.

12    Q.    So you read the:

13              "Did you, after you got the mortgage

14              in the years prior to the fire, did you

15              ever have a discussion with your father

16              with regards to transferring ownership of

17              the property to him?"

18              You read that to mean transferring the mortgage to

19 him?

20    A.    Yes.

21    Q.    Okay.

22              And page 116, paragraph, starting on line 13 it

23 says:

24              "How many conversations did you have

25              with your father about potentially

```
1            transferring ownership of the building to
2            him?"
3       Doesn't say anything about a mortgage, does it?
4       A.   Well, I guess I misunderstood the question because
5  I mean, I thought he was speaking of mortgage, and I said
6  multiple times.  I said multiple.
7       Q.   Does it say mortgage there or note?
8       A.   I thought he was referring to mortgage.
9       Q.   All right.
10          Let's go to page 117 then.  I think we have to
11  start at the last page, 116 on line 22.  Do you see page
12  116 at the very end of the, Mr. Salas?
13      A.   Uh-huh.
14      Q.   All right.
15          It ways:
16              "What was the catalyst..."
17          And this is referring to the conversation that you
18  had in the spring or summer of 2015, okay?
19      A.   Uh-huh.
20      Q.      "What was the catalyst for that specific
21          conversation?
22              Answer:  I don't know.  It was always
23          in my mind to get it off of my name.
24              Question:  Do you remember why it
25          occurred that spring before the fire?  Was
```

1          there anything going on in your life or

2          your father's life which was the catalyst

3          for that conversation?

4              Answer:  No, I don't think so.  Maybe

5          I knew that I was going to be a father

6          again and that prompted me.  I don't know."

7          Correct?

8     A.   Correct.

9     Q.   All right.

10             "Okay.  What did your father say

11         during that conversation?

12             Answer:  'I'm trying.'"

13         I read that correctly, didn't I?

14    A.   Correct.

15    Q.   All right.

16         And then the next question is:

17             "And what did you understand that to

18         mean?

19             Answer:  That he was looking to get

20         it repackaged or remortgaged or

21         something."

22    A.   Uh-huh.

23    Q.   I read that correctly, didn't I?

24    A.   Right.

25    Q.   So you were hoping that your father was trying to

1   get the home refinanced so you could be taken off the
2   mortgage?
3       A.   Correct.
4       Q.   Okay.
5            And the question is:
6                "Who was he trying to get the house
7            re-mortgaged with?
8                Answer:  SunTrust."
9            Right?
10      A.   Correct.
11      Q.   Line 20?
12      A.   Yes.
13      Q.   All right.
14           And then I believe this is, I'm not sure who was
15  asking the questions here, but counsel for one of the
16  estates is asking you about whether you saw any documents
17  related to the refinancing that you were talking about.
18      A.   Uh-huh.
19      Q.   And on page 118 starting at line 20, the question
20  is:
21               "What documents did you see that led
22           you to believe that that process had
23           started?
24               Answer:  Refinancing documents."
25           Right?

1      A.    When, at -- when I'm asking him to get --

2      Q.    In 2015.

3      A.    For, in 2007 in the original or?  Or in the --

4      Q.    In the context of your answers here, which I

5 believe are in the spring or summer of 2015.

6      A.    So what was the question again then?

7      Q.    The question is why are you filling out

8 applications with your income and credit information if

9 your father is trying to refinance the property and get you

10 off the mortgage?

11     A.    I -- I don't know.

12     Q.    Are you aware of any refinancing that your father

13 requested that did not have your financial information and

14 credit information attached to it at any time?

15     A.    Excuse me?

16     Q.    At any time after 2007 are you aware of any

17 refinancing sought by your father in which your credit

18 information and income were not a part of the application?

19     A.    I don't know.  I don't.

20     Q.    So as we sit here today, your father has not been

21 able to refinance the property or take your name off the

22 property since 2007?  That's accurate, isn't it?

23     A.    I don't know.

24     Q.    Okay.

25           Are you aware of whether your father up until the

Ex 000224
611

1    Q.   Who prepared these documents?

2    A.   I prepared them.

3    Q.   All right.

4    And did you have your brother and your father in

5 your office with respect to these documents?

6    A.   I did.

7    Q.   And what happened at that time?

8    A.   At that time myself, my father, my brother, and

9 his wife were present.  We signed the trust documents.  I

10 as a witness, my sister-in-law as a witness.  It was a

11 notary present.  We signed the trust agreement.  We signed

12 the quit-claim -- well, I did not sign the quit-claim.  The

13 quit-claim deed was signed by my brother Len and Max, and

14 the deed was given to, from Len to Max, the original to be

15 filed.  And a copy was given to my brother for his records,

16 and I kept a copy.

17    Q.   Okay.

18    And these documents were notarized also, correct?

19    A.   They were, yes, that's correct.

20    Q.   And who notarized them?

21    A.   Lori King.  She worked in my office at that point

22 for several years and she notarized -- well, it was a

23 shared office.  She worked in the office as a receptionist.

24 She notarized documents for the attorneys in the office.

25    Q.   Okay.

x 000270

1          And you witnessed the other people, including the

2    notary signing, were appropriate?

3          A.   I did.

4          Q.   You saw your brother sign, you saw your father

5    sign?

6          A.   Yes.

7          Q.   Did you review these documents with them before

8    they signed them?

9          A.   Yes, I did.

10         Q.   And do you know whether these documents were ever

11   recorded?

12         A.   I know today that they were not recorded.  My

13   assumption was that they were, but as of today I knew they,

14   I know now that they were not.

15         Q.   Okay.

16         Did there come a time you knew your father and

17   brother were involved in litigation involving the deaths

18   that occurred from a fire in 2015?

19         A.   Yes.

20         Q.   What did you, who did you learn about this

21   litigation from and what did you learn?

22         A.   I learned that they were both named in a lawsuit.

23   I don't recall who contacted me first, whether it was my

24   brother or my father.  I know they both at some point did.

25   Both sent me copies of the summons or petition, summons I

1

2

3

4

5

6   I certify that the foregoing is a correct transcript from

7   the electronic sound recording of the proceedings in the

8   above-entitled matter.

9

10  /s/Kristen Shankleton, CER-6785      Dated: 10/27/18

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18-00260 |
| MAX E. SALAS, | ) | Chapter 11 |
| | ) | |
| Debtor In Possession. | ) | |
| | ) | |
| NICOLAAS J. BREKELMANS AND GAIL | ) | |
| GREGORY BREKELMANS, TRUSTEES OF | ) | |
| THE ESTATE OF NINA BREKELMANS; | ) | |
| And | ) | |
| | ) | |
| MICHAEL McLOUGHLIN AND | ) | |
| MARTHA JOHNSON, TRUSTEES OF | ) | |
| THE ESTATE OF PATRICK | ) | |
| McLOUGHLIN | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MAX E. SALAS | ) | |
| | ) | |
| Respondent. | ) | |

## DEBTOR'S RESPONSES TO MOVANTS' FIRST SET REQUEST FOR PRODUCTION OF DOCUMENTS RE: THE MOVANTS' OBJECTION TO TH DEBTOR'S CLAIM OF EXEMPTIONS TO HIS RESIDENCE AND THE MOVANTS MOTION TO DISMISS OR CONVERT

TO: Philip McNutt, Esq. Law Office of Philip J. McNutt, PLLC, 11921 Freedom Drive, Suite 584, Reston, VA 20190

Pursuant to Bankruptcy Rules 7033 and 7026-1(B), and Rule 33 of the Federal Rules of

Civil Procedure, Max E. Salas, the debtor and debtor-in-possession ("Debtor") in this Chapter 11

case hereby responds to the July 3, 2018 First Request for Production of Documents served by

Movant's Nicolaas J. Brekelmans and Gail Gregory Brekelmans, Trustees for the Estate of Nina

---

1. CORE/3502869.0005/141727844.1

Brekelmans ("Brekelmans Estate") and Michael McLoughlin and Martha Johnson, Trustees for the Estate of Patrick McLoughlin ("McLoughlin Estate," and collectively with the Brekelmans Estate, the "Estates"). .

## GENERAL OBJECTIONS

The Debtor objects to each of the Estates' request for production of documents to the extent that each broadens the scope of a permissible interrogatory or is otherwise inconsistent with the Federal Rules of Civil Procedure or Federal Bankruptcy Rules. The Debtor further objects to each interrogatory to the extent that it calls for the disclosure of privileged information.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** All documents which are identified in your answers to the Interrogatories propounded by the Movants herein.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 2:** All documents which concern, or relate to, your answers to the Interrogatories propounded by the Movants herein.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 3:** All documents which relate to all known or anticipated sources of income to the Debtor, including any known or anticipated source of funding for a proposed Plan of Reorganization.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 4:** All documents which concern, or relate to, the Trust, including all drafts of trust documents, all deeds, deeds of trust and related documents and all communications regarding the Trust.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 5:** All Documents regarding communications you had with your sons, or any other party, concerning the Trust.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 6**: All Documents related to your travel to Colorado and lodging at or about the time of your execution of the Trust documents.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 7:** All Documents related to your income, and expenses for the period January, 2017 through the present, including all correspondence with creditors or claimants and all documents related to payments you made to creditors for the same period.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 8**: All Documents related to your 401k loan and repayments.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 9:** All Documents related to the claim of Len Salas identified in Schedule E/F

of your schedules filed herein.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 10:** All Documents related to communications with your sons, Len, Ron and

Chris, related to the Superior Court litigation, the Trust, your bankruptcy filing or Len's

bankruptcy filing, from the period, January, 2017 through the present.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 11:** All Documents which relate to the Objection to your Exemption or the

Motion to Dismiss filed herein by the Movants or your responses and/or oppositions to the

Objection and Motion to Dismiss.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 12:** All Documents which you provided to any Expert whom you intend to

callas a witness in this matter.

**ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 13:** All Documents which any Expert you intend to use as a witness in any

hearing in this Case has provided to you, including all reports and drafts of reports you intend to

use at trial and all documents set forth in Fed. R. Civ. P. 26 (a)(2)(B) and (C), as incorporated

into these proceedings by Fed. R. Bankr. P. 7026, and 9014 (c).

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

/s/ Joshua W. Cox
/s/ Joshua W. Cox
Marc E. Albert, No. 345181
Joshua W. Cox, No. 1033283
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
joshua.cox@stinson.com
*Attorneys for*
*Max E. Salas, Debtor and Debtor-In-Possession*

Dated: August 6, 2018

Case 3:23-cv-00987    Document 7-2    Filed 10/04/23    Page 136 of 532 PageID #: 724

619

**CERTIFICATE OF SERVICE**

I hereby certify that I did serve a copy of the foregoing Responses to Movant's First Set of Interrogatories on August 6, 2018, electronically via the Court's ECF system, and by electronic mail upon the following:

Philip J. McNutt, Esquire
Law Office of Philip J. McNutt, PLLC
11921 Freedom Drive
Suite 584
Reston, VA 20190

/s/ Joshua W. Cox
Joshua W. Cox

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

In re:                                    ) Case No.  18-00260-SMT
                                          )
MAX E. SALAS                              )
FDBA CLR INC.                             ) Chapter 11
AKA ERNIE M. SALAS,                       )
                                          )
        Debtor.                           ) **STIPULATION FOR PLAN TREATMENT**
                                          ) **ON FIRST LIEN SECURED BY REAL**
                                          ) **PROPERTY AT 1610 RIGGS PLACE NW,**
                                          ) **WASHINGTON, DC 20009**
                                          )
                                          )
                                          )
                                          )
_____      )

        U.S. Bank National Association as Trustee for the holders of Banc of America Funding

Corporation Mortgage Pass-through Certificates, Series 2007-6, its assignees and/or successors,

by and through its servicing agent Select Portfolio Servicing, Inc. ("Secured Creditor" herein)

and Debtor, Max E. Salas ("Debtor" herein), by and through their attorneys of record, now enter

into the below stipulation to resolve and agree to plan treatment of the real property commonly

known as 1610 Riggs Place NW, Washington, DC 20009.

### RECITALS

A.  On April 16, 2007, Len Salas, for valuable consideration, made, executed and delivered a

Note secured by a First Deed of Trust (the "Loan Documents") both in the amount of $870,

000.00 on the property commonly known as on the property commonly known as 1610 Riggs

Place NW, Washington, DC 20009 (the "Subject Property").

B.  On or about 4/18/2018, the Debtor filed a voluntary petition under Chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the District of Columbia.

C.  As of the date of September 29, 2019 the total amount of Secured Creditor's claim with

regard to the Subject Property was approximately $1,208,720.40.

1

621

D.  The parties have conferred and agreed upon the treatment of Secured Creditor's first lien secured by the Subject Property for purposes of Debtor's Chapter 11 Plan and those terms are reflected below.

**THE PARTIES HERETO STIPULATE AND AGREE AS FOLLOWS:**

1.  The value of the Subject Property is in excess of the amount owed in the amount of $1,208,720.40 for the purposes of this instant Chapter 11 case.

2.  Secured Creditor will have a fully secured claim.

3.  Debtor agrees to pay the secured claim in the approximate amount of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037.

4.  All amounts still outstanding upon the maturity date under this agreement, will be due and owing in full on the maturity date May 1, 2037.   There will be deferred interest due upon maturity.

5.  The principal and interest payment ("P&I" herein) under these agreed terms is approximately $6,682.26 per month. This amount is approximate, and the formal re-amortization under this agreement will be completed by Secured Creditor after successful confirmation of the Plan of Reorganization that incorporates same.

6.  The loan will remain impounded for taxes and insurance on the Subject Property in accordance with the terms of the deed of trust and note.  The current amounts due are taxes at $1,188.43 per month and insurance at $458.50 per month.  Debtor is aware these amounts may fluctuate.  Secured Creditor may exercise its remedies as described in the deed of trust and note.  Debtor also agrees to provide proof of insurance to Secured Creditor within 30 days upon request.

7.  The first payment under this agreement is due November 1, 2019 in the amount of $8,329.19 per month (principal and interest in the amount of $6682.26 plus taxes in the amount of $1,188.43 and insurance in the amount of $458.50). Debtor agrees to make payments in this amount until the permanent loan adjustments are made and post

2

confirmation mortgage statement is sent out reflecting the new loan terms and monthly payment amount.  Debtor agrees to pay the amounts reflected in those statements.

8. Payments shall be made directly to Secured Creditor at Attn: Remittance Processing, P.O. Box 65450, Salt Lake City, UT 84165-0450, with reference to the last four digits of the Loan Number 3844, or as otherwise directed.

9. All post petition escrow advances will remain due and owing on the loan and will be included in the total principal balance due upon maturity.  The payment required under this stipulation prior to confirmation does not include any amounts needed to fund the escrow payment per RESPA.  If funding is needed, the escrow shortage if applicable will be calculated and added to the monthly payment after the permanent loan adjustments are made and post confirmation mortgage statement is sent out reflecting the new loan terms and monthly payment amount.

10. The parties agree that this loan may be refinanced postpetition as part of a plan to pay unsecured creditor or liens junior to this lien.  If the property is refinanced with a new lender, Secured Creditor will be entitled to full payoff prior to any fees or payments to junior lienholder.  The parties also agree that the reamortization of the loan per this Agreement post confirmation will give credit, and/or the total debt will be reduced by, any amounts credited for any escrow now due on the loan.

11. All other terms of the Loan Documents not directly altered by this agreement will remain in full force and effect.

12. Secured Creditor has relief from the automatic stay as to the Subject Property upon confirmation of Debtor's Chapter 11 Plan.

13. In the event of a default on payments to Secured Creditor under the terms of this stipulation prior to the entry of the confirmation order, Secured Creditor shall notify Debtor and Debtor's counsel of the default by CM/ECF.  Debtor shall have ten (10) calendar days from the date of the written notification to cure the default, and Debtor agrees to pay an additional $100.00 for attorney fees for each default occurrence.  If Debtor fails to cure the default, Secured Creditor may lodge a declaration of default and order terminating the automatic stay and include that the 14-day stay as provided in

3

623

FRBP 4001(a)(3) is waived.  Upon entry of the order the automatic stay shall be terminated and extinguished for purposes of allowing Secured Creditor to notice, proceed with, and hold a trustee's sale of the Subject Property, pursuant to applicable state law and without further Court Order or proceeding being necessary, including any action necessary to obtain complete possession of the Subject Property, including unlawful detainer.

14. In the event of a default on payments to Secured Creditor under the terms of this stipulation after the entry of the confirmation order, Secured Creditor shall may proceed pursuant to the terms of the underlying Loan Documents, and state and federal law, to obtain complete possession of the Subject Property, including unlawful detainer, without further court order or proceeding being necessary.  Any and all default provisions included in Debtor's Chapter 11 plan are not applicable to Secured Creditor with regard to the Subject Property, and Secured Creditor is only bound by the terms included in this stipulation.

15. Debtor agrees to incorporate the above agreed terms of lien treatment into any and all existing and future proposed Chapter 11 Plans through either exact language or by attaching this stipulation as an exhibit to the plan, and if any terms in Debtor's Chapter 11 Plan conflict with the terms of this stipulation the terms of this stipulation will control. In the event that Debtor's Chapter 11 Plan does not reflect the language of this stipulation, Debtor agrees) that the stipulation terms will be incorporated into the confirmation order through exact language, attachment of the stipulation as an exhibit to the confirmation order, or by reference in the confirmation order of the stipulation by document number.

16. Secured Creditor agrees to vote for Debtor's Chapter 11 Plan provided that Debtor has complied with all provisions of this stipulation.

17. If this instant Chapter 11 bankruptcy petition is dismissed and/or converted to another chapter under title 11, Secured Creditor's lien shall remain a valid secured lien for the full amount due under the original Promissory Note and all payments received under this

4

Stipulation for Plan Treatment, Case No. 18-00260-SMT
File No. DC-19-157592

agreement will be applied contractually under the original terms of the Deed of Trust and original Promissory Note.


IT IS SO STIPULATED:

/s/ Leah Freedman
Leah Freedman, Esq., MD Fed. Bar No. 18950
BWW Law Group, LLC
6003 Executive Blvd, Suite 101
Rockville, MD 20852
P: 301-961-6555, F:301-961-6545
bankruptcy@bww-law.com
*Counsel for the Movant*

/s/ Justin P. Fasano
Justin P. Fasano
McNamee, Hosea, Jernigan, Kim,
Greenan & Lynch, P.A.
Janet M. Nesse (Bar No. 358514)
Justin P. Fasano (Bar No. MD21201)
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770
Phone: 301-441-2420
jnesse@mhlawyers.com
jfasano@mhlawyers.com
*Proposed Conflicts Counsel for Debtor*

Stipulation for Plan Treatment, Case No. 18-00260-SMT
File No. DC-19-157592

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL | : | |
| GREGORY BREKELMANS, | | |
| CO-PERSONAL REPRESENTATIVES | : | |
| OF THE ESTATE OF NINA | | |
| BREKELMANS, et al | : | |
| | | |
| Plaintiffs | : | |
| | | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| | | |
| MAX SALAS | : | |
| | | |
| Defendant | : | |

AMENDED MEMORANDUM IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs herein, by and through their undersigned counsel and, in

support of their Motion for Summary Judgment, submit the following Amended Memorandum

of facts, points and authorities.

I.   **INTRODUCTION**

Through this Motion, the Plaintiffs are seeking summary judgment on Counts I, II, IV, V

and VI of the Complaint[1].  The Motion will focus largely on the recovery of the Property at issue

---

[1] For purposes of this Motion for Summary Judgment and Memorandum, all references to
"Complaint" or "the Complaint" refer to the Amended Complaint filed herein on February 16,
2021 D-40.

here, located at 1610 Riggs Place, NW, Washington, DC ("The Property"), under the statutory

provisions of the United States Bankruptcy Code, 11 U.S.C. ("Bankruptcy Code" or "Code")

§550, asserting a right to recovery under Code § 548(A)(1)(B) and Code") and the D.C. Code §§

28-3104 and 28-3105 concerning recovery of fraudulent conveyances. The Defendant along with

the Debtor, Len, engaged in a scheme intended to remove the Property from Len's bankruptcy

while allowing Max to exempt the Property in his bankruptcy. As argued below, although this

scheme constitutes actual fraud, the constructive fraud which is spelled out in 11 U.S.C. § 548

(a)(1)(B) is clearly shown by the record in this case and those documents, filings and testimony

referenced in this Motion. Therefore, while the Plaintiffs assert the case for recovery based upon

actual fraud is unusually strong at this Summary Judgment stage, because of the element of

intent, although obvious here, and the need to explore a series of facts over a period of time, the

insolvency standard of Code § 548(a)(1)(B) is an easier target.

As discussed below, none of the material facts necessary to show fraud or insolvency

under the standards of 11 U.S.C. § 548 (a)(1)(B) are in dispute. Because the Plaintiffs meet the

standardized test of the statute, they are entitled to judgment on their fraudulent conveyance

claim, Count IV, of the Complaint. Additionally, since the criteria for recovery of a fraudulent

conveyance under D.C. law tracks the language of 11 U.S.C. § 548, and the Plaintiffs have also

clearly met their burden under that statute, the Plaintiffs are also entitled to judgment on their

state law fraudulent conveyance claim, Count V.

Furthermore, the Trustee's interests in the Property pursuant to 11 U.S.C. § 544 as a

judgment lien creditor and successor to the rights of creditors and purchasers as a bona fide

purchaser, without knowledge, are superior to those of the defendant, if any, and also allow the

Debtor's estate to recover the Property or its value for distribution to creditors pursuant to ==11 U.S.C. § 550== (a).

The attempted conveyance of the Property in 2010 from the Debtor, Len Salas, to his father, Max Salas, was never completed and was, in fact abandoned by the parties. In order to attempt to avoid liability in the D.C. Superior Court, wrongful death, litigation commenced by the Plaintiffs 2015, the Salas family including at least, the Defendant, Max Salas and his son Ron, with the assistance of the Debtor, Len Salas, concocted a scheme which involved using an abandoned, stale, and defective quitclaim deed to attempt to remove Len Salas from the Superior Court case and, by so doing, allowing Max to claim an exemption of the Property in his planned bankruptcy which was filed shortly after the Plaintiffs' obtained their judgments.

The scheme involved resurrecting an invalid trust ("the 1610 Riggs Place Trust") prepared by Ron on July 6, 2010, under Colorado law, accompanied by an equally infirm quitclaim deed ("the Quitclaim Deed") purporting to transfer the Property from Len to the trust. The Quitclaim Deed was never recorded and, according to communications between and among family members and local (D.C. area) counsel, Len Salas ("Len" or "the Debtor") and Max Salas ("Max" of "the Defendant") abandoned the Quitclaim Deed. While the reasons for this are not clear there are some obvious reasons which may have caused the family to abandon the Quitclaim Deed, as discussed below. Regardless, it is clear that as soon as June, 2011 Max and Ron had no intention of using or recording the Quitclaim Deed.

During the course of Max's bankruptcy case (Case no. 18-00260 in the United States Bankruptcy Court for the District of Columbia) and in preparation for the hearing on the Plaintiffs' objection to Max's claimed exemption of the Plaintiffs conducted discovery which

consisted of the deposition of Ron Salas and Interrogatories and a Request for Production of Documents propounded to the Defendant, Max Salas. Neither Ron Salas, nor his father, Max, mentioned or referred to a series of email communications in 2011 and 2012, months following the July, 2010 quitclaim deeed, which clearly state that a deed needed to be created to transfer the Property from Len to Max.and that all family members, including, at at a minimum, Max, Len and Ron, were still attempting to obtain a deed or other means to remove Len's name from the title to the Property.  It is clear from the emails that Ron and Max both knew that the quitclaim deed was ineffective and no longer valid or enforceable to transfer the Property. See emails between and among Max, Ron, Len, Stan Goldstein and Lynn Boileau, between June 17, 2011 and February 27, 2012, Exhibit 7, Bates Nos. LenSalas 000016 - LenSalas000034. The eMails are attached to this Memorandum as Exhibit 7.

At the very least, these eMails show that Ron, Len and Max made significant misrepresentations to the D.C. bankruptcy court, and likely this court, regarding the existence and usefulness of the Quitclaim Deed.

These misrepresentations and the scheme concocted by the Salas family represent actual fraud within the meaning of 11 U.S.C. § 548.  However, the Plaintiffs' claim for recovery under Code, § 548 (a)(1)(B) is much more straightforward.

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed on April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary

Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021 (D-40).

All references to Case No. 20-90027 refer to the Adversary Proceeding captioned above in which the Plaintiffs Motion for Summary Judgment and this Memorandum are being filed.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Motion for Summary Judgment unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

The words "Code" or "the Code", except as expressly stated otherwise, refer to the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*. as amended.

For ease of reference to members of the Salas family, who are discussed throughout this Memorandum, Max Salas, the Defendant, will sometimes be referred to as "Max" or "the Defendant", Len Salas will sometimes be referred to as "Len" or "the Debtor" and Ron Salas will sometimes be referred to as "Ron."

II.　**BACKGROUND OF THE CASE**

1. The Plaintiffs' Complaint was filed on behalf of the Estate of Len Salas in accordance with this Court's Order entered on February 11, 2021. The Complaint seeks a declaratory judgment that under the Trustee's avoiding powers, the Plaintiffs have a superior interest in the Property and are entitled to recovery of the Property, or its value, under 11 U.S.C. §550.

2. The Plaintiffs assert that they have a superior interest in the Property whether under the Trustee's avoiding powers, pursuant to 11 U.S.C. §§ 544, et seq, or as an actual creditor, pursuant to 11 U.S.C. §§ 548 and D.C. Code §§ 28-3104 and 28-3105.

3. The Plaintiffs' Complaint seeks recovery of the Property, or its value. The Plaintiffs assert they are entitled to recovery under the Trustee's avoiding powers pursuant to a sale conducted by the Trustee under Court authority (Order of June 12, 2019 (D-179) in Case no. 18-

-5-

2662) and a sale to the Plaintiffs approved by this Court and evidenced by the Trustee's Report of Sale dated August 14, 2019 in Case No. 18-2662 (D-191).

4. Because the trustee, Mr. Gigandet, declined to pursue the causes of action set forth in the Complaint despite Plaintiffs' request that he do so, facts admitted by the Defendant, the Plaintiffs have derivative standing to pursue each count of the Complaint as determined by this Court's Order of February 11, 2021 in Adversary No. 20-90027(D-39). Because the effective date of transfer of the Property is April 17, 2018 under both bankruptcy and D.C. law, the Complaint was timely filed and is not subject to a claim of limitations.

5. The Plaintiffs reserve the right, under bankruptcy law and procedure and D.C. law to invoke remedies intended to protect the property and preserve its value for the Debtor's Estate.

6. The Plaintiffs' Complaint contains six counts, three seeking recovery under Code § 544, one under Code § 548, one under D.C. Code §§ 28-3104 and 28-3105 and one under Code §550. The Plaintiffs are seeking summary judgment on all counts except Count III.

7. As a result of this Court's Memorandum Opinion and Order of February 11, 2021 (D-38 and D-39, respectively, in Adversary No. 20-90027), the Plaintiffs assert that the affirmative defenses of violation of the applicable statutes of limitations have been overruled and finally determined for purposes of the Complaint. There are no disputed facts which could change the Court's legal conclusions and the Court's conclusions are based upon well established and longstanding statutory language and supporting case law.

III.    **BACKGROUND FACTS FOR MOTION FOR SUMMARY JUDGMENT**

    **A.    Background Facts**

8. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans

-6-

and Michael Patrick McLoughlin, respectively (collectively, "the Decedents' Estates"), creditors of the Estate of Len Salas and suing for the benefit of the Estate of Len Salas. Nina and Michael were tragically killed in a fire at a residence in Washington, DC ("the Fire") which residence was owned by the Debtor, Len Salas and occupied and managed by his father, the Defendant, Max Salas. The Plaintiffs herein, the Estates, were the successful bidders at an auction sale of this bankruptcy estate's interest in the trustee's avoidance and recovery actions under Code, §§544, *et seq*. A copy of the Trustee's Report of Sale of those actions is attached to the Plaintiffs' Complaint as Exhibit A. For purposes of this Motion, all references to the Plaintiffs' Complaint refer to the Amended Complaint docketed at D-40, filed on February 16, 2021.

9. The Defendant Max Salas, is the Debtor in Case No. 18-00260, in the United States Bankruptcy Court for the District of Columbia (hereinafter "Max's Bankruptcy"). Max filed a voluntary petition, under Chapter 11 of the Code on April 18, 2018.

10. Len Salas (hereinafter "Len"), is the Debtor is Case No. 3:18-bk-02662, filed in the United States Bankruptcy Court for the Middle District of Tennessee (Nashville) ("Len's Bankruptcy") on or about April 18, 2018. Len's Bankruptcy was converted from a Chapter 11 to a Chapter 7 bankruptcy on or about December 12, 2018.

11. Michael Gigandet was appointed Chapter 7 Trustee and administered Len's Chapter 7 Estate.

12. The Complaint was timely filed.

13. The parties have completed their discovery and there are no disputed facts which

-7-

bear on the issues presented in this Motion.

14. The Plaintiffs' Complaint seeks the recovery of property located at 1610 Riggs Place, NW, Washington, DC ("the Property") at which the Defendant, Max, presently resides. Alternatively, the Plaintiffs are seeking a fair market sale of the Property to recover its value, believed to be in excess of $1 Million above all prior and/or secured claims.

15. The Plaintiffs are pursuing this matter through, and on behalf of, Len's Estate. The Plaintiffs made requests to the Court appointed trustee, Michael Gigandet ("the Trustee"), in early April, 2019, to pursue the causes of action set forth herein. The Trustee declined to do so. See Memorandum Decision entered on February 15, 2021 in Adversary No. 20-90027 (D-38), p.6.

16. All relief sought through or by the Complaint, as amended, is sought on behalf of the Estate and its creditors. See Complaint at ¶ 9.

17. On or about September 18, 2020, the Plaintiffs again contacted the Trustee asking that the Trustee take over, or join, in the avoidance actions and other claims asserted herein, for the benefit of all creditors. The Trustee declined, once again, asserting that by selling the claims he intended that they and any benefit from them, would inure solely to the purchasers (the Plaintiffs). The Trustee also indicated that if the Actions benefitted Len's Estate, he would take appropriate action to receive and distribute any recovered property or proceeds.

18. In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). The Judgment resulted from a fire at the Property which, at the time, Max had rented rooms to renters including Nina Brekelmans and

-8-

Michael McLoughlin. Through the gross negligence of Max and his deliberate failure to make safety improvements to the Property required by law, Nina and Michael tragically lost their lives in a horrific and traumatic manner from a fire in June, 2015. Len was named a Defendant since he was, at all times, the owner of the Property, including at the time of the fire.

19. The Estates filed separate lawsuits against Max and Len in 2015. After a lengthy period of discovery and pre-trial matters, the case was tried in late March, 2018 and early April, 2018, resulting in Judgments for the Plaintiffs in the amounts of $7.5 Million and $7.7 Million respectively ("the Judgments").

20. The Judgments are allowed claims in the bankruptcy cases of both Len and Max. Through Max's confirmed Chapter 11 Plan and distributions from Len's Estate, the Plaintiffs have received minor payments against their claims - payments of less than $700,000.

21. Shortly after the entry of the Judgments Max and Len filed separate bankruptcies, Max in the District of Columbia (Case No. 18-00260)("Max's Bankruptcy") and Len in this Court (Case No. 18-02662) ("Len's Bankruptcy").

22. The Defendant's approved Amended Disclosure Statement, December 5, 2019 (D-276) and his confirmed Plan of Reorganization (Max Salas's Third Amended Plan of Reorganization), (D-298), January 22, 2020, specifically reference the Plaintiffs as the purchasers of the avoidance actions which are included in the Complaint, as amended.

23. The Defendant's Confirmed Plan provides that the Plaintiffs "possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len

Salas Bankruptcy Case."  Confirmed Plan, Section 3.6, p. 9.

24.  At the time of the bankruptcy filings by Len and Max, Len was, and was, at the time of the Debtor's bankruptcy filing in April, 2018, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property").

25.  According to Max and Len, in July, 2010, Max and Len traveled to Colorado in July 2010 to visit Ron, one of Max's sons.  Ron was a recent law school graduate and admitted to practice law in Colorado.

26.  While in Colorado, Len and Max executed a very simple trust agreement which Ron stated he prepared using a Colorado form even though the alleged trust property, the Property, was located in D.C.  Ron also prepared a form "Quitclaim Deed," which Len also signed ("the Quitclaim Deed").

27. Max asserts that Len, who is unsophisticated in business and legal transactions, deeded the Property to his father while Len remained the sole obligor on the Sun Trust Deed of Trust Note ("the Note").

28.  Max and Ron convinced Len to deed the Property to his father despite the fact that by that deed, Len would have lost all collateral for his $870,000 loan obligation to Sun Trust.

29.  The attempted transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank.  L Salas Depo Trans., Exhibit 13, 144:7 - 148:7.

30.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property.  At all relevant times, Len worked only part time and had limited

-10-

income and assets. At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

31. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed. Exemption Trans. Vol 3, (attached hereto as Exhibit 6) 139:15 - 140:2; Len Salas testimony, Plan Confirmation Hearing, United States Bankruptcy Court for the Middle District of Tennessee, December 13, 2018 ("L Salas Conf. Hrg. Trans."), 68:22 - 69:2. Those pages of Len's testimony in December, 2018 are attached hereto as Exhibit 4.

32. Max asserts that he intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. The Quitclaim Deed has never been recorded and Len remained the titled owner of the Property through the date of his bankruptcy filing in April, 2018.

33. Max also testified at the Exemption Hearing that he delivered the original Quitclaim Deed to Mr. Goldstein's office and did not recall that Mr. Goldstein mailed it back to Mr. Salas. Exemption Trans. Vol. 3, 55:7 - 56:21.

34. Later in the same testimony Mr. Salas testified that he told his counsel, Mr. Albert and his associate, Mr. Cox what he did with the Quitclaim Deed and left it up to them to obtain the original from Mr. Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

35. After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

-11-

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13

36. In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed, executed on July 6, 2010, as follows:

"Q And I believe you said, but I want to
clarify this, that between the time of 2012,
roughly, and I realize you said, I think, a year
or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came in my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind
I don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.
He didn't live in the District, he
never- he didn't live in the house, and I- so
that's the only logical reason I could make that
he would be involved, that it was never done. And
until that point, I did not even know that it had
not been done. I assumed at some point that he
came up with the money and did it. But he didn't,
as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the

District of Columbia, Case No. 18-00260, August 8, 2018, ("R Salas Trans"), 73:15 - 74:21

(emphasis in original).[2] Attached hereto as Exhibit 8.

_____

[2]Mr. Albert was acting as counsel for Max Salas in his bankruptcy and attended the
deposition on behalf of Max. Ron Salas appeared without counsel.

37.  Toward the end of the Superior Court litigation with the Plaintiffs, which resulted in the Judgment, Max, apparently with the cooperation and participation of Ron and Len, concocted a scheme to attempt to keep the Property for himself in the face of a pending substantial judgment award to the Plaintiffs.

38.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments.  See D.C. Code § 15-501 (a)(14) (exemption is available only to property in which the owner resides). These conversations took place in early 2018.  See Exemption Trans. Vol. 3, Exhibit 6, 119:19 - 122:9; See also Albert-R Salas eMails, 2/14 - 3/7/18, attached hereto as Exhibit 19; Exemption Trans. Vol 1, Exhibit 20, 145:22 - 147:20.

39.  Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

40.  Because Len was not residing in the Property, he could not claim the benefit of the D.C. homestead exemption.

41.  In early 2018, less than a month prior to the Superior Court trial, Max and Len, for the first time, alleged and produced a copy of the 2010 trust ("the Trust") and quitclaim deed ("the Quitclaim Deed") and sought to exclude Len from the Superior Court litigation by asserting Max was the real owner of the Property.  The Superior Court summarily denied Max's attempt and the trial continued, resulting in the Judgment.

42.  The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy.  M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee,

-13-

Docket Entries ("D- ") D-209 (Trustee's Final Report) and 220, Trustee's Final Account, and 222 (Final Decree).

43.  Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

44.  On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max.  This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property.  A copy of Ron's email, dated June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022.  These emails were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C.  Max, Ron and Len all testified at that hearing and all asserted, or supported the lie that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

45.  Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len."  Exhibit 7, Bates Number: LenSalas000016 - 17.

46.  On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein.  In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..."  Exhibit 7, Bates Number LenSalas000016.

47.  In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are **two different** requests.  One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supllied) Exhibit 7, Bates Number LenSalas000023.

-14-

48. On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon." Exhibit 7, Bates Number LenSalas000029.

49. Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust. M Salas Trans. , Exhibit 10, 64:16 - 74:2. He further testified that he does not recall any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18. When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

> Q. Have you contacted Ms. Boileau or
> Mr. Goldstein to determine if they
> have a copy of any deed that might
> have been created?
>
> **A. I did try to contact them. I
> did try to contact them actually
> recently. And I -- but I didn't -- I
> mean, they were trying -- they
> were -- no. I mean, we worked on
> something and then they said it couldn't go
> any further and depends on what you
> were going to do. So I don't -- I guess --
> I can't guess. I don't know.**

M Salas Trans. 73:13-23

50. There was some confusion in the Salas family testimony concerning whether there was more than one original of the Quitclaim Deed and whether Len may have had an original. That issue seems to be cleared up by an email string provided by Max Salas as part of the discovery and trial in the Exemption dispute. Regardless, the Defendant has produced no evidence that anyone other than Max Salas had an original of the deed after July 6, 2010 and Max does not know where the original is or when he last had it. See, for example, M Salas

-15-

Trans., Exhibit 10, 77:2 - 82:23; Max speculated at the Exemption Hearing that the original of the Quitclaim Deed may be at the office of the title attorney, Stan Goldstein. Exemption Trans. Vol. 3, (August 24, 2018), Exhibit 6, 55:7 - 57:19. However, in his most recent testimony he testified that he recently contacted Mr. Goldstein's office and was unable to obtain the Quitclaim Deed. See above, Exhibit 10, M Salas Trans. 73:13-23.

51.    In his testimony at the Exemption Hearing in August, 2018, Ron testified, under oath, that he assumed the Quitclaim Deed had been recorded. He stated, in August, 2018 that "my assumption was that they were, but as of today I knew they, I know now that they were not." Testimony of Ron Salas, witness for the Debtor Max Salas, August 22, 2018, Exemption Trans. Vol 1, 211:7 - 212:14. Ron Salas's complete testimony at the Exemption Hearing, Exemption Trans. Vol. 1, 206:8 - 246:16, is attached as Exhibit 12.

52.    Ron Salas further testified that he did not know why neither his father, his brother, his brother's wife, or he did not think to produce the Quitclaim Deed during the Superior Court litigation. Based upon the 2011 email exchange between Ron Salas and his father, it is obvious that the Quitclaim Deed Ron prepared could not be recorded and was, likely defective. That is the only rational explanation for Ron stating to his father that a Deed needed to be prepared in 2011, a year after Ron's Quitclaim Deed. That is the only rational explanation for the continued efforts, through February, 2012 to obtain a Quitclaim Deed from Len. That is the only rational explanation for Ron, Len, Kendra (Len;s wife) and Max to conveniently forget about the Quitclaim Deed until the very eve of the Superior Court Trial, in February, 2018. Exemption Trans. Vol 3, 39:15-25.

53.    The only deed referenced by Max or his counsel, allegedly entitling Max to an

-16-

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been

proffered, or even mentioned by the Salas family or by Max, specifically.

54. Unfortunately, it appears that Ron, his father and his brother hid the fact that the

Quitclaim was defective, or otherwise unrecordable at the hearing in Max's case in 2018.

55. The Plaintiffs are unaware of the reason why the Quitclaim Deed was abandoned.

However, there are clues. For example, in the Exemption Hearing in D.C., Ron Salas testified

that he was unaware of the requirements of Quitclaim Deeds in D.C. See, Ron Salas's testimony,

Exhibit 12, 227:5 - 228:12. He stated that he was unaware that Deeds made to trusts had to be

made in the name of the trustee. Id. Even in 2018, Ron was unaware whether the trust

documents he created were valid under D.C. law. See, Ron Salas's testimony, Exhibit 12, 243:8-

56. Max testified that he did not have the funds to record the deed. More importantly, it

seems evident that he was unwilling to spend the money to record the deed. He spent hundreds

of thousands of dollars from retirement savings and other funds in his bankruptcy, funds, at least

a substantial portion of which, would have been available to Max if he wanted to record the Deed

in 2010, or thereafter. See, for example, excerpts from Max Salas' schedules of assets, filed

April 18, 2018 in Case No. 18-00260, (D-1), attached hereto as Exhibit 9. See also M Salas

Third Amended Plan, Complaint, Exhibit B, at p. 11, Section 4.1.

57. No deed was recorded prior to Len's bankruptcy filing. See Max's Second Amended

Disclosure Statement filed in his bankruptcy case in the District of Columbia, Case No. 18-

00260, December 5, 2019, (D-276), attached hereto as Exhibit 2, pp. 4, 22.

58. Max testified in his deposition in the Superior Court case in February, 2016 that there

was one trust, the CLR Trust. He confirmed that when he mentioned "the 1610 Salas Trust" he

was referring to the same trust, namely, the CLR Trust.  Max Salas testimony at the Exemption

Hearing, Exemption Trans. Vol 2, August 23, 2018 ("Exemption Trans. Vol. 2"), Exhibit 3,

33:23 - 50:25, Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and

2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February

24, 2016 ("M Salas Sup Ct Depo"), 42:18 - 43:2. Excerpts from the M Salas Sup Ct Depo are

attached hereto as Exhibit 1.

59.  Len Salas is not aware of the location of any of the wet ink signature originals of the

July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas

Trans."), Exhibit 13, 15:4-9.  Len testified in his deposition that he provided an original"wet ink"

original of the Quitclaim Deed, or a copy,  to his lawyer on the eve of the Superior Court trial in

March, 2018. L Salas Trans, Exhibit 13,  16:6-24, 19:11-25 - 21:18.  Regardless, Len testified

that the document he produced on the eve of the Superior Court trial, which commenced on

March 26, 2018, was kept in his possession at all known times between July, 2010 and March,

2018.  Id. Len's wife, Kendra, testified that she "had a pdf of it" (the July, 2010 Quitclaim Deed)

and that she thought it was "the same as what Len had " I thought it was the same thing as what

Len had, but I'm not sure."  K Rowe Trans. , Exhibit 14, 30:13-20.

60.  At all relevant times Len's liabilities exceeded his assets when the value of the

Property is not included.  The attempted transfer, or actual transfer, of the Property made Len

insolvent.

61.  On July 6, 2010, the date of the alleged Quitclaim Deed, Len's primary asset was the

home at 1610 Riggs Place, the Property at issue here.  His most substantial liability was his

obligation to Sun Trust Bank in 2007 for which Len remained liable through October 2020.  In

-18-

November, 2020 Sun Trust entered into a new agreement with Max Salas which eliminated Len's obligation on the Property as part of Max's Chapter 11 Plan. Therefore, on July 6, 2010, and at all times after, through October, 2020, Len's most substantial liability, by far, except for the Plaintiffs' judgments, consisted of his obligation to Sun Trust Bank.

62. The obligation to Sun Trust Bank was $870,000 in 2007. No payments were made to reduce the principal owed to Sun Trust Bank through the date of Len's Bankruptcy in April, 2018.

63. There were no agreements between Len and Max regarding responsibility for payment of the Sun Trust Note or any other obligations related to the Property. L Salas Trans. 28:9 - 29:4; Exemption Trans. Vol I, Exhibit 20, 40:25 - 41:18. Max's testimony at his most recent deposition in March, 2022 confirms that there was no note or other written document making Max primarily, or secondarily liable on the SunTrust Note:

Q. Okay. Let's go to number 19,
Mr. Salas. Request for admission in 19 asks you
to admit or deny that Max Salas did not notify
Sun Trust or the D.C. government that he was an
obligor under the Sun Trust deed of trust. Your
response was denied. Max Salas notified Sun
Trust that he was obligated under the deed of
trust. I read that correctly, didn't I?

**A. You read it correctly, yes, sir.**

Q. When you notified Sun Trust that you
were obligated, did you sign a note?

**A. No. I didn't sign.**

Q. Did you sign a guaranty?

**A. Huh?**

Q. Did you sign a guaranty?

-19-

**A. I was -- well, the loan was --
actually it was a modification. It was a
modification and a way to get -- to get
Lenny's -- Lenny wanted the house off of his
name, and I kept trying to do that. That's
what happened. I don't blame him. I promised
him I would do that right away back when he
first did it. Well, I'm just going on too
far. So I don't remember, sir.**

Q. Okay. I need to give you a timeframe
here, so I apologize.
Prior to your bankruptcy filing, okay,
prior to your bankruptcy filing, did you notify
Sun Trust that you were obligated under the deed
of trust?

**A. I don't remember.**

Q. Did you ever provide, again, prior to
your bankruptcy filing, did you ever provide Sun
Trust with a note that you signed as an obligor
under the deed of trust note?

**A. Same answer.**

Q. Do you have any documents that would
indicate that you did sign such a note?

**A. I can't remember. You know, I don't
know. It's just -- it's almost like -- I
don't know. I don't remember.**

Q. Do you remember if you provided Sun
Trust with a guaranty of the note obligation
that Len was obligated for?

**A. Did I provide them a guaranty to
what, sir?**

Q. Did you provide Sun Trust with a
guaranty of the deed of trust note obligation?

**A. Did I provide Sun Trust a deed?**

Q. A guaranty.

-20-

**A. A guaranty. You know, Mr. McNutt, I
may have. I don't remember. I just can't
remember right. It just doesn't -- it's not
there.**

Q. If there was a note obligation or a
guaranty, would those documents have been
provided to the plaintiff's in this case?

**A. I don't know what -- if there was
what would have happened. I don't know.**

Q. You haven't provided any documents
related to a note obligation or a guaranty that
you provided the Sun Trust Bank prior to your
bankruptcy filing though, correct?

**A. That's not correct. I don't know
what I've done. I don't know. I may have. I
may have. Maybe I didn't. I don't know.**

Transcript of the Deposition of Max Salas on March 22, 2022 ("M Salas Depo Trans"), Exhibit 10, 85:5 -

87:20.

  64. While the Defendant seems to be confused or perhaps reluctant to testify directly on this

issue, it is undisputed that there are no documents indicating that Max was liable on the SunTrust loan at

any time and Max never entered into any agreement or understanding with Len that Max was liable or

responsible. Moreover, and most importantly there is no document raised, proffered or produced by Max

indicating that Len was not the sole party responsible for the Deed of Trust payments until at least

November, 2019.[3]

---

  [3]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did
finally reach an agreement with Max for him to make the payments under the Deed of Trust from
and after November, 2019. However, there is no indication in the agreement reached between
Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not
in effect. Therefore, Len is still liable for the entire balance under the SunTrust Note which, as
of September 29, 2019, was $1,208,720.40. See Max Salas Stipulation with U.S. Bank
(Stipulation for Plan Treatment of First Lien Secured by Real Property at 1610 Riggs Place NW,
Washington, DC 20009), filed in Case No. 18000260 (D-266-1) on November 20, 2019, attached

-21-

65. Len Salas was fairly straightforward in his testimony.  However in response to the question whether Len executed more than one Quitclaim Deed, he not only couldn't remember whether he signed any other document but answered "I don't know" to the question "if you would have executed any other agreement [quitclaim deed], you would have kept a copy of it; correct?" L Salas Trans. Exhibit 13, 40:1-20.  Regardless of Len's faulty memory or evasiveness, it is clear from his testimony that he is not aware of any documents related to the alleged conveyance of the Property other than the trust and quitclaim deed both dated July 6, 2010.

66. Len had several conversations with his father regarding getting his name off the loan and deed after 2010.  L Salas Trans., Exhibit 10, 71:25 - 74:16; Exemption Trans.,Vol 1., Exhibit 20,158:13 - 163:10; Deposition Transcript of the Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

67. Max Salas confirmed in his testimony at the Exemption Hearing that Len was attempting to get Max to get Len "off of the deed to the property" shortly after the original deed to Len in 2007 and **continuing all the way into 2018**.   Exemption Trans. Vol. 1,Exhibit 20, 42:20 - 43:8.  Later in his testimony Max claimed that Len only asked Max to take Len off the loan, not off the title asserting that "he'd already taken his name off the property" in 2010. Exemption Trans. Vol. 1, Exhibit 20,  44:1-10.  That was just another misrepresentation, however.  During Len's deposition in the Superior Court litigation, Len testified in March, 2016, that the last time Len talked to his father about **transferring ownership of the property, not the loan**, out of Len's name, was the spring of 2015, the year of the tragic fire that took the lives of Nina and Michael.  See Exemption Trans. Vol. 1, Exhibit 20,  47:11 - 49:11.  The emails

hereto as Exhibit 15.

between Len and his father in the time frame of 2011 -2012, well after the July, 2010 Quitclaim Deed, confirm and corroborate Len's testimony in his 2016 Deposition.  See Exhibit 7.

68.  The emails of 2011 - 2012 among Ron, Len, Max and Max's counsel, produced, for the first time, by Len in this litigation, show that Max's statements are direct contradictions of his testimony in 2018 at the Exemption Hearing.  Moreover, the testimony of both Ron and Max in 2018 directly contradicts their email communications in 2011 and 2012. Their testimony in 2018 was under oath and was used to try to support Max's claim that he was the owner of the Property in April, 2018 for purposes of his exemption claim.  Now that testimony appears to be largely, if not completely, fabricated for the sole purpose of advancing the false claim that there was an effective Deed after 2010.  See emails between and among Max, Ron, Len, Stan Goldstein and Lynn Boileau, between June 17, 2011 and February 27, 2012, Exhibit 7.

69.  The Sun Trust Note was in default during the period 2010 - 2018.  L Salas Trans., Exhibit 13,  55:11-20.

70.  Len Salas was involved in more than one attempt to refinance the Property in the time frame of 2010 through 2013 and all such attempts failed. L Salas Trans. 83:23 - 84:4.  The clear inference from Len's emails to/from his father and the refinancing attempts is that Len was the recognized owner of the Property and was, therefore, necessary for any refinancing. Therefore, again, Despite the existence, in July, 2010 of a Quitclaim Deed, that deed was not recorded, likely could not be recorded, and was abandoned by Max and Len.  See, for example, Ron's email of June 17, 2011, Bates Nos., LenSalas000016-17,attached hereto as part of Exhibit 7.

71.  Len did not have sufficient funds to pay his attorneys in the Superior Court litigation.

He lives "paycheck to paycheck." L Salas Trans. Exhibit 13,76:20 - 77:2

72. At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans., Exhibit 13, 61:1 - 63:2.

73. Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, April 27, 2018, D-10, at page 3 of 10.

74. During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them. See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

75. On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41. Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

76. Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust." Exemption Trans. Vol 1, Exhibit 20, 148:1 - 152:24. In Len's Deposition Testimony in the Superior Court Litigation, Len testified, on March 9, 2016, that he had no knowledge of "the 1610 Salas Trust" asserted by his father but he did know about "CLR Trust", "A. Yes, that one I know." Len Salas Deposition Testimony,

-24-

March 9, 2016 in the Superior Court Litigation, attached as Exhibit 11, 29:14 - 30:14

77. Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2 - 150:21.

78. The fire occurred in June, 2015. From that time, until February or March, 2018, no one resided in the Property. During that time, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he received as a result of the fire damage.

79. Although Max claims he was the sole party responsible for all payments on the Sun Trust Loan, and made all loan payments, no payments have been made since prior to 2018 (with the exception of one payment from insurance proceeds) and the current balance was increasing at the rate of approximately $7770 month as of October, 2019. Sun Trust sold its Note, in 2019, to U.S. Bank National Association/Select Portfolio Servicing, Inc. ("U.S. Bank"). Pursuant to an agreement reached with U.S. Bank, Max is required to make monthly payments of approximately $8,300. Upon information and belief, Max has been making the required payments since approximately November, 2019. *See*, Exhibit B, Confirmed Plan, p. 8, ¶ 3.3.

80. Through October, 2019, Len remained solely responsible under the SunTrust Note, although Max asserts he was responsible and "made all payments." However, according to the SunTrust Motion for Relief from Stay, filed in Case No. 18-2662 on November 2, 2018, the arrearage owed to SunTrust under the Note, as of April, 2018 was $374,282.18. As the sole obligor on the Note, Len was responsible for payment of the arrearage.

81. On the effective date of the attempted transfer of the Property from Len to Max,

-25-

April 17, 2018, Len's assets were approximately $53,000 plus the value of the Property. Len's liabilities at the same time included the Plaintiffs' Judgments, attorney fees owed ot his litigation counsel for the Superior Court Litigation, the SunTrust arrearage, the SunTrust Note balance of at least $1.03 Million and some taxes and credit card obligations.

82. On the effective date of the attempted transfer, Len was required to pay the credit cards, taxes, attorney fees, SunTrust arrearage and the Plaintiffs' Judgments.

B. **Facts Related to the Plaintiffs' Acquisition of the Trustee's Avoiding and Recovery Actions**

83. The Court held a hearing on the Trustee's Motion to sell in June, 2019. Mr. Young, counsel for the Defendant, appeared at the hearing representing Mr. Ron Salas and the Defendant. Mr. Young had entered his appearance in this case on behalf of the Defendant. At all relevant times, Mr. Young represented both Ron Salas and the Defendant. Mr. Young represented his clients' support for the sale at the Court hearing.

84. After the hearing in June, 2019, this Court entered an order on June 12, 2019 authorizing the sale and also setting forth the bidding and sale procedures which the Trustee followed. The Defendant supported the sale and requested that the Court authorize the sale, which it did pursuant to its order of June 12, 2019 (D- 179) ("the Sale Order").

85. Thereafter, in accordance with the Sale Order, the Trustee conducted an auction sale. The sale took place on July 23, 2019. At the end of the auction, the Plaintiffs were the successful bidders. The Trustee's Report of Sale was filed herein on August 14, 2019 (D-191) ("Report of Sale").

-26-

86. The Defendant filed no objections or opposition to the proposed sale, this Court's Order of June 12, 2019, or the Report of Sale.

87. No party appealed the Sale Order and no party sought any additional review or modification of that Order, the Report of Sale or the accompanying Bill of Sale (D-191, pp. 3-4).

88. In the Defendant's confirmed Plan of Reorganization in his Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Columbia, Case No. 18-00260 ("the D.C. Bankruptcy"), filed simultaneously with this case, the Defendant acknowledges that the Plaintiffs were the successful bidders for the Trustee's avoidance and recovery actions. Although the Defendant's Plan and court approved Disclosure Statement specifically state that the Defendant has reserved all defenses and objections to the subject avoidance and recovery actions, at no time did the Defendant assert that the Plaintiffs were not the rightful owners of the causes of action set forth in this Complaint or lacked standing to pursue those causes of action. In fact, the Defendant's approved Disclosure Statement (the D.C. Bankruptcy, Case No. Docket No. 276) the Defendant states specifically that "...[the Plaintiffs] possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len Salas Bankruptcy Case." *See*, M Salas Second Amended Disclosure Statement, Exhibit 2, at p. 17. The Plaintiffs reached agreement with the Defendant to withdraw their objections to the Defendant's proposed plan of reorganization based upon the representations made in the Disclosure Statement and proposed Plan of Reorganization, including the representation that the Plaintiffs were the rightful owners of the causes of action which form the bulk of this Complaint.

89. The Defendant filed his proposed Chapter 11 Plan of Reorganization on August 1, 2019. In response to objections and events unrelated to this Complaint, the Debtor filed an

-27-

Amended Disclosure Statement and Plan, followed by a Third Amended Plan, which was eventually confirmed by the D.C. bankruptcy court. The Defendant's disclosure statements and proposed plans specifically referenced the sale of the avoidance actions at issue here, but did not raise any objections or deficiencies regarding the sale. While the Defendant reserved his right to defend the prospective avoidance actions, he did not raise any issues regarding the Plaintiffs rightful ownership of those actions. *See* above discussion.

C. **Plaintiffs' List of Uncontested Facts**

90. In accordance with the local rules of this Court, the Plaintiffs have attached to this Memorandum a List of Undisputed Facts which support the Plaintiffs' Motion, along with citations to the documents, pleadings, filings, depositions and testimony which support those Facts.

IV. **ARGUMENT**

A. **The Plaintiffs are Entitled to Summary Judgment in Accordance with Fed. R. Civ. P. 56**

91. Summary Judgment in bankruptcy cases, adversary proceedings and contested matters, is governed by Fed. R. Civ. P. ("FRCP") 56 which is incorporated into this adversary proceeding pursuant to Fed. R. Bankr. P. 7056 (with only minor changes)(unless stated specifically to the contrary, all references to summary judgment rules wqill refere to the language of FRCP 56.

92. This court should grant summary judgment to the Plaintiffs if the record before the court is sufficient to show that there is no genuine dispute as to any material fact and the Plaintiffs are entitled to judgment as a matter of law. *Beard v. Banks*, 548 U.S. 521, 529

-28-

(2006). Rule 56 mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's defense. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

93. In order to obtain summary judgment the Plaintiffs' burden is to show the absence of a genuine, material dispute and an entitlement to judgment under applicable law. *Id., at* 323.

94. Because this case is not a jury trial, most of the facts of the case are accepted and not disputed and judgment is based upon the specific language of the Bankruptcy Code and D.C. Code, the Plaintiffs, the facts to establish entitlement are straightforward. Furthermore, entitlement to a judgment at this stage, after completion of discovery, is governed by long standing statutory provisions that are the subject of significant court review and approval. Nevertheless, the Plaintiffs are required in this Motion to show that the evidence is not subject to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). *See also, Limor v. Anderson (In re Scarbrough)* , 2019 Bankr. LEXIS 933 (BAP 6th Cir. 2019) in which the 6th Circuit's Bankruptcy Appellate Panel explained:

> perhaps a better way to describe the summary judgment analysis in bankruptcy proceedings is to say that when the moving party bears the burden of proof at trial, she must make a prima facie case strong enough to justify depriving the other party of her day in court. Depending on who bears the burden of proof on a material issue, the moving party can make this showing by using deposition testimony and affidavits; offering documentary evidence that would be admissible at trial; and/or pointing the court to facts in the record that otherwise preclude judgment for the non-moving party.

*Id.* at *4.

95. A genuine dispute exists, such that the Plaintiffs Motion should be denied, only when

a rational fact finder, considered the evidence in the summary judgment record could find in favor of the non-moving party. ***Ricci v. DeStefano***, 557 U.S. 557, 586 (2009); ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242 , 247-252 (1986).

96. A genuine dispute is not created by a mere scintilla of evidence or evidence which is only "colorable' or insufficiently probative. ***Id.*** Additionally, summary judgment will not be defeated if the claim or defense asserted by the non-moving party is based upon a factual scenario that is plainly contradicted by the summary judgment record. ***Scott v. Harris***, 550 U.S. 272, 280 (2007); ***Coble v. City of White House***, 634 F.3d 865, 868-9 (6th Cir. 2011) (the principle declared in ***Scott***, that is, that the court need not credit "visible fiction", applies to all types of objectively conflicting evidence).

97. According to the 6th Circuit, in ***Coble***, construing the facts on summary judgment in the light most favorable to the non-moving party usually means adopting the plaintiff's version of the facts. ***Id.***, at 868, citing ***Scott,*** 550 U.S. at 378. However, as the 6th Circuit acknowledged, the Supreme Court clarified in **Scott** that facts must be viewed in the light most favorable to the non-moving party "only if there is a 'genuine' dispute as to those facts." ***Coble, supra***, citing ***Scott,*** 550 U.S. at 380(quoting Fed. R. Civ. P. 56(c)).

98. In the context of a motion for summary judgment courts should not accept that which is so utterly discredited by the record that no reasonable trier of fact could have believed it. ***United States v. Hughes***, 606 F.3d 311, 319 (6th Cir.2010)(quoting ***Scott,*** 550 U.S. at 379-81)(cited and quoted in ***Coble***, 634 F.3d, at 868.

99. In a trio of summary judgment cases all decided in 1986, the Supreme Court put its stamp of approval on summary judgment motions as a means to eliminate unnecessary trials.

-30-

The Supreme Court has analogized a motion for summary judgment to a motion for directed verdict, because both remove the trial of factual questions from the finder of fact. If the movant under Rule 56 presents evidence that, if not controverted at trial, would entitle the movant to a Rule 50 judgment as a matter of law, that evidence must be accepted as true in a summary judgment motion, when the party opposing the motion does not offer counter-affidavits or other evidentiary material showing that a genuine issue remains to be tried, or that she is unable to present facts justifying opposition to the motion under Rule 56(d). Celotex, 477 U.S. at 323, 106 S. Ct. at 2552; Liberty Lobby, 477 U.S. at 250, 106 S. Ct. at 2511 (standard for granting summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a)).

**Limor, supra,** 2019 Bankr. LEXIS 933, at *5.

100.  The Plaintiffs assert that they are entitled to Summary Judgment on Counts I, II, IV, V, and VI of the Complaint because the Plaintiffs claims fit squarely with the language of 11 U.S.C. §§ 544 (a) and 548(a)(1)(A) and (B) and D.C. Code §§ 28-3104 and 28-3105 and there are no disputed material facts, within the meaning of Rule 56, which would create a genuine, or colorable issue preventing judgment at this time.

B.     **The Plaintiffs Have Standing to Pursue The Causes of Action Stated in the Complaint**

101. Pursuant to the confirmed Plan in Max's case, which specifically recognizes the Plaintiffs' standing to pursue the Complaint's causes of action for the benefit of Len's bankruptcy estate, and the Trustee's sale of his avoidance and recovery actions to the Plaintiffs in Case No. 18-2662, as confirmed by this court, the Plaintiffs the owners of the recovery and avoidance claims set forth in this Complaint and have standing to pursue those claims. **See Jefferson County Bd. Of County Comm'rs v. Voinovich (In re V Cos.)**, 292 B.R. 290, 294, 298 (B.A.P. 6th Cir. 2003) (following **Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group)**, 66 F.3d 1436, 1438 (6th Cir. 1995).

-31-

C. **The Plaintiffs are Entitled to Recovery under Count IV of Their Complaint (Fraudulent Conveyance Under 11 U.SC. § 548)**

102. The purpose of avoidance of preferential transfers under 11 USCS § 547 and fraudulent transfers under 11 USCS § 548 is to prevent a debtor from diminishing, to the detriment of some or all of his creditors, funds or property that would, except for the transfer, be generally available for distribution to creditors. Consequently, any funds or property under the control of the debtor, regardless of source, are deemed property of debtor and cannot be transferred if such transfer diminishes the estate. *In re Chase & Sanborn Corp.*, Bankr. L. Rep. (CCH) ¶ 1753, 813 F.2d 1177 (11th Cir. 1987).

103. Purpose of statute is to recover for estate assets that could be distributed to unsecured creditors, equity secured creditors, or to debtor as exempt property, and to rectify prepetition depletion of debtor's estate. *Ryker v. Current (In re Ryker)*, 272 B.R. 602, Bankr. L. Rep. (CCH) P78605, (Bankr. D.N.J. 2002), rev'd, remanded, 301 B.R. 156, 2003 U.S. Dist. LEXIS 20515 (D.N.J. 2003).

    1. Actual Fraud - 548 (a)(1)(A)

104. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors of Len Salas, including Sun Trust Bank, the Plaintiffs and the other creditors of the bankruptcy estate of Len Salas by transferring the Property to Max without permission and by fabricating the facts and circumstances of the alleged Quitclaim .

105. The Defendant and the Debtor executed a Trust and Quitclaim Deed in July, 2010 at the Colorado office of Ron Salas, the Debtor's brother and the Defendant's son. Ron was a

-32-

fledging Colorado attorney at the time who, by his own admission, had limited knowledge of trusts and no knowledge about creating an effective trust or deed to property in the District of Columbia. He confirmed as much in his deposition on August 10, 2018 (Exhibit 8) and his testimony at the Exemption Hearing in August, 2018 in Case No. 18-260 (Exhibits 6 and 20).

106. The purpose of the Deed was to "remove Len" from the title to the Property. The Deed was never recorded and the location of the original deed is unknown.

107. In 2011, by virtue of emails addressed from Ron to the defendant and the debtor, and addressed from Max to his real estate attorneys at the time (Exhibit 7), it is clear that Len and Max had long since abandoned the Quitclaim Deed. Ron's direction to Max to have a D.C. attorney prepare a deed show that the deed Ron created must not have been defective and could not be recorded.

108. From 2011 through 2017 Len continually asked Max to remove him (Len) from the title to the Property, a clear indication that the deed was ineffective and not recordable.

109. In October, 2015, Max and Len were sued in the D.C. Superior Court by the Plaintiffs for damages resulted from the gross negligene of Len and Max and the horrific deaths of Nina Brekelmans and Michael McLoughlin from a fire at the Property in June, 2015.

110. In October, 2015, Len, Max, Ron and Len's wife, Kendra, all knew that the only reason Len was sued was because his name remained on the title to the Property. They also knew that if Len could be proven not to be the owner of the Property he could be dismissed from the lawsuit.

111. Ron Salas testified in 2018 that he knew that the July, 2010 Deed could not have been recorded because Len was named a defendant in the lawsuit. He testified as if the Deed was

-33-

still in effect even though he knew it was not valid, could not have been recorded and no longer existed.

112. The Superior Court case eventually went to trial in late March, 2018. In early April, 2018 the Plaintiffs obtained their judgments.

113. From October, 2015 until February, 2018, a month before the Superior Court trial was to begin, none of the Salas' produced an original or copy of the Quitclaim Deed.

114. Max had the only original of the Deed. He testified that he gave the original to his real estate counsel and was not sure if he ever got it back. Based upon the communications among the Salas's and Max's counsel in 2011 and 2012 it appears certain that the Deed was left at the offices of Max's counsel and likely thrown out as useless. Regardless, Max did not retain the original or, if he did, it may have been destroyed in the fire. It is likely that Max's real estate attorney knows the answer.

115. By late 2017, with the trial looming, it was obvious to Len and Max that they were facing substantial judgments from the Superior Court Litigation. Still no one produced the Deed or a copy.

116. It was only after Max learned from his bankruptcy counsel, just weeks before trial, that the long lost deed could give him an opportunity to exempt the Property from the judgments he was facing. Max and Len learned that Len could not exempt the Property because he was not residing in the Property which meant if Max could somehow be deemed the owner, then he could exempt the Property under D.C.'s very generous homestead exemption. D.C. Code § 15-501(a)(14).

117. Armed with the knowledge of what they needed to do, from Max's bankruptcy

-34-

counsel, Ron, Len and Max concocted the scheme whereby they would now claim they forgot about the deed for all these years and magically produced it so that Max could claim the exemption he eventually got under, to say the least, false pretenses.

118. The schemers involved in this fraud include, at a minimum, Len, Max and Ron.

119. The purpose of the fraud was to transfer the Property from non-exempt to exempt status to thwart the Plaintiffs' collection of their judgments.

120. The fraud scheme was developed and initiated in or about February, 2018 and continues to this day.

121. In February, 2018 Len (and Max) was facing a substantial judgment. On the effective date of the transfer, April 17, 2018, Len (and Max) owed more than $15 Million to creditors including Len's attorneys, the IRS and the Plaintiffs.

2.    Fraudulent Conveyance - § 548 (a)(1)(B)

122. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because, by transferring the only major asset of Len to his father, the transfer was likely to, and did, make Len insolvent and unable to pay his mortgage obligations to Sun Trust Bank. Moreover, at the time of the transfer, and at all times from 2007 through 2018, Max gave no consideration, made no payments and gave or transferred no property to Len. Max has produced no evidence of consideration for the transfer and Len has testified repeatedly, that Max gave Len no money or property of value at any time from 2007 through 2018.

123. In addition, at the time of the transfer under 548(d)(1), April 17, 2018, Len was clearly insolvent since he was unable to pay his attorneys and the IRS, among other creditors, and he had a recent unsatisfied judgment recorded against him totaling in excess of $15 Million.

-35-

124. Len received no compensation or property of value and gave up property worth in excess of $2 Million while remaining solely obligated on a Deed of Trust Note to Sun Trust bank that was in default at the time of the alleged transfer. The arrearage alone, on the SunTrust Note was more than $374,000.

125. The transfer of the Property in 2010 by Quitclaim Deed was made after two years prior to Max's Bankruptcy because pursuant to Code § 548 (d)(1) the transfer of real property is deemed perfected when the deed is recorded or, if not recorded prior to the bankruptcy filing, the date immediately prior to the bankruptcy filing, namely April 18, 2018. Therefore, the effective date of the transfer is April 17, 2018.

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition.

§548 (A)(1).

126. Section 548(d)(l) also provides:

> For purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

Accordingly, for purposes of 11 U.S.C. § 548, the transfer date would be April 1 7, 2018, because the Quitclaim Deed was not recorded at the time of Len's bankruptcy filing..

127. A transfer under Code §548 (a)(1)(B)(2) if:

-36-

2.  The debtor received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    a.  The Debtor was insolvent at the time of the transfer; or

    b.  the Debtor became insolvent as a result of such transfer or obligation; or

    c.  the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such Debts matured.

128.  The Plaintiffs assert that there is no dispute regarding any facts relevant to the Plaintiffs ability to recover the Property as a fraudulent conveyance under the provisions of 11 U.S.C. §548 (a)(1)(B)(2) and the documents and testimony of the Salas family members confirm that the "transfer" of the Property pursuant to the Quitclaim Deed was a fraudulent conveyance based upon the following:

    a.  The Salas family members hid the emails and communications between and among Ron, Len, Max, and the Goldstein firm (Stan Goldstein and Lynn Boileau), during the period 2011-2012 which clearly shows that the Quitclaim Deed was abandoned by Max and Len; and

    b.  Both Len and Max testified that Len was attempting to get his name off the Property, not the loan, in the period after 2010 at least through the year of the tragic fire at the Property (2015); and

    c.  None of the Salas family members could confirm the existence, or identify the location of the original Quitclaim Deed after 2012; and

    d.  The 1610 Riggs Place Trust filed no tax returns for any period; and

    e. Len testified that Max made no payments to Len at the time of the alleged transfer in 2010; and

    f.  Max made no payments of any kind related to the Propery to Len in or after 2007; and

-37-

g.  Max gave no consideration of a non-monetary kind to Len, at any time, 2007 through 2018; and

h.  The obligation under the Sun Trust Deed of Trust increased from $870,000 in 2007 to at least $1,030,825.85 as of the filing of Max Salas's bankruptcy case on April 18, 2018.  See Max Salas Schedules A/B-J, May 2, 2018 (D-12) Case No. 18-00260, United States Bankruptcy Court for the District of Columbia.  A copy of the Schedules page (p. 19 of 37) of Docket Entry 12 is attached hereto as Exhibit 18. According to a Stipulation filed by the Defendant/Debtor and U.S. Bank (successor in interest to SunTrust) the balance of the Sun Trust Deed of Trust as of September 29, 2019 was $1,208,720.40.  See Stipulation filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, a copy of which is attached hereto as Exhibit 15; and

i.  The Property represented, by far, the only major asset owned by Len; and

j.  When the Property was transferred on April 17, 2018, Len was still obligated on the SunTrust loan for at least $1,030,825.85; and

k.  When the Property was transferred, Len was obligated to the Estates in the amount of $15.2 Million, plus interest; and

l.  According to Len's schedules his assets as of April 18 2018 totaled $53,373.38.  His liabilities totaled $16,307,795.41.  Len Salas Schedules, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, (D-1), p. 12 of 56; and

127.  In an analogous case, ***Rameker v. Peterson (In re Associated Enters., Inc)***, 234 B.R. 718, the Wisconsin bankrupt court held that an attempted transfer of real estate into a defective trust was a fraudulent conveyance recoverable for the benefit of the debtor's estate.

The court entered judgment in favor of the bankruptcy trustee finding:

> Because the trust fails, so does this argument. The transfers were made to an insider within one year before the petition was filed. The defendant is the president of the debtor corporation and a consummate insider. All relevant transfers took place in 1998 and the petition was filed in October 1998. The debtor was insolvent at the time of the transfers or the transfers caused the debtor to become insolvent. The debtor's bankruptcy schedules list total assets of about $ 14,000 and liabilities of almost $ 23,000 less than six months after the transfers took place. Finally, the debtor received no consideration for the

-38-

transfers. This is obviously less than reasonably equivalent value.

***Rameker v. Peterson (In re Associated Enters., Inc.)***, 234 B.R. 718, 724 (Bankr. W.D. Wis. 1999).  Although the trust at issue here is defective for a different reason, it was, nonetheless, a defective trust, void ab initio, as in ***Rameker***.  Additionally, as here, in ***Rameker*** found that the debtor's liabilities exceeded its assets at the time of the transfer determining that the debtor was either insolvent at the time of the transfer or the transfer caused the debtor to become insolvent.  The debtor, in ***Rameker***, received no consideration for the transfer and neither did Len. And, finally, no deed of any kind was recorded to effect the attempted transfer.

128.  In another case similar to this one, the bankruptcy court for the Middle District of Florida determined that the trustee could avoid, pursuant to 11 U.S.C.S. § 548, a transfer of real property which the Debtor deeded to her former husband and son and to recover the property for the benefit of the estate. The court found that the initial transfer of debtor's real property took place on the date that the deed was recorded, which was less than one year before the petition date (the limitations period prior to 2005). In addition, debtor was insolvent at the time of the initial transfer and the initial transfer was made without consideration. It was undisputed that debtor was not residing on the property at the time of the initial or subsequent transfers, and could not have claimed the property as her homestead. Thus, the necessary statutory elements were established and the transfers were subject to avoidance by the bankruptcy trustee under 11 U.S.C.S. § 548(a)(2).

***Cohen v. Bellamy (In re Shannis)***, 237 B.R. 862, 862 (Bankr. M.D. Fla. 1999).

129.  In its decision, the ***Shannis*** court noted that, "other then the effective date of the

-39-

transfer, the facts are not in dispute." *Id.* Here, the material facts are not in dispute, except the effective date of the transfer (the Defendant continues to assert the transfer took place in July, 2010). Max has consistently testified that he was the party responsible for paying the SunTrust loan, from 2007 through the commencement of Max's bankruptcy case. He paid no consideration for the original SunTrust loan of 2007 and the loan balance increased from 2007 to September, 2019 by more than $300,000. The Quitclaim Deed was not recorded as of the commencement of Max's bankruptcy case on April 18, 2018. Len was insolvent on April 18, 2018 and the Property was Len's only asset of more than a few thousand dollars. During the period 2010 through 2018, Len's income was limited and he was unable to pay his obligation including the SunTrust Mortgage during that time.

130. Applicable Florida law appears to be more restrictive than D.C. law regarding the rights of a subsequent purchaser for value. *See*, Fla. Stat. § 695.01. *Cohen v. Bellamy (In re Shannis)*, 229 B.R. 234, 237 (Bankr. M.D.Fla. 1999)( depends upon interpretation of Florida's provision which states "without notice"). However, under the analogous (to this case) facts of the *Shannis* decisions above, the court determined that the trustee can avoid the attempted transfer to relatives since that transfer occurred within 1 year (under pre-2005 language of § 548 (a)) even though the date of the deed was more than one year prior to the bankruptcy because the deed was not recorded until the period within one year of the bankruptcy filing.

131. Standard of proof required under 11 USCS § 548 is preponderance of evidence. *Dahar v. Jackson (In re Jackson),* 2004 BNH 26, 318 B.R. 5, 2004 Bankr. LEXIS 1917 (Bankr. D.N.H. 2004). By that standard, the record in this case and the plain language of the statute, § 548(a)(1)(B) the Plaintiffs are entitled to summary judgment under Count IV of the Complaint.

-40-

### D. The Plaintiffs are Entitled to Recover Under Count V of Their Complaint (Fraudulent Conveyance Under D.C. Law)

132.  The Plaintiffs, as the holders of the rights and claims of the Trustee, may avoid any transfer that is voidable under applicable law pursuant to Code § 544 (b) (1).

133.  Under the law of the District of Columbia, the transfer of the Property alleged herein, is a fraudulent conveyance because the transfer was performed with fraudulent intent as to existing creditors, such as the IRS, other taxing authorities, Sun Trust Bank, and others, including the Plaintiffs, and was made for less than reasonably equivalent value, all as specifically prohibited by D.C. Code § 28-3104, *et seq.*

134.  A transfer made is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. D.C. Code § 28-3105.

135.  Here the transfer was to the Debtor's father on the eve of bankruptcy less than two weeks after the entry of judgments against the Debtor in an amount in excess of $15,000,000. Moreover, the Defendant not only knew Len could not pay the judgment balances, he also knew that the Debtor was unable to pay his attorneys in the Superior Court case.  The Defendant's bankruptcy schedules show a payment of $2,000 from Max to Len's attorneys prior to the Defendant's bankruptcy filing.

136.  A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in

-41-

exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> In the District of Columbia, a transfer of real property is made:
> (A) With respect to an asset that is real property other than a fixture, including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee.

D.C. Code § 28-3106. Therefore, under D.C. law the alleged 2010 transfer, even if this Court determines that the Quitclaim Deed is valid, was not perfected at the time of Max's bankruptcy filing and is recoverable under D.C. law.

137. In an action for relief against a transfer or obligation under D.C. law, a creditor may obtain:

> (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

> (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee...;

> (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

>> (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

>> (B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

>> (C) Any other relief the circumstances may require.

D.C. Code § 28-3107

-42-

138. The date of transfer according to the law in the District of Columbia, for purposes of creditors and bona fide purchasers without notice, is the date the deed is recorded, in this case, no earlier than April 17, 2018.

> Any deed conveying real property in the District, or interest therein, or declaring or limiting any use or trust thereof, executed and acknowledged and certified as provided in §§ *42-101*, *42-121* to 42-123 [repealed],*42-306*, and *42-602* and delivered to the person in whose favor the same is executed, shall be held to take effect from the date of the delivery thereof, except that as to creditors and subsequent bona fide purchasers and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

D.C. Code §42-401. ***Sovran Bank v. United States (In re: Aumiller)***, 168 B.R. 811 (Bankr. D.D.C. 1994).

139. As this court has already noted, because the underlying state law avoidance claim was not time-barred as of the commencement of Len Salas' case, this claim could have been brought by the Trustee provided the complaint was filed within the time periods prescribed in 11 U.S.C. § 546(a). ***See UMB Bank , N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down, LLC***), 610 B.R. 779, 785 (Bankr. D. Del. 2020). (If "underlying state law avoidance claim is not time-barred as of the commencement of a bankruptcy case, a section 544(b)(l) claim may be brought provided that it is commenced within the time periods prescribed by section 546(a)."); ***Tabor v. Davis***, No. 05-15794-L, 2016 WL 11696269, at *13 (Bankr. W.D. Tenn. June 15, 2016) ("The reachback period for avoiding fraudulent transfers that could have been avoided by a creditor but for the filing of a bankruptcy case is measured from the entry of the order for relief.").

140. All of the arguments set forth in the section on recovery under §548(a)(1)(B)(2),

particularly those involving the circumstances of the transfer of the Property and the insolvency of the Debtor apply here. The Plaintiffs assert they are entitled to judgment under the D.C. fraudulent conveyance statute.

     E.     **The Trustee's Status as a Bona Fida Purchaser Gives the Trustee a Superior Interest in the Property Than the Defendant's**

141. ***Aumiller, supra*** explained that Section 544(a) of the Bankruptcy Code, the "strong arm" clause, bestows upon the trustee the rights of a hypothetical judgment lien creditor and the rights of a bona fide purchaser for value as of the date of the filing of the bankruptcy petition. Although the trustee's strong arm powers arise under federal law, the scope of these powers is governed by the substantive laws of the state in which the property is located, in this case, the District of Columbia. ***In re Bridge***, 18 F.3d 195, 200 (3d Cir. 1994). Therefore, the relevant inquiry in this case is whether the trustee, clothed with the rights bestowed upon him as a bona fide purchaser or judgment lien creditor pursuant to D.C. law, prevails over whatever equitable or legal rights the Defendant has.

142. Pursuant to District of Columbia law, a deed conveying an interest in real property is not effective against a subsequent bona fide purchaser or creditor without notice unless it is recorded. D.C. Code § 45-801 (1990); 3 ***Manogue v. Bryant***, 15 App. D.C. 245 (1899) (purpose of statute is to protect judgment creditors as well as purchasers against claims of which they had no notice). Because the equitable lien in this case was not recorded, it would not be effective against a bona fide purchaser or judgment creditor who acquired an interest in the property without notice of that equitable lien.

143. Pursuant to 11 U.S.C. § 544 (a), the Trustee has as of the date of the Len Salas

bankruptcy petition, namely, May 2, 2018, the status of a bona fide purchaser of real property from the debtor, without notice.

144. Under Code § 544 (a)(3) the trustee's bona fide purchaser status gives the Plaintiffs priority over subsequently recorded interests in the Property.

145. Under D.C. Code, § 42-401:

Any deed conveying real property in the District, or interest therein, ...shall be held to take effect from the date of the delivery thereof, except that **as to creditors and subsequent bona fide purchasers** and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

146. As a result, the Plaintiffs have a superior and priority interest in the Property ahead of any interest acquired by Max Salas and, therefore, the Property should be turned over to the Plaintiffs, or sold to recover the net equity for the benefit of the unsecured creditors of Len Salas' bankruptcy estate.

147. Section 544 is known as the Trustee's "the 'strong arm' clause," *Aumiller, supra*, 168 B.R. at 817, and "'gives a bankruptcy trustee the rights and powers of a judicial lien creditor or a bona fide purchaser of real property and allows the trustee to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a judicial lien creditor or a bona fide purchaser of real property.'" *Drown v. Wells Fargo Bank, N.A. (In re Scott)*, 424 B.R. 315,327 (Bankr. S.D. Ohio 2010) (quoting *Craig v. Seymour (In re Crabtree)*, 871 F.2d 36, 37 (6th Cir. 1989)).

148. The scope of these powers is governed by the substantive laws of the state in which the property is located, in this case, the District of Columbia. *Midlantic Nat'l Bank v. Bridge (In re Bridge)*, 18 F.3d 195, 200 (3d Cir. 1994) (citations omitted).

-45-

149.  Historically, the bankruptcy code has been hostile to secret liens such as the Quitclaim Deed at issue here. ***Bridges, supra***, at 199.

> "While an equitable lien . . . may be enforceable against . . . subsequent purchasers and incumbrancers with notice, it may not be enforced against prior incumbrancers or subsequent incumbrancers without notice. The trustee belongs to the latter class." ***Hayes v. Gibson***, 279 F. 812, 814 (3d Cir. 1922) (internal citations omitted)

***In re Bridge, supra***, 18 F.3d at 199 n.3.

150.  The trustee's status under section 544(a) is governed by the state substantive law defining that notice. See, e.g., ***In re Probasco***, 839 F.2d 1352 (9th Cir. 1988) (debtor in possession could not avoid partner's interest in real property as a hypothetical bona fide purchaser under section 544(a)(3) because it had constructive notice under California law of the partner's interest in the property); ***Angeles Real Estate Co. v. Kerxton***, 737 F.2d 416, 420 (4th Cir. 1984) (trustee's rights under section 544(a) as judgment lien creditor are subject to prior equitable interests under Maryland law); ***McCannon v. Marston***, 679 F.2d 13 (3d Cir. 1982) (where possession of property by claimed purchaser put trustee on constructive notice of purchaser's interest under Pennsylvania law, trustee could not avoid purchase of the property under section 544(a)(3)); ***In re Roman Crest Fruit, Inc.***, 35 Bankr. 939 (Bankr. S.D.N.Y. 1983) (where reasonable inquiry would have revealed existence of agreement between debtor and assignee for the sale of debtor's interest in store leases, and knowledge of such agreement was of sufficient magnitude to require hypothetical purchaser to inquire further, assignee's equitable lien could not be avoided by bankruptcy trustee under section 544(a)).

151.  Pursuant to District of Columbia law, a bona fide purchaser or judgment creditor is subject to actual, constructive or inquiry notice. ***Clay Properties, Inc. v. The Washington Post***,

-46-

604 A.2d 890, 894 (D.C. App. 1992) (subsequent bona fide purchaser can be held to inquiry notice); *Kayfirst Corp. v. Washington Terminal Co.*, 813 F. Supp. 67, 72 (D.D.C. 1993) (same); *Manoque*, 15 App. D.C. at 261-62 (judgment lien creditor that was held to inquiry notice of the mortgagee's equitable rights took subject to those rights); *Hume*, 12 App. D.C. at 368-69 (failure to record or acknowledge deed does not deprive it of priority over judgment creditor having notice of its existence); *Groome*, 13 App. D.C. at 470 (equitable lien has priority over a subsequent judgment lien creditor who had notice of equitable claim). See also *Harris v. Maryland National Bank*, 165 B.R. 729 (Bankr. D.D.C. 1994) (recorded Deed of Trust is sufficient notice, (despite misindexing at the Recorder of Deeds) under D.C. statute which states that Deed is perfected when presented to the Recorder of Deeds for recording).

152.  Actual notice is not relevant in the context of section 544(a) as the trustee assumes the role of a bona fide purchaser or judgment creditor without actual knowledge. *McCannon*, 679 F.2d at 16-17 (statute's language renders trustee's actual knowledge irrelevant but trustee may be held to constructive or inquiry notice). *See also, In re Sandy Ridge Oil Co.,* 807 F.2d 1332 *(7th Cir. 1986)*, *S. Bank and Trust Co. v. Alexander (In re Alexander)*, 524 B.R. 82 (E.D. Va. 2014)(trustee took title to half-interest in property despite existence of an unrecorded deed); *Hardesty v. Horn (In re Horn)*, 606 B.R. 747, 67 BCD 212 (Bankr. S.D. Ohio 2019). In *Hardesty,* the debtors had transferred the subject property by an unrecorded deed to the father prior to filing their petition and at the time of the filing the father was merely the holder of an unrecorded deed. The bankruptcy court granted summary judgment in favor of the trustee. The Court determined the fact that the father had previously transferred the title to the debtors so they could obtain financing did not matter, nor did the fact that the county auditor's office had

-47-

approved the conveyance back to the father because such approval was insufficient under Ohio Rev. Code Ann. § 5301.25 to put the trustee on constructive notice of the transfer. *Id.*, 606 B.R. 747, 748 (Bankr. S.D.).

153.  Constructive notice, which has generally come to mean record notice, could not exist in this case because the equitable lien was not recorded. *Clay*, 604 A.2d at 895 n.15.  See also, *Sandy Ridge Oil* and  *Hardesty, supra.*  Compare *Treinish v. Norwest Bank Minn., N.A. (In re Periandri)*, 266 B.R. 651 (B.A.P. 6th Cir. 2001)(Pending foreclosure, which operated as a lis pendens under Ohio law was constructive notice which defeated the trustee's bona fide purchaser status). Here, the trustee had no notice of any recorded document which could defeat his interest as of Len's bankruptcy filing on April 18, 2018.  *Sovran Bank v. United States (In re Aumiller*), 168 B.R. 811, 817-19 (Bankr. D.D.C. 1994)

154.  Under well established law interpreting the subject D.C. statute, and other, similar state statutes, the conveyance, for purposes of avoidance or recovery is the date the subject deed is recorded or, if unrecorded, the day before the Debtor's bankruptcy petition, here - April 17, 2018.  As a result,  the avoidance and recovery actions set forth in the Complaint are well within the limitations periods established by 11 U.S.C. §546 (a), or any other applicable limitations period.  *See, for example, Williams v. Marlar*, 252 B.R. 743, 758 (8th Cir BAP 2000)(Arkansas Law); *Southern Bank & Trust Co. v. Alexander (In re Alexander)*, 2014 Bankr. LEXIS 3048, *21(Bankr. E.D. Va. 2014) *Health Science Prods. v. Taylor (In re Health Science Prods.)*, 183 B.R. 903, 919 (Bankr. N.D. Ala. 1995);

155.  The record of an instrument that is not permitted by law to be recorded, or that is not proved for record as required by law, is constructive notice to no one.  *Clark v. Harmer*,

-48-

156.  Since the "transfer" at issue here, occurred, by statute, on April 17, 2018 and was an unrecorded transfer of real property, at best, the Trustee's status as a bona fide purchaser and judgment lien creditor, as of the date of the Debtor's bankruptcy filing, is superior to whatever interest the Defendant may have as of the same date.

F.    **The Trustee's Status as Hypothetical Judgment Lien Holder Gives the Trustee a Superior Interest in the Property**

157.  As of the commencement of this case, April 18, 2018, the trustee has, without regard to any knowledge of the trustee or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien, whether or not such a creditor exists. Code §544 (a)(1).

158.  The Plaintiffs are the authorized representatives for prosecution of all of the Trustee's rights and powers under Code §§ 544, *et seq.*

159.  A judicial lien creditor, under the laws of the District of Columbia, has a superior interest in the Property than that of a competing creditor or owner who has not recorded an interest in the Property.  Thus, as discussed below, the Trustee's interest is superior to the unrecorded interest of the Defendant.

160.  Section 544( a)( 1) grants a trustee "the status of a hypothetical lien creditor who

-49-

is deemed to have perfected his interest as of the date of the filing of the bankruptcy petition."

***Rogan v. Bank One, N.S. (In re Cook)***, 457 F .3d 561, 564 ( 6th Cir. 2006).

161.  The difference between a bona fide purchaser and a judgment creditor, for

purposes of the Trustee's Avoiding Powers, is explained as follows:

> a judgment creditor is not in the position of a bona fide purchaser, and his
> claim is subject to prior, undisclosed equities. "He is neither in fact nor in law
> a bona fide purchaser, and must stand or fall by the real, and not the apparent
> rights of the defendant in the judgment."' ***Kolker v. Gorn***, 193 Md. 391, 398,
> and cases cited.

***E. Shore Bldg. & Loan Corp. v. Bank of Somerset***, 253 Md. 525, 530, 253 A.2d 367, 370

(1969).  Therefore, unlike a bona fide purchaser, a judgment creditor is subject to any

existing equitable claims, regardless of notice.  Here, however, there are no equities that

could defeat the Trustee's lien since the Quitclaim Deed, at best, constituted a secret lien.

Moreover, the facts and circumstances of the resurrection of the Quitclaim Deed in February,

2018, as described above hardly favor the Defendant.

162.  As the uncontested facts in this case show:

> a.  The Defendant failed to record the Quitclaim Deed despite his obligation to
> do so; and

> b.  Less than 6 months after the execution of the Quitclaim Deed Len and Max
> were instructed by Ron, the creator of the Quitclaim Deed, that a new Deed
> needed to be created by someone in D.C. See Exhibit 7.

> c.  Ron Salas acknowledged that he knew the only reason Len could be a
> defendant was if the Quitclaim Deed had not been recorded; and

> d.  Neither Max, Len, Ron or Kendra produced a copy of the Quitclaim Deed
> during the Superior Court litigation, until February, 2018, even though they all
> knew of its existence and they all also knew that the only reason Len was a
> defendant in the Superior Court litigation was if Len was a titled owner of the

-50-

Property; and

e.  As of February, 2018 no Salas family member had an original Quitclaim Deed; and

f.  As of February, 2018 no Salas family member was aware of the existence of an original Quitclaim or, if it existed, its location.

g.  Len produced a copy of the Quitclaim Deed in or about February, 2018 only after Max (and Len) learned from Marc Albert that the 1610 Riggs Property Trust and the Quitclaim Deed could be used to exempt the Property in Max's future bankruptcy.

h.  Both Ron and Max testified that the Quitclaim Deed was still in effect in 2018, when their own email communications in 2011 and 2012 tell a complete contradictory story.

163.  A perfected mortgage is superior to a later-recorded judicial lien. *Id.* at 565. That would apply to the SunTrust Deed of Trust but not to the Quitclaim Deed, even if it is in effect as of April 17, 2018.

164.  Much of the argument in previous Section, applied to the Trustee's status as a bona fide purchaser for value and without notice, also applies to the Trustee's status as a hypothetical, judicial lien holder but is not repeated here to avoid unnecessary duplication.

165.  Based upon the undisputed facts of this case and the express provisions of Code, § 544(a)(1) the Plaintiffs are entitled to judgment on their supeiror claim to the Property due to the Trustee's status as a judgment lien creditor.

G.  **The Plaintiffs May Recover, for the Benefit of the Debtor's Estate, the Property or its Value**

166.  Under Code § 550 (a) the trustee may recover, for the benefit of the estate, the property transferred or, upon court order, the value of the property.  Here the Plaintiffs are seeking

-51-

the equity in the Property, either through payment of the agreed amount of the equity (approximately $1.3 Million), or through the proceeds of a court ordered sale of the Property.  *See,* for example, ***ASARCO LLC v. Americas Mining Corp***., 404 B.R. 150, 162 (S.D.Tex. 2009)(court has discretion); *In re Vedaa*, 49 B.R. 409, 411 (Bankr. N.D. 1985); *In re: Beck*, 25 B.R. 947 (Bankr. N.D.Ohio 1982).

V.  **CONCLUSION**

For the reasons set forth in the foregoing Memorandum, the Plaintiffs assert that they are entitled to summary judgment on Counts I, II, IV, V, VI of their Complaint and seek a judgment declaring and adjudging that the Plaintiffs, on behalf of the Debtor's Estate are the owners of the Property and are entitled to recover the Property or its value for the benefit of the Debtor's Estate and for such other and further relief as is consistent with the Plaintiffs' Complaint and the relief sought therein.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC

By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt
        Philip J. McNutt
        11921 Freedom Drive, Ste 584
        Reston, VA 20190
        703-904-4380

-52-

202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

Certificate of Service

I HEREBY CERTIFY THAT a copy of the foregoing Amended Memorandum, List of Uncontested Facts and Exhibits was delivered electronically, on the 1st day of August, 2022 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt
Philip J. McNutt

-53-

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA | : | |
| BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX  SALAS | : | |
| Defendant | : | |

PLAINTIFFS' AMENDED LIST OF UNDISPUTED FACTS,
PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 7056-1 of the rules of this Court, the Plaintiffs submit the

following facts in support of their Motion for Summary Judgment.  The Plaintiffs assert that these

facts are either stipulated by the parties, supported by the Summary Judgment Record herein, or

otherwise undisputed.

**PLAINTIFFS' LIST OF UNDISPUTED FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed on
April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee, Case
No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Motion for Summary Judgment unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

1. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans and Michael Patrick McLoughlin, respectively. Joint Stipulation of Uncontested Facts, Joint Pretrial Statement, June 22, 2020 (D-14) ("Stip"), No. 1.

**RESPONSE:**

2. Nina Brekelmans and Michael Patrick McLoughlin were tragically killed in a fire at a residence in Washington, DC (the "Fire") located at 1610 Riggs Place, NW, Washington, DC (the "Property"). Stip. No. 2

**RESPONSE:**

3. Defendant resided in the Property from approximately 2007 through early June, 2015 and then commenced residing in the Property again in early 2018. Stip No. 3, Exemption Trans. Vol. 3, 62:11 - 63:17.

**RESPONSE:**

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement.

-2-

5.  Michael Gigandet, the Court appointed Trustee of the Estate, has declined to pursue the causes asserted herein and has also declined to join in this action. Court's Memorandum Opinion dated February 11, 2021 (D-38)("L Salas Memorandum Opinion"), at p. 6-7.

**RESPONSE:**

6.  The Complaint is brought as a derivative action on behalf of the Estate of Len Salas. L Salas Memorandum Opinion dated February 11, 2021, in Case No. 20-90027 (D-38).

**RESPONSE:**

7.  In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). Joint Statement of Stipulated Facts, Joint Pre-trial Statement dated June 22, 2020 (D-14), Stipulation No. ("Stip. No.") 6.

**RESPONSE:**

8.  The Defendant, Max Salas does not have the original of the Quitclaim Deed and the 1610 Riggs Property Trust, dated July 6, 2010. Defendant's Amended Responses to the Plaintiffs Request for Admissions, dated November 11, 2021 ("Amended Responses-RFP"), Exhibit 17, Resp No. 2, p.3.  Amended Responses-RFA, Request No. 1., p. 2.

**RESPONSE:**

9.  Len Salas does not remember seeing a "wet ink" original of the Quitclaim Deed after July 6, 2010.  L Salas Trans. 140:13-23.

**RESPONSE:**

10.  The Defendant does not have the original Quitclaim Deed created in July, 2010. Defendant's Amended Responses to the Plaintiffs' Request for Admissions ("RFA"), Req. 1

-3-

**RESPONSE:**

11. That the Defendant is unaware of the location of the original Quitclaim Deed after 2012.

**RESPONSE:**

12. Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max Salas and only kept a copy.

**RESPONSE:**

13. The Defendant did not attempt to record the Quitclaim Deed after 2010.      RFA, Req. 3.

**RESPONSE:**

14. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.  RFA 16.

**RESPONSE:**

15. Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation. RFA 17.

**RESPONSE:**

16. Neither Len Salas nor Max Salas informed SunTrust in writing that Max was responsible for the SunTrust Deed of Trust Note payments.

**RESPONSE:**

17. Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note. RFA 18.

**RESPONSE:**

-4-

18.  Max Salas did not contact Ms. Sylvia Jones, a real estate broker acquaintance, regarding the location or existence of the original Quitclaim Deed since June, 2015. RFA 41

**RESPONSE:**

19. That the Note balance as of April, 2007 totaled approximately $870,000. RFA 44

**RESPONSE:**

20. That the Note balance as of the commencement of the Salas bankruptcy case (April 18, 2018) totaled more than $1,030,825.86. RFA 47

**RESPONSE:**


21.  That the Note Balance as of September 29, 2019 totaled $1,208,720.40.  Stipulation filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, Motion to Approve Settlement with U.S. Bank, Exhibit 15.

**RESPONSE:**


22.  That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim Deed purporting to transfer the Property from Len to Max.

**RESPONSE:**


23.  That the foresaid Trust and Deed were prepared and executed in Colorado.

**RESPONSE:**

24.  That the Trust was registered in Colorado by Ron Salas in 2011 even though the

-5-

Property was located in D.C. Email dated June 17, 2011 from Ron to Max, Exhibit 7.

   **RESPONSE:**

   25.  That the Defendant made at least two attempts to obtain a new or different Quitclaim Deed from the Law Firm of Stan Goldstein in 2011 and 2012.  Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

   **RESPONSE:**


   26.  That on June 17, 2011, Ron Salas sent an email to his father, the Defendant, stating that the "next step" was for his father to obtain counsel to prepare a Quitclaim Deed for Len to sign.  Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

   **RESPONSE:**


   27.  That on June 21, 2011 the Defendant forwarded Ron Salas's email of June 17, 2011 to Stanley Goldstein requesting Mr. Goldstein to assist the Defendant to transfer the Property from Len to Max.   Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

   **RESPONSE:**


   28.  On January 17, 2012, more than six months later, the Defendant sent another email to Lynn Boileau, an associate of Mr. Goldstein requesting that she "get Lenny's name off of the property." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012,

Exhibit 7.

**RESPONSE:**


29.  On February 24, 2012, Len sent his father an email asking for the status of removing Len from the property title.  Max responded on February 24, 2012 that he is "still working on this..." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7 .

**RESPONSE:**


30.  There were no further communications regarding the creation or recording of a Deed for the transfer of the Property from Len to Max after February, 2012. L Salas Trans. ____ .

**RESPONSE:**

31.  From 2010 through early 2015 Len had numerous communications with Max asking Max to remove his name from the Property. L Salas Trans. 70:18 - 74:16

**RESPONSE:**

32.  Len had several conversations with his father regarding getting his name off the loan and deed after 2010.  L Salas Trans. 71:25 - 74:16; Transcript of Len Salas's testimony at the hearing on Objections to the Claim of Exemption (of the Property) by the Debtor, Max Salas, in case no. 18-00260 in the United States Bankruptcy Court for the District of Maryland, Trial Transcript ("Exemption Trans."),Vol 1., Exhibit 20, 158:13 - 163:10; Deposition Transcript of the Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

**RESPONSE:**

-7-

33. The Sun Trust Note was in default during the period 2010 - 2018. L Salas Trans., Exhibit 13, 55:11-20.

**RESPONSE:**

34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns.

**RESPONSE:**

35. The Plaintiffs are the holders of undisputed and accepted claims totaling $15.2 Million. Of that amount, the claim of the Brekelmans estate represents $7.5 Million and the claim of the McLoughlin Estate represents $7.7 Million. Stip. No. 6

**RESPONSE:**

36. According to the Debtor's schedules and the Trustee's Final Report (D-209), in Case No. 18-2662, the Plaintiffs represent 99.8% of all allowed unsecured claims of the estate.

**RESPONSE:**

37. The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's).

**RESPONSE:**

38. The Plaintiffs received distributions on account of their claims from both estates.

**RESPONSE:**

39. The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018.

**RESPONSE:**

40. On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in

-8-

the Middle District of Tennessee and the District of Columbia, respectively.

**RESPONSE:**

41.  At the time of the bankruptcy filings by Len and Max, Len was, and continued to be, until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property").

**RESPONSE:**

42.  In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then wife, divorced.

**RESPONSE:**

43.  Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan").

**RESPONSE:**

44.  The proceeds of the Sun Trust Loan were paid to Max's wife as part of the divorce settlement. Exemption Trans. Vol. 3, Exhibit 6, 70:2-17.

**RESPONSE:**

45.  Len received no part of the $870,000.

**RESPONSE:**

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.

**RESPONSE:**

-9-

47.  At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. Exemption Trans. Vol. 3, 71:9 - 72:23.

**RESPONSE:**

48.     At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in  July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed.  Exemption Trans. Vol 3, Exhibit 6, 139:15 - 140:2; Len Salas testimony, Plan Confirmation Hearing, United States Bankruptcy Court for the Middle District of Tennessee, December 13, 2018 ("L Salas Conf. Hrg. Trans."), 68:22 - 69:2. Exhibit 4.

**RESPONSE:**

49.     Max delivered the original Quitclaim Deed to Mr. Goldstein's office but did not recall whether Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

50. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor.

**RESPONSE:**

51.  There are no documents indicating that Max was liable on the SunTrust loan at any time and Max never entered into any agreement or understanding with Len that Max was liable or

-10-

responsible.

**RESPONSE:**

52.  There is no document raised, proffered or produced by Max indicating that Len was not the sole party responsible for the Deed of Trust payments until at least November, 2019.[1]

**RESPONSE:**

53.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that, when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas testimony at the Exemption Hearing, Exemption Trans. Vol. 2, August 23, 2018 ("Exemption Trans. Vol. 2"),Exhibit 3, 33:23 - 50:25, Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 1, 42:18 - 43:2.

**RESPONSE:**

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee.

**RESPONSE:**

_____

[1]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did finally reach an agreement with Max for him to make the payments under the Deed of Trust from and after November, 2019.  However, there is no indication in the agreement reached between Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not in effect.  Therefore, Len is still liable for the entire balance under the SunTrust Note which, as of September 29, 2019, was $1,208,720.40.  See Max Salas Stipulation with U.S. Bank attached hereto as Exhibit 15.

-11-

55. According to Len, the CLR Trust, was a trust created by Max for the benefit of his three sons, Chase, Len and Ron. Len Salas, Sup. Ct. Depo, Exhibit 11, 30:5-14.

**RESPONSE:**

56. Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust." L Salas Trans. 148:1-13. In Len's Deposition Testimony in the Superior Court Litigation, Len testified, on March 9, 2016, that he had no knowledge a trust other then the CLR Trust. Len Salas Deposition Testimony, March 9, 2016 in the Superior Court Litigation, Exhibit 11, 29:14 - 30:14

**RESPONSE:**


57. The lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property.

**RESPONSE:**

58. Max did not want the rents deposited into his personal account. Exemption Trans. Vol 3., Exhibit 6, 222:12 - 16

**RESPONSE:**

59. Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2 - 150:21.

**RESPONSE:**

60. During the period 2015 through 2018, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he

-12-

received as a result of the fire damage.

**RESPONSE:**


61.  As of October, 2018, the deficiency on the SunTrust Note was $420,928.34.  Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

62. As of April, 2018, the deficiency on the SunTrust Note was $374,282.18.  Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

63.  As of April, 2018, Len remained the sole obligor on the SunTrust Note.

**RESPONSE:**

64.  The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7, 152:3 - 153:10.  See SunTrust Deed of Trust, dated April 16, 2007, Exhibit A to SunTrust Motion for Relief from Stay ("SunTrust Motion"), filed in Case No. 18-2662 on November 2, 2018 (D-79-1), Exhibit 15.

**RESPONSE:**


65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property.

**RESPONSE:**

66.  At all relevant times, Len worked only part time and had limited income and assets.

**RESPONSE:**

-13-

67.  At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

**RESPONSE:**

68.  Len did not have sufficient funds to pay his attorneys in the Superior Court litigation. He lives "paycheck to paycheck." L Salas Trans. 76:20 - 77:2

**RESPONSE:**

69.  At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans. 61:1 - 63:2.

**RESPONSE:**

70.  In 2016, Len's income was a total of $15,151.  L Salas Statement of Financial Affairs, filed April 18, 2018 in Case No. 18-2662, (D-1), Exhibit 16, p 38.

**RESPONSE:**

71.  In 2017 Len's total income was $30,408. Exhibit 16, p. 38.

**RESPONSE:**

72.  In 2018, through April 17, 2018 Len's total income was $6,720.  Exhibit 16, p. 38.

**RESPONSE:**

73.  During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them.  See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District

-14-

of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

**RESPONSE:**

74. Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, filed April 27, 2018 in Case No. 18-2662, D-10, at page 3 of 10.

**RESPONSE:**

75. On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41. Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

**RESPONSE:**

76. Len received no income, payments or property from Max in 2007 or 2010. L Salas Mtg Trans., 4/1/19, Exhibit 5, 5:22 - 7:15.

**RESPONSE:**

77. Len repeatedly attempted to get Max to remove Len's name from the Property after 2010. L Salas Depo. Testimony, Exhibit 13, 70:18 - 74:16

**RESPONSE:**

-15-

78.  Mr. Salas told his counsel, Mr. Albert and his associate, Mr. Cox, in 2018,  what Max

did with the Quitclaim Deed and left it up to his counsel to obtain the original from Mr.

Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

**RESPONSE:**


79.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13.

**RESPONSE:**


80.  In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed,

executed on July 6, 2010, as follows:

"Q And l believe you said, but l want to
clarify this, that between the time of 2012,
roughly, and l realize you said, l think, a year
or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came** in **my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind
I don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.**

-16-

**He didn't live in the District, he never- he didn't live in the house, and I- so that's the only logical reason I could make that he would be involved, that it was never done. And until that point, I did not even know that it had not been done. I assumed at some point that he came up with the money and did it. But he didn't, as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the District of Columbia, Case No. 18-00260, August 8, 2018, excerpts attached hereto as Exhibit 8, ("R Salas Trans"), 73:15 - 74:21 (emphasis in original).[2]

**RESPONSE:**

81. The Plaintiffs Judgments are now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy.  M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries  D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries  D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and D-222 (Final Decree).

**RESPONSE:**

82.  Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

**RESPONSE:**

83.  On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust

---

[2]Mr. Albert was acting as counsel for Max Salas in his bankruptcy and attended the deposition on behalf of Max.  Ron Salas appeared without counsel.

-17-

had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max. This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property. A copy of Ron's email, dated June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022.

RESPONSE:

84. These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Debtor's Responses to Movants' First Set Request for Production of Documents, served on August 6, 2018, in Case No. 18-260, Exhibit 21.

RESPONSE:

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

RESPONSE:

86. Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Nos.: LenSalas000016-17.

RESPONSE:

87. On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein. In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..." Exhibit 7, Bates Number LenSalas000016.

-18-

**RESPONSE:**

88.  In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are **two different** requests.  One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supllied) Exhibit 7, Bates Number LenSalas000023.

**RESPONSE:**

89.  On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon."  Exhibit ___ , Bates Number LenSalas000029.

**RESPONSE:**

90.  Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust.  M Salas Trans. , Exhibit 10, 64:16 -74:2.

**RESPONSE:**

91.  Max also testified that he does not recall any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18.

**RESPONSE:**

92.  When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

> **Q.  Have you contacted Ms. Boileau or**
> Mr. Goldstein to determine if they have
> a copy of any deed that might have
> been created?

-19-

**A.  I did try to contact them.  I
did try to contact them actually
recently.  And I -- but I didn't -- I
mean, they were trying -- they
were -- no.  I mean, we worked on
something and then they said it couldn't go
any further and depends on what you
were going to do.  So I don't -- I guess -- I
can't guess.  I don't know.**

M Salas Trans. 73:13-23

**RESPONSE:**

93.  Only Max Salas had an original of the Quitclaim Deed after July 6, 2010 and Max does not know where the original is or when he last had it.  Exhibit 10, M Salas Trans. 73:13-23, 77:2 - 82:23.

**RESPONSE:**

94.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 19, 42:18 - 43:2.

**RESPONSE:**


95.  Len Salas is not aware of the location of any of the wet ink signature originals of the July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas Trans."), 15:4-9.  Len testified in his deposition that he provided an original"wet ink" original of

-20-

the Quitclaim Deed, or a copy, to his lawyer on the eve of the Superior Court trial which resulted in the judgment against Len and his father. L Salas Trans, 16:6-24, 19:11-25 - 21:18. Regardless, Len testified that the document he produced on the eve of the Superior Court trial, which commenced on March 26, 2018, was kept in his possession at all known times between July, 2010 and March, 2018. Id. Len's wife, Kendra, testified that she "had a pdf of it (the July, 2010 Quitclaim Deed) and that she thought it was the same as what Len had " I thought it was the same thing as what Len had, but I'm not sure." K Rowe Trans. 30:13-20.

     **RESPONSE:**


96. Ron Salas stated that he was unaware the Quitclaim Deed had not been recorded until he found out that Len had been sued in the Superior Court (in October, 2015. Transcript of the Deposition of Ron Salas, August 8, 2018, Exhibit 8, 65:21 - 66:21

     **RESPONSE:**


97. Ron Salas was unaware of the requirements of Quitclaim Deeds in D.C. Ron Salas's testimony, Exhibit 12, at pp.227:5 - 228:12.

     **RESPONSE:**


98. Ron stated he was unaware whether the trust documents he created were valid under D.C. law in August, 2018. Ron Salas's testimony, Exhibit 12, 243:8-15.

     **RESPONSE:**

99. The only deed referenced by Max or his counsel, allegedly entitling Max to an

-21-

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered, or even mentioned by the Salas family or by Max, specifically.

**RESPONSE:**

100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15 Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee filed objections to the Plaintiffs' claims filed in Len's bankruptcy.

**RESPONSE:**

101. In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.
On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least $1,035,000 approx) per his consistent promise that he would pay that amount and his consistent assertion that he was responsible for payment of the SunTrust Note which was, at all relevant times, in Len's name.

**RESPONSE:**

102. The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-

-22-

002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket

Entries ("D- ") D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and 222

(Final Decree).

**RESPONSE:**

103.  Len was solely obligated on the Sun Trust Deed of Trust on the Property which,

according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018. M Salas

Schedules, Case No. 18-260 (D-12), p. 19 of 37, attached as Exhibit __ .

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July,

2010, did Max make any payments to Len and Len received no property or other value from Max

related to the Trust or Quitclaim Deed. Transcript of Confirmation Hearing in Case No. 18-02662,

December 13, 2018 at pp. 68-69, excerpts attached as Exhibit 4.  See also, Transcript of the

Chapter 7 Meeting of Creditors of Len Salas, April 1, 2019 (L Salas Mtg. Trans.), Exhibit 5,  5:22

- 7:15.

**RESPONSE:**


104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office.  He does recall

that Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**


105.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13

-23-

**RESPONSE:**

106.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments.  D.C. Code § 15-501 (a)(14). These conversations took place in early 2018.  Exemption Trans. Vol. 3, Exhibit 6, 119:9 - 122:9; Albert-R Salas eMails, 2/14 - 3/7/18, Exhibit 19, Exemption Trans. Vol 1, Exhibit 20, 145:22 - 147:20.

**RESPONSE:**

107.  Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

**RESPONSE:**

108.  Mr. Albert confirmed that no original was found after 2010 at the Exemption Hearing through Ron Salas' "rebuttal" testimony on August 24, 2018. Rebuttal Testimony of Ron Salas, at the Exemption Evidentiary Hearing, August 24, 2018. Exemption Trans., Vol 3, 4:10 - 5:16.  See also, Exemption Trans. 5:19 - 6:3, 7:18 - 12:8, 13:17 - 15:24

**RESPONSE:**

-24-

108.  At the time of Ron Salas' conversation with Mr. Albert regarding copies of the trust documents, Ron Salas understood that Mr. Albert was representing Max regarding a potential bankruptcy filing after the Superior Court trial.  Exemption Trans. 12:12 - 13:14

**RESPONSE:**


109. Max Salas valued the Property at $2.5 Million on his schedules in or about May 2018, and the Property was appraised for approximately $2.4 Million in or about August 2019. Stip. No. 50.

**RESPONSE:**


110.  Pursuant to an order of this Court dated June 12, 2019, the trustee in this case was authorized to sell the estate's interest in the Trustee's avoidance and recovery rights under 11 U.S.C. §§ 544 through 551.  Stip. No. 47

**RESPONSE:**


111.  On July 23, 2019, the trustee in Len Salas' case held an auction sale to sell the bankruptcy estate's interest in the avoidance and recovery actions pursuant to 11 U.S.C. §§ 544 through 553. Stip. No. 48

**RESPONSE:**


112. The Plaintiffs were the successful bidders at the Trustee's auction sale. Stip No. 49

**RESPONSE:**

-25-

113. The D.C. Bankruptcy Court made no final determination of the effect of the trustee's avoiding powers asserting that effect was up to Len Salas' bankruptcy estate. Stip. No. 44

**RESPONSE:**


114. No deed was recorded naming Max Salas as trustee or owner of the Property prior to Len Salas' bankruptcy filing. Stip. No. 45

**RESPONSE:**


115. Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed related to the Property as of June 6, 2022. Stip. No. 46

**RESPONSE:**


116. From the time of the Fire until February or March 2018, no one resided in the Property. Stip. No. 35.

**RESPONSE:**


117. During that time, and until November 2019, no payments were made on the SunTrust Loan with the exception of one payment made by Max Salas from the insurance proceeds he received as a result of the fire damage. Stip No. 36

**RESPONSE:**


118. According to the schedules filed in Max Salas' bankruptcy, as of the

-26-

commencement of his bankruptcy case, in April, 2018, the only lien creditors were the IRS ($6,768.66 claim) and SunTrust Mortgage ($1,030,825.86). Stip. No. 37

**RESPONSE:**


119. The balance of the SunTrust Loan as of October 26, 2018 was $1,141,021.14. Stip. No. 38

**RESPONSE:**


120. Max Salas has been making the required payments on the Property since November 2019, as of June 22, 2020. Stip. No. 39.

**RESPONSE:**


121. At all relevant times, Len Salas had limited income and assets, other than the Property. Stip. No. 28.

**RESPONSE:**


122. Max Salas intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. Stip. No. 29.

**RESPONSE:**


123. The Quitclaim Deed has never been recorded.  Stip. No. 30

**RESPONSE:**

-27-

124. As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had any intent to use or record it. Emails dated June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**


125. While in Colorado, Len Salas and Max Salas executed a trust agreement which Ron Salas prepared using a Colorado form even though the purported trust property, the Property, was located in D.C. Stip. No. 25.

**RESPONSE:**


126. The Defendant's Second Amended Disclosure Statement and Third Amended Plan of Reorganization, as confirmed by the D.C. bankruptcy court, recognize that the Plaintiffs are the owners of, and have the right to pursue, the avoidance actions which are alleged in the Complaint, as amended. Exhibit 2, Complaint Exhibit B, M Salas Second Amended Disclosure Statement, Exhibit 2, at p. 17.

**RESPONSE:**


                              Respectfully submitted,

                              BURCH, PORTER & JOHNSON, PLLC


                              By: /s/ Taylor A. Cates
                              130 North Court Avenue
                              Memphis, TN 38103
                              901-524-5165
                              901-524-5000 (fax)
                              Tacates@bpjlaw.com

                                    -28-

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By: ___/s/ Philip J. McNutt___
       Philip J. McNutt
       11921 Freedom Drive, Ste 584
       Reston, VA 20190
       703-904-4380
       202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

**41**

1  believe the owner to be a trust known as 1610 Salas
2  Trust; is that correct?
3      A    That may be what it says, but that's not
4  what I know.
5      Q    Then in your similar answer to
6  interrogatory 3 in the Brekelmans set, you contend
7  some other person is the owner of the property in
8  question and you believe that to be the trust known
9  as 1610 Salas Trust?
10     A    Are you asking are these two different
11  answers to the same question?
12     Q    I am asking if I have correctly
13  identified your sworn answer to those two questions.
14     A    My smart answer?
15     Q    Sworn.
16     A    Oh, my sworn.  Are you asking if that's
17  the same question and I have answered different
18  ways?
19         MR. BARNES:  No, he's not he's asking if
20  that was your answer to both of those questions.
21     A    The answer is here and I signed it.  If
22  it means something that I thought it meant at the

**42**

1  time, I can tell you that nobody owns that property
2  but me.
3      Q    You are not the legal owner of the
4  property, are you?
5      A    Yes, I am, sir.
6      Q    Are you identified in any record in the
7  District of Columbia as the owner of the property?
8      A    I don't know but I know I own it.
9      Q    Are you identified on any document of any
10  governmental authority identifying you as the owner
11  of the property?
12     A    I don't know that, sir, but I know I own
13  it.
14     Q    You know that the records identify your
15  son Len Salas as the owner; isn't that true?
16     A    I don't know that, sir, but I now own
17  it.
18     Q    Who is the 1610 Salas Trust?  What is it?
19     A    I don't know -- I mean it's a trust
20  that -- there's a trust called CLR, CLR Trust, it's
21  our trust.
22     Q    You say our trust.  Who is "our"?  Whose

**43**

1  trust is it?
2      A    I believe it's my son's and mine.
3      Q    I'm going to come to CLR in a minute
4  that's not what the answer says, and I'm going to
5  ask you what is the 1610 Salas Trust.  Why did you
6  identify it here?
7      A    Okay.  So because when people paid their
8  rent, they made the rent out to CLR --
9      Q    I didn't ask you who CLR is, sir.  I am
10  going to come to that.
11     A    Do you understand did I just tell you CLR
12  Trust?
13     Q    But both answers identify 1610 Salas
14  Trust so I'm asking you is there such an entity.
15     A    So this is wrong.
16     Q    There is no 1610 Salas Trust?
17     A    There is a 1610 Trust doing business as
18  CLR.
19     Q    When was the trust created?
20     A    I don't recall.
21     Q    Who created the trust?  In other words,
22  who is the seller who transferred the properties to

**44**

1  the trustee?
2      A    I don't know the answer to who is the
3  trustee.
4      Q    That is the person who was holding the
5  property for the beneficiary?
6      A    I believe I am, but I'm not sure.
7      Q    Who is the beneficiary of the trust
8  that's the person for whose benefit the property is
9  being held?
10     A    Isn't that the same question?
11     Q    No.  I asked you who was the trustee that
12  is the person holding the property for the benefit
13  of a beneficiary and you said you thought it was you
14  but you are not sure, correct?
15     A    So what's the other question?
16     Q    The other question is who is the
17  beneficiary, for whose benefit is the property being
18  held?
19     A    I mean I don't know.  I mean I know what
20  I think but I don't know.
21     Q    What do you think?
22     A    I think it's my property.

Case 3:23-cv-00987   Document 7-2   Filed 11/04/23   Page 225 of 532 PageID #: 813

708

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 18-00260 |
| MAX E. SALAS, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

_____

**SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF
REORGANIZATION DATED DECEMBER 5, 2019**

COMES NOW Max E. Salas, the Debtor and Debtor-in-Possession ("Debtor"), and

hereby presents this Disclosure Statement pursuant to the provisions of Chapter 11 of Title 11 of

the United States Code.

## I. **INTRODUCTION**

The Debtor provides this Disclosure Statement in order to disclose the information

believed to be material for creditors to arrive at a reasonably informed decision in exercising the

right to vote on acceptance of the Plan of Reorganization Under Chapter 11 of the United States

Bankruptcy Code Proposed by the Debtor (the "Plan").

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED

BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE

STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE

ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE NOT CONTAINED IN

THIS STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR AND

SHOULD BE REPORTED TO THE OFFICE OF THE UNITED STATE TRUSTEE.

INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN**

DB02/804722 0002/6981750.2
CORE/3502869.0005/156430962.1

**SUBJECT TO A CERTIFIED AUDIT.  CONSEQUENTLY, THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.**

## II.  <u>VOTING ON THE PLAN AND CONFIRMATION</u>

Voting on acceptance or rejection of the Plan is governed by provisions of the Bankruptcy Code.  Each voting creditor will be supplied with an Official Ballot, in a form prescribed by the Bankruptcy Rules.  Creditors may vote to accept or reject the Plan by filing a completed ballot with counsel for the Debtor, within the time prescribed for voting.  A class of creditors will be considered to have accepted the Plan (i) if it is accepted by creditors holding at least two-thirds in amount and more than one half in number of the allowed claims of such class that have voted, or (ii) if the class is unimpaired within the meaning of the Bankruptcy Code.

The Bankruptcy Court will conduct a hearing and rule on confirmation of the Plan in accordance with the Bankruptcy Code at the United States Bankruptcy Court for the District of Columbia, Bankruptcy Court's Courtroom, United States Courthouse, 3rd and Constitution Avenues, NW, Washington, DC 20001.  You will receive a separate notice of that hearing.

## III.  <u>CONFIRMATION UNDER ALTERNATE STANDARDS</u>

If all requirements for confirmation of the Plan under the Bankruptcy Code are otherwise satisfied, the Debtor will ask the Bankruptcy Court to confirm the Plan without the unanimous acceptance of classes of creditors assuming the Court finds that the Plan does not discriminate unfairly against, and is fair and equitable (within the meaning of the Bankruptcy Code) with respect to, any class of holders of claims that has or is deemed to have rejected the Plan.

## IV.  HISTORY AND BACKGROUND OF THE DEBTOR
## AND REASONS FOR FILING BANKRUPTCY

The debtor in this case is an individual residing in the District of Columbia at 1610 Riggs Place, NW, Washington, DC 20009 (the "Property"). During the night of June 3, 2015, a fire occurred at the Property. Tragically, two roomers living in the main part of the home, Nina Brekelmans and Michael Patrick McLoughlin, were not able to escape and died in the blaze. As a result of the fire, the Property was nearly completely destroyed. Max Salas was also present at the time of the fire, where, along with his visiting grandson, he was forced to jump from the second story of the building. As a result, Max sustained serious injuries including burns and a broken ankle that required hospitalization for a period of six weeks. Following his release from the hospital Max further was in convalescence as a result of his injuries and due to an infection he contracted, was required to receive drip antibiotics for three months and was heavily sedated during this time. During this time, Max lived at an apartment provided to him through the insurance policy he had previously obtained in his name for the Property.

On October 20, 2015, the parents of Nina Brekelmans and Michael Patrick Mcloughlin initiated wrongful death actions against both Max Salas and Len Salas in D.C. Superior Court as Case Numbers 2015 CA 008054 B and 2015 CA 008061 B (the "Superior Court Litigation"). One of the Debtor's sons, Len Salas, was included in the action due his appearing as the last recorded interest in the Property with the D.C. Recorder of Deeds. The two cases brought by each family were later consolidated into a single action.

Following a jury verdict at the trial against Len and Max, Len, as record owner of the Property, was found jointly liable with Max to the McLoughlin Estate and the Brekelmans Estate (together, the "Judgment Creditors") in the respective amounts of $7.7 million and $7.5 million

711

(together, the "D.C. Superior Court Judgments"). These judgments prompted Max Salas and Len

Salas to each file a Chapter 11 bankruptcy case on April 18, 2018. Len Salas's bankruptcy case

was later converted to chapter 7 and is currently pending before the United States Bankruptcy

Court for the Middle District of Tennessee as Case No. 3:18-bk-02662 (the "Len Salas

Bankruptcy Case").

## V.    SIGNIFICANT EVENTS DURING THE DEBTOR'S CHAPTER 11 CASE

A.    Confirmation of the Debtor's Ownership Interest in the Property and Ability to Claim the
District of Columbia's Homestead Exemption for the Property

Max Salas's status as sole legal and equitable owner of the Property had previously been

called into question through the course of the Superior Court Litigation based on the fact that DC

Land Records displays Len Salas as possessing the last recoded deeded interest in the Property.

Questions concerning who possessed the proper ownership interest in the Property were further

complicated by the existence of a Trust Agreement previously signed by Len Salas and Max

Salas and a Quitclaim Deed that was not recorded with the DC Recorder of Deeds. With the

bankruptcy, Debtor claimed full ownership of the Property and claimed an exemption in this

interest in the Property pursuant to the District of Columbia's homestead exemption found in

D.C. Code § 15-501(a)(14). The Debtor's claim to ownership of the Property and to the

homestead exemption were objected to by the Judgment Creditors. Following a three-day trial on

the matter, on September 25, 2018, the Bankruptcy Court issued a fifty-nine page opinion (the

"Homestead Opinion") [ECF Dkt. No. 108]  detailing Max Salas's history with the Property. The

Homestead Opinion confirmed that Max Salas possessed the full legal and equitable interest to

the Property and overruled the Judgment Creditors' objection to the Debtor's claim of the

homestead exemption in the Property. A copy of the Homestead Opinion, which details Max

Salas's full ownership history of the Property is attached to this Disclosure Statement for

reference as Exhibit A.

The Judgment Creditors timely appealed the Homestead Opinion and that appeal is

currently pending before the United States District Court for the District of Columbia as Case

No. 1:18-cv-02318-KBJ (the "Homestead Appeal"). Although the Homestead Opinion is on

appeal, no stay has been issued concerning the Homestead Opinion and it currently remains an

enforceable order of the Court.

B.    Judgment Creditors Purchase of Avoidance Claims from the Len Salas Bankruptcy Estate

The Len Salas Bankruptcy Case was converted to chapter 7 on December 26, 2018, and a

chapter 7 trustee has been appointed to that case. Following the conversion, another of Debtor's

sons, Ron Salas, sought to purchase any potential avoidance rights concerning transfer of the

property from Len Salas to Max Salas described in the Homestead Opinion in order to help his

father with reducing further contingencies and uncertainties in his bankruptcy case concerning

the Property. Following an auction conducted by the trustee in the Len Salas Bankruptcy Case,

the Judgment Creditors purchased "each and every claim and recovery action to which the

Trustee or the [Len Salas bankruptcy] estate may have under the provisions of 11 U.S.C. § § 544

through 553, as applicable, related to" the Property for the purchase price of $156,000.00. As

evidenced by a *Trustee's Report of Sale* filed by the Trustee in the Len Salas Bankruptcy Case on

August 14, 2019 and a *Sale of Estate Property Free and Clear of Liens and Interests* attached to

that report, Payment was delivered by the Judgment Creditors and their purchase of the

avoidance actions from the Len Salas bankruptcy estate was competed on July 31, 2019. To date,

Case 3:23-cv-00987    Document 7-2    Filed 10/04/23    Page 230 of 532 PageID #: 818

713

no avoidance actions have yet been initiated by the Judgment Creditors based on these claims,

although on October 11, 2019, the Judgment Creditors did file a Motion for Relief from the

Automatic Stay in the Debtor's bankruptcy case seeking authority to file such claim. [ECF Dkt.

No. 252]. This motion is currently pending before the Court and is scheduled for hearing on

November 14, 2019.

C.    Debtor Obtaining a Conditional Certificate of Occupancy and Licensing to Rent Rooms
      at the Property through Short-Tem Rentals

Following the issuance of the Homestead Opinion, the Debtor was able to secure a

Certificate of Occupancy and licensing to begin renting rooms at the Property though the short-

term rental site, Airbnb. A copy of the Debtor's Certificate of Occupancy and associated

licensing is attached as Exhibit B. Debtor's Certificate of Occupancy in his name is conditioned

upon Debtor's continued status as owner of the Property and would be revoked should that status

be overturned through an adverse ruling in the Homestead Appeal or through an adverse ruling

in a potential avoidance action that could be brought by the Judgment Creditors based on their

purchase of those claims from the trustee in the Len Salas Bankruptcy Case. Since beginning to

rent the rooms on a short-term basis through Airbnb beginning in April 2019, the Debtor has

earned $62,041.42 in rental payouts for the period of April 1, 2019 through September 30, 2019.

Additionally, the Debtor has secured a lease for the basement unit at the property for the monthly

rental amount of $4,500.00.

D.    Fusion Contracting Default Judgment

On February 8, 2019, the Debtor filed a Complaint initiating Adversary Proceeding No.

19-10002 against Fusion Contracting Group, LLC (the "Fusion Adversary Proceeding") based on

breach contract claims stemming from unfinished and faulty work performed by a contractor

contracted to perform renovation work to the Property after the fire that occurred in 2015. Following a default by the defendant in that action, Judgment for the Debtor was entered on July 30, 2019, in the amount of $79,287.17 in damages and attorney's fees, with post-judgment interest on that judgment award as provide by 28 U.S.C. § 1961. The Debtor has not yet performed any post-judgment discovery regarding the Fusion Judgment and makes no representations regarding its collectability.

E.      Deed of Trust Stipulation for Plan Treatment & New Funding for the Plan

Through the Plan the Debtor is seeking approval of a Stipulation Regarding Plan Treatment reached between the Debtor and U.S. Bank/Select Portfolio Servicing for the existing Deed of Trust on the Property. Under the terms of the proposed agreement, the Debtor will assume payments of $8,329.19 per month toward the Deed of Trust for the Property as adequate protection until Plan confirmation. Following approval of confirmation of the Plan, the Debtor shall make payments following re-amortization by U.S. Bank following Confirmation based on an approximate balance of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037. The full stipulation between the Debtor and U.S. Bank, subject to approval of the Bankruptcy Court of the Debtor's Plan, is attached hereto as Exhibit C.

In addition to the agreement reached between the Debtor and U.S. Bank/Select Portfolio Servicing, the Debtor will deliver all non-exempt assets, primarily consisting of the Fusion Judgment, towards funding of the Plan. Debtor additionally, will provide $225,000.00 in additional new value into the Plan, in funds guaranteed and secured by funds contained in the Debtor's exempt retirement account.

F.     Post-Petition Employment of Professionals

The Debtor has been represented in this Chapter 11 proceeding by Stinson LLP as his

general bankruptcy counsel, Phillip G. Young, Jr. of Thompson Burton, PLLC as local counsel

for representation in the Len Salas Bankruptcy Case[1], and Justin Fasano and Janet Nesse of

McNamee Hosea as conflicts counsel for matters concerning U.S. Bank. The Debtor's

accountant is Arthur Lander, CPA PC.  The Debtor will continue to use these professionals post-

confirmation as necessary until the bankruptcy case is closed.

## VI.  OVERVIEW OF ASSETS AND MAJOR CLAIMS

The Debtor's primary Asset, as declared in the Homestead Opinion, is the real property

located at 1610 Riggs Place, NW, Washington, DC 20009 and serves both as the primary

residence of the Debtor and source of rental income through the renting of rooms through short-

term rental site Airbnb. Debtor has scheduled the value of this property on his Schedules as $2.5

million. The recent appraised value of the real property is $2.45 million. Although not

specifically a secured claim of the Debtor, the Property is subject to a Note and Deed of Trust

made by Len Salas originally in favor of U.S. Bank National Association as Trustee for the

holders of Bank of America Funding Corporation Mortgage pass-Through Certificates, Series

2007-6 and originally serviced by SunTrust Mortgage, Inc. On April 8, 2019, Select Portfolio

Servicing, Inc. filed a Transfer of Claim Other than for Security in the Len Salas Bankruptcy

Case indicating that they now serve as servicer on the Note and Deed of Trust on the Property.

---

[1] The Debtor has also employed Roderick K. Barnes of Rollins, Smalkin, Richards & Mackie,
LLC ("Barnes") as special counsel for matters concerning the Superior Court Litigation.
Payment to Barnes is covered by the insurance policy the debtor possessed at the time of the
Property fire and no attorney fees are expected to be owed from debtor's bankruptcy estate.

This claim is treated as Class 3 in the Plan. The Debtor has negotiated with U.S. Bank/Select Portfolio Servicing and has arrived at terms for adequate protection payments to U.S. Bank while confirmation of the debtor's plan is sought and for modification of the secured loan upon approval of the plan, pursuant to the Stipulation for Plan Treatment attached as Exhibit C. Debtor's interest in the property has been fully exempted pursuant to the Homestead Opinion and DC Code § 15-501(a)(14).

From Debtor's exempt Property he generates rental income through the leasing of the basement unit at the Property, and through short-term rentals of two individual room in the Property through the web/rental service Airbnb. These rental monies received are themselves exempt as fruits of the Debtor's exempt asset and are further detailed in the income projection attached as Exhibit D. Airbnb records of demonstrating the rental history for the Property is attached as Exhibit E.

A second significant asset of the estate includes the recently entered Judgment against Fusion Contracting Group, LLC in the amount of $79,287.17. The likely collectability of the Fusion Judgment is unknown at this time.

Although not an asset of the estate, the Debtor possesses an exempt retirement account. From this exempt account, the Debtor is proposing in his plan to offer $225,000 to further fund his Plan through funds backed by this exempt retirement account. Debtor plans to accomplish this either by receiving a loan 100 percent guaranteed and secured by the exempt retirement assets, or a direct withdrawal from his retirement account of these funds for delivery into a Plan Fund for distribution to claimants. Debtor's exempt retirement account contains funds of approximately $500,000 and is sufficient to cover direct withdrawal of the proposed $225,000,

717

and any additional tax labilities incurred based on a withdrawal of the this amount, and any payments toward extended tax payments under the Plan if necessary.

Other significant claims of the estate include those of the Judgment Creditors in the respective amounts of $7.5 million (Brekelmans) and $7.7 million (McLoughlin). The Debtor listed these claims as disputed in his bankruptcy Schedules based on the fact that the Debtor had timely filed appeals of each judgment and on the fact that the judgements were not based on final orders of the Superior Court pursuant to D.C. Sup. Ct. R. Civ. P Rule 54(b). Nevertheless, the Debtor has provided for treatment of the Judgment Creditor claims within the Plan.

Based on the findings of fact stated in the Homestead Opinion, the District of Columbia filed a Proof of Claim asserting a $83,960.42 associated with unpaid transfer and recordation taxes associated with transfer of the Property from Len Salas to Max Salas in 2010, including $34,832.19 in recordation and transfer taxes due based on the transfer of the property occurring in July 6, 2010 and which is listed as a secured by the Property, a non-filing penalty of $8,708.05 (25%) (unsecured), and interest on the supposed deficiency in the amount of $40,420.18 (claimed as secured).

Debtor's Plan contains definitions, a procedure for claims objections and a provision for post-confirmation jurisdiction. Readers should refer to the Plan for a complete discussion of these provisions.

## VII.  SUMMARY OF THE PLAN

### A.  Classification and Treatment of Claims Under the Plan:

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN.  THIS SUMMARY SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES.  CREDITORS ARE URGED

718

TO READ THE ENTIRE PLAN.  A COPY OF THE PLAN IS BEING SENT TO YOU WITH

THIS DISCLOSURE STATEMENT.  THE PLAN REPRESENTS A PROPOSED LEGALLY

BINDING AGREEMENT BY AND BETWEEN THE DEBTOR AND ITS CREDITORS.  ALL

CREDITORS WILL BE BOUND BY THE PLAN.

      1.      **Classification - Summary**

      The following is a designation of each Class of Claims and Interests under the Plan.  A

Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest

qualifies within the description of that Class, and is classified in another Class or Classes to the

extent that any remainder of the Claim or Interest qualifies within the description of such other

Class or Classes.  Each "Class" (e.g., Class 2A versus Class 2B and Class 2A versus Class 2B) is

separate and distinct from all other Classes for all purposes.

      2.      **Classification - Specifics**

      Claims and Interests are classified for all purposes, including voting, confirmation and

distribution pursuant to the Plan, as follows:

| | |
|---|---|
| **Class 1:** | All administrative claims including for professional fees, United States Trustee Quarterly fees and administrative taxes.  This class consists of fees and expenses for Stinson LLP, fees and expenses for Thompson Burton PLLC, fees and expenses for McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.,  fees and expenses of Art Lander CPA PC, any other professional fees that may be incurred by the Debtor, and the United States Trustee's quarterly fees. (Unimpaired). |
| **Class 2**: | All Priority Claims including those arising pursuant to Bankruptcy Code Section 507(a)(8). (Impaired). |
| **Class 3:** | U.S. Bank National Association/ Select Portfolio Servicing, Inc. Secured Claim against Property (Impaired). |

Class **4**:      Allowed Secured Claim of IRS (Impaired).

Class **5:**      District of Columbia Transfer & Recordation Tax Claim (Claim 5)
(Impaired)

Class **6**:      Unsecured Claims of Judgment Creditors (Claim No. 3 –
McLoughlin; Claim No. 4 - Brekelmans) (Impaired).

Class **7:**      All Remaining Allowed Unsecured Non-Priority Claims.
(Impaired).

Class **8**:      Allowed Unsecured Penalty Claim of the District of Columbia
(Impaired).

Class **9**:      Paid Hyundai Lease Titling Trust Lease claim (Unimpaired)

Class **10:**     Contribution Claim of Len Salas listed on Schedules associated
with U.S. Bank/SPS Arrearages (Unimpaired)

3.      **Treatment of Claims and Interests**

A.      Administrative Claims

1.      Class 1 Administrative Claims

The Debtor shall assume and pay to each holder of an Allowed Administrative Claim, on

account of the Administrative Claim and in full satisfaction thereof, Cash equal to the allowed

amount of such Administrative Claim, unless the holder agrees or shall have agreed to other less

favorable treatment of such Claim. Debtor anticipates that some form of agreement concerning

payment of fees will need to be reached with his legal counsel and accountant in order to

preserve desired amounts for payment to additional creditors. Administrative Claims are

expected to exceed $175,000, but payment of Administrative Claims from the Plan Fund shall

not exceed and be capped at $175,000.

2.      Statutory Fees and Continuing Duties to the Office of the United
States Trustee

All fees payable pursuant to 28 U.S.C. § 1930, shall be paid by the Debtor in Cash in an amount equal to the amount of such Administrative Claim.

Until such time as the case is closed, dismissed or converted, the Debtor shall continue to report its disbursements each calendar quarter to the U.S. Trustee and shall timely pay all fees due under 28 U.S.C. § 1930(a)(6).

3.    Treatment and Payment of Administrative Claims.

After the Effective Date, all professional or others requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 503(b) and 1103 for services rendered before the Effective Date shall file an application for final allowance of compensation and reimbursement of expenses. Applications need not be filed with respect to fees and expenses previously applied for by Court approved professionals (including applications previously approved by and/or previously paid pursuant to an order of the Court). Fees and expenses of professionals shall be paid in Cash in full (a) immediately before the Effective Date, to the extent allowed by the Court as of such date (such payments to be made by the Debtor) or as agreed by the Parties if a lesser amount, but not to exceed an aggregate amount of $175,000.00 from the Plan Fund, and (b) on or before the tenth (10th) day after entry of an order allowing any such fees and expenses, to the extent such fees and expenses were not allowed as of the Effective Date, or upon such payment schedule as agreed between the Parties.

B.    Class 2:  Priority Claims

The only known Priority Claim consists of a certain portion of the claim filed by the Internal Revenue Service in the amount of $13,196.78 (Claim 2-2). Unless the applicable taxing agency or any other priority claim holders that may be established agree to less favorable

treatment, each holder of an Allowed Priority Claim to the extent their claim is allowable and entitled to priority under Bankruptcy Code section 507(a), shall be paid by the Debtor in regular monthly installment payments totaling the full amount of the claim plus interest pursuant to 11 U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to generate sufficient funds from his future rental income from the Property and other monthly income received, Debtor will deliver payment on the Class 2 claims from funds held in his exempt retirement account if necessary. This class is impaired.

      C.    <u>Class 3: U.S. Bank National Association/ Select Portfolio Servicing, Inc. Secured Claim against Property</u>

Class 3 consists of the secured lien currently in the name on Len Salas possessed by U.S. Bank National Association/ Select Portfolio Servicing, Inc. and secured by the Property (the U.S. Bank Claim).  Based on Debtor's ownership in the Property established through the Homestead Opinion, the Debtor has entered into a Stipulation for Plan Treatment with U.S. Bank National Association/ Select Portfolio Servicing, Inc. to establish terms for Debtor's payment toward the US Bank Claim and address current arrearages owed. Full terms of the U.S. Bank Stipulation for Plan Treatment are attached as Exhibit C. Under the stipulation, beginning November 1, 2019, the Debtor is to begin making adequate protection payments on the U.S. Bank Claim in the amount of $8,329.19 per month until approval of the U.S. Bank agreement through confirmation of the Plan and the Plan's Effective Date, after which time the Debtor shall make payments following re-amortization by U.S. Bank following Confirmation based on an approximate balance of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037. U.S. Bank's

claim is an *in rem* claim attaching to the Property, and the Debtor shall not be liability under the underlying Deed of Trust and Note hall be limited to Debtor's interest in the Property, with no personal liability. Debtor further intends to seek a refund of vacant real property taxes previously erroneously assessed against the Debtor and paid pre-petition by U.S. Bank (at the time serviced through SunTrust Bank) to the District of Columbia. If the Debtor were to be successful in receiving a refund of tax payments previously paid, they are to be delivered in full to U.S. Bank/SPS for payment of the existing escrow balance on the U.S. Bank Claim. This class is impaired.

        D.    <u>Class 4: Allowed Secured Claim of IRS.</u>

        Class 4 consists of the Allowed Secured Claim of the IRS consisting of that $6,768.66 portion of the claim they have filed in the Case (Claim 2-2). Unless the holder of this claim agrees to less favorable treatment, to the extent the claim is allowed, payment on Class 4 claims, is to be paid by the Debtor in regular monthly installment payments totaling the full amount of the claim plus interest pursuant to 11 U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to generate sufficient funds from his future rental income from the Property and other monthly income received, Debtor will deliver payment on the Class 4 claims from funds held in his exempt retirement account if necessary. The IRS shall retain its lien until paid in full. This class is Impaired.

        E.    <u>Class 5: District of Columbia Transfer & Recordation Tax Claim</u>

        Class 5 consists of that portion claimed as owing for Transfer & Recordation Taxes and Interest on Deficiency in the amount of $75,252.37 claimed on Claim 5 filed by the District of

Columbia. The District has claimed this amount associated with the August 4, 2010 date of

transfer from Len Salas to Max Salas described in the Homestead Opinion. The Debtor believes

the District is not entitled to claim this amount due to the fact that no deed was recorded at that

time and any future recording confirming of Max Salas's ownership in the Property is to be

enacted through this Plan and exempt from such taxes pursuant to 11 U.S.C. § 1146(a). Debtor

intends to object to the District's Claim prior to Confirmation of the Plan. Nevertheless, payment

to the District, to the extent their claim is allowable, is to be paid by the Debtor in regular

monthly installment payments totaling the full amount of the claim beginning on the first day of

the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11

U.S.C. § 1129(a)(9)(C). Class 5 is impaired.

        F.      <u>Class 6: Allowed Unsecured Claims of Judgment Creditors (Claim No. 3 –
McLoughlin; Claim No. 4 - Brekelmans)</u>

      Class 6 consists of the two claims of the Judgment Creditors in the total amount of $15.2

million (Claim No. 3 – McLoughlin $7.7 million; Claim No. 4 – Brekelmans; $7.5 million).

Debtor's plan provides that payment on the Class 6 Claims will be made pro-rata, along with the

Class 7 remaining allowed unsecured non-priority claims, from a Plan Fund funded by the

minimal amounts of the existing non-exempt assets of the Debtor consisting of non-exempt cash

assets existing in Debtor's DIP account at the time of Confirmation, plus an additional influx of

$225,000 of funds secured by Debtor's exempt retirement account. Administrative Claims are

expected to exceed $175,000, but payment from the Plan Fund towards Administrative Claims

shall be capped at $175,000, leaving at least $50,000 of remaining funds from the additional

$225,000 cash infusion for distribution to Class 6 and Class 7 Claims. The Plan further provides

assignment of any uncollected amounts of the Fusion Judgment on the Effective Date jointly to

both Judgment Creditors. The Debtor will not oppose efforts and provide reasonable assistance

to the Judgment Creditors' efforts to collect available Insurance Proceeds from Encompass

associated with their judgments. Upon receipt of discharge, the Debtor will take steps to

withdraw his appeal of the Judgment Creditor Judgments in the DC Superior Court to further

resolve that issue. Judgment Creditor Claims are being given separate Class treatment based on

the fact that they may also collect on the amounts owed to them from available Insurance

Proceeds (See Motion for Relief from Stay Order; ECF Dkt. No. 74), and based on the fact that

they possess the right to prosecute the Tennessee Avoidance Actions regarding the Property

purchased from the Len Salas Bankruptcy Case.  The Class 6 and Class 7 claims listed on

Debtor's Schedules have been valued at $15,239,769.40, 99.7% percent ($15.2 million) of which

is possessed by the Judgment Creditors. It is anticipated therefore that 99.7% percent of

distributions from the Plan Fund will be distributed to Class 6 Claims.

The payment will be made thirty (30) days after the later of (i) the payment of all

Administrative Claims; and (ii) the Effective Date. This Class is Impaired.

G.    Class 7:  Remaining Allowed Unsecured Non-Priority Claims.

All Class 7 Claims, consisting of all remaining allowed unsecured non-priority claims

will receive a one-time pro-rata distribution following the Effective Date from remaining

amounts in the Plan Fund following payment to those possessing claims of a higher priority.

Administrative Claims are expected to exceed $175,000, but payment from the Plan Fund

towards Administrative Claims shall be capped at $175,000, leaving at least $50,000 of

remaining funds from the additional $225,000 cash infusion for distribution towards other

creditors. The Class 6 and Class 7 claims listed on Debtor's Schedules have been valued at

$15,239,769.40, 0.3% percent ($39,769.40) of which is possessed by the Class 7 Claimants. It is anticipated therefore that 0.3% percent of distributions from the Plan Fund will be distributed to Class 7 Claims. The payment will be made thirty (30) days after the later of (i) the payment of Administrative Claims from the Plan Fund; and (ii) the Effective Date. This class is impaired.

H.    Class 8:  Allowed Unsecured Penalty Claim of the District of Columbia

Class 8 consists of that portion of the Claim filed by the District of Columbia in the amount of $8,708.05 representing a non-filing penalty associated with other aspects of Claim 5, to the extent such claim is an allowed unsecured penalty claim. Assuming funds remain available in the Plan Fund, Class 8 claims will receive a one-time pro-rata distribution following the Effective Date from remaining amounts in the Plan Fund following payment to those possessing claims of a higher priority. However, based on the large amount of claims in Class 6 and Class 7, no distribution is expected to be made on Class 8 claims. To the extent a payment is made, the payment will be made thirty (30) days after the later of (i) the payment of all higher priority Claims to be made from the Plan Fund; and (ii) the Effective Date.  This class is impaired.

I.    Class 9:  Allowed Paid Hyundai Lease Titling Trust Lease Claim

Class 9 consists of the lease claim filed by Hyundai Titling Trust filed on May 3, 2018 as Claim 1 associated with the lease of a vehicle by the Debtor at the time of the Petition Date. Following the Petition Date, Debtor continued to make lease payments due for the vehicle until the lease terminated in January 2019. No further payments are owed under the Hyundai lease and the Debtor has surrendered the Vehicle. No further payments are therefore contemplated for this claim. This class has been paid in full and is unimpaired.

J.    Class 10:  Contribution Claim of Len Salas listed on Schedules associated with U.S. Bank/SPS Arrearages (Unimpaired)

Class 10 consists of the claim of Len Salas listed on the Debtor's Schedule E/F at 4.14 in the amount of $428,614.90. This claim solely represents arrearages existing on the U.S. Bank/SPS Claim existing on the Petition Date. Because the deed of trust and underlying note for the Property were in the name of Len Salas, but the Debtor was responsible for making payments for the Property pursuant to his ownership interest later established in the Homestead Opinion, the Debtor included this claim to Len Salas representing amounts ultimately owed as arrearages for the lien on the Property. Len Salas having received his discharge and the Debtor having reached agreement with U.S. Bank/SPS regarding the U.S. Bank Claim described in the Stipulation for Plan Treatment, no further treatment or payment to Len Salas (for forwarding to U.S. Bank) is warranted by the Debtor and will not occur under Debtor's Plan. Class 10 is Unimpaired.

### 4.  Means of Funding the Plan.

Debtor's Plan seeks modification of the existing secured debt on the Property through the Stipulation for Plan Treatment with U.S. Bank. All continuing payments under the Plan, including pre- and post-confirmation monthly payments to U.S. Bank per the Stipulation for Plan Treatment, and for the Extended Tax Payments are expected to be derived wholly from the Debtor's future exempt earnings consisting of monthly deposits from social security, disability payments, and Airbnb and other rental earnings from the Property. A Projection of the Debtor's future income generated from these exempt sources is attached as Exhibit D. Further with respect to the Extended Tax Payments of the IRS, if Debtor's future income is insufficient to make these payments, Debtor will make payment on these claims from funds held in his exempt retirement account if necessary.  The Debtor will further submit all available non-exempt assets for the

benefit of creditors under the Plan at the time of Confirmation consisting of the Fusion Judgment and existing non-exempt cash assets existing in Debtor's DIP account at the time of Confirmation, but not including any value associated with the non-exempt portion of Debtor's home furnishings, equipment, or clothes. The non-exempt portion of such home furnishings, equipment, and clothes are believed to be *de minimus*, especially when compared to the additional exempt Plan funding being supplied by the Debtor and the cost of ascertaining value of the exempt portion. With the exception of the Fusion Judgment, further non-exempt assets of the Debtor are expected to be minimal.

Following delivery of the existing non-exempt assets, the Plan will be further funded through delivery of $225,000 towards the Plan Fund from either a loan to be received by the Debtor for funds 100% secured by the Debtor's exempt retirement account, or if the Debtor was unable to receive such a loan, from delivery of $225,000 directly withdrawn from this exempt account by the Debtor within forty-five (45) days after Confirmation. Direct withdrawal of funds from Debtor's account will cause the Debtor to incur additional tax consequences, making a loan preferable. Nevertheless, Debtor's retirement account contains sufficient funds to cover tax liability associated with a withdrawal of these funds. From this new value, payment towards Administrative Claims from the Plan Fund would be capped at $175,000, allowing for payment of at least $50,000 from the new value added into the Plan Fund for distribution to other claimants. It is assumed that confirmation of the Debtor's Plan would require cramdown of the Judgment Creditor's claims pursuant to 11 U.S.C. § 1129(b).

### 5.  Executory Contracts and Unexpired Leases.

The Plan proposes to assume all unexpired leases and executory contracts that have not previously been rejected in this bankruptcy case. Debtor's Plan further proposes that it shall have no effect on the post-petition lease of the Debtor's vehicle approved by the Court at ECF Dkt. Entry 159, and the post-petition tenant lease entered into by the Debtor for the renting of the basement unit at the Property.

### 6. Pending Litigation.

Debtor intends to object to the claim of the District of Columbia that asserts Debtor owes transfer and recordation taxes, penalties, and interests associated with the creation of the 2010 Quitclaim Deed from Len Salas for the Property and cited in the Homestead Opinion. Debtor further intends to seek a refund of vacant real property taxes previously erroneously assessed against the Debtor and paid pre-petition by U.S. Bank for the Deed of Trust for the Property (at the time serviced through SunTrust Bank). Any refunded tax payments would be delivered to US Bank/SPS to reduce the a outstanding escrow balance on the Property account associated with the previous payment.  Other pending litigation includes the appeal of the Homestead Opinion, which has been fully briefed for the United State District Court for the District of Columbia, as well as avoidance action litigation to be brought by the Judgment Creditors in the U.S. Bankruptcy Court for the Middle District of Tennessee following the Judgment Creditors' purchase of those claims from the Len Salas Bankruptcy Estate (the "Tennessee Avoidance Actions"). Other pending litigation includes the outstanding appeal of the Judgment Creditor Judgments in the DC Superior Court brought by the Debtor prior to filing bankruptcy. This appeal is currently stayed and would be withdrawn/dismissed by the Debtor upon discharge of debts owed to the Judgement Creditors contemplated in the Plan. Additional litigation may also

be brought to resolve the additional action against 1610 Riggs Place Trust contemplated

previously by the Superior Court and/or an action to reduce the judgments in favor of the

Judgment Creditors to final judgments pursuant to DC Superior Court Rule of Civil Procedure

Rule 54(b). *See Order on Motion to Lift Automatic Stay With Respect to Finalization of Superior*

*Court Judgments and Judgment Creditors' Recovery of Insurance Proceeds,* ECF Dkt. NO. 74.

With Plan Confirmation, the Debtor would not oppose steps taken by the Judgment Creditors to

resolve these issues or to claim insurance proceeds available under Debtor's Encompass

Insurance Policy.

### 7. Confirmation Order as Recordable Order Conveying Property to Max Salas.

The Plan provides that, upon Confirmation, the Confirmation Order, or a separate order

as needed, shall contain terms that will constitute an Order conveying the Property to Max Salas

based on the ownership interest of the Debtor to the Property established through the Homestead

Opinion and that such order may be recorded with the land records of the District of Columbia in

lieu of a deed. If the District of Columbia shall later refuse to honor the Confirmation Order as a

document properly conveying the Property to the Debtor, the Debtor reserves the right to obtain

an appropriate deed to th Property signed by the trustee in the Len Salas Bankruptcy Case, or if

such trustee refuses, to seek the appointment of an escrow agent in Debtor's Bankruptcy Case to

sign such deed for recording purposes.

### 8. Recordation and Other Taxes Covered by Section 1146(a).

Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of an

instrument of transfer under the Plan (including the proposed recordation of the Confirmation

Order or other Order as necessary to confirm Debtor's interest in the Property pursuant to the

Homestead Opinion) will not be subject to any stamp tax, real estate transfer, mortgage

recording, or any other similar tax.

### 9. Discharge Following Distribution on the Effective Date of the Plan Pursuant to 11 U.S.C. § 1141(d)(5)(B).

Debtor's Plan provides for a discharge of debts upon the Effective Date of the Plan and

distribution of funds from the Plan Fund. Because Debtor's Plan provides for payment of tax

debts through April 2023, payments under the Plan will not be completed until that time. Cause

is warranted to grant a discharge of debts instead upon the Effective Date pursuant to 11 U.S.C.

1141(d)(5)(B), because unsecured creditors are to receive distribution of funds from the Plan

Fund at that time, which will be of a greater value than they would receive if the estate were to

be liquidated under chapter 7. Additionally, following the required monthly payments to U.S.

Bank and for the extended tax payments, Debtor is unlikely to have any additional disposable

income for distribution to his other creditors following the initial distributions of the Plan Fund.

Finally, cause is warranted to grant the Debtor a discharge upon the Effective Date of the Plan

instead of upon completion of all payments because doing so will allow the Debtor to take steps

(and the Debtor will take such steps) to withdraw the appeal of the Judgment Creditor Judgments

in the DC Superior Court to further resolve that issue.

## VIII.  CHAPTER 7 LIQUIDATION ANALYSIS

A comparison of the amounts to be paid under the Plan and the amounts that would be

available for distribution to creditors in the event of a liquidation under Chapter 7 indicates that

the Plan is fair and equitable and in the best interest of the creditors. The Homestead Opinion has

confirmed that the Debtor's primary asset is fully exempt pursuant to D.C. Code § 15-501(a)(14)

and any sale of the Property in Chapter 7 would not generate funds for payment to the estate

creditors. The Debtor maintains that income generated from the Property (including all Airbnb

and other rental income) is similarly exempt as income generated from an exempt asset. At least

two creditors (the Judgment Creditors) have questioned whether it is clear that such business

income derived from renting of parts of the Property may be treated as exempt. The Court has

not issued a ruling on this issue in this case. The Debtor possesses no other assets, other than the

Fusion Judgment, likely to generate any significant value to the estate. The Debtor is not aware

of any recovery or avoidance actions and does not believe any such actions exist. In addition, a

Chapter 7 trustee would hire his own attorneys and would charge a commission on any

distributions he did realize. Here, the Debtor is offering to use his exempt Property to fund a Plan

of Reorganization, which after reaching agreement with the primary secured lienholder for the

Property regarding continued payments for the Property, offers anticipated amounts of $225,000

in new value for payment towards the Debtor's creditors and claimants. For these reasons, a

conversion to Chapter 7 would not necessarily result in a greater distribution to unsecured and

penalty claimants and would result in delay of the creditor distributions.

## IX.  POTENTIAL RECOVERIES FROM VOIDABLE TRANSFERS

The Debtor has not fully analyzed the potential recoveries from voidable transfers, but

does not believe any voidable transfers exist that would be beneficial to pursue. The Debtor does

not anticipate pursuing any avoidance actions.

## X.  TAX CONSEQUENCES OF PLAN

To the extent creditors have written off any accounts receivable on their tax returns,

ordinary income may be recognized from any distributions received under this Plan.

THE DISCUSSION OF FEDERAL INCOME TAX CONSEQUENCES SET OUT HEREIN IS LIMITED TO THE GENERAL TAX CONSEQUENCES AFFECTING CREDITORS AS A RESULT OF THE DISCHARGE OF INDEBTEDNESS WITHOUT PAYMENT UNDER THE PLAN.  THE TAX CONSEQUENCES APPLICABLE TO A CREDITOR WILL BE ENTIRELY DEPENDENT UPON THE TAX STATUS OF THAT ENTITY OR INDIVIDUAL.  EACH CREDITOR SHOULD CONSULT THEIR OWN TAX ADVISOR TO DETERMINE THE TREATMENT AFFORDED THEIR RESPECTIVE CLAIMS BY THE PLAN UNDER FEDERAL TAX LAW, THE TAX LAW OF THE VARIOUS STATES AND LOCAL JURISDICTIONS OF THE UNITED STATES AND THE LAW OF FOREIGN JURISDICTIONS.

BECAUSE OF CONTINUAL CHANGES BY THE CONGRESS, THE TREASURY DEPARTMENT, AND THE COURTS WITH RESPECT TO THE TAX LAWS, NO ASSURANCES CAN BE GIVEN REGARDING INTERPRETATIONS OF THE TAX LAWS, REPRESENTATIONS WITH RESPECT THERETO OR ANY OTHER MATTER ASSOCIATED THEREWITH.

NO STATEMENT IN THIS DISCLOSURE STATEMENT IS TO BE CONSTRUED AS TAX ADVICE OR LEGAL ADVICE TO ANY CREDITOR.  THE DEBTOR AND ITS COUNSEL AND ACCOUNTANTS ASSUME NO RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES A CREDITOR MAY SUSTAIN AS A RESULT OF THE TREATMENT AFFORDED THEIR CLAIM UNDER THE PLAN.

## XI.  RISK FACTORS/FEASIBILITY

While there are risk factors with certain individual aspects of the Debtor's Plan, including securing a loan backed by the Debtor's retirement funds for proposed Plan funding, the Debtor believes that his Plan provides for adequate contingency measures in each instance and that the Plan overall provides minimal risk factors or feasibility issues. Other risk factors include the potential that Debtor's interest in the Property will be overturned either though reversal of the Homestead Opinion on appeal or through loss of a potential avoidance action that may be brought by the Judgment Creditors based on the claims they have purchased from the Len Salas Bankruptcy Case. Reversal of the Debtor's claim to ownership in the Property would affect Debtor's ability to make his continuing payments for tax payments extended under the Plan (which would not be discharged) and for the secured loan for the Property (which would remain as an *in rem* lien on the Property), but would not likely affect other aspects of payment to Debtor's other creditors from the additional Plan funding supplied by the Debtor. The Debtor and his counsel have reviewed the merits of both of these litigation risks associated with the Debtor's ownership in in the Property being lost and believe that they will prevail both on the Appeal and in any potential avoidance action that could be brought through the Tennessee Avoidance Actions. Because Debtor's Airbnb income is subject to market forces, there is also the risk that he will not be as successful generating income from this source for payments under the U.S. Bank Stipulation for Plan Treatment and the Extended Tax Payments. In this instance, however, U.S. Bank would be protected by the default provisions under the Stipulation for Plan Treatment. Tax claimants are similarly protected because their debts are not subject to discharge. For these reasons, therefore, the Debtor submits that there is minimal risk under this Chapter 11 Plan.

CORE/3502869.0005/156430962.1

## XII.  **CONCLUSION**

For all the reasons described above, the Debtor urges you to vote to accept the Plan of

Reorganization.  Any questions regarding this Disclosure Statement may be directed to the

undersigned.

Dated: December 5, 2019        By:    /s/ Max E. Salas
                               Max E. Salas, Debtor and Debtor-In-Possession


                               /s/ Joshua W. Cox
                               Marc E. Albert, No. 345181
                               Joshua W. Cox, No. 1033283
                               STINSON LLP
                               1775 Pennsylvania Ave., N.W., Suite 800
                               Washington, DC 20006
                               Tel. (202) 785-3020
                               Fax (202) 572-9999
                               marc.albert@stinson.com
                               joshua.cox@stinson.com
                               *Attorneys for*
                               *Max E. Salas, Appellee and Debtor and Debtor-In-*
                               *Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .       Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .       Washington, D.C.
                Debtor.         .       August 24, 2018
                                .
. . . . . . . . . . . . . . .   .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 3 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:   PHILIP J. McNUTT


APPEARANCES:
For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020


For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380


Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

Salas 000407

                    TABLE OF CONTENTS

WITNESSES:                                          PAGE:
RON SALAS
Direct examination continued by Mr. Albert      4
Cross-examination by Mr. McNutt                 6
Redirect examination by Mr. Albert              16
Recross-examination by Mr. McNutt               19
Redirect examination by Mr. Albert              24

MAX SALAS
Direct examination by Mr. McNutt continued      29

MAX SALAS
Direct examination by Mr. Albert                61
Cross-examination by Mr. McNutt                 137
Redirect examination by Mr. Albert              207
Recross-examination by Mr. McNutt               215
Redirect examination by Mr. Albert              227

CLOSING ARGUMENT:                                   PAGE:
By Mr. McNutt                                   232
By Mr. Albert                                   266
By Mr. McNutt                                   281
By Mr. Albert                                   294

EXHIBITS:                               MARKED: RECEIVED:
DEBTOR'S
L.  DCRA corporation document           227     227

CREDITOR'S
14. M.Salas Deposition Transcript        *      296
    dated 2/14/16
44. 4/3/2018 transcript of hearing      155     --
45. Excerpt of document production      216  Reject-218

*Exhibits marked on previous days of trial.
**Transcriptionist's note: The notations of
"(unintelligible)" in this transcript are due to the audio
recording levels being turned up too high, or individuals
speaking outside of the vocal capture range of the
microphone.

1   Mr. McNutt has been kind enough to permit me, subject to

2   the Court's okay, to call him now if that's all right.

3           THE COURT:  That's fine.

4     RON SALAS, DEBTOR'S REBUTTAL WITNESS, PREVIOUSLY SWORN

5           THE COURT:  Go ahead, Mr. Albert.

6           MR. ALBERT:  Thank you.

7                     DIRECT EXAMINATION

8           BY MR. ALBERT:

9       Q.   Good morning.

10          I just wanted to clarify again, because I heard

11  yesterday something that seemed inconsistent with what you

12  had told the Court and me earlier this week.  When you and

13  I spoke and you and I exchanged emails, there was a

14  discussion regarding the trust agreement and the quit-claim

15  deed, correct?

16      A.   Yes.

17      Q.   And tell the Court and me again what we discussed

18  and what you did.

19          MR. McNUTT:  Objection.  Your Honor, this is not

20  rebuttal testimony.  He's asking him to state again what he

21  testified to earlier.  It's not rebuttal.

22          THE COURT:  Overruled.

23          THE WITNESS:  So in regards to the email where I

24  said I sent you originals, or I had the originals, I had

25  spoke with my brother.  He told me he had the original.  I

1    said, "Send them to me.  Mr. Albert is asking for them."

2              MR. McNUTT:  Objection.  Hearsay, Your Honor.

3              THE COURT:  I'll not receive it for the truth of

4    the contents.

5              THE WITNESS:  When he told me he had them, I told

6    you had originals.  When they arrived in my office I

7    contacted you immediately and said, "Well, these are not

8    the originals.  The originals" -- so the only original

9    would have been to Max.  The reason I knew they were not

10   the originals is because I, as I testified earlier, scan

11   all my documents for preservation, and I know there was

12   blue ink on at least the notary as I recall, and the

13   documents I received were all blank ink, which indicated to

14   me they were copies not originals.  So I let you know at

15   that point.

16             MR. ALBERT:  Thank you.

17             THE WITNESS:  Uh-huh.

18             MR. ALBERT:  Your witness.

19             THE COURT:  You said you got them from your son.

20   Do you mean from your --

21             THE WITNESS:  From my brother.  If I said son, I

22   apologize.

23             THE COURT:  Your brother.  Okay.

24             THE WITNESS:  Yes, my brother Len had them, mailed

25   them to me.  I was going to mail them to you, but they were

1     A.    So couldn't assert nothing --

2     Q.    -- but can you answer --

3     A.    -- couldn't assert anything about that.

4     Q.    Can you answer my question, please?

5     A.    What's the question?

6           I think I answered it.

7     Q.    The question is did you produce all documents related

8  -- did you produce all documents related to your ownership of

9  the property that you claimed during the Superior Court

10 litigation?

11    A.    I don't -- I guess I don't know the difference --

12 well, I don't know.  Did we submit them?

13          Yeah, we submitted them, but weren't, one of them

14 weren't -- this document wasn't allowed.

15    Q.    When you say "this document," you mean what's been

16 marked --

17    A.    The deed --

18    Q.    -- as Exhibit 30, the quit-claim deed and the trust

19 documents, correct?

20    A.    That's what I'm talking about, yeah.

21    Q.    All right.

22          And those were submitted, as you put it, on or after

23 March 12, 2018, correct?

24    A.    Yeah -- yeah, uh -- yes, sir.  It was like, like a

25 couple of weeks before the trial.

1  Salas?

2       A.   Because I bought -- because I paid for the policy I

3  guess.  I don't know.

4       Q.   Okay.  Fair enough.

5            Any other reason that you're aware of?

6       A.   No, I -- I don't know.  I have no idea.

7       Q.   You also testified earlier that, in the corrections

8  that you told Judge Teel about, you also testified that the

9  original of the document may be at the title attorney's office,

10  right?

11      A.   That just came to me -- that just came to me as I was

12  sitting over there.  I never -- I never told Mr. Albert about

13  it because I can't talk to him about my testimony, but I just

14  thought about it, and it's -- and it's possible because I don't

15  know if they mailed it back to me.  I don't remember that.  All

16  the papers that I had in my house were burned, so I -- and I

17  didn't recover it from there.  So I couldn't have recovered it

18  there.  But it's, you know, it's possible that it's still at

19  his office because I don't remember -- I don't remember him

20  mailing it back to me, and I don't remember -- but, there's a

21  lot of things I don't remember.

22      Q.   Well, when did you, and I'm assuming because you were

23  attempting to get the quit-claim deed recorded that you gave

24  these documents to Mr. Goldstein shortly after you signed the

25  trust documents in July of 2010; is that fair?

1    A.   Yeah, so what -- so I had this realtor.  Her name is

2  in here, Sylvia Jones, and she told me what she had done --

3              MR. McNUTT:  Your Honor, I'm going to object.

4              THE WITNESS:  Well, I'm trying to answer your

5  question because --

6              MR. McNUTT:  You can't answer --

7              THE WITNESS:  -- that has to tell --

8              MR. McNUTT:  This is more hearsay, Your Honor.

9              THE COURT:  Overruled.

10              THE WITNESS:  So I talked to her.  She told me how

11  she had put her house in a trust because she had three

12  daughters, and so I said I formed a trust, and I've got the,

13  and I quit-claim -- my son quit-claimed the deed over to me,

14  and I want to now register the trust.  And I said, "How do you

15  do that?"  She said, "Well, you got to go to a title company."

16  I said, "Well, who is that?"  She said call Goldstein, Maryland

17  Title Company or something, and she gave me the number to them.

18  And so I called them up and they said, "Send us the

19  information."  So I sent them the information, and about a week

20  later I called them back and they called -- or they called me

21  and they told me what the situation was.

22              So I don't know if I answered your question there or

23  not.

24              BY MR. McNUTT:

25    Q.   I can guarantee you didn't answer the question.

1    A.    I'm sorry.  What's the question?

2    Q.    I'll leave it at that.

3    A.    All right.

4    Q.    So as you sit here today, you're not really sure what

5  happened to the original quit-claim deed after you gave it to

6  Mr. Goldstein, right?

7         MR. ALBERT:  That was asked and answered.

8         THE WITNESS:  I just told you, I don't know if it was

9  in my house or it's in his office, but I -- I don't know.

10        MR. McNUTT:  Okay.

11        THE COURT:  The objection is overruled.

12        BY MR. McNUTT:

13   Q.    And if it was in Mr. Goldstein's office, then you

14  could have gotten it by just simply calling him, right?

15   A.    I -- I -- I could -- I told -- I guess -- I told

16  Mister -- I told my attorney what I did, and so I -- that's his

17  job I guess.  I relied on him.

18   Q.    Which one is that?

19   A.    Mr. Albert and Mr. Cox.

20   Q.    Okay.

21        You don't have a copy of the original quit-claim deed

22  with you today, do you?

23   A.    No.

24   Q.    Are you aware of at any time after you gave it to Mr.

25  Goldstein that you were in possession of the original of the

1  quit-claim deed?

2       A.   Any time after that?

3       Q.   Yes, sir.

4       A.   No.  I --

5       Q.   Up until obviously February of 2018.

6       A.   No, sir.

7       Q.   Okay.

8       A.   I don't remember.

9       Q.   Did you ever try to record the quit-claim deed after

10  the time that you gave it to Mr. Goldstein?

11      A.   No.

12      Q.   Did you ever make another attempt?

13      A.   No.  No, sir.

14      Q.   What activities did you undertake as trustee of the

15  1610 Riggs Property Trust after July 6, 2010?

16      A.   What activities?

17      Q.   Yes, sir.  Did you undertake as trustee?  What

18  activities?

19      A.   I answered that.  Do you want me to do it again?

20      Q.   Yes, sir.

21      A.    I thought I answered it.  I called them and -- I mean

22  after I called Mr. Goldstein and asked him to register it, and

23  then he told me that it was going to cost me $50,000, did I do

24  anything after that?

25      Q.   Yes, sir.

1         Well, you said that you had to pay the mortgage,
2    but your testimony is that prior to approximately January
3    of 2015 CLR Trust paid the mortgage.
4         A.   No, I testified that I paid the mortgage.
5         Q.   Well, I don't think so, Mr. Salas.  Let's try to
6    look at this one more time.
7              Look at your deposition transcript.  This is Tab
8    14.
9         A.   Okay.
10             I mean, you already asked the question and I
11   already answered it.  I know the question you're going to
12   ask.
13             THE COURT:  Don't speculate.
14             Go ahead, Mr. McNutt.
15             THE WITNESS:  Sorry.
16             BY MR. McNUTT:
17        Q.   Look at page 216.  This is page 54 of the
18   transcript.
19        A.   I'm at page 54.
20        Q.   Okay.
21             Look at page 216?
22        A.   Okay, I'm there.
23        Q.   I'm sorry.  Page 215.  The page above that.
24        A.   Right.
25        Q.   Last line, 22:

```
 1              "Okay.  You would get payments from
 2         the tenants made payable to CLR, is that
 3         right?  If I understand your testimony.
 4         Your answer:
 5              "Right."
 6         So you didn't disagree, correct?
 7    A.   Correct.
 8    Q.        "Question:  And you would deposit
 9         those payments either in your own account
10         or a CLR account.  Is that fair to say?"
11    A.   Yes.
12    Q.        "Answer:  Yes.  So in the beginning,
13         well, for years they just went into the
14         CLR account, and then the CLR account made
15         the mortgage payments."
16         Did I read that correctly?
17    A.   Yes.
18    Q.        "After a while or at the very end of
19         this whole thing I just made the payments.
20         I put the money into my personal account
21         and made the personal account, made the
22         payments out of my personal account.
23              Question:  Do you know when you made
24         that change approximately?
25              Answer:  Do I know?  Yes.  Probably
```

1          December, January of 2015."

2          Did I read that correctly?

3     A.   You read it correctly.

4     Q.   All right.

5          So your testimony was that the money went into the

6  CLR account and was used to pay the mortgage payments from

7  the CLR account until December of 2014 or January of 2015,

8  approximately five months prior to the fire, correct?

9          And subsequent to the fire from 2015 until early

10 this year, I believe April of this year, you did not live

11 at the residence; you actually lived at an apartment that

12 was provided for you by the insurance company, correct?

13    A.   Right.  So what happened, what actually happened

14 is that --

15    Q.   There's no question --

16    A.   -- lots of times --

17    Q.   There's no question pending.

18    A.   -- there wasn't enough money --

19    Q.   Mr. Salas, there's no question pending.

20    A.   -- in the CLR Trust account, and so -- I'm trying

21 to answer your question, sir.  So --

22    Q.   You answered my question.

23         THE COURT:  Let him answer.

24         Go ahead, Mr. Salas.

25         MR. McNUTT:  All right.

1          Go ahead.

2          THE WITNESS:  So lots of times there wasn't enough

3     money in the CLR account, so I would take money out of my

4     personal account to add it to the CLR account to make the

5     payments.

6          BY MR. McNUTT:

7     Q.    Tell me where --

8     A.    But at the same time it didn't matter if the

9     payments to the CLR -- if there wasn't enough money in the

10    CLR account I had to put personal money, my other personal

11    -- well, I had to add money to the CLR account to make sure

12    the payments were made.

13    Q.    Is that the money that you did not use to pay the

14    taxes that were owed?

15    A.    What do you mean, the taxes that were owed?

16          What taxes are you talking about?

17    Q.    During the period of time from 2010 to 2015 you

18    had substantial tax obligations that you did not pay,

19    correct?

20    A.    From what now?

21    Q.    2010 to 2015 you had substantial tax obligations

22    that you did not pay, correct?

23    A.    (No verbal response).

24          MR. McNUTT:  Your Honor, I'd like to have this

25    document marked as Exhibit, I think we're on 42.  This is

1     A.   Monthly payments.

2     Q.   What -- I don't think you answered my question

3   exactly.  She gets the money; who got the house?

4     A.   Oh, I got the house.

5     Q.   All right.

6          So you took title to the house in your name at that

7   time?

8     A.   Yeah, for a day or two.

9     Q.   Okay.

10         Explain the circumstances behind that.

11    A.   Well, I -- I tried to get a loan.  I couldn't.  I

12  went to SunTrust Bank.  They said there's enough equity in the

13  house to get a loan to pay your wife off, but unfortunately you

14  can't get a loan.  So my, so Len, who had a very good

15  relationship with my ex-wife and myself, we both went to Len

16  and asked him if he would sign for a loan to get Vicki paid

17  off, and he -- and he did.  So that -- so we got a loan so we

18  could pay her, so I could pay her off and she could move back

19  to Tennessee.

20    Q.   Was it necessary to get the loan that the title would

21  have to go in Len's name?

22    A.   Yes, it --

23         MR. McNUTT:  Objection.

24         THE WITNESS:  Yes, it was.

25         MR. McNUTT:  He's not only leading the questions,

x 000477

1    he's also asking for a legal conclusion.

2         THE COURT:  The objection is sustained.  Rephrase the

3    question.

4         MR. ALBERT:  Of course, Your Honor.

5         BY MR. ALBERT:

6    Q.   Who -- so the property was put in your name then when

7    you got the loan?

8    A.   No, it wasn't.

9    Q.   Whose name was it put in?

10   A.   Put in my son's name, Len.

11   Q.   Why?

12   A.   Because the loan was made by SunTrust, and his credit

13   -- that was kind of like the peak of the housing market and the

14   loan was made out to him.  He didn't have any -- he had good

15   credit, and they were giving loans to just about anybody at

16   that point in time, and there was enough equity in the house to

17   get it.

18   Q.   But they wouldn't give you credit -- excuse me.

19        They wouldn't lend you the money because?

20   A.   Because I had liens from, tax liens from years eighty

21   -- uh -- '97, '98, and '99.  Yeah.

22   Q.   Okay.

23   A.   I owed money to the IRS.

24   Q.   I see.

25        Now, you owe money to the IRS today, correct?

1    A.   Yes, I do.

2    Q.   All right.

3         And you heard yesterday in the questioning by Mr.

4    McNutt, you owe a certain amount of money, the IRS has filed a

5    claim in this case?

6    A.   Yes.

7    Q.   How much did -- are they claiming?

8    A.   I think about $25,000.

9    Q.   How much is the house worth today if you remember?

10   A.   So it's about 2.4, 2.3, 2.4 million.

11   Q.   And how do you know that, sir?

12   A.   We had a guy, an appraiser, a real estate appraiser

13   do an -- do an appraisal.

14   Q.   Thank you.

15        So, is the property recorded in Len's name?

16   A.   Yes.

17   Q.   Has it ever been recorded in your name or any trust

18   as far as you know?  Recorded?

19   A.   Well, I --

20   Q.   Recorded?

21        THE COURT:  In the land records, Mr. Salas.

22        BY MR. ALBERT:

23   Q.   In the land records.

24   A.   In the land records?  I think it was recorded by name

25   for a day until it was -- until it was -- then I quit-claimed

1   it back over to Len until, so he could file the -- so, yeah.

2   One day I think.  The day that the transaction happened.

3       Q.   And Lenny also signed a deed of trust?

4       A.   Yes.

5       Q.   And he signed the note?

6       A.   Yes.

7       Q.   In connection with the loan?

8       A.   Yes.

9       Q.   And Lenny I suppose has been paying everything since

10   that time?

11       A.   Lenny has never paid any -- Lenny has never paid a

12   penny, a penny towards the loan of the house.

13       Q.   No down payment, no monthly payments?

14       A.   No.

15       Q.   No loan?

16       A.   No.  Nothing.

17       Q.   Besides this accommodation, this help that Lenny gave

18   you, did he have any responsibility with respect to 1610 Riggs

19   Place Northwest?

20       A.   No.

21       Q.   Who was handling any and everything about the

22   property?

23       A.   All my responsibility.  Me.  I was doing it all.

24       Q.   Okay.

25       Even before the divorce from Vicki who was paying all

```
 1              THE COURT:  Ask a question.
 2              BY MR. ALBERT:
 3         Q.   Do you know what -- what are -- explain the
 4    circumstances to the Court regarding finding the trust document
 5    and the quit-claim deed.
 6         A.   So you asked me, "You keep talking about this trust
 7    in your deposition.  I read your deposition and you keep
 8    talking about" --
 9         Q.   Who are you talking about?  Are you talking about me?
10         A.   Yes.
11         Q.   When you say "you"?
12         A.   Yes.  You -- you talked to me about, "You keep
13    talking about this trust through your whole deposition.  I've
14    read the whole thing.  What trust are you talking about?"  And
15    I said, "The trust."  I said what -- and he said, you said to
16    me, "Who put this trust together for you?  Was there a lawyer
17    involved?"  And I said, "Yes."  I (sic) said, "Which lawyer?"
18    "My son."  I (sic) said, "Your son is a lawyer?"  "Yes."
19    "Where is he at?"  "Colorado."  I  said, "Colorado."  He says,
20    "Do you -- does he have a copy of the trust?"  I said -- no you
21    asked me, "Do you have a copy of the trust?"  I said, "No."
22    "Where is it?"  I said, "It burned in the fire.  I don't have
23    any" -- he says, "Well, do you think your son has a copy of the
24    trust?"  I said, "Well, he should.  I guess, yeah, he might --
25    he should."  I don't remember what I said.  "But I can call
```

1   him."

2          So I called him.  You said, "May I talk to him?"  I

3   said, "Yes."  You said, "Will you call him and tell him that

4   I'm going to call him?"  I said, "Yes."

5          So I called him, told him, asked him if he had a copy

6   and he said yes.  And so you -- you called him and you got a

7   copy of that, of the doc -- you got a copy of the trust and the

8   quit-claim deed.

9      Q.   Thank you.

10         Can you think of any reason why that document wasn't

11  obtained earlier than that time?

12     A.   No, I can't think of any reason why it was -- I --

13  you know, I -- I don't understand why Mr. Barnes didn't ask for

14  that before.  I just, I can't understand why he didn't ask for

15  that before but -- and I can't -- there's a lot of things I

16  look at now and I don't understand why Mr. Barnes didn't get

17  any witnesses to the trial, like people that saw the windows

18  open, people that --

19         THE COURT:  It's not --

20         THE WITNESS:  No --

21         THE COURT:  -- pertinent to the question.

22         THE WITNESS:  Yes, sir.  I'm sorry.

23         So did I answer your question?

24         BY MR. ALBERT:

25     Q.   Thank you.

1  of the money to Vicki.  So we got a loan for $800,000 but that

2  was to pay the old loan off.

3      Q.   Right.

4      A.   And then the rest of the loan, the rest of the money

5  was to pay her for her half of the equity in the house.

6      Q.   So my question is, did you ever pay your son back for

7  the money that he borrowed that you used to pay your wife?

8      A.   I didn't borrow any money from my son.

9      Q.   I'm sorry.  I missed that.

10     A.   I didn't borrow any money from my son.

11     Q.   So the answer is you didn't pay any of this money

12  back to your son, right?

13     A.   I didn't borrow any money from my son.

14     Q.   Okay.

15         After -- let me try it this way.  After April --

16  yeah.  After April 2007, I think it was April 16th when the

17  deed of trust was recorded?

18     A.   Uh-huh.

19     Q.   Does that sound about right?

20     A.   Yes, sir.

21     Q.   And that's, there were the three deeds and then the

22  deed of trust, right?

23     A.   Right.

24     Q.   After April of 2010 did you pay any money to your son

25  Len with respect to any of the money that you paid your wife,

1  your ex-wife Vicki?

2       A.   I never paid Lenny any money.

3       Q.   Okay, fair enough.

4            Now, you also said that you tried to refinance.  When

5  did you try to refinance the property, and I think you said it

6  was with SunTrust.  When was that?

7       A.   So lots of times.  I mean, I continually tried.  At

8  least twice a year.

9       Q.   At least twice a year?

10       A.   Since -- since we borrowed the money from SunTrust.

11       Q.   Okay.

12            And was that always with SunTrust?  The attempts to

13  refinance, were they always with SunTrust?

14       A.   I -- I think so.  I mean, we looked at other sources.

15  I think one time we tried Capital One, but always the -- our

16  best chances were with SunTrust because we had a track record

17  with them.  We kept paying the loan to them.  Up until the

18  fire, and then we fell behind on the mortgage.

19       Q.   All right.

20            And none of those efforts were successful in

21  obtaining a new loan, right?

22       A.   No.

23       Q.   Okay.

24            And your son Len was part of the application process,

25  is that right?

1  separate?

2          THE WITNESS:  Well, because -- because of, the

3  individual account of Cornet was -- was my personal income,

4  and the other account for CLR was different.  And the

5  intentions were originally is to, CLR was to be -- give

6  that account to my sons, but that never happened.  Because

7  it never made any money.

8          THE COURT:  What never made any money?

9          THE WITNESS:  CLR.  It just became a way to

10  separate income and meet the bills and pay for the mortgage

11  and -- and the ability to pay for the house.

12          THE COURT:  This may have been answered already.

13  Why use the CLR account for your rents?

14          THE WITNESS:  Because I didn't want to put the

15  rent money into my personal account, into my -- my -- my

16  personal account because -- see, in the very beginning,

17  from the very beginning from when Vicki and I owned, well,

18  when the house was in Vicki's name, and we always had the

19  basement rented even when she and I -- when she and I were

20  together we rented the basement, and that wasn't my money.

21  That really wasn't -- I didn't consider that my money.

22  That was just money to pay the mortgage.  And so I would

23  put the money into the CLR account and then I would

24  supplement that money from CLR from my personal account,

25  from the Bank of America -- or I mean from -- yeah, Bank of

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

|  |  |  |
|---|---|---|
| | . | Case No. 18-02662 |
| IN RE: | . | |
| | . | Chapter 11 |
| LEN SALAS, | . | |
| | . | 701 Broadway |
| | . | Nashville, TN 37203 |
| Debtor. | . | |
| | . | Thursday, December 13, 2018 |
| . . . . . . . . . . . . . . . | . | 9:25 a.m. |

PARTIAL TRANSCRIPT OF MOTION TO CONVERT CHAPTER 11 CASE
TO CHAPTER 7 UNDER SECTION 1112(a), FEE AMOUNT $15.00,
ALTERNATIVELY TO APPOINT A CHAPTER 11 TRUSTEE
IF TIMELY RESPONSE
**BEFORE THE HONORABLE MARIAN F. HARRISON**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Debtor:          Niarhos & Waldron, PLC
                         By:  TIMOTHY G. NIARHOS, ESQ.
                              DENIS GRAHAM WALDRON, ESQ.
                         1106 18th Avenue South
                         Nashville, TN 37212
                         (615) 320-1101


APPEARANCES CONTINUED


Audio Operator:          Lauren Langston, ECR


Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46038
                         (855) 873-2223
                         www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Max Salas:                 Thompson Burton PLLC
                               By:  PHILLIP G. YOUNG, ESQ.
                               One Franklin Park
                               6100 Tower Circle, Suite 200
                               Franklin, TN 37067
                               (615) 465-6008

                               Stinson Leonard Street LLP
                               By:  MARC ALBERT, ESQ.
                                    JOSHUA COX, ESQ.
                               1775 Pennsylvania Avenue Northwest
                               Suite 800
                               Washington, DC 20006
                               (202) 785-9100

For Gail Brekelmans,           Burch Porter & Johnson, PLLC
Michael McLoughlin, Jr.,       By:  LANI LESTER, ESQ.
Nicolaas Brekelmans,           130 North Court Avenue
and Martha Johnson:            Memphis, TN 38103
                               (901) 524-5166

                               Law Office of Philip J. McNutt, PLLC
                               By:  PHILIP JAMES MCNUTT, ESQ.
                               11921 Freedom Drive, Suite 584
                               Reston, VA 20190
                               (703) 904-4380

For the United                 U.S. Department of Justice
States Trustee:                Office of the United States Trustee
                               By:  MEGAN REED SELIBER, ESQ.
                               701 Broadway, Suite 318
                               Nashville, TN 37203
                               (615) 742-6273

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

3

<u>I N D E X</u>
<u>12/13/18</u>

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| Len Salas | 4 | 72 | -- | -- |

| <u>EXHIBITS</u>: | | <u>Marked</u> | <u>Admitted</u> |
|---|---|---|---|
| Exhibit 1014 | Deposition of Max Salas | 36 | -- |
| Exhibit 1015 | 3/9/2016 Deposition Excerpts | 25 | -- |
| Exhibit 1019 | Deed of Trust | 6 | -- |
| Exhibit 1036 | Schedules of Max Salas | 62 | -- |
| Exhibit 1040 | SunTrust Motion for Relief from Automatic Stay | 13 | -- |
| Exhibit 1041 | Fixed Rate Note | 10 | -- |

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

L. Salas – Direct                                      68

1   Q    All right.  Are you aware, personally, between 2010 and

2   today whether there have been any attempts to file, record, or

3   otherwise formalize the quitclaim deed that you signed in July

4   of 2010?

5   A    I don't know.

6   Q    Are you aware of any provisions in your plan that provide

7   for the payment of the deed of trust note currently due

8   SunTrust Bank?

9   A    No.

10  Q    Do you have any source, whether your own money or someone

11  else's, to pay off the SunTrust balance that is approximately

12  $1.14 million?

13  A    What was the question again?

14  Q    Are you aware of any source that's available to you,

15  whether it's yours or someone else's, to pay off the SunTrust

16  mortgage balance of $1.14 million?

17  A    No.

18  Q    Do you know if you have provided any additional collateral

19  or benefit to SunTrust Bank in exchange for deeding the

20  property under your plan to your father?

21  A    No.

22  Q    When you -- when your brother created the trust documents,

23  did your father pay any money to you?

24  A    No.

25  Q    Did he give you any other consideration?  Did he give you

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

L. Salas – Direct                                    69

1   any property, any personal property, or anything like that?

2   A    No.

3        (Pause)

4   Q    Are you aware of any income or assets that your father has

5   that would enable him to pay down or pay off the SunTrust deed

6   of trust note?

7   A    No.

8   Q    Are you aware of any other source he may have, if not

9   himself then someone else or some other party, to pay off the

10  SunTrust deed of trust note?

11  A    No.

12  Q    Have you had any discussions with your father prior to

13  filing your plan of reorganization of how the SunTrust note

14  would be paid off?

15  A    No.

16  Q    Other than the $570 -- I believe that's the number in

17  your -- whatever the number is in your plan, other than the

18  $570 per month under your plan, do you have any other resources

19  or income that could be used to pay your creditors?

20  A    No.

21  Q    And you don't intend to use any of your exempt assets to

22  pay creditors, correct?

23  A    I don't know.

24  Q    And you don't intend to use any of your wife's income

25  other than what's provided in the plan, because I know it's

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

80

1         **C E R T I F I C A T I O N**

2

3         I, Alicia Jarrett, court-approved transcriber, hereby

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter.

7

8

9 

10 _____

11 ALICIA JARRETT, AAERT NO. 428      DATE:  February 11, 2019

12 ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE


- - - - - - - - - - x
IN RE:                  :
LEN SALAS               : Case 3:18-bk-02662
       Debtor           :
- - - - - - - - - - - x

April 1, 2019
Nashville, Tennessee

CONTINUED FIRST MEETING OF CREDITORS

Pursuant to Section 341 of the U.S.
Bankruptcy Code.

APPEARANCES:  MICHAEL GIGANDET, ESQUIRE
              Trustee


PHILIP J. McNUTT, ESQUIRE
   On behalf of the Decedents




Also Present:  Mr. Naras, Esquire

_____

SUBURBAN REPORTING SERVICE
5303 Strathmore Avenue
Kensington, Maryland 20895

(240) 920-6886

# C O N T E N T S

LEN SALAS                                          Page
        Examination by Mr. McNutt                  4
        Examination by Mr. Gigandet                8

SUBURBAN REPORTING SERVICE     (240) 920-6886

9ba0808e-5ecf-42ad-a495-4bbf5b694301

```
1                P R O C E E D I N G S

2                MR. GIGANDET:  Our next case is

3    going to be Len Salas, 18-02662.  Come on up,

4    Mr. Salas.

5                MR. SALAS:  (Complying.)

6                MR. GIGANDET:  Remain standing and

7    raise your right hand.

8    Whereupon,

9                        LEN SALAS

10   was called as a witness, and, having first been

11   duly sworn by the Trustee, was examined and

12   testified as follows:

13               MR. GIGANDET:  You can have a seat.

14   You've been here before, we've already had a

15   preliminary Meeting of Creditors.  We continued

16   the case, resolved some administrative issues

17   and we're here for your Continued Meeting of

18   Creditors.

19               At this time I want to take

20   appearances, identify who you are and who you

21   represent.

22               MR. McNUTT:  Philip McNutt on behalf
```

1  of the Estates of the Mcloughlyn and Reclamams

2  decedents.

3          MR. GIGANDET:  All right.  You may

4  proceed, Mr. McNutt.

5          MR. McNUTT:  Thank you.

6     EXAMINATION BY COUNSEL FOR THE DECEDENTS

7          BY MR. McNUTT:

8     Q.    I just have a couple of short --

9  well, they may not be short, but quick

10  questions, Mr. Salas.

11          I want to give you a document that

12  as entered in your father's proceeding that I

13  know you've seen before.

14          It's identified as Document 66-1 in

15  Case 18-00260 and it is also identified at the

16  bottom there as Creditor's Exhibit No. 3.

17          I will represent to you that this is

18  the revocable trust and quit claim deed that

19  you and your father executed in July of 2010.

20          Do you recognize those documents?

21  The quit claim deed is actually on the last

22  page, if you want to review that.

1      A.    (Reviewing document.)  Yes, I

2  recognize this.

3      Q.    You know that we've talked about

4  this many times before, so I'm not going to try

5  to go over old ground, but I do want to cover a

6  couple of things that I don't think that we

7  know specifically.

8            This transaction by which you became

9  the owner of the deed-of-trust of the property

10  in D.C., the Briggs Place property, do you

11  remember that property?

12      A.    Yes.

13      Q.    Your father's property, right?

14      A.    Yes, I know that property.

15      Q.    You obtained the deed-of-trust for

16  that in approximately 2007, correct?

17            MR. GIGANDET:  That's not that

18  document.

19            THE WITNESS:  It's not that

20  document?  I don't -- yes.

21            BY MR. McNUTT:

22      Q.    You have the original deed-of-trust

1    on the property through Sun Trust Bank,

2    correct?

3         **A.    Yes.**

4         Q.    And that was in approximately 2007,

5    correct?

6         **A.    Yes.**

7         Q.    At the time that you obtained the

8    deed-of-trust on that property did your father

9    make any payments to you?

10        **A.    No.**

11        Q.    Did he give you any property that

12   you're aware of?

13        **A.    No.**

14        Q.    All right.  Skipping forward to the

15   date of the trust and quit claim deed, which

16   was in July of 2010, did your father make any

17   payments to you at that time?

18        **A.    No.**

19        Q.    Did he give you any property at that

20   time?

21        **A.    No.**

22        Q.    Did he give you anything of value in

1    or about july of 2010, at the time of the

2    irrevocable trust?

3        **A.    No.**

4        Q.    Since 2010, since the date of the

5    irrevocable trust, has your father made any

6    payments to you with respect to the deed-of-

7    trust on the property on Briggs Place in

8    Washington, D.C.?

9        **A.    No.**

10            MR. GIGANDET:  You mean directly to

11    him, right?  As opposed to payments to the

12    bank?

13            MR. McNUTT:  Directly to Len?

14            MR. GIGANDET:  Yes.

15            MR. McNUTT:  Yes.

16            MR. GIGANDET:  Okay.

17            BY MR. McNUTT:

18        Q.    Do you know if your father has made

19    all of the payments on the deed-of-trust since

20    2007?

21        **A.    I don't know.**

22        Q.    Do you know if the indebtedness on

1    the deed-of-trust is greater today than it was

2    in 2007?

3        **A.    I don't know.**

4            MR. McNUTT:  That's fine, that's all

5    I have.

6        `    MR. GIGANDET:  All right.  Mr. Naras

7    (phonetic) do you have any questions?

8            MR. NARAS:  I do not.

9            EXAMINATION BY THE TRUSTEE

10            BY M R. GIGANDET:

11       Q.

12       Mr. Salas, has anything changed in your

13   petition between the last time you were here

14   and now?  I mean anything that you found that

15   was incorrect that you need to correct.

16       **A.    I don't think so.**

17       Q.   All right.  Very good.  Then if

18   there's nothing further, I'm going to conclude

19   the Meeting of Creditors now.

20            (Whereupon, the Continued 341

21   Meeting of Creditors was concluded)

22

CERTIFICATE OF REPORTER

```
- - - - - - - - - - x
IN RE:                 :
LEN SALAS              : Case 3:18-bk-02662
       Debtor          :
- - - - - - - - - - - x
```

        I, Martin S. Scheinberg, Notary
Public, do hereby certify that the witness
whose testimony appears in the foregoing pages
was duly affirmed; that the testimony of said
witness was recorded by the Trustee and
thereafter reduced to typewritten form by me;
that said transcript is a true record of the
testimony given by said witness to the best of
my ability; that I am neither counsel for,
related to, nor employed by any of the parties
to the action in which this Rule 341 Meeting of
Creditors was taken; and, further, that I am
not a relative of or employee of any attorney
or counsel employed by the parties thereto, nor
financially or otherwise interested in the
outcome of the action.


        _____

        Martin S. Scheinberg
        Notary Public in and for
        the State of Maryland

My Commission expires:
September 1, 2022




SUBURBAN REPORTING SERVICE    (240) 920-6886

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .     Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .     Washington, D.C.
              Debtor.           .     August 24, 2018
                                .
. . . . . . . . . . . . . . .   .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 3 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT

APPEARANCES:
For the Debtor:           Stinson Leonard Street, LLP
                          By: MARC E. ALBERT
                              JOSHUA W. COX
                          1775 Pennsylvania Avenue, NW
                          Suite 800
                          Washington, D.C., 20036
                          (202) 728-3020

For the Creditors:        By: PHILIP J. McNUTT
                          11921 Freedom Drive
                          Suite 584
                          Reston, Virginia  20190
                          (703) 904-4380

Court Recorder:           THE CLERK

Transcribed By:           MS. KRISTEN SHANKLETON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____
MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

WITNESSES:                                          PAGE:
RON SALAS
Direct examination continued by Mr. Albert      4
Cross-examination by Mr. McNutt                 6
Redirect examination by Mr. Albert              16
Recross-examination by Mr. McNutt               19
Redirect examination by Mr. Albert              24

MAX SALAS
Direct examination by Mr. McNutt continued      29

MAX SALAS
Direct examination by Mr. Albert                61
Cross-examination by Mr. McNutt                 137
Redirect examination by Mr. Albert              207
Recross-examination by Mr. McNutt               215
Redirect examination by Mr. Albert              227

CLOSING ARGUMENT:                                   PAGE:
By Mr. McNutt                                   232
By Mr. Albert                                   266
By Mr. McNutt                                   281
By Mr. Albert                                   294

EXHIBITS:                                MARKED: RECEIVED:
DEBTOR'S
L.  DCRA corporation document            227     227

CREDITOR'S
14. M.Salas Deposition Transcript        *       296
    dated 2/14/16
44. 4/3/2018 transcript of hearing       155     --
45. Excerpt of document production       216  Reject-218

*Exhibits marked on previous days of trial.
**Transcriptionist's note: The notations of
"(unintelligible)" in this transcript are due to the audio
recording levels being turned up too high, or individuals
speaking outside of the vocal capture range of the
microphone.

1    Mr. McNutt has been kind enough to permit me, subject to

2    the Court's okay, to call him now if that's all right.

3              THE COURT:  That's fine.

4      RON SALAS, DEBTOR'S REBUTTAL WITNESS, PREVIOUSLY SWORN

5              THE COURT:  Go ahead, Mr. Albert.

6              MR. ALBERT:  Thank you.

7                        DIRECT EXAMINATION

8              BY MR. ALBERT:

9         Q.   Good morning.

10              I just wanted to clarify again, because I heard

11   yesterday something that seemed inconsistent with what you

12   had told the Court and me earlier this week.  When you and

13   I spoke and you and I exchanged emails, there was a

14   discussion regarding the trust agreement and the quit-claim

15   deed, correct?

16        A.   Yes.

17        Q.   And tell the Court and me again what we discussed

18   and what you did.

19              MR. McNUTT:  Objection.  Your Honor, this is not

20   rebuttal testimony.  He's asking him to state again what he

21   testified to earlier.  It's not rebuttal.

22              THE COURT:  Overruled.

23              THE WITNESS:  So in regards to the email where I

24   said I sent you originals, or I had the originals, I had

25   spoke with my brother.  He told me he had the original.  I

```
 1    said, "Send them to me.  Mr. Albert is asking for them."
 2             MR. McNUTT:  Objection.  Hearsay, Your Honor.
 3             THE COURT:  I'll not receive it for the truth of
 4    the contents.
 5             THE WITNESS:  When he told me he had them, I told
 6    you had originals.  When they arrived in my office I
 7    contacted you immediately and said, "Well, these are not
 8    the originals.  The originals" -- so the only original
 9    would have been to Max.  The reason I knew they were not
10    the originals is because I, as I testified earlier, scan
11    all my documents for preservation, and I know there was
12    blue ink on at least the notary as I recall, and the
13    documents I received were all blank ink, which indicated to
14    me they were copies not originals.  So I let you know at
15    that point.
16             MR. ALBERT:  Thank you.
17             THE WITNESS:  Uh-huh.
18             MR. ALBERT:  Your witness.
19             THE COURT:  You said you got them from your son.
20    Do you mean from your --
21             THE WITNESS:  From my brother.  If I said son, I
22    apologize.
23             THE COURT:  Your brother.  Okay.
24             THE WITNESS:  Yes, my brother Len had them, mailed
25    them to me.  I was going to mail them to you, but they were
```

1     A.    So couldn't assert nothing --

2     Q.    -- but can you answer --

3     A.    -- couldn't assert anything about that.

4     Q.    Can you answer my question, please?

5     A.    What's the question?

6           I think I answered it.

7     Q.    The question is did you produce all documents related

8 -- did you produce all documents related to your ownership of

9 the property that you claimed during the Superior Court

10 litigation?

11     A.    I don't -- I guess I don't know the difference --

12 well, I don't know.  Did we submit them?

13           Yeah, we submitted them, but weren't, one of them

14 weren't -- this document wasn't allowed.

15     Q.    When you say "this document," you mean what's been

16 marked --

17     A.    The deed --

18     Q.    -- as Exhibit 30, the quit-claim deed and the trust

19 documents, correct?

20     A.    That's what I'm talking about, yeah.

21     Q.    All right.

22           And those were submitted, as you put it, on or after

23 March 12, 2018, correct?

24     A.    Yeah -- yeah, uh -- yes, sir.  It was like, like a

25 couple of weeks before the trial.

1  Salas?

2      A.   Because I bought -- because I paid for the policy I

3  guess.  I don't know.

4      Q.   Okay.  Fair enough.

5           Any other reason that you're aware of?

6      A.   No, I -- I don't know.  I have no idea.

7      Q.   You also testified earlier that, in the corrections

8  that you told Judge Teel about, you also testified that the

9  original of the document may be at the title attorney's office,

10 right?

11     A.   That just came to me -- that just came to me as I was

12 sitting over there.  I never -- I never told Mr. Albert about

13 it because I can't talk to him about my testimony, but I just

14 thought about it, and it's -- and it's possible because I don't

15 know if they mailed it back to me.  I don't remember that.  All

16 the papers that I had in my house were burned, so I -- and I

17 didn't recover it from there.  So I couldn't have recovered it

18 there.  But it's, you know, it's possible that it's still at

19 his office because I don't remember -- I don't remember him

20 mailing it back to me, and I don't remember -- but, there's a

21 lot of things I don't remember.

22     Q.   Well, when did you, and I'm assuming because you were

23 attempting to get the quit-claim deed recorded that you gave

24 these documents to Mr. Goldstein shortly after you signed the

25 trust documents in July of 2010; is that fair?

1    A.   Yeah, so what -- so I had this realtor.  Her name is

2  in here, Sylvia Jones, and she told me what she had done --

3            MR. McNUTT:  Your Honor, I'm going to object.

4            THE WITNESS:  Well, I'm trying to answer your

5  question because --

6            MR. McNUTT:  You can't answer --

7            THE WITNESS:  -- that has to tell --

8            MR. McNUTT:  This is more hearsay, Your Honor.

9            THE COURT:  Overruled.

10            THE WITNESS:  So I talked to her.  She told me how

11  she had put her house in a trust because she had three

12  daughters, and so I said I formed a trust, and I've got the,

13  and I quit-claim -- my son quit-claimed the deed over to me,

14  and I want to now register the trust.  And I said, "How do you

15  do that?"  She said, "Well, you got to go to a title company."

16  I said, "Well, who is that?"  She said call Goldstein, Maryland

17  Title Company or something, and she gave me the number to them.

18  And so I called them up and they said, "Send us the

19  information."  So I sent them the information, and about a week

20  later I called them back and they called -- or they called me

21  and they told me what the situation was.

22            So I don't know if I answered your question there or

23  not.

24            BY MR. McNUTT:

25    Q.   I can guarantee you didn't answer the question.

1    A.   I'm sorry.  What's the question?

2    Q.   I'll leave it at that.

3    A.   All right.

4    Q.   So as you sit here today, you're not really sure what

5  happened to the original quit-claim deed after you gave it to

6  Mr. Goldstein, right?

7         MR. ALBERT:  That was asked and answered.

8         THE WITNESS:  I just told you, I don't know if it was

9  in my house or it's in his office, but I -- I don't know.

10        MR. McNUTT:  Okay.

11        THE COURT:  The objection is overruled.

12        BY MR. McNUTT:

13   Q.   And if it was in Mr. Goldstein's office, then you

14  could have gotten it by just simply calling him, right?

15   A.   I -- I -- I could -- I told -- I guess -- I told

16  Mister -- I told my attorney what I did, and so I -- that's his

17  job I guess.  I relied on him.

18   Q.   Which one is that?

19   A.   Mr. Albert and Mr. Cox.

20   Q.   Okay.

21        You don't have a copy of the original quit-claim deed

22  with you today, do you?

23   A.   No.

24   Q.   Are you aware of at any time after you gave it to Mr.

25  Goldstein that you were in possession of the original of the

1  quit-claim deed?

2      A.  Any time after that?

3      Q.  Yes, sir.

4      A.  No.  I --

5      Q.  Up until obviously February of 2018.

6      A.  No, sir.

7      Q.  Okay.

8      A.  I don't remember.

9      Q.  Did you ever try to record the quit-claim deed after

10  the time that you gave it to Mr. Goldstein?

11     A.  No.

12     Q.  Did you ever make another attempt?

13     A.  No.  No, sir.

14     Q.  What activities did you undertake as trustee of the

15  1610 Riggs Property Trust after July 6, 2010?

16     A.  What activities?

17     Q.  Yes, sir.  Did you undertake as trustee?  What

18  activities?

19     A.  I answered that.  Do you want me to do it again?

20     Q.  Yes, sir.

21     A.  I thought I answered it.  I called them and -- I mean

22  after I called Mr. Goldstein and asked him to register it, and

23  then he told me that it was going to cost me $50,000, did I do

24  anything after that?

25     Q.  Yes, sir.

1     A.   Monthly payments.

2     Q.   What -- I don't think you answered my question

3 exactly.  She gets the money; who got the house?

4     A.   Oh, I got the house.

5     Q.   All right.

6        So you took title to the house in your name at that

7 time?

8     A.   Yeah, for a day or two.

9     Q.   Okay.

10       Explain the circumstances behind that.

11    A.   Well, I -- I tried to get a loan.  I couldn't.  I

12 went to SunTrust Bank.  They said there's enough equity in the

13 house to get a loan to pay your wife off, but unfortunately you

14 can't get a loan.  So my, so Len, who had a very good

15 relationship with my ex-wife and myself, we both went to Len

16 and asked him if he would sign for a loan to get Vicki paid

17 off, and he -- and he did.  So that -- so we got a loan so we

18 could pay her, so I could pay her off and she could move back

19 to Tennessee.

20    Q.   Was it necessary to get the loan that the title would

21 have to go in Len's name?

22    A.   Yes, it --

23       MR. McNUTT:  Objection.

24       THE WITNESS:  Yes, it was.

25       MR. McNUTT:  He's not only leading the questions,

Exx 000477

1    he's also asking for a legal conclusion.

2             THE COURT:  The objection is sustained.  Rephrase the

3    question.

4             MR. ALBERT:  Of course, Your Honor.

5             BY MR. ALBERT:

6        Q.   Who -- so the property was put in your name then when

7    you got the loan?

8        A.   No, it wasn't.

9        Q.   Whose name was it put in?

10       A.   Put in my son's name, Len.

11       Q.   Why?

12       A.   Because the loan was made by SunTrust, and his credit

13   -- that was kind of like the peak of the housing market and the

14   loan was made out to him.  He didn't have any -- he had good

15   credit, and they were giving loans to just about anybody at

16   that point in time, and there was enough equity in the house to

17   get it.

18       Q.   But they wouldn't give you credit -- excuse me.

19            They wouldn't lend you the money because?

20       A.   Because I had liens from, tax liens from years eighty

21   -- uh -- '97, '98, and '99.  Yeah.

22       Q.   Okay.

23       A.   I owed money to the IRS.

24       Q.   I see.

25            Now, you owe money to the IRS today, correct?

1    A.   Yes, I do.

2    Q.   All right.

3         And you heard yesterday in the questioning by Mr.

4  McNutt, you owe a certain amount of money, the IRS has filed a

5  claim in this case?

6    A.   Yes.

7    Q.   How much did -- are they claiming?

8    A.   I think about $25,000.

9    Q.   How much is the house worth today if you remember?

10   A.   So it's about 2.4, 2.3, 2.4 million.

11   Q.   And how do you know that, sir?

12   A.   We had a guy, an appraiser, a real estate appraiser

13  do an -- do an appraisal.

14   Q.   Thank you.

15        So, is the property recorded in Len's name?

16   A.   Yes.

17   Q.   Has it ever been recorded in your name or any trust

18  as far as you know?  Recorded?

19   A.   Well, I --

20   Q.   Recorded?

21        THE COURT:  In the land records, Mr. Salas.

22        BY MR. ALBERT:

23   Q.   In the land records.

24   A.   In the land records?  I think it was recorded by name

25  for a day until it was -- until it was -- then I quit-claimed

        1   it back over to Len until, so he could file the -- so, yeah.
        2   One day I think.  The day that the transaction happened.
        3          Q.   And Lenny also signed a deed of trust?
        4          A.   Yes.
        5          Q.   And he signed the note?
        6          A.   Yes.
        7          Q.   In connection with the loan?
        8          A.   Yes.
        9          Q.   And Lenny I suppose has been paying everything since
       10   that time?
       11          A.   Lenny has never paid any -- Lenny has never paid a
       12   penny, a penny towards the loan of the house.
       13          Q.   No down payment, no monthly payments?
       14          A.   No.
       15          Q.   No loan?
       16          A.   No.  Nothing.
       17          Q.   Besides this accommodation, this help that Lenny gave
       18   you, did he have any responsibility with respect to 1610 Riggs
       19   Place Northwest?
       20          A.   No.
       21          Q.   Who was handling any and everything about the
       22   property?
       23          A.   All my responsibility.  Me.  I was doing it all.
       24          Q.   Okay.
       25               Even before the divorce from Vicki who was paying all

Dox 000480

1          Do you see that?

2     A.    The bottom?

3     Q.    On page 219?

4     A.    Line which one?  What line?

5     Q.    Oh, line 17.  I'm sorry, sir.

6     A.    Okay.  Yeah.

7              "No, there's one trust, so no, they are

8          not different, they are the same, I think."

9     Q.    And then read the question and the next answer.

10    A.       "Did you ever formally set up a trust?"

11             "Yes."

12    Q.    Okay, and read the answer.

13    A.       "Okay.  Do you agree if it's called CLR?"

14             "Yes, sir."

15    Q.    And is that correct, it was called CLR?

16    A.    The trust?  No.

17    Q.    Because that -- all right, thank you.

18          Okay.

19          Can you explain when you brought to my attention

20    the trust document and quit-claim deed?

21    A.    Can I explain when I brought the trust to your

22    attention?

23    Q.    Approximately when did you --

24    A.    Yeah.  So after we had, after the judgment came,

25    after the trial where Mr. Barnes defended, represented me, you

1    -- so I was talking to you and you asked me --

2         Q.   Did you say after the trial or during the trial?

3              MR. McNUTT:  Objection.

4              THE WITNESS:  After, well, I think it was after the

5    trial.  After the trial.  I don't know when it was.

6              MR. McNUTT:  Your Honor, that was a blatant attempt -

7    -

8              THE WITNESS:  Oh no --

9              MR. McNUTT:  -- to lead the witness.

10             THE WITNESS:  -- before the trial.  So, I don't -- I

11   don't remember when, but I talked with you, and you asked me --

12             MR. McNUTT:  Your Honor, I ask that this answer be

13   stricken.

14             THE COURT:  He can answer it now.  He's not honing it

15   down to a specific time.

16             MR. McNUTT:  Your Honor, that was a blatant attempt

17   to lead him and correct him.

18             THE WITNESS:  Okay.

19             MR. McNUTT:  That's highly improper.

20             THE COURT:  The question was when did this occur, and

21   he can't remember at this moment.  It's been answered

22   previously during the trial.

23             We're covering a lot of ground all over again.

24             MR. ALBERT:  I understand, Judge, but Mr. McNutt took

25   approximately six hours with --

1          THE COURT:  Ask a question.

2          BY MR. ALBERT:

3     Q.   Do you know what -- what are -- explain the

4  circumstances to the Court regarding finding the trust document

5  and the quit-claim deed.

6     A.   So you asked me, "You keep talking about this trust

7  in your deposition.  I read your deposition and you keep

8  talking about" --

9     Q.   Who are you talking about?  Are you talking about me?

10    A.   Yes.

11    Q.   When you say "you"?

12    A.   Yes.  You -- you talked to me about, "You keep

13 talking about this trust through your whole deposition.  I've

14 read the whole thing.  What trust are you talking about?"  And

15 I said, "The trust."  I said what -- and he said, you said to

16 me, "Who put this trust together for you?  Was there a lawyer

17 involved?"  And I said, "Yes."  I (sic) said, "Which lawyer?"

18 "My son."  I (sic) said, "Your son is a lawyer?"  "Yes."

19 "Where is he at?"  "Colorado."  I  said, "Colorado."  He says,

20 "Do you -- does he have a copy of the trust?"  I said -- no you

21 asked me, "Do you have a copy of the trust?"  I said, "No."

22 "Where is it?"  I said, "It burned in the fire.  I don't have

23 any" -- he says, "Well, do you think your son has a copy of the

24 trust?"  I said, "Well, he should.  I guess, yeah, he might --

25 he should."  I don't remember what I said.  "But I can call

1 him."

2       So I called him. You said, "May I talk to him?" I

3 said, "Yes." You said, "Will you call him and tell him that

4 I'm going to call him?" I said, "Yes."

5       So I called him, told him, asked him if he had a copy

6 and he said yes. And so you -- you called him and you got a

7 copy of that, of the doc -- you got a copy of the trust and the

8 quit-claim deed.

9     Q. Thank you.

10       Can you think of any reason why that document wasn't

11 obtained earlier than that time?

12     A. No, I can't think of any reason why it was -- I --

13 you know, I -- I don't understand why Mr. Barnes didn't ask for

14 that before. I just, I can't understand why he didn't ask for

15 that before but -- and I can't -- there's a lot of things I

16 look at now and I don't understand why Mr. Barnes didn't get

17 any witnesses to the trial, like people that saw the windows

18 open, people that --

19       THE COURT: It's not --

20       THE WITNESS: No --

21       THE COURT: -- pertinent to the question.

22       THE WITNESS: Yes, sir. I'm sorry.

23       So did I answer your question?

24       BY MR. ALBERT:

25     Q. Thank you.

1  of the money to Vicki.  So we got a loan for $800,000 but that

2  was to pay the old loan off.

3      Q.   Right.

4      A.   And then the rest of the loan, the rest of the money

5  was to pay her for her half of the equity in the house.

6      Q.   So my question is, did you ever pay your son back for

7  the money that he borrowed that you used to pay your wife?

8      A.   I didn't borrow any money from my son.

9      Q.   I'm sorry.  I missed that.

10     A.   I didn't borrow any money from my son.

11     Q.   So the answer is you didn't pay any of this money

12 back to your son, right?

13     A.   I didn't borrow any money from my son.

14     Q.   Okay.

15          After -- let me try it this way.  After April --

16 yeah.  After April 2007, I think it was April 16th when the

17 deed of trust was recorded?

18     A.   Uh-huh.

19     Q.   Does that sound about right?

20     A.   Yes, sir.

21     Q.   And that's, there were the three deeds and then the

22 deed of trust, right?

23     A.   Right.

24     Q.   After April of 2010 did you pay any money to your son

25 Len with respect to any of the money that you paid your wife,

1    your ex-wife Vicki?

2         A.   I never paid Lenny any money.

3         Q.   Okay, fair enough.

4              Now, you also said that you tried to refinance.  When

5    did you try to refinance the property, and I think you said it

6    was with SunTrust.  When was that?

7         A.   So lots of times.  I mean, I continually tried.  At

8    least twice a year.

9         Q.   At least twice a year?

10        A.   Since -- since we borrowed the money from SunTrust.

11        Q.   Okay.

12             And was that always with SunTrust?  The attempts to

13   refinance, were they always with SunTrust?

14        A.   I -- I think so.  I mean, we looked at other sources.

15   I think one time we tried Capital One, but always the -- our

16   best chances were with SunTrust because we had a track record

17   with them.  We kept paying the loan to them.  Up until the

18   fire, and then we fell behind on the mortgage.

19        Q.   All right.

20             And none of those efforts were successful in

21   obtaining a new loan, right?

22        A.   No.

23        Q.   Okay.

24             And your son Len was part of the application process,

25   is that right?

1  separate?

2         THE WITNESS:  Well, because -- because of, the

3  individual account of Cornet was -- was my personal income,

4  and the other account for CLR was different.  And the

5  intentions were originally is to, CLR was to be -- give

6  that account to my sons, but that never happened.  Because

7  it never made any money.

8         THE COURT:  What never made any money?

9         THE WITNESS:  CLR.  It just became a way to

10 separate income and meet the bills and pay for the mortgage

11 and -- and the ability to pay for the house.

12        THE COURT:  This may have been answered already.

13 Why use the CLR account for your rents?

14        THE WITNESS:  Because I didn't want to put the

15 rent money into my personal account, into my -- my -- my

16 personal account because -- see, in the very beginning,

17 from the very beginning from when Vicki and I owned, well,

18 when the house was in Vicki's name, and we always had the

19 basement rented even when she and I -- when she and I were

20 together we rented the basement, and that wasn't my money.

21 That really wasn't -- I didn't consider that my money.

22 That was just money to pay the mortgage.  And so I would

23 put the money into the CLR account and then I would

24 supplement that money from CLR from my personal account,

25 from the Bank of America -- or I mean from -- yeah, Bank of

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

# RE: Trust
1 message

**Stanley Goldstein** <SGoldstein@capitoltitle.com>                     Wed, Jun 22, 2011 at 8:50 AM
To: "MaxSalas@aol.com" <MaxSalas@aol.com>
Cc: "lensalas77@gmail.com" <lensalas77@gmail.com>, "ronsalas@salaslegal.com" <ronsalas@salaslegal.com>, Lynne
Boileau <LBoileau@capitoltitle.com>

    Max-

    By copy of this email, I am sending your email to Lynne Boileau, Esq. who will contact you.

    Thanks,

    Stan

    ---

    **From:** MaxSalas@aol.com [MaxSalas@aol.com]
    **Sent:** Tuesday, June 21, 2011 12:05 PM
    **To:** Stanley Goldstein
    **Cc:** lensalas77@gmail.com; ronsalas@salaslegal.com
    **Subject:** Fwd: Trust

    I sent it to the wrong e mail before

    > From: MaxSalas@aol.com
    > To: s.goldstein@capitoltitle.com
    > CC: lensalas77@gmail.com, ronsalas@salaslegal.com
    > Sent: 6/21/2011 11:51:54 A.M. Eastern Daylight Time
    > Subj: Fwd: Trust
    >
    >
    > Stan-
    >
    > As per our conversation I am sending you the e-mail from my son prepared to documents Ron also my other
    > son, Len is the gentleman who will quick claim deed to the trust.
    > I am the trustee other information for the documents can be requested from Ron Salas , who was copied on this
    > e-mail.  Please let me know what you need me next.  I will also send you over a in a different e-mail.  Tax
    > identification for the trust,
    >
    > At the end of the day.  We need to have done is have Lenny sign a quick claim deed into the trust, which has
    > been extend lives by my son, Ron, in Colorado
    >
    > Hope this is not too confusing
    >
    > Thank you,
    > sincerely yours,
    >
    > Max Salas
    >
    > > ---
    > > From: ronsalas@salaslegal.com
    > > To: MaxSalas@aol.com, lensalas77@gmail.com
    > > Sent: 6/17/2011 2:45:54 P.M. Eastern Daylight Time
    > > Subj: Trust
    > >
    > > Gentlemen –

The 1610 Riggs Property Trust has been registered with the State of Colorado and the IRS. The attached document is the Trust's EIN. The number is to be used as the Trust's "Social Security Number". A bank account should be opened using this number. The name and number should also be used to finance the property. Please note that Income Taxes on the Trust must be filed annually.

The next step is for someone in DC to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward  and will need to be signed by at least the grantor, Len. In some "states" both parties may need to sign so check with the drafter of the deed. The deed will then need to be filed with the District/City. Let me know if you have any other questions.

By the way Happy Birthday, Len and Happy Father's Day, Dad.

Ron

Ron Salas, Esq.

5205 S. College Ave, Suite B

Fort Collins, CO 80525

Phone (970) 232-3330

Fax (877) 667-2860

[ronsalas@salaslegal.com](mailto:ronsalas@salaslegal.com)

[www.thesalaslawfirm.com](http://www.thesalaslawfirm.com)



**CONFIDENTIALITY NOTICE:** This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

 Gmail

**Len Salas <lensalas77@gmail.com>**

---

## Re: trust #
1 message

---

**maxsalas@aol.com** <maxsalas@aol.com>                          Wed, Jun 22, 2011 at 3:19 PM
To: Len Salas <lensalas77@gmail.com>

NO

Max Salas 202  271 2800


----- Reply message -----
From: "Len Salas" <lensalas77@gmail.com>
Date: Wed, Jun 22, 2011 3:47 pm
Subject: trust #
To: "maxsalas@aol.com" <maxsalas@aol.com>

Yeah, I saw that. But that is not what I asked. I asked if you used this EIN # to set up a bank acct with a bank either BB&T
or bank of america or Suntrust.

Sent from my iPhone

On Jun 22, 2011, at 12:09 PM, "maxsalas@aol.com" <maxsalas@aol.com> wrote:

> I sent you a copy of the email yesterday
>
> Max Salas 202  271 2800
>
>
> ----- Reply message -----
> From: "Len Salas" <lensalas77@gmail.com>
> Date: Wed, Jun 22, 2011 10:58 am
> Subject: trust #
> To: "MaxSalas@aol.com" <MaxSalas@aol.com>
>
> Have you contacted a bank to set up an acct for the trust?
>
> Sent from my iPhone
>
> On Jun 21, 2011, at 12:04 PM, MaxSalas@aol.com wrote:
>
>> please see the attached,
>>
>> <EINNumber trust.pdf>
>
> =

 Gmail

**Len Salas <lensalas77@gmail.com>**

---

## trust paper work
1 message

---

**Max Salas** <m.salas@cornet.com>                          Tue, Jan 17, 2012 at 5:02 PM
To: "ljboileau@goldsteinandlevey.com" <ljboileau@goldsteinandlevy.com>
Cc: Ron Salas <ronsalas@salaslegal.com>, Len Salas <lensalas77@gmail.com>

Dear Lynn,

As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.

Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.

There are two different requests:

One is to get Lenny's name off of the property. (want to do this asap)

The second request is to refinance the property under the name of the trust.

Please feel free to contact either Ron or Len for any clarification.

Ron phone # is  970 214 6356

Len phone  # is 202 246 4901

**Max Salas,**

**Senior VP Corporate Development**

**Cornet Technology , Inc**

Case 3.23-cv-00987     Document 7-2     Filed 10/04/23     Page 314 of 532 PageID #: 992
Len Salas000023

**6800 Versar Center**  **, Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

---

 **trust information.pdf**
8801K

 **Gmail**                  **Len Salas <lensalas77@gmail.com>**

## trust paper work
1 message

**Max Salas** <m.salas@cornet.com>          Tue, Jan 17, 2012 at 5:23 PM
To: "ljboileau@goldsteinandlevey.com" <ljboileau@goldsteinandlevy.com>
Cc: Ron Salas <ronsalas@salaslegal.com>, Len Salas <lensalas77@gmail.com>

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901



**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology , Inc**

Case 3:23-cv-00987     Document 7-2     Filed 10/04/23     Page 316 of 532 PageID #: 864
lensalas000025

**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

---


**trust information.pdf**
8801K

 Gmail

**Len Salas <lensalas77@gmail.com>**

## Re: trust paper work
1 message

**Len Salas** <lensalas77@gmail.com>                      Fri, Feb 24, 2012 at 7:22 PM
To: Max Salas <m.salas@cornet.com>

Where are we on this?

Len Salas
lensalas77@gmail.com
202-246-4901 (mobile)


On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need
additional information let me know what need.  I have copied both my sons on this email  Ron
Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901

**Max Salas,**

**Senior VP Corporate Development**

**Cornet Technology , Inc.**

**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

 Gmail

**Len Salas <lensalas77@gmail.com>**

## Re: trust paper work
1 message

**Maxs** <m.salas@cornet.com>                            Fri, Feb 24, 2012 at 9:04 PM
To: Len Salas <lensalas77@gmail.com>

Still working on this ..,,Iam in Miami will be back soon

Max Salas 202-271-2800

On Feb 24, 2012, at 8:22 PM, Len Salas <lensalas77@gmail.com> wrote:

Where are we on this?

Len Salas
lensalas77@gmail.com
202-246-4901 (mobile)

On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,

As per our conversation, today please find the trust paper work information.  If you
need additional information let me know what need.  I have copied both my sons on
this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.

Len Salas was also copied on this e-mail is who quit claimed the property over to the
trust.

There are two different requests:

One is to get Lenny's name off of the property. (want to do this asap)

The second request is to refinance the property under the name of the trust.

Please feel free to contact either Ron or Len for any clarification.

Ron phone # is  970 214 6356

Len phone  # is 202 246 4901

**Max Salas,**

**Senior VP Corporate Development**

**Cornet Technology , Inc.**

**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

 Gmail

## RE: trust paper work

1 message

---

**Max Salas** <m.salas@cornet.com>           Mon, Feb 27, 2012 at 10:08 AM
To: Len Salas <lensalas77@gmail.com>

Len,

can you send over the original e-mail I will check with Lynn again and try to move this thing along.
Thanks

Max Salas,

Senior VP Corporate Development

Cornet Technology , Inc.

6800 Versar Center , Suite 216

Springfield Virginia 22151

Direct phone 703-658-6163

Mobile phone 202-271-2800

M.Salas@cornet.com

---

**From:** Len Salas [mailto:lensalas77@gmail.com]
**Sent:** Friday, February 24, 2012 8:23 PM
**To:** Max Salas
**Subject:** Re: trust paper work

Where are we on this?

Len Salas
lensalas77@gmail.com

202-246-4901 (mobile)


On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901


**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology , Inc.**


**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

## Getting house changed over into trust name
1 message

**Max** <maxsalas@aol.com>                                           Mon, Feb 27, 2012 at 7:42 PM
To: "lboileau@capitoltitle.com" <lboileau@capitoltitle.com>
Cc: Len Salas <lensalas77@gmail.com>, Ron Salas <ronsalas@salaslegal.com>

Hi Lynn, about a month and a half back I sent you information  in reference to documents of the house 1610 Riggs. NW


please let me know when it be convenient for you.

My son and I are anxious and would like to close on this as soon as possible please let us know what the next that are from our side

We look forward to working with you what are the next steps?

Thanking you in advance

Sincerely yours

Max Salas 202-271-2800



# Transcript of Ron Salas

**Date:** August 10, 2018
**Case:** Max E. Salas, In Re:

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
1        IN THE UNITED STATES BANKRUPTCY COURT
2           FOR THE DISTRICT OF COLUMBIA
3   ----------------------------X
    In re:                      :
4                               :Case No. 18-00260
    MAX E. SALAS,               :Chapter 11
5                               :
        Debtor In Possession.   :
6   ----------------------------:
    NICOLAAS J. BREKELMANS AND  :
7   GAIL GREGORY                :
    BREKELMANS, PERSONAL        :
8   REPRESENTATIVES OF THE ESTATE :
    OF NINA BREKELMANS          :
9                               :
    And                         :
10                              :
    MICHAEL McLOUGHLIN, JR. AND :
11  MARTHA JOHNSON, PERSONAL    :
    REPRESENTATIVES OF THE ESTATE :
12  OF MICHAEL PATRICK McLOUGHLIN,:
        Movants,                :
13  v.                          :
                                :
14  MAX E. SALAS,               :
        Respondent.             :
15  ----------------------------X
16        Deposition of RON SALAS
17            Washington, DC
18        Friday, August 10, 2018
19               1:30 p.m.
20  Job No.:  202529
21  Pages: 1 - 83
22  Reported by:  Sydney Crawford
```

**2**

```
1          Deposition of RON SALAS, held at the offices
2   of:
3
4
5         STINSON LEONARD STREET LLP
6         1775 Pennsylvania Avenue, NW
7         Suite 800
8         Washington, DC
9
10
11
12
13
14         Pursuant to agreement, before Sydney
15  Crawford, Notary Public in and for the District of
16  Columbia.
17
18
19
20
21
22
```

**3**

```
1            A P P E A R A N C E S
2
3   ON BEHALF OF MOVANTS, NICOLAAS J. BREKELMANS,
4   ET. AL.:
5      PHILIP J. MCNUTT, ESQUIRE
6      LAW OFFICE OF PHILIP J. MCNUTT, PLLC
7      11921 Freedom Drive
8      Suite 584
9      Reston, Virginia 20148
10
11  ON BEHALF OF RESPONDENT, MAX E. SALAS:
12      MARC E. ALBERT, ESQUIRE
13      STINSON LEONARD STREET LLP
14      1775 Pennsylvania Avenue
15      Suite 800
16      Washington, DC 20006
17
18
19
20
21
22
```

**4**

```
1            I N D E X
2
3   EXAMINATION BY                      PAGE
4      Mr. McNutt                    6
5      Mr. Albert                    77
6
7
8   SALAS EXHIBIT      DESCRIPTION      PAGE
9   1    Notice of Deposition         17
10  2    Deed, 27th April 1993        17
11  3    Deed, 16th April 2007        20
12  4    Deed, 16th April 2007        24
13  5    Deed of Trust                24
14  6    Corporate Assignment of Deed Trust  25
15  7    Irrevocable Trust Agreement     26
16  8    Quickclaim Deed              26
17
18
19
20
21
22
```

5

1     P R O C E E D I N G S

2  WHEREUPON,

3           RON SALAS,

4    having duly been sworn to tell the truth, the

5  whole truth and nothing but the truth, testifies

6  as follows:

7

8           EXAMINATION BY COUNSEL FOR THE MOVANTS

9  BY MR. MCNUTT:

10    Q   Mr. Salas, can you please state your

11  full name and current residence for the record?

12    A   Yes.  Ron Salas, S-A-L-A-S, 7111 Diamond

13  Tail, T-A-I-L, Drive, Fort Collins, Colorado

14  80525.

15    Q   And I understand you're a practicing

16  attorney; is that correct, Mr. Salas?

17    A   Yes.

18    Q   And can you tell me what your -- where

19  your office is?

20    A   My office is in Fort Collins.  I have

21  two offices: one in Fort Collins, Colorado, the

22  address is 323 West Drake, Suite 116, ZIP is

6

1  80526.  I also have one in Greeley, Colorado, and

2  I don't know what the address is.  It's in the

3  Bank of the West building on 10th Street in

4  Greeley, Colorado.  It's a satellite I use once a

5  week.

6    Q   Okay.  Is that -- is that an official

7  office of your firm, though?

8    A   Yes.

9    Q   And what's the name of your firm?

10    A   The Salas Law Firm.

11    Q   Okay.  And are you the only attorney in

12  the firm or are there others?

13    A   I have one associate attorney, Cody

14  Knebel, that works for me at this point.

15    Q   Can you spell the name for the reporter?

16    A   Yes, K-N-E-B-E-L.

17    Q   And are there any other professionals

18  that work for you, paralegals or paraprofessionals

19  of any kind?

20    A   No.  I have a legal assistant, but

21  she -- she's not a certified paralegal so no.

22    Q   Okay.  Can you tell me what type of law

7

1  you practice?  Do you have any specialties?

2    A   You know, I do probably 60 percent

3  bankruptcy work.  I do 30 percent domestic:

4  divorce, family law, custody.  I do some wills and

5  trusts, small percentage.  I'm fluent in Spanish,

6  so I do take traffic cases for individuals that

7  don't speak English.  Not my specialty.

8        I did work -- I interned in the district

9  attorney's office, so I'm familiar with it, don't

10  like it, but I help folks that need help so I do a

11  little bit of that.

12    Q   Do you hold yourself out to be a

13  specialist in any given area?

14    A   I wouldn't say a specialist, but I'd say

15  my primary focus is bankruptcy, and that's where

16  I'm most familiar.

17    Q   And when you say "bankruptcy," what

18  types of bankruptcy do you focus on, if any?

19    A   Mostly Chapter 7, so currently, I

20  probably have 30 open Chapter 7 cases and 25

21  Chapter 13s that are somewhere within the filing

22  and -- and --

8

1    Q   How many did you say?  I'm sorry.  13s?

2    A   13, I probably have 25 open cases

3  currently.

4    Q   Sorry.  I didn't mean to interrupt.

5        That's in Chapter 13, I think you said?

6    A   Yes, that are in 13.

7    Q   What about Chapter 11; do you ever

8  handle Chapter 11 cases?

9    A   I have not done a Chapter 11 case.

10    Q   And I know you've probably been through

11  this before as an attorney, but just in case,

12  because everybody violates this rule including --

13  including the people on both sides of the table,

14  so please try to wait until I finish my question

15  before you answer, and I will try to do the same.

16        Meaning, that we'll try to -- I don't

17  think that's quite the right thing to say.  I will

18  try to wait until you're finished before I begin

19  the next question.

20        At any time you feel that I've -- well,

21  if at any time I've interrupted you or you think

22  I've interrupted you -- it's your perception, I

9

1  guess -- please tell me so you can finish your
2  answer.
3      Subject to your attorney's instructions
4  or, well, I guess, Mr. Albert's not representing
5  you here, but subject to any objections that
6  Mr. Albert raises, in the event that you feel you
7  need to clarify or restate something that you've
8  said earlier in the deposition at any time, let me
9  know.  I'll be happy to let you add to, correct,
10  or change the record.  Okay?
11      Have you ever been deposed before?
12  **A    I have not.**
13  Q    Well, this is your first big experience.
14  **A    Yeah.**
15  Q    Have you ever attended depositions
16  before?
17  **A    I have.**
18  Q    And you know why we're here today;
19  right?  We're here related to the objection to the
20  claim of your father.  That's Max Salas; right?
21  **A    Yes.**
22  Q    He's your father; right?

10

1  **A    He's my father.**
2  Q    We're in the objection to your father's
3  claim of a homestead exemption.
4      Being a bankruptcy attorney, do you
5  generally understand or do you generally have an
6  understanding what a homestead exemption is?
7  **A    I do.**
8  Q    And my understanding is that you may be
9  called as a witness in the case that's scheduled
10  for hearing on the 22nd?
11  **A    Yes.**
12  Q    All right.  What -- what will you
13  testify to?
14      MR. ALBERT:  Objection.
15  **A    I don't know.  Sorry.**
16  Q    Okay.  At any time, have you formally
17  represented your father in any legal matter?
18  **A    Formally represented him --**
19      MR. ALBERT:  I would have to object to
20  the question, form of the question.
21  Q    You don't have to.  You can if you want.
22      You're hesitant.  You're not sure how to

11

1  answer that?
2  **A    I'm not sure how to answer that**
3  **question, so --**
4  Q    Do you believe that you've acted as an
5  attorney and represented your father at any time
6  in the past?
7      MR. ALBERT:  Objection as to the form of
8  the question.
9  **A    I have prepared documents for him, and**
10  **this is where I don't know if I prepared them for**
11  **my brother or if I prepared them for my father, so**
12  **the answer is I do not know.**
13  Q    And the documents you -- what documents
14  are you referring to?
15  **A    I'm referring to -- I prepared a trust**
16  **document and a quitclaim deed document for my**
17  **brother and my father in 2010.**
18  Q    Okay.  Have you ever entered into a
19  retainer agreement with your father or your
20  brother on any matter?
21  **A    No.**
22  Q    Do you normally enter into retainer

12

1  agreements with your clients?
2  **A    I do.**
3  Q    Now, you said that part of your
4  practice, I believe you said 30 percent, correct
5  me if I'm wrong, was in estates and trusts; is
6  that --
7  **A    I'd say it's more like 10 percent.**
8  Q    10 percent; okay.
9  **A    Yeah.**
10  Q    And how often would you say that you
11  prepare wills or trusts for clients on an annual
12  basis?
13  **A    I do maybe three trusts a year.  I**
14  **probably do three to four wills a month.**
15  Q    And when you do these, are you acting as
16  a Colorado attorney or do you do them for people
17  in other states?
18  **A    Just a Colorado attorney.**
19  Q    Have you ever prepared a trust
20  agreement, and excluding the document we're going
21  to get to, the -- which is one of the subject
22  matters of our hearing.

13

1       Excluding the one that you prepared in
2 2010 for your father and/or your brother, have you
3 ever prepared a trust agreement for a person or
4 entities in the District of Columbia?
5     A   **I have not.**
6     Q   Okay. Well, have you ever lived in the
7 District of Columbia?
8     A   **I have.**
9     Q   Okay. During what period of time?
10    A   **I lived here for three months in the**
11 **summer of '95. That's my best recollection.**
12 **Somewhere between '94 and '96, I spent a summer**
13 **here, and I can't exactly recall exactly what**
14 **summer.**
15    Q   And -- and where did you live when you
16 stayed here?
17    A   **I lived in an apartment with my father**
18 **on R Street. I don't know the address.**
19    Q   Okay. Are you familiar with the
20 litigation that occurred in the Superior Court of
21 the District of Columbia in which your brother and
22 your father were named defendants in a personal

14

1 injury and wrongful death case?
2     A   **I am.**
3     Q   And can you tell me how you're familiar
4 with it?
5     A   **I attended the hearing in support of my**
6 **brother and my father. My -- my son was involved**
7 **in the incident. So, you know, I knew what**
8 **happened. So --**
9     Q   Have you ever visited the house on Riggs
10 Place?
11    A   **Yes.**
12    Q   Can you tell me if you visited the house
13 on Riggs Place after 2010?
14    A   **I don't know for a fact, but I'm pretty**
15 **sure.**
16    Q   Okay. You don't have a specific
17 recollection that you did that?
18    A   **I visited that house 25 times over the**
19 **last 25 years, and I don't recall specifically**
20 **after 2010, but it's likely. I don't recall.**
21    Q   Okay. Now, in the litigation in the
22 superior court, did you represent or are you

15

1 representing either your brother or your father?
2     A   **In the superior court here?**
3     Q   Yes.
4     A   **No.**
5     Q   With respect to Mr. Lynn Salas'
6 bankruptcy case in the Middle District of
7 Tennessee, are you familiar with that?
8     A   **I am.**
9     Q   Are you representing him in any capacity
10 in that case?
11    A   **I am not.**
12    Q   Okay. With respect to Max Salas, who is
13 the debtor in this case, 00260 in the United
14 States Bankruptcy Court for the District of
15 Columbia, are you representing him in any capacity
16 in his current bankruptcy case?
17    A   **No.**
18    Q   All right. Are you representing either
19 your brother or your father in any capacity that
20 you're aware of at the present time?
21    A   **No.**
22    Q   Okay. So you're appearing here today as

16

1 son and witness. Does that sound right?
2     A   **Yes.**
3     Q   And I'm not trying to pin you down.
4     MR. ALBERT: He's appearing here today
5 because he's been summoned as a witness pursuant
6 to a notice to take deposition.
7     A   **Right. Correct. I'm not here**
8 **voluntarily.**
9     MR. MCNUTT: Well, you made me do that,
10 though.
11    Q   Okay. Now, what I'd like to get into
12 now, Mr. Salas, is how it came about that you
13 prepared the documents that we're eventually going
14 to get to here.
15     The trust, which in my mind started with
16 the irrevocable trust agreement that was in 2010.
17 Do you remember when you were first -- do you
18 remember your first communication with either your
19 brother or your father about that?
20    A   **The first? Not really.**
21    Q   I'm assuming it would have been -- well,
22 I tell you what, why don't we do this: Why don't

17

1 we go through the documents. I'll get to the
2 trust and then we can have it sit in front of you
3 and not confuse the court reporter anymore.
4      (Exhibit 1 was marked for
5 identification.)
6      The first document I have here is marked
7 Exhibit 1 is titled "Notice of Deposition," and I
8 ask you if you can review that and tell me if
9 you're here today testifying pursuant to that
10 notice.
11     **A   I am.**
12     (Exhibit 2 was marked for
13 identification.)
14     Q   Okay. The document I have is titled --
15 it's got three exhibit stickers on it, the one for
16 this purpose is Exhibit 2, and it appears to be a
17 deed dated April 27, 1995, by and between David
18 Wilhelm -- and I can't read the second first name,
19 but it's another Wilhelm -- tenants by the
20 entireties, and Vicky L. Buff, a single person,
21 party of the second part.
22     Can you tell me if you've ever seen that

18

1 document before?
2     **A   I don't believe I have, no.**
3     Q   Okay. Do you recognize the name, Buff?
4     **A   I do.**
5     Q   All right. And can you tell me who that
6 is?
7     **A   Yes. That was my father's third wife.**
8     Q   Okay.
9     **A   My stepmother.**
10    Q   And that is his most recent wife that
11 you're aware of?
12    **A   He's now been married since, yes, that's**
13 **correct. That I know of.**
14    Q   To the best of your knowledge?
15    **A   Sure.**
16    Q   All right. And you don't think you've
17 seen that document before?
18    **A   I do not. I was -- no.**
19    Q   Okay. Let me take --
20    MR. ALBERT: Well, other than -- this
21 was a booklet of documents that were put
22 together, and so I had the booklet you're

19

1 actually showing him now, and I showed it to him
2 this morning. I'm not sure he focused in on
3 that, but it was part of the group of documents.
4     **A   Right. I mean, let me clarify that.**
5     Q   But you're not testifying for him;
6 right?
7     MR. ALBERT: No. No, but I'm just
8 trying -- I want to just clarify things. I don't
9 want --
10    **A   I do want to clarify that I was sent a**
11 **group of documents prior to this deposition. I**
12 **looked them over. I don't recall that one in**
13 **particular. Just for clarification.**
14    Q   Okay. And as long as we're on that,
15 then, prior to the documents that Mr. Albert, I
16 guess, gave you to review, do you recall seeing
17 any of the documents that we've now produced, the
18 Exhibit 2, which is the --
19    **A   I definitely read Exhibit 2 --**
20 **Exhibit 1. 2, I did not. My understanding was I**
21 **was here to talk about what I had prepared, and**
22 **that's the document I've looked at.**

20

1     Q   Fair enough. Let me show you what's
2 been marked as Exhibit 3.
3     (Exhibit 3 was marked for
4 identification.)
5     Q   This again is a document titled "Deed."
6 It's dated April 16, 2007 between Vicky L. Buff,
7 Sole Owner, and Max E. Salas, sole owner.
8     And let me ask you if you've ever seen
9 that document before.
10    **A   Again, I saw it in the documents that**
11 **were sent to me, I presume, but not before that,**
12 **not before two days ago.**
13    Q   Okay. And that answers my next
14 question. You've received some documents from
15 Mr. -- from Mr. Albert a couple days ago?
16    **A   They were actually, I believe, from**
17 **Mr. Cox.**
18    Q   Mr. Cox, okay.
19    **A   And I did not review them, I don't**
20 **think, until I was on the plane yesterday, but**
21 **yes, I did.**
22    Q   Can you tell me what documents you have

Case 3:23-cv-00987    Document 7-2    Filed 10/04/23    Page 331 of 532 PageID #: 919

814

21

1 reviewed, then?
2    **A    Whatever was in the packet I looked at.**
3 **I read in detail the objection, your objection.  I**
4 **read in detail the response.**
5    Q    My objection was pretty good, wasn't it.
6    **A    Yeah.  I might use some of it.  And then**
7 **I -- and then I reviewed the document.  Anyhow, I**
8 **looked at the document that I prepared.  I have**
9 **actually seen it quite a bit.  So I didn't -- just**
10 **checked to see if there was anything in there that**
11 **I didn't -- was not familiar with, and because I**
12 **knew I was here on that document, I left it alone.**
13    Q    Okay.
14    **A    I didn't spend a lot of time.**
15    Q    Other than -- other than the trust
16 agreement, the objection to exemption, and the
17 opposition filed by Mr. Albert on your dad's
18 behalf, are there any other documents that you
19 reviewed in preparation for your deposition this
20 morning -- this afternoon?
21    **A    Not that I can recall, no.  There's --**
22 **it's --**

22

1    Q    Okay.  So when you say you reviewed the
2 documents, do you know if you reviewed all of the
3 exhibits or -- let me start with this.
4        Do you know if the exhibits that Mr. --
5 that were attached to the opposition were part of
6 the packet that you were sent?
7    **A    I did not see any, so I -- I -- that I**
8 **recall, because I kind of looked.  It says there**
9 **were some attachments, and I didn't see them.**
10 **What they sent me for this, there were**
11 **attachments, and I did look at those.**
12    Q    Okay.  That's what I'm talking about.
13 Okay.  So you did see everything that Mr. Albert
14 filed on behalf --
15    **A    Yeah, I looked at them.**
16    MR. ALBERT:  Well, wait a minute.  You
17 don't know that.  What he said was he saw
18 documents I gave him this morning, but you don't
19 know they were the same documents that were
20 provided and filed with the court.
21    MR. MCNUTT:  I do know, however, the
22 question I asked the witness, and I do know what

23

1 the witness gave as an answer.  I do know that.
2    MR. ALBERT:  Okay.
3    THE WITNESS:  So --
4    MR. ALBERT:  But you characterized it a
5 little differently, that's all I'm trying to say.
6 He looked at the documents that we're -- we're
7 looking at right now, but there might have been
8 other documents that were attached.  I don't now.
9    MR. MCNUTT:  Again, my understanding of
10 the way the deposition works is that the witness
11 is the person who testifies, not the counsel that
12 is sitting --
13    MR. ALBERT:  Absolutely.
14    MR. MCNUTT:  -- by his side.
15    MR. ALBERT:  Absolutely.  So can we keep
16 it that way?
17    MR. MCNUTT:  Of course, but we're not
18 going to have you characterize something for the
19 record that's not correct.
20    MR. ALBERT:  You're --
21    MR. MCNUTT:  Although I didn't notice an
22 objection, you're certainly entitled to state an

24

1 objection.  And I have no objection to your doing
2 so.
3    MR. ALBERT:  That -- that's fine.
4    MR. MCNUTT:  I don't want you -- you
5 know, this is not an informal proceeding where
6 you get to lead the witness or suggest answers to
7 the witness, and I'm not suggesting you're doing
8 that.  But it's my questions and his answers, and
9 you certainly have the right to object.
10    MR. ALBERT:  That's right, it's your
11 questions, his answers, but not your
12 characterization.  But I'm not leading the
13 witness.  Thank you.
14    Q    All right.  Let me -- take a look at
15 what's been marked as Exhibit 4, Mr. Salas, and
16 tell me if you've ever seen that document before.
17        (Exhibits 4 and 5 was marked for
18 identification.)
19    **A    Again, I may have seen it in the**
20 **documents that were sent to me.  I don't recall it**
21 **specifically.**
22    Q    Okay.  When you -- strike that.

25

1        Let me just go through the rest of
2   these.  Let me show you what we've marked as
3   Exhibit 5.  And this is a document that is titled
4   the "Deed of Trust."  It identifies a security
5   interest, and the borrower as Lynn Salas, lender
6   as SunTrust Mortgage, Inc., and it is
7   approximately -- I think it is approximately 16
8   pages.
9        Have you ever seen that document before?
10   **A   Again, if it was in the packet, I**
11 **probably glanced through it.  I've not read**
12 **through it.  I don't know for a fact that it was**
13 **in there.**
14       (Exhibit 6 was marked for
15   identification.)
16   Q    Okay.  Let me show you what's been
17 marked as Exhibit 6.  This is a document
18 titled "Corporate Assignment of Deed of Trust."
19       It appears to be dated -- let me see
20 here -- appears to be dated April of 2015, and
21 I'll ask you if you've ever seen that document?
22   **A   Yeah.  Same -- same answer as before.  I**

26

1   **received a packet of information.  If it was in**
2   **there, I glanced at it, I have not read it, and I**
3   **don't know that it's the same one that I saw**
4   **before.  Didn't pay much attention.**
5        (Exhibit 7 was marked for
6   identification.)
7   Q    Okay.  Here's a document that's been
8   marked as Exhibit 7.  This is a document
9   titled "Irrevocable Trust Agreement."  It has the
10 markings of a filing of Exhibit A, Bankruptcy
11 Court for the District of Columbia in case number
12 18-00260 and again title, "Irrevocable Trust
13 Agreement."
14       On the third-to-last page, it has the
15 signatures that are stated as Lynn Salas, Max
16 Salas, and others.
17       The second-to-last page appears to have
18 notary -- I'm sorry, appears to have an Exhibit A,
19 which is -- looks like the real property address
20 of the trust.
21       I didn't say that correctly.  Real
22 estate property that is identified in the trust.

27

1        And the final page appears to be two
2   notary journal entries which referenced the names
3   of Lynn Salas and Max Salas.
4        And I'll show that to you.
5        Tell me if you recognize that document.
6   **A   I do.**
7   Q    And is that a document that you
8   prepared?
9   **A   It is.**
10   Q    All right.  And we were talking about
11 this briefly before I interrupted with the -- with
12 the succession of documents, but do you remember
13 when it is that you were first con -- well, let me
14 put it this way:
15       Do you recall having a communication
16 with either your brother or your father with
17 respect to the creation of a trust or any other
18 document related to the Riggs Place property?
19       And, again, I'm talking about the time
20 frame of 2010.
21   **A   Yeah.  I don't recall any specific**
22 **conversations.  I recall several conversations**

28

1   **regarding creating something to get the residence**
2   **from my brother's name into my father's name.**
3        **And those were specifically with my**
4   **father, Max.  I do not recall any with my brother**
5   **other than he wanted to make sure that the house**
6   **was not in his name anymore.**
7   Q    All right.  And -- all right.  So when
8   did you have those communications with your
9   brother?
10   **A   Sometime in 2007, '8, '9.  It was a**
11 **contentious thing between my brother and my**
12 **father, and I remember having discussions with**
13 **both of them.  I don't recall specific times.  I**
14 **just recall it was an issue.**
15   Q    Okay.  And obviously it became a much
16 greater issue after the fire in 2015; right?
17   **A   I don't think it became a greater issue**
18 **because it's the same amount of issue.**
19   Q    Well, isn't it your understanding that
20 the reason why your brother Lynn is involved in
21 the litigation in the Superior Court and this
22 current bankruptcy because of his --

29

1      MR. ALBERT: Can you speak louder?

2      Q   -- because of his title ownership of the

3  property at Riggs Place?

4      **A   I understand that that's why he's in it,**

5  **yes.**

6      Q   And if he was not, as you sit here

7  today, if he was not an owner of the property, are

8  you aware of any liability he would have had with

9  respect to the property fire?

10      MR. ALBERT: Objection.

11      **A   Your question was is it any more so**

12  **after the fire originally, and I'm telling you**

13  **that he didn't want to be part of it then, and it**

14  **didn't get bigger after the fire. He never wanted**

15  **to be part of this house. He was doing it for his**

16  **father back then. He was angry with his father**

17  **for years because he wouldn't get it out of his**

18  **name, and it did not increase because of where we**

19  **are today.**

20      **The anger has been the same anger about**

21  **the same issue for a long time. He's married, and**

22  **his wife is very upset about it and was very upset**

30

1  **about it previously.**

2      **And if you're married, you'll understand**

3  **that when your wife is upset, it makes you upset.**

4  **So again, back to the original where we started,**

5  **did it increase? It did not. He's been angry**

6  **about this for a long time.**

7      Q   Are you aware of any liabilities that

8  your brother expressed to you regarding the house

9  prior to the fire in June of 2015?

10      **A   Any liabilities?**

11      Q   Yes.

12      **A   No. I don't think he -- I mean, he --**

13  **he was always afraid that -- he just didn't want**

14  **it, responsibility. He never -- he expressed to**

15  **me he didn't want responsibility.**

16      Q   Now, when you had this conversation with

17  your brother, what was -- what was your side of

18  the conversation?

19      **A   I said I a hundred percent agree. I**

20  **said I wouldn't want the responsibility either.**

21  **It's all, you know --**

22      Q   Did you make any recommendations to him?

31

1      **A   I said we should get it out of your name**

2  **and put it back in Max's name.**

3      Q   And did you give him any recommendations

4  regarding how to do that?

5      **A   Yeah. I think we've set up this**

6  **agreement.**

7      Q   Did you -- did you tell him that he

8  could have deeded the property to his father?

9      **A   Did I tell him that he could have deeded**

10  **the property to his father? No.**

11      Q   Are you aware of any reason why he

12  couldn't have deeded the property to his father

13  back in 2010?

14      **A   On his side, no.**

15      Q   Okay. What about on -- you said "on his

16  side"; what about on your father's side?

17      **A   At the time, as I recall, my father had**

18  **some tax issues that he was dealing with, and was**

19  **unable to gain any financing on it. And so, I**

20  **guess, so, you know, there were issues with my**

21  **father, not necessarily my brother.**

22      Q   Issues meaning that his father was the

32

1  titled owner of the property at the --

2      MR. ALBERT: I can't hear you.

3      Q   Issues that if his father was the titled

4  owner of the property, that might have caused your

5  father problems?

6      **A   Correct.**

7      Q   And that included tax issues?

8      **A   To the best of my recollection, that's**

9  **correct.**

10      Q   And do you know what period of time

11  we're talking about?

12      **A   No. My father's had tax issues since**

13  **1991.**

14      Q   Okay.

15      **A   So I don't know when those ended or what**

16  **that period was. There was two divorces, I mean,**

17  **so, no, I -- I don't know.**

18      Q   Do you know what the status was in 2010

19  with respect to these tax issues?

20      **A   I don't know for -- no.**

21      Q   Okay. Did you have any reason to

22  believe in 2010 that the tax issues had been

33

1 resolved?

**2    A    I don't -- I don't recall.**

3    Q    Okay.  Now, the date of the irrevocable
4 trust agreement, this is Exhibit -- I forgot the
5 number.

6         MR. ALBERT: 7.

7         MR. MCNUTT: 7.  Okay.

8    Q    Did you -- when did you prepare that, do
9 you know?

**10    A    I don't know for a fact.  My guess is**
**11 it -- the day that it was signed or the day before**
**12 would be my best guess.**

13    Q    Well, being as best you can remember, at
14 whose request did you prepare this document?

**15    A    I don't recall.  You know, it's a, it's**
**16 July 6th is when this thing was signed.  My**
**17 recollection, you know, I don't know.  I'd be**
**18 guessing, but I'd say --**

19         MR. ALBERT: You don't want to guess.

**20    A    Sorry.  I don't know.**

21         MR. MCNUTT: Again, he's not your
22 client.

34

1         MR. ALBERT: I understand, but he's
2 supposed to answer --

3         MR. MCNUTT: So raise an objection.

4         MR. ALBERT: That is an objection.

5         MR. MCNUTT: No, it's not.  You raised
6 no objection.

7         MR. ALBERT: Objection.  The witness was
8 about to guess.

9         MR. MCNUTT: Which is -- he can guess
10 all he wants.  If you want to object to it, then
11 you can object.

12         MR. ALBERT: Okay.  I'm not telling him
13 not to answer, I'm just objecting.

**14    A    So --**

15    Q    What did you understand the effect of
16 this document to be?

**17    A    Transferring -- transferring the**
**18 property from my brother to my father.**

19    Q    All right.  And how did you understand
20 that was to occur?  How did you understand this
21 would have affected the transfer of the property?

**22    A    That the -- we set up a trust so that it**

35

**1    would get transferred to a -- basically a**
**2    self-settled trust, which Max would be the owner**
**3    of, and that the property would transfer from my**
**4    brother to my father as a sole owner of this**
**5    trust.**

6    Q    All right.

**7    A    Owner and beneficiary.**

8    Q    Okay.  And there was a quitclaim deed
9 that you prepared; correct?

**10    A    That's right.**

11    Q    And who were the -- who were the parties
12 to the deed? It's not here.

**13    A    Lynn Salas was a party of the deed, and**
**14 giving it to Max Salas, who was the settlor of the**
**15 trust.  I believe both parties signed, although --**

16         MR. ALBERT: Did you want him to see the
17 document or do you want him to guess?  I mean,
18 wouldn't it be helpful to put the document in
19 front of him?

20         MR. MCNUTT: Sure.  I don't have it.  Do
21 you have it?

22         MR. ALBERT: Oh, I probably do have it.

36

1 May I show him the document?

2         MR. MCNUTT: As long as we're going to
3 talk about it, we probably should have it marked,
4 don't you think?

5         (Off the record.)

6         (Exhibit 8 was marked for
7 identification.)

8    Q    Mr. Salas, you've been handed the
9 exhibit which Mr. Albert has been gracious enough
10 to copy for us, and it's your Exhibit 8, and the
11 title at the top is "quitclaim deed."

12         Can you identify that document for me,
13 please?

**14    A    Yes.  It's a quitclaim deed that I**
**15 prepared for my brother and my father, July 6th,**
**16 2010.**

17    Q    And what was your understanding of the
18 purpose of the quitclaim deed?

**19    A    It was to transfer the property from my**
**20 brother to the Riggs property trust.**

21    Q    Okay.  And who did you understand the
22 trust -- the transferee to be?

37

1    A    **The transferee was the trust.**
2    Q    And who was the trustee of the trust?
3    **A    My father, Max Salas.**
4    Q    Was he the only trustee?
5    **A    He was.**
6    Q    Did that ever change between 2010 to
7    2015 that you're aware of?
8    **A    Not that I'm aware of.**
9    Q    Has it changed even since 2015?
10   **A    Not that I'm aware of.**
11   Q    Okay.  Who was the beneficiary of the
12   trust in 2010 when you created it?
13   **A    The same, Max Salas, my father.**
14   Q    Okay.  Are you aware of whether that
15   changed at any time between 2010 to 2014?
16   **A    Not that I'm aware of.**
17   Q    All right.  What about after 2015?
18   **A    Not that I'm aware of.**
19   Q    You mentioned that you appeared -- that
20   you attended a deposition in the superior court
21   litigation --
22        MR. ALBERT:  Objection.

38

1    Q    -- is that correct?
2        MR. ALBERT:  Objection.  I'll explain to
3    you why I'm objecting if you'd like me to.
4    But -- he said he attended the hearing.
5    **A    I think, yeah.**
6        MR. ALBERT:  He never said anything
7    about attending depositions.
8    **A    I never attended any --**
9        MR. ALBERT:  Again, I won't tell you
10   that because you don't want me to.  I'm just
11   objecting.
12       MR. MCNUTT:  He just told me that.
13       MR. ALBERT:  Oh, I thought you wanted me
14   to clarify that for you.
15   **A    I never went to a deposition.**
16   Q    Never went to a deposition.
17   **A    For any of the parties.  I was at the**
18   **hearing.**
19   Q    Do you know if -- how many brothers do
20   you have?
21   **A    I have three.  Three brothers.  Well,**
22   **half brothers, I have two half brothers and a full**

39

1    brother.
2    Q    And who is -- who is Chase?
3    **A    Chase is my youngest brother.**
4    Q    Okay.  And you said there was one other
5    brother?
6    **A    Yes.  Lynn is my younger brother, the**
7    **oldest one from my mother.  Chase is my baby**
8    **brother who is from my father's second wife and my**
9    **father, and then I have a brother whose name is**
10   **Joe, who is my mother's youngest son.**
11   Q    Okay.  When did you first become aware
12   of the lawsuit in the superior court lawsuit?
13   **A    When?**
14   Q    Yes.
15   **A    I don't recall.**
16   Q    Would it have been shortly after the
17   lawsuit was filed in 2015?
18       MR. ALBERT:  Objection.
19   **A    My guess is probably -- my guess --**
20       MR. ALBERT:  Objection.
21       MR. MCNUTT:  You already objected.
22       MR. ALBERT:  That's true.  Sorry.  He

40

1    said he didn't recall and then you -- you then
2    started to lead him to what it would probably
3    have been.  I don't know.  If he doesn't know, he
4    doesn't know.
5    Q    Okay.  Do you know if it was in 2015?
6    **A    I don't know.**
7    Q    Did you -- were you kept abreast of the
8    status of the litigation in the superior court
9    between 2015 and April of 2018?
10   **A    My brother and my father both contacted**
11   **me regarding issues several times over the years.**
12   **I don't know when, but, of course, they called me.**
13   Q    Okay.  Were you generally familiar with
14   the allegations that were made in the lawsuit?
15   **A    I was — understood that there was a**
16   **charge of negligence.**
17   Q    All right.  Did you understand who the
18   charge of negligence was made against?
19   **A    Yes.  Both my father and my brother.**
20   Q    Did you understand why your brother was
21   being accused of being negligent?
22   **A    Because his name was on the deed;**

41

1 correct. Yes.
2    Q    Okay. Now, it's your understanding that
3 the quitclaim deed was prepared and signed on or
4 about -- well, not on or about -- it was signed on
5 July 6th, 2010.
6        Do you know if this quitclaim deed was
7 ever recorded?
8    A    I knew that at one point it was not
9 recorded.
10    Q    And what were you told as to why it was
11 not recorded?
12    A    My father contacted me -- I -- I don't
13 recall who contacted me, either my brother or my
14 father contacted me and stated it was not going to
15 be recorded because it was a $30,000 -- or a
16 substantial amount of money for a transfer charge
17 to -- to record the deed, and no one had the
18 money.
19    Q    Okay. And we also had the issue of the
20 tax problems; right?
21    A    I don't know if that had anything to do
22 with it.

42

1    Q    I'm sorry?
2    A    There was a tax issue. I don't know
3 when that ended and I don't know if that had
4 anything to do with whether it was done or not.
5 My understanding.
6        MR. ALBERT: Whether it was what? I'm
7 sorry.
8    A    Whether it was recorded or not. My
9 understanding of why it was not recorded was
10 because they couldn't afford to pay the tax.
11    Q    Okay.
12    A    I have no recollection of any of the
13 income tax having to do with it. It was the
14 transfer tax, to be clear.
15    Q    Okay. With respect to the -- what was
16 the approximate time frame of this communication
17 you had with either your son or your father?
18        MR. ALBERT: "With your son," did you
19 say?
20    A    Yeah, my father or my brother.
21    Q    I'm sorry, your brother and your father.
22    A    Which communications?

43

1    Q    Regarding the subject we were just
2 talking about, which is the inability or --
3 inability to record the quitclaim deed?
4    A    I don't recall. Sometime after we
5 prepared it, within the first two years, but I
6 don't know the exact date.
7    Q    Have you had any subsequent
8 communications with your brother or your father
9 after 2011, 2012 regarding the -- the quitclaim
10 deed or the recording of the deed?
11    A    No.
12    Q    Did you have any discussions with your
13 brother or your father regarding your brother's
14 ownership of the property after the commencement
15 of the superior court litigation?
16    A    Did we discuss the deed was the
17 question? Can you repeat the question? I'm
18 sorry.
19    Q    Regarding your brother's ownership of
20 the property after the commencement of the
21 superior court litigation.
22    A    Did we have discussions? Yes.

44

1    Q    Okay. And when did you have those
2 discussions?
3    A    From after they were served until and
4 through the hearing, the trial.
5    Q    Okay. Now, you said that you attended
6 the hearings, I believe was your statement.
7        Which hearings did you attend?
8    A    If I said that, I misspoke, I attended
9 the trial in the two days -- two, maybe three days
10 of the trial.
11    Q    That was -- and when you say "the
12 trial," you're talking about the trial that
13 occurred in late March and early April of this
14 year?
15    A    Yes. It sounds about right. I don't
16 remember the dates.
17    Q    And why were you there?
18    A    Just to give them support. My brother
19 and my father. To keep them from beating each
20 other up, really.
21    Q    Okay. Why would they beat each other
22 up, you think?

45

1    A    Because of this issue, I mean, my
2 brother thought that he had given the property
3 back and didn't believe that he should be involved
4 in this.  And he was still angry, as I said
5 before, since back in two -- before the documents
6 were made, and they didn't get along very well.
7    Q    Now, do you know this document, the
8 document titled "Irrevocable Trust Agreement,"
9 this is Exhibit 7; do you know where this -- do
10 you know if you produced this copy for your father
11 or your brother during the superior court
12 litigation?
13    A    No.  I did not, that I recall.
14    Q    Okay.  Did you ever bring up the
15 existence of this trust agreement that's marked as
16 Exhibit 7?
17    A    Did I bring it up?
18    Q    Yes.
19    A    I don't think I did, no.
20    Q    So you knew that your brother was mad
21 because he was still the owner of the property as
22 early as --

46

1         MR. ALBERT:  Objection.
2    Q    -- 2010; correct?
3         MR. ALBERT:  Objection.
4    A    I didn't know why my brother was mad.
5 But he was upset.
6    Q    Well, you told me that your brother
7 wanted his name off the property; right?
8    A    Yes.
9    Q    You were aware that prior to 2000 --
10 prior to this irrevocable trust agreement in 2010;
11 correct?
12    A    Yes.
13    Q    You knew that the quitclaim deed had not
14 been recorded, so you knew it was still an issue,
15 at least as of 2012; correct?
16    A    Yes.
17    Q    All right.  And you had no information
18 that the quitclaim deed had been delivered or
19 recorded subsequent to 2012; correct?
20         MR. ALBERT:  Objection.
21    A    What was the question?
22    Q    You had no information that the

47

1 quitclaim deed had been recorded after 2012;
2 correct?
3    A    I didn't know if it had or had not;
4 that's accurate.
5    Q    Okay.  So as of the time that you first
6 learned about the superior court litigation, you
7 were not aware that your brother was not the title
8 owner of the property; correct?
9         MR. ALBERT:  Objection.
10    A    I didn't know anything, no.
11    Q    You didn't know that the quitclaim deed
12 had been recorded?
13    A    I didn't have knowledge of what was
14 going on with the deed, no.
15    Q    All right.  And your father never said
16 it was recorded; did he?
17    A    No.  Not that I recall.
18    Q    And your brother never said it was
19 recorded; did he?
20    A    Didn't tell me that I recall.
21    Q    And the biggest issue to your brother
22 during the litigation was the fact that he was the

48

1 title owner of the property; wasn't he?
2         MR. ALBERT:  Objection.
3    A    I don't know.
4    Q    When you discussed it with him,
5 wasn't -- wasn't that his biggest concern?
6         MR. ALBERT:  Objection.
7    A    What was the question?
8    Q    When you discussed the litigation with
9 your brother, wasn't his biggest concern that he
10 was still the title owner of the property?
11         MR. ALBERT:  Objection.
12    A    I don't know what his biggest concern
13 was.
14    Q    What did he tell you?
15    A    I don't recall.
16    Q    You don't recall him mentioning that he
17 was concerned that he was still the title owner of
18 the property?
19    A    My brother would not say anything about
20 title owner of anything, he's not that
21 sophisticated.  My brother was upset because he
22 was involved in anything.

49

1    Q    And your understanding of the reason why
2  he was involved in anything, in this case being
3  the superior court litigation, is because he was
4  the title owner of the property --
5        MR. ALBERT: Objection.
6    Q    -- at the time of the fire; right?
7        MR. ALBERT: Objection.
8    Q    That's what you just said.
9    A    That's not what I just said. I said
10 that he --
11   Q    That is what you said.
12   A    He said -- he was upset because he was
13 being sued. I don't know why he was being sued.
14 I don't know that he knows why he was being sued.
15 He didn't tell me why he was being sued. He
16 didn't understand anything that he was being sued.
17   Q    Okay.
18   A    He was mad that he was being sued and
19 had to deal with something that he didn't think he
20 needed to have to deal with. That's why he was
21 upset.
22   Q    And why? Why did he tell you he was

50

1  upset?
2    A    I can't answer why he was upset, other
3  than what I just told you. He was involved in
4  litigation that he did not feel he should have to
5  be in. Because all he was trying to do was help
6  his father years ago, and he doesn't under -- he
7  didn't understand why he was in it today.
8    Q    And when you say he was trying to help
9  his father years ago, you're talking about the
10 time when he became the title owner of the
11 property in 2007; correct?
12   A    Correct.
13   Q    Okay. Now, at the time that you
14 prepared the trust agreement, were you aware that
15 the property, the property that we're talking
16 about, 1610 Riggs Place, Northwest Washington,
17 DC -- when I say "property," we can agree that
18 that's what I'm talking about; right?
19   A    Yes.
20   Q    Okay. Have the same understanding.
21 When you prepared the trust in 2010, were you
22 aware that there was an encumbrance on the

51

1  property, a deed of trust in favor of SunTrust?
2  Do you know what that is?
3    A    No. I did not.
4    Q    Did you know whether the property was
5  held by your brother free and clear of liens?
6    A    No. I did not.
7    Q    Did you do a title search?
8    A    No. I did not.
9    Q    Did you ask your brother if there were
10 any encumbrances on the property?
11   A    No. I did not.
12   Q    You just prepared the trust, nothing
13 else?
14   A    Yes.
15   Q    Okay.
16       MR. ALBERT: By the way, objection.
17       MR. MCNUTT: Okay. I don't know if you
18 can "by the way" object, but okay. Fair enough.
19       MR. ALBERT: The answer's not complete.
20 You asked him whether the only thing he did was
21 prepare the trust. He's also testified that he
22 prepared the deed.

52

1        MR. MCNUTT: Again, the witness is
2  capable of testifying. If you want to testify
3  for him, we can put you under oath.
4        MR. ALBERT: I do not want to testify.
5  I thought you wanted --
6        MR. MCNUTT: Maybe we should do that.
7  Madam Reporter, would you please put Mr. Albert
8  under oath so he -- he wants to testify --
9        MR. ALBERT: I do not want to testify.
10       MR. MCNUTT: Let's put him under oath so
11 he can testify.
12       MR. ALBERT: I wanted to clarify. I
13 wanted --
14       MR. MCNUTT: That way he can be --
15       MR. ALBERT: I wanted to clarify your
16 response to his answer.
17       MR. MCNUTT: See, here's the way it
18 works: If you would like to ask the witness
19 questions --
20       MR. ALBERT: I will ask him --
21       MR. MCNUTT: -- then you can do that.
22       MR. ALBERT: Of course I will.

53

1    MR. MCNUTT: Okay.

2    MR. ALBERT: Thank you. I'm sorry to

3 interrupt. Please continue.

4    MR. MCNUTT: Thank you.

5    Q   Now, when you prepared the quitclaim

6 deed, Mr. Salas, can you tell me what the source

7 was of the language that you used in the quitclaim

8 deed?

9    **A   Yes. I believe it was a standard**

10 **Colorado language from a group of, you know,**

11 **standard form language from the -- I have an**

12 **Orange book, Colorado, that gives us templates of**

13 **proper language, and I took it from there.**

14   Q   And what about the irrevocable trust

15 agreement; where did you get that language?

16   **A   I do not recall for a fact, but -- I**

17 **don't know.**

18   Q   Do you know if prior to 2010, you

19 prepared an irrevocable trust agreement?

20   **A   I had not.**

21   Q   Okay. So you were not aware that you

22 had any language in documents in your office that

54

1 would have been usable for the irrevocable trust

2 agreement that we're looking at as Exhibit 7; is

3 that what you're telling me?

4    **A   I think that is accurate, yes.**

5    Q   Okay. Now, do you have any

6 understanding of what law would apply to this

7 trust agreement and this quitclaim deed?

8    MR. ALBERT: Objection. Are you

9 deposing him as an expert today or as a fact

10 witness?

11   MR. MCNUTT: As a fact witness.

12   MR. ALBERT: Okay. Objection.

13   Q   Do you have an understanding, any

14 understanding?

15   **A   Do I have any --**

16   Q   Yes.

17   **A   Repeat the question.**

18   Q   Do you have any understanding of the law

19 that would be applied to determine the terms and

20 validity of the trust agreement?

21   MR. ALBERT: Objection.

22   Q   And the quitclaim deed?

55

1    **A   I don't know. I don't understand the**

2 **question.**

3    Q   Well, let me ask it this way: If you're

4 dealing with a trust, the trust that you

5 previously created, from today going back, in

6 Colorado, what law would you -- would you have an

7 understanding of the law that would apply?

8    **A   I would have used Colorado law in**

9 **anything I prepared.**

10   Q   And why is that?

11   **A   Because I'm a Colorado lawyer.**

12   Q   Did you have any understanding that DC

13 law would apply to the documents that you created?

14   **A   Objection.**

15   Q   And when I say documents you created, I

16 mean the irrevocable trust agreement and the

17 quitclaim deed.

18   MR. ALBERT: Objection.

19   **A   At the time, the intent was to establish**

20 **the trust in Colorado, hence why I used Colorado**

21 **law.**

22   Q   Okay.

56

1    **A   The deed --**

2    Q   Go ahead.

3    **A   -- was, again, I used Colorado law and**

4 **probably should have looked at DC law because it's**

5 **probably not the same, although fairly similar,**

6 **but -- so at the time, I did not. I would do**

7 **things differently today with the experience I**

8 **have today.**

9    Q   Okay. I'm not sure that answered my

10 question, but --

11   MR. ALBERT: I can't hear you.

12   What did you say before?

13   MR. MCNUTT: I said I don't think that

14 answered my question, but, okay.

15   MR. ALBERT: Thank you.

16   Q   Let me direct your attention to the

17 trust. If you would look at Exhibit 7 in

18 paragraph 3, it contains a paragraph that is

19 titled "Dispositive Provisions."

20   Do you see that? That's on the first

21 page?

22   **A   I do.**

---

57

1   Q    All right.  And it says under -- it
2   says, "The trustees shall hold the property for
3   the primary benefit of Max E. Salas."
4        Did I read that correctly?
5   A    Yes.
6   Q    And Max E. Salas is the person -- that's
7   your father, of course; right?
8   A    Yes.
9   Q    And that is the only person that is a
10  beneficiary of this trust; correct?
11  A    Yes.
12  Q    There are no other beneficiaries?
13  A    Correct.
14  Q    In paragraph B of that same numbered
15  paragraph, 3B, it says, "If any of the beneficiary
16  shall die, the trust for his or her benefit shall
17  cease, and the corpus, together with any
18  undistributed income, shall be paid over
19  absolutely to the issue of the beneficiary then
20  living per stirpes; but if there be no issue, then
21  to the other beneficiaries if living, either
22  outright, or if the other beneficiary shall not

---

58

1   have then attained the age of 18 years, in trust,
2   to be added to, held, administered and distributed
3   as part of the trust for the other beneficiary."
4        I'm not going to go on.
5        Did I read that correctly so far?
6   A    Yes.
7   Q    In this case, however, there was only
8   one beneficiary; correct?
9   A    Yes.
10  Q    And that was your father?
11  A    Yes.
12  Q    And that was the case on July 6th, 2010;
13  correct?
14  A    Yes.
15  Q    And there was never an intent that this
16  document be prepared for the benefit of anyone
17  other than your father; correct?
18       MR. ALBERT:  Objection.
19  A    I don't know.
20  Q    Well, you prepared it; did you intend to
21  prepare this for --
22       MR. ALBERT:  Objection.

---

59

1   Q    -- somebody else's benefit?
2   A    I guess define "benefit."
3   Q    Well, okay.  Fair enough.
4        For any other beneficiary of the
5   property?
6   A    For any other beneficiary, living --
7   well, I think his children benefited from it upon
8   passing, so I think there were more beneficiaries
9   other than himself potentially.
10  Q    All right.  Are there any other named
11  beneficiaries in this trust document?
12  A    Named beneficiaries?  No.
13  Q    Are there any other trustees in this
14  trust document other than your father and Max E.
15  Salas?
16  A    I don't think so.
17  Q    Now, during the course of the superior
18  court litigation, did your brother ever ask you
19  for a copy of the trust agreement?
20  A    No.  Not that I recall.
21  Q    Did your father ask you for a copy of
22  the trust agreement?

---

60

1   A    Not that I recall.
2   Q    All right.  Are you aware of a trust by
3   the name of CLR Trust?
4   A    I am not.
5   Q    Have you ever heard that name before?
6   A    CLR trust?  No, I have not.
7   Q    Okay.
8   A    I take that back.  I've heard it in the
9   last couple of days, but not prior to that.
10  Q    Okay.
11  A    And I read it, actually to be very
12  clear, I read about it in some of the documents.
13  I've not heard of it other than that.
14  Q    Okay.  You're not aware, then, that you
15  are or may be the beneficiary of a trust titled
16  the CLR Trust?
17  A    No.  That would be news to me.
18  Q    Okay.  Are you aware of any other trust
19  related to your immediate family members?  And by
20  that, I'm referring to Chase, Lynn, you, and your
21  father?
22  A    No.

---

61

1  Q   Have you created any other trust
2  documents for family members -- well, not for
3  family members, for your father, Max, or your
4  brother Lynn?
5  **A  I have not, no.**
6  Q   Okay.  Would you take a look at
7  Exhibit 7 again.
8      And I'm specifically looking at the
9  signature page of the trust document, which I
10 believe is page 4.
11     MR. ALBERT:  Can you -- I'm sorry, could
12 she just read back the last questions and
13 answers?  Just the last two, if that's possible.
14     (Record read.)
15 Q   Do you have the signature page there,
16 Mr. Salas?
17 **A  I do.**
18 Q   Okay.  And at the top, it looks to have
19 signature lines for your brother Lynn, and your
20 father, Max.  Do you recognize those signatures?
21 **A  I do.**
22 Q   Do you recognize those as the

62

1  signatures, the left-hand signature being that of
2  your brother?
3  **A  Yes.**
4  Q   And the right-hand signature being that
5  of your father?
6  **A  Yes.**
7  Q   Were you there when this was signed?
8  **A  I was.**
9  Q   Was this signed in your presence?
10 **A  Yes.  I signed myself.**
11 Q   Okay.  All right.  When you say you
12 signed yourself --
13 **A  "Witness to" is my signature.**
14 Q   Let's go off the record for a second.
15     (Off the record.)
16 Q   Back on the record.  All right.  And I
17 believe the second -- the first witness signature
18 is Mr. Lynn Salas' wife, Kendra; is that fair?
19 **A  Yes.**
20 Q   And do you recognize that as her
21 signature?
22 **A  No.  I — I mean, this is the only time**

63

1  I've ever seen it.  I recall her being there.
2  Q   Okay.
3  **A  I've seen my brother's and my father's**
4  **several times, so I recognize it clearly.**
5      **Looks like Kendra Rowe to me.  I don't**
6  **know for a fact that's her signature, but I was**
7  **there, so I have to say it was.**
8  Q   So these, other than the notary, these
9  were the only people, were these the only people
10 present at the time?  You, your brother, his wife
11 and your father?
12 **A  Yes.**
13 Q   Okay.  Was there anybody else present,
14 any other family members?
15 **A  No.**
16 Q   Where does this -- where did this take
17 place, the signing of this document?
18 **A  In my office.**
19 Q   Okay.  And that's the one in Fort
20 Collins?
21 **A  It is in Fort Collins.  It was a**
22 **different office.**

64

1  Q   Okay.  But still in Fort Collins at the
2  time?
3  **A  Yes.**
4  Q   And Lori King, I understand she is --
5  works in another law office; is that right?
6  **A  Currently, my understanding is she does**
7  **work in another law office; yes.**
8  Q   But you recognize this as her signature
9  and her notary stamp.  And this was placed on the
10 document on July 6th, 2010?  Is that correct?
11 **A  Yes, she notarized hundreds of**
12 **documents.  Quite a few.**
13 Q   All right.  And the next page after the
14 signature page is the description of the real
15 property; correct?
16 **A  Yes.**
17 Q   And that's the 1610 Riggs Place
18 Northwest property in Washington, DC; correct?
19 **A  Yes.**
20 Q   You understood that at the time to be
21 the property that was titled in your brother's
22 name and occupied by your father; correct?

65

1    A    Yes.

2    Q    And on the last page, tell me what the

3 last page is.  It looks to have two notary journal

4 entries.

5    A    Yes.  That's the first time -- well,

6 second time.  I saw it the other day -- I've seen

7 it, but it's what it appears to be.

8    Q    Do you understand what these are?

9    A    Well, reading them, it says they're

10 notary journal entries with my father's signature

11 and my brother's signature.  So that, I recognize,

12 it says "Client of Ron Salas," so I can guess what

13 they are, but I don't know for a fact what they

14 are.

15    Q    Okay.

16    A    So I don't know.  Like I said, it's the

17 first time I've seen them.

18        MR. ALBERT:  I could answer the question

19 if you like.

20        MR. MCNUTT:  You've testified enough.

21    Q    All right.  Let me go back to the

22 quitclaim deed.  This -- again, this is Exhibit 8.

66

1        Do you have that have there?

2    A    Yes.

3    Q    And this was also dated July 6th, 2010;

4 correct?

5    A    Yes.

6    Q    And again it references the Riggs Place

7 address, and that's the property that was intended

8 to be deeded from your brother Lynn to your

9 father, Max E. Salas, trustee of the 1610 Riggs

10 Property Trust on July 6th, 2010.  Is that

11 accurate?

12    A    I think it actually was deeded, I don't

13 think there was intent.  Was it was filed is

14 another issue.  So --

15        MR. ALBERT:  What's that?  Was it what?

16    A    He said it was the intent to deed -- to

17 deed it.  I think the deed speaks for itself.

18        MR. ALBERT:  You said deeded.  Okay.

19 Thank you.  That's what I thought you said.

20    A    I don't think it was recorded.  I don't

21 know that it was recorded.

22        MR. ALBERT:  Thank you.

67

1    Q    During the course of the lawsuit in the

2 District of Columbia, the superior court

3 litigation that your father and your brother were

4 involved in, did you ever offer to provide your

5 brother or your father a copy of the trust

6 document?

7    A    I did not.

8    Q    Did you have any discussions with your

9 brother or your father regarding the trust

10 document?

11    A    I wish I had.  I assumed, falsely, I

12 suppose, that both of them had it, they both had

13 competent attorneys, and that their attorneys

14 would ask for them and they would provide them.

15 Had I known and had I had the gumption to jump

16 into somebody else's case, I wish to God that I

17 would have given it to them then.  And I didn't

18 know, and I didn't, and I believed my brother and

19 my father had the sense to do that, and I believed

20 that their attorneys were competent enough to ask

21 the questions.

22        And I beat myself up that I didn't.  But

68

1 the answer's no.

2        MR. ALBERT:  We're talking about the

3 attorneys in the superior court litigation?

4    A    Correct.  Mr. Barns and Mr. Forester.  I

5 don't understand why they didn't.

6        MR. MCNUTT:  Again, for the record, I

7 sure wish Mr. Albert would stop testifying, and

8 we never did put him under oath so I can't --

9        MR. ALBERT:  I apologize.  I just

10 thought I'd clarify that.

11    Q    Mr. Salas, I'm going to ask you a couple

12 of questions regarding the SunTrust mortgage that

13 I understand you may not be able to answer.  But

14 I'm prefacing this by saying that I would like you

15 to answer them, and I'll try to direct your answer

16 to two time frames: one being the time frame of

17 the trust agreement in 2010, and then the second

18 time frame being today, present time.

19        First question is:  Let's go back to

20 the -- let's go back to the deed of trust?

21    A    Exhibit 5.

22    Q    I don't believe so, yes.  This is the

69

1  document that, at the top, has the name "SunTrust
2  Mortgage, Inc.," on it, and gives a Richmond,
3  Virginia, address.  And then it's titled, toward
4  the middle of the page, "Deed of Trust."
5      Do you have that in front of you?
6  **A  Yes.**
7      Q  You said that you've never seen this
8  document before; is that correct?
9  **A  That's correct.**
10     Q  And it was never given to you in the
11 context of the 2010, I'll call it "transaction,"
12 and I mean the creation of the trust document?
13 **A  Correct.**
14     Q  And you did not ask whether there was
15 any encumbrances on the property; is that correct?
16 **A  That's correct.**
17     Q  So, that as of -- as of July of -- no.
18 As of -- let me get the date right.
19     As of July 6th, 2010, you did not know
20 that there were any encumbrances on the property
21 that would have -- let me try to ask a better
22 question.

70

1      You were not aware of any restrictions
2  on the transfer of the property from your son to
3  your father?
4  **A  From my brother to my father.**
5      Q  I'm sorry.  I keep saying son.  I don't
6  know why.  I apologize.
7  **A  No problem.**
8      Q  From your brother to your father.
9  **A  What was the question?  Sorry.**
10     Q  That was my fault.  I threw you off.
11     You're not aware of any restrictions in
12 July of 2010 on the transfer of the Riggs Place
13 property from your brother to your father?
14 **A  I was not aware of any restrictions.**
15     Q  Did you ask if there were any?
16 **A  No.**
17     Q  Did your father or your brother talk to
18 you about any restrictions?
19 **A  No.**
20     Q  Did one of them mention at any time that
21 you're aware of prior to today that there was or
22 is an encumbrance on the property by SunTrust

71

1  mortgage or any other mortgage entity?
2  **A  My father told me that there's a**
3  **mortgage and he pays it every month.  I didn't**
4  **know that it was SunTrust.**
5      Q  So you didn't know -- did you know that
6  your father was paying the mortgage in 2010?
7  **A  Did I know in -- yes, I did.**
8      Q  Okay.  Did you ask your father whether
9  there was any restriction on the transfer as a
10 result of the transfer documents that you were
11 preparing, the trust and the quitclaim deed?
12 **A  No.**
13     Q  Did he tell you there were any?
14 **A  No.**
15     Q  Other than the tax issues that you
16 testified to previously and the recording costs,
17 are you aware of any other reason why the
18 quitclaim deed that you prepared in July of 2010
19 was not recorded?
20     MR. ALBERT:  Objection.
21 **A  To clarify, the only reason I knew was**
22 **because of the tax, was because of the transfer**

72

1  **tax issue.  I had no idea about the income tax**
2  **issue.  They called me and said we cannot afford**
3  **to do this.  My dad called me and said I cannot --**
4  **I went down to do this deed, they told me it was,**
5  **I thought $30,000, but I don't recall, maybe more.**
6  **I don't know.**
7      **And they said -- and your brother will**
8  **not talk to me because I can't get it done, will**
9  **you talk to him because I can't afford it and I**
10 **don't know what to do.**
11     **I called my brother, I said he went to**
12 **do it, they told him what it cost, he doesn't have**
13 **the money.  I said don't hold your kids away from**
14 **him.**
15     MR. ALBERT:  Oh, hold your kids --
16 **A  His grandkids.  He won't let my dad see**
17 **his grandkids because he didn't transfer it, and**
18 **he wouldn't pay the money.**
19     MR. ALBERT:  Well, wait a minute.
20 **A  He wouldn't pay the transfer -- he**
21 **wouldn't pay the transfer fee, or didn't have the**
22 **money to pay the transfer fee.  It upset my**

73

1 brother.
2      So that is the conversation I had,
3 related only to the transfer that I recall, not to
4 the income tax issue, or any other issue other
5 than the cost to transfer, which was news to me
6 because they don't have such a thing in Colorado.
7 Shocking to me. I didn't know. But I don't
8 practice in DC.
9      Q   And they have such a thing, you're
10 talking about the transfer tax?
11      A   The transfer tax, yes.
12      Q   Now --
13      A   I think that's what it's called. I
14 don't even know that for a fact.
15      Q   And I believe you said, but I want to
16 clarify this, that between the time of 2012,
17 roughly, and I realize you said, I think, a year
18 or two after the transaction, so I'm not trying to
19 pin it down, but say roughly 2012, which would be
20 two years later, until today, are you aware of any
21 other reasons why the deed, the quitclaim deed
22 that you prepared would not have been or could not

74

1 have been recorded?
2      A   I don't know of any reason and I did not
3 know that it was not recorded until the lawsuit
4 came in my brother's name.
5      Q   And what is it about the lawsuit that
6 came in your brother's name that made you believe
7 the quitclaim deed had not been recorded?
8      A   The only reason my brother would be
9 involved was because his name had to still be on
10 the title is the assumption I've made in my mind.
11 I don't know that that is factually correct, but
12 that is my assumption, that it must not have been
13 filed or he wouldn't be in this situation.
14      He didn't live in the District, he
15 never -- he didn't live in the house, and I -- so
16 that's the only logical reason I could make that
17 he would be involved, that it was never done. And
18 until that point, I did not even know that it had
19 not been done. I assumed at some point that he
20 came up with the money and did it. But he didn't,
21 as we sit here today we all know.
22      Q   Okay. On July 7th, 2010, did you have

75

1 an understanding of who the Riggs Place property
2 belonged to?
3      MR. ALBERT: Objection.
4      A   Max Salas. I mean, it was deeded on the
5 6th, so. Not Max. The trust, Max Salas.
6      Q   Okay. Did you have any supporting role
7 in the litigation either financially or otherwise?
8      A   Which litigation?
9      Q   The -- I'm sorry, good question. The
10 superior court litigation.
11      MR. ALBERT: What was the question,
12 please?
13      Q   Did you have any supporting role,
14 financially or otherwise, in the superior court
15 litigation?
16      A   I was not involved at all, financially
17 or in an advisory role.
18      MR. ALBERT: And I object to the
19 question, by the way.
20      MR. MCNUTT: But at least you didn't
21 answer it.
22      MR. ALBERT: I didn't. I would answer

76

1 it.
2      MR. MCNUTT: That's a step in the right
3 direction.
4      MR. ALBERT: I think the question's
5 unclear.
6      Q   Are you aware of whether any other
7 family members contributed to the litigation cost?
8      A   Which litigation? To be clear.
9      Q   Of your brother Lynn.
10      A   No. I mean, he still owes his attorney
11 some money and I'm paying him some money, so
12 let -- I want to be clear about that.
13      Q   So you're paying him some money?
14      A   I'm paying Mr. Forester money that my
15 brother owes him. Prior to, I believe was your
16 question before, I had no contribution. Post, I
17 have.
18      Q   When you say "post," I'm not sure what
19 you're referring to?
20      A   Once the verdict was entered and an
21 outstanding balance was still remaining,
22 Mr. Forester contacted me and said in order to

77

1  continue with the appeal, he needed some money.

2  So I gave him some money.

3      Q    Just so we're clear, prior to the

4  judgment, you made no financial contribution to

5  the representation of either your father or your

6  brother --

7      A    Correct.

8      Q    -- in the superior court litigation?

9      A    Correct.

10         MR. MCNUTT:  All right.  I think that's

11  all I have.

12         MR. ALBERT:  May I ask some questions?

13         MR. MCNUTT:  It's not up to me.  Can I

14  answer them for you?

15         MR. ALBERT:  Of course.

16         MR. MCNUTT:  Just to be fair.

17         EXAMINATION BY COUNSEL FOR THE RESPONDENT

18  BY MR. ALBERT:

19      Q    Of course.  Mr. Salas, you're licensed

20  to practice law in the State of Colorado?

21      A    Yes.  I am.

22      Q    And your -- your license is in good

78

1  standing?

2      A    Yes.

3      Q    Both your father and brother know you

4  are an attorney?

5      A    Yes.

6      Q    Looking at Exhibit 8 and the quitclaim

7  deed --

8      A    Yes.

9      Q    -- you were present when both your

10  father and brother signed these documents?

11      A    Yes.

12      Q    And Ms. King was in the room as well

13  when they signed them?

14      A    Yes.

15      Q    And you witnessed her notarize them?

16      A    I did.

17      Q    And you witnessed your brother actually

18  handing the deed to your father as trustee at the

19  time?

20      A    I did, and I recall he was very

21  relieved.

22      Q    Thank you.  Okay.

79

1         Looking at this deed, Exhibit 8, and I

2  recognize you're not an attorney in the District

3  of Columbia; however, you are an attorney in the

4  District -- excuse me -- in the State of Colorado,

5  is there anything in this deed that suggests to

6  you that it's not a proper document for purposes

7  of transferring property, DC real estate?

8         MR. MCNUTT:  Objection.

9      A    No.

10         MR. ALBERT:  What is the basis of your

11  objection, please?

12         MR. MCNUTT:  That he's not, you didn't

13  call him as an expert and he's not a DC lawyer,

14  so how the hell would he know?  How the heck

15  would he know?  That's what I meant to say, how

16  the heck would he know?

17      Q    Looking at -- at the irrevocable trust

18  agreement, paragraph 14, could you tell me what

19  that says, please?

20      A    It says, "This trust has been executed

21  and delivered in the State of Colorado and shall

22  be construed and administered according to the

80

1  laws of Colorado.  In witness, whereof the grantor

2  the trustees have executed this agreement in

3  Colorado."

4      Q    And both your father and brother

5  executed the documents in the State of Colorado;

6  is that correct?

7      A    They did.

8      Q    Both the trust and the deed?

9      A    Yes.  Correct.

10         MR. MCNUTT:  Just for the record, he did

11  say "wherefore."  It says "whereof."  Not a big

12  deal, but --

13      A    Sorry.  Thank you.

14         MR. ALBERT:  You may answer.

15         MR. MCNUTT:  Minor correction.

16      Q    And could you also look at paragraph 8,

17  please, and read that?

18      A    "The grantor reserves" -- "Additional

19  Properties" heading, "The grantor reserves the

20  right to himself or to any other person at any

21  time, by deed or will, to add to the corpus of

22  either both of the trusts, and any property added

81

1  shall be held, administered, and distributed as

2  part of the trust or trusts."

3        MR. ALBERT:  I have no further

4  questions.  Thank you very much.

5        MR. MCNUTT:  You may not know this

6  because you're not involved in a bunch of

7  depositions, but the court reporter will ask you,

8  you have the right to read this and sign it.

9        The court reporter will give you the

10 directions on that, but I just want you to be

11 aware that you have the right to read it and

12 correct anything you think that was taken down in

13 error.  But that's up to the court reporter and

14 you.

15       THE WITNESS:  Great.

16       MR. MCNUTT:  Because neither one of us

17 represent you.

18       THE WITNESS:  Thank you.

19       MR. ALBERT:  Thank you.

20       THE WITNESS:  I do want to read it.

21       MR. ALBERT:  I will order a copy of

22 this.

82

1        MR. MCNUTT:  We will take the original.

2        (Off the record at 3:05 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

83

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2

3        I, Sydney Crawford, the officer

4  before whom the foregoing deposition was taken, do

5  hereby certify that the foregoing transcript is a

6  true and correct record of the testimony given;

7  that said testimony was taken by me

8  stenographically and thereafter reduced to

9  typewriting under my direction; that reading and

10 signing was requested; and that I am neither

11 counsel for related to, nor employed by any of the

12 parties to this case and have no interest,

13 financial or otherwise, in its outcome.

14       IN WITNESS WHEREOF, I have hereunto set

15 hand and affixed my notarial seal this 16th day of

16 August, 2018.

17

18

19

20

21 *Sydney R. Crawford*

22 My commission expires: May 15, 2024

**Fill in this information to identify your case and this filing:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name        Middle Name        Last Name |
| Debtor 2 | |
| (Spouse, if filing) | First Name        Middle Name        Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | 18-00260 |

☐ Check if this is an amended filing

## Official Form 106A/B
# Schedule A/B: Property

12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:** Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☑ Yes. Where is the property?

1.1

**1610 Riggs Place, NW**
Street address, if available, or other description

**Washington** **DC** **20009-0000**
City            State      ZIP Code

County

**What is the property?** Check all that apply
☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one
☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$2,500,000.00** | **$2,500,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**Owner**

☐ Check if this is community property (see instructions)

Other information you wish to add about this item, such as local property identification number:

**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**
**trust collapsed on creation through merger to convey property to debtor**
**DC Records displays owner as Len Salas**
**Contains furnished basement that is possible to be rented as a seperate unit, but which debtor currently is using as part of personal residence with remainder of property**

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here...........................................................=>**

| $2,500,000.00 |
|---|

**Part 2:** Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                              Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                      Case number *(if known)*    **18-00260**

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☑ No
☐ Yes

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☑ No
☐ Yes

5  Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for
   pages you have attached for Part 2. Write that number here..............................................=>         **$0.00**

---

| **Part 3:** | Describe Your Personal and  Household Items | |
|---|---|---|

| Do you own or have any legal or equitable interest in any of the following items? | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |
|---|---|

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ☑ Yes.  Describe.....

| **\*\*See Attached List\*\*** | **$14,000.00** |
|---|---|

| **Previously damaged and restored personal property being held in storage by Columbia Restoration \*\*See attached list for property description\*\*** | **$2,000.00** |
|---|---|

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
   ☐ No
   ☑ Yes.  Describe.....

| **HP Laptop 18 in. MacBook Pro 13 in. IPad 10 In. IPhone 6** | **$200.00** |
|---|---|

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☑ No
   ☐ Yes.  Describe.....

9. **Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ☐ No
   ☑ Yes.  Describe.....

| **1 set Taylor-Made Golf Clubs and Bag 1 set Titleist Golf Clubs and Bag** | **$300.00** |
|---|---|

| **1 Precor home treadmill** | **$1,500.00** |
|---|---|

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

| Debtor 1 | **Max E. Salas** | Case number *(if known)* | **18-00260** |

**10. Firearms**
   *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
   ☑ No
   ☐ Yes.  Describe.....

**11. Clothes**
   *Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
   ☐ No
   ☑ Yes.  Describe.....

| 11 suits, 2 tuxedos, 7 pairs of shoes, and 15-20 business shirts, 7-8 pairs of pants, various golf wearing apparel and other wearing apparel. | $500.00 |

**12. Jewelry**
   *Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
   ☐ No
   ☑ Yes.  Describe.....

| Timex watch | $25.00 |
| Gold costume jewelry ring | $20.00 |

**13. Non-farm animals**
   *Examples:* Dogs, cats, birds, horses
   ☑ No
   ☐ Yes.  Describe.....

**14. Any other personal and household items you did not already list, including any health aids you did not list**
   ☐ No
   ☑ Yes.  Give specific information.....

| Hearing aides | $300.00 |
| Framed Family Pictures | $100.00 |

**15. Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here ...............................................................................** | $18,945.00 |

| Part 4: | Describe Your Financial Assets |

**Do you own or have any legal or equitable interest in any of the following?**

Current value of the portion you own?
Do not deduct secured claims or exemptions.

**16. Cash**
   *Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
   ☐ No
   ☑ Yes..................................................................................................

**Cash on hand** | $200.00 |

**17. Deposits of money**
   *Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
   ☐ No
   ☑ Yes.........................   Institution name:

---

Official Form 106A/B               Schedule A/B: Property                                                page 3

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

Debtor 1    **Max E. Salas**    Case number *(if known)*    18-00260

| | | | |
|---|---|---|---|
| 17.1. | **Checking** | **Bank of America Core checking account** | $1,779.24 |
| 17.2. | **Checking** | **Bank of America Interest Checking (in name of 1610 Riggs Property Trust, Max Salas Trtee)** | $334.96 |
| 17.3. | **Other financial account** | **BB&T bank account x5086 (CLR, Inc.)** | $29,624.97 |
| 17.4. | **Other financial account** | **BB&T bank account x1095 (CLR, Inc. - Construction Account)** | $39.68 |
| 17.5. | **Other financial account** | **BB&T bank account (1610 Riggs Property Trust)** | $6,429.44 |

18. **Bonds, mutual funds, or publicly traded stocks**
   *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
   ☑ No
   ☐ Yes..................    Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
   ☑ No
   ☐ Yes.  Give specific information about them...................
         Name of entity:    % of ownership:

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
   *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
   *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
   ☑ No
   ☐ Yes. Give specific information about them
         Issuer name:

21. **Retirement or pension accounts**
   *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
   ☐ No
   ☑ Yes. List each account separately.
         Type of account:    Institution name:

|  |  |  |
|---|---|---|
| **401(k)** | **T. Rowe Price/Cornet, Inc. 401(k)** | $505,435.72 |

22. **Security deposits and prepayments**
   Your share of all unused deposits you have made so that you may continue service or use from a company
   *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
   ☑ No
   ☐ Yes. ....................    Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
   ☑ No
   ☐ Yes.............    Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
   26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
   ☑ No
   ☐ Yes.............    Institution name and description. Separately file the records of any interests. 11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
   ☐ No
   ☑ Yes.  Give specific information about them...

| | |
|---|---|
| **Interest in 1610 Riggs Property Trust -**<br>**Establishes Debtor as sole-trustee and sole-beneficiary**<br>**Trust terminated through merger to grant ownership of trust**<br>**property to debtor** | **$0.00** |

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
    *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
    ☑ No
    ☐ Yes.  Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
    *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
    ☑ No
    ☐ Yes.  Give specific information about them...

| **Money or property owed to you?** | **Current value of the portion you own?**<br>Do not deduct secured claims or exemptions. |
|---|---|

28. **Tax refunds owed to you**
    ☑ No
    ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
    *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
    ☑ No
    ☐ Yes. Give specific information......

30. **Other amounts someone owes you**
    *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security
    benefits; unpaid loans you made to someone else
    ☑ No
    ☐ Yes.  Give specific information..

31. **Interests in insurance policies**
    *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
    ☐ No
    ☑ Yes. Name the insurance company of each policy and list its value.

| | Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|---|
| | **Interest in Life Insurance Policy**<br>**through employer Cornet Technology,**<br>**Inc.**<br>**Interest to terminate upon full**<br>**retirement on May 3, 2018**<br>**$0.00 refund value** | **Ron Salas** | **$0.00** |
| | **Interest in health, vision, and dental**<br>**insurance policies through employer**<br>**Cornet Technology, Inc.**<br>**$0.00 cash value** | | **$0.00** |
| | **Interest in Casualty Insurance -**<br>**Progressive**<br>**$0.00 cash value** | | **$0.00** |

Official Form 106A/B                              Schedule A/B: Property                                              page 5

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                          Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                          Case number *(if known)*    **18-00260**

---

32. **Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.

☑ No
☐ Yes.  Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue
☐ No
☑ Yes.  Describe each claim.........

| Potential claim against Encompass Insurance for unpaid insurance funds due under policy | Unknown |
|---|---|
| Contract claim against Fusion Contracting Group for deficient and unperformed renovation work | Unknown |

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
☑ No
☐ Yes.  Describe each claim.........

35. **Any financial assets you did not already list**
☑ No
☐ Yes.  Give specific information..

36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached
for Part 4. Write that number here............................................................................................................

**$543,844.01**

**Part 5:**    Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

37. **Do you own or have any legal or equitable interest in any business-related property?**
☑ No. Go to Part 6.
☐ Yes.  Go to line 38.

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

38. **Accounts receivable or commissions you already earned**
☑ No
☐ Yes.  Describe.....

39. **Office equipment, furnishings, and supplies**
*Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices
☑ No
☐ Yes.  Describe.....

40. **Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**
☑ No
☐ Yes.  Describe.....

41. **Inventory**
☑ No
☐ Yes.  Describe.....

42. **Interests in partnerships or joint ventures**
☐ No
☑ Yes.  Give specific information about them...................
Name of entity:                                    % of ownership:

---

Official Form 106A/B                    Schedule A/B: Property                    page 6

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

Debtor 1    **Max E. Salas**                    Case number *(if known)*    **18-00260**

**1610 Riggs Property Trust a/k/a CLR, Inc.**
**(Collapsing trust with full ownership vesting in**    **100%**    %    **Unknown**
**Max Salas of all trust property)**

43. **Customer lists, mailing lists, or other compilations**
☑ No.
☐ Do your lists include personally identifiable information (as defined in 11 U.S.C. § 101(41A))?

☑ No
☐ Yes.  Describe.....

44. **Any business-related property you did not already list**
☑ No
☐ Yes. Give specific information.........

45. Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached
for Part 5. Write that number here......................................................................................    **$0.00**

| Part 6: | Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In. |
|---|---|
| | If you own or have an interest in farmland, list it in Part 1. |

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
☑ No. Go to Part 7.
☐ Yes.  Go to line 47.

| Part 7: | Describe All Property You Own or Have an Interest in That You Did Not List Above |
|---|---|

53. **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
☐ No
☑ Yes. Give specific information.........

| Washington Nationals MLB season tickets | $10,000.00 |
|---|---|

| Washington Wizards NBA season basketball tickets | $5,940.00 |
|---|---|

| Policy holder for potential insurance payout to third parties for liability from 2015 house fire - Encompass Insurance | Unknown |
|---|---|

54. Add the dollar value of all of your entries from Part 7. Write that number here  ...................................    **$15,940.00**

Debtor 1   **Max E. Salas**                                                  Case number *(if known)*   **18-00260**

| Part 8: | List the Totals of Each Part of this Form |
|---|---|

55.  **Part 1: Total real estate, line 2** .................................................................................   **$2,500,000.00**

56.  **Part 2: Total vehicles, line 5**                                                        $0.00

57.  **Part 3: Total personal and household items, line 15**                     $18,945.00

58.  **Part 4: Total financial assets, line 36**                                       $543,844.01

59.  **Part 5: Total business-related property, line 45**                             $0.00

60.  **Part 6: Total farm- and fishing-related property, line 52**                    $0.00

61.  **Part 7: Total other property not listed, line 54**              +              $15,940.00

62.  **Total personal property.** Add lines 56 through 61...      $578,729.01    Copy personal property total    **$578,729.01**

63.  **Total of all property on Schedule A/B.** Add line 55 + line 62                       **$3,078,729.01**

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                               Best Case Bankruptcy

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name      Middle Name      Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name      Middle Name      Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number (if known) | 18-00260 |

☐ Check if this is an amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt                                         4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

**Part 1:    Identify the Property You Claim as Exempt**

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ☑ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on** *Schedule A/B* **that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **1610 Riggs Place, NW Washington, DC 20009**<br>**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**<br>**trust collapsed on creation through merger to convey property to debtor DC Records displays owner as Len Salas**<br>**Contains**<br>Line from *Schedule A/B*: **1.1** | $2,500,000.00 | ☐ _____<br>☑ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(14)** |
| **\*\*See Attached List\*\***<br>Line from *Schedule A/B*: **6.1** | $14,000.00 | ☑ _____ $8,621.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |
| **Previously damaged and restored personal property being held in storage by Columbia Restoration \*\*See attached list for property description\*\***<br>Line from *Schedule A/B*: **6.2** | $2,000.00 | ☑ _____ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                        Best Case Bankruptcy

41

```
1   IN THE UNITED STATES BANKRUPTCY COURT FOR THE
            MIDDLE DISTRICT OF TENNESSEE
2                  AT NASHVILLE
    ----------------------------------------x
3   IN RE:
                       Case No: 3:18-bk-02662
4   Len Salas              Chapter 7
                           Judge Harrison
5          Debtor
    _____
6   Nicolass Brekelmans and Gail Gregory
    Brekelmans, Co-Personal Representatives
7   of the Estate of Nina Brekelmans

8   and

9   Michael McLoughlin and Martha Johnson,
    Co-Personal Representatives of the
10  Estate of Michael Patrick McLoughlin,

11  In their capacity as authorized representatives
    of the Estate of Len Salas
12
              Plaintiffs
13
           -v-
14
    Max Salas,
15                 Ad Pro No.3:20-ap-90027

16          Defendant.

17  ----------------------------------------x
18            March 3, 2022
              10:30
19          Videoconference

20      DEPOSITION of the Defendant MAX SALAS, taken

21  by Plaintiff, before Christine Cutrone, a Notary

22  Public.

23

24

25
```

42

```
1   A P P E A R A N C E S :

2

3   LAW OFFICE OF PHILIP J. MCNUTT, P.C.
    Attorney for Plaintiff
4       Two fountain Square
        11921 Freedom Drive,
5       Suite 584
        Reston Virginia 20190
6
    BY:   PHILLIP MCNUTT, ESQ.
7

8   THOMPSON BURTON, PLLC
9   Attorney for Defendant
        6100 Tower Circle
10      Suite 200
        Franklin, Tennessee 37067
11
    BY:  PHILIP G. YOUNG, ESQ.
12
    MS. DEBORAH LUNN (court clerk)
13

14  Also present:  Ethan Rex
                   (Planet Depos Tech)
15                 Nico and Gail Brekelmans
                   Mindy Johnson
16

17

18

19

20

21

22

23

24

25
```

43

```
1       IT IS HEREBY STIPULATED AND AGREED by and

2   between the attorneys for the respective parties

3   herein, that filing and sealing be and the same are

4   hereby waived.

5       IT IS FURTHER STIPULATED AND AGREED that all

6   objections, except as to the form of the question,

7   shall be reserved to the time of the trial.

8       IT IS FURTHER STIPULATED AND AGREED that the

9   within deposition may be sworn to and signed before

10  any officer authorized to administer an oath, with

11  the same force and effect as if signed and sworn to

12  before the Court.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

44

1  REPORTER:  Will counsel please
2  stipulate that in lieu of formally swearing in the
3  witness, the reporter will instead ask the witness to
4  acknowledge that their testimony will be true under
5  the penalties of perjury, that counsel will not
6  object to the admissibility of the transcript based
7  on proceeding in this way, and that the witness has
8  verified that MAX SALAS is in fact the name of the
9  witness. All counsel agree?
10      MR. MCNUTT:  I do.
11      MR. YOUNG:  Yes.  Thank you.
12      REPORTER:  Do you hereby acknowledge
13  that your testimony will be true under the
14  penalties of perjury.
15      THE WITNESS:  I will.
16      MR. MCNUTT:  Thank you, madam
17  reporter.
18      First, just a brief statement,
19  Mr. Salas, and all involved.  This is a
20  continuation of a deposition that was started in
21  September of last year.  The deposition was
22  adjourned and continued to an indefinite date
23  by agreement of the parties.  We have a member
24  of the court present here to monitor the
25  deposition.

49

1  what other documents might be around that. I
2  have no idea.
3    Q.   Not other copies.
4       Do you know if there are any other
5  trust agreements that you executed regarding the
6  property?
7    A.   I don't know. I don't know. There
8  may be.
9    Q.   Okay. Are you aware of any?
10   A.   There was a lot of documents handed
11 back and forth for a long time for three days
12 in a row, and I just don't remember what I
13 saw, sir, so I can't answer that question.
14 So, I guess, I can't answer it. I don't know
15 or I don't remember.
16   Q.   Would you go to the fifth page, the
17 next page of that document.
18   A.   Yeah.
19   Q.   No. The next page. I think it's the
20 next page we're looking at.
21   A.   The notarized signature you mean, is
22 that what you're talking about?
23   Q.   I'm looking for the Quitclaim Deed.
24 Can you scroll up to the top of that page, Mr.
25 Salas, the top of the previous page. I'm sorry,

50

1  I gave you the wrong direction. Can you scroll
2  to the last page, 6 of 6. There we go, right
3  there.
4       Do you recognize that document, which
5  is titled Quitclaim Deed also dated July 6,
6  2010?
7    A.   Again, it's the same answer as the
8  last.
9    Q.   Do you recognize it?
10   A.   It's a copy -- yes, a Quitclaim Deed,
11 that's correct.
12   Q.   That's the deed that you executed
13 between your son and you in July of 2010; is
14 that correct?
15   A.   No, I don't know that.
16   Q.   You don't know that. Can you scroll
17 down to the signatures. Right there.
18       Is that your signature at the bottom?
19   A.   Yes, it is.
20   Q.   That's dated July 6, 2010?
21   A.   Yes, it is.
22   Q.   This is the Quitclaim Deed that
23 resulted in the deed of the property at 1610
24 Riggs Place from your son to the trust; is that
25 accurate?

51

1    A.   Repeat that please?
2    Q.   Yes. This is the deed that you're
3  asserting transferred the property at 1610 Riggs
4  Place from your son Len to you as trustee of the
5  1610 Riggs Property Trust?
6    A.   It's a copy of that, yes, sir. Is
7  that what you want? That's the transfer. I
8  don't know if there's any other ones. I don't
9  know.
10   Q.   Do you know where the original of this
11 document is?
12   A.   I don't.
13   Q.   Do you know if you received an original
14 of this document on or about July 6, 2010?
15   A.   2010. You know, I don't know. So I
16 really can't say that I do. My -- my
17 attorneys may have it. I don't have it. The
18 only paperwork that I knew that I had, burned
19 in the fire, sir.
20   Q.   When is the last time --
21       JUDGE HARRISON: Let me interrupt here
22 for just a minute. I'm sorry I was a little
23 late, but we had a little technical difficulty.
24       I'm just here to monitor. Mr. Salas,
25 not answering will not do you any favors.

52

1  Mr. McNutt, any rowdiness will not do you any
2  favors. So let's just get this done. I know you
3  already started, but go ahead.
4       MR. MCNUTT: Thank you, your Honor.
5       THE WITNESS: Thank you. Sorry.
6    Q.   Mr. Salas, when is the last time you
7  remember having the original of the Quitclaim
8  Deed?
9    A.   I remember having the file right
10 before the fire, I guess. I remember -- I
11 remember I saw -- I didn't see it then, but I
12 would have had it. Again, it was destroyed in
13 the fire. Was that the question?
14   Q.   So you believe that the original was
15 destroyed in the fire that took place in, I
16 think, it was June of 2015; is that accurate?
17   A.   Mr. McNutt that's possible. You
18 know, yes, maybe it is, but I don't remember.
19 I mean, I can't say for sure. So I rather be
20 safe than smart.
21   Q.   Fine. That's fine.
22       Mr. Salas, do you recall at any time
23 after June of 2015 that you saw or had in your
24 possession the original of this document, the
25 Quitclaim Deed?

57

1 name and number should also be used to finance
2 the property. Please note that income taxes on
3 the trust must be filed annually.
4     Did I read that correctly?
5  **A.    Yes, sir.**
6  Q.    This is your son sending an e-mail to
7 you and your other son Len?
8  **A.    Yes. Yes, sir.**
9  Q.    Do you recognize
10 LenSalas77@Gmail.com --
11  **A.    Yes, sir.**
12  Q.    -- was that your son Len's e-mail
13 address at the time?
14  **A.    Yes.**
15  Q.    Now, it says the name and number should
16 also be used to finance the property. And by
17 property, he's referring to 1610 Riggs Place,
18 correct?
19  **A.    Yes. Correct. Wait, wait ask me**
20  **that again, please?**
21  Q.    He says, the name and number should
22 also be used to finance the property. And by
23 the property, he's referring to the 1610 Riggs
24 Place property, correct?
25  **A.    Right. Yes.**

58

1  Q.    He says, please note the income taxes
2 on the trust must be filed annually.
3  **A.    Yes, sir.**
4  Q.    But you didn't file income taxes for
5 the trust for any year, did you?
6  **A.    So -- no, I don't -- I don't -- I**
7  **don't know how to file income taxes. I don't**
8  **file them today.**
9  Q.    You didn't file any annual income tax
10 returns for the trust, did you?
11  **A.    I don't know, sir.**
12  Q.    You haven't produced any. If you had
13 them, you would have produced them, correct?
14  **A.    If I was asked to and I had them,**
15  **yes, of course.**
16  Q.    In the next paragraph, let me read a
17 portion of this to you, Mr. Salas. The next
18 step is for someone in D.C. to draft a Quitclaim
19 Deed in order to move the property from the
20 possession of Len to the trust. Did I read that
21 correctly?
22  **A.    Yes, sir.**
23  Q.    Okay. Do you know why your son was
24 asking for someone to draft a Quitclaim Deed on
25 June 17, 2011?

59

1  **A.    I don't know. I mean, I don't know**
2  **-- I don't know why.**
3  Q.    Do you think he just forgot that there
4 was one signing in July of 2010?
5  **A.    Give me that again?**
6  Q.    Do you think that your son, Ron, may
7 have forgotten that you signed a Quitclaim Deed
8 in July of 2010?
9  **A.    I don't know. I can't remember.**
10  Q.    Do you know if in response to this
11 e-mail, Mr. Salas, did you attempt to obtain
12 someone to draft a Quitclaim Deed?
13  **A.    I don't remember. No, I don't -- I**
14  **didn't get anybody to -- no, I don't think so,**
15  **sir.**
16  Q.    Okay. Now it says, the deed will then
17 need to be filed with the district/city. And
18 then, let me know if you have any other
19 questions.
20     But no deed was filed with the District
21 City as far as you know, correct?
22  **A.    I don't -- again, Mr. McNutt, I don't**
23  **remember.**
24  Q.    Would you turn to the next document.
25 This is an e-mail that I think it's the e-mail

60

1 dated June 21, 2011 at 10:51 a.m. Right there.
2 Go to the top. It appears to be an e-mail from
3 you to S.Goldstein@capitoltitle.com.
4  **A.    Yes. Yes. I remember that.**
5  Q.    Mr. Goldstein, is he an attorney, do
6 you know?
7  **A.    I don't know what he is. Real estate**
8  **company. He owns like a title company or a**
9  **closing company. I'm not sure what it is,**
10  **sir. I'm sorry, I can't tell you.**
11  Q.    Would you go to the top of that page.
12  **A.    This one?**
13  Q.    Yes, right there.
14  **A.    Oh, yeah, okay.**
15  Q.    Actually I think it's the next one up.
16 Scroll up. Not down. Scroll up. Right there.
17  **A.    Right to this e-mail, right here?**
18  Q.    Let's do the one before that.
19  **A.    That's this one here, correct?**
20     MR. MCNUTT: Ethan, I'm wondering if it
21 might be better that I have control of the
22 document, and I can direct Mr. Salas more easily.
23     MR. YOUNG: I was going to suggest
24 that, Mr. McNutt. That might be easier to put it
25 on the page that you're asking about.

61

1    THE WITNESS:  Thank you.
2    THE TECH:  You should have control of
3  the screen now.
4    MR. MCNUTT:  Now, I'm sorry, I was
5  trying to do something better.  That's my fault.
6  A.    Just so you know, I'm a little bit
7  limited in computer -- my computer skills at
8  my age.
9  Q.    That's fine and understandable,
10  Mr. Salas.  I have confused you and I apologize.
11  I didn't mean to.
12    On this page, which is, again, an
13  e-mail that your son provided in his document
14  production, and it's dated June 21, 2011, at
15  10:51 a.m. It's addressed from you to
16  Mr. Goldstein, and your sons are copied.  It
17  says, Stan, and that's Mr. Goldstein, right, is
18  his name Stan?
19  A.    Yes.  I believe, yeah.
20  Q.    It says, as per our conversation, I am
21  sending you the e-mail from my son prepared to
22  documents.  Ron, also my other son, Len, is the
23  gentleman who will Quitclaim Deed to the trust.
24  I read that correctly, didn't I?
25  A.    Yes, sir.

62

1  Q.    When it says, Quitclaim Deed to the
2  trust, at the end of that sentence, it's
3  referring to the 1610 Riggs Property Trust,
4  correct?
5  A.    I mean, yes.  I believe there's only
6  one trust, I guess.  No, I don't know.  I
7  mean, I can't remember, but...
8  Q.    Well, let me try this -- I'm sorry, are
9  you finished, Mr. Salas?
10  A.    No, it's just -- you know,
11  Mr. McNutt, I've seen so many documents so
12  many different times.  And lots of times, I
13  just don't -- you said this or did this, and I
14  just don't -- I don't remember.  I just don't.
15  I'm not trying to evade the question.  I'm not
16  trying to -- I'm under oath and I want to tell
17  the truth, but if I don't know, I don't know.
18  Q.    I understand.  But with respect to this
19  sentence though, it says, whatever the trust is,
20  it's talking about a Quitclaim Deed to the
21  trust.  So whatever trust it is, someone,
22  according to this sentence, Len is supposed to
23  provide a Quitclaim Deed to the trust, whatever
24  the trust is; is that fair?
25  A.    Well, we're assuming that Len has the

63

1  trust here.  I can't answer for him.  I could
2  answer that this -- I understand -- I could
3  answer, but I don't know what trust we're
4  talking about.  And I don't know what Len is
5  talking -- I mean, I wrote the e-mail in 2011.
6  Ten years ago.  I don't remember.
7  Q.    The second paragraph, Mr. Salas, says,
8  at the end of the day, we need to have done is
9  have Lenny sign a Quitclaim Deed into the trust,
10  which has been extend lives my son, Ron, in
11  Colorado.
12    Now, that's a little awkward, but I
13  think you're saying that the trust is a Colorado
14  trust; is that fair?
15  A.    Mr. McNutt, I can't agree with
16  anything you think of me. You said, I think
17  you mean. I don't know what you mean. I
18  mean, you read the sentence as best as you
19  could, yes, sir.
20  Q.    Do you know if it refers to a trust
21  that was created in Colorado?
22  A.    I thought I answered that.  Yeah, I
23  don't know.  I don't remember.
24  Q.    Other than the trust that you executed
25  on July 6, 2010, are you aware of any other

64

1  trust created in Colorado for you or your son?
2  A.    I don't remember.
3  Q.    Okay.
4  A.    So there's the one sentence in there
5  that says, hope this is not too confusing.
6  It's very confusing to me what I wrote.
7  Q.    We all have lots of e-mails we like to
8  take back, so I'm sympathetic.
9    Let me go down to this next page.  We
10  don't think need to worry about that.  I don't
11  think we need to worry about this one either.
12  A.    We already did this one, right?
13  Q.    Yes, sir.  It's just a string of
14  e-mails which has the same e-mail in it, so not
15  a problem.
16    Let's go to this one.  This is an
17  e-mail dated June 22, 2011, at 8:50 a.m. This is
18  from Stanley Goldstein.  It appears to be the
19  Stan at Capitol Title.  It's addressed to you at
20  your AOL address with copies to your sons, and
21  to, apparently, an attorney by the name of
22  Lynne, I'll say, Boileau.  That's the way I
23  pronounce it.
24    Do you see that e-mail?
25  A.    Yes, sir, I see the e-mail.

69

1  7:22 p.m. This is an e-mail from your son, Len,
2  to you at your work e-mail address; is that
3  correct?
4  **A.   Yeah.**
5  Q.   And it says, where are we on this? It
6  appears to be referring to your most recent
7  e-mail to Lynne Boileau, which is right
8  underneath. Is that how you read it?
9  **A.   That's what it says.**
10  Q.   This appears to be a response to Len's
11  previous e-mail that we just mentioned. This is
12  an e-mail dated February 24, 2012 at 9:04 p.m.
13  Your response to Len is, still working on this.
14  I am in Miami. Will be back soon. I read that
15  correctly, didn't I?
16  **A.   Yes, sir.**
17  Q.   So as of February 24, 2012, it does not
18  appear that anything has been finalized with
19  respect to a Quitclaim Deed; is that correct?
20  **A.   I don't know that, sir.**
21  Q.   Is that what these e-mails seem to be
22  saying?
23  **A.   Well, they seem to be saying a lot of**
24  **stuff. I just don't, you know -- you're**
25  **asking me to look back 12 years, I guess, or**

70

1  **how many years was it? I don't remember.**
2  Q.   Ten years. Okay. So with the phrase,
3  still working on this, do you know what the this
4  is, what you were still working on?
5  **A.   No, I don't, sir.**
6  Q.   You don't. Okay. Other than the
7  Quitclaim Deed on the property, are you aware of
8  any other reason why you would be communicating
9  with Len Salas about what you're working on?
10  **A.   I worked with Len for a long time on**
11  **a lot of different things. So I worked on a**
12  **whole lot of different things. Getting him a**
13  **new job. Going through different things.**
14  **Whatever you talk to about your son when he's**
15  **that age. So I don't know what this is.**
16  Q.   Okay.
17  **A.   If you're asking me to predict**
18  **something, I can't do that.**
19  Q.   I don't want you to guess.
20  Mr. Salas, the next e-mail is dated
21  February 27, 2012. It's at 10:08 a.m. It's
22  addressed from you from your work e-mail to your
23  son, Len, at his personal account, I guess, that
24  is, right?
25  **A.   Right.**

71

1  Q.   It says, Len -- this is from you to
2  Len. Len, can you send over the original
3  e-mail. I will check with Lynne again and try
4  to move this thing along. Thanks. I read that
5  correctly, didn't I?
6  **A.   Yes, sir, you read it correctly.**
7  Q.   Again, you're not sure what this refers
8  to, what thing you're trying to move along; is
9  that accurate?
10  **A.   That's -- this is in 2012,**
11  **February 27th. This is different than the one**
12  **we had before, right, a different e-mail?**
13  Q.   Yes, sir.
14  **A.   So this is what this e-mail says,**
15  **yeah. I get what you mean. I mean, you don't**
16  **know really what this is. I'm sorry.**
17  Q.   Let's take a look at this e-mail. This
18  one is dated February 27, 2012 at 7:42 p.m.
19  It's addressed from you at your personal account
20  to Ms. Boileau at Capitol Title. And it looks
21  like you copied both of your sons, Len and Ron;
22  am I correct so far?
23  **A.   That's what it looks like, sir.**
24  Q.   Then it says, Hi, Lynne, about a month
25  and a half back, I sent you information in

72

1  reference to documents of the house, 1610 Riggs
2  Northwest. Please let me know when it would be
3  convenient for you. My son and I are anxious
4  and would like to close on this as soon as
5  possible. Please let us know what the next
6  that are from our side. We look forward to
7  working with you. What are the next steps? Did
8  I read that correctly?
9  **A.   Again, another badly written e-mail**
10  **that's pretty confusing, but you read it**
11  **correctly. I don't know what it means.**
12  Q.   Do you know if you received any
13  instructions as to next steps from Ms. Boileau?
14  **A.   No. Not according to this e-mail.**
15  Q.   Are you aware of any further
16  communications that you had after February 27,
17  2012, where Ms. Boileau, concerning the
18  documents related to 1610 Riggs Place?
19  **A.   So there's -- I can't remember for**
20  **sure. I mean, I can't remember. It's**
21  **possible, but I can't remember. I mean...**
22  Q.   Are you aware of any deed that was
23  created after February 27, 2012 with respect to
24  the property at 1610 Riggs Place Northwest?
25  **A.   Any other deed that was created?**

73

1    Q.    Yes.
2    **A.    I don't know.  I mean, I am not aware**
3    **of any, no.**
4    Q.    If I make it more specific, are you
5    aware of any Quitclaim Deed that was created
6    after February 27, 2012 related to the 1610
7    Riggs Place property?
8    **A.    I don't remember.**
9    Q.    Okay.  You don't have any such deed in
10   your possession, correct?
11   **A.    Mr. McNutt, I've answered that**
12   **question three times.**
13   Q.    Have you contacted Ms. Boileau or
14   Mr. Goldstein to determine if they have a copy
15   of any deed that might have been created?
16   **A.    I did try to contact them.  I did try**
17   **to contact them actually recently.  And I --**
18   **but I didn't -- I mean, they were trying --**
19   **they were -- no.  I mean, we worked on**
20   **something and then they said it couldn't go**
21   **any further and depends on what you were going**
22   **to do.  So I don't -- I guess -- I can't**
23   **guess.  I don't know.**
24   Q.    But when you contacted them most
25   recently, did they provide you with any

74

1    documents related to the property?
2    **A.    No, they didn't take my call.**
3          MR. MCNUTT:  Ethan, can we go to
4    Exhibit 22, please.
5          THE TECH:  You still have control of
6    the document, counsel.
7          MR. MCNUTT:  Thank you.
8    Q.    This is Exhibit number 22 in the
9    premarked exhibits for this deposition,
10   Mr. Salas.
11         I'll represent to you that these are
12   e-mails that you provided that appear to be from
13   Joshua Cox.  Joshua Cox is an associate, partner
14   of Marc Albert.  They were your attorneys or are
15   your attorneys, I guess, in the bankruptcy case
16   that you filed in the District of Columbia; is
17   that accurate so far?
18   **A.    Yes, sir.**
19   Q.    And these appear to be a series of
20   e-mails, string of e-mails between or among your
21   attorneys and your son, Ron Salas.
22         The first page at the top is
23   February 14, 2018 at 3:48 p.m. It says, it's
24   from Ron Salas, and that is his office e-mail
25   address, is it not?  Is that your son's office

75

1    e-mail address, Mr. Salas, do you know, at the
2    very top?
3          MR. YOUNG:  It looks like Mr. Salas may
4    be on mute.
5    **A.    I'm sorry, I hear it now.  I'm was on**
6    **mute there.  Sorry about that.**
7    Q.    I was asking if you recognize your
8    son's office e-mail address at the top of that
9    page?
10   **A.    Yeah, sir.  I thought I answered that**
11   **one.**
12   Q.    He states there, this is to Mr. Albert,
13   and this is Ron, Ron's e-mail, it says, my
14   apologies for the delay.  I have the originals.
15   I read that correctly, did I not?
16   **A.    Yes.**
17   Q.    If you go to the next page.  Again,
18   this appears to be an e-mail from Mr. Cox's
19   computer.  It says from Marc Albert at the top
20   to Rod Barnes with a copy to Max Salas, and the
21   subject says, signed trust; do you see that?
22   **A.    Yes, sir.**
23   Q.    It's dated March 7, 2018 at 11:11 a.m.
24         That's approximately two weeks prior to
25   the Superior Court trial, right?

76

1    **A.    Sir, I don't know when the Superior**
2    **Court Trial was.  I can't understand -- so**
3    **part of the questions -- so, no, I don't -- I**
4    **don't know. I remember the subject, yes.**
5    Q.    Okay.  Do you recall that your
6    bankruptcy was filed, I believe, on May 2nd,
7    2018? Do you recall that, Mr. Salas?
8    **A.    Give me a minute here.  I'm thinking.**
9    Q.    Okay.
10   **A.    You said when? May 7th or --**
11   Q.    May 2nd, 2018.
12   **A.    I don't -- I would remember that**
13   **date.  My birthday is May 3rd.  No, I can't**
14   **remember that, sir.**
15   Q.    Actually, I'm in there as well, but it
16   was in that timeframe I believe.  That's okay.
17         You don't remember when the Superior
18   Court trial took place though?
19   **A.    Sorry, could you repeat?**
20   Q.    Well, do you know when the Superior
21   Court trial took place, the actual trial?
22   **A.    No, I don't.**
23   Q.    Do you remember if it was in 2018?
24   **A.    I really don't.  That sounds right,**
25   **but I couldn't -- I can't swear, so I'm going**

77

1  to say I don't remember.
2  Q.    Now, if you look at the bottom of this
3  page, this is the same e-mail that I just read
4  to you. It says, from Ron to Mr. Albert. My
5  apologies for the delay. I have the originals;
6  do you see that?
7  A.    I see that.
8  Q.    And the response from Marc Albert to
9  Mr. Barnes and to you, with a copy to Mr. Cox,
10 subject, forward, signed trust. It says,
11 clarification, I spoke to Rod Barnes this
12 morning. He indicated he misspoke in his
13 e-mail. He gave the originals to his father so
14 they could be recorded in D.C. He only retained
15 a copy of the signed documents. Did I read that
16 correctly?
17 A.    You read it correctly.
18 Q.    Then just to clarify, there's an e-mail
19 from Mr. Cox addressed to Mr. Albert that says,
20 I think you meant Ron Salas. Not Rod Barnes.
21 And Mr. Albert makes that correction in his
22 e-mail to Mr. Barnes and a copy to you on
23 March 7, 2018, at 11:11 a.m.; am I correct so
24 far?
25 A.    You read it correct.

78

1  Q.    Do you know what this refers to with
2  respect to the originals?
3  A.    So, Mr. McNutt, I can't remember --
4  if you ask me -- if you read something, I can
5  tell you whether you read it or not. You ask
6  me to remember something, I don't remember. I
7  just don't remember.
8  Q.    The subject references signed trust.
9     Isn't that a reference to the 1610
10 Riggs Property Trust?
11 A.    I don't know what it is, sir.
12 Q.    Could it be any other trust that you're
13 aware of?
14 A.    I don't know that it could of. I
15 don't know -- I don't know what it was. I
16 don't want to...
17    MR. MCNUTT: Okay. Can you pull up
18 Exhibit 39, Max Salas number 39.
19 Q.    Mr. Salas, Exhibit number 39 is a
20 document titled, amended responses to request
21 for admissions to the defendant. And it says,
22 comes now, Defendant, Max Salas and for his
23 amended responses to requests for admissions to
24 the Defendant states as follows. And then
25 proceeds to state objections and responses. We

79

1  go to the signature page here.
2     These were submitted by your attorney,
3  Philip Young, on your behalf, is that accurate
4  so far, Mr. Salas?
5  A.    Okay. It took quite a while for you
6  to ask that question. It was a long question.
7  Can you cut it down --
8  Q.    Sure.
9  A.    -- by sections one and two, and I can
10 answer that, because I don't know remember the
11 first question, the first part of the question
12 was.
13 Q.    Sure. What I'm asking you, Mr. Salas,
14 is if you can identify this document as the
15 response that your attorney provided for you
16 with respect to the plaintiff's request for
17 admissions.
18 A.    I don't know how to answer that
19 question.
20 Q.    Do you recall in viewing the request
21 for admissions, the first five of which, for
22 example, appear on the page in front of you?
23 A.    No, I don't recall reviewing any of
24 that.
25 Q.    Do you recall providing information to

80

1  your attorney so that he could fill out the
2  response to these requests?
3  A.    So sometimes I get documents from Rod
4  Barnes. Sometimes I get them from, you know,
5  from different people, Ron included, and I'll
6  skim over them really, and I didn't understand
7  them. So I just sent them on to whoever was
8  helping me with that subject, with that issue.
9  So, you know, you're asking me if I remember.
10 No, I can't -- can I say this is the document?
11 I can't.
12 Q.    Okay. Just so the record is clear, who
13 is Mr. Barnes, Mr. Salas?
14 A.    That was my original attorney. The
15 attorney for the criminal or -- the fire
16 attorney. The criminal thing or whatever the
17 -- not the civil judge. My attorney.
18 Q.    He was your attorney or one of your
19 attorneys in the Superior Court litigation,
20 right?
21 A.    Yes, sir.
22    MR. YOUNG: Mr. McNutt, the responses
23 to the request for admission, we'll stipulate
24 that they are.
25    MR. MCNUTT: I understand.

81

1      MR. YOUNG: I know you're probably
2  going to ask if he remembers this, and I know
3  that's a different question, but if you're asking
4  if this is what it is, that is what it is, we'll
5  stipulate to that.
6      MR. MCNUTT: I understand and I
7  appreciate that.
8   Q.   Mr. Salas, I like to read for you the
9  request and response for number 2. It says,
10 that the defendant --
11  **A.   Oh, I'm sorry. Maybe you should ask**
12 **Mr. Albert, that was him. Go ahead.**
13  Q.   Tell him I'd love to talk to him.
14  **A.   I bet you would.**
15  Q.   Number 2, that the defendant is unaware
16 of the location of the original Quitclaim Deed.
17 Response, denied. Ron Salas has an original
18 copy. I read that correctly, didn't I?
19  **A.   You read it correctly, yes, sir.**
20  Q.   Now, your answer says that Ron Salas
21 has an original copy. But I showed you the
22 e-mail exchanged between your son, Ron, and
23 Mr. Albert, which is Exhibit 22. And I'll read
24 it again for you. If you want me to pull it up,
25 I will. Mr. Albert, says, on March 7, 2018,

82

1  clarification, I spoke to Ron Barnes -- we know
2  Ron Barnes means Ron Salas. It's a mistake --
3  this morning. He indicated that he misspoke in
4  his e-mail. He gave the originals to his
5  father, so they can be recorded in D.C. He only
6  retained a copy of the signed documents.
7   **A.   Yeah.**
8   Q.   That indicates that your son, Ron, does
9  not have an original copy of the Quitclaim Deed;
10 isn't that correct?
11  **A.   That's what that indicates, but well,**
12 **that's what that indicates.**
13  Q.   Okay.
14  **A.   But I think that he did have or he**
15 **later found an original copy of it. An**
16 **original copy of it.**
17  Q.   Do you know where that original copy
18 is?
19  **A.   No.**
20  Q.   Do you know if you've ever produced the
21 original in this litigation or in the D.C.
22 Bankruptcy Court litigation?
23  **A.   I don't -- I don't recall.**
24  Q.   In number 7, Mr. Salas, it says, that
25 the defendant, that's you, made no attempts to

83

1  refinance the D.C. property after 2012. And
2  your response is denied. That indicates to me
3  that you did make attempts to refinance the D.C.
4  property after 2012. Is that accurate, that you
5  made attempts to refinance after 2012?
6   **A.   No, that's not accurate. That was --**
7  **that's not accurate. I have tried to -- I**
8  **have in fact tried to refinance a lot of**
9  **different times, you know, yes.**
10  Q.   Okay.
11  **A.   That was denied. That's wrong, I'm**
12 **sorry. I could tell you that it's a mistake.**
13 **Or maybe I didn't remember, but I knew -- so**
14 **this is really clear, as the defendant makes**
15 **no attempts to refinance the D.C. property**
16 **after 2012. That's not right. I don't**
17 **understand how -- I said this, right?**
18  Q.   You denied it. That's correct. You
19 denied it.
20  **A.   Okay. I don't understand it. Maybe I**
21 **need a break.**
22  Q.   Do you need a break?
23  **A.   I'm okay.**
24  Q.   Okay. I'm hoping I don't have a lot
25 more to go over, Mr. Salas, but I haven't gone

84

1  through everything yet, so I can't give you an
2  accurate appraisal. But if you need a break at
3  any time, short or longer, just let me know,
4  okay?
5   **A.   Understood. Thank you, sir.**
6   Q.   I apologize if I confused you that you
7  denied that you didn't make any attempts to
8  refinance.
9      My question to you though is, the
10 attempts that you did make after 2012, all of
11 them were unsuccessful, correct, you were unable
12 to refinance?
13  **A.   Right. No, I wasn't -- I was unable**
14 **to refinance, that's correct.**
15  Q.   Is it correct, Mr. Salas, that when you
16 did attempt to refinance, that your son, Len,
17 was a borrower or co-borrower in every attempt?
18  **A.   No. No. So the whole point -- the**
19 **whole point -- I don't -- Len was -- Len kept**
20 **trying to get me to finance the house and get**
21 **-- so get him off the loan basically, that's**
22 **what he wanted. Get him off -- he was on me**
23 **and I wanted to do it for him. I kept working**
24 **on it and I couldn't get it done.**
25  Q.   The banks or institutions where you

---

85

1 attempted to refinance required Len to be a
2 borrower?
3 **A. I didn't attempt to get any loans for**
4 **Len anywhere that I can possibly remember.**
5 Q. Okay. Let's go to number 19,
6 Mr. Salas. Request for admission in 19 asks you
7 to admit or deny that Max Salas did not notify
8 Sun Trust or the D.C. government that he was an
9 obligor under the Sun Trust deed of trust. Your
10 response was denied. Max Salas notified Sun
11 Trust that he was obligated under the deed of
12 trust. I read that correctly, didn't I?
13 **A. You read it correctly, yes, sir.**
14 Q. When you notified Sun Trust that you
15 were obligated, did you sign a note?
16 **A. No. I didn't sign.**
17 Q. Did you sign a guaranty?
18 **A. Huh?**
19 Q. Did you sign a guaranty?
20 **A. I was -- well, the loan was --**
21 **actually it was a modification. It was a**
22 **modification and a way to get -- to get**
23 **Lenny's -- Lenny wanted the house off of his**
24 **name, and I kept trying to do that. That's**
25 **what happened. I don't blame him. I promised**

86

1 **him I would do that right away back when he**
2 **first did it. Well, I'm just going on too**
3 **far. So I don't remember, sir.**
4 Q. Okay. I need to give you a timeframe
5 here, so I apologize.
6 Prior to your bankruptcy filing, okay,
7 prior to your bankruptcy filing, did you notify
8 Sun Trust that you were obligated under the deed
9 of trust?
10 **A. I don't remember.**
11 Q. Did you ever provide, again, prior to
12 your bankruptcy filing, did you ever provide Sun
13 Trust with a note that you signed as an obligor
14 under the deed of trust note?
15 **A. Same answer.**
16 Q. Do you have any documents that would
17 indicate that you did sign such a note?
18 **A. I can't remember. You know, I don't**
19 **know. It's just -- it's almost like -- I**
20 **don't know. I don't remember.**
21 Q. Do you remember if you provided Sun
22 Trust with a guaranty of the note obligation
23 that Len was obligated for?
24 **A. Did I provide them a guaranty to**
25 **what, sir?**

87

1 Q. Did you provide Sun Trust with a
2 guaranty of the deed of trust note obligation?
3 **A. Did I provide Sun Trust a deed?**
4 Q. A guaranty.
5 **A. A guaranty. You know, Mr. McNutt, I**
6 **may have. I don't remember. I just can't**
7 **remember right. It just doesn't -- it's not**
8 **there.**
9 Q. If there was a note obligation or a
10 guaranty, would those documents have been
11 provided to the plaintiffs in this case?
12 **A. I don't know what -- if there was**
13 **what would have happened. I don't know.**
14 Q. You haven't provided any documents
15 related to a note obligation or a guaranty that
16 you provided the Sun Trust Bank prior to your
17 bankruptcy filing though, correct?
18 **A. That's not correct. I don't know**
19 **what I've done. I don't know. I may have. I**
20 **may have. Maybe I didn't. I don't know.**
21 Q. Let's go to number 20, Mr. Salas. The
22 request for admission asks that you admit or
23 deny that Max Salas did not notify D.C. or any
24 taxing authority that he was the owner of the
25 D.C. property. Your response is denied. Max

88

1 Salas has recorded the D.C. Bankruptcy Court
2 order, which declares him the owner. Max Salas
3 also filed the homestead exemption with the
4 Register of Deeds in December 2012. I read that
5 correctly, right?
6 **A. Yeah, I did. I did file a -- I got a**
7 **note at the house that I was eligible for**
8 **signing. So I went down and tried to -- tried**
9 **to get the homestead exemption, and I made my**
10 **application. And I don't remember the last**
11 **part of that. Max also filed a homestead**
12 **exemption within the register of deeds in**
13 **2012. As you -- I mean, you could read these**
14 **things and, yes, could understand what they**
15 **said. Obviously I didn't write them. But...**
16 Q. Do you have --
17 **A. Yes, I remember doing a homestead**
18 **exemption. I don't know -- I provided -- I**
19 **don't know what I provided the court. And the**
20 **court order says that it's my property, agrees**
21 **with me.**
22 Q. Do you have a copy of the homestead
23 exemption that you filed, Mr. Salas?
24 **A. I don't, but you can get it,**
25 **Mr. McNutt. All you have to do is call the**

---

**89**

1 D.C. government and they have it there. Yep.
2 Q. So you don't have a copy? Is that what
3 you're telling me, you don't have a copy?
4 A. I'm thinking. I can't remember where
5 it's at if I have it. No, I probably don't
6 have it. So what happened is, Mr. McNutt, is
7 you go there and you apply. You pay your
8 money. And then they e-mail you your
9 homestead exemption letter and number,
10 whatever it is. So that's what happens.
11 That's the way they do it in D.C.
12 Q. Subsequent to 2015, did you seek to
13 obtain a copy of the homestead exemption?
14 A. I had years before, right after my
15 divorce. I believe -- I explained to them
16 that the house was mine, but it was -- title
17 was in my son's name, and they said, well, you
18 can't get it.
19 Q. Okay.
20 A. So that was right there -- so that
21 would be 12, 15 years ago. And then the last
22 time was in 28 [sic] -- whenever it was. You
23 know, I can't be tied down to dates, because I
24 don't know. I really don't.
25 Q. You and me both, Mr. Salas. I

**90**

1 understand.
2 MR. MCNUTT: Tell you what, why don't
3 we take a short break, maybe 10 or 15 minutes.
4 I'm going to review my notes and documents to see
5 how much more I have if any. If we can reconvene
6 at 12:05, if that's okay with everybody.
7 MR. YOUNG: That works for me. Just for
8 clarification that's 11:05 central, correct?
9 MR. MCNUTT: Right. 12:05 my time.
10 (Whereupon, a short break was taken.)
11 MR. MCNUTT: Mr. Salas, you will be
12 happy to know that I just have a few more
13 questions.
14 Ethan, can we bring back Exhibit 39
15 please.
16 Q. Mr. Salas, one more question on this
17 exhibit. It relates to response to request
18 number 30. If I can pull that up. Number 30,
19 the request to admit or deny says that on and
20 after July 6, 2010, you were aware that you had
21 received the only signed original Quitclaim
22 Deed. Your response is denied. Defendant later
23 became aware of other signed original copies of
24 the quitclaim deed existed.
25 Now, with respect to this response,

**91**

1 Mr. Salas, my question is, whether you became
2 aware of other signed original copies of the
3 Quitclaim Deed other than what Ron Salas told
4 Mr. Albert?
5 A. So what is this exhibit from? I know
6 we worked on it a little while ago -- I mean,
7 before, but I don't remember what we went back
8 to now.
9 Q. These are the requests for admissions.
10 A. From who to who?
11 Q. These are your responses to the
12 plaintiff's request for admissions that your
13 counsel prepared and served on or about
14 November 9, 2002.
15 A. Okay.
16 Q. And that's the title right there. Then
17 I'm asking you about request number 30. Maybe I
18 could make this simpler.
19 Other than your son, Ron, were you
20 aware of any other party that had an original of
21 the Quitclaim Deed?
22 A. Well, you know, I think there were
23 four copies when we signed them, or at least
24 three I remember. So Ron got one of them.
25 Len got one of them. I got one of them. I

**92**

1 don't remember who got the other or if there
2 was a fourth really.
3 Q. Okay.
4 (Technical issue.)
5 A. Are you there? Yeah. So I don't
6 remember.
7 Q. Now, I think you said there were three
8 originals, and you got one of them, and your
9 sons had the other two.
10 Are you talking about originals or are
11 you talking about copies of the original?
12 A. No. So these were -- when we went,
13 we signed, we did this. There were three
14 original copies. Wow -- no, I can't remember
15 that for sure. I think there were more than
16 one copy. I thought Len had an original, and
17 I thought Ron had an original, and I had an
18 original. So, yeah. Am I aware that more
19 than three? No. Do I think there were at
20 latest three? I think, yes.
21 Q. But other than you and your two sons,
22 you're not aware of anyone that would have had
23 an original of the Quitclaim Deed; is that fair?
24 A. I'm not -- I'm sorry. I'm not aware.
25 MR. MCNUTT: Ethan, can we pull up

93

1  Exhibit number 40?
2  Q.    Mr. Salas, I'll represent to you that
3  these are the amended responses to plaintiff's
4  first request to the defendant, Max Salas, for
5  the production of documents.
6       So these are your written responses to
7  my client's request for production of documents.
8  And these were amended pursuant to Judge
9  Harrison's order that required additional
10 responses.  These are also prepared and provided
11 by your counsel on or about November 9, 2021.  I
12 just have a couple of questions regarding these
13 responses.
14      This is request number one, Mr. Salas;
15 do you see that?
16 **A.    Yeah.  Yes, sir, I'm sorry.**
17 Q.    It asks for, all federal and state
18 income tax returns for the following persons and
19 entities for the period of 2015 through the
20 present.  Those are the entities.  It says, any
21 other entity in which you were a member, owner,
22 partner, officer or shareholder.  And then it
23 says also, any other account on which you were
24 an authorized signatory or in which you
25 deposited funds from which you withdrew funds.

94

1       Your attorney prepared an objection.
2  And then said, notwithstanding these objections.
3  I'm reading from response paragraph.
4  Notwithstanding these objections and subject to
5  the provision of the discovery order, as Judge
6  Harrison's order, Salas has attached his
7  personal income tax returns for 2014, 2015,
8  2016, 2017 and 2018 hereto.  I read that
9  correctly so far, haven't I?
10 **A.    Yes, sir.**
11 Q.    Then the last sentence says, Salas
12 states that CLR Trust, CLR Inc., CLR Corp. and
13 CLR, LLC did not file tax returns for any year
14 from 2014 to 2018.  I read that correctly,
15 didn't I?
16 **A.    Yeah, you read it correctly.  Yes,**
17 **but I'm not sure I'm agreeing with the**
18 **response.  The first time I'm seeing it, but,**
19 **yeah, go ahead.**
20 Q.    And that was my first question, is that
21 statement correct that --
22 **A.    That's what you read, yes.**
23 Q.    Pardon me?
24 **A.    That's what you read, yes, sir.**
25 Q.    Is the statement correct though, did

95

1  CLR Trust file any tax returns from 2014 to
2  2018?
3  **A.    I can't remember that.  I don't know.**
4  Q.    You're not aware of any?
5  **A.    I'm not -- I'm not aware of any.**
6  **Sounds like CLR, LLC -- it's probably not.**
7  **You know, I don't know, that's it.  I just**
8  **don't know.  I'm guessing now, and I don't**
9  **want to guess.**
10 Q.    Do you know if you provided this
11 information to your attorney?
12 **A.    I don't remember providing any of**
13 **this to my attorney.**
14 Q.    Okay.  Well, you don't believe your
15 attorney made this up, do you?
16 **A.    No, I don't believe he made it up.**
17 **You're asking me if this is -- am I aware?**
18 **No, I don't think -- I don't even know which**
19 **attorney it was.  But I don't -- sir, you**
20 **know, I'm not trying to be cute really.**
21 Q.    I understand.
22 **A.    I don't -- I don't...**
23 Q.    Unless there's something else you want
24 to say, let me let that go.
25 **A.    Okay. That's it.**

96

1  Q.    But if there's something that you want
2  to say, go ahead.
3  **A.    You can ask shorter questions.  You**
4  **know, sometimes I think you ask three**
5  **questions in one question, so it confuses me.**
6  **I'm a simple guy.  You know, I just need a yes**
7  **or no.  Past ten words, it's a little**
8  **difficult for me.**
9  Q.    I apologize.  I'm doing my best.
10 **A.    I understand, sir.**
11 Q.    Let me ask you this.  The main reason
12 why I went over this is, you did not mention in
13 your answer the 1610 Riggs Property Trust.
14 Previously, I believe you said that you were not
15 aware that the trust had filed a tax return.
16 But I want to make sure that is correct, and
17 that from the period of 2014 through 2018, 1610
18 Riggs Property Trust did not file a federal or
19 state income tax return?
20 **A.    Again, yeah, that sounds right.  Yes,**
21 **sir, that sounds right, but, you know, I can't**
22 **-- I'll be guessing if I knew that it**
23 **happened.  You know, I didn't -- I don't**
24 **remember saying that.  I don't -- see the**
25 **thing is, I don't remember even seeing this**

101

1  don't know.
2  Q.   Have you asked them whether they have
3  e-mails, such as the e-mails that we've reviewed
4  today between you and Ms. Boileau?
5  A.   No.
6  Q.   Now, Mr. Salas, your insurance company,
7  which I believe was Encompass, does that sound
8  right?
9  A.   Yes.
10 Q.   Did you receive or they awarded you,
11 whatever the correct wording is, proceeds that
12 you used to reconstruct or rebuild your home at
13 1610 Riggs Place, right?
14 A.   Yes. Yes, sir.
15 Q.   I'm assuming that you received
16 insurance proceeds from time to time for that
17 renovation or reconstruction?
18 A.   I can't remember what -- how it did.
19 So there was a guy that was managing that
20 project -- was managing that. Some guy called
21 an adjustment professional or something. So
22 I, you know...
23 Q.   Insurance adjuster or somebody like
24 that?
25 A.   That's it. There you go. Insurance

102

1  adjuster. No, it wasn't an adjuster.
2  Investigator or something. I don't know what
3  it was. It was somebody else that was -- in
4  other words, he...
5  Q.   You're saying that somebody on behalf
6  of the insurance company was monitoring the
7  renovation reconstruction and providing you with
8  payments for contractors and that sort of thing,
9  does that sound right?
10 A.   That sounds right. But, you know,
11 it's just one of those questions that is hard
12 for me to answer yes or no.
13 Q.   Okay.
14 A.   Maybe some. I don't know. I don't
15 remember.
16 Q.   Let me tell you what I'm trying to get
17 at. I'm trying to figure out the insurance
18 proceeds that you got for the rebuilding of the
19 house, what account they were put in? Was that
20 the CLR Construction account?
21 A.   Was there -- I don't -- was there a
22 CLR Construction account?
23 Q.   Yes, sir.
24 A.   Yeah, that sounds like that, but I
25 don't remember. This is a -- so that account

103

1  -- yeah, I mean, CLR Construction account,
2  yes, that sounds familiar, but, yeah.
3  Q.   None of those proceeds went into the
4  1610 Riggs Property Trust account, did they?
5  A.   The account or the property?
6  Q.   Well, maybe I confused you. Let me
7  backup.
8       Looking through your accounts, it does
9  not appear that any of the insurance proceeds
10 were deposited into an account under the name
11 1610 Riggs Property Trust; is that correct?
12 A.   That sounds correct, yes, sir.
13      MR. MCNUTT: Mr. Salas, I think that's
14 all I have.
15      THE WITNESS: Thank you.
16      MR. YOUNG: I have no questions.
17      (Court reporter asks for order.)
18      MR. MCNUTT: Electronic.
19      MR. YOUNG: Yes, ma'am, please.
20      THE TECH: Would you both like exhibits
21 attached on that?
22      MR. MCNUTT: Yes. Please.
23      Instructions about reading and signing,
24 you want to mention that?
25      MR. YOUNG: Max, you're allowed to read

104

1  your deposition transcript and make sure that
2  it's accurate and signoff on it before it becomes
3  official, if you want to. Or you're welcome to
4  waive that right. Do you want to review it
5  beforehand or waive that right?
6       THE WITNESS: Yeah, I like to review
7  it. I like to review it.
8       MR. YOUNG: We'll review it.
9       (Time noted: 12:29 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



# PLANET DEPOS®
## We make it ›› *happen.*™

## Transcript of **Len Salas**

**Date:** March 9, 2016

**Case:** Brekelmans, et al. -v- Salas, et al.

Planet Depos, LLC
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: <www.planetdepos.com>

Worldwide Court Reporting | Interpretation | Trial Services



**EXHIBIT**
tabbies®
Creditors 15

SALAS_000822

**1**

```
 1   SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
             CIVIL DIVISION
 2
     - - - - - - - - - - - - - -x
 3
     MICHAEL MCLOUGHLIN, JR.,   :
 4   et al.,                    :
 5   and            :   Case Nos.:
                    : 2015 CA 8054 B and
 6   NICOLAAS J. BREKELMANS,    : 2015 CA 8061 B
     et al,         : (consolidated)
 7                  : Calendar 12
        Plaintiffs, :   Judge Brian F.
 8                  :   Holeman
        vs.         :
 9                  :
     LEN SALAS, et al.          :
10                  :
        Defendants.            :
11                  :
     - - - - - - - - - - - - - -x
12
13
14       Videotaped Deposition of LEN SALAS
15              Washington, D.C.
16            Wednesday, March 9, 2016
17                 9:08 a.m.
18
19   Job No. 105983
20   Pages 1 - 127
21   Reported by: Paula J. Eastes
22   Videographer: Bangaly Cisse
```

**2**

```
 1       Videotaped Deposition of LEN SALAS, held at
 2   the offices of:
 3
 4       STEIN, MITCHELL, CIPOLLONE, BEATO &
 5              MISSNER, LLP
 6       1100 Connecticut Avenue, N.W.
 7       Suite 1100
 8       Washington, D.C. 20036
 9       (202) 737-7777
10
11
12
13
14
15
16
17       Pursuant to agreement, before Paula J.
18   Eastes, Court Reporter and Notary Public in and for
19   the District of Columbia.
20
21
22
```

**3**

```
 1       A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS MICHAEL MCLOUGHLIN,
 4   MARTHA JOHNSON AND ESTATE OF MICHAEL PATRICK
 5       MCLOUGHLIN:
 6       RICHARD A. BUSSEY, ESQUIRE
 7       STEIN, MITCHELL, CIPOLLONE, BEATO &
 8          MISSNER, LLP
 9       1100 Connecticut Avenue, N.W.
10       Suite 1100
11       Washington, D.C. 20036
12       (202) 737-7777
13
14   ON BEHALF OF THE PLAINTIFFS NICOLAAS J.
15   BREKELMANS AND THE ESTATE OF NINA BREKELMANS:
16       PAUL CORNONI, ESQUIRE
17       REGAN, ZAMBRI & LONG, PLLC
18       1919 M Street, N.W.
19       Suite 350
20       Washington, D.C. 20036
21       (202) 463-3030
22
```

**4**

```
 1       A P P E A R A N C E S
 2
 3   ON BEHALF OF THE DEFENDANT LEN SALAS:
 4
 5       MICHAEL C. FORSTER, ESQUIRE
 6       FORSTER LAW FIRM, PLLC
 7       2007 Vermont Avenue, N.W.
 8       Washington, D.C. 20001
 9       (202) 400-2489
10
11   ON BEHALF OF THE DEFENDANT MAX SALAS:
12
13       RODERICK R. BARNES, ESQUIRE
14       ROLLINS, SMALKIN, RICHARDS & MACKIE, L.L.C.
15       401 North Charles Street
16       Baltimore, Maryland 21201
17       (410) 727-2443
18
19
20   ALSO PRESENT: MAX SALAS
21
22
```

Case 3:23-cv-00987   Document 72   Filed 11/28/24   Page 370 of 532   PageID #: 953

000823
853

## 29

1    A   No.
2    Q   Did you identify rental income from Riggs
3   Place on any income tax returns?
4    A   No.
5    Q   Have you taken deductions for expenses
6   associated with rental of the property on any of your
7   income tax returns?
8    A   No.
9    Q   What do you know about 1610 Salas Trust?
10   A   Not much.  It is an account.
11   Q   What does that mean?
12   A   It is some kind of account I guess.  I
13  don't really know really.  It is just a Trust.
14   Q   Do you have any personal knowledge
15  regarding 1610 Salas Trust?
16   A   No actually.
17       I mean what I found out the other day from
18  your deposition of my father is what I know.
19   Q   Apart from what your father testified to at
20  his deposition had you ever heard of the 1610 Salas
21  Trust?
22   A   No.

## 30

1    Q   Do you have any personal knowledge of the
2   CLR Trust?
3    A   Yes.  That one I know.
4    Q   All right.
5        And what is the CLR Trust?
6    A   It is a Trust that I assume my dad set up
7   for when he died that he would split up the assets
8   equally among his three sons.
9    Q   And CLR are the initials of the first names
10  of the three sons?
11   A   Correct.
12   Q   Do you have any other information regarding
13  the CLR Trust?
14   A   No.
15   Q   Have you executed a deed transferring legal
16  title to the property to the 1610 Salas Trust?
17   A   No.
18   Q   Have you executed a deed transferring legal
19  title to the property to the CLR Trust?
20   A   No.
21   Q   To your knowledge has the 1610 Salas Trust
22  ever been identified as owner of the property in any

## 31

1   District of Columbia land records or other records?
2    A   I don't know.
3    Q   To your knowledge has the CLR Trust ever
4   been identified as owner of the property in any of the
5   District of Columbia's land records or other records?
6    A   I don't know.
7    Q   There was a memorandum filed by your
8   counsel in support of a motion by you to dismiss the
9   claim against you in which it talks about a verbal
10  agreement that you had with your father regarding the
11  property.
12   A   Correct.
13   Q   Had you had an opportunity to review the
14  contents of that memorandum?
15   A   No.
16   Q   It indicates that as part of that verbal
17  agreement he was going to live in some of the house or
18  some of the space and that he would rent out some of
19  the other rooms.
20   A   Correct.
21   Q   So part of the verbal agreement you had
22  with your father was that he would rent out some of

## 32

1   the rooms in the building?
2    A   Yes.
3    Q   Was it your understanding that he would use
4   the rental income to pay the monthly mortgage
5   obligation on the property?
6    A   Yes.  I guess.  Yes.
7    Q   Were you aware that he had rented rooms to
8   tenants after you took legal title to the property in
9   April of 2007?
10   A   At that time it was I assume the basement.
11   Q   I am taking you from April 2007 up through
12  June 3, 2015.
13   A   Right.
14   Q   During that time were you aware that from
15  time to time he had rented rooms to tenants after you
16  took legal title to the property?
17   A   Yes.
18   Q   And as of June 3, 2015 were you aware that
19  there were tenants living in the building?
20   A   Repeat your question.
21   Q   As of June 3, 2015 were you aware that
22  there were tenants living in the building?

Case 3:23-cv-00987   Document 43-3   Filed 09/20/24   Page 371 of 532 PageID #: 969   000827

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                         .    Case No. 18-00260-smt
                               .
MAX E. SALAS,                  .
                               .    Washington, D.C.
               Debtor.         .    August 22, 2018
                               .
. . . . . . . . . . . . . . .  .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 1 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:
For the Debtor:            Stinson Leonard Street, LLP
                           By: MARC E. ALBERT
                               JOSHUA W. COX
                           1775 Pennsylvania Avenue, NW
                           Suite 800
                           Washington, D.C., 20036
                           (202) 728-3020


For the Creditors:         By: PHILIP J. McNUTT
                           11921 Freedom Drive
                           Suite 584
                           Reston, Virginia  20190
                           (703) 904-4380


Court Recorder:            THE CLERK

Transcribed By:            MS. KRISTEN SHANKLETON




Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

TABLE OF CONTENTS

OPENING STATEMENTS:                                    PAGE:
By Mr. McNutt                                          10
By Mr. Albert                                          27


WITNESSES:                                             PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt                       37

LEN SALAS
Direct examination by Mr. Albert                       98
Cross-examination by Mr. McNutt                        116
Redirect examination by Mr. Albert                     187
Recross-examination by Mr. McNutt                      199


RON SALAS
Direct examination by Mr. Albert                       206
Cross-examination by Mr. McNutt                        219
Redirect examination by Mr. Albert                     245

EXHIBITS:                                    MARKED: RECEIVED:


DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)              *        9
B.  4/16/07 deed of trust                       *        9
    (L.Salas/SunTrust) with 7/8/15
    Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement          *        9
D.  7/6/10 L.King journal entries               *        9
E.  Encomass insurance policy                   *        9
F.  1610 lease documents                        *        9
G   Email chain beginning 2/14/18               *        --
    R.Salas to insurance counsel
H.  3/19/18 emergency motion for                *        9
    summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules *             9
J.  M.Salas Answer to Interrogatories           *        9
    (Brekelmans case)
K.  M.Salas Answer to Interrogatories           *        9
    (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S | | |
| 1. Trial Transcript, 3/26/18, pp.1-19 | * | 8 |
| 2. Joint pretrial statement, 7/18/17 | * | 8 |
| 3. Pretrial order, 12/29/17 | * | 8 |
| 4. Amended joint pretrial statement, 2/15/18 | * | 8 |
| 5. McLoughlin Complaint, 10/20/15 | * | 8 |
| 6. Brekelmans Complaint, 10/20/15 | * | 8 |
| 7. L. Salas Answer (Brekelmans Complaint) 11/13/15 | * | 8 |
| 8. L. Salas Answer (McLoughlin Complaint) 11/13/15 | * | 8 |
| 9. M.Salas Answer (McLoughlin Complaint) | * | 8 |
| 10. M.Salas Answer (Brekelmans Complaint) | * | 8 |
| 11. Memorandum in support of L.Salas motion to dismiss | * | 8 |
| 12. M.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 13. L.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 14. M.Salas Deposition Transcript dated 2/14/16 | * | -- |
| 15. L.Salas Deposition, 3/9/16 pages 117-120 | * | 54 |
| 16. 4/27/95 deed (Wilhelm/Bruff) | * | 8 |
| 17. 4/16/07 deed (Bruff/M.Salas) | * | 8 |
| 18. 4/16/07 deed (M.Salas/L.Salas) | * | 8 |
| 19. Deed of trust (L.Salas/Sun Mortgage) | * | 8 |
| 20. Property request report for 1610 Riggs Place Northwest | * | 8 |
| 21. D.C. notice of infraction | * | 8 |
| 22. DCRA notice of immediate abatement | * | 8 |
| 23. Memorandum in Support of L. Salas' Emergency Motion for Summary Judgment | * | 8 |
| 24 8/10/18 R.Salas deposition excerpts | * | -- |
| 25. Lease, 10/1/14 - Tamasco | * | 8 |
| 26. Lease, 6/2/14 (first page) | * | 8 |
| 27. Lease, 17th of 2014 to Brekelmans | * | 8 |
| 28. Lease, 8/17/14 to Brekelmans | * | 8 |
| 29. Lease, 11/1/14 to Mecham | * | 8 |

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S (continued) | | |
| 30. Irrevocable Trust, 7/6/10 | * | 8 |
| 31. Cornet letter, 5/19/17 | * | 8 |
| 32. Debtor's report, excerpts, 4/5/18 | * | 8 |
| 33. Debtor's report, excerpts, 6/8 | * | 8 |
| 34. Excerpts, L.Salas, first Meeting of creditors, 5/24/18 | * | -- |
| 35. M.Salas Answers to Interrogatories, 8/6/18 | * | 8 |
| 36. Debtor's schedules A/B, C-J, 5/2/18 | * | 8 |
| 37. Debtor's responses, 8/6/18 | * | 8 |
| 38. Debtor's statement of financial affairs(D-13), 5/2/18 | * | 8 |
| 39. Debtor's amended statement of financial affairs(D-50), 6/27/18 | * | 8 |
| 40. Debtor's amended petition | * | 8 |
| 41. R.Salas email (trust documents) | 231 | -- |

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of "(unintelligible)" in this transcript are due to the audio recording levels being turned up too high, or individuals speaking outside of the vocal capture range of the microphone.

1    Court.  We'll have to discuss that once we're finished.

2            RON SALAS, DEBTOR'S WITNESS, SWORN

3            THE CLERK:  Please have a seat and state your name

4    for the record.

5            THE WITNESS:  Ron Salas.  S-a-l-a-s.

6                    DIRECT EXAMINATION

7            BY MR. ALBERT:

8      Q.   Thank you for traveling all the way from Denver.

9    We appreciate it.

10     A.   You bet.

11     Q.   What is the relationship with the Debtor, Max

12   Salas, please?

13     A.   I'm his eldest son.

14     Q.   Where do you live, please?

15     A.   I live in Fort Collins, Colorado.

16     Q.   And what is your occupation?

17     A.   I am an attorney.

18     Q.   And when were you admitted to practice and in what

19   state?

20     A.   In the state of Colorado, 2009.

21     Q.   Are you familiar with the property located at 1610

22   Riggs Place Northwest?

23     A.   I am.

24     Q.   And what is your familiarity with the property?

25     A.   It's my father's home.  Lived there since '95 or

1  '96.

2      Q.   Do you know if the D.C. records display the

3  property as being your father's name?

4      A.   My current knowledge is that it is the official --

5  it is -- the recorded deed is in my brother's name, but

6  there was a quit-claim deed signed years ago that

7  transferred it from my brother to a trust and my father.

8      Q.   Do you know why the property was transferred to

9  your brother at some point?

10      A.   Yes.  So originally it was in my step-mother's

11  name, my father's second wife.  They divorced.  When they

12  did so the house needed to be refinanced so that she could

13  get her marital portion of the property.  My father was

14  unable to refinance it at that point in time.  And my step-

15  mother, Vicki Bruff, and my father asked my brother to see

16  if he could refinance it in his name.  And so, you know, so

17  that she could get the buyout with the intent of my father

18  getting a loan thereafter and doing it, so that's what --

19      Q.   Doing what?

20           I'm sorry.  I couldn't hear you.

21      A.   Yeah, the intent was that my father would

22  refinance the loan when his credit, when his

23  creditworthiness met that so that he could do so, and then

24  refinance it and keep it in his name; keep his house.

25      Q.   Who do you consider to be the owner of the

1  property?

2       A.   My father.

3            MR. McNUTT:  Objection.  No foundation for who he

4  considers --

5            THE COURT:  Overruled.  It's not received as

6  anything other than his understanding.  It's not going to

7  determine the title.

8            BY MR. ALBERT:

9       Q.   Why do you say your father?

10      A.   Because my father has lived in the home as I said

11  since '94, '95, '96; in that area.  He purchase the home,

12  he remodeled the home -- bless you, Your Honor -- he

13  remodeled the home several times.  He lived there with my

14  step-mother.  To my knowledge he, you know, paid all the

15  bills and no one else did.  So it's his home.  I visited

16  there over the years a multitude of times with my children

17  and had holidays there.  It's his home.

18      Q.   What was Len's role in connection with this

19  property?

20      A.   Len lived there briefly before the divorce, and

21  then he lived there briefly after the divorce with his I

22  think then girlfriend and now wife.  But that was less than

23  a year is my recollection back in, I don't know, mid-

24  nineties.  Other than that, that's the only relationship I

25  know.  Well, I know that he was, besides the loan that I

1   spoke of earlier.

2       Q.   The loan was in his name, correct?

3       A.   The records that I've seen recently in depositions

4   and such indicate that yes, the loan was in his name until,

5   I guess the loan is still in his name.  I don't know that,

6   though.

7       Q.   Did you ever help your father and Len do anything

8   to further confirm the property was Max's?

9       A.   Yes.  So, you know, after my -- so one of the

10  reasons my sister-in-law and brother moved out is they

11  didn't get along.  My sister-in-law didn't get along with

12  Max, and it was a bone of contention that the home was

13  still in his name, and he wanted to get it off.  My brother

14  and my father asked me to do a, set up a trust or set up a

15  document to transfer the home out of my brother's name and

16  put it back into his name because it was his home.

17      Q.   Who's name?

18      A.   Into Max's name, my father, because it was a

19  stress on my brother's marriage, and it was a stress on my

20  brother.  And so shortly after, you know, I graduated from

21  law school I prepared those documents for them per their

22  request.  We prepared a quit-claim deed, we prepared a

23  trust.  I had them at my office to sign those documents,

24  and --

25      Q.   Can I interrupt for a minute?

x 000268
862

1  A. Yes.

2  Q. You said put it in your father's name, but then

3 you switched to a trust.  Can you --

4  A. It was a trust document that we set up rather than

5 directly into his name.  So it was a trust with him as the

6 sole beneficiary of the trust, and he as the trustee of the

7 trust.  So, but yes.  That was the plan.  The plan was to

8 get it out of my brother's name.

9  Q. Okay.

10  A. That was the intent.

11  Q. Thank you.

12  And so let's look at that Exhibit Number C

13 document in the little, I think it's the little book.  Yes.

14 Would you look at that document, or documents please?

15  A. That's C as in Charlie?

16  Q. Yes.

17  A. Yes.

18  Q. What's the title of the first page, please?

19  A. It's Irrevocable Trust Agreement.

20  Q. Okay.  And if you go to the back, the end, what's

21 the title of that document, the last page?

22  A. The last page is a quit-claim deed.

23  Q. All right.  And have you seen these documents

24 before?

25  A. I have, yes.

1    Q.   Who prepared these documents?

2    A.   I prepared them.

3    Q.   All right.

4         And did you have your brother and your father in

5    your office with respect to these documents?

6    A.   I did.

7    Q.   And what happened at that time?

8    A.   At that time myself, my father, my brother, and

9    his wife were present.  We signed the trust documents.  I

10   as a witness, my sister-in-law as a witness.  It was a

11   notary present.  We signed the trust agreement.  We signed

12   the quit-claim -- well, I did not sign the quit-claim.  The

13   quit-claim deed was signed by my brother Len and Max, and

14   the deed was given to, from Len to Max, the original to be

15   filed.  And a copy was given to my brother for his records,

16   and I kept a copy.

17   Q.   Okay.

18        And these documents were notarized also, correct?

19   A.   They were, yes, that's correct.

20   Q.   And who notarized them?

21   A.   Lori King.  She worked in my office at that point

22   for several years and she notarized -- well, it was a

23   shared office.  She worked in the office as a receptionist.

24   She notarized documents for the attorneys in the office.

25   Q.   Okay.

x 000270
864

1          And you witnessed the other people, including the

2    notary signing, were appropriate?

3          A.   I did.

4          Q.   You saw your brother sign, you saw your father

5    sign?

6          A.   Yes.

7          Q.   Did you review these documents with them before

8    they signed them?

9          A.   Yes, I did.

10         Q.   And do you know whether these documents were ever

11   recorded?

12         A.   I know today that they were not recorded.  My

13   assumption was that they were, but as of today I knew they,

14   I know now that they were not.

15         Q.   Okay.

16         Did there come a time you knew your father and

17   brother were involved in litigation involving the deaths

18   that occurred from a fire in 2015?

19         A.   Yes.

20         Q.   What did you, who did you learn about this

21   litigation from and what did you learn?

22         A.   I learned that they were both named in a lawsuit.

23   I don't recall who contacted me first, whether it was my

24   brother or my father.  I know they both at some point did.

25   Both sent me copies of the summons or petition, summons I

1    guess at that point.  I don't recall what it was.  I know
2    that I spoke to my brother and he was upset.  But so
3    sometime after the accident or incident a year or so later,
4    nine months, I don't recall exactly, after the fire.
5         Q.   There was a lawsuit filed?
6         A.   There was a lawsuit filed.
7         Q.   You're not sure you remember when?
8         A.   Right.  I don't remember exactly, no.
9         Q.   What did you think of Len being involved in the
10   litigation?
11              MR. McNUTT:  Objection.
12              THE COURT:  Overruled.
13              THE WITNESS:  At that point I was a bit surprised.
14   I did not -- we prepared the documents previously.  I
15   didn't think that my brother had any ownership interest at
16   that point.  I don't even know if he was still living in
17   the district.  He may have been.  And I asked him why, and
18   we looked at it, and it said that he was the registered
19   owner of it, or the deeds showed that he was indicated.  I
20   said, "Wow, that's not good."  I said, "You probably need
21   to get an attorney and make sure that they understand that
22   you don't even own the property."
23              BY MR. ALBERT:
24        Q.   Did your brother get an attorney?
25        A.   He did later get an attorney, yes.

1    Q.   And what was his name, do you remember?

2    A.   Michael Forester I believe was his attorney at the

3  trial.  I don't know if that was the attorney for the

4  entire period.  I don't know.

5    Q.   There's -- there's going to be a lot of questions

6  I'm sure after I finish about whether or not you provided

7  the trust documents to your brother and your father, their

8  lawyers, opposing counsel?

9    A.   I didn't.  I didn't provide them.  I assumed they

10  had them.  Honestly I didn't think about it a lot.  I knew

11  what we had done, but I didn't think about providing the

12  documents.  I was never asked for them.  They had

13  attorneys.  I assumed if they needed them and if they were

14  being properly vetted by an attorney that they would search

15  for those documents, they'd ask for those documents if they

16  needed them.  I, you know, I don't practice in the

17  district.  I don't -- you know, as an attorney I don't like

18  when other attorneys from family members get involved in my

19  cases, so I kept my distance.  I didn't think it was

20  appropriate for me to do that.  I don't do insurance

21  defense, so I didn't get involved.

22    Q.   Did there come a time that you did provide the

23  trust documents and the quit-claim deed?

24    A.   I did.  Once it was getting close to trial time, I

25  know I told my father that if it were to happen that he

needed to contact a bankruptcy attorney, because that's

what I do, and I provided him some names, and I believe he

hired you. I know he did. And then you contacted me after

your interview with him and asked if -- because he

mentioned to you there was a trust document. And he said,

"You know, Mr. Albert asked me about the trust, the copy

that I had, burned. And I need one. Do you have one?" I

said, "Yeah, I have it." And so that was shortly before

the trial I provided it to you.

    Q. We spoke on the phone?

    A. Yes, you called me a couple of times. And I

finally was able to locate it and get it to you.

    Q. And then what happened at that point?

    A. I provided it to you. I believe you provided it,

or Max provided it to his attorney in the civil litigation.

However, because of the late date had passed and the Judge

in that case barred that information from coming in due to

disclosure deadlines being missed --

    THE COURT: What did you retain, a photocopy or a

scanned copy?

    THE WITNESS: A scanned copy.

    THE COURT: Back in July of 2010 you created a

scanned copy and retained that electronic copy?

    THE WITNESS: That's correct, Your Honor. That's

my process. I scan every document and keep it in a e-file.

Tax 000274
868

1   Soft copy.

2          THE COURT:  And so that's what you sent to Mr.

3   Albert?

4          THE WITNESS:  I sent to Mr. Albert, yeah, I have a

5   scanned copy --

6          THE COURT:  Well, you sent to somebody at Mr.

7   Albert's request?

8          THE WITNESS:  It was Mr. Albert directly spoke to

9   me.  He asked me if I had it.  I said I have it somewhere

10  in my scanned documents.  I found it and I emailed the PDF

11  copy to him.

12         THE COURT:  All right, thank you.

13         THE WITNESS:  Yes, sir.

14         BY MR. ALBERT:

15     Q.  Do you know of any reason why you, your brother,

16  or your father would purposely keep this trust document,

17  quit-claim deed away from their own lawyers or the opposing

18  parties in the litigation?

19     A.  No.  I mean I assumed they had it; they were

20  working their case, they knew what was going on.  You know,

21  had I known, I wish I would have provided these documents

22  immediately, but I ignorantly at this point thought that

23  they would come up.  My brother had a copy, my father had a

24  copy, and that they were working towards that.  I just, you

25  know, hindsight now, I wish I'd have been more involved,

 1   but I'm, you know, 3,000 miles away.  I have, at the time

 2   two teenagers.  My son was involved in the fire and was

 3   going through issues because of it.  You know, I just, I --

 4   I didn't think about it.

 5        Q.   And at the time of the trial, a little before

 6   that, did you have some other personal events that caused

 7   you to focus on other issues?

 8        A.   Yeah.  You know, three months before my son was

 9   murdered, and, you know, it was a grieving time for the

10   family, and I just -- you know, I was thinking about my

11   wife and my daughter.

12        Q.   I'm sorry.

13        A.   No, it's okay.

14        Q.   Just a couple other questions.

15        A.   Sure.

16        Q.   The fire took place in June, was it June of 2015?

17        A.   Three years, yes.

18        Q.   Was your father injured in the fire?

19        A.   Yes.  My father and my son escaped the fire.  He

20   jumped from a second story window.  My father broke his

21   ankle I believe.  He had --

22             MR. McNUTT:  Your Honor, I'm going to object

23   because this is information that's not personal knowledge,

24   not first-hand knowledge of this witness.

25             THE COURT:  It's cumulative, too, Mr. Albert.

1  Sustained.

2          MR. ALBERT:  It is, but can I, just a couple

3  questions on it?

4          I understand it's cumulative.  May I just ask a

5  couple questions or no?

6          THE COURT:  Well, he learned of that information.

7  He learned of that information.  That's obvious.

8          MR. ALBERT:  Well, I was going to ask him what his

9  condition of his father was after the fire, if he could

10 tell the Court.

11         THE COURT:  All right.

12         BY MR. ALBERT:

13    Q.   How was your father physically and mentally doing

14 after the accident?

15    A.   My father had a tough time.  He had to see

16 therapists.  He was under medication for pain for his

17 breaks.  He had a difficult time --

18         MR. McNUTT:  Objection again, Your Honor.  This is

19 second or third-hand information.  Mr. Max Salas may be

20 able to testify to this, but I don't understand how his son

21 can.  There's been no establishment of any foundation for

22 the information that this witness would know in his

23 personal first-hand information.

24         THE COURT:  Sustained.

25         MR. ALBERT:  Judge, I have no further questions.

1          Thank you.

2          THE COURT:  The answer to the question is

3    stricken.

4          MR. ALBERT:  I'm sorry, Judge?

5          THE COURT:  The partial answer to the question is

6    stricken.

7          MR. ALBERT:  Yes, sir.  Thank you.

8                    CROSS-EXAMINATION

9          BY MR. McNUTT:

10    Q.   Good afternoon, Mr. Salas.

11    A.   Good afternoon.

12    Q.   I have to tell you, this is the first time I heard

13    about your son, and I am, you know, as a parent myself, I

14    can't imagine what that's like or what you may even be

15    going through now.  So I apologize for you to have to be

16    here and go through this, but I really do sincerely --

17    A.   Thank you.

18    Q.   I mean, this is a tough case obviously for the

19    reasons that my clients' family have gone through as well.

20    So we have to carry on as they say.

21    A.   Yes.

22    Q.   I have just a couple of questions, a few questions

23    I should say, based on your testimony.

24          You said in your testimony that in July of 2010

25    your intent was to create a document that would get the

1  property out of your brother's name.  Is that a fair

2  characterization of your testimony?

3      A.   Yes.

4      Q.   Now, you also said at the time I believe that you

5  were a fairly young attorney, is that right?

6      A.   That's correct.

7      Q.   How long after you had passed the bar?

8      A.   Six, eight months.

9      Q.   And I believe when I took your deposition I

10  believe you said that your primary focus for your practice

11  is in the area of bankruptcy and then some estates and

12  trusts.  I think you also did a smattering of minor

13  criminal matters and immigration matters.  Is that fair?

14      A.   Majority is bankruptcy, probably 70 percent.  I do

15  20 percent family law, divorce.

16      Q.   Okay.

17      A.   And then a smattering of the other issues.

18      Q.   Not much in the way of estates and trusts?

19      A.   No.

20      Q.   And no real estate practice?

21      A.   None.

22      Q.   Now I would think that as an attorney talking

23  about transfer of property that the first thing that would

24  come to mind would be a deed.  And you did prepare a quit-

25  claim deed?

1    A.   Yes.

2    Q.   Why was there no quit-claim deed?  Why was there a

3  need for a trust?  Why wasn't the property just deeded from

4  Ron -- from your brother to your father?

5    A.   Because at the time my father had some outstanding

6  tax issues, and there was fear that if it was placed

7  directly in his name it would be easier to lien the

8  property.

9    Q.   All right, and I believe -- that's fair.

10         And in your testimony I believe you said that your

11  father has had continuous tax problems for a long period of

12  time?

13    A.   He's had tax problems since the late '90s.

14    Q.   All right, so --

15    A.   Or early '90s.  Excuse me.

16    Q.   So it was important for this transaction that the

17  property not be in your father's name.  Is that accurate?

18    A.   Directly in his name, that's accurate.

19    Q.   Okay.

20         Because if the property was in his name there was

21  a possibility that these tax issues or tax liens I guess

22  they were, would have attached to your father's property,

23  correct?

24    A.   Correct.

25    Q.   Now, you said that after the transaction you said

1    that you kept a copy electronically.  You gave a copy to

2    your father -- I'm sorry.  Did you say you gave the

3    original or a copy to your father?

4        A.   My father had an original.

5        Q.   All right.

6             And you said that your brother had a copy.  Do you

7    know if there were any other copies?  Do you know if your

8    brother and sister had a copy?

9             MR. ALBERT:  Brother and sister?

10            MR. McNUTT:  Oh, I'm sorry.  What did I say?

11            Thank you for mentioning that.

12            BY MR. McNUTT:

13       Q.   I'm sorry.  Your brother's wife I meant obviously.

14   I don't know where -- and I keep calling you the brother,

15   the son; I don't know.

16       A.   That's all right.  No problem.

17       Q.   I apologize.

18       A.   She may have.  I don't know for a fact, but now

19   that you say that, I kind of remember that she may have

20   wanted to have a copy of her own, but I don't recall with

21   certainty.

22       Q.   But she was there, so she certainly knew that this

23   had taken place?

24       A.   That is correct.

25       Q.   And I heard you say I think in your response to

1   Mr. Albert's questioning that you explained the documents

2   to your father and your brother. Was your brother's wife

3   there at the time you explained it as well?

4       A. She was.

5       Q. So all those parties knew what the purpose of the

6   document was and what the effect was, and you told them

7   that the effect of the document was that the property would

8   no longer be owned by your brother; it would be out of his

9   name? Is that fair?

10      A. Yes.

11      Q. Okay.

12         And that never happened because the deed was never

13   recorded. Is that also fair?

14      MR. ALBERT: Objection. He says it never

15   happened. That's not true.

16      THE COURT: Sustained. It involves a conclusion

17   of law.

18      BY MR. McNUTT:

19      Q. Well, let me ask you what your understanding was

20   then, because the deed was, as you now understand because

21   the deed was never recorded, do you know what affect that -

22   - do you have an understanding of what the effect was on

23   the ownership of the property?

24      MR. ALBERT: Objection. Is Mr. Salas an expert

25   witness today?

1          THE COURT:  The objection is sustained.

2          MR. McNUTT:  Thank you, Your Honor.

3          THE COURT:  What were you trying to accomplish by

4  having title transferred to a trust of which Max Salas was

5  the beneficiary?

6          THE WITNESS:  To get the house back in control of

7  my father because it was his house.

8          MR. McNUTT:  All right.

9          THE COURT:  What was the purpose of having him

10  have control of the house?

11         THE WITNESS:  To relieve my brother from any

12  responsibility because his name happened to be on it, and

13  he had no interest in it.

14         THE COURT:  What kind of responsibility?

15         THE WITNESS:  I thought he had minimal

16  responsibility.  His wife disagreed and didn't want any

17  ties to my father and the home whatsoever.  And, there was

18  a loan and the point was to get it refinanced because there

19  was still the loan in my brother's name which he didn't

20  want responsibility for should my father default on that

21  loan because my father had been paying the mortgage.  And

22  my brother had no knowledge of if he was paying or if he

23  was not paying.

24         THE COURT:  Did you have discussions about

25  refinancing of the loan?

1          THE WITNESS:  No.  I mean, other than my brother

2     wanted my father to do it, but I didn't have any

3     discussions in who should be doing it or what needed to

4     take place.

5          THE COURT:  Go ahead, Mr. McNutt.

6          MR. McNUTT:  Thank you, Your Honor.

7          BY MR. McNUTT:

8     Q.   Mr. Salas, the quit-claim deed that you prepared,

9     and I think you were looking at the Debtor's book, so let's

10    use that.  I think it's Exhibit C?

11    A.   Yes.

12    Q.   And specifically as you look at the quit-claim

13    deed, in the first paragraph it states the parties to the

14    deed, and the person conveying is Len Salas in the first

15    line.  Do you see that?

16    A.   Yes.

17    Q.   And then the recipient of the property, the quit-

18    claim deed to is named 1611 Riggs Property Trust.  Do you

19    see that?

20    A.   Yes.

21    Q.   Do you know what the 1611 Riggs Property Trust is?

22    A.   It's a typo is my guess.  I don't know the -- the

23    trust was the 1610 Riggs Property Trust.  The common

24    address in the real property is 1610 Riggs Place, and the

25    house is 1610 Riggs Place, so.

1    Q.   Okay.

2    A.   I think I just made an error typing it.

3    Q.   Okay.

4         So tell me, did you prepare a corrected deed?

5    A.   No.

6    Q.   So this is the only deed that you prepared with

7    respect to the purport transfer of the property from Len

8    Salas to his father as trustee, is that accurate?

9    A.   I believe that is correct.  I do not recall any

10   other one.

11   Q.   All right.

12        Now, do you know -- let's just take what your

13   knowledge is in Colorado.  I'm assuming that you have a

14   deed to your property there?

15   A.   I do.

16   Q.   Have you ever seen other deeds in the performance

17   of your practice as an attorney?

18   A.   I have.

19   Q.   All right.

20        With respect to estates and trusts and those sorts

21   of things did you see deeds from time to time?

22   A.   I see them -- not really.  I see more quit-claim

23   deeds in my divorce work.  When one party leaves a

24   marriage, we typically quit-claim it over to the other

25   party so that they can refinance that debt and pay off the

1   other spouse, so.

2        Q.   Okay.

3        A.   I see it more in that context.

4        Q.   All right.

5             This deed states that the property is being quit-

6   claimed to the 1611, and I understand that's a typo, but

7   the 1611 Riggs Property Trust.  Do you know if the deed can

8   be recorded in the name of the Riggs Property Trust, or

9   does it have to be recorded in the name of the trustee, Max

10  Salas?

11       A.   In Colorado we can transfer it to the trust.  I

12  don't know in D.C.

13       Q.   All right.

14            If I told you in D.C. the property would have to

15  be titled in the name of Max Salas as trustee would that

16  affect your plan to quit-claim the property without putting

17  it in your father's name?

18       A.   I think the plan would have been the same.  The

19  plan was to transfer it to them.  If that is required in

20  D.C. and I made an error, then I -- I don't know.  Didn't

21  change the plan, sir.

22       Q.   Well, and you told me in your deposition, did you

23  not, that you didn't look at D.C. law to determine what was

24  required with respect to either the trust or the quit-claim

25  deed, correct?

1    A.   That's correct.

2    Q.   In fact, you used a Colorado form book --

3    A.   That's correct.

4    Q.   -- to prepare both documents, correct?

5    A.   Yes.

6    Q.   So as you sit here today you still don't know

7  whether or not a deed that states it's being deeded,

8  property is deeded to 1611 Riggs Property Trust, which

9  admittedly is a typo but that's what it says, could be

10 deeded in the name of the trust or would have to be deeded

11 in the name of the trustee, Max Salas?

12   A.   I don't know.

13   Q.   You don't know?

14   A.   That's correct.

15   Q.   All right.

16        And if it was Max Salas, that would create the

17 same problem with respect to the taxes or other obligations

18 of your father, correct?

19   A.   As trustee I don't know.

20   Q.   It would be under the name of Max Salas, trustee.

21 So his name would be on the deed.  That would present a

22 problem if he had tax issues, right?

23   A.   I don't know.

24   Q.   Okay.  You don't know.  Fair enough.

25        THE COURT:  His name would show up in the land

1   records as having some sort of interest in the property,

2   whereas if it were recorded in the name of the trust he

3   wouldn't show up in the land records necessarily, correct?

4           THE WITNESS:  I agree with that, yes, Your Honor.

5   What threw me with the question is Max Salas, trustee.  I

6   don't know if -- if the trustee portion would skew it or

7   not.

8           THE COURT:  If the IRS started looking at land

9   recorded they'd see Max Salas, that it had been recorded in

10  the name of Max Salas, trustee, and they might start

11  investigating what the trust said, correct?

12          THE WITNESS:  That's fair.  Yes, Your Honor.

13          THE COURT:  All right.

14          BY MR. McNUTT:

15      Q.   Now, Mr. Salas, would you take a look at what's

16  been introduced in evidence, and these actually appear in

17  both books, but this is Tab F in the smaller binder.  These

18  are a series of lease documents.  It looks like there are

19  one, two, three, four, five lease documents.  Would you

20  look at those, please, each of the five documents and tell

21  me when you've had a chance to look at them?

22      (At 4:57 p.m., brief pause as witness reviews

23      documents.)

24          THE WITNESS:  Okay.

25          BY MR. McNUTT:

x 000288

1      Q.    If you look at the first one, the one that has the

2  exhibit stamp on it, or did -- I'm sorry.  Exhibit sticker

3  on it?

4      A.    Yes.

5      Q.    It looks like it's dated the first day of

6  November, 2014.  The tenant is John Mechum, and the

7  landlord it says is Max Salas CLR.  Do you see that?

8      A.    I do.

9      Q.    Do you know what CLR is?

10      A.    No.

11      Q.    Okay.

12            It also says, if you look down, I guess it's maybe

13  the third paragraph where it says, "Payment of rent will be

14  made to."  Do you see that?

15            Same page.  "Payment of rent will be made to."  Do

16  you see that?

17      A.    Which number?  Oh, yes.  Yes.

18      Q.    Right above number 1?

19      A.    Yes.  I see, yes.

20      Q.    Okay.

21            And it also says, "Max Salas CLR."  Do you have

22  any recollection what CLR is?

23      A.    I've heard CLR years ago, but I don't know exactly

24  what type of entity it is.  I don't know what it is.  I've

25  heard the initials, acronym.

1    Q.   Okay.  And you know obviously that the initials

2  CLR stand for, could stand for at least, Chase, Len, and

3  Ron, right?

4    A.   I've heard them in that context.  I don't know

5  what it is.

6         MR. McNUTT:  Okay.

7         Now, Your Honor, I'd like to offer a document that

8  I have not put in the book yet.  This is Exhibit 41.

9         THE COURT:  Forty-one.

10         MR. McNUTT:  I made copies before I put the

11  exhibit sticker on it, but I do have the exhibit sticker on

12  the original at least.  I apologize for that.

13         I have two copies for the Court, Your Honor.

14       (At 5:00 p.m., Creditor Exhibit 41 marked.)

15         MR. ALBERT:  Judge, I think we were supposed to

16  submit all of our exhibits by date certain.

17         MR. McNUTT:  This is an impeachment document, Your

18  Honor.

19         MR. ALBERT:  I suggest this relates to the

20  documents that he was objecting to in my exhibit book.

21  This is one page out of a series of pages.  I would suggest

22  that we have to include all the documents that --

23         MR. McNUTT:  Well, Your Honor, the reason I have

24  this document is because we objected, as you recall to

25  Exhibit G, and the reason we objected to it is because it

1    had that hearsay statement by Mr. Albert actually.

2         This document represents the actual email, an

3    actual email sent by Mr. Ron Salas to Mr. Albert with the

4    trust document that is at issue here.  And I believe it's

5    admissible because it is a statement against interest, and

6    it impeaches the witness' prior testimony that he gave

7    copies, that he gave the original to his father.

8         MR. ALBERT:  Judge, I think if you look at the

9    whole series of emails it explains that that was a mistake,

10   and so we might as well have all the documents --

11        MR. McNUTT:  This --

12        MR. ALBERT:  It was quickly corrected that he

13   indicated, "No, it wasn't the originals.  It was a copy."

14        MR. McNUTT:  That -- Your Honor, you can look at

15   Exhibit G.  What Exhibit G says --

16        THE COURT:  The objection to the exhibits is

17   overruled.  You may ask the witness about it.

18        MR. ALBERT:  I'm sorry, Judge?

19        THE COURT:  The objection is overruled.  He may

20   ask the witness about it.

21        MR. McNUTT:  All right.

22        So Exhibit G is in evidence then, Your Honor?

23        THE COURT:  It's not in evidence yet.  It hasn't

24   been authenticated yet.

25        MR. McNUTT:  Okay.  All right.

1          If you would turn in the -- it's still in the

2   book, right?

3          MR. ALBERT:  I'm sorry?

4          MR. McNUTT:  It's still in the book, right?

5          MR. ALBERT:  In my book.

6          BY MR. McNUTT:

7      Q.   If you would look at Exhibit G?

8      A.   Yes.

9          THE COURT:  Well, Exhibit 41 is what I was ruling

10  upon.

11         MR. McNUTT:  Oh, I'm sorry.  Oh, I'm sorry.  I

12  apologize, Your Honor.

13         Then don't look at Exhibit G.

14         THE WITNESS:  Okay.

15         MR. McNUTT:  I haven't handed this to the witness.

16  May I approach?

17         I apologize, Your Honor.  I misunderstood.

18         BY MR. McNUTT:

19     Q.   Can you identify that exhibit, please?

20     A.   It looks like an email that I sent to Mr. Cox.

21         BY MR. McNUTT:

22     Q.   All right.

23         And that email, you attached to that email the

24  trust documents that you created in July 6, 2010, correct?

25     A.   Yes.

1    Q.   And your email says that you are sending to Mr.
2  Albert the originals, right?
3    A.   No.  It says:
4              "My apologies for the delay.  I have
5         the originals."
6    Q.   Okay.  So it says that you have the original of
7  the documents that you created in July of 2010, right?
8    A.   That's what this email says, yes.
9    Q.   Okay.
10             Now, Mr. Albert contends that they weren't the
11 originals but they were only copies?
12   A.   He's accurate.
13   Q.   Okay.
14             Did you ever correct your statement that those
15 were not the originals, they were copies?
16   A.   I did speak to them.  So if I can explain?
17   Q.   Did you ever correct your email?
18   A.   Did I send an email?  No, I -- I don't know.  I
19 may.  I don't know.
20   Q.   You stated that your father was supposed to record
21 the original, right?
22   A.   Yes.
23   Q.   The original was never recorded?
24   A.   Correct.
25   Q.   As you sit here today, you have no idea where the

1  original is, do you?

2      A.   I suspect it burned in the fire.

3      Q.   Do you know?

4      A.   But no, I do not know.

5      Q.   Okay.

6           Do you know if there was ever an intent to record

7  any document?

8      A.   I do know there was an intent to record a

9  document, yes.

10     Q.   But no document was ever recorded changing the

11  title of the property from your brother to your father,

12  correct?

13     A.   To my knowledge at this point, that is correct.

14     Q.   Okay.

15          Now, would you take a look at, in the white book,

16  sir, this would be Exhibit 24.

17     A.   Before we get into this, for the record I never

18  did get to -- received a copy of this, nor have I been able

19  to review it, and I did ask for it.

20     Q.   Well, there's a copy right there.

21     A.   It's a little late now, but I -- just so that you

22  understand.  I just want it on the record.

23     Q.   Well, if there's any part of this that you believe

24  is incorrect you can certainly say so.

25          What I would like you to look at is, and I do

1  apologize because not all of the pages of your transcript

2  are actually in here because I didn't deem them relevant to

3  the case today.  But I would like you to take a look at

4  page 17 of the transcript.  This is transcript pages 65 to

5  68.  Do you have that, sir?

6      A.   Yes.

7      Q.   All right.

8           And are you looking at or can you look at page 67

9  of the transcript?

10     A.   Yes.

11     Q.   It starts:

12          "Question:  During the course of the

13          lawsuit in the District of Columbia."

14          Do you see that?

15     A.   Yes.

16     Q.   All right.

17          "Question:  During the course of the

18          lawsuit in the District of Columbia, the

19          Superior Court litigation that your father

20          and your brother were involved in, did you

21          ever offer to provide your brother or your

22          father a copy of the trust document?

23              Answer:  I did not.

24              Question:  Did you have any

25          discussions with your brother or your

1              father regarding the trust document?

2                  Answer:  I wish I had.  I assumed

3              falsely, I suppose, that both of them had

4              it.  They both had competent attorneys,

5              and that their attorneys would ask for

6              them and they would provide them.  Had I

7              known and had I had the gumption to jump

8              into somebody else's case, I wish to God

9              that I would have given it to them then.

10            And I didn't know, and I didn't, and I

11            believed my brother and my father had the

12            sense to do that, and I believe that their

13            attorneys were competent enough to ask the

14            questions, and I beat myself up that I

15            didn't, but the answer is no."

16          I read that correctly, didn't I?

17    A.   Yes.

18    Q.   Okay.

19          So during the entire course of the litigation,

20   even though you knew how important the trust documents

21   would be to absolve your brother from any responsibility,

22   you never talked to your brother or your father about them?

23   Never gave them to the attorneys?  Never talked to the

24   attorneys about them?  That's your testimony, right?

25    A.   Yeah.

1    Q.   Okay.

2         And during the course of that litigation, your

3    father had the same issue.  You said in your deposition,

4    and I can quote it here if I need to, I'm sure I don't, in

5    your deposition that you knew that your, the relationship

6    between your brother and your father had been strained for

7    years because your brother was still on the property at

8    1610 Riggs Place, right?

9    A.   Yes.

10   Q.   And despite your knowledge of that -- and you also

11   knew that the reason that he was being sued was because he

12   was a titled owner of the property.  You already said that

13   in response to Mr. Albert's questions, right?

14   A.   Yes.

15   Q.   And yet for the entire period of time that you

16   were aware of the litigation, which was starting when, in

17   2015?

18   A.   I -- yeah.  I don't know the date that it

19   happened, but shortly after they were filed, so.

20   Q.   Okay.

21   A.   So that was 2015, then yes.

22   Q.   So for almost three years you never brought it up?

23   A.   No.

24   Q.   And despite the fact that your brother, your

25   father, and your sister-in-law also knew about the

1  transaction, apparently they never brought it up either?

2      A.   That's accurate.  That's correct.

3      Q.   All right.

4           Now, the reason for that wasn't the fact that your

5  father had all kinds of issues with respect to taxes and

6  other obligations, was it?

7      A.   The reason for what?

8      Q.   Not bringing the trust documents up?

9      A.   I have no idea why he didn't bring 'em up.  Like I

10 said, I assumed he would have.  I don't know why he didn't

11 --

12     Q.   Right, I think -- right.  I think everybody would.

13 Sure.  But you never talked to him about it?

14          Never said, "Hey, did you guys bring up the

15 trust?"

16     A.   No.

17     Q.   "Hey, Len, remember that trust?"  You never said

18 that?

19     A.   No, I didn't.

20          THE COURT:  You remembered the trust, clearly,

21 when your brother called you --

22          THE WITNESS:  No.

23          THE COURT:  -- and said, "I've been sued?"

24          THE WITNESS:  No, actually when he first called me

25 did I remember the trust?  I didn't.  I mean, I -- you

1  know, I didn't until later on and I remembered.  I don't --
2  yeah, I don't remember how I remembered.  I mean, I -- I
3  don't know.  I wish I'd have known.  I, you know, I -- I
4  don't know.

5          You know, what I can tell you is I do too many
6  cases.  I do -- I'm dealing with my son that had drug
7  issues.  I'm dealing with my daughter and my wife, and to
8  be frank, you know, I can't babysit the entire world,
9  especially my own family.  I'm not babysitting my family.
10 So should I have done it?  Yeah.  Like I said, I beat
11 myself up that my brother's in this spot and my father's in
12 this spot.  I didn't do it.  What I did was took care of my
13 family the best I could to try to keep my son out of jail
14 and off drugs, tried to keep my practice afloat.  And no, I
15 didn't do it, sir.

16         THE COURT:  So when Mr. Albert called you and
17 said, "Max Salas says that you prepared a trust document,"
18 did that jog your memory?

19         THE WITNESS:  Yes.  I said, "Yeah, we did.  Let me
20 find it."

21         THE COURT:  But you didn't remember it when Len
22 Salas called you and said, "I've been sued"?

23         THE WITNESS:  I didn't put two and two together
24 about it.  I mean, like I said, I thought they had it.  I
25 didn't have it.  I didn't think about it.  I just didn't --

1  no, I mean --

2          THE COURT:  All right.

3          THE WITNESS:  -- I don't know.  No.

4          BY MR. McNUTT:

5      Q.   Mr. Salas, if I recall correctly, you just

6  testified in response to a question by Mr. Albert that you

7  were surprised at Len's involvement in the lawsuit because

8  you knew about the trust, and that occurred --

9      A.   I knew --

10     Q.   -- shortly after the case was filed?

11     A.   Yeah, I mean I knew that he had the deal.  I knew

12  that -- I was surprised.  I was surprised.

13     Q.   So you did know and you didn't bring it up?

14     A.   I guess.  I knew there was a document at some

15  point.  I didn't -- I didn't know where it was.  They had

16  copies.  I didn't do any digging.  I was lazy.  I just

17  waited.  You know, I waited for them to tell me, for the

18  attorneys to ask for it.  I just didn't go digging.  I

19  didn't -- I didn't get into the case.

20     Q.   You knew that there was a reason your father

21  didn't want the trust documents known, didn't you?

22     A.   No, I didn't.

23     Q.   Okay.

24          Well, I don't see any other explanation, do you?

25     A.   Explanation --

1     Q.   I didn't think so.

2     A.   -- for what?

3          I didn't understand the question.

4     Q.   Let me ask you this, Mr. Salas, do you know where

5     your father lived in July of 2010?

6     A.   1610 Riggs Place.

7     Q.   And do you know where your brother lived in 2010?

8     In July of 2010?

9     A.   No, I don't.

10    Q.   Did he live in the District of Columbia?

11    A.   In 2010 I believe he did, yes.  Yes, he did.  Yes.

12    Q.   All right.

13         So I'm assuming that mail service works well from

14    your office in Colorado, right?

15    A.   Yes.

16    Q.   And I'm assuming back in 2010 that the internet

17    worked reasonably well from your office in Colorado?

18    A.   Yes.

19    Q.   Okay.

20         So you could have sent the trust documents and the

21    quit-claim deed to your brother or your father, and they

22    could have signed them in D.C., right?

23    A.   They could have.

24    Q.   But instead you chose, or one of them chose to

25    have it done in Colorado?

1     A.   I believe we did that because they were there for

2 the holiday.  It was July 6th.  I think they were there for

3 the holiday weekend and everybody was together, so that's

4 how we did it, but yes, that's true.

5     Q.   Was there something about Colorado law that you

6 thought would protect either party more?

7     A.   No.

8     Q.   In fact, you didn't even know what the difference

9 was, if any, between Colorado law and D.C. law, right?

10     A.   That's accurate.

11     Q.   Yeah.

12     Are you aware as you sit here today whether or not

13 this trust document, the documents that you've prepared,

14 created a valid trust under D.C. law?

15     A.   As of today I don't know.

16     Q.   Are you aware as of today whether that trust

17 document created a valid trust under Colorado law?

18     A.   I don't know.

19     Q.   All right.

20     When you prepared it in July of 2010, were you

21 aware of whether or not the trust documents created a valid

22 trust under Colorado law?

23     A.   I believe at the time it did, yes.

24     Q.   What makes you say that?

25     A.   I pulled the form from stock form in Colorado.  I

1   assumed it was accurate.

2       Q.   In the form that you pulled did it say anything

3   about naming a trust with the same trustee and beneficiary?

4       A.   I don't recall that, no.

5       Q.   Yeah.

6           And you didn't know at the time that you created

7   the trust whether the trust was valid under D.C. law

8   either, right?

9       A.   I think I answered that.  I did not know.

10      Q.   Well, I apologize, but I think I asked you as of

11  today rather than as of July of 2010, so --

12      A.   So no.

13      Q.   -- I wanted to go back and cover both things.

14      A.   Understood.  My apologies.

15      Q.   Now, as you described the transactions and the

16  purpose of the transactions, as you sit here today you're

17  not aware whether your father at any time could have

18  obtained a mortgage, deed of trust, or even a deed to the

19  property in his own name without the help of your brother

20  Len, correct?

21      A.   Do I know if he could have?

22      Q.   Yeah, do you know?

23      A.   No, I don't.

24      Q.   Okay.

25          In fact, you're not aware at any time of your

02 000303
897

1   father's ability to obtain property or a mortgage or deed

2   of trust on property in his own name, right?

3      A.  I don't know.

4         MR. McNUTT:  I think that's all I have, Your

5   Honor.

6         MR. ALBERT:  Briefly, Your Honor.

7                REDIRECT EXAMINATION

8         BY MR. ALBERT:

9      Q.  Why would it be to your father's advantage not to

10  tell people about the trust?

11        MR. McNUTT:  Objection.

12        THE COURT:  It's overruled.

13        THE WITNESS:  I don't know.

14        BY MR. ALBERT:

15      Q.  Can you think of any reason?

16      A.  Not at all.

17        MR. McNUTT:  Objection.  If he said he doesn't

18  know, he doesn't know.

19        THE COURT:  Sustained.  That answer is stricken.

20        BY MR. ALBERT:

21      Q.  Do you -- you mentioned your father had some tax

22  problems.  Do you know whether those tax problems were

23  eventually resolved?

24      A.  I don't know.

25      Q.  Okay.

```
 1           And look at Exhibit C, please.  And that's the
 2  trust document.  Look at paragraph 14 on the third page.
 3       A.   Yes.
 4       Q.   Could you read that to me, please?
 5       A.   Yes.
 6                "The trust has been executed and
 7                delivered in the State of Colorado and
 8                shall be instructed and administered
 9                according to the laws of Colorado.  In
10                witness whereof Grantor and Trustee have
11                executed the agreement in Colorado."
12            MR. ALBERT:  No further questions, Your Honor.
13            THE COURT:  Anything else of this witness?
14            MR. McNUTT:  No, Your Honor.
15            THE COURT:  May this witness be excused?
16       (No verbal response).
17            THE COURT:  You're excused.  Mr. Salas, thank you
18  for coming from Colorado.
19            THE WITNESS:  Yes, Your Honor.  Thank you.
20       (At 5:18 p.m., witness excused.)
21            MR. McNUTT:  Your Honor, if I may, it's now
22  approaching 5:30.  Rather than get started on another line
23  of questioning, would this be a good time to break since
24  we're going to have to come back anyway?
25            THE COURT:  Tell me what you're going to do.
```

1    You're going to re-call Max Salas as your --

2              MR. McNUTT:  Yes, Your Honor, and I --

3              THE COURT:  -- next step?

4              MR. McNUTT:  I told Mr. Albert that I probably

5    have another hour with Mr. Max Salas.

6              THE COURT:  Then who else do you have as

7    witnesses?

8              MR. McNUTT:  That's it.  That would be just --

9              THE COURT:  And who else do you have as witnesses?

10             MR. ALBERT:  Judge, I would probably put Max on

11   again on direct testimony.

12             THE COURT:  And that's it you think?

13             MR. ALBERT:  That would be it.  Yes, sir.

14             THE COURT:  So what time do you want to resume

15   tomorrow?

16             MR. ALBERT:  Judge, I have those business cases

17   Martini and TK at 341 at 1:00 tomorrow.

18             THE COURT:  So do you want to start early tomorrow

19   morning?

20             MR. ALBERT:  I have a, one of my Creditor's

21   committee counsel, I have a 9:00 meeting by phone that

22   should last about 15 minutes.  Besides that I'm good in the

23   morning.

24             MR. McNUTT:  I'm free all day tomorrow, Your

25   Honor.

05 000306
900

1          THE COURT:  So do you think we can start at 10:00

2    --

3          MR. McNUTT:  I could do morning, afternoon.

4          THE COURT:  -- and finish it up in time enough for

5    Mr. Albert to make a 1:00 341?

6          MR. ALBERT:  It's just downstairs, yeah.

7          MR. McNUTT:  I would hope.

8          THE COURT:  We can start at 9:30 if you'd like.  I

9    -- if you think we can finish in two hours.

10          MR. McNUTT:  I think we can, Your Honor.  I

11    hesitate only because I'm terrible at predicting this.  I

12    always take longer than I think, but we've got a lot in,

13    and I would think that I need no more than an hour, which I

14    think would probably mean that two hours or so would do it.

15    I would prefer not to try to -- I live a long way away,

16    Your Honor.  I would prefer not to try to come in at 9:30

17    if at all possible.

18          THE COURT:  If he wanted -- then we'll start at

19    10:00 or 10:30 depending upon what the parties agree upon.

20          MR. ALBERT:  I don't have to, you know, take a

21    lunch break, Judge.  I can go straight through to 1:00.

22          MR. McNUTT:  Yeah, I can as well.

23          MR. ALBERT:  But of course that's up to your

24    deputy and your --

25          THE COURT:  So Mr. McNutt, you tell me, 10:00 or

1  10:30?

2          MR. McNUTT:  10:00 is fine, Your Honor.

3          THE COURT:  This matter is continued until

4  tomorrow morning at 10:00 a.m.

5          Thank you.

6          MR. McNUTT:  Thank you, Your Honor.

7          MR. ALBERT:  Thank you, Judge.

8          Thank you, Phil.

9          THE CLERK:  All rise.

10          Court stands in recess.

11          THE COURT:  You're excused

12      (At 5:21 p.m., proceedings adjourned to resume the

13      following day, August 23, 2018 at 10:00 a.m.; off the

14      record.)



# Transcript of Len Salas

**Date:** August 27, 2021
**Case:** Brekelmans, et al. -v- Salas

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
1        IN THE UNITED STATES BANKRUPTCY COURT
2        FOR THE MIDDLE DISTRICT OF TENNESSEE
3              Nashville, Tennessee
4    - - - - - - - - - - - - - - -x
5   IN RE:              :
6   LEN SALAS,          : CHAPTER 7
7   Debtor-in-possession  : CASE NO:  18-02662
8                       :  JUDGE:  HARRISON
9                       :
10  (Caption continued on next page)
11   - - - - - - - - - - - - - - -x
12
13
14           Deposition of LEN SALAS
15           Conducted Virtually
16           Friday, August 27, 2021
17           11:13 a.m. EST
18
19
20
21
22
23   Job No.: 393647
24   Pages: 1 - 199
25   Reported By: Cynthia A. Whyte
```

**2**

```
1   (Caption continued from previous page)
2
3   NICOLAAS BREKELMANS      :
4   AND GAIL GREGORY     :  ADVERSARY PROCEEDING NO.
5   BREKELMANS,          :  3:20-ap-90027
6   CO-PERSONAL          :
7   REPRESENTATIVES OF   :
8   THE ESTATE OF NINA   :
9   BREKELMANS, et al.,  :
10  In their capacity as :
11  authorized           :
12  representatives of   :
13  the Estate of Len    :
14  Salas,               :
15          Plaintiffs,  :
16  v.                   :
17  MAX SALAS,           :
18          Defendant    :
19
20
21      Deposition of LEN SALAS, conducted virtually
22
23
24   Pursuant to notice, before Cynthia A. Whyte,
25   Notary Public in and for the State of Maryland.
```

**3**

```
1            A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFFS:
4      PHILIP J. McNUTT, ESQUIRE
5      LAW OFFICE OF PHILIP J. McNUTT, PLLC
6      11921 Freedom Drive, Suite 584
7      Reston, Virginia 20190
8      (703) 904-4380
9
10  ON BEHALF OF DEFENDANT:
11     PHILLIP G. YOUNG, JR., ESQUIRE
12     THOMPSON BURTON, PLLC
13     One Franklin Park
14     6100 Tower Circle, Suite 200
15     Franklin, Tennessee  37067
16     (615) 465-6000
17
18  ALSO PRESENT:
19     JUSTIN WOODWARD, AV Technician
20     MINDY JOHNSON
21     GAIL BREKELMANS
22     NICOLAAS BREKELMANS
23     KENDRA ROWE SALAS
24
25
```

**4**

```
1            C O N T E N T S
2   EXAMINATION OF LEN SALAS           PAGE
3   By Mr. McNutt                        7
4   By Mr. Young                       170
5   By Mr. McNutt                      188
6
7            E X H I B I T S
8          (Attached to the Transcript)
9   LEN SALAS DEPOSITION EXHIBITS      PAGE
10  Exhibit 1   Subpoena                12
11  Exhibit 2   Irrevocable Trust Agreement   33
12  Exhibit 3   Document to Max Salas from
13              IRS                     41
14  Exhibit 5   E-mail chain, LenSalas000009
15              to LenSalas000010       43
16  Exhibit 6   E-mail chain, LenSalas000011
17              to LenSalas000012       48
18  Exhibit 36  Motion for Relief from
19              Automatic Stay          51
20  Exhibit 24  Len Salas Bankruptcy
21              Schedules, 4/18/18      57
22  Exhibit 7   E-mail, 6/21/11, to Mr.
23              Goldstein from Max Salas,
24              LenSalas000013          69
25
```

5

E X H I B I T S   C O N T I N U E D

(Attached to the Transcript)

| LEN SALAS DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 12 | E-mail chain, LenSalas 000021 | 80 |
| Exhibit 13 | E-mail chain, LenSalas 000022 | 81 |
| Exhibit 19 | E-mail, 2/27/12, to Ms. Boileau from Max Salas, LenSalas000034 | 82 |
| Exhibit 20 | List of personal property, LenSalas000035 | 86 |
| Exhibit 21 | List of household property, LenSalas000036 to 000037 | 89 |
| Exhibit 32 | 2015 Income Tax Return | 98 |
| Exhibit 33 | 2016 Income Tax Return | 102 |
| Exhibit 28 | SunTrust Loss Mitigation Form, 3/18/16, Salas002271 to Salas002292 | 103 |
| Exhibit 34 | 2017 Income Tax Return | 118 |
| Exhibit 25 | Statement of Financial Affairs, 4/18/18 | 120 |
| Exhibit 23 | Trust Registration Statement | 127 |
| Exhibit 30 | Len Salas transcript, 3/9/16 | 137 |

6

E X H I B I T S   C O N T I N U E D

(Attached to the Transcript)

| LEN SALAS DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 8 | E-mail chain, LenSalas 000014 to 000015 | 161 |
| Exhibit 9 | E-mail chain, LenSalas 000016 to 000018 | 161 |
| Exhibit 10 | E-mail, 6/22/11, to Max Salas from Len Salas, LenSalas000019 | 162 |
| Exhibit 11 | E-mail, 6/22/11, to Len Salas from Max Salas, LenSalas000020 | 163 |
| Exhibit 14 | E-mail, 1/17/12, to Ms. Boileau from Max Salas, LenSalas000023 to 000024 | 166 |

7

P R O C E E D I N G S

LEN SALAS

Having been duly sworn, testified as follows:

BY MR. McNUTT:

Q   Mr. Salas, this is Phil McNutt.  We've met before.  You know that I represent the Brekelmans estate and the McLoughlin estate with respect to their claims in your bankruptcy proceeding and that of your father, Max Salas, which is currently underway in the District of Columbia.

Do you understand that so far?

A   Yeah.  Yes.

Q   All right.  And you are here for a deposition.  I know that you have been deposed before, but can you tell me the last time that you remember being deposed?

A   I don't.

Q   Were you deposed in the Superior Court case in the District of Columbia involving the death of Nina Brekelmans and Michael McLoughlin?

A   Yes.

Q   And that was in March of 2016.  Does that sound correct?

A   Sure.  I don't know.

8

Q   Okay.  Tell me your full name and your present address, Mr. Salas.

A   Len Salas, 1018 Vince Court.

Q   And that's in Murfreesboro, Tennessee; correct?

A   Yes.

Q   Is that where you are now?

A   Yes.

Q   And are you in a specific room in your house?

A   Yes.

Q   Are you alone in the room?

A   No.

Q   Who else is in the room with you?

A   My wife.

Q   And you're sitting in front of a computer; is that correct?

A   Yes.

Q   Is it a laptop or a desktop?

A   Laptop.

Q   Are you the only one that has access to it?

A   No.

Q   Right now are you the only one who has access to it?

13

1    A   Yes.
2    Q   Okay.  And let me go through the requests
3  and ask you to give me a little bit of
4  information.
5         With respect to Item No. 1:  "All email
6  or other communications between Len Salas, and Ron
7  Salas, or Max Salas, for the period 2010 through
8  the present regarding the property at 1610 Riggs
9  Place, NW, Washington DC, the sale or refinancing
10 of that property, the Sun Trust Deed of Trust on
11 that property or attempts to sell, convey or
12 otherwise dispose of, that property."
13        Did I read that correctly?
14   A   Yes.
15   Q   Okay.  Can you tell me what efforts you
16 made to obtain any documents related to Request
17 No. 1?
18   A   I looked through my e-mail.
19   Q   Did you do anything else?
20   A   No.
21   Q   Okay.  And you did produce some documents
22 which I'll get into later.  Are you confident that
23 you found every e-mail that you believe fits the
24 description in No. 1?
25   A   Yes.

14

1    Q   Let's go to No. 2:  "The originals and
2  all copies of the Quitclaim Deed executed in
3  Colorado in July, 2010."
4         AV TECHNICIAN:  You wanted me to go to
5  Exhibit 2; correct?
6         MR. McNUTT:  No, no, no.  It's still on
7  the same exhibit.  No. 2 is just the item on that
8  page.  Thank you.
9         AV TECHNICIAN:  Sorry about that.
10        MR. McNUTT:  That's all right.
11   Q   Mr. Salas, do you see that No. 2, "The
12 originals and all copies of the Quitclaim Deed
13 executed in Colorado in July, 2010"?
14   A   Yes.
15   Q   What did you do to obtain those
16 documents?
17   A   I looked through my Dropbox and submitted
18 what I had.
19   Q   So what you submitted to me was an
20 electronic copy?
21   A   Yes.
22   Q   Of the quitclaim deed?
23   A   Yes.
24   Q   Are you aware of the existence of any
25 original wet ink signature originals of that

15

1  quitclaim deed?
2    A   Yes, they are -- yes, I'm aware of them.
3  What was your question?  I'm sorry.
4    Q   That was it, whether you're aware of any
5  wet ink signature originals of the quitclaim deed.
6    A   Yes.
7    Q   And do you know where they're presently
8  located?
9    A   I do not know.
10   Q   When is the last time that you saw a wet
11 ink signature original of the quitclaim deed?
12   A   When I gave it to my lawyer shortly
13 before the trial.
14   Q   Okay.  And that was a wet ink original
15 you're saying --
16   A   Yes.
17   Q   -- or was that a copy?
18   A   I believe mine was an original.
19   Q   Okay.  So --
20   A   Which did not get admitted into evidence.
21   Q   I'm sorry?
22   A   Which did not get admitted into evidence
23 during the trial.
24   Q   Do you know where that wet ink signature
25 copy is right now?

16

1    A   No.
2    Q   And you said your attorneys.  You mean be
3  your attorneys in the Superior Court case?
4    A   Yes.  The one in D.C., that one I guess,
5  yeah.
6    Q   Do you recall how you obtained that wet
7  ink signature original with respect to the
8  Superior Court trial?
9    A   Yes.
10   Q   Okay.  How?
11   A   I found it.
12   Q   And where did you find it?
13   A   In a filing cabinet.
14   Q   At your home?
15   A   I don't know.  I don't remember.
16   Q   Well, you said you found it in a file
17 cabinet.  Was it your file cabinet?
18   A   Yes.
19   Q   In other words, it wasn't located
20 anywhere else but where you live; correct?
21   A   I don't remember.
22   Q   Was it in a file cabinet that you believe
23 belonged to someone other than you?
24   A   No.
25   Q   Okay.  Other than the original that you

17

1  just described, when is the last time that you saw
2  a wet ink signature original of the quitclaim deed
3  executed in July of 2010?
4      A  **Probably July of 2010.**
5      Q  Okay.  And just to be clear, when you say
6  that you found it in a file cabinet, I think you
7  said before the trial but I want to make sure I'm
8  not misstating your testimony.
9      A  **Oh, I'm sorry; maybe I misunderstood the**
10 **question.**
11     Q  I'm sorry?
12     A  **Maybe I misunderstood the previous**
13 **question.**
14     Q  Well, all right.  And what are you saying
15 you may have misunderstood?
16     A  **What was the previous question?**
17     Q  The previous question was -- I don't know
18 the exact words, but rather than have the court
19 reporter read it back, I'll just paraphrase it for
20 you -- was the last time you saw a wet ink
21 signature original of the quitclaim deed, and I
22 believe your answer was you found one in a file
23 cabinet that either belonged to you or was at or
24 near your residence.  And I'm trying to find out
25 what time frame that was.

18

1      A  **Oh, okay.**
2      Q  Can you tell me what time frame?
3      A  **Shortly before the trial, somewhere in**
4  **the trial, between, you know -- I don't know.**
5  **Shortly before the trial.**
6      Q  Okay.  And the trial, I will represent to
7  you that the first day of the trial was
8  approximately March 27, 2018.  Are you saying that
9  it was sometime immediately prior to that date,
10 March 27, 2018?
11     A  **Yes.**
12     Q  Now, to be fair, your attorneys filed on
13 your behalf a motion I believe in February of 2018
14 that related to the existence of the quitclaim
15 deed.  Do you remember that?
16     A  **No, I don't know.  I do not.**
17     Q  Okay.  Do you know if prior to or about
18 your attorneys filing a motion in or about February of
19 2018 that you found this wet ink original
20 document?
21     A  **I'm sorry; state your question again.**
22     Q  Yeah.  Do you know if you found the wet
23 ink signature original that you have just
24 testified to before or after your attorneys filed
25 the motion, I believe it was a motion for summary

19

1  judgment --
2      A  **I assume --**
3          THE COURT REPORTER:  If you can wait
4  until the question is finished because I didn't
5  hear the very end.
6          THE WITNESS:  Sorry about that.
7          (The court reporter read the last
8  question.)
9      Q  In the Superior Court case, that was the
10 question.
11         Maybe the best way to ask it is this:  I
12 will represent to you that your attorneys filed a
13 motion with a copy of the proposed quitclaim --
14 well, I say proposed -- of the quitclaim deed in
15 approximately February of 2018.  Do you know if
16 what they had was the original, the wet ink
17 signature, or just a photocopy?
18     A  **I don't know.  I don't remember exactly,**
19 **but I -- I don't know what they found.  But I**
20 **think I found that -- I must have found that wet**
21 **ink copy before that filing.  That's what I assume**
22 **set that motion in file and I gave it to the**
23 **lawyers and they moved forward.  How they -- they**
24 **proceeded with due diligence, I assume.**
25     Q  Sure.  And between July of 2010 and

20

1  approximately February of 2018 you're not aware of
2  the existence of any other wet ink original of the
3  quitclaim deed; is that accurate?
4      A  **I remember the day we signed it.  I don't**
5  **know.  I assume -- I don't remember.  We were in**
6  **Ron's office, I signed a copy -- I signed**
7  **something -- I signed a copy, Kendra signed a**
8  **copy, Max signed a copy, Ron saw it.  You know, I**
9  **don't remember.  That's the -- I filed it away.**
10 **After that I filed it away and forgot about it and**
11 **that's all.  You can refer back to my subpoena**
12 **from the previous deposition about that.  I don't**
13 **remember what I said so I don't want to say**
14 **something that I didn't say that I said back then.**
15 **So you can read that transcript because I have**
16 **answered that question before.**
17     Q  Yeah.  I'm not trying to trap you; I'm
18 just trying to get as clear as I can.
19         So you believe that the document that you
20 found in your file cabinet was the original that
21 you signed in your brother's office in Colorado in
22 2010; is that accurate?
23     A  **Again, I don't know.**
24     Q  Well, you didn't sign any other original
25 of the quitclaim deed between 2010 and 2018, did

21

1  you?
2      A   I signed that copy -- I signed a piece of
3  paper that day.  I don't know if I got a copy.  I
4  don't know if I got an original.  So I don't know.
5      Q   So you don't know if you had an original
6  on that day, but you do know that you found an
7  original in February of 2018; is that correct?
8      A   I guess.  I don't know.  I don't know
9  what I found.  I found -- I don't know if I found
10 a copy.  I don't know if I found an original.  I
11 found what I found.
12     Q   Okay.  Well, are you now telling me
13 you're not sure whether what you found was a wet
14 ink original of the quitclaim deed?
15     A   Now you've put that in my mind, I don't
16 know.
17     Q   Because you're not sure?
18     A   I don't know now.
19     Q   Okay.  What about let's go to still this
20 first Exhibit, same page, No. 3: "All documents,
21 invoices, receipts, purchase orders, deeds,
22 titles, or other documents of" -- that's a
23 spelling error; sorry -- or other documents
24 "regarding your assets and liabilities during the
25 period, 2010 through 2018."

22

1      Did you look for any of these documents?
2      A   Yes.
3      Q   Did you find any?
4      A   No.
5      Q   Okay.  So with respect to whatever assets
6  and liabilities you had or incurred from the
7  period 2010 through 2018, you have no documents,
8  invoices, receipts, purchase orders, deeds,
9  titles, or other documents of any kind; is that
10 what you're saying?
11     A   I guess documents regarding your assets
12 and liabilities, for my subsequent -- because of
13 the trial and because of my subsequent bankruptcy,
14 I did list a set of assets and liabilities for
15 that that I had to submit for the bankruptcy.  I
16 believe I submitted that.  That's what I found so
17 that's what I submitted.
18     Q   Okay.  Well, let me ask you this:  During
19 the period of 2010 through 2018 did you acquire
20 any assets or purchase any assets that you believe
21 were major assets in nature?
22     A   No.
23     Q   Do you believe that you acquired or
24 purchased any assets during that period valued
25 more than a thousand dollars?

23

1      A   Oh, I guess my -- more than a thousand
2  dollars.  I guess -- I guess the house, my house.
3  I bought my house.  I don't know.  No?  No, no,
4  unh-unh.
5      Q   I know you looked to your wife then.
6  What you're saying is that the house you live in
7  now is owned by your wife; correct?
8      A   Correct.
9      Q   And it has always been owned in your
10 wife's name only; correct?
11     A   Yes.
12     Q   Okay.  Okay.  Thank you.  No. 5 on still
13 the same exhibit, it's: "All documents and
14 records related to the sale, conveyance or
15 disposition of any asset or property held by
16 you..."  Other than the property in D.C. at 1610
17 Riggs Place Northwest -- that's the home that your
18 father presently lives in.  You're aware of that;
19 correct?
20     A   Yes.
21     Q   Okay -- other than that asset, did you
22 sell, transfer, or dispose of any asset worth more
23 than a thousand dollars during the period 2010 to
24 2018?
25     A   No.

24

1      Q   Okay.
2      A   I don't know.  I'm going to say I don't
3  know because I don't remember.  I don't remember.
4      Q   Now, in response to this No. 5, did you
5  provide any documents in your document production?
6      A   I don't remember.
7      Q   All right.  Well, let's see what we have
8  here.  I have a list of your document production,
9  Mr. Salas, and I'm looking at the list, and you
10 have the trust documents, the trust EIN form; SSN
11 from the Internal Revenue Service; and then you
12 have e-mails, mostly either to or from your father
13 or from your father to Mr. Goldstein or persons in
14 his office for the period of approximately 2011
15 through early 2012 --
16     A   Oh.
17     Q   -- then you provided the list of personal
18 property that you mentioned previously, and that
19 looks to be the same list that you filed in your
20 bankruptcy.  Do you know if that's correct?
21     A   Yes.
22     Q   Okay.  And then you provided a list of
23 household property.  And I will represent to you
24 that I compared that to your bankruptcy list of
25 property and it differs, although it's similar.

---

**25**

1  Do you know what I'm talking about, the list of
2  household goods that you provided me?
3      A  I believe so, yeah, approximately.
4      Q  Okay.  And that was approximately three
5  or four pages; correct?
6      A  I don't remember.
7      Q  It was just a list of property, though,
8  nothing else, no documents of title, no e-mails,
9  no correspondence, just a list of the property;
10 correct?
11     A  I don't know.
12     Q  Okay.  And then you provided a trust
13 registration statement that I believe you obtained
14 from your brother Ron.  And that's the extent.  So
15 I don't see any documents related to the sale,
16 conveyance, or the disposition of any asset or
17 property held by you.  Do you think you provided
18 any, any such documents?
19     A  I provided what I had, what I could find.
20     Q  And you looked for these documents and
21 this is all you could provide; correct?
22     A  Yes.
23     Q  Okay.  And when you looked for these
24 documents, did you make a thorough look?  What did
25 you look through to try to attempt to find

---

**26**

1  documents in response to No. 5?
2      A  I looked through my e-mail and I looked
3  through my filing cabinet.
4      Q  Okay.  Does your wife have any files
5  related to assets or property held by you?
6      A  I don't know.  I don't remember.  I don't
7  think so.
8      Q  You didn't look for them, in any event;
9  correct?  You didn't look through any of your
10 wife's documents?
11     A  I looked what I looked at, I found what I
12 found, and I submitted what I had.
13     Q  I understand.  But I'm just trying to
14 make sure that I have the full breadth of where
15 you looked.  So you didn't look in any documents
16 your wife may have had, you only looked through
17 the documents that you had in your filing cabinet;
18 is that accurate?
19     A  Her documents are my documents at this
20 point.
21     Q  Is that a yes?
22     A  It's the same filing cabinet.  It's a
23 little cabinet and a drawer, that's it.  That's
24 what we have and that's what we keep it in.  We
25 don't keep any receipts anymore.  We don't --

---

**27**

1      Q  Okay.  So you --
2      A  We have what we have.  Everything is
3  digital now.  So I don't know.  No.  There is no
4  need to keep them.  We don't want to waste paper.
5  We are very conscious of that so we don't keep a
6  lot of paper documents around.  So...
7      Q  Okay.  So you're saying that whatever
8  documents you may have had from 2010 through 2018
9  that you did not provide may have been lost or
10 thrown away or discarded in some fashion?
11     A  If they were paper, they were recycled.
12     Q  Meaning you put them in a recycle bin and
13 somebody else took care of them, trashed them?
14     A  I don't -- if it was paper, I recycled
15 it.  I don't know I guess is the best answer.  I
16 don't know.
17     Q  All right.  What about No. 6, Mr. Salas:
18 "All agreements between you and any other person
19 or entity, respecting the payment of the SunTrust
20 Deed of Trust obligation, representing the first
21 Deed of Trust obligation on the property at Riggs
22 Place, NW, Washington, DC from 2007 through April,
23 2018"; what did you do to find any agreements that
24 would be responsive to No. 6?
25     A  I looked through my filing cabinet, my

---

**28**

1  filing system, and I found what I found, submitted
2  what I submitted.
3      Q  Did you ask your father for any documents
4  he may have had?
5      A  No.
6      Q  Did you contact SunTrust to determine if
7  SunTrust had any documents responsive to No. 6?
8      A  No.
9      Q  Okay.  Did you have any written
10 agreements between you and your father with
11 respect to the payment of the SunTrust Deed of
12 Trust or other obligations related to the property
13 in D.C.?
14     A  I don't remember any.
15     Q  Okay.  If there would have been one, you
16 would have kept it, though, I'm assuming; right?
17     A  If.
18     Q  All right.  And you did look for
19 documents in response to No. 6, didn't you?
20     A  Yes.
21     Q  All right.  You didn't find any.
22     A  Yes.
23     Q  And you would agree with me that any such
24 document would have been kept either in paper copy
25 or digitally by you --

---

29

1    A   Yes.

2    Q   -- is that fair?  Okay.

3        You didn't find any; right?

4    A   Right, yes.

5    Q   Okay.  Thank you.

6        Now, with respect to No. 7:  "All

7  financial statements which you prepared, or

8  provided to any person or party, respecting

9  your" -- well, it says "your," it's supposed to be

10 "you" -- "or your and your wife's financial

11 condition during the period 2010 through 2018,"

12 you do indicate that you provided documents.  You

13 say "See attached."  I'm not sure which documents

14 you believe were responsive.

15   A   Oh, that was the -- that -- the thing

16 that I provided for the bankruptcy prior to --

17   Q   The list of personal --

18   A   Yeah, I prepared that.

19   Q   Okay.  The list of personal property?

20   A   Yes.

21   Q   What about the list of household

22 property?

23   A   Yeah.  It was both.  They were both --

24 they were both required for the bankruptcy.

25   Q   Okay.  So other than those -- I'm sorry.

30

1        THE COURT REPORTER:  I'm sorry, sir.

2    A   Again, that's what I found so that's what

3  I submitted.

4    Q   And you attempted to find any documents

5  that you believe were responsive to No. 7;

6  correct?

7    A   Yes.

8    Q   And what you provided was the list of

9  personal property from your bankruptcy proceeding

10 and a list of household property that you and your

11 wife prepared; is that correct?

12   A   Yes.  It was also required for the

13 bankruptcy.

14   Q   Okay.  But that's not the same list that

15 was filed in your bankruptcy; correct?

16   A   I don't remember at this time.

17   Q   Did your wife help you fill it out?

18   A   I assume.  I don't know.  I don't

19 remember.

20   Q   The document that you provided, the list

21 of household property, do you know when that was

22 prepared?

23   A   Before my bankruptcy.

24   Q   Okay.  You did not prepare any document

25 like that subsequent to your bankruptcy filing in

31

1  April of 2018?

2    A   I don't remember.

3    Q   But you looked for one and you didn't

4  find any; correct?

5    A   Yes.

6    Q   Going down to No. 8, 8 says:  "All

7  records of payments, transfers or property, of any

8  nature, paid, transferred or given to you by your

9  father Max, or on his behalf, during the period

10 2007 through 2018."  And your answer is that there

11 were none to produce.  Am I correct on that?

12   A   Yes.  That's what the paper says.

13   Q   And that's what you determined after a

14 thorough review of all of the records that you

15 believe you had access to; correct?

16   A   Yes.

17   Q   All right.  Going on to No. 10, it looks

18 like there wasn't a 9 --

19       MR. McNUTT:  Can we get that exhibit

20 pulled up so we can see No. 10.  You can pull it

21 all the way up.

22       AV TECHNICIAN:  Exhibit what was that

23 again, counsel?

24       MR. McNUTT:  Same exhibit, same page, so

25 we can see the bottom of the page.

32

1        AV TECHNICIAN:  Okay.

2        MR. McNUTT:  There you go.  Thank you.

3    Q   There is No. 9 so that there's no

4  confusion on the record.  No. 10 is:  "All written

5  or recorded communications between you and your

6  D.C. Superior Court litigation counsel during the

7  period 2015 through April 2018 regarding your

8  ownership of the Riggs Place property.  And you

9  declined to answer that asserting an

10 attorney/client privilege.  Have I got that right?

11   A   Yes.

12   Q   And you're not waiving that privilege;

13 correct?

14   A   I don't understand.

15   Q   Well, it's your privilege, you can waive

16 it if you want to.  What I'm trying to establish

17 is that by your answer you do not waive the

18 attorney/client privilege and you are not willing

19 to divulge any written or recorded communication

20 between you and your D.C. Superior Court counsel.

21 Is that accurate?

22   A   Yes.

23   Q   All right.  And the same is true with

24 respect to No. 11; correct?

25   A   Yes.

37

1  the trustee is "Max E Salas." Do you see that?
2  **A  No.  Oh, yeah.  Yes.**
3  Q  Okay.  And that's your father; correct?
4  **A  Yes.**
5  Q  And your understanding is that when you
6  signed this irrevocable trust agreement, you were
7  signing it with the intent that your father be the
8  trustee of this trust; correct?
9  **A  Yes.**
10  Q  Now, in 2010 do you know where your
11  father lived?
12  **A  I believe he lived at 1610 Riggs Place.**
13  Q  In Washington, D.C.; correct?
14  **A  Uh-huh, yes.**
15  Q  To your knowledge did he ever have a
16  residence at 155 East Boardwalk, Suite 300, Fort
17  Collins, Colorado 80525?
18  **A  No.**
19  Q  Was Mr. Salas ever a resident, to your
20  knowledge, in the State of Colorado?
21  **A  Yes.**
22  Q  Your father?
23  **A  Yes.**
24  Q  Okay.  Do you know when?
25  **A  He was born there and I don't -- he lived**

38

1  **there off and on.  You have to ask him.  I don't**
2  **know.  I know he lived there.**
3  Q  Subsequent to 2007 did you ever
4  communicate with your father at an address in
5  Colorado that you understood was his residence?
6  **A  I don't know.  I don't remember.**
7  Q  Do you remember any time?
8  **A  No.**
9  Q  He was living at 1610 Riggs Place,
10  Northwest, in Washington, D.C., in 2007; correct?
11  **A  Yes.**
12  Q  In fact, I believe you were as well;
13  right?
14  **A  Yeah.**
15  Q  Or at least part of that year?
16  **A  I think so, yeah.**
17  Q  I'm sorry; say it again, please.
18  **A  Yes, I think so.**
19  Q  And are you aware between the period 2007
20  through 2018 that your father had a different
21  residence address than 1610 Riggs Place,
22  Northwest, Washington, D.C.?
23  **A  I don't know.**
24  Q  You're not aware of any, are you?
25  **A  I don't know.**

39

1  Q  Well, can you tell me any address other
2  than 1610 Riggs Place that you believe your father
3  may have resided between the period 2010 and 2018
4  other than Washington, D.C.?
5  **A  No.**
6  Q  And I just realized I gave you sort of a
7  trick question.  I understand that your father did
8  not live at the Riggs Place property for some
9  period of time after June of 2015, but he always
10  lived in the District of Columbia; isn't that
11  correct?
12  **A  As far as I know.**
13  Q  Say that again.
14  **A  As far as I know.  I don't know.  People**
15  **have secret lives, you know, people have two**
16  **families.  I don't know what he's up to.  You'd**
17  **have to ask him.**
18  Q  Sure, and I will.  I'm just trying to get
19  what knowledge you have, that's all.
20  **A  But I don't know.**
21  Q  Now, Mr. Salas, are you aware of any
22  other trust agreement that you executed or
23  delivered to your father at any time between 2007
24  and 2018?
25  **A  I don't remember.**

40

1  Q  Do you recall any other trust agreement
2  that your brother prepared for you to sign than
3  this one between the period of January 1, 2010,
4  and 2018?
5  **A  I don't remember.**
6  Q  Okay.  Do you recall any other quitclaim
7  deed that you executed other than this one that is
8  I think starting on Page 6 of this document
9  between the period January 1, 2010, and 2018?
10  **A  I don't remember.**
11  Q  If you would have executed any other
12  agreement, you would have kept a copy of it;
13  correct?
14  **A  I don't know.**
15  Q  You don't know if you would have kept a
16  copy of a trust agreement that you executed?
17  **A  Yes.**
18  Q  In the ordinary course of keeping records
19  you would have kept such a document, wouldn't you?
20  **A  I don't know.**
21  Q  You don't know.  Okay.  All right.
22  MR. McNUTT:  Justin, let's go on to
23  Exhibit 3, I think it is.
24  (A discussion was held off the record.)
25  AV TECHNICIAN:  Counsel, this is going to

53

1  PURSUANT TO SECTION 404 OF THE DISTRICT OF
2  COLUMBIA THEFT AND WHITE COLOR CRIMES ACT OF 1982,
3  EFFECTIVE DECEMBER 1, 1982 (DC LAW 4-164; DC CODE
4  22-2514), THAT THE REAL PROPERTY DESCRIBED WITHIN
5  IS EITHER CLASS 1 PROPERTY OR CLASS 2 PROPERTY, AS
6  THOSE CLASSES OF PROPERTY ARE ESTABLISHED PURSUANT
7  TO SECTION 412A OF THE DISTRICT OF COLUMBIA REAL
8  PROPERTY TAX REVISION ACT OF 1974, APPROVED
9  SEPTEMBER 3, 1984 (88 STAT. 1051; DC CODE 47-813),
10 WITH 5 OR FEWER UNITS."
11     And that's your signature; correct?
12  A   Yes.
13     Q   And it is notarized by it looks like
14 Antuanette Requejo, I believe, on the 16th day of
15 April 2007.  Do you see that?
16  A   No.
17     Q   You said no?  Look below that where it
18 says "STATE OF MARYLAND, COUNTY OF MONTGOMERY,"
19 and then it has under that a paragraph that says
20 that: "I...DO HEREBY CERTIFY THAT LEN SALAS, WHO
21 EXECUTED THE FOREGOING ATTACHED DEED OF TRUST,
22 BEARING THE DATE OF THE 16 DAY OF APRIL, 2007,
23 PERSONALLY APPEARED BEFORE ME," et cetera.  Do you
24 see that?
25  A   Yes.

54

1     Q   And that's signed by Ms. Requejo, I think
2  is how you pronounce it, first name Antuanette,
3  and her notary seal appears.  Do you see that?
4   A   No.
5     Q   You don't see that.  You don't see the
6  notary seal at the bottom?
7   A   Oh, I do now.
8     Q   Sorry; my fault.  So that's a document
9  that you signed on April 16, 2007.  And on neither
10 of those two pages is there a signature of any
11 other party; correct?
12  A   Correct.
13     Q   And you've already said that you made no
14 agreement, written agreement anyway, with your
15 father with respect to his responsibility for the
16 SunTrust loan payments; correct?
17  A   We had a -- as I said, we had like a
18 gentlemen's agreement again, so...
19     Q   I understand.
20  A   Which I testified before in the previous
21 deposition so you can --
22     Q   Right, gentlemen's agreement.  And that's
23 something you discussed with your brother last
24 week; correct?
25  A   No.

55

1     Q   You didn't, okay.
2        Okay.  And you produced no written
3  document that indicates that your father is the
4  only one responsible for payments of the SunTrust
5  Deed of Trust note; correct?
6   A   Correct, I think.
7     Q   Do you know that during the period 2010
8  to 2018 that at any time the SunTrust monthly Deed
9  of Trust payments were in default?
10  A   Say again.
11     Q   Do you know whether or not the SunTrust
12 Deed of Trust monthly payments were in default
13 during the period 2010 through 2018 at any time?
14  A   Yes.
15     Q   Do you know how many times?
16  A   No.
17     Q   Do you know if it was months?
18  A   I don't -- I don't --
19     Q   Was it years?
20  A   I don't remember.
21     Q   Okay.  Do you remember the original
22 amount of the note?
23  A   No.  You stated a number earlier.  That
24 sounded about right.
25     Q   Let's see what we have here.  Look at

56

1  Page 23 of that document.  According to this
2  document, in Paragraph 1 it states that the
3  original amount of the note was $870,000.  Do you
4  agree with that number?
5   A   Yes.
6     Q   And let's take a look at the signatures
7  under the note.  It looks like that's on Page 25.
8  And whose name do you see there?
9   A   That's mine.
10     Q   Do you see your father's name anywhere?
11  A   No.
12     Q   Anyone else?
13  A   Tamar Hill, officer.
14     Q   Okay.  She was a member of SunTrust;
15 correct?
16  A   I don't know.
17     Q   It says "SUNTRUST MORTGAGE, INC." Above
18 her name; correct?
19  A   Yes.
20     Q   All right.  She wasn't obligated under
21 the note, as far as you know, was she?
22  A   I don't know.
23     Q   Do you know if anyone else other than you
24 was obligated under the note?
25  A   No, I don't know.

61

1    Q   And "Part 1"says: "List All Secured
2   Claims," and the first two you list are the
3   "Estate of Michael Patrick McLoughlin" and the
4   "Estate of Nina Brekelmans." Do you see that?
5    A   Yes.
6    Q   Now, do you know if in your bankruptcy
7   you filed any objections to those claims?
8    A   I don't remember.
9    Q   Do you know if those claims were allowed
10  in your bankruptcy case?
11   A   I don't know.
12   Q   Do you know whether or not judgments were
13  obtained on behalf of those two estates in April
14  of 2018?
15   A   I don't know.
16   Q   You don't know. You don't know there
17  were judgments entered against you?
18   A   What are you -- I don't understand the
19  question, I guess. I don't know. That's why I
20  said I don't know.
21   Q   Do you know if you became obligated
22  sometime in April of 2018 to pay the estate of
23  Michael McLoughlin, Jr., $7,700,000?
24   A   Oh, yes.
25   Q   Do you know --

62

1       THE COURT REPORTER: I'm sorry, sir; I
2   didn't hear you.
3       THE WITNESS: Which sir?
4       THE COURT REPORTER: I heard you say yes.
5   I didn't hear what you said after that.
6       THE WITNESS: I said -- I don't remember
7   what I said actually. I said I assume -- I said
8   that's why it's on the bankruptcy, I guess, is
9   what I think I said.
10   Q   And at the same time a judgment of
11  $7,500,000 was entered against you in favor of the
12  estate of Nina Brekelmans; correct?
13   A   Yes.
14   Q   Now, those claims are listed as
15  contingent and disputed on your bankruptcy
16  schedules, but you never objected to their claims
17  in your bankruptcy as far as you know; right?
18   A   I don't remember.
19   Q   Do you know whether or not the assets
20  obtained by your trustee were paid in part to the
21  two estates that I just mentioned?
22   A   I remember something -- I remember you
23  said that something was paid, some -- everybody
24  got percentages of something. I don't know what
25  the final -- I don't remember what the final

63

1   outcome of who got what, so you would have to ask
2   him I guess.
3    Q   I'm looking at the "Sun Trust Mortgage"
4   below that. Do you see that? This is under 2.3
5   on the left. Do you see the numbers 2.3, same
6   page?
7    A   No, I do not.
8       MR. McNUTT: You have to go down, Justin,
9   go down a little bit. Some more. Next page I
10  guess it is.
11      Stop there. Yeah, there we go.
12   Q   Do you see 2.3, "Sun Trust Mortgage"?
13   A   Yes.
14   Q   All right. And you listed the balance
15  owed as $868,754.73. Can you tell me where you
16  got that number?
17   A   No.
18   Q   Do you know if that was the actual amount
19  owed to SunTrust mortgage at the time that you
20  filed your bankruptcy in April of 2018?
21   A   I don't know.
22   Q   Do you know whether your father listed a
23  different amount on his bankruptcy schedules?
24   A   No.
25   Q   Between you and your father, who would

64

1   you believe had the better knowledge of what the
2   current amount due SunTrust was as of April 18,
3   2018?
4    A   Him.
5    Q   Okay. And do you have any reason to
6   disagree with the number that your father stated
7   on his schedules in 2018, in April of 2018?
8    A   No.
9       MR. McNUTT: Justin, let's go back to
10  Exhibit 6.
11      AV TECHNICIAN: Okay. One moment.
12   Q   This is, again, the e-mail from your
13  father, Max Salas, to Mr. Goldstein on June 21,
14  2011. You have produced no document that I'm
15  aware of related to any communications between
16  your father and anyone else related to the
17  quitclaim deed since July 6, 2010. Are you aware
18  of any document that exists between the period of
19  July 6, 2010, to June 21, 2011, related to the
20  recording of the quitclaim deed?
21   A   No.
22   Q   And with respect to your own records and
23  documents, you looked at everything you thought
24  was available to you and could not find any
25  documents between July 6, 2010, and June 2011; is

69

1    AV TECHNICIAN: One moment.
2    This is Exhibit 7. Is this what you're
3 looking for?
4    MR. McNUTT: Yes, sir.
5    AV TECHNICIAN: Okay.
6    Q   Mr. Salas, would you look at what has
7 been -- well, it hasn't been marked, but I guess
8 it's Exhibit 7. It looks like it's going to be
9 marked pretty soon. And it is so marked.
10   (Len Salas Deposition Exhibit 7 marked
11 for identification and is attached to the
12 transcript.)
13   Q   This is another e-mail that you produced
14 back on I believe it was the 23rd of August. And
15 it is an e-mail that the title of the e-mail is
16 "trust #" and then it says Max Salas to
17 Mr. Goldstein, it looks like, with a copy to you
18 and a copy to your brother and it looks like the
19 "EINNumber" is attached dated June 21, 2011. Do
20 you see that?
21   A   Yes.
22   Q   All right. And you got a copy of this
23 e-mail. So you're aware that there was this
24 communication between your father and
25 Mr. Goldstein on June 21, 2011; correct?

70

1    A   Yes.
2    Q   And there were a series of communications
3 between your father and Mr. Goldstein's office. I
4 believe the attorney's name was Lynne, I will
5 pronounce it, Boileau, B-O-I-L-E-A-U, between
6 approximately this time and early 2017, and the
7 reason I know that is because they're in the
8 e-mails that you produced.
9    After February of 2017 are you aware of
10 any activity with respect to the recordation of
11 the quitclaim deed?
12   A   I don't remember any.
13   Q   Okay. Are you aware of any conversations
14 or communications you had with your father
15 regarding the recordation of the quitclaim deed
16 after February of 2012?
17   A   I don't remember.
18   Q   In your previous testimony in your
19 bankruptcy case you indicated that you had
20 numerous conversations with your father through
21 early 2015 about getting your name off the title
22 to the property. Do you recall that?
23   A   Yeah. If that's what you meant, sure,
24 yeah. I told him multiple times. Is that what
25 you mean?

71

1    Q   Right.
2    A   Yeah, I mean, I told him multiple times
3 to get it off my name -- to get my name off of it,
4 to get my name off the loan, yes.
5    Q   Not off the title.
6    A   That was a different question.
7    Q   Are you saying get your name off the loan
8 or your name off the title?
9    A   I wanted both. Well, I wanted both. And
10 I guess I didn't remember about the trust and so
11 then it was the question of the loan at that
12 point.
13   Q   All right. Now --
14   A   Maybe. I don't know. I don't remember
15 that much about it. This is ten years ago. You
16 know, I don't even remember.
17   Q   You didn't review your prior testimony in
18 your bankruptcy case before this deposition, did
19 you?
20   A   No.
21   Q   You didn't review your testimony in your
22 father's bankruptcy case in August of 2018 before
23 your deposition today; right?
24   A   No.
25   Q   You made several communications every

72

1 year since 2010 asking your father for an update
2 on getting your name off the loan and the title.
3 That was your previous testimony. Is that still
4 accurate?
5    A   Sure, yes. I mean, yeah, I said that. I
6 remember saying that.
7    Q   And that's true; correct?
8    A   Yes.
9    Q   Did you do this in 2010 after July 6?
10   A   I don't remember when I started to ask.
11   Q   If you were so concerned about getting
12 your name off the loan and the title, I would
13 think after months went by after July of 2010 you
14 would have been asking your father what's up with
15 this and --
16   A   I remember now, okay. Yes, because I
17 wasn't able -- yes. This sounds about right,
18 2010, 2011, because I wanted -- I had been -- I
19 got married in 2010 and we wanted to buy a house
20 together in my name -- in our joint names, and I
21 wasn't able to. So that was the precipice of all
22 of the e-mails to get the -- I couldn't qualify
23 for a loan for my house so we had to just -- so my
24 wife bought -- so it's not -- so I don't even have
25 a -- yes, so that was the precipice. That's when

73

1 the communication started and that's when I
2 started haggling him about getting me off the loan
3 so I could thus qualify to get my name on my house
4 and that loan.
5 So that house was always in my wife's
6 name. And all of our houses are in her name
7 because -- well, I guess they're not our houses,
8 they're her houses. So that was the precipice.
9 So that's probably when the communications
10 started. And there were various on and off and I
11 would, you know, bug him for a while and I would
12 get no answer and then I would start again and --
13 I don't know. I guess it was like that until this
14 whole thing happened.
15 Q And that happened in every year, 2011,
16 2012, 2013, 2014, and 2015; right?
17 A Probably. I can't -- I don't remember
18 specific dates.
19 Q You said that you started and stopped.
20 So maybe a few months would go by and then you
21 would bug him again; is that fair?
22 A Something like that.
23 Q Was there ever a period of time more than
24 a year where you think you didn't bug him, just
25 let it go?

74

1 A Yeah, I guess. I don't know.
2 Q You don't know, do you?
3 A No. I probably --
4 Q Do you know at what period of time --
5 A I don't remember how often --
6 Q I'm sorry; go ahead finish your answer.
7 Go ahead. Sorry.
8 A I don't remember how often I bugged him
9 about it is the answer.
10 Q Well, you told me before every year. Is
11 that inaccurate?
12 A Right. But -- yes, every year. But like
13 I don't know if it was once a year, I don't know
14 if it was twice a year, I don't know if it was 12
15 times a year, I don't know if it was 24 times a
16 year. I don't know. That's the part --
17 Q Fair enough. Fair enough. So at what
18 point did you start forgetting that there was a
19 quitclaim deed?
20 A How would I -- how could I remember when
21 I forgot?
22 MR. YOUNG: Object as to form.
23 Q You said that you forgot about it. And
24 I'm asking during all of these attempts to get
25 your father to take your name off the title, at

75

1 what point in time did you start to forget that
2 there was a quitclaim deed?
3 A I don't know.
4 Q 2011? 2012?
5 A I think it wasn't the deed at that point;
6 I think it was the loan.
7 Q Okay. So at some point your discussions
8 changed from getting the deed recorded to get your
9 name off the property to getting the property
10 refinanced?
11 A Yes.
12 Q And you just forgot about the deed.
13 A Yes.
14 Q Okay. So after this point in time,
15 whenever it was, 2013, 2014, did your father ever
16 bring up the subject of the quitclaim deed?
17 A I don't remember.
18 Q Did he ever discuss with you the
19 importance of getting the quitclaim deed recorded?
20 A I don't remember.
21 Q Did he ever discuss with you his
22 inability to get the quitclaim deed recorded?
23 A I don't remember.
24 Q When were you served with the papers in
25 the Superior Court litigation from the estates of

76

1 Ms. Brekelmans and Mr. McLoughlin?
2 A After the fire and before the trial. I
3 don't remember exact date.
4 Q The lawsuits were filed in October of
5 2015. Do you know if you were served in 2015?
6 A October of 2015 sounds about right.
7 Q When you were served with the papers, who
8 did you discuss that with, the lawsuit?
9 A Multiple people.
10 Q Did you discuss it with your father?
11 A Yes.
12 Q Did you discuss it with your wife?
13 A Yes.
14 Q Did you discuss it with your brother?
15 A Yes.
16 Q Okay. Do you recall what you discussed
17 with your brother, what the subject matter was?
18 A In October of 2015 and this is 2021, six
19 years ago? No, I don't remember.
20 Q Now, do you know whether you had enough
21 money to pay the attorneys to defend the case
22 against you in the lawsuit?
23 A Yes.
24 Q Did you have the money to do that?
25 A No.

**77**

1    Q    Okay.  Why not?
2    **A    Because I live paycheck to paycheck.**
3    Q    Okay.  And did you then borrow the money
4  to pay your lawyers?
5    **A    No.  They were paid.**
6    Q    I'm sorry?
7    **A    Excuse me?  No, I didn't.  No.  The**
8  **answer is no.**
9    Q    Okay.  You didn't borrow it.  Where did
10 you get the money from then?
11   **A    I didn't get the money.**
12   Q    You didn't get the money.  So your
13 lawyers worked for nothing?
14   **A    No.  Oh, how did I get the -- oh, well.**
15 **Oh, how did I get the money.  I guess Max paid**
16 **them because I told him I wasn't going to put**
17 **any -- if you want me to have a lawyer, you're**
18 **going to have to pay for it.  So Max paid for it.**
19   Q    So Max paid it.  Did Ron pay any of the
20 money for the legal fees?
21   **A    Yeah, I guess.  I don't know actually.**
22   Q    Okay.  Do you know who paid the retainer
23 for your bankruptcy lawyer?
24   **A    That was Ron.**
25   Q    Did he pay the filing fees as well?

**78**

1        THE COURT REPORTER:  I'm sorry, sir; I
2  didn't hear you.
3        THE WITNESS:  Which sir?
4    **A    I said I don't know -- I didn't know if**
5  **you were talking about the litigation or the trial**
6  **when you asked your question.**
7    Q    So there is no confusion, let's do it
8  this way:  With respect to the Superior Court
9  litigation, do you know if your brother paid any
10 portion of your legal fees?
11   **A    I don't know.**
12   Q    With respect to the appeal of the
13 Superior Court litigation, do you know if your
14 brother paid any portion of the litigation fees
15 for the appeal?
16   **A    No, I don't know.**
17   Q    Did you pay them?
18   **A    No.**
19   Q    Did you pay any legal fees?
20   **A    No.**
21   Q    So those legal fees were paid by your
22 father, your brother, or someone else?
23   **A    Yes.**
24   Q    Not by you; correct?
25   **A    Yes.**

**79**

1    Q    And not by your wife?
2    **A    Correct.**
3    Q    And it was because you couldn't afford to
4  pay them in the first place; correct?
5    **A    Yes.**
6    Q    And that goes from the time that the case
7  was commenced in approximately October 2015 to the
8  time of the appeal, which was in April of 2018;
9  correct?
10   **A    Yes.**
11   Q    And then on April 18, 2018, you filed
12 bankruptcy and your brother paid for that?
13   **A    Somebody paid for it.  I don't know if it**
14 **was him.**
15   Q    Well, your bankruptcy schedules actually
16 say that.
17   **A    Okay.**
18   Q    You paid Mr. --
19   **A    Well, all I can tell you is I didn't pay.**
20 **So I don't know.**
21   Q    Fine.
22   **A    If you want the truth, that's the truth.**
23 **I don't know.**
24   Q    I do want the truth.
25   **A    Right.  That's what I'm telling you.  I**

**80**

1  **don't -- I can tell you for sure that I didn't pay**
2  **them.**
3    Q    Okay.  At least that part I believe.
4        MR. McNUTT:  Justin, let's go to Exhibit
5  12, please.
6        AV TECHNICIAN:  Okay.  One moment.
7        (Len Salas Deposition Exhibit 12 marked
8  for identification and is attached to the
9  transcript.)
10   Q    Exhibit 12, Mr. Salas, is a document that
11 has the reference "trust #."  It's dated June 22,
12 2011, one day later than our previous e-mail, and
13 it is addressed from you to your father.  And it
14 is actually in response to your father's e-mail
15 responding to your prior e-mail asking your
16 father:  "Have you contacted a bank to set up an
17 acct for the trust?"
18   **A    Uh-huh.**
19   Q    And your response is:  "Yeah, I saw that.
20 But that is not what I asked.  I asked if you used
21 this EIN # to set up a bank acct with a bank
22 either BB&T or bank of america or SunTrust."
23       Did I read that correctly?
24   **A    Yes.**
25       MR. McNUTT:  Let's go to the next e-mail.

Case 3:23-cv-00987    Document 7-2    Filed 10/04/23    Page 433 of 532 PageID #: 1021

916

81

1  This is Exhibit 13, Justin.
2       AV TECHNICIAN:  Yes.  One moment.
3       (Len Salas Deposition Exhibit 13 marked
4  for identification and is attached to the
5  transcript.)
6   Q   That e-mail, this is Exhibit 13, e-mail
7  dated -- well, at the top e-mail dated -- June 22,
8  2011, at 3:19 p.m. from Max Salas to you.  That's
9  in response to the previous e-mail that I just
10 recited and Max' response is "NO."  So I would
11 recognize that as an answer with emphasis.  That's
12 how you read it?
13  **A   Well, no, not really.  Sure, he said no.**
14  Q   No?  How did you read it?
15  **A   No.  He probably -- my assumption was he**
16 **texted -- or he used his phone to answer that**
17 **and -- to answer that e-mail and he's not the most**
18 **technical savvy person that I know so he probably**
19 **left the caps on or whatever.  I don't know.  But**
20 **I don't know if it was emphasis.  That's his**
21 **answer.**
22  Q   Okay.  But his answer was clearly no,
23 wasn't it?
24  **A   Yeah.**
25  Q   Okay.

82

1       MR. McNUTT:  Let me see if we can skip a
2  little bit here.  Okay.  Yeah, let's go to Exhibit
3  19, Justin.
4       (Len Salas Deposition Exhibit 19 marked
5  for identification and is attached to the
6  transcript.)
7   Q   Mr. Salas, this is your Exhibit 19.  It's
8  dated February 27, 2012.  It's an e-mail with a
9  reference "Getting house changed over into trust
10 name."  So this is February of 2012.  This is now
11 more than a year and a half after the quitclaim
12 deed was signed and nothing has happened.  You
13 received this e-mail, didn't you?
14  **A   Yes.**
15  Q   Is this one of the times when you
16 contacted your father and insisted that he do
17 something to get your name off the title?
18  **A   I guess that's what precipitated this**
19 **e-mail, but I'm not sure.  I couldn't tell you for**
20 **sure.**
21  Q   Okay.  As you read it, it says:  "Hi
22 Lynn, about a month and a half back I sent you
23 information in reference to documents of the house
24 1610 Riggs, NW.  Please let me know when it be
25 convenient for you" -- and "it would be" obviously

83

1  -- "My son and I are anxious and would like to
2  close on this as soon as possible please let us
3  know what the next" -- I think it's supposed to
4  mean steps -- "that are from our side."
5       Do you know if anything happened as a
6  result of Mr. Salas' communications with Ms.
7  Boileau, if I pronounced her name right, the
8  attorney at Capitol Title?
9   **A   I don't know.**
10  Q   This is the last e-mail regarding
11 changing the name of the owner of the house into
12 the trust.  Were there no more attempts after
13 February 2012?
14  **A   I don't know.**
15  Q   There were no more communications between
16 you and your father related to the status of this?
17  **A   Probably.**
18  Q   Probably there were?
19  **A   Yeah.**
20  Q   Do you know?
21  **A   I don't know for a fact.  I'm going -- I**
22 **don't remember.**
23  Q   It's true, is it not, Mr. Salas, that in
24 the time frame of 2010 through at least 2012 or
25 '13 that you were involved in more than one

84

1  attempt to refinance the property?
2   **A   Yes.**
3   Q   And all of those failed?
4   **A   Yes.**
5   Q   In fact, weren't you told or your father
6  told that because of the type of loan it couldn't
7  be refinanced?
8   **A   I remember something to that fact.**
9   Q   Do you know when that was?
10  **A   No.**
11      **Can we take five?**
12  Q   I'm sorry?
13  **A   I need to take five.**
14      MR. McNUTT:  Sure.  Let's take a break.
15      (A recess was taken.)
16 BY MR. McNUTT:
17  Q   Let's get back to Exhibit 19 we were
18 looking at.  And I just want to be clear,
19 Mr. Salas, that you found no e-mails or other
20 notes or documents related to any communications
21 with your father after this date with respect to
22 the recordation of the quitclaim deed; is that
23 accurate?
24  **A   Yes.**
25  Q   And you found no written communications

141

1    A   I believe three.
2    Q   At least three?
3    A   I think.
4    Q   Why would you want three originals of a
5  trust document and a quitclaim deed?
6    A   One for each of us.  One for the lawyer,
7  which is Ron; one for Max, who signed it; and one
8  for me, who signed it.  I --
9    Q   Why do you -- are you done?  I'm sorry;
10 are you done?
11   A   No.  That's -- well, I think.  I'm not
12 sure I am right, but that's what I think.
13   Q   Okay.  Why would you need an original
14 rather than a photocopy?
15   A   I don't know.
16   Q   I don't either.  Do you have any idea why
17 you would need one?
18   A   No.  I mean, I just assumed that's -- I
19 guess what I'm saying is -- yeah, I don't know who
20 kept them.  I don't know.  Maybe I got a copy of
21 the wet that day.  I don't remember.  I don't know
22 who kept the original.  I assume Ron did, I guess.
23 Now I assume that, but I don't know.
24   Q   Why would Ron have the original if the
25 quitclaim deed had to be recorded by your father

142

1  in the District of Columbia?
2    A   I don't know.  That's just a guess.
3    Q   On July 5, 2010, you were the owner of
4  the property at 1610 Riggs Place Northwest; right?
5    A   I was not an owner.  I owned the loan.
6  My name was on the loan.  I did not own -- I don't
7  believe I owned the property.
8    Q   So your name was not on the deed?
9    A   I don't know how to answer that.
10   Q   Well, you can answer it from what you
11 know.
12   A   I guess when we referred back to that
13 thing, I mean, from our earlier conversation.
14   Q   I have no idea what you're saying.  Try
15 to explain it to me.
16   A   You asked me this earlier, so just take
17 my answer from earlier this morning.
18   Q   Well, that might be just as confusing as
19 what you just told me, so I'm trying to clarify
20 it.
21   A   I don't want to -- yeah, I don't want to
22 muddy the waters, so just refer back to that
23 answer.
24   Q   Let me try it this way:  You understand
25 that a deed is a document that shows the ownership

143

1  of in this case a piece of property; right?
2    A   I understand that, yes.
3    Q   And the purpose of the quitclaim deed was
4  to allow your father to record a deed showing that
5  he was the owner of the property; correct?
6    A   Yes.
7    Q   Okay.
8    A   Okay.  So as of 2007 -- or July 2010 he
9  owned the property.  Okay.  If that's your
10 reasoning, sure, he owned the property.
11   Q   Okay.  But if you had an original
12 quitclaim deed, you could have recorded that deed,
13 too?
14   A   I guess.
15   Q   Because you have an original.  Your
16 brother could have recorded one because he had the
17 original.
18   A   Right.
19   Q   And anybody who came into possession --
20 are you still there, Len?
21   A   Yeah, I'm still here.  Go ahead.  Sorry;
22 I just have --
23   Q   We can't see your face now.
24   A   So I just have to move rooms.  Go ahead.
25   Q   So anyone who had a copy of the quitclaim

144

1  deed could have reported that deed and would be
2  the title owner of the property?
3    A   I guess.  I don't know how that works.
4    Q   Are you there, Len?
5    A   Yeah, I'm here.  Go ahead.
6    Q   Okay.  Enough of that.
7        MR. McNUTT:  Let's go to Exhibit 36,
8  Justin, please.
9        AV TECHNICIAN:  The exhibit is on the
10 screen.
11       MR. McNUTT:  Yes, I see it.  Thanks.
12 Let's go to Page 15 of 29.
13   Q   Do you see that in front of you,
14 Mr. Salas?
15   A   Yeah.
16   Q   All right.  Would you look at Paragraph
17 18, please.  By the way, do you recognize this
18 document as the Deed of Trust that you executed in
19 2007?
20   A   I don't know.  I mean, not from this
21 paragraph, no, I don't.
22   Q   Well, we reviewed it before.  But why
23 don't you --
24       MR. McNUTT:  Justin if you could.
25   Q   -- take a look at Page 18.

145

1    MR. McNUTT:  Maybe make that page a
2  little smaller.  Yeah.
3    **A   Okay.**
4    Q   Do you recognize that as the document
5  that you signed on April 16, 2007?
6    **A   Yeah; now.**
7    Q   And if you look at Page 5 --
8    MR. McNUTT:  Justin, please.
9    Q   -- this is the Deed of Trust that you
10 signed in April 2007.
11   **A   Okay.**
12   MR. McNUTT:  Now, Justin, if you go back
13 to Page 15, please.
14   Q   Paragraph 18, do you see that there,
15 Mr. Salas?
16   **A   I do now.**
17   Q   Paragraph 18 reads:  "Transfer of the
18 Property or a Beneficial Interest in Borrower.  As
19 use in this Section 18, 'Interest in the Property'
20 means any legal or beneficial interest in the
21 Property, including, but not limited to, those
22 beneficial interests transferred in a bond for
23 deed, contract for deed, installment sales
24 contract or escrow agreement, the intent of which
25 is the transfer of title by Borrower at a future

146

1  date to a purchaser.
2    "If all or any part of the Property or
3  any Interest in the Property is sold or
4  transferred (or if Borrower is not a natural
5  person and a beneficial interest in Borrower is
6  sold or transferred) without Lender's prior
7  written consent, Lender may require immediate
8  payment in full of all sums secured by this
9  Security Instrument."
10   Did I read that correctly?
11   **A   Yes.**
12   Q   Is it your understanding from the second
13 paragraph of Section 18 that the bank had the
14 right to accelerate the entirety of the Deed of
15 Trust indebtedness upon the transfer of the
16 property from you to your father?
17   **A   I don't know.**
18   Q   Did you refer to this section to
19 determine whether or not you created any problems
20 with SunTrust by virtue of the quitclaim deed to
21 your father?
22   **A   I don't remember.**
23   Q   Did you discuss it with your brother?
24   **A   I don't remember.  (Indecipherable).**
25   Q   Your brother was a lawyer at the time;

147

1  right?
2    **A   Yeah.**
3    Q   And he prepared both of these documents?
4  He prepared the trust and the quitclaim deed;
5  correct?
6    **A   Yes.**
7    Q   And you signed them in his office.
8    **A   Yes.**
9    Q   Did you ask your brother whether there
10 were any consequences of doing this, bad
11 consequences, of having the quitclaim deed
12 recorded?
13   **A   Not that I remember.**
14   Q   Do you think a competent attorney would
15 have told you that there might be such
16 consequences?
17   **A   I don't know.**
18   Q   Did you attempt to find out or ask anyone
19 if there were consequences of you executing the
20 quitclaim deed?
21   **A   I don't remember.**
22   Q   Did you notify SunTrust at any time that
23 you were no longer the owner of the property?
24   **A   Not that I can recall.**
25   Q   Are you aware of any time that your

148

1  father notified SunTrust that he was the owner of
2  the property?
3    **A   No, I couldn't attest to that.**
4    Q   Well, you don't know of any time; right?
5    **A   Yeah, I don't know.  You know, I don't**
6  **know if that's something that he would do.  How**
7  **would I know something...**
8    Q   The lawsuit was filed in 2015 and your
9  deposition was taken in 2016 in March, correct,
10 March 9 --
11   **A   I think so.**
12   Q   -- to be exact?
13   And on March 8 your testimony is that
14 your father prepared a loss mitigation statement
15 attempting to modify the terms of the loan
16 documents because of your inability to pay the
17 loan payments; correct?
18   **A   No.**
19   Q   Yes, I think so, because it was all based
20 on your inability to make the monthly payments,
21 you lost your job and you had no money to pay it.
22   **A   Okay.**
23   Q   Isn't that right?
24   **A   I don't know.  I guess.**
25   Q   It is also true that the house was burned



# Transcript of Kendra Coral Rowe Salas

**Date:** August 27, 2021
**Case:** Brekelmans, et al. -v- Salas

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

1         IN THE UNITED STATES BANKRUPTCY COURT
2          FOR THE MIDDLE DISTRICT OF TENNESSEE
3                  Nashville, Tennessee
4      - - - - - - - - - - - - - -x
5   IN RE:              :
6   LEN SALAS,          : CHAPTER 7
7   Debtor-in-possession  : CASE NO: 18-02662
8                       : JUDGE: HARRISON
9                       :
10  (Caption continued on next page)
11     - - - - - - - - - - - - - -x
12
13
14        Deposition of KENDRA CORAL ROWE SALAS
15               Conducted Virtually
16            Friday, August 27, 2021
17                 2:50 p.m. EST
18
19
20
21
22
23   Job No.: 393647
24   Pages: 1 - 35
25   Reported By: Cynthia A. Whyte

**Page 2**

1   (Caption continued from previous page)
2
3   NICOLAAS BREKELMANS    :
4   AND GAIL GREGORY       : ADVERSARY PROCEEDING NO.
5   BREKELMANS,            : 3:20-ap-90027
6   CO-PERSONAL            :
7   REPRESENTATIVES OF     :
8   THE ESTATE OF NINA     :
9   BREKELMANS, et al.,    :
10  In their capacity as   :
11  authorized             :
12  representatives of     :
13  the Estate of Len      :
14  Salas,                 :
15          Plaintiffs,    :
16  v.                     :
17  MAX SALAS,             :
18          Defendant      :
19
20      Deposition of KENDRA CORAL ROWE SALAS,
21   conducted virtually
22
23
24   Pursuant to notice, before Cynthia A. Whyte,
25   Notary Public in and for the State of Maryland.

**Page 3**

1              A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFFS:
4       PHILIP J. McNUTT, ESQUIRE
5       LAW OFFICE OF PHILIP J. McNUTT, PLLC
6       11921 Freedom Drive, Suite 584
7       Reston, Virginia 20190
8       (703) 904-4380
9
10  ON BEHALF OF DEFENDANT:
11      PHILLIP G. YOUNG, JR., ESQUIRE
12      THOMPSON BURTON, PLLC
13      One Franklin Park
14      6100 Tower Circle, Suite 200
15      Franklin, Tennessee 37067
16      (615) 465-6000
17
18  ALSO PRESENT:
19      JUSTIN WOODWARD, AV Technician
20
21
22
23
24
25

**Page 4**

1              C O N T E N T S
2   EXAMINATION OF KENDRA CORAL ROWE SALAS     PAGE
3     By Mr. McNutt                              5
4
5
6
7
8              E X H I B I T S
9          (Attached to the Transcript)
10  KENDRA SALAS DEPOSITION EXHIBITS           PAGE
11  Exhibit 4    Len Salas Bankruptcy
12              Schedules, 4/18/18             7
13  Exhibit 1    Subpoena                     10
14
15
16
17
18
19
20
21
22
23
24
25

13

1    Q   Anyone else?
2    A   My cousin --
3    Q   Okay.
4    A   -- was --
5    Q   What about Ron Salas? I'm sorry; did I
6    cut off your answer?
7    A   Oh, I said my cousin was visiting. It's
8    irrelevant. But I remember her being there so I
9    told her about it.
10       And as far as Ron, I'm sure we discussed
11   it at family gatherings. I don't recall dates or
12   content of those conversations.
13   Q   Okay. And what about your father-in-law,
14   Max Salas?
15   A   I'm sure we also had communication with
16   him about this. I don't recall dates or
17   specifics.
18   Q   Did you understand at any time after your
19   husband was sued that the reason he was sued was
20   because he was the titled owner of the property?
21   A   Yes, that's -- well, yes.
22   Q   Okay.
23   A   I mean, technically. I don't -- none of
24   us consider him the owner of the home. But, yes,
25   I know what you mean, that it was in his name.

14

1    Q   And when you say "none of us consider him
2    the owner of the home," what do you mean by that?
3    A   That that house is Max', that we
4    always -- you know, that Max lived there and took
5    care of the home and that was Max' house.
6    Q   Okay. But you were aware that your
7    husband was obligated to pay the mortgage at least
8    in the event that Max Salas did not pay it; right?
9    A   No.
10   Q   You were not aware of that?
11   A   No, because Max took care of the home,
12   including the mortgage.
13   Q   Were you aware that your husband was on
14   the note to SunTrust for the entire mortgage
15   balance?
16   A   Yes.
17   Q   Had you ever seen the SunTrust loan
18   documents prior to today?
19   A   Not that I remember.
20   Q   Okay. Were you aware that your husband
21   was the only borrower on the SunTrust loan
22   documents?
23   A   Not that I remember. I don't know if I
24   thought Max was on it as well. I'm aware now that
25   Len's name's on it. I don't know if at the time I

15

1    was aware of Max not being on that at that time.
2    Q   Okay. Now, you were present in July of
3    2010 when the infamous trust and the quitclaim
4    deed were executed at Ron's office; right?
5    A   Yes.
6    Q   And when you were there, what did you
7    understand those documents to mean?
8    A   I thought it meant Len's name was going
9    to get off of the house officially and that it
10   would be put into the trust.
11   Q   Okay. Did you have any discussion with
12   Ron, your husband, or Max concerning how that was
13   going to happen?
14   A   Not that I recall. I thought that Max or
15   Ron was going to file it right away and that it
16   was going to be put in place.
17   Q   All right. Do you know whether or not --
18   A   So that's what I assumed.
19   Q   Sorry. Do you know whether or not there
20   were attempts to file the quitclaim deed at any
21   time after July 6, 2010?
22   A   I don't know. Like I said, I thought it
23   had been done already.
24   Q   Did you have any discussions with your
25   husband regarding any issues concerning the

16

1    recordation of the quitclaim deed?
2    A   I don't remember.
3    Q   As you sit there today, do you have an
4    understanding?
5    A   Of what? I'm sorry.
6    Q   Do you have an understanding of any
7    issues with respect to the recording of the
8    quitclaim deed?
9    A   I understand that it did not get put
10   through like it was supposed to or recorded, I
11   guess, as it was supposed to.
12   Q   All right. Do you recall any
13   communications after 2012 concerning the quitclaim
14   deed at all?
15   A   I don't know about the quitclaim deed
16   specifically. I do know Len would -- I don't know
17   how often, but every -- more than once a year
18   would call his father and ask the status of
19   getting his name off of everything. I don't know
20   if that was specific to the quitclaim deed or the
21   mortgage.
22   Q   And when you say "everything," you're
23   talking about the mortgage loan and the deed --
24   A   Yes.
25   Q   -- right?

29

1 sole purpose -- not the sole purpose, but for at
2 least the partial purpose -- of taking Len's name
3 off the property, that all four people, including
4 the people that discussed it, created it,
5 registered it in Colorado forgot completely about
6 the quitclaim deed? Doesn't that seem unusual to
7 you?
8     A   Do I think it's unusual?
9     Q   Yes.
10    A   No. I think it's unfortunate. That's
11 five years. That's a long time for a document
12 that, like I said, I thought it had been filed or
13 recorded. So to me it's just unfortunate. I
14 can --
15    Q   If you had a document that stated that
16 you were the titled owner of a piece of property
17 and somebody challenged that like in a lawsuit,
18 wouldn't you remember to pull up that document and
19 make sure everybody knew that you were the actual
20 owner of the property?
21    A   I would hope so. That would be great;
22 right?
23    Q   Yeah.
24    A   Like I said, we are all unhappy with
25 ourselves that we forgot that document.

30

1     Q   Oh, yeah, yeah, I'm sure you're all
2 unhappy. I think my clients are unhappy, too.
3         MR. McNUTT: All right, Kendra, I
4 appreciate your bearing with me on this. Let me
5 just make sure I don't need anything else.
6     Q   Oh, one other thing. Other than July 6,
7 2010, have you ever seen a wet ink original of the
8 quitclaim deed?
9     A   I don't know. I mean, I saw it when he
10 signed it. I don't know if I saw an original or a
11 copy after that. I don't know if what we had was
12 a copy or the original. I'm not sure.
13    Q   Well, the copy that your husband said he
14 found in the file cabinet, is that the same copy
15 that you produced --
16    A   I had a --
17    Q   -- or is that a different version?
18    A   I had a pdf of it, which I think is the
19 same thing -- I thought it was the same thing as
20 what Len had, but I'm not sure.
21    Q   And Len said approximately February of
22 2018, I'll even pin it down, but approximately
23 February of 2018 is when he found the document in
24 the file cabinet. That was not an original, that
25 was a copy; correct?

31

1     A   I don't know.
2     Q   You haven't seen an original, though?
3     A   I don't know. I don't recall if the
4 document he found was an original or a copy. I
5 don't know.
6     Q   As you sit here today, you can't remember
7 seeing an original of the quitclaim deed on or
8 about February of 2018?
9     A   I'm not sure how else to answer this. I
10 have said I don't know. I'm not trying to be
11 rude. I don't know. I do not remember if the
12 document was the original or a copy. I did not
13 think at the time, four years ago, to look at the
14 copy or the original and note if it was a wet
15 signature or if it was a copy of it. So I don't
16 know what else to tell you on that. I don't know.
17 I wish I knew and I wish I had a better memory for
18 you, but I do not know.
19        MR. McNUTT: Kendra, that's all I have.
20 And I, again, appreciate your time and your
21 patience.
22        Madam Court Reporter, do you need to tell
23 the witness about reading and signing and all of
24 that.
25        MR. YOUNG: Just a moment. Let me go on

32

1 the record. This is Phillip Young.
2         MR. McNUTT: Oh, I'm sorry, Phillip.
3         MR. YOUNG: I represent Max Salas. I
4 have no questions for this witness. Thank you.
5         MR. McNUTT: Okay. Okay. Sorry; I
6 should have asked.
7         Madam Reporter?
8         THE COURT REPORTER: It's up to you guys
9 about reading and signing. I don't say anything
10 about that.
11        MR. McNUTT: Okay. Kendra, just for the
12 sake of being professional about this, you are
13 entitled to read the transcript that the court
14 reporter provides or you can waive the reading.
15 If you waive the reading, then you accept whatever
16 the court reporter has put down. The court
17 reporters are pretty good, but sometimes they hear
18 things different than it was said or from the
19 pronunciation have the wrong words or things like
20 that. So if you're concerned about that, then you
21 would ask to read and sign, which means that the
22 court reporter can provide you with a copy and you
23 have a period of time, I think it's 30 days, to
24 review it and make any corrections that you
25 believe should be in the record, and then that

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

In re:                                          ) Case No.  18-00260-SMT
                                                )
MAX E. SALAS                                    )
FDBA CLR INC.                                   ) Chapter 11
AKA ERNIE M. SALAS,                             )
                                                )
        Debtor.                                 ) **STIPULATION FOR PLAN TREATMENT**
                                                ) **ON FIRST LIEN SECURED BY REAL**
                                                ) **PROPERTY AT 1610 RIGGS PLACE NW,**
                                                ) **WASHINGTON, DC 20009**
                                                )
                                                )
                                                )
                                                )
_____        )

U.S. Bank National Association as Trustee for the holders of Banc of America Funding Corporation Mortgage Pass-through Certificates, Series 2007-6, its assignees and/or successors, by and through its servicing agent Select Portfolio Servicing, Inc. ("Secured Creditor" herein) and Debtor, Max E. Salas ("Debtor" herein), by and through their attorneys of record, now enter into the below stipulation to resolve and agree to plan treatment of the real property commonly known as 1610 Riggs Place NW, Washington, DC 20009.

## RECITALS

A.  On April 16, 2007, Len Salas, for valuable consideration, made, executed and delivered a Note secured by a First Deed of Trust (the "Loan Documents") both in the amount of $870,000.00 on the property commonly known as on the property commonly known as 1610 Riggs Place NW, Washington, DC 20009 (the "Subject Property").

B.  On or about 4/18/2018, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Columbia.

C.  As of the date of September 29, 2019 the total amount of Secured Creditor's claim with regard to the Subject Property was approximately $1,208,720.40.

1

924

D.  The parties have conferred and agreed upon the treatment of Secured Creditor's first lien secured by the Subject Property for purposes of Debtor's Chapter 11 Plan and those terms are reflected below.

**THE PARTIES HERETO STIPULATE AND AGREE AS FOLLOWS:**

1.  The value of the Subject Property is in excess of the amount owed in the amount of $1,208,720.40 for the purposes of this instant Chapter 11 case.

2.  Secured Creditor will have a fully secured claim.

3.  Debtor agrees to pay the secured claim in the approximate amount of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037.

4.  All amounts still outstanding upon the maturity date under this agreement, will be due and owing in full on the maturity date May 1, 2037.    There will be deferred interest due upon maturity.

5.  The principal and interest payment ("P&I" herein) under these agreed terms is approximately $6,682.26 per month. This amount is approximate, and the formal re-amortization under this agreement will be completed by Secured Creditor after successful confirmation of the Plan of Reorganization that incorporates same.

6.  The loan will remain impounded for taxes and insurance on the Subject Property in accordance with the terms of the deed of trust and note.  The current amounts due are taxes at $1,188.43 per month and insurance at $458.50 per month.  Debtor is aware these amounts may fluctuate.  Secured Creditor may exercise its remedies as described in the deed of trust and note.  Debtor also agrees to provide proof of insurance to Secured Creditor within 30 days upon request.

7.  The first payment under this agreement is due November 1, 2019 in the amount of $8,329.19 per month (principal and interest in the amount of $6682.26 plus taxes in the amount of $1,188.43 and insurance in the amount of $458.50). Debtor agrees to make payments in this amount until the permanent loan adjustments are made and post

confirmation mortgage statement is sent out reflecting the new loan terms and monthly payment amount. Debtor agrees to pay the amounts reflected in those statements.

8. Payments shall be made directly to Secured Creditor at Attn: Remittance Processing, P.O. Box 65450, Salt Lake City, UT 84165-0450, with reference to the last four digits of the Loan Number 3844, or as otherwise directed.

9. All post petition escrow advances will remain due and owing on the loan and will be included in the total principal balance due upon maturity. The payment required under this stipulation prior to confirmation does not include any amounts needed to fund the escrow payment per RESPA. If funding is needed, the escrow shortage if applicable will be calculated and added to the monthly payment after the permanent loan adjustments are made and post confirmation mortgage statement is sent out reflecting the new loan terms and monthly payment amount.

10. The parties agree that this loan may be refinanced postpetition as part of a plan to pay unsecured creditor or liens junior to this lien. If the property is refinanced with a new lender, Secured Creditor will be entitled to full payoff prior to any fees or payments to junior lienholder. The parties also agree that the reamortization of the loan per this Agreement post confirmation will give credit, and/or the total debt will be reduced by any amounts credited for any escrow now due on the loan.

11. All other terms of the Loan Documents not directly altered by this agreement will remain in full force and effect.

12. Secured Creditor has relief from the automatic stay as to the Subject Property upon confirmation of Debtor's Chapter 11 Plan.

13. In the event of a default on payments to Secured Creditor under the terms of this stipulation prior to the entry of the confirmation order, Secured Creditor shall notify Debtor and Debtor's counsel of the default by CM/ECF. Debtor shall have ten (10) calendar days from the date of the written notification to cure the default, and Debtor agrees to pay an additional $100.00 for attorney fees for each default occurrence. If Debtor fails to cure the default, Secured Creditor may lodge a declaration of default and order terminating the automatic stay and include that the 14-day stay as provided in

3

1      FRBP 4001(a)(3) is waived.   Upon entry of the order the automatic stay shall be

2      terminated and extinguished for purposes of allowing Secured Creditor to notice, proceed

3      with, and hold a trustee's sale of the Subject Property, pursuant to applicable state law

4      and without further Court Order or proceeding being necessary, including any action

5      necessary to obtain complete possession of the Subject Property, including unlawful

6      detainer.

7    14. In the event of a default on payments to Secured Creditor under the terms of this

8      stipulation after the entry of the confirmation order, Secured Creditor shall may proceed

9      pursuant to the terms of the underlying Loan Documents, and state and federal law, to

10      obtain complete possession of the Subject Property, including unlawful detainer, without

11      further court order or proceeding being necessary.   Any and all default provisions

12      included in Debtor's Chapter 11 plan are not applicable to Secured Creditor with regard

13      to the Subject Property, and Secured Creditor is only bound by the terms included in this

14      stipulation.

15    15. Debtor agrees to incorporate the above agreed terms of lien treatment into any and all

16      existing and future proposed Chapter 11 Plans through either exact language or by

17      attaching this stipulation as an exhibit to the plan, and if any terms in Debtor's Chapter

18      11 Plan conflict with the terms of this stipulation the terms of this stipulation will control.

19      In the event that Debtor's Chapter 11 Plan does not reflect the language of this

20      stipulation, Debtor agrees) that the stipulation terms will be incorporated into the

21      confirmation order through exact language, attachment of the stipulation as an exhibit to

22      the confirmation order, or by reference in the confirmation order of the stipulation by

23      document number.

24    16. Secured Creditor agrees to vote for Debtor's Chapter 11 Plan provided that Debtor has

25      complied with all provisions of this stipulation.

26    17. If this instant Chapter 11 bankruptcy petition is dismissed and/or converted to another

27      chapter under title 11, Secured Creditor's lien shall remain a valid secured lien for the full

28      amount due under the original Promissory Note and all payments received under this

29

927

1    agreement will be applied contractually under the original terms of the Deed of Trust and

2    original Promissory Note.

3

4      IT IS SO STIPULATED:

5

6    /s/ Leah Freedman                          /s/ Justin P. Fasano
     Leah Freedman, Esq., MD Fed. Bar No. 18950  Justin P. Fasano
7    BWW Law Group, LLC                          McNamee, Hosea, Jernigan, Kim,
     6003 Executive Blvd, Suite 101              Greenan & Lynch, P.A.
8    Rockville, MD 20852                         Janet M. Nesse (Bar No. 358514)
     P: 301-961-6555, F:301-961-6545             Justin P. Fasano (Bar No. MD21201)
9    bankruptcy@bww-law.com                      6411 Ivy Lane, Suite 200
     *Counsel for the Movant*                    Greenbelt, MD 20770
10                                               Phone: 301-441-2420
11                                               jnesse@mhlawyers.com
                                                 jfasano@mhlawyers.com
12                                               *Proposed Conflicts Counsel for Debtor*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

Debtor 1    **Max E. Salas**                                                Case number *(if known)*    **18-00260**

---

7.  Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?
    *Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations
    of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for
    a business you operate as a sole proprietor. <mark>11 U.S.C. § 101</mark>. Include payments for domestic support obligations, such as child support and
    alimony.

    ☐  No
    ■  Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|
| **Len Salas 1018 Vince Court Mufreesboro, TN 37128** | **4/6/2017, 5/3/2017, 12/11/2017, 2/27/2018, 4/5/2018** | **$1,656.66** | **Unknown** | **Reimbursement of travel an other expenses associated with Superior Court trials.** |

---

8.  Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an
    insider?
    Include payments on debts guaranteed or cosigned by an insider.

    ☐  No
    ■  Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment Include creditor's name |
|---|---|---|---|---|
| **Len Salas 1018 Vince Court Mufreesboro, TN 37128** | **3/26/2018** | **$2,000.00** | **Unknown** | **Payment of attorney fees associated with DC Superior Court Cases Paid to: Michael C. Forster, Esq. Forster Law Firm 2007 Vermont Ave., NW Washington, DC 20001** |

---

**Part 4:**    Identify Legal Actions, Repossessions, and Foreclosures

9.  Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?
    List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody
    modifications, and contract disputes.

    ☐  No
    ■  Yes. Fill in the details.

| Case title Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Michael McLoughlin, Jr. et al. v. Len Salas, et al. 2015 CA 0008054 B** | **wrongful death and survival actions** | **DC Superior Court 500 Indiana Ave., NW Washington, DC 20001** | ☐ Pending ■ On appeal ☐ Concluded |
| **Nina Brekelmans, et al. v. Len Salas, et al. 2015 CA 0008061 B** | **wrongful death and survival actions** | **DC Superior Court 500 Indiana Ave., NW Washington, DC 20001** | ☐ Pending ■ On appeal ☐ Concluded |

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                    Case number *(if known)*    **18-00260**

---

24. Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you<br>know it | Date of notice |
|---|---|---|---|
| | | | |

25. Have you notified any governmental unit of any release of hazardous material?

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you<br>know it | Date of notice |
|---|---|---|---|
| | | | |

26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

■ No
☐ Yes. Fill in the details.

| Case Title<br>Case Number | Court or agency<br>Name<br>**Address** (Number, Street, City,<br>State and ZIP Code) | Nature of the case | Status of the<br>case |
|---|---|---|---|
| | | | |

**Part 11:**  Give Details About Your Business or Connections to Any Business

27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?

■ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

☐ A partner in a partnership

☐ An officer, director, or managing executive of a corporation

☐ An owner of at least 5% of the voting or equity securities of a corporation

☐ No. None of the above applies.  Go to Part 12.

■ Yes. Check all that apply above and fill in the details below for each business.

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br><br>Name of accountant or bookkeeper | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| **CLR Inc.<br>1610 Riggs Place, NW<br>Washington, DC 20009** | **Revoked DC Corporatin with interests reverting to Debtor. Name of business used by debtor following revokation.** | **EIN:**      52-2080620<br><br>**From-To**   1995 - 2009 |

28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.

■ No
☐ Yes. Fill in the details below.

| Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|
| | |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

930

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### Nashville, Tennessee

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor-in-possession | : | |

| | |
|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS, et al | : |
| | : |
| In their capacity as authorized representatives of the Estate of Len Salas | : |
| | : |
| Plaintiffs | |
| | |
| v. | : Adversary Proceeding No. 3:20-ap-90027 |
| | |
| MAX SALAS | : |
| | |
| Defendant | : |

## AMENDED RESPONSES TO REQUESTS
## FOR ADMISSIONS TO THE DEFENDANT

Comes Now, Defendant, Max Salas ("Defendant"), and for his Amended Responses to Requests for Admissions to the Defendant (the "Discovery")[1], states as follows:

### GENERAL OBJECTIONS

1.  Defendant's Responses to the Discovery shall not constitute a waiver of his objections as to admissibility.

2.  Defendant objects to the Discovery to the extent it exceeds the scope of permissible discovery.

the amendment to the production to the Court's existing regarding and information in the Motion to Compel Written Answers to Discovery and Production of Documents (Doc. 67) (the "Discovery Order").

931

3.       Defendant objects to the Discovery to the extent that the information sought is protected from discovery by the attorney-client privilege or the attorney work-product doctrine.

4.       Defendant objects to the Discovery to the extent that the information and documents sought are not in his possession, custody or control.

5.       Defendant objects to the Discovery to the extent that the information sought is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6.       Defendant objects to the Discovery to the extent that the information sought is equally available to Plaintiff as to Defendant.

7.       Defendant objects to the definitions and instructions to the extent Plaintiff seeks to impose any requirement in excess of those imposed by the Federal Rules of Civil Procedure. Additionally, Defendant is not required by the Federal Rules of Civil Procedure to adopt, follow or utilize Plaintiff's definitions and instructions, and Defendant's Responses are based upon the governing provisions of the applicable Rules, laws and the ordinary and usual meaning of the words used, except as otherwise noted in the Responses.

8.       Defendant reserves the right to supplement his Responses to the Discovery based upon subsequently acquired information as permitted by the Federal Rules of Civil Procedure.

## REQUESTS FOR ADMISSION

1.  That the Defendant does not have the original Quitclaim Deed allegedly created in July, 2010.
   **Response:**  Admitted.

2.  That the Defendant is unaware of the location of the original Quitclaim Deed.
   **Response:**  Denied.  Ron Salas has an original copy.

3.  That the Defendant did not attempt to record the Quitclaim Deed after 2010.
   **Response:**  Admitted.

4.  That the Defendant is unaware that the original Quitclaim Deed exists.
   **Response:**  Denied.  Ron Salas has an original copy.

Defendant to refinance the D.C. Property.
>    **Response:**  Admitted.

6.  That the Defendant tried to obtain refinancing after July, 2010 but was unsuccessful in doing so.
>    **Response:**  Admitted.

7.  That the Defendant made no attempts to refinance the D.C. Property after 2012.
>    **Response:**  Denied.

8.  That all D.C. notices regarding the Property, after 2007, were addressed to Len Salas as owner of the Property.
>    **Response:**  Admitted.

9.  That the Defendant did not want the Property in his name after 2010 so that he could avoid any tax or other obligations in his name.
>    **Response:**  Denied.  Titling the Property in Len Salas' name had nothing to do with tax obligations or any other obligations.

10.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
>    **Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

11.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid D.C. property taxes owed against the Property.
>    **Response:**  Denied.  Property taxes were paid from 2008 – 2018.

12.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid local utilities' obligations owed against the Property.
>    **Response:**  Denied.  Utilities were paid from 2008-2018.

13.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid fines for violations of D.C. ordinances against the Property.
>    **Response:**  Denied.  Defendant is aware of no unpaid fines from 2008-2018.

14.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
>    **Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

15.  That the Defendant was aware, in 2016 that his son Ron Salas and his son Len Salas, both had, or should have had, copies of the 2010 Quitclaim Deed.
>    **Response:**  Denied.  Defendant was unaware in 2016 that Ron Salas or Len Salas

16. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.

    **Response:** Admitted.

17. That Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation.

    **Response:** Admitted.

18. That Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note.

    **Response:** Admitted.

19. That Max Salas did not notify Sun Trust or the D.C. government that he was an obligor under the Sun Trust Deed of Trust.

    **Response:** Denied. Max Salas notified SunTrust that he was obligated under the Deed of Trust.

20. That Max Salas did not notify D.C. or any taxing authority that he was the owner of the DC Property.

    **Response:** Denied. Max Salas has recorded the DC Bankruptcy Court order which declares him the owner. Max Salas also filed a homestead exemption with the Register of Deeds in 2012.

21. That the document attached as Exhibit B to the Amended Complaint filed herein is a true and correct copy of the Order Confirming Debtor's Third Amended Plan of Reorganization and The Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020.

    **Response:** Admitted.

22. That the transcript of your testimony in the bankruptcy case of Len Salas, Case No. 3:18-bk-02662 "the Len Salas Case"), dated December 12, 2018 is a true and correct copy of your testimony on December 12, 2018 in Nashville, Tennessee.

    **Response:** Admitted.

23. That you were present at all times, during the hearing on the attempted confirmation of the Debtor's proposed Chapter 11 Plan, the Len Salas Case, on December 12 and 13, 2018.

    **Response:** Admitted.

24. That you were represented by counsel at that hearing, including Mr. Cox, Mr. Albert and Mr. Young.

    **Response:** Admitted.

25. That on or about July 6, 2010 you visited your son, Ron, at his residence in Colorado along with your son, Len, and his wife.

    **Response:** Admitted.

26. That all lease payments for rental income from the rental of all or part of the DC Property from the period May, 2007 through April, 2018 were deposited into an account in the

**Response:** Denied as stated. Some, but not all, lease payments for rental income from the DC Property from May 2007 through Aprils 2018 were deposited into a CLR Trust bank account.

27. That there was no active bank account in the name of "CLR" other than the CLR Trust during the period between July, 2010 and April, 2018.
**Response:** Defendant can neither admit nor deny this Request as he does not understand the question as stated.

28. That you did not provide copies of bank statements, canceled checks, or other bank records related to any bank account on which you were a signatory, or in which you deposited funds as part of your document production to the Plaintiffs in the matter of their objection to your claim of exemption in the Salas Bankruptcy.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

29. That as of June 1, 2015 you had a copy of the signed Quitclaim Deed in your possession.
**Response:** Admitted.

30. That on and after July 6, 2010 you were aware that you had received the only signed, original Quitclaim Deed.
**Response:** Denied. Defendant later became aware that other signed, original copies of the Quitclaim Deed existed.

31. That the sole purpose of the Quitclaim Deed was to allow you the opportunity to refinance the Property so that your son would no longer have Deed of Trust obligation to Sun Trust Bank, or any other lender associated with the Property.
**Response:** Denied. Another purpose of the Quitclaim Deed was to secure a mortgage with a lower interest rate than the SunTrust Deed of Trust carried.

32. That the source of the funds to be used by your son, Ron, to purchase the Trustee's Avoiding and Recovery Powers from Mr. Gigandet in the L Salas Bankruptcy was funds owned and controlled by you.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

33. That all at times after commencement of the Superior Court Litigation you were aware of the existence of the Quitclaim Deed and the Riggs Property Trust.
**Response:** Denied.

34. That, at all times after commencement of the Superior Court Litigation you were aware that your sons, Ron and Len, had copies of the Quitclaim Deed.
**Response:** Denied.

35. That your son, Ron Salas, a Colorado lawyer was aware of the pendency of the Superior Court Litigation almost immediately after its commencement in 2015.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

36.  That your son, Ron, was aware that the only reason your other son, Len, was a defendant in the Superior Court Litigation is because he was the titled owner of the Property.

**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Defendant further objects on the grounds that the Request seeks information from Defendant regarding the mental impressions of a third party.

37.  You were aware, prior to 2016, that the only reason your son, Len, was a Defendant in the Superior Court Litigation was because he was the titled owner of the Property.

**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

38.  That your son, Len, was physically present at your deposition in the Superior Court Litigation held on February 24, 2016.

**Response:**  Admitted.

39.  That you were physically present at Len's deposition in the Superior Court Litigation held on March 9, 2016.

**Response:**  Admitted.

40.  That you were unaware of the possibility that the Property could be exempted in a bankruptcy proceeding by you until after you spoke to Mr. Marc Albert in early 2018.

**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Defendant further objects on the grounds that the Request seeks information that is protected by the attorney-client privilege.

41.  That you have not contacted Ms. Sylvia Jones regarding the location or existence of the original Quitclaim Deed since June, 2015.

**Response:**  Admitted.

42.  That you have not contacted Stan Goldstein or Capitol Title regarding the location or existence of the original Quitclaim Deed since June, 2015.

**Response:**  Denied.

43.  That you made no payments against the Sun Trust Deed of Trust Note during the period June 1, 2015 through October, 2019.

**Response:**  Denied.

44.  That the Note balance as of April, 2007 totaled approximately $870,000.

**Response:**  Admitted.

45.  That the Note balance as of June, 2010 totaled more than $870,000.

**Response:**  Defendant is without sufficient knowledge to admit or deny this Request.

46.  That the Note balance as of July, 2010 totaled more than $870,000.

**Response:**  Defendant is without sufficient knowledge to admit or deny this Request.

than $1,030,825.86.

       **Response:** Admitted.

48, That the Note balance as of October 23, 2019 was $1,208,720.40.
       **Response:** Admitted.

49. That the Proof of Claim filed by the Internal Revenue Service ("the IRS Claim") in your bankruptcy case on December 16, 2018 (C-2-1) is a true and correct copy of the IRS claim which was allowed under your Confirmed Plan.
       **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

50. That you did not object to the IRS Claim and it remains an allowed secured and priority claim allowed in the Salas Bankruptcy.
       **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

51. That from the period 2008 through May, 2015 you rented multiple rooms at the Property, from time to time.
       **Response:** Admitted.

52. That from the period 2008 through 2018 you did not declare the income from the rentals of rooms at the Property as income on your Federal or D.C. Income Tax Returns.
       **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

53. That from 2008 through the present, all notices from the District of Columbia and all tax forms related to the Property were addressed to Len Salas.
       **Response:** Defendant objects to this Request on the grounds that it is duplicative.

54. That the Complaint is made by the Plaintiffs on behalf of the bankruptcy estate of Len Salas.
       **Response:** Admitted.

55. That Salas had no communications with the Trustee concerning the Quitclaim Deed or the Riggs Property Trust until sometime after March, 2019.
       **Response:** Denied. Defendant's first communications with the Trustee concerning the Quitclaim Deed and the Riggs Property Trust occurred in December 2018.

56. That neither Salas nor Len produced a copy of the Quitclaim Deed or the Riggs Property Trust in their document production as part of the Superior Court Litigation.
       **Response:** Admitted.

57. That neither Salas nor Len provided the original or a copy of the Quitclaim Deed or Riggs Property Trust to Plaintiffs or their counsel (in the Superior Court Litigation) until after February 15, 2018.
       **Response:** While Defendant cannot admit to an exact date, Defendant admits that it was sometime after this general timeframe.

58.  That the intent of the attempted Quitclaim Deed in July, 2010 was to remove Len Salas from any liability related to the DC Property.

**Response:**  Defendant denies that this was the only reason for the Quitclaim Deed, as explained in other responses herein.

59.  That the intent of the Riggs Property Trust was to avoid having the property in the name of Max Salas.

**Response:**  Admitted, but the transfer to the trust was only done to aid in refinancing the note.

60.  That the intent of the Riggs Property Trust was to avoid income tax liability of, or by, Max Salas.

**Response:**  Denied.

61.  That Salas was unaware he could exempt his alleged interest in the DC Property until after 2017.

**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

62.  That Salas did not attempt to locate a copy of the Quitclaim Deed or Riggs Property Trust until 2018.

**Response:**  Admitted.

63.  That Salas was unaware of any assets owned or controlled by Len over the value of $25,000 in July, 2010.

**Response:**  Admitted, because Defendant had little knowledge of Len Salas' assets in July 2010.

64.  That Salas had more than one conversation with Len after 2010 about removing Len from the title to the DC Property.

**Response:**  Admitted.

65.  That Salas had more than one conversation with Len after 2010 about eliminating Len as an obligor on obligation(s) secured by the DC Property.

**Response:**  Admitted.

Respectfully submitted,

/s/ Phillip G. Young
Phillip G. Young (TN 021087)
THOMPSON BURTON, PLLC
6100 TOWER CIRCLE, SUITE 200
FRANKLIN, TENNESSEE 37067
(615)-465-6008
phillip@thompsonburton.com

*Attorneys for Defendant*

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name    Middle Name    Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | 18-00260 |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 106D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

☑ Yes. Fill in all of the information below.

**Part 1:    List All Secured Claims**

**2. List all secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | Column A<br>Amount of claim<br>Do not deduct the<br>value of collateral. | Column B<br>Value of collateral<br>that supports this<br>claim | Column C<br>Unsecured<br>portion<br>If any |
|---|---|---|---|---|
| **2.1** Internal Revenue Service | **Describe the property that secures the claim:** | $6,766.92 | Unknown | $0.00 |

Creditor's Name

**Cental Insolvency Operation PO Box 7346 Philadelphia, PA 19101-7346**

Number, Street, City, State & Zip Code

**Who owes the debt?** Check one.

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☑ Check if this claim relates to a community debt

**Describe the property that secures the claim:**

**All property**

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
☑ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset)    IRS Tax Lien

| Date debt was incurred | **2009, 2010, 2011** | Last 4 digits of account number | 2714 |
|---|---|---|---|

| **2.2** SunTrust Mortgage, Inc. | | $1,030,825.86 | $2,500,000.00 | $0.00 |
|---|---|---|---|---|

Creditor's Name

**Describe the property that secures the claim:**

**1610 Riggs Place, NW Washington, DC 20009**
**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**
**trust collapsed on creation through merger to convey property to debtor**
**DC Records displays owner as Len**

**ATTN: Client Services - RVW 30 P.O. Box 26149 Richmond, VA 23260-6149**

Number, Street, City, State & Zip Code

**Who owes the debt?** Check one.

☐ Debtor 1 only
☐ Debtor 2 only

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)

Official Form 106D    Schedule D: Creditors Who Have Claims Secured by Property    page 1 of 2

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

**Cox, Joshua W.**

| | |
|---|---|
| **From:** | Ron Salas <ronsalas@salaslegal.com> |
| **Sent:** | Wednesday, February 14, 2018 3:48 PM |
| **To:** | Albert, Marc |
| **Cc:** | maxsalas@aol.com; m.salas1953@gmail.com |
| **Subject:** | Signed Trust |
| **Attachments:** | Trust Doc.pdf |

My apologies for the delay. I have the originals.

Regards,
Ron

Ron Salas, Esq.

ronsalas@salaslegal.com
Office (970) 232.3330
Fax (877) 667-2860

**Fort Collins**
323 W Drake Road, Suite 116
Fort Collins, CO 80526

**Greeley**
4290 West 10th Street, Suite 110
Greeley, CO 80634

www.thesalaslawfirm.com

**CONFIDENTIALITY NOTICE**: This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

 Virus-free. www.avg.com

**Cox, Joshua W.**

| | |
|---|---|
| **From:** | Albert, Marc |
| **Sent:** | Wednesday, March 07, 2018 11:11 AM |
| **To:** | 'Rod R. Barnes' |
| **Cc:** | 'Max Salas' |
| **Subject:** | RE: Signed Trust |

Sorry I meant Ron Salas.

**From:** Cox, Joshua W.
**Sent:** Wednesday, March 07, 2018 11:04 AM
**To:** Albert, Marc
**Subject:** RE: Signed Trust

I think you meant Ron Salas.

Joshua W. Cox
Attorney
Washington
202.728.3023
x63023

**From:** Albert, Marc
**Sent:** Wednesday, March 07, 2018 11:03 AM
**To:** Rod R. Barnes; Max Salas
**Cc:** Cox, Joshua W.
**Subject:** FW: Signed Trust

Clarification. I spoke to Ron Barnes this morning. He indicated he misspoke in his email. He gave the originals to his father so they could be recorded in DC. He only retained a copy of the signed documents.

Marc E. Albert
Partner
Washington
202.728.3020
x63020

**From:** Ron Salas [mailto:ronsalas@salaslegal.com]
**Sent:** Wednesday, February 14, 2018 3:48 PM
**To:** Albert, Marc
**Cc:** maxsalas@aol.com; m.salas1953@gmail.com
**Subject:** Signed Trust

My apologies for the delay. I have the originals.

Regards,
Ron

Ron Salas, Esq.

ronsalas@salaslegal.com
Office (970) 232.3330
Fax (877) 667-2860

**Fort Collins**
323 W Drake Road, Suite 116
Fort Collins, CO 80526

**Greeley**
4290 West 10th Street, Suite 110
Greeley, CO 80634

www.thesalaslawfirm.com

**CONFIDENTIALITY NOTICE:** This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

 Virus-free. www.avg.com

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .      Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .      Washington, D.C.
              Debtor.           .      August 22, 2018
                                .
. . . . . . . . . . . . . . .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 1 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:

For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020


For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia   20190
                         (703) 904-4380


Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON




Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____
MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

OPENING STATEMENTS:                               PAGE:
By Mr. McNutt                                     10
By Mr. Albert                                     27


WITNESSES:                                        PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt                  37

LEN SALAS
Direct examination by Mr. Albert                  98
Cross-examination by Mr. McNutt                   116
Redirect examination by Mr. Albert                187
Recross-examination by Mr. McNutt                 199

RON SALAS
Direct examination by Mr. Albert                  206
Cross-examination by Mr. McNutt                   219
Redirect examination by Mr. Albert                245

EXHIBITS:                           MARKED: RECEIVED:

DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)      *       9
B.  4/16/07 deed of trust               *       9
    (L.Salas/SunTrust) with 7/8/15
    Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement  *       9
D.  7/6/10 L.King journal entries       *       9
E.  Encomass insurance policy           *       9
F.  1610 lease documents                *       9
G   Email chain beginning 2/14/18       *       --
    R.Salas to insurance counsel
H.  3/19/18 emergency motion for        *       9
    summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules *    9
J.  M.Salas Answer to Interrogatories   *       9
    (Brekelmans case)
K.  M.Salas Answer to Interrogatories   *       9
    (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S | | |
| 1.  Trial Transcript, 3/26/18, pp.1-19 | * | 8 |
| 2.  Joint pretrial statement, 7/18/17 | * | 8 |
| 3.  Pretrial order, 12/29/17 | * | 8 |
| 4.  Amended joint pretrial statement, 2/15/18 | * | 8 |
| 5.  McLoughlin Complaint, 10/20/15 | * | 8 |
| 6.  Brekelmans Complaint, 10/20/15 | * | 8 |
| 7.  L. Salas Answer (Brekelmans Complaint) 11/13/15 | * | 8 |
| 8.  L. Salas Answer (McLoughlin Complaint) 11/13/15 | * | 8 |
| 9.  M.Salas Answer (McLoughlin Complaint) | * | 8 |
| 10. M.Salas Answer (Brekelmans Complaint) | * | 8 |
| 11. Memorandum in support of L.Salas motion to dismiss | * | 8 |
| 12. M.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 13. L.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 14. M.Salas Deposition Transcript dated 2/14/16 | * | -- |
| 15. L.Salas Deposition, 3/9/16 pages 117-120 | * | 54 |
| 16. 4/27/95 deed (Wilhelm/Bruff) | * | 8 |
| 17. 4/16/07 deed (Bruff/M.Salas) | * | 8 |
| 18. 4/16/07 deed (M.Salas/L.Salas) | * | 8 |
| 19. Deed of trust (L.Salas/Sun Mortgage) | * | 8 |
| 20. Property request report for 1610 Riggs Place Northwest | * | 8 |
| 21. D.C. notice of infraction | * | 8 |
| 22. DCRA notice of immediate abatement | * | 8 |
| 23. Memorandum in Support of L. Salas' Emergency Motion for Summary Judgment | * | 8 |
| 24  8/10/18 R.Salas deposition excerpts | * | -- |
| 25. Lease, 10/1/14 - Tamasco | * | 8 |
| 26. Lease, 6/2/14 (first page) | * | 8 |
| 27. Lease, 17th of 2014 to Brekelmans | * | 8 |
| 28. Lease, 8/17/14 to Brekelmans | * | 8 |
| 29. Lease, 11/1/14 to Mecham | * | 8 |

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S (continued) | | |
| 30. Irrevocable Trust, 7/6/10 | * | 8 |
| 31. Cornet letter, 5/19/17 | * | 8 |
| 32. Debtor's report, excerpts, 4/5/18 | * | 8 |
| 33. Debtor's report, excerpts, 6/8 | * | 8 |
| 34. Excerpts, L.Salas, first Meeting of creditors, 5/24/18 | * | -- |
| 35. M.Salas Answers to Interrogatories, 8/6/18 | * | 8 |
| 36. Debtor's schedules A/B, C-J, 5/2/18 | * | 8 |
| 37. Debtor's responses, 8/6/18 | * | 8 |
| 38. Debtor's statement of financial affairs(D-13), 5/2/18 | * | 8 |
| 39. Debtor's amended statement of financial affairs(D-50), 6/27/18 | * | 8 |
| 40. Debtor's amended petition | * | 8 |
| 41. R.Salas email (trust documents) | 231 | -- |

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of "(unintelligible)" in this transcript are due to the audio recording levels being turned up too high, or individuals speaking outside of the vocal capture range of the microphone.

1 000063
946

1  she signed it back over to me, right?

2      Q.   I'm sorry?

3      A.   She -- what do you mean?  Can you ask the question

4  -- what does convey mean for sure?

5           I'm -- she signed it back over to me?

6      Q.   Did you understand that she signed the property

7  back over to you, in your words, in April of 2007?

8      A.   Yes.

9      Q.   All right.

10          And the purpose of that was to allow you to live

11  in the property and to also obtain funds to pay her as part

12  of the divorce settlement, correct?

13     A.   Well, I lived in the property since 1995 when we

14  bought the property together.

15     Q.   I understand that, but what was the purpose -- let

16  me try it this way.

17          In April 2007 you conveyed the property to your

18  son, correct?

19     A.   What do you mean by convey?  Can you tell me that?

20     Q.   Did you sign a deed --

21     A.   Yes.

22     Q.   -- of the property to your son Len?

23     A.   Yes.

24     Q.   Okay.

25          And the purpose of that was so that he could

1  obtain a deed of trust on the property to pay your ex-wife,

2  correct?

3      A.   Well, I signed it over to him so we could get a

4  loan to pay my ex-wife for her half of the settlement in

5  the divorce.

6      Q.   Okay.

7           And you son agreed to do that, correct?

8      A.   Yes.

9      Q.   All right.

10          And when you say "we obtained a loan," were you on

11  the loan?

12     A.   I promised my son that I would pay for the loan,

13  yes.

14     Q.   Is that in writing?

15     A.   I promised my -- I know it was my word to my son.

16     Q.   What was that -- that wasn't my question.  My

17  question is was that promise in writing?

18     A.   No.

19     Q.   Okay.

20          Now, at the time in 2007 there was a deed of trust

21  taken out on the property through SunTrust Mortgage,

22  correct?

23     A.   Yes, sir.

24     Q.   And that deed of trust and the loan was taken out

25  by your son Len Salas, correct?

1    A.   Yes, sir.

2    Q.   And he was the only person obligated on that loan,

3  correct?

4    A.   Technically, yes.  Yes, sir.

5    Q.   Technically, legally on paper, all of that,

6  correct?

7    A.   Well, I promised him that he wouldn't have to pay

8  for the loan, that I would pay for the loan.

9    Q.   I understand, but who was responsible for paying

10  the loan according to the loan documents as you understood

11  them?

12    A.   I was responsible for paying the loan.

13    Q.   Under the loan documents as you understood them

14  you were responsible to make the payments on the loan?

15    A.   Yes.  I've made every payment on every -- on that

16  loan since 1995 to today.

17    Q.   Did you sign the promissory note to SunTrust?

18    A.   I didn't sign a promissory note to SunTrust.

19    Q.   Okay.

20         Now, during the course of -- let's go back to the

21  period subsequent to 2007 when these deeds transferring the

22  property from Ms. Bruff to you, and from you to your son,

23  were created.  Do you remember that timeframe?

24    A.   Yes, sir.

25    Q.   All right.

1        And it's true that shortly after that timeframe

2   your son started asking you to undertake to get him off of

3   the deed to the property, is that correct?

4        A.   Yes.

5        Q.   And that was something that he was consistently

6   asking you to do even through 2018, correct?

7        A.   Yes, every opportunity he could every -- yes.  He

8   wanted off the loan.

9        Q.   Okay.

10        And what efforts did you undertake to get him off

11   the loan between, well, let's start with the period between

12   2007 and July of 2010?

13        And the reason I'm using July of 2010 is because

14   that was the month in which the alleged trust -- and I'm

15   saying alleged trust, you might believe it's a trust I

16   understand, was created in Colorado -- during that period

17   of time, how many times would you say your son contacted

18   you with respect to getting his name off the property, the

19   Riggs Place Property?

20        A.   So let me make sure I understand your question.

21   From 2010 to 2007 -- from 2007 to 2010, three years?

22        Q.   Yes, sir.

23        A.   I would say at least three times or four times a

24   year, so that would be twelve times.

25        Q.   Okay.

1          Now, did your son talk to you about taking his

2    name off the deed after July of 2010?

3         A.   Yes.  Well -- yes.  No, he -- he talked to me

4    about taking his name off the loan.

5         Q.   Did he talk to you about taking his name off the

6    property?

7         A.   No, he'd already taken his name off the property.

8         Q.   When did he do that?

9         A.   He signed it over to me, he signed it over to my

10   trust on 2010, July 6th of 2010.

11        Q.   So after July of 2010 it's your position that your

12   son was no longer on the property, no longer an owner of

13   the property, is that correct?

14        A.   That's correct, sir.

15        Q.   Okay.

16             Now, during the course of the Superior Court

17   litigation in the District of Columbia, there were

18   depositions taken of you and your son in 2016.  Do you

19   remember that?

20        A.   Repeat the question, please.

21        Q.   Yes.

22             Do you remember the depositions that were taken of

23   you and your son in the Superior Court case, and when I say

24   Superior Court case I'm talking about the personal injury

25   and wrongful death litigation --

```
 1          THE COURT:

 2          BY MR. McNUTT:

 3     Q.   Let me refer you to page 113 of the same

 4   deposition, Mr. Salas.

 5          MR. ALBERT:  Judge, did he -- you took the whole

 6   transcript into evidence, right?

 7          THE COURT:  I took pages 117 through 120.

 8          MR. ALBERT:  Not the whole thing.  Okay.

 9          THE COURT:  Into evidence.

10          BY MR. McNUTT:

11     Q.   Are you with me, Mr. Salas?  Page 113?

12     A.   Yes, sir.

13     Q.   All right.

14          Starting on line 7 of page 113, the question,

15   again I believe this is Mr. Curnonni?

16     A.   Yes, sir.

17     Q.        "Did you, after you got the mortgage

18            in the years prior to the fire, did you

19            ever have a discussion with your father

20            with regards to transferring ownership of

21            the property to him?"

22            Did I read that correctly?

23     A.   Yes, sir.

24     Q.   And his answer is, "Yes," on line 11, correct?

25     A.   Yes, sir.
```

1   Murfreesboro.  It went from the truck to the garage.  It's

2   always been in the garage since.  Whenever we moved to the

3   Murfreesboro, whatever date that was.

4              THE COURT:  All right.

5              THE WITNESS:  December of 2016 -- well -- right?

6              THE COURT:  Okay.

7              December of 2017, a few months before the trial?

8              THE WITNESS:  I guess the filing cabinet at --

9   yeah.  What -- no.  So I'd been -- yeah, I guess it'd been

10  in there for a year.

11             THE COURT:  Thank you.

12             THE WITNESS:  Or a year --

13             THE COURT:  That clears that up.  Thank you.

14             THE WITNESS:  A year and some change.  But it was

15  stuck in the corner with a whole bunch of stuff in front of

16  it, so I never looked in it.  Hardly ever.

17             MR. McNUTT:  All right.

18             May I continue, Your Honor?

19             THE COURT:  Yes.

20             MR. McNUTT:  Thank you.

21             BY MR. McNUTT:

22    Q.   I just want to be clear, prior to sometime in the

23  weeks before trial you never talked to your brother about

24  produce, your brother Ron, about producing a copy of the

25  trust document, is that correct?

1      A.    When?   What was the timeframe?   What was your --

2      Q.    Prior to, let's say prior to March of 2018.

3      A.    No.

4      Q.    Okay.

5      A.    I guess --

6            THE COURT:   Did you know he had a copy?

7            THE WITNESS:   No, I didn't -- I mean in retrospect

8    I thought all, you know, the day we signed it he put a copy

9    in it, but I didn't think about that at the time, and, that

10   he kept an electronic copy.   So I don't know.   And then I

11   don't know when he and Marc got together and decided, and

12   said, "Send me the files."   I don't know when that

13   happened.

14           BY MR. McNUTT:

15     Q.    Do you know if your father Max ever requested a

16   copy of the trust documents from your brother prior to

17   March of 2018?

18     A.    I don't know if he requested a copy.   I assume he

19   got a copy like I did the day we signed it, but I don't

20   know if he requested a copy.

21     Q.    Do you know if your wife requested a copy from

22   your brother?

23     A.    Yeah, the day we signed it.   Yeah, I guess.   I

24   mean --

25     Q.    And what about during the timeframe after the

1  signature in July of 2015 through March of -- through

2  February of 2018?

3      A.   Uh --

4      Q.   Did your wife ask for a copy?

5      A.   No, I assume she forgot it just like I did.

6      Q.   So --

7      A.   And then, you know.

8      Q.   So the important issue with respect to your

9  liability was your ownership of the property, and you knew

10 that from the date that the lawsuits were filed in October

11 of 2015 yet -- and your brother had knowledge of the

12 lawsuit, your wife had knowledge of the lawsuit, your

13 father had knowledge of the lawsuit, and you had knowledge

14 of the lawsuit, and none of the four of you thought to come

15 up with a copy of the trust document that you claim deeded

16 the property from you to your father which would have

17 absolved you from liability of the lawsuit, none of you

18 thought to obtain a copy of that from your brother through

19 February of 2018?  That's what you're telling me?

20     A.   Yeah.  We all forgot about it.  Which is --

21     Q.   Okay, now is that the only trust that you're aware

22 of with respect to the family?

23     A.   There's a -- no.

24     Q.   Sorry?

25     A.   Yes.

1    Q.   It's not the only one?

2    A.   There's a CLR Trust or something.  I don't know.

3    Q.   Okay.

4         What do you know about the CLR Trust?

5    A.   That it exists.  That's about it.  I have no idea.

6    Q.   Have you ever seen a copy of the trust documents?

7    A.   No.

8    Q.   Did you ever ask your brother for a copy of the

9    trust documents?

10   A.   No.

11   Q.   Did you ever ask your father for a copy of the

12   trust documents?

13   A.   No.

14   Q.   All right.

15        In your deposition, would you look at paragraph --

16   I'm sorry.  Would you look at document 15 again in the

17   white binder?

18        That's your deposition transcript.

19   A.   What page again?

20   Q.   This would be on page 8.  And it refers to

21   transcript pages 29 through 32.

22   A.   Uh-huh.

23   Q.   Do you see that?

24        I'm looking specifically at page 29, starting at

25   line 9.

1    A.    Yes.

2    Q.    Okay.  And you were asked the question:

3              "What do you know about the 1610

4          Salas Trust?"

5    A.    Yeah.

6    Q.    All right.

7          Do you know what the reference to the 1610 Salas

8    Trust is?

9    A.    Oh, no, I mean, no.  Uhm -- actually, no.  Not

10   quite.  See, it says not much.  It's an account.  I thought

11   it was an account.

12   Q.    And what made you think it was an account?

13   A.    Because he, when I got that call from SunTrust

14   saying that the mortgage hadn't been paid, I said what

15   happened.  He says, "Well, I've set up this account for

16   1610 so all the rent checks go into there, and then I pay

17   that."  And I guess one check didn't clear before they

18   pulled my check.  I -- something.  I got some kind of

19   answer like that.  Something to that effect.

20   Q.    And that's what your father told you?

21   A.    So that's what I thought, that's what I referred

22   to.

23   Q.    But that's what your father told you, right?

24   A.    Correct.

25   Q.    Is that what you're saying?

000208
957

1          Okay.  And he filled you in on an account in the

2     name the Salas Trust?

3          A.   Yeah.

4          Q.   Okay.

5          A.   But I don't --

6          Q.   And that's --

7          A.   I don't --

8          Q.   And that's where the rents were paid?

9          A.   Excuse me?

10              I don't know if -- I couldn't --

11         Q.   And that's where the rents were paid?

12         A.   I think.

13         Q.   Okay.

14         A.   I assume.  I don't know.  That's what he's told

15    me, so I don't know.

16         Q.   Okay.

17              And that's what he told you.  When did he tell you

18    that?

19         A.   I don't know.  I don't remember.

20         Q.   Sometime prior to the fire?

21         A.   Yes.

22         Q.   Okay.

23              And he, did he tell you what the purpose of the

24    account was?

25         A.   To pay the rent I guess, or to pay the mortgage.

```
 1      Q.   Okay.  All right.
 2           Continuing, you say, you say in answer to the
 3   question what do you know about the 16 Salas Trust (sic),
 4   you say, starting in line 10:
 5                "Not much.  It is an account.
 6                Question:  What does that mean?
 7                Answer:  It is some kind of account,
 8           I guess. I don't really know.  I don't
 9           really know, really.  It is just the
10           trust."
11      A.   Uh-huh.
12      Q.   Continuing:
13                "Question:  Do you have any personal
14           knowledge regarding 1610 Salas Trust?
15                Answer:  No, actually, I mean what I
16           found out the other day from your
17           deposition of my father is what I know."
18      A.   Right.
19      Q.   So do I understand from that testimony that the
20   first time you heard of the 1610 Salas Trust is at the
21   deposition of your father in the Superior Court case?
22      A.   I guess.  Well, I -- sorry.  There -- I -- yeah.
23   He -- I'm not sure, to tell you the truth.
24           What was the question?  I'm sorry.
25      Q.   The question is whether you had any knowledge of
```

1   the 1610 Salas Trust outside of the testimony of your
2   father in his deposition in the Superior Court case?
3       A.   Uh --
4            THE COURT:  Whether he had knowledge as of what
5   point, Mr. McNutt?
6            MR. McNUTT:  This would have been at the time of
7   the depositions which were in February and March of 2018.
8            THE COURT:  So rephrase the question to be precise
9   --
10           MR. McNUTT:  Sure.
11           THE COURT:  -- as to the time of the state of his
12  knowledge.
13           MR. McNUTT:  Sure.  Thank you, Your Honor.
14           BY MR. McNUTT:
15      Q.   Is it your understanding, is it -- am I correct
16  based on your answer that I've just read that as of
17  approximately March 9, 2016 the only knowledge you had
18  concerning the 1610 Salas Trust was knowledge obtained from
19  the testimony of your father at his deposition in February
20  of that same year?
21      A.   I don't know.
22      Q.   Are you aware of any other information or
23  knowledge that you had regarding the 1610 Salas Trust?
24      A.   I don't know.  I don't remember.  I don't know.
25      Q.   Okay.

1  think it's supposed to mean:

2          "Why did your wife want to transfer

3      ownership?

4          Answer:  Because she didn't want that

5      in my name.  Same thing for the reason I

6      guess."

7      That was your answer, correct?

8  A.   Uh-huh.  For the --

9  Q.   All right.

10     Would you turn then to page 116?  That's

11 on the same typed page, but transcript page 116.

12 A.   Yes, I have it.

13 Q.   All right.

14     Starting on line 13, the question is:

15          "How many conversations did you have

16      with your father about potentially

17      transferring ownership of the building to

18      him?

19          Answer:  Multiple.

20          Question:  When was the last time you

21      had such a conversation prior to the fire?

22          Answer:  That spring since we were in

23      that summer."

24     Did I read that correctly?

25 A.   You read it correctly, yes.

1    Q.   All right.

2         So in 2015, five years after you executed the

3    trust documents and five years after you believe that you

4    deeded the property to your father, you're still asking the

5    father to transfer ownership of the property to him?

6    A.   The mortgage is what I was talking about.

7    Q.   It doesn't say mortgage here, does it?

8    A.   Yeah, but that's what I was referring to.

9    Q.   Well, you were referring to ownership in the

10   property, weren't you?

11   A.   No, because it said the mortgage because I said I

12   want to buy my house.  The reason I couldn't buy my, well,

13   the house that I live in that was currently my wife's, is

14   because I couldn't because of my credit that was on the

15   1610 Riggs Place.  So I couldn't buy, I quote/unquote

16   "couldn't buy" my house or have my house, my name on my

17   house because my credit wasn't good enough to get, to have

18   two houses.

19   Q.   Okay, let's try this again.

20        If you look on page 113, please?

21   A.   Uh-huh.

22   Q.   The question is, starting in line 8:

23            "Did you ever have a discussion with

24            your father with regards to transferring

25            ownership of the property to him?"

1            And your answer was:

2                  "Yes."

3       A.    Where does --

4       Q.    It doesn't ask you --

5       A.    -- it say that?

6       Q.    -- about a mortgage.  It asks about transferring

7  ownership of the property, right?

8       A.    Line 7, "Do you...did you do...you got the

9  mortgage in the years..."  So I thought when he said

10  mortgage, I assumed he was talking about the mortgage.

11  Line 7 on page 13.

12      Q.    So you read the:

13                  "Did you, after you got the mortgage

14            in the years prior to the fire, did you

15            ever have a discussion with your father

16            with regards to transferring ownership of

17            the property to him?"

18            You read that to mean transferring the mortgage to

19  him?

20      A.    Yes.

21      Q.    Okay.

22            And page 116, paragraph, starting on line 13 it

23  says:

24                  "How many conversations did you have

25            with your father about potentially

1              transferring ownership of the building to

2              him?"

3              Doesn't say anything about a mortgage, does it?

4         A.   Well, I guess I misunderstood the question because

5    I mean, I thought he was speaking of mortgage, and I said

6    multiple times.  I said multiple.

7         Q.   Does it say mortgage there or note?

8         A.   I thought he was referring to mortgage.

9         Q.   All right.

10             Let's go to page 117 then.  I think we have to

11   start at the last page, 116 on line 22.  Do you see page

12   116 at the very end of the, Mr. Salas?

13        A.   Uh-huh.

14        Q.   All right.

15             It ways:

16                  "What was the catalyst..."

17             And this is referring to the conversation that you

18   had in the spring or summer of 2015, okay?

19        A.   Uh-huh.

20        Q.        "What was the catalyst for that specific

21             conversation?

22                  Answer:  I don't know.  It was always

23             in my mind to get it off of my name.

24                  Question:  Do you remember why it

25             occurred that spring before the fire?  Was

1              there anything going on in your life or
2              your father's life which was the catalyst
3              for that conversation?
4                   Answer:  No, I don't think so.  Maybe
5              I knew that I was going to be a father
6              again and that prompted me.  I don't know."
7              Correct?
8         A.   Correct.
9         Q.   All right.
10                  "Okay.  What did your father say
11             during that conversation?
12                  Answer:  'I'm trying.'"
13             I read that correctly, didn't I?
14        A.   Correct.
15        Q.   All right.
16             And then the next question is:
17                  "And what did you understand that to
18             mean?
19                  Answer:  That he was looking to get
20             it repackaged or remortgaged or
21             something."
22        A.   Uh-huh.
23        Q.   I read that correctly, didn't I?
24        A.   Right.
25        Q.   So you were hoping that your father was trying to

1  get the home refinanced so you could be taken off the

2  mortgage?

3        A.    Correct.

4        Q.    Okay.

5              And the question is:

6                    "Who was he trying to get the house

7              re-mortgaged with?

8                    Answer:  SunTrust."

9              Right?

10       A.    Correct.

11       Q.    Line 20?

12       A.    Yes.

13       Q.    All right.

14             And then I believe this is, I'm not sure who was

15  asking the questions here, but counsel for one of the

16  estates is asking you about whether you saw any documents

17  related to the refinancing that you were talking about.

18       A.    Uh-huh.

19       Q.    And on page 118 starting at line 20, the question

20  is:

21                    "What documents did you see that led

22             you to believe that that process had

23             started?

24                    Answer:  Refinancing documents."

25             Right?

1  A. When, at -- when I'm asking him to get --

2  Q. In 2015.

3  A. For, in 2007 in the original or?  Or in the --

4  Q. In the context of your answers here, which I

5 believe are in the spring or summer of 2015.

6  A. So what was the question again then?

7  Q. The question is why are you filling out

8 applications with your income and credit information if

9 your father is trying to refinance the property and get you

10 off the mortgage?

11  A. I -- I don't know.

12  Q. Are you aware of any refinancing that your father

13 requested that did not have your financial information and

14 credit information attached to it at any time?

15  A. Excuse me?

16  Q. At any time after 2007 are you aware of any

17 refinancing sought by your father in which your credit

18 information and income were not a part of the application?

19  A. I don't know.  I don't.

20  Q. So as we sit here today, your father has not been

21 able to refinance the property or take your name off the

22 property since 2007?  That's accurate, isn't it?

23  A. I don't know.

24  Q. Okay.

25   Are you aware of whether your father up until the

000224
967

1    Q.   Who prepared these documents?

2    A.   I prepared them.

3    Q.   All right.

4         And did you have your brother and your father in

5    your office with respect to these documents?

6    A.   I did.

7    Q.   And what happened at that time?

8    A.   At that time myself, my father, my brother, and

9    his wife were present.  We signed the trust documents.  I

10   as a witness, my sister-in-law as a witness.  It was a

11   notary present.  We signed the trust agreement.  We signed

12   the quit-claim -- well, I did not sign the quit-claim.  The

13   quit-claim deed was signed by my brother Len and Max, and

14   the deed was given to, from Len to Max, the original to be

15   filed.  And a copy was given to my brother for his records,

16   and I kept a copy.

17   Q.   Okay.

18        And these documents were notarized also, correct?

19   A.   They were, yes, that's correct.

20   Q.   And who notarized them?

21   A.   Lori King.  She worked in my office at that point

22   for several years and she notarized -- well, it was a

23   shared office.  She worked in the office as a receptionist.

24   She notarized documents for the attorneys in the office.

25   Q.   Okay.

1          And you witnessed the other people, including the

2    notary signing, were appropriate?

3         A.   I did.

4         Q.   You saw your brother sign, you saw your father

5    sign?

6         A.   Yes.

7         Q.   Did you review these documents with them before

8    they signed them?

9         A.   Yes, I did.

10        Q.   And do you know whether these documents were ever

11   recorded?

12        A.   I know today that they were not recorded.  My

13   assumption was that they were, but as of today I knew they,

14   I know now that they were not.

15        Q.   Okay.

16             Did there come a time you knew your father and

17   brother were involved in litigation involving the deaths

18   that occurred from a fire in 2015?

19        A.   Yes.

20        Q.   What did you, who did you learn about this

21   litigation from and what did you learn?

22        A.   I learned that they were both named in a lawsuit.

23   I don't recall who contacted me first, whether it was my

24   brother or my father.  I know they both at some point did.

25   Both sent me copies of the summons or petition, summons I

1

2

3

4

5

6   I certify that the foregoing is a correct transcript from

7   the electronic sound recording of the proceedings in the

8   above-entitled matter.

9

10   /s/Kristen Shankleton, CER-6785     Dated: 10/27/18

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18-00260 |
| MAX E. SALAS, | ) | Chapter 11 |
| | ) | |
| Debtor In Possession. | ) | |
| | ) | |
| NICOLAAS J. BREKELMANS AND GAIL | ) | |
| GREGORY BREKELMANS, TRUSTEES OF | ) | |
| THE ESTATE OF NINA BREKELMANS; | ) | |
| And | ) | |
| | ) | |
| MICHAEL McLOUGHLIN AND | ) | |
| MARTHA JOHNSON, TRUSTEES OF | ) | |
| THE ESTATE OF PATRICK | ) | |
| McLOUGHLIN | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MAX E. SALAS | ) | |
| | ) | |
| Respondent. | ) | |

## DEBTOR'S RESPONSES TO MOVANTS' FIRST SET REQUEST FOR PRODUCTION OF DOCUMENTS RE: THE MOVANTS' OBJECTION TO TH DEBTOR'S CLAIM OF EXEMPTIONS TO HIS RESIDENCE AND THE MOVANTS MOTION TO DISMISS OR CONVERT

TO:     Philip McNutt, Esq. Law Office of Philip J. McNutt, PLLC, 11921 Freedom Drive, Suite 584, Reston, VA 20190

Pursuant to Bankruptcy Rules 7033 and 7026-1(B), and Rule 33 of the Federal Rules of

Civil Procedure, Max E. Salas, the debtor and debtor-in-possession ("Debtor") in this Chapter 11

case hereby responds to the July 3, 2018 First Request for Production of Documents served by

Movant's Nicolaas J. Brekelmans and Gail Gregory Brekelmans, Trustees for the Estate of Nina

---

1.     CORE/3502869.0005/141727844.1

Brekelmans ("Brekelmans Estate") and Michael McLoughlin and Martha Johnson, Trustees for the Estate of Patrick McLoughlin ("McLoughlin Estate," and collectively with the Brekelmans Estate, the "Estates"). .

## GENERAL OBJECTIONS

The Debtor objects to each of the Estates' request for production of documents to the extent that each broadens the scope of a permissible interrogatory or is otherwise inconsistent with the Federal Rules of Civil Procedure or Federal Bankruptcy Rules. The Debtor further objects to each interrogatory to the extent that it calls for the disclosure of privileged information.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**: All documents which are identified in your answers to the Interrogatories propounded by the Movants herein.

> **ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 2**: All documents which concern, or relate to, your answers to the Interrogatories propounded by the Movants herein.

> **ANSWER**: Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 3**: All documents which relate to all known or anticipated sources of income to the Debtor, including any known or anticipated source of funding for a proposed Plan of Reorganization.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 4:** All documents which concern, or relate to, the Trust, including all drafts of

trust documents, all deeds, deeds of trust and related documents and all communications

regarding the Trust.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 5:** All Documents regarding communications you had with your sons, or any

other party, concerning the Trust.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 6:** All Documents related to your travel to Colorado and lodging at or about the

time of your execution of the Trust documents.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 7:** All Documents related to your income, and expenses for the period January,

2017 through the present, including all correspondence with creditors or claimants and all

documents related to payments you made to creditors for the same period.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 8:** All Documents related to your 401k loan and repayments.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 9:** All Documents related to the claim of Len Salas identified in Schedule E/F of your schedules filed herein.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 10:** All Documents related to communications with your sons, Len, Ron and Chris, related to the Superior Court litigation, the Trust, your bankruptcy filing or Len's bankruptcy filing, from the period, January, 2017 through the present.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 11:** All Documents which relate to the Objection to your Exemption or the Motion to Dismiss filed herein by the Movants or your responses and/or oppositions to the Objection and Motion to Dismiss.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 12:** All Documents which you provided to any Expert whom you intend to callas a witness in this matter.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 13:** All Documents which any Expert you intend to use as a witness in any

hearing in this Case has provided to you, including all reports and drafts of reports you intend to

use at trial and all documents set forth in Fed. R. Civ. P. 26 (a)(2)(B) and (C), as incorporated

into these proceedings by Fed. R. Bankr. P. 7026, and 9014 (c).

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and
> copying any documents responsive to this request, in his possession, custody and control, if
> any.

/s/ Joshua W. Cox
/s/ Joshua W. Cox
Marc E. Albert, No. 345181
Joshua W. Cox, No. 1033283
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
joshua.cox@stinson.com
*Attorneys for*
*Max E. Salas, Debtor and Debtor-In-Possession*

Dated: August 6, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I did serve a copy of the foregoing Responses to Movant's First Set of Interrogatories on August 6, 2018, electronically via the Court's ECF system, and by electronic mail upon the following:

Philip J. McNutt, Esquire
Law Office of Philip J. McNutt, PLLC
11921 Freedom Drive
Suite 584
Reston, VA 20190

/s/ Joshua W. Cox
Joshua W. Cox

CORE/3502869.0005/141727844.1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LEN SALAS | ) | CASE NO. 3:18-BK-02662 |
| | ) | CHAPTER 11 |
|    DEBTOR. | ) | JUDGE HARRISON |
| | ) | |
| NICOLAAS BREKELMANS AND | ) | |
| GAIL GREGORY BREKELMANS, | ) | |
| CO-PERSONAL REPRESENTATIVES OF | ) | |
| THE ESTATE OF NINA BREKELMANS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL MCLOUGHLIN AND | ) | |
| MARTHA JOHNSON, CO-PERSONAL | ) | |
| REPRESENTATIVES OF THE ESTATE | ) | |
| OF MICHAEL PATTRICK MCLOUGHLIN, | ) | |
| | ) | |
|    PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 3:20-ap-90027 |
| | ) | |
| MAX SALAS, | ) | |
| | ) | |
|    DEFENDANT. | ) | |

**DEFENDANT'S OBJECTION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

**This matter is set to be heard on September 13, 2022 at 9:30 a.m.
Courtroom Three, US Customs House, 701 Broadway, Nashville, Tennessee**

---

Comes now Max Salas, Defendant herein ("Salas" or "Defendant"), and for his objection to the Plaintiffs' Motion for Summary Judgment (the "Motion") (Doc. 73)[1], states as follows:

## INTRODUCTION

The Plaintiffs are not entitled to summary judgment. The Motion contains fatal procedural and substantive flaws which the Court cannot overlook and which necessitate the denial of the Motion.

Procedurally, the Plaintiffs have failed to comply with Rule 7056 of the Federal Rules of Bankruptcy Procedure, Rule 56(c) of the Federal Rules of Civil Procedure, and Rule 7056-1(a) of the Local Rules of Court for the United States Bankruptcy Court for the Middle District of Tennessee. Opinions from across the country, including one from the Sixth Circuit Bankruptcy Appellate Panel that upheld a decision of this Court, have held that failure to abide by Rule 56(c) and its companion local rule must result in the Court's denial of any motion based upon the defective statement of undisputed facts.

Substantively, the Plaintiffs have put the cart before the horse. While the Plaintiffs spend fifty-two (52) pages discussing an alleged fraudulent transfer of certain real property, they have failed to demonstrate any undisputed facts that establish that the real property in question was ever property of the Debtor or of the estate, over which the Trustee and/or the Plaintiffs have any authority. In fact, the real property in question was always owned

---

[1] In addition to the Motion, the Plaintiffs late-filed an amended motion for summary judgment (Doc. 74) after the deadline of July 29, 2022. The Defendant believes that the only amendment was the attachment of certain exhibits that the Plaintiffs' counsel could not upload on July 29, 2022. The Defendant has no objection to the Court's consideration of those late-filed exhibits. However, to the extent that the amended motion contained substantive alterations to the facts and/or law presented, the Defendant objects to the consideration of the amendments. This Objection addresses the Motion, supporting brief, and supporting statement of undisputed facts filed on July 29, 2022, along with all exhibits filed on July 29, 2022 and August 1, 2022.

by the Defendant, with the Debtor and this estate holding nothing but bare legal title. Case law is clear that, on facts similar to these, the estate has no authority to avoid a transfer of property in which the Debtor held only bare legal title. Whether the Debtor ever owned anything other than bare legal title to the real property is a disputed question of fact that must be decided by the Court at a trial of this matter.

## FACTS

The facts show quite clearly that the Debtor owned nothing more than bare legal title to the real property in question and, as such, the Plaintiffs have no valid cause of action against the Defendant.[2] The Defendant and his wife owned real property located at 1610 Riggs Place, NW, Washington, D.C. (the "Property"), as husband and wife, until 2007. Affidavit of Max Salas ("Salas Aff."), attached hereto as ==Exhibit 2==, ¶ 2. In 2007, Defendant and his wife divorced, and Defendant was ordered to pay wife a portion of the equity in the Property. Salas Aff, ¶ 3. The Defendant, who wished to stay in his home, determined that he would take out a loan against the Property in order to fund the payment to his ex-wife. Id, ¶ 4. However, upon seeking financing for the payment, he learned that he was not credit worthy to borrow the funds. Id, ¶ 5. To facilitate this transaction, he quitclaimed the Property to his son, the Debtor in this matter, who then borrowed $870,000 against the Property. Id, ¶ 6. The Defendant's ex-wife received the proceeds of the loan. Id, ¶ 7. The Debtor received no proceeds from the loan nor did he pay anything in exchange for the quitclaim deed. Id, ¶ 8.

---

[2] The Defendant attaches hereto, as ==Exhibit 1==, his Response to Plaintiffs' Amended List of Undisputed Facts, Pursuant to Local Rule 7056-1 in Support of the Plaintiffs' Motion for Summary Judgment (the "Response")

3

At the time that the Property was quitclaimed to the Debtor, the Defendant promised to refinance the loan and remove the Debtor's name from both the loan and the title to the Property as soon as possible. Id, ¶ 9. The Defendant made multiple attempts to refinance the Property over a number of years but found each time that he was unable to qualify for a loan. Id, ¶ 10. In 2010, with the assistance of his son Ron Salas, who was an attorney in Colorado, the Defendant determined to have the Property quitclaimed from the Debtor to a trust, in hopes that the trust could then borrow the funds to remove the Debtor from the loan and the title to the Property. Id, ¶ 11. In furtherance of that plan, the Debtor executed a quitclaim deed (the "2010 Quitclaim Deed") to the 1610 Riggs Place Trust (the "Trust") in July 2010.[3] Id, ¶ 12. Attempts to refinance the Property in the name of the Trust were ultimately unsuccessful and the 2010 Quitclaim Deed was never recorded. Id, ¶ 13.

Despite the Debtor's name remaining on the formal title to the Property, the Property was never the Debtor's primary residence. Id, ¶ 14. Despite the mortgage being in the name of the Debtor, the Debtor never made a single mortgage payment. Id, ¶ 15. The Debtor never paid any property taxes on the Property. Id, ¶ 16. The Debtor never paid for any upkeep on the Property. Id, ¶ 17. In fact, after the fire that gives rise to the Plaintiffs' involvement in this matter, it was exclusively the Defendant, not the Debtor, who oversaw and paid for the renovation and rebuilding of the structure on the Property. Id, ¶ 18.

---

[3] The United States Bankruptcy Court for the District of Columbia subsequently ruled that the 1610 Riggs Place Trust was never properly formed, and that any transfer to the Trust was in fact a transfer to the Defendant. *In re Max E. Salas,* Case No. 18-00260-ELG, Bankr. D.C., Doc. 108.

The Defendant rented out rooms in the Property through an entity known as the "CLR Trust". Id, ¶ 19. The Debtor had no involvement with the CLR Trust. Id, ¶ 20. The Defendant dealt with tenants, signed leases, and accepted rent payments on behalf of CLR Trust. Id, ¶ 21. The Defendant deposited all rent checks into an account in the name of CLR Trust, for which the Defendant was a signatory. Id, ¶ 22. The Debtor was never involved in the leasing of the Property, nor did he receive any portion of the rents paid for rooms in the Property. Id, ¶ 23.

Importantly, the Plaintiffs had *actual knowledge* of the Defendant's ownership of the Property well before the Petition Date. The Plaintiffs in this case had actual knowledge that the Defendant lived in the Property, signed leases for the Property, accepted rent for the Property, and that Len Salas had quitclaimed his interest in the Property in July 2010. Id, ¶ 24. Therefore, it is no necessary to consider whether they had constructive or inquiry notice.

Based upon these facts, neither the Debtor nor the bankruptcy estate ever owned anything more than bare legal title in the Property. As such, under well-established case law, the Plaintiffs cannot avoid the transfer of the Property back to the Defendant, nor can the Plaintiffs seek turnover of the Property.

## STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment on a matter only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P 56(a)*. Fed. R. Civ. P. 56 is made applicable in these proceedings pursuant to Fed. R. Bankr. P. 7056. Moreover, "[a] party asserting that a fact cannot be . . . disputed must support the assertion by citing to particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. *Fed. R. Civ. P 56(c)*. The Local Rules of this Court reiterate and further this requirement, mandating that:

> To assist the court in ascertaining whether there are material facts in dispute, any motion for summary judgment made pursuant to FED. R. BANKR. P. 7056 shall be accompanied by a separate, concise statement of the material facts which the moving party contends are not disputed. Each fact shall be stated in a separate, numbered paragraph. Each fact shall be supported by specific citation to the record. After each paragraph, the word "response" shall be inserted and a blank space shall be provided reasonably calculated to enable the nonmoving party to respond to the assertion that the fact is undisputed.

Local Rules of the United States Bankruptcy Court for the Middle District of Tennessee, Rule 7056-1(a).

At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Hargrave v. Radbill*, 2013 Bankr. LEXIS 2883 (Bankr. N.J. 2013) (citing *Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003). An issue of fact is "genuine" if a reasonable juror could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

## APPLICATION

The Plaintiffs' Motion contains two fatal flaws: (1) its Statement of Undisputed Facts do not comply with Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, nor Local Rule 7056-1; and (2) the Motion fails to demonstrate undisputed facts to establish that the Debtor owned anything more than bare legal title to the Property, thus calling into question the Plaintiffs' standing to pursue these causes of action on behalf of an estate that never owned the Property.

**A.  The Plaintiffs' Statement of Undisputed Facts Must Be Stricken For Non-Compliance with Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1.**

The requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1 are clear and unambiguous:  a party moving for summary judgment bears the burden of presenting undisputed facts in separate paragraphs and, for each such fact, there must be a *specific* citation to the record that establishes the fact.  Where the movant fails to provide a specific citation to the record establishing the alleged undisputed facts, court have uniformly held that the proposed fact must be stricken.  *See, e.g., Langley v. Tulare Police Dep't,* 2017 U.S. Dist. LEXIS 21572, *5-7 (E.D. Cal. 2017) (denying plaintiff's motion for summary judgment where the plaintiff did not support allegedly undisputed facts with record citations); *Moore v. Sacramento County Sheriff's Dep't,* 2015 U.S. Dist. LEXIS 19986, *11-13 (E.D. Cal. 2015) (denying plaintiff's motion for summary judgment where "plaintiff has often failed to cite to specific parts of the record or evidence submitted in support of his purported statement of undisputed facts"); *Gipbsin v. Kernan,* 2015 U.S. Dist. LEXIS 25090, *3-5 (E.D. Cal. 2015) (denying summary judgment where plaintiff's statement of undisputed facts failed to cite to the record); *Beaudreault v. Delfarno,* 2014 U.S. Dist. LEXIS 73332, *12-14 (D.R.I. 2014) (striking paragraphs from the statement of undisputed facts that contained no citations to the record and, thus, denying the movant's motion for summary judgment).

The Sixth Circuit Bankruptcy Appellate Panel has previously considered and ruled on a case from this Court that addressed this very issue, albeit in the context of a respondent who failed to identify specific citations to the record in support of his denial of alleged undisputed facts.  In *Hadley v. Harrison*, 2022 Bankr. LEXIS 483 (6th Cir. BAP 2022), the

Bankruptcy Appellate Panel was asked to review Judge Walker's granting of summary judgment in favor of the movant. In addressing what facts it would consider, the BAP considered allegedly undisputed facts to be true where the respondent simply denied the undisputed facts (or stated that he lacked knowledge about the facts), rather than citing to specific portions of the record as required by the Bankruptcy Rules, the Rules of Federal Civil Procedure and the Local Rules. *Id* at *5-8. The *Hadley* court noted, "in response to Hadley PLLC's motion for summary judgment, which was supported by 166 statements of material fact not in dispute, each of which included citations to the record, Harrison was required to prove that there were genuine disputes of material fact for trial. In so doing, he was not entitled to rely solely on allegations or denials in the pleadings." *Id* at *6.

In this case, the Plaintiffs rely upon approximately thirty-two (32) allegedly undisputed facts for which they provide no factual support, i.e. no reference to the record whatsoever. *See* Plaintiffs' List of Undisputed Facts, Pursuant to Local Rule 7056-1 in Support of the Plaintiffs' Motion for Summary Judgment (the "Statement of Undisputed Facts"), Doc. 73-2, Paragraph Nos. 4, 11, 12, 16, 22, 23, 34, 37, 38, 39, 40, 41, 42, 43, 45, 50, 51, 52, 54, 55, 57, 60, 63, 65, 66, 67, 84, 85, 99, 100, 101, and 107. The Plaintiffs also rely on at least two allegedly undisputed facts for which they provide only general, not *specific*, citations to the record. *See* Statement of Undisputed Facts, Doc. 73-2, Paragraph Nos. 30 and 124. Based upon the caselaw cited herein, the Court should not consider any of the facts alleged in these thirty-four (34) paragraphs in determining this Motion. Because of the sheer volume of the Plaintiff's Statement of Undisputed Facts that do not comply with Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, nor Local Rule 7056-1, the Defendant suggests that the Court should simply deny the Motion rather than

8

attempting to parse through the properly-alleged undisputed facts to determine whether they support the relief sought. *See Moore v. Sacramento County Sheriff's Dep't,* 2015 U.S. Dist. LEXIS 19986, *11-13 (E.D. Cal. 2015) (where the court denied the plaintiff's motion for summary judgment where he "often" failed to support facts with citations to the record). It is a movant's duty to appropriately present undisputed facts to support its motion; it is not this Court's duty to try to "hunt and peck" through the allegations to determine what is property supported and what is not. *Hadley v. Harrison*, 2022 Bankr. LEXIS 483, *6 (6th Cir. BAP 2022).

### B. The Plaintiffs Have Failed To Assert Undisputed Facts Demonstrating That The Debtor Owned Anything More Than Bare Legal Title To The Property.

Even if the Court were to consider all of the allegedly undisputed facts presented in the Plaintiffs' Statement of Undisputed Facts, even those without a scintilla of support from the record, the Plaintiffs' Motion would still fail because the Plaintiffs have failed to present undisputed facts showing that the Debtor held anything but bare legal title to the Property. Without a showing that the Debtor owned something more than bare legal title, the Plaintiffs (and their predecessor, the Trustee) have no standing to pursue any avoidance actions that seek a recovery of the Property because the Property was never "property of the estate" according to § 541 of the Bankruptcy Code. Alternatively, even if bare legal title to the Property was "property of the estate", it had no value such that there can be no recovery.

When faced with facts similar to those at issue in this matter, courts throughout the nation have been remarkably consistent in finding that the debtor held only bare legal title, rather than possessing full ownership to property. Those courts have likewise been

consistent in denying trustees' recovery efforts, whether under § 547, § 548, § 544, or state fraudulent transfer laws.  For example:

- In *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021), the court granted a motion for summary judgment in favor of the defendant on a § 544 action, finding that the debtor held the properties in constructive trust for the defendant and that the debtor herself held only bare legal title. The defendant (who was the debtor's brother) purchased two parcels of real property with his own funds, and maintained both parcels as rental properties.  One of the properties was rented to the debtor and the debtor paid rent to the defendant.  When the defendant separated from his wife, the defendant conveyed both properties to the debtor for no value as part of pre-divorce planning.  Despite being the record owner of the property, the debtor continued paying rent to the defendant and the defendant paid all taxes, insurance, and repair costs.  Defendant continued collecting rent from the properties, and addressing tenant issues, even while the debtor was the record owner.  Less than a year prior to her bankruptcy filing, the debtor transferred the properties back to the defendant for no value.  On these facts, the court held that the debtor owned only bare legal title to the property and held it in constructive trust for the defendant while she was the record owner of the property.  As such, when the debtor transferred the property back to the defendant, it was not a transfer of property of the estate such that could be avoided under §544.  The court also rejected the trustee's argument that the defendant should be barred from defending the action by the doctrine of

unclean hands, on account of the defendant having transferred the property to the debtor in the first place in an attempt to avoid certain outcomes in divorce court. The court found that the unclean hands doctrine was not a bar to the defendant's defense, even if the property had been transferred for a questionable purpose.

- In *Geremia v. Dwyer (In re Dwyer)*, 250 B.R. 472 (Bankr. D.R.I. 2000), the court granted the defendant's motion for summary judgment in a fraudulent transfer action brought by a trustee. In *Dwyer*, the defendant purchased a home in 1978 and put her eldest son, the debtor, on the deed to the property. The defendant lived in the property for a number of years; paid all mortgage and tax obligations on the property; paid for all utilities and repairs; and later collected all rents from the property. When the debtor began experiencing marital difficulties, the defendant asked him to quitclaim the property back to his mother as the sole owner. He filed bankruptcy approximately six months later. On these facts, the court found that the debtor owned only bare legal title to the property. It further found that bare legal title has no value to an estate and that a transfer of bare legal title cannot form the basis for a fraudulent transfer action.

- In *Dunham v. Kiask,* 192 F.3d 1104 (7th Cir. 1999), the Seventh Circuit affirmed the bankruptcy court's denial of a trustee's § 548 action. In this case, a home was built on an unimproved lot and titled in the name of parents, their son (the debtor), and the debtor's wife. The parents alone lived in the home, paid the taxes, paid the insurance, and paid for all upkeep.

The debtor and his wife executed a quitclaim deed to remove their names from the title to his parents' home ten months prior to his bankruptcy filing, and while he was embroiled in litigation. The bankruptcy court concluded that the debtor held nothing more than bare legal title to his parents' home or that, alternatively, he held it in constructive trust for his parents. The district court tweaked the bankruptcy court's finding, holding that the debtor was the trustee of a resulting, rather than constructive, trust for his parents – but the end result was the same. The Seventh Circuit found that the debtor merely held the property in trust for his parents (even as a record owner of the property) and, as such, the transfer was not a transfer of property of the estate. Like the case now before this Court, the Seventh Circuit noted: "What the trustee has overlooked, however, is that section 548(a)(1) requires proof of circumstances in addition to the debtor's transfer of a property interest before a transfer can be deemed fraudulent and set aside." *Id* at 1109. The court noted that property held in trust for another is not property of the estate, so the trustee's complaint fails.

- In *In re Gillman*, 120 B.R. 219 (Bankr. M.D. Fla. 1990), the bankruptcy court denied the trustee's motion for summary judgment on an adversary proceeding for fraudulent transfer, finding that the debtor owned nothing but bare legal title to the property in question. In that case, the debtor and his mother were joint tenants of a residential lot. The mother paid for the lot, paid to build a house on the lot, made all mortgage payments, paid all insurance premiums, and paid all real estate taxes. The debtor quit claimed

his interest in the property to his mother less than a year prior to his bankruptcy. The court found that the debtor's interest in the property had no economic value, thus it could not have been fraudulently conveyed back to his mother.

- In *Lovesac Corp. v. Cox (In re Lovesac Corp.),* 422 B.R. 478 (Bankr. D. Del. 2010), a corporation transferred a ski resort to another party for the purpose of attempting to get financing through the third party. The third party, the debtor corporation, transferred the property back to its original owner prior to the bankruptcy. The trustee moved for summary judgment in a fraudulent transfer adversary proceeding, which was denied by the court. The Delaware bankruptcy court found that the property was held by the debtor in a resulting trust for its original owner. In so finding, the court noted, "in factual situations analogous to the case at bar, where one entity transferred the title to property to another entity for purposes of obtaining financing, courts routinely impose a trust on the parties, even in the absence of a written trust agreement." *Id* at 488.

- In *In re Torrez,* 827 F.2d 1299 (9th Cir. 1987), parents purchased 120 acres in California but had the property deeded to their son and his wife. The sole reason for deeding the property to their son and his wife was to gain access to federally subsidized irrigation water, because the parents had exceeded their maximum allotment. The parents made all mortgage payments, all tax payments, improved the property, and operated a farm on the property. When the debtors became financially troubled, they deeded the property to

13

the parents and their bankruptcy ensued less than a year later. On these facts, the Ninth Circuit found that the real property was never property of the estate, as the debtors held only bare legal title. It found that the property was always held in a resulting trust in favor of the parents. The Ninth Circuit also rejected the trustee's argument that the parents' unclean hands prevented them from asserting the equitable trust.

- In *Tolz v. Miller (In re Todd)*, 391 B.R. 504 (Bankr. S.D. Fla. 2008), the court granted summary judgment in favor of the defendant in a fraudulent transfer action pursuant to § 548 and state law. In 2005, the defendants transferred a parcel of real property to the debtor for no value in an attempt to lower the loan to value ratio of one of the defendants, in hopes that she would be able to qualify for a loan to purchase a business. In 2006, after the loan transaction had been completed, the debtor transferred the property back to the defendants for no value. The debtor filed bankruptcy less than a year later. There was no dispute that the debtor was insolvent at the time of the transfer of the property to the defendants, and no dispute that the sole reason for the transfer to the debtor in the first place was to assist with bank financing. On these facts, the court found that the debtor held the property in a resulting trust for the defendants and that the debtor herself possessed only bare legal title to the property. The court likewise denied the trustee's unclean hands argument. While it found that the defendants "parked" the property in the debtor's name and in doing so acted in bad faith, it noted

that unclean hands only bars a litigant from seeking "active intervention by the Court". *Id* at 510.

- In *Swanson v. Stoffregen (In re Stoffregen)*, 206 B.R. 939 (Bankr. E.D. Wis. 1997), the court granted the defendants' motion for summary judgment in a § 548 action, finding that the debtor held only bare legal title to the property in question. In that case, parents purchased a parcel of unimproved property and added their minor children's name to the deed. The mother, a defendant, and her deceased husband built a house on the property and paid all taxes, insurance, HOA fees, repairs, and upkeep expenses. Neither the debtor, one of the children on the deed, nor his brother financially contributed to the property. Just sixteen days before filing bankruptcy, the debtor deeded his interest in the property to his mother and brother, the defendants. The trustee sought to set aside the transfer under § 548. The court found that the debtor owned only bare legal title to the property and, as such, a transfer of that property could not be recovered for the estate under § 548.

- In *Kapila v. Moodie (In re Moodie)*, 362 B.R. 554 (Bankr. S.D. Fla. 2007), the court denied the trustee's complaint to avoid the transfer of real property pursuant to § 548 and state fraudulent transfer laws. The defendant, debtor's mother, purchased a parcel of real property and added the debtor, her daughter, to the deed. The defendant provided all of the funds used to purchase the property and paid all expenses of ownership. While both the debtor and the defendant were on the mortgage, the debtor never contributed

to the mortgage payment. The debtor was never involved in owning the property in any way, other than appearing on the deed and the mortgage. In the year prior to the bankruptcy, the debtor transferred her interest in the property to the defendant for no value. The debtor and the defendant both testified that the purpose of the transfer was to avoid the property being "tied up" in the bankruptcy. On these facts, the court found that there was a resulting trust in favor of the defendant and that the debtor owned nothing more than bare legal title to the property. The court further found that, when a debtor holds only bare legal title to property, there can be no transfer of that interest for "less than reasonably equivalent value".

- In *In re Penney*, 632 B.R. 181 (Bankr. E.D. Ark. 2021), the court denied a trustee's motion for summary judgment pursuant to § 548. In *Penney,* the debtor and his daughter acquired title to real property as joint tenants. Prior to the petition date, the debtor transferred all of his interest in the property to his daughter, the defendant, for no value. The defendant paid the entire purchase price for the property. There was no encumbrance upon the property. The defendant lived on the property and made substantial renovations thereto. The defendant always held herself out as the owner of the property, even when it was jointly owned with the debtor, and the debtor never held himself out as the owner of the property despite being on the deed. Based on these facts, the court found that the debtor might hold only bare legal title to the property, and ordered a trial be conducted in order to weigh the evidence and determine the truthfulness of certain assertions. The

court noted that, if the debtor held only bare legal title to the property, then it might have no value to the estate; therefore, a transfer for no value would be a transfer for reasonably equivalent value.

- In *Swinson v. Fritz (In re Lytle)*, 2010 Bankr. LEXIS 4337 (Bankr. N.D. Okl. 2010), the court dismissed an adversary proceeding that sought to recover real property pursuant to §§ 548 and 544. The debtor and the defendant were both listed on the deed to a parcel of unimproved property, though the purchase price was paid entirely by the defendant. The debtor was to build a home for the defendant's parents on the property but ran into financial problems before the home was constructed. The debtor quitclaimed the property back to the defendant prior to bankruptcy so that he could find another builder to build a home on the lot, and the debtor subsequently filed bankruptcy. The debtor built a home for his parents on the lot. The trustee sought to recover the property (with improvements) under § 548 and/or § 544. The court found that the debtor owned only bare legal title to the property and that the property was subject to a resulting trust in favor of the defendant; thus a § 548 action could not be instituted. Since there had been a transfer of the property which constituted constructive notice, the court found that § 544 was ineffective.

The consistency of these opinions and their application to the facts of the case at hand are equally obvious. Like the facts of the cases summarized above, the Debtor had no involvement in the true ownership of the Property. The Property was deeded to the Debtor exclusively for the purpose of obtaining financing, as was the situation in several

of the cases cited above. The Debtor did not purchase the Property, did not live in the Property, made no payments on the mortgage, made no tax payments, did not pay for maintenance of the Property, did not sign leases on the Property, did not collect rent on the Property, and was not the person who oversaw the refurbishment of the Property after the fire. It is clear, based upon these facts and applying the case law cited above, that the Debtor owned nothing more than bare legal title to the Property. When a debtor owns bare legal title to a property, courts consistently find that the trustee is not entitled to avoid the transfer of that property.

While the outcomes of these cases are all very consistent, the manner by which they reach that outcome differs slightly. Some courts find that § 544 and § 548 cases fail when a debtor has only bare legal title because the property never became property of the estate. *See, e.g., Dunham v. Kiask,* 192 F.3d 1104 (7th Cir. 1999); *In re Torrez,* 827 F.2d 1299 (9th Cir. 1987); *Kelley v. Haar (In re Haar),* 634 B.R. 429 (Bankr. M.D. Ga. 2021); *Lovesac Corp. v. Cox (In re Lovesac Corp.),* 422 B.R. 478 (Bankr. D. Del. 2010); *Swinson v. Fritz (In re Lytle),* 2010 Bankr. LEXIS 4337 (Bankr. N.D. Okl. 2010); *Tolz v. Miller (In re Todd),* 391 B.R. 504 (Bankr. S.D. Fla. 2008). Others rule in favor of the defendants because, even if bare legal title to property constitutes an asset of the estate, it has no value and, thus, can never be transferred for less than reasonably equivalent value. *See. e.g., In re Penney,* 632 B.R. 181 (Bankr. E.D. Ark. 2021); *Kapila v. Moodie (In re Moodie),* 362 B.R. 554 (Bankr. S.D. Fla. 2007); *Geremia v. Dwyer (In re Dwyer),* 250 B.R. 472 (Bankr. D.R.I. 2000); *Swanson v. Stoffregen (In re Stoffregen),* 206 B.R. 939 (Bankr. E.D. Wis. 1997); *In re Gillman,* 120 B.R. 219 (Bankr. M.D. Fla. 1990). Most of these courts also generally

impress an equitable trust upon the property in favor of the defendants, whether a resulting trust or a constructive trust.

One thing about which these courts uniformly agree is that it is state law, not bankruptcy law, that determines the extent and nature of the property (including whether an equitable trust is created) and that bankruptcy law merely applies the state law property rights. "A debtor's interest in property under 11 U.S.C. § 541(a)(1) is defined by state law at the time of the commencement of the case unless altered by applicable federal law or a countervailing federal interest." *Haar*, 634 B.R. at 435 (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)). In this case, because the Property is located in the District of Columbia, it is D.C. property law that governs this matter. *See. e.g., Lovesac Corp.*, 422 B.R. at 487 (Delaware bankruptcy court applying Utah law where the property in question was located in Utah). The District of Columbia recognizes both constructive trusts and resulting trusts. *See, e.g., Zanders v. Baker*, 207 A.3d 1129 (D.C. Ct. App. 2019) (discussing both resulting and constructive trusts as they exist under D.C. law); *Dennis v. Edwards*, 831 A.2d 1006 (D.C. Ct. App. 2003) (discussing constructive trusts); *Leeks v. Leeks*, 570 A.2d 271 (D.C. Ct. App. 1989) (discussing resulting trusts under D.C. law); *Save Immaculata/Dunblame, Inc. v. Immaculata Preparatory School, Inc.*, 514 A.2d 1152, 1157 (D.C. Ct. App. 1986) (discussing resulting trusts); *Gray v. Gray*, 412 A.2d 1208 (D.C. Ct. App. 1980) (impressing a constructive trust in favor of mother despite daughter's name appearing on deed); *Hertz v. Klavan*, 374 A.2d 871 (D.C. Ct. App. 1977) (impressing a constructive trust on property to avoid unjust enrichment); *Woodruff v. Coleman*, 98 A.2d 22 (D.C. Ct. App. 1953) (discussing both resulting and constructive trusts under D.C. law, and explaining the differences between the two).

Under D.C. law, the Property is impressed with a resulting trust in favor of the Defendant. *See Save Immaculata/Dunblame, Inc. v. Immaculata Preparatory School, Inc.,* 514 A.2d 1152, 1157 (D.C. Ct. App. 1986) (a resulting trust "is a property relationship designed to effectuate the parties' intent when one party takes title to property for which another has furnished the consideration", quoting *Edwards v. Woods,* 385 A.2d 780, 783(D.C. Ct. App. 1978)). The Defendant deeded the property to the Debtor solely for the purpose of obtaining refinancing, the Defendant provided all consideration for and operation of the property, and there was a clear understanding (as evidenced by both emails and testimony) that the Debtor was to transfer the Property back to the Defendant as soon as alternate financing was obtained. This is the quintessential case for the imposition of a resulting trust.

Because the Debtor never possessed anything more than bare legal title to the Property and he held it in a resulting trust for the Defendant, the Property was never a part of the bankruptcy estate and cannot be recovered under § 548 or state fraudulent transfer law. Similarly, if the Property was never part of the bankruptcy estate, then a trustee would have no right to recover the Property on behalf of creditors pursuant to § 544.[4] *Markair, Inc. v. Markair Express, Inc.,* 172 B.R. 638, 642 (9th Cir. BAP 1994) ("A resulting trust can defeat the trustee's strongarm powers under § 544. The resulting trust having been determined by law to exist, the trustee has no equitable rights in the trust, and the *res* is not property of the estate pursuant to § 541."); *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021). Even if the Court were to find that the Debtor's bare legal title to the Property was nonetheless an asset of the estate, the Plaintiffs' fraudulent transfer claims

---

[4] It is axiomatic that the filing of a bankruptcy preserves assets of the estate; it does not create assets where no estate assets ever existed.

and its § 544 claims still fail because the Property would be impressed with an equitable trust in favor of the Defendant. Since the Defendant's trust attached to the Property upon its transfer to him in 2007, no creditor's claims can eclipse the Defendant's interest in the Property.

Finally, the Plaintiffs' fraudulent transfer causes of action fail because the Plaintiffs have not, and cannot, show that the Debtor received less than reasonably equivalent value for the transfer of the Property via the 2010 quitclaim deed. Courts have repeatedly noted that bare legal title to property has no value. *See. e.g., Geremia v. Dwyer (In re Dwyer)*, 250 B.R. 472 (Bankr. D.R.I. 2000); *In re Gillman*, 120 B.R. 219 (Bankr. M.D. Fla. 1990); *Swanson v. Stoffregen (In re Stoffregen)*, 206 B.R. 939 (Bankr. E.D. Wis. 1997); *Kapila v. Moodie (In re Moodie)*, 362 B.R. 554 (Bankr. S.D. Fla. 2007); *In re Penney*, 632 B.R. 181 (Bankr. E.D. Ark. 2021). If the Debtor's bare legal title to the Property had no value, then receiving no value for its transfer was reasonably equivalent value.

The Plaintiffs seem to argue two counterpoints to avoid the outcome that is necessitated by a finding that the Debtor owned nothing more than bare legal title. First, they insinuate that the Defendant has "unclean hands" based upon his transfer of the Property to the Defendant to gain bank financing and/or the unsubstantiated claims that he transferred the Property as some sort of a scheme to defraud the Internal Revenue Service. With regard to the tax claims, the Plaintiffs have presented no evidence (much less uncontroverted evidence) to demonstrate that the transfer of the Property was related to tax evasion, so that matter can be easily dispensed. With regard to his admission that the transfer of the Property was done in order to obtain financing, other cases have refused to permit the unclean hands defense on similar, or much worse, fact patterns. *Lovesac Corp.*

*v. Cox (In re Lovesac Corp.)*, 422 B.R. 478 (Bankr. D. Del. 2010) (property deeded in order to obtain financing); *Tolz v. Miller (In re Todd)*, 391 B.R. 504 (Bankr. S.D. Fla. 2008) (property deeded to obtain financing); *In re Torrez*, 827 F.2d 1299 (9th Cir. 1987) (property deeded to obtain federally subsidized irrigation to which the actual property owner was not entitled); *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021) (property deeded to avoid inclusion in divorce case). In fact, as explained by all of the courts that examine the unclean hands defense in resulting trust cases, unclean hands prevents a party from proactively claiming an equitable title to property where it does not otherwise exist, but it does not prevent a party from defending its title to property under a trust theory. Therefore, unclean hands is inapplicable to this case.

Second, the Plaintiffs seem to argue § 544 allows them to step into the shoes of a hypothetical lien holder and avoid the transfer of the Property to the Defendant, irrespective of the Defendant's ownership rights as the beneficiary of a resulting trust. There are multiple problems with the Plaintiffs' theory. First, courts have found that § 544 cannot be used to avoid a transfer of property in which the Debtor had only bare legal title because the property was never property of the estate under § 541. *See, e.g., Markair, Inc. v. Markair Express, Inc.*, 172 B.R. 638, 642 (9th Cir. BAP 1994); *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021). This is only sensible; a bankruptcy trustee cannot create a property right for the estate where none existed. The United States Supreme Court has adopted this general theory, noting: "The legislative history [of § 541(a)(1)] indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interests such as a lien or bare legal title." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1988). Second, the Plaintffs are barred from pursuing a § 544

action because they had *actual* notice of the 2010 quitclaim deed prior to the petition date. By their own admission, the Plaintiffs will be the only beneficiary of an avoidance of the Property, since they hold approximately 99.8% of the debt. Therefore, their actual knowledge of the transfer is highly relevant in this, a court of equity. Finally, even if the Court were to ignore that this action benefits the Plaintiffs and only the Plaintiffs, there are no undisputed facts that illustrate that any other party would not have been on reasonable inquiry notice of the Defendant's interest in this Property. The Defendant lived there, paid the mortgage, paid the taxes, contracted for and paid for all renovations, signed leases for the Property, and accepted rent on the Property. Prior to the petition date, the Plaintiffs themselves filed a lien lis pendens on the Property, which would require further inquiry from a hypothetical purchaser. The Court needs to conduct a trial to determine whether a reasonable creditor would have been on inquiry notice of the Defendant's equitable interest in the Property. Thus, summary judgment is inappropriate.

### C. The Defendant Has Other Meritorious Defenses Which Are The Subject Of Disputed Facts.

Other disputed facts exist with regard to the substance of the Plaintiffs' claims that work to defeat their motion for summary judgment. For example:

- The Plaintiffs cannot offer undisputed facts to establish when the transfer of the Property actually occurred, much less do they offer facts to prove the insolvency of the Debtor as of the date of that transfer.

- The Plaintiffs offer no undisputed facts to establish that creditors existed on the date of the transfer, a necessary element to their § 544 and § 548 claims.

- The Plaintiffs offer no undisputed facts that demonstrate that the Debtor intended to defraud his creditors in 2010 when he executed the quitclaim

deed in favor of the Defendant, an element necessary for their §
548(a)(1)(A) claim.[5]

Any of these issues, standing alone, would warrant the denial of this Motion. However, due to the strength and conclusive nature of the legal argument concerning the Debtor's bare legal title ownership, and the fatal procedural flaws of the Plaintiffs' Motion, the Defendant will reserve further discussion of these issues for the trial of this matter.

## **CONCLUSION**

This matter cannot be decided on a motion for summary judgment; to determine the true nature and value of the Debtor's ownership interest in the Property, the Court must hear and weight the probative value of evidence on what was done, when, for what reasons, and what was known by the Plaintiffs. *See In re Penney*, 632 B.R. 181, 191 (Bankr. E.D. Ark. 2021). For the reasons set forth herein, the Defendant prays that this Court deny the Plaintiffs' Motion and grant any other further relief that the Court deems equitable and appropriate under the circumstances.

Dated this 12th day of August, 2022

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr. (Tn. Bar No. 21078)
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Phone: 615-465-6015
phillip@thompsonburton.com

Attorneys for Max Salas

---

[5] At most, they have alleged *disputed* facts that establish fraudulent intent at the time of *perfection* of the transfer in 2018, not the *initiation* of the transfer in 2010. The Defendant vehemently denies any allegation of fraudulent intent.

## Certificate of Service

The undersigned hereby certifies that a true and exact copy of the foregoing has been served via electronic notice/ECF on all parties having made an appearance herein, including counsel for the Plaintiffs.

This 12th day of August, 2022.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE:

LEN SALAS

    DEBTOR.

NICOLAAS BREKELMANS AND
GAIL GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES OF
THE ESTATE OF NINA BREKELMANS

and

MICHAEL MCLOUGHLIN AND
MARTHA JOHNSON, CO-PERSONAL
REPRESENTATIVES OF THE ESTATE
OF MICHAEL PATTRICK MCLOUGHLIN,

    PLAINTIFFS,

v.

MAX SALAS,

    DEFENDANT.

CASE NO. 3:18-BK-02662
CHAPTER 11
JUDGE HARRISON

Adv. Pro. No. 3:20-ap-90027

## DEFENDANTS' RESPONSE TO PLAINTIFFS' AMENDED LIST OF UNDISPUTED FACTS, PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Max Salas (the "Defendant"), by and through counsel, and submits

the following responses to the statement of undisputed facts (Doc. 74-1) (the "Plaintiffs' Statement of

Undisputed Facts") submitted by the Plaintiffs:

1. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans

and Michael Patrick McLoughlin, respectively. Joint Stipulation of Uncontested Facts, Joint

Pretrial Statement, June 22, 2020 (D-14) ("Stip"), No. 1.

**RESPONSE:**

Admitted

2. Nina Brekelmans and Michael Patrick McLoughlin were tragically killed in a fire at a residence in Washington, DC (the "Fire") located at 1610 Riggs Place, NW, Washington, DC (the "Property"). Stip. No. 2

**RESPONSE:**

Admitted

3. Defendant resided in the Property from approximately 2007 through early June, 2015 and then commenced residing in the Property again in early 2018. Stip No. 3, Exemption Trans. Vol. 3, 62:11 - 63:17.

**RESPONSE:**

Admitted

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

5. Michael Gigandet, the Court appointed Trustee of the Estate, has declined to pursue the causes asserted herein and has also declined to join in this action. Court's Memorandum Opinion dated February 11, 2021 (D-38)("L Salas Memorandum Opinion"), at p. 6-7.

**RESPONSE:**

Admitted

6. The Complaint is brought as a derivative action on behalf of the Estate of Len Salas. L Salas Memorandum Opinion dated February 11, 2021, in Case No. 20-90027 (D-38).

**RESPONSE:**

Admitted

7.  In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). Joint Statement of Stipulated Facts, Joint Pre-trial Statement dated June 22, 2020 (D-14), Stipulation No. ("Stip. No.") 6.

**RESPONSE:**

Admitted

8.  The Defendant, Max Salas does not have the original of the Quitclaim Deed and the 1610 Riggs Property Trust, dated July 6, 2010. Defendant's Amended Responses to the Plaintiffs Request for Admissions, dated November 11, 2021 ("Amended Responses-RFP"), Exhibit 17, Resp No. 2, p.3. Amended Responses-RFA, Request No. 1., p. 2.

**RESPONSE:**

Admitted

9.  Len Salas does not remember seeing a "wet ink" original of the Quitclaim Deed after July 6, 2010. L Salas Trans. 140:13-23.

**RESPONSE:**

Admitted

10.     The Defendant does not have the original Quitclaim Deed created in July, 2010. Defendant's Amended Responses to the Plaintiffs' Request for Admissions ("RFA"), Req. 1

**RESPONSE:**

Admitted

11. That the Defendant is unaware of the location of the original Quitclaim Deed after 2012.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

12. Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max Salas and only kept a copy.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

13. The Defendant did not attempt to record the Quitclaim Deed after 2010.    RFA, Req. 3.

**RESPONSE:**

Admitted

14. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007. RFA 16.

**RESPONSE:**

Admitted

15. Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation. RFA 17.

**RESPONSE:**

Admitted

16. Neither Len Salas nor Max Salas informed SunTrust in writing that Max was

responsible for the SunTrust Deed of Trust Note payments.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

17. Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note. RFA 18.

**RESPONSE:**

Admitted

18. Max Salas did not contact Ms. Sylvia Jones, a real estate broker acquaintance, regarding the location or existence of the original Quitclaim Deed since June, 2015. RFA 41

**RESPONSE:**

Admitted

19. That the Note balance as of April, 2007 totaled approximately $870,000. RFA 44

**RESPONSE:**

Admitted

20. That the Note balance as of the commencement of the Salas bankruptcy case (April 18, 2018) totaled more than $1,030,825.86. RFA 47

**RESPONSE:**

Admitted

21. That the Note Balance as of September 29, 2019 totaled $1,208,720.40. Stipulation filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, Motion to Approve Settlement with U.S. Bank, Exhibit 15.

**RESPONSE:**

Admitted

22. That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim Deed purporting to transfer the Property from Len to Max.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

23. That the foresaid Trust and Deed were prepared and executed in Colorado.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

24. That the Trust was registered in Colorado by Ron Salas in 2011 even though the

Property was located in D.C. Email dated June 17, 2011 from Ron to Max, Exhibit 7.

**RESPONSE:**

Admitted

25. That the Defendant made at least two attempts to obtain a new or different Quitclaim Deed from the Law Firm of Stan Goldstein in 2011 and 2012. Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**

Admitted

26. That on June 17, 2011, Ron Salas sent an email to his father, the Defendant, stating that the "next step" was for his father to obtain counsel to prepare a Quitclaim Deed for Len to sign. Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012,

Exhibit 7.

**RESPONSE:**

Admitted

27.  That on June 21, 2011 the Defendant forwarded Ron Salas's email of June 17, 2011 to Stanley Goldstein requesting Mr. Goldstein to assist the Defendant to transfer the Property from Len to Max.  Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**

Admitted

28.  On January 17, 2012, more than six months later, the Defendant sent another email to Lynn Boileau, an associate of Mr. Goldstein requesting that she "get Lenny's name off of the property." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**

Admitted

29.  On February 24, 2012, Len sent his father an email asking for the status of removing Len from the property title.  Max responded on February 24, 2012 that he is "still working on this..." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7 .

**RESPONSE:**

Admitted

30.  There were no further communications regarding the creation or recording of a Deed

for the transfer of the Property from Len to Max after February, 2012. L Salas Trans. _____.

    **RESPONSE:**

      This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

    31.  From 2010 through early 2015 Len had numerous communications with Max asking Max to remove his name from the Property. L Salas Trans. 70:18 - 74:16

    **RESPONSE:**

    Admitted

    32.  Len had several conversations with his father regarding getting his name off the loan and deed after 2010.  L Salas Trans. 71:25 - 74:16; Transcript of Len Salas's testimony at the hearing on Objections to the Claim of Exemption (of the Property) by the Debtor, Max Salas, in case no. 18-00260 in the United States Bankruptcy Court for the District of Maryland, Trial Transcript ("Exemption Trans."),Vol 1., Exhibit 20, 158:13 - 163:10; Deposition Transcript of the Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

    **RESPONSE:**

    Admitted

    33.  The Sun Trust Note was in default during the period 2010 - 2018.  L Salas Trans., Exhibit 13,  55:11-20.

    **RESPONSE:**

    Admitted

    34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns.

    **RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

35.  The Plaintiffs are the holders of undisputed and accepted claims totaling $15.2 Million.  Of that amount, the claim of the Brekelmans estate represents $7.5 Million and the claim of the McLoughlin Estate represents $7.7 Million. Stip. No. 6

**RESPONSE:**

Admitted

36.  According to the Debtor's schedules and the Trustee's Final Report (D-209), in Case No. 18-2662, the Plaintiffs represent 99.8% of all allowed unsecured claims of the estate.

**RESPONSE:**

Admitted

37.  The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's).

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

38.  The Plaintiffs received distributions on account of their claims from both estates.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

39.  The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

40.  On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in

the Middle District of Tennessee and the District of Columbia, respectively.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

41.  At the time of the bankruptcy filings by Len and Max, Len was, and continued to be,

until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C.

("the Property").

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

42.  In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then

wife, divorced.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

43.  Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust

Loan").

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

44.  The proceeds of the Sun Trust Loan were paid to Max's wife as part of the divorce

settlement. Exemption Trans. Vol. 3, Exhibit 6, 70:2-17.

**RESPONSE:**

Admitted

45.  Len received no part of the $870,000.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.

**RESPONSE:**

The wording of the Plan is admitted.  The remainder of the statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.  To the extent a response is required, the remainder of the statement is denied.  The facts contained in Paragraphs 1-24 of the Max Salas Affidavit, attached to the Response to Motion for Summary Judgment, illustrate that Len Salas held nothing but bare legal title to the Property.

47.  At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. Exemption Trans. Vol. 3, 71:9 - 72:23.

**RESPONSE:**

Admitted

48.     At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in  July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed.  Exemption Trans. Vol 3, Exhibit 6, 139:15 - 140:2; Len Salas testimony, Plan Confirmation Hearing, United States Bankruptcy Court

for the Middle District of Tennessee, December 13, 2018 ("L Salas Conf. Hrg. Trans."), 68:22 -
69:2. Exhibit 4.

    **RESPONSE:**

    Admitted

    49.    Max delivered the original Quitclaim Deed to Mr. Goldstein's office but did not
recall whether Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

    **RESPONSE:**

    Admitted

    50. According to Max, he tried to refinance the Property several times after 2007, all to no
avail. In fact, at least through 2015 every attempt to refinance the Property required the
participation of Len as a co-signer or co-obligor.

    **RESPONSE:**

    This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule
of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

    51.  There are no documents indicating that Max was liable on the SunTrust loan at any
time and Max never entered into any agreement or understanding with Len that Max was liable or
responsible.

    **RESPONSE:**

    This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule
of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

    52.  There is no document raised, proffered or produced by Max indicating that Len was
not the sole party responsible for the Deed of Trust payments until at least November, 2019.[1]

    **RESPONSE:**

    This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule

of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

53.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that, when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas testimony at the Exemption Hearing, Exemption Trans. Vol. 2, August 23, 2018 ("Exemption Trans. Vol. 2"),Exhibit 3, 33:23 - 50:25, Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 1, 42:18 - 43:2.

**RESPONSE:**

Admitted

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

55.  According to Len, the CLR Trust, was a trust created by Max for the benefit of his three sons, Chase, Len and Ron. Len Salas, Sup. Ct. Depo, Exhibit 11, 30:5-14.

**RESPONSE:**

Admitted.

56.  Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust."  L Salas Trans. 148:1-13. In Len's Deposition Testimony in the Superior Court Litigation, Len testified, on March 9, 2016, that he

had no knowledge a trust other then the CLR Trust. Len Salas Deposition Testimony, March 9, 2016 in the Superior Court Litigation, Exhibit 11, 29:14 - 30:14

**RESPONSE:**

Admitted

57. The lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

58. Max did not want the rents deposited into his personal account. Exemption Trans. Vol 3., Exhibit 6, 222:12 - 16

**RESPONSE:**

Admitted for purposes of this motion only.

59. Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2 - 150:21.

**RESPONSE:**

Admitted

60. During the period 2015 through 2018, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he received as a result of the fire damage.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.