61.  As of October, 2018, the deficiency on the SunTrust Note was $420,928.34.  Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

Admitted

62. As of April, 2018, the deficiency on the SunTrust Note was $374,282.18.  Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

Admitted

63.  As of April, 2018, Len remained the sole obligor on the SunTrust Note.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

64.  The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7, 152:3 - 153:10.  See SunTrust Deed of Trust, dated April 16, 2007, Exhibit A to SunTrust Motion for Relief from Stay ("SunTrust Motion"), filed in Case No. 18-2662 on November 2, 2018 (D-79-1), Exhibit 15.

**RESPONSE:**

Admitted for purposes of this motion only.

65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

66.  At all relevant times, Len worked only part time and had limited income and assets.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

67.  At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

68.  Len did not have sufficient funds to pay his attorneys in the Superior Court litigation. He lives "paycheck to paycheck." L Salas Trans. 76:20 - 77:2

**RESPONSE:**

Admitted

69.  At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans. 61:1 - 63:2.

**RESPONSE:**

Admitted

70.  In 2016, Len's income was a total of $15,151.  L Salas Statement of Financial Affairs, filed April 18, 2018 in Case No. 18-2662, (D-1), Exhibit 16, p 38.

**RESPONSE:**

Admitted

71.  In 2017 Len's total income was $30,408. Exhibit 16, p. 38.

**RESPONSE:**

Admitted

72.  In 2018, through April 17, 2018 Len's total income was $6,720.  Exhibit 16, p. 38.

**RESPONSE:**

Admitted

73.  During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them.  See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District

of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

**RESPONSE:**

Admitted

74.  Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, filed April 27, 2018 in Case No. 18-2662, D-10, at page 3 of 10.

**RESPONSE:**

Admitted

75.  On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41.  Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

**RESPONSE:**

Admitted

76.  Len received no income, payments or property from Max in 2007 or 2010. L Salas Mtg Trans., 4/1/19, Exhibit 5, 5:22 - 7:15.

**RESPONSE:**

Admitted

77.  Len repeatedly attempted to get Max to remove Len's name from the Property after 2010. L Salas Depo. Testimony, Exhibit 13, 70:18 - 74:16

**RESPONSE:**

Admitted

78.  Mr. Salas told his counsel, Mr. Albert and his associate, Mr. Cox, in 2018,  what Max did with the Quitclaim Deed and left it up to his counsel to obtain the original from Mr. Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

**RESPONSE:**

Admitted

79.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See emails attached as Exhibit 7) Max did not make any further attempts to record the Deed. Exemption Trans. Vol 3, 58:9-13.

**RESPONSE:**

Admitted for purposes of this Motion only.

80.  In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed, executed on July 6, 2010, as follows:

"Q And I believe you said, but I want to clarify this, that between the time of 2012, roughly, and I realize you said, I think, a year or two after the transaction, so I'm not trying to pin it down, but say roughly 2012, which would be two years later, until today, are you aware of any other reasons why the deed, the quitclaim deed that you prepared would not have been or could not have been recorded?

**A. I don't know of any reason and I did not know that it was not recorded until the lawsuit came** in **my brother's name.**

Q And what is it about the lawsuit that came in your brother's name that made you believe the quitclaim deed had not been recorded?

**A The only reason my brother would be involved was because his name had to still be on the title is the assumption I've made in my mind** I **don't know that that is factually correct, but that is my assumption, that it must not have been filed or he wouldn't be in this situation.**

**He didn't live in the District, he never- he didn't live in the house, and I- so that's the only logical reason** I **could make that he would be involved, that it was never done. And until that point, I did not even know that it had not been done.** I **assumed at some point that he came up with the money and did it. But he didn't, as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the District of Columbia, Case No. 18-00260, August 8, 2018, excerpts attached hereto as Exhibit 8, ("R Salas Trans"), 73:15 - 74:21 (emphasis in original).[2]

      **RESPONSE:**

    Admitted

    81. The Plaintiffs Judgments are now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries D-298 and 303; L Salas Chapter 7, Case No. 18-002662

in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and D-222 (Final Decree).

      **RESPONSE:**

      Admitted

82. Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

      **RESPONSE:**

      Admitted

83. On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max. This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property. A copy of Ron's email, dated June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022.

      **RESPONSE:**

      The Defendant denies that the Quitclaim Deed is his only proof of ownership of the Property. Otherwise, the statement is admitted.

84. These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Debtor's Responses to Movants' First Set Request for Production of Documents, served on August 6, 2018, in Case No. 18-260, Exhibit 21.

      **RESPONSE:**

      This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim

that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

    **RESPONSE:**

    This statement fails to comply with the requirements of Bankruptcy Rule 7056, <mark>Federal Rule of Civil Procedure 56</mark>, and Local Rule 7056-1; therefore, no response is required.

    86.  Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust.  The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Nos.: LenSalas000016-17.

    **RESPONSE:**

    Admitted

    87.  On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein.  In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..."  Exhibit 7, Bates Number LenSalas000016.

    **RESPONSE:**

    Admitted

    88.  In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are **two different** requests.  One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supplied) Exhibit 7, Bates Number LenSalas000023.

    **RESPONSE:**

    Admitted

    89.  On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon."  Exhibit ____, Bates Number LenSalas000029.

**RESPONSE:**

Admitted

90. Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust. M Salas Trans. , Exhibit 10, 64:16 -74:2.

**RESPONSE:**

Admitted.

91. Max also testified that he does not recall any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18.

**RESPONSE:**

Admitted

92. When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

> **Q. Have you contacted Ms. Boileau or**
> Mr. Goldstein to determine if they have
> a copy of any deed that might have
> been created?
>
>
> **A. I did try to contact them. I**
> **did try to contact them actually**
> **recently. And I -- but I didn't -- I**
> **mean, they were trying -- they**
> **were -- no. I mean, we worked on**
> **something and then they said it couldn't go**
> **any further and depends on what you**
> **were going to do. So I don't -- I guess -- I**
> **can't guess. I don't know.**

M Salas Trans. 73:13-23

**RESPONSE:**

Admitted

93.  Only Max Salas had an original of the Quitclaim Deed after July 6, 2010 and Max does not know where the original is or when he last had it.  Exhibit 10, M Salas Trans. 73:13-23, 77:2 - 82:23.

**RESPONSE:**

Admitted for purposes of this Motion only.

94.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 19, 42:18 - 43:2.

**RESPONSE:**

Admitted

95.  Len Salas is not aware of the location of any of the wet ink signature originals of the July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas Trans."), 15:4-9.  Len testified in his deposition that he provided an original "wet ink" original of the Quitclaim Deed, or a copy,  to his lawyer on the eve of the Superior Court trial which resulted in the judgment against Len and his father. L Salas Trans, 16:6-24, 19:11-25 - 21:18.  Regardless, Len testified that the document he produced on the eve of the Superior Court trial, which commenced on March 26, 2018, was kept in his possession at all known times between July, 2010 and March, 2018.  Id. Len's wife, Kendra, testified that she "had a pdf of it (the July, 2010 Quitclaim Deed) and that she thought it was the same as what Len had " I thought it was the same thing as what Len had, but I'm not sure."  K Rowe Trans. 30:13-20.

**RESPONSE:**

Admitted

96. Ron Salas stated that he was unaware the Quitclaim Deed had not been recorded until he found out that Len had been sued in the Superior Court (in October, 2015. Transcript of the Deposition of Ron Salas, August 8, 2018, Exhibit 8, 65:21 - 66:21

**RESPONSE:**

Admitted

97. Ron Salas was unaware of the requirements of Quitclaim Deeds in D.C. Ron Salas's testimony, Exhibit 12, at pp.227:5 - 228:12.

**RESPONSE:**

Admitted

98. Ron stated he was unaware whether the trust documents he created were valid under D.C. law in August, 2018. Ron Salas's testimony, Exhibit 12, 243:8-15.

**RESPONSE:**

Admitted

99. The only deed referenced by Max or his counsel, allegedly entitling Max to an ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered, or even mentioned by the Salas family or by Max, specifically.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15 Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee

filed objections to the Plaintiffs' claims filed in Len's bankruptcy.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

101. In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len listed total monthly income of $4977.75 and total monthly expenses of $4,407.14. On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least $1,035,000 approx) per his consistent promise that he would pay that amount and his consistent assertion that he was responsible for payment of the SunTrust Note which was, at all relevant times, in Len's name.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

102. The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries ("D- ") D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and 222 (Final Decree).

**RESPONSE:**

Admitted

103.  Len was solely obligated on the Sun Trust Deed of Trust on the Property which, according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018. M Salas Schedules, Case No. 18-260 (D-12), p. 19 of 37, attached as Exhibit ___.

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed. Transcript of Confirmation Hearing in Case No. 18-02662, December 13, 2018 at pp. 68-69, excerpts attached as Exhibit 4.  See also, Transcript of the Chapter 7 Meeting of Creditors of Len Salas, April 1, 2019 (L Salas Mtg. Trans.), Exhibit 5,  5:22 - 7:15.

**RESPONSE:**

Admitted

104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office.  He does recall that Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

Admitted

105.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See emails attached as Exhibit 7) Max did not make any further attempts to record the Deed. Exemption Trans. Vol 3, 58:9-13

**RESPONSE:**

Admitted

106.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be

exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments. D.C. Code § 15-501 (a)(14). These conversations took place in early 2018. Exemption Trans. Vol. 3, Exhibit 6, 119:9 - 122:9; Albert-R Salas emails, 2/14 - 3/7/18, Exhibit 19, Exemption Trans. Vol 1, Exhibit 20, 145:22 - 147:20.

**RESPONSE:**

Admitted for purposes of this Motion only, and such admission is made without waiving the attorney-client privilege.

107. Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, ==Federal Rule of Civil Procedure 56==, and Local Rule 7056-1; therefore, no response is required.

108. Mr. Albert confirmed that no original was found after 2010 at the Exemption Hearing through Ron Salas' "rebuttal" testimony on August 24, 2018. Rebuttal Testimony of Ron Salas, at the Exemption Evidentiary Hearing, August 24, 2018. Exemption Trans., Vol 3, 4:10 - 5:16. See also, Exemption Trans. 5:19 - 6:3, 7:18 - 12:8, 13:17 - 15:24

**RESPONSE:**

Admitted

108. At the time of Ron Salas' conversation with Mr. Albert regarding copies of the trust documents, Ron Salas understood that Mr. Albert was representing Max regarding a potential bankruptcy filing after the Superior Court trial. Exemption Trans. 12:12 - 13:14

**RESPONSE:**

Admitted

109. Max Salas valued the Property at $2.5 Million on his schedules in or about May 2018, and the Property was appraised for approximately $2.4 Million in or about August 2019. Stip. No. 50.

**RESPONSE:**

Admitted

110. Pursuant to an order of this Court dated June 12, 2019, the trustee in this case was authorized to sell the estate's interest in the Trustee's avoidance and recovery rights under ==11 U.S.C. §§ 544== through 551. Stip. No. 47

**RESPONSE:**

Admitted

111. On July 23, 2019, the trustee in Len Salas' case held an auction sale to sell the bankruptcy estate's interest in the avoidance and recovery actions pursuant to ==11 U.S.C. §§ 544== through 553. Stip. No. 48

**RESPONSE:**

Admitted

112. The Plaintiffs were the successful bidders at the Trustee's auction sale. Stip No. 49

**RESPONSE:**

Admitted

113. The D.C. Bankruptcy Court made no final determination of the effect of the trustee's avoiding powers asserting that effect was up to Len Salas' bankruptcy estate. Stip. No. 44

**RESPONSE:**

Admitted

114. No deed was recorded naming Max Salas as trustee or owner of the Property prior to Len Salas' bankruptcy filing. Stip. No. 45

**RESPONSE:**

Admitted

115. Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed related to the Property as of June 6, 2022. Stip. No. 46

**RESPONSE:**

Admitted

116. From the time of the Fire until February or March 2018, no one resided in the Property. Stip. No. 35.

**RESPONSE:**

Admitted

117. During that time, and until November 2019, no payments were made on the SunTrust Loan with the exception of one payment made by Max Salas from the insurance proceeds he received as a result of the fire damage. Stip No. 36

**RESPONSE:**

Admitted

118. According to the schedules filed in Max Salas' bankruptcy, as of the commencement of his bankruptcy case, in April, 2018, the only lien creditors were the IRS ($6,768.66 claim) and SunTrust Mortgage ($1,030,825.86). Stip. No. 37

**RESPONSE:**

Admitted

119. The balance of the SunTrust Loan as of October 26, 2018 was $1,141,021.14. Stip. No. 38

**RESPONSE:**

Admitted

120. Max Salas has been making the required payments on the Property since November 2019, as of June 22, 2020. Stip. No. 39.

**RESPONSE:**

Admitted

121. At all relevant times, Len Salas had limited income and assets, other than the Property. Stip. No. 28.

**RESPONSE:**

Admitted

122. Max Salas intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. Stip. No. 29.

**RESPONSE:**

Admitted

123. The Quitclaim Deed has never been recorded. Stip. No. 30

**RESPONSE:**

Admitted

124. As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had

any intent to use or record it.  Emails dated June, 2011 through February, 2012, Exhibit 7.

   **RESPONSE:**

   This statement fails to comply with the requirements of Bankruptcy Rule 7056, <mark>Federal Rule of Civil Procedure 56</mark>, and Local Rule 7056-1; therefore, no response is required.  To the extent a response is required, the Defendant denies that the referenced emails establish this alleged fact and would request that the Plaintiffs identify a specific email upon which they rely.

   125. While in Colorado, Len Salas and Max Salas executed a trust agreement which Ron Salas prepared using a Colorado form even though the purported trust property, the Property, was located in D.C. Stip. No. 25.

   **RESPONSE:**

   Admitted

   126. The Defendant's Second Amended Disclosure Statement and Third Amended Plan of Reorganization, as confirmed by the D.C. bankruptcy court, recognize that the Plaintiffs are the owners of, and have the right to pursue, the avoidance actions which are alleged in the Complaint, as amended. Exhibit 2, Complaint Exhibit B, M Salas Second Amended Disclosure Statement, Exhibit 2, at p. 17.

   **RESPONSE:**

   Admitted

Dated: August 12, 2022

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel:    615.465.6008
Fax:    615.807.3048
Email: phillip@thompsonburton.com

Attorneys for Defendant

**Certificate of Service**

The undersigned hereby certifies that a true and exact copy of the foregoing has been served via electronic notice/ECF on all parties having made an appearance herein, including counsel for the Plaintiffs.

This 12th day of August, 2022.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE:                          ) | |
|                                 ) | |
| LEN SALAS                       ) | CASE NO. 3:18-BK-02662 |
|                                 ) | CHAPTER 11 |
|    DEBTOR.                       ) | JUDGE HARRISON |
|                                 ) | |
| NICOLAAS BREKELMANS AND         ) | |
| GAIL GREGORY BREKELMANS,        ) | |
| CO-PERSONAL REPRESENTATIVES OF  ) | |
| THE ESTATE OF NINA BREKELMANS   ) | |
|                                 ) | |
| and                             ) | |
|                                 ) | |
| MICHAEL MCLOUGHLIN AND          ) | |
| MARTHA JOHNSON, CO-PERSONAL      ) | |
| REPRESENTATIVES OF THE ESTATE   ) | |
| OF MICHAEL PATTRICK MCLOUGHLIN, ) | |
|                                 ) | |
|    PLAINTIFFS,                   ) | |
|                                 ) | |
| v.                              ) | Adv. Pro. No. 3:20-ap-90027 |
|                                 ) | |
| MAX SALAS,                       ) | |
|                                 ) | |
|    DEFENDANT.                     ) | |

## AFFIDAVIT OF MAX SALAS

DISTRICT OF COLUMBIA          )

I, Max Salas, hereby state under oath that the following statements are true and correct:

1.   I am over the age of 18 and competent to testify.  I have personal knowledge
     of all facts contained in this affidavit.

2.   I owned the real property located at 1610 Riggs Place, NW, Washington,
     D.C. (the "Property") with my former wife, as husband and wife, until 2007.

3.      In 2007, my wife and I divorced, and I was ordered to pay my ex-wife a portion of the equity in the Property.

4.      I wanted to stay in my home, so I decided that I would take out a loan against the Property in order to fund the payment to my ex-wife.

5.      Upon seeking financing for the payment, I learned that I was not credit worthy to borrow the funds.

6.      To facilitate this transaction, I quitclaimed the Property to my son, Len Salas, who then borrowed $870,000 against the Property.

7.      My ex-wife received the proceeds of the loan.

8.      Len Salas received no proceeds from the loan nor did he pay anything in exchange for the quitclaim deed.

9.      At the time that the Property was quitclaimed to Len Salas, I promised to refinance the loan and remove his name from both the loan and the title to the Property as soon as possible.

10.     I made multiple attempts to refinance the Property over a number of years but found each time that I was unable to qualify for a loan.

11.     In 2010, with the assistance of my son Ron Salas, who was an attorney in Colorado, I decided to have the Property quitclaimed from Len Salas to a trust, in hopes that the trust could then borrow the funds to remove Len Salas from the loan and the title to the Property.

12.     Len Salas executed a quitclaim deed (the "2010 Quitclaim Deed") to the 1610 Riggs Place Trust (the "Trust") in July 2010.

2

13. Attempts to refinance the Property in the name of the Trust were ultimately unsuccessful and the 2010 Quitclaim Deed was never recorded.

14. The Property was never Len Salas' primary residence.

15. Len Salas never made a single mortgage payment on the Property.

16. Len Salas never paid any property taxes on the Property.

17. Len Salas never paid for any upkeep on the Property.

18. After the fire, I exclusively oversaw and paid for the renovation and rebuilding of the structure on the Property.

19. I rented out rooms in the Property through an entity known as the "CLR Trust".

20. Len Salas had no involvement with the CLR Trust.

21. I dealt with tenants, signed leases, and accepted rent payments on behalf of CLR Trust.

22. I deposited all rent checks into an account in the name of CLR Trust, for which I was a signatory.

23. Len Salas was never involved in the leasing of the Property, nor did he receive any portion of the rents paid for rooms in the Property.

24. Prior to the filing of the petition in Len Salas' bankruptcy case, the Plaintiffs in this case had actual knowledge that I lived in the Property, signed leases for the Property, accepted rent for the Property, and that Len Salas had quitclaimed his interest in the Property in July 2010.

FURTHER AFFIANT SAYETH NOT

_MAX SALAS_

DISTRICT OF COLUMBIA        )

Subscribed and sworn to before me this _10th_ day of August, 2022.

Notary Public

My Commission Expires: _07/31/2027_

**Endurance N. Arinze**
**Notary** Public, District of Columbia
**My Commission** Expires 07/31/2027

**District of Columbia**
Signed and sworn to (or affirmed) before **me**
on _08/10/22_ by _Endurance Arinze_
    Date                    Name(s) of Individual(s) making Statement

Signature of Notarial Officer
_BANKER_
Title of Office
**My commission expires:** _07/31/2027_

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville Division

In Re:                                    :

  LEN SALAS                         :        CASE NO. 3:18-BK-02662
                                                   CHAPTER 11
                 DEBTOR     :        JUDGE HARRISON

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

NICOLAAS BREKELMANS AND                   :
GAIL GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES OF            :
THE ESTATE OF NINA BREKELMANS
                                          :
    and                          :

MICHAEL MCLOUGHLIN AND                    :
MARTHA JOHNSON, CO-PERSONAL
REPRESENTATIVES OF THE ESTATE            :
OF MICHAEL PATTRICK MCLOUGHLIN
                                          :

          PLAINTIFFS     :

    v.                           : Adv. Pro. No. 3:20-ap-90027

MAX SALAS                                 :

        DEFENDANT        :

## PLAINTIFFS' RESPONSE TO THE DEFENDANT'S
## OBJECTION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**This matter is set to be heard on September 13, 2022 at 9:30 a.m.
Courtroom Three, US Customs House, 701 Broadway, Nashville, Tennessee**

COME NOW, the Plaintiffs herein, Nicolaas Brekelmans and Gail Gregory Brekelmans,

Co-personal Representatives of the Estate of Nina Brekelmans and Michael McLoughlin and

Martha Johnson, Co-personal Representatives of the Estate of Michael Pattrick McLoughlin

("the Estates"), by and through their counsel and, for their response to the Defendants'

Objections to the Plaintiffs' Motion for Summary Judgment state as follows:

I.      **INTRODUCTION**

1. As a threshold matter, the Defendant did not file an opposition to the Motion for Summary Judgment and offered no undisputed facts in support of his "Objections." Although the Defendant makes the general statement that he has other meritorious defenses to the Plaintiffs' Complaint, he fails to explain them in any detail, fails to assert any undisputed facts in support and those "defenses" do not impact the right of the Trustee to avoid and recovery the subject Property in D.C. from the Defendant. The Defendant did file an Affidavit of the Defendant but the Defendant stated in his Opposition that the purpose of the Affidavit was to show that the Debtor had no interest in the Property. From the Plaintiffs' perspective, the Affidavit supports the Plaintiffs' Motion, as discussed below.

2. The Plaintiffs assert that the Defendant has conceded that the undisputed facts support the Plaintiffs' entitlement to Summary Judgment, except for the single "objection" that the Debtor's "bare legal title" is an insufficient basis for the use of the Trustee's "strong arm" remedies under 11 U.S.C. § 544 (a). That argument is completely without merit and not even supported by cases cited by the Defendant. In addition, the Defendant has offered no argument against the state law claim in Complaint, Count V (Fraudulent Conveyance - D.C.). Therefore, the Plaintiffs assert that, at a minimum, they are entitled to judgment on Count V. See D.C. Code §§ 28-3104, *et seq.*, 42-401 and *Clay Properties, Inc. v. Washington Post Co.* 604 A.2d 890, 894 (D.C. 1992). Furthermore, the Defendant's Affidavit, filed in support of his "Objections" confirm facts which not only support the Plaintiffs' allegations and right to relief but also show that Defendant was not the owner of the Property, at least since sometime before 2015 and that

-2-

the "trust" to which the Quitclaim Deed of July 2010 was purportedly transferred did not exist and, in fact, the CLR Trust was the actual owner of the subject Property, not the Defendant.

3. The Plaintiffs are emphasizing that they are entitled to judgment on the basis of actual fraud, bad faith, misrepresentations which border on perjury, and other factors that do not allow the Defendant to obtain the equitable relief he seeks in this court. However, for purposes of this Motion the Plaintiffs are asserting that they are entitled to summary judgment on the counts of the Complaint alleging fraudulent conveyances, namely, Counts IV and V, and avoidance of the transfer from the Debtor to the Defendant on April 17, 2018 pursuant to 11 U.S.C. § 544 (a)(3) ("bona fide purchaser"). The Plaintiffs are also asserting that they are entitled to the recovery of the property at 1610 Riggs Place, N.W., Washington, DC ("the Property"), or its value upon sale of the Property, under Count VI, all for the benefit of the Debtor's bankruptcy estate.

4. In his Objection, the Defendant does not offer any direct evidence that refutes the allegations of the Plaintiffs' Motion, but does offer two "Objections" related to compliance with Fed. R. Civ. P. ("FRCP") 56 (c) and Local Rule 7056-1 and the misguided theory that the Debtor's interest is just that of "bare legal title." Therefore, the Trustee is not entitled to use his "strong arm" powers to avoid the alleged transfer and recover the Property for the benefit of the Debtor's Estate. As argued below, neither of these objections are valid and the lack of an appropriate opposition requires this Court to grant summary judgment.

5. The Defendant asserts that he has other meritorious defenses which are the subject of disputed facts but does not elaborate in his Opposition and has cited no facts in support of those arguments.

-3-

## II.  ARGUMENT

### A.  The Applicable Provisions of Fed. R. Civ. P. 56 and Local Rule 7056-1 Do Not Constitute an Impediment to Summary Judgment

6.  The Defendant's threshold argument is that the summary judgment rule (Fed. R. Civ. P. 56 (c), as modified by this Court's Local Rule 7056-1 (L.R. 7056-1) requires that each of the Plaintiffs' listed items of undisputed facts must be supported by a direct reference to the record, including depositions, admissions, etc., citing several cases from the Eastern District of California and a recent case of the 6th Circuit Bankruptcy Appellate Panel, *Hadley v. Harrison*, 2022 Bankr. LEXIS 483 (6th Cir. BAP).

7. The lead case asserted by the Defendant is the case of *Langley v. Tulare Police Dept.*, in which Langley's "Motion for Summary Judgment" consisted of the following letter sent to the Court:

> September 22, 2016 an AdmissionRequest [sic] was served on counsel for defendants, Jose Colegio [sic] and Tulare Police Department. A copy was also filed with the United States Courts, Eastern District of California received and dated 09/26/2016.
>
> Counsel for the defendants acknowledges receipt, and dates receipt as 09/26/2016. Counsels failure to respond to Admissions Request demonstrates [they're] conceding my allegations are true and correct. Counsels [sic] claim of "No Proof of Service" does not solidify actions in "Failure" to contest the admissions of fact. Enclosed is letter from counsel acknowledging receipt.
>
> Counsel's failure to respond, contests allegations supports my claims, and therefore there is no need for trial as there is no dispute in fact making summary of judgement appropriate."

*Langley v. Tulare Police Dep't*, No. 1:16-cv-00336-DAD-SKO, 2017 U.S. Dist. LEXIS 21572, at *4-5 (E.D. Cal. Feb. 15, 2017).  The "motion" filed in *Langley* bears no resemblance or possible comparison to the Plaintiffs' motion in this case.

-4-

8.   The Defendant seems to believe that relying on inmate, or criminal defendants' *pro se* cases are relevant to the facts and circumstances of the pending motion.  The Plaintiffs' would like to think that their Motion and the 90+ admitted Statements of Fact which accompany their Motion, rise to a justiciable level a little above, that of ***Langley*** and the other cases cited by the Defendant.

9.   Like ***Langley***, ***Moore v. Sacramento Sheriff's Dep't***, 2015 U.S. Dist. LEXIS 19986 is a case in which the Plaintiff, a state prisoner, is acting *pro se*. ***Id.***, at \*1.  The relevant facts in ***Moore*** are that the Plaintiff filed six motions for summary judgment, all confusing and duplicative, prompting the court to advise the Plaintiff "that improper and superfluous filings by the parties impede the progress of civil action and the court's handling of the case." ***Id.***, at \*10-11.  The court provided an example of the Plaintiff's failure to provide citations to the record as required by the court's local rule, which rule appears to be similar to Rule 56 but, unlike Local Rule 7056-1, the California rule allows citations to any supporting document. Local Rule 260(a), United States District Court for the Eastern District of California (E.D. L.R. 260(a)).  The Eastern District stated in ***Moore***: "plaintiff notes in his motion for summary judgment against defendants Jennings and Carriger that his motion is supported by "Exhibit (A) not attached so not to burden this court with excessive paper work..." ***Id.***, at \*12.  The court also noted that the Movant's  apparent attempt to provide the required Statement of Undisputed Facts through a defective and improper affidavit was not in compliance with Rule 56, or E. D. L.R. 260(a).

10.   The Eastern District of California denied the inmate Plaintiff's Motion for Summary but, despite the significant deficiencies noted above, did so without prejudice. ***Id.***, at \*13

11. In the instant case, the Plaintiffs' concede that most, but not all, of the 32 Statements

of which the Defendant complains do not contain citations to the record as required under <mark>FRCP 56</mark> and Local Rule 7056-1. However, that leaves over 90 Statements which are admitted and at least two Statements which the Plaintiffs contend are supported by proper record citations, but to which the Defendant does not counter and, therefore, those Statements are also deemed undisputed.

12. In *Harrison, supra*, the Plaintiff stated 166 statements of fact each of which including citations to the record. In response, the Defendant, Harrison, was required to prove that there were genuine disputes of material fact to defeat the Plaintiff's motion. *See*, Salas Objections, at p. 8 of 25. Harrison failed to sufficiently deny any of the allegations which Hadley submitted and therefore the motion for summary judgment was granted. The *Harrison* court implied that the Defendant failed to respond correctly to any of the Statements of Facts properly presented by the Plaintiff. Unlike in the cases cited by the Defendant, in the instant case, the Plaintiffs have provided more than 90 Statements of Fact supported by record citations and admitted by the Defendant. See Defendant's Response to Plaintiffs' Amended List of Undisputed Facts ("Defendant's Response") filed on August 12, 2022 (D-75-2). Moreover, most of the Statements objected to are covered, completely, or to a very large extent, by other Statements which the Defendant did admit.

13. Of the 32 Statements of Fact to which the Defendant objected, some are obvious facts which are not in dispute (but admittedly do not contain direct references to the record), like for example, Statement No. 4. : "In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement." However, compare Statement No. 4 to the Defendant's Affidavit, (D-75-2) which states:

-6-

"3.  In 2007, my wife and I divorced, and I was ordered to pay my ex-wife a portion of the equity in the Property.

...

5. ...I learned that I was not credit worthy to borrow the funds.

6.  To facilitate this transaction, I quitclaimed the Property to my son,, Len Salas, who then borrowed $870,000 against the Property.

7.  My wife received the proceeds of the loan.

8.  Len Salas received no proceeds from the loan nor did he pay anything in exchange for the quitclaim deed."

14.  In addition, Plaintiffs' List of Undisputed Facts ("Plaintiffs' List") No. 19. States: "That the Note balance as of April, 2007 totaled approximately $870,000."  Defendant admits that Statement. See Defendant's Response to Plaintiffs' Amended List of Undisputed Facts (D-75-1), August 12, 2022 ("Defendant's Response"), at p. 5 of 32.

15.  Defendant also objects to Statement No. 11, which reads: "That the Defendant is unaware of the location of the original Quitclaim Deed."  However, Plaintiffs' List, Statement No. 82 states: "Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is (sic), or if it even exists." (Citations omitted).  The Defendant admits Statement No. 82.  See Defendant's Response, at p. 20 of 32.

16.  Defendant has also objected to Plaintiffs' List, Statements Nos. 22 and 23.  These are particularly surprising to the Plaintiffs. While the Plaintiffs admit they did not provide a direct citation to the record, the facts recited by Statements 22 and 23 (and related "facts") were first advanced by the Defendant as early as April, 2018.  See, for example, Defendant's Schedule A

-7-

attached hereto as part of Exhibit 9, pp 1, 5, and 9; Exhibit 18; M Salas Affidavit attached to the

Defendant's Objections (D-75-2), at ¶¶ 11 & 12.  In addition, Statement No. 24, which the

Defendant admits, states: "That the Trust was registered in Colorado by Ron Salas in 2011 even

though the Property was located in D.C."  See Defendant's Response, Statement No. 24, at p. 6

of 32.

      17.  The Defendant objects to the Plaintiffs' List, Statement No. 57, despite the fact that

Defendant's own affidavit recites nearly identical facts.  See Max Salas Affidavit dated August

10, 2022 (D-75-2), at ¶¶ 19, 21-22.

      18.  Defendant also objects to Plaintiffs' List, Statement No. 84 which reads: "These

emails attached as Exhibit 7 were within the scope of the document production requested from

Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's

bankruptcy in D.C.  This statement bears two citations, one to Exhibit 7, which is the emails

produced by Len Salas at the time of his deposition in this adversary proceeding (August, 2021)

case but also Exhibit 21, attached to the Plaintiffs' Memorandum.  Plaintiffs assert that the

Defendant's objection should be overruled and Statement No. 84 should be deemed undisputed.

FRCP 56 (e)(2).

      19.  The above makes it very clear that the Defendant's objection is based upon nothing

more than the hope the technical failure to support a relatively small minority of the Statements

on the Plaintiffs' List is sufficient to establish a road block to the inevitable judgment in this

case.  While the Plaintiffs concede that in these few cases, 30 out of 126 Statements, the

Statements do not comply with the requirements of FRCP 56 (c)(1)(A), that technical failure

does not preclude this Court's consideration of the remaining 94 Statements which do comply

-8-

with the rules and to which the Defendant did not object, or seek to counter.  Of those 94

Statements, the Defendant admitted, either without reservation or limited to the pending Motion,

92 Statements.  The Defendant only partially admitted Statement No. 46 and did object to

Statement No. 124 but also answered stating that he "denies the referenced emails establish this

alleged fact."  The Defendant, however, offers no counter fact or citation to the record in his

denial.  ==FRCP 56== (c)(1)(A). The Plaintiffs submit that Statement No. 124 should be deemed

undisputed. ==FRCP 56== (e)(2).

20.  It is curious that the Defendant provided no response to any of the Statements to

which he objected, with the sole exception of Statement No. 124.  Statement No. 124 references

the statements in the emails among the Salas family members (Ron, Max and Len) and Max's

real estate attorneys in the time frame of June, 2011 through February, 2012 (Memorandum,

Exhibit 7) in which emails the parties, including Len and Max make clear that they have either

abandoned the July, 2010 Quitclaim Deed or determined that the Deed was defective, or

ineffective to transfer the D.C. Property at issue here.

21.  This Court's Local Rule (L.R.) 7056-1 requires the presentation of undisputed facts

in a particular manner, described in L.==R. 7056-1== (a).  In every case, the defective Statements,

even if stricken or ignored by the Court, will not defeat the Plaintiffs' claim for Summary

Judgment.

22. L.==R. 7056-1== does not provide a specific remedy for failure to comply with paragraph

(a) of the Local Rule.  However, ==FRCP 56==, which is incorporated into Fed R. Bankr. P. 7056

without any modification relevant to this case, does provide some direction.  In addition to Rule

56 (c)(1)(A)'s requirement of citation to parts of the record, which includes the broad category of

"other materials," FRCP 56 (c)(1)(B) allows a party asserting a fact in support of his motion or opposition to show, alternatively, "that the materials cited do establish the absence or presence of a genuine dispute...

23. FRCP § 56 (c)(3) further states that while "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). *Bateman v. Driggett*, No. 11-13142, 2012 U.S. Dist. LEXIS 91221, at *16-17 (E.D. Mich. July 2, 2012).

24. Ultimately the court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

25. The remedies for failure to comply with FRCP 56 (a) are set forth in FRCP 56(e) which states that the court may:

"(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

*Bateman, supra*. Since this Court's Local Rules do not specify the remedy for non-compliance, the Plaintiffs assert that FRCP 56 (e) applies and the court is well within its discretion to grant summary judgment to the Plaintiffs. Most importantly, even without the Statements of Fact to which the Defendant objects, considering the remaining Statement of Facts, and the failure of the Defendant to offer any counter facts, the Plaintiffs assert they are entitled to summary judgment. The Plaintiffs' believe, and therefore assert, that such a judgment on Counts III, IV, V and VI is

-10-

compelled by the overwhelming factual evidence in support, the lack of disputed facts material to the recovery under the Trustee's strong arm powers, and the statutory and case law which uniformly supports the Plaintiffs' theory of this case.

26. The Defendant has attempted to paint a picture of a wholly unsupported motion with numerous, necessary material facts unsupported by the record. That is hardly the case. As argued above, most of the contested facts are stated elsewhere in Plaintiffs' List and supported by both record citations and the admission of the Defendant. In some instances, while relevant to the matters before the court, the defective Statements are not necessary to support the pending Motion. In other instances, the contested facts are supported by parts of the record which are readily available to the court, including for example, the Defendant's Affidavit attached to his Objections (D-75-2).

27. Neither FRCP 56, Local Rule 7056-1 nor the cases cited by the Defendant conclude that the court must ignore the Statements presented by the Plaintiffs that do contain references to the record. Rule 56 (c)(3) allows this Court to also consider other materials in the record such as the Debtor's bankruptcy filings, schedules and statement of financial affairs, the Complaint, the Defendant's answer to the Complaint, deposition transcripts, Complaint exhibits, deposition exhibits and other documents that are in the record. Rule 56 (c)(3).

**B. Defendant's Response is Defective and Certain Statements Objected to Should be Deemed Undisputed**

28. The Defendant has objected to several statements of fact that contain references to the Motion Exhibit which supports the statement of fact. See, for example, Defendant's Response to Plaintiff's Amended List of Undisputed Facts, ¶¶84, 101, 124. These facts should

-11-

be deemed admitted under the Defendant's own arguments regarding the requirement for citations to the record by both the moving **and the non-moving party**.

29.  In almost every case, the stated fact objected to by the Defendant is an uncontroversial statement that the Defendant has either admitted in his answer to the Plaintiff's (Amended) Complaint, admitted in discovery or admitted in prior hearings in this matter.

30.  In almost every case, where the Defendant has objected to one of the listed facts, the same or very similar fact or facts are supported by another Statement of Fact, submitted with specific citations to the record and admitted by the Defendant.

31.  The Defendant objected to Statement No. 34.  The Plaintiff is satisfied with the statements made in the Defendant's affidavit regarding the fact that all of the rental income from the Property was deposited into an account in the name of "CLR Trust."  *See*, Affidavit of Max Salas, attached as an exhibit to the Defendant's "Objections" ("Salas Affidavit"), at ¶¶ 19-22 ("I dealt with tenants, signed leases, and accepted rent payments on behalf of CLR Trust." ¶21; and, "I deposited all rent checks into an account in the name of CLR Trust, for which I was signatory. ¶22") Later, the Defendant admits, in response to Statement No. 55 that the Debtor understood the CLR Trust was a trust created by the Defendant for the benefit of his sons, Chase, Len and Ron.

32.  Among the documents produced by the Defendant pursuant to the Plaintiffs' Motion to Compel, were the Defendant's individual federal and state income tax returns for the years 2014 through 2018.  Although the Defendant's 2014 tax return shows rental income, the 2015 return shows no rental income despite the acknowledged fact that the Defendant had at least two tenants paying rent in 2015, namely the deceased children of the Plaintiff Estates.  A copy of the

-12-

Defendant's 2015 federal tax return, undated and unsigned, is attached hereto as an Exhibit to this Response. Notably, the Defendant's 2014 and 2016 returns show preparation by a tax preparation service while no tax preparation service is identified in the 2015 return. The date the tax return was signed, if at all, was presumably after April 15, 2016 because attached to the return is an Application for an Automatic Extension of the 2015 return which would have been due on or about April 15, 2016.

33. The Defendant also objected to Statement of Fact No. 37. which stated "the Plaintiff's judgments were allowed claims in both bankruptcy estates." The Plaintiff admittedly failed to cite to the record regarding this statement. However, again, this is a non-controversial statement which is already supported by the Defendant's admission of Statements Nos. 35 and 36

34. The Defendant objected to, and did not respond to Statement No. 101. However, the first sentence of that Statement is clearly supported by the reference to "Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35." Therefore, the Defendant's objection to that part of No. 101 should be overruled and that statement should be deemed admitted.

35. Statement No. 107, to which the Defendant also objected, is a continuation of Statement No. 106 which contains several references to materials in the record.

36. Max denies that the Quitclaim Deed is Max's only proof of ownership. Defendant's Response, Statement No. 83, at p. 20. However, the Defendant provides no facts to support that claim. Without a citation to the record, Statement No 83 should be deemed undisputed in its entirety.

-13-

**C.    Legal Title is an Obvious Interest in Property Which Brings the Property Under the Trustee's Avoiding Powers**

1.    The Debtor had more than Bare Legal Title

37.  At all times prior to the Debtor's bankruptcy petition on April 18, 2018, he was the acknowledged owner of the Property for all purposes.

38.  It should be noted that, although the Debtor apparently did not pay anything in exchange for the quitclaim deed, he did obligate himself solely for the entire balance of the SunTrust Mortgage which, as of the date of the Debtor's bankruptcy in April, 2018 had a balance of more than $1.037 Million per the Defendant's schedules attached as Exhibit 18 to the Plaintiffs' Motion.  See also Defendant's Response, at p. 5 of 32, Statement No. 20.

39.  Furthermore, all of the notices regarding the Property were sent in Len's name as owner.  In addition, the Defendant has admitted that he was unable to obtained refinancing for the Property and all efforts to obtain refinancing required the participation of Len and a co-borrower and co-obligor.  See Complaint, ¶17 (admitted per Defendant's Answer of March 9, 2021 (D-42), at p. 4 of 9.

40.  The Debtor, at all times prior to November, 2019, was solely obligated under the SunTrust Deed of Trust.  Plaintiffs' List, Statement 103, admitted by the Defendant.  See Defendant's Response, Statement 103, at p. 26.

41.  The Debtor was found liable for the damages suffered by the Plaintiffs in the Superior Court's April, 2018 decision from which the judgments totaling $15.2 Million were rendered.

-14-

2. <u>The Evidence is Overwhelming and Unrefuted that There is No Deed in Existence Transferring the Property from the Debtor to the Defendant prior to April 18, 2018</u>

41. According to the Defendant, he had no deed to record in 2011 or 2012 and he made no attempt to acquire such a deed after 2012. See discussion above.

42. Neither the Debtor nor the Defendant are aware of the existence of an original of the Quitclaim Deed after 2010.

43. The Debtor was not the owner of the Property. CLR Trust was. See, for example, Defendant's Affidavit (D-75-2). There is no evidence offered by the Defendant that he was the owner of the property on April 17, 2018, but the Defendant and the Debtor have now provided irrefutable evidence that, if any "trust" owned the property after 2010, it was the CLR Trust. The Debtor has been consistent on that issue since 2015. He is now corroborated by the Defendant's affidavit.

**D. The Trustee is Entitled to Avoid and Recovery the D.C. Property Pursuant to His Avoidance and Recovery Authority in 11 U.S.C. §§ 544, *et seq.***

44. The Defendant asserts in his "Objections" that the Debtor's interest in the property was a bare legal title and appears to argue, therefore, that such an interest cannot be property of the estate for purposes of application of the Trustee's avoiding powers. The cases cited by the Defendant do not support this contention and numerous cases, including in the 6th Circuit, support the Plaintiff's claims and, therefore, the summary judgment sought in the pending Motion.

-15-

45. ***Ransel v. Libertyville Bank & Tr. Co. (In re Holco Capital Grp., Inc.)***, 2013 Bankr. LEXIS 4068, at *30-32 (Bankr. N.D. Ind. 2013) provides a partial explanation of the relationship between what is property of the estate and the trustee's avoiding powers.

> The Code provides a sweeping definition of "property of the estate" in § 541(a), and it normally includes "property fraudulently or improperly transferred by the debtor before bankruptcy." ***Koch Refining v. Farmers Union Central Exchange,*** 831 F.2d 1339, 1343 (7th Cir. 1987). The Supreme Court and Seventh Circuit have made clear that "'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." ***Begier v. I.R.S.***, 496 U.S. 53, 58, 110 S. Ct. 2258, 110 L.Ed.2d 46 (1990); accord, ***Warsco v. Preferred Technical Group***, 258 F.3d 557, 564 (7th Cir. 2001); ***Homann v. R.I.H. Acquisitions IN, LLC (In re Lewinski)***, 410 B.R. 828, 833 (Bankr. N.D. Ind. 2008). The Fourth Circuit applied that analysis to § 548. ***See French v. Liebmann (In re French)***, 440 F.3d 145, 151-52 (4th Cir.), cert. denied, 549 U.S. 815, 127 S. Ct. 72, 166 L. Ed. 2d 25 (2006) ("§ 548 plainly allows a trustee to avoid any transfer of property that would have been 'property of the estate' prior to the transfer in question – as defined by § 541 – even if that property is not 'property of the estate' now.") (citing ***Begier)***.

46. In ***Ransel***, the defendants asserted that the Funds accounts at issue were not property of the estate because "[t]he transfer of a property interest that the debtor holds in trust for another person will not qualify" as a transfer of an interest of the debtor in property. (Internal citations omitted) (quoting ***Dunham v. Kisak***, 192 F.3d 1104, 1109 (7th Cir. 1999)). They cited § 541(d) of the Bankruptcy Code and contended that, in a trust arrangement like this one, Holco's interest in the Funds was purely a legal interest, not an equitable one. Without an equitable interest, they insisted, as a matter of law the Funds could not constitute property of the debtor.

47. In ***Ransel v. Libertyville Bank & Tr. Co. (In re Holco Capital Grp., Inc.***), Nos. 10-30006 HCD, 12-3023, 2013 Bankr. LEXIS 4068, at *25-26 (Bankr. N.D. Ind. Sep. 25, 2013) the court explained that the 7th Circuit's ***Dunham*** decision made no determination as to the

-16-

ability of the Trustee to avoid the subject deed issued prior to bankruptcy, but not recorded. In

*Ransel*, the court explained:

> The Seventh Circuit, in *Dunham*, did state that general principle, but only in dictum. It declined to "confront the question of whether the 1995 deed amounted to a 'transfer of an interest of the debtor in property'" under § 548(a)(1), because the trustee forfeited the issue by failing to challenge the bankruptcy court's specific findings that there was no evidence that the debtor intended to hinder, delay, or defraud his creditors; that the debtor was insolvent when the transfer was made; or that the transfer rendered him insolvent. *Dunham*, 192 F.3d at 1110.

*Ransel v. Libertyville Bank & Tr. Co., supra*, at *26 n.12.

48.  Likewise, the Defendant totally misstates the effect of the case of *In re Torrez*, also

relied upon in the Defendant's Objections.

> At oral argument, Chbat relied on *In re Matter of Torrez*, 63 Bankr. 751 (9th Cir. BAP 1986), aff'd on other grounds, 827 F.2d 1299 (9th Cir. 1987). *Torrez* held that the "strong arm" power of section 544 could not make the corpus of the valid resulting trust in that case property of a bankruptcy estate. *Id.* at 754. Chbat argues that *Torrez* should be extended to the constructive trust in this case. This extension of *Torrez* is unwarranted. *Torrez* did not hold that section 544 was inapplicable in general to resulting trusts or any other kind of trust. Rather, the BAP, applying section 544(a)(3), held that the debtor-in-possession in that case did not qualify as a bona fide purchaser for value without notice under California law and therefore could not invoke the avoidance power of section 544(a)(3). *Id.* *Torrez* leaves open, rather than forecloses, the possibility that under certain circumstances the corpus of a valid resulting trust may become estate property upon exercise of section 544(a)(3)'s avoidance powers. Neither *Torrez*, nor Chbat, presents any reason why we should not apply this reasoning to a constructive trust.

*In re Tleel*, 876 F.2d 769, 772 (9th Cir. 1989)

49.  The Defendant is apparently arguing that his alleged equitable interest in the D.C.

Property trumps the Trustee's 11 U.S.C. § 544(a)(1) powers. Courts, including in the Sixth

Circuit, have ruled, however, that the Trustee can still use his 11 U.S.C. § 544(a) powers to

preempt 11 U.S.C. § 541(d). *See In re Elin*, 20 Bankr. 1012 (D.C.N.J. 1982) aff'd without

-17-

opinion 707 F.2d 1400 ( 3rd Cir. 1983); *In re Dlott*, 43 Bankr. 789 (Bankr. D. Mass. 1983); *In re Anderson*, 30 Bankr. 995 (Bankr. M.D. Tenn.1983); *In re Tleel, supra*. These decisions demonstrate that the Trustee can bring any property into the bankruptcy estate which he could have reached with his 11 U.S.C. § 544(a) strong arm powers. *See also, Dutch Miller Chevrolet, Inc. v. Tri-State Mech. Servs., Inc.*, 141 B.R. 488, 495 (Bankr. W.D. Pa. 1992) (Plaintiff's constructive trust, which was unperfected at the time of the Debtor's bankruptcy filing could be avoided and recovered for the benefit of creditors pursuant to 11 U.S.C. §§ 544, 550 and 551).

     50.  In *In re Anderson*, a decision of this District Court, Judge Paine noted that

> "a reading and comparison of § 541(d) and § 544 leads to the inescapable
> conclusion that § 541(d) does not represent a general limitation on the trustee's
> avoidance powers under § 544.  Section 541(d) qualifies the trustee's right under §
> 541(a) to succeed to certain property interests possessed by the debtor at the time
> of the filing of his bankruptcy petition. In contrast, § 544(a) arms the trustee at the
> time of the filing of the debtor's bankruptcy petition with all the rights and powers
> of various creditors and transferees of the debtor so as to avoid incomplete or
> improperly perfected transfers of the debtor and thereby insure an equality of
> distribution among the debtor's general unsecured creditors. See, e.g., 4 L. KING,
> COLLIER ON BANKRUPTCY para. 541.01, 541-5 to 541-9 and para. 544.01,
> 544-2 to 544-4 (15th ed. 1982); 2 W. NORTON, BANKRUPTCY LAW AND
> PRACTICE §§ 29.01 and 30.01 (1982). Section 544(a) in fact contemplates that
> the debtor has no remaining interest in the property which is the subject of the
> avoided transaction.  The trustee is thus given the ability to bring into the estate,
> in addition to the debtor's property as defined by § 541(a) and limited by § 541(d),
> any property which he can obtain through his avoidance powers under the
> Bankruptcy Code, including his ability to invalidate certain transfers by the debtor
> under § 544(a). See 11 U.S.C.A. §§ 541(a)(3), 550, 551 (West 1979).

*In re Anderson*, 30 B.R. 995, 1009-10 (M.D. Tenn. 1983)

     51.  Judge Paine offered as support for his decision an analysis of the two provisions of the bankruptcy code referenced above by Judge Debevoise in the case of  *Elin v. Busche*, 20 Bankr. 1012, 1016-1017 (D. N.J. 1982).  As Judge Debevoise explained:

"The fallacy of plaintiff's position [that § 541(d) restricts the application of § 544(a)(3)] lies in a misreading of § 541. Three sections of the Act must be read together -- § 541, § 551 and § 544. Granted that the bare language of these sections may appear to be elliptical, the meaning which emerges is that assets recoverable by a trustee pursuant to § 544 become property of the estate notwithstanding the provisions of § 541(d). In other words, if a person other than the debtor holds an equitable interest in assets subject to recovery under § 544, the provisions of § 541(d) upon which plaintiff relies do not prevent the trustee from recovering those assets.

Section 541(a)(4) provides that an estate is comprised of "any interest in property preserved for the benefit of or ordered transferred to the estate under section . . . . 551. " § 551 provides that 'any transfer avoided under section . . . . 544 . . . . is preserved for the benefit of the estate but only with respect to property of the estate. ' Thus, § 541, and § 551 which is incorporated therein by reference, bring within the debtor's estate property recoverable pursuant to § 544."

*Id.*, cited and quoted in ***In re Anderson***, 30 B.R. at 1010.

52.  The Ninth Circuit has held that a constructive trust or equitable lien is subject to the bankruptcy trustee's section 544 "strong arm" powers and may be voided to the extent voidable by a bona fide purchaser under state law. ***National Bank of Alaska v. Erickson (In re Seaway Express Corp.)***, 912 F.2d 1125, 1128-29 (9th Cir. 1990) ***Chbat v. Tleel (In re Tleel)***, 876 F.2d 769, 770 (9th Cir. 1989).  ***See also, Bank of Alex Brown v. Goldberg (In re Goldberg)***, 158 B.R. 188, 196-97 (Bankr. E.D. Cal. 1993) (Bank's constructive trust was not perfected prior to the Debtor's bankruptcy filing, thus Bank's interest may be avoided pursuant to section 544).

53.  Thus, even if the Debtor held just "bare legal title" that clearly constitutes an interest in property under the umbrella of the Trustee's avoidance and recovery powers.

**E.    The Plaintiffs are Entitled to Summary Judgment, on Behalf of the Estate Under the Bankruptcy Code and D.C. Fraudulent Conveyance Act**

54.  In order to establish a right to recovery as a fraudulent conveyance in Counts IV and V of the Complaint, the Plaintiffs must show that the Debtor (1) transferred an interest in

-19-

property; (2) for less than reasonably equivalent value; and the debtor was either (3) insolvent on the date the transfer was made, or became insolvent as a result of the transfer.  11 U.S.C. § 548 (a)(1)(B).  ***See also, Dunham v. Kisak***, 192 F.3d 1104, 1109 (7th Cir. 1999); ***Limor v. Anderson In re Scarbrough)***, 2019 Bankr. LEXIS 933 (6th Cir. BAP 2019), at *9.

55.  D.C. Code §28-3105 (a) tracks 11 U.S.C. § 548 (a)(1)(B) except for the addition of the requirement that the transfer is  "fraudulent as to a creditor whose claim arose before the transfer was made..."  D.C. Code §28-3105(a).

56.  The Debtor held a recorded deed and was the maker of a Deed of Trust on the Property as of April 17, 2018.

57.  That Deed was more than just an accommodation as the Debtor was required to assist the Defendant in his attempts to obtain refinancing and continued to be obligated under the SunTrust Deed of Trust.  The Debtor was also listed as the owner on all notices from the D.C. government and was liable, as owner, for any damages sustained at the property as evidenced by the final judgment in the D.C. Superior Court case in April, 2018.

58.  The Property was the subject of an alleged Quitclaim Deed dated July 6, 2010.

59.  The Quitclaim Deed was not recorded as of the Debtor's bankruptcy filing on April 18, 2018.

60.  By statute, the Deed was, therefor, deemed recorded on April 17, 2018.

61.  At the time of the transfer, the Debtor had obligations which exceeded $16 Million just with the SunTrust Note and the Plaintiffs' judgments.  Plaintiffs' List, Statements Nos. 75, 81.

-20-

62. At the moment before the transfer, the Debtor's assets included the Property, worth approximately $2.5 Million, and approximately $53,000. Plaintiffs' List, Statement No. 75.

63. At no time did the Defendant pay any money or transfer anything of value to the Debtor related to the D.C. Property. Defendant's Affidavit (D-75-2); Plaintiffs' List, Statement No. 103; Plaintiffs' Memorandum, Exhibits 4 and 5.

64. Immediately following the transfer of the Property on April 17, 2018, the Debtor's assets were approximately $53,000 and his liabilities exceeded $16 Million. Debtor's Schedules of Asset and Liabilities filed herein on April 18, 2018; Statement No. 75.

65. In accordance with the above stated facts all of which are undisputed and admitted by the Defendant, the Plaintiffs have met their burden to prove undisputed facts showing entitlement to judgment on their fraudulent conveyance claims under Counts IV and V of the Complaint. The Debtor transferred his interest in the subject Property to the Defendant on April 17, 2018. At the time of the transfer the Debtor was insolvent and the transfer made him even more insolvent by removing his only major asset, the Property. The transfer was not for valid consideration since the Defendant paid no money and transferred nothing of value to the Debtor at the time.

66. For the purposes of § 548, the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" 11 U.S.C. § 548(d)(2)(A); see also *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 319 B.R. 134, 138 (Bankr. E.D. Ky. 2004) (defining "value" as "that which provides an economic benefit, either direct or indirect, to the debtor."). Courts generally compare the value of the property transferred with the value of what the debtor received to ascertain whether there was a reasonably equivalent

-21-

value, although a dollar-for-dollar equivalent is not required. ***Corzin v. Fordu (In re Fordu)***, 201 F.3d 693, 707 (6th Cir. 1999); ***Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.)***, 6 F.3d 1119, 1125-26 (5th Cir. 1993); see also ***Allard v. Flamingo Hilton (In re Chomakos)***, 69 F.3d 769, 771 (6th Cir. 1995) (holding that "the contractual right to receive payment in the event that it turns out well is obviously worth something.").

67. The value of the Property at the time of transfer, excluding liens, was $2.5 Million. Plaintiffs' List, Statement No. 109. It's present value is estimated to be more than $2.4 Million. Id.

68. The original Sun Trust loan balance was $870,000. The balance in October, 2018 was $1,114,021.14. Statement No. 119.

69. The SunTrust Note deficiency was $374,282.18 as of April, 2018. Statement No. 62. No payments were made on the SunTrust loan from 2015 through 2018 except one, only from insurance proceeds. Statement No. 116.

70. The Defendant has stated in previous testimony that he "promised" to pay the SunTrust Note obligation. Obviously, by failing to keep up with the payments and the necessary upkeep on the Property (reference: the fire), he wholly failed in that "promise." Regardless, that promise cannot be used as "consideration" or "value." See ***In re Palermini***, 113 B.R. 380, 384 (Bankr. S.D. Ohio 1990) and ***Whitlock v. Hause (In re Hause)***, 13 Bankr. 75, 79 (Bankr. D. Mass. 1981), aff'd, 694 F.2d 861 (1st Cir. 1982).

-22-

**F.** **The Plaintiffs are Entitled to Summary Judgment on Counts I (Bona Fide Purchaser) and II (Judicial Lienholder) of the Amended Complaint**

71.  The Plaintiffs are entitled to summary judgment on Count I of the Complaint because the undisputed facts show that the subject Deed was not recorded and there is no other recorded interest in the records of the District of Columbia that would provide the Trustee with actual or constructive notice of the Defendant's alleged interest on the date of the bankruptcy filing.  A deed conveying real property in the District of Columbia is not valid against a subsequent bona fide purchaser without notice **until the deed is recorded**.  D.C. Code §42-401.

72.  Likewise, the Plaintiffs are entitled to summary judgment on Count II of the Complaint because the Quitclaim Deed, if ever valid, was not recorded prior to April 18, 2018, the date of which the Trustee, as a hypothetical lien creditor, is deemed to have perfected his interest.  See ***Rogan v. Bank One, N.A. (In re Cook)***, 457 F.3d 561, 564 (6th Cir. 2006).

**G.** **The Defendant's "Other Meritorious Defenses" Claim is Not Supported by any Statements of Fact**

73.  Finally, the Defendant asserts that he has other "meritorious defenses" which would thwart the Plaintiffs' right to summary judgment.  See, Defendant's Objections, pp. 23 and 24. These claims contain nothing but bare arguments without reference to the record and without reference to any facts.  Fatal to these arguments by the Defendant is his failure to support any of these "meritorious defenses" with facts supported by citations to the record.  See Defendant's discussion at Section A. starting on page 7 of his Objection (D-75).

-23-

**CONCLUSION**

For the reasons set forth above and in the Plaintiffs' Memorandum filed in support of their Motion for Summary Judgment, the Plaintiffs assert that they are entitled to summary judgment on Counts I, II, IV, V and VI of the Amended Complaint.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt
Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

<u>Certificate of Service</u>

I HEREBY CERTIFY THAT a copy of the foregoing Motion, along with the Plaintiffs Memorandum and accompanying exhibits, was delivered electronically, on the 23th day of August, 2022 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067


-24-

615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt
Philip J. McNutt

-25-

Case 3:23-cv-00987   Document 7-3   Filed 10/04/23   Page 47 of 579 PageID #: 1167

1062

Form **8879**

Department of the Treasury
Internal Revenue Service

# IRS *e-file* Signature Authorization

OMB No. 1545-0074

## 2015

▶ Do not send to the IRS. This is not a tax return.
▶ Keep this form for your records.
▶ Information about Form 8879 and its instructions is at *www.irs.gov/form8879.*

Submission Identification Number (SID)

| Taxpayer's name | Social security number |
|---|---|
| Max E Salas | |
| Spouse's name | Spouse's social security number |

| **Part I** | **Tax Return Information—Tax Year Ending December 31, 2015** (Whole Dollars Only) | | |
|---|---|---|---|
| 1 | Adjusted gross income (Form 1040, line 38; Form 1040A, line 22; Form 1040EZ, line 4) . . . . . . . . | 1 | 70,722 |
| 2 | Total tax (Form 1040, line 63; Form 1040A, line 39; Form 1040EZ, line 12) . . . . . . . . . . . . | 2 | 10,900 |
| 3 | Federal income tax withheld (Form 1040, line 64; Form 1040A, line 40; Form 1040EZ, line 7) . . . . . . | 3 | 6,352 |
| 4 | Refund (Form 1040, line 76a; Form 1040A, line 48a; Form 1040EZ, line 13a; Form 1040-SS, Part I, line 13a) . . . | 4 | |
| 5 | Amount you owe (Form 1040, line 78; Form 1040A, line 50; Form 1040EZ, line 14) . . . . . . . . | 5 | 4,548 |

| **Part II** | **Taxpayer Declaration and Signature Authorization** (Be sure you get and keep a copy of your return) |
|---|---|

Under penalties of perjury, I declare that I have examined a copy of my electronic individual income tax return and accompanying schedules and statements for the tax year ending December 31, 2015, and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts from my electronic income tax return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send my return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** the reason for any delay in processing the return or refund, and **(c)** the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an ACH electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of my federal taxes owed on this return and/or a payment of estimated tax, and the financial institution to debit the entry to this account. This authorization is to remain in full force and effect until I notify the U.S. Treasury Financial Agent to terminate the authorization. To revoke (cancel) a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537. Payment cancellation requests must be received no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I further acknowledge that the personal identification number (PIN) below is my signature for my electronic income tax return and, if applicable, my Electronic Funds Withdrawal Consent.

**Taxpayer's PIN: check one box only**

☐ I authorize _____ to enter or generate my PIN | 12121
ERO firm name | Enter five digits, but do not enter all zeros

as my signature on my tax year 2015 electronically filed income tax return.

☐ I will enter my PIN as my signature on my tax year 2015 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Your signature ▶ _____ Date ▶ _____

**Spouse's PIN: check one box only**

☐ I authorize _____ to enter or generate my PIN | 
ERO firm name | Enter five digits, but do not enter all zeros

as my signature on my tax year 2015 electronically filed income tax return.

☐ I will enter my PIN as my signature on my tax year 2015 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Spouse's signature ▶ _____ Date ▶ _____

## Practitioner PIN Method Returns Only—continue below

| **Part III** | **Certification and Authentication—Practitioner PIN Method Only** |
|---|---|

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN. | 12121
Do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature for the tax year 2015 electronically filed income tax return for the taxpayer(s) indicated above. I confirm that I am submitting this return in accordance with the requirements of the Practitioner PIN method and **Publication 1345**, Handbook for Authorized IRS *e-file* Providers of Individual Income Tax Returns.

ERO's signature ▶ _____ Date ▶ _____

### ERO Must Retain This Form — See Instructions
### Do Not Submit This Form to the IRS Unless Requested To Do So

For Paperwork Reduction Act Notice, see your tax return instructions. | Form **8879** (2015)
HTA

Government of the
District of Columbia

# 2015 D-40E SUB
## District of Columbia Individual Income Tax
## Declaration for Electronic Filing

Tax period ending    1215

IRS Declaration Control Number (DCN)

| Your First name and initial | Last name | Social Security Number |
|---|---|---|
| MAX E | SALAS | ████████ |

| Spouse's/Domestic partner's First name and initial | Last name | Spouse's Social Security Number |
|---|---|---|

| Present Home Address (number, street and suite/apartment number if applicable) | Federal Filing Status |
|---|---|
| 777 7 STREET NW | SINGLE |

| City, Town, and State | Zip Code + 4 | District of Columbia Filing Status |
|---|---|---|
| WASHINGTON DC | 20001 | SINGLE |

## PART I - TAX RETURN INFORMATION

**PLEASE ENTER WHOLE DOLLAR AMOUNTS**

1. District of Columbia Adjusted Gross Income, Form D-40, Line 14 or D-40EZ, Line 3          69955.00

2. District of Columbia Tax, Form D-40, Line 21 or D-40EZ, Line 6          3853.00

3. DC Income Tax Withheld, Form D-40, Line 30 or D-40EZ, Line 11          4236.00

4. District of Columbia Refund Net, Form D-40, Line 40 or D-40EZ, Line 19          383.00

5. District of Columbia Total Amount Due, Form D-40, Line 45 or D-40EZ, Line 18          .00

## PART II - REFUND METHOD          Direct Deposit          Refund Card          Paper Check

*For Direct Deposit or Direct Debit enter the following information:*

6. Routing Number*          *Routing Number must be nine digits and the first two must be 01 through 12 or 21 through 32.

7. Account Number

8. Type of Account          Checking          Savings

## PART III - DECLARATION OF TAXPAYER

Under penalties of perjury, I/we declare that I/we have examined a copy of my/our electronic individual income tax return and accompanying schedules and statements for the 2015 tax year, and to the best of my knowledge and belief, it is true, correct and complete. I/we further declare that the amounts in Part I above are the amounts from my/our electronic income tax return. I consent to allow my/our intermediate service provider, transmitter, or electronic return originator (ERO) to send my/our return to the District of Columbia (DC). I/we authorize DC and its designated financial institution to initiate an ACH electronic funds withdrawal (direct debit). Refunds cannot be direct deposited and payments cannot be transmitted from a financial institution.

| Your Signature | Date | Spouse's Signature | Date |
|---|---|---|---|

## PART IV - DECLARATION OF ELECTRONIC RETURN ORIGINATOR (ERO) AND PAID PREPARER

I declare that I have reviewed the individual income tax return and that the entries on D40-E are complete and correct to the best of my knowledge. The taxpayer will have signed this form before I submit the return. I will give the taxpayer a copy of all forms and information to be filed with DC. If I am also the Paid Preparer, under penalties of perjury, I declare that I have examined the above individual income tax return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct and complete. Declaration of preparer is based on all information of which the preparer has any knowledge.

| ERO's Signature | Date | SSN, EIN, or PTIN |
|---|---|---|

| Paid Preparer's Signature | Date | SSN, EIN, or PTIN |
|---|---|---|

# PLEASE KEEP FOR YOUR RECORDS. DO NOT MAIL.

2015 D-40E  SUB

▼ **Detach Here and Mail With Your Payment and Return** ▼

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Department of the Treasury **Internal Revenue Service** | **2015** | **Form 1040-V Payment Voucher** |
|---|---|---|

- Use this voucher when making a payment with Form 1040
- Do not staple this voucher or your payment to Form 1040
- Make your check or money order payable to the "United States Treasury"
- Write your Social Security Number (SSN) on your check or money order

| Amount you are paying by check or money order ▶ | Dollars |
|---|---|
| | 4,548 |

1833

MAX E SALAS
777 7 STREET, NW, APT 216
WASHINGTON, DC 20001

Internal Revenue Service
P.O. Box 37008
Hartford, CT 06176-7008

 KO SALA 30 0 201512 610

▼ DETACH HERE ▼

1833

**Form 4868**

Department of the Treasury
Internal Revenue Service (99)

## Application for Automatic Extension of Time To File U.S. Individual Income Tax Return

For calendar year 2015, or other tax year beginning                    , 2015, ending                    ,

OMB No. 1545-0074

20**15**

| Part I | Identification |
|---|---|
| **1** Your name(s) (see instructions) | |
| Max E Salas | |
| Address (see instructions) | |
| 777 7 Street, NW, Apt 216 | |

| City, town, or post office | State | ZIP Code |
|---|---|---|
| Washington | DC | 20001 |

| **2** Your social security number | **3** Spouse's social security number |
|---|---|
| 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 | |

| Part II | Individual Income Tax |
|---|---|
| **4** Estimate of total tax liability for 2015 . . . $ | 10,900 |
| **5** Total 2015 payments . . . . . . . . . | 6,352 |
| **6** **Balance due.** Subtract line 5 from line 4 (see instructions) . . . . . . . . . . | 4,548 |
| **7** Amount you are paying (see instructions) . ▶ | 4,548 |
| **8** Check here if you are "out of the country" and a U.S. citizen or resident (see instructions) . . . . . . . . . ▶ ☐ |
| **9** Check here if you file Form 1040NR or 1040NR-EZ and did not receive wages as an employee subject to U.S. income tax withholding . . . . . . . . . . ▶ ☐ |

KO SALA 30 0 201512 670

Form **1040**   Department of the Treasury—Internal Revenue Service   (99)
**U.S. Individual Income Tax Return**   **2015**   OMB No. 1545-0074   IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2015, or other tax year beginning _____, ending _____   See separate instructions.

| | | |
|---|---|---|
| Your first name: Max   M.I. E | Last name: Salas   Suffix | Your social security number |
| If a joint return, spouse's first name   M.I. | Last name   Suffix | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions.   777 7 Street, NW   Apt. no. 216

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).   Washington   DC   20001

Foreign country name   Foreign province/state/county   Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.   ☐ You ☐ Spouse

**Filing Status**
Check only one box.

1. [X] Single
2. ☐ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a [X] **Yourself.** If someone can claim you as a dependent, **do not** check box 6a . . . . . . . . .
b ☐ **Spouse** . . . . . . . . . . . . . . . .

| Boxes checked on 6a and 6b | 1 |
|---|---|

c **Dependents:**

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

- No. of children on 6c who:
  - lived with you
  - did not live with you due to divorce or separation (see instructions)
- Dependents on 6c not entered above

d Total number of exemptions claimed . . . . . . . . . . . . . . .   Add numbers on lines above ▶ | 1 |

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . | 7 | 69,955 |
| 8a | **Taxable** interest. Attach Schedule B if required . . . . . . . . . . | 8a | |
| b | **Tax-exempt** interest. **Do not** include on line 8a . . . . | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . . | 9a | |
| b | Qualified dividends . . . . . . . . . . | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes | 10 | 767 |
| 11 | Alimony received . . . . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . . | 14 | |
| 15a | IRA distributions . . . . . . . . 15a | b Taxable amount . . . . | 15b | |
| 16a | Pensions and annuities . . . . . . 16a | b Taxable amount . . . . | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . . . . . | 19 | |
| 20a | Social security benefits . . . . 20a | b Taxable amount . . . . | 20b | |
| 21 | Other income. List type and amount _____ | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your total income . . . ▶ | 22 | 70,722 |

**Adjusted Gross Income**

| | | | | |
|---|---|---|---|---|
| 23 | Educator expenses . . . . . . . . . . . . . | 23 | | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ . . . . | 24 | | |
| 25 | Health savings account deduction. Attach Form 8889 . . . | 25 | | |
| 26 | Moving expenses. Attach Form 3903 . . . . . . . | 26 | | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . . . . | 27 | | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . . . . . | 28 | | |
| 29 | Self-employed health insurance deduction . . . . . | 29 | | |
| 30 | Penalty on early withdrawal of savings . . . . . . | 30 | | |
| 31a | Alimony paid   b Recipient's SSN ▶ | 31a | | |
| 32 | IRA deduction . . . . . . . . . . . . | 32 | | |
| 33 | Student loan interest deduction . . . . . . . | 33 | | |
| 34 | Tuition and fees. Attach Form 8917 . . . . . . . | 34 | | |
| 35 | Domestic production activities deduction. Attach Form 8903 . . . . | 35 | | |
| 36 | Add lines 23 through 35 . . . . . . . . . . . . . . . | | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . ▶ | | 37 | 70,722 |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.   Form **1040** (2015)

HTA

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) . . . . . . . . . . | 38 | 70,722 |
| | 39a | Check if: ☐ **You** were born before January 2, 1951, ☐ Blind. ☐ **Spouse** was born before January 2, 1951, ☐ Blind. Total boxes checked ▶ 39a | | |
| | b | If your spouse itemizes on a separate return or you were a dual-status alien, check here . ▶ 39b ☐ | | |
| **Standard Deduction for—** • People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions. • All others: Single or Married filing separately, $6,300 Married filing jointly or Qualifying widow(er), $12,600 Head of household, $9,250 | 40 | **Itemized deductions** (from Schedule A) or your **standard deduction** (see left margin) | 40 | 6,300 |
| | 41 | Subtract line 40 from line 38 . . . . . . . . . . . . . . | 41 | 64,422 |
| | 42 | **Exemptions.** If line 38 is $154,950 or less, multiply $4,000 by the number on line 6d. Otherwise, see instructions | 42 | 4,000 |
| | 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . | 43 | 60,422 |
| | 44 | **Tax** (see instructions). Check if any from: **a** ☐ Form(s) 8814 **b** ☐ Form 4972 **c** ☐ | 44 | 10,900 |
| | 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 . . . . | 45 | |
| | 46 | Excess advance premium tax credit repayment. Attach Form 8962 . . . . | 46 | |
| | 47 | Add lines 44, 45, and 46 . . . . . . . . . . . . . . ▶ | 47 | 10,900 |
| | 48 | Foreign tax credit. Attach Form 1116 if required . . . | 48 | | |
| | 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | | |
| | 50 | Education credits from Form 8863, line 19 . . . . | 50 | | |
| | 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | | |
| | 52 | Child tax credit. Attach Schedule 8812, if required . . | 52 | | |
| | 53 | Residential energy credits. Attach Form 5695 . . . | 53 | | |
| | 54 | Other credits from Form: **a** ☐ 3800 **b** ☐ 8801 **c** ☐ | 54 | | |
| | 55 | Add lines 48 through 54. These are your **total credits** . . . . . . . | 55 | |
| | 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- . . . ▶ | 56 | 10,900 |
| **Other Taxes** | 57 | Self-employment tax. Attach Schedule SE . . . . . . . . . . | 57 | |
| | 58 | Unreported social security and Medicare tax from Form: **a** ☐ 4137 **b** ☐ 8919 . . | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| | 60a | Household employment taxes from Schedule H . . . . . . . . . | 60a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required . . . . | 60b | |
| | 61 | Health care: individual responsibility (see instructions) Full-year coverage ☐ . . | 61 | |
| | 62 | Taxes from: **a** ☐ Form 8959 **b** ☐ Form 8960 **c** ☐ Instructions; enter code(s) | 62 | |
| | 63 | Add lines 56 through 62. This is your **total tax** . . . . . . . . . ▶ | 63 | 10,900 |
| **Payments** If you have a qualifying child, attach Schedule EIC. | 64 | Federal income tax withheld from Forms W-2 and 1099 . | 64 | 6,352 | |
| | 65 | 2015 estimated tax payments and amount applied from 2014 return | 65 | | |
| | 66a | **Earned income credit (EIC)** . . . . . . . . | 66a | | |
| | b | Nontaxable combat pay election . . . . | 66b | | |
| | 67 | Additional child tax credit. Attach Schedule 8812 . . . | 67 | | |
| | 68 | American opportunity credit from Form 8863, line 8 . . | 68 | | |
| | 69 | Net premium tax credit. Attach Form 8962 . . . . | 69 | | |
| | 70 | Amount paid with request for extension to file . . . | 70 | | |
| | 71 | Excess social security and tier 1 RRTA tax withheld . . | 71 | | |
| | 72 | Credit for federal tax on fuels. Attach Form 4136 . . | 72 | | |
| | 73 | Credits from Form: **a** ☐ 2439 **b** ☐ Reserved **c** ☐ 8885 **d** ☐ | 73 | | |
| | 74 | Add lines 64, 65, 66a, and 67 through 73. These are your total payments . . . . ▶ | 74 | 6,352 |
| **Refund** Direct deposit? See instructions. | 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you **overpaid** | 75 | |
| | 76a | Amount of line 75 you want refunded to you. If Form 8888 is attached, check here . ▶ ☐ | 76a | |
| | ▶ b | Routing number _____ ▶ **c** Type: ☐ Checking ☐ Savings | | |
| | ▶ d | Account number _____ | | |
| | 77 | Amount of line 75 you want applied to your 2016 estimated tax . . ▶ | 77 | |
| **Amount You Owe** | 78 | **Amount you owe.** Subtract line 74 from line 63. For details on how to pay, see instructions . ▶ | 78 | 4,548 |
| | 79 | Estimated tax penalty (see instructions) . . . . . | 79 | | |

| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ **Yes. Complete below.** ☐ **No** |
|---|---|
| | Designee's name ▶ Preparer　　Phone no. ▶ (202) 387-1798　　Personal identification number (PIN) ▶ 12121 |

| **Sign Here** Joint return? See instructions. Keep a copy for your records. | Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. |
|---|---|
| | Your signature　　　Date　　　Your occupation Director of Business Dev　　　Daytime phone number (202) 271-2800 |
| | Spouse's signature. If a joint return, **both** must sign.　　　Date　　　Spouse's occupation　　　If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

Form **1040** (2015)

| SCHEDULE E<br>(Form 1040)<br><br>Department of the Treasury<br>Internal Revenue Service (99) | **Supplemental Income and Loss**<br><br>(From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.)<br><br>▶ Attach to Form 1040, 1040NR, or Form 1041.<br>▶ Information about Schedule E and its separate instructions is at *www.irs.gov/schedule.* | OMB No. 1545-0074<br><br>**2015**<br><br>Attachment<br>Sequence No. **13** |
|---|---|---|

Name(s) shown on return

Max E Salas

Your social security number

■■■■■■■

**Part I**  Income or Loss From Rental Real Estate and Royalties  **Note:** If you are in the business of renting personal property, use **Schedule C or C-EZ** (see instructions). If you are an individual, report farm rental income or loss from **Form 4835** on page 2, line 40.

A  Did you make any payments in 2015 that would require you to file Form(s) 1099? (see instructions)   ☐ Yes  ☐ No
B  If "Yes," did you or will you file required Forms 1099?   ☐ Yes  ☐ No

| 1a | Physical address of each property (street, city, state, ZIP code) |
|---|---|
| A | 1610 Riggs Place NW Washington, DC 20009 |
| B | |
| C | |

| 1b | Type of Property (from list below) | 2 | For each rental real estate property listed above, report the number of fair rental and personal use days. Check the **QJV** box only if you meet the requirements to file as a qualified joint venture. See instructions. | | Fair Rental Days | Personal Use Days | QJV |
|---|---|---|---|---|---|---|---|
| A | 2 | | | A | | | ☐ |
| B | | | | B | | | ☐ |
| C | | | | C | | | ☐ |

**Type of Property:**
1 Single Family Residence   3 Vacation/Short-Term Rental  5 Land       7 Self-Rental
2 Multi-Family Residence    4 Commercial                6 Royalties   8 Other (describe)

| Income: | | Properties: | | A | B | C |
|---|---|---|---|---|---|---|
| 3 | Rents received . . . . . . . . . . . . . . . . | 3 | | | | |
| 4 | Royalties received . . . . . . . . . . . . . . | 4 | | | | |

| Expenses: | | | | | | |
|---|---|---|---|---|---|---|
| 5 | Advertising . . . . . . . . . . . . . | 5 | | | | |
| 6 | Auto and travel (see instructions) . . . . . . . | 6 | | | | |
| 7 | Cleaning and maintenance . . . . . . . . . | 7 | | | | |
| 8 | Commissions . . . . . . . . . . . . | 8 | | | | |
| 9 | Insurance . . . . . . . . . . . . . | 9 | | | | |
| 10 | Legal and other professional fees . . . . . . | 10 | | | | |
| 11 | Management fees . . . . . . . . . . . | 11 | | | | |
| 12 | Mortgage interest paid to banks, etc. (see instructions) . . | 12 | | | | |
| 13 | Other interest . . . . . . . . . . . | 13 | | | | |
| 14 | Repairs . . . . . . . . . . . . . | 14 | | | | |
| 15 | Supplies . . . . . . . . . . . . . | 15 | | | | |
| 16 | Taxes . . . . . . . . . . . . . . | 16 | | | | |
| 17 | Utilities . . . . . . . . . . . . . | 17 | | | | |
| 18 | Depreciation expense or depletion . . . . . . | 18 | | | | |
| 19 | Other (list) ▶ | 19 | | | | |
| 20 | Total expenses. Add lines 5 through 19 . . . . | 20 | | | | |
| 21 | Subtract line 20 from line 3 (rents) and/or 4 (royalties). If result is a (loss), see instructions to find out if you must file **Form 6198** . . . . . . . . . . . | 21 | | | | |
| 22 | Deductible rental real estate loss after limitation, if any, on **Form 8582** (see instructions) . . . . . . | 22 | ( ) | ( ) | ( ) |

| 23 a | Total of all amounts reported on line 3 for all rental properties . . . . . . . . | 23a | | | |
| b | Total of all amounts reported on line 4 for all royalty properties . . . . . . . . | 23b | | | |
| c | Total of all amounts reported on line 12 for all properties . . . . . . . . . . | 23c | | | |
| d | Total of all amounts reported on line 18 for all properties . . . . . . . . . . | 23d | | | |
| e | Total of all amounts reported on line 20 for all properties . . . . . . . . . . | 23e | | | |
| 24 | **Income.** Add positive amounts shown on line 21. **Do not** include any losses . . . . . . . | 24 | | |
| 25 | **Losses.** Add royalty losses from line 21 and rental real estate losses from line 22. Enter total losses here . . | 25 | ( 0 ) |
| 26 | **Total rental real estate and royalty income or (loss).** Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Form 1040, line 17, or Form 1040NR, line 18. Otherwise, include this amount in the total on line 41 on page 2 . . . . . . . | 26 | | |

For Paperwork Reduction Act Notice, see the separate instructions.

HTA

Schedule E (Form 1040) 2015

Form **6251**

Department of the Treasury
Internal Revenue Service (99)

# Alternative Minimum Tax—Individuals

▶ Information about Form 6251 and its separate instructions is at *www.irs.gov/form6251*.

▶ Attach to Form 1040 or Form 1040NR.

OMB No. 1545-0074

**2015**

Attachment
Sequence No. **32**

Name(s) shown on Form 1040 or Form 1040NR
Max E Salas

Your social security number

## Part I  Alternative Minimum Taxable Income (See instructions for how to complete each line.)

| | | | |
|---|---|---|---|
| 1 | If filing Schedule A (Form 1040), enter the amount from Form 1040, line 41, and go to line 2. Otherwise, enter the amount from Form 1040, line 38, and go to line 7. (If less than zero, enter as a negative amount.) | **1** | 70,722 |
| 2 | Medical and dental. If you or your spouse was 65 or older, enter the **smaller** of Schedule A (Form 1040), line 4, **or** 2.5% (.025) of Form 1040, line 38. If zero or less, enter -0- | **2** | |
| 3 | Taxes from Schedule A (Form 1040), line 9 | **3** | |
| 4 | Enter the home mortgage interest adjustment, if any, from line 6 of the worksheet in the instructions for this line. | **4** | |
| 5 | Miscellaneous deductions from Schedule A (Form 1040), line 27 | **5** | |
| 6 | If Form 1040, line 38, is $154,950 or less, enter -0-. Otherwise, see instructions | **6** | ( ) |
| 7 | Tax refund from Form 1040, line 10 or line 21 | **7** | ( 767 ) |
| 8 | Investment interest expense (difference between regular tax and AMT) | **8** | |
| 9 | Depletion (difference between regular tax and AMT) | **9** | |
| 10 | Net operating loss deduction from Form 1040, line 21. Enter as a positive amount | **10** | |
| 11 | Alternative tax net operating loss deduction | **11** | ( ) |
| 12 | Interest from specified private activity bonds exempt from the regular tax | **12** | |
| 13 | Qualified small business stock, see instructions | **13** | |
| 14 | Exercise of incentive stock options (excess of AMT income over regular tax income) | **14** | |
| 15 | Estates and trusts (amount from Schedule K-1 (Form 1041), box 12, code A) | **15** | |
| 16 | Electing large partnerships (amount from Schedule K-1 (Form 1065-B), box 6) | **16** | |
| 17 | Disposition of property (difference between AMT and regular tax gain or loss) | **17** | |
| 18 | Depreciation on assets placed in service after 1986 (difference between regular tax and AMT) | **18** | |
| 19 | Passive activities (difference between AMT and regular tax income or loss) | **19** | |
| 20 | Loss limitations (difference between AMT and regular tax income or loss) | **20** | |
| 21 | Circulation costs (difference between regular tax and AMT) | **21** | |
| 22 | Long-term contracts (difference between AMT and regular tax income) | **22** | |
| 23 | Mining costs (difference between regular tax and AMT) | **23** | |
| 24 | Research and experimental costs (difference between regular tax and AMT) | **24** | |
| 25 | Income from certain installment sales before January 1, 1987 | **25** | ( ) |
| 26 | Intangible drilling costs preference | **26** | |
| 27 | Other adjustments, including income-based related adjustments | **27** | |
| 28 | **Alternative minimum taxable income.** Combine lines 1 through 27. (If married filing separately and line 28 is more than $246,250, see instructions.) | **28** | 69,955 |

## Part II  Alternative Minimum Tax (AMT)

| | | | |
|---|---|---|---|
| 29 | Exemption. (If you were under age 24 at the end of 2015, see instructions.) | | |

| IF your filing status is . . . | AND line 28 is not over . . . | THEN enter on line 29 . . . | | |
|---|---|---|---|---|
| Single or head of household . . . . | $119,200 . . . . . . . . . | $53,600 | | |
| Married filing jointly or qualifying widow(er) | 158,900 . . . . . . . . . | 83,400 | | |
| Married filing separately . . . . . . | 79,450 . . . . . . . . . | 41,700 | **29** | 53,600 |

If line 28 is **over** the amount shown above for your filing status, see instructions.

| | | | |
|---|---|---|---|
| 30 | Subtract line 29 from line 28. If more than zero, go to line 31. If zero or less, enter -0- here and on lines 31, 33, and 35, and go to line 34 | **30** | 16,355 |
| 31 | • If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter.<br>• If you reported capital gain distributions directly on Form 1040, line 13; you reported qualified dividends on Form 1040, line 9b; **or** you had a gain on both lines 15 and 16 of Schedule D (Form 1040) (as refigured for the AMT, if necessary), complete Part III on the back and enter the amount from line 64 here.<br>• **All others:** If line 30 is $185,400 or less ($92,700 or less if married filing separately), multiply line 30 by 26% (.26). Otherwise, multiply line 30 by 28% (.28) and subtract $3,708 ($1,854 if married filing separately) from the result. | **31** | 4,252 |
| 32 | Alternative minimum tax foreign tax credit (see instructions) | **32** | |
| 33 | Tentative minimum tax. Subtract line 32 from line 31 | **33** | 4,252 |
| 34 | Add Form 1040, line 44 (minus any tax from Form 4972), and Form 1040, line 46. Subtract from the result any foreign tax credit from Form 1040, line 48. If you used Schedule J to figure your tax on Form 1040, line 44, refigure that tax without using Schedule J before completing this line (see instructions) | **34** | 10,900 |
| 35 | **AMT.** Subtract line 34 from line 33. If zero or less, enter -0-. Enter here and on Form 1040, line 45 | **35** | |

**For Paperwork Reduction Act Notice, see your tax return instructions.**

HTA

Form **6251** (2015)

Form **2106-EZ**

Department of the Treasury
Internal Revenue Service  (99)

# Unreimbursed Employee Business Expenses

▶ **Attach to Form 1040 or Form 1040NR.**

▶ Information about Form 2106 and its separate instructions is available at *www.irs.gov/form2106.*

OMB No. 1545-0074

**2015**

Attachment
Sequence No. **129A**

| Your name | Occupation in which you incurred expenses | Social security number |
|---|---|---|
| Max E Salas | Director of Business Dev |  |

## You Can Use This Form Only if All of the Following Apply.

• You are an employee deducting ordinary and necessary expenses attributable to your job. An ordinary expense is one that is common and accepted in your field of trade, business, or profession. A necessary expense is one that is helpful and appropriate for your business. An expense does not have to be required to be considered necessary.

• You **do not** get reimbursed by your employer for any expenses (amounts your employer included in box 1 of your Form W-2 are not considered reimbursements for this purpose).

• If you are claiming vehicle expense, you are using the standard mileage rate for 2015.

**Caution:** *You can use the standard mileage rate for 2015 only if: (a) you owned the vehicle and used the standard mileage rate for the first year you placed the vehicle in service, or (b) you leased the vehicle and used the standard mileage rate for the portion of the lease period after 1997.*

### Part I   Figure Your Expenses

| | | | |
|---|---|---|---|
| 1 | Complete Part II. Multiply line 8a by 57.5¢ (.575). Enter the result here . . . . . . . . . | **1** | |
| 2 | Parking fees, tolls, and transportation, including train, bus, etc., that **did not** involve overnight travel or commuting to and from work . . . . . . . . . . . . . . . . | **2** | |
| 3 | Travel expense while away from home overnight, including lodging, airplane, car rental, etc. **Do not** include meals and entertainment . . . . . . . . . . . . . . . | **3** | |
| 4 | Business expenses not included on lines 1 through 3. **Do not** include meals and entertainment . . . . . . . . . . . . . . . . . . . . . . . . | **4** | |
| 5 | Meals and entertainment expenses: $ _____ x  50% (.50). (Employees subject to Department of Transportation (DOT) hours of service limits: Multiply meal expenses incurred while away from home on business by 80% (.80) instead of 50%. For details, see instructions.) . . | **5** | |
| 6 | **Total expenses.** Add lines 1 through 5. Enter here and on **Schedule A (Form 1040), line 21** (or on **Schedule A (Form 1040NR), line 7**). (Armed Forces reservists, fee-basis state or local government officials, qualified performing artists, and individuals with disabilities: See the instructions for special rules on where to enter this amount.) . . . . . . . . . . | **6** | |

### Part II   Information on Your Vehicle. Complete this part **only** if you are claiming vehicle expense on line 1.

7   When did you place your vehicle in service for business use? (month, day, year)   ▶ ------------------------------------

8   Of the total number of miles you drove your vehicle during 2015, enter the number of miles you used your vehicle for:

    **a** Business --------------------  **b** Commuting (see instructions) --------------------  **c** Other --------------------

9   Was your vehicle available for personal use during off-duty hours? . . . . . . . . . . . . . . . . ☐ Yes ☐ No

10  Do you (or your spouse) have another vehicle available for personal use? . . . . . . . . . . . . . ☐ Yes ☐ No

11 **a** Do you have evidence to support your deduction? . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

    **b** If "Yes," is the evidence written? . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

**For Paperwork Reduction Act Notice, see your tax return instructions.**

HTA

Form **2106-EZ** (2015)

Government of the
District of Columbia

## 2015 D-40 SUB Individual Income Tax Return



1 5 0 4 0 0 4 1 1 8 3 3

Tax period ending

SOFTWARE DEVELOPER USE ONLY
VENDOR ID# 1833

## Personal information

Your telephone number    2022712800    Mark if ☐   Amended return
                                        Mark if ☐   Filing for a deceased taxpayer

Your social security number (SSN)    and Date of Birth (MMDDYYYY)    Spouse's/registered domestic partner's SSN    and Date of Birth (MMDDYYYY)

Your first name    M.I.    Last name
MAX    E    SALAS

Spouse's/registered domestic partner's first name    M.I.    Last name

Home address (number, street and suite/apartment number if applicable)
777 7 STREET NW
216

City    State    ZIP Code + 4
WASHINGTON    DC    20001

## Filing Status

1  Mark only one:  **X**  Single    Married filing jointly    Married filing separately    Dependent claimed by someone else
                    Married filing separately on same return    Enter combined amounts for lines 4 - 42. See instructions.
                    Registered domestic partners filing jointly or    filing separately on same return
                    Head of household  Enter qualifying dependent and/or non-dependent information on Schedule S.
                    Qualifying widow(er) with dependent child. Enter qualifying dependent information on Schedule S.

2  Mark if you are:    Part-year resident in DC from    (month) to    (month): # of months in DC    See instructions.

*Complete your federal return first -- Enter your dependents' information on DC Schedule S*

## Income Information

| | | | | |
|---|---|---|---|---|
| a | Wages, salaries, unemployment compensation and/or tips, see instructions | | a $ | 69955.00 |
| b | Business income or loss, see instructions. | Mark if loss | b $ | .00 |
| c | Capital gain (or loss). | Mark if loss | c $ | .00 |
| d | Rental real estate, royalties, partnerships, etc. | Mark if loss | d $ | .00 |

## Computation of DC Gross and Adjusted Gross Income

| | | | | |
|---|---|---|---|---|
| 3 | Federal adjusted gross income. From adjusted gross income lines on federal Forms 1040, 1040A, 1040EZ, 1040NR or 1040NR-EZ. | Mark if loss | 3 $ | 70722.00 |

## Additions to DC Income

| | | | | |
|---|---|---|---|---|
| 4 | Franchise tax deducted on federal forms, see instructions. | | 4 $ | .00 |
| 5 | Other additions from DC Schedule I, Calculation A, Line 8. | | 5 $ | .00 |
| 6 | Add Lines 3, 4 and 5. | Mark if loss | 6 $ | 70722.00 |

## Subtractions from DC Income

| | | | | |
|---|---|---|---|---|
| 7 | Part year residents, enter income received during period of nonresidence, see instructions. | 7 $ | .00 |
| 8 | Taxable refunds, credits or offsets of state and local income tax. | 8 $ | 767.00 |
| 9 | Taxable amount of social security and tier 1 railroad retirement | 9 $ | .00 |
| 10 | Income reported and taxed this year on a DC franchise or fiduciary return. | 10 $ | .00 |
| 11 | DC and federal government survivor benefits, see instructions. | 11 $ | .00 |
| 12 | Other subtractions from DC Schedule I, Calculation B, Line 16. | 12 $ | .00 |
| 13 | Total subtractions from DC income, Lines 7 - 12. | 13 $ | 767.00 |
| 14 | DC adjusted gross income,  Line 6 minus Line 13. | Mark if loss  14 $ | 69955.00 |

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 57 of 579 PageID #: 1177
1072



1 5 0 4 0 0 4 2 1 8 3 3

| 15 | Deduction type Take the same type of deduction you took on your federal return. | | | |
|---|---|---|---|---|
| | Mark which type: X Standard | Itemized See instructions for amount to enter on Line 16. | | |
| 16 | DC deduction amount. Do not copy from federal return. For amount to enter, see instructions. | 16 | $ | 5200.00 |
| 17 | Number of exemptions If more than 1 (more than 2 if filing jointly), or if you or your<br>spouse/domestic partner are over 65 or blind, attach a completed Calculation G, Schedule S. | 17 | 1 | |
| 18 | Exemption amount. Multiply $1,775 by number on Line 17. Part-year DC residents see Cal E.<br>* If AGI is greater than $150,000, see instructions on page 25. | 18 | $ | 1775.00 |
| 19 | Add Lines 16 and 18. | 19 | $ | 6975.00 |
| 20 | DC Taxable income Subtract Line 19 from Line 14. Enter result. Mark if loss | 20 | $ | 62980.00 |

**DC tax, credits and payments**

| 21 | Tax If Line 20 is $100,000 or less, use tax tables. If more, use Calculation I | 21 | $ | 3853.00 |
|---|---|---|---|---|
| | Mark if filing separately on same return. Complete Calculation J on Schedule S. | | | |
| 22 | Credit for child and dependent care expenses $ .00 x .32 Enter result > | 22 | $ | .00 |
| | From federal Form 2441; if part-year DC resident, from Line 5, DC Form D-2441. | | | |
| 23 | Non-refundable credits from DC Schedule U, Part 1a, Line 7 Attach DC Schedule U. | 23 | $ | .00 |
| 24 | DC Low Income Credit Use Calc. LIC/EITC to see if LIC or EITC is a greater benefit. See instructions, | 24 | $ | .00 |
| 24a | Enter the number of exemptions claimed on your federal return. 1 | | | |
| 25 | Total non-refundable credits. Add Lines 22, 23 and 24. | 25 | $ | .00 |
| 26 | Total tax. Subtract Line 25 from Line 21. If Line 21 is less than Line 25, leave Line 26 blank. | 26 | $ | 3853.00 |
| 27 | DC Earned Income Tax Credit Leave blank if you took Line 24 DC Low Income Credit (LIC) | | | |
| 27a | Enter the number of qualified EITC children. 27b Enter earned income amount | 27b | $ | .00 |
| 27c | For filers with qualifying children. Enter federal EITC $ .00 x .40 Enter result > | 27d | $ | .00 |
| 27e | For filers without qualifying children. See instructions for special calculations. Enter result > | 27e | $ | .00 |
| 28 | Property Tax Credit. From your DC Schedule H; attach a copy. | 28 | $ | .00 |
| 29 | Refundable credits from DC Schedule U, Part 1b, Line 3 Attach DC Schedule U. | 29 | $ | .00 |
| 30 | DC income tax withheld shown on Forms W-2 and 1099. Attach these forms. | 30 | $ | 4236.00 |
| 31 | 2015 estimated income tax payments and amount applied from 2014 return. | 31 | $ | .00 |
| 32 | Tax paid with extension of time to file or with original return if this is an amended return. | 32 | $ | .00 |
| 33 | Total payments and refundable credits. Add Lines 27d or 27e and 28 - 32. | 33 | $ | 4236.00 |

**Refund** Complete if Line 33 is more than Line 26.

| 34 | Amount you overpaid<br>Subtract Line 26 from Line 33 | 34 | $ | 383.00 |
|---|---|---|---|---|
| 35 | Amount to be applied to your<br>2016 estimated tax | 35 | $ | .00 |
| 36 | Penalty See instructions | 36 | $ | .00 |
| | Mark if Form D-2210 is attached | | | |
| 37 | Underpayment Interest | 37 | $ | .00 |
| 38 | Refund Subtract sum of Lines<br>35, 36 and 37 from Line 34. | 38 | $ | 383.00 |
| 39 | Contribution amount<br>from Sched. U, Part II, Line 5<br>Can not exceed refund amt on Line 38<br>Put additional amt on Line 42. | 39 | $ | .00 |
| 40 | Net refund<br>Subtract Line 39 from Line 38 | 40 | $ | 383.00 |

**Amount owed** Complete if Line 33 is equal to or less than Line 26.

| 41 | Tax due<br>Subtract Line 33 from Line 26 | 41 | $ | .00 |
|---|---|---|---|---|
| 42 | Contribution amount<br>from Schedule U, Part II, Line 6 | 42 | $ | .00 |
| 43a | Penalty $ .00 | | | |
| 43b | Interest $ .00 | | | |
| | Enter total P & I. | 43 | $ | .00 |
| | Mark if Form D-2210 is attached | | | |
| 44 | Underpayment Interest | 44 | $ | .00 |
| 45 | Total amount due<br>Add Lines 41- 44 | 45 | $ | .00 |

Will this refund request or amount owed go to or come from an account outside the U.S.? Yes     No     See instructions

**Refund Options:** For information on the tax refund card and program limitations, see instructions or visit our website: otr.dc.gov/refundprepaidcards.
Make one refund choice     Direct deposit     Tax refund card     Paper check
**Direct Deposit** To have your refund deposited into your     checking OR     savings account, mark X and enter bank routing and account numbers.
Routing Number                    Account Number

**Third Party Designee** To authorize another person to discuss this return with the OTR, mark here     X     and enter the name and phone number of that person
Designee's name PREPARER                              Phone number 2023871798

**Signature** Under penalties of law, I declare that I have examined this return and, to the best of my knowledge, it is correct. Declaration of paid preparer is based on information available to the preparer.

| Your signature | Date | Preparer's signature | Date |
|---|---|---|---|
| Spouse's/registered domestic partner's signature if filing jointly | Date | Preparer's Tax Identification Number (PTIN) | PTIN telephone number |

2015 D-40 SUB P2

Government of the
District of Columbia

## 2015 SCHEDULE I SUB
### Additions to and Subtractions from
### Federal Adjusted Gross Income

*Make entries using black ink. Attach to your D-40.*



1 5 0 4 0 0 4 8 1 8 3 3

SOFTWARE DEVELOPER USE ONLY

Enter your last name

SALAS

Social Security Number

VENDOR ID# 1833

**Calculation A** Additions to federal adjusted gross income. *Fill in only those that apply.*

| | | | |
|---|---|---|---|
| 1 | Part-year DC resident - enter the portion of adjustments (from Federal Form 1040, 1040A or 1040NR) that relate to the time you <u>resided outside</u> DC. *For Lines 2 - 7 below include only the amounts related to the time you resided in DC.* | 1 | $ |
| 2 | Income distributions eligible for income averaging on your federal tax return *(from federal Form 4972).* | 2 | $ |
| 3 | 30% or 50% federal bonus depreciation and/or extra IRC § 179 expenses claimed on federal return. | 3 | $ |
| 4 | Any part of a discrimination award subject to income averaging. | 4 | $ |
| 5 | Deductions for S Corporations from Schedule K-1, form 1120 S. | 5 | $ |
| 6 | Other pass through losses from DC unincorporated businesses that exceed the $12,000 threshold (reported as a loss on federal 1040 return) | 6 | $ |
| 7 | Other (see instructions) | 7 | $ |
| 8 | Total additions Add entries on Lines 1-7. *Enter the total here and on D-40, Line 5.* | 8 | $ |

**Calculation B** Subtractions from federal adjusted gross income. *Fill in only those that apply.*

| | | | |
|---|---|---|---|
| 1 | Taxable interest from US Treasury bonds and other obligations. *(See instructions.)* | 1 | $ |
| 2 | Disability income exclusion from DC Form D-2440, Line 10 *(See instructions.)* | 2 | $ |
| 3 | Interest and dividend income of a child from Federal Form 8814*. | 3 | $ |
| 4 | Awards, other than front and back pay, received due to unlawful employment discrimination. | 4 | $ |
| 5 | Excess of DC allowable depreciation over federal allowable depreciation. *See instructions.* | 5 | $ |
| 6 | Amount paid (or carried over) to DC College Savings plan in 2015 (maximum $4,000 per person, $8,000 for joint filers if each is an account owner). *Part year residents, see instructions.* | 6 | $ |
| 7a | Exclusion of up to $10,000 for DC residents (certified by the Social Security Admin. as disabled) with adjusted annual household income of less than $100,000. *See instructions.* | 7a | $ |
| 7b | Annual household adjusted gross income. *See instructions.* 7b | $ | |
| 8 | Expenditures by DC teachers for necessary classroom teaching materials, $500 annual limit per person. *See instructions.* | 8 | $ |
| 9 | Expenditures by DC teachers for certain tuition and fees, $1,500 annual limit per person. *See instructions.* | 9 | $ |
| 10 | Loan repayment awards received by health-care professionals from DC government. *See instructions.* | 10 | $ |
| 11 | Health-care insurance premiums paid by an employer for an employee's registered domestic partner or same sex spouse. *Make no entry if the premium was deducted on your federal return, see instructions* | 11 | $ |
| 12 | DC Poverty Lawyer Loan Assistance. *See instructions.* | 12 | $ |
| 13 | Other (see instructions) | 13 | $ |
| 14 | Military Spouse Residency Relief Act. *See instructions.* | 14 | $ |
| 15 | **RESERVED** | 15 | $ |
| 16 | Total subtractions. Add entries on Lines 1-7a and 8-15. *Enter the total here and on D-40, Line 12.* | 16 | $ |

*Note: Since income reported on Federal Form 8814, Parents' Election to Report Child's Interest and Dividends, and included in the parents' federal return income is subtracted above on Line 3 of Calculation B, the child must file a separate DC return reporting this income.

2015 SCHEDULE I SUB

Government of the
District of Columbia

## 2015  D-2220 Underpayment of Estimated
## Franchise Tax By Businesses

VENDOR ID # 1833

### IMPORTANT: Please read the instructions before completing this form.

Business name (from your D-20 or D-30 return).

MAX E SALAS

Federal Employer Identification Number (FEIN) or

Person to contact if there are questions

Social Security Number (SSN)

Daytime telephone number

## No underpayment interest is due and this form should not be filed if:

A. Your tax liability on taxable income after deducting your DC applicable credits and estimated tax payments is less than $1001, or

B. You have made the required periodic DC estimated franchise tax payments and the total is equal to or more than 110% of last year's taxes or 90% of current year's taxes. Note: In order to use the prior year 110% exception, you must have filed a DC franchise tax return last year and you must have been in business in DC for the entire year.

### Computation of Underpayment Interest

| | | | |
|---|---|---|---|
| 1 | 2015 DC franchise tax liability *from Forms D-20 or D-30.* | $ | 0 |
| 2 | Multiply the amount on Line 1 by 90% (.90). | $ | 0 |
| 3 | 2014 DC franchise tax liability *from Forms D-20 or D-30 X 110%.* | $ | |
| 4 | Minimum estimated tax requirement for tax year 2015 *(lesser of Lines 2 and 3).* | $ | 0 |
| 5 | Multiply the amount on Line 4 by 25% (.25). | $ | 0 |

*Note: If your income was not evenly received over 4 periods, see instructions on the "Annualized Income" method.*

| | | Due date of Payments | | |
|---|---|---|---|---|
| Due dates shown are for calendar year; for fiscal year, use the 15th day of the 4th, 6th, 9th and 12th months after the end of the fiscal year. | 1st Period 4/15/15 | 2nd Period 06/15/15 | 3rd Period 09/15/15 | 4th Period 12/15/15 |
| 6  Enter the amount from Line 5 or the annualized income amount in each period *(The 2nd period includes the 1st period amount, 3rd period includes the 1st and 2nd period amounts, the 4th period includes all period amounts).* Check here ☐ if you are using "Annualized Income" method. | 0 | 0 | 0 | 0 |
| 7  DC estimated taxes paid each period *(The 2nd period includes the 1st period amount, 3rd period includes the 1st and 2nd period amounts, the 4th period includes all period amounts).* | 0 | 0 | 0 | 0 |
| 8  Underpayment each period *(Line 6 minus Line 7).* | 0 | 0 | 0 | 0 |
| 9  Underpayment Interest Factors. | .0175 | .0265 | .0262 | .0348 |
| 10  Line 8 multiplied by Line 9. | 0 | 0 | 0 | 0 |
| 11  Underpayment Interest – Total of amounts from Line 10. Pay this amount. *(See instructions)* | | | $ | 0 |

*Make check or money order payable to: DC Treasurer*

D-2220 SUB



Marian F. Harrison
US Bankruptcy Judge

Dated: 9/12/2022



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) CASE NO. 318-02662 |
| LEN SALAS, | ) |
| | ) JUDGE MARIAN F. HARRISON |
| Debtor. | ) |
| | ) CHAPTER 7 |
| NICOLAAS BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, | ) |
| CO-PERSONAL REPRESENTATIVES | ) ADV. NO. 320-90027 |
| OF THE ESTATE OF NINA | ) |
| BREKELMANS, | ) |
| | ) |
| and | ) |
| | ) |
| MICHAEL MCLOUGHLIN AND | ) |
| MARTHA JOHNSON, CO-PERSONAL | ) |
| REPRESENTATIVES OF THE | ) |
| ESTATE OF PATRICK | ) |
| MCLOUGHLIN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MAX SALAS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

This matter is set to be heard on September 13, 2022, upon the plaintiffs' motion for summary judgment. As pointed out by the defendant, the plaintiffs' statement of

undisputed facts does not comply with ==Federal Rule of Bankruptcy Procedure 7056== or Local Bankruptcy Rule 7056-1.  Specifically, the Plaintiffs failed to provide a "specific citation to the record" for 34 of the alleged undisputed facts.  For this reason, the Court finds that the hearing on the plaintiffs' motion for summary judgment should be continued to give the plaintiffs the opportunity to correct this procedural error.

**IT IS, THEREFORE, ORDERED** that the plaintiffs shall file an amended statement of undisputed facts no later than *September 21, 2022*. The amended statement shall either remove unsupported facts or provide specific citations to the record for the aforementioned unsupported facts.

**IT IS FURTHER ORDERED** that the defendant shall file a response to any amended undisputed facts no later than *September 28, 2022*.

**IT IS FURTHER ORDERED** that the hearing on the plaintiffs' motion for summary judgment is hereby continued to *October 4, 2022, at 9:30 a.m., via Zoom at* *https://www.zoomgov.com/j/16029839352*.  The parties may request a different hearing date if this does not work with their schedule.

**IT IS SO ORDERED.**

**This Order was signed and entered electronically as indicated at the top of the first page.**

2

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

---

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA | : | |
| BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

---

PLAINTIFFS' SUPPLEMENTAL LIST OF UNDISPUTED FACTS,
PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 7056-1 of the rules of this Court, and this Court's Order of September 12, 2022, the Plaintiffs submit the following facts in support of their Motion for Summary Judgment and citations, or additional citations to the record. This supplemental list is intended to supplement and support the Amended List of Undisputed Facts filed herein and only addresses those facts listed previously by the Plaintiff to which the Defendant objected. To the extent necessary, except as stated herein, the Plaintiffs adopts and incorporates their Amended List filed herein.

**Plaintiffs' Citations, or Additional Citations
to Their List of Undisputed Facts
In Support of Their Motion for Summary Judgment**

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed on April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, as amended, unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

The numbered listed facts refers to the numbers set forth in the Plaintiffs Amended List of Undisputed Facts filed herein.

4.  In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed

$500,000 in a divorce settlement. Amended Joint Pre-trial Statement filed herein on March 29,

2021, Parties Joint Statement of Uncontested Facts, (D-43, pp. 3-10) ("Joint Statement"), Nos. 12

and 13.

**RESPONSE:**

11. That the Defendant is unaware of the location of the original Quitclaim Deed after

2012.  Exh. 3, Exemption Hrg Trans. Vol. 2, 55:7 - 58:13; Joint Statement No. 33.

-2-

**RESPONSE:**


12.   Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max

Salas and only kept a copy.  Exh. 4, L Salas Confirmation Hearing Transcript, 12/13/18, in Case

No. 3:18-2662 ("L Salas Conf. Trans."), 22:8-20; 53: 3-24. Exhibit 19 (Ron Salas - M Albert

eMail chain, "Bates" No. salassm7-16-18 00557)

**RESPONSE:**


16.   Neither Len Salas nor Max Salas informed SunTrust in writing that Max was

responsible for the SunTrust Deed of Trust Note payments.  Exh. 4, L Salas Conf. Trans. 67:13-

25; Exh. 13, L Salas Depo Trans. 22:22 - 23:7;

**RESPONSE:**


22.   That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law

in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim

Deed purporting to transfer the Property from Len to Max.  Joint Statement Nos. 24, 25, 26; Exh.

7.

**RESPONSE:**


23.   That the foresaid Trust and Deed were prepared and executed in Colorado. Joint

Statement Nos. 24, 25, 26; Exh. 7.

**RESPONSE:**

-3-

30.  There were no further communications regarding the creation or recording of a Deed for the transfer of the Property from Len to Max after February, 2012. Exh. 13, L Salas Depo Trans. 70:2-17.

**RESPONSE:**

34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns. Salas 2015 Federal Tax Return, Exh A to Plaintiffs' Response (D-76-1).

**RESPONSE:**

37.  The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's).  Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220 (Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

38.  The Plaintiffs received distributions on account of their claims from both estates. Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220 (Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

-4-

39. The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018. Plaintiffs' Proofs of Claim filed herein at claims C-5-1 and C-6-1, filed August 7, 2018, at pp. 4-9 of 9, respectively.

**RESPONSE:**

40. On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in the Middle District of Tennessee and the District of Columbia, respectively. Joint Statement No. 5, Case No. 18-2662 (D-1), Case No. 18-260 (D-1).

**RESPONSE:**

41. At the time of the bankruptcy filings by Len and Max, Len was, and continued to be, until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property"). Joint Statement Nos. 7 and 23, Complaint Exhibit B, Defendant's Third Amended Plan (D-40-2), p. 19 of 37, Exh. 6, Exemption Hrg Trans. Vol 3, 40:2 - 46:16.

**RESPONSE:**

42. In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then wife, divorced. Joint State Nos. 11-13

**RESPONSE:**

43. Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan"). Joint Statement No. 12.

**RESPONSE:**

45.  Len received no part of the $870,000.  M. Salas Affidavit attached as an Exhibit to the Defendant's Opposition in Case No. 20-9007 (D-75-2)("M Salas Aff."); Exh. 5, L Salas Mtg of Creds Trans, at p. 6.

**RESPONSE:**

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.; Joint Statement Nos. 7 and 23; Exh. 4, L Salas Conf Hrg Trans, 67:13-25; Exh. 6, Exemption Hrg Trans, Vol. 3, 43:25 - 44:24

**RESPONSE:**

47.  At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. Exh. 6, Exemption Hrg Trans, Vol. 3, 71:9 - 72:23.

**RESPONSE:**

50. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor. Joint Statement Nos. 17, 18.

-6-

**RESPONSE:**

51.  There are no documents indicating that Max was liable on the SunTrust loan at any time and Max never entered into any agreement or understanding with Len that Max was liable or responsible. Exh. 22, M Salas Document Production, 8/17/18, for Exemption Hearing, August 22-24, 2018, <mark>Docket No.  84, pp. 4-7</mark>; M Salas Aff.; Exh. 15, Motion to Approve U.S. Bank Settlement; Defendant's Amended Answers to Plaintiffs' Request for Admissions ("RFA"), 17; Exh. 23, Court Proceeding Memo in Case No. 18-00260 (D-96), 8/28/18 ("Proceeding Memo"), Exhibits Lists.

**RESPONSE:**

52.  There is no document raised, proffered or produced by Max indicating that Len was not the sole party responsible for the Deed of Trust payments until at least November, 2019.[1] Exh. 22, M Salas Document Production, Exemption Hearing, August 22-24, 2018, <mark>Docket No. 84, pp. 4-7</mark>; Exh. 15, Motion to Approve Settlement with U.S. Bank; Defendant's Document Production in Case No. 3:20-90027; RFA 16, 18-20, Exh. 23, Proceeding Memo, Exhibits Lists.

**RESPONSE:**

_____

[1]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did finally reach an agreement with Max for him to make the payments under the Deed of Trust from and after November, 2019.  However, there is no indication in the agreement reached between Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not in effect.  Therefore, Len is still liable for the entire balance under the SunTrust Note which, as of September 29, 2019, was $1,208,720.40.  See Max Salas Stipulation with U.S. Bank attached hereto as Exhibit 15.

-7-

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee. M Salas Aff. Exh. 1 (M Salas Depo Trans) 42:18 - 43:2, 43:13-18; Joint Statement. Nos. 19-20; RFA 51.

**RESPONSE:**

57. The lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property. M Salas Aff.; Joint Statement. Nos. 19-22; RFA 26.

**RESPONSE:**

60. During the period 2015 through 2018, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he received as a result of the fire damage. Joint Statement. No. 39.

**RESPONSE:**

63. As of April, 2018, Len remained the sole obligor on the SunTrust Note. RFA 16.
**RESPONSE:**

-8-

65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property. Joint Statement. No. 28.

**RESPONSE:**


66.  At all relevant times, Len worked only part time and had limited income and assets. Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21; Joint Statement No. 28.

**RESPONSE:**

67.  At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments. Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21, Joint Statement Nos. 28 - 30.

**RESPONSE:**


84.  These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C.  Exh. 21, Debtor's Responses to Movants' First Set Request for Production of Documents, in Case No. 18-260, served on August 6, 2018,  Request No. 10.

**RESPONSE:**


85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim

-9-

that the Quitclaim Deed of July 6, 2010 was in effect in 2018.  Exhibits 3, 6, 20, Exemption Hrg

Trans, Vols 1-3.

**RESPONSE:**


99.     The only deed referenced by Max or his counsel, allegedly entitling Max to an

ownership interest in the Property, is the 2010 Quitclaim Deed.  No other deed has been proffered,

or even mentioned by the Salas family or by Max, specifically.  Exhibit 13, L Salas Depo Trans,

39:21 - 40:20, Exemption Hearing Transcripts Vols 1-3.

**RESPONSE:**


100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15

Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee

filed objections to the Plaintiffs' claims filed in Len's bankruptcy. Exh. 13, L Salas Depo Trans,

61:12 - 62:13, Proofs of Claim Nos. C-5 and C-6,

**RESPONSE:**


101.  In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len

listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.

On April 5, 2018 Max was a creditor of Len's.  He owed Len, at the very least, his contribution

for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least

$1,035,000 approx) per his consistent promise that he would pay that amount and his consistent

-10-

assertion that he was responsible for payment of the SunTrust Note which was, at all relevant times, in Len's name. Exh. 9, M Salas Schedules filed in Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, 5/2/18, (D-12), ("M Salas Scheds"), Schedule A/B, p. 3 of 37, Schedule D, pp. 19-20 of 37, Schedule F, p. 27 of 37.

**RESPONSE:**

104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office. He does *not* recall that Mr. Goldstein mailed it back to Mr. Salas. Exh. 6, Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

107. Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs. Exh. 6, Exemption Hrg Trans. Vol 3, 121:3 - 122:1

**RESPONSE:**

124. As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had

-11-

any intent to use or record it.  Exh. 7, eMails dated June, 2011 through February, 2012; Exh. 13, L

Salas Depo Trans. 68:13 - 70:17.

**RESPONSE:**

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC

By: /s/ Taylor A. Cates
       Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt
       Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

-12-

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .    Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .    Washington, D.C.
            Debtor.             .    August 23, 2018
                                .
. . . . . . . . . . . . . . .   .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 2 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:
For the Debtor:         Stinson Leonard Street, LLP
                        By: MARC E. ALBERT
                            JOSHUA W. COX
                        1775 Pennsylvania Avenue, NW
                        Suite 800
                        Washington, D.C., 20036
                        (202) 728-3020


For the Creditors:      By: PHILIP J. McNUTT
                        11921 Freedom Drive
                        Suite 584
                        Reston, Virginia   20190
                        (703) 904-4380


Court Recorder:         THE CLERK

Transcribed By:         MS. KRISTEN SHANKLETON


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

x 000310
1090

TABLE OF CONTENTS

WITNESSES:                                              PAGE:

MAX E. SALAS
Direct examination continued by Mr. McNutt             4


EXHIBITS:                                    MARKED: RECEIVED:

CREDITOR'S
15. L. Salas Deposition (full deposition)  *        88
24. 8/10/18 R.Salas full deposition        *        88
34. Transcript: L.Salas, first meeting     *     Rejected-88
    of creditors
41. R.Salas 2/14/18 email                  *        87
42. IRS amended proof of claim            69        87
43. Transcript of hearing                 82        87

*Exhibits marked on first day of trial.

1  attorney involved in CLR?

2      A.   That's correct.

3      Q.   All right.

4           So did you contact him to determine if he had the

5  trust documents for the CLR Trust?

6      A.   I knew that -- I knew that Mr. Fernandez had not

7  put together the trust.

8      Q.   So --

9      A.   I knew that he had put together CLR, but not the

10 trust.

11     Q.   Okay.

12          CLR the entity --

13     A.   The corp.

14     Q.   -- that you acted as trustee for with respect to

15 all of the leases that were generated for the property at

16 1610 Riggs Place, right?

17     A.   Repeat the question.

18     Q.   CLR Trust was the entity that you acted as trustee

19 for with respect to all of the leases for the property at

20 1610 Riggs Place through January of 2015, right?

21     A.   Mr. McNutt, there is no CLR Trust.  There never

22 has been a CLR Trust.

23     Q.   All right.

24          So you're now saying that suddenly at some point

25 when you talked to Mr. Albert that you came up with this

1  idea about the trust?

2      A.   It's not an idea, sir.  It was -- it's not an

3  idea.  It's not sudden, suddenly.  It didn't even cross my

4  mind.  I'd totally forgot about it.  Mr. Albert says, "I

5  read your testimony," or, "I read your transcript," and he

6  says, "You keep talking about a trust.  Who put together -

7  - do you have a copy of the trust?  Where is it?"  I said,

8  "It burned; all my documents burned in the fire."  He said,

9  "Who formed the trust for you?"  He said -- I told him, "My

10 son did."  And he says, "Does he have a copy of the trust?"

11 I said, "He must."  And I -- he said, "Can I talk to him?"

12 And I said, "Yes."  I says, "Call him."

13     Q.   So --

14     A.   And so I gave him my son's number, and he called

15 Ron for the trust and asked him about the trust.

16     Q.   So what's your --

17     A.   This was not sudden, sir.  This was -- it was not

18 suddenly.  It was not planned.  It was discovered by Mr.

19 Albert.  That's one thing that Mr. Barnes, these people

20 from Baltimore that were my insurance attorneys, did a poor

21 job of, and they never asked me for that.  They were at the

22 deposition.  They never asked me for it, "Who was this

23 trust -- who put it together?"  They should have, and --

24 they didn't prepare well and -- and they should have.  And

25 I should have known.  I've got an eighth grade education.

1    I look like I know what I'm doing, but I don't.  I look
2    like I know about corporations and I know about trusts and
3    I know about the law and I know about writing leases, and I
4    -- but I don't.
5         Q.   Mr. Salas, have you ever operated a business that
6    you owed?
7         A.   I did.  I did.
8         Q.   How many?
9         A.   Several.  Well, two.
10        Q.   For what period of time?
11        A.   So, from the time I was 15 years old 'til the time
12   I was -- to the time I was 45.  And I didn't do very good
13   at that.  I did good enough to have me underreport my
14   income, and have me put in jail for underreporting taxes.
15   So I am not very good.  I am good enough to get in trouble,
16   but I'm not good enough to stay out of trouble.
17        Q.   You ever sign business agreements on behalf of the
18   businesses that you represented and worked for and owned?
19        A.   I -- yes, I have.
20        Q.   You ever sign sales agreements on behalf of Cornet
21   Technologies?
22        A.   No, I haven't.
23        Q.   None?  Ever?
24        A.   Sales agreements?
25        Q.   Yes, sir.

1     A.   No.  I turned -- I got -- I'm a salesman.  That's

2  all I do.  I put people together.  I find deals.  I turn

3  them over to administrative, and they sign contracts.  I

4  never do.

5     Q.   What kind of deals did you put together for

6  Cornet?

7     A.   Federal contracts.

8     Q.   What kind of contracts?  For what services?

9     A.   IT services.

10     Q.   Okay.

11          You negotiated those with federal contract

12  officers?

13     A.   I didn't negotiate 'em.

14     Q.   You didn't?

15     A.   I've -- no.  I found the deals, I turned them over

16  to contracts, they put the deals together.

17     Q.   In order to find the deals you had to pursue

18  solicitations and requests for bids and those sorts of

19  things from federal agencies, correct?

20     A.   Right.

21     Q.   All right.

22          And you know how to read those and respond to

23  them, correct?

24     A.   Sir, I'm a salesman.  I am a business development.

25  I am good at being able to talk to people and put people

```
1    together.  Once they start negotiations, once they start
2    really the doc -- the work, the best thing to do, for me,
3    is to get out of the way.  Because I can screw up a deal as
4    fast as I can get it.  I've learned that much.
5         Q.   Mr. Salas, you've now spent quite a bit of time
6    talking about the fact that the CLR Trust and the 1610
7    Salas Trust that you testified to in your deposition never
8    existed, and that the information that you set forth in
9    your Answers to Interrogatories and the deposition was
10   inaccurate.  That's what you've testified to, correct?
11        A.   I did the best I could; yes, sir, that's correct.
12        Q.   Okay.
13             And you never corrected that testimony, you never
14   corrected your Interrogatory Answers, you never provided
15   any documents relative to any trust to opposing counsel or
16   to the Brekelmans Estate or to the McLoughlin Estate until
17   sometime after you hired Mr. Albert, right?
18        A.   That's correct.
19        Q.   When did you hire Mr. Albert?
20             Was it in 2018?
21        A.   No, it was -- I think it was '17.  When I -- I
22   hired Mr. Albert when we started to do mediation for, with
23   the Brekelmans and the McLoughlins.  And it was clear that
24   the attorneys that were representing me in terms of the
25   insurance, for the insurance were representing the
```

1  insurance and they really weren't representing me, my best
2  interests I thought, and in fact the attorneys that were
3  representing the insurance said that I really should get my
4  personal attorney.  That's what they said.  And as I did in
5  sales and I did as -- and I did in my businesses, I knew
6  that I didn't know what I was doing, and I knew that I --
7  that I was way over my head.  So just like in a business
8  meeting when I know I can put a deal together, but when it
9  comes to details, I -- I don't know what I'm doing.  I --
10 and so I can cause more trouble than I can do good.  So I
11 knew I needed some help.
12     Q.  So you hired Mr. Albert to be your personal
13 attorney?
14     A.  Yes.
15     Q.  All right.
16         Representing you in the Superior Court case?
17     A.  To advise me through the mediation and through the
18 Spirit court case to help guide me and give me advice as to
19 what I should -- what I -- what I should do.
20     Q.  All right.
21         You were here when your son Ron testified
22 yesterday, correct?
23     A.  Yes.
24     Q.  You sat through all his testimony, right?
25     A.  Yes, sir.

Ex 000368
1097

1

2

3

4

5

6 I certify that the foregoing is a correct transcript from

7 the electronic sound recording of the proceedings in the

8 above-entitled matter.

9

10 /s/Kristen Shankleton, CER-6785      Dated: 10/28/18

Ex 000406
1098

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

|   |   |   |
|---|---|---|
|  | . | Case No. 18-02662 |
| IN RE: | . |  |
|  | . | Chapter 11 |
| LEN SALAS, | . |  |
|  | . | 701 Broadway |
|  | . | Nashville, TN 37203 |
| Debtor. | . |  |
|  | . | Thursday, December 13, 2018 |
| . . . . . . . . . . . . . . | . | 9:25 a.m. |

PARTIAL TRANSCRIPT OF MOTION TO CONVERT CHAPTER 11 CASE
TO CHAPTER 7 UNDER SECTION 1112(a), FEE AMOUNT $15.00,
ALTERNATIVELY TO APPOINT A CHAPTER 11 TRUSTEE
IF TIMELY RESPONSE
**BEFORE THE HONORABLE MARIAN F. HARRISON**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Debtor:            Niarhos & Waldron, PLC
                           By:  TIMOTHY G. NIARHOS, ESQ.
                                DENIS GRAHAM WALDRON, ESQ.
                           1106 18th Avenue South
                           Nashville, TN 37212
                           (615) 320-1101

APPEARANCES CONTINUED

Audio Operator:            Lauren Langston, ECR

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Max Salas:                    Thompson Burton PLLC
                                  By:  PHILLIP G. YOUNG, ESQ.
                                  One Franklin Park
                                  6100 Tower Circle, Suite 200
                                  Franklin, TN 37067
                                  (615) 465-6008

                                  Stinson Leonard Street LLP
                                  By:  MARC ALBERT, ESQ.
                                       JOSHUA COX, ESQ.
                                  1775 Pennsylvania Avenue Northwest
                                  Suite 800
                                  Washington, DC 20006
                                  (202) 785-9100

For Gail Brekelmans,              Burch Porter & Johnson, PLLC
Michael McLoughlin, Jr.,          By:  LANI LESTER, ESQ.
Nicolaas Brekelmans,              130 North Court Avenue
and Martha Johnson:               Memphis, TN 38103
                                  (901) 524-5166

                                  Law Office of Philip J. McNutt, PLLC
                                  By:  PHILIP JAMES MCNUTT, ESQ.
                                  11921 Freedom Drive, Suite 584
                                  Reston, VA 20190
                                  (703) 904-4380

For the United                    U.S. Department of Justice
States Trustee:                   Office of the United States Trustee
                                  By:  MEGAN REED SELIBER, ESQ.
                                  701 Broadway, Suite 318
                                  Nashville, TN 37203
                                  (615) 742-6273

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

3

I N D E X
12/13/18

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Len Salas | 4 | 72 | -- | -- |

| EXHIBITS: | | Marked | Admitted |
|---|---|---|---|
| Exhibit 1014 | Deposition of Max Salas | 36 | -- |
| Exhibit 1015 | 3/9/2016 Deposition Excerpts | 25 | -- |
| Exhibit 1019 | Deed of Trust | 6 | -- |
| Exhibit 1036 | Schedules of Max Salas | 62 | -- |
| Exhibit 1040 | SunTrust Motion for Relief from Automatic Stay | 13 | -- |
| Exhibit 1041 | Fixed Rate Note | 10 | -- |

L. Salas - Direct                           22

1   Q    Were you aware at the time that your father had credit and

2   tax issues that prevented him from being the title owner of the

3   property?

4   A    Yes.  I mean, that -- yes.

5   Q    Okay.  And that was the reason why the trust was created

6   in the first place, right?

7   A    I assume.  I don't know.

8   Q    All right.  Now, after the trust document was signed, do

9   you know what happened to the copies -- well, do you know how

10  many -- do you know how many -- or I asked your father this

11  question yesterday -- do you know how many originals of the

12  trust and quitclaim deed were executed in July of 2010?

13  A    Excuse me.  I just remember signing the one, and I --

14  that's all.  And I got a copy, I think -- and I got a copy.

15  Q    Okay.

16  A    I -- yeah --

17  Q    Have you --

18  A    -- I think.  Yeah.

19  Q    Yeah.  Are you finished?

20  A    Yes.

21  Q    Okay.

22       After I think it was July 6th -- was that the date of the

23  trust?  Let me see.

24  A    I believe so.

25            MR. WALDRON:  Your Honor, we can stipulate and it's

                              L. Salas - Direct                      53

1              MR. MCNUTT:  That's my understanding.

2  BY MR. MCNUTT:

3  Q    Now, Mr. Salas, you knew that, your brother knew that.

4  Your brother created the trust documents, right?

5  A    Yes.

6  Q    And, in fact, he produced copies to your father, I

7  believe, right?  Do you know that?  Do you know whether or not

8  your brother was the one who produced copies of the trust to

9  your father or your father's counsel during the superior court

10 litigation?

11 A    Which trust?

12 Q    The 2010 Trust.

13 A    The July 6th one.

14 Q    Yes, sir.

15 A    Okay.

16 Q    Yes, sir.  Do you know that?

17 A    Yes, he provided -- say -- what was your question, again?

18 So -- sorry.

19 Q    Whether you knew if it was your brother.  I was just

20 trying to establish who it was that actually produced the copy

21 that has now been circulated in this case.

22 A    Yes.

23 Q    It was your brother.

24 A    Yes.  He's -- he found them in his files, apparently.

25 Q    Okay.  And you're saying that -- and your wife was also

L. Salas – Direct                                   67

1              THE COURT:  Sustained.

2   BY MR. MCNUTT:

3   Q    Are there any government authorities that you have

4   contacted and explained that you are no longer the owner of the

5   property?

6              MR. WALDRON:  Same objection, Your Honor.  He's said

7   that relative to Washington, D.C., would be the only government

8   authority here that is relevant.  He said that he doesn't aware

9   because he believed he wasn't the owner and wouldn't have a

10  purpose of telling them that.

11             THE COURT:  Sustained.

12  BY MR. MCNUTT:

13  Q    Are there any other parties that you have notified since

14  2010 that you are not the owner of the property?

15  A    No.

16  Q    All right.  Do you know if your father has notified any

17  government authorities that you are no longer the owner of the

18  property?  And I'm talking about the period prior to your

19  bankruptcy.

20  A    I don't know.

21  Q    Do you know if he has identified any lender, such as

22  SunTrust, that you are no longer the owner of the property?

23  A    I don't know.

24  Q    Okay.  Any other parties?

25  A    I don't know.

ACCESS TRANSCRIPTS, LLC            ⚖            1-855-USE-ACCESS (873-2223)

L. Salas – Direct                                   68

1  Q    All right.  Are you aware, personally, between 2010 and

2  today whether there have been any attempts to file, record, or

3  otherwise formalize the quitclaim deed that you signed in July

4  of 2010?

5  A    I don't know.

6  Q    Are you aware of any provisions in your plan that provide

7  for the payment of the deed of trust note currently due

8  SunTrust Bank?

9  A    No.

10 Q    Do you have any source, whether your own money or someone

11 else's, to pay off the SunTrust balance that is approximately

12 $1.14 million?

13 A    What was the question again?

14 Q    Are you aware of any source that's available to you,

15 whether it's yours or someone else's, to pay off the SunTrust

16 mortgage balance of $1.14 million?

17 A    No.

18 Q    Do you know if you have provided any additional collateral

19 or benefit to SunTrust Bank in exchange for deeding the

20 property under your plan to your father?

21 A    No.

22 Q    When you -- when your brother created the trust documents,

23 did your father pay any money to you?

24 A    No.

25 Q    Did he give you any other consideration?  Did he give you

L. Salas – Direct                                         69

1    any property, any personal property, or anything like that?

2    A    No.

3         (Pause)

4    Q    Are you aware of any income or assets that your father has

5    that would enable him to pay down or pay off the SunTrust deed

6    of trust note?

7    A    No.

8    Q    Are you aware of any other source he may have, if not

9    himself then someone else or some other party, to pay off the

10   SunTrust deed of trust note?

11   A    No.

12   Q    Have you had any discussions with your father prior to

13   filing your plan of reorganization of how the SunTrust note

14   would be paid off?

15   A    No.

16   Q    Other than the $570 -- I believe that's the number in

17   your -- whatever the number is in your plan, other than the

18   $570 per month under your plan, do you have any other resources

19   or income that could be used to pay your creditors?

20   A    No.

21   Q    And you don't intend to use any of your exempt assets to

22   pay creditors, correct?

23   A    I don't know.

24   Q    And you don't intend to use any of your wife's income

25   other than what's provided in the plan, because I know it's

80

1                     **C E R T I F I C A T I O N**

2

3              I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    

10   _____

11   ALICIA JARRETT, AAERT NO. 428     DATE:  February 11, 2019

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .      Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .      Washington, D.C.
                Debtor.         .      August 24, 2018
                                .
. . . . . . . . . . . . . . .   .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 3 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT

APPEARANCES:

For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020


For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380


Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

WITNESSES:                                                PAGE:
RON SALAS
Direct examination continued by Mr. Albert        4
Cross-examination by Mr. McNutt                    6
Redirect examination by Mr. Albert                16
Recross-examination by Mr. McNutt                 19
Redirect examination by Mr. Albert                24

MAX SALAS
Direct examination by Mr. McNutt continued        29

MAX SALAS
Direct examination by Mr. Albert                  61
Cross-examination by Mr. McNutt                   137
Redirect examination by Mr. Albert                207
Recross-examination by Mr. McNutt                 215
Redirect examination by Mr. Albert                227

CLOSING ARGUMENT:                                         PAGE:
By Mr. McNutt                                     232
By Mr. Albert                                     266
By Mr. McNutt                                     281
By Mr. Albert                                     294

EXHIBITS:                                  MARKED: RECEIVED:
DEBTOR'S
L.  DCRA corporation document              227      227

CREDITOR'S
14. M.Salas Deposition Transcript          *        296
     dated 2/14/16
44. 4/3/2018 transcript of hearing         155      --
45. Excerpt of document production         216  Reject-218

*Exhibits marked on previous days of trial.
**Transcriptionist's note: The notations of
"(unintelligible)" in this transcript are due to the audio
recording levels being turned up too high, or individuals
speaking outside of the vocal capture range of the
microphone.

1  Mr. McNutt has been kind enough to permit me, subject to
2  the Court's okay, to call him now if that's all right.
3          THE COURT:  That's fine.
4    RON SALAS, DEBTOR'S REBUTTAL WITNESS, PREVIOUSLY SWORN
5          THE COURT:  Go ahead, Mr. Albert.
6          MR. ALBERT:  Thank you.
7                    DIRECT EXAMINATION
8          BY MR. ALBERT:
9     Q.   Good morning.
10         I just wanted to clarify again, because I heard
11  yesterday something that seemed inconsistent with what you
12  had told the Court and me earlier this week.  When you and
13  I spoke and you and I exchanged emails, there was a
14  discussion regarding the trust agreement and the quit-claim
15  deed, correct?
16    A.   Yes.
17    Q.   And tell the Court and me again what we discussed
18  and what you did.
19         MR. McNUTT:  Objection.  Your Honor, this is not
20  rebuttal testimony.  He's asking him to state again what he
21  testified to earlier.  It's not rebuttal.
22         THE COURT:  Overruled.
23         THE WITNESS:  So in regards to the email where I
24  said I sent you originals, or I had the originals, I had
25  spoke with my brother.  He told me he had the original.  I

1  said, "Send them to me.  Mr. Albert is asking for them."

2          MR. McNUTT:  Objection.  Hearsay, Your Honor.

3          THE COURT:  I'll not receive it for the truth of

4  the contents.

5          THE WITNESS:  When he told me he had them, I told

6  you had originals.  When they arrived in my office I

7  contacted you immediately and said, "Well, these are not

8  the originals.  The originals" -- so the only original

9  would have been to Max.  The reason I knew they were not

10  the originals is because I, as I testified earlier, scan

11  all my documents for preservation, and I know there was

12  blue ink on at least the notary as I recall, and the

13  documents I received were all blank ink, which indicated to

14  me they were copies not originals.  So I let you know at

15  that point.

16          MR. ALBERT:  Thank you.

17          THE WITNESS:  Uh-huh.

18          MR. ALBERT:  Your witness.

19          THE COURT:  You said you got them from your son.

20  Do you mean from your --

21          THE WITNESS:  From my brother.  If I said son, I

22  apologize.

23          THE COURT:  Your brother.  Okay.

24          THE WITNESS:  Yes, my brother Len had them, mailed

25  them to me.  I was going to mail them to you, but they were

```
 1      A.   So couldn't assert nothing --

 2      Q.   -- but can you answer --

 3      A.   -- couldn't assert anything about that.

 4      Q.   Can you answer my question, please?

 5      A.   What's the question?

 6           I think I answered it.

 7      Q.   The question is did you produce all documents related

 8 -- did you produce all documents related to your ownership of

 9 the property that you claimed during the Superior Court

10 litigation?

11      A.    I don't -- I guess I don't know the difference --

12 well, I don't know.  Did we submit them?

13           Yeah, we submitted them, but weren't, one of them

14 weren't -- this document wasn't allowed.

15      Q.   When you say "this document," you mean what's been

16 marked --

17      A.   The deed --

18      Q.   -- as Exhibit 30, the quit-claim deed and the trust

19 documents, correct?

20      A.   That's what I'm talking about, yeah.

21      Q.   All right.

22           And those were submitted, as you put it, on or after

23 March 12, 2018, correct?

24      A.   Yeah -- yeah, uh -- yes, sir.  It was like, like a

25 couple of weeks before the trial.
```

1      Q.    Okay.

2            Take a look at what's been -- well, take a look at

3      Tab 20 in the white book.  This is a document that has been

4      entered, that has been admitted into evidence in this case, and

5      it was also admitted as Plaintiff's Exhibit Number 7 in the

6      Superior Court litigation.

7      A.    Yeah.

8      Q.    And this is a D.C. property request report for the

9      property at 1610 Riggs Place Northwest dated Wednesday, June

10     17, 2015.  So that's approximately two weeks after the fire,

11     right?

12     A.    Yes, sir, that sounds right.  Yes.

13     Q.    And if you look at the second page of that document?

14     A.    Right.

15     Q.    About a third of the way down the page --

16     A.    Uh-huh.

17     Q.    -- it has, listing owner, and it says Len Salas.

18     A.    Right.

19     Q.    Take a look at Number 21 if you would, please?

20     A.    Yes, sir.

21     Q.    This is a document, the first page of which is

22     titled, Certificate of Service Related to a Notice of

23     Infraction.  This notice of infraction was sent I believe on

24     November 6, 2015.  Do you see that?

25     A.    No, uh -- no -- yeah, the notice of infraction.  I

1   see that, yes, sir.

2        Q.   Okay.

3             This was sent to Len Salas at his address on Otis

4   Street, correct?

5        A.   That's correct.

6        Q.   And that's because he was listed as the owner of the

7   property at 1610 Riggs Place, right?

8        A.   That's correct.

9        Q.   All right.

10            Here's a document.  Look at Tab 22, please.

11       A.   Yes, sir.

12       Q.   This is a document, and all of these were introduced

13  in your trial in the Superior Court.  This is a document that

14  titled, Notice of Immediate Abatement Issued by the Department

15  of Consumer and Regulatory Affairs?

16       A.   Right.

17       Q.   And it says the address of the violation is 1610

18  Riggs Place Northwest?

19       A.   Right.

20       Q.   And then underneath that is says, Responsible Party:

21  Len Salas.  Correct?

22            Do you see that on the left hand side of the page,

23  sir?

24       A.   Uh --

25       Q.   If you look at the --

1    A.   What was the -- compliance enforcement?  Is that the

2  one dated June 17?

3         "Dear Property Owner," is that -- am I on the right

4  document here?

5    Q.   Number 22, sir.

6    A.   Oh.  Number 22, Notice of Infraction.  And then the

7  next page?

8    Q.   All right.

9         Number 22 is a document titled, Notice of Immediate

10  Abatement.  Do you see that?

11    A.   Yes, I see it.

12    Q.   Okay.

13         And then the first page on that document it lists the

14  address as 1610 Riggs Place Northwest?

15    A.   Right.

16    Q.   Responsible Party --

17    A.   Right.

18    Q.   -- Len Salas?

19    A.   Right.

20    Q.   Same address, correct?

21    A.   Yes, sir.

22    Q.   Okay.

23         And if you turn to the third page?

24    A.   Third page of?

25    Q.   Of that document.

```
 1        A.    Yep.
 2        Q.    At the top right it says, DCRA Special Assessment
 3   Bill?
 4        A.    Right.
 5        Q.    Care of Office of Tax and Revenue.  Correct?
 6        A.    Right.
 7        Q.    It identifies the property address as 1610 Riggs
 8   Place Northwest, correct?
 9        A.    Yes.
10        Q.    It identifies the responsible person as Len Salas at
11   1610 Riggs Place Northwest, Washington, D.C.?
12        A.    I don't see where it says responsible, but it says
13   Len Salas.
14        Q.    It's addressed to Mr. Salas.
15        A.    I know, but I can tell you that I paid every one of
16   these bills.  Personally.  Including the fine and all of that.
17   I -- every one of these things.  None of these did Len pay
18   because he wasn't the guy that broke -- that caused the
19   problem.  I paid 'em all.  Every of 'em.
20        Q.    Did you receive a copy of this special assessment
21   bill then?
22        A.    Yes.
23        Q.    Did you hand it over to your son?
24        A.    No.
25        Q.    Did you contact DCRA and tell them that your son
```

000449
1116

1  wasn't responsible, you were?

2          A.    Yes.

3          Q.    Do you have that in writing?

4          A.    I went over and paid the bill.

5          Q.    Do you have that in writing was my question.

6          A.    Do I have that in writing from DCRA?

7          Q.    Do you have it in writing that you told DCRA that you

8   were responsible for the bill?

9          A.    I paid 'em and they gave me a receipt.

10         Q.    Did you provide anything in writing to DCRA

11  indicating that you were the responsible party, not your son?

12         A.    Sir, I just answered that.

13         Q.    No, you didn't.

14         A.    Okay, so I gave them a check --

15         Q.    The answer is a yes or no.

16         A.    -- and they said your issue is taken care of.

17         Q.    Mr. Salas, you can answer that question yes or no.

18  If you want to say yes or no with an explanation, I'm happy to

19  hear your explanation, but I'd like an answer --

20         A.    No with an explanation.

21         Q.    -- to it.

22         A.    I don't have it in writing, sir.  I said, "I am

23  responsible for this bill, here is my check," and I paid it,

24  and they said, "Okay, you're done here."

25         Q.    Take a look at the next page.

000450
1117

1    A.   Okay.

2    Q.   We're now on page 4.

3    A.   What's the title?

4    Q.   At the top it's got a recording set of numbers.  It

5    says, Filed and Recorded 6/17/2015 at 12:38 p.m.  Do you see

6    that?

7         The document is titled, Government of the District of

8    Columbia, Department of Consumer and Regulatory Affairs,

9    Housing Regulation Administration.

10   A.   Right.  I got that.

11   Q.   Okay.

12        And it says, Certificate of Delinquent Costs for

13   Correction of Wrongful Housing Conditions.

14   A.   Yes, sir.

15   Q.   Did I read that correctly?

16   A.   Yes.

17   Q.   All right.

18        And it states the complainant is the District of

19   Columbia, right?

20   A.   Yes, sir.

21   Q.   And it says the respondent is Len Salas, your son,

22   correct?

23   A.   That's right.

24   Q.   Okay.

25        Now would you take a look at the next page?

1    A.   Yes, sir.

2    Q.   This is a document titled, Government of the

3  dischargeable offense, Division of Enforcement and Legislative

4  Affairs?

5    A.   Yes.

6    Q.   It says, Cost Assessment Summary, Cost Sheet for

7  Abatement of Nuisance Properties.

8    A.   Yes, sir.

9    Q.   Did I read that correctly?

10   A.   Yes, sir.

11   Q.   The address of the property location is 610 (sic)

12 Riggs Place Northwest, correct?

13   A.   Yes, sir.

14   Q.   It identifies the owner just below that, Owner of

15 Record, Owner: Len Salas.  Correct?

16   A.   Yes, sir.

17   Q.   All right.

18        Now, Mr. Salas, we've talked about the trust and the

19 quit-claim deed.  Do you have any documents in your exhibits in

20 the smaller binder that state that you are the titled owner of

21 the property or that the District of Columbia is to look to you

22 for assessments regarding infractions and the like?

23        Do you have any documents like that in your exhibits?

24   A.   In this -- this exhibit?

25   Q.   In your exhibits, sir.

```
 1      A.   This is --
 2      Q.   You have exhibits in the small --
 3      A.   I don't know if this is my exhibit or not.
 4      Q.   In the small binder.
 5           I'm sorry?
 6      A.   I don't know.  The answer is I don't know.
 7      Q.   Okay.
 8           Have you looked?
 9           Are you familiar with your exhibits?  Have you looked
10 at them?
11      A.   This is the black binder?
12      Q.   Yes, sir.
13      A.   I -- I've looked at them, sir.  I'm not a
14 sophisticated man and -- with the law.  I mean I -- I don't
15 know what's in there.  I mean I -- I -- so the question is have
16 I looked at it?  Yes, with an explanation.  I don't know -- I
17 don't know.  I mean I don't know what's in there.  I couldn't -
18 - I really couldn't tell you.
19           I'm not trying to be cute and I'm not trying to be
20 fancy.  I just don't know.
21      Q.   Okay.
22           But as you sit here today you're not aware of any
23 documents that you have introduced in this case that indicate
24 that you have paid any amounts respecting the property at 1610
25 Riggs Place Northwest, right?
```

1          THE COURT:  Any amounts regarding what?

2          MR. McNUTT:  Yeah, that was a bad question.  Let me

3    withdraw it.

4          THE WITNESS:  Yeah.

5          BY MR. McNUTT:

6    Q.    As you sit here today, Mr. Salas, with respect to the

7    documents that you have offered into evidence, none of these

8    documents relate to any payments that you've made with respect

9    to your alleged ownership of the property at 1610 Riggs Place

10   Northwest, do they?

11   A.    Sir, I've made every payment in every expense in any

12   way and in every way.  There's nobody, absolutely nobody, not

13   Vicki, not Lenny, not Ron, not Chase, not anyone has made any

14   payments towards that house for any expenses but myself since

15   1995.  I have made every payment.

16   Q.    You and CLR Trust?

17   A.    Me.

18   Q.    CLR Trust, right?

19   A.    Sir, I don't -- you know, technically I don't know

20   what that -- I -- I don't know what you mean, so.

21   Q.    So Mr. Salas, let me ask you this: if you made all

22   these payments and you claim that by making those payments --

23   A.    Not if, sir; I did.

24   Q.    -- you're the owner of the property --

25   A.    I'm trying -- I don't know how many times I gotta

000454
1121

1  tell you, I did it.  It's my money.  I made the payments, I've

2  been responsible.  I've paid 'em.  I don't know what -- I mean

3  --

4      Q.   All right.

5      A.   I don't know what you're trying to say.  I made every

6  payment.

7      Q.   Take a look at your exhibits.

8      A.   Which one?

9      Q.   Just calm down.  Take a look at the exhibits.

10     A.   These exhibits?

11     Q.   Take a look at your book of exhibits.

12     A.   Yeah.

13     Q.   And show me the documents that show that you've made

14  all these payments.

15     A.   So, what I'm trying to -- what I'm saying is if

16  there's any exhibits in here -- there's nobody else that made

17  any payments except me.

18     Q.   If you made the payments, you would have proof of the

19  payment, wouldn't you?

20          You'd have a canceled check, you'd have a bank

21  statement, you'd have --

22     A.   If there's somebody else that made the payments can

23  you bring them forward?

24     Q.   That's not my job, Mr. Salas.

25     A.   Okay.

007 000455

1  Salas?

2      A.    Because I bought -- because I paid for the policy I

3  guess.  I don't know.

4      Q.    Okay.  Fair enough.

5            Any other reason that you're aware of?

6      A.    No, I -- I don't know.  I have no idea.

7      Q.    You also testified earlier that, in the corrections

8  that you told Judge Teel about, you also testified that the

9  original of the document may be at the title attorney's office,

10 right?

11     A.    That just came to me -- that just came to me as I was

12 sitting over there.  I never -- I never told Mr. Albert about

13 it because I can't talk to him about my testimony, but I just

14 thought about it, and it's -- and it's possible because I don't

15 know if they mailed it back to me.  I don't remember that.  All

16 the papers that I had in my house were burned, so I -- and I

17 didn't recover it from there.  So I couldn't have recovered it

18 there.  But it's, you know, it's possible that it's still at

19 his office because I don't remember -- I don't remember him

20 mailing it back to me, and I don't remember -- but, there's a

21 lot of things I don't remember.

22     Q.    Well, when did you, and I'm assuming because you were

23 attempting to get the quit-claim deed recorded that you gave

24 these documents to Mr. Goldstein shortly after you signed the

25 trust documents in July of 2010; is that fair?

1    A.   Yeah, so what -- so I had this realtor.  Her name is

2  in here, Sylvia Jones, and she told me what she had done --

3         MR. McNUTT:  Your Honor, I'm going to object.

4         THE WITNESS:  Well, I'm trying to answer your

5  question because --

6         MR. McNUTT:  You can't answer --

7         THE WITNESS:  -- that has to tell --

8         MR. McNUTT:  This is more hearsay, Your Honor.

9         THE COURT:  Overruled.

10        THE WITNESS:  So I talked to her.  She told me how

11  she had put her house in a trust because she had three

12  daughters, and so I said I formed a trust, and I've got the,

13  and I quit-claim -- my son quit-claimed the deed over to me,

14  and I want to now register the trust.  And I said, "How do you

15  do that?"  She said, "Well, you got to go to a title company."

16  I said, "Well, who is that?"  She said call Goldstein, Maryland

17  Title Company or something, and she gave me the number to them.

18  And so I called them up and they said, "Send us the

19  information."  So I sent them the information, and about a week

20  later I called them back and they called -- or they called me

21  and they told me what the situation was.

22        So I don't know if I answered your question there or

23  not.

24        BY MR. McNUTT:

25    Q.   I can guarantee you didn't answer the question.

1    A.    I'm sorry.  What's the question?

2    Q.    I'll leave it at that.

3    A.    All right.

4    Q.    So as you sit here today, you're not really sure what

5  happened to the original quit-claim deed after you gave it to

6  Mr. Goldstein, right?

7         MR. ALBERT:  That was asked and answered.

8         THE WITNESS:  I just told you, I don't know if it was

9  in my house or it's in his office, but I -- I don't know.

10        MR. McNUTT:  Okay.

11        THE COURT:  The objection is overruled.

12        BY MR. McNUTT:

13   Q.    And if it was in Mr. Goldstein's office, then you

14 could have gotten it by just simply calling him, right?

15   A.    I -- I -- I could -- I told -- I guess -- I told

16 Mister -- I told my attorney what I did, and so I -- that's his

17 job I guess.  I relied on him.

18   Q.    Which one is that?

19   A.    Mr. Albert and Mr. Cox.

20   Q.    Okay.

21         You don't have a copy of the original quit-claim deed

22 with you today, do you?

23   A.    No.

24   Q.    Are you aware of at any time after you gave it to Mr.

25 Goldstein that you were in possession of the original of the

1  quit-claim deed?

2         A.    Any time after that?

3         Q.    Yes, sir.

4         A.    No.  I --

5         Q.    Up until obviously February of 2018.

6         A.    No, sir.

7         Q.    Okay.

8         A.    I don't remember.

9         Q.    Did you ever try to record the quit-claim deed after

10  the time that you gave it to Mr. Goldstein?

11        A.    No.

12        Q.    Did you ever make another attempt?

13        A.    No.  No, sir.

14        Q.    What activities did you undertake as trustee of the

15  1610 Riggs Property Trust after July 6, 2010?

16        A.    What activities?

17        Q.    Yes, sir.  Did you undertake as trustee?  What

18  activities?

19        A.    I answered that.  Do you want me to do it again?

20        Q.    Yes, sir.

21        A.    I thought I answered it.  I called them and -- I mean

22  after I called Mr. Goldstein and asked him to register it, and

23  then he told me that it was going to cost me $50,000, did I do

24  anything after that?

25        Q.    Yes, sir.

1    A.   Monthly payments.

2    Q.   What -- I don't think you answered my question

3  exactly.  She gets the money; who got the house?

4    A.   Oh, I got the house.

5    Q.   All right.

6         So you took title to the house in your name at that

7  time?

8    A.   Yeah, for a day or two.

9    Q.   Okay.

10        Explain the circumstances behind that.

11   A.   Well, I -- I tried to get a loan.  I couldn't.  I

12 went to SunTrust Bank.  They said there's enough equity in the

13 house to get a loan to pay your wife off, but unfortunately you

14 can't get a loan.  So my, so Len, who had a very good

15 relationship with my ex-wife and myself, we both went to Len

16 and asked him if he would sign for a loan to get Vicki paid

17 off, and he -- and he did.  So that -- so we got a loan so we

18 could pay her, so I could pay her off and she could move back

19 to Tennessee.

20   Q.   Was it necessary to get the loan that the title would

21 have to go in Len's name?

22   A.   Yes, it --

23        MR. McNUTT:  Objection.

24        THE WITNESS:  Yes, it was.

25        MR. McNUTT:  He's not only leading the questions,

1    he's also asking for a legal conclusion.

2              THE COURT:  The objection is sustained.  Rephrase the

3    question.

4              MR. ALBERT:  Of course, Your Honor.

5              BY MR. ALBERT:

6         Q.   Who -- so the property was put in your name then when

7    you got the loan?

8         A.   No, it wasn't.

9         Q.   Whose name was it put in?

10        A.   Put in my son's name, Len.

11        Q.   Why?

12        A.   Because the loan was made by SunTrust, and his credit

13   -- that was kind of like the peak of the housing market and the

14   loan was made out to him.  He didn't have any -- he had good

15   credit, and they were giving loans to just about anybody at

16   that point in time, and there was enough equity in the house to

17   get it.

18        Q.   But they wouldn't give you credit -- excuse me.

19             They wouldn't lend you the money because?

20        A.   Because I had liens from, tax liens from years eighty

21   -- uh -- '97, '98, and '99.  Yeah.

22        Q.   Okay.

23        A.   I owed money to the IRS.

24        Q.   I see.

25             Now, you owe money to the IRS today, correct?

1    A.   Yes, I do.

2    Q.   All right.

3         And you heard yesterday in the questioning by Mr.

4    McNutt, you owe a certain amount of money, the IRS has filed a

5    claim in this case?

6    A.   Yes.

7    Q.   How much did -- are they claiming?

8    A.   I think about $25,000.

9    Q.   How much is the house worth today if you remember?

10   A.   So it's about 2.4, 2.3, 2.4 million.

11   Q.   And how do you know that, sir?

12   A.   We had a guy, an appraiser, a real estate appraiser

13   do an -- do an appraisal.

14   Q.   Thank you.

15        So, is the property recorded in Len's name?

16   A.   Yes.

17   Q.   Has it ever been recorded in your name or any trust

18   as far as you know?  Recorded?

19   A.   Well, I --

20   Q.   Recorded?

21        THE COURT:  In the land records, Mr. Salas.

22        BY MR. ALBERT:

23   Q.   In the land records.

24   A.   In the land records?  I think it was recorded by name

25   for a day until it was -- until it was -- then I quit-claimed

1  it back over to Len until, so he could file the -- so, yeah.

2  One day I think.  The day that the transaction happened.

3      Q.   And Lenny also signed a deed of trust?

4      A.   Yes.

5      Q.   And he signed the note?

6      A.   Yes.

7      Q.   In connection with the loan?

8      A.   Yes.

9      Q.   And Lenny I suppose has been paying everything since

10  that time?

11      A.   Lenny has never paid any -- Lenny has never paid a

12  penny, a penny towards the loan of the house.

13      Q.   No down payment, no monthly payments?

14      A.   No.

15      Q.   No loan?

16      A.   No.  Nothing.

17      Q.   Besides this accommodation, this help that Lenny gave

18  you, did he have any responsibility with respect to 1610 Riggs

19  Place Northwest?

20      A.   No.

21      Q.   Who was handling any and everything about the

22  property?

23      A.   All my responsibility.  Me.  I was doing it all.

24      Q.   Okay.

25           Even before the divorce from Vicki who was paying all

```
1              Do you see that?
2     A.    The bottom?
3     Q.    On page 219?
4     A.    Line which one?  What line?
5     Q.    Oh, line 17.  I'm sorry, sir.
6     A.    Okay.  Yeah.
7              "No, there's one trust, so no, they are
8         not different, they are the same, I think."
9     Q.    And then read the question and the next answer.
10    A.       "Did you ever formally set up a trust?"
11             "Yes."
12    Q.    Okay, and read the answer.
13    A.       "Okay.  Do you agree if it's called CLR?"
14             "Yes, sir."
15    Q.    And is that correct, it was called CLR?
16    A.    The trust?  No.
17    Q.    Because that -- all right, thank you.
18         Okay.
19         Can you explain when you brought to my attention
20    the trust document and quit-claim deed?
21    A.   Can I explain when I brought the trust to your
22    attention?
23    Q.   Approximately when did you --
24    A.   Yeah.  So after we had, after the judgment came,
25    after the trial where Mr. Barnes defended, represented me, you
```

1    -- so I was talking to you and you asked me --

2         Q.   Did you say after the trial or during the trial?

3              MR. McNUTT:  Objection.

4              THE WITNESS:  After, well, I think it was after the

5    trial.  After the trial.  I don't know when it was.

6              MR. McNUTT:  Your Honor, that was a blatant attempt -

7    -

8              THE WITNESS:  Oh no --

9              MR. McNUTT:  -- to lead the witness.

10             THE WITNESS:  -- before the trial.  So, I don't -- I

11   don't remember when, but I talked with you, and you asked me --

12             MR. McNUTT:  Your Honor, I ask that this answer be

13   stricken.

14             THE COURT:  He can answer it now.  He's not honing it

15   down to a specific time.

16             MR. McNUTT:  Your Honor, that was a blatant attempt

17   to lead him and correct him.

18             THE WITNESS:  Okay.

19             MR. McNUTT:  That's highly improper.

20             THE COURT:  The question was when did this occur, and

21   he can't remember at this moment.  It's been answered

22   previously during the trial.

23             We're covering a lot of ground all over again.

24             MR. ALBERT:  I understand, Judge, but Mr. McNutt took

25   approximately six hours with --

1    THE COURT:  Ask a question.

2    BY MR. ALBERT:

3    Q.    Do you know what -- what are -- explain the

4  circumstances to the Court regarding finding the trust document

5  and the quit-claim deed.

6    A.    So you asked me, "You keep talking about this trust

7  in your deposition.  I read your deposition and you keep

8  talking about" --

9    Q.    Who are you talking about?  Are you talking about me?

10   A.    Yes.

11   Q.    When you say "you"?

12   A.    Yes.  You -- you talked to me about, "You keep

13 talking about this trust through your whole deposition.  I've

14 read the whole thing.  What trust are you talking about?"  And

15 I said, "The trust."  I said what -- and he said, you said to

16 me, "Who put this trust together for you?  Was there a lawyer

17 involved?"  And I said, "Yes."  I (sic) said, "Which lawyer?"

18 "My son."  I (sic) said, "Your son is a lawyer?"  "Yes."

19 "Where is he at?"  "Colorado."  I  said, "Colorado."  He says,

20 "Do you -- does he have a copy of the trust?"  I said -- no you

21 asked me, "Do you have a copy of the trust?"  I said, "No."

22 "Where is it?"  I said, "It burned in the fire.  I don't have

23 any" -- he says, "Well, do you think your son has a copy of the

24 trust?"  I said, "Well, he should.  I guess, yeah, he might --

25 he should."  I don't remember what I said.  "But I can call

1  him."

2          So I called him.  You said, "May I talk to him?"  I

3  said, "Yes."  You said, "Will you call him and tell him that

4  I'm going to call him?"  I said, "Yes."

5          So I called him, told him, asked him if he had a copy

6  and he said yes.  And so you -- you called him and you got a

7  copy of that, of the doc -- you got a copy of the trust and the

8  quit-claim deed.

9      Q.   Thank you.

10         Can you think of any reason why that document wasn't

11  obtained earlier than that time?

12     A.   No, I can't think of any reason why it was -- I --

13  you know, I -- I don't understand why Mr. Barnes didn't ask for

14  that before.  I just, I can't understand why he didn't ask for

15  that before but -- and I can't -- there's a lot of things I

16  look at now and I don't understand why Mr. Barnes didn't get

17  any witnesses to the trial, like people that saw the windows

18  open, people that --

19         THE COURT:  It's not --

20         THE WITNESS:  No --

21         THE COURT:  -- pertinent to the question.

22         THE WITNESS:  Yes, sir.  I'm sorry.

23         So did I answer your question?

24         BY MR. ALBERT:

25     Q.   Thank you.

of the money to Vicki. So we got a loan for $800,000 but that was to pay the old loan off.

    Q.   Right.

    A.   And then the rest of the loan, the rest of the money was to pay her for her half of the equity in the house.

    Q.   So my question is, did you ever pay your son back for the money that he borrowed that you used to pay your wife?

    A.   I didn't borrow any money from my son.

    Q.   I'm sorry. I missed that.

    A.   I didn't borrow any money from my son.

    Q.   So the answer is you didn't pay any of this money back to your son, right?

    A.   I didn't borrow any money from my son.

    Q.   Okay.

    After -- let me try it this way. After April -- yeah. After April 2007, I think it was April 16th when the deed of trust was recorded?

    A.   Uh-huh.

    Q.   Does that sound about right?

    A.   Yes, sir.

    Q.   And that's, there were the three deeds and then the deed of trust, right?

    A.   Right.

    Q.   After April of 2010 did you pay any money to your son Len with respect to any of the money that you paid your wife,

1  your ex-wife Vicki?

2      A.   I never paid Lenny any money.

3      Q.   Okay, fair enough.

4           Now, you also said that you tried to refinance.  When

5  did you try to refinance the property, and I think you said it

6  was with SunTrust.  When was that?

7      A.   So lots of times.  I mean, I continually tried.  At

8  least twice a year.

9      Q.   At least twice a year?

10     A.   Since -- since we borrowed the money from SunTrust.

11     Q.   Okay.

12          And was that always with SunTrust?  The attempts to

13 refinance, were they always with SunTrust?

14     A.    I -- I think so.  I mean, we looked at other sources.

15 I think one time we tried Capital One, but always the -- our

16 best chances were with SunTrust because we had a track record

17 with them.  We kept paying the loan to them.  Up until the

18 fire, and then we fell behind on the mortgage.

19     Q.   All right.

20          And none of those efforts were successful in

21 obtaining a new loan, right?

22     A.   No.

23     Q.   Okay.

24          And your son Len was part of the application process,

25 is that right?

1  separate?

2          THE WITNESS:  Well, because -- because of, the

3  individual account of Cornet was -- was my personal income,

4  and the other account for CLR was different.  And the

5  intentions were originally is to, CLR was to be -- give

6  that account to my sons, but that never happened.  Because

7  it never made any money.

8          THE COURT:  What never made any money?

9          THE WITNESS:  CLR.  It just became a way to

10  separate income and meet the bills and pay for the mortgage

11  and -- and the ability to pay for the house.

12          THE COURT:  This may have been answered already.

13  Why use the CLR account for your rents?

14          THE WITNESS:  Because I didn't want to put the

15  rent money into my personal account, into my -- my -- my

16  personal account because -- see, in the very beginning,

17  from the very beginning from when Vicki and I owned, well,

18  when the house was in Vicki's name, and we always had the

19  basement rented even when she and I -- when she and I were

20  together we rented the basement, and that wasn't my money.

21  That really wasn't -- I didn't consider that my money.

22  That was just money to pay the mortgage.  And so I would

23  put the money into the CLR account and then I would

24  supplement that money from CLR from my personal account,

25  from the Bank of America -- or I mean from -- yeah, Bank of

**Fill in this information to identify your case and this filing:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse, if filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | 18-00260 |

☐ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:    Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In**

1.  **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☑ Yes.  Where is the property?

1.1

**1610 Riggs Place, NW**
Street address, if available, or other description

| | | |
|---|---|---|
| **Washington** | **DC** | **20009-0000** |
| City | State | ZIP Code |

County

**What is the property?** Check all that apply

☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**
**trust collapsed on creation through merger to convey property to debtor**
**DC Records displays owner as Len Salas**
**Contains furnished basement that is possible to be rented as a seperate unit, but which debtor currently is using as part of personal residence with remainder of property**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| $2,500,000.00 | $2,500,000.00 |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**Owner**

☐ Check if this is community property (see instructions)

2.  **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here.........................................................................=>**

| |
|---|
| **$2,500,000.00** |

**Part 2:    Describe Your Vehicles**

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☑ No
☐ Yes

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☑ No
☐ Yes

5  Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for
   pages you have attached for Part 2. Write that number here..................................................=>    | $0.00 |

| **Part 3:** | Describe Your Personal and  Household Items |
| --- | --- |

| Do you own or have any legal or equitable interest in any of the following items? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
| --- | --- |

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ☑ Yes.  Describe.....

| **\*\*See Attached List\*\*** | $14,000.00 |
| --- | --- |

| **Previously damaged and restored personal property being held in storage by Columbia Restoration \*\*See attached list for property description\*\*** | $2,000.00 |
| --- | --- |

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices
            including cell phones, cameras, media players, games
   ☐ No
   ☑ Yes.  Describe.....

| **HP Laptop 18 in. MacBook Pro 13 in. IPad 10 In. IPhone 6** | $200.00 |
| --- | --- |

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☑ No
   ☐ Yes.  Describe.....

9. **Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ☐ No
   ☑ Yes.  Describe.....

| **1 set Taylor-Made Golf Clubs and Bag 1 set Titelist Golf Clubs and Bag** | $300.00 |
| --- | --- |

| **1 Precor home treadmill** | $1,500.00 |
| --- | --- |

| Debtor 1 | **Max E. Salas** | | Case number *(if known)* | **18-00260** |

**10. Firearms**
*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
- ☑ No
- ☐ Yes. Describe.....

**11. Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
- ☐ No
- ☑ Yes. Describe.....

| 11 suits, 2 tuxedos, 7 pairs of shoes, and 15-20 business shirts, 7-8 pairs of pants, various golf wearing apparel and other wearing apparel. | $500.00 |

**12. Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
- ☐ No
- ☑ Yes. Describe.....

| Timex watch | $25.00 |
| Gold costume jewelry ring | $20.00 |

**13. Non-farm animals**
*Examples:* Dogs, cats, birds, horses
- ☑ No
- ☐ Yes. Describe.....

**14. Any other personal and household items you did not already list, including any health aids you did not list**
- ☐ No
- ☑ Yes. Give specific information.....

| Hearing aides | $300.00 |
| Framed Family Pictures | $100.00 |

**15.** Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here .......................................................................... | $18,945.00 |

| **Part 4:** | **Describe Your Financial Assets** |

Do you own or have any legal or equitable interest in any of the following?

Current value of the portion you own?
Do not deduct secured claims or exemptions.

**16. Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
- ☐ No
- ☑ Yes.................................................................................................

| | **Cash on hand** | $200.00 |

**17. Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
- ☐ No
- ☑ Yes........................        Institution name:

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

Debtor 1   **Max E. Salas**                                          Case number *(if known)*   18-00260

| | | | |
|---|---|---|---|
| | 17.1. | **Checking** | **Bank of America Core checking account** | **$1,779.24** |
| | 17.2. | **Checking** | **Bank of America Interest Checking (in name of 1610 Riggs Property Trust, Max Salas Trtee)** | **$334.96** |
| | 17.3. | **Other financial account** | **BB&T bank account x5086 (CLR, Inc.)** | **$29,624.97** |
| | 17.4. | **Other financial account** | **BB&T bank account x1095 (CLR, Inc. - Construction Account)** | **$39.68** |
| | 17.5. | **Other financial account** | **BB&T bank account (1610 Riggs Property Trust)** | **$6,429.44** |

18. **Bonds, mutual funds, or publicly traded stocks**
    *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
    ☑ No
    ☐ Yes...................    Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
    ☑ No
    ☐ Yes.  Give specific information about them...................
                Name of entity:                              % of ownership:

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
    *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
    *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
    ☑ No
    ☐ Yes. Give specific information about them
                Issuer name:

21. **Retirement or pension accounts**
    *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
    ☐ No
    ☑ Yes. List each account separately.
                Type of account:          Institution name:

| | | |
|---|---|---|
| **401(k)** | **T. Rowe Price/Cornet, Inc. 401(k)** | **$505,435.72** |

22. **Security deposits and prepayments**
    Your share of all unused deposits you have made so that you may continue service or use from a company
    *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
    ☑ No
    ☐ Yes. ....................        Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
    ☑ No
    ☐ Yes............        Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
    26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
    ☑ No
    ☐ Yes............        Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property** (other than anything listed in line 1), and rights or powers exercisable for your benefit
    ☐ No
    ☑ Yes.  Give specific information about them...

Debtor 1    **Max E. Salas**    Case number *(if known)*    **18-00260**

| | |
|---|---|
| **Interest in 1610 Riggs Property Trust -** <br> **Establishes Debtor as sole-trustee and sole-beneficiary** <br> **Trust terminated through merger to grant ownership of trust** <br> **property to debtor** | **$0.00** |

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
    *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
    ☑ No
    ☐ Yes.  Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
    *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
    ☑ No
    ☐ Yes.  Give specific information about them...

| **Money or property owed to you?** | **Current value of the portion you own?** <br> Do not deduct secured claims or exemptions. |
|---|---|

28. **Tax refunds owed to you**
    ☑ No
    ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
    *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
    ☑ No
    ☐ Yes. Give specific information......

30. **Other amounts someone owes you**
    *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security
    benefits; unpaid loans you made to someone else
    ☑ No
    ☐ Yes.  Give specific information..

31. **Interests in insurance policies**
    *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
    ☐ No
    ☑ Yes. Name the insurance company of each policy and list its value.

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| **Interest in Life Insurance Policy** <br> **through employer Cornet Technology,** <br> **Inc.** <br> **Interest to terminate upon full** <br> **retirement on May 3, 2018** <br> **$0.00 refund value** | **Ron Salas** | **$0.00** |
| **Interest in health, vision, and dental** <br> **insurance policies through employer** <br> **Cornet Technology, Inc.** <br> **$0.00 cash value** | | **$0.00** |
| **Interest in Casualty Insurance -** <br> **Progressive** <br> **$0.00 cash value** | | **$0.00** |

Official Form 106A/B    Schedule A/B: Property    page 5

Debtor 1    **Max E. Salas**                                    Case number *(if known)*    **18-00260**

---

32. **Any interest in property that is due you from someone who has died**
    If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
    ☑ No
    ☐ Yes.  Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
    *Examples:* Accidents, employment disputes, insurance claims, or rights to sue
    ☐ No
    ☑ Yes.  Describe each claim.........

| Potential claim against Encompass Insurance for unpaid insurance funds due under policy | Unknown |
|---|---|
| Contract claim against Fusion Contracting Group for deficient and unperformed renovation work | Unknown |

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
    ☑ No
    ☐ Yes.  Describe each claim.........

35. **Any financial assets you did not already list**
    ☑ No
    ☐ Yes.  Give specific information..

36. **Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here.................................................................................................**    | **$543,844.01** |

| **Part 5:** | Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1. |
|---|---|

37. **Do you own or have any legal or equitable interest in any business-related property?**
    ☑ No. Go to Part 6.
    ☐ Yes.  Go to line 38.

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

38. **Accounts receivable or commissions you already earned**
    ☑ No
    ☐ Yes.  Describe.....

39. **Office equipment, furnishings, and supplies**
    *Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices
    ☑ No
    ☐ Yes.  Describe.....

40. **Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**
    ☑ No
    ☐ Yes.  Describe.....

41. **Inventory**
    ☑ No
    ☐ Yes.  Describe.....

42. **Interests in partnerships or joint ventures**
    ☐ No
    ☑ Yes.  Give specific information about them...................
    Name of entity:                                    % of ownership:

---

Official Form 106A/B                              Schedule A/B: Property                              page 6

**1610 Riggs Property Trust a/k/a CLR, Inc.
(Collapsing trust with full ownership vesting in
Max Salas of all trust property)**          100%   %          Unknown

43. **Customer lists, mailing lists, or other compilations**
- ☑ No.
- ☐ Do your lists include personally identifiable information (as defined in 11 U.S.C. § 101(41A))?

    - ☑ No
    - ☐ Yes.  Describe.....

44. **Any business-related property you did not already list**
- ☑ No
- ☐ Yes. Give specific information.........

45. **Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached
for Part 5. Write that number here.................................................................................................**    $0.00

| Part 6: | **Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.** |
|---|---|
| | If you own or have an interest in farmland, list it in Part 1. |

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
- ☑ No. Go to Part 7.
- ☐ Yes.  Go to line 47.

| Part 7: | **Describe All Property You Own or Have an Interest in That You Did Not List Above** |
|---|---|

53. **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
- ☐ No
- ☑ Yes. Give specific information.........

| Washington Nationals MLB season tickets | $10,000.00 |
|---|---|

| Washington Wizards NBA season basketball tickets | $5,940.00 |
|---|---|

| Policy holder for potential insurance payout to third parties for liability
from 2015 house fire - Encompass Insurance | Unknown |
|---|---|

54. **Add the dollar value of all of your entries from Part 7. Write that number here  ...................................**    $15,940.00

Debtor 1   **Max E. Salas**                                        Case number *(if known)*   **18-00260**

| Part 8: | List the Totals of Each Part of this Form |
|---|---|

| | | |
|---|---|---|
| 55. | **Part 1: Total real estate, line 2** ....................................................................................... | **$2,500,000.00** |
| 56. | **Part 2: Total vehicles, line 5** | **$0.00** |
| 57. | **Part 3: Total personal and household items, line 15** | **$18,945.00** |
| 58. | **Part 4: Total financial assets, line 36** | **$543,844.01** |
| 59. | **Part 5: Total business-related property, line 45** | **$0.00** |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | **$0.00** |
| 61. | **Part 7: Total other property not listed, line 54**          + | **$15,940.00** |
| 62. | **Total personal property.** Add lines 56 through 61...      **$578,729.01**    Copy personal property total | **$578,729.01** |
| 63. | **Total of all property on Schedule A/B.** Add line 55 + line 62 | **$3,078,729.01** |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | 18-00260 |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt                    4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

| Part 1: | Identify the Property You Claim as Exempt |
|---|---|

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ■ You are claiming state and federal nonbankruptcy exemptions. 11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions. 11 U.S.C. § 522(b)(2)

2. **For any property you list on** *Schedule A/B* **that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **1610 Riggs Place, NW Washington, DC 20009**<br>**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**<br>**trust collapsed on creation through merger to convey property to debtor DC Records displays owner as Len Salas**<br>**Contains**<br>Line from *Schedule A/B*: **1.1** | $2,500,000.00 | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(14)** |
| **\*\*See Attached List\*\***<br>Line from *Schedule A/B*: **6.1** | $14,000.00 | ■ $8,621.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |
| **Previously damaged and restored personal property being held in storage by Columbia Restoration \*\*See attached list for property description\*\***<br>Line from *Schedule A/B*: **6.2** | $2,000.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |

Official Form 106C                    **Schedule C: The Property You Claim as Exempt**                    page 1 of 3

| Fill in this information to identify your case: | |
|---|---|

| Debtor 1 | **Max E. Salas** | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the: DISTRICT OF DISTRICT OF COLUMBIA

Case number 18-00260
(if known)

☐ Check if this is an
   amended filing

Official Form 106D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

1. Do any creditors have claims secured by your property?

   ☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

   ■ Yes. Fill in all of the information below.

**Part 1:** List All Secured Claims

2. List all secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | | Column A<br>Amount of claim<br>Do not deduct the<br>value of collateral. | Column B<br>Value of collateral<br>that supports this<br>claim | Column C<br>Unsecured<br>portion<br>if any |
|---|---|---|---|---|---|
| **2.1** | **Internal Revenue Service** | Describe the property that secures the claim: | $6,766.92 | Unknown | $0.00 |
| | Creditor's Name<br>**Cental Insolvency<br>Operation<br>PO Box 7346<br>Philadelphia, PA<br>19101-7346**<br>Number, Street, City, State & Zip Code | **All property**<br><br>As of the date you file, the claim is: Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | | |
| | Who owes the debt? Check one.<br><br>■ Debtor 1 only<br>☐ Debtor 2 only<br>☐ Debtor 1 and Debtor 2 only<br>☐ At least one of the debtors and another<br>☐ Check if this claim relates to a community debt | Nature of lien. Check all that apply.<br>☐ An agreement you made (such as mortgage or secured car loan)<br>■ Statutory lien (such as tax lien, mechanic's lien)<br>☐ Judgment lien from a lawsuit<br>■ Other (including a right to offset)   **IRS Tax Lien** | | | |
| | Date debt was incurred **2009, 2010, 2011** | Last 4 digits of account number **2714** | | | |

| | | | | | |
|---|---|---|---|---|---|
| **2.2** | **SunTrust Mortgage, Inc.** | Describe the property that secures the claim: | $1,030,825.86 | $2,500,000.00 | $0.00 |
| | Creditor's Name<br><br><br>**ATTN: Client Services -<br>RVW 30<br>P.O. Box 26149<br>Richmond, VA<br>23260-6149**<br>Number, Street, City, State & Zip Code | **1610 Riggs Place, NW Washington,<br>DC 20009<br>Property held in name of 1610 Riggs<br>Property Trust through unrecorded<br>2010 Quitclaim Deed<br>trust collapsed on creation through<br>merger to convey property to debtor<br>DC Records displays owner as Len**<br>As of the date you file, the claim is: Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | | |
| | Who owes the debt? Check one.<br><br>☐ Debtor 1 only<br>☐ Debtor 2 only | Nature of lien. Check all that apply.<br>☐ An agreement you made (such as mortgage or secured car loan) | | | |

Official Form 106D          Schedule D: Creditors Who Have Claims Secured by Property          page 1 of 2

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor 1 | **Max E. Salas** | | | Case number (if known) | **18-00260** |
| | First Name | Middle Name | Last Name | | |

☐ Debtor 1 and Debtor 2 only

■ At least one of the debtors and another

☐ Check if this claim relates to a
   community debt

☐ Statutory lien (such as tax lien, mechanic's lien)

☐ Judgment lien from a lawsuit

■ Other (including a right to offset)     **Deed of Trust and Note held in name of Len Salas. Debtor**
**not personally liable**

Date debt was incurred   **2007**          Last 4 digits of account number   **9438**

Add the dollar value of your entries in Column A on this page. Write that number here:     | $1,037,592.78 |

If this is the last page of your form, add the dollar value totals from all pages.
Write that number here:     | $1,037,592.78 |

**Part 2:    List Others to Be Notified for a Debt That You Already Listed**

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

Debtor 1   **Max E. Salas** _____   Case number (if know)   **18-00260**

---

| 4.1 3 | **Len Salas** | Last 4 digits of account number _____ | **$428,614.90** |

Nonpriority Creditor's Name
**1018 Vince Court**
**Mufreesboro, TN 37128**
Number Street City State Zip Code

When was the debt incurred? _____

As of the date you file, the claim is: Check all that apply

Who incurred the debt? Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim is for a community debt

Is the claim subject to offset?

■ No

☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

Type of NONPRIORITY unsecured claim:

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify   **Claim for unpaid mortgage payments for note and Deed of Trust held by Len Salas with SunTrust but owed by Debtor due to ownership interest in property**

---

| 4.1 4 | **Marty Sullivan, Esq.** | Last 4 digits of account number _____ | **$4,000.00** |

Nonpriority Creditor's Name
**1909 M St., NW**
**Suite 200**
**Washington, DC 20007**
Number Street City State Zip Code

When was the debt incurred?   **Dec 2017**

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim is for a community debt

Is the claim subject to offset?

■ No

☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

Type of NONPRIORITY unsecured claim:

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify   **Legal fees - land use attorney**

---

| 4.1 5 | **MediCredit, Inc.** | Last 4 digits of account number   **2827;8331;0 809** | **$60.00** |

Nonpriority Creditor's Name
**PO Box 1629**
**Maryland Heights, MO 63043-0629**
Number Street City State Zip Code

When was the debt incurred?   **2014**

Who incurred the debt? Check one.

As of the date you file, the claim is: Check all that apply

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim is for a community debt

Is the claim subject to offset?

■ No

☐ Yes

☐ Contingent
☐ Unliquidated
☐ Disputed

Type of NONPRIORITY unsecured claim:

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify   **Unpaid medical debt**

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: )<br><br>MAX E. SALAS, )<br><br>Debtor In Possession. ) | Case No. 18-00260<br>Chapter 11 |

| | |
|---|---|
| NICOLAAS J. BREKELMANS AND GAIL<br>GREGORY BREKELMANS, TRUSTEES OF<br>THE ESTATE OF NINA BREKELMANS;<br>And )<br><br>MICHAEL McLOUGHLIN AND<br>MARTHA JOHNSON, TRUSTEES OF<br>THE ESTATE OF PATRICK<br>McLOUGHLIN )<br><br>Movants, )<br><br>vs. )<br><br>MAX E. SALAS )<br><br>Respondent. ) | **Hearing Date: August 22, 2018**<br>**Time: 10:30 a.m.** |

MOVANTS' OBJECTION TO CLAIM OF EXEMPTIONS
**DEBTOR'S EXHIBIT LIST AND DESIGNATION OF DEPOSITIONS**

| **Date**<br>Aug. 22, 2018 | **Case or Adv. Proc. No.**<br>18-00260 | **Operator***  | **Page Number**<br>1 |
|---|---|---|---|

| **Exhibit Number** | **Description** | **ID*** | **Date Admitted*** |
|---|---|---|---|
| A | April 16, 2007 Deed – Max Salas to Len Salas | | |
| B | April 16, 2007 Deed of Trust – Len Salas and SunTrust Mortgage, Inc. with July 8, 2015 Corporate Assignment of Deed of Trust | | |

CORE/3502869.0005/141953257.1

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>2 |
|---|---|---|---|

| Exhibit Number | Description | ID* | Date Admitted* |
|---|---|---|---|
| C | July 6, 2010 Irrevocable Trust Agreement and Quitclaim Deed | | |
| D | July 6, 2010 Notary Journal Entries of Lori King regarding Trust Documents | | |
| E | Encompass Ins. Co. of America Insurance Policy with Max Salas - Renewal for Policy Period 4/20/2015 to 4/20/2016 | | |
| F | 1610 Riggs Place NW leases<br><br>- Nov. 1, 2014 - Mecham<br><br>-Aug. 17, 2014 - Brekelmans<br><br>-May 17, 2014 - Brekelmans<br><br>-June 2, 2014 - Tamasco<br><br>-Oct. 1, 2014 - Tamasco | | |
| G | E-mail chain beginning Feb 14, 2018 providing Trust Documents from Ron Salas and delivery to insurance counsel | | |
| H | March 19, 2018 Emergency Motion for Summary Judgment filed by Len Salas in the DC Superior Court Litigation | | |

2

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>3 |
|---|---|---|---|
| I | April 18, 2018 Len Salas Ch. 11 Voluntary Petition and Schedules and Statements; U.S. Bankr. Court Middle Dist. Tenn.<br><br>Case No. 3:18-bk-02662 | | |
| J | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - Brekelmans | | |
| K | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - McLoughlin | | |

\* For Court Use

**<u>Designation of Deposition Testimony</u>**

1.    February 24, 2016 Deposition of Max Salas; Case: Brekelmans, et al. v. Salas, et al.

Dated:  August 17, 2018                    Respectfully submitted,

                                                    /s/ Joshua W. Cox
                                                    Marc E. Albert, No. 345181
                                                    Joshua W. Cox, No. 1033283
                                                    STINSON LEONARD STREET LLP
                                                    1775 Pennsylvania Ave., N.W., Suite 800
                                                    Washington, DC 20006
                                                    Tel. (202) 785-3020
                                                    Fax (202) 572-9999
                                                    marc.albert@stinson.com
                                                    joshua.cox@stinson.com
                                                    Attorneys for
                                                    Max E. Salas, Debtor and Debtor-In-Possession

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I did serve a copy of the foregoing Exhibit List on August 17, 2018, electronically via the Court's ECF system, and by electronic mail, upon the following:

Philip J. McNutt, Esquire
Law Office of Philip J. McNutt, PLLC
11921 Freedom Drive
Suite 584
Reston, VA 20190
pmcnutt@mcnuttlawoffice.com

4

CASE HEARING SUMMARY
**(This is NOT an ORDER)**

FILED

AUG 2 4 2018

Clerk, U.S. District and
Bankruptcy Courts

Date: 08/24/2018 Time: 10:00

**CASE: 18-00260-SMT Max E. Salas : CHAPTER 11**

Joshua W. Cox and Marc Elliott Albert and Roderick R. Barnes
representing Max E. Salas (Debtor In Possession)

Joseph A. Guzinski representing U. S. Trustee for Region Four (U.S.
Trustee)

*Trial- Day 3 ( Trial Concluded)*

[44] Objection to Homestead Exemption *as to Property at 1610 Riggs
Place, NW* Filed by Nicolaas Brekelmans, Michael McLoughlin.
(Attachments: # 1 Exhibit Notice of Objection and Opportunity to Respond
# 2 Proposed Order Granting Objection to Debtor's Claim of Exemption)

**MOVANT** : Nicolaas Brekelmans Michael McLoughlin BY P McNutt; P McNutt;

DE# _____ _____      DE# _____ _____

DE# _____ _____      DE# _____ _____

DE# _____ _____      DE# _____ _____

DE# _____ _____      DE# _____ _____


DISPOSITIONS:
    Granted_____   Sustained_____ Denied_____
    Overruled_____ Withdrawn_____ Under Adv.____
    Moot_____      Consent_____   Dismissed_____
    Continued to: _____*Thur.* ___*9/6*____, 20__*18*___, AT _*10*_ : _*30*_ _*A*_.M.
    Proposed Order To Be Submitted By ___/___/___
    By [ ] Court [ ]Movant [ ]Opposing Party [ ]Trustee [ ]Jointly

DECISION:              *for decision*

    [ ] Signed by Court          [ ] Filed by Counsel
    [ ] To be prepared by:
        [ ] Movant's counsel          [ ] Court
        [ ] Respondent's counsel      [ ] Other _____

NOTES:

_____

_____

_____

_____

_____

*SWS*

18-00260-SMT: 1 of 2

1154

S. Martin Teel, Jr. , United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | : |
| MAX E. SALAS | : Case No. 18-00260 |
| | (Chapter 11) |
| Debtor-in-possession | : |
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS | : |
| | : |
| and | : |
| MICHAEL McLOUGHLIN AND MARTHA JOHNSON, | : |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF MICHAEL | : |
| PATRICK McLOUGHLIN | : |
| Creditors | : |
| v. | : |
| MAX E. SALAS | : |
| Debtor | : |

CREDITORS' WITNESS LIST AND EXHIBIT RECORD
FOR THE HEARING ON CREDITORS OBJECTION TO
DEBTOR'S HOMESTEAD EXEMPTION SCHEDULED FOR AUGUST 22, 2018

COME NOW the Creditors captioned above and submit the following Witness and

Exhibit lists for the evidentiary hearing on their objection to the Debtor's claim of a Homestead

Exemption:

A. The Creditors' List of Witnesses:

| Date | Case No. | Operator | Page Number |
|---|---|---|---|
| August 22, 2018 | 18-0260 | | 1 |

| Name of Witness | Brief Description of Testimony | Estimated Time of Examination | Date Called |
|---|---|---|---|
| Max E. Salas | Mr. Salas will be called as an adverse witness. He will primarily testify concerning the facts and circumstances of his homestead and the basis for his claim of exemption and the creation of the trust referenced in the Debtor's Schedules.  He will also testify concerning matters and facts which he asserted in the Superior Court litigation and his current prosecution of his Chapter 11 bankruptcy | 2 hours | 8/22/18 |
| Len Salas | Len Salas will be called as an adverse witness. He will primarily testify concerning his ownership of the Riggs Place Property, attempts to remove his name from ownership of the Property and his lack of knowledge of the 1610 Riggs Property Trust and his current prosecution of his bankruptcy proceeeding | 1 hour | |
| Ron Salas (Deposition Transcript) | The Creditors intend to offer portions of the deposition testimony of Ron Salas transcribed on August 10, 2018, related primarily to his knowledge of the ownership status of the Property from approximately 2007 through the present, his knowledge of efforts to remove his brother, Len, from the title and his knowledge of the creation of the trust known as the "1610 Riggs Property Trust." | | |

-2-

The Creditors may also call one or more rebuttal witnesses.

The Creditors reserve the right to call as a witness any person on the Debtor's Witness List.

**THE REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK**

-3-

B. <u>The Creditors' List of Exhibits, not including rebuttal exhibits</u>

| EXH. NO. | DESCRIPTION | ID | DATE ADMITTED |
|---|---|---|---|
| 1 | Trial Transcript Case Nos. 2015 CA 8054 B and 2015 CA 8061 B (Consolidated), March 26, 2018, pp. 1-19 | | 8\|22\|18 |
| 2 | Joint Pretrial Statement in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 7/18/2017 | 8\|24\|18 | 8\|22\|18 |
| 3 | Pretrial Order in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 12/29/2017 | | 8\|22\|18 |
| 4 | Amended Joint Pretrial Statement in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 2/15/18 | 8\|24\|18 | 8\|22\|18 |
| 5 | McLoughlin Complaint 2015 CA 8054 B - 10/20/15 | 8\|22\|18 | 8\|22\|18 |
| 6 | Brekelmans Complaint 2015 CA 8061 B - 10/20/15 | 8\|22\|18 | 8\|22\|18 |
| 7 | Len Salas' Answer to Brekelmans Complaint - 11/13/2015 | 8\|22\|18 | 8\|22\|18 |
| 8 | Len Salas' Answer to McLoughlin Complaint - 11/13/2015 | 8\|24\|18 | 8\|22\|18 |
| 9 | Max Salas' Answer to McLoughlin Complaint - 11/9/2015 | 8\|22\|18 | 8\|22\|18 |
| 10 | Max Salas' Answer to Brekelmans Complaint - 11/2/2015 | | 8\|22\|18 |
| 11 | Memorandum in Support of Len Salas' Motion to Dismiss in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B | 8\|24\|18 | 8\|22\|18 |
| 12 | Max Salas Answers to Interrogatories in Case No. 2015 CA 8061 B 11/17/15 | 8\|23\|18 | 8\|22\|18 |
| 13 | Len Salas Answers to Interrogatories in Case No. 2015 CA 8061 B 11/30/15 | 8\|24\|18 | 8\|22\|18 |
| 14 | Max E. Salas' Deposition Transcript in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 2/24/2016 | 8\|23\|18 | 8\|23\|18 |
| 15 | Len Salas' Deposition Transcript in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 3/9/2016 | 8\|23\|18 | 8\|23\|18 |
| 16 | Deed from Wilhelm to Bruff - 4/27/95 (Trial Exh. 2) | 8\|22\|18 | 8\|22\|18 |
| 17 | Deed from Bruff to Salas - 4/16/07 (Trial Exh. 3) | 8\|22\|18 | 8\|22\|18 |
| 18 | Deed from Max Salas to Len Salas- 4/16/07 (Trial Exh. 4) | 8\|22\|18 | 8\|22\|18 |

-4-

| 19 | Deed of Trust from Len Salas to Sun Trust Mortgage - 4/16/07 (Trial Exh. 5) | 8\|23\|18 | 8\|22\|18 |
| 20 | DCPropertyQuest Report for 1610 Riggs Place, NW - 6/17/2015 (Trial Exh. 7) | 8\|22\|18 | 8\|22\|18 |
| 21 | DC Notice of Infraction - 11/16/2015 (Trial Exh. 18) | | 8\|22\|18 |
| 22 | DCRA Notice of Immediate Abatement - 6/3/2015 (Trial Exh. 19) | 8\|24\|18 | 8\|22\|18 |
| 23 | Memorandum in Support of Len Salas' Emergency Motion for Summary Judgment - 3/19/18 | 8\|22\|18 | 8\|22\|18 |
| 24 | Ron Salas Deposition Transcript Excerpts (See designations below) August 10, 2018 | 8\|22\|18 | 8\|23\|18 |
| 25 | Lease dated 10/1/14 - Tamasco | 8\|23\|18 | 8\|22\|18 |
| 26 | Lease dated 6/2/14 (first page) | 8\|23\|18 | 8\|22\|18 |
| 27 | Lease dated 17th of 2014 to Brekelmans (first page) | 8\|23\|18 | 8\|22\|18 |
| 28 | Lease dated 8/17/2014 to Brekelmans | 8\|23\|18 | 8\|22\|18 |
| 29 | Lease to Mecham, 11/1/2014 | 8\|23\|18 | 8\|22\|18 |
| 30 | Irrevocable Trust Agreement dated July 6, 2010 | 8\|22\|18 | 8\|22\|18 |
| 31 | Cornet Technologies Letter of 5/19/2017 | | 8\|22\|18 |
| 32 | Debtor's Monthly Report for 4-5/18 (Excerpts) | | 8\|22\|18 |
| 33 | Debtor's Monthly Report for 6/18 (Excerpts) | | 8\|22\|18 |
| 34 | Transcript Excerpts from the Len Salas First Meeting of Creditors, May 24, 2018, Case no. 3:18-bk-02662 in the Bankruptcy Court for the Middle District of Tennessee | | |
| 35 | Max Salas Answers to Interrogatories in Case No. 18-00260 8/6/2018 | 8\|24\|18 | 8\|22\|18 |
| 36 | Debtor's Schedules A/B and C-J (D-12) - May 2, 2018 | 8\|24\|18 | 8\|22\|18 |
| 37 | Debtor's Responses to Movants First Set Request for Documents - 8/6/18 | | 8\|22\|18 |
| 38 | Debtor's Statement of Financial Affairs (D-13) 5/2/18 | | 8\|22\|18 |

-5-

| 39 | Debtor's Amended Statement of Financial Affairs (D-50) - 6/27/18 | | 8\22\18 |
| 40 | Debtor's Amended Petition (D-48) - 6/27/18 | | 8\22\18 |
| 41 | 2\14\18 email | 8\21\18 | 8\23\18 |
| 42 | IRS proof of claim | 8\23\18 | 8\23\18 |
| 43 | transcript | 8\23\18 | 8\23\18 |
| 44 | transcript | 8\24\18 | 8\24\18 |
| 45 | | 8\24\18 | 8\24\18 |

The Creditors reserve the right to use as an exhibit, and introduce into evidence any exhibit on the Debtor's Exhibit List.

The Creditors reserve the right to produce additional exhibits for impeachment purposes and for rebuttal

The Creditors reserve the right to use as an exhibit, and introduce, matters and documents of which the Court can take judicial notice.

C. The Creditors designate the following Deposition and Hearing Transcript Sections for testimony at the hearing (All references are to Page:Line(s)):

1. The First Meeting of Creditors of Len Salas (May 24, 2018, United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:18-bk-02662):

31:19-22
32: 1-22
33:1-22
34:1-6
35:1-9
40:3-6
42:19-22
43:1-22
44:1-22
45:1-22
46:1-22
47:1-8
47:11-22
48:1-5
49:19-22

-6-

50:18-22
51:3-22
52:1-2

2.  The Deposition Testimony of Len Salas in Case Nos. 2015 CA 8054 B and 2015 CA

8061 B (Consolidated) in the Superior Court of the District of Columbia, March 9, 2016:

10:15-22
11:1-6
12:3-21
17:1-22
18:1-20
19:5-12
20:11-13
29:9-22
30:1-22
31:1-6
31:21-22
32:1-6
113:7-22
114:1-11
116:9-22
117:7-22
118:12-22
119:1-22
120:1
121:1-22
122:1-6

3.  The Deposition Testimony of Max E. Salas in Case Nos. 2015 CA 8054 B and 2015

CA 8061 B (Consolidated) in the Superior Court of the District of Columbia, February 24, 2016:

39:1-19
39:20-22
40:1-4
41:21-22
42:1-22
43:1-22
44:12-22
45:1-22

-7-

46:1-9
84:12-22
85:1-7
85:14-19
88:14-22
89:1-13
95:1-22
96:1-3
101:21-22
102:1-9
102:21-22
103:21-22
201:8-16
204:9-22
205:1-13
212:16-22
213:1-17
214:20-22
215:1-5
215:22
216:1-17
216:18-22
217:1-3
217:17-22
218:1
218:19-22
219:1-11
220:1-19

4.  Ron Salas' Deposition Testimony, August 10, 2018, in In re Max E. Salas, Case No.
18-00260:

6:22
7:1-22
13:1-5
16:15-20
27:15-22
28:1-22
29:1-22
30:1-6
31:1-22
32:1-22
33:1-22

-8-

34:1-2
34:15-22
35:1-15
36:8-22
37:1-18
39:11-22
40:1-22
41:1-22
42:1-5
43:7-22
44:1-4
45:7-19
46:6-22
47:1-22
48:1-22
49:22
50:1-22
51:1-14
53:5-22
54:1-4
57:1-13
58:1-14
59:17-22
60:1
67:1-7
67:8-22
68:1
73:15-22

5.  In addition to the above, Creditors reserve the right to produce any available

transcribed testimony for purposes of impeachment and/or rebuttal.

6.  The Creditors also reserve the right to counter designate portions of any transcripts

offered by the Debtor.

RESPECTFULLY SUBMITTED

LAW OFFICES OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt

-9-

Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawoffice.com

COUNSEL FOR THE CREDITORS

### Certificate of Service

I HEREBY CERTIFY, that a copy of the foregoing Witness and Exhibit Record was was served electronically, this 17th day of August, 2018 through the Court's ecf filing system on Counsel for the Debtor, Marc E. Albert and Joshua Cox, Esquire at Marc.albert@stinson.com and Joshua.cox@stinson.com . In addition, copies of all listed trial exhibits were simultaneously transmitted electronically to Debtor's forementioned counsel by agreement of counsel.

/s/ Philip J. McNutt
Philip J. McNutt

-10-

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In re: | ) |
| | ) |
| | ) Case No. 18-00260 |
| MAX E. SALAS, | ) Chapter 11 |
| | ) |
| Debtor In Possession. | ) |
| | ) |
| NICOLAAS J. BREKELMANS AND GAIL | ) |
| GREGORY BREKELMANS, TRUSTEES OF | ) |
| THE ESTATE OF NINA BREKELMANS; | ) |
| And | ) |
| | ) |
| MICHAEL McLOUGHLIN AND | ) |
| MARTHA JOHNSON, TRUSTEES OF | ) **Hearing Date: August 22, 2018** |
| THE ESTATE OF PATRICK | ) **Time: 10:30 a.m.** |
| McLOUGHLIN | ) |
| | ) |
| Movants, | ) |
| | ) |
| vs. | ) |
| | ) |
| MAX E. SALAS | ) |
| | ) |
| Respondent. | ) |

**MOVANTS' OBJECTION TO CLAIM OF EXEMPTIONS**
**DEBTOR'S WITNESS LIST**

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>1 |
|---|---|---|---|

| Name of Witness | Brief Description of Testimony<br>to be Elicited | Estimated Time to<br>Elicit Testimony | Date Called* |
|---|---|---|---|
| Max E. Salas | Debtor – Debtor's involvement<br>and history with the Property,<br>creation of the Trust Documents,<br>and the DC Superior Court<br>Litigation | 35 min | 8\22\18 |

CORE/3502869.0005/141951166 1

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>2 |
|---|---|---|---|

| Name of Witness | Brief Description of Testimony to be Elicited | Estimated Time to Elicit Testimony | Date Called* |
|---|---|---|---|
| Ron Salas<br>7111 Diamond Tail Drive<br>Fort Collins, CO 80525<br>(970) 797-3731 | Creation and signing of the trust documents and the extent of Debtor and Len Salas's history and respective involvement with the Property | 15 min. | 8\22\18 |
| Len Salas<br>1018 Vince Ct.<br>Murfresboro, TN 37128-6417<br><br>(202) 246-4901 | Creation and signing of the trust documents and the extent of Debtor and Len Salas's history and respective involvement with the Property and the DC Superior Court Litigation | 10 min. | 8\22\18 |

* For Court Use

Max E. Salas, Debtor and Debtor-In-Possession ("Movant") reserves the right to call any witnesses on the witness lists of the Movants and to call additional witnesses whose testimony would be offered for rebuttal purposes only.

Dated:  August 17, 2018

Respectfully submitted,

/s/ Joshua W. Cox
Marc E. Albert, No. 345181
Joshua W. Cox, No. 1033283
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
joshua.cox@stinson.com
*Attorneys for*
*Max E. Salas, Debtor and Debtor-In-Possession*

2

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | ) |
| | ) |
| MAX E. SALAS, | ) Case No. 18-00260 |
| | ) Chapter 11 |
| Debtor In Possession. | ) |
| | ) |
| NICOLAAS J. BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, TRUSTEES OF | ) |
| THE ESTATE OF NINA BREKELMANS; | ) |
| And | ) |
| | ) |
| MICHAEL McLOUGHLIN AND | ) |
| MARTHA JOHNSON, TRUSTEES OF | ) **Hearing Date: August 22, 2018** |
| THE ESTATE OF PATRICK | ) **Time: 10:30 a.m.** |
| McLOUGHLIN | ) |
| | ) |
| Movants, | ) |
| | ) |
| vs. | ) |
| | ) |
| MAX E. SALAS | ) |
| | ) |
| Respondent. | ) |

MOVANTS' OBJECTION TO CLAIM OF EXEMPTIONS
**DEBTOR'S EXHIBIT LIST AND DESIGNATION OF DEPOSITIONS**

| Date Aug. 22, 2018 | Case or Adv. Proc. No. 18-00260 | Operator* | Page Number 1 |
|---|---|---|---|

| Exhibit Number | Description | ID* | Date Admitted* |
|---|---|---|---|
| A | April 16, 2007 Deed – Max Salas to Len Salas | | 8\22\18 |
| B | April 16, 2007 Deed of Trust – Len Salas and SunTrust Mortgage, Inc. with July 8, 2015 Corporate Assignment of Deed of Trust | | 8\22\18 |

CORE/3502869.0005/141953257.1

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>2 |
|---|---|---|---|

| Exhibit Number | Description | ID* | Date Admitted* |
|---|---|---|---|
| C | July 6, 2010 Irrevocable Trust Agreement and Quitclaim Deed | 8\|22\|18 | 8\|22\|18 |
| D | July 6, 2010 Notary Journal Entries of Lori King regarding Trust Documents | | 8\|22\|18 |
| E | Encompass Ins. Co. of America Insurance Policy with Max Salas - Renewal for Policy Period 4/20/2015 to 4/20/2016 | 8\|24\|18 | 8\|22\|18 |
| F | 1610 Riggs Place NW leases<br><br>- Nov. 1, 2014 - Mecham<br><br>-Aug. 17, 2014 - Brekelmans<br><br>-May 17, 2014 - Brekelmans<br><br>-June 2, 2014 - Tamasco<br><br>-Oct. 1, 2014 - Tamasco | 8\|22\|18 | 8\|22\|18 |
| G | E-mail chain beginning Feb 14, 2018 providing Trust Documents from Ron Salas and delivery to insurance counsel | | |
| H | March 19, 2018 Emergency Motion for Summary Judgment filed by Len Salas in the DC Superior Court Litigation | | 8\|22\|18 |

2

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>3 |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| I | April 18, 2018 Len Salas Ch. 11 Voluntary Petition and Schedules and Statements; U.S. Bankr. Court Middle Dist. Tenn.<br><br>Case No. 3:18-bk-02662 | 8/24/18 | 8/22/18 |
| J | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - Brekelmans | | 8/22/18 |
| K | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - McLoughlin | | 8/22/18 |
| L | DCRA record | 8/24/18 | 8/24/18 |

\* For Court Use

**Designation of Deposition Testimony**

    1.     February 24, 2016 Deposition of Max Salas; Case: *Brekelmans, et al. v. Salas, et al.*

Dated:  August 17, 2018

Respectfully submitted,

/s/ Joshua W. Cox
Marc E. Albert, No. 345181
Joshua W. Cox, No. 1033283
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
joshua.cox@stinson.com
*Attorneys for*
*Max E. Salas, Debtor and Debtor-In-Possession*

3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE:

LEN SALAS

    DEBTOR.

NICOLAAS BREKELMANS AND
GAIL GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES OF
THE ESTATE OF NINA BREKELMANS

and

MICHAEL MCLOUGHLIN AND
MARTHA JOHNSON, CO-PERSONAL
REPRESENTATIVES OF THE ESTATE
OF MICHAEL PATTRICK MCLOUGHLIN,

    PLAINTIFFS,

v.

MAX SALAS,

    DEFENDANT.

CASE NO. 3:18-BK-02662
CHAPTER 11
JUDGE HARRISON

Adv. Pro. No. 3:20-ap-90027

## DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL LIST OF UNDISPUTED FACTS, PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Max Salas (the "Defendant"), by and through counsel, and submits the following responses to the supplemental statement of undisputed facts (Doc. 79-1) (the "Plaintiffs' Statement of Undisputed Facts") submitted by the Plaintiffs:

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement. Amended Joint Pre-trial Statement filed herein on March 29, 2021, Parties Joint Statement of Uncontested Facts, (D-43, pp. 3-10) ("Joint Statement"), Nos. 12 and 13.

**RESPONSE:**

Admitted.

11. That the Defendant is unaware of the location of the original Quitclaim Deed after 2012. Exh. 3, Exemption Hrg Trans. Vol. 2, 55:7 - 58:13; Joint Statement No. 33.

**RESPONSE:**

Admitted.

12. Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max Salas and only kept a copy. Exh. 4, L Salas Confirmation Hearing Transcript, 12/13/18, in Case No. 3:18-2662 ("L Salas Conf. Trans."), 22:8-20; 53: 3-24. Exhibit 19 (Ron Salas - M Albert eMail chain, "Bates" No. salassm7-16-18 00557)

**RESPONSE:**

Admitted.

16. Neither Len Salas nor Max Salas informed SunTrust in writing that Max was responsible for the SunTrust Deed of Trust Note payments. Exh. 4, L Salas Conf. Trans. 67:13-25; Exh. 13, L Salas Depo Trans. 22:22 - 23:7;

**RESPONSE:**

Admitted that neither Len Salas nor Max Salas notified SunTrust in writing that Max Salas was "responsible" for the SunTrust Deed of Trust, but denied to the extent that there is an implication that SunTrust was not made aware of Max Salas' involvement in the payment of the note. All payments were made by Max Salas and Len Salas had signed a document authorizing SunTrust to speak directly to Max Salas about the loan, so SunTrust had notice of Max Salas' involvement.

22. That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim Deed purporting to transfer the Property from Len to Max. Joint Statement Nos. 24, 25, 26; Exh.

7.

**RESPONSE:**

Admitted.

23.  That the foresaid Trust and Deed were prepared and executed in Colorado. Joint Statement Nos. 24, 25, 26; Exh. 7.

**RESPONSE:**

Admitted.

30.  There were no further communications regarding the creation or recording of a Deed for the transfer of the Property from Len to Max after February, 2012. Exh. 13, L Salas Depo Trans. 70:2-17.

**RESPONSE:**

Admitted.

34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns. Salas 2015 Federal Tax Return, Exh A to Plaintiffs' Response (D-76-1).

**RESPONSE:**

The Defendant objects to this statement on the basis that it is irrelevant.  The Court has already determined that these tax issues are irrelevant to this matter.

37.  The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's).  Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220 (Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

Admitted.

38.  The Plaintiffs received distributions on account of their claims from both estates. Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220 (Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

Admitted.

39.  The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018. Plaintiffs' Proofs of Claim filed herein at claims C-5-1 and C-6-1, filed August 7, 2018, at pp. 4-9 of 9, respectively.

**RESPONSE:**

Admitted.

40.  On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in the Middle District of Tennessee and the District of Columbia, respectively.  Joint Statement No. 5, Case No. 18-2662 (D-1), Case No. 18-260 (D-1).

**RESPONSE:**

Admitted.

41.  At the time of the bankruptcy filings by Len and Max, Len was, and continued to be, until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property"). Joint Statement Nos. 7 and 23, Complaint Exhibit B, Defendant's Third Amended Plan (D-40-2), p. 19 of 37, Exh. 6, Exemption Hrg Trans. Vol 3, 40:2 - 46:16.

**RESPONSE:**

Admitted that Lex Salas was the "owner" of the property listed on the deed to the property, but denied that he held anything other than bare legal title.

42.  In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then

wife, divorced. Joint State Nos. 11-13

**RESPONSE:**

Admitted.

43. Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan"). Joint Statement No. 12.

**RESPONSE:**

Admitted.

45. Len received no part of the $870,000. M. Salas Affidavit attached as an Exhibit to the Defendant's Opposition in Case No. 20-9007 (D-75-2)("M Salas Aff."); Exh. 5, L Salas Mtg of Creds Trans, at p. 6.

**RESPONSE:**

Admitted.

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.; Joint Statement Nos. 7 and 23; Exh. 4, L Salas Conf Hrg Trans, 67:13-25; Exh. 6, Exemption Hrg Trans, Vol. 3, 43:25 - 44:24

**RESPONSE:**

Admitted that Lex Salas was the "owner" of the property listed on the deed to the property, but denied that he held anything other than bare legal title.

47. At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. Exh. 6, Exemption Hrg Trans, Vol. 3, 71:9 - 72:23.

**RESPONSE:**

Admitted.

50. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor. Joint Statement Nos. 17, 18.

**RESPONSE:**

Admitted.

51. There are no documents indicating that Max was liable on the SunTrust loan at any time and Max never entered into any agreement or understanding with Len that Max was liable or responsible. Exh. 22, M Salas Document Production, 8/17/18, for Exemption Hearing, August 22-24, 2018, Docket No. 84, pp. 4-7; M Salas Aff.; Exh. 15, Motion to Approve U.S. Bank Settlement; Defendant's Amended Answers to Plaintiffs' Request for Admissions ("RFA"), 17; Exh. 23, Court Proceeding Memo in Case No. 18-00260 (D-96), 8/28/18 ("Proceeding Memo"), Exhibits Lists.

**RESPONSE:**

Admitted that Max Salas never entered into any written agreement with Len Salas, but denied that he never had an oral agreement or understanding that Max Salas would be responsible for the loan. Both Max Salas and Len Salas have testified multiple times that there was an oral agreement to that effect. Also denied that there are "no documents indicating that Max was liable on the SunTrust loan." All payments were made by Max Salas and Len Salas had signed a document authorizing SunTrust to speak directly to Max Salas about the loan, so SunTrust was on notice of Max Salas' involvement in the loan repayment.

52. There is no document raised, proffered or produced by Max indicating that Len was not the sole party responsible for the Deed of Trust payments until at least November, 2019. Exh. 22, M Salas Document Production, Exemption Hearing, August 22-24, 2018, Docket No.

84, pp. 4-7; Exh. 15, Motion to Approve Settlement with U.S. Bank; Defendant's Document

Production in Case No. 3:20-90027; RFA 16, 18-20, Exh. 23, Proceeding Memo, Exhibits Lists.

**RESPONSE:**

Denied. All payments were made to SunTrust by Max Salas and Len Salas had signed a document authorizing SunTrust to speak directly to Max Salas about the loan. Documents evidencing this have been produced by Max Salas to the Plaintiffs.

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the

Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR

Trust" and Max signed each lease as Trustee. M Salas Aff. Exh. 1 (M Salas Depo Trans) 42:18 -

43:2, 43:13-18; Joint Statement. Nos. 19-20; RFA 51.

**RESPONSE:**

Admitted.

57. The lease payments were put into an account in the name of the CLR Trust and were

used to pay for the Deed of Trust obligations and other expenses associated with the Property. M

Salas Aff.; Joint Statement. Nos. 19-22; RFA 26.

**RESPONSE:**

Admitted.

60. During the period 2015 through 2018, and continuing after Max's Bankruptcy filing

until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun

Trust Note") with the exception of one payment of made by Max from the insurance proceeds he

received as a result of the fire damage. Joint Statement. No. 39.

**RESPONSE:**

Admitted.

63.  As of April, 2018, Len remained the sole obligor on the SunTrust Note.  RFA 16.

**RESPONSE:**

Admitted.

65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property. Joint Statement. No. 28.

**RESPONSE:**

Admitted.

66.  At all relevant times, Len worked only part time and had limited income and assets. Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21; Joint Statement No. 28.

**RESPONSE:**

Admitted.

67.  At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments. Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21, Joint Statement Nos. 28 - 30.

**RESPONSE:**

Admitted.


84.  These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C.  Exh. 21, Debtor's Responses to Movants' First Set Request for Production of Documents, in Case No. 18-260, served on August 6, 2018,  Request No. 10.

**RESPONSE:**

The Defendant objects to the relevance of this statement. The scope of the discovery requests in the D.C. bankruptcy is irrelevant to this matter.

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim

that the Quitclaim Deed of July 6, 2010 was in effect in 2018. Exhibits 3, 6, 20, Exemption Hrg

Trans, Vols 1-3.

**RESPONSE:**

Admitted.

99. The only deed referenced by Max or his counsel, allegedly entitling Max to an

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered,

or even mentioned by the Salas family or by Max, specifically. Exhibit 13, L Salas Depo Trans,

39:21 - 40:20, Exemption Hearing Transcripts Vols 1-3.

**RESPONSE:**

Admitted.

100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15

Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee

filed objections to the Plaintiffs' claims filed in Len's bankruptcy. Exh. 13, L Salas Depo Trans,

61:12 - 62:13, Proofs of Claim Nos. C-5 and C-6,

**RESPONSE:**

Admitted

101. In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len

listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.

On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution

for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least

$1,035,000 approx) per his consistent promise that he would pay that amount and his consistent

assertion that he was responsible for payment of the SunTrust Note which was, at all relevant

times, in Len's name. Exh. 9, M Salas Schedules filed in Case No. 18-00260 in the United States

Bankruptcy Court for the District of Columbia, 5/2/18, (D-12), ("M Salas Scheds"), Schedule

A/B, p. 3 of 37, Schedule D, pp. 19-20 of 37, Schedule F, p. 27 of 37.

**RESPONSE:**

The Defendant objects to the compound nature of this statement. Notwithstanding that objection, the Defendant answers as follows.
The Defendant admits the statement concerning the contents of Len Salas' Schedule J (the first sentence of Paragraph 101).
The Defendant denies that he was a creditor of Len Salas', as he never filed a claim and was not listed as a creditor (the second sentence of Paragraph 101).
The Defendant denies that he owed Len Salas contribution, as no such demand was ever made, but he admits that he owed the balance of the SunTrust Note pursuant to his promise to pay that note (the third sentence of Paragraph 101).


104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office. He does _not_

recall that Mr. Goldstein mailed it back to Mr. Salas. Exh. 6, Exemption Trans. Vol. 3, 55:7 -

56:21.

**RESPONSE:**

Admitted.


107. Max also learned from Albert that if Max could claim he is the actual owner of the

Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to

D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as

exempt from execution by the Plaintiffs. Exh. 6, Exemption Hrg Trans. Vol 3, 121:3 - 122:1

**RESPONSE:**

The Defendant objects to this request on the grounds that it seeks information that is subject to the attorney/client privilege. The citations provided by the Plaintiffs do not support the statements made in Paragraph 107.

124. As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had

any intent to use or record it. Exh. 7, eMails dated June, 2011 through February, 2012; Exh. 13, L

Salas Depo Trans. 68:13 - 70:17.

**RESPONSE:**

The Defendant denies this statement. The emails cited by the Plaintiffs show that Len Salas and Max Salas continued their attempt to record the Quitclaim Deed, and the deposition transcript cited by the Plaintiffs simply reflects that Len Salas could not recall what conversations occurred when.

Dated: September 28, 2022

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel:    615.465.6008
Fax:    615.807.3048
Email: phillip@thompsonburton.com

Attorneys for Defendant

## Certificate of Service

      The undersigned hereby certifies that a true and exact copy of the foregoing has been served via electronic notice/ECF on all parties having made an appearance herein, including counsel for the Plaintiffs.

This 28th day of September, 2022.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

Marian F. Harrison
US Bankruptcy Judge

Dated: 1/4/2023



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) CASE NO. 318-02662 |
| LEN SALAS, | ) |
| | ) JUDGE MARIAN F. HARRISON |
| Debtor. | ) |
| | ) CHAPTER 7 |
| NICOLAAS BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, | ) |
| CO-PERSONAL REPRESENTATIVES | ) ADV. NO. 320-90027 |
| OF THE ESTATE OF NINA | ) |
| BREKELMANS, | ) |
| | ) |
| and | ) |
| | ) |
| MICHAEL MCLOUGHLIN AND | ) |
| MARTHA JOHNSON, CO-PERSONAL | ) |
| REPRESENTATIVES OF THE | ) |
| ESTATE OF PATRICK | ) |
| MCLOUGHLIN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MAX SALAS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

---

## ORDER

---

On November 8, 2022, this matter was before the Court on the plaintiffs' motion for

summary judgment. In court, the motion was denied and a pretrial conference was set for

January 24, 2023.  In preparation for the upcoming pretrial conference, the Court has revisited the issues presented and has determined that the parties should be given time for additional briefing, specifically upon the effect of the District of Columbia Bankruptcy Court's ("D.C. Court") opinion on the plaintiffs' objection to the defendant's homestead exemption has on both the fraudulent conveyance claims under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B), and the strong arm claims under 11 U.S.C. § 544(a)(3) (bona fide purchaser) or 11 U.S.C. § 544(a)(1) (hypothetical judgment lien holder).

At the hearing, the Court ruled that if the debtor, Len Salas, only holds bare legal title to the property, the plaintiffs would not be entitled to relief.  This statement is true as to the fraudulent conveyance claims (11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B)).  However, as discussed below, the issue of bare legal title has no bearing on the plaintiffs' other avoidance claims.  Moreover, upon further review of the D.C. Court's opinion on the plaintiffs' objection to the defendant's homestead exemption, it appears the D.C. Court may have already determined this issue of ownership and bare legal title.  If so, the question is whether the D.C. Court's homestead exemption opinion is entitled to preclusive or collateral estoppel effect.

Because this issue was neither raised nor considered at the previous hearing, the Court finds that the parties should be given an opportunity to brief whether the D.C. Court has already determined that Len Salas held bare legal title, and if so, whether the D.C.

Court's homestead exemption opinion is entitled to issue preclusive or collateral estoppel effect in this matter.

The issue of bare legal title has no bearing on the plaintiffs' strong-arm avoidance claims under 11 U.S.C § 544(a)(3) (bona fide purchaser) or 11 U.S.C. § 544(a)(1) (hypothetical judgment lien holder). In determining whether bona fide purchaser or hypothetical judgment lien holder status exists, this Court must look to state law. *Albert v. Green Tree Serv., LLC (In re El-Erian)*, 512 B.R. 391, 396 (Bankr. D.D.C. 2014) (citations omitted). Under District of Columbia law, a deed conveying an interest in real property is not effective against a subsequent bona fide purchaser without notice of said deed unless it is recorded. *Id.* (citations omitted). Such notice may be actual, constructive, or inquiry. *Clay Props., Inc. v. Washington Post Co.*, 604 A.2d 890, 895 (D.C. 1992). *See also Webster v. Hope (In re Hope)*, 231 B.R. 403, 424 (Bankr. D.D.C. 1999).

Actual knowledge is inapplicable because the trustee assumes the role of a bona fide purchaser without actual knowledge. *Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 818-819 (Bankr. D.D.C. 1994). In this case, the plaintiffs were granted derivative standing and stepped into the shoes of the Trustee. Additionally, constructive notice is not applicable because constructive notice has come to mean record notice. *Clay Props.*, 604 A.2d at 895 n.15. However, a Trustee may be held to inquiry notice. *In re El-Erian*, 512 B.R. at 396 (citation omitted). The same is true for both bona fide purchaser and hypothetical judgment lien creditor status. If a purchaser would be on inquiry or

3

constructive notice, so would a judgment lien creditor. *In re Aumiller*, 168 B.R. at 818-19 (applying same analysis of constructive and inquiry notice under D.C. law to both a purchaser and a judgment lien creditor). *See also In re El-Erian*, 512 B.R. at 397 (citing *In re Aumiller*).

Inquiry notice is found when a purchaser is "aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed." *Clay Props.*, 604 A.2d at 895.

Here, the question may be whether courts in the District of Columbia would find that physical possession is sufficient to place the Trustee on inquiry notice. While the Court was unable to find any District of Columbia cases with similar facts, other courts have so found: *Patel v. Rupp*, 195 B.R. 779, 784 (D. Utah 1996) (Actual physical possession by an individual with an unrecorded interest in the property satisfies the first prong of the analysis because the bona fide purchaser will learn of that potentially adverse claim upon inquiring of that person of their interest); *Reinhold v. Thorpe (In re Thorpe),* 546 B.R. 172, 185 (Bankr. C.D. Ill. 2016) ("actual physical possession and occupancy of the real estate is easily enough to trigger a duty of further inquiry"); *Osberg v. Fibison (In re Fibison)*, 474 B.R. 864, 870 (Bankr. W.D. Wis. 2011) (under Wisconsin law, defendant's sole possession of the property would prompt further inquiry); *LR Partners v.*

4

*Steiner (In re Steiner)*, 251 B.R. 137, 142 (Bankr. D. Ariz. 2000) (citations omitted) ("[I]t has long been recognized that where there is constructive notice effective as to the world of an interest in property, such as by physical possession of the property, no hypothetical bona fide purchaser could acquire rights superior to the rights that would have been learned upon reasonable inquiry, and consequently such constructive notice defeats the strong arm clause of § 544(a)(3)."); *Fowler v. Rauso (In re Fowler)*, 425 B.R. 157, 198 (Bankr. E.D. Pa. 2010) ("[A] buyer of real property is *obliged* to ask those in *physical possession of property* (who are not also the current record titleholders) if they have some title to, or interest in, the occupied property that is adverse to the prospective buyer's title.").

      Proof may be required as to whether a reasonable purchaser would be on inquiry notice, and the D.C. Court opinion may or may not bear on the notice issue. The parties were not given a full opportunity to address this issue and whether it would entitle either party to summary judgment. As such, the Court finds that the parties should be given an opportunity to also brief the issue of inquiry notice.

      **IT IS, THEREFORE, ORDERED** that the plaintiffs and/or the defendant may file motions for summary judgment and/or briefs on the issues outlined above. Such motions and/or briefs, if any, should be filed by *January 31, 2023*, and replies should be filed by *February 15, 2023*. If the parties wish the opportunity for oral argument, the hearing will be held on *February 21, 2023, at 9:30 a.m. (CST), via Zoom at* *https://www.zoomgov.com/j/16029839352*.

**IT IS FURTHER ORDERED** that if the parties determine that the issues outlined above are not ripe for summary judgment and no motions and/or briefs are filed, the Court's original ruling from the bench, denying the plaintiffs' motion for summary judgment, will stand. Under these circumstances, the pretrial conference, rather than a hearing on summary judgment, will be held on *February 21, 2023, at 1:15 (CST), via Zoom at* [*https://www.zoomgov.com/j/16029839352*](https://www.zoomgov.com/j/16029839352).

**IT IS SO ORDERED.**

**This Order was signed and entered electronically as indicated at the top of the first page.**

6

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| _____ | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT MAX SALAS' MOTION FOR SUMMARY JUDGMENT**

---

**This matter is set to be heard on March 14, 2023 at 9:30 a.m. via Zoom video**

---

Comes the Defendant, Max Salas, by counsel, pursuant to Bankruptcy Rule 7056, Rule 56 of the Federal Rules of Civil Procedure, and this Court's orders dated January 5, 2023 (Doc. 83) and January 12, 2023 (Doc. 87), and moves the Court to grant summary judgment in his favor on all counts alleged by the Plaintiffs in this matter. As set forth in the accompanying Memorandum and the Statement of Undisputed Facts filed with this Court, there are no genuine

issues of material fact in this case and the Defendant is entitled to a judgment as a matter of law on all counts.

RESPECTFULLY SUBMITTED:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6008
Email: phillip@thompsonburton.com

Attorneys for Defendant Max Salas

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served this 21st day of February, 2023, upon all parties of record requesting notice through the Court's electronic filing system, and by United States mail to:

Philip J. McNutt                                Taylor A. Cates
Law Office of Philip J. McNutt, PLLC            Burch, Porter & Johnson, PLLC
11921 Freedom Drive, Suite 584                  130 North Court Avenue
Reston, VA  20190                               Memphis, TN  38103

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| _____ | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


Comes now the Defendant, Max Salas, by and through counsel and pursuant to Fed. R.

Civ. P. 56 and Fed. R. Bankr. P. 7056, and submits the following statement of undisputed facts

in support of Defendant's Motion for Partial Summary Judgment:

1.  On September 25, 2018, the United States Bankruptcy Court for the District of

    Columbia entered a Memorandum Decision and Order for Objection to Homestead

    Exemption, a true and correct copy of which is attached hereto as Exhibit A.

2.  On April 11, 2018, the Plaintiffs recorded the documents attached hereto as Exhibit B

with the District of Columbia recorder of deeds.

3. Because they were recorded with the District of Columbia recorder of deeds, the documents attached hereto as Exhibit B would have appeared in any title search conducted as to the real property located at 1610 Riggs Place, NW, Washington, DC. *See* Full Title Search conducted on May 1, 2018, attached hereto as Exhibit C.

4. For purposes of the Defendant's Motion for Summary Judgment only, the Defendant hereby adopts and incorporates by reference the Plaintiffs' Amended List of Disputed Facts (Doc. 74-1), as further supplemented by the Plaintiffs (Doc. 79-1) and as previously admitted by the Defendant (Docs. 75-1 and 81).

RESPECTFULLY SUBMITTED:


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6008
Email: phillip@thompsonburton.com

Attorneys for Defendant Max Salas

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served this 21st day of February, 2023, upon all parties of record requesting notice through the Court's electronic filing system, and by United States mail to:

Philip J. McNutt                            Taylor A. Cates
Law Office of Philip J. McNutt, PLLC        Burch, Porter & Johnson, PLLC
11921 Freedom Drive, Suite 584              130 North Court Avenue
Reston, VA  20190                           Memphis, TN  38103


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

The document below is hereby signed.

Signed: September 24, 2018



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
MAX E. SALAS,                  )    Case No. 18-00260
                               )    (Chapter 11)
            Debtor.            )
                               )    **Not for Publication in**
                               )    **West's Bankruptcy Reporter.**

MEMORANDUM DECISION AND ORDER
<u>RE OBJECTION TO HOMESTEAD EXEMPTION</u>

The debtor, Max E. Salas, has claimed an exemption under

D.C. Code § 15-501(a)(14) of the real property located at 1610

Riggs Place, NW, Washington, D.C. (the "Property") even though he

is not the record owner of the Property in the District of

Columbia land records.  For the reasons stated below, I will

overrule the pending objection to the claimed exemption of the

Property.

I

FACTS

On June 3, 2015, Michael Patrick McLoughlin and Nina

Brekelmans, two roomers at the Property, were killed in a fire at

the Property.  The parents of McLoughlin and Brekelmans, as
personal representatives of their children's estates brought
actions in the Superior Court of the District of Columbia
(respectively the McLoughlin plaintiffs in Case No. 2015 CA
008054 B and the Brekelmans plaintiffs in Case No. 2015 CA 008061
B), pursuing wrongful death and survivorship claims against both
the debtor, Max Salas, and one of his sons, Len Salas.[1]  Their
actions were later consolidated as a single action and, on April
4, 2018, the McLoughlin plaintiffs and the Brekelmans plaintiffs
obtained jury verdicts in the Superior Court of $7.7 million and
$7.5 million, respectively, against Max and Len, jointly and
severally.  On April 18, 2018, Max filed a petition commencing
this case under Chapter 11 of the Bankruptcy Code (11 U.S.C.) and
Len filed a petition in the United States Bankruptcy Court for
the Middle District of Tennessee (Case No. 3:18-bk-02662)
commencing his own case under chapter 11 of the Bankruptcy Code.
Max claimed an exemption on the Property and the plaintiffs
timely objected to that exemption.

---

[1]  I will refer to the debtor and his family members by
their first names for ease of discussion.

2

A.   Events Preceding the Transfer to Len of Record Title to
the Property

The events relevant to the disposition of the objection to
Max's exemption claim began in 1995, when Vickie L. Bruff (later
Vickie Salas) purchased the Property, with Max making the $80,000
down payment.  Vickie bought the Property because Max had
financial and credit problems that prevented him from obtaining a
mortgage to purchase the Property.  Thereafter, Max and Vickie
began living at the Property, with Max making the mortgage
payments.  Max has resided at the Property since 1995, except for
when he was forced to live elsewhere temporarily after the fire
pending the restoration of the Property.

Max married Vickie on March 1, 2002.  In April 2007, they
decided to get divorced.  In contemplating a divorce agreement,
Max wanted to keep the Property as his home and Vickie wanted to
realize cash out of the Property.  They determined that if Vickie
transferred the Property to Max and Max refinanced the mortgage,
he could pay Vickie her share of equity in the Property and
otherwise retain the Property.  This plan could not be carried
out because Max's poor credit record would have impeded him from
refinancing the mortgage on the Property upon the conveyance of
the Property to him.  However, they realized that if the Property
were transferred to Max's son, Len, Len would be able to

3

refinance the mortgage and pay Vickie the cash to which she was entitled under the divorce arrangement.

Vickie, Max, and Len took a series of steps to achieve that goal on April 16, 2007: Vickie conveyed the Property to Max pursuant to a deed duly recorded in the District of Columbia land records; in turn, Max conveyed the Property to Len pursuant to a deed similarly recorded in the land records;[2] Len then obtained a loan from SunTrust whereby any previously existing liens were eliminated and a new mortgage, a deed of trust, in favor of SunTrust, was recorded to secure repayment of the promissory note for the loan; and, finally, proceeds received by Len incident to the refinancing were then used to pay Vickie the cash to which she was entitled under the divorce agreement. Each deed recorded indicates that consideration of $10 was paid for the transfer of the Property. As a result of these transactions, title to the Property, according to the land records, was in Len's name.

---

[2] Apparently a transfer directly from Vickie to her stepson, Len, would have triggered a D.C. transfer tax whereas neither the transfer from Vickie to her husband, Max, nor the transfer from Max to his son, Len, was subject to a transfer tax.

4

B.    Residence in and Management of the Property by Max and Len After April 16, 2007, and Prior to the Signing of the Trust Documents

Len represented in the loan documents that the Property would serve as his sole residence for at least a year, and that he would maintain the Property.  Nevertheless, Len and Max agreed that the Property would, in actuality, remain Max's home.  In accordance with this, Len treated Max as the real owner of the Property.  Indeed, Len paid Max rent when Len and his girlfriend (later his wife) lived in the house for approximately six to eight months after the transactions with Vickie closed.

Max and Len also agreed that Max would make the mortgage payments even though only Len was an obligor on the note secured by the deed of trust.  There is no writing evidencing an agreement to that effect, but the existence of that agreement is demonstrated by that fact that over the years Max alone made all monthly mortgage payments.  Len made none of the payments, even though he on occasion did receive communications from SunTrust whenever a payment was missed.[3]  Similarly, Max has paid for all other expenses associated with the Property, including amounts incurred for utilities, real property taxes, insurance, maintenance, and general upkeep.  Accounts associated with the

---

[3]  At some point, Len gave Max authority to deal with SunTrust regarding the mortgage.

5

Property have been established in Max's name, including all electric and water utility accounts, cable and internet accounts, and a Deluxe-Home insurance policy for the Property with Encompass Insurance Company of America ("Encompass").[4]  None of the leases entered into with roomers at the Property ever listed Len as the lessor, and Len never executed any of the leases.  The roomers viewed Max as the landlord.  Max and Len never told them that Len was the owner of the Property.

    C.   Conflict between Max and Len Regarding Len's
         Obligations under the SunTrust Loan

    Max and Len contemplated that within a few years after Len's execution of the promissory note in favor of SunTrust on April 16, 2007, Max would have an improved financial status enabling him to take steps to eliminate Len's financial obligations in relation to the Property.  The existence of the SunTrust debt in Len's name was an impediment to Len's ability to obtain financing to purchase real property for his own use.  Over the years, Len contacted Max to urge Max to take steps to eliminate his responsibility for the debt owed SunTrust secured by the Property.  Max told Len that he was working with SunTrust to

_____

    [4]  Real estate tax records maintained by the District
reflect Len as the owner of the Property, but Len never paid the
real estate taxes.  Max's payments to SunTrust included amounts
that SunTrust used to pay real estate taxes regarding the
Property.

replace Len as the obligor on the debt, but such efforts did not

succeed.  Len's wife, Karen, nagged Len continually regarding

eliminating Len's obligations under the SunTrust debt.  Len hoped

his father would sell or refinance the Property and thereby

eliminate Len's obligations regarding the Property.  The issue

was increasingly a sore point for Len.

     D.   Creation of the 1610 Riggs Property Trust and Attempted
          Transfer of Ownership

Because of Max's income tax liabilities, Max's credit was

shot and he could not get refinancing for the Property to remove

Len as the obligor.  Max thought, based on discussions with

Sylvia Jones, an acquaintance who was active in real estate

transactions, that transferring the Property to a trust in his

favor might make refinancing the Property easier than placing

title to the Property in his own name: a business entity with no

credit record would have a better chance of success in obtaining

financing than would Max, an individual with a bad credit record.

Max also may have been concerned that transferring title to the

Property directly to himself would create a risk of the

outstanding income tax liens against him being enforced against

the Property.  In 2010, Max, Len, and Karen spent the July 4th

holiday in Colorado with Ron Salas, Max's eldest son.  Ron had

recently graduated from law school and had begun practicing law

7

in Colorado.  On July 6, 2010, Max, Len, Karen, and Ron met at Ron's office.  Using Colorado legal forms, Ron prepared (or had already prepared) an *Irrevocable Trust Agreement* and a *Quitclaim Deed*.

At the July 6, 2010 meeting, Len executed the *Irrevocable Trust Agreement* as "Len Salas, Grantor," and Max executed it as "Max Salas, Trustee."  Karen and Ron witnessed the execution of the document and Lori King, a notary public, certified that Max and Len executed the document before her.  The *Irrevocable Trust Agreement* purports to create a trust named the 1610 Riggs Property Trust ("the Trust"), and recites that the Grantor (Len) "desiring to create a trust for the benefit of his father and for other good and valuable consideration, irrevocably assignees [sic] to the Trustee the [Property], in trust, for the purposes and on the conditions hereinafter stated."  The *Irrevocable Trust Agreement* names Max as the sole trustee and the sole beneficiary of the Trust and makes clear Len's intent to grant Max complete authority regarding management of the Property and the sole right to enjoy income generated by the Property, with, for example, the right to sell or encumber the Property.

At the same meeting, Len and Max (as Trustee of the Trust) executed the *Quitclaim Deed*, which Lori King notarized as executed before her.  The *Quitclaim Deed* recites:

8

THIS QUITCLAIM DEED, Executed this 6th day of July, 2010, by first Len Salas whose post office address is 1859 Newton St. Unit B, Washington, DC 20010 to second party, 1611 Riggs Property Trust whose post office address is 155 E Boardwalk, Suite 300, Fort Collins, CO 80525.

WITNESSETH, That the said first party, for good consideration and for the sum of $100.00 paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the said second party forever, all the right, title, interest and claim which the said first party has in and to the following described parcel of land, and improvements and appurtenances thereto in the County of Denver [sic], District of Columbia, to wit:

### Real Property

| Common Address | Legal Description |
|---|---|
| 1610 Riggs Pl NW | Square: 0178 |
| Washington, DC 20009 | Suffix: |
| | Lot: 0030 |
| | Neighborhood: Old City II |
| | Sub-Neighborhood: D |
| | Use Code 24 |

Despite the mis-description of the Trust in the *Quitclaim Deed* as the 1611 Riggs Property Trust, the entire transaction, including Max's execution of the *Quitclaim Deed* as "Trustee, 1610 Riggs Property Trust" and the terms of the *Irrevocable Trust Agreement* reciting that the Property was being transferred into the 1610 Riggs Property Trust, of which Max was to be the Trustee, makes clear that the *Quitclaim Deed* was conveying the property to the 1610 Riggs Property Trust.

9

    E.   Max's Failure to Record the *Quitclaim Deed*

Max originally intended to record the *Quitclaim Deed* around the time of its creation.  Before doing so, he sought the legal services of Stan Goldstein and his title company.  Max was counseled that because the *Quitclaim Deed* transferred the Property from Len to a trust, the recordation of the *Quitclaim Deed* would require payment to the District of Columbia of transfer and recordation taxes.  Though he desired to eliminate Len's financial obligations in regard to the Property, because he could not obtain a refinancing at that time, Max decided that there was no present reason to record the *Quitclaim Deed* and incur the resulting transfer and recordation taxes.  Because Max lacked sufficient funds at the time to pay such taxes, he chose to wait to record the *Quitclaim Deed* until he, as trustee, sought to sell or refinance the Property to make the Trust the obligor under a new mortgage.  Max never intended to sell the Property and remains uninterested in doing so.  However, since the execution of the *Quitclaim Deed* and continuing through today, he has continually and unsuccessfully desired and sought to refinance the SunTrust mortgage via obtaining a new loan.  Accordingly, Max never recorded the *Quitclaim Deed*.  He merely stored copies of the executed documents at the Property with other personal files.

10

F.   Len's Understanding of the Impact of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*

Len understood the *Irrevocable Trust Agreement* and the *Quitclaim Deed* as papers Max needed in order to attempt to refinance the SunTrust debt.  After executing those documents, Len continued to treat Max as the true owner of the Property.  He did not recall afterwards that his execution of those documents had conveyed title to the Property to the Trust.  Len never checked with Max to see if the *Quitclaim Deed* had been recorded, and his involvement regarding the Property after July 2010 was only periodically checking with Max regarding efforts to remove Len from the Property mortgage debt.  His focus was not on removing himself as an owner of the Property in the land records.

After the July 6, 2010, meeting, Len put his copies of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* in a file cabinet.  He eventually forgot that he had received copies and put them there, and, indeed, completely forgot about the execution of those documents, as did his wife.

G.   Inability to Refinance the Debt Preceding the Fire

Len's focus was on eliminating his indebtedness to SunTrust, but it became clear that was not going to occur without a sale of the Property because of the inability of Max, alone, to refinance the debt.  In early 2015, Len and Max supplied information

11

concerning their finances to SunTrust for an application for refinancing.  Under the terms of the proposed refinancing, Len would have remained the obligor on the debt but the mortgage would have had a more favorable interest rate for Max to pay. The existing note called for interest-only payments at 6% per annum, and the refinancing that Max and Len sought would have been in the form of a conventional 30-year mortgage that would call for a lower interest rate, and that would include amortizing payments of principal.  However, they did not succeed in obtaining such refinancing.

      H.  Max's Leasing of Rooms in the Property and the Entity
          Known as CLR, Inc.

Prior to 2009, Max had a company, CLR, Inc., that he used in running food businesses, and had BB&T bank accounts in that corporation's name.  The letters "CLR" are the first letters of the first names of Max's three sons, Chase, Len, and Ron.  Max hoped that CLR, Inc.'s businesses eventually would be successful and the CLR, Inc. bank accounts would contain considerable sums of money that he could transfer to his three sons.  However, those businesses never became a success, and CLR, Inc.'s charter was revoked in 2009.

By 2010, Max, who had already been renting out the basement of the Property for years, began leasing two of the five bedrooms

in the Property to roomers while continuing to live at the Property himself.  Once Max began renting to roomers, he used one of the CLR, Inc. BB&T bank accounts for depositing rents received from the roomers, and used those deposits to make the mortgage payments on the Property.  BB&T insisted that all deposited rent payment checks indicate CLR as the payee.  Accordingly, Max drafted leases to indicate that the lessor was "Max Salas (CLR) Landlord" or "Max Salas CLR Landlord" with the leases directing that payments be made to "Max Salas (CLR)" or "Max Salas CLR."

     I.    The Superior Court Action Against Max and Len by the McLoughlin Plaintiffs and the Brekelmans Plaintiffs

On June 3, 2015, almost five years after execution of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*, the fire in which McLoughlin and Brekelmans were killed occurred at the Property.  Their parents, as representatives of their respective children's estates, filed complaints commencing the Superior Court actions against Max and Len on October 20, 2015, before Max had completed his medical treatments related to his physical injuries resulting from his escape from the fire.  The two separate cases were later consolidated as a single action.

The basis for the McLoughlin plaintiffs and Brekelmans plaintiffs suing Len was that he was the record owner of the Property.  If Len, who played no role in the management of the

13

Property, could show that he had conveyed ownership to Max before
the fire occurred, there would be no basis upon which Len could
be liable to the plaintiffs.

Remarkably, Max and Len failed to recall for many months in
the course of the Superior Court action, until a few weeks before
the trial began in March 2018, the formal papers they had
executed to establish the Trust and to convey title of the
Property to the Trust.  However difficult it is initially to view
without skepticism the testimony of Max and Len regarding their
forgetting about the existence of the documents executed on July
6, 2010, I credit that testimony.  They had no reason to hide the
existence of the documents; indeed, they had every reason to
disclose the documents so that Len would not be held liable, as
owner of the Property, to the plaintiffs.  The circumstances
demonstrate that their testimony is credible.

Len is highly unsophisticated in financial and legal
matters.  The Trust was created in 2010 at Max's instigation, not
Len's.  Len knew at the time he executed the documents that he
was signing papers that might help his father obtain refinancing
for the Property, but he failed to recall, when sued in 2015,
that the documents he had executed on July 6, 2010, had been
intended to effect a transfer of the Property from him to the
Trust, with the consequence of terminating his ownership of the

14

Property.  Before he executed the *Irrevocable Trust Agreement* and
the *Quitclaim Deed* in 2010, he already viewed Max as the true
owner of the Property, and, from his perspective, formalizing
Max's ownership via the execution of those documents was not
altering anything.  When sued in 2015, Len simply did not
appreciate the legal significance of the *Irrevocable Trust
Agreement* and the *Quitclaim Deed* he had executed in 2010.

Max is somewhat unsophisticated in legal and financial
matters, albeit not to the extent that Len is.  However, Max also
suffers from depression, anxiety, and memory loss problems, due
in part to the traumatic effects of the fire of June 3, 2015.
Max was severely injured escaping from the fire, suffering burns
and a broken ankle, and spent six weeks hospitalized.  Even upon
his release from the hospital, Max was unable to move back into
the Property because it required restoration from the fire
damage.  Pending restoration of the Property, he lived in an
apartment paid for by his insurance company, but he always
intended to return to living in the Property once he was able to
do so.  He was in convalescence at the apartment and suffered an
infection that required him to receive drip antibiotics for three
months, and was heavily sedated during that time.  Afterwards, he
lived with home care for some time.  Max also suffered from the
emotional trauma of having the two young roomers killed in the

15

fire in his home.  He did not return to work for eight months
after the fire (approximately February 2016).  The restoration of
the Property was completed in March 2018, at which point he moved
back into the Property.

Shortly after the filing of the plaintiffs' complaints in
the Superior Court, Max and Len each discussed with Ron the
existence of the pending litigation.  Max had counsel supplied by
his insurance company in the Superior Court litigation, but the
insurance company did not supply Len with counsel.  Ron advised
Len to obtain counsel, which he did.  Ron was chary of meddling
in the handling of the litigation by the attorney that Len would
hire.  For that reason, Ron did not mention to Len the existence
of the documents executed in July 2010 (the *Irrevocable Trust
Agreement* and the *Quitclaim Deed*), as the handling of Len's
defense would be by Len's counsel in the litigation, and Ron
assumed that such counsel would provide competent advice to Len.
Ron also had personal troubles involving the death of his son
that distracted his attention and he did not stay abreast of
developments in the litigation.

Max, in the answers to the Superior Court complaints he
served on November 2, 2015, and November 5, 2015, indicated that
Len was the owner of the Property and that he managed the
Property for the owner.  Len similarly served answers indicating

16

that he technically was the title owner of the Property but

denying that he was an operator and/or property manager.

However, at the start of the litigation, before the trust

documents were found, Max revealed that he believed the Property

to be held in trust for his benefit, and Len revealed that he

viewed Max as the true owner of the Property (as had always been

the case).

In answers to interrogatories served on November 17, 2015,

Max made this response:

> INTERROGATORY NO. 3: If you contend that some other
> person or entity was the real owner or manager of the
> property in question, located at 1610 Riggs Place, NW,
> Washington, DC, identify that entity.

> ANSWER: Defendant contends that some other person is the
> owner of the property in question.  Defendant does not
> know the identity of the owner, but believes the same to
> be a trust known as 1610 Salas Trust.

In answers to interrogatories served on November 30, 2015, Len

filed this response:

> INTERROGATORY NO. 3: If you contend that some other
> person or entity was the real owner or manager of the
> property in question, located at 1610 Riggs Place, NW,
> Washington, DC, identify that entity.

> ANSWER: Defendant contends that Max Salas was the real
> owner and the manager of the property in question.

In a deposition of February 24, 2016, in the Superior Court

litigation, Max was asked about the 1610 Salas Trust to which he

had referred in his answers to interrogatories.  His answers

17

demonstrate his confusion about the trust that he believed owned the Property, not an attempt to hide anything.  Max, at first, took the position that nobody but he owned the Property when asked about his interrogatories answers that a 1610 Salas Trust was the owner of the Property.  But then when asked who and what the 1610 Salas Trust was he said: "I don't know--I mean it's a trust that--there's a trust called CLR, CLR Trust, it's our trust."  Max said the trust was for him and his sons.  Deposition of Max Salas (Feb. 24, 2016) [hereinafter "Max Dep."] at 42.  However, there never was a CLR Trust; there was only a corporation of that name, CLR, Inc., that Max had hoped would eventually contain funds he could give his sons.  Importantly, Max then stated: "There is a 1610 Trust doing business as CLR." Max Dep. at 43.

This is consistent with Max's testimony in this court regarding how he had rent checks paid to him.  Additionally, the lease with Brekelmans, executed on August 14, 2014, was signed by Max as "Agent/Land Lord/Agent" but his title was indicated to be "Trustee."  Her rental payments, as all other rental payments Max received by renters, were deposited into CLR, Inc.'s bank account.  But during the deposition for the Superior Court action, Max could not recall any important information regarding the trust.  When asked when the trust was created, he did not

18

know; when asked who was the trustee of the trust, he said he believed he was but was not sure; when asked who was the beneficiary of the trust, he said he thought it was his property; and when asked if there was a written trust agreement signed by anyone, he said he did not know.

Later in the deposition, when asked about the reference to CLR on leases he had entered into with roomers, Max said he used that designation "because I was depositing the money in the trust account named like this," Max Dep. at 89, and then this testimony ensued:

> Q  You had a trust account in the name of CLR Trust?
>
> A  Yes.  There's a -- yes.
>
> Q  That's the name of the account?
>
> A  I'm not sure it's the name of the account.  I think it's called 1610 Riggs Place Trust.

*Id.*  Even later in the deposition Max was asked about CLR again and said: "It is a corporation and then there was a trust in the corporation's name I think."  Max Dep. at 209.  This varying testimony demonstrated Max's confusion as to the corporate entity, CLR, Inc., and its associated bank accounts, one of which was used for deposits of rent, and the Trust.

As to what Max referred to in the deposition as the CLR Trust, but what was actually CLR, Inc., he explained that it was

19

set up to protect him from liability, and identified an attorney, David Fernandez, who he had not seen in ten years (which would have been in 2006, before Vickie Salas ceased to be the owner of the Property in 2007 and long before the execution of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* on July 6, 2010), as the one who set up and handled the incorporation of CLR.  The intent was that Max, as the owner of CLR, Inc., would have protection from personal liability for the debts of the corporation.  This explains why Max referred to a CLR entity as protecting him from liability.

Max then indicated that the entities he referred to as the "1610 Salas Trust" and the "CLR Trust" were not separate trusts.  Rather, he testified, there was only one trust, and the bank account for the rental checks went to a trust account (which, at that time in the deposition, he mistakenly thought the bank called "1610 Salas").

The bottom line is that during his deposition for the Superior Court action, and for a long time afterwards, Max vaguely recalled there being some trust that held an interest in the Property, and at times remembered a trust with a name similar to the actual name of the Trust ("1610 Riggs Property Trust") but he was unable to recall any details establishing the existence of the Trust.  He also confused the Trust with CLR, Inc.

20

This continued to be the case even as late as (or shortly before) February 9, 2018.  In the *Amended Joint Pretrial Statement* filed in the consolidated Superior Court actions on February 9, 2018, both Max and Len conceded that Len was the title owner of the Property but noted that Len had taken title to enable Max to continue to reside in the Property and exercise all indicia of ownership (and recited the ways in which Max acted as owner of the Property).  Len disputed that he was a property manager of the Property or had any possession, control or authority of the Property; disputed that he owed any duty to the tenants of the Property "as he [was] merely the bare **record** owner of the property;" and disputed "that he received any benefit from his bare title ownership of the [Property]."  *Amended Joint Pretrial Statement* at 10-11 (emphasis added).

Late in the Superior Court litigation, the attorney that the insurance company had hired for Max suggested that Max ought to consider hiring a separate attorney to represent his interests. Max contacted Ron for advice in hiring an attorney.  Ron suggested that Max consider hiring a bankruptcy attorney in case he needed to utilize the protections afforded by bankruptcy, and gave Max the names of several attorneys in the District to consider.

21

Max employed Marc E. Albert.  Albert reviewed Max's deposition testimony that a trust owned the Property. Albert asked Max about that testimony, and pointed out to Max that the creation of any trust would have entailed the execution of a written document.  He pressed Max as to whether there was some written document he had executed regarding a trust.  That finally triggered Max's memory that in July 2010 he had executed the documents relating to the Trust at Ron's office.  Max notified Ron that Albert planned to call him to request copies of the documents relating to the Trust.  When Albert called Ron, Ron located his electronic copies of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* as of February 14, 2018, and sent them to Albert.  Len was also provided Ron's copies of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*.[5]

On March 19, 2018, in advance of the Superior Court trial set for March 26, 2018, Len filed an *Emergency Motion for Summary Judgment* ("*Emergency Motion*") in the Superior Court litigation based on the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*, in which his counsel explained the delay in filing the *Emergency Motion* by saying: "the discovery of this

---

[5] Len stumbled upon his copies of the documents by accident only a week before the trial in the Superior Court, but by then copies from Ron had already been supplied to the plaintiffs.

22

document occurred very recently and [Len] has filed this motion
as quickly as possible given its discovery and investigative work
to ensure that it is legitimate."  *Memorandum in Support of
Defendant Len Salas's Emergency Motion for Summary Judgment* at 9.
However, on the day of the trial, the Superior Court declined to
grant the *Emergency Motion*, and in doing so did not take evidence
as to whether there was an explanation for the delay in the
*Irrevocable Trust Agreement* and the *Quitclaim Deed* coming to
light.  The Superior Court barred presentation of evidence
regarding the *Irrevocable Trust Agreement* and the *Quitclaim Deed*
in the jury trial.  The court's decision rested on various
reasons, including that:

- the *Emergency Motion* was "filed untimely" (Transcript
  of Proceedings (Mar. 26, 2018) [hereinafter "Tr. Day
  1"] at 5);

- in "the exercise of reasonable diligence" in complying
  with discovery obligations, Len should have disclosed
  the existence of the Trust far earlier (Tr. Day 1 at
  6), and allowing Len to contradict his earlier position
  would "impose an unfair detriment" on the plaintiffs
  and allow Len to derive "an unfair advantage" (Tr. Day
  1 at 12), such that Len was judicially estopped from
  altering, late in the litigation, his earlier position

that he had legal title to the Property at the time of
the fire (Tr. Day 1 at 6, 10-13);

- the Superior Court had "a serious question as to
whether a trust actually exists" (Tr. Day 1 at 6)
because Max was both the sole trustee and the sole
beneficiary and a trust terminates when the legal
interest and beneficial interest under the trust are
vested in one person (Tr. Day 1 at 6-7, 12); and

- raising the "late issue" of whether Len should be a
party to the case right before trial "seemed to be a
business decision that was made by the insurance
company with regard to settlement of the case," and
Len's raising the issue by the *Emergency Motion*
appeared to be "a strategy, if you will, to have Mr.
Len Salas divested of any title and, therefore, of any
responsibility when it comes to defending this case and
as to any . . . adverse verdict that might render" (Tr.
Day 1 at 7-8), such that presentation of the defense
was barred by "the circumstances surrounding this whole
theory involving Mr. Len Salas" (Tr. Day 1 at 8).

The Superior Court did not take evidence regarding whether there
was any explanation for the late production of the *Irrevocable
Trust Agreement* and the *Quitclaim Deed*, and did not hear from Max

24

Salas or his counsel in regard to Len's *Emergency Motion*.  Max
(who had no standing as a defendant to move for an adjudication
of his ownership of the Property as, regardless of that issue, he
could be found liable on the basis of his management of the
property) did not respond to Len's *Emergency Motion*, and was not
asked by the Superior Court to address the issue of the Trust.

The Superior Court orally supplemented its ruling of March
26, 2018, the next day, noting as to the last point that "indeed,
this Court was confronted with, in my view, the untenable
position that the insurer for the defendant had made a business
decision, and that was to, essentially, provide coverage for Max
Salas, but not Len Salas, and this was the theory, okay?"  and
stated: "Insurance companies do not direct the Court in matters
of this nature.  And so I can't speak to what negotiations or
arrangements are made outside of this Court . . . ."  Transcript
of Proceedings (Mar. 27, 2018) [hereinafter "Tr. Day 2"] at 340-
41.

Based on Len's belated disclosure of the *Irrevocable Trust
Agreement* and the *Quitclaim Deed*, the plaintiffs had filed a
motion in the Superior Court for leave to amend their complaints
to add the Trust as a party.  The Superior Court heard that
motion at the same time as it heard the *Emergency Motion for
Summary Judgment.*  The attorney for the Brekelmans plaintiffs

25

requested that "the Court sever" the claim that the title was divested to the Trust and that the trial proceed with "no mention of the trust." Tr. Day 1 at 15. Similarly, the attorney for the McLoughlin plaintiffs indicated that:

> the best course of action is just to delay adjudication of this motion until after trial on the current complaint as it existed before we filed the leave to amend. And then we can take that up after, if necessary, after trial and just -- we don't even need to reach the issue at this point in time.

Tr. Day 1 at 16-17. The Superior Court indicated to Len's attorney that Len "would stand to benefit from the Court's ruling acknowledging the existence of a trust and, therefore, relieving [Len] of any responsibility to defend or indemnify if the -- or to be responsible for an adverse judgment." Tr. Day 1 at 19.

The Superior Court granted (or the clerk of the Superior Court understood the Superior Court to have granted) the plaintiffs' motion for leave to amend their complaints,[6] but agreed to defer ruling definitively on the issue of whether a

---

[6] The docket entry for March 26, 2018, in the McLoughlin case, Case No. 2015 CA 008054 B, reads: "Oral Ruling GRANTING Plaintiffs' Emergency Motion to Amend Their Complaints to add as a Defendant' 1610 Riggs Property Trust in open court by Judge Holeman Entered on the Docket 3/26/2018." Similarly, the docket entry for March 26, 2018, in the Brekelmans case, Case No. 2015 CA 008061 B reads: "Plaintiffs Motion to Amend the Complaint is GRANTED and stayed as to all proceedings against the trust." However, neither the dockets nor the portions of the transcript offered as evidence by the plaintiffs show that an order was entered to that effect.

26

trust existed.[7]  Tr. Day 1 at 18.  The trial went forward only as

to Max and Len, not as to the Trust, and Len was not permitted to

present evidence regarding the existence of the Trust.  Pursuant

to a jury verdict, Len, as the record owner of the Property, was

held jointly and severally liable with Max for the damages that

the plaintiffs recovered pursuant to the judgments of April 4,

2018.  That led to Max and Len commencing their bankruptcy cases

on April 18, 2018.  The Superior Court has not yet entered a

certification under Superior Court Rule of Civil Procedure 54(b)

to make the judgments against Max and Len final and appealable.[8]

---

[7]  At the trial on March 27, 2018, the Superior Court stated: "That issue, whether or not a trust exists, and anything flowing from that, will be taken up, if necessary, following this case, as I articulated yesterday."  Tr. Day 2 at 338.

[8]  By an order in this bankruptcy case entered on July 20, 2018, disposing of a motion for relief from the automatic stay filed by the plaintiffs, this court authorized the plaintiffs and Max:

>   to take the necessary steps in the Superior Court Litigation to the extent necessary to make the Judgments final, enforceable, and appealable through certification of the Superior Court for the District of Columbia pursuant to D.C. Superior Court Rule of Civil Procedure Rule 54(b), or, if the Superior Court is not willing to grant certification under that rule, through continuation of the Superior Court Litigation to dispose of claims against 1610 Riggs Property Trust . . . .

27

II

DOCTRINES OF ESTOPPEL AND RES JUDICATA

The plaintiffs rely on principles of judicial estoppel,
collateral estoppel (issue preclusion), and res judicata (claim
preclusion) in objecting to the claimed exemption.

A.   Judicial Estoppel

"Courts may invoke judicial estoppel '[w]here a party
assumes a certain position in a legal proceeding, . . . succeeds
in maintaining that position, . . . [and then,] simply because
his interests have changed, assume[s] a contrary position.'"
*Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010) (quoting
*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal
quotation marks omitted)).  *See also Moses v. Howard Univ. Hosp.*,
606 F.3d 789, 792 (D.C. Cir. 2010) (quoting *Comcast Corp. v. FCC*,
600 F.3d at 647).  The issue of ownership in the Superior Court
trial was only pertinent to whether Len could be held liable.
Max, having managed the Property, was liable regardless of who
owned the Property.  Max was not attempting to succeed on a
position that Len was the owner of the Property: he had no desire
to have his own son held liable to the plaintiffs.  It was the
plaintiffs who were attempting to hold Len liable as owner of the
Property, not Max.  Max cannot be viewed as succeeding in the

28

Superior Court based on taking a position that Len, not Max, owned the Property.

Max made clear early on in the Superior Court that he believed the Property was held in trust for him, but for years he could not recall the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*. When, late in the litigation, Albert pressed Max on Max's belief that a trust existed and pointed out that such a trust would entail an executed trust instrument, Max recalled that Ron had prepared documents that Max and Len had executed. That led to locating the *Irrevocable Trust Agreement* and the *Quitclaim Deed*. When that in turn led to Len's *Emergency Motion for Summary Judgment* which disclosed to the Superior Court the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*, Max did not contest the existence of those documents. He would have been delighted had Len's *Emergency Motion for Summary Judgment* been granted, and Len had been held not liable to the plaintiffs.

The *Amended Joint Pretrial Statement* in Superior Court, filed before the *Irrevocable Trust Agreement* and the *Quitclaim Deed* were located, offered a stipulation of fact that at "the time of the occurrence, Len Salas held legal title to the building." *Amended Joint Pretrial Statement* at 9. However, the *Amended Joint Pretrial Statement* went on to note Len's contention

29

that he was "merely the bare record owner of the property" and
Len's disputing that he "had any possession, control or authority
at the Property," or that he "received any benefit from his bare
title ownership of the property."  *Amended Joint Pretrial
Statement* at 10-11.  Accordingly, when the *Amended Joint Pretrial
Statement* is viewed as a whole, the stipulation that Len "held
legal title" to the Property refers to the fact that at the time
of the occurrence, as well as now, Len's interest in the Property
was limited to being the displayed record owner for the Property
in the land records, and is entirely consistent with Max's
position that he is the true owner of the Property, and thus
entitled to exempt the Property.

Even if the stipulation could be viewed as Max's taking a
position contrary to the position that Max takes now, Max later
acted consistently with his current position by providing the
information that led to the *Irrevocable Trust Agreement* and the
*Quitclaim Deed* being uncovered in Ron's office.  Max did not
oppose Len's *Emergency Motion for Summary Judgment* which sought
to show that Len should not be held liable as the owner of the
Property.  Max's conduct in the Superior Court demonstrates that
he was not attempting to succeed in the Superior Court on a
position that Len is the owner of the Property, and is consistent
with the position he has taken in this court that he is the true

30

beneficial owner of the Property, through the existence of the

*Irrevocable Trust Agreement* and the *Quitclaim Deed*, and entitled

to claim the Property exempt.[9]

B.   Collateral Estoppel (Issue Preclusion)

The doctrine of collateral estoppel is also known as issue

preclusion, and the doctrine:

> renders conclusive in the same or a subsequent action
> determination of an issue of fact or law when (1) the
> issue is actually litigated and (2) determined by a
> valid, final judgment on the merits; (3) after a full and
> fair opportunity for litigation by the parties or their
> privies; (4) under circumstances where the determination
> was essential to the judgment, and not merely dictum.

*Davis v. Davis*, 663 A.2d 499, 501 (D.C. 1995) (quoting *Washington*

*Med. Ctr. v. Holle*, 573 A.2d 1269, 1283 (D.C. 1990)).  *See also*

*Modiri v. 1342 Rest. Grp., Inc.*, 904 A.2d 391, 394 (D.C. 2006).

In the Superior Court, Max, as the manager of the Property, was

---

[9]   The plaintiffs have not invoked equitable estoppel, and
plainly that doctrine would be inapplicable.  "A party raising
equitable estoppel must show that he changed his position
prejudicially in reasonable reliance on a false representation or
concealment of material fact which the party to be estopped made
with knowledge of the true facts and intent to induce the other
to act.  *Cassidy v. Owen*, 533 A.2d 253, 255 (D.C. 1987)."  *Nolan
v. Nolan*, 568 A.2d 479, 484 (D.C. 1990).  Max had no intent to
cause the plaintiffs to act based on any representation that
legal title was in Len: Max wanted Len off the hook.  Nor was
there any knowingly false representation: Max recalled there was
a trust but did not recall the existence of the *Irrevocable Trust
Agreement* and the *Quitclaim Deed* until late in the litigation.
Moreover, the plaintiffs did not rely on the stipulation in the
*Amended Joint Pretrial Statement* to their prejudice.

31

liable regardless of whether he owned the Property or not, and thus a finding that he lacked ownership was not necessary to hold him liable.  A finding in that regard was *not* "essential to the judgment" against Max, and thus the judgment against Max cannot be given collateral estoppel effect on the issue of ownership of the Property.

The determination that Len owned the Property *was* "essential to the judgment" against Len.  However, Max was not a party to the claims against Len.  Max was liable regardless of whether Len was liable, and he had no standing to defend against the claims against Len.  In that sense, he was a non-party regarding the claim against Len and Len's legal rights in that regard.

As a nonparty to the judgments against Len, Max, unless an exception applies, is entitled to the protection of "the general rule that a litigant is not bound by a judgment to which she was not a party."  *Taylor v. Sturgell*, 553 U.S. 880, 898 (2008); *see also Richards v. Jefferson County*, 517 U.S. 793, 798 (1996). Only the privity exception is of possible relevance to that general rule.

Under the privity exception, the judgment against Len cannot apply to Max unless Max was in privity with Len.  As stated in *Modiri*, 904 A.2d at 396-97:

"A privy is one so identified in interest with a party to

32

the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." [Quoting *Smith v. Jenkins*, 562 A.2d 610, 615 (D.C. 1989).] The "orthodox categories" of privies are "'those who control an action although not parties to it . . .; those whose interests are represented by a party to the action . . .; [and] successors in interest." *Id.* (quoting *Lawlor v. National Screen Serv.*, 349 U.S. 322, 329 n. 19, 75 S.Ct. 865, 99 L.Ed. 1122 (1955)). 18 Moore's Federal Practice § 132.04[1] [b][iv] at p. 132-148 (defining the three types of "sufficiently close" relationships that establish privity as 1) a successor to a party's property interest; 2) a nonparty that controlled the original suit; and 3) a nonparty whose interests were represented in the original suit).

(Footnote omitted).

The tort claims against Len are not the same cause of action as Max's claim of ownership of the Property. However, for issue preclusion purposes, an "issue" is not limited to a "cause of action." *Jackson v. District of Columbia*, 412 A.2d 948, 953 (D.C. 1980). Accordingly, privity could apply.

Nevertheless, the three categories of the privity exception enumerated in *Modiri* do not apply to Max. First, the facts do not show that collateral estoppel applies on the basis that Max is "a successor to a party's property interest." That latter exception applies to successors who acquired their interest in property after the commencement of the litigation leading to the

33

judgment declaring ownership of property.[10]  Max is asserting an
ownership interest already in existence when the Superior Court
action began, and the Superior Court action was not one by Len to
establish that he owned the Property but instead was the
plaintiffs' action to find Max and Len liable on tort claims.[11]

Second, Max did not control the defense of the claims
against Len: Max had counsel supplied by the insurance company,
and that counsel was not defending Len, who had separate counsel.
Third, Len did not represent Max with respect to any ownership
claim Max might make to the Property.  As noted by the Court in
*Taylor*, 553 U.S. at 894 "'in certain limited circumstances,' a

---

[10]   *See* Restatement (Second) of Judgments § 43 (discussing
effect of judgment regarding property on a later successor to the
property, and noting in *Comment a* thereto that a determination
adjudicating title to property "is carried over upon
succession"); Restatement (Second) of Judgments § 44 (discussing
effect of judgment regarding property on an entity to whom an
interest in the property is conveyed during the pendency of the
litigation leading to the judgment). *See*, *e.g.*, *Diversified Fin.
Sys., Inc. v. Boyd*, 678 N.E.2d 308, 311 (Ill. App. 1997) ("Where
the transferor becomes a party to an action concerning property,
after it has been transferred, his becoming a party 'does not
make him in any sense a representative of his successor in
estate.'  Restatement (Second) of Judgments § 44, Comment *f*, at
12 (1982).").

[11]   One other point regarding privity, when property law is
at issue, is that privity "denotes a mutual or successive
relationship to the same rights of property." *District of
Columbia Redevelopment Land Agency v. Dowdey*, 618 A.2d 153, 163
(D.C. 1992), quoted in *Modiri*, 904 A.2d at 396 n.4.  Len and Max
did not stand in mutuality regarding ownership of the Property:
Max's ownership of the Property would negate the existence of any
mutual interest of Len in the Property.

nonparty may be bound by a judgment because she was 'adequately
represented by someone with the same interests who [wa]s a party'
to the suit." (Quoting *Richards*, 517 U.S. at 798).

Representatives under the Restatement (Second) of Judgments
§ 41(1) are restricted to five specific categories: trustees,
persons authorized by the nonparty, executors, authorized public
officials, and class representatives designated by a court.
However, privity may be based on "adequate[] representation" of
the "same interests" in other circumstances.

   In *Franco v. District of Columbia*, 3 A.3d 300, 306 (D.C.
2010), the court viewed with favor the Supreme Court's rejection
in *Taylor* of the doctrine of "virtual representation," observing:

> The Supreme Court has rejected any broad doctrine of
> virtual representation that would allow preclusion based
> on identity of interests and relationships between
> parties and non-parties without due process protections
> such as those prescribed for class actions under Fed. R.
> Civ. P. 23. *Taylor*, 128 S. Ct. at 2176. In disapproving
> the theory of virtual representation under review in
> *Taylor*, the Supreme Court cited among its reasons: (1)
> the importance of discrete exceptions to non-party
> preclusion in light of "the fundamental nature of the
> general rule that a litigant is not bound by a judgment
> to which she was not a party"; (2) the limitations on
> non-party preclusion based on adequate representation
> which requires, at a minimum, an alignment of interests
> between the party and non-party and the party's
> understanding that he or she was acting in a
> representative capacity or the first court took steps to
> protect the non-party's interest, and sometimes notice of
> the original suit to those purportedly represented; and
> (3) the preferability of definite rules to avoid
> unnecessary complication generated by preclusion

35

questions under a balancing approach. *Id.* at 2175–77 (citations omitted).

Len was not representing Max's interests with respect to Max's claim of ownership of the Property, and given the posture of the claims in the Superior Court, there is no evidence that Len understood himself to be representing Max's interests in that regard. Nor did Max view Len as representing Max's ownership interest. They each had separate counsel.[12] Accordingly, the third of the categories of the privity exception enumerated in *Modiri* does not apply to Max.

More fundamentally, as in *Lassiter v. District of Columbia*, 447 A.2d 456, 462 (D.C. 1982), the question is whether Max "had a 'full and fair' opportunity in the first trial to litigate to a final judgment the issue raised in the second suit. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971); *Jackson v. District of Columbia*, D.C.App., 412 A.2d 948, 953 (1980)." As stated in *Allen v. McCurry*, 449 U.S. 90, 95 (1980), "one general limitation the Court has repeatedly

---

[12] Max's ownership interest was not an issue as to whether Max was liable (as he was already liable based on managing the Property) and Max's insurance-company-supplied-counsel's representation of Max did not include representation as to Max's ownership claim, so Max never had occasion to litigate his claim of ownership in the Superior Court.

36

recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case."  (Citations omitted).  In that regard, collateral estoppel ought not apply when a party "may have little incentive to defend vigorously, particularly if future suits are not foreseeable." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 330 (1979).  In determining whether a party had a "full and fair opportunity" to litigate an issue, "the decision will necessarily rest on the trial courts' sense of justice and equity." *Blonder-Tongue*, 402 U.S. at 333-34. Moreover, "the *Parklane* requirement that the defendant in the first action have incentive in that action to litigate the lawsuit fully and vigorously also mandates conflict-free representation of issues sought to be precluded." *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1140 (5th Cir. 1991) (citing *Parklane Hosiery Co.*, 439 U.S. at 652).

Here, Max's insurance company supplied counsel for Max, but the insurance policy only related to defending Max regarding liability, not ownership of the Property.  Regarding the view that collateral estoppel does not apply to issues not actually litigated, the Restatement (Second) of Judgments § 27, Comment e notes:

37

> Sometimes the party against whom preclusion is asserted
> is covered by an insurance policy and represented by
> insurance company counsel in the prior action but not in
> the subsequent action.  In such instances, preclusion
> with respect to unlitigated issues seems particularly
> unfair.

This case well illustrates the wisdom of not according issue preclusion to an issue that insurance-company-supplied-counsel did not litigate because it was immaterial to such counsel's representation of the insured.  The existence of the Trust was immaterial to the issue of Max's liability, and was thus not a topic germane to Max's insurance-company-supplied-counsel's defense of him as to liability in the Superior Court litigation. Moreover, Max's insurance company's interests diverged from Max's with respect to Max's claim of ownership: it was in the insurance company's interest for Len to be held liable.  If the plaintiffs made collections from Len, that might reduce the amount that the insurance company would have to pay.  Early in the Superior Court litigation, Max's counsel in that litigation ought to have alerted Max regarding the need for independent counsel regarding Max's claim of ownership, and the divergence of the insurance company's interests and Max's in that regard.  Not until late in the litigation did Max's insurance-company-supplied-counsel suggest that Max should consider employing independent counsel.

When the insurance-company-supplied-counsel belatedly

38

suggested that Max hire independent counsel, Max hired Marc
Albert.  It was Albert's making a probing inquiry of Max
regarding whether trust papers were ever executed that led to the
discovery of the *Irrevocable Trust Agreement* and the *Quitclaim
Deed*.  Max had no standing to take a position on the *Emergency
Motion for Summary Judgment*, and at the argument on that motion,
the Superior Court did not ask Max to state his position on that
motion.  Moreover, Max never had an opportunity to explain the
reasons for his delay in uncovering the *Irrevocable Trust
Agreement* and the *Quitclaim Deed*.  In addressing and ruling on
Len's *Emergency Motion*, the Superior Court heard no evidence as
to whether Max could explain reasons for the delay, and the
Superior Court barred presentation of evidence regarding the
*Irrevocable Trust Agreement* and the *Quitclaim Deed* in the
Superior Court jury trial.  Here, in contrast, Max has explained
the reasons for the delay.  I find his explanation is credible
and I find that the *Irrevocable Trust Agreement* and the *Quitclaim
Deed* have existed and have an impact on whether Max owned the
Property.  In these circumstances, my "sense of justice and
equity" (*see Blonder-Tongue,* 402 U.S. at 333-34) is that Max has
not had a "full and fair opportunity" (*see Allen v. McCurry*, 449
U.S. at 95) to litigate the issue of his ownership of the
Property.

39

Moreover, under *Parklane*, 439 U.S. at 330, the lack of
foreseeability bars preclusion.  Max was not reasonably in a
position (until he hired independent counsel) to foresee that his
ownership of the Property (including Max's right to exempt the
Property) could be affected by Len being held liable as the owner
of the Property in the Superior Court litigation.  The court in
*Tutt v. Doby*, 459 F.2d 1195, 1200 (D.C. Cir. 1972), stated "the
principle of collateral estoppel is not properly applicable 'to
unlitigated issues underlying default or consent judgments . . .
unless it could be said that the parties could reasonably have
foreseen the conclusive effect of their actions."  Moreover,
"[e]ven where issues have been litigated, the criterion of
foreseeability serves to limit the estoppel effect of the first
judgment."  *Id.* at 1200 n.5.

The foregoing analysis is supported by *Casco Indem. Co. v.
O'Connor*, 755 A.2d 779, 782-83 (R.I. 2000), the only decision I
have found dealing with issue preclusion when there was a failure
of insurance-company-supplied-counsel to warn the insured that
the insured might need to consult with independent counsel.  In
*Casco*, the court stated:

> Although the legal standard governing collateral estoppel
> is clear, "it is not to be mechanically applied, for it
> is capable of producing extraordinarily harsh and unfair
> results."  *Remington Rand Corp. v. Amsterdam-Rotterdam
> Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).  To avoid

40

unfairness, courts have declined to apply collateral estoppel in situations in which the doctrine would lead to an inequitable result. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552, 561 (1979) (noting that it would be unfair to apply collateral estoppel "[i]f a defendant in the first action is sued for small or nominal damages, [because] he may have little incentive to defend vigorously, particularly if future suits are not foreseeable"). Of particular importance to the case at bar is the principle that "collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308, 313 (1980).

In *Casco*, 755 A.2d at 783–84, Kevin O'Connor, as a driver of a car owned by Carol Interlini, was involved in a two-car collision with another driver, Melissa Defelice. O'Connor was considered an additional insured under Interlini's insurance policy with Casco Indemnity Company (Casco) with respect to the accident. When Defelice (who was uninsured) sued O'Connor, Casco hired defense counsel for O'Connor. While Defelice's suit was proceeding, O'Connor (through independent counsel) filed a written claim for personal injuries against Casco, pursuant to the uninsured motorist provision of the policy. Defelice's suit went to arbitration. When an arbitration award was issued, defense counsel acted contrary to O'Connor's interests: she did not provide him with a copy of the arbitrator's award, never informed him that he had a right within 20 days to reject the

arbitration award, never told him that the arbitration award could or would have an impact on his own uninsured motorist claim against Casco, and never informed O'Connor's independent counsel about the arbitration award.  The arbitration award went to judgment, and in the litigation of O'Connor's uninsured motorist claim against Casco, the judgment pursuant to the arbitration award was invoked by Casco as collateral estoppel against O'Connor.  The Supreme Court of Rhode Island held:

> Although defense counsel was hired and paid by Casco, O'Connor was her client, and she owed him unswerving loyalty during the course of her representation. . . . . Even if defense counsel reasonably believed that it was beyond the scope of her engagement to inform O'Connor of the possible preclusive effect that the arbitrator's award might have on his uninsured motorist claim, she should have advised him to consult with Donelan before deciding whether to accept or reject the award.  *Cf. DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 769-72 (R.I. 2000) (discussing an attorney's obligation to disclose potential conflicts of interest).  Defense counsel's failure to inform or consult O'Connor concerning the arbitrator's award denied O'Connor the opportunity to have the issue of his negligence fully litigated.  Had O'Connor been given a copy of the arbitrator's award and had he been advised to discuss that award with his own attorney, he might have exercised his right to timely reject the arbitrator's award and insist that Defelice's suit be tried.  At trial, the findings concerning the relative liability of the parties might have been substantially different.

*Id.*  Accordingly, the Supreme Court of Rhode Island held that collateral estoppel did not apply.

Here, in a situation similar to *Casco*, Max's insurance-

42

company-supplied-counsel in the Superior Court ought to have recognized early on that Max's claim of ownership of the Property through a trust presented a matter (separate from the issue of whether Max could be held liable to the plaintiffs) as to which Max should obtain independent counsel.  The insurance company's interests potentially diverged from Max's.  However, the insurance-company-supplied-counsel waited until late in the litigation to advise Max that he might want to have independent counsel.  Had Max been advised to discuss the litigation with independent counsel early on, the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* might have come to light much sooner, and the outcome in the litigation on the issue of whether Len owned the Property might have been different.  Max ought not suffer a loss of the Property arising from the consequent delay in his obtaining independent counsel.

Moreover, for collateral estoppel to apply there must be a final judgment.  The judgments in the Superior Court are not final because the Superior Court has not adjudicated the claims

43

the plaintiffs are pursuing against the Trust.[13]  An order is
generally not final for collateral estoppel purposes where the
order may not be appealed.  *Davis*, 663 A.2d at 503.  "A final
judgement is defined as a prior adjudication of an issue in
another action that is determined to be sufficiently firm to be
accorded conclusive effect."  *Johnson v. Capital City Mortg.
Corp.* 723 A.2d 852, 856 (D.C. 1999) (quoting *Kleinbart v. United
States*, 604 A.2d 861. 864 (D.C. 1992)) (internal quotes omitted).
Preclusive effect should not be given to tentative judgments.
*Id.*

　　　Under Sup. Ct. Civ. R. 54(b), any order or decision "that
adjudicates fewer than all the claims or **the rights and
liabilities** of fewer than all the parties does not end the action
as to any of the claim or parties and may be revised at any time
before the entry of a judgment adjudicating all the claims and
all the parties' rights and liabilities."  (Emphasis added).
Because the court has not decided or acted on the motion for
leave to amend the complaint to add the Trust as a party, the

---

[13]  As noted previously, it is not clear whether the
Superior Court granted the plaintiffs' motions for leave to amend
the complaint to add the Trust as a party.  Either way, claims
against the Trust are being pursued by the plaintiffs, and the
judgments against Max and Len cannot yet be treated as final for
purposes of res judicata (claims preclusion) and collateral
estoppel (issue preclusion).

44

judgment against Len is not a final judgment.

In addition, not all of Len's rights and liabilities had been adjudicated, including Len's right to seek indemnity from the 1610 Riggs Property Trust, as the true title holder of the Property.  The Superior Court specifically recognized that Len "would stand to benefit from the Court's ruling acknowledging the existence of a trust and, therefore, relieving [him] of any responsibility to defend or indemnify if the -- or to be responsible for an adverse judgment."  Tr. Day 1 at 19.  The attorney for the Brekelmens' estate specifically requested that "the Court sever" the claim that the title was divested to the Trust and that the trial proceed with "no mention of the trust."  Tr. Day 1 at 15.  The Superior Court deferred ruling on whether the Trust could be the title owner of the Property.  There was no holding that the Trust is not a legal entity that holds title to the Property by a *Quitclaim Deed* properly executed by Len.  The court held only that Len was the record title holder of the Property for purposes of the trial regarding liability for the deaths of Michael Patrick McLoughlin and Nina Brekelmens.

C.   Res Judicata

Res judicata, also known as claim preclusion, is the doctrine that "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 40 U.S. 147, 153 (1979).  "Whether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Drake v. F.A.A.*, 29 F.3d 59, 66 (D.C. Cir. 2002) (quoting *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984).

This doctrine is easily dismissed as these cases are not from the same cause of action.  The Superior Court case involved the liabilities of Len in a civil wrongful death and survivorship action, whereas this case is regarding Max's right under D.C. Code § 15-519(a)(14) to exempt the Property in his bankruptcy. The only possibility of res judicata coming into play is if there were privity between Len and Max, but as already discussed in the section on collateral estoppel, there is no privity in this case. Also, as already discussed, there is not a final judgment.  For all theses reasons, I do not find res judicata applicable here.

III

CONVEYANCE OF THE PROPERTY

The plaintiffs contend that should the court find that the doctrines of judicial estoppel, collateral estoppel, or res

46

judicata do not apply to this case, then the conveyance of the

Property never occurred because the Trust was a nullity *ab*

*initio*, under the law of the District of Columbia and Colorado,

and the *Quitclaim Deed* was defective with a typo referring to the

"1611 Riggs Property Trust."  For the reasons stated below, I

reject the plaintiffs' contentions.

    A.   Conflict of Laws: District of Columbia Law Applies

    The court must first determine whether District of Columbia

or Colorado law controls before the court proceeds to determine

whether a valid transfer took place.  A federal court must apply

the choice of law principles of the state in which it is located.

*Klaxon Co. V. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496

(1941).  The District of Columbia's conflict of laws analysis is

governed by the Restatement (Second) of Conflict of Laws.  *Pearce*

*v. E.F. Hutton Group, Inc.*, 664 F. Supp. 1490, 1495-96 (D.D.C.

1987).  Under the Restatement (Second) of Conflict of Laws § 278

"the validity of a trust of an interest in land is determined by

the law that would be applied by the courts of the situs."  The

law of the situs also governs conveyance transfers of an interest

in land and the nature of any interest.  Restatement (Second) of

Conflict of Laws § 223.

    The District of Columbia has also adopted the "governmental

interest analysis" approach.  *Williams v. Williams*, 390 A.2d 4, 5

(D.C. 1978).  However, the District has also modified the "government interest analysis" approach to include the "most significant relationship" approach and has adopted the observation that "the state with the 'most significant relationship' should also be that whose policy would be advanced by application of [its] law." *Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 n.2 (D.C. 1985).

The *Irrevocable Trust Agreement* provides that Colorado law would apply.[14]  However, the court does not find that provision controlling.  The District of Columbia will enforce choice-of-law provisions "so long as there is some reasonable relationship with the state specified." *Norris v. Norris*, 419 A.2d 982, 983 (D.C. 1980).  The relationship here is not reasonable when considering the totality of the circumstances.  As will be further discussed below, Colorado had very little connection to the parties, and no connection to the Property at all.  Additionally, Ron admitted that he used a Colorado stock form to prepare the agreement.  He further admitted that there was no particular reason to use

---

[14]  The *Irrevocable Trust Agreement* provides:

14    SITUS.  This trust has been executed and delivered
      in the State of Colorado and shall be construed and
      administered according to the laws of Colorado.  In
      witness whereof the Grantor and the Trustees have
      executed this Agreement in Colorado.

48

Colorado law over District of Columbia law and he did not research the law of either Colorado or the District of Columbia, or know of any difference between the laws of the two jurisdictions.

All of this evidences that it was not a deliberate choice to choose Colorado law over District of Columbia law. For all these reasons, the court does not find a sufficiently reasonable relationship with Colorado, nor an intent from the parties, that Colorado law should govern a land conveyance transaction that would take place in the District of Columbia.

As noted above, the District of Columbia follows the Restatement (Second) of Conflict of Laws. Under the Restatement § 278, the validity of a trust regarding an interest in land is governed by the law of the situs. The Property is real property located in the District of Columbia, not Colorado, and accordingly, District of Columbia law applies. Additionally, the conveyance of real property is governed by the law of the situs. The *Quitclaim Deed* was executed and delivered in Colorado, but the Property is located in the District. Accordingly, District of Columbia law applies to the conveyance of the Property.

The court would come to the same conclusion if the court is required to apply the "governmental interest" and "most significant relationship" tests, as adopted and applied by the

49

District.  The only connection Colorado has to the *Irrevocable Trust Agreement* is that the attorney who wrote the instrument is a bar member in Colorado, and the *Irrevocable Trust Agreement* and *Quitclaim Deed* were executed and delivered in Colorado.  On the other hand, the Property was located, and both Len and Max lived, in the District.

Because the *Irrevocable Trust Agreement* governed neither property nor people located in Colorado, Colorado would likely have either no interest or an extremely limited interest in the validity or the effect of the Trust.  On the other hand, the District had a far greater interest governing the types of trusts that may exist and own property within the District's jurisdiction where the District is the collector of property taxes and its laws govern the use and maintenance of the Property.

The 2015 fire is a useful example of the District's interest regarding the Property.  It was a violation of the District's laws that contributed to the deaths of two residents of the District in the 2015 fire.  It was the District's fire department that put out the fire, and the District's streets that were blocked by the events surrounding the fire.  Additionally, it was other property located in the District that was threatened by the fire.  It was the District's courts that handled and resolved

50

liability suits related to the fire.

For the same reasons mentioned above, the District has a superior interest over the conveyance of the Property. Accordingly, the court holds that the law of the District of Columbia governs the formation of the Trust and the conveyance of the Property.

B.   Validity of the Trust

D.C. Code § 19-1304.03 provides that:

A trust not created by will is validly created if its creation complies with the law of the jurisdiction in which the trust instrument was executed, or the law of the jurisdiction in which, at the time of creation:

(1)   The settlor was domiciled, had a place of abode, or was a national;

(2)   A trustee was domiciled or had a place of business; or

(3)   Any trust property was located.

This means that the Trust would be valid if it is valid either in Colorado or the District of Columbia.  Under Colorado law, at the time the Trust was created, a trust would terminate if the entire beneficial interest and the entire legal interest fell upon the same person.  *Denver Found. v. Wells Fargo Bank*, 163 P.3d 1116, 1125 (Colo. 2007) ("When the entire beneficial interest of a trust is held by the same person or entity that holds the entire legal interest, the trust terminates under the doctrine of

merger; in other words, if the sole beneficiary also functions as the sole trustee, the trust ceases to exist.").  The District of Columbia is in agreement with Colorado on this issue.  D.C. Code § 19-1304.02(a)(5) provides that a trust can only be created if "[t]he same person is not the sole trustee and sole beneficiary." The Trust is therefore clearly invalid.  Max was the sole trustee and the sole beneficiary of the Trust.  Such a trust could never exist under Colorado or District of Columbia law, and a fortiori, the Trust could never have been formed.  Accordingly, the court finds that the 1610 Riggs Property Trust never existed and was a nullity *ab initio*.

C.   Validity of the Conveyance of the Property

However, just because the court finds that the Trust never existed, does not mean that the conveyance failed from the beginning.  Section 19-1304.03 only addresses what can and cannot constitute a trust.  It does not address, however, what happens when parties attempt to convey property to a trust that is a nullity under § 19-1304.03.  In the District of Columbia,[15] the conveyance of property through an invalid trust results in a

---

[15]   It was necessary to review Colorado law to determine whether a valid trust had been formed under D.C. Code § 19-1304.03; however, Colorado law would not control the effect of an invalid trust in conveying legal and beneficial interests in this case.

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 229 of 579 PageID #: 1349

1244

resulting trust, unless there is consideration, in which case,
the legal and beneficial rights are conveyed to the intended
beneficiary of the conveyance.  *Kemp v. Eiland*, 139 F. Supp. 3d
329, 340 (D.D.C. 2015) (citing Restatement (Third) of Trusts § 8
cmt. f); *see also Smith v. Washington*, 226 A.2d 335, 339 (Md.
1967) ("*When there is a consideration for the conveyance, and it
is made upon a trust which is void for uncertainty, or otherwise
fails, then the grantee takes the beneficial interest*.")
(emphasis in original); *Rosenthal v. Miller*, 129 A. 28, 30 (Md.
1925) ("Where there are certain trusts, created either by will or
deed, which fail in whole or in part, or which are of such an
indefinite nature, either as to the purposes or beneficiaries,
that courts of equity will not carry them into effect, or which
are illegal in their nature and character, a resulting trust will
arise to the party creating the trust, or to his heirs and legal
representatives, as the case may be. . . . 'When there in a
consideration for the conveyance, and it is made upon a trust
which is void for uncertainty or otherwise fails, then the

grantee takes the beneficial interest.'" (citations omitted)).[16]

There are a couple of issues here.  There is an issue of whether Max provided consideration to Len for the conveyance of the Property.  The *Quitclaim Deed* states:

> WITNESSETH, That the said first party, for good consideration and for the sum of $100.00 paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the said second party forever, all the right, title, interest and claim which the said first party has in and to the following described parcel of land . . . .

Thus, the *Quitclaim Deed* provides that a consideration of $100 was paid by Max to Len for the Property.  The plaintiffs did not provide any evidence to contradict the *Quitclaim Deed*, and, therefore, the court finds that consideration was paid.

The next issue is whether $100 is valuable consideration to allow the Property to convey to Max.  *See Smith*, 226 A.2d at 340.  The court finds that $100 was valuable consideration, even though $100 is a nominal amount when considered against the value of the Property, because Len paid consideration of $10 when Max deeded the Property to Len in 2007.  In effect, Len purchased the

---

[16]   The court may appropriately look to Maryland law because "the common law of the District of Columbia encompasses all common law in force in Maryland in 1801, unless expressly repealed or modified."  *United States v. Jackson*, 528 A.2d 1211, 1215 (D.C. 1987); *see also* D.C. Code § 45-401(a).  "Maryland authorities expounding the common law of that state constitute powerful precedent in this jurisdiction . . . ."  *Little v. United States*, 709 A.2d 708, 711 (D.C. 1998).

54

Property for $10 in 2007 and sold the Property for $100 three years later in 2010.

Additionally, while the mortgage was in Len's name, Max made all payments on the mortgage, and there was an agreement between Len and Max that Max would take Len's name off the mortgage when Max was able to refinance the Property on his own credit. Moreover, Max paid all bills, taxes, and other expenses related to the Property, and maintained and kept up the Property. Len put no investment into the Property, and got more out of the Property than he put into it. Accordingly, the court finds that there was valuable consideration.

There is also an issue of whether the *Quitclaim Deed* is valid for misspelling the Trust's name as "1611 Riggs Property Trust." This was clearly a scrivener's error. The *Quitclaim Deed* makes clear that Len was transferring the Property to the 1610 Riggs Property Trust, with the correct address of "1610 Riggs Pl NW" and the title next to Max's name as "Trustee, 1610 Riggs Property Trust." Furthermore, Max, if he had recorded the deed, could easily have provided the Recorder of Deeds with a notice of a name change, and a confirmatory deed, correcting the

55

name on the *Quitclaim Deed*, under D.C. Code § 42-405,[17] at the
time he recorded the deed, or within 30 days thereafter. The
court does not find the deed defective for the misspelling of the
Trust's name.

Finally, there is the issue that Max failed to record the
*Quitclaim Deed*. This, however, does not invalidate the transfer.
A deed conveying property will be valid, even if that deed is
never recorded as required by D.C. Code § 42-401,[18] because that
section:

_____

[17]  D.C. Code § 42-405 provides in relevant part:

(a)  Any owner, as defined under § 47-802(5), of real
     property entitled to receive notices under Chapter
     8 of Title 47 shall notify the Office of Tax and
     Revenue of a name change or address change within
     30 days.
(b)  Any name change shall be evidenced by the recording
     of a confirmatory deed with the Recorder of Deeds
     and submission of supporting documents with and as
     required by the Recorder of Deeds relating to the
     applicable property.

[18]  D.C. Code § 42-401 provides:

Any deed conveying real property in the District, or
interest therein, or declaring or limiting any use or
trust thereof, executed and acknowledged and certified as
provided in §§ 42-101, 42-121 to 42-123, 42-306, and
42-602 and delivered to the person in whose favor the
same is executed, shall be held to take effect from the
date of the delivery thereof, except that as to creditors
and subsequent bona fide purchasers and mortgagees
without notice of said deed, and others interested in
said property, it shall only take effect from the time of
its delivery to the Recorder of Deeds for record.

56

deals with acknowledgment, certification, and recordation as protections for "creditors and subsequent bona fide purchasers,' . . . [t]hose requirements do not bar the operation of a signed, sealed, and delivered deed against parties and their assignees.

*Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 425 (D.C. 2006) (quoting *Clay Props., Inc. v. Wash. Post Co.*, 604 A.2d 890, 894 (D.C. 1992) (en banc) and *Munsey Trust Co. v. Alexander, Inc.*, 42 F.2d 604 (D.C. Cir. 1930)); *see also Juergens v. Urban Title Servs., Inc.*, 533 F. Supp. 2d 64, 79 (D.D.C. 2008).

Accordingly, the court finds that under District of Columbia law, the Property was conveyed to Max and he holds both the legal and beneficial interests in the Property.

IV

AVOIDANCE UNDER SECTION 544

The plaintiffs contend that if a trustee was appointed in Len's bankruptcy case, the trustee would be able to avoid the transfer of the Property under the so called "strong arm statute," 11 U.S.C. § 544(a)(3), because even if the Property did pass into the possession of Max in 2010, Max failed to record the *Quitclaim Deed*. Section 544(a)(3) provides:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . . a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law

57

permits such transfer to be perfected, that obtains the
status of a bona fide purchaser and has perfected such
transfer at the time of the commencement of the case,
whether or not such a purchaser exists.

"A bona fide purchaser is one 'who acquires an interest in
property for a valuable consideration and without notice of any
outstanding claims which are held against the property by third
parties.'" *Clay Props., Inc. v. Wash. Post Co.*, 604 A.2d 890,
894 (D.C. 1992) (en banc) (quoting 6A R. Powell & P. Rohan, *The
Law of Real Property* § 904[2][b], at 82-10 (1989)).  In the
District of Columbia, a bona fide purchaser's claim over property
is superior to a nonrecorded deed conveying interest in the
property.  D.C. § 42-401.  However, "[w]hat constitutes notice
varies among states and the trustee's status under § 544(a) is
governed by state substantive law governing notice." *Webster v.
Hope (In re Hope)*, 231 B.R. 403, 423-24 (Bankr. D.D.C. 1999).
Under District of Columbia law, a bona fide purchaser is subject
to three types of notice: actual, constructive and inquiry. *Clay
Props.*, 604 A.2d at 895.  "A purchaser is held to be on inquiry
notice where he or she is aware of circumstances which generate
enough uncertainty about the state of a title that a person of
ordinary prudence would inquire further about those
circumstances." *Id.*

   The *Clay Props.* court recognized that mere possession would

not give rise to inquiry notice except where "such possession [was] '*sufficiently* distinct and unequivocal *so as to put the purchaser on his guard.*'"  *Id.* at 897 (quoting *Hayward v. Mayse*, 1 App. D.C. 133, 140 (1893)) (emphasis in original).  There is thus an issue of fact as to whether a hypothetical purchaser of the Property would have inquiry notice of Max's ownership of the Property.  However, that is an issue of fact that must be decided by the U.S. Bankruptcy Court for the Middle District of Tennessee.  How a judgment regarding the right of Len's estate to recover the Property under § 544 would affect Max's homestead exemption in this case is an issue for another day.  The issue before the court now is whether Max can claim the homestead exemption over the Property, and for the reasons already stated, the court holds that he can.

V

CONCLUSION

For the foregoing reasons, it is

ORDERED that the plaintiffs' *Objection to the Debtor's Claim of Exemption* (Dkt. No. 44) is overruled.

[Signed and dated above.]

Copies to: Recipients of e-notifications of orders.

59

Close
Open
Save
Print

2015 CA 008061 B        BREKELMANS, ESTATE OF NINA et al    Vs.   SALAS, LEN et al      BFH

Filed        04/05/2018                              # of Pages      1
Docket Entry  Judgment                    >

1 Add Record                                            Journal Name
2 Image                                                 Journal Book
3 Scan                                                  Starting Page
4 Dismiss Costs    Attorney                  >          Docket Nbr
5 Parties          Participants  1__         Sealed     Document Nbr
6 Financial                                  Create   F    ImagesF    File Reference
  Summary                                    Notice                   Nbr
7 System
  Notification
8 Docket ID        Description
  Display
9 Condition        Judgment
10 AR Assignment

                   Judgment Amount:        7,500,000.00
                   Judgment Total:         7,500,000.00

                   Terms: Judgment found in favor of Plaintiff: ESTATE OF NINA BREKELMANS, et al and against
                   LEN SALAS and MAX SALAS in the amount of $7,500,000.00 with interest at the statutory rate
                   and cost of the action.

                   Judgment Type: Judgment from Jury Trial
                   Judgment Date: 04/04/2018

                   Judgment For: BREKELMANS, ESTATE OF NINA - Plaintiff

                   Judgment Against: SALAS, LEN - Defendant

                                     SALAS, MAX E. - Defendant

                   Judgment Balance:        7,500,000.00
                   Case Total:                      7,500,000.00
                   Case Balance:            7,500,000.00

                   Entered  DARBYK       Updated   DARBYK        Updated    04/05/2018
                   By:                   By:                     Date:      16:38



A TRUE COPY
TEST:
Clerk, Superior Court of
the District of Columbia

By

Doc #: 2018036535 Fees: $31.50
04/11/2018 11:46 AM   Pages: 1
Filed and Recorded in Official Records of
WASH DC RECORDER OF DEEDS IDA WILLIAMS

RECORDING FEES        $25.00
SURCHARGE             $6.50

2015 CA 008054 B     MCLOUGHLIN, ESTATE OF MICHAEL PATRICK et al   Vs.   SALAS, LEN et al
     BFH

Filed      04/04/2018             # of Pages      1
Docket Entry   Judgment                  >

---

1 Add Record                                                Journal Name
2 Image                                                    Journal Book
3 Scan                                                       Starting Page
4 Dismiss Costs     Attorney                          >            Docket Nbr
5 Parties            Participants   !_         Sealed            Document Nbr
6 Financial                                      Create       F     ImagesF    File Reference
   Summary                                               Notice                          Nbr
7 System
   Notification
8 Docket ID           Description
   Display
9 Condition          Judgment
10 AR Assignment

Judgment Amount:          7,700,000.00
Judgment Total:             7,700,000.00

Terms: Judgment found in favor of Plaintiffs: ESTATE OF MICHAEL PATRICK MCLOUGHLIN, et al
and against LEN SALAS and MAX SALAS in the amount of $7,700,000.00 with interest at the
statutory rate and cost of the action.

Judgment Type: Judgment from Jury Trial
Judgment Date: 04/04/2018

Judgment For: MCLOUGHLIN, ESTATE OF MICHAEL PATRICK - Plaintiff

Judgment Against: SALAS, LEN - Defendant

                 SALAS, MAX E. - Defendant

Judgment Balance:         7,700,000.00
Case Total:               7,700,000.00
Case Balance:            7,700,000.00

Entered   DARBYK       Updated    DARBYK       Updated    04/05/2018
By:                       By:                          Date:        16:44

2018036557-1



Doc #: 2018036557  Fees: $31.50
04/11/2018 11:47 AM  Pages: 1
Filed and Recorded in Official Records of
WASH DC RECORDER OF DEEDS IDA WILLIAMS

RECORDING FEES       $25.00
SURCHARGE            $6.50



# J&M Abstracts, Inc.

## Property:

Lot 30, Square 178, Plat 12/30, Washington D.C.

**Address:** 1610 Riggs Place, N.W.

## Fee Simple Vested in:

Len Salas

**By Deed Dated** 4/16/2007     **Rec.:** 4/24/2007     **Lib.:**     **Fol.:**     **Ins #:** 55317

## Subject To:

**D/T #1of1**   **From** *(Fee ☑ )*

To:   Joseph V. Buonassissi, II, Richard E. Henning, Jr. and/or  Richard A. Nash

**Dated:** 4/16/2007   **Rec.:** 4/24/2007   **Lib.:**   **Fol.:**   **Ins #:** 55319   **Amt.:** $870,000.00

**Securing:** "MERS", as nominee for SUNTRUST MORTGAGE, INC.

1.) Assignment #34873 (4/14/15).   2.) Appt. of Sub. Trustee #9500 (2/1/16).

**From** *(Fee ☐ )*                    N/A

To:

**Dated:** _____   **Rec.:** _____   **Lib.:** _____   **Fol.** _____   **Ins #:** _____   **Amt.:** _____

**Securing:** _____

**From** *(Fee ☐ )*

To:

**Dated:** _____   **Rec.:** _____   **Lib.:** _____   **Fol.** _____   **Ins #:** _____   **Amt.:** _____

**Securing:** _____

## Equity, Judgments and  Liens:

1.) Housing Lien #60834 (6/17/15) on caption property.   2.) SCJ #36535 (4/11/18) on "Len Salas", etal.   3.) SCJ #36557 (4/11/18) on "Len Salas", etal.   4.) The following court items appeaar in the Superiorr Court & District Court websites on "Len Salas":  #2015 CA 008054 B, #2015 CA 008061 B, #2016 CA 003334 R(RP) and BKCY #3:18-bk-02662.  (Printouts attached)

## Restrictions on Plat:

None of Record.

## Rights of Way:

None of Record.

## Covenants:

None of Record.

## Remarks:

1.) NOTE: J&M ABSTRACTS, INC. BEARS NO RESPONSIBILITY  FOR ITEMS INDEXED INCORRECTLY AT THE RECORDER OF DEEDS.  2.) Prior Deeds #28816 (5/8/95) and #55316 (4/24/07), attached for info only.   3.) This report is a rundown from 12/26/2017, the "thru date" of your back case #Salas (J&M #18-0084).  However, this report shows all open items from said back case.  4.) This report was a special request order from Bayer & Kaufman to update the property thru 5/1/2018 ONLY.  This report makes no certification as to any documents recorded after said date and makes no certification as to any documents recorded on any names other than the vested owner, "Len Sales".

| | | | |
|---|---|---|---|
| **Fee:** | $135.00 | ***This  does not represent an opinion of title.*** | **Mailing Address:** |
| **Copies:** | $0.00 | | |
| **Misc:** | $0.00 | **Examination Report** | 14626 Main Street, Suite 204 |
| **Recording:** | $0.00 | **Abstracted by:**   Michael P. Lemon | Upper Marlboro, MD. 20772 |
| **Total:** | **$135.00** | **For:**   Bayer & Kaufman, LLP | **Phone:** (202) 547-6632   **Fax:** (301) 627-5704 |

NOTE: Real Estate Taxes, Special Assessments, Water/Sewer Service charges and domestic relations have not been determined and are not a subject of this report.

No Consideration Between Father and Son
Sussex Title, LLC
File No. **200702-30**

This Deed, MADE THIS ⟨16⟩ day of **April, 2007**, by and between **Max E. Salas**, Sole Owner party(ies) of the first part, Grantor(s); and **Len Salas**, Sole Owner, party(ies) of the second part, Grantee(s). Whereas Max E. Salas and Len Salas are Father and Son, and therefore exempt from recordation and transfer tax.

## Witnesseth

That for and in consideration of the sum of Ten Dollars and **00/100** ($10.00), which includes the amount of any outstanding Mortgage or Deed of Trust, if any, the receipt whereof is hereby acknowledged, the said Grantor does grant and convey to the said **Len Salas**, as sole owner, their assigns, the survivor of them and the survivor's personal representatives and assigns in fee simple, all that lot of ground situate in the **Disctrict of Columbia** and described as follows, that is to say:

**Lot** numbered Thirty (30) in Square numbered One Hundred Seventy-eight (178) in a subdivision made by Laurason Riggs, Executor, as per plat recorded in Libor 12 at folio 30 among the Records of the Office of the Surveyor for the District of Columbia.

Property Address: 1610 Riggs Place, Northwest, Washington, DC 20009

Tax id: Square 0178 Lot 0030

Being the same property described in Instrument No. 9500028816

Together with the buildings and improvements thereon erected, made or being; and all and every, the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging, or in anywise appertaining.

To Have and To Hold the said tract of ground and premises above described and mentioned, and hereby intended to be conveyed, together with the rights, privileges, appurtenances and advantages thereto belonging or appertaining unto and to the proper use and benefit of the said **Len Salas,** as sole owner, their assigns, the survivor of them and the survivor's personal representatives and assigns of the survivor, in fee simple.

And the said party of the first part hereby covenants that he/she/they have/have not done or suffered to be done any act, matter or thing whatsoever, to encumber the property hereby conveyed; that he/she/they will warrant specially the property hereby granted; and that he/she/they will execute such further assurances of the same as may be requisite.

As Witness the hand and seal of said Grantors, the day and year first above written.

WITNESS:

_____     _Max E. Salas_ {Seal}
                                     Max E. Salas

_____     _____ {Seal}


STATE OF **Maryland**                to wit:  Montgomery County

I HEREBY CERTIFY, That on this 16 day of **April, 2007**, before me, the subscriber, a Notary Public of the State and County aforesaid, personally appeared **Max E. Salas,** the Grantor(s) herein, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged the same for the purposes therein contained, and further acknowledged the foregoing Deed to be his/her/their act, and in my presence signed and sealed the same, giving oath under penalties of perjury that the consideration recited herein is correct.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My commission expires:

ANTUANETTE REQUEJO
NOTARY PUBLIC
MY
COMMISSION
EXPIRES
8/21/2010
MONTGOMERY COUNTY, MD

AFTER RECORDING, PLEASE RETURN TO:
**Sussex Title, LLC**
**8230 Boone Blvd, Suite 445**
**Vienna, Virginia 22182**
**Order Number: 200702-30**

I (WE) THE OWNER(S) OF THE REAL PROPERTY DESCRIBED WITHIN CERTIFY, SUBJECT TO CRIMINAL PENALTIES FOR MAKING FALSE STATEMENTS PURSUANT TO SECTION 404 OF THE DISTRICT OF COLUMBIA THEFT AND WHITE COLLAR CRIMES ACT OF 1982, EFFECTIVE DECEMBER 1, 1982 (DC LAW 4-164; DC CODE 22-2514), THAT THE REAL PROPERTY DESCRIBED WITHIN IS EITHER CLASS 1 PROPERTY OR CLASS 2 PROPERTY, AS THOSE CLASSES OF PROPERTY ARE ESTABLISHED PURSUANT TO SECTION 412A OF THE DISTRICT OF COLUMBIA REAL PROPERTY TAX REVISION ACT OF 1974, APPROVED SEPTEMBER 3, 1974 (88 STAT. 1051; DC CODE 47-813), WITH 5 OR FEWER UNITS.

_____
Max E. Salas

STATE OF __MARYLAND__ COUNTY OF __MONTGOMERY__

I, __Antuanette Requejo__, A NOTARY PUBLIC IN AND FOR THE __STATE AND COUNTY AFORESAID__, DO HEREBY CERTIFY THAT __Max Salas__ WHO EXECUTED THE FOREGOING AND ATTACHED DEED OF TRUST, BEARING THE DATE OF THE __16__ DAY OF April, 2007, PERSONALLY APPEARED BEFORE ME IN SAID DISTRICT, THE SAID __Max Salas__ BEING PERSONALLY WELL-KNOWN TO AS (OR PROVED BY THE OATH OF RELIABLE WITNESS TO BE) THE PERSON WHO EXECUTED THE SAID DEED OF TRUST AND ACKNOWLEDGED THE SAME TO BE HIS/HER ACT AND DEED, AND HE/SHE DELIVERED THE SAME AS SUCH.

GIVEN UNDER MY AND SEAL THIS __16__ DAY OF April, 2007.

_____
NOTARY PUBLIC

ANTUANETTE REQUEJO
NOTARY PUBLIC
MY
COMMISSION
EXPIRES
8/21/2010
MONTGOMERY COUNTY, MD

MY COMMISSION EXPIRES: _____

Doc# 2007055317
Filed & Recorded
04/24/2007   18:29:58 PM
LARRY TODD
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
  E-RECORD                    $        27.00
  ESURCHARGE                  $         6.50
Total:                        $        33.50

Doc# 2007055319

After recording please return to:

SUNTRUST MORTGAGE, INC.
*[Company Name]*

RVW 5093
*[Name of Natural Person]*

1001 SEMMES AVENUE
*[Street Address]*

RICHMOND, VIRGINIA 23224
*[City, State Zip Code]*

_____ *[Space Above This Line For Recording Data]* _____

Loan No.: 0205069438

☐ "X" Box if "Purchase Money Deed of Trust"

# DEED OF TRUST

MIN 100010402050694383

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 16, 2007, together with all Riders to this document.

(B) "Borrower" is LEN SALAS, SINGLE MAN. Borrower's address is 1510 COLUMBIA ROAD NW, WASHINGTON, DC 20009. Borrower is the trustor under this Security Instrument.

(C) "Lender" is SUNTRUST MORTGAGE, INC.. Lender is a corporation organized and existing under the laws of THE COMMONWEALTH OF VIRGINIA. Lender's address is 901 SEMMES AVENUE, RICHMOND, VA 23224.

(D) "Trustee" is JOSEPH V. BUONASSISSI, II, RICHARD E. HENNING, JR. AND/OR RICHARD A. NASH. Trustee's address is 11350 RANDOM HILLS ROAD, SUITE 600, FAIRFAX, VIRGINIA 22030, ,.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

---

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3009 05/02
—THE COMPLIANCE SOURCE, INC.—                                    Page 1 of 14                                           14301DC (Rev. 05/02)
www.compliancesource.com                                                                                      © 2002, The Compliance Source, Inc.



+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 1 + 1 4

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 244 of 579 PageID #: 1364

1259

**(F)** "**Note**" means the promissory note signed by Borrower and dated **April 16, 2007.** The Note states that Borrower owes Lender **Eight Hundred Seventy Thousand and 00/100ths** Dollars (U.S. **$870,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2037.**

**(G)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☐ Other(s) *[specify]* | | |

**(J)** "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions; transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** "**Escrow Items**" means those items that are described in Section 3.

**(N)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT** MERS Modified Form 3009 05/02
—THE COMPLIANCE SOURCE, INC.— Page 2 of 14 14301DC (Rev. 05/02)
www.compliancesource.com © 2002, The Compliance Source, Inc.

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 2 + 1 4

(Q)     "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)     "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the CITY of DISTRICT OF COLUMBIA:
        *[Type of Recording Jurisdiction]*        *[Name of Recording Jurisdiction]*

**SEE ATTACHED SCHEDULE A**

which currently has the address of **1610 RIGGS PLACE NW**
                                        *[Street]*
Washington, District of Columbia **20009**                          ("Property Address"):
                        *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.



BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3009  05/02
—THE COMPLIANCE SOURCE, INC.—                            Page 4 of 14                                        14301DC (Rev. 05/02)
        www.compliancesource.com                                                                          © 2002, The Compliance Source, Inc.

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 4 + 1 4

Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends

---

District of Columbia Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     MERS Modified Form 3009 05/02
—THE COMPLIANCE SOURCE, INC.—                                    Page 5 of 14                                                    14301DC (Rev. 05/02)
www.compliancesource.com                                                                                              © 2002, The Compliance Source, Inc.



Case 3:23-cv-00987     Document 7-3     Filed 10/04/23     Page 248 of 579 PageID #: 1368

1263

against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien, which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     MERS Modified Form 3009 05/02
—THE COMPLIANCE SOURCE, INC.—                                     Page 6 of 14                                              14301DC (Rev. 05/02)
www.compliancesource.com                                                                                              © 2002, The Compliance Source, Inc.

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 6 + 1 4

shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 7 + 1 4

Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance,**

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 8 + 1 4

to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

      **11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

      If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

      In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

      In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

      In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

      If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

      Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

      All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

      **12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   MERS Modified Form 3009 05/02
—THE COMPLIANCE SOURCE, INC.—                  Page 9 of 14                     14301DC (Rev. 05/02)
www.compliancesource.com                                                  © 2002, The Compliance Source, Inc.

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 9 + 1 4

any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3009 05/02
—THE COMPLIANCE SOURCE, INC.—                                    Page 10 of 14                                    1430IDC (Rev. 05/02)
www.compliancesource.com                                                                              © 2002, The Compliance Source, Inc.



```
+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 1 0 + 1 4
```

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3009 05/02
—THE COMPLIANCE SOURCE, INC.—                                 Page 11 of 14                                                   14301DC (Rev. 05/02)
www.compliancesource.com                                                                                              © 2002, The Compliance Source, Inc.

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 1 1 + 1 4

any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



```
+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 1 2 + 1 4
```

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 255 of 579 PageID #: 1375

1270

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.00% of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3009  05/02
—THE COMPLIANCE SOURCE, INC.—                    Page 13 of 14                              14301DC (Rev. 05/02)
www.compliancesource.com                                                          © 2002, The Compliance Source, Inc.



```
+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 1 3 + 1 4
```

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 256 of 579 PageID #: 1376

1271

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                    LEN SALAS                    -Borrower
                                                                                 [Printed Name]

                                                    Address
                                                    1510 COLUMBIA ROAD NW,
                                                    WASHINGTON, DC  20009

_____                    _____ (Seal)
                                                                                 -Borrower
                                                                                 [Printed Name]

                                                    Address

                                                    _____ (Seal)
                                                                                 -Borrower
                                                                                 [Printed Name]

                                                    Address

                                                    _____ (Seal)
                                                                                 -Borrower
                                                                                 [Printed Name]

                                                    Address

MARYLAND                    MONTGOMERY COUNTY
District of Columbia:

This instrument was acknowledged before me on April 16, 2007    by LEN SALAS.

(Seal)                                              _____
                                                    Notary Public
                                                    My Commission Expires: 8/21/2010

ANTUANETTE REQUEJO
NOTARY PUBLIC
MY
COMMISSION
EXPIRES
8/21/2010
MONTGOMERY COUNTY, MD

District of Columbia Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3009  05/02
—THE COMPLIANCE SOURCE, INC.—                    Page 14 of 14                    14301DC (Rev. 05/02)
www.compliancesource.com                                                         © 2002, The Compliance Source, Inc.

+ 0 2 0 5 0 6 9 4 3 8 + 0 0 A D + 1 4 + 1 4

I (WE) THE OWNER(S) OF THE REAL PROPERTY DESCRIBED WITHIN CERTIFY, SUBJECT TO CRIMINAL PENALTIES FOR MAKING FALSE STATEMENTS PURSUANT TO SECTION 404 OF THE DISTRICT OF COLUMBIA THEFT AND WHITE COLLAR CRIMES ACT OF 1982, EFFECTIVE DECEMBER 1, 1982 (DC LAW 4-164; DC CODE 22-2514), THAT THE REAL PROPERTY DESCRIBED WITHIN IS EITHER CLASS 1 PROPERTY OR CLASS 2 PROPERTY, AS THOSE CLASSES OF PROPERTY ARE ESTABLISHED PURSUANT TO SECTION 412A OF THE DISTRICT OF COLUMBIA REAL PROPERTY TAX REVISION ACT OF 1974, APPROVED SEPTEMBER 3, 1974 (88 STAT. 1051; DC CODE 47-813), WITH 5 OR FEWER UNITS.

_____
Len Salas

STATE OF _MARYLAND_____ COUNTY OF _MONTGOMERY_

I, _____, A NOTARY PUBLIC IN AND FOR THE STATE AND COUNTY AFORESAID , DO HEREBY CERTIFY THAT _Len Salas,_ WHO EXECUTED THE FOREGOING AND ATTACHED DEED OF TRUST, BEARING THE DATE OF THE _14_ DAY OF April, 2007, PERSONALLY APPEARED BEFORE ME IN SAID DISTRICT, THE SAID _Len Salas_ BEING PERSONALLY WELL-KNOWN TO AS (OR PROVED BY THE OATH OF RELIABLE WITNESS TO BE) THE PERSON WHO EXECUTED THE SAID DEED OF TRUST AND ACKNOWLEDGED THE SAME TO BE HIS/HER ACT AND DEED, AND HE/SHE DELIVERED THE SAME AS SUCH.

GIVEN UNDER MY AND SEAL THIS _16th_ DAY OF April, 2007.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES: _____

ANTUANETTE REQUEJO
NOTARY PUBLIC
MY COMMISSION EXPIRES
8/21/2010
MONTGOMERY COUNTY, MD

Exhibit A

Lot numbered Thirty (30) in Square numbered One Hundred Seventy-eight (178) in a subdivision made by Laurason Riggs, Executor, as per plat recorded in Libor 12 at folio 30 among the Records of the Office of the Surveyor for the District of Columbia.

1610 Riggs Place, Northwest, Washington, District of Columbia 20009

Tax id: Square 0178 Lot 0030

```
Doc# 2007055319
Filed & Recorded
04/24/2007   18:30:48 PM
LARRY TODD
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
  E-RECORD                 $      118.00
  ESURCHARGE               $        6.50
Total:                     $      124.50
```



2015034873-2

Recording Requested By:
SUNTRUST MORTGAGE, INC.

When Recorded Return To:

Faith Tribbey
SUNTRUST MORTGAGE, INC.
1001 SEMMES AVENUE
RVW 5303
RICHMOND, VA 23224

## CORPORATE ASSIGNMENT OF DEED OF TRUST

**District of Columbia, District of Columbia**
**SELLER'S SERVICING #:0205069438 "SALAS"**

**MIN #: 100010402050694383 SIS #: 1-888-679-6377**

Date of Assignment: April 6th, 2015
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR SUNTRUST MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS at P.O. BOX 2026, FLINT, MI 48501-2026
Assignee: U.S BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE OF BAFC 2007-6 at 4050 REGENT BLVD, IRVING, TX 75063

Executed By: LEN SALAS, SINGLE MAN To: SUNTRUST MORTGAGE, INC
Date of Deed of Trust: 04/16/2007 Recorded: 04/24/2007 in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.: 2007055319' In District of Columbia, State of District of Columbia.

Property Address: 1610 RIGGS PLACE NW, WASHINGTON, DC 20009

Square Number: 0178,    Lot Number: 0030 ✓
Legal: See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

    KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Deed of Trust having an original principal sum of $870,000.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Deed of Trust.

    TO HAVE AND TO HOLD the said Deed of Trust, and the said property unto the said Assignee forever, subject to the terms contained in said Deed of Trust. IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above written:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR SUNTRUST MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS
On _____7-8-15_____

By: _____, Vice
President      **Doyle Mitchell    Vice President**

*(MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. CORPORATE SEAL 1999 DELAWARE seal)*

COMMONWEALTH OF Virginia
COUNTY OF Richmond (City)
On 4-8-2015, before me, Dionne Anntonette Holmes-Lee, a Notary Public in and for Richmond (City) in the State of Virginia, personally appeared Doyle Mitchell, Vice President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_Dionne Anntonette Holmes-Lee_
Notary Expires: 4/00/2017

*(Notary seal: DIONNE ANNTONETTE HOLMES-LEE Notary Public Commonwealth of Virginia 7547447 My Commission Expires Apr 30, 2017)*
(This area for notarial seal)

*FST*FS1SUNT*04/06/2015 07 53 49 AM* SUNT09SUNTA0000000000000001920976* DCWASH* 0205069438 DCSTATE_TRUST_ASSIGN_ASSN *FST*FS1SUNT*

· ¶10

Exhibit A

Lot numbered Thirty (30) in Square numbered One Hundred Seventy-eight (178) in a subdivision made by Laurason Riggs, Executor, as per plat recorded in Libor 12 at folio 30 among the Records of the Office of the Surveyor for the District of Columbia.

1610 Riggs Place, Northwest, Washington, District of Columbia 20009

Tax id: Square 0178 Lot 0030

Doc #: 2015034873 Fees: $31.50
04/14/2015 09:37 AM   Pages: 2
Filed and Recorded in Official Records of
WASH DC RECORDER OF DEEDS IDA WILLIAMS


RECORDING FEES        $25.00
SURCHARGE             $6.50

BWW#: 205342
**Square 0178 Lot 0030**

AFTER RECORDING, PLEASE RETURN TO:

BWW Law Group, LLC
6003 Executive Blvd, Ste 101
Rockville, MD 20852

### APPOINTMENT OF SUBSTITUTE TRUSTEES

WHEREAS, by a Deed of Trust dated April 16, 2007 and recorded among the Land Records of the District of Columbia on April 24, 2007 bearing Instrument Number 2007055319, Len Salas did grant and convey to Joseph V. Buonassissi II, Richard E. Henning, Jr. and/or Richard A. Nash, Trustee(s), the real property described in said Deed of Trust to secure an indebtedness evidenced by a promissory note of the same date and also described in said Deed of Trust, and;

WHEREAS, under the terms of the Deed of Trust, the holder of the beneficial interest in the Deed of Trust may remove the trustee(s) and appoint successor trustee(s), and;

WHEREAS, SunTrust Mortgage, Inc. is the holder of the beneficial interest in the Deed of trust by virtue of being the holder or agent of the holder of the Note secured by the aforementioned Deed of Trust.

NOW THEREFORE, by virtue of the authority granted in the aforementioned Deed of Trust, the undersigned hereby appoints Carrie M. Ward, Howard N. Bierman, Jacob Geesing, Jason T. Kutcher, Joshua P. Coleman, Joseph A. Delozier, Andrew J. Brenner and Angela M. Dawkins as Substitute Trustees under said Deed of Trust, any of whom may act independently, in the place and stead of the trustee(s) originally named therein or in place of any other trustee(s) who have heretofore been substituted for the originally named trustee(s), the said Substitute Trustees being vested with all of the right, title, and interest, and clothed with all the rights, power, and privileges of the trustee(s) by the terms of said Deed of Trust and by applicable law.

**Property address: 1610 Riggs Place North West, Washington, DC 20001**
**Square/ Lot Number: Square 0178/ Lot 0030**

U.S. Bank National Association, not in its individual capacity, but solely as trustee of BAFC 2007-6, by SunTrust Mortgage, Inc., its attorney in fact

Name: Tamore Brown
Title: Officer
Date: 1·27·16

STATE OF VIRGINIA )
CITY OF RICHMOND ) ss.

On this 27TH day of JANUARY, 20 16, before me, personally appeared Tamore Brown, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to within the instrument and acknowledged that he/she/they executed the same for purposes therein contained.

Given under my hand and seal.

Notary Public

My Commission Expires: 11/30/2019

> DEAN LIVERMAN
> Notary Public
> Commonwealth of Virginia
> 7509255
> My Commission Expires Nov 30, 2019

**Doc #: 2016009500**
**Filed & Recorded**
**02/01/2016 04:14 PM**
**IDA WILLIAMS**
**RECORDER OF DEEDS**
**WASH DC RECORDER OF DEEDS**
  **RECORDING FEES**      **$25.00**
  **SURCHARGE**         **$6.50**
**TOTAL:**              **$31.50**

Doc #: 2015060834
Filed & Recorded
06/17/2015 12:48 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS



**GOVERNMENT OF THE DISTRICT OF
COLUMBIA**
DEPARTMENT OF CONSUMER AND
REGULATORY AFFAIRS
HOUSING REGULATION ADMINISTRATION
**CERTIFICATE OF DELINQUENT COSTS
FOR CORRECTION OF WRONGFUL HOUSING CONDITIONS**

DISTRICT OF COLUMBIA

vs.

Len Salas
1610 Riggs Pl NW
Washington, DC 20009

Date: 6/17/2015
Square - 0178  Suffix -  Lot - 0030
Assmt Control #: Sa15-00103
Address of Premises:
1610 Riggs Pl NW

This Certificate is filed under the authority of and pursuant to Title 42, Chapter 42,
Section 3131 of the D.C. Code, 2002 Edition, as amended. The District of Columbia
shall have a continuing lien for taxes against the property for correction of wrongful
conditions including administrative, contracting, and advertising costs, if any.

This Certificate, from the date of its filing, has the force and effect, as against the
aforesaid delinquent party or parties, of a lien created by a judgment granted by the
Superior Court of the District of Columbia. This lien remains in force and effect
until all fines set forth below, together with penalties and interest thereon, shall be
paid.

**Assessed Amount: $1456.16**

By:

Paul E. Waters, Esq.
Deputy Director
Enforcement and Legislative Affairs

Case 3:23-cv-00987   Document 7-3   Filed 10/04/23   Page 265 of 579 PageID #: 1385

1280

2015 CA 008061 B    BREKELMANS, ESTATE OF NINA et al    Vs.   SALAS, LEN et al    BFH

Filed        04/05/2018                          # of Pages    1
Docket Entry  Judgment                    >

1 Add Record
2 Image
3 Scan
4 Dismiss Costs    Attorney                              >
5 Parties          Participants  [_                    Sealed
6 Financial                                            Create      F   ImagesF
  Summary                                              Notice
7 System
  Notification
8 Docket ID        Description
  Display
9 Condition        Judgment
10 AR Assignment

Journal Name
Journal Book
Starting Page
Docket Nbr
Document Nbr
File Reference
Nbr

Judgment Amount:           7,500,000.00
Judgment Total:            7,500,000.00

Terms: Judgment found in favor of Plaintiff: ESTATE OF NINA BREKELMANS, et al and against
LEN SALAS and MAX SALAS in the amount of $7,500,000.00 with interest at the statutory rate
and cost of the action.

Judgment Type: Judgment from Jury Trial
Judgment Date: 04/04/2018

Judgment For: BREKELMANS, ESTATE OF NINA - Plaintiff

Judgment Against: SALAS, LEN - Defendant

                  SALAS, MAX E. - Defendant

Judgment Balance:          7,500,000.00
Case Total:                     7,500,000.00
Case Balance:              7,500,000.00

Entered   DARBYK        Updated   DARBYK        Updated    04/05/2018
By:                     By:                     Date:      16:38



A TRUE COPY
TEST:
Clerk, Superior Court of
the District of Columbia
By

Doc #: 2018036535  Fees: $31.50
04/11/2018 11:46 AM   Pages: 1
Filed and Recorded in Official Records of
WASH DC RECORDER OF DEEDS IDA WILLIAMS

RECORDING FEES        $25.00
SURCHARGE             $6.50

C-lose
2015 CA 008054 B    MCLOUGHLIN, ESTATE OF MICHAEL PATRICK et al  Vs.  SALAS, LEN et al
       BFH
%Open
%Save
%Print      Filed      04/04/2018              # of Pages     1
      Docket Entry  Judgment             >

1 Add Record                                 Journal Name
2 Image                                    Journal Book
3 Scan                                     Starting Page
4 Dismiss Costs   Attorney                   >       Docket Nbr
5 Parties        Participants !_      Sealed            Document Nbr
6 Financial                        Create    F    ImagesF    File Reference
  Summary                      Notice                Nbr
7 System
  Notification
8 Docket ID     Description
  Display
9 Condition     Judgment
10 AR Assignment

                 Judgment Amount:       7,700,000.00
                 Judgment Total:         7,700,000.00

                 Terms: Judgment found in favor of Plaintiffs: ESTATE OF MICHAEL PATRICK MCLOUGHLIN, et al
                 and against LEN SALAS and MAX SALAS in the amount of $7,700,000.00 with interest at the
                 statutory rate and cost of the action.

                 Judgment Type: Judgment from Jury Trial
                 Judgment Date: 04/04/2018

                 Judgment For: MCLOUGHLIN, ESTATE OF MICHAEL PATRICK - Plaintiff

                 Judgment Against: SALAS, LEN - Defendant

                               SALAS, MAX E. - Defendant

                 Judgment Balance:      7,700,000.00
                 Case Total:            7,700,000.00
                 Case Balance:         7,700,000.00

                 Entered  DARBYK      Updated    DARBYK       Updated   04/05/2018
                 By:                 By:                   Date:     16:44

2018036557-1



A TRUE COPY
TEST:
Clerk, Superior Court
the District of
By

Doc #: 2018036557 Fees: $31.50
04/11/2018 11:47 AM   Pages: 1
Filed and Recorded in Official Records of
WASH DC RECORDER OF DEEDS IDA WILLIAMS

RECORDING FEES      $25.00
SURCHARGE          $6.50

Doc# 2007055316
Filed & Recorded
04/24/2007   18:28:48 PM
LARRY TODD
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
  E-RECORD                   $        27.00
  ESURCHARGE                 $         6.50
Total:                       $        33.50

·00·86·00275 *192*

After recording please mail to:
Vickie L. Bruff
1610 Riggs Place, NW
Washington, DC 20009

955790MP/JM495-033-MP
1610 Riggs Place, NW

THIS DEED, made this 27th day of April, 1995, by and between David Wilhelm and Degee Wilhelm, Tenants by the Entirety, parties of the first part, and Vickie L. Bruff, a single person, party of the second part: *VB*

WITNESSETH, that in consideration of Five Hundred Thousand and 00/100 ($500,000.00), the said parties of the first part do hereby grant unto the party of the second part in fee simple as Sole Owner, all that piece or parcel of the land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, described as follows, to wit:

Lot numbered Thirty (30) in Square numbered One Hundred Seventy-eight (178) in a subdivision made by Leurason Riggs, Executor, as per plat recorded in Liber 12 at folio 30 among the Records of the Office of the Surveyor for the District of Columbia.

AND the said parties of the first part covenant that they will warrant specially the property hereby conveyed; and that they will execute such further assurances of said land as may be requisite.

WITNESS their hands and seals the day and year hereinbefore written.

_____ [Seal]      _____ [Seal]
Degee Wilhelm                 David Wilhelm

State of Illinois
County of                    ss:

I, the undersigned, a Notary Public in and for the jurisdiction aforesaid do hereby certify that David Wilhelm and Degee Wilhelm who are personally well known to me as the parties who executed the foregoing and annexed Deed bearing date on the 27th day of April, 1995, personally appeared before me in said district and acknowledged the same to be their act and deed.

Witness my hand and official seal this ___ day of _____, 1995.

"OFFICIAL SEAL"
DEBORAH A. SWADE
Notary Public, State of Illinois
My Commission Expires 8/28/97

_____
Notary Public
My Commission Expires:

[Notarial Seal]

MORTON H. PRESS
ATTORNEY AT LAW
2100 Wisconsin Ave. N.W.
Washington D.C. 20007
(202) 333-6663

9500028816  95 MAY -8 PM 1:02

Case 3:23-cv-00987   Document 7-3   Filed 10/04/23   Page 269 of 579 PageID #: 1389
1284

Doc #: 2015060834
Filed & Recorded
06/17/2015 12:48 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
DEPARTMENT OF CONSUMER AND
REGULATORY AFFAIRS
HOUSING REGULATION ADMINISTRATION

**CERTIFICATE OF DELINQUENT COSTS
FOR CORRECTION OF WRONGFUL HOUSING CONDITIONS**

DISTRICT OF COLUMBIA

vs.

Len Salas
1610 Riggs Pl NW
Washington, DC 20009

Date: 6/17/2015
Square - 0178   Suffix -   Lot - 0030
Assmt Control #:  Sa15-00103
Address of Premises:
1610 Riggs Pl NW

This Certificate is filed under the authority of and pursuant to Title 42, Chapter 42,
Section 3131 of the D.C. Code, 2002 Edition, as amended. The District of Columbia
shall have a continuing lien for taxes against the property for correction of wrongful
conditions including administrative, contracting, and advertising costs, if any.

This Certificate, from the date of its filing, has the force and effect, as against the
aforesaid delinquent party or parties, of a lien created by a judgment granted by the
Superior Court of the District of Columbia. This lien remains in force and effect
until all fines set forth below, together with penalties and interest thereon, shall be
paid.

**Assessed Amount: $1456.16**

By:

*Paul E. Waters*

Paul E. Waters, Esq.
Deputy Director
Enforcement and Legislative Affairs

No Consideration Between Husband and Wife
Sussex Title, LLC
File No. 200702-30

## This Deed, MADE THIS 1✓ day of **April, 2007**, by and between **Vickie L. Bruff**, sole owner, party(ies) of the first part, Grantor(s); and **Max E. Salas**, sole owner, party(ies) of the second part, Grantee(s). Where as Vickie L. Bruff is also known on record as Vickie Salas per marriage certificate dated 03/01/2002 recorded 03/04/2002 in Instrument No. 8384044 and whereas Vickie L. Bruff and Max E. Salas are husband and wife, therefore are exempt from recordation and transfer tax.

## Witnesseth

That for and in consideration of the sum of Ten Dollars and **00/100** ($10.00), which includes the amount of any outstanding Mortgage or Deed of Trust, if any, the receipt whereof is hereby acknowledged, the said Grantor does grant and convey to the said **Max E. Salas**, sole owner, their assigns, the survivor of them and the survivor's personal representatives and assigns in fee simple, all that lot of ground situate in the **Disctrict of Columbia** and described as follows, that is to say:

**Lot** numbered Thirty (30) in Square numbered One Hundred Seventy-eight (178) in a subdivision made by Laurason Riggs, Executor, as per plat recorded in Libor 12 at folio 30 among the Records of the Office of the Surveyor for the District of Columbia.

Property Address: 1610 Riggs Place, Northwest, Washington, DC 20009

Tax id: Square 0178 Lot 0030

Being the same property described in Instrument No. 9500028816

## Together with the buildings and improvements thereon erected, made or being; and all and every, the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging, or in anywise appertaining.

## To Have and To Hold the said tract of ground and premises above described and mentioned, and hereby intended to be conveyed, together with the rights, privileges, appurtenances and advantages thereto belonging or appertaining unto and to the proper use and benefit of the said **Max E. Salas,** as sole owner, their assigns, the survivor of them and the survivor's personal representatives and assigns of the survivor, in fee simple.

And the said party of the first part hereby covenants that he/she/they have/have not done or suffered to be done any act, matter or thing whatsoever, to encumber the property hereby conveyed; that he/she/they will warrant specially the property hereby granted; and that he/she/they will execute such further assurances of the same as may be requisite.

As Witness the hand and seal of said Grantors, the day and year first above written.

WITNESS:

_____     _Vickie L. Bruff_____ {Seal}
                                  Vickie L. Bruff also known on record as
                                  Vickie Salas

_____     _____{Seal}

STATE OF **Maryland**                    to wit: Montgomery County

    I HEREBY CERTIFY, That on this 10th day of **April, 2007**, before me, the subscriber, a Notary Public of the State and County aforesaid, personally appeared **Vickie L. Bruff also known on record as Vickie Salas**, the Grantor herein, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged the same for the purposes therein contained, and further acknowledged the foregoing Deed to be his/her/their act, and in my presence signed and sealed the same, giving oath under penalties of perjury that the consideration recited herein is correct.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My commission expires:

AFTER RECORDING, PLEASE RETURN TO:
Sussex Title, LLC
8230 Boone Blvd, Suite 445
Vienna, Virginia 22182
Order Number: 200702-30

*(Notary seal: ANTUANETTE REQUE O, NOTARY PUBLIC, MY COMMISSION EXPIRES 8/21/2010, MONTGOMERY COUNTY, MD)*

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 272 of 579 PageID #: 1392

I (WE) THE OWNER(S) OF THE REAL PROPERTY DESCRIBED WITHIN CERTIFY, SUBJECT TO CRIMINAL PENALTIES FOR MAKING FALSE STATEMENTS PURSUANT TO SECTION 404 OF THE DISTRICT OF COLUMBIA THEFT AND WHITE COLLAR CRIMES ACT OF 1982, EFFECTIVE DECEMBER 1, 1982 (DC LAW 4-164; DC CODE 22-2514), THAT THE REAL PROPERTY DESCRIBED WITHIN IS EITHER CLASS 1 PROPERTY OR CLASS 2 PROPERTY, AS THOSE CLASSES OF PROPERTY ARE ESTABLISHED PURSUANT TO SECTION 412A OF THE DISTRICT OF COLUMBIA REAL PROPERTY TAX REVISION ACT OF 1974, APPROVED SEPTEMBER 3, 1974 (88 STAT. 1051; DC CODE 47-813), WITH 5 OR FEWER UNITS.

_Vickie L. Bruff_
Vickie L. Bruff a/k/a Vickie Salas

STATE OF MARYLAND _____ COUNTY OF MONTGOMERY

I, ANTUANETTE REQUEJO , A NOTARY PUBLIC IN AND FOR THE STATE AND COUNTY AFORESAID , DO HEREBY CERTIFY THAT **Vickie L. Bruff also known as Vickie Salas** , WHO EXECUTED THE FOREGOING AND ATTACHED DEED OF TRUST, BEARING THE DATE OF THE 16 DAY OF April, 2007, PERSONALLY APPEARED BEFORE ME IN SAID DISTRICT, THE SAID **Vickie L. Bruff also known as Vickie Salas** BEING PERSONALLY WELL-KNOWN TO AS (OR PROVED BY THE OATH OF RELIABLE WITNESS TO BE) THE PERSON WHO EXECUTED THE SAID DEED OF TRUST AND ACKNOWLEDGED THE SAME TO BE HIS/HER ACT AND DEED, AND HE/SHE DELIVERED THE SAME AS SUCH.

GIVEN UNDER MY AND SEAL THIS 16 DAY OF April, 2007.

_Antuanette Requejo_
NOTARY PUBLIC

MY COMMISSION EXPIRES: _____

ANTUANETTE REQUEJO
NOTARY PUBLIC
MY
COMMISSION
EXPIRES
8/21/2010
MONTGOMERY COUNTY, MD

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 273 of 579 PageID #: 1393

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| _____ | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT MAX SALAS'
MOTION FOR SUMMARY JUDGMENT**

---

**This matter is set to be heard on March 14, 2023 at 9:30 a.m. via Zoom video**

---

Defendant Max Salas ("Max Salas" or "Defendant") respectfully submits this

memorandum in support of his Motion for Summary Judgment pursuant to Rule 7056 of the

Federal Rules of Bankruptcy Procedure.

## I. Introduction

On November 8, 2022, the Court considered and rejected the Plaintiffs' motion for summary judgment. Subsequently on January 5, 2023, after its further examination of the facts of this case, the Court entered an Order inviting the parties to file additional motions for summary judgment and/or briefs on certain issues raised by the Court. In essence, the Court asked the parties to address three questions:

1) Whether the United States Bankruptcy Court for the District of Columbia had previously ruled on the issue of ownership of the real property at issue, including whether it had already determined that Len Salas (the Debtor herein) owned nothing more than bare legal title?

2) Whether that finding by the United States Bankruptcy Court for the District of Columbia has a preclusive effect on this matter?

3) Whether the Plaintiffs are precluded from pursuing the causes of action alleged in their complaint because a reasonable purchaser of the real property or judgment lien creditor would have been on inquiry notice of Max Salas' ownership interest?

The undisputed facts demonstrate that (1) the United States Bankruptcy Court for the District of Columbia has already found that the Debtor Len Salas owns nothing but bare legal title, (2) collateral estoppel determines the outcome of this matter, and (3) any reasonable purchaser of the property would have been on inquiry notice. Accordingly, the Defendant respectfully requests that this Court enter summary judgment in his favor on all counts of the complaint. More specifically, applying these conclusions to the complaint's individual counts yields the following outcomes:

Count I – Declaratory Judgment under § 544(a)(3) – Barred due to inquiry notice

Count II - Declaratory Judgment under § 544(a)(1) – Barred due to inquiry notice

Count III - Declaratory Judgment under § 544(a)(2) – Barred due to inquiry notice

Count IV – Fraudulent Transfer under § 548 – Precluded by DC Court's order

Count V – Fraudulent Transfer under § 544(b)(1) – Precluded by DC Court's order

Count VI – Previously dismissed by this Court

Count VII – Relief under § 550(a) – No independent cause of action

## II.    Material Facts

The facts material to determining this dispute are deceptively simple and are uncontested. On April 11, 2018, just one week prior to Len Salas (the "Debtor") filing for bankruptcy protection in this Court, the Plaintiffs recorded documents with the District of Columbia recorder of deeds evidencing the judgment held by the Plaintiffs. (Defendant's Statement of Undisputed Facts, ¶ 2; Defendant's Statement of Undisputed Facts Exhibit B). As evidenced by the recorder's stamp on Exhibit B to the Defendant's Statement of Undisputed Facts, and as further evidenced by the title search attached as Exhibit C to the Defendant's Statement of Undisputed Facts, the documents recorded by the Plaintiffs would have appeared in any title search related to 1610 Riggs Place, NW, Washington, DC (the "Property"). (Defendant's Statement of Undisputed Facts, ¶ 3; Defendant's Statement of Undisputed Facts Exhibit B; Defendant's Statement of Undisputed Facts Exhibit C).

On September 25, 2018, the United States Bankruptcy Court for the District of Columbia issued a Memorandum Decision and Order for Objection to Homestead Exemption. (Defendant's Statement of Undisputed Facts, ¶ 1; Defendant's Statement of Undisputed Facts Exhibit A). Among the findings of the United States Bankruptcy Court for the District of Columbia was the following: "Accordingly, the court finds that under District of Columbia law, the Property was conveyed to Max and he holds both the legal and beneficial interests in the Property." (Defendant's Statement of Undisputed Facts Exhibit A, p. 57).

These are the *only* facts needed by this Court in order to grant summary judgment in favor of the Defendant.

### III. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c). *See also, Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986). The Defendant submits that there are no genuine issues of material fact in this case and he is entitled to a judgment as a matter of law as to all counts in the Complaint. In support of this Motion, the Defendant relies upon the Defendant's Statement of Undisputed Facts which also incorporates by reference the Plaintiffs' Amended List of Disputed Facts (Doc. 74-1), as further supplemented by the Plaintiffs (Doc. 79-1) and as previously admitted by the Defendant (Docs. 75-1 and 81).

### IV. Argument

1.  <u>The United States Bankruptcy Court for the District of Columbia has already found that the Defendant owns all legal and beneficial interests in the Property.</u>

The United States Bankruptcy Court for the District of Columbia has clearly, unequivocally, and undeniably ruled that the Defendant, Max Salas, is the owner of all legal and beneficial interests in the Property. The question of whether the Debtor, Len Salas, owned anything other than bare legal title was considered at length by the D.C. Bankruptcy Court in the context of the Plaintiffs' objection to the homestead exemption claimed by the Defendant in his own Chapter 11 bankruptcy proceeding. This is evident on the very face of the Memorandum Decision and Order Re Objection to Homestead Exemption (the "DC Order"), attached as <u>Exhibit A</u> to the Defendant's Statement of Undisputed Facts. *See, e.g.,* D.C. Order pp. 21 and 29-30.

After considering the Plaintiffs' argument that Len Salas was the owner of the Property, and the Defendant's argument that Len Salas owned nothing more than bare legal title to the Property, the D.C. Bankruptcy Court concluded: "Accordingly, the court finds that under District of Columbia law, the Property was conveyed to Max and he holds both the legal and beneficial interests in the Property." D.C. Order p. 57. With this conclusion, the D.C. Bankruptcy Court left no doubt that Len Salas owned nothing more than bare legal title, at most.

2. <u>The doctrine of collateral estoppel prevents the Plaintiffs from relitigating this issue, and has a preclusive effect upon this Court.</u>

As the Court correctly noted in its oral ruling after the November 8, 2022 hearing, and reiterated in its January 5, 2023 Order, "if the debtor, Len Salas, only holds bare legal title to the property, the plaintiffs would not be entitled to relief." Doc. 83, p. 2. As determined by the D.C. Bankruptcy Court, Len Salas owns *at most* bare legal title to the Property.[1] The only question that remains, then, is whether this Court is bound by the prior findings of the D.C. Bankruptcy Court cited above. The doctrine of collateral estoppel prevents the Plaintiffs from relitigating the issue of whether or not Len Salas owned anything other than bare legal title in the Property, and this Court is bound to uphold the conclusion of the D.C. Bankruptcy Court. As such, this Court must grant summary judgment in favor of the Plaintiffs as to Counts IV and V.

The doctrine of res judicata "usually is parsed into claim preclusion and issue preclusion." *Angelex Ltd. v. United States*, 2015 WL 5011421, 7 (D.D.C. Aug. 24, 2015). Moreover, issue preclusion, also called "collateral estoppel'[2] … 'bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment[.]'" *Id.* (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). Nonetheless, the

---

[1] For further support of this conclusion, the Defendant incorporates by reference the arguments made and law cited in his Objection to Plaintiffs' Motion for Summary Judgment, Doc. 75.

[2] "Collateral Estoppel" is sometimes hereinafter referred to as "issue preclusion" for clarity purposes

Supreme Court has given guidance to courts, instructing lower courts to invoke the doctrine of issue preclusion "only after careful inquiry," explaining: "because [it] may govern grounds and defenses not previously litigated … it blockades unexplored paths that may lead to the truth." *Brown v. Felsen*, 442 U.S. 127, 132 (1979). Consequently, to preclude a party from relitigating an issue under the doctrine of issue preclusion, the moving party must demonstrate that:

> (1) the same issue now being raised was contested by the parties and submitted for judicial determination earlier; (2) the issue [was] actually and necessarily determined by the earlier court of competent jurisdiction; and (3) preclusion would not work a basic unfairness to the party bound by the first determination."

*Canonsburg Gen'l Hosp. v. Burwell*, 807 F.3d 295, 301 (D.C. Cir. 2015) (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)).

First, the party asserting collateral estoppel bears the burden of showing that an issue in question is identical to what was decided before. *Merle v. United States*, 683 A.2d 755, 762 (D.C. 1996). Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C. Cir. 1986) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

When the first two prerequisites for application of the issue preclusion doctrine are met, the plaintiff "must be permitted to demonstrate, if he can, that he did not have a fair opportunity procedurally, substantively, and evidentially to pursue his claim the first time." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971) (internal quotation marks omitted). On this note, the Supreme Court has explained, "a party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time … both orderliness and reasonable time saving in judicial

administration require that this be so unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case." *Id*. at 324-25.

The D.C. Bankruptcy Court clearly ruled that Max Salas could properly claim a homestead exemption of the Property because he was the owner of *both* the legal and beneficial rights to the Property. That decision was affirmed by the District Court for the District of Columbia. Under the doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes re-litigation of the issue in a suit on a different cause of action involving a party to the first case.

District of Columbia courts have used the doctrine of issue preclusion to determine whether collateral estoppel was applicable to bar a suit. *See Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (outlining that [issue preclusion applies when] (1) the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case; (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. (3) preclusion in the second case must not work a basic unfairness to the party bound by the first determination). The Sixth Circuit employs a very similar test, adding only a requirement that the prior order be final, which is present in this case. *See N.L.R.B. v. Kentucky May Coal Co. Inc.*, 89 F.3d 1235, 1239 (6th Cir. 1996). This case presents a classic example of where issue preclusion is appropriate: the same parties to the homestead objection are parties to this case; the same ultimate issue is in dispute, that is whether Max Salas or Len Salas owns the Property; and the issue at stake was determined by a court of competent jurisdiction — the D.C. Bankruptcy Court. An application of the *Yamaha* test for issue preclusion clearly establishes that the Plaintiffs are barred from re-litigating whether Len Salas owns anything more than bare legal title to the Property.

i.  The same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case.

In evaluating the first element of issue preclusion, it is clear that the Plaintiffs seek to re-litigate the same issue that has been decided by the D.C. Bankruptcy Court — who is the owner of the Property. This exact issue was decided by the D.C. Bankruptcy Court when it authored the D.C. Opinion. As discussed earlier, the D.C. Bankruptcy Court clearly stated that Max Salas was the legal and beneficial owner of the Property. Accordingly, by collateral estoppel precedent established by the D.C. Circuit, this order would bar further litigation on this issue. *See Klayman v. Rao*, 49 F.4th 550, 553 (D.C. Cir. 2022) (explaining that where Klayman was a party to Judicial Watch I and Judicial Watch II, and he sought to relitigate issues that were raised and decided in that litigation, his claims were barred by res judicata); *Vantage Commodities Fin. Servs. I, LLC v. Willis Ltd.*, 531 F. Supp. 3d 153, 169 (D.D.C. 2021) (showing — by contrast — that the court will not apply collateral estoppel against a party on an issue tangential to an unconfirmed arbitration award against its bankrupt debtor, who did not even participate in the arbitration).

ii.  The issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case.

In evaluating the second element, it is clear that this element is met; namely, that the issue has been actually and necessarily determined by a court of competent jurisdiction in the prior case. In the first instance, the D.C. Bankruptcy Court expressly held that Max Salas owned all legal and equitable interests in the Property. The Plaintiffs then appealed that decision to the D.C. District Court, which affirmed the Bankruptcy Court. *See In re Salas*, No. CV 20-3091 (FYP), 2022 WL 1154596, at 9 (D.D.C. Apr. 19, 2022) (stating that "even if this Court could reach the merits of the Homestead Decision, and even if this Court considered Appellants'

arguments regarding the effect of the newly proffered testimony, Appellants would fail to persuade the Court that the Homestead Decision should be overturned"). Given these clear decisions from the D.C. Bankruptcy Court and the District Court, it is obvious that the issue of ownership of the Property was actually and necessarily adjudicated by *two* courts of competent jurisdiction. *See Yamaha Corp. of Am.* at 254.

    iii.  Preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

Finally, in evaluating the last element of the issue preclusion test, preclusion works no basic unfairness to the Plaintiffs. *See Martin v. Dep't of Just.*, 488 F.3d 446, 254 (D.C. Cir. 2007). Simply put, whether issue preclusion works some unfairness upon a party turns primarily on whether "the losing party clearly lacked any incentive to litigate the point" at issue in the earlier case. *Canonsburg Gen. Hosp. v. Sebelius*, 989 F. Supp. 2d 8, 19 (D.D.C. 2013). Courts evaluating the fairness of preclusion also consider whether the "prior proceedings were seriously defective." *Martin*, 488 F.3d at 455. Neither concern is present in this case. As stated earlier, the Plaintiffs fully litigated the issue of the ownership of the Property both before the D.C. Bankruptcy Court and then the D.C. District Court. The Plaintiffs had every incentive to forcefully litigate the ownership issue as part of their objection to Defendant's homestead exemption; after all, winning the homestead exemption issue was the only practical way the Plaintiffs could ever collect any significant portion of their $15.2 million dollar judgments from either Max Salas or Len Salas. In fact, not only did they forcefully litigate that matter before the D.C. Bankruptcy Court, they appealed the D.C. Order to a federal district court and lost. As such, precluding the Plaintiffs from once again litigating this issue before this Court creates no basic unfairness.

After applying the issue preclusion / collateral estoppel test to the matter now before this Court, it is clear that the D.C. Bankruptcy Court's decision that Max Salas owns all legal and equitable interests in the Property is entitled to preclusive effect. As such, this Court must grant the Defendant summary judgment on Counts IV and V.[3]

3. <u>Any reasonable purchaser of the Property would have been on inquiry notice of the Defendant's interest in the Property.</u>

The last remaining question is whether a reasonable purchaser of the Property would have been on inquiry notice of the Defendant's ownership of the Property. In its January 5, 2023 Order, the Court framed the issue this way: "Here, the question may be whether courts in the District of Columbia would find that physical possession is sufficient to place the Trustee on inquiry notice." Doc. 83, p. 4. The Court went on to cite a number of cases from jurisdictions other than the District of Columbia that have held that physical possession by one party is sufficient to place a reasonable third party on inquiry notice: *Patel v. Rupp*, 195 B.R. 779, 784 (D. Utah 1996); *Reinhold v. Thorpe (In re Thorpe)*, 546 B.R. 172, 185 (Bankr. C.D. Ill. 2016); *Osberg v. Fibison (In re Fibison)*, 474 B.R. 864, 870 (Bankr. W.D. Wis. 2011); *LR Partners v. Steiner (In re Steiner)*, 251 B.R. 137, 142 (Bankr. D. Ariz. 2000); and *Fowler v. Rauso (In re Fowler)*, 425 B.R. 157, 198 (Bankr. E.D. Pa. 2010).

Indeed, courts within the District of Columbia have held that physical possession of real property by a person other than its title owner would be sufficient to put a party on inquiry notice where "such possession is 'sufficiently distinct and unequivocal as so as to put the purchaser on his guard.'" *Clay Props., Inc. v. Wash. Post Co.,* 604 A.2d 890, 897 (D.C. 1992) (quoting *Hayward v. Mayse,* 1 App. D.C. 133, 140 (D.C. 1893)). In this case, the record is replete with

---

[3] As noted by the Court in its prior order, a finding that Len Salas owned nothing more than bared legal title is fatal to the Plaintiffs' fraudulent transfer claims. The Defendant cites to his brief opposing the Plaintiffs' motion for summary judgment as further legal support for this conclusion.

indicia that Max Salas' possession of the Property was open, distinct and unequivocal: Max Salas lived in the Property (Plaintiffs' Undisputed Facts, ¶ 3); Max Salas was the only party who ever made mortgage payments on the Property (Plaintiffs' Undisputed Facts, ¶ 60, 117 and 120); Max Salas signed leases with the Plaintiffs to rent portions of the Property (Plaintiffs' Undisputed Facts, ¶ 54); Max Salas collected rent payments from the Property (Plaintiffs' Undisputed Facts, ¶ 57 and 59); and Max Salas collected and distributed insurance proceeds after the Property was destroyed by fire (Plaintiffs' Undisputed Facts, ¶ 60). While all of this is true and would put any third party on inquiry notice, this Court need not determine whether Max Salas' possession of the Property alone was sufficient to put a bankruptcy trustee, creditor, or good faith purchaser on notice of his ownership interest in the Property.

Instead, the fact that the Plaintiffs recorded notice of their judgments against Max Salas and Len Salas with the District of Columbia recorder of deeds would have *per se* provided inquiry notice to any reasonable third party. Because a trustee or any reasonable third party would have been put on notice of the judgments against Max Salas and Len Salas, which appeared in the chain of title to the Property, the Plaintiffs are precluded from any recovery under 11 U.S.C. § 544(a).

For purposes of § 544(a), notice may be actual, constructive, or inquiry. *Clay Properties, Inc., 604 A.2d at 895*. A trustee's actual knowledge of the contents of a deed is irrelevant under § 544(a) as the trustee assumes the role of a bona fide purchaser or judgment creditor without actual knowledge. *Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 818 (Bankr. D.D.C. 1994). However, that hypothetical purchaser may be held to constructive or inquiry notice. *See McCannon v. Marston*, 679 F.2d 13, 16–17 (3d Cir.1982). If that constructive notice or inquiry notice would put the purchaser on notice of the contents of a deed of trust, then, like a

purchaser with actual notice of the contents, the deed of trust would be effective against the purchaser. The District of Columbia Court of Appeals has described inquiry notice as follows:

> A purchaser is held to be on inquiry notice where he or she is aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed.

*Clay Properties, Inc.* 604 A.2d at 895.

In the District of Columbia, constructive notice has come to mean record notice. *See Id.* However, inquiry notice extends to that knowledge which a purchaser would have possessed after due investigation as measured by an objective standard of reasonable diligence under the circumstances. *See BDO Seidman, LLP v. Morgan, Lewis & Bockius LLP*, 89 A.3d 492, 500 (D.C. 2014) (quoting *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996)); *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 958 (D.C. 2003) (explaining that "the standards by which the discovery rule is applied are objective"). The critical question is whether a party exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him. *See Ray v. Queen*, 747 A.2d 1137, 1141-42 (D.C. 2000). Regardless, a judgment lien creditor fares no better than a hypothetical purchaser; simply put, if a purchaser would be on inquiry or constructive notice, so would a judgment lien creditor. *See In re Aumiller*, 168 B.R. at 818–19 (applying the same analysis of constructive and inquiry notice under District of Columbia law to both a purchaser and a judgment lien creditor); *In re El-Erian*, 512 B.R. 391, 397 (Bankr. D.D.C. 2014).

Section 544(a) of the Bankruptcy Code gives the trustee the rights of a hypothetical judgment lien creditor or a hypothetical bona fide purchaser of real property from the debtor at the time of the commencement of the case. 11 U.S.C. §§ 544(a)(1), (3). On this note, the trustee

can avoid a lien on real property if a bona fide purchaser or judgment lien creditor could avoid the lien on the petition date. *Hamilton v. Washington Mut. Bank FA (In re Colon)*, 563 F.3d 1171, 1173 (10th Cir.2009). State law governs who may be a bona fide purchaser or judgment lien creditor for purposes of section 544(a). *See Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 818 (Bankr.D.D.C.1994).

Under District of Columbia law, a deed conveying an interest in real property is not effective against "subsequent bona fide purchasers ... without notice of said deed" unless it is recorded. *See* D.C. Code § 42–401; see also *Clay Properties, Inc. v. Washington Post Co.*, 604 A.2d 890, 894 (D.C.1992) (referring to the previous codification of this statute, at D.C. Code § 45–801). In particular, as to third parties, a deed conveying an interest in real property "only take[s] effect from the time of its delivery to the Recorder of Deeds for record." D.C. Code § 42–401.

However, in cases similar to the one at hand, District of Columbia courts universally charge a reasonable third party with inquiry notice. For example, in *In re Aumiller*, a Chapter 7 trustee, or any hypothetical purchaser or creditor, was placed on inquiry notice of a creditor's interest in the debtor's real property, for purpose of determining whether creditor's equitable lien was avoidable under trustee's strong-arm powers. *In re Aumiller*, 168 B.R. 811, 819 (Bankr. D.D.C. 1994). There, a covenant between debtor and creditor was filed with recorder of deeds, and debtor agreed under the covenant to execute such documents as requested by creditor to cause a lien or encumbrance in favor of creditor to be recorded against debtor's property interests. The recording of the covenant with the D.C. recorder of deeds was sufficient to put a reasonable party on notice; thus, the Trustee could not exercise its strong-arm powers.

In another case, a D.C. court held that a reasonably prudent purchaser would have been on notice of the contents of a deed of trust granting a lien on Chapter 7 debtors' nonresidential

real property. *In re El-Erian*, 512 B.R. 391, 396 (Bankr. D.D.C. 2014). In *El-Erian*, despite the deed of trust containing both correct and incorrect square and lot numbers for the property and being indexed under the square and lot number for debtors' residence, the Trustee could not avoid the deed of trust using strong-arm powers. This result was reached because the deed of trust was recorded, thereby providing constructive notice to subsequent purchasers or lien holders of all matters which would have been disclosed by an examination of that deed of trust. The fact that the deed of trust was misindexed did not affect the validity of its recordation because a search of the grantor/grantee index would have revealed the deed of trust — despite its inaccuracies. The deed of trust indicated that the subject property was encumbered, or at the least would have led purchaser to inquire which property was encumbered by the deed of trust.

Finally, the D.C. Bankruptcy Court held that a reasonable purchaser would have been put on inquiry notice of the terms of a marital property distribution agreement simply by conducting a title search, seeing that the property at issue was owned as tenants by the entirety, but noticing that the parties were now divorced. In *Webster v. Hope (In re Hope)*, 231 B.R. 403, 423-26 (Bankr. D.D.C. 1999), the court found that a trustee was barred from pursuing a § 544(a) action because a reasonable party would have been put on notice by a recorded divorce judgment, and was then charged with inquiring further about the terms of that divorce. The court found that any title search of the property would have revealed that its owners had divorced. The court further found that, upon realizing that the parties were divorced, a reasonable party should have (a) read the divorce court's judgment and (b) inquired about the property distribution agreement referenced in the divorce court's judgment.

Applying these cases to the facts of the matter now before this Court, it is apparent that any reasonable third party (be it a lien creditor or a bona fide purchaser) would have been put on notice of the questions regarding the ownership of the property as a result of the Plaintiffs'

recording the judgments in the chain of title for the Property. A simple title search would – and indeed did – reveal the judgment liens. Any reasonable party would have thus been put on notice to inquire further about the facts and circumstances surrounding the judgment, as the D.C. Bankruptcy Court found in *Hope*. With any amount of due diligence, the third party would have quickly discovered that there existed a dispute about who owned the property, since Len Salas was only included in the underlying lawsuit because his name was on the deed to the Property and he subsequently filed multiple pleadings attempting to get out of the lawsuits because he exercised no ownership in fact over the Property. A reasonable purchaser or judgment lien creditor would surely be charged with such inquiry notice, as would a trustee. Because the Plaintiffs are pursuing this matter in a derivative fashion, on behalf of the trustee, they are likewise charged with inquiry notice in the case.

Any reasonable party would have been subject to inquiry notice of the dispute concerning ownership of the Property as of the petition date, because the notice of the adverse judgments was filed with the D.C. recorder of deeds just one week prior to the filing of this case. The judgments would have appeared in any title search conducted on the petition date. Inquiry notice is sufficient to defeat the trustee and/or the Plaintiffs' causes of action under 11 U.S.C. § 544(a). Thus, this Court should grant the Defendant summary judgment as to Counts I, II, and III of the complaint.[4]

### V. Conclusion

The D.C. Bankruptcy Court has already determined that Len Salas owns nothing more than bare legal title to the Property, at best. That determination precludes the Plaintiffs from re-

---

[4] As noted earlier, Count VII seeks relief under 11 U.S.C. § 550 which is not an independent action. Without any basis for recovery under § 544 or § 548, the Plaintiffs are entitled to no relief under § 550. Therefore, the Defendant is also entitled to summary judgment on Count VII.

litigating that issue and this Court is bound by the prior determination. As such, the Defendant is entitled to summary judgment on both fraudulent transfer counts (Counts IV and V).

The undisputed facts show that the Plaintiffs recorded notice of the judgments in the chain of title of the Property just one week before the filing of this bankruptcy. Due to that filing, any bona fide purchaser or judgment lien creditor of the debtor, Len Salas, would have been on inquiry notice of the facts and disputes related to the underlying lawsuit; this includes the claims made by Len Salas that Max Salas was the sole owner of the Property. The inquiry notice that Plaintiffs must be charged with invalidates any claim that they might otherwise have under 11 U.S.C. § 544(a). This means that the Court should grant the Defendant summary judgment as to Counts I, II, and III.

Having previously disposed of Count VI, and Count VII (one under § 550) containing no independent right, the Defendant should be granted summary judgment as to the entirety of Plaintiffs' complaint and this matter should be dismissed.

For all of these reasons, the Defendant respectfully requests that this Court grant summary judgment in his favor as to all causes of action alleged in this adversary proceeding.


RESPECTFULLY SUBMITTED:


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6008
Email: phillip@thompsonburton.com

Attorneys for Defendant Max Salas

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served this 21st day of February, 2023, upon all parties of record requesting notice through the Court's electronic filing system, and by United States mail to:

Philip J. McNutt                                           Taylor A. Cates
Law Office of Philip J. McNutt, PLLC        Burch, Porter & Johnson, PLLC
11921 Freedom Drive, Suite 584                130 North Court Avenue
Reston, VA  20190                                      Memphis, TN  38103


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

---

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA | : | |
| BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

---

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
IN RESPONSE TO THE COURT'S ORDER OF JANUARY 4, 2023

COME NOW the Plaintiffs herein, by and through their undersigned counsel and, files

this supplemental memorandum in accordance with the Court's Order of January 4, 2023:

I.      BACKGROUND

1. The Plaintiffs are seeking summary judgment on Counts I, II, IV, V and VI of the

Amended Complaint filed herein. On November 8, 2022 the Court held a hearing on the

Plaintiffs' Motion for Summary Judgment, the Defendant's Objections and the Plaintiff's

Response to those Objections. The Court denied the Plaintiffs' Motion and set this matter for a

pretrial conference on January 24, 2023. In its Order of January 4, 2023 (D-83)("the January

Order") the court determined that the parties should be given time for additional briefing. The Court asked for briefing on the effect the opinion of the United States Bankruptcy Court for the District of Columbia on the plaintiff's objection to the defendant's homestead exemption has on both the Plaintiffs' fraudulent conveyance claims under bankruptcy and state law and the Trustee's strong arm claims as a bona fide purchaser or hypothetical judgment lien holder and unsecured creditor.

2. In its January Order, this Court stated that if the Debtor, Len Salas, only holds bare legal title to the property, 1610 Riggs Place, NW, Washington, D.C. (hereinafter, " The Property), then the Plaintiffs would not be entitled to relief as to their fraudulent conveyance claims under 11 U.S.C. § 544(b)(1) and 11 U.S.C. § 548 (a)(1)(B).

3. 11 U.S.C. § 544 (b)(1) refers to the trustee's avoidance power based upon the rights of unsecured creditors under applicable (non-bankruptcy) law. 11 U.S.C. § 548 (a)((1)(B) refers to the fraudulent conveyance clause in §548 that allows recovery for transfers that were made without adequate consideration, made while the Debtor was insolvent, or as a result of which the Debtor became insolvent.

4. In the Court's January Order, the Court also stated that the determination whether the Debtor here held only bare legal title on the date of bankruptcy, has no bearing on the Plaintiffs' avoidance claims under 11 U.S.C. § 544 (a) or § 548 (a)(1)(A). Therefore, under the January Order, the status of the Plaintiffs' Section 544 (a) claims is not affected by a determination of whether the Debtor held just a "bare legal title" on the date of his bankruptcy filing on or about May 2, 2018. That analysis, then, relates to the Plaintiffs' claims in Counts I-III of the Amended Complaint filed herein on February 16, 2021 (D-40) (hereinafter referred to as "the Complaint").

-2-

5.   In its January Order this Court determined that the parties to this litigation should be given an opportunity to determine whether the issue of bare legal title has already been determined by the D.C. [Bankruptcy] Court and, if so, whether that determination is entitled to issue preclusion or estoppel effect so that it is binding upon the Plaintiffs.  January Order, at pp. 2-3.  For the reasons set forth below, the Plaintiffs assert that the interest held by the Debtor at the time the instant bankruptcy was filed is more than the "bare legal title" as described in the *Whiting Pools*[1] Supreme Court decision and its progeny, that the term "bare legal title", as described in *Whiting Pools* is not binding on this Court, and that the cases cited by the Defendant do not require or promote the broad scope of the phrase "bare legal title" which the Defendant asserts.  Additionally, the interest in the Property held by the Debtor at commencement of this bankruptcy proceeding goes well beyond the notion of "bare legal title."

6.   The Plaintiffs further assert that under the well established principles of issue preclusion the determinations, if any, made by the D.C. Bankruptcy Court concerning the extent of the Debtor's interest in the Property are not binding on this Court or on the Plaintiffs and, therefore, have no effect on the issues in this litigation.

7.   Finally, under equally established principles of equity, the Plaintiffs urge this Court to determine that it should not, and cannot, grant relief to the Defendant due to his longstanding and consistent bad faith efforts to deceive both the D.C. Bankruptcy Court, and this Court, regarding the Defendant's alleged ownership of the Property.

8.   For ease of reference to members of the Salas family, who are discussed throughout this Memorandum, Max Salas, the Defendant, will sometimes be referred to as "Max" or "the

---

[1] 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

-3-

Defendant", Len Salas will sometimes be referred to as "Len" or "the Debtor" and Ron Salas will sometimes be referred to as "Ron."

9.  Unless otherwise specifically set forth herein, all references to Exhibits will refer to the Exhibits attached to the Plaintiffs' Amended Memorandum in support of the Plaintiffs' Motion for Summary Judgment which are incorporated into this Supplemental Memorandum by this reference.  The Plaintiffs' Amended Memorandum (D-74) is incorporated herein along with the Plaintiffs' List of Undisputed Facts and Exhibits.  The Plaintiffs' Response to the Defendant's Objection to the Plaintiffs' Motion for Summary Judgment (D-76), along with its Exhibits, is also incorporated herein.

## II.    ARGUMENT

### A.    Bankruptcy Courts are Courts of Equity

10.  Bankruptcy have been recognized as courts of equity since the inception of the Bankruptcy Act of 1898.  The bankruptcy courts have exercised their equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They  have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.  *Pepper v. Litton*, 308 U.S. 295, 303-05, 60 S. Ct. 238, 244 (1939)

11.  The status of courts of bankruptcy being essentially courts of equity, and their proceedings inherently proceedings in equity, has not changed since 1898. *Bardes v. Hawarden Bank*, 178 U.S. 524, 534-536 (1900); *Granfinanciera v. Nordberg*, 492 U.S. 33, 81, 109 S. Ct. 2782, 2811 (1989), *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.),* 555 F.3d 231, 242 (6th Cir. 2009), *Gaff v. FDIC*, 919 F.2d 384, 392 (6th

-4-

Cir. 1990).

12. Section 105(a) of the Bankruptcy Code confers upon the bankruptcy courts the equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code. This statutory authority, as the Supreme Court of the United States has pointed out, is in line with "the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990).

**B.     The Doctrine of Unclean Hands Prevents this Court From Granting any Relief to the Defendant**

13. He who comes into the Bankruptcy Court seeking equity, must come with clean hands.

> This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity." *Bein v. Heath*, 6 How. 228, 247. Thus while "equity does not demand that its suitors shall have led blameless lives," *Loughran v. Loughran*, 292 U.S. 216, 229, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245; *Johnson v. Yellow Cab Co.*, 321 U.S. 383, 387; 2 Pomeroy, *Equity Jurisprudence* (5th Ed.) §§ 379-399.

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15, 65 S. Ct. 993, 997 (1945)

> This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." Accordingly one's misconduct need not necessarily have been of such

-5-

a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

*Id*. at 997-98(internal citations omitted)

14. The clean hands maxim is particularly applicable to false testimony. False testimony in a formal proceeding is intolerable. We must neither reward nor condone such a "flagrant affront" to the truth-seeking function of adversary proceedings. *See United States v. Mandujano*, 425 U.S. 564, 576-577, 48 L. Ed. 2d 212, 96 S. Ct. 1768 (1976). *See also United States v. Knox*, 396 U.S. 77, 24 L. Ed. 2d 275, 90 S. Ct. 363 (1969); *Bryson v. United States*, 396 U.S. 64, 24 L. Ed. 2d 264, 90 S. Ct. 355 (1969); Perjury should be severely sanctioned in appropriate cases. *ABF Freight Sys. v. NLRB*, 510 U.S. 317, 323, 114 S. Ct. 835, 839 (1994)

15. The doctrine of unclean hands may bar a defendant's equitable defenses including estoppel (i.e., issue preclusion). *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999) ("The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice.") (citing *Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S. Ct. 993, 89 L. Ed. 1381, 1945 Dec. Comm'r Pat. 582 (1945)); *In re Richardson*, 497 B.R. 546, 2013 WL 4498998, at *9 (Bankr. S.D. Ind. 2013) (same); see also *Indiana Mills & Mfg., Inc. v. Evenflo Co., Inc.*, No. 04-cv-540SEBVSS, 2005 U.S. Dist. LEXIS 31149, 2005 WL 3150164, at *7 (S.D. Ind. Nov. 22, 2005) (holding unclean hands barred the defendant's equitable defenses); see also *Edwards v. Academy Pub. Corp.*, 562 N.E.2d 60, 61 (Ind. Ct. App. 1990) (holding the trial court erred in failing to consider whether a

-6-

defendant seeking equitable relief did so with unclean hands).  Accord, ***Bash v. Laikin (In re Fair Fin. Co.)***, Nos. 10-50494, 10-5043, 2013 Bankr. LEXIS 5663, at *54 (Bankr. N.D. Ohio Oct. 24, 2013).

16.   Under the well established doctrine of unclean hands, as outlined above, the Defendant is unable to assert, and estopped from asserting, that he had anything more than a caretaker interest in the property for either his son, the Debtor, or for the CLR Trust of which the Debtor was one of three beneficiaries with his two brothers, Chase and Ron.  Pursuant to the discovery belatedly produced by Len in this case, it is clear that the Defendant, the Debtor and Ron Salas, another son of the Defendant and brother of the Debtor, all concocted a scheme to allow the father to falsely claim that he was the actual owner of the property when the communications among the family members and the Defendant's lawyers in 2011 and 2012 make it clear that the property was not transferred to the Defendant in 2010 as falsely asserted by Len, Ron and the Defendant in the D.C. Bankruptcy Court and, further, that the alleged Quitclaim Deed was abandoned no later than June, 2011.

17.   In addition to the misrepresentations made by the Debtor, the Defendant and Ron Salas in the D.C. bankruptcy case and, the misrepresentations of the Debtor and the Defendant in this case, the Defendant's August, 2022 affidavit now declares, for the first time, that all transactions regarding the Property were made under the name of "the CLR Trust"and all rental receipts were made into the CLR Trust account.  The Defendant does not offer any source for the payments that were made on the Deed of Trust Note, other than the CLR Trust account.  See Max Salas Affidavit, August 10, 2022, (D-75-2).   While Max attempts to "skirt" the issue related to Len's "interest" in the CLR Trust, Max has never refuted the testimony of Len in the Superior

-7-

Court case in which Len confirms that the CLR Trust was a trust set up for the benefit of Max's children, Chase, Len, and Ron ("that one I know.").

18. Furthermore, although in his Affidavit the Defendant continues the fiction that the Property was transferred in 2010 by virtue of the "Quitclaim" Deed, the emails produced by the Debtor in 2021 state clearly and definitely that the 2010 Trust and the "Quitclaim" Deed from Len into the Trust were not in force, were abandoned and were of no legal effect as early as 2011 and that status continued through February, 2012. Neither the Debtor nor the Defendant has produced any documents or provided any credible testimony that the Deed was in effect after 2010.

19. Moreover, there is unrefuted testimony from Len that the Defendant paid no consideration for the supposed transfer of the Property in 2010, not even a nominal sum. See, for example, the Debtor's testimony at his meeting of creditors in April, 2019, Exhibit 4.

20. At best, the Defendant can say that he and his son unsuccessfully attempted to transfer the Property from the son to the father (the Defendant) in 2010, but that the Property was not effectively transferred and remained in Len's name, in all respects since 2010. Furthermore, for reasons which appear to be based upon the need to shield his "ownership" from federal, state and local authorities, for the period 2007 through the Debtor's bankruptcy filing, there was no record anywhere that the Defendant held an interest in the Property. The Deed and Deed of Trust were solely in Len's name, all tax and D.C. notices regarding the Property were in Len's name. All requests for refinancing include Len as an owner and co-borrower.

21. In addition, during the period 2007 through the date of the bankruptcy filing, the balance due on the Property on the Deed of Trust Note ballooned from $870,000 to

-8-

$1,037,592.78. Even after the bankruptcy filing the Defendant continued to ignore the Deed of Trust Note payments for which he asserted he was solely responsible. As of September 29, 2019 the Deed of Trust Note balance was $1,208,720.40. All this time, the Debtor was the sole owner and the sole person responsible for making payments on the Note.

22. Max and Ron convinced Len to deed the Property to his father despite the fact that by that deed, Len would have lost all collateral for his $870,000 loan obligation to Sun Trust.

23. The attempted transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7.

24. According to the D.C. Bankruptcy Court, Len testified and the Court believed that

> Len never checked with Max to see if the *Quitclaim Deed* had been recorded, and his involvement regarding the Property after July 2010 was only periodically checking with Max regarding efforts to remove Len from the Property mortgage debt.

and

> His [Len's] focus was not on removing himself as an owner of the Property in the land records.

Memorandum and Opinion dated September 25, 2018 in Case No. 18-260 in the United States Bankruptcy Court for the District of Columbia ("Exemption Decision"), at p. 11. However, the eMails which the Debtor produced in this case, set forth as Exhibit 7 to the Plaintiffs' Motion for Summary Judgment clearly show that Len was consistently attempting to get his father to take him off the deed and not simply to refinance. Moreover, the Defendant specifically requested that his counsel accomplish the task of removing Len's name as owner as early as June, 2011, less than a year after the alleged 2010 conveyance. See Exhibit 7, Salas eMails, (D-74-8) pp. 1-

-9-

16, Bates Nos., LenSalas000016 - 000034.

25.    The D.C. Bankruptcy Court bought the Salas family scheme completely.  The entire

Salas family, including the Defendant, the Debtor and the Debtor's brother, Ron, conveniently

forgot that the Quitclaim Deed was abandoned no later than June 17, 2011.  See Exhibit 7:

> The next step is for someone in DC to draft a Quitclaim Deed in order to move the
> property from the possession of Len to the Trust....

(Excerpt from Ron Salas's eMail to Max Salas and Len Salas, dated June 17, 2011, Exhibit 7,

Memorandum in Support of Plaintiffs' Amended Motion for Summary Judgment, pp. 1 and 2.).

In his affidavit, the Defendant asserts that he did not have the funds to pay for the transfer taxes.

However, that is simply not true.  At the time of the Defendant's bankruptcy filing, he had

accumulated a substantial retirement funds totaling several hundred thousand dollars.  The

Defendant chose to keep his son's name on the Property and abandoned the 1610 Riggs Property

Trust.

26.    The Defendant forwarded the above-referenced email to his attorney, Stanley

Goldstein on June 21, 2011 with the instruction that the Defendant needed to have Len sign a

Quitclaim Deed.  Although a bit gargled in the typing, that portion of the email makes it clear

that the July 2010 Quitclaim Deed has been abandoned and there is no deed that can be recorded:

> At the end of the day.  We need to have done is have Lenny sign a quick claim
> deed into the trust, which has been extend lives by my son, Ron, in Colorado.

Exhibit 7, p. 1.

27.    And there is more.  On January 17, 2012, the Defendant sent another email to his

attorney, this time Lynn Boileau, also an attorney at Mr. Goldstein's firm, and stated that he had

two requests, namely:

-10-

"One is to get Lenny's name off of the property. (Want to do this asap)

The second request is to refinance the property under the name of the trust."

Both Ron and Len are copied on that email. Exhibit 7, p. 5 of 16.

28. On February 24, 2012 Len sent an email to his father asking what the status was of the effort "to get Lenny's name off of the property." The Defendant responded: "Still working on this..." Exhibit 7, p. 11 of 16.

29. As to the existence of the 2010 Quitclaim Deed, the Defendant admitted the following:

a. That he does not have the original. Defendant's Amended Responses to the Plaintiffs' Requests for Admission ("RFA") #1.

b. That he did not attempt to record the Quitclaim Deed after 2010. RFA #3

c. That the only purposes of the Quitclaim Deed were to allow him the opportunity to refinance the Property so that the Debtor would no longer have Deed of Trust obligation to Sun Trust Bank, or any other lender associated with the Property and for him to secure a mortgage at a lower interest rate than the one for which the Debtor was solely responsible from 2007 through October, 2019. RFA #31.

30. The next piece of the deception related to the limited liability company and trust using the name "CLR". The D.C Court noted that

The letters "CLR" are the first letters of the first names of Max's three sons, Chase, Len, and Ron. Max hoped that CLR, Inc.'s businesses eventually would be successful and the CLR, Inc. bank accounts would contain considerable sums of money that he could transfer to his three sons.

Exemption Decision, at p. 12.

-11-

31.  For some inexplicable reason, the D.C. Court, however, ignored the plain writing, in the Defendant's own hand, that the leases were in the name of a trust, namely the CLR trust, and not CLR, Inc. which, as the D.C. Court did actually determine, stood for Chase, Len and Ron. The Tamasco lease, dated October 1, 2014, for example listed the landlord as "Max Salas (CLR) and was signed: "Max E. Salas, Landlord/Agent, **Trustee**" (emphasis added).See Exhibit A[2], attached hereto.  The Brekelman's lease, dated August 17, 2014, was also signed: Max E. Salas, Agent/landlord/agent, **Trustee**" (emphasis added).See Exhibit A.  The Meeham lease, dated November 1, 2014, also attached as part of Exhibit A, does not contain the words "Trust" or "Trustee" but did state that the Defendant was acting for "(CLR)".

32.  The Defendant's Affidavit, filed herein in his Objection to the Plaintiffs' Motion for Summary Judgment (D-75-2)  states unequivocally that the Defendant

"19.  "...rented out rooms in the Property through an entity known as the "CLR Trust"." and

"20.  "...dealt with tenants, signed leases, and accepted rent paymnets on behalf of CLR Trust.

 "21.  "...deposited all rent checks into an account in the name of CLR Trust..."

33.  The Defendant's Affidavit does not even mention an account in the name of, or any other reference to, the "1610 Riggs Place Trust" after July, 2010.

34.  Although the Defendant's affidavit also asserts that "Len Salas had no involvement with the CLR Trust." that statement is directly contradicted by Len's testimony at his deposition

---

[2]The references to Exhibits from the Amended Memorandum in Support of the Plaintiffs' Motion for Summary Judgment are all numbers and are attached to the Amended Memorandum. The Exhibits attached to this Supplemental Memorandum are lettered to avoid confusion.

in the Superior Court case during which, when asked about the CLR Trust he stated:

"A.  Yes, that one I know.

Q All right.

And what is the CLR Trust?

A.  It is a Trust that I assume my dad set up for when he died that he would split up the assets equally among his three sons."

Exhibit 11, Salas Deposition Transcript, March 9, 2016: 30, 3-8.  The Defendant was present at his son's deposition in 2016.  He has never challenged that testimony of the Debtor until his recent Affidavit.

35.  The Defendant's document production in this case includes statements for one account under the name of the 1610 Riggs Property Trust.  The account was apparently opened on October 31, 2016 with a deposit of $6,429.44.  The last statement is for the period ending April 30, 2018 and shows a balance of $6,429.44.  There was no account activity shown on the statements from October 31, 2017 to April 30, 2018 other than the deposit of $6,429.44. A copy of the bank statements with the pages of banking activity for each month are attached hereto as Exhibit B. The Defendant produced no bank records for the alleged 1610 Riggs Property Trust prior to October, 2017 and no banking activity other than that one deposit.  No tax return was ever filed for the 1610 Riggs Property Trust.

36.  The Defendant was instructed by Ron in 2011 to open up a bank account in the name of the 1610 Riggs Property Trust.  He has provided no evidence any account was opened in the name of the Trust until October, 2017, more than two years after the fire, two years after the Plaintiffs filed lawsuits against the Debtor and the Defendant, and only a few months after hiring

-13-

the law firm of Stinson Leanard, et al, and Marc Albert, to represent the Defendant in his upcoming bankruptcy case. See, Defendant's Statement of Financial Affairs, filed in Case No. 18-00260, in the United States Bankruptcy Court for the District of Columbia, on May 2, 2018, (D-13) p. 7 of 10 (initial retainer of $2500 paid on May 2, 2017, payment of $6,339.69 on Novmber 9, 2017, total legal fees paid prior to Chapter 11 filing $68,349.69). A copy of the relevant page of the Defendant's Statement of Financial Affairs is attached as Exhibit C.

37. In his testimony at the Exemption Hearing in August, 2018, Ron testified, under oath, that he assumed the Quitclaim Deed had been recorded. He stated, in August, 2018 that "my assumption was that they were, but as of today I knew they, I know now that they were not." Testimony of Ron Salas, witness for the Debtor Max Salas, August 22, 2018, Exhibit 12, Exemption  Trans. Vol 1, 211:7 - 212:14.

38. Ron Salas further testified that he did not know why neither his father, his brother, his brother's wife, or he thought to produce the Quitclaim Deed during the Superior Court litigation. Based upon the 2011 email exchange between Ron Salas and his father, it is obvious that the Quitclaim Deed Ron prepared could not be recorded and was, likely defective and, more importantly, he knew it. That is the only rational explanation for Ron stating to his father that a Deed needed to be prepared in 2011, a year after Ron's Quitclaim Deed. That is the only rational explanation for the continued efforts, through February, 2012 to obtain a Quitclaim Deed from Len. That is the only rational explanation for Ron, Len, Kendra (Len;s wife) and Max to conveniently forget about the Quitclaim Deed until the very eve of the Superior Court Trial, in February, 2018. Exhibit 6, Exemption Trans. Vol 3, 39:15-25.

39. The only deed referenced by Max or his counsel, allegedly entitling Max to an

-14-

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered, or even mentioned by the Salas family or by Max, specifically.

40. Unfortunately, it appears that Ron, his father and his brother hid from the D.C. Bankruptcy Court, and the Plaintiffs, the fact that the Quitclaim was defective, or otherwise unrecordable at the hearing in Max's case in 2018.

41. The Plaintiffs are unaware of the reason why the Quitclaim Deed was abandoned. However, there are clues. For example, in the Exemption Hearing in D.C., Ron Salas testified that he was unaware of the requirements of Quitclaim Deeds in D.C. See, Ron Salas's testimony, Exhibit 12, 227:5 - 228:12. He stated that he was unaware that Deeds made to trusts had to be made in the name of the trustee. Id. Even in 2018, Ron was unaware whether the trust documents he created were valid under D.C. law. See, Ron Salas's testimony, Exhibit 12, 243:8. See D.C. Code §42-404, for formal requisites of a deed.

42. Max testified that he did not have the funds to record the deed. More importantly, it seems evident that he was unwilling to spend the money to record a deed. He spent hundreds of thousands of dollars from retirement savings and other funds in his bankruptcy, funds, at least a substantial portion of which, would have been available to Max if he wanted to record the Deed in 2010, or thereafter. See, for example, excerpts from Max Salas' schedules of assets, filed April 18, 2018 in Case No. 18-00260, (D-1), Exhibit 9. See also M Salas Third Amended Plan, Complaint, Exhibit B, at p. 11, Section 4.1.

43. No deed was recorded prior to Len's bankruptcy filing. See Max's Second Amended Disclosure Statement filed in his bankruptcy case in the District of Columbia, Case No. 18-00260, December 5, 2019, (D-276) , Exhibit 2, pp. 4, 22.

-15-

44. Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust. He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust. Exhibit 3, 33:23 - 50:25, 42:18 - 43:2. See Exhibit 1.

45. In his Objection to the Plaintiffs' Motion for Summary Judgment the Defendant cites the case of **Tolz v. Miller**[3] for the proposition that the doctrine of unclean hands is not available to the Plaintiffs unless the doctrine seeks "active intervention by the Court." Defendant's Objection, D-75), at p. 14. However, the Defendant misreads the basis for the decision in **Tolz**. In its determination that the doctrine of "unclean hands" does not apply the **Tolz** Court stated that "the problem here is not that the Millers acted in bad faith and have "unclean hands" it is that the Millers are not seeking active intervention by the Court." **Id.**, at 510. The principle relied upon by the Court in **Tolz** is set forth in *Pomeroy's Equity Jurisprudence* (3d. Ed.), Vol. 1 § 398 which states, in part:

> ...while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscionable or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies.

*Tolz, supra*, at 510.

46. **Tolz** cites as its only case law authority, the case of **Carmen v. Fox Film Corp.**, 269

---

[3]391 B.R. 504 (Bankr. M.D. Fla. 2008)

-16-

(2nd Cir. 1920) a case in which the 2nd Circuit asserts the not so surprising position that a court "will refuse its aid in any manner to one seeking its active interposition if he has been fulity either of unlawful or inequitable conduct respecting the subject matter of the litigation."

*Id.*

47.   ***Carmen*** was case involving a contract dispute between the Plaintiff, an actress, and the Fox movie company.   The Court found that the Plaintiff sought equitable relief but had not communicated honestly regarding the contracts she was attempting to repudiate so she could enter into a new contract with another movie maker at a much higher rate.   The court held that "a contract dishonestly, or dishonorably obtained was a bar to relief in equity."   In explaining the court's equitable role, **Carmen** stated:

> The maxim that one who comes into equity must come with clean hands expresses rather a principle of inaction than one of action. It means that equity will refuse its aid in any manner to one seeking its active interposition if he has been guilty either of unlawful or inequitable conduct respecting the subject-matter of the litigation.

***Carmen, supra,*** at  932.   Because the Trustee has not acted in bad faith, dishonestly, or dishonorably, nor have the Plaintiffs, the doctrine of unclean hands is available to them against the Debtor and the Defendant.

48.   The Defendant also cited the ***Tolz*** case for the proposition that since the Debtor, in ***Tolz*** only held "bare legal title," she had no interest in the transferred property and, therefore, the Trustee could not recover under the bankruptcy or state fraudulent conveyance statutes.   The Court described initial transfer (to the debtor) as a transfer which "parked" the property with the Debtor for the sole purpose of making one of the transferors a more attractive candidate for financing in a business venture. ***Tolz, supra,*** at 508. While the actions of the Defendant and the

-17-

Debtor here may be at least as nefarious as those of the Millers in ***Tolz***, the facts surrounding the determination of "bare legal title" in ***Tolz*** are hardly the facts of the instant case, in which the Debtor took out a loan for which he was solely responsible and actively participated, as owner for the purpose of future refinancing, in addition to the other facts outlined herein.

49.  In ***Swanson v. Stoffregen (In re Stoffregen)***[4], cited on p. 15 of the Defendant's Opposition, the Debtor was a minor son of his parents whose name was put on the title to property for no stated reason.  According to the Defendant, the son did not contribute financially to the property and, therefore, the son's trustee was unable to recover the transfer from the son to his parents as a fraudulent conveyance.  Once again, the Debtor in ***Swanson*** clearly held only the barest of "bare legal title(s)" to the property.  Here the Debtor financed the purchase of the property by his father, lived in the property, was not a minor, and participated in attempts to refinance including filing a Loss Mitigation Statement with SunTrust bank in February, 2016 in which he asserted that he was the owner and borrower, seeking forbearance or other relief regarding the lack of payments on the Sun Trust Note (which the Defendant claims he paid and was solely responsible for.

50.  While there may be an issue as to what constitutes "bare legal title", at least these cases show only that "bare legal title" without any financial or other involvement concerning  the property frustrates the trustee's ability to recover under applicable fraudulent conveyance statutes.  The Plaintiffs assert that there is no controlling law which binds this Court to the conclusion that the Debtor's interest is not recoverable as a fraudulent conveyance.

---

[4] 206 B.R. 939 (Bankr. E.D. Wis.1997)

**C.    The Rulings of the D.C. Bankruptcy Court are Not Binding on the Parties to this Adversary Proceeding**

51. Issue Preclusion which includes the doctrines of *res judicata* and collateral estoppel does not apply in this case because the parties are not the same, as in the D.C. Bankruptcy Court, the issues are not the same (exemption not avoidance and recovery claims) and the conclusions reached by the D.C. Bankruptcy Court were not fully litigated (the so-called "Resulting Trust" theory was not proposed, opposed, or argued by either party) and/or were not necessary to the Court's decision (the "limited' interest of the Debtor, Len Salas, in the Property was not necessary to the determination of a resulting trust.)

52.   The doctrine of res judicata bars a party from re-litigating claims that were, or could have been, asserted in the initial action. *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). For res judicata to apply, the following elements must be satisfied: "(1) an identity of parties in both suits; (2) a judgment rendered by a court of competent jurisdiction; (3) a final judgment on the merits; and (4) an identity of the cause of action in both suits." *Paley v. Estate of Ogus,* 20 F. Supp. 2d 83, 87 (D.D.C. 1998).  Even if the other three elements existed, which they did not (i.e. no "identity of issues" and different causes of action), there is no identity of parties here.  The Trustee and the Debtor's Estate were not parties to the D.C. Exemption Decision but they are the parties to this case.  "The Plaintiffs'...stepped into the shoes of the Trustee."  January Order, at p. 3.

53.   Because the Trustee is a separate party, not in privy with the Plaintiffs, he is not barred by the doctrine of *res judicata*.  "a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or

their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192, 374 U.S. App. D.C. 63 (D.C. Cir. 2006). Broadly speaking, "'[a] privy is one [who is] so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case.'" *Herrion v. Children's Hosp. Nat'l Med. Ctr.*, 786 F. Supp. 2d 359, 371 (D.D.C. 2011) (quoting *Smith v. Jenkins*, 562 A.2d 610, 615 (D.C. 1989) (alterations in original)). Simply put, a trustee has different status, rights, responsibilities and causes of action than a creditor.

54.   For the doctrines of issue preclusion to apply to the D.C. Bankruptcy Court's decision would require that the trustee, the claimant here, participated in the D.C. bankruptcy court case and that the case was decided on the merits such that he was bound by the decision. However, issue preclusion does not apply here because the trustee was not a party to the D.C. case, period.  Furthermore, no issue in the D.C. bankruptcy case related to the issue of this Trustee's avoidance and strong arm authority and powers but only to whether the Defendant was entitled to an exemption under D.C. law.  The D.C. Bankruptcy Court specifically declined to hear the assertion of the Plaintiffs in the Exemption Hearing on the issue of the Trustee's avoidance and recovery powers.  See Exemption Decision, at p. 59. (deferring to this Court).

55.   Under the collateral estoppel form of issue preclusion, "'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254, 295 U.S. App. D.C. 158 (D.C. Cir. 1992)). This form of issue preclusion applies if three conditions are met:

-20-

First, the issue must have been actually litigated, that is, contested by the parties and submitted for determination by the court. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in the first . . . [case]. Third, preclusion in the second . . . [case] must not work an unfairness. ***Otherson v. Dep't of Justice***, 711 F.2d 267, 273, 228 U.S. App. D.C. 481 (D.C. Cir. 1983) (internal citations, quotations, and quotation marks omitted).

Cited and Quoted in ***Sodexco Operations, LLC v. Not-For-Profit Hosp. Corp***. 210 F.Supp.3d 138, 148 (D.C.D.C. 2016)

56.  Issue preclusion is an "essentially procedural concept." ***Abbate v. United States***, 359 U.S. 187, 200 n.4, 79 S. Ct. 666, 3 L. Ed. 2d 729 (1959). It "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." ***Gen. Elec. Med. Sys. Europe v. Prometheus Health***, 394 Fed. Appx. 280, 283 (6th Cir. 2010) (citation omitted) (internal quotation marks omitted). The choice of law in issue preclusion depends on the forum of the previous determination. ***Id***. at n.2

> To prevail on a claim of collateral estoppel [in Tennessee], a party must establish: (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

***Bowen ex rel. Doe v. Arnold***, 502 S.W.3d 102, 107 (Tenn. 2016) (quoting ***Mullins v. State***, 294 S.W.3d 529, 535 (2009)). Further, the issue must not only have been actually litigated and decided on the merits, it must also have been necessary to the previous judgment. Mullins, supra, at 535 (citing ***State v. Thompson***, 285 S.W.3d 840, 848 (Tenn. 2009)). Dicta will not be given

-21-

preclusive effect. *Id.* (citation omitted). D.C. law is not substantively different from Tennessee law. *See Yamaha Corp. of Am., supra* and *Otherson*, **supra**.

57. In the instant case, the D.C. Bankruptcy Court determined that the Debtor transferred his property by virtue of a resulting trust allegedly occurring as a "result" of the July, 2010 attempted Trust and Quitclaim Deed. However, the issue of the resulting trust was never litigated by the parties, not argued as part of the August, 2018 exemption hearing and not part of the filings related to the Plaintiffs' Objection to the Debtor's claim of Exemption. See, United States Bankruptcy Court for the District of Columbia, Case No. 18-00260 Docket Entries, Plaintiffs' Objection to the Debtor's Claim of Exemptions, filed June 20, 2018 (D-44), and Debtor's Opposition to Objection to Claim of Exemptions, filed July 11, 2018 (D-66). Copies are attached hereto as Exhibits D and E, respectively.

58. Finally, the family's consistent lies and misrepresentation regarding the status of the alleged 2010 transfer makes the Defendant ineligible for relief. Issue Preclusion, unlike Res Judicata, is subject to "equitable considerations." *American Forest Res. Council v. Shea*, 172 F.Supp.2d 24, 30 (D.C.D.C. 2001).

### D. The Debtor's Interest in the Property is a Sufficient Interest for the Effective Use of the Trustee's Avoidance and Recovery Powers

59. The issue of whether only bare legal title is sufficient to establish a basis for recovery of a fraudulent conveyance was referenced, but not decided, in the Supreme Court case of *In re Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) which involved the determination of the status of an IRS lien on the debtor's property. In a footnote which was clearly *dicta*, the Supreme Court noted that Congress apparently did not intend that the trustee

-22-

could recover transfers of property, title to which was limited to "bare legal title."

60. The 6th Circuit has defined "obiter dictum" as "a judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision of the case and therefore not precedential (although it may be considered persuasive). ***Richmond Health Facilities v. Nichols***, 811 F.3d 192, 201, n. 8, quoting *Black's Law Dictionary*, (10th Ed. 2014).

> "[i]f the court's judgment and the reasoning which supports it would remain unchanged, regardless of the proposition in question, that proposition plays no role in explaining why the judgment goes for the winner." Pierre N. Leval, *Judging under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1256 (2006). Dicta may include overbroad statements, see, e.g., ***United States v. Freeman***, 640 F.3d 180, 193 (6th Cir. 2011), up to an analysis of an entire issue, verging on an advisory opinion, see, e.g., ***Spears v. Stewart***, 283 F.3d 992, 999 (9th Cir. 2002).

***Callahan v. Fed. Bureau of Prisons***, 965 F.3d 520, 526 (6th Cir. 2020)

61. Although there are many techniques for determining the difference between binding precedent and non-binding dicta, one approach is to ask whether the questionable language is essential to the holding's reasoning. ***See Tyler v. Cain***, 533 U.S. 656, 663 n.4, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001). Accord, ***Logan v. MGM Grand Detroit Casino***, 939 F.3d 824, 836 (6th Cir. 2019)

62. In his introduction to the Court's decision in ***Whiting Pools***, Justice Blackmun, stated:

> Promptly after the Internal Revenue Service (IRS or Service) seized respondent's property to satisfy a tax lien, respondent filed a petition for reorganization under the Bankruptcy Reform Act of 1978, hereinafter referred to as the "Bankruptcy Code." The issue before us is whether § 542(a) of that Code authorized the Bankruptcy Court to subject the IRS to a turnover order with respect to the seized property.

-23-

462 U.S. 198, 199.  The issue decided by the Supreme Court is whether a secured party, such as the IRS, must turn over property seized prior to the bankruptcy case.  The statement, made in a footnote, that Congress did not intend that a trustee could recover property in which the debtor retained only bare legal title, is *obiter dicta* and is not binding on lower courts.

63.  In ***Whiting Pools***, the comment that a Trustee could not recover property in which the Debtor held only bare legal title, was mere *dicta*, unnecessary and not directly related to the Court's decision, which is likely part of the reason why the comment is contained only in a single footnote.

64.  The relevant part of the Whiting Pools decision which relates to the scope of the Trustee's right to exercise possession or control over the Debtor's Property recited below:

> Section 541(a)(1) provides that the "estate is comprised of all the following property, wherever located: . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U. S. C. § 541(a) (1) (1976 ed., Supp. V).  The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad.  Most important, in the context of this case, § 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code. See H. R. Rep. No. 95-595, p. 367 (1977). Several of these provisions bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.

462 U.S. at 204-05.  The footnote which discusses limitations on the scope of the estate is set out in full:

> See, e. g., §§ 543, 547, and 548. These sections permit the trustee to demand the turnover of property that is in the possession of others if that possession is due to a custodial arrangement, § 543, to a preferential transfer, § 547, or to a fraudulent transfer, § 548.

> We do not now decide the outer boundaries of the bankruptcy estate. We note only that Congress plainly excluded property of others held by the debtor in

-24-

trust at the time of the filing of the petition. See § 541(b); H. R. Rep. No. 95-595, p. 368 (1977); S. Rep. No. 95-989, p. 82 (1978). Although it may well be that funds that the IRS can demonstrate were withheld for its benefit pursuant to 26 U. S. C. § 7501 (employee withholding taxes), are excludable from the estate, see 124 Cong. Rec. 32417 (1978) (remarks of Rep. Edwards) (Service may exclude funds it can trace), the IRS did not attempt to trace the withheld taxes in this case. See Tr. of Oral Arg. 18, 28-29.

462 U.S. 205 n.10. Note that the Supreme Court specifically stated that it did not decide "the outer boundaries of the bankruptcy estate." While the pronouncement in footnote 10 can be considered relevant, important or even persuasive by lower courts, it is *obiter dicta*, and not binding.

65. Under the plain meaning rule of statutory construction, the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* does not contain any such limitation and clearly states a right to recovery of "an interest in property." Legal title is clearly an interest in property. ***In re Tleel***, 876 F.2d 769, 771 (9th Cir. 1989)(citing California law).

66. The Defendant has cited a number of cases in which courts have determined that if the debtor holds only "bare legal title" the trustee is prohibited from recovering under 11 U.S.C. §548(a)(1)(B). In most of the cases cited by the Defendant the court has determined that the subject property belongs to the "equitable owner" under a resulting trust theory. See, for example ***Dunham v. Kisak***, 192 F.3d 1104 (7th Cir. 1999). Under Illinois law, as asserted in ***Scott v. C.I.R.***, 226 F.3d 871, 874 (7th Cir. 2000), the intent to create a resulting trust must be demonstrated by clear and convincing evidence that is "unequivocal both as to its existence and to its terms and conditions." ***Id.*** "If the evidence is doubtful or capable of reasonable explanation upon any theory other than the existence of a trust, it is insufficient." ***Id.*** In accord, ***Sei v. United States***, No. 04 C 6446, 2005 U.S. Dist. LEXIS 17732, at *9, 96 A.F.T.R.2d (RIA) 2005-5917

-25-

(N.D. Ill. Aug. 22, 2005).

67. Even if the ***Whiting Pools*** pronouncement eliminating "bare legal title" from the property interests which the Trustee may recovery under Bankruptcy Code sections such as §§ 544 and 548 is binding or is followed by this Court, the interpretation of the phrase: "bare legal title" in cases from other circuits is not clear and is not binding on this court. There is no congressional report language or other legislative history references in ***Whiting Pools***, or other case reviewed by the Plaintiffs, which defines the scope, or limits of "bare legal title."

68. In most instances of jurisprudence, except where the "plain meaning" leads to an absurd result, this Court should look no further than the language of the Bankruptcy Code which clearly gives the Trustee the right to recover any **transfer of an interest in property** under §§ 544 (b)(1) and 547 (a)(1)(B). Congress could have added "interest in property of the estate" rather than just "interest in property" but chose not to do so. Moreover, given the lack of definition of the phrase "bare legal title" and the apparent confusion among the circuits over the scope of recoverable property, Congress could have amended §§ 544 and 548 to make clear any recovery must be of property of the estate as limited by §541 (d). However, to date, Congress has not chosen to do so.

69. It is not the Court's responsibility to add or subtract language from statutes. As the Supreme Court has held:

> If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think … is the preferred result." ***United States v. Granderson***, 511 U.S. 39, 68, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (concurring opinion). This allows both of our branches to adhere to our respected, and respective, constitutional roles. In the meantime, we must determine intent from the statute before us.

-26-

***Lamie v. United States Trustee***, 540 U.S. 526, 542 (2004)

70. And the United States Supreme Court has also further explained and emphasized its

limits on the review of plain an unambiguous statutory language:

> As we have repeatedly held, the authoritative statement is the
> statutory text, not the legislative history or any other extrinsic
> material. Extrinsic materials have a role in statutory interpretation
> only to the extent they shed a reliable light on the enacting
> Legislature's understanding of otherwise ambiguous terms. Not all
> extrinsic materials are reliable sources of insight into legislative
> understandings, however, and legislative history in particular is
> vulnerable to two serious criticisms. First, legislative history is itself
> often murky, ambiguous, and contradictory. Judicial investigation
> of legislative history has a tendency to become, to borrow Judge
> Leventhal's memorable phrase, an exercise in "'looking over a
> crowd and picking out your friends.'" See Wald, *Some Observations*
> *on the Use of Legislative History in the 1981 Supreme Court Term*,
> 68 Iowa L.Rev. 195, 214 (1983). Second, judicial reliance on
> legislative materials like committee reports, which are not
> themselves subject to the requirements of Article I, may give
> unrepresentative committee members--or, worse yet, unelected
> staffers and lobbyists--both the power and the incentive to attempt
> strategic manipulations of legislative history to secure results they
> were unable to achieve through the statutory text.

***Exxon Mobil Corp. v. Allapattah Servs.***, 545 U.S. 546, 568-69, 125 S.Ct. 2611, 2626 (2005).

***Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp.***, 485 U.S. 495, 501, 99 L. Ed.

2d 582, 108 S. Ct. 1350 (1988) ("Unenacted approvals, beliefs, and desires are not laws"). ***See***

***also, United States v. Granderson, supra***, 511 U.S. at 68-69.

71. Regardless of the outcome of the debate over statutory construction, under any

reasonable analysis of his interest in the Property, the Debtor in this case, Len Salas, held more

than "bare" legal title. He held an equitable and a beneficial interest in the property as the result

of the borrowing that he incurred for the property and his recognized interest in the property by

all federal and state agencies. He also retained a beneficial interest in the property by virtue of his interest in the CLR Trust which was the "actual" owner of the property and the entity for which the Defendant managed the property. The Debtor was also a necessary party to all attempts to refinance so that the Defendant could obtain his "desired lower interest rate." See, for example, the Loss Mitigation Statement prepared on February 28, 2016 for SunTrust Mortgage and signed by Len Salas, as "borrower", based upon his income and circumstances (unemployment) only. The Loss Mitigation Statement is attached hereto as Exhibit F. The Defendant did not list himself as a co-borrower or participant in the attempt to obtain loss mitigation relief. Note that this document was prepared during discovery in the Superior Court litigation, four days after the Defendant's deposition in the Superior Court case (2/28/16) and only nine days before the Debtor's deposition (3/9/16). Although in related documents the Defendant did state the Property was his "home," he never identified himself as the "owner."

72. The Defendant's claimed interest in the Property is solely an equitable interest to which he is not entitled under the undisputed facts and circumstances of this case, as evidenced by the history of lies and deceit perpetrated on the D.C. Bankruptcy Court and this court. That history is evidenced by the following undisputed facts:

a. The Defendant hid his "ownership" of the property from taxing authorities, other governmental authorities, the lender, and the public.

b. In the Superior Court litigation the Defendant and the Debtor were vague and misleading concerning the existence of any owner other than the Debtor. Only the CLR Trust was specifically recognized by the Debtor. See Exhibit F.

c. The Superior Court rejected the "last minute" efforts of the Debtor and the

-28-

Defendant, in March, 2018, to belatedly assert that the Defendant was the owner.

d. The Defendant violated D.C. law when he rented rooms at the Property without a proper inspection and permit which directly led to the unsafe conditions at the Property and then the deaths of Michael McLoughlin and Nina Brekelmans.

e. From 2015 - 2019, the Defendant made no payments on the mortgage for which only Len was obligated.

f. Despite knowing that the 2010 Trust and Deed were invalid and abandoned as early as 2011, the Defendant "resurrected" the Deed in early 2018 but only after finding out that if he could claim the Deed was still in existence, he would be able to claim the Property as his and exempt the Property's entire equity under D.C. law.

g. The Debtor also knew, prior to his bankruptcy filing that if the Property belonged to him, it would not be exempt.

h. The Debtor had, in his possession, the emails, or copies of the emails, that prove the 2010 Quitclaim Deed was abandoned and not in effect no later than mid-2011. The Debtor's brother, Ron, determined that the 2010 Quitclaim Deed was not effective sometime in 2011 and so notified his father, the Defendant and his brother, the Debtor. Nevertheless, each member of the Salas Family participated in the scheme to lie about the Quitclaim Deed in the attempt to retain possession of the Property for the Defendant and the Debtor.

h. In the period 2011 - 2015 the Debtor repeatedly asked his father to remove his name from ownership of the Property. In these communications, some of which were by email, at no time did the Defendant dispute that the Debtor was still the owner of the Property despite the 2010 Quitclaim deed which was later used as the basis for claiming an exemption in the D.C.

-29-

Bankruptcy Court.

i. In his affidavit, attached to his Objections to the Plaintiffs' Motion for Summary Judgment, the Defendant admitted that he leased rooms at the Property under the name of the CLR Trust and deposited rental income into a CLR Trust Account.

E. **The Trustee is Not Under Inquiry Notice That Would Show the Defendant May Be The Owner of the Property.**

73. Inquiry notice is found when the purchaser (the Trustee) is "aware of circumstances which generate enough uncertainty about the **state of title** that a person **of ordinary prudence** would inquire further about those circumstances. (Order, at p. 4)(emphasis supplied) The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed. (Order at p. 4, quoting *Clay Props*, 604 A.2d at 895. At the time of the Debtor's bankruptcy filing, in April, 2018, the trustee would know that all indicia of title and all government notices regarding the property were in the name of Len Salas, not the Defendant. Furthermore, the Trustee would know that the Superior Court of the District of Columbia rejected the claim of Len that he was not the owner. A further inquiry into the Superior Court case would show that the CLR Trust was the owner and manager of the property and that Len was the "L" in CLR and had, at a minimum, a beneficial interest in the property in addition to his title interest.

74. The Debtor and the Defendant have admitted in their testimony and in discovery in this adversary proceeding that there is no written document setting forth any agreement between the Debtor and the Defendant regarding either the Defendant's "ownership interest" in the Property or the Defendant's responsibility to pay the mortgage and other expenses of the

-30-

Property. Thus, when confronted by a purchaser, the Defendant would not have been able to produce a single document showing he was the owner of the Property or the beneficiary of the owner. Moreover, the Defendant has made no effort, prior to December, 2019, to notify "the world" that he is the owner of the Property.

> A purchaser is held to be on inquiry notice where he or she is aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed. 6A R. POWELL, REAL PROPERTY, supra, para. 905[1][d][iv], at 82-57. See, e.g., *Rosenthal v. J. Leo Kolb, Inc.*, supra, 97 A.2d at 927 ("'the knowledge of facts or circumstances reasonably sufficient to put a person of ordinary prudence upon inquiry which, if pursued with proper diligence, would lead to the discovery of the actual condition of the title, is equivalent to knowledge direct and certain,'" quoting *Manogue v. Bryant*, supra, 15 App. D.C. at 261); *Williams v. Skyline Dev. Corp.*, 265 Md. 130, 288 A.2d 332 (Md. 1972) (if the purchaser "'had knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry, he will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued'") (citation omitted).

75. This Court, in its January Order cited several cases which found that physical possession is sufficient to place the Trustee on inquiry notice. However, under the undisputed facts of this instant case, those cases would not result in notice to a bona fide purchaser. In this case, unlike, for example, *Patel v. Rupp*[5], the Defendant does not have an unrecorded Deed no matter how hard the Defendant waves the photocopy of the abandoned, 8 year old deed, to an non-existent trust. In *Patel*, the District of Utah stated:

> once the purchaser knows that the occupants have no title interest in the property, the purchaser is under no further duty to investigate the identity of the owners beyond those that are recorded.

---

[5] 195 B.R. 779, 784 (D. Utah 1996), January Order, at p. 4.

-31-

*Id.*, at 784.

76. Note also that the actions and statements of the parties speak volumes as to the existence of a valid deed. None of the actions and communications of the Debtor or the Defendant between 2010 and 2017 show the existence of a valid, recordable, document. In fact those actions and communications are evidence of the contrary. See, Exhibits 7, A, B, and F, for example.

77. In ***Reinbold v. Thorpe***[6] , another case cited in this Court's January Order, a recorded Deed identified the party claiming an interest as a joint tenant and as husband of the titled owner. The Court determined that the husband's interest was within the scope of facts which would have put a prospective purchaser on notice, namely, the husband was <u>listed on the deed</u> as a joint tenant, he was the husband of the other joint tenant and he was in continuous physical possession of the property. The facts of the instant case simply do not give rise to an "unusual circumstance [that] is a ground of suspicion...[demanding] investigation." ***Id.***, at 185. Similarly, in ***Osberg v Fibison (In Re Fibison)***, the Wisconsin bankruptcy court determined a recordable conveyance (contract of sale) made the physical possession sufficient notice to a purchaser. Indeed, under Wisconsin law, when the deed is unambiguous it is deemed unassailable and proof of ownership. See ***Osberg v. Risler (In re Risler)***, 443 B.R. 508, 511 (Bankr. W.D. Wisconsin 2010) (cited in ***Osberg, supra***). (D.C. law appears to be similar. ***See DLY-Adams Place, LLC v. Waste Mgmt of Md.*** 2 A.3d 163, 1656-167 (D.C. App. 2010).) The other cases cited by this Court also require some title or recordable interest in the Property to overcome the bona fide purchaser status. ***LR***

_____

[6] 546 B.R. 172 (Bankr. C.D. Ill 2016)

*Partners L.L.C.  v. Steiner*[7] involved a recorded notice of trustee's sale. Since the recorded notice of Trustee's Sale would have put a subsequent purchaser on notice, the resulting unrecorded Trustee's Deed was superior to a subsequent purchaser.  *Id.*

78.  In *Fowler v. Russo*[8], the Pennsylvania bankruptcy court determined that the parties asserting bona fide purchaser status were on notice of facts that required further inquiry based upon "facts and circumstances derived from the publicly-recorded documents within the chain of title..."  Citing Pennsylvania law, the court stated:

> A bona fide purchaser obtains title that is essentially purged of the fraud of his or her predecessors in interest. See *Puharic*[9], 176 A. at 233 ("a purchaser of land who pays value for it and has no knowledge, express or implied, of the existence of any equities in third parties, holds the title so purchased, free and clear of secret liens or equities"); *In re Lauver*[10][11], 372 B.R. 751, 760 (Bankr. W.D. Pa. 2007) (under Pennsylvania law, "a purchaser of real property without actual or constructive notice of a third party's claims with respect to the property takes it free of the claim of that party").

Cited and quoted in *Fowler v. Rauso (In re Fowler)*, 425 B.R. 157, 196 (Bankr. E.D. Pa. 2010)

79. Since 2007, the Defendant has had no recordable instrument or other document evidencing he had any interest in the Property.  Indeed, in 2014 and 2015, the last years in which

---

[7]251 B.R. 137, 142 (Bankr. D. Ariz. 2000)

[8]425 B.R. 157, 198 (Bankr. E.D. Pa 2010)

[9]176 A. 233, 234 (Pa. 1934)

[10]372 B.R. 751, 760 (Bankr.W.D. Pa. 2007

[11]The *Lauver* ruling (relying on the Debtor's Schedules as notice of facts which could p;ut the Trustee on inquiry notice) was subsequently abrogated by the Bankruptcy Court for the Western District of Pennsylvania in *Zelby v. First Horizon Loans (In re Orig)*, 458 B.R. 717, 722-23 (Bankr. W.D. Pa. 2011).  That abrogation relates      to the use of the Debtor's Schedules, filed contemporaneously with the commencement of the bankruptcy case, as notice of adverse possession, or possessory rights.

-33-

the Defendant occupied the Property before his bankruptcy, the only documents produced by the Defendant that related to "ownership" of the Property were leases in the name of the CLR Trust. The Defendant has alleged, and the record contains, no public record of the Defendant's alleged interest in the Property after 2007. Moreover, it is inequitable for the Defendant to assert, after 11 years of maintaining that he had no ownership interest in the Property that he suddenly has an ownership interest that trumps the Trustee's avoidance or recovery powers. Indeed, the Defendant made no effort to advise any governmental agency or other party that he was the owner of the Property and not his son.

80. The Defendant has admitted that he does not have an original Deed, did not have a copy, does not know where the original Deed was, at any time after 2012 and, most importantly, his own emails show that he had no document which he believed gave him possession of the property. Moreover, he has admitted that he operated the property for the benefit of his sons, including the Debtor, through the CLR Trust. See Defendant's Affidavit (D-75-2).

81. A person "of ordinary prudence" would have asked for a copy of a deed showing that the Defendant was the owner of the Property. The Defendant did not have such a deed and there was no deed that could have been recorded (See Ron's email to Len and Max on June 17, 2011, for example, Exhibit 7, Bates Number, LenSalas000016 -17. A person of ordinary prudence would have checked the District of Columbia records which showed ownership and responsibility in the name of Len Salas only (See, for example, Exhibits G-I, attached to this Memorandum, consisting of notices to Len Salas, as owner, at his address on Otis Street,NW, Washington, DC 20018 of a property ownership report (Exhibit G) and notices of infractions from D.C. Agencies (Exhibits H and I) in the time frame of June, 2015 to November, 2015). A

-34-

person of ordinary prudence might also have searched the Superior Court case filings which show that the owner of the Property was Len Salas, at all relevant times. None of this would have seemed unusual to a person relying on the public record that Len Salas was the owner. It is hardly unusual for a relative to be living in a house owned by a family member, or managing that house for the family member.

82. Although cases in Pennsylvania state that open and notorious possession gives rise to sufficient notice to require a subsequent purchaser to inquire as to the status of the possessor's interest in the Property, none of the cases cited by the Pennsylvania courts involve unrecorded documents. *See, for example, Kinch v. Fluke*, 311 Pa. 405 (1933)( Knowledge of Agreement of purchase) and *Long John Silver's Inc. v. Fiore*, 2554 Pa. Super. 183 (1978)(knowledge of agreement of sale or deed). Here, there were no agreements between the Debtor and the Defendant regarding ownership of the Property outside the abandoned Quitclaim Deed and at all times after 2011, the Defendant had no deed either in his name, or in the name of a trust, that would have provided notice to anyone. He had no agreement with the Debtor regarding his ownership of the Property or his responsibility for the Property. In short, he had no documentation to show a purchaser in 2018. In fact even in the first three years of the Superior Court litigation, neither the Debtor nor the Defendant produced even a copy of the alleged 2010 Quitclaim Deed.

83. When physical possession is relied upon as a circumstance providing notice, "'it must be open and unambiguous, and not liable to be misunderstood or misconstrued'" and "it must be sufficiently distinct and unequivocal so as to put the purchaser on his guard." *Hayward v. Mayse*, 1 App. D.C. 133, 140 (1893) (quoting *Townsend v. Little*, 109 U.S. 504, 511, 27 L. Ed. 1012, 3

-35-

S. Ct. 357 (1883)). The type of possession necessary to give rise to inquiry notice must be inconsistent with the record title, otherwise it will not be notice of the unrecorded interest. ***Chillemi v. Pennsylvania Rubber Co.***, 58 App. D.C. 394, 396, 31 F.2d 638, 640 (1929).

84.  In the ***Clay Properties***[12] case, a lessor occupied the property through Clay, the record title holder, along with another one of Clay's companies. There were also other tenants in the multi-unit office building. Under these circumstances, the lessor's occupancy seems to convey no suggestion that it is inconsistent with the record title in Clay. Lessor's occupancy appears neither distinct nor unequivocal, see Hayward, supra, 1 App. D.C. at 140-41, but instead consistent with the record title since CPI occupied with and through Clay, its president and the record title holder. ***See also Cohen v. Thomas & Son Transfer Line, Inc.*** 196 Colo. 386, 586 P.2d 39, 41 (Colo. 1978). Likewise here, when the property is titled in the name of Len Salas, all notices and other indicia of ownership are also in the name of Len Salas, and the property is managed by the owner's father under a trust for the benefit of the children, including Len.  There is no basis for further inquiry and bona fide purchaser status requires no further inquiry.  However, even if further inquiry were required by a prudent purchaser that inquiry would have shown that the Debtor is the owner for all legal purposes.

85.  Continued possession by a prior owner is not so inconsistent with the record title as to provide sufficient notice to a subsequent purchaser of the seller's interest where the seller has signed a deed to the titled owner.  See, for example, ***McKinley v. Crawford***, 58 F.2d 528 (D.C. Cir. 1932).  The rationale is explained in ***McKinley***,

An exception to the general rule is recognized where a vendor remains for a time in

---

[12] 604 A.2d 890, 894 (D.C. App. 1992)

-36-

possession after giving a fee-simple deed, with covenants, which he permits to be recorded. The object of the general rule is to protect one in possession from acts of others who do not derive their title from him; **not to protect him against his own acts, and especially against his own deed**. *Bloomer v. Henderson*, 8 Mich. 398, 77 Am.Dec. 453; *Van Keuren v. Central R. Co.*, 38 N.J. Law, 165; *Strong v. Efficiency Apt. Corp.*, 159 Tenn. 337, 17 S.W.2d 1, 19 S.W.2d 273; *Wicklein v. Kidd*, 149 Md. 412, 131 A. 780.

58 F.2d, 529-30.

> 86 . The Court also explained a second rationale for the exception noted above, that is
>
> Another reason for this exception to the rule is the equitable maxim that, where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it. *National Safe Deposit, etc., Co. v. Hibbs*, 229 U.S. 391, 33 S.Ct. 818, 57 L.Ed. 1248; *Pirkey v. Williams*, 45 App.D.C. 590, 599; *Moore v. Moore*, 47 App.D.C. 23, 28; Gray v. Jacobsen, 56 App.D.C. 353, 13 F.2d 959, 48 A.L.R. 583.

*Id*. Following the logic of *McKinley*, when the Defendant deeded the Property to his son, he declared to the world that the Debtor was the owner of the Property. His failure to "declare to the world" that he was the "real owner" of the Property does not change the equities in favor of the Defendant.

87. The Plaintiffs could not find a case which clearly defines what constitutes "open and unambiguous" possession. However, it seems axiomatic that when the person in possession is attempting to hide his possession, that possession is neither "open" nor "ambiguous". The facts in this case are clear that the Defendant did nothing to inform creditors, the District of Columbia or any other individual or entity that he was the owner of the Property. Even the leases were in the name of the children's trust, CLR Trust, and not the Defendant. And, according to the entire family, Ron, the lawyer, the Debtor and the Defendant, there was no document transferring the Property from the Debtor to the Defendant.

88.  Furthermore, even if a prospective purchaser were to find a reference to the Superior Court litigation between the Debtor and the Defendant and the Plaintiffs, that purchaser would have seen that the Superior Court judgment against the Defendant was based upon his [mis] management of the Property which at the time was leased to  tenants under the name of the CLR Trust as set forth in the Defendant's Affidavit filed with the Defendant's Opposition to the Plaintiffs' Motion for Summary Judgment (See D-75-2).  The Defendant produced parts or all of five leases that were in existence prior to the 2015 fire which made the Property uninhabitable and cost the lives of Michael McLoughlin and Nina Brekelmans. See Exhibit F.

89.  The are no documents in existence which would have stated that the Defendant was the owner of the Property and the abandoned 2010 transaction would have not provided notice to anyone that the Defendant had an interest in the Property, only the abandoned, 2010 Trust which was, by applicable law, a nullity.  Since the trust transfer was made without consideration of any kind, there is no basis by which the Defendant would have obtained title, or be able to allege that he did, that is without the schemed later concocted by the Salas family, in 2018.

III.    <u>CONCLUSION</u>

For the reasons set forth in the foregoing Supplemental Memorandum, the Plaintiffs assert that they remain entitled to summary judgment on Counts I, II, IV, V, VI of their Complaint and seek a judgment declaring and adjudging that the Plaintiffs, on behalf of the Debtor's Estate are the owners of the Property and are entitled to recover the Property or its value for the benefit of the Debtor's Estate and for such other and further relief as is consistent with the Plaintiffs' Complaint and the relief sought therein.

Respectfully submitted,

-38-

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt
        Philip J. McNutt
        11921 Freedom Drive, Ste 584
        Reston, VA 20190
        703-904-4380
        202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

<u>Certificate of Service</u>

I HEREBY CERTIFY THAT a copy of the foregoing Supplemental Memorandum, was delivered electronically, on the 21st day of February, 2023 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt
Philip J. McNutt


-39-

-40-

DISTRICT OF COLUMBIA LEASE: SHORT FORM

# THIS LEASE

Made this 1 st day of Nov , 2014

Between John Mecham Tenant

and_Max Salas (CLR) Landlord

WITNESSETH, that Landlord leases to Tenant the premises known as Basement 1610 Riggs Pl NW  in the District of Columbia, for the term of ONE year(s) commencing on the FIRST day of November 1, 2014  and ending at midnight on the day of 31Oct 2015 , thereby yielding a total rent during this term of 24,000 .00 ($2000.00), payable in monthly installments of 12 ($2000.00), the first installment due on the FIRST_ day of Nov 1, 2015.

> If the term begins on a day other than the first of a month, then the Tenant will pay pro-rate for the balance of that month, and the lease shall commence from the first day of the following month.

Payment of rent will be made to    Max Salas (CLR)

                                   1610 Riggs Pl NW

                                   Washington Dc 20009_____

1.  Monthly payments will be made in advance, at the time specified and without deduction or demand. Tenant deposits with Landlord a SECURITY DEPOSIT equal to the first full month's rent ($_2000.00

2.  To secure the full and faithful performance of the conditions of the lease. This SECURITY DEPOSIT is not to be used by the tenant as a substitute for rent.

The SECURITY DEPOSIT will be returned to the Tenant within forty-five (45) days after the termination of this lease, less any expenses resulting from the breach of any condition of this lease or from damage to the premises other than usual wear and tear.


2.  The premises will be used as a residence only and for  1 person(s) only.. This lease will not be assigned or the premises sublet without the written consent of the Landlord.


3.  Tenant agrees to secure and pay when due the following utilities:
☐ Electricity.    ☐           ☐              ☐         ☐              ☐


4.  Tenant agrees to maintain in good order the plumbing, heating, septic and electrical systems within the premises and to pay for any damage to them resulting from the negligence of the Tenant, his/her family, guests or sub-tenants. Tenant agrees to pay the first $25.00 of any minor repairs. Premises will be delivered at the termination of this lease in the same good order as received, usual wear and tear expected. Any painting or remolding is to be supervised by the Landlord.


5.  Tenant agrees to comply with all health, fire and police regulations with respect to the premises, and Tenant will not use or allow the use of the premises for any disorderly or unlawful purpose.

EXHIBIT

18-00260

E

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 331 of 579  PageID #: 1451

1246

8. If the Tenant fails to pay the rent as scheduled, or if he/she violates any other conditions of this lease, then this lease may be terminated at the option of the Landlord. In such cases this lease will operate as a NOTICE TO QUIT, any NOTICE TO QUIT as required by law being hereby expressly waived.

In such cases the Landlord may proceed to recover possession of the premises without a demand for rent or possession under and by virtue of the provisions of the District of Columbia Code which regulate proceedings between Landlord and Tenant (Title 45 – Chapter 9). Tenant agrees to remain answerable for all damage or loss of rent resulting from such re-entry, and Landlord reserves full power to re-let the premises for his own benefit.

9. If the premises becomes uninhabitable as a result of fire or other casualty not caused by the Tenant, his/her family, guests or sub-tenants, then this lease will either be terminated at the option of the Landlord, or it will be suspended until the premises is restored. Landlord is under no obligation to restore the premises.

10. The waiver of one condition of this lease does not waive or in any other manner affect the other conditions of this lease.

11. Tenant agrees to pay a late fee of $45.00 per month for rent received after the 5th day of each month. The postmark on the mailing envelope will serve as the date paid.

12. Tenant agrees to obtain and maintain an agreement with the P.E.P.C.O.

~~Tenant~~ Landlord

MAX E SALAS

*Max E Salas*

Oct 24 2013

Tenant

John Mecham

*[signature]*

Oct 24, 2013

Received 500.00 Deposit Oct 24 2013
500 Add Deposit on Nov 2. Total Deposit
$1000.00 Rent Do on Nov 2 1500.00
Total Owe is $2000.00 *Max E Salas*

WITNESS the following signatures and seals on the day and year first appearing above:

# THIS LEASE

Made this _17_ day of _Aug_ , 20_14_

between _NINA BREKELMANS_ _____ Tenant

and _MAX SALAS CLR_ _____ Landlord

WITNESSETH, that Landlord leases to Tenant the premises known as _UPSTAIRS BACK ROOM UNIT A_ _1610 Riggs PL NW_ in the District of Columbia, for the term of ONE year(s) commencing on the ~~FIRST~~ day of _17 Aug_ , 20_14_, and ending at midnight on the _31_ day of _MAY_ , 20_15_ thereby yielding a total rent during this term of _9 Months + 15 days_ _700— + 1400. per Mont_.00 ($_7,700_.00), payable in monthly installments of One _700— 1400.00_ .00 ($_1400_.00), the first installment due on the FIRST _/_ day of _Sept_ , 20_14_

If the term begins on a day other than the first of a month, then the Tenant will pay pro-rate for the balance of that month, and the lease shall commence from the first day of the following month.

Payment of rent will be made to _MAX SALAS CLR_
_1610 Riggs PL NW_
_Wash DC 20009_

1. Monthly payments will be made in advance, at the time specified and without deduction or demand. Tenant deposits with Landlord a SECURITY DEPOSIT ~~equal to the first full month's rent~~ ($_1000_.00

2. ) to secure the full and faithful performance of the conditions of the lease. This SECURITY DEPOSIT is not to be used by the tenant as a substitute for rent.

The SECURITY DEPOSIT will be returned to the Tenant within forty-five (45) days after the termination of this lease, less any expenses resulting from the breach of any condition of this lease or from damage to the premises other than usual wear and tear.

2. The premises will be used as a residence only and for _1_ person(s) only.. This lease will not be assigned or the premises sublet without the written consent of the Landlord.

3. Tenant agrees to secure and pay when due the following utilities:

☐ electricity  ☐ gas  ☐ heating fuel  ☐ water  ☐ sewage  ☐ _____

4. Tenant agrees to maintain in good order the plumbing, heating, septic and electrical systems within the premises and to pay for any damage to them resulting from the negligence of the Tenant, his/her family, guests or sub-tenants. Tenant agrees to pay the first $25.00 of any minor repairs. Premises will be delivered at the termination of this lease in the same good order as received, usual wear and tear expected. Any painting or remolding is to be supervised by the Landlord.

5. Tenant agrees to comply with all health, fire and police regulations with respect to the premises, and Tenant will not use or allow the use of the premises for any disorderly or unlawful purpose.

8. If the Tenant fails to pay the rent as scheduled, or if he/she violates any other conditions of this lease, then this lease may be terminated at the option of the Landlord. In such cases this lease will operate as a NOTICE TO QUIT, any NOTICE TO QUIT as required by law being hereby expressly waived.

In such cases the Landlord may proceed to recover possession of the premises without a demand for rent or possession under and by virtue of the provisions of the District of Columbia Code which regulate proceedings between Landlord and Tenant (Title 45 – Chapter 9). Tenant agrees to remain answerable for all damage or loss of rent resulting from such re-entry, and Landlord reserves full power to re-let the premises for his own benefit.

9. If the premises becomes uninhabitable as a result of fire or other casualty not caused by the Tenant, his/her family, guests or sub-tenants, then this lease will either be terminated at the option of the Landlord, or it will be suspended until the premises is restored. Landlord is under no obligation to restore the premises.

10. The waiver of one condition of this lease does not waive or in any other manner affect the other conditions of this lease.

11. Tenant agrees to pay a late fee of $45.00 per month for rent received after the 5th day of each month. The postmark on the mailing envelope will serve as the date paid.

12. ~~All rents MUST BE paid by money order.~~ _Check or Elect Transfer_ (MS) NB

13. ~~Tenant agrees to obtain and maintain an agreement with the Washington Gas Company and P.E.P.C.O.~~ MS NB

14. Tenant agrees to furnish all fuses and light bulbs.

| MAX E SALAS | X _May E Salas_ | TRUSTEE |
| Name | Agent/Landlord/Agent | Title |
| 1610 Riggs PL NW | WASh DC 20009 | 2027717800 |

| X 8-17-2014 | X _A Behrham_ | 502 777 8213 |
| Date | Tenant Name Sign. | Phone |
| 1610 Riggs PL NW | WASh DC | 20009 |
| Address | City | Zip |

# THIS LEASE

Made this 17th  day of 2014,

Between Nina Brelelmans Tenant and Max Salas (CLR) Landlord

WITNESSETH, that Landlord leases to Tenant the premises known as upstairs Back Room 1610 Riggs PL MW in the District of Columbia, for the term of ONE year(s) commencing on the FIRST day of August 2014 and ending at midnight on the 31 day of July, 2015, thereby yielding a total rent during this term of 16,800 .00, payable in monthly installments of (12ea) 1400.00 , the first installment due on the FIRST day of August, 2014.

> If the term begins on a day other than the first of a month, then the Tenant will pay pro-rate for the balance of that month, and the lease shall commence from the first day of the following month.

Payment of rent will be made to    Max Salas (CLR)

> 1610 Riggs Pl NW
>
> Washington DC 20009

1. Monthly payments will be made in advance, at the time specified and without deduction or demand. Tenant deposits with Landlord a SECURITY DEPOSIT equal to the first full month's rent ($1400.00

2. To secure the full and faithful performance of the conditions of the lease. This SECURITY DEPOSIT is not to be used by the tenant as a substitute for rent.

The SECURITY DEPOSIT will be returned to the Tenant within forty-five (45) days after the termination of this lease, less any expenses resulting from the breach of any condition of this lease or from damage to the premises other than usual wear and tear.

2. The premises will be used as a residence only and for 1 person(s) only.. This lease will not be assigned or the premises sublet without the written consent of the Landlord.

3. Lanloard agrees to secure and pay when due the utilities:

☐        ☐        ☐            ☐            ☐            ☐

4. Tenant agrees to maintain in good order the plumbing, heating, septic and electrical systems within the premises and to pay for any damage to them resulting from the negligence of the Tenant, his/her family, guests or sub-tenants. Tenant agrees to pay the first $25.00 of any minor repairs. Premises will be delivered at the termination of this lease in the same good order as received, usual wear and tear expected. Any painting or remolding is to be supervised by the Landlord.

5. Tenant agrees to comply with all health, fire and police regulations with respect to the premises, and Tenant will not use or allow the use of the premises for any disorderly or unlawful purpose.

6. Landlord will give the Tenant quiet enjoyment of the premises for the term of this lease. Tenant will allow Landlord

# THIS LEASE

Made this _2_ day of _June_, 20_14_

between ___Christian Tamasco___ Tenant

and ___Max Salas (CLR)___ Landlord

WITNESSETH, that Landlord leases to Tenant the premises known as _1610 Riggs PL NW_ _Back to a room_ in the District of Columbia, for the term of ~~ONE year~~(s) _6 months_ commencing on the FIRST day of _June_, 20_14_ and ending at midnight on the _31_ day of _Dec_, 20_14_, thereby yielding a total rent during this term of _____ _9000.00_ .00 ($_1500_.00), payable in monthly installments of One _____.00 ($_____.00), the first installment due on the FIRST /day of _June_, 20_14_.

If the term begins on a day other than the first of a month, then the Tenant will pay pro-rate for the balance of that month, and the lease shall commence from the first day of the following month.

Payment of rent will be made to _Max Salas CLR_
_1610 Riggs PL NW_
_Wash. DC 20009_

1. Monthly payments will be made in advance, at the time specified and without deduction or demand. Tenant deposits with Landlord a SECURITY DEPOSIT equal to the first full month's rent ($_1008_ .00

2. ) to secure the full and faithful performance of the conditions of the lease. This SECURITY DEPOSIT is not to be used by the tenant as a substitute for rent.

The SECURITY DEPOSIT will be returned to the Tenant within forty-five (45) days after the termination of this lease, less any expenses resulting from the breach of any condition of this lease or from damage to the premises other than usual wear and tear.

2. The premises will be used as a residence only and for _1_ person(s) only.. This lease will not be assigned or the premises sublet without the written consent of the Landlord.

3. Tenant agrees to secure and pay when due the following utilities:
☑ electricity ☑ gas ☑ heating fuel ☑ water ☑ sewage ☐ _____

4. Tenant agrees to maintain in good order the plumbing, heating, septic and electrical systems within the premises and to pay for any damage to them resulting from the negligence of the Tenant, his/her family, guests or sub-tenants. Tenant agrees to pay the first $25.00 of any minor repairs. Premises will be delivered at the termination of this lease in the same good order as received, usual wear and tear expected. Any painting or remolding is to be supervised by the Landlord.

5. Tenant agrees to comply with all health, fire and police regulations with respect to the premises, and Tenant will not use or allow the use of the premises for any disorderly or unlawful purpose.

# THIS LEASE

Made this 1st day of October , 2014

between  Christan Tamasco  Tenant

and Max Salas Landlord

WITNESSETH, that Landlord leases to Tenant the premises known as Upstairs Front bedroom 1610 Riggs Pl NW  in the District of Columbia, for the term of ONE year(s) commencing on the FIRST day of  October, 2014, and ending at midnight on the 30 day of September, 2015, thereby yielding a total rent during this term of ($18,000.00), payable in monthly installments of 12 ($1500.00), the first installment due on the FIRST day of October, 2014.

> If the term begins on a day other than the first of a month, then the Tenant will pay pro-rate for the balance of that month, and the lease shall commence from the first day of the following month.

Payment of rent will be made to    Max Salas  (CLR)

> 1610 Riggs PL NW
>
> Washington DC 20009

1. Monthly payments will be made in advance, at the time specified and without deduction or demand. Tenant deposits with Landlord a SECURITY DEPOSIT equal to the first full month's rent ($1500.00)

2. To secure the full and faithful performance of the conditions of the lease. This SECURITY DEPOSIT is not to be used by the tenant as a substitute for rent.

The SECURITY DEPOSIT will be returned to the Tenant within forty-five (45) days after the termination of this lease, less any expenses resulting from the breach of any condition of this lease or from damage to the premises other than usual wear and tear.

2. The premises will be used as a residence only and for  2 person(s) only.. This lease will not be assigned or the premises sublet without the written consent of the Landlord.

3. Tenant agrees to secure and pay when due the following utilities:

☐         ☐      ☐          ☐        ☐         ☐

4. Tenant agrees to maintain in good order the plumbing, heating, septic and electrical systems within the premises and to pay for any damage to them resulting from the negligence of the Tenant, his/her family, guests or sub-tenants. Tenant agrees to pay the first $25.00 of any minor repairs. Premises will be delivered at the termination of this lease in the same good order as received, usual wear and tear expected. Any painting or remolding is to be supervised by the Landlord.

5. Tenant agrees to comply with all health, fire and police regulations with respect to the premises, and Tenant will not use or allow the use of the premises for any disorderly or unlawful purpose.

8. If the Tenant fails to pay the rent as scheduled, or if he/she violates any other conditions of this lease, then this lease may be terminated at the option of the Landlord. In such cases this lease will operate as a NOTICE TO QUIT, any NOTICE TO QUIT as required by law being hereby expressly waived.

In such cases the Landlord may proceed to recover possession of the premises without a demand for rent or possession under and by virtue of the provisions of the District of Columbia Code which regulate proceedings between Landlord and Tenant (Title 45 – Chapter 9). Tenant agrees to remain answerable for all damage or loss of rent resulting from such re-entry, and Landlord reserves full power to re-let the premises for his own benefit.

9. If the premises becomes uninhabitable as a result of fire or other casualty not caused by the Tenant, his/her family, guests or sub-tenants, then this lease will either be terminated at the option of the Landlord, or it will be suspended until the premises is restored. Landlord is under no obligation to restore the premises.

10. The waiver of one condition of this lease does not waive or in any other manner affect the other conditions of this lease.

11. Tenant agrees to pay a late fee of $45.00 per month for rent received after the 5th day of each month. The postmark on the mailing envelope will serve as the date paid.

12. All rents MUST BE paid by money order.

13. Tenant agrees to obtain and maintain an agreement with the Washington Gas Company and P.E.P.C.O.

14. Tenant agrees to furnish all fuses and light bulbs.

_Abdulla Silas June 1214_
_Landlord/Agent_    x _May Edylas_    _TRUSTEE_
               _Landlord/Agent_       _TITLE_

_1610 RiggsPL NW_    _Wash AC_    _20089_
_Address_             _City & State_        _Zip_

_6/1/14_    x _Clif_    (917) 280-5618
_Date_           _Tenant_

_1610 Riggs PL NW_    _Wash AC_    _20089_
_Address_             _City_          _Zip_


410-12-01-00 12212  0 C 001 30    60 004
**1610  RIGGS  PROPERTY  TRUST**
**TTE  MAX  E  SALAS**
**777  7TH  ST  NW  APT  1126**
**WASHINGTON  DC    20001-5717**

# Your account statement

For 11/30/2017

## Contact us

 BBT.com

 (800) BANK-BBT or (800) 226-5228

### Small Business Saturday

BB&T will once again support our clients by promoting Small Business Saturday on Nov. 25. Keep an eye out for our social media posts as we encourage our followers to #Shopsmall this holiday season. We appreciate you being a BB&T client and wish you the best as you close out what we hope is a successful 2017. We also look forward to continuing to support your business as you grow in the coming year.

BB&T, Member FDIC.

■ BUSINESS VALUE 83184

**Account summary**

| | |
|---|---|
| Your previous balance as of 10/31/2017 | $6,429.44 |
| Checks | - 0.00 |
| Other withdrawals, debits and service charges | - 0.00 |
| Deposits, credits and interest | + 0.00 |
| Your new balance as of 11/30/2017 | = $6,429.44 |

### We heard your feedback, and we're reintroducing the combined balance qualifier!

We appreciate the feedback we received about the recent account qualifier changes and are pleased to announce effective Oct. 1, 2017, we're adding the combined balance qualifier back to our list of ways you can avoid the $12 monthly maintenance fee for BB&T Business Value 200 and Basic Public Fund Checking accounts.

And you only need to meet one of the qualifiers below to avoid the monthly maintenance fee.

- Maintain $1,500 average monthly balance in Business Value 200 or Basic Public Fund checking
- Maintain $6,000 combined average monthly balances in checking accounts (business/public fund/personal), money market savings accounts (business/public fund/personal) and/or outstanding balances on business/personal BB&T credit cards[1] *(reintroduced combined balance qualifier)*
- Use your BB&T business debit card and/or business credit card to make at least $1,000 in eligible purchases each month[2]
- Make a qualifying transaction from a BB&T Merchant Services account[3]

Thanks again for sharing your opinions. We truly want to help you achieve your financial goals, and we sincerely value your feedback and your business.

If you have any questions, please contact your local financial center representative or call BB&T Phone24 at 800-BANK BBT (800-226-5228), 6 a.m. to midnight, seven days a week. Thank you for banking with BB&T.

Case 3:23-cv-00987   Document 7-3   Filed 10/04/23   Page 339 of 579 PageID #: 1459
1354



410-12-01-00 12212  0 C 001 30   50 004
**1610  RIGGS  PROPERTY  TRUST
TTE  MAX  E  SALAS
777  7TH  ST  NW  APT  1126
WASHINGTON  DC   20001-5717**

# Your account statement
For 04/30/2018

## Contact us
 BBT.com

 (800) BANK-BBT or
(800) 226-5228

### BB&T Merchant Services

Accept payments from a name you can trust, BB&T. With BB&T Merchant Services, we offer next-business-day funding, a monthly maintenance fee waived on a Business Value 200 and Business Value 500 checking accounts*, competitive pricing and the newest technologies.

Visit BBT.com/MerchantServices to learn more.

Subject to business type and credit approval.
*Services fee apply. See the Business Services Pricing Guide for details.
BB&T Merchant Services are offered by Branch Banking and Trust Company.  Member FDIC.



■ BUSINESS VALUE ▇▇▇▇▇83184

**Account summary**

| | |
|---|---|
| Your previous balance as of 03/30/2018 | $6,429.44 |
| Checks | - 0.00 |
| Other withdrawals, debits and service charges | - 0.00 |
| Deposits, credits and interest | + 0.00 |
| Your new balance as of 04/30/2018 | = $6,429.44 |

Case 3:23-cv-00987   Document 7-3   Filed 10/04/23   Page 340 of 579 PageID #: 1460
1355



410-12-01-00 12212 0 C 001 30   60 004
**1610 RIGGS PROPERTY TRUST**
**TTE MAX E SALAS**
**777 7TH ST NW APT 1126**
**WASHINGTON DC 20001-5717**

# Your account statement

For 03/30/2018

## Contact us

 BBT.com

 (800) BANK-BBT or
(800) 226-5228

## Protect Yourself from Identity Theft

At BB&T, protection of your information and accounts is our priority. Here are some ways you can prevent identity theft and fraud:

- Shred this statement and other personal information before throwing them away
- Never disclose your personal information, account number, or password to an unexpected email or text
- Monitor your financial accounts and credit reports for suspicious activity
- Notify BB&T at 800-BANK-BBT (800-226-5228) or visit your local branch if you have an issue with your accounts

Learn more security tips at **BBT.com/Security**

BB&T, Member FDIC.

■ BUSINESS VALUE ▓▓▓▓▓283184

**Account summary**

| | |
|---|---:|
| Your previous balance as of 02/28/2018 | $6,429.44 |
| Checks | - 0.00 |
| Other withdrawals, debits and service charges | - 0.00 |
| Deposits, credits and interest | + 0.00 |
| Your new balance as of 03/30/2018 | = $6,429.44 |

## AMENDMENT TO YOUR DEPOSIT AGREEMENT

### EFFECTIVE APRIL 1, 2018

The following changes have been made to the Deposit Agreement that you were provided when you opened your account at BB&T. Continued use of your account after the effective date of this Amendment constitutes your acceptance of the change. You are directed to obtain the most current version of the Deposit Agreement from any branch or online at www.bbt.com. The current version of the Deposit Agreement will govern your account upon receipt of this Amendment. If you have any questions about this change, contact your local BB&T financial center, your relationship manager, or call 1-800-BANK BBT (1-800-226-5228).

F. FUNDS AVAILABILITY

The following has been added to the second paragraph of 1. GENERAL WITHDRAWAL POLICY:

Deposits received as a Real-Time Payment (RTP) will be available to you immediately. You acknowledge that any RTP is governed specifically by RTP Operating Rules of The Clearing House in effect at the time of the transaction and can be found at

410-12-01-00 12212   D C 001 30   50 004
**1610 RIGGS PROPERTY TRUST**
**TTE MAX E SALAS**
**777 7TH ST NW APT 1126**
**WASHINGTON DC 20001-5717**

# Your account statement
## For 02/28/2018

## Contact us

 BBT.com

 (800) BANK-BBT or (800) 226-5228

---

### Protect Yourself from Identity Theft

At BB&T, protection of your information and accounts is our priority. Here are some ways you can prevent identity theft and fraud:

- Shred this statement and other personal information before throwing them away
- Never disclose your personal information, account number, or password to an unexpected email or text
- Monitor your financial accounts and credit reports for suspicious activity
- Notify BB&T at 800-BANK-BBT (800-226-5228) or visit your local branch if you have an issue with your accounts

Learn more security tips at **BBT.com/Security**

BB&T, Member FDIC.

---

■ BUSINESS VALUE ██████████83184

**Account summary**

| | |
|---|---:|
| Your previous balance as of 01/31/2018 | $6,429.44 |
| Checks | - 0.00 |
| Other withdrawals, debits and service charges | - 0.00 |
| Deposits, credits and interest | + 0.00 |
| Your new balance as of 02/28/2018 | = $6,429.44 |

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 342 of 579 PageID #: 1462

1357



410-12-01-00 12212  0 C 001 30    50 004
**1610 RIGGS PROPERTY TRUST
TTE MAX E SALAS
777 7TH ST NW APT 1126
WASHINGTON DC   20001-5717**

# Your account statement
For 01/31/2018

## Contact us

 BBT.com

 (800) BANK-BBT or
(800) 226-5228

### Beware of Phishing and Spoofing Emails

Just a friendly reminder, BB&T never uses email to obtain personal information. Watch out for emails that try to trick you into clicking a link or calling a hotline to update your confidential information like account numbers, payment card details or your Social Security number. If you receive an urgent email like this, DO NOT click links, open attachments or provide confidential information to the hotline. Simply delete it without responding. If you revealed your account details to a phishing email, call 800-BANK-BBT (800-226-5228) for assistance.

Learn more security tips at **BBT.com/Security**.

BB&T, Member FDIC.

■ BUSINESS VALUE ▮▮▮▮▮▮▮83184

**Account summary**

| | |
|---|---|
| Your previous balance as of 12/29/2017 | $6,429.44 |
| Checks | - 0.00 |
| Other withdrawals, debits and service charges | - 0.00 |
| Deposits, credits and interest | + 0.00 |
| Your new balance as of 01/31/2018 | = $6,429.44 |

## AMENDMENT TO YOUR DEPOSIT AGREEMENT

### EFFECTIVE IMMEDIATELY

The following changes have been made to the Deposit Agreement that you were provided when you opened your account at BB&T. Continued use of your account after the effective date of this Amendment constitutes your acceptance of the change. You are directed to obtain the most current version of the Deposit Agreement from any branch or online at www.bbt.com. The current version of the Deposit Agreement will govern your account upon receipt of this Amendment. If you have any questions about this change, contact your local BB&T financial center, your relationship manager, or call 1-800-BANK BBT (1-800-226-5228).

C. RULES APPLICABLE TO ALL ACCOUNTS

The following paragraph has been added to 13. FORGED OR UNAUTHORIZED TRANSACTIONS section:

Fraud Detection Products. The Bank offers products/services (such as Positive Pay, Reverse Positive Pay, and ACH Block), that are designed to detect and/or deter fraudulent activity that can occur on your account. If you previously had fraud on your account either at BB&T or elsewhere, it is your responsibility to enroll in one of the Bank's applicable fraud detection services. In addition, if you believe your account may be susceptible to fraud, or if there is a reasonable possibility that fraud may occur on your account, you are directed to



410-12-01-00 12212  0 C 001 30    60 004
**1610  RIGGS  PROPERTY  TRUST**
**TTE  MAX  E  SALAS**
**777  7TH  ST  NW  APT  1126**
**WASHINGTON  DC   20001-5717**

# Your account statement
## For 12/29/2017

## Contact us

 BBT.com

 (800) BANK-BBT or
(800) 226-5228

BB&T is pleased to announce that beginning on Dec. 11, 2017, the available balance in your account will be updated multiple times throughout the day upon receipt of a same-day, electronic, direct deposit transaction. If a same-day direct deposit is received to your account by 5 p.m. local time, Monday through Friday, on regular business days you will have intraday access to these funds earlier in the day which allows you to better manage your cash positioning.

Please feel free to contact your local financial center or call Phone24 at 800-BANK-BBT (800-226-5228) if you have any questions.

Thank you for banking with **BB&T**.

BB&T, Member FDIC

■ BUSINESS VALUE 83184

**Account summary**

| | |
|---|---|
| Your previous balance as of 11/30/2017 | $6,429.44 |
| Checks | - 0.00 |
| Other withdrawals, debits and service charges | - 0.00 |
| Deposits, credits and interest | + 0.00 |
| Your new balance as of 12/29/2017 | = $6,429.44 |

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 344 of 579 PageID #: 1464

1359

Debtor 1    **Max E. Salas**                                    Case number (if known)   **18-00260**

| Person Who Was Paid<br>Address<br>Email or website address<br>Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| **Stinson Leonard Street, LLP**<br>**1775 Pennsylvcania Ave., NW**<br>**Suite 800**<br>**Washington, DC 20006**<br>**Paid from account in name of CLR, Inc.** | **Payments for legal fees and expenses for evaluation of options and personal representation thorugh course of DC Superior Court wrongful death and survival trial and bankruptcy preparation. Includes $25,000 retainer for post-petition bankruptcy representation and $1,717.00 for bankruptcy filing fee. Includes $1,471 paid for legal services unrelated to bankruptcy consultation or preparation.** | **5/2/2017 - $2,500**<br>**11/9/2017 - $6,339.69**<br>**3/12/2018- $14,193.00**<br>**4/12/2018 - $45,317.00**<br>**4/12/2018 - $25,000.00 (retainer for post petition work)**<br>**4/12/2018 - $1,717.00 (Ch. 11 filing fees)** | **$95,066.69** |
| **Debtorcc.org** | **Credit Counseling Course** | **4/6/2018** | **$14.95** |

17. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

■ No
☐ Yes. Fill in the details.

| Person Who Was Paid<br>Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

18. **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

■ No
☐ Yes. Fill in the details.

| Person Who Received Transfer<br>Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|

19. **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices*.)

■ No
☐ Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                                          :

   MAX SALAS                                   :      Case No. 18-00260
                                                      Chapter 11

                  Debtor-in-possession         :
_____

OBJECTION TO THE DEBTOR'S CLAIM OF EXEMPTIONS

   Nicolaas J. Brekelmans and Gil Gregory Brekelmans, Trustees of the Estate of Nina

Brekelmans ("Brekelmans Estate") and Michael McLoughlin and Martha Johnson, Trustees of

the Estate of Patrick McLoughlin ("McLoughlin Estate")(Brekelmans Estate and McLoughlin

Estate are sometimes collectively referred to hereinafter as "the Estates"), pursuant to the

provisions of F. R. Bankr. P. 4003 (b) and LBR 4003-1, hereby object to the Debtor's claim of

exemption to the Debtor's alleged interest in property located at 1610 Riggs Place N.W.,

Washington, DC ("the Property") and, in support of their objection, the Estates set forth the

following grounds:

Introduction

   1. The Debtor alleges that he is the property owner of property located at 1610 Riggs

Place, NW, Washington, DC, as a result of a quitclaim deed which was created by the Debtor's

son in 2010.  The Property, according to the Debtor's Schedules was deeded to the 1610 Riggs

Property Trust ('the Trust") in 2010.  The Debtor's Schedules state that the Trust "collapsed on

creation through merger to convey property to debtor."  Schedule C, ¶ 2. However, the Debtor's

son, Len, also in a Chapter 11 bankruptcy (in the Middle District of Tennessee), always was, and

remains the title owner of the Property.

Grounds for Objection

2.  The following grounds exist to sustain the Estates' Objection to the Claim of Exemption of the Debtor in the Property:

a.  The subject property is not titled in the name of the Debtor; and

b.  The Debtor does not have an interest in the property which enables him to exempt Riggs Place property under D.C. law; and

c.  The Debtor's interest was acquired, if at all, less than 1,215 days prior to the Debtor's bankruptcy filing in violation of 11 U.S.C. §522 (p); and

d.  The Debtor's exemption, if it exists at all, is limited to equity of $160,375; and

e.  The Debtor's exemption in the subject property is subject to the right of the Trustee as lien creditor and as successor to certain creditors and purchasers under 11 U.S.C. §544; and

f.  The Debtor's interest in the subject property was obtained by fraud; and

g.  Neither the Debtor, nor his son, the supposed title owner of the subject property listed, stated, or testified to, the Debtor's supposed interest in the property during an almost three year long wrongful death litigation in the Superior Court of the District of Columbia and, therefore, are estopped from asserting that the Debtor has an interest in the Riggs Place property that makes that property part of the Debtor's estate or an interest that the Debtor may claim as exempt under D.C. law and/or 11 U.S.C. § 522.

3.  For the reasons set forth above, and for any additional factual or legal bases which the the Estates may raise at or prior to any hearing on this Objection, the Estates assert that the Debtor is not entitled to an exemption of the Riggs Place property.

4.  Therefore, the Estates assert that the Debtor's claim of exemption as to the Riggs Place property be denied, or, alternatively, be limited to equity in the amount of $160,375, after

-2-

sale of the Riggs Place property

WHEREFORE, the Estates pray for an Order:

1.  Sustaining their Objection to the Debtor's claimed exemption of the Riggs Place

Property; and

2.  Finding and declaring the amount, if any, of the Debtor's claim of exemption to the

Riggs Place Property; and

3.  Granting such other and further relief as is consistent with the Estates' Objection and

is just and proper.

LAW OFFICE OF PHILIP J. MCNUTT, PLLC

By:  /s/ Philip J. McNutt
Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawoffice.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Objection and accompanying Notice
of Objection, was served electronically on the Debtor's counsel, the Office of the United States
Trustee and all parties requesting notice and was mailed, postage prepaid, this 20th day of June,
2018 to the Debtor, Max Salas, 1610 Riggs Place, NW, Washington, DC 20009 and his attorney,
Marc E. Albert, Stinson Leonard Street LLP, 1775 Pennsylvania Avenue, NW, Suite 800,
Washington, DC 20036.

/s/ Philip J. McNutt
Philip J. McNutt

-3-

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: ) | |
| ) | Case No. 18-00260 |
| MAX E. SALAS, ) | Chapter 11 |
| ) | |
| Debtor In Possession. ) | |

NICOLAAS J. BREKELMANS AND GAIL
GREGORY BREKELMANS, TRUSTEES OF
THE ESTATE OF NINA BREKELMANS;
And

MICHAEL McLOUGHLIN AND
MARTHA JOHNSON, TRUSTEES OF
THE ESTATE OF PATRICK
McLOUGHLIN

      Movants,

vs.

MAX E. SALAS

      Respondent.

## **DEBTOR'S OPPOSITION TO OBJECTION TO CLAIM OF EXEMPTIONS**

TO THE HONORABLE S. MARTIN TEEL, JR., BANKRUPTCY JUDGE:

     Max E. Salas, the debtor and debtor-in-possession ("Debtor") in this Chapter 11 case,

through his undersigned attorneys, hereby responds and files this opposition to the *Objection to*

*the Debtor's Claim of Exemptions* (the "Exemption Objection") [ECF Docket No. 44] filed by

Nicolaas J. Brekelmans and Gail Gregory Brekelmans, Trustees for the Estate of Nina

Brekelmans ("Brekelmans Estate") and Michael McLoughlin and Martha Johnson, Trustees for

the Estate of Patrick McLoughlin ("McLoughlin Estate," and collectively with the Brekelmans

Estate, the "Estates").

The Debtor has claimed an exemption for the full value of his residence located at 1610

Riggs Place, NW, Washington DC 20009 through the District of Columbia's homestead

exemption found in D.C. Code § 15-501(a)(14). Despite listing a number of blanket legal

conclusions in the Exemption Objection, the Estates oppose Debtor's claim of exemption on the

sole factual basis that the District of Columbia Recorder of Deeds displays the record owner of

the Property as Debtor's son, Len Salas. Debtor, however, has lived and exclusively provided all

payments associated with the Property for over a decade. Furthermore, Debtor's full ownership

in the Property was confirmed through a trust agreement and quitclaim deed entered between

Debtor and his son in 2010 that, through well-established law, confirms the Debtor as the full

owner of the Property. These interests fully support the homestead exemption claimed by the

Debtor in his residence, and in further support of Debtor's opposition to the Exemption

Objection, the Debtor respectfully represents as follows:

**Background**

1.      The Debtor filed a voluntary Chapter 11 petition on April 18, 2018 (the "Petition

Date").

2.      Debtor's bankruptcy was prompted following entry of two verdicts against the

Debtor and his son Len Salas jointly and severally totaling $15.2 million ($7.7 Million for the

McLoughlin Estate and $7.5 million for the Brekelmans Estate) (together, the "Litigation

Claims") in favor of the Movants following a consolidated jury trial before the Superior Court of

the District of Columbia in consolidated Cases Nos. 2015 CA 08061 and 2015 CA 0854 (the

"Superior Court Litigation"). The Superior Court Litigation was based on wrongful death and

survivorship claims stemming from the deaths of Nina Brekelmans and Patrick McLoughlin –

two roomers killed in a house fire at Debtor's residence located at 1610 Riggs Place NW,

Washington DC 20009 (the "Property") on June 3, 2015. Believing certain rulings in the

Superior Court Litigation were issued in error, the Debtor, though his insurance-provided legal

counsel, timely filed appeals to each of the Litigation Claims on April 13, 2018 and April 24,

2018 (the "Appeals") and has listed the Litigation Claims on his Schedules as disputed.

3.      Debtor's son, Len Salas, has also filed his own appeals to the Litigation Claims

and has recently filed Chapter 11 bankruptcy. Len Salas's bankruptcy case is currently pending

before the U.S. Bankruptcy Court for the Middle District of Tennessee; Case No. 3:18-bk-02662.

4.      Debtor filed his bankruptcy Schedules A/B-J on May 2, 2018. Debtor's Schedule

A lists the Property as having a value of $2.5 million with only the Debtor having an interest in

the Property. Debtor's Schedule A also provides the following description with respect to the

Property:

> Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed
> Trust collapsed on creation through merger to convey property to debtor
> DC Records displays owner as Len Salas
> Contains furnished basement that is possible to be rented as a separate unit, but which debtor
> currently is using as part of personal residence with remainder of property

5.      Debtor's Schedule C lists an exemption of Debtor's interest in the Property for

100% of the fair market value, up to any applicable statutory limit pursuant to D.C. Code Ann.

§ 15-501(a)(14). D.C. Code § 15-501(a)(14), commonly referred to as the District of Columbia's

homestead exemption, offers an exemption of unlimited value when properly claimed.

6.      Debtor has lived at the Property and used it as his residence since 1995. From

1995 to 2007 the Property was titled in the name of Debtor's wife at the time.

7.      Records with the D.C. Recorder of Deeds currently show one of the Debtor's

three sons, Len Salas, as the record owner of the Property since 2007. Len Salas's involvement

with the Property arose through efforts to secure the Property for the exclusive benefit of his

father, the Debtor, following Debtor's divorce from his wife in 2007. Through the terms of a

divorce settlement, the Debtor was to fully retain ownership of the Property through the purchase

of his wife's half interest in the Property, but was unable to secure a favorable loan to complete

this purchase. In order to secure financing for the Debtor's purchase of his wife's interest in the

Property, the Debtor, Debtor's ex-wife, and Len Salas, entered into near-simultaneous transfers

of the Property first from Debtor's ex-wife to the Debtor, then from Debtor to his son. Len Salas

executed a Note and Deed of Trust with SunTrust Bank (the "SunTrust Loan") to finance

payment for the transaction to Debtor's ex-wife for the benefit of the Debtor.

8.      Since its creation, all payment towards the SunTrust Loan since has come

exclusively from the Debtor with no contribution from Len Salas.

9.      While the deed and SunTrust Loan were placed in the name of Len Salas, nearly

all other accounts associated with the Property have been established in the name of the Debtor,

including all electric and water utility accounts, cable and internet, and a Deluxe-Home

insurance policy Debtor obtained for the Property with Encompass Ins. Co of America

("Encompass").[1]

10.     Like the SunTrust Loan payments, all other payments for the Property, including

electric payments, water payments, and payment for the maintenance and general upkeep for the

Property have been paid exclusively by the Debtor.

11.     Following the 2007 transfer, Len Salas moved into the third floor of the Property

for a period of approximately 8 months. During this time Len Salas paid rent for his use of these

---

[1] The District of Columbia's Real Property Tax Division establishes the taxpayer for properties in the District based on the record owner of the Property with the DC Recorder of Deeds, and, thus, lists Len Salas as the named taxpayer for the Property. The funds for the real property taxes for the Property previously were paid directly by SunTrust, from funds provided by the Debtor to SunTrust.

rooms, further bolstering the fact that at the time he considered the Property to be that of his

father.

      12.     In 2010, to confirm that the Property was held for the exclusive benefit of the

Debtor, Len Salas and the Debtor executed both an Irrevocable Trust Agreement and a quitclaim

deed (the "Trust Documents") transferring Len Salas's interest in the Property to a trust, named

1610 Riggs Property Trust (the "Trust"). A signed and notarized copy of the trust agreement and

quitclaim deed is attached as **Exhibit A**. Excerpts from the Colorado notary public that notarized

the Trust Documents on the date the Trust Documents were signed in 2010 are attached as

**Exhibit B**.

      13.     The Trust documents were drafted by another of Debtor's sons, Ron Salas, an

attorney who lives and practices in the state of Colorado. Because the Trust Documents were

drafted by Ron Salas in Colorado, Debtor and Len Salas signed the documents in that state. In

addition to signing the documents in the presence of a notary, Ron Salas and Len Salas's wife

were also present.

      14.     The Irrevocable Trust Agreement established the Debtor as both sole-trustee and

sole-beneficiary of the Trust.

      15.     Debtor originally intended to record the quitclaim deed around the time of its

creation. To do this the Debtor sought the legal services of Stan Goldstein and the title company

Capitol Title. Because the Trust Documents seemed to transfer the Property from Len Salas to a

trust, Capitol Title informed Debtor that the recordation of the deed would result in transfer and

recordation taxes due to the District of Columbia, which Debtor did not have at the time.

Because the Trust Agreement and quitclaim deed were validly executed and delivered and

because Debtor had no intention to sell or otherwise transfer the Property and did not expect any

CORE/3502869.0005/141283133.1

other challenges regarding its ownership, Debtor was informed that there was no rush to record

the deed and it could be recorded later when he possessed the needed transfer taxes. Based on

this, Debtor did not record the deed. Debtor did intend to eventually record the deed once he

could arrange some form of financing arrangements to do so, but over time planning this was

given low priority and the quitclaim deed was never recorded.

16.     Prior to the establishment of the Trust in 2010, Debtor rented out his finished

basement to roomers as a source of extra income. Following the establishment of the Trust,

Debtor also began to rent the two bedrooms on the third floor of the Property. In order to accept

rent payments from roomers at the Property, Debtor established a bank account with BB&T

Bank in the name of 1610 Riggs Property Trust and himself as trustee for the account. Len Salas

was not included as a signatory on the account and had no access to it. All interaction with

roomers at the Property was handled exclusively by the Debtor. Len Salas, in turn, never met or

interacted with any roomers and had no involvement with renting the Property either in person or

through use of his name. Rent payments from the Property were used to fund needed payments

for the Property and for the personal use of the Debtor.

17.     On June 3, 2018, a fire occurred at the Property that tragically resulted in the

deaths of Nina Brekelmans and Patrick McLoughlin, as well as injury to the Debtor requiring

hospital care for three months. The fire also resulted in significant structural damage to the

Property and a near total loss of all personal property of the Debtor held in the Property

including his personal records and official documents.

18.     The Superior Court Litigation was initiated following the fire and Debtor's

release from the hospital. The Superior Court Litigation included the Debtor as the manager of

the Property. Because the quitclaim deed had not been recorded, Len Salas remained as the

6

record owner of the Property and also was included as a named defendant in the Superior Court

Litigation. Debtor and Len Salas did acknowledge that D.C. Records displayed Len Salas as the

deeded owner of the Property. Contrary to the contentions of Movants, however, although

Debtor and Len Salas could not remember the specifics of the previous 2010 transfer or produce

the Trust Documents, throughout the course of the Superior Court Litigation the Debtor

repeatedly maintained that he was the owner of the Property and that at some point it had been

transferred into a trust for his benefit. Discovery from the Superior Court Litigation of the Debtor

evidencing this, including answers to interrogatories as well as deposition testimony is attached

as **Exhibit C**.

19.     Despite stating in discovery that Debtor believed a trust existed and that he

believed he was full owner of the Property, the Trust Documents were unable to be produced

until they were discovered shortly before the consolidated trial in the Superior Court Litigation

was scheduled to take place. The Debtor's original official documents and records destroyed in

the 2015 fire at the Property. The discovery of the Trust Documents prompted two filings in the

Superior Court Litigation, an Emergency Motion for Summary Judgment filed on behalf of Len

Salas to dismiss him from the case based on the evidence of his transfer of his interest in the

Property to his father, and an Emergency Motion to Amend the Complaint filed by Movants to

add 1610 Riggs Property Trust as a party to the Superior Court Litigation.

20.     Rulings on both Len Salas's Emergency Motion for Summary Judgment and the

Movants' Motion to Amend the Complaint were ruled on orally by Judge Holeman, who

presided over the Superior Court Litigation, just prior to the start of trial. The Superior Court

denied Len Salas's Motion for Summary Judgment and granted Movants' Emergency Motion to

Amend the Complaint. The Superior Court further precluded introducing the Trust Documents

into evidence or mentioning the Trust during the course of the trial. As to 1610 Riggs Property

Trust, the Court added the Trust as a party to the Superior Court Litigation, but stayed all action

against it while allowing the trial against Len Salas and the Debtor to proceed. The dockets for

the consolidated Superior Court Litigation cases evidencing these oral rulings are attached as

**Exhibit D**[2]. These rulings as well as additional rulings made through the course of the trial are

the subject of the Appeals.

      21.     Following the fire, Debtor lived in temporary apartment housing paid through

Encompass through Debtor's insurance policy. Debtor also received insurance proceeds for the

Property which he used to renovate and refurbish the Property so that he could return to the

Property and use it as his residence. In early March 2018 Debtor completed renovations to the

Property and received proper permitting to allow him to return to living at the Property. Debtor

now occupies the Property alone and uses it as his residence.

      22.     The Estates have objected to Debtor's homestead exemption claimed in this case

seemingly solely on the fact that D.C. Records displays Len Salas as the record owner of the

Property. However, the Trust Documents, as well as Debtor's history of use and complete

control over the Property (and near complete lack of use by Len Salas) represent an interest in

the Property D.C.'s homestead exemption was designed to protect. The Estates have failed to

meet their burden of proof for why Debtor should be denied the ability to exempt his residence,

and therefore the Exemption Objection should be denied in full.

---

[2] Exhibit C includes the dockets for both the McLoughlin case and the Brekelmans case, however, upon
consolidation most rulings that affected both cases were entered only on the McLoughlin docket.

**Argument**

*I.     Burden of Proof for Objections to Exemptions*

23.     Objections to exemptions are governed by Federal Rule of Bankruptcy Procedure 4003. Bankruptcy Rule 4003(c) provides under any objection hearing, "the objecting party has the burden of proof that the exemptions are not properly claimed. After hearing on notice, the court shall determine the issues presented by the objections." Fed R. Bankr. P. 4003(c).With the deadline to object to Debtor's exemptions found in Fed. R. Bankr. P. 4003(b)(1) having now expired, the Estates are, thus, limited to those objection contained in the Exemption Objection and may not raise further issues for the Court's consideration. With the burden of proof falling on the shoulders of the Estates as the objecting party, the Court should proceed as if the Debtor's homestead exemption has been validly claimed and only if the Estates meet their burden with respect to their objections, should Debtor's claim of the homestead exemption be denied.

24.     Much of the Exemption Objection reads as a list of potential grounds for denying Debtor's claim of the homestead exemption but with little no factual basis for the Estates' belief that the ground is justified. Lacking a factual justification for why many of these grounds have been claimed, the Debtor lacks an ability to properly respond. For instance, the Exemption Objection states that the Debtor's "interest was acquired, if at all, less than 1,215 days prior to the Debtor's bankruptcy filing in violation of 11 U.S.C. § 522(p)," and asks the court to limit any exemption of the Debtor in the Property to the $160,375 contained in that Bankruptcy Code provision. Exemption Objection at ¶ 2(c), (d).The Exemption Objection, however, offers no factual support for this contention or states when the Estates believe Debtor's interest may have arose in the Property. As explained above, Debtor has lived at the Property and used it as his residence since 1995. The transfer from Debtor's ex-wife occurred over a decade ago in 2007

CORE/3502869.0005/141283133.1

and the quitclaim deed executed with Debtor's son in 2010 – all well before 1,215 days before the filing of the Debtor's petition on April 18, 2018.

25.    The Exemption Objection makes the additional statement that "the Debtor's exemption in the subject property is subject to the right of the Trustee as lien creditor and as successor to certain creditors and purchasers under 11 U.S.C. § 544," but offers no further support for this contention. Exemption Objection at ¶ 2(e). Debtor does not attempt here to invent a reasoning and justification of this claim of the Estates.

26.    The Estates' claim that the Debtor's interest in the Property was "obtained by fraud" has been plead with no level of particularity as required by Fed. R. Civ. P. 9(b) (made applicable through Fed. R. Bankr. P. 7009). Debtor, therefore, lacks an ability to properly respond to the contention.

27.    A fact the Estate's do contend, however, is that the Debtor may not claim the homestead exemption in bankruptcy because he does not have an interest in the Property based on the fact his son appears as the current record owner of the Property in the D.C. Recorder of Deeds. However, because both the executed Trust Documents served as a full conveyance of the Property to the Debtor, and Debtor's history of supplying all payments toward the property and its maintenance establish Debtor's full equitable interest in the Property, Debtor's interest in the Property is properly satisfied and the Debtor may exempt the Property from the bankruptcy estate for its full value.

## II. D.C.'s Homestead Exemption

28.    D.C.'s homestead exemption statute allows a bankruptcy debtor to exempt:

**the debtor's aggregate interest in real property used as the residence of the debtor,** or property that the debtor or a dependent of the debtor in a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence, or in a burial plot for the debtor or

> dependent of the debtor, except nothing relative to these exemptions shall impair the following
> debt instruments on real property: deed of trust, mortgage, mechanic's lien, or tax lien.

D.C. Code 15-501(a)(14) (emphasis added).

29.    The phrase "aggregate interest" is not specifically defined in the D.C. Code, and

nowhere does it state that an excludable interest is limited only to those with a recorded

ownership interest. As explained by this Court in *In re Springmann*, "the word interest is a broad

term encompassing many rights of a party, tangible, intangible, legal and equitable." In re

Springmann, 328 B.R. 251, 254 U.S. Bankr. D.D.C. 2005) (citing *In Re Maddox*, 713 F.2d 1526,

1530 (11th Cir. 1983), which defined the term "interest" as used in § 522(d)(1), which the

wording of the D.C. Exemption statute appears to be based on.)  As the *Springmann* case further

noted, the interest protected by D.C.'s homestead exemption is not simply a recorded interest,

but encompasses the full "bundle of rights the debtor has in property." *Id.*  This Court has also

noted that the phrase "aggregate interest" is somewhat ambiguous and in such cases should be

construed in favor of the debtor.  *In re Springmann*, 328 B.R. 251, 257 (U.S. Bankr.D. D.C.

2005) (citing *Wallerstead v. Sosne (In re Wallerstedt)*, 930 F.2d 630, 631 (8th Cir. 1991).

30.    Here it is undisputed that Debtor used the Property as his residence.

Furthermore Debtor has established, both through the previously executed Trust Documents and

through his longstanding actions at the Property, that his aggregate interest in the Property

qualifies as an appropriate interest exemptible for the full value of the Property.

***III. The Trust and Quitclaim Deed establish the Debtor as full legal and equitable owner of
the Property***

   *A.    Non-recorded Deeds Still Represent Valid Transfers of Interest*

31.    Although the Trust Documents, including the quitclaim deed from Len Salas to

the trust titled 1610 Rigs Property Trust was never recorded, the execution and delivery of this

CORE/3502869.0005/141283133.1

deed between Len Salas and the Debtor still represented a valid and complete transfer of interest

to the Debtor.

     32.     Under D.C. law, a deed is not required to be recorded in order to be effective.

Recording of a deed only serves to protect any later bona fide purchasers from title claims once

they have purchased the Property. According to the D.C. Code:

> Any deed conveying real property in the District, or interest therein, or declaring or limiting any
> use or trust thereof, **executed and acknowledged and certified** as provided in §§ 42-101, 42-121
> to 42-123, 42-306, and 42-602 and **delivered** to the person in whose favor the same is executed,
> shall be held to take effect from the date of the delivery thereof, except that as to creditors and
> subsequent bona fide purchasers and mortgagees without notice of said deed, and others interested
> in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for
> record

D.C. Code § 42-401. Effective date of deeds; exception (emphasis added).

     33.     Here, there are no subsequent purchases of the Property. The deed was executed

under the presence of a notary and delivered to Debtor in 2010, and therefore represents a valid

conveyance of Len Salas's interest in the Property.

     *B.*     *Upon Creation of the Trust Documents, the Trust Collapsed through Merger to*
                     *Vest Full Ownership Rights in the Debtor.*

     34.     Although the Trust documents purported to establish and transfer ownership of

the property into a separate named trust entity, because the Trust established the Debtor as both

sole-trustee and sole-beneficiary, the legal effect of the Trust Documents instead served as a full

conveyance of the Property to the Debtor due to the well-established tenant of trust law known as

the Doctrine of Merger. *See* Restatement (Third) of Trusts § 69 - Merger (2003), *See also*

Restatement (Third) of Trusts § 10 – Methods of Creating a Trust (2003).  Recognized by

Colorado trust law, the Doctrine of Merger holds that "When the entire beneficial interest of a

trust is held by the same person or entity that holds the entire legal interest, the trust terminates

under the doctrine of merger; in other words, if the sole beneficiary also functions as the sole

trustee, the trust ceases to exist." *Denver Foundation v. Wells Fargo Bank, N.A.*, 163 P.3d 1116,

CORE/3502869.0005/141283133.1

1125 (S.Ct. Col. 2007) (establishing the existence of the merger doctrine with respect to

Colorado law, but declining to find that it existed for a charitable trust where the beneficiary was

deemed to be the public at large and not the same as the trustee of the established charitable

trust.) For the Doctrine of Merger to apply, however, the legal and beneficial interests must be

completely coextensive; if other equitable interests remain, the trust will not be terminated. *Id.*

(citing *in re Estate of Brenner*, 37 Colo. App. 271, 274, 547 P.2d 938 (1976).)

35.     Although the Doctrine of Merger serves to terminate trusts, that does not mean

that the Trust Documents had no effect causing the property to revert back to the grantor.

Instead, because all aspects of title (complete legal title as sole trustee and complete equitable

title as sole beneficiary) merge and vest in the trustee/beneficiary, that person may be considered

the owner of the property. See *In re Szwyd*, 370 B.R. 882, 888 (B.A.P. 1st Cir. 2007). After

merger of title, the trust serves as nothing more than an alias for the sole trustee/beneficiary. *Id.*

(citing *Cunningham v. Bright,* 228 Mass 385, 117 N.E. 909, 909-10 (1917); See also *Langley v.

Conlan*, 212 Mass. 135, 98 N.E. 1064, 1065 (1912) ("Where the legal and equitable title of real

estate both vest in the same person, the equitable title will merge in the legal estate, and absolute

ownership will ensue divested of the trust.")

36.     While the Restatement observes that application of the Doctrine of Merger occurs

when a party to an established trust *becomes* both the sole-trustee and sole-beneficiary through

the resignation or removal of another party, the Restatement is clear to point out that a similar

result occurs upon the attempted *formation* of a trust as well. *See* Restatement (Third) of Trusts §

69 – Merger at Comment *e* (2003).

37.     Here, the execution of the Trust Documents served to not create an active trust,

but rather transferred full ownership and title of the Property to the Debtor, with the entity named

in the document merely serving as Debtor's alias. In order for merger of legal and equitable title

to occur, the Debtor must serve as both the sole-trustee and sole-beneficiary, with no others

having a contingent interest in these roles. The Irrevocable Trust Agreement clearly establishes

the Debtor as the sole-trustee and no other person is named in the document as trustee of the

1610 Riggs Property Trust. The document does contain a section on appointment of a "Successor

Trustee," but the power to do so is given to the Debtor and is not a requirement. This section also

mentions Ron Salas, but does not establish him as a successor trustee, only that he may appoint

one at the death or incapacitation of the Debtor. Because this is not a nomination to serve as

successor trustee itself and would occur only on the death or incapacitation of the Debtor, who

was alive at the Trust's formation, this is not a contingent interest in the Trust that would serve to

defeat merger.

38.    The Trust Agreement repeatedly references "beneficiaries" (in the plural)

throughout the document. Likely this was the result of using a form trust agreement and not

removing references to multiple beneficiaries contained in that form document. In defining who

the beneficiaries under the agreement are, however, it is clear that the Debtor is the only

beneficiary of the Trust. Section 3 of the document states that "The Trustees shall hold the

property for the primary benefit of Max E. Salas." Additionally later in that same section it states

that the trustee "shall dispose of the corpus and income equally to the following: Max E. Salas".

No other names are listed, and there are no other remainder beneficiaries listed the document.

Section 3(b) of the Trust Agreement provides that "if any of the beneficiary shall die, **the trust

for his or her benefit shall cease**, and the corpus, together with any undistributed income shall

be paid over absolutely to the issue of the beneficiary then living per stirpes". The language of

this section indicates the potential for other beneficiaries, but only names Max and provides no

power in the document to name others as beneficiaries to the Trust. Upon the death of the

Debtor, he therefor would have a 100% beneficial interest, which, per the terms of the

agreement, would then cease to exist in trust and would pass the Property out of the trust estate

to his issues, instead of letting them rise to his role as beneficiary. Other left over form language

in this section detailing rights of other beneficiaries to the trust property seem to therefore have

no effect, because the Debtor serves as the only beneficiary named in the document and it

provides no way for others to be added. No remainder beneficiaries, therefore, are possible and

the complete beneficial interest in the property is held by the debtor alone. *Compare Mond v.

Pitts*, Mass App. Ct. 15-P-86, Aug. 1, 2016 (finding that merger did not apply due to contingent

beneficial interests when the trust document specifically named the beneficiary's sons as

remainder beneficiaries to the trust.)

39.     There is no case law from the District of Columbia detailing the application of

D.C.'s homestead exemption statute in bankruptcy with respect to a trust extinguished due to the

merger doctrine. However, implication of the doctrine leads to the Debtor being able to claim the

Property as his fully exempt homestead.  Because the Irrevocable Trust Agreement granted the

Debtor both legal title in the Property through appointing him as sole-trustee, and equitable title

under the agreement as sole-beneficiary, the agreement served as a conveyance of absolute

ownership in the Property to the Debtor. A full, absolute ownership interest, by definition, will

be an "aggregate interest" in the Property, satisfying the requirements of D.C. Code 15-

501(a)(14).

40.     Although there is no D.C. case law specifically stating that an interest obtained

through the Doctrine of Merger can qualify for the District's homestead exemption, other

jurisdictions have found that ownership interest derived by the debtor through the Doctrine of

15

Merger have qualified those debtors for their respective state's homestead exemptions. See *In re Szwyd*, 370 B.R at 891; See also *In re Aroesty*, 385 B.R. 1, 5 (BAP 1st Cir. 2008)(allowing for merger doctrine to create a homestead exemption in the debtor, but declining to find it did in the case due to the fact that, even though the Debtor lived in the property and was beneficiary of a trust, her parents served as trustees and did not cause merger of title.); *In re Khan* 375 B.R. 5, 9 (BAP 1st Cir. 2007).

## IV. Irrespective of the Trust Documents, the Debtor's equitable interest in the Property alone qualifies him for the homestead exemption.

41.    Although the full conveyance of the Property to the Debtor represented by the Trust Documents establish Debtor's eligibility to claim D.C.'s homestead exemption in his bankruptcy case, even without the Trust Documents, the Debtor and Len Salas's actions with respect to the Property qualify the Debtor to claim the exemption for the full value of the Property through his equitable interest alone.

42.    As mentioned above, the term "interest" is not defined in the D.C. Code and nowhere is it deemed necessary that the debtor have legal title to the property in order to declare an interest in it for purposes of the homestead exemption. Other courts with similar homestead statutes have found that debtors have qualified for their state's homestead exemptions in bankruptcy just through an equitable interest in the property alone. This has been seen in cases dealing with both a beneficial interest in an actual written trust. See *In re Kester*, 493 F.3d 120 (10th Cir. 2007)(finding that as beneficiaries (but not trustees) of a trust, the debtors could claim the homestead exemption based on their equitable interest alone.) Some Courts have even gone a step further to find that actions of the debtor, in the absence of a formal trust document, still created an equitable interest in the property allowing a homestead claim through the formation of a constructive trust. See *In re Wicker*, 2014 Bankr. Lexis 5382 (U.S. Bankr. D. S.C. 2014)

CORE/3502869.0005/141283133.1

(allowing a debtor wife to claim a homestead exemption in the residence she shared with her husband based on an equitable ownership interest by virtue of constructive trust where the wife contributed funds to increase the value of the property in a belief she possessed an ownership interest in it.) District of Columbia Courts have also recognized that equitable interests in property may create constructive trusts for the benefit of non-deeded beneficiaries. *See Gray v. Gray*, 412 A.2d 1208 (D.C. App. 1980) (finding that a daughter who added her name to the deed and mortgage with her mother upon the purchase of property in order to satisfy the lender held only bare legal title to the property upon the death of the mother and that the rights to the Property were subject to a constructive trust for the benefit of the mother, and upon her death, all nine of her children.)

43.    Like in *Gray*, Len Salas offered to deed the Property in his name in order to secure financing for the Property so his father could own the Property. Since deeding the Property in the name of Len Salas to effectuate the purchase of Debtor's ex-wife's interest for the Debtor, Len Salas has had virtually no involvement with the Property and all aspects of the Property, including use as a residence, upkeep, all matters involved with renting rooms at the Property, and payment of all payments for the Property have come exclusively from the Debtor. In the minimal time Len Salas did live at the Property, he paid rent, further confirming that he considered the Property to be not his and owned by his father. Regardless of  the Trust Documents and establishment of an actual trust, the actions of the Debtor and Len Salas have created a constructive trust for the benefit of the Debtor representing the full value of the Property. Len Salas in turn, at best possesses bare legal title of no value, and the Debtor may exclude his equitable interest in the Property for the full value of the Property through D.C.'s homestead exemption.

17

V.      **Conclusion**

44.     D.C.'s homestead exemption is not limited to recorded interests alone. Here the Debtor's interest in the Property has been established both through validly executed documents representing a full transfer of ownership to the Debtor, as well as the actions of the Debtor and his son which establish that Len Salas at best possesses bare legal title of no value and the full equitable interest in the property is, and always has been, maintained by the Debtor. The Estates cannot satisfy the burden of proof to show why Debtor's exemption claim should not be granted.

WHEREFORE, Max E. Salas, Debtor and Debtor-In-Possession, respectfully requests for the foregoing reasons, and upon notice and hearing, that this Court enter an Order:

a)  Denying Movants' Objection to Claim of Exemption in full;

b)  Declaring that the Debtor homestead exemption covers the full value of the Property; and

c)  granting such other and further relief as this Court may deem just and equitable.

Dated:  July 11, 2018                    Respectfully submitted,

                                          /s/ Joshua W. Cox
                                          Marc E. Albert, No. 345181
                                          Joshua W. Cox, No. 1033283
                                          STINSON LEONARD STREET LLP
                                          1775 Pennsylvania Ave., N.W., Suite 800
                                          Washington, DC 20006
                                          Tel. (202) 785-3020
                                          Fax (202) 572-9999
                                          marc.albert@stinson.com
                                          joshua.cox@stinson.com
                                          *Attorneys for*
                                          *Max E. Salas, Debtor and Debtor-In-*
                                          *Possession*

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I did serve a copy of the foregoing Response to Objection to Claim of Exemptions on July 11, 2018, electronically via the Court's ECF system, and by first class mail, postage prepaid, upon the following:

Office of the U.S. Trustee
115 S. Union Street, Suite 210
Alexandria, VA 22314

Philip J. McNutt, Esquire
Law Office of Philip J. McNutt, PLLC
11921 Freedom Drive
Suite 584
Reston, VA 20190


/s/ Joshua W. Cox
Joshua W. Cox

CORE/3502869.0005/141283133.1



**SUNTRUST**

SunTrust Mortgage
1001 Semmes Avenue
Richmond, Virginia 23224
Tel 800.443.1032

# Loss Mitigation Fax Coversheet

## Please fax all documents to: **877-589-0758**

Date: _____ February 18, 2016 _____

Client's Full Name: _____ Len Salas _____

Loan #: _____ 0205069438 _____
- All loan numbers must be ten (10) digits.

Additional Loan #'s: _____

Property Address: _____ 1610 Riggs Pl. NW. Washington DC 20009 _____
- Please only include loan numbers that you wish to have considered for Loss Mitigation options
- Please submit a separate cover sheet for additional property addresses.

### Comments:

### IMPORTANT NOTES
- Please do the following to facilitate the prompt and accurate imaging of your documents:
- Include your FULL name, applicable 10 digit loan numbers and date are at the top of this form.
- Ensure each document includes a valid mortgage loan number. If multiple documents for the same loan are being submitted, include the loan number at the top of the each page.
- Please refer to the Homeowner Checklist and the Uniform Borrower Assistance Form 710 to ensure that all required information is being submitted.

**GET STARTED** – Use this checklist to ensure you have completed all required forms and have the right information.

| Step 1 | ☐ | **Review the information provided to help you understand your options, responsibilities, and next steps.** |
|---|---|---|
| | | ☒ Avoiding Foreclosure      ☐ Frequently Asked Questions      ☐ Beware of Foreclosure Rescue Scams |

| Step 2 | ☐ | **Complete and sign the enclosed Borrower Assistance Form. Must be signed by all borrowers on the mortgage** (notarization is not required) and must include: |
|---|---|---|
| | | ☐ All income, expenses, and assets for each borrower |
| | | ☐ An explanation of financial hardship that makes it difficult to pay the mortgage |
| | | ☐ Your acknowledgment and agreement that all information that you provide is true and accurate |

| Step 3 | ☐ | **Complete and sign a dated copy of the enclosed IRS Form 4506-T.** |
|---|---|---|
| | | ☐ For each borrower, please submit a signed, dated copy of IRS Form 4506T (Request for Transcript of Tax Return) |
| | | ☐ Borrowers who filed their tax returns jointly may send in one IRS Form 4506T signed and dated by both joint filers |

| Step 4 | ☐ | **Provide required Hardship documentation. This documentation will be used to verify your hardship.** |
|---|---|---|
| | | ☐ Follow the instructions set forth on the Borrower Assistance Form (attached) |

| Step 5 | ☐ | **Provide required Income documentation. This documentation will be used to verify your hardship and all of your income (including any alimony or child support that you choose to disclose and rely upon to qualify).** |
|---|---|---|
| | | ☐ Follow the instructions set forth on the Borrower Assistance Form (attached) |
| | | ☐ You may also disclose any income from a household member who is not on the promissory note (non-borrower), such as a relative, spouse, domestic partner, or fiancé who occupies the property as a primary residence. If you elect to disclose and rely upon this income to qualify, the required income documentation is the same as the income documentation required for a borrower. See Page 2 of the Borrower Assistance Form for specific details on income documentation. |

| Step 6 | ☐ | **Gather and send your completed Borrower Response Package immediately.** |
|---|---|---|
| | ☐ | **For Home Retention Requests, you must send in all required documentation listed in steps 2-5 above, and summarized below:** |
| | | • Borrower Assistance Form (attached) |
| | | • HAMP Hardship Affidavit |
| | | • Income Documentation as outlined on Page 2 of the Borrower Assistance Form (attached) |
| | | • Hardship Documentation as outlined on Page 3 of the Borrower Assistance Form (attached) |
| | | • Additional Information Pertaining to Household and Living Expenses (attached) |
| | | • Authorization Form for Non-Borrower (if applicable) |
| | ☐ | **For Home Liquidation Requests, you must send in all required documentation as outlined above PLUS:** |
| | | • 2 most recent bank statements (if applicable) |
| | | • Last 2 years worth of tax returns (if applicable) |
| | | • Sales contract (if applicable) |
| | | • Estimated HUD-1 (if applicable) |
| | | • Affidavit of ARM's Length Transaction signed by all parties (if applicable) |
| | | • 3rd Party Authorization Form (if applicable) |
| | | Please fax all documents to 877.589.0758 or you may mail the documents to: SunTrust Mortgage Inc., VA-RVW-5113, PO BOX 26150, Richmond, VA 23260. You may also email them to: homepreservationdocuments@suntrust.com. Please include your loan number in the subject line as well as at the top of each page. Please do not email more than eight (8) attachments per submission. If you have additional attachments, please send a supplemental email. |

**IMPORTANT REMINDERS:**
- ☐ If you cannot provide the documentation within the time frame provided, have other types of income not specified on Page 2 of the Borrower Assistance Form, cannot locate some or all of the required documents, OR have any questions, please contact us at the number provided on Page 2.
- ☐ Keep a copy of all documents and proof of mailing/emailing for your records. **Don't send original income or hardship documents. Copies are acceptable.**

Questions? Contact us at the number provided on Page 2

# Information on Avoiding Foreclosure
## For Your Information Only - Do Not Return with Your Borrower Response Package

**Mortgage Programs Are Available to Help**

There are a variety of programs available to help you resolve your delinquency and keep your home. You may be eligible to refinance or modify your mortgage to make your payments and terms more manageable, for example, lowering your monthly payment to make it more affordable. Or, if you have missed a few payments, you may qualify for a temporary (or permanent) solution to help you get your finances back on track. Depending on your circumstances, staying in your home may not be possible. However, a short sale or deed-in-lieu of foreclosure may be a better choice than foreclosure — see the table below for more information:

| OPTION | OVERVIEW | BENEFIT |
|---|---|---|
| Refinance | Originate a new loan with lower interest rate or other favorable terms | Makes your payment or terms more affordable |
| Reinstatement | Pay the total amount you owe, in a lump sum payment and by a specific date. This may follow a forbearance plan as described below | Allows you to avoid foreclosure by bringing your mortgage current if you can show you have funds that will become available at a specific date in the future |
| Repayment Plan* | Pay your past-due payments together with your regular payments over an extended period of time | Allows you time to catch up on late payments without having to come up with a lump sum |
| Forbearance Plan* | Make reduced mortgage payments or no mortgage payments for a specific period of time | Have time to improve your financial situation and get back on your feet |
| Modification | Modify the terms of your mortgage to make it more affordable or manageable after successfully making the reduced payment during a "trial period" (i.e., completing a three [or four] month trial period plan) | Permanently modifies your mortgage so that your payments or terms are more manageable as a permanent solution to a long-term or permanent hardship |
| Partial Claim | HUD will provide funds to bring loan to a current status. All amounts utilized in the partial claim option will become a lien against the property due at loan payoff. | Brings loan to a current status without increasing monthly payment amount. |
| Short Sale | Sell your home and pay off a portion of your mortgage balance when you owe more on the home than it is worth | Allows you to transition out of your home without going through foreclosure. In some cases relocation assistance may be available |
| Deed-in-Lieu of Foreclosure | Transfer the ownership of your property to us | Allows you to transition out of your home without going through foreclosure. In some cases relocation assistance may be available. This is useful when there are no other liens on your property |

**We Want to Help**

Take action, gain peace of mind and control of your situation. Complete and return the Borrower Response Package to start the process of getting the help you need now.

## Frequently Asked Questions
### For Your Information Only - Do Not Return with Your Borrower Response Package

**1. Why Did I Receive This Package?**
You received this package because we have not received one or more of your monthly mortgage payments and want to help you keep your home if at all possible. We are sending this information to you now so that we can work with you to quickly resolve any temporary or long-term financial challenge you face to making all of your late mortgage payments.

**2. Where Can I Find More Information on Foreclosure Prevention?**
Please see the Avoiding Foreclosure attachment in this package for more information, or you can contact SunTrust at 800.443.1032. Additional foreclosure prevention information is provided by SunTrust at suntrust.com/mortgage.

**3. Will It Cost Money to Get Help?**
There should never be a fee from your servicer or qualified counselor to obtain assistance or information about foreclosure prevention options. However, foreclosure prevention has become a target for scam artists. Be wary of companies or individuals offering to help you for a fee, and never send a mortgage payment to any company other than the one listed on your monthly mortgage statement or one designated to receive your payments under a state assistance program.

**4. What Happens Once I Have Sent the Borrower Response Package to You?**
We will contact you within three business days of our receipt of your Borrower Response Package to confirm that we have received your package and will review it to determine whether it is complete. Within five business days of receipt of your request, we will send you a notice of incompleteness in the event there is any missing information or documentation that you must still submit. If your complete application and documents required for a Borrower Response Package is received 15 or more days prior to the foreclosure sale date, we will conduct a thorough evaluation of your request for retention options. Additionally, if your complete application and documents required for a Borrower Response Package is received 30 or more days prior to the foreclosure sale date, we will conduct a thorough evaluation of your request for a short sale or deed in lieu. Please submit your Borrower Response Package as soon as possible.

Note: For properties in California, if your complete application and documents required for a Borrowers Response Package is received at any time prior to the foreclosure sale date, we will conduct a thorough evaluation for requests received for retention options only.

**5. What Happens to My Mortgage While You Are Evaluating My Borrower Response Package?**
You remain obligated to make all mortgage payments as they come due, even while we are evaluating the types of assistance that may be available.

**6. Will the Foreclosure Process Begin If I Do Not Respond to this Letter?**
If you have missed four monthly payments or there is reason to believe the property is vacant or abandoned, we may refer your mortgage to foreclosure regardless of whether you are being considered for a modification or other types of foreclosure alternatives.

**7. What Happens if I Have Waited Too Long and My Property Has Been Referred to an Attorney for Foreclosure? Should I Still Contact You?**
Yes, the sooner the better!

**8. What if My Property is Scheduled for a Foreclosure Sale in the Future?**
If your application for a retention option is received between 15 days and 4 days before a scheduled foreclosure sale date or your application for a short sale or deed in lieu is received between 30 days and 15 days before a scheduled foreclosure sale, an expedited evaluation will be conducted. If we are unable to complete the review due to insufficient time, you will be notified and the foreclosure sale will continue. Please submit your Borrower Response Package as soon as possible.

## FREQUENTLY ASKED QUESTIONS continued

**9. Will My Property be Sold at a Foreclosure Sale If I Accept a Foreclosure Alternative?**
No. The property will not be sold at a foreclosure sale once you accept a loss mitigation retention or liquidation workout option.

**10. Will My Credit Score Be Affected by My Late Payments or Being in Default?**
The delinquency status of your loan will be reported to credit reporting agencies as well as your entry into a Repayment Plan, Forbearance Plan, or Trial Period Plan in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association requirements.

**11. Will My Credit Score Be Affected if I Accept a Foreclosure Prevention Option?**
While the effect on your credit will depend on your individual credit history, credit scoring companies generally would consider entering into a plan with reduced payments as increasing your credit risk. As a result, entering into a plan with reduced payments may adversely affect your credit score, particularly if you are current on your mortgage or otherwise have a good credit score.

**12. Is Foreclosure Prevention Counseling Available?**
Yes, HUD-approved counselors are available to provide you with the information and assistance you may need to avoid foreclosure. You can use the search tool at http://www.hud.gov/offices/hsg/sfh/hcc/fc/ to find a counselor near you.

**13. I Have Seen Ads and Flyers From Companies Offering to Help Me Avoid Foreclosure for a Fee. Are These Companies on the Level?**
Foreclosure prevention has become a target for scam artists. We suggest using the HUD Web site referenced in question 12 to locate a counselor near you. Also, please refer to the "Beware of Foreclosure Rescue Scams" section for more information.

## BEWARE OF FORECLOSURE RESCUE SCAMS — TIPS & WARNING SIGNS
### For Your Information Only - Do Not Return with Your Borrower Response Package

Scam artists are stealing millions of dollars from distressed homeowners by promising immediate relief from foreclosure, or demanding cash for counseling services when HUD-approved counseling agencies provide the same services for FREE. If you receive an offer, information or advice that sounds too good to be true, it probably is. Don't let them take advantage of you, your situation, your house or your money. **Remember, help is FREE.**

**How to Spot a Scam** – beware of a company or person who:
- Asks for a fee in advance to work with your lender to modify, refinance or reinstate your mortgage.
- Guarantees they can stop a foreclosure or get your loan modified.
- Advises you to stop paying your mortgage company and pay them instead.
- Pressures you to sign over the deed to your home or sign any paperwork that you haven't had a chance to read, and you don't fully understand.
- Claims to offer "government-approved" or "official government" loan modifications.
- Asks you to release personal financial information online or over the phone and you have not been working with this person and/or do not know them.

**How to Report a Scam** – do one of the following:
- Go to www.preventloanscams.org and fill out the Loan Modification Scam Prevention Network's (LMSPN) complaint form online and get more information on how to fight back. Note: you can also fill out this form and send to the fax number/e-mail/address (your choice!) on the back of the form.
- Call 888.995.HOPE (4673) and tell the counselor about your situation and that you believe you got scammed or know of a scam.

*The Loan Modification Scam Prevention Network is a national coalition of governmental and private organizations led by Fannie Mae, Freddie Mac, NeighborWorks America™ and the Lawyers' Committee for Civil Rights Under Law.*

# UNIFORM BORROWER ASSISTANCE FORM

If you are experiencing a temporary or long-term hardship and need help, you must complete and submit this form along with other required documentation to be considered for available solutions. On this page, you must disclose information about (1) you and your intentions to either keep or transition out of your home; (2) the property's status; (3) bankruptcy; and (4) your credit counseling agency.

On Page 2, you must disclose information about all of your income, expenses and assets. Page 2 also lists the required income documentation that you must submit in support of your request for assistance. Then on Page 3, you must complete the Hardship Affidavit in which you disclose the nature of your hardship. The Hardship Affidavit informs you of the required documentation that you must submit in support of your hardship claim.

NOTICE: In addition, when you sign and date this form, you will make important certifications, representations and agreements, including certifying that all of the information in this Borrower Assistance Form is accurate and truthful and any identified hardship has contributed to your submission of this request for mortgage relief.

REMINDER: The Borrower Response Package you need to return consists of: (1) this completed, signed and dated Borrower Assistance Form; (2) completed and signed IRS Form 4506T-EZ (4506T for self-employed borrowers or borrowers with rental income); (3) required income documentation; and (4) required hardship documentation.

| Loan Number | 0205069438 | (usually found on your monthly mortgage statement) |
|---|---|---|
| Servicer's Name | SunTrust | |

| I want to: | ☑ Keep the Property | ☐ Vacate the Property | ☐ Sell the Property | ☐ Undecided |
|---|---|---|---|---|
| The property is currently: | ☑ My Primary Residence | ☐ A Second Home | ☐ An Investment Property | |
| The property is currently: | ☑ Owner Occupied | ☐ Renter Occupied | ☐ Vacant | |

| BORROWER | CO-BORROWER |
|---|---|
| **BORROWER'S NAME** <br> Len Salas | **CO-BORROWER'S NAME** |

| SOCIAL SECURITY NUMBER | DATE OF BIRTH <br> June 18, 1977 | SOCIAL SECURITY NUMBER | DATE OF BIRTH |
|---|---|---|---|
| **HOME PHONE NUMBER WITH AREA CODE** <br> 202246 4901 | | **HOME PHONE NUMBER WITH AREA CODE** | |
| **CELL OR WORK NUMBER WITH AREA CODE** <br> same | | **CELL OR WORK NUMBER WITH AREA CODE** | |

**MAILING ADDRESS**
2411 Otis St. NE. Washington DC 20008

| PROPERTY ADDRESS (IF SAME AS MAILING ADDRESS, JUST WRITE SAME) <br> 1610 Riggs Pl. NW. Washington DC | 20009 | EMAIL ADDRESS <br> lensalas77@Gmail.com |
|---|---|---|

| | |
|---|---|
| Is the property listed for sale? ☐ Yes ☑ No <br> If yes, what was the listing date? _____ <br> If property has been listed for sale, have you received an offer on the property? ☐ Yes ☐ No <br> Date of offer: _____ Amount of Offer: $ _____ <br> Agent's Name: _____ <br> Agent's Phone Number: _____ <br> For Sale by Owner? ☐ Yes ☐ No | Have you contacted a credit counseling agency for help? <br> ☐ Yes ☑ No <br> If yes, please complete the counselor contact information below: <br> Counselor's Name: _____ <br> Agency's Name: _____ <br> Counselor's Phone Number: _____ <br> Counselor's Email Address: _____ |

Do you have condominium or homeowner association (HOA) fees? ☐ Yes ☑ No

Total monthly amount: $ _____    Name and address that fees are paid to: _____

Have you filed for bankruptcy? ☐ Yes ☑ No    If yes:   ☐ Chapter 7   ☐ Chapter 11   ☐ Chapter 12   ☐ Chapter 13

If yes, what is the filing Date: _____  Has your bankruptcy been discharged? ☐ Yes   ☐ No   Bankruptcy case number: _____

| | | |
|---|---|---|
| Is any Borrower an active duty service member? | ☐ Yes | ☑ No |
| Has any Borrower been deployed away from his/her primary residence or received a Permanent Change of Station order? | ☐ Yes | ☑ No |
| Is any Borrower the surviving spouse of a deceased service member who was on active duty at the time of death? | ☐ Yes | ☑ No |

# UNIFORM BORROWER ASSISTANCE FORM

| Monthly Household Income | | Monthly Household Expenses and Debt Payments | | Household Assets (associated with the property and/or borrower(s) excluding retirement funds) | |
|---|---|---|---|---|---|
| Gross wages | 0 | Mortgage Payment | $ $5900 | Checking Account(s) | $ 3000.00 |
| Overtime | $ | 2nd Mortgage Payment | $ | Checking Account(s) | $ 1000.00 |
| Child Support / Alimony* | $ | Homeowner's Insurance | [included] | ngs / Money Market | $ |
| Non-taxable social security/SSDI | $ | Property Taxes | $ | | $ |
| Taxable SS benefits or other monthly income from annuities or retirement plans | $ | Credit Cards / Installment Loan(s) (total minimum payment per month) | $ | ks / Bonds | $ |
| Tips, commissions, bonus and self-employed income | $ | Alimony, child support payments | $ | Other Cash on Hand | $ 500.00 |
| Rents Received | $ 4900.00 | Car Lease Payments | $ | Other Real Estate (estimated value) | $ |
| Unemployment Income | $ | HOA/Condo Fees/Property Maintenance | $ | Other | $ |
| Food Stamps/Welfare | $ | Mortgage Payments on other properties | $ | | $ |
| Other | $1000.00 | er | $ | | $ |
| Total (Gross Income) | $ 5900.00 | al Household Expenses and Debt Payment | $ 5900.00 | Total Assets | $ 4500.00 |

Any other liens (mortgage liens, mechanics liens, tax liens, etc.)

| Lien Holder's Name | Balance and Interest Rate | Loan Number | Lien Holder's Phone Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## Required Income Documentation

☐ **Do you earn a salary or hourly wage?**
For each borrower who is a salaried employee or paid by the hour, include paystub(s) reflecting the most recent 30 days' earnings and documentation reflecting year-to-date earnings, if not reported on the paystubs (e.g. signed letter or printout from employer).

☐ **Are you self-employed?**
For each borrower who receives self-employed income, include a complete, signed individual federal income tax return and, as applicable, the business tax return; AND either the most recent signed and dated quarterly or year-to-date profit/loss statement that reflects activity for the most recent three months; OR copies of bank statements for the business account for the last two months evidencing continuation of business activity.

☑ Do you have any additional sources of income? Provide for each borrower as applicable:
**"Other Earned Income"** such as bonuses, commissions, housing allowance, tips, or overtime:
☐ Reliable third-party documentation describing the amount and nature of the income (e.g., paystub, employment contract or printouts documenting tip income).
**Social Security, disability or death benefits, pension, public assistance, or adoption assistance:**
☐ Documentation showing the amount and frequency of the benefits, such as letters, exhibits, disability policy or benefits statement from the provider, and
☑ Documentation showing the receipt of payment, such as copies of the two most recent bank statements showing deposit amounts.
**Rental income:**
☐ Copy of the most recent filed federal tax return with all schedules, including Schedule E—Supplement Income and Loss. Rental income for qualifying purposes will be 75% of the gross rent you reported reduced by the monthly debt service on the property, if applicable; or
☐ If rental income is not reported on Schedule E — Supplemental Income and Loss, provide a copy of the current lease agreement with either bank statements or cancelled rent checks demonstrating receipt of rent.
**Investment income:**
☐ Copies of the two most recent investment statements or bank statements supporting receipt of this income.
**Alimony, child support, or separation maintenance payments as qualifying income:***
☐ Copy of divorce decree, separation agreement, or other written legal agreement filed with a court, or court decree that states the amount of the alimony, child support, or separation maintenance payments and the period of time over which the payments will be received, and
☐ Copies of your two most recent bank statements or other third-party documents showing receipt of payment.

*Notice: Alimony, child support, or separate maintenance income need not be revealed if you do not choose to have it considered for repaying this loan.

# UNIFORM BORROWER ASSISTANCE FORM

## HARDSHIP AFFIDAVIT

I am requesting review of my current financial situation to determine whether I qualify for temporary or permanent mortgage loan relief options.          Date Hardship Began is:

I believe that my situation is:

☑ Short-term (under 6 months)   ☐ Medium-term (6 – 12 months)   ☐ Long-term or Permanent Hardship (greater than 12 months)

I am having difficulty making my monthly payment because of reason set forth below:
*(Please check the primary reason and submit required documentation demonstrating your primary hardship)*

| If Your Hardship is: | Then the Required Hardship Documentation is: |
|---|---|
| ☑ Unemployment | ☐ No hardship documentation required |
| ☐ Reduction in Income: a hardship that has caused a decrease in your income due to circumstances outside your control (e.g., elimination of overtime, reduction in regular working hours, a reduction in base pay) | ☐ No hardship documentation required |
| ☐ Increase in Housing Expenses: a hardship that has caused an increase in your housing expenses due to circumstances outside your control | ☐ No hardship documentation required |
| ☐ Divorce or legal separation; Separation of Borrowers unrelated by marriage, civil union or similar domestic partnership under applicable law | ☐ Divorce decree signed by the court; OR<br>☐ Separation agreement signed by the court; OR<br>☐ Current credit report evidencing divorce, separation, or non-occupying borrower has a different address; OR<br>☐ Recorded quitclaim deed evidencing that the non-occupying Borrower or co-Borrower has relinquished all rights to the property |
| ☐ Death of a borrower or death of either the primary or secondary wage earner in the household | ☐ Death certificate; OR<br>☐ Obituary or newspaper article reporting the death |
| ☐ Long-term or permanent disability; Serious illness of a borrower/co-borrower or dependent family member | ☐ Proof of monthly insurance benefits or government assistance (if applicable); OR<br>☐ Written statement or other documentation verifying disability or illness; OR<br>☐ Medical bills<br>None of the above shall require providing detailed medical information. |
| ☐ Disaster (natural or man-made) adversely impacting the property or Borrower's place of employment | ☐ Insurance claim; OR<br>☐ Federal Emergency Management Agency grant or Small Business Administration loan; OR<br>☐ Borrower or Employer property located in a federally declared disaster area |
| ☐ Distant employment transfer / Relocation | For active duty service members: Notice of Permanent Change of Station (PCS) or actual PCS orders.<br>For employment transfers/new employment:<br>☐ Copy of signed offer letter or notice from employer showing transfer to a new employment location; OR<br>☐ Pay stub from new employer; OR<br>☐ If none of these apply, provide written explanation<br>In addition to the above, documentation that reflects the amount of any relocation assistance provided, if applicable (not required for those with PCS orders). |
| ☐ Business Failure | ☐ Tax return from the previous year (including all schedules) AND<br>☐ Proof of business failure supported by one of the following:<br>  ☐ Bankruptcy filing for the business; OR<br>  ☐ Two months recent bank statements for the business account evidencing cessation of business activity; OR<br>  ☐ Most recent signed and dated quarterly or year-to-date profit and loss statement |
| ☐ Other: a hardship that is not covered above | ☐ Written explanation describing the details of the hardship and relevant documentation |

**Borrower/Co-Borrower Acknowledgement and Agreement**

I certify, acknowledge, and agree to the following:

1. All of the information in this Borrower Assistance Form is truthful and the hardship that I have identified contributed to my need for mortgage relief.
2. The accuracy of my statements may be reviewed by the Servicer, owner or guarantor of my mortgage, their agent(s), or an authorized third party*, and I may be required to provide additional supporting documentation. I will provide all requested documents and will respond timely to all Servicer, or authorized third party*, communications.
3. Knowingly submitting false information may violate Federal and other applicable law.
4. If I have intentionally defaulted on my existing mortgage, engaged in fraud or misrepresented any fact(s) in connection with this request for mortgage relief or if I do not provide all required documentation, the Servicer may cancel any mortgage relief granted and may pursue foreclosure on my home and/or pursue any available legal remedies.
5. The Servicer is not obligated to offer me assistance based solely on the representations in this document or other documentation submitted in connection with my request.
6. Charges associated with the servicing of my loan may be billed in the form of corporate advance and will appear on my periodic billing statement.
7. I may be eligible for a trial period plan, repayment plan, or forbearance plan. If I am eligible for one of these plans, I agree that:
    a. All the terms of this Acknowledgement and Agreement are incorporated into such plan by reference as if set forth in such plan in full.
    b. My first timely payment under the plan will serve as acceptance of the terms set forth in the notice of the plan sent by the Servicer.
    c. The Servicer's acceptance of any payments under the plan will not be a waiver of any acceleration of my loan or foreclosure action that has occurred and will not cure my default unless such payments are sufficient to completely cure my entire default under my loan.
    d. Payments due under a trial period plan for a modification will contain escrow amounts. If I was not previously required to pay escrow amounts, and my trial period plan contains escrow amounts, I agree to the establishment of an escrow account and agree that any prior waiver is revoked. Payments due under a repayment plan or forbearance plan may or may not contain escrow amounts. If I was not previously required to pay escrow amounts and my repayment plan or forbearance plan contains escrow amounts, I agree to the establishment of an escrow account and agree that any prior escrow waiver is revoked.
8. A condemnation notice has not been issued for the property.
9. The Servicer or authorized third party* will obtain a current credit report on all borrowers obligated on the Note.
10 The Servicer or authorized third party* will collect and record personal information that I submit in this Borrower Response Package and during the evaluation process. This personal information may include, but is not limited to: (a) my name, address, telephone number, (b) my social security number, (c) my credit score, (d) my income, and (e) my payment history and information about my account balances and activity. I understand and consent to the Servicer or authorized third party*, as well as any investor or guarantor (such as Fannie Mae or Freddie Mac), disclosing my personal information and the terms of any relief or foreclosure alternative that I receive to the following:
    a. Any investor, insurer, guarantor, or servicer that owns, insures, guarantees, or services my first lien or subordinate lien (if applicable) mortgage loan(s) or any companies that perform support services to them; and
    b. The U.S. Department of Treasury, Fannie Mae and Freddie Mac, in conjunction with their responsibilities under the Making Home Affordable program, or any companies that perform support services to them.
11. I understand that by providing my phone number, I consent to SunTrust Bank, its affiliates, agents, and assignees of any of those contacting me at this number by calling, texting, or sending other electronic messages, from time to time, for any reason about my accounts with SunTrust Bank and its affiliates, including but not limited to, for collection and payment purposes, even if I have submitted a request to cease collection calls. I agree that automated dialing equipment or prerecorded voice messages may be used for any of these purposes.

| | | | |
|---|---|---|---|
| _(signature)_ | 2/25/16 | | |
| Borrower Signature | Date | Co-Borrower Signature | Date |

*An authorized third party may include, but is not limited to, a counseling agency, Housing Finance Agency (HFA) or other similar entity that is assisting me in obtaining a foreclosure prevention alternative.

## DCPropertyQuest report for 1610 riggs place, nw - Wed Jun 17 2015

| | |
|---|---|
| SSL | 0178   0030 |
| Lot type | record lot |
| Property type | FLATS/CONVERSIONS |
| Use code | 024 Residential-Conversions-Less t |
| Land area | 1847 square feet |
| Premise address | 1610 RIGGS PL NW |
| Owner | LEN SALAS |
| Mailing address | 1610 RIGGS PL NW |
| City, state, zip | WASHINGTON, DC 20009-6417 |
| Vacant land use | N |
| Class type | 001 |
| Homestead tax deduction | (none) |
| Tax rate | 0.85 |
| Mixed use | N |
| Mixed use 1 tax type | TX |
| New land | $521,080 |
| New improvements | $829,600 |
| New total | $1,350,680 |
| Sale price | $0 |
| Sale date | 4/24/2007 |

000855·
1392

**Department of Consumer and Regulatory Affairs**
**Enforcement & Compliance Administration**
**1100 4th Street, SW 5th Floor**
**Washington, DC 20024**
**Tel: (202) 442-4332 Fax: (202) 442-9564 dcra.dc.gov**



## NOTICE OF IMMEDIATE ABATEMENT

| CONTROL NUMBER | COA1500239 | | |
|---|---|---|---|
| ADDRESS OF VIOLATION | SSL 0178 | WARD | DATE AND TIME OF NOTICE |
| 1610 Riggs Pl. N.W. | 0030 | 2 | 6·3·15 @ 9 ᵃ |
| RESPONSIBLE PARTY AND MAILING ADDRESS | | ☒ OWNER ☐ TENANT | |
| Len Salas / Same Address | | ☐ AGENT | |

The government has determined your vacant building was open and accessible and constituted an imminent life and/or health threatening condition which required immediate correction for the protection of the public. Therefore it has been secured. See D.C. Code § 42-3131.01(a)(2). Under these circumstances, the government was unable to provide you with prior notice. You have or will receive a bill for the cost of securing the building. You have a right to challenge the government's action by following the appeal instructions below.

INSPECTOR - "I personally declare under penalty of perjury that I observed and/or determined that the infraction(s) charged have been committed."

| INSPECTOR'S NAME | INSPECTOR'S SIGNATURE | BADGE # | TIME |
|---|---|---|---|
| Kevin Jackson | Kevin Jln | 106 | 9 ᵃ |

### PERSONAL SERVICE AND POSTING

| NAME OF PERSON NOTIFIED | RELATIONSHIP TO THE RESPONSIBLE PARTY | DATE/TIME OF SERVICE OR POSTING |
|---|---|---|
| | | 6·3·15 @ 9ᵃ |
| SIGNATURE OF PERSON RECEIVING NOTICE | NAME OF PERSON SERVING NOTICE | POSITION OF NOTICE SERVER |

You have the right to appeal this Notice requiring you to pay for the government's costs in correcting the condition by requesting a hearing. To request a hearing, you must contact the Office of Administrative Hearings at 441 4th Street NW #450, Washington DC 20001 or 202-442-9094 within fifteen (15) calendar days of the date on this notice.

(Fire Damage) First & 2ⁿᵈ floor
windows & doors

Original-Post          Pink-Mail          Yellow-Civil Infraction

FY 2014

L. Salas
EXHIBIT NO. 2

000867

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**

Office of Compliance
and Enforcement



DEPARTMENT OF CONSUMER & REGULATORY AFFAIRS

Date: June 17, 2015

Address: 1610 RIGGS PL NW
Square & Lot #: 0178    0030
Control #: SA15-00103

Dear Property Owner:

The Office of Compliance and Enforcement Branch corrected the violation(s) cited at your property at: 1610 RIGGS PL NW. A lien in the amount of $1,456.16 was levied against the property as a cost incurred by correcting the violations cited.

Payment can be made at any District of Columbia Wells Fargo Bank or you may mail your payment with your enclosed invoice to DCRA/Enforcement 1100 4th St, SW Rm 510, Washington DC. 20024, Att: Marcia Smith. Please make your payment payable to the D.C. Treasurer. For proper application please write your square, lot, and control number on your payment in the lower left corner of your check.

Please be advised that the above referenced property can be advertised and offered for sale at the next scheduled tax sale.

Sincerely,

Marcia Smith, for

Paul Waters, Esq.
Deputy Director
Enforcement & Legislative Affairs

1100 4th Street, S.W., Washington, D.C. 20024
Phone: (202) 442-8946
Web: dcra.dc.gov

MURIEL BOWSER - Mayor of the District: olumbia

MELINDA BOLLING - Director, Department of Consumer and Regulatory Affairs (DCRA)

ERNMENT OF THE DISTRICT OF COLUMBIA

★★★

DCRA SPECIAL ASSESSMENT BILL
C/O OFFICE OF TAX AND REVENUE
P.O. BOX 98095
Washington DC 20090-8095

| SQUARE | SUFFIX | LOT | PROPERTY ADDRESS | MORTGAGE NO. | TAXABLE ASSESSMENT | TAX RATE PER $100 | TOTAL TAX FOR YEAR |
|--------|--------|-----|------------------|--------------|--------------------|--------------------|--------------------|
| 0178 | | 0030 | 1610 RIGGS PL NW | 000 | | | |

## DCRA Special Assessment (Payment Voucher/Coupon)

LEN SALAS
1610 RIGGS PL NW
WASHINGTON DC 200009

PAYMENT DUE BY June 30, 2015 | AMOUNT DUE: 1,478.00

0   0178        0030  151740451  0000147800

Please Detach Here and Return This Upper Portion With Your Payment.

MURIEL BOWSER - Mayor of the District of Columbia

MELINDA BOLLING - Director, Department of Consumer and Regulatory Affairs (DCRA)

GOVERNMENT OF THE DISTRICT OF COLUMBIA

★★★

DCRA SPECIAL ASSESSMENT BILL
C/O OFFICE OF TAX AND REVENUE
P.O. BOX 98095
Washington DC 20090-8095

| SQUARE | SUFFIX | LOT | PROPERTY ADDRESS | MORTGAGE NO. | TAXABLE ASSESSMENT | TAX RATE PER $100 | TOTAL TAX FOR YEAR |
|--------|--------|-----|------------------|--------------|--------------------|--------------------|--------------------|
| 0178 | | 0030 | 1610 RIGGS PL NW | 000 | | | |

| CONTROL NUMBER | DESCRIPTION | LIEN | PENALTY | INTEREST | TOTAL |
|----------------|-------------|------|---------|----------|-------|
| A15-00103 | **DCRA Special Assessment Bill**<br>06/19/2015 - SECURE | 1,456.16 | 0.00 | 21.84 | 1,478.00 |
| | **TOTALS** | 1,456.16 | 0.00 | 21.84 | 1,478.00 |

| | PAYMENT DUE BY: June 30, 2015 | AMOUNT DUE 1,478.00 |
|---|---|---|
| YER'S RECORD<br>INVERSE SIDE FOR IMPORTANT INFORMATION | IF PAID AFTER: | PAYMENT DUE BY: |
| | IF PAID AFTER: | PAYMENT DUE BY: |

Doc #: 2015060324
Filed & Recorded
06/17/2015 12:48 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
### HOUSING REGULATION ADMINISTRATION
### CERTIFICATE OF DELINQUENT COSTS
### FOR CORRECTION OF WRONGFUL HOUSING CONDITIONS

DISTRICT OF COLUMBIA

vs.

Len Salas
1610 Riggs Pl NW
Washington, DC 20009

Date: 6/17/2015
Square - 0178  Suffix -  Lot - 0030
Assmt Control #: Sa15-00103
Address of Premises:
1610 Riggs Pl NW

This Certificate is filed under the authority of and pursuant to Title 42, Chapter 42, Section 3131 of the D.C. Code, 2002 Edition, as amended. The District of Columbia shall have a continuing lien for taxes against the property for correction of wrongful conditions including administrative, contracting, and advertising costs, if any.

This Certificate, from the date of its filing, has the force and effect, as against the aforesaid delinquent party or parties, of a lien created by a judgment granted by the Superior Court of the District of Columbia. This lien remains in force and effect until all fines set forth below, together with penalties and interest thereon, shall be paid.

### Assessed Amount: $1456.16

By:

Paul E. Waters, Esq.
Deputy Director
Enforcement and Legislative Affairs

SA15-00103



GOVERNMENT OF THE DISTRICT OF COLUMBIA

DIVISION OF ENFORCEMENT AND LEGISLATIVE AFFAIRS

## 42-3131.01 COST ASSESSMENT SUMMARY COST SHEET FOR ABATEMENT OF NUISANCE PROPERTIES

CONTROL # COA1500239   SITE REPRESENTATIVE: K. Jackson

LOCATION: 1610 RIGGS PL N.W. SQUARE: 0178 LOT: 0030

OWNER OF RECORD: 1610 RIGGS PL N.W. WASH, DC
20009-6417

OWNER: LEN SALAS

### WORK SCHEDULE

DATE: 6/3/15   TIME STARTED: 10:00 AM   TIME COMPLETE: 11:00 AM
DATE: _____   TIME STARTED: _____   TIME COMPLETE: _____
DATE: _____   TIME STARTED: _____   TIME COMPLETE: _____
DATE: _____   TIME STARTED: _____   TIME COMPLETE: _____
DATE: _____   TIME STARTED: _____   TIME COMPLETE: _____

TOTAL HOURS OF WORK: _____1_____

### LABOR

__1__ CDL Truck Driver Hours:              @ $30.00/hr. = $30.00

__1__ HCEB Site Representatives Hours:     @ $31.50/hr. = $31.50

__10__ HCEB Workers Hours:                 @ $28.00/hr. = $280.00

__∅__ National Guard Hours:               @ $40.00/hr. = ∅

                    TOTAL LABOR COST: $341.50

                    4% of Total Labor Cost: 13.66

                    Grand Total Labor Cost: 355.16

GOVERNMENT OF THE DISTRICT OF COLUMBIA

# NOTICE OF INFRACTION

Notice No. *S9C3702*

Date of Service: *1 6 15*

**Issuing Agency:** ☐ DOH   ☐ DMH   ☐ DCRA
☐ DDOE   ☑ FEMS   ☐ Other _____

*1610 Riggs Place N W Washington DC 20009*

Location of Infraction:   **Type of Location:** ☐ Vacant Lot   ☐ Construction Site   ☐ Occupied   ☐ Other _____

Business/Company Name *Salazar Len*   Charge as Respondent (circle): YES   NO   Telephone Number

Individual Name (Last, First, Middle) *2411 Davis Street N E*   Charge as Respondent (circle): YES   NO   Telephone Number

Mailing/Email Address *Washington, D C*   *20018*

City   State   Zip Code

Business License/Permit Type _____   Business License/Permit No. _____

You are charged with violating the District of Columbia laws or regulations stated below. You MUST answer the charge(s) within 15 calendar days of the date of service noted above (20 calendar days if you received this by mail). You must indicate below each infraction whether you ADMIT, ADMIT WITH EXPLANATION or DENY. **Instructions on back.**

If you DENY one or more of the infractions, you must appear for a hearing. You will receive a separate order from the Office of Administrative Hearings advising you where and when to appear for your hearing.

| D.C. Official Code AND/OR D.C. Municipal Regulation Citation | Fine for Infraction |
|---|---|
| *11 DCMR Section 3203* | $ *2,000.00* |

Nature of Infraction *Failure to obtain a Certificate of Occupancy*

Date of Infraction *6/3/15 (two violations)*   Time of Infraction *12:00pm*   Previous Infractions Committed   1   2   3   4

**ANSWER:** ☐ ADMIT (Pay Fine)   ☐ DENY (Appear for a Hearing)   ☐ ADMIT WITH EXPLANATION (Hearing by Mail)

Signature _____

| D.C. Official Code AND/OR D.C. Municipal Regulation Citation | Fine for Infraction |
|---|---|
| | $ |

Nature of Infraction _____

Date of Infraction _____   Time of Infraction _____   Previous Infractions Committed   1   2   3   4

**ANSWER:** ☐ ADMIT (Pay Fine)   ☐ DENY (Appear for a Hearing)   ☐ ADMIT WITH EXPLANATION (Hearing by Mail)

Signature _____   **Total Fines and Penalties** $ *2,000.00*

**WARNING:** If you fail to answer each charge on this Notice within 15 calendar days of the date of service (20 calendar days if you received this by mail), you will be subject to a penalty equal to twice the amount of the fine, in addition to the fine itself, and to the entry of a default order without additional notice. You also may be subject to other penalties and actions allowed by law including suspension or non-renewal of your license or permit, the sealing of your business, a lien being placed on your property, and attachment of your equipment. For information, call (202) 442-9094.

I personally declare under penalty of perjury that I observed and/or determined that the infraction(s) charged have been committed. I further certify under penalty of perjury that (CHECK ONE):
☐ the Respondent is not in the military service of the United States.
☑ the Respondent is in the military service of the United States.
☐ I am unable to determine whether the Respondent is in the military service of the United States.

*Steven B. Allen*   *Steven B. Allen*   *7/10/15*   *31*

Inspector's/Investigator's Signature   Print Name   Date   Badge/Identification Number

I sign my name below to acknowledge receipt of this Notice and not as an admission of guilt or liability to the charge(s) listed.

_____   _____   _____   _____
Respondent's Signature   Print Name   Date   Telephone Number

OAH (WHITE)   RESPONDENT (YELLOW)   INSPECTOR (PINK)   ENFORCEMENT (GOLDENROD)

Form OAH-412, Rev. 8-10

# ANSWERING THIS NOTICE OF INFRACTION

**DEADLINE:** You must answer this Notice within 15 calendar days of the date of service listed on the top of the other side of this Notice (20 calendar days if you received this Notice by mail). If you do not, you will be subject to an order finding you in default and assessing both the fine stated on the other side, and an additional penalty equal to two times the amount of that fine. You also may be subject to other penalties and actions allowed by law, suspension or non-renewal of any District of Columbia license or permit that you hold, the sealing of your business and the placement of a lien on property that you own.

**WHERE TO ANSWER:** Your answer must be received by the Office of Administrative Hearings by the deadline stated above. The Office of Administrative Hearings is an independent agency of the District of Columbia Government, and is separate from the agency that sent this Notice to you. Its address is:

**Clerk**
**Office of Administrative Hearings**
**One Judiciary Square**
**441 4th Street, N.W.**
**Washington, DC 20001-2714**
TELEPHONE: 202-442-9094

**HOW TO ANSWER:** You must answer each charge with a plea of **ADMIT, ADMIT WITH EXPLANATION,** or **DENY.** The instructions below give information about how to answer with each of these pleas.

**1. To Admit and Pay the Fine.** If you wish to admit liability for a violation, you also must pay the fine at the same time. Sign on the other side of this Notice and check the Admit box. Mail or bring this Notice to the address above, with a check or money order for the amount of the fine, payable to "D.C. TREASURER." We cannot accept cash payments. Write the Notice number on your check or money order.

**2. To Deny and Request an In-Person Hearing.** If you wish to deny liability for a violation, sign on the other side of this Notice and check the Deny box. Mail or bring this Notice to the address above. A hearing will be scheduled at which you and the inspector must appear. At the hearing, both you and the inspector can explain your positions to an independent Administrative Law Judge, who will decide whether you committed the violation and whether you must pay a fine. You will receive a notice from the Office of Administrative Hearings with information about your hearing date.

**3. To Admit with Explanation and Request a Hearing by Mail.** If you wish to admit liability for a violation, but want to submit an explanation that you would like an independent Administrative Law Judge to consider in deciding whether the fine should be reduced or suspended, sign on the other side of this Notice and check the Admit with Explanation box. Mail or bring this Notice, along with your written explanation and any supporting documents, photographs or other materials, to the address above.

**IMPORTANT: Keep a copy of everything that you send to the Office of Administrative Hearings.**

**Office of Administrative Hearings Clerk's Office: (202) 442-9094**
Form OAH-4120, Rev. 10-10

GOVERNMENT OF THE DISTRICT OF COLUMBIA

# NOTICE OF INFRACTION

Notice No. S403702

Date of Service 11.6.15

**Issuing Agency:** ☐ DOH ☐ DMH ☑ DCRA

☐ DDOE ☐ FEMS ☐ Other_____

**Location of Infraction:** 1610 Riggs Place, N.W. Washington, DC 20009

**Type of Location:** ☐ Vacant Lot ☑ Construction Site ☐ Occupied ☐ Other_____

**Business/Company Name:** SALAS, LEN

**Charge as Respondent (circle):** YES NO

**Telephone Number**

**Individual Name (Last, First, Middle):** 2411 Otis Street, N.E.

**Charge as Respondent (circle):** YES NO

**Telephone Number**

**Mailing/Email Address:** Washington, DC

**City** **State** **Zip Code** 20018

**Business License/Permit Type**_____ **Business License/Permit No.**_____

You are charged with violating the District of Columbia laws or regulations stated below. You MUST answer the charge(s) within 15 calendar days of the date of service noted above (20 calendar days if you received this by mail). You must indicate below each infraction whether you ADMIT, ADMIT WITH EXPLANATION or DENY. **Instructions on back.**

If you DENY one or more of the infractions, you must appear for a hearing. You will receive a separate order from the Office of Administrative Hearings advising you where and when to appear for your hearing.

| D.C. Official Code AND/OR D.C. Municipal Regulation Citation | Fine for Infraction |
|---|---|
| 11 DCMR Section 3203 | $ 2,000.00 |

**Nature of Infraction** Failure to obtain a Certificate of Occupancy

**Date of Infraction** 6/3/15 (two family 77.00 $m) **Time of Infraction** 11:00 $m **Previous Infractions Committed** 1 2 3 4

**ANSWER:** ☐ ADMIT (Pay Fine) ☐ DENY (Appear for a Hearing) ☐ ADMIT WITH EXPLANATION (Hearing by Mail)

**Signature** _____

| D.C. Official Code AND/OR D.C. Municipal Regulation Citation | Fine for Infraction |
|---|---|
| | $ |

**Nature of Infraction** _____

**Date of Infraction** _____ **Time of Infraction** _____ **Previous Infractions Committed** 1 2 3 4

**ANSWER:** ☐ ADMIT (Pay Fine) ☐ DENY (Appear for a Hearing) ☐ ADMIT WITH EXPLANATION (Hearing by Mail)

**Signature** _____

**Total Fines and Penalties $** 2,000.00

**WARNING:** If you fail to answer each charge on this Notice within 15 calendar days of the date of service (20 calendar days if you received this by mail), you will be subject to a penalty equal to twice the amount of the fine, in addition to the fine itself, and the entry of a default order without additional notice. You may also be subject to other penalties and actions allowed by law including suspension or non-renewal of your license or permit, the sealing of your business, a lien being placed on your property, and attachment of your equipment. For information, call (202) 442-9094.

I personally declare under penalty of perjury that I observed and/or determined that the infraction(s) charged have been committed. I further certify under penalty of perjury that (CHECK ONE):
the Respondent is not in the military service of the United States.
the Respondent is in the military service of the United States.
I am unable to determine whether the Respondent is in the military service of the United States.

**Inspector's/Investigator's Signature** Steven S. Allen **Print Name** Steven G. Allen **Date** 7/10/15 **Badge/Identification Number** 31

I sign my name below to acknowledge receipt of this Notice and not as an admission of guilt or liability to the charge(s) listed.

**Respondent's Signature** _____ **Print Name** _____ **Date** _____ **Telephone Number** _____



July 14, 2015
DCRA/BPLA/RIS: Investigator Steven Allen
Len Salas (Property Owner)
1610 Riggs Pl, NW
Operating w/o BBL Housing Transient License
(Two Family Rental)
Exhibit #2



July 14, 2015
DCRA/BPLA/RIS: Investigator Steven Allen
Len Salas (Property Owner)
1610 Riggs Pl., NW
Operating w/o BBL Housing Transient License
(Two Family Rental)
Exhibit #3



July 14, 2015
DCRA/BPLA/RIS: Investigator Steven Allen
Len Salas (Property Owner)
1610 Riggs Pl., NW
Operating w/o BBL Housing Transient License
(Two Family Rental)
Exhibit #4

④

000868

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| _____ | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE TO SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THE
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

**This matter is set to be heard on March 14, 2023 at 9:30 a.m. via Zoom video**

---

Defendant Max Salas ("Max Salas" or "Defendant") respectfully submits this Response

(the "Response")[1] to the Supplemental Memorandum in Support of the Plaintiffs' Motion for

---

[1] All capitalized terms herein shall have the meaning ascribed to them in Max Salas' memorandum in support of his motion for summary judgment (Doc. 91).

Summary Judgment in Response to the Court's Order of January 4, 2023 (<mark>Doc. 92</mark>) (the "Supplemental Memorandum").

**<u>The majority of the arguments made in the Supplemental Memorandum have already been considered and rejected by this and two other courts.</u>**

The majority of the Plaintiffs' forty (40) page Supplemental Memorandum is nothing more than a restatement and resurrection of arguments that have already been considered and rejected by this Court. In fact, they have also been considered and rejected by the DC Bankruptcy Court and the DC District Court. Specifically, the Supplemental Memorandum *again* argues that Max Salas is unable to defend himself in this action due to alleged unclean hands. This was also argued in the Plaintiffs' original summary judgment memorandum (<mark>Doc. 74</mark>), responded to by Max Salas (<mark>Doc. 75</mark>), and ruled upon by the Court at the November 8, 2022 hearing. Similarly, the Supplemental Memorandum *again* argues that the Debtor, Len Salas, owned more than just bare legal title. The Plaintiffs also argued this in their original summary judgment memorandum and Max Salas addressed the issue in his response. As this Court properly noted in its January 5, 2023 Order, the DC Bankruptcy Court also heard arguments about that same issue before ruling, "the Property was conveyed to Max and he holds both the legal and beneficial interests in the Property." Finally, the Supplemental Memorandum recites the facts of the cases already cited by this Court regarding inquiry notice in an attempt to distinguish them, but fails to address the most important fact – that is, that the world was on inquiry notice of the issues concerning ownership of the property when the Plaintiffs filed a notice of their judgment in the Property's chain of title one week before the commencement of this bankruptcy case.

Max Salas has already addressed all of these arguments (in multiple courts) and this Court has already made its decision on most of these issues. Therefore, Max Salas will not

repeat his arguments regarding issues that he has already fully briefed.[2]  Instead, this Response will focus solely on the one novel argument raised in the Supplemental Memorandum; that is, whether the Plaintiffs in this action (with derivative standing to pursue this action on behalf of all creditors) are bound by the doctrine of collateral estoppel to rulings rendered against the Plaintiffs in the DC bankruptcy matter (pursuing causes of action for themselves only).

### The Plaintiffs in this action are bound by collateral estoppel because they were in privity with the Plaintiffs in the DC Bankruptcy Court action.

While most of the Plaintiffs' Supplemental Memorandum is little more than a restatement of previous, unsuccessful arguments, the Plaintiffs do raise one issue with some facial validity. On pages 19-22 of the Supplemental Memorandum, the Plaintiffs raise the question of whether the DC Bankruptcy Court's ruling that under DC law Max Salas owns all legal and beneficial interests in the Property is binding on the Plaintiffs in this matter due to the doctrine of collateral estoppel.  In support of their argument that this Court should not be bound by the DC Bankruptcy Court's ruling, the Plaintiffs note that a bankruptcy trustee is not ordinarily precluded from pursuing estate actions due to equitable doctrines such as unclean hands or collateral estoppel. While that is true as a general matter, the unique facts of this case require a different outcome.

The United States Supreme Court has outlined that "issue preclusion," also known as "collateral estoppel," precludes a party from relitigating an issue actually decided in a prior case and necessary to the judgment.  *Brownback v. King*, 209 L. Ed. 2d 33, 141 S. Ct. 740 (2021). Similarly, "claim preclusion," sometimes itself called "res judicata," prevents parties from relitigating the same "claim" or "cause of action" even if certain issues were not litigated in the prior action.  *Id.*   Generally speaking — despite distinctions in the procedures afforded to litigants in different jurisdictions — the "full and fair opportunity" requirement comports with

---

[2] Max Salas is willing to address any of these issues further if the Court would like to re-examine them at any time; however, this brief will remain focused on the issues presented by the Court's January 5, 2023 Order.

what must be made available to litigants under the Fourteenth Amendment's Due Process Clause; in other words, a party is considered to have had a full and fair opportunity to litigate an issue if — in the context of the prior case — the party or their privy was given an opportunity to present witnesses, introduce exhibits, challenge contrary evidence, make statements, and receive a determination of the facts and the law. *See Kremer v. Chem. Constr. Corpor.*, 456 U.S. 461, 481, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Davis v. Davis*, 663 A.2d 499, 502 (D.C.1995).

Issue preclusion applies when: (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of Am. V. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). Put another way, if there has been prior litigation, issue preclusion applies provided that: (1) "it involves the same claims or cause of action, (2) between the same parties <u>or their privies</u>, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Peek v. SunTrust Bank, Inc.*, 313 F. Supp. 3d 201, 205 (D.D.C. 2018) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)) (emphasis added).

In this case, there is no question that most of the elements of issue preclusion have been met. There can be no dispute that a final judgment has been rendered on the merits by a court of competent jurisdiction, the DC Bankruptcy Court. And while the Plaintiffs contend that the issue of who held title to the Property was never litigated in the DC Bankruptcy Court, that court's order and the Plaintiffs' own Supplemental Memorandum belie that contention. The DC Bankruptcy Court's September 25, 2018 Order primarily concerns ownership of the Property under DC law. Near the end of its fifty-nine (59) page opinion, the DC Bankruptcy Court concludes: "Accordingly, the court finds that under District of Columbia law, the Property was

conveyed to Max and he holds both the legal and beneficial interests in the Property." Far from dicta, as the Plaintiffs surprisingly argue, this was a finding under DC law that was central to whether Max Salas could claim a homestead exemption. Furthermore, even the Plaintiffs' own Supplemental Memorandum demonstrates that the issue of ownership of the Property was fully and completely litigated before the DC Bankruptcy Court. Paragraphs 37-44 of the Supplemental Memorandum is replete with references to testimony at the hearing before the DC Bankruptcy Court concerning the ownership of the Property. Plaintiffs' claim that the DC Bankruptcy Court's finding that Max Salas owns all legal and beneficial interest in the Property was mere dicta does not pass muster.

Thus, the most relevant element of equitable estoppel in this matter is whether the litigation is between the same parties or their privies. *Peek*, 313 F.Supp. 201 at 205. On this note, the Sixth Circuit defines a party in privity as "(a) a successor in interest to the party, (b) one who controlled the earlier action, or (c) one whose interests were adequately represented." *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 481 (6th Cir.1992). All three of these elements are present here, even though only one factor is sufficient for estoppel purposes. DC courts also define a privy as "one so identified in interest with a party to the former litigation that he or she [or it] represents precisely the same legal right in respect to the subject matter of the case." *Smith v. Jenkins*, 562 A.2d 610, 615 (D.C. 1989) (citing *Jefferson School of Social Science v. Subversive Activities Control Board*, 331 F.2d 76, 83 (D.C. Cir. 1963).

The term "privity" signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon the others, although those others were not party to the lawsuit. *Gill and Duffus Servs., Inc., v. A.M. Nural Islam*, 675 F.2d 404, 405 (D.C.Cir.1982). Generally, there must be some type of relationship between the parties

for privity to exist. *See Dillard v. Bank of Am.*, N.A., 2013 WL 4590541, at 7 (W.D.Tenn. Aug. 28, 2013) (explaining that privity is met, for example, when parties stand in an employer-employee relationship, a principal-agent relationship, or an attorney-client relationship). Also, the analysis for "shared identity of interests" considers the working relationship between the parties "in which the interests of the nonparty are presented and protected by the party in the litigation." *Vanmeerbeeck v. M & T Bank*, 2012 WL 2943400, at 3–4 (E.D.Mich. July 18, 2012).

The D.C. Circuit finds a plaintiff to have been a party to prior litigation for preclusion purposes when he is "so identified in interest with a party to the former litigation that he represents precisely the same legal right in respect to the subject matter of the case." *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448, 451 (D.C.2012) (internal quotation marks and citation omitted). Furthermore, the D.C. Circuit has indicated that among the traditional categories of privies are "those whose interests are represented by a party to an action," and those who have a "pre-existing substantive legal relationship" with the "party to the judgment." *Carr v. Rose*, 701 A.2d 1065, 1075 (D.C.1997) (internal quotation marks and citation omitted) and *EDCare Mgmt.*, 50 A.3d at 451 (internal quotation citation omitted).

A number of DC Circuit opinions flesh out when a subsequent party may be found to be in privity with a prior litigant. For example, in *Mars Inc. v. Nippon Conlux Kabushiki–Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995), the court concluded that a parent company who controlled a wholly-owned subsidiary was in privity with that subsidiary for purposes of res judicata, even though they were different legal entities. In another case, the DC court concluded that union members are considered to be in privity with their union for purposes of res judicata because the union fairly represented the interests of the members. *Adams v. Pension Ben. Guar. Corp.*, 332 F.Supp.2d 231, 239 n. 8 (D.D.C.2004). Finally, in *Sae Young Kim v. Nat'l Certification Comm'n for Acupuncture & Oriental Med.*, 888 F. Supp. 2d 78, 82 (D.D.C. 2012), the court found that

privity existed where each of the parties to the subsequent proceeding were either directors, officers, or owners of a party in a prior case who were suing or being sued for actions taken in their official capacities.

As each of these cases demonstrate, the issue for collateral estoppel is not whether the exact same legal entity is involved in the prior and subsequent legal action; rather, these cases focus on control, decision-making, and adequate representation. In most cases in which a bankruptcy trustee pursues a cause of action, he or she is represented by new counsel, is making decisions independent of any former party, and often considers different motivations and fiduciary duties in making litigation decisions. This is not the case here. The Plaintiffs in this case are represented by the exact same counsel that represented them before the DC Bankruptcy Court, the litigation decisions are being made by the exact same parties (i.e. the Breckelmans, the McLoughlins and their legal counsel), and they are pursuing the exact same issues on behalf of the same parties (or parties similarly with the exact same legal interests). In that regard, it is important to note that the Plaintiffs hold 99.5% of the general unsecured claims in this case; thus, it is the interests of the Plaintiffs that are controlling their actions. The Plaintiffs have previously pursued their interests before the DC Bankruptcy Court and that court determined that Max Salas owned all legal and equitable title to the Property, though the Plaintiffs had argued that Len Salas was the owner of the Property. The Plaintiffs had control, decision-making authority, and adequate representation in the first matter, which led to a final adjudication of the same issues now facing this court. The decision of the DC Bankruptcy Court, applying DC property law, should have preclusive effect in this case.

For these reasons, and those detailed in Max Salas' brief in support of his Motion for Summary Judgment, the Defendant respectfully requests that this Court grant summary judgment in Max Salas' favor as to all causes of action alleged in this adversary proceeding.

RESPECTFULLY SUBMITTED:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6008
Email: phillip@thompsonburton.com

Attorneys for Defendant Max Salas

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served this 7th day of March, 2023, upon all parties of record requesting notice through the Court's electronic filing system, and by United States mail to:

Philip J. McNutt
Law Office of Philip J. McNutt, PLLC
11921 Freedom Drive, Suite 584
Reston, VA 20190

Taylor A. Cates
Burch, Porter & Johnson, PLLC
130 North Court Avenue
Memphis, TN 38103

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA | : | |
| BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

**PLAINTIFFS' OPPOSITION TO
THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**This matter is set to be heard on March 14, 2023, at 9:30 a.m. via Zoon video**

COME NOW the Plaintiffs herein, by and through their undersigned counsel and, for their Opposition to the Defendant's Motion for Summary Judgment state as follows:

I. **BACKGROUND**

1. In the Defendant's Memorandum in Support of Max Salas' Motion for Summary Judgment ("Defendant's Memorandum") the Defendant asserts that the Debtor held only "bare legal title" to 1610 Riggs Place, NW, Washington, D.C., ("the Property"), the property which is

the subject of the Trustee's avoidance and recovery claims in this adversary proceeding.

Defendant's Memorandum, at p. 2.

 

2.  The Defendant also asserts that collateral estoppel prevents the Plaintiffs from "re-litigating" issues already determined by the D.C. Bankruptcy Court, namely that the Debtor held only "bare legal title" and, therefore the Plaintiffs have no basis for recovery

3.  Finally, the Defendant asserts that his "interest" in the Property was one of "open and notorious" possession thus giving him an interest superior to a subsequent bona fide purchaser or lien creditor.

4.  However, the arguments made by the Defendant are fatally flawed.  First, collateral estoppel does not apply here because the Trustee and this Estate are the real parties in interest and they were not parties to the D.C. Bankruptcy Court's hearings or rulings.  Second, the issue of the Defendant's ownership was not decided in the D.C. bankruptcy court and was not necessary to the D.C. Bankruptcy Court's conclusion that the Defendant was the owner, for purposes of his exemption status only, by way of a resulting trust - a position which the D.C. Bankruptcy constructed "out of thin air, " conclusion that was neither argued, briefed, promoted or defended, by either the Defendant or the Plaintiffs before or during the exemption hearing. The D.C. Bankruptcy Court specifically noted that it could not decide the status or effectiveness of this estates' recovery or avoidance claims.  Third, because the Defendant deeded the Property to his son in 2007 and otherwise hid his interest in the Property after 2007 and acknowledged the Debtor's continuing ownership thereafter, under the law of the District of Columbia, and many other jurisdictions, a deed by the resident of the property eliminates any further need for

-2-

investigation as to ownership and establishes the Debtor as the owner for all purposes. Fourth, under the doctrine of unclean hands, the Defendant is not entitled to equitable relief in this court, including, but not limited to, collateral estoppel, even if otherwise applicable.

5. In support of their Opposition to the Defendant's Motion for Summary Judgment, the Plaintiffs rely on the parties' Joint Statement of Uncontested Facts set forth on pages 3 through 10 of the parties Amended Joint Pretrial Statement, filed herein on March 29, 2021 (D-43), Defendants' (sic) Response to Plaintiffs' Amended List of Undisputed Facts, Pursuant to Local Rule 7056-1 in Support of the Plaintiffs' Motion for Summary Judgment, filed herein on August 12, 2022 (D-75-1), Defendants' (sic) Response to Plaintiffs' Supplemental List of Undisputed Facts Pursuant to Local Rule 7056-1 in Support of the Plaintiffs' Motion for Summary Judgment, filed herein on September 28, 2022 (D-81), Defendant's Amended Responses to Requests for Admission to the Defendant, dated November 9, 2021, a copy of which is attached hereto, the Plaintiffs' Amended Memorandum in Support of Plaintiffs' Motion for Summary Judgment and the Exhibits attached thereto, filed herein on August 1, 2022 (D-74, 74-1 - 74-22) and the Summary of Undisputed Facts, attached hereto, identifying those facts which have particular relevance to the arguments in this Opposition.

## II.    ARGUMENT

### A.    Collateral Estoppel Does Not Apply to Any of the Trustee's Causes of Action

6. As stated in its January Order, this Court has already determined that: "In this case the plaintiffs were granted derivative status and stepped into the shoes of the Trustee."  Order entered herein on January 5, 2023 (D-83)("the January Order"), at p. 3 of 6.  In fact, the entire context of the Court's Order relative to whether inquiry notice is applicable to defeat the trustee's

-3-

claims is that of a trustee's avoidance and recovery claims. For example "Actual knowledge is inapplicable because the trustee assumes the role of a bona fide purchaser without actual knowledge" (January Order at p. 3 of 6) and "...a Trustee may be held to inquiry notice" (January Order, p. 3 of 6).

7. The Trustee is the real party in interest, on behalf of the Len Salas bankruptcy estate. Neither were parties to the D.C. bankruptcy of the Defendant and neither participated in the D.C. Exemption Hearing which is the subject of the issue on collateral estoppel raised by this Court in its January Order.

8. Courts recognize a general bar against applying collateral estoppel to those who were not parties in the prior litigation. ***See, for example, Nationwide Mut. Fire Ins. Co. v. George v. Hamilton, Inc.***, 571 F.3d 299, 310 (3d Cir. 2009). The only exception to this general rule is when the nonparty is in privity with one of the parties to the original suit.

9. The factors, as articulated by the Third Circuit, citing recent Supreme Court precedent, include the following:

 1) the nonparty agrees to be bound by the determination of issues in an action between others;

 2) a substantive legal relationship-i.e. traditional privity-exists that binds the nonparty;

 3) the nonparty was "adequately represented by someone with the same interests who [wa]s a party";

 4) the nonparty assumes control over the litigation in which the judgment is rendered;

 5) the nonparty attempts to bring suit as the designated representative of someone who was a party in the prior litigation; and,

-4-

6) the nonparty falls under a special statutory scheme that "expressly foreclos[es] successive litigation by nonlitigants."

*Id.* at 312-13 (quoting ***Taylor v. Sturgell***, 553 U.S. 880, 895, 128 S. Ct. 2161, 171 L. Ed. 2d 155

(2008). Cited in ***GE Bus. Fin. Servs. v. Grove St. Realty Urban Renewal***, L.L.C., No. 10-2279

(JBS/KMW), 2011 U.S. Dist. LEXIS 117042, at *9 (D.N.J. Oct. 11, 2011)

> The doctrine of collateral estoppel, also known as issue preclusion, renders conclusive in the same or a subsequent action determination of an issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.

***Davis v. Davis***, 663 A.2d 499, 501 (D.C. 1995) (quoting ***Washington Med. Ctr. v. Holle***, 573

A.2d 1269, 1283 (D.C. 1990)).

10. When ensuring that the foundational requirements of collateral estoppel have been

met, courts consider whether:

> (1) the issue [was] actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.

***Davis***, 663 A.2d at 501 (internal citations omitted). The foundational requirements do not exist in

this case in favor of the Defendant. The Trustee and this estate are the real parties in interest and

neither were parties to the exemption litigation nor were their interests represented or determined

in the D.C. exemption litigation. Regardless, collateral estoppel in favor of the Defendant also

fails here because the issue of the Defendant's equitable ownership of the Property was not

"actually" or fully litigated, the D.C. Bankruptcy Court decided the exemption case based upon a

theory neither stated, advanced, defended, briefed, or argued in the D.C. Bankruptcy Court. The

-5-

Defendant's premise for an exemption was based upon the failed 2010 Quitclaim Deed which the Bankruptcy Court determined was a sound basis for a resulting trust. That resulting trust, even without any adequate consideration or proof of intent was the ultimate basis for the decision of the D.C. bankruptcy court.

11.  The Supreme Court established that while matters which were actually litigated and determined in the prior proceeding cannot be relitigated, if a cause of action is " not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time." *Commissioner v. Sunnen*, 333 U.S., at 597-598. ***See also, Sea-Land Servs. v. Gaudet***, 414 U.S. 573, 593, 94 S. Ct. 806, 819 (1974).

12.  Therefore, even if there were an identity of parties in both cases, issue preclusion would not apply in this case because the determination of the Defendant's ownership and the Debtor's alleged "bare legal title" were not finally decided by the D.C. Bankruptcy Court and were not necessary to the determination of a resulting trust which, ultimately the D.C. Bankruptcy Court used as its ruling to support the Defendant's claim of exemption. See Exemption Decision, at pp. 52-54. The Court's conclusion is based upon its determination that the 2010 Deed transferred the Property pursuant to a resulting trust and that there was adequate consideration for the transfer. While the Plaintiffs disagree with the outcome of the D.C. Bankruptcy Court's decision, it is clear that the issues before this court are different and have not been previously litigated in D.C. even if the other factors regarding the application of collateral estoppel were to exist here.

-6-

**B.     Neither the Trustee Nor the Debtor's Estate Were in Privity with the Plaintiffs in the Exemption Decision Litigation**

13.   In *Modiri v. 1342 Rest. Grp., Inc.*, 904 A.2d 391, 394-97 (D.C. 2006) the D.C. Court

of Appeals, discussed the fairness doctrine in relation to the use of Collateral Estoppel:

> As explained in MOORE'S FEDERAL PRACTICE, the *Parklane Hosiery*
> criteria for assessing fairness "of course presume that the defendant (and party to
> be bound) in the second action was either a party in the prior action, or was in
> privity with a party to the prior action, and that issue preclusion is otherwise
> applicable." 18 id. at § 132.04[2][c][iii], p. 132-165 (emphasis added; footnotes
> omitted).
>
> "A privy is one so identified in interest with a party to the former litigation that he
> or she represents precisely the same legal right in respect to the subject matter of
> the case." *Smith*, 562 A.2d at 615. The "orthodox categories" of privies are "'those
> who control an action although not parties to it . . .; those whose interests are
> represented by a party to the action . . .; [and] successors in interest." *Id.* (quoting
> *Lawlor v. National Screen Serv.*, 349 U.S. 322, 329 n.19, 75 S. Ct. 865, 99 L. Ed.
> 1122 (1955)). 4 18 MOORE'S FEDERAL PRACTICE § 132.04 [1][b][iv] at p.
> 132-148 (defining the three types of "sufficiently close" relationships that
> establish privity as 1) a successor to a party's property interest; 2) a nonparty that
> controlled the original suit; and 3) a nonparty whose interests were represented in
> the original suit).

*Modiri, Supra*, at 396-97.  In this case, the Trustee's claims were not part of the Exemption

litigation and the Debtor was not a party to that litigation, either.  The Trustee is the successor in

interest to the Debtor, not the Plaintiffs.  The Trustee's avoidance powers are independent of

Plaintiffs and did not come into being until the commencement of the Debtor's Chapter 7 case.

14.  In *GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 343 (6th Cir. 2016), the 6th

Circuit noted the importance of establishing who the real parties in interest are in the current

litigation in which one of the parties seeks to impose issue preclusion:

> "Identity of parties is not a mere matter of form, but of substance. Parties
> nominally the same may be, in legal effect, different; and parties nominally
> different may be, in legal effect, the same."); see also 47 Am. Jur. 2d Judgments §

-7-

595 ("For the purpose of res judicata or collateral estoppel, the courts will look
beyond the nominal parties of record to determine the real parties in interest.").

15.  The Defendant argues that the D.C. Bankruptcy Court concluded that "under D.C. law, the Property was conveyed to Max and he holds both the legal and equitable interests in the Property."  Defendant's Memorandum, at p. 5, citing the Exemption Decision, at p. 57.  The above quoted statement was used to support that court's determination that the Defendant obtained "ownership" of the Property through a resulting trust and the resulting ownership provided a sufficient interest for the Defendant to claim he was the sole owner of the property. The cited provision has no bearing on the Trustee's claims in this case since those claims are based upon the timing and circumstances of the "conveyance" not the methodolgy (i.e. resulting trust).  Under D.C. law and the provisions of the Bankruptcy Code (§ 548 (d)) the transfer did not take place until April 17, 2018, the day before the bankruptcy filings by both the Debtor and the Defendant.  See, Exemption Decision, p. 56, n.18 (citing D.C. Code §42-401 which states that "as to creditors and subsequent bona fide purchasers and mortgagees without notice...", an unrecorded deed "shall only take effect from the time of its delivery to the [D.C.] Recorder of Deeds for record."

16.  The above cited section from the Exemption Decision precedes the D.C. Bankruptcy Court's determination that the avoidance powers of the Trustee in this case are a subject for this Court and were not determined or determinable, by the D.C. Bankruptcy Court.  See Exemption Decision, at pp. 58-59.

### C.    There Are No Documents of Record That Would Cause a Purchaser to Inquire as to the Defendant's Alleged "Ownership" of the Property

17.  On the issue of "inquiry notice" the law in the District of Columbia and other

-8-

jurisdictions, including Tennessee, is clear that once an "owner" deeds his interest to another he has broadcast to the public that he has no interest and his mere possession is not sufficient to establish inquiry notice, or the need for further inquiry as to the Defendant's "ownership" of the Property.

18. In his Memorandum, the Defendant asserts that the recording of the Judgments against the Debtor and the Defendant in D.C. is enough to put a purchaser on notice of the "ownership interest" that the Defendant claims in the Property. However, that inquiry would stop when the purchaser reviews the title record and finds out that on April 18, 2018, the date of the Debtor's bankruptcy filing, the Debtor was the title owner and also the sole obligor under the Sun Trust Deed of Trust. Furthermore, even if the Defendant asserts that a purchaser would or should review the record of the Superior Court case, it would show only that the Debtor was sued, and held liable as the owner and, that the Defendant was sued and held liable as the manager and the party, as trustee, that leased the rooms at the Property which then led to the death of Nina Brekelmans and Michael McLoughlin. Neither a title search nor a search of the Superior Court litigation would have produced any remarkable, confusing or troubling information other than the Debtor owned the Property and the Defendant managed the Property.

19. The Defendant cites ***In re Aumiller***[1] as support for his argument that the trustee would be on inquiry notice of the Defendant's alleged interest in the Property. However, ***Aumiller*** is easily distinguished. In **Aumiller** there was a covenant filed with the recorder of deeds that created a record of the creditor's interest. Here, the only record was a judgment which contained the name of the Debtor, as owner and judgment debtor. That recording is consistent

_____

[1] 168 B.R. 811, cited in the Defendant's Memorandum, at p. 13

-9-

with the title record ownership of the Debtor and created no reason to inquire further, especially in the light of the fact that the Defendant had previously deeded the Property to the Debtor "to tell the world" that the Debtor was the owner.

20. The cases of ***Webster v. Hope*** and ***In re: El-Erian*** are also of no help to the Defendant. In those cases there were also recorded documents, deeds in both cases, which put the trustee on notice of the contesting party's ownership. Here there were no title documents filed, no contracts filed and no covenants of record showing anyone but the Debtor as the owner. Neither ***Aumiller***, ***Webster*** and ***El-Erian*** presented facts similar to this case where the party contesting the trustee's claims had previously deeded the Property to the Debtor and there were no subsequent deeds of record.

### D. The Defendant Has Ignored an Exception to the "Open" Possession Rule That Establishes the Debtor as the Actual Owner of the Property

21. The Defendant's position is that he was in open possession of the Property such that the possession was "sufficiently distinct and unequivocal as so as to put the purchaser on his guard", quoting the ***Clay Properties*** case cited in both the Defendant's Motion (at p. 10 of 17) and this Court's January Order (D-83), at p. 3 of 6.

22. In ***McKinley v. Crawford***, 58 F.2d 528 (D.C. Cir. 1932) the Circuit Court of Appelas for the D.C. Circuit acknowledged the general rule regarding possession as constructive notice but noted an important exception:

> An exception to the general rule is recognized where a vendor remains for a time in possession after giving a fee-simple deed, with covenants, which he permits to be recorded. The object of the general rule is to protect one in possession from acts of others who do not derive their title from him; not to protect him against his own acts, and especially against his own deed. ***Bloomer v. Henderson,*** 8 Mich. 398, 77 Am.Dec. 453; ***Van Keuren v. Central R. Co.***, 38 N.J. Law, 165; ***Strong v.***

-10-

*Efficiency Apt. Corp.*, 159 Tenn. 337, 17 S.W.2d 1, 19 S.W.2d 273; *Wicklein v. Kidd*, 149 Md. 412, 131 A. 780.

23.  *McKinley* went on to explain another reason for this exception to the general rule regarding possession:

> Another reason for this exception to the rule is the equitable maxim that, where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it. *National Safe Deposit, etc., Co. v. Hibbs*, 229 U.S. 391, 33 S.Ct. 818, 57 L.Ed. 1248; *Pirkey v. Williams*, 45 App.D.C. 590, 599; *Moore v. Moore*, 47 App.D.C. 23, 28; *Gray v. Jacobsen*, 56 App.D.C. 353, 13 F.2d 959, 48 A.L.R. 583.

24.  In *McKinley*, the facts are that the Plaintiff and Appellant, McKinley, executed a deed to the property while remaining in possession.  Although the Court does not state the basis for a second transfer, it acknowledges that the subject property was apparently deeded to another party, Murray.  A deed of trust was later placed on the property to secure a loan to Murray.  On these facts, the D.C. Circuit explained:

> when she executed her deed to Crawford and the deed was recorded, [she]declared to the world that she had conveyed all her interest to Crawford. When, therefore, Drury and Nicholson, as trustees, accepted the deed of trust from Murray, the record owner, to secure the loan of $ 4,000, the mere fact that Mrs. McKinley had remained in possession of the property did not charge the trustees with notice of her equities.

*McKinley*, supra, at 530.

25.  The Court in *Bloomer, supra*, stated the effect of a conveyance followed by possession of the grantor as follows:

> If a party executes and delivers to another a solemn deed of conveyance of the land itself, and suffers that deed to go upon record, he says to all the world, "whatever right I have, or may have claimed to have in this land, I have conveyed to my grantee; and though I am yet in possession, it is for a temporary purpose, without claim of right, and merely as a tenant at sufferance to my grantee."

-11-

This is the natural inference to be drawn from the recorded deed; and, **in the minds of all men, would be calculated to dispense with the necessity of further inquiry upon the point**. All presumption of right, or claim of right, is rebutted by his own act and deed. One of the main objects of the registry law would be defeated by any other rule. Citations omitted. (Emphasis Added).

***Bloomer v. Henderson***, supra, 8 Mich. at 405 (1860)

26. In ***Strong v. Efficiency Apartment Corp.***, 159 Tenn. 337, 343-44, 17 S.W.2d 1, 3

(1928) the Supreme Court of Tennessee explained the exception, as follows:

we approve the rule announced in ***Curry v. Williams***, 38 S.W. 278, 283 (Court of Chancery Appeals, affirmed by this Court), wherein an exception is recognized to the general rule that the possession of land is notice of the possessor's title, or claim of title, where a vendor remains for a time in possession after giving a fee-simple deed with full covenants, which he permits to be duly recorded. This is consistent with the general policy and purpose of our registration laws. As well said in ***Bloomer v. Henderson***, 8 Mich. 395, quoted with approval in ***Curry v. Williams***, supra, "If a party executes and delivers to another a solemn deed or conveyance of the land itself, and suffers that deed to go upon record, he says to all the world: 'Whatever right I have, or may claim to have, in this land, I have conveyed to my grantee; and, though I am yet in possession, it is for a temporary purpose, without claim or right, and merely as a tenant at sufferance to my grantee.' This is the natural inference to be drawn from the recorded deed, and **in the minds of all men would be calculated to dispense with further inquiry** upon the point. All presumption of right, or claim of right, is rebutted by his own act and deed. One of the main objects of the registry law would be defeated by any other rule." And see note (a) in 13 L. R. A. (N.S.) 117, citing cases from some fourteen states, including ***Curry v. Williams***, supra. (emphasis added).

27. This court should note the emphasis of Courts like ***Curry, supra***, ***Bloomer, supra***, and ***Efficiency Apartments, supra*** on equitable principles to support their conclusions that "All presumption of right, or claim of right, is rebutted by his [the possessor's] own act and deed."

***Bloomer, supra***.

E. **The Defendant's "Ownership" of the Property Was Obscure, Hidden and Equivocable**

28. The Defendant argues that his possession was open, distinct and unequivocal.

-12-

However, the facts set forth in the Plaintiffs' Motion for Summary Judgment, their Reply to the Objection filed by the Defendant and, in particular, the Plaintiffs' Supplemental Memorandum shows a devious Defendant who hid his interest in the property from the public, but did present the public with the 2007 Deed and the 2007 SunTrust Deed of Trust showing "to all the world" that the Debtor was the owner of the property. The Defendant continued to hide his interest in the Property well after the Superior Court cases of these Plaintiffs were commenced in 2015. The Defendant's statements and testimony were vague, at best, regarding who actually owned the Property. It was clear the Defendant was happy to acknowledge that his son was the owner of the Property and, therefore, liable for the deaths of Nina and Michael. The Defendant did not change his position until informed by his bankruptcy counsel that manufacturing a resurrected Quitclaim Deed that was abandoned in 2011 could help him avoid satisfying the judgments obtained by the Plaintiffs for the gross and callous indifference and negligence which directly led to the deaths of Nina Brekelmans and Michael McLoughlin.

29. Moreover, the Defendant continued to hide his alleged interest in the property for the entire period of 2007 through 2017 and into 2018. In addition to no public record or document evidencing an interest in the Property, the Defendant went so far as to create leases in the name of the CLR Trust, rather than the Salas Trust or the 1610 Riggs Place Trust, he put the money from the leases into an account in the name of CLR Trust, had no account in the name of 1610 Riggs Place Trust until October, 2017 and, even then, had no transactions and he filed no tax returns for the CLR Trust or the 1610 Riggs Place Trust.

-13-

**F. The Debtor Held Much More than the "Bare Legal Title" Which Could Limit the Trustee's Recovery and Avoidance Powers**

30. On the issue of "bare legal title", the phrase used by the Senate and House Reports in 1978 as well as that cited in ***Whiting Pools***, is "**bare** legal title." "Bare" in its common definitions means "unadorned; bald; plain *the bare facts*" or "scarcely, or just sufficient; mere *the bare necessities,,,*" *Webster's New Universal Unabridged Dictionary,* Barnes and Noble, 2003. On the facts of this case, it is clear that the Debtor had legal and equitable interests in the Property and that the Defendant hid his interest in the Property holding out to all parties that Len was the owner, for all purposes, at all relevant times. More importantly, the cases cited by the Defendant and those discussed below show that the phrase "bare legal title" should be limited to a title that was not intended to convey any actual ownership interest, not the circumstances of the instant case.

31. In addition to the Plaintiffs' claims that "bare legal title' would not prevent the recovery of a fraudulent conveyance under 11 U.S.C. §548 and under D.C. Law, the Plaintiffs assert that the term "bare legal title" has an obvious limited usefulness to the Defendant. The phrase "bare legal title" means what it states and should not be extended to the facts of this case in which the Debtor decidedly has legal and equitable interests of a longstanding nature, and was found to be the owner of the property for all purposes, including liability, in the Superior Court wrongful death action.

32. Even if this Court adopts the dicta in ***Whiting Pools*** and some courts that have relied upon that dicta, the result is only that a debtor's "bare legal title" limits the trustee's recovery and/or avoidance powers. The Plaintiffs contend that a reading of the House and Senate Reports

-14-

accompanying the Bankruptcy Reform Act through Congress does not show any basis for extending the usage to any circumstance other than a deed or conveyance that was not intended to transfer ownership. Here, the transfer of ownership was essential for the Defendant to obtain funds to stay in the house and, further, was necessary to continue to finance and refinance the property for the continued use of the Defendant.

33. Several cases, including some of those cited by the Defendant demonstrate that the "bare legal title" limitation suggested by *Whiting Pools* is itself limited to those circumstances in which there was no intent to convey an actual interest in the subject property, to the debtor. For example, in *Geremia v. Dwyer (In re: Dwyer)*, a widowed mother bought property with her own funds and a bank loan to her (only). For reasons not stated in the record, the mother put her young son (under 18 yrs. old) on the deed. She paid all expenses and all notices regarding the property were sent to her as the (publicly advertised) owner. She also claimed the income from rental rooms on the property on her tax returns. Years later, the son deeded his interest in the property back to his mother while he was going through marital difficulties which eventually caused him to file bankruptcy several months later. The Court found that the trust in the son's bankruptcy could not recover under a fraudulent conveyance theory.

34. Unlike *Geremia*, here the Defendant deeded the property to his son so that no taxing, or other authority would know that the Defendant was the owner. He also needed a loan to pay off the Defendant's ex-wife so he could keep the entire property. Len, the Debtor, obtained the loan for his father, the Defendant, using the Debtor's credit. All notices of ownership were sent to the Debtor either at the Property address or at the Debtor's residence address in Washington, D.C. Like the defendant in *Geremia*, the Defendant here managed rental rooms at the property.

-15-

However, the rents received by the Defendant were deposited into the account of the Trust for the Defendant's children, C̲hase, L̲en, and R̲on, the CLR Trust.  From the facts in ***Geremia***, it appears the mother was openly and unequivocably the owner of the property, including record ownership and all notices and other indicia of ownership The mortgage loan was in her name and not that of her son.  ***Geremia*** does not support the Defendant's argument.  See also discussion in the Plaintiffs' Supplemental Memorandum regarding the ***Tolz*** and ***Stoffregen*** cases, also cited by the Defendant, at Supplemental Memorandum, p. 18, ¶¶48, 49.

### G.    For Purposes of the Doctrines of Issue Preclusion, the Trustee, and Not the Plaintiffs, Is the Real Party in Interest

35.  In ***Gecker v. Marathon Fin. Ins. Co.***, 389 B.R. 630 (Bankr. N.D.Ill. (2008) the trustee sought permission to join a creditors' committee in an adversary proceeding attempting to collect from an insurance company based on claims claims for fraudulent transfer, breach of contract, unjust enrichment, promissory estoppel and fraud.

36.  The insurance company defendant asserted that the Committee was not a real party in interest but conceded that the trustee had standing to bring the fraudulent transfer claims under §§ 544(b) and 548(a)(1) of the Bankruptcy Code and also had standing to bring the state law claims against the defendant.

37.  The bankruptcy court denied the trustee's request and dismissed the committee from the adversary proceeding stating that

> under well established standing principles, a party has standing to prosecute a suit in the federal courts only if he is the real party in interest. ***U.S. v. 936.71 Acres of Land***, 418 F.2d 551, 556 (5th Cir. 1969). A real party in interest is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." ***Farrell Constr. Co. v. Jefferson Parish, La.***, 896 F.2d 136, 140 (5th Cir. 1990). Therefore, "the plaintiff generally

-16-

must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." ***Valley Forge***[2], 454 U.S. at 474-75 (citing ***Warth***[3], 422 U.S. at 499); The plaintiff must generally assert his own legal rights and interests; he cannot rest his claim on the legal rights of third parties. ***936.71 Acres of Land***, 418 F.2d at 556 **(real party in interest is one who possesses the right under substantive law that is sought to be enforced).** (emphasis added).

***Marathon, supra*** 389 B.R. at 633. The Court determined that the Trustee was the real party in interest and had standing to pursue the stated causes of action, but not the creditors' committee (as a party).

### (i) The Plaintiffs Have Derivative Standing

38.  Courts have frequently granted derivative standing to third parties allowing them to step into the shoes of the debtor or trustee, but usually in limited circumstances when the debtor or trustee either refuses or otherwise fails to assert the claims directly. Even though §§ 544(b), 548(a), and other provisions of Chapter 5 of the Bankruptcy Code give standing only to the trustee, many courts have permitted committees or individual creditors to pursue the trustee's rights for the benefit of the estate when the trustee has refused to pursue the claim and the third party (a creditors' committee or a creditor) has obtained bankruptcy court approval to sue in the trustee's stead. See, for example, ***Fogel v. Zell***, 221 F.3d 955, 965 (7th Cir. 2000) (bankruptcy court may confer derivative standing on a creditor if the trustee unjustifiably refuses demand to bring action); ***In re Perkins***, 902 F.2d 1254, 1258 (7th Cir. 1990) (citing factors for derivative standing when the trustee "unjustifiably refuses" a demand to pursue action to collect an asset of

---

[2]***Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.***, 454 U.S. 464, 472, 102 S. Ct. 752, 70 L. Ed. 2d 700

[3]***Warth v. Seldin***, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)

-17-

debtor); ***Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)***, 330 F.3d 548, 566-67 (3rd Cir. 2003) (committee could pursue fraudulent transfer action under § 544(b) when debtor-in-possession refused to do so and bankruptcy court authorized committee to proceed derivatively).

39.   Courts generally require the committee or creditor seeking derivative standing to establish that the trustee or debtor unjustifiably refuses to pursue the claim, that the claim is colorable and it is in the best interests of the estate that the action be pursued. ***Fogel***, 221 F.3d at 965; ***Perkins***, 902 F.2d at 1258 (stating that committee may prosecute an action when the trustee unjustifiably refuses to pursue it, the creditor establishes colorable claim, and the creditor seeks leave from the court); ***In re Xonics Photochemical, Inc.***, 841 F.2d 198, 203 (7th Cir. 1998) (holding that a creditor can seek the bankruptcy court's permission to bring derivative suit in name of debtor if it shows that the debtor-in-possession was "shirking his statutory responsibilities."); ***Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)***, 779 F.2d 901, 905 (2nd Cir. 1985).

### (ii) The Trustee Remains the Real Party in Interest

40.   The concept of derivative standing, however, still means that the real party-in-interest is the trustee.  ***French v. Smithey (In re Smithey)***, No. 10-3135, 2012 Bankr. LEXIS 4207, at *4 (Bankr. N.D. Ohio Sep. 10, 2012).  See also, ***Gray v. Exec. Risk Idemn., Inc. (In re Molten Metal Tech, Inc.)*** 271 B.R. 711 (Bankr. D. Mass. 2002)(In pursuing debtor's insurance claim on behalf of the estate, the trustee is the real party in interest).

-18-

**H.     The Overwhelming Evidence is That the Debtor and the Defendant Abandoned the 2010 Quitclaim Deed**

41.   The Plaintiffs have consistently argued that the undisputed facts of this case show, beyond doubt, that the Quitclaim Deed and the 1610 Riggs Trust were both abandoned as early as 2011.  Certainly the emails among the family members and Defendant's various counsel in 2011-12 (See Plaintiffs Amended Memorandum, Exhibit 7) show that the Quitclaim Deed had already been abandoned by mid-2011. Those emails, along with other factors raise serious questions about the Deed's validity, in the first place.  Moreover, there was no bank account set up for the 1610 Riggs Property Trust prior to October, 2017 (See Supplemental Memorandum, Exhibit B). The Quitclaim Deed was lost sometime after 2010 and never located.  In addition, the Defendant admitted that "the transfer to the trust was only done to aid in refinancing the Note."  Requests for Admission, ¶59.  Since all the attempts to refinance failed, there was no reason for the 1610 Riggs Property Trust or the Quitclaim Deed.  If the 1610 Riggs Property Trust was valid, the Defendant would have, and should have, opened an account in the name of the Trust, but he did not.  If the 1610 Property Trust (and Quitclaim Deed) were valid, the Defendant would not have entered into leases under the name of the "CLR Trust')

42.   The delivery of a Deed withheld for a long period of time raises doubt that there was actual delivery necessary to create a transfer.  ***Walker v. Warner*** 31 App.D.C. 76, <mark>1908 U.S. App LEXIS 5585</mark> (1908).  Delivery without means of recording raises a question of actual delivery. Under DC Code § 42-401 a deed is not effective until actual delivery to the transferee.

43.   In ***Walker***, the D.C. Court of Appeals acknowledged that, under normal circumstances, the fact that a deed is withheld from record for a long period of time has no effect

-19-

on the conveyance of title. However, circumstances which present facts inconsistent with the deed, if unexplained, "would have weight in determining whether there had been an actual delivery, where there is evidence of circumstances tending to raise a doubt whether there was in fact a delivery of the deed..." *Id., at 90.* Based upon the defective nature of the Deed, the failure of the Trust, the loss of the original and the failure to even acknowledge the Trust or Deed for more than 5 years, plus the inconsistent creation and operation of a competing trust, the CLR Trust, it seems clear that the Quitclaim Deed could not be recorded, was never effectively delivered, was lost and abandoned after 2010 and did not create a transfer to the Defendant prior to 2018. *See also, Marden v, Hopkins*, 47 D.C. App. 202, 206, 1918 U.S. App. LEXIS 2397, 6. (1918).

44.  In the Defendant's Amended Responses to the Plaintiffs' Requests for Admission, the Defendant admitted that the attempted transfer of the Property to the 1610 Riggs Property Trust was "**only done to aid in refinancing the [Sun Trust]note**. Request for Admission No. 59, attached to the Plaintiffs' List of Undisputed Facts, as Exhibit A. That admission also weighs against the effective transfer of the Quitclaim Deed since the undisputed facts are that the Defendant failed in all of his several attempts to obtain refinancing after 2010.

I. **This Court, as a Court of Equity Should Not Reward the Defendant's Deceit with any Relief**

45.  The Supreme Court has long recognized that bankruptcy courts are courts of equity with the power to apply flexible equitable remedies in bankruptcy proceedings. See *Young v. United States*, 535 U.S. 43, 50, 122 S. Ct. 1036, 152 L. Ed. 2d 79 (2002) ("[B]ankruptcy courts . . . are courts of equity and 'appl[y] the principles and rules of equity jurisprudence.'" (quoting

-20-

***Pepper v. Litton,*** 308 U.S. 295, 304, 60 S. Ct. 238, 84 L. Ed. 281 (1939) (second alteration in original)); ***United States v. Energy Resources Co.***, 495 U.S. 545, 549, 110 S. Ct. 2139, 109 L. Ed. 2d 580 (1990) (bankruptcy courts, are courts of equity and have broad authority to modify creditor-debtor relationships); ***Local Loan Co. v. Hunt,*** 292 U.S. 234, 240, 54 S. Ct. 695, 78 L. Ed. 1230 (1934) (courts of bankruptcy are courts of equity, and their proceedings are proceedings in equity); see also H.R. Rep. No. 95-595, at 359 (1977)(stating that under the new Bankruptcy Code "[t]he bankruptcy court will remain a court of equity"). Cited and Quoted in ***Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)***, 555 F.3d 231, 242 (6th Cir. 2009)

     46. Collateral Estoppel is an equitable concept which, even if otherwise applicable here, which the Plaintiffs deny, should not be used to limit the trustee's claims due to the fraudulent scheme concocted and perpetuated by the Salas family members, Len, Ron and Max.

     47. Moreover, the continuous deception and lies promoted and practiced by the Salas family, including the Debtor and, particularly, the Defendant, with respect to the Debtor's ownership of the Property, the status of the two trusts, the CLR Trust and the 1610 Riggs Property Trust and the 2010 Quitclaim Deed should prevent the Defendant, at a minimum from asserting any equitable defenses to the Plaintiffs' Complaint.

     **J.**    **Equitable Estoppel Prevents this Court from Granting Any Relief to the Defendant**

     48. Under the doctrine of equitable estoppel, a party is prevented from using a false or misleading representation as the basis for future relief. The elements of equitable estoppel are; (1) a representation intended to induce a course of conduct; (2) resulting in an act or omission by

the opposing party, and (3) detriment to the opposing party.  ***See, for example, Ragosa***, 295 B.R. 166 (1st Cir. B.A.P. 2003).

49.  The Plaintiffs assert that the fraud and deceit practiced, promoted and perpetuated by the Defendant should prevent this Court from allowing any defenses or granting any relief to the Defendant.  That fraud and deceit is evidence by the facts and circumstances set forth in this Opposition, as well as the undisputed facts set forth in the Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, their Amended List of Undisputed Facts, the Exhibits attached to the Amended Memorandum, the Plaintiffs Supplemental Memorandum, including all exhibits and the Summary of Undisputed Facts attached hereto.

## III.    CONCLUSION

For the reasons stated in the Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Plaintiffs' Supplemental Memorandum and this Opposition, the Plaintiffs assert that there are undisputed facts and well established law which require denial of the Defendant's Motion for Summary Judgment.  The Plaintiffs assert that there are no disputed facts which prevent this Court from granting summary judgment on the issues of Issue Preclusion, "Bare Legal Title" and Inquiry Notice and the case law cited by the parties supports the Plaintiffs causes of action so that this Court can grant the Plaintiffs' Motion for Summary Judgment on all counts of the Plaintiffs Complaint, including the Plaintiffs' state and bankruptcy law claims for fraudulent conveyance recovery under both actual fraud and constructive fraud theories as stated in the Complaint.

BURCH, PORTER & JOHNSON, PLLC

-22-

By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt
Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

Certificate of Service

I HEREBY CERTIFY THAT a copy of the foregoing Opposition, List of Undisputed Facts and Exhibit A, was delivered electronically, on the 7th day of March, 2023 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com

/s/ Philip J McNutt
Philip J. McNutt

-23-

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| LEN SALAS | : | CHAPTER 11<br>CASE No. 18-02662<br>JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA | : | |
| BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

**FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

References to the "Joint Statement' means the parties Joint Statement of Uncontested

Facts included on pp. 3 through 10 of the parties Amended Joint Pre-trial Statement filed herein

on March 29, 2021 at Docket No. ("D-") 43.

References to "the Plaintiffs' Memorandum" means the Plaintiffs' Amended

Memorandum in Support of the Plaintiffs' Motion for Summary Judgment filed herein on August

1, 2022 at D-74.

References to "List of Undisputed Facts" means the Defendant's Responses to the

Plaintiffs Amended List of Undisputed Facts filed herein on August 12, 2022 at D-75-1

References to "Supplemental Undisputed Facts" refers to the Defendant's Response to Plaintiffs' Supplemental List of Undisputed Facts filed herein on September 28, 2022 at D-81.

References to "Requests for Admission" means the Defendant's Amended Responses to Requests for Admissions to the Defendant dated November 9, 2021 and attached hereto as Exhibit A.

References to "the M Salas Affidavit" means the affidavit dated August 10, 2022 and filed herein as an Exhibit to the Defendant's Objections to the Plaintiffs' Motion for Summary Judgment, at D-75-2.

References to "the Complaint" means the Amended Complaint filed herein.

References to "the Superior Court Litigation" means the two D.C. Superior Court wrongful death cases filed against the Defendants in 2015 which resulted in Judgments against the Debtor and the Defendant in April, 2018.

The following undisputed facts are organized by the issue concerning which the Plaintiffs assert they have the most relevance. However, many of the undisputed facts set forth below apply to more than one issue presently before the Court for determination.

1. On the issue of Open and Unambiguous Possession by the Defendant, the Plaintiffs submit the following uncontested facts:

Len Salas was named a party to the Superior Court lawsuit in 2015 because he was, at all times relevant, the record title holder of the Property/ Joint Statement, ¶ 7, p. 4.

Max voluntarily deeded the property to Len so that Len could refinance the property for Max to pay off his now ex-wife's interest in the Property. Joint Statement, ¶¶11, 12, 13.

Len obtained a loan from SunTrust Bank, based upon his ownership of the Property and

-2-

his credit, of $870,000. Joint Statement, ¶12; Requests for Admission, ¶ 44.

The Defendant had tax liens and other obligations which made it impossible for the Defendant to obtain a loan on the Property. Joint Statement, ¶15. In addition, the Defendant has a tax evasion conviction on this record, Joint Statement, ¶16, Supplement List of Undisputed Facts, ¶ 47.

From sometime after 2007 through the date of the fire, the Defendant, acting as "agent" or "trustee" rented out rooms at the Property. Joint Statement, ¶19. M Salas Affidavit at ¶¶ 21, 22. All tenants signed leases with "the CLR Trust." and the Defendant signed each lease as trustee of the trust. Joint Statement, ¶20. M Salas Affidavit at ¶¶ 21, 22.

The Debtor understood the CLR Trust was a trust created for the benefit of the Defendant's three sons, including the Debtor and he so testified at his deposition in the Superior Court case. Joint Statement, ¶ 21, Supplemental Memorandum, Exhibit A.

All lease payments for rental income from the Property were deposited into an account in the name of the CLR Trust. M Salas Affidavit, at ¶¶ 19-22 ("I deposited **all rent checks**..." (Emphasis supplied); Requests for Admission, ¶ 26 (partially denied);Supplemental List of Undisputed Facts, ¶¶ 54, 55.

Through the date of the fire (June, 2015) and at all times prior to the bankruptcy filings (April 18, 2018) all governmental notices and tax bills and notices regarding the Property were addressed to Len Salas at 1610 Riggs Place, NW or at Len's current residence. Joint Statement, ¶23.

From the time of the fire until 2018 no one resided at the Property. Joint Statement, ¶38, List of Undisputed Facts, ¶ 3.

From the time of the fire until November 2019, only one payment was made on the SunTrust Deed of Trust and that was made from the insurance proceeds. Joint Statement, ¶39

The Defendant does not have the original Quitclaim Deed and is unaware of its location. , Requests for Admission, ¶¶ 1,2

The Defendant did not attempt to record the Quitclaim Deed after 2010. Requests for Admission, ¶3, List of Undisputed Facts, ¶ 13.

From 2007 through April 18, 2018 the Debtor was the sole obligor under the Sun Trust loan documents. The Defendant was not a listed or added obligor or guarantor of the SunTrust loan. Requests for Admission, ¶¶16, 18.

The Defendant attempted to refinance the Property several ties after 2007, all to no avail.

-3-

At least through 2015, every attempt to refinance the Property required the participation of the Debtor as co-signor or co-obligor. Supplemental List of Undisputed Facts, ¶ 50.

The Defendant had no written agreement or understanding with the Debtor that the Defendant was responsible for the Sun Trust Deed of Trust obligation. Requests for Admission, ¶ 17, Supplemental List of Undisputed Facts, ¶ 51, List of Undisputed Facts, ¶15.

The Loss Mitigation Statement attached to the Plaintiffs' Supplemental Memorandum, dated February 28, 2016 shows that Len is the Owner of the Property. Supplemental Memorandum, Exhibit F. ("I want to: Keep the Property." and "The property is currently: My Primary Residence." and "The property is currently: Owner Occupied.") Exhibit F at p. 6.

In the Superior Court case, the Defendant's deposition took place on February 24, 2016 and the Debtor's deposition took place on March 9, 2016. See Plaintiffs' Memorandum (D-74), Exhs. A and K.

The D.C Agency documents attached to the Supplemental Memorandum as Exhibits G through I show that the Debtor was the listed owner of the Property according to D.C. public records.

Neither the Debtor nor the Defendant produced a copy of the Quitclaim Deed of 2010 or the 1610 Riggs Property Trust as part of the Superior Court litigation. Requests for Admission, ¶ 56.

Neither the Debtor nor the Defendant produced a copy of the Quitclaim Deed to the Plaintiffs in the Superior Court litigation until after February 15, 2018. Requests for Admission, ¶57 (Defendant admitted the delayed production "was sometime after this general timeframe.)

The purpose of the 1610 Riggs Property Trust was to avoid having the property in the name of Max Salas. Requests for Admission, ¶59

Nether the Debtor nor the Defendant informed Sun Trust in writing that the Defendant was responsible for the Sun Trust Deed of Trust Note payments. Supplemental List of Undisputed Facts ¶ 16.

There were no further communications regarding the creation or recording of a deed for the transfer of the Property from the Debtor to the Defendant after February, 2012. Requests for Admission, ¶ 30, Supplemental List of Undisputed Facts, ¶ 30.

From 2007 through May 3, 2022 the Debtor remained the title owner of the Property. Requests for Admission, ¶¶ 41, 46.

-4-

2.  The Trustee is the Real Party in Interest for Purposes of Collateral Estoppel.

Mr. Gigandet, the Trustee, declined to pursue the causes asserted in the Complaint and also declined to join in the Complaint. List of Undisputed Facts, ¶ 5.

The Plaintiffs requested that the Debtor's trustee pursue the estate's avoidance and recovery rights under 11 US.C. §§ 544 through 551.  The trustee declined to do so electing instead to sell the estate's interest in those avoidance and recovery rights.  Joint Statement, ¶51.

The Plaintiffs were the successful bidders at an auction sale of the estate's interest in the trustee's avoidance and recovery actions.  Amended Joint Pre-trial Statement ("Pre-trial Statement"), Joint Statement of Uncontested Facts ("Joint Statement"), ¶ 4, p. 4.

This Court authorized the trustee to sell the estate's interest in the trustee's avoidance and recovery rights on June 12, 2019.  Joint Statement, ¶52.

On July 23, 2019 the trustee conducted the court ordered auction sale of the estate's interest in the trustee's avoidance and recovery claims.  The auction was attended by the Debtor's counsel and the Defendant and Ron Salas (by phone).  The Plaintiffs were the successful bidders. Joint Statement, ¶¶53 through 55.

That the Complaint filed in this Adversary Proceeding was on behalf of the bankruptcy estate of the Debtor. Requests for Admission, ¶ 54, List of Undisputed Facts, ¶ 6.


3.  The Defendant abandoned the 2010 Deed.

The original Quitclaim Deed was abandoned in 2011.  Plaintiffs' Amended Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Exhibit 7.

At no time since 2015 did the Defendant contact Ms. Sylvia Jones (D.C. real estate agent) regarding the location or existence of the Quitclaim Deed.  Requests for Admission, ¶ 41.

At no time since June, 2015 did the Defendant contact (attorney) Stan Goldstein or Capitol Title regarding the location or existence of the original Quitclaim Deed. Requests for Admission, ¶ 42.

Neither the Debtor nor the Defendant produced a copy of the Quitclaim Deed in their document production s part of the Superior Court litigation. Requests for Admission, ¶ 56.

Neither the Debtor nor the Defendant produced a copy of the Quitclaim Deed to the Plaintiffs in the Superior Court litigation until after February 15, 2018. Requests for Admission, ¶57 (Defendant admitted the delayed production "was sometime after this general timeframe.)

-5-

The purpose of the 1610 Riggs Property Trust was to avoid having the property in the name of Max Salas. Requests for Admission, ¶59. The Defendant admitted this Request and added "but the transfer to the trust **was only done to aid in refinancing the note**." Id.

That the Defendant had more than one conversion with the Debtor after 2010 about removing the Debtor from the title to the Property. Requests for Admission, ¶ 64.

The Quitclaim Deed was never recorded. Joint Statement, ¶32,

The original Quitclaim Deed has been lost. Joint Statement, ¶33, Supplemental List of Undisputed Facts, ¶¶ 11, 12.

There were no further communications regarding the creation or recording of a deed for the transfer of the Property from the Debtor to the Defendant after February, 2012. Requests for Admission, ¶ 30, Supplemental List of Undisputed Facts, ¶ 30.

The Defendant delivered the original Quitclaim Deed to Mr. Goldstein's office and does not recall Goldstein mailing it back to the Defendant. Supplemental List of Undisputed Facts, ¶ 104.

The Defendant made at least two attempts to obtain a new or different Quitclaim Deed from the Goldstein law firm in 2011 and 2012. Lists of Undisputed Facts, ¶ 25.

Prior to June, 2011, the Trust and Quitclaim Deed were abandoned by the Debtor and the Defendant. Plaintiffs' Memorandum, Exhibit 7, List of Undisputed Facts ¶¶ 27 - 30.

The Debtor repeatedly attempted to get the Defendant to remove the Debtor's name from the Property after 2010. List of Undisputed Facts, ¶ 77.

4. The Debtor held more than "bare legal title"

Len Salas was named a party to the Superior Court lawsuit in 2015 because he was, at all times relevant, the record title holder of the Property/ Joint Statement, ¶ 7, p. 4.

Max voluntarily deeded the property to Len so that Len could refinance the property for Max to pay off his now ex-wife's interest in the Property. Joint Statement, ¶¶11, 12, 13.

Len obtained a loan from SunTrust Bank, based upon his ownership of the Property and his credit, of $870,000. Joint Statement, ¶12.

The Defendant had tax liens and other obligations which made it impossible for the Defendant to obtain a loan on the Property. Joint Statement, ¶15. In addition, the Defendant has

-6-

a tax evasion conviction on this record, Joint Statement, ¶16, Supplement List of Undisputed Facts, ¶ 47.

The Defendant tried to refinance the Property several times after 2007 but did not succeed.  Every attempt to refinance the Property required the participation of the Debtor as co-signor or co-borrower.  Joint Statement, ¶¶17, 18.

From sometime after 2007 through the date of the fire, the Defendant, acting as "agent" or "trustee" rented out rooms at the Property. Joint Statement, ¶19. M Salas Affidavit at ¶ ___ .  All tenants signed leases with "the CLR Trust." and the Defendant signed each lease as trustee of the trust. Joint Statement, ¶20.

The Debtor understood the CLR Trust was a trust created for the benefit of the Defendant's three sons, including the Debtor and he so testified at his deposition in the Superior Court case.  Joint Statement, ¶ 21, Supplemental Memorandum, Exhibit A.

The Defendant was present at the testimony of the Debtor in 2016 when he testified concerning the "CLR Trust."  Requests for Admission, ¶ 39.

At no time prior to 2020 did the Defendant dispute Len's testimony regarding the CLR Trust.

Through the date of the fire (June, 2015) and at all times prior to the bankruptcy filings (April 18, 2018) all governmental notices and tax bills and notices regarding the Property were addressed to Len Salas at 1610 Riggs Place, NW or at Len's current residence.  Joint Statement, ¶23, Requests for Admission, ¶8.

The Quitclaim Deed was never recorded.  Joint Statement, ¶32

The original Quitclaim Deed has been lost. Joint Statement, ¶33,

Other than the original deed of 2007 no deeds or other documents of title have been filed related to the Property through the bankruptcy filings of the Debtor and the Defendant in April, 2018.  Joint Statement, ¶49.

Through 2019, no deed or other document of title was recorded showing that the Defendant had an interest in the Property.  Joint Statement, ¶49

The original Quitclaim Deed was abandoned in 2011.  Plaintiffs' Amended Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Exhibit 7.

In April, 2018 the Plaintiffs, in their D.C. Superior Court cases against the Debtor and the Defendant, obtained judgments against the Debtor and the Defendant as owner and manager of the

-7-

Property, respectively.  Joint Statement, ¶¶35-37.

In early 2018, on the eve of the D.C. Superior Court trial, the Debtor filed a motion seeking to exclude the Debtor from the Superior Court cases of the Plaintifs on the basis of the abandoned, Quitclaim Deed, even though both the Debtor and the Defendant knew that the Deed was not effective as early as 2011.  The Superior Court denied the Debtor's Motion. Joint Statement, ¶¶35, 36, Plaintiffs' Memorandum, Exhibit 7.

    5.  Unclean Hands Doctrine prevents relief

The original balance of the SunTrust loan taken out by the Debtor in 2007 was $870,000. The balance at the time of the bankruptcies of the Debtor and the Defendant was at least $1,037,592.78.  Joint Statement, ¶12; Requests for Admission, ¶ 47..  The balance of the SunTrust loan as of October 23, 2018 was $1,208,720.40. Requests for Admission, ¶ 48.

From the time of the fire until November 2019, only one payment was made on the SunTrust Deed of Trust and that was made from the insurance proceeds. Joint Statement, ¶39

According to the Defendant's Monthly Operating Reports filed in his bankruptcy case, the Defendant made no payments on the SunTrust loan from April, 2018 through at least October, 2019.

The original Quitclaim Deed was abandoned in 2011.  Plaintiffs' Amended Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Exhibit 7.

The documents attached to the Plaintiffs' Memorandum were produced, for the first time, in discovery documents delivered by the Debtor to the Plaintiffs in August, 2021.

During the period 2015 - 2018 the Defendant owed federal income taxes that were outstanding and overdue.  Requests for Admission, ¶14.

Prior to 2018, the Defendant was unaware that either Ron Salas or the Debtor had copies of the 2010 Quitclaim Deed.  Requests for Admission ¶15.

The Defendant's document production shows that the 1610 Riggs Place Trust maintained a bank account from October, 2018 through April, 2018.  Other than an initial deposit, the Riggs Place Trust Account shows no activity.  Supplemental Memorandum, Exhibit B.

Neither the Debtor nor the Defendant produced a copy of the Quitclaim Deed of 2010 or the 1610 Riggs Property Trust as part of the Superior Court litigation.  Requests for Admission, ¶ 56.

Neither the Debtor nor the Defendant produced a copy of the Quitclaim Deed to the Plaintiffs in the Superior Court litigation until after February 15, 2018. Requests for Admission, ¶57

-8-

(Defendant admitted the delayed production "was sometime after this general timeframe.)

That the Defendant had more than one conversion with the Debtor after 2010 about removing the Debtor from the title to the Property. Requests for Admission, ¶ 64.

There were no further communications regarding the creation or recording of a deed for the transfer of the Property from the Debtor to the Defendant after February, 2012. Requests for Admission, ¶ 30, Supplemental List of Undisputed Facts, ¶ 30.

The Debtor, the Defendant and Ron Salas all testified at the Exemption Hearing, or supported the claim, that the Quitclaim Deed was in effect in 2018. Supplemental List of Undisputed Facts, ¶ 98.

The only deed referenced by the Defendant or his counsel, allegedly entitling the Defendant to an ownership interest in the Property is the 2010 Quitclaim Deed. No other deed has been proffered or even mentioned by the Salas family or the Defendant, specifically. Supplemental List of Undisputed Facts, ¶ 99.

In February, 2016 the Defendant testified that there was only one Trust, the CLR Trust. List of Undisputed Facts, ¶ 53.

The Debtor testified that the CLR Trust was created for the benefit of the Debtor and his brothers, Ron and Chase. List of Undisputed Facts, ¶ 55.

The Defendant did not want the rents, including those of Nina Brekelmans and Michael McLoughlin deposited into his personal account. List of Undisputed Facts, ¶ 58.

The attempted transfer by way of the Quitclaim Deed was a violation of the Debtor's Deed of Trust with Sun Trust Bank. List of Undisputed Facts, ¶ 64.

6. Collateral Estoppel

The D.C. Bankruptcy Court made no final determination of the effect of this Trustee's avoiding powers and asserted the status of the avoiding powers was left to the Tennessee bankruptcy court. Joint Statement, ¶48.

This Court authorized the trustee to sell the estate's interest in the trustee's avoidance and recovery rights on June 12, 2019. Joint Statement, ¶52.

On July 23, 2019 the trustee conducted the court ordered auction sale of the estate's interest in the trustee's avoidance and recovery claims. The auction was attended by the Debtor's counsel and the Defendant and Ron Salas (by phone). The Plaintiffs were the successful bidders. Joint Statement, ¶¶53 through 55.

-9-

That the Complaint filed in this Adversary Proceeding was on behalf of the bankruptcy estate of the Debtor. Requests for Admission, ¶ 54, List of Undisputed Facts, ¶ 6.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt
 Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
 202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

-10-

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville, Tennessee

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor-in-possession | : | |

| | |
|---|---|
| NICOLAAS BREKELMANS AND GAIL | : |
| GREGORY BREKELMANS, | |
| CO-PERSONAL REPRESENTATIVES | : |
| OF THE ESTATE OF NINA | |
| BREKELMANS, et al | : |
| | |
| In their capacity as authorized | : |
| representatives of the Estate of Len Salas | |
| | : |
| Plaintiffs | |
| | |
| v. | : Adversary Proceeding No. 3:20-ap-90027 |
| | |
| MAX SALAS | : |
| | |
| Defendant | : |

## AMENDED RESPONSES TO REQUESTS
## FOR ADMISSIONS TO THE DEFENDANT

Comes Now, Defendant, Max Salas ("Defendant"), and for his Amended Responses to

Requests for Admissions to the Defendant (the "Discovery")[1], states as follows:

## GENERAL OBJECTIONS

1.      Defendant's Responses to the Discovery shall not constitute a waiver of his

objections as to admissibility.

2.      Defendant objects to the Discovery to the extent it exceeds the scope of permissible

discovery.

the amended answer or producing them to the Court, concerning or reflecting the Brekelmans'

Motion to Compel Written Answers to Discovery and Production of Documents (Doc. 67) (the "Discovery Order").

3.      Defendant objects to the Discovery to the extent that the information sought is protected from discovery by the attorney-client privilege or the attorney work-product doctrine.

4.      Defendant objects to the Discovery to the extent that the information and documents sought are not in his possession, custody or control.

5.      Defendant objects to the Discovery to the extent that the information sought is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6.      Defendant objects to the Discovery to the extent that the information sought is equally available to Plaintiff as to Defendant.

7.      Defendant objects to the definitions and instructions to the extent Plaintiff seeks to impose any requirement in excess of those imposed by the Federal Rules of Civil Procedure. Additionally, Defendant is not required by the Federal Rules of Civil Procedure to adopt, follow or utilize Plaintiff's definitions and instructions, and Defendant's Responses are based upon the governing provisions of the applicable Rules, laws and the ordinary and usual meaning of the words used, except as otherwise noted in the Responses.

8.      Defendant reserves the right to supplement his Responses to the Discovery based upon subsequently acquired information as permitted by the Federal Rules of Civil Procedure.

## REQUESTS FOR ADMISSION

1.  That the Defendant does not have the original Quitclaim Deed allegedly created in July, 2010.
     **Response:**  Admitted.

2.  That the Defendant is unaware of the location of the original Quitclaim Deed.
     **Response:**  Denied.  Ron Salas has an original copy.

3.  That the Defendant did not attempt to record the Quitclaim Deed after 2010.
     **Response:**  Admitted.

4.  That the Defendant is unaware that the original Quitclaim Deed exists.
     **Response:**  Denied.  Ron Salas has an original copy.

Defendant to refinance the D.C. Property.
      **Response:** Admitted.

6. That the Defendant tried to obtain refinancing after July, 2010 but was unsuccessful in doing so.
      **Response:** Admitted.

7. That the Defendant made no attempts to refinance the D.C. Property after 2012.
      **Response:** Denied.

8. That all D.C. notices regarding the Property, after 2007, were addressed to Len Salas as owner of the Property.
      **Response:** Admitted.

9. That the Defendant did not want the Property in his name after 2010 so that he could avoid any tax or other obligations in his name.
      **Response:** Denied. Titling the Property in Len Salas' name had nothing to do with tax obligations or any other obligations.

10. That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
      **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information. Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

11. That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid D.C. property taxes owed against the Property.
      **Response:** Denied. Property taxes were paid from 2008 – 2018.

12. That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid local utilities' obligations owed against the Property.
      **Response:** Denied. Utilities were paid from 2008-2018.

13. That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid fines for violations of D.C. ordinances against the Property.
      **Response:** Denied. Defendant is aware of no unpaid fines from 2008-2018.

14. That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
      **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information. Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

15. That the Defendant was aware, in 2016 that his son Ron Salas and his son Len Salas, both had, or should have had, copies of the 2010 Quitclaim Deed.
      **Response:** Denied. Defendant was unaware in 2016 that Ron Salas or Len Salas

16. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.
**Response:** Admitted.

17. That Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation.
**Response:** Admitted.

18. That Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note.
**Response:** Admitted.

19. That Max Salas did not notify Sun Trust or the D.C. government that he was an obligor under the Sun Trust Deed of Trust.
**Response:** Denied. Max Salas notified SunTrust that he was obligated under the Deed of Trust.

20. That Max Salas did not notify D.C. or any taxing authority that he was the owner of the DC Property.
**Response:** Denied. Max Salas has recorded the DC Bankruptcy Court order which declares him the owner. Max Salas also filed a homestead exemption with the Register of Deeds in 2012.

21. That the document attached as Exhibit B to the Amended Complaint filed herein is a true and correct copy of the Order Confirming Debtor's Third Amended Plan of Reorganization and The Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020.
**Response:** Admitted.

22. That the transcript of your testimony in the bankruptcy case of Len Salas, Case No. 3:18-bk-02662 "the Len Salas Case"), dated December 12, 2018 is a true and correct copy of your testimony on December 12, 2018 in Nashville, Tennessee.
**Response:** Admitted.

23. That you were present at all times, during the hearing on the attempted confirmation of the Debtor's proposed Chapter 11 Plan, the Len Salas Case, on December 12 and 13, 2018.
**Response:** Admitted.

24. That you were represented by counsel at that hearing, including Mr. Cox, Mr. Albert and Mr. Young.
**Response:** Admitted.

25. That on or about July 6, 2010 you visited your son, Ron, at his residence in Colorado along with your son, Len, and his wife.
**Response:** Admitted.

26. That all lease payments for rental income from the rental of all or part of the DC Property from the period May, 2007 through April, 2018 were deposited into an account in the

**Response:**  Denied as stated.  Some, but not all, lease payments for rental income from the DC Property from May 2007 through Aprils 2018 were deposited into a CLR Trust bank account.

27.  That there was no active bank account in the name of "CLR" other than the CLR Trust during the period between July, 2010 and April, 2018.
**Response:**  Defendant can neither admit nor deny this Request as he does not understand the question as stated.

28.  That you did not provide copies of bank statements, canceled checks, or other bank records related to any bank account on which you were a signatory, or in which you deposited funds as part of your document production to the Plaintiffs in the matter of their objection to your claim of exemption in the Salas Bankruptcy.
**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

29.  That as of June 1, 2015 you had a copy of the signed Quitclaim Deed in your possession.
**Response:**  Admitted.

30.  That on and after July 6, 2010 you were aware that you had received the only signed, original Quitclaim Deed.
**Response:**  Denied.  Defendant later became aware that other signed, original copies of the Quitclaim Deed existed.

31.  That the sole purpose of the Quitclaim Deed was to allow you the opportunity to refinance the Property so that your son would no longer have Deed of Trust obligation to Sun Trust Bank, or any other lender associated with the Property.
**Response:**  Denied.  Another purpose of the Quitclaim Deed was to secure a mortgage with a lower interest rate than the SunTrust Deed of Trust carried.

32.  That the source of the funds to be used by your son, Ron, to purchase the Trustee's Avoiding and Recovery Powers from Mr. Gigandet in the L Salas Bankruptcy was funds owned and controlled by you.
**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

33.  That all at times after commencement of the Superior Court Litigation you were aware of the existence of the Quitclaim Deed and the Riggs Property Trust.
**Response:**  Denied.

34.  That, at all times after commencement of the Superior Court Litigation you were aware that your sons, Ron and Len, had copies of the Quitclaim Deed.
**Response:**  Denied.

35.  That your son, Ron Salas, a Colorado lawyer was aware of the pendency of the Superior Court Litigation almost immediately after its commencement in 2015.
**Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

36.  That your son, Ron, was aware that the only reason your other son, Len, was a defendant in the Superior Court Litigation is because he was the titled owner of the Property.
  **Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Defendant further objects on the grounds that the Request seeks information from Defendant regarding the mental impressions of a third party.

37.  You were aware, prior to 2016, that the only reason your son, Len, was a Defendant in the Superior Court Litigation was because he was the titled owner of the Property.
  **Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

38.  That your son, Len, was physically present at your deposition in the Superior Court Litigation held on February 24, 2016.
  **Response:**  Admitted.

39.  That you were physically present at Len's deposition in the Superior Court Litigation held on March 9, 2016.
  **Response:**  Admitted.

40. That you were unaware of the possibility that the Property could be exempted in a bankruptcy proceeding by you until after you spoke to Mr. Marc Albert in early 2018.
  **Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.  Defendant further objects on the grounds that the Request seeks information that is protected by the attorney-client privilege.

41.  That you have not contacted Ms. Sylvia Jones regarding the location or existence of the original Quitclaim Deed since June, 2015.
  **Response:**  Admitted.

42.  That you have not contacted Stan Goldstein or Capitol Title regarding the location or existence of the original Quitclaim Deed since June, 2015.
  **Response:**  Denied.

43.  That you made no payments against the Sun Trust Deed of Trust Note during the period June 1, 2015 through October, 2019.
  **Response:**  Denied.

44.  That the Note balance as of April, 2007 totaled approximately $870,000.
  **Response:**  Admitted.

45.  That the Note balance as of June, 2010 totaled more than $870,000.
  **Response:**  Defendant is without sufficient knowledge to admit or deny this Request.

46.  That the Note balance as of July, 2010 totaled more than $870,000.
  **Response:**  Defendant is without sufficient knowledge to admit or deny this Request.

than $1,030,825.86.

        **Response:** Admitted.

48, That the Note balance as of October 23, 2019 was $1,208,720.40.

        **Response:** Admitted.

49. That the Proof of Claim filed by the Internal Revenue Service ("the IRS Claim") in your bankruptcy case on December 16, 2018 (C-2-1) is a true and correct copy of the IRS claim which was allowed under your Confirmed Plan.

        **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

50. That you did not object to the IRS Claim and it remains an allowed secured and priority claim allowed in the Salas Bankruptcy.

        **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

51. That from the period 2008 through May, 2015 you rented multiple rooms at the Property, from time to time.

        **Response:** Admitted.

52. That from the period 2008 through 2018 you did not declare the income from the rentals of rooms at the Property as income on your Federal or D.C. Income Tax Returns.

        **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

53. That from 2008 through the present, all notices from the District of Columbia and all tax forms related to the Property were addressed to Len Salas.

        **Response:** Defendant objects to this Request on the grounds that it is duplicative.

54. That the Complaint is made by the Plaintiffs on behalf of the bankruptcy estate of Len Salas.

        **Response:** Admitted.

55. That Salas had no communications with the Trustee concerning the Quitclaim Deed or the Riggs Property Trust until sometime after March, 2019.

        **Response:** Denied. Defendant's first communications with the Trustee concerning the Quitclaim Deed and the Riggs Property Trust occurred in December 2018.

56. That neither Salas nor Len produced a copy of the Quitclaim Deed or the Riggs Property Trust in their document production as part of the Superior Court Litigation.

        **Response:** Admitted.

57. That neither Salas nor Len provided the original or a copy of the Quitclaim Deed or Riggs Property Trust to Plaintiffs or their counsel (in the Superior Court Litigation) until after February 15, 2018.

        **Response:** While Defendant cannot admit to an exact date, Defendant admits that it was sometime after this general timeframe.

58. That the intent of the attempted Quitclaim Deed in July, 2010 was to remove Len Salas from any liability related to the DC Property.

**Response:** Defendant denies that this was the only reason for the Quitclaim Deed, as explained in other responses herein.

59. That the intent of the Riggs Property Trust was to avoid having the property in the name of Max Salas.

**Response:** Admitted, but the transfer to the trust was only done to aid in refinancing the note.

60. That the intent of the Riggs Property Trust was to avoid income tax liability of, or by, Max Salas.

**Response:** Denied.

61. That Salas was unaware he could exempt his alleged interest in the DC Property until after 2017.

**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

62. That Salas did not attempt to locate a copy of the Quitclaim Deed or Riggs Property Trust until 2018.

**Response:** Admitted.

63. That Salas was unaware of any assets owned or controlled by Len over the value of $25,000 in July, 2010.

**Response:** Admitted, because Defendant had little knowledge of Len Salas' assets in July 2010.

64. That Salas had more than one conversation with Len after 2010 about removing Len from the title to the DC Property.

**Response:** Admitted.

65. That Salas had more than one conversation with Len after 2010 about eliminating Len as an obligor on obligation(s) secured by the DC Property.

**Response:** Admitted.


Respectfully submitted,

/s/ Phillip G. Young
Phillip G. Young (TN 021087)
THOMPSON BURTON, PLLC
6100 TOWER CIRCLE, SUITE 200
FRANKLIN, TENNESSEE 37067
(615)-465-6008
phillip@thompsonburton.com

*Attorneys for Defendant*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| LEN SALAS | : | CHAPTER 11<br>CASE No. 18-02662<br>JUDGE: HARRISON |
| Debtor | : | |
| NICOLAAS BREKELMANS AND GAIL<br>GREGORY BREKELMANS,<br>CO-PERSONAL REPRESENTATIVES<br>OF THE ESTATE OF NINA<br>BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

PLAINTIFFS' SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs herein, by and through their undersigned counsel and,

files this Second Supplemental Memorandum in accordance with the direction of the Court at the

hearing on the parties' Motions for Summary Judgment held herein on March 21, 2023.

This Memorandum is intended to respond to questions or issues raised by the Court at the

hearing on March 21, 2023 or to certain arguments asserted by the Defendant at that hearing.

This Memorandum is a supplement, and in addition, to the Plaintiffs' Motion for Summary

Judgment and Amended Memorandum in support, the Plaintiffs' Reply to the Defendant's

Opposition to the Plaintiffs' Motion for Summary Judgment, the Plaintiffs' Supplemental

Memorandum in Support of its Motion for Summary Judgment, Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment and all of the Exhibits and attachments thereto.

I.    **ARGUMENT**

   **A.    The Debtor was the Owner of the Property for all Purposes After 2007**

   1.  The Defendant asserted, in support of his Motion, that he owned the subject property (1610 Riggs Place, NW, Washington, DC "the Property") and paid the mortgage.  However, those assertions are refuted by the following undisputed facts:

      a.  After 2007 there was no deed created which purported to transfer the property to the Defendant.

      b.  The 2010 Quitclaim Deed, even if effective, deeded the property to an invalid trust, not to the Defendant.  See Defendant's Motion for Summary Judgment, Exh. A (D-90-1).

      c.  The Defendant has produced no documents showing that he was the owner of the Property at any time after 2007.  In fact, the leases produced by the Defendant show that he was acting as "trustee"  for an entity named "the CLR Trust."  See Supplemental Memorandum, Exh. A, D-92-1. He did not declare the rental income on his 2015 tax return.

      d.  The Defendant abandoned the Quitclaim Deed prior to June, 2011.  Plaintiffs' Amended Memorandum, Exh. 7 (D-74-8), Plaintiffs List of Undisputed Facts, D-74-1, ¶¶9, 10 - 13, 25 -30, Defendant's Responses to Plaintiffs' Requests for Admission, ¶¶ 3, 56, 57.

      e.  The Defendant made only one mortgage payment after June, 2015. Amended Joint Pre-trial Statement, ¶ 39.

      f.  The Defendant used essentially all of the insurance proceeds to upgrade and update the Property so he could get a license to rent.

      g.  from June, 2015 through early, 2018, the Defendant did not live at the

property.

2.  The above facts have been established as undisputed See Defendants responses to the Plaintiffs' Lists of Undisputed Facts (D-74-1), the Exhibits attached to the Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment (D-74-2 -74-22), the Exhibits attached to the Plaintiffs' Supplemental Memorandum (D-92-1 - 92-9) and the Plaintiffs' Statement of Undisputed Facts attached to its Opposition to the Defendant's Motion for Summary Judgment (D-95-1).

3.  On the other hand, the Debtor was the open and notorious owner of the Property as evidenced by the Deed, Deed of Trust, Governmental Notices (Supplemental Memorandum, Exhs. G- I), the SunTrust Loss Mitigation Statement of February, 2016 (Supplemental Memorandum, Exh. F) and all other documents of ownership and title after 2007.

**B.      The Plaintiffs are Acting on Behalf of the Debtor's Estate**

4.  The Defendant argued that collateral estoppel should apply to the Plaintiffs because they are acting in their own self interest.  There is no case law to support that finding and other courts, like the Western District of Pennsylvania (***Kind***) do not support such a finding, as discussed below.

5.  The Defendant argued that by the Plaintiffs' exercising their right to purchase the Trustee's claims, but only after asking the Trustee to pursue them and the Trustee's refusal, they were acting in their own self-interest at least partly because the Plaintiffs represent the vast majority of creditors' claims.  That suggests that if the trustee acted on his own, under the same circumstances, that action would somehow be improper.  That scenario would yield a ridiculous result.  Moreover, it is axiomatic that when the trustee fails to pursue a cause of action and decides to sell it, the likely buyer is the creditor, or party, who is most likely to benefit.  The

purchase of that claim benefits the estate by the purchase price (here over $150,000) plus the result of any recovery.

6. Additionally, the Defendant bid at the auction and stated that his purpose was to buy the trustee's claims so that they would not be pursued, clearly acting in his own self-interest. It is true that the Defendant bid through his son, Ron. However, Ron was represented at the auction by the Defendant's counsel and, during the auction, Ron and Defendant's counsel had several private conversations among the Defendant, his counsel, and his son, Ron. Clearly, when it came to Ron's attempted purchase of the trustee's avoidance and recovery claims, the Defendant was the "real party in interest."

7. While the Defendant asserts that the Plaintiffs will largely benefit from any recovery and while the Plaintiffs represent the vast majority of the claims against the Debtor's estate, there are other creditors who will also benefit, including taxing authorities and unsecured creditors. Furthermore, the estate's additional administrative expenses and fees will be paid before any payments are made to the Plaintiffs from any recovery.

8. Additionally, the Plaintiffs paid good consideration for the claims they are pursuing on behalf of the estate and they have borne all risk of loss, shielding the estate from unnecessary expense. The trustee, the estate, and all creditors, along with the Debtor's counsel, have all benefitted from the payment made into the estate by the Plaintiffs to purchase the estate's rights to the trustee's recovery and avoidance actions.

9. Finally, the Defendant repeatedly acknowledged the Plaintiffs legitimate purchase of avoidance and recovery actions of the trustee subject only to the ordinary defenses available to parties defending those avoidance and recovery actions. The Defendant, as part of his agreement upon which the Plaintiffs relied, acknowledged and confirmed the right of the Plaintiffs to

pursue the claims set forth in the Complaint and are now estopped from changing his position as clearly set forth in the Debtor's approved disclosure statement and plan of reorganization in Case No.18-00260. In the Defendant's approved Disclosure Statement, the Defendant asserts that there is "pending litigation" including: avoidance action litigation to be brought by the Judgment Creditors in the U.S. Bankruptcy Court for the Middle District of Tennessee following the Judgment Creditors' purchase of those claims from the Len Salas Bankruptcy Estate (the "Tennessee Avoidance Actions")." Case No. 18-260, United States Bankruptcy Court for the District of Columbia ("Defendant's Bankruptcy"), (D-276), filed on December 5, 2019, p. 21.

10. In the Defendant's confirmed Plan of Reorganization dated, January 22, 2020, the Defendant defined the Plaintiffs causes of action as follows:

1.44 **Tennessee Avoidance Actions** means the avoidance actions previously purchased by the Judgment Creditors from the Len Salas Bankruptcy Case and includes each and every claim and recovery action to which the Len Salas Bankruptcy Case Trustee or the Len Salas Bankruptcy Case estate may have under the provisions of 11 U.S.C. § § 544 through 553, as applicable, related to the Property, and an resultant litigation thereto.

In Section 3.6 of the confirmed Plan of Reorganization, the Defendant states:

Judgment Creditor Claims are being given separate Class treatment based on the fact that they may also collect on the amounts owed to them from available Insurance Proceeds (See Motion for Relief from Stay Order; ECF Dkt. No. 74), and based on the fact that they possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len Salas Bankruptcy Case. Upon Confirmation, the Debtor's listing of the Class 6 Claims as Disputed Claims shall be withdrawn without any further notice or order of the Court and the Class 6 Claims shall be treated as Allowed Claims to allow for distribution under the Plan as contemplated herein. Such withdrawal of the Class 6 Claims as disputed, however, shall in no way limit or otherwise affect any defenses the Debtor may have to the Tennessee Avoidance Actions...

The Plaintiffs' acceptance of the Defendant's Third Amended Plan of Reorganization was expressly made in reliance on the recognition of the Defendant that the Plaintiffs had the right to

pursue the trustee's claims in this estate. The Plaintiffs accepted the defenses available to the Defendant but their agreement with the Defendant required the Defendant to acknowledge the Plaintiffs were the rightful owners of this estate's claim and had standing to sue the Defendant in this case.

      **C.    The D.C. Bankruptcy Court did not Determine Issues Related to the Trustee's Causes of Action and Neither the Trustee nor the Debtor's Estate Were Parties to the D.C. Exemption Hearing or Decision**

     11. The Defendant also argued that the D.C. Bankruptcy Court specifically determined the issue of fraudulent conveyance. In support of his claim, the Defendant recited language in Exemption Decision that did not reference a fraudulent conveyance or Section 548 and clearly was not addressing or determining the rights of the Tennessee Trustee. On p. 59 of the D.C. Bankruptcy Court's Memorandum Opinion, the Court stated, under a section titled "AVOIDANCE UNDER SECTION 544": "...that is an issue of fact that must be decided by the U.S. Bankruptcy Court for the Middle District of Tennessee. How a judgment regarding the right of Len's estate to recover the Property under § 544 would affect Max's homestead exemption in this case is an issue for another day." Memorandum and Opinion in Case No. 18-00260, filed and entered on September 25, 2018 (D-108)("D.C. Memorandum") (Defendant's Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment, filed herein on February 21, 2023 (D-90-1).

     12. ==11 U.S.C. § 548== was neither mentioned, argued or determined in the D.C. Bankruptcy Case (18-00260). See, for example, D.C. Memorandum at *passim.* See also, Creditors' Opposition to the Debtor's Claim of Exemption and the Debtor's Response, in the D.C Bankruptcy Case, attached to the Plaintiffs' Supplemental Memorandum, D-92, as Exhibits D (D-92-4), and E (D-92-5), respectively.

13.  The D.C. Bankruptcy Court specifically deferred to this Court on all issues related to the interest of this Debtor's estate.  See, Memorandum and Opinion filed in Case No. 18-00260, pp. 48-59.  On the first day of the Exemption Hearing, August 22, 2018, the D.C. Bankruptcy Court (Teel, J.) stated: "It seems to me it's Len Salas' Chapter 7 Trustee who is going to have an incentive to avoid the transfers invoking Section 544."  See Exemption Hearing Transcript, Vol 1, August 22, 2018, pp. 24-26 ("August 22 Excerpt"), attached hereto as Exhibit 1 to this Second Supplemental Memorandum, at 24: 20-22.

14.  In a discussion with Plaintiffs' counsel at the commencement of the Exemption Hearing, Judge Teel stated:

> "So it seems to me we may be -- we may be wasting our time going through this exercise when – maybe I'm wrong, but it seems to me inevitable that if exemption is upheld in this case, it'll be taken away by the trustee in the Len Salas case."

Exhibit 1, August 22 Excerpt, at 26: 8-12.

15.  Judge Teel stated during the Exemption Trial in August, 2018, that the D.C. Court's ruling on the Exemption, if granted, would be mooted by the Tennessee trustee's avoidance and recovery powers.  While not determinative, the Court's statement is a clear indication that the D.C. Court did not think it could, and did not intend to, affect this Court's consideration of the trustee's avoidance and recovery powers.

D.  **The Plaintiffs' Derivative Status Precludes the Application of Issue Preclusion**

16. Essentially all of the arguments raised by Defendant's counsel concerning issue preclusion are irrelevant to the undisputed facts of this case because this court has already determined that the Plaintiffs are acting in a derivative capacity and they stand in the shoes of the Trustee representing the Debtor's estate. See, Memorandum and Opinion filed herein on February 11, 2021 (D-38). Furthermore, the Defendant cited no cases which countered the Plaintiffs' derivative status. There is no case which the Defendant did, or can, cite that holds the interests of this estate were determined, or protected, in the D.C. Case. The Plaintiffs stand in the shoes of the trustee, their claims are derivative of the Debtor's estate and neither the Debtor's estate nor the trustee were parties to the D.C. Exemption Decision. Therefore, these Plaintiffs, in their current capacity, are not collaterally estopped and issue preclusion does not apply to the claims of the Debtor's estate, as set forth in the pending Complaint. Furthermore, even if there were otherwise grounds for issue preclusion, the D.C. Bankruptcy Court specifically declined to rule on any issues before this court. The D.C. Bankruptcy Court simply lacked authority to decide issues relate to the claims of this Debtor's trustee and estate.

17. Numerous bankruptcy courts, and appellate courts, have consistently ruled that, for all purposes, including issue preclusion, the real party in interest is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *See, for example, Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990). The person (or party) holding the substantive right in this case is the trustee, on behalf of the Debtor's estate. The claims asserted by the Plaintiffs' are claims belonging to the estate and they are claims unique to this bankruptcy case.

18. This Court conclusively determined that the Plaintiffs met the 6th Circuit's "strict prerequisites for exercising derivative standing..." See, Memorandum Opinion, February 11,

2021 (D-38), at pp. 5-16.  Thus, the Plaintiffs "stand in the shoes of the trustee" in the pending Complaint. Plaintiffs' List of Undisputed Facts, D-74-1, ¶¶ 5, 6.

19.  Derivative standing, like that in the instant case, is a suit brought in the name of the debtor, or the debtor's estate.  The Plaintiff steps "into the shoes of the debtor or trustee." ***Gecker v. Marathon Fin. Ins. Co. (In re Auto. Prof'ls, Inc.)***, 389 B.R. 630, 634 (Bankr. N.D. Ill. 2008).

20.  Discussing the history of case law regarding suits brought by creditors and committees of bankruptcy estates on behalf of the estate, ***Gecker*** explained that in cases where derivative standing has been granted to creditors or committees, "a party is simply being permitted to step into the shoes of the party with standing." *Id.*, at 635.  The court concluded: "Thus, the committees or creditors given derivative standing were filling the empty shoes of the trustee, who clearly had standing to pursue them [the trustee's causes of action]..."

21.  In ***Gecker***, the Court declined to allow a committee to assist the Trustee in the Trustee's cause of action asserting that to allow a party to be added along side the Trustee is

> to confer a type of "helper" or "buddy" standing upon a party who is not asserting his own right under substantive law but seeks merely to assist the rightful plaintiff in pursuing his case...

> Because the **<u>trustee</u>** is a **<u>plaintiff</u>** asserting her own rights as trustee, there is no unexercised right to sue that can be conveyed to the Committee on a derivative basis.

*Id.* (emphasis in original)

22.  ***Gecker*** emphasized that the status of a committee attempting to join the trustee's cause of action, with the trustee as co-plaintiff, is far different from the situation, as in this case, when a creditor pursues a cause of action when the trustee fails, or refuses to act. *Id.*, at 634.

Moreover, the ***Gecker*** court suggested that, as to the "buddy system" which the trustee attempted to employ there are other means to accomplish the same result. The trustee could hire the creditor's attorney, sell the trustee's claim, or otherwise gain assistance from the creditor without adding the creditor as another party to the trustee's cause of action.

23. The court, in ***Modiri v. 1341 Rest. Grp., Inc.***, 904 A.2d 391, 394-97 (D.C. 2006), emphasized that "a privy is one so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." internal citation omitted. The legal rights asserted in the instant case are those solely belonging to the Trustee or the Debtor's Estate. The Trustee is not privy to the debtor or to the debtor's estate when pursuing recovery or avoidance actions. ***In re Worldcom, Inc.***, 401 B.R. 637, 651 (Bankr. SD.N.Y.). Because the Plaintiffs, as representatives of the Debtor's Estate, stand in the shoes of the Trustee, the real party in interest, they are not in privity with any party to the D.C. Exemption Decision. Therefore, issue preclusion does not apply here even if the issues before this court were raised and/or decided in the D.C Exemption Decision, which, of course, they were not as discussed above.

**E.     *Kind Operations* Supports the Plaintiffs' Motion for Summary Judgment on the Issue of Collateral Estoppel**

24. The case of ***Kind Operations, Inc. v. Cadence Bank (In re PA Co-Man, Inc.)***, 644 B.R. 553 (Bankr. W.D. Pa. 2022) is a recently reported decision from the bankruptcy court for the Western District of Pennsylvania. While a much more complicated procedural background than the instant case, ***Kind Operations*** has remarkable similarities to this case and in many important respects.

25. In ***Kind Operations*** the Plaintiff, Kind Operations, Inc. ("Kind, Inc.") purchased the

Chapter 7 Trustee's Avoidance and Recovery Claims. The purchase was made as part of a settlement agreement Kind, Inc. reached with the trustee. The settlement included Kind, Inc. making a payment to the estate for the benefit of creditors and included an assignment of the estate's causes of action to Kind, Inc. so that Kind, Inc. could "investigate, prosecute, and fund the litigation of the estate's causes of action for the benefit of both the bankruptcy estate's creditors and Kind, Inc. pursuant to a sharing agreement. *Id.*, at 571-72. Kind, Inc. then filed, as assignee, three separate complaints against the secured lenders and the purchasers related to a pre-petition foreclosure sale of essentially all the Debtor's assets. *Id.*, at 572. The Court allowed the Plaintiff to file a single consolidated complaint, which Kind, Inc. did. In the consolidated complaint, Kind, Inc. added the Debtor's President and Chief Executive Officer as an additional defendant.

26. In response to motions to dismiss filed by the various defendants, the Plaintiff argued that "this case involves the principal of a debtor, [the] debtor's secured lenders and an eager, well-heeled purchaser conspiring to manufacture a fraudulent sale of all of the debtor's assets (and none of its liabilities) to the great detriment and harm of the debtor and its creditors." citation to the record omitted. The Plaintiff further argued that "[e]ach party to this secretive and improper arrangement had something to gain from it." Citation to the record omitted. *Id.*

27. In the Consolidated Amended Complaint, Kind, Inc. asserted seven causes of action which consist of (*inter alia*): a claim for civil conspiracy against the Debtor's President, the lenders and the purchasers; a claim for breach of fiduciary duty against the Debtor's President; a claim for fraudulent concealment against the Debtor's President; and a claim for avoidance of fraudulent transfers against Debtor's President, the lenders and the purchasers.

28.  In response to challenges by the Defendants, including the Debtor's president, Kind, Inc. asserted that it was not suing in the same capacity and, therefore, collateral estoppel did not apply. The court found Kind, Inc.'s argument persuasive noting that New York courts have looked to whether parties, though arguably the same, appeared in the same capacity in both actions. ***Juan C. v. Cortines***, 679 N.E.2d 1061, 1065 (N.Y. 1997).  The same analysis is applicable under both D.C. cases and those of the 6th Circuit.

29.  The ***Kind Operations*** Court discussed the requisites for the application of collateral estoppel (under New York law) as follows:

> In general, "a nonparty to a prior litigation may be collaterally estopped by a determination in that litigation by having a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation[.]" ***Juan C. v. Cortines***, 679 N.E.2d 1061, 1065 (N.Y. 1997) (quoting ***D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.***, 76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (N.Y. 1990); see also, ***People v. Roselle***, 84 N.Y.2d 350, 618 N.Y.S.2d 753, 643 N.E.2d 72 (N.Y. 1994)).

30.  The Court concluded:

> In due consideration of these standards, it is abundantly clear that the bankruptcy estate had no representation in the State Court Litigation. It is also clear that the bankruptcy estate's claims against the Defendants in this adversary proceeding are not derivative of those claims previously asserted by KIND in its individual capacity in the State Court Litigation. Thus, it is equally clear that KIND did not appear in the same capacity in both actions; here before this Court, KIND is acting in its capacity as the assignee of the Trustee's interests, and in the State Court Litigation KIND was pursuing its own self interest. Accordingly, the Court finds that neither res judicata nor collateral estoppel operate to bar the claims asserted in the instant pending adversary proceeding.

*Id.*, at 637.

31.  Analogous to the instant case, Kind, Inc.'s Complaint asserted, among other causes, three causes of action for fraud, namely, actual fraud, constructive fraud (lack of reasonable equivalent value, and a fraudulent transfer under state law. ***Kind Operations, supra***, at 604-05.

Also analogous to this case, Kind was a party to a previous case against the Debtor's principal and lost although the reasons are not clear in the record.

32.    The Plaintiffs assert that the long standing principles of collateral estoppel as consistently applied in D.C. and other jurisdictions prevent the use of issue preclusion in this case, as argued in the Plaintiffs' Motion, Supplemental Memorandum and Opposition to the Defendant's Motion.  The factual and procedural similarities between this case and ***Kind Operations*** give those principles a more direct application to the Plaintiffs' Complaint and explain clearly why issue preclusion must not be applied here.

   **F.    The Actions and Interactions Between the Debtor and the Defendant Represent Substantially all of the Badges of Fraud Set Forth in the Uniform Fraudulent Transfer Act as Enacted in the District of Columbia**.

33.    D.C. has adopted the Uniform Fraudulent Transfer Act.  See D.C. Code § 28-3104.

34.    Under D.C. Code § 28-3101(12), a "transfer" includes any parting with an asset or an interest in an asset. ***Malone v. Iceberg Transp. S.A. (In re Gold & Appel Transfer S.A.)***, Nos. 05-00775, 05-10022, 2013 Bankr. LEXIS 3695, at *1 (Bankr. D.D.C. Sep. 6, 2013).

35.    Judge Teel explained in ***Malone*** that the existence of the badges of fraud set forth in the UFTA (D.C. Code § 28-3101, *et seq*. present a compelling and ***prima facie*** case for a finding of fraudulent intent requiring the avoidance and recovery of the subject transfer.

> While it is often difficult for a claimant seeking to avoid a transfer as a fraudulent conveyance to present direct evidence to establish a debtor's actual intent to defraud creditors, ***Kelly v. Armstrong***, 141 F.3d 799, 802 (8th Cir. 1998), summary judgment is appropriate "where all the facts 'point[] to a finding of intent with no inference of a pure motive possible.'" ***Consumers United Ins. Co. v. Smith***, 644 A.2d 1328, 1358 (D.C. 1994) (quoting ***Jones v. Cent. Nat'l Bank of St. Johns***, 547 N.E.2d 887, 891 (Ind. Ct. App. 1989)). Accordingly, the law recognizes certain "badges of fraud," including the factors enumerated in § 28-3104(b), as "common indicia . . . which have frequently bespoken fraudulent intent in the past." ***Kelly v. Armstrong***, 141 F.3d at 802.  Once a claimant "establishes a confluence of several badges of fraud, the [claimant] is entitled to a

presumption of fraudulent intent" and "[i]n such cases 'the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue.'" *Id.* (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994)); see also *Schilling v. Heavrin (In re Triple S Rests., Inc.)*, 422 F.3d 405, 414-416 (6th Cir. 2005) ("Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." (internal quotation marks and citation omitted)). "The presence of a single badge of fraud may spur mere suspicion . . . and the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991). Once a record contains only evidence establishing badges of fraud supporting an inference that the transfer was made with an actual intent to defraud a creditor, the transfer must be set aside as a fraudulent conveyance unless sufficient evidence is presented to explain or justify the circumstances constituting badges of fraud. *Leonardo v. Leonardo*, 251 F.2d 22, 26, 102 U.S. App. D.C. 119 (D.C. Cir. 1958).

*Malone v. Iceberg Transp. S.A. supra*,  at *65-67.

36.  The so-called "badges of fraud" to be considered are as follows:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer...was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made...;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.*, at 66. D.C. Code § 28-3104(b). See also, ***Kind Operations, supra***, at 608.

37. Paragraphs (6) and (11) are not applicable to the facts of this case. The other factors all support the finding of actual fraud:

(1) The transfer was made by the Debtor, Len, to an insider, his father, the Defendant;

(2) The Debtor retained ownership of the Deed and the SunTrust Deed of Trust obligation after the transfer (which took place on April 17, 2018); See, for example, Facts in Support of Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment, D-95-1 ("Opposition Facts"), Section 1, pp. 2-3; Plaintiffs' List of Undisputed Facts, D-74-1, ¶¶14 -17.

(3) The transfer was concealed from the Defendant's creditors, D.C. agencies and the lender; See, for example, Opposition Facts, Section 1, pp. 2-4

(4) The Debtor had been sued in 2015 and judgments entered against him in April, 2018 just weeks before the transfer; See, Judgement Recording, Defendant's Motion for Summary Judgment, Defendant's Statement of Undisputed Facts, Exhibit B (D-90-2)

(5) The subject Property had estimated equity at the time of the debtor's bankruptcy of more than $1.2 Million. (Defendant's Schedules, Summary of Assets and Liabilities, Case No. 18-00260, D-12, p. 1 of 37). The Debtor's other assets totaled $53,373.38 on April 18, 2018 (Debtor's Schedules, Summary of Assets and Liabilities, Case No. 18-2662, D-1, p. 12 of 56);

(7) The Debtor aiding his father in concealing the fact that the Quitclaim Deed had been abandoned. See Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, Exhibit 7 (2011-12 eMails) (D-74-8),

(8) the Debtor received no consideration for the transfer nor did the Debtor receive anything of value from his father from 2007 through 2018. See Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, Exh. 4, (D-74-5) and Exh. 5, (D-74-6).

(9) The Debtor's schedules, the parties stipulations, admissions and the Plaintiffs' Statement of Undisputed Facts establish, without dispute, that at all times from 2010 through April, 2018, the Debtor was insolvent. Moreover, the attempted transfer of the Property by Quitclaim Deed transferred the Debtor's only substantial asset but left the Debtor with the SunTrust Deed of Trust Note obligation which was at least $870,000 at all times. By April, 2018 the Note obligation exceeded $1 Million and by October, 2019, the Note obligation exceeded $1.2 Million. See, Plaintiffs Amended List of Undisputed Facts, August 1, 2022 (D-74-1), ¶¶ 19, 20, 21 and Defendant's Responses, D-75-1, ¶¶ 19, 20, 21.

(10) by operation of law, both 11 U.S.C. 548 (d) and D.C.Code § 42-401 the transfer took place on April 17, 2018, just two weeks after judgments were entered against the Debtor and the Defendant totaling more than $15 Million. See Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment, Exh. 2, D-90-2, filed herein on February 21, 2023.

31. In the Loss Mitigation Statement Len Salas signed, dated February 25, 2016 ("the Loss Mitigation"), Len signed "as borrower" on page 9 of the Loss Mitigation (D-92-6, p. 9 of 9). On the same page, above Len's signature the Loss Mitigation states: "knowingly submitting false information may violate Federal or other applicable law." On page 6 of the Loss

Mitigation (D-92-6, p. 6 of 9) Len stated "**I want to - Keep the Property**" and "The property is currently - **My Primary Residence**" and "The property is currently - **Owner Occupied**."  Those statements directly contradict the Debtor's later position that he deeded the property to his father in 2010 or that he, Len, was not the owner in 2016.  The date of the Loss Mitigation is also important because it is same time frame as the depositions of Len and Max taken in the Superior Court case in February and March, 2016.  Len's deposition was March 9, 2016, just two weeks after the date of the Loss Mitigation. See Plaintiffs' Amended Memorandum, Exh. 11 (D-74-12).

32.  Additionally, in his testimony in the Exemption Hearing in Case No. 18-00260, Len testified that he did not bring up the 2010 Quitclaim Deed because he "simply forgot about it" as did all of his family members that were present at the time of the execution of the Quitclaim deed. See Len Salas testimony, August 22, 2018, Case No. 18-00260, (Exemption Hearing Transcript, Vol 1 of 3), at pp. 135-139, attached hereto as Exhibit A.

33.  He further testified that he did not know the Deed needed to be recorded even though Ron's email of June 17, 2011, addressed to both Len and Max, states clearly that a new deed "will then need to be filed with the District/City."  Plaintiffs' Amended Memorandum, Exh. 7, D-74-8), filed herein on August 1, 2022.

34. This directly contradicts the emails which Len produced in this case, for the first time, in August, 2021 wherein he asks his father about getting his name off the deed in the time frame of June, 2011 through February, 2012, well after the signing of the 2010 Quitclaim Deed. See also, Plaintiffs List of Uncontested Facts, ¶31. And, in the same emails both Ron and Max reference the need to create a new, or different instrument, to remove Len's name from ownership of the Property. See Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, Filed herein on August 1, 2022, Exh. 7, (D-74-8), at pp. 1, 3, 5, 7, 11, 13.

On page 16 of Exh. 7, Max emailed his counsel, for the last time of which we have a record, stating quite clearly that no progress had been made as of February 27, 2012, over 19 months since the creation of the 2010 Quitclaim Deed.

35. In his testimony at the Exemption Hearing the Debtor also admitted that he made "multiple" attempts to get his name off the property through the Spring, 2015. See, Exhibit B, Exemption Hearing Transcript, Vol. 1, pp. 111, 130, 156-64, at pp. 156-60. See also, Plaintiffs List of Uncontested Facts, ¶31.

36. Len's testimony, when contrasted with the 2011-12 emails and the admission that he asked his father "multiple" times to get his name off the Property, plus other evidence, like the February, 2016 Loss Mitigation, Plaintiffs' Supplemental Memorandum, Exh. F (D-92-6), makes it clear that Len was simply not telling the truth about the Quitclaim Deed and that his family members only "remembered" the Deed after Marc Albert told Max he could exempt the Property if he was the owner, but not if Len was. See discussion below.

37. Len also testified at the Exemption Hearing, Len testified, as follows

"6 Q. All right.
7 Do you know what the reference to the 1610 Salas
8 Trust is?

9A. Oh, no, I mean, no. Uhm -- actually, no. Not
10 quite. See, it says not much. It's an account. I thought
11 it was an account.

12 Q. And what made you think it was an account?

13 A. Because he, when I got that call from SunTrust
14 saying that the mortgage hadn't been paid, I said what
15 happened. He says, "Well, I've set up this account for
16 1610 so all the rent checks go into there, and then I pay
17 that." And I guess one check didn't clear before they
18 pulled my check. I -- something. I got some kind of
19 answer like that. Something to that effect.

20  Q. And that's what your father told you?

21 A. So that's what I thought, that's what I referred
22 to.

23 Q. But that's what your father told you, right?

24 A. Correct."

See Exhibit A, Exemption Hearing Transcript, August 22, 2018, Vol. 1, p. 149.

38.  The above testimony is contradicted by the bank records produced by the Defendant.

See Supplemental Memorandum, Exhibit B (D-92-2), 1610 Riggs Property Trust Bank of

America account records for account ending in 3184.  That exhibit clearly shows that there was

no bank account opened for the alleged 1610 Riggs Property Trust until October, 2017, just a

few months after the Defendant hired bankruptcy counsel, Marc Albert.  See for example, the

Debtor's testimony at the Exemption Hearing

11 THE COURT: Do you remember signing the documents,
12 the two documents on July the 6th, 2010 now that you've
13 seen them?

14 THE WITNESS: Yes, I do remember that.

15 THE COURT: But you didn't recall that during the
16 litigation?

17 THE WITNESS: No, I don't. I wish I had.

18 THE COURT: Until at least as of the deposition on
19 March the 9th, 2016?

20 THE WITNESS: I didn't remember them until Max had
21 told me that Albert had discovered them in his research,
22 which was I don't know when. I'd totally forgotten about
23 it. And then I was like, "Oh, yeah. I totally forgot."

Exh. A, Exemption Hearing Transcript, August 22, 2018, Vol. 1, p. 154

39.  The record is replete with references to testimony of the entire Salas family seeking to resurrect a Deed that had been abandoned and discarded, **no later than June, 2011**.  See Supplemental Memorandum, Exh. 7 and Loss Mitigation, Plaintiffs' Supplemental Memorandum Exh. F.


### G.    The Recorded Judgments on April 5, 2018, Even if Applicable to the Issue of Inquiry Notice, Do Not Show any Information Inconsistent with the Title Record

40.  On the issue of Inquiry Notice, the Defendant asserted that the recorded judgment liens (recorded on April 5, 2018) would have put a purchaser on notice and would have required further inquiry.  That does not follow the case law.  See ***McKinley v. Crawford***, 58 F.2d 528 (D.C. Cir. 1932). Under facts as described by the Defendant, the judgment was recorded against Len Salas as Owner and Max Salas as Manager.  There is nothing in the docketed judgment which is inconsistent with the public record.  Moreover, a review of the Superior Court docket would show that the Superior Court specifically found that Len was the owner.  As Mr. Young stated in his argument at the hearing on March 22nd, (from counsel's notes): "You don't have to run down the final answer" when doing the reasonable inquiry required in D.C.

41.  The Defendant's so-called "ownership" of the Property was hidden and private. The only documents produced by the Defendant regarding the D.C. Property are the 2007 Deed from Max to Len, the 2010 Deed from Len to the Trust (a copy only, no original), the 2010 Trust (which due diligence would have determined was "*void ab initio*, and leases to the CLR Trust, with Max acting as trustee (Supplemental Memorandum, Exh. A (D-92-1)).  He did produce an insurance policy but no other documents related to his alleged interest in the Property.

42. Len's ownership, however, is both open and notorious, recorded and otherwise of public record, including, but not limited to, the 2007 Deed, the 2007 Deed of Trust, the 2016 SunTrust Loss Mitigation Statement (prepared by the Defendant)(Supplemental Memorandum, Exh. F (D-92-6), all government and public records through December, 2019 (Plaintiffs' Supplemental Memorandum, Exhs G, H, and I (D-92-7, 92-8, 92-9, respectively).

43. The Defendant argued further that a purchaser would have had to make a call if for no other reason that "to obtain a pay off." That call would have been made to SunTrust which was Len's lender and recognized Len as the only obligor and only resident at the Property. See, for example, Plaintiffs' List of Uncontested Facts, ¶¶16, 17.

44. The Defendant also argued that supporting case law showed that the recordation of a judgment lien was sufficient notice of an interest requiring additional inquiry. However, the judgment lien, in this case, identified Len as the owner. Moreover, the cases cited by the Defendant only argue that a judgment lien which differs from the title record would require further inquiry. The judgment here was against the title owner of the Property, namely, the Debtor.

II.    **CONCLUSION**

For the reasons stated herein, and those argued in the Plaintiffs' Motion for Summary Judgment, Supplemental Memorandum, the Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment, the attached exhibits and the voluminous number of undisputed facts set forth in the Plaintiffs' Motion and Opposition, the Plaintiffs assert they are entitled to summary judgment as a matter of law on all Counts of the Complaint and there are no material facts in dispute which would prevent the entry of judgment in favor of the Plaintiffs.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt
                    Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
 202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

Certificate of Service

        I HEREBY CERTIFY THAT a copy of the foregoing Opposition, was delivered electronically, on the 26th day of March, 2023 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt
Philip J. McNutt

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: | . | Case No. 18-00260-smt |
| | . | |
| MAX E. SALAS, | . | |
| | . | Washington, D.C. |
| Debtor. | . | August 22, 2018 |
| | . | |

. . . . . . . . . . . . . .

TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 1 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT

APPEARANCES:

For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020

For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380

Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

---

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

OPENING STATEMENTS:                                    PAGE:
By Mr. McNutt                                          10
By Mr. Albert                                          27


WITNESSES:                                             PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt                       37

LEN SALAS
Direct examination by Mr. Albert                       98
Cross-examination by Mr. McNutt                        116
Redirect examination by Mr. Albert                     187
Recross-examination by Mr. McNutt                      199

RON SALAS
Direct examination by Mr. Albert                       206
Cross-examination by Mr. McNutt                        219
Redirect examination by Mr. Albert                     245

EXHIBITS:                                    MARKED: RECEIVED:

DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)             *        9
B.  4/16/07 deed of trust                      *        9
     (L.Salas/SunTrust) with 7/8/15
     Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement         *        9
D.  7/6/10 L.King journal entries              *        9
E.  Encomass insurance policy                  *        9
F.  1610 lease documents                       *        9
G   Email chain beginning 2/14/18              *       --
     R.Salas to insurance counsel
H.  3/19/18 emergency motion for               *        9
     summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules *            9
J.  M.Salas Answer to Interrogatories          *        9
     (Brekelmans case)
K.  M.Salas Answer to Interrogatories          *        9
     (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S | | |
| 1.  Trial Transcript, 3/26/18, pp.1-19 | * | 8 |
| 2.  Joint pretrial statement, 7/18/17 | * | 8 |
| 3.  Pretrial order, 12/29/17 | * | 8 |
| 4.  Amended joint pretrial statement, 2/15/18 | * | 8 |
| 5.  McLoughlin Complaint, 10/20/15 | * | 8 |
| 6.  Brekelmans Complaint, 10/20/15 | * | 8 |
| 7.  L. Salas Answer (Brekelmans Complaint) 11/13/15 | * | 8 |
| 8.  L. Salas Answer (McLoughlin Complaint) 11/13/15 | * | 8 |
| 9.  M.Salas Answer (McLoughlin Complaint) | * | 8 |
| 10. M.Salas Answer (Brekelmans Complaint) | * | 8 |
| 11. Memorandum in support of L.Salas motion to dismiss | * | 8 |
| 12. M.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 13. L.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 14. M.Salas Deposition Transcript dated 2/14/16 | * | -- |
| 15. L.Salas Deposition, 3/9/16 pages 117-120 | * | 54 |
| 16. 4/27/95 deed (Wilhelm/Bruff) | * | 8 |
| 17. 4/16/07 deed (Bruff/M.Salas) | * | 8 |
| 18. 4/16/07 deed (M.Salas/L.Salas) | * | 8 |
| 19. Deed of trust (L.Salas/Sun Mortgage) | * | 8 |
| 20. Property request report for 1610 Riggs Place Northwest | * | 8 |
| 21. D.C. notice of infraction | * | 8 |
| 22. DCRA notice of immediate abatement | * | 8 |
| 23. Memorandum in Support of L. Salas' Emergency Motion for Summary Judgment | * | 8 |
| 24  8/10/18 R.Salas deposition excerpts | * | -- |
| 25. Lease, 10/1/14 - Tamasco | * | 8 |
| 26. Lease, 6/2/14 (first page) | * | 8 |
| 27. Lease, 17th of 2014 to Brekelmans | * | 8 |
| 28. Lease, 8/17/14 to Brekelmans | * | 8 |
| 29. Lease, 11/1/14 to Mecham | * | 8 |

TABLE OF CONTENTS
(Continued)

EXHIBITS:                                    MARKED: RECEIVED:


CREDITOR'S (continued)
30. Irrevocable Trust, 7/6/10                   *          8
31. Cornet letter, 5/19/17                      *          8
32. Debtor's report, excerpts, 4/5/18           *          8
33. Debtor's report, excerpts, 6/8             *          8
34. Excerpts, L.Salas, first Meeting            *         --
    of creditors, 5/24/18
35. M.Salas Answers to                          *          8
    Interrogatories, 8/6/18
36. Debtor's schedules A/B, C-J, 5/2/18         *          8
37. Debtor's responses, 8/6/18                  *          8
38. Debtor's statement of
    financial affairs(D-13), 5/2/18             *          8
39. Debtor's amended statement of
    financial affairs(D-50), 6/27/18            *          8
40. Debtor's amended petition                   *          8
41.  R.Salas email (trust documents)          231         --

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of
"(unintelligible)" in this transcript are due to the audio
recording levels being turned up too high, or individuals
speaking outside of the vocal capture range of the
microphone.

```
 1              THE COURT:  It seems to me it's inevitable that's
 2   going to happen if the Chapter 7 Trustee in Len Salas' case
 3   wants to maximize the estate for the benefit of Creditors,
 4   he's going to invoke Section 544 successfully and avoid the
 5   transfer that wasn't recorded.
 6              MR. McNUTT:  I believe that's correct, Your Honor.
 7   Now, just to be certain, Len --
 8              THE COURT:  So it seems to me we may be -- we may
 9   be wasting our time going through this exercise when --
10   maybe I'm wrong, but it seems to me inevitable that if
11   exemption is upheld in this case, it'll be taken away by
12   the trustee in the Len Salas case.  But I guess I'm stuck
13   with trying this first.
14              MR. McNUTT:  And Your Honor, we had the quandary
15   of if we don't file an objection to the exemption, then we
16   may lose our right to assert that Len Salas -- and by the
17   way, you mentioned Chapter 7 Trustee.  Len Salas is in a
18   Chapter 11 as well.
19              THE COURT:  I understand, but I'm saying --
20              MR. McNUTT:  But, yeah.
21              THE COURT:  -- that if he doesn't exercise the 544
22   power, you'll get a trustee appointed.
23              MR. McNUTT:  Exactly.  That's our plan, if you
24   will, Your Honor.
25              THE COURT:  All right.
```

1   And he said, "Let me look through my files."  And lo and
2   behold there was a file, and so he sent the electronic file
3   to Marc, and Marc read through all of them.  He came across
4   this digital copy apparently.
5       Q.   Okay.
6       A.   That's what I mean by these --
7       Q.   Okay.
8       A.   -- that was done before I found my original paper
9   copies.
10      Q.   Do you know if your brother Ron was aware of the
11  lawsuits filed against you and your father in March of
12  2016?
13      A.   March of 2016.  I assume he had been informed by
14  the -- if somebody told him in October when we were, me and
15  Max were both served.
16      Q.   Do you know if your brother saw a copy of the
17  Complaints?
18      A.   No, I don't know.
19      Q.   All right.
20           Do you know if you had discussions with your
21  brother about the fact that you were concerned that you
22  were named a party to this lawsuit just because you were
23  the title owner of the property?
24      A.   Yeah.
25      Q.   Okay.

```
 1              And those discussions, you actually had those
 2   discussions with Ron throughout the lawsuit, didn't you?
 3   Throughout the proceedings in the Superior Court?
 4        A.   I would imagine so.
 5        Q.   Was your wife aware of the lawsuit?
 6        A.   Yes.
 7        Q.   Was your wife aware that you were being sued
 8   because you were the owner of the property?
 9        A.   I guess, yeah.
10        Q.   Okay.
11        A.   We -- I --
12        Q.   All right.
13              So if I recall correctly, in your testimony you
14   testified that there were I believe five people present at
15   the time that the trust documents were executed?
16        A.   Yes.
17        Q.   That's the notary public, Ms. King I think was her
18   name?
19        A.   Uh-huh.
20        Q.   And then there was your brother Ron?
21        A.   Uh-huh.
22        Q.   Your wife Kendra?
23        A.   Uh-huh.
24        Q.   Your father Max?
25        A.   Uh-huh.
```

1    Q.   And you?

2    A.   Correct.

3    Q.   So four family members, two of whom were sued, you

4 and your father?

5    A.   Uh-huh.

6    Q.   One is the wife of one of those sued, namely your

7 wife Kendra?

8    A.   Uh-huh.

9    Q.   And the fourth one is the brother of one of those

10 sued, your brother Ron; and the son of one of those sued,

11 Max's son, your brother Ron, correct?

12   A.   Yes.

13   Q.   And at no time prior to March of 2018 did any of

14 you think about or produce the trust documents; is that

15 accurate?

16   A.   Yeah, I mean I was getting laid off, I was trying

17 to sell my house, I had just had a newborn boy, you know,

18 and five years had passed since I signed it.  You know, a

19 lot was going on for me personally.  I was getting, I got

20 served while I had a guest in my house.

21   Q.   And none of --

22   A.   It was a very stressful time for me.

23   Q.   Sure.

24   A.   So, I mean, sorry I forgot about some documents I

25 signed five years earlier.

1    Q.   Yeah, it was a difficult time for Nina and

2  Michael, too.

3    A.   Uh-huh.

4    Q.   They were actually dead.  It wasn't much of a joke

5  to them, was it?

6    A.   Yeah, I understand.

7    Q.   Yeah.

8         So during all this time you understood that the

9  only reason you were being sued is because you were the

10 titled owner of the property?

11   A.   Yes, I guess -- I don't --

12   Q.   Sure.

13   A.   I guess.  I don't know.

14   Q.   And during all that time when you knew that, your

15 brother knew that, your father knew that, your father kept

16 saying that Len is not responsible, nobody came up with

17 this trust document, nobody?

18   A.   I guess.  I don't -- I mean as soon as we found it

19 we brought it to everybody's attention.

20   Q.   Well, as soon as you found it.  You said you

21 didn't even look for it until a week before trial.  Isn't

22 that what you just said?

23   A.   I -- I don't know how to answer that.

24        THE COURT:  He didn't look for that specific

25 document.  His testimony was he looked for some other

1    A.   Yes.

2    Q.   Okay.  And you were asked the question:

3             "What do you know about the 1610

4         Salas Trust?"

5    A.   Yeah.

6    Q.   All right.

7         Do you know what the reference to the 1610 Salas

8  Trust is?

9    A.   Oh, no, I mean, no.  Uhm -- actually, no.  Not

10 quite.  See, it says not much.  It's an account.  I thought

11 it was an account.

12   Q.   And what made you think it was an account?

13   A.   Because he, when I got that call from SunTrust

14 saying that the mortgage hadn't been paid, I said what

15 happened.  He says, "Well, I've set up this account for

16 1610 so all the rent checks go into there, and then I pay

17 that."  And I guess one check didn't clear before they

18 pulled my check.  I -- something.  I got some kind of

19 answer like that.  Something to that effect.

20   Q.   And that's what your father told you?

21   A.   So that's what I thought, that's what I referred

22 to.

23   Q.   But that's what your father told you, right?

24   A.   Correct.

25   Q.   Is that what you're saying?

1    Q.   Okay.  All right.

2         You're not aware of any deed which transfers any

3    property into either the 1610 Salas Trust or the CLR Trust

4    are you?

5    A.   Now I am.  Wait, say that again?  I'm sorry.

6    Q.   Are you aware of any deed transferring any

7    property, any property, into either the 1610 Salas Trust or

8    the CLR Trust?

9    A.   No.

10   Q.   Okay.

11        THE COURT:  Do you remember signing the documents,

12   the two documents on July the 6th, 2010 now that you've

13   seen them?

14        THE WITNESS:  Yes, I do remember that.

15        THE COURT:  But you didn't recall that during the

16   litigation?

17        THE WITNESS:  No, I don't.  I wish I had.

18        THE COURT:  Until at least as of the deposition on

19   March the 9th, 2016?

20        THE WITNESS:  I didn't remember them until Max had

21   told me that Albert had discovered them in his research,

22   which was I don't know when.  I'd totally forgotten about

23   it.  And then I was like, "Oh, yeah.  I totally forgot."

24        THE COURT:  So now you are aware that there was a

25   quit-claim deed purporting to transfer property of some

1

2

3

4

5

6   I certify that the foregoing is a correct transcript from

7   the electronic sound recording of the proceedings in the

8   above-entitled matter.

9

10  /s/Kristen Shankleton, CER-6785      Dated: 10/27/18

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                        .    Case No. 18-00260-smt
                              .
MAX E. SALAS,                 .
                              .    Washington, D.C.
              Debtor.         .    August 22, 2018
                              .
. . . . . . . . . . . . . . . .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 1 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:
For the Debtor:            Stinson Leonard Street, LLP
                           By: MARC E. ALBERT
                               JOSHUA W. COX
                           1775 Pennsylvania Avenue, NW
                           Suite 800
                           Washington, D.C., 20036
                           (202) 728-3020

For the Creditors:         By: PHILIP J. McNUTT
                           11921 Freedom Drive
                           Suite 584
                           Reston, Virginia  20190
                           (703) 904-4380


Court Recorder:            THE CLERK

Transcribed By:            MS. KRISTEN SHANKLETON




Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____
MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

Case 3:23-cv-00987    Document 7-3    Filed 10/04/23    Page 472 of 579 PageID #: 1592
1487

TABLE OF CONTENTS

OPENING STATEMENTS:                              PAGE:
By Mr. McNutt                                    10
By Mr. Albert                                    27


WITNESSES:                                       PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt                 37

LEN SALAS
Direct examination by Mr. Albert                 98
Cross-examination by Mr. McNutt                  116
Redirect examination by Mr. Albert               187
Recross-examination by Mr. McNutt                199

RON SALAS
Direct examination by Mr. Albert                 206
Cross-examination by Mr. McNutt                  219
Redirect examination by Mr. Albert               245

EXHIBITS:                              MARKED: RECEIVED:

DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)        *        9
B.  4/16/07 deed of trust                 *        9
    (L.Salas/SunTrust) with 7/8/15
    Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement    *        9
D.  7/6/10 L.King journal entries         *        9
E.  Encomass insurance policy             *        9
F.  1610 lease documents                  *        9
G   Email chain beginning 2/14/18         *        --
    R.Salas to insurance counsel
H.  3/19/18 emergency motion for          *        9
    summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules *       9
J.  M.Salas Answer to Interrogatories     *        9
    (Brekelmans case)
K.  M.Salas Answer to Interrogatories     *        9
    (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S | | |
| 1. Trial Transcript, 3/26/18, pp.1-19 | * | 8 |
| 2. Joint pretrial statement, 7/18/17 | * | 8 |
| 3. Pretrial order, 12/29/17 | * | 8 |
| 4. Amended joint pretrial statement, 2/15/18 | * | 8 |
| 5. McLoughlin Complaint, 10/20/15 | * | 8 |
| 6. Brekelmans Complaint, 10/20/15 | * | 8 |
| 7. L. Salas Answer (Brekelmans Complaint) 11/13/15 | * | 8 |
| 8. L. Salas Answer (McLoughlin Complaint) 11/13/15 | * | 8 |
| 9. M.Salas Answer (McLoughlin Complaint) | * | 8 |
| 10. M.Salas Answer (Brekelmans Complaint) | * | 8 |
| 11. Memorandum in support of L.Salas motion to dismiss | * | 8 |
| 12. M.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 13. L.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 14. M.Salas Deposition Transcript dated 2/14/16 | * | -- |
| 15. L.Salas Deposition, 3/9/16 pages 117-120 | * | 54 |
| 16. 4/27/95 deed (Wilhelm/Bruff) | * | 8 |
| 17. 4/16/07 deed (Bruff/M.Salas) | * | 8 |
| 18. 4/16/07 deed (M.Salas/L.Salas) | * | 8 |
| 19. Deed of trust (L.Salas/Sun Mortgage) | * | 8 |
| 20. Property request report for 1610 Riggs Place Northwest | * | 8 |
| 21. D.C. notice of infraction | * | 8 |
| 22. DCRA notice of immediate abatement | * | 8 |
| 23. Memorandum in Support of L. Salas' Emergency Motion for Summary Judgment | * | 8 |
| 24 8/10/18 R.Salas deposition excerpts | * | -- |
| 25. Lease, 10/1/14 - Tamasco | * | 8 |
| 26. Lease, 6/2/14 (first page) | * | 8 |
| 27. Lease, 17th of 2014 to Brekelmans | * | 8 |
| 28. Lease, 8/17/14 to Brekelmans | * | 8 |
| 29. Lease, 11/1/14 to Mecham | * | 8 |

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| | | |
| CREDITOR'S (continued) | | |
| 30. Irrevocable Trust, 7/6/10 | * | 8 |
| 31. Cornet letter, 5/19/17 | * | 8 |
| 32. Debtor's report, excerpts, 4/5/18 | * | 8 |
| 33. Debtor's report, excerpts, 6/8 | * | 8 |
| 34. Excerpts, L.Salas, first Meeting of creditors, 5/24/18 | * | -- |
| 35. M.Salas Answers to Interrogatories, 8/6/18 | * | 8 |
| 36. Debtor's schedules A/B, C-J, 5/2/18 | * | 8 |
| 37. Debtor's responses, 8/6/18 | * | 8 |
| 38. Debtor's statement of financial affairs(D-13), 5/2/18 | * | 8 |
| 39. Debtor's amended statement of financial affairs(D-50), 6/27/18 | * | 8 |
| 40. Debtor's amended petition | * | 8 |
| 41. R.Salas email (trust documents) | 231 | -- |

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of "(unintelligible)" in this transcript are due to the audio recording levels being turned up too high, or individuals speaking outside of the vocal capture range of the microphone.

1  after that, after you signed the documents?

2      A.    No.

3      Q.    You weren't the trustee as far as you know?

4      A.    As far as I know, no.

5      Q.    You weren't a beneficiary as far as you know?

6      A.    No, correct.

7      Q.    Okay.

8            And do you know why the property wasn't deeded

9  directly to Max at that time by you?

10     A.    No, I don't know why.

11     Q.    I'm sorry?

12     A.    No, I don't know why.

13     Q.    After signing the documents did you follow-up with

14  your father to see if he ever recorded the documents?

15     A.    No, I assumed that's all we needed to do.  I

16  didn't understand that it needed to be recorded.  I thought

17  this is all that would -- needed to be done.

18     Q.    You just signed the documents, gave them to your

19  father, and you thought you were done?

20     A.    Yeah.

21     Q.    Okay.

22           How did you hear about the fire that took place at

23  1610 Riggs Place?

24     A.    My nephew Dillon called me at 3:00 in the morning

25  pretty panicked, said that Papa Max's house is on fire and

1      A.    No.

2            MR. ALBERT:  Objection.  You said son.

3            MR. McNUTT:  Oh, did I say son?  I keep doing

4  that.  Sorry.

5            BY MR. McNUTT:

6      Q.    It was your brother and your father, it was the

7  idea of your brother and your father to create the trust to

8  get the property out of your name, is that accurate?

9      A.    So, yes.

10     Q.    Okay.

11     A.    Which I didn't remember on November 13, twenty --

12 I still hadn't remembered that we'd signed it.

13     Q.    Okay.

14     A.    It was five years before.

15     Q.    Now, did your wife know about the lawsuit?

16     A.    Yes.

17     Q.    When did she find out about the lawsuit?  About

18 the same time you did?

19     A.    I got served, she was with me.

20     Q.    Okay.

21           And did your brother Ron know about the lawsuit?

22     A.    Yes.

23     Q.    Did he find out about the same time that you were

24 served as well?

25     A.    I don't know when he found out.

```
 1      A.   Yeah, one second.

 2      Q.   I'm sorry.

 3      A.   Yes, I do now.

 4      Q.   It's page 29?

 5      A.   Yep.

 6      Q.   Transcription pages, transcript pages 113 to 116?

 7      A.   Uh-huh.

 8      Q.   On 113 starting at line 7:

 9                "Did you, after you got the mortgage

10            in the years prior to the fire did you

11            ever have a discussion with your father

12            with regards to transferring ownership of

13            the property to him?

14                Answer:  Yes."

15            Correct?

16      A.   Yes.

17      Q.   All right.

18            And then it says:

19                "When did you have those

20            discussions?"

21            In line 13.

22      A.   Uh-huh.

23      Q.   Excuse me.  In line 14 you say:

24                "On multiple times."

25      A.   Uh-huh.
```

```
 1    Q.   Fifteen:
 2              "And what did you say to him?
 3              Answer:  I said, 'Sell the house, get
 4         it out of my name.'"
 5    A.   Uh-huh.
 6    Q.        "Question:  Why do you want to get it
 7         out of your name?
 8              Answer:  Because it is not my house
 9         and I wanted to buy my house because it
10         was my understanding that I couldn't buy
11         my house under my name since I already had
12         his house under my name, so I said, 'Sell
13         so I can go buy my house.'"
14         Did I read that correctly?
15    A.   Correct.
16    Q.   All right.
17         And that was your answer, correct?
18    A.   Correct.  I was referring to the mortgage.
19    Q.   Starting line 4 on page 114.  The question is:
20              "Any other reason why you wanted to
21         transfer ownership to your father?
22              Answer:  No.  I mean my wife did.
23              Question:  Why did your wife want to"
24         --
25         Well, again it says "Why did you wife," but I
```

1   think it's supposed to mean:

2            "Why did your wife want to transfer

3        ownership?

4            Answer:  Because she didn't want that

5        in my name.  Same thing for the reason I

6        guess."

7        That was your answer, correct?

8   A.   Uh-huh.  For the --

9   Q.   All right.

10       Would you turn then to page 116?  That's

11  on the same typed page, but transcript page 116.

12  A.   Yes, I have it.

13  Q.   All right.

14       Starting on line 13, the question is:

15            "How many conversations did you have

16       with your father about potentially

17       transferring ownership of the building to

18       him?

19            Answer:  Multiple.

20            Question:  When was the last time you

21       had such a conversation prior to the fire?

22            Answer:  That spring since we were in

23       that summer."

24       Did I read that correctly?

25  A.   You read it correctly, yes.

```
 1        Q.    All right.
 2              So in 2015, five years after you executed the
 3   trust documents and five years after you believe that you
 4   deeded the property to your father, you're still asking the
 5   father to transfer ownership of the property to him?
 6        A.    The mortgage is what I was talking about.
 7        Q.    It doesn't say mortgage here, does it?
 8        A.    Yeah, but that's what I was referring to.
 9        Q.    Well, you were referring to ownership in the
10   property, weren't you?
11        A.    No, because it said the mortgage because I said I
12   want to buy my house.  The reason I couldn't buy my, well,
13   the house that I live in that was currently my wife's, is
14   because I couldn't because of my credit that was on the
15   1610 Riggs Place.  So I couldn't buy, I quote/unquote
16   "couldn't buy" my house or have my house, my name on my
17   house because my credit wasn't good enough to get, to have
18   two houses.
19        Q.    Okay, let's try this again.
20              If you look on page 113, please?
21        A.    Uh-huh.
22        Q.    The question is, starting in line 8:
23                   "Did you ever have a discussion with
24              your father with regards to transferring
25              ownership of the property to him?"
```

```
 1              And your answer was:
 2                   "Yes."
 3      A.    Where does --
 4      Q.    It doesn't ask you --
 5      A.    -- it say that?
 6      Q.    -- about a mortgage.  It asks about transferring
 7  ownership of the property, right?
 8      A.    Line 7, "Do you...did you do...you got the
 9  mortgage in the years..."  So I thought when he said
10  mortgage, I assumed he was talking about the mortgage.
11  Line 7 on page 13.
12      Q.    So you read the:
13                   "Did you, after you got the mortgage
14              in the years prior to the fire, did you
15              ever have a discussion with your father
16              with regards to transferring ownership of
17              the property to him?"
18              You read that to mean transferring the mortgage to
19  him?
20      A.    Yes.
21      Q.    Okay.
22              And page 116, paragraph, starting on line 13 it
23  says:
24                   "How many conversations did you have
25              with your father about potentially
```

1        And your answer was:

2            "Yes."

3    A.   Where does --

4    Q.   It doesn't ask you --

5    A.   -- it say that?

6    Q.   -- about a mortgage.  It asks about transferring

7  ownership of the property, right?

8    A.   Line 7, "Do you...did you do...you got the

9  mortgage in the years..."  So I thought when he said

10 mortgage, I assumed he was talking about the mortgage.

11 Line 7 on page 13.

12   Q.   So you read the:

13           "Did you, after you got the mortgage

14           in the years prior to the fire, did you

15           ever have a discussion with your father

16           with regards to transferring ownership of

17           the property to him?"

18           You read that to mean transferring the mortgage to

19 him?

20   A.   Yes.

21   Q.   Okay.

22           And page 116, paragraph, starting on line 13 it

23 says:

24           "How many conversations did you have

25           with your father about potentially

1          transferring ownership of the building to

2          him?"

3          Doesn't say anything about a mortgage, does it?

4     A.   Well, I guess I misunderstood the question because

5  I mean, I thought he was speaking of mortgage, and I said

6  multiple times.  I said multiple.

7     Q.   Does it say mortgage there or note?

8     A.   I thought he was referring to mortgage.

9     Q.   All right.

10         Let's go to page 117 then.  I think we have to

11 start at the last page, 116 on line 22.  Do you see page

12 116 at the very end of the, Mr. Salas?

13    A.   Uh-huh.

14    Q.   All right.

15         It ways:

16              "What was the catalyst..."

17         And this is referring to the conversation that you

18 had in the spring or summer of 2015, okay?

19    A.   Uh-huh.

20    Q.        "What was the catalyst for that specific

21         conversation?

22              Answer:  I don't know.  It was always

23         in my mind to get it off of my name.

24              Question:  Do you remember why it

25         occurred that spring before the fire?  Was

```
 1            there anything going on in your life or
 2            your father's life which was the catalyst
 3            for that conversation?
 4                Answer:  No, I don't think so.  Maybe
 5            I knew that I was going to be a father
 6            again and that prompted me.  I don't know."
 7            Correct?
 8     A.    Correct.
 9     Q.    All right.
10                "Okay.  What did your father say
11            during that conversation?
12                Answer:  'I'm trying.'"
13            I read that correctly, didn't I?
14     A.    Correct.
15     Q.    All right.
16            And then the next question is:
17                "And what did you understand that to
18            mean?
19                Answer:  That he was looking to get
20            it repackaged or remortgaged or
21            something."
22     A.    Uh-huh.
23     Q.    I read that correctly, didn't I?
24     A.    Right.
25     Q.    So you were hoping that your father was trying to
```

1  get the home refinanced so you could be taken off the
2  mortgage?
3      A.   Correct.
4      Q.   Okay.
5           And the question is:
6               "Who was he trying to get the house
7           re-mortgaged with?
8               Answer:  SunTrust."
9           Right?
10     A.   Correct.
11     Q.   Line 20?
12     A.   Yes.
13     Q.   All right.
14          And then I believe this is, I'm not sure who was
15 asking the questions here, but counsel for one of the
16 estates is asking you about whether you saw any documents
17 related to the refinancing that you were talking about.
18     A.   Uh-huh.
19     Q.   And on page 118 starting at line 20, the question
20 is:
21              "What documents did you see that led
22          you to believe that that process had
23          started?
24              Answer:  Refinancing documents."
25          Right?

1      A.   Yes.

2      Q.   All right.

3           Next page, 119.

4                "Okay.  And when you say that a

5           refinancing application, is that what you

6           were referring to?

7                Answer:  Yes.

8                Question:  Did you fill that out?

9                Answer:  Partly.

10               Question:  What part did you fill

11          out?

12               Answer:  They asked me for my monthly

13          income and things like that.  You know,

14          they want to know my expenses and my

15          assets and things like that.  That was one

16          section of it."

17          I read that correctly, didn't I?

18     A.   Yes.

19     Q.   All right.

20          If your father was attempting to refinance the

21   house in his name, why were you providing credit

22   information on the application?

23     A.   I don't know.  Ask SunTrust I guess.

24     Q.   So you were providing credit information because

25   your father wasn't able to get credit on his own?

1

2

3

4

5

6    I certify that the foregoing is a correct transcript from

7    the electronic sound recording of the proceedings in the

8    above-entitled matter.

9

10   /s/Kristen Shankleton, CER-6785       Dated: 10/27/18




Marian F. Harrison
US Bankruptcy Judge

Dated: 5/23/2023

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) **CASE NO. 318-02662** |
| **LEN SALAS,** | ) |
| | ) **JUDGE MARIAN F. HARRISON** |
| Debtor. | ) |
| | ) **CHAPTER 7** |
| **NICOLAAS BREKELMANS AND** | ) |
| **GAIL GREGORY BREKELMANS,** | ) |
| **CO-PERSONAL REPRESENTATIVES** | ) **ADV. NO. 320-90027** |
| **OF THE ESTATE OF NINA** | ) |
| **BREKELMANS,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **MICHAEL MCLOUGHLIN AND** | ) |
| **MARTHA JOHNSON, CO-PERSONAL** | ) |
| **REPRESENTATIVES OF THE** | ) |
| **ESTATE OF PATRICK** | ) |
| **MCLOUGHLIN,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| **v.** | ) |
| | ) |
| **MAX SALAS,** | ) |
| | ) |
| Defendant. | ) |

---

## MEMORANDUM OPINION

---

On March 21, 2023, this matter was before the Court on cross-motions for summary

judgment. Previously, the Court heard argument on a motion for summary judgment filed

by Nicolaas Brekelmans and Gail Gregory Brekelmans, Co-Personal Representatives of the Estate of Nina Brekelmans, and Michael McLoughlin and Martha Johnson, Co-Personal Representatives of the Estate of Patrick McLoughlin (collectively "plaintiffs").[1] The Court ruled from the bench that summary judgment was not appropriate in this case. After further consideration, the Court raised two specific issues and requested that the parties address them with respect to summary judgment:

1.     In relationship to the strong-arm avoidance claims under 11 U.S.C. § 544(a)(3) (a bona fide purchaser) and 11 U.S.C. § 544(a)(1) (a hypothetical judgment lienholder), whether it is appropriate to consider inquiry notice and if so, whether inquiry notice existed as a matter of law based on the undisputed facts.[2]

2.     In relationship to the fraudulent conveyance claims under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B), whether the District of Columbia Bankruptcy Court ("D.C. Court") already determined the issue of ownership and bare legal title in its homestead exemption opinion.[3]  If so, is the D.C. Court's Homestead Opinion entitled to preclusive or collateral effect in this proceeding.

---

[1] The plaintiffs have been granted derivative standing to pursue these claims on behalf of the estate.

[2] If a purchaser would be on inquiry or constructive notice, so would a judgment lien creditor. *Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 818-819 (Bankr. D.D.C. 1994) (applying same analysis of constructive and inquiry notice under D.C. law to both a purchaser and a judgment lien creditor). *See also Albert v. Green Tree Serv., LLC (In re El-Erian)*, 512 B.R. 391, 397 (Bankr. D.D.C. 2014) (citing *In re Aumiller*).

[3] *In re Salas*, No. 18-00260, 2018 WL 4621930 (Bankr. D.D.C. Sept. 24, 2018) ("Homestead Opinion").

2

## I. Summary Judgment Standards

Pursuant to Federal Rule of Civil Procedure 56(a), as incorporated by Federal Rule of Bankruptcy Procedure 7056, an entry of summary judgment is mandated "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court "must view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (citation omitted). The Court does not "'weigh the evidence and determine the truth of the matter but . . . determine[s] whether there is a genuine issue for trial.'" *Id*. (citation omitted).

## II. Claims Pursuant to 11 U.S.C. §§ 544(a)(3) and 544(a)(1)

In Counts I and II of the amended complaint, the plaintiffs seek to avoid Max Salas' interest in property located at 1610 Riggs Place, NW, Washington, D.C. ("Property") pursuant to 11 U.S.C. § 544(a)(3) (as a bona fide purchaser) and 11 U.S.C. § 544(a)(1) (as a hypothetical judgment lienholder). To determine whether bona fide purchaser or hypothetical judgment lienholder status exists, this Court must look to state law. *In re El-Erian*, 512 B.R. 391, 396 (citations omitted). *See also Treinish v. Norwest Bank Minnesota, N.A. (In re Periandri)*, 266 B.R. 651, 655 (B.A.P. 6th Cir. 2001) (citation omitted).

Under District of Columbia ("D.C.") law, if a deed conveying an interest in real property is recorded, it is effective against a subsequent bona fide purchaser whether or not they had notice. In contrast, when a deed is unrecorded, the Court must determine whether

3

the subsequent bona fide purchaser had notice of said deed. *In re El-Erian*, <mark>512 B.R. at 396</mark> (citations omitted). In the present case, the deed was not recorded. Therefore, whether a subsequent bona fide purchaser would have had notice is the issue here. Under D.C. law, notice may be actual, constructive, or inquiry. *Clay Props., Inc. v. Washington Post Co.,* <mark>604 A.2d 890, 895</mark> (D.C. 1992). *See also Webster v. Hope (In re Hope),* <mark>231 B.R. 403, 424</mark> (Bankr. D.D.C. 1999).[4]

First, actual knowledge would be inapplicable because the trustee assumes the role of a bona fide purchaser *without* actual knowledge. *In re Aumiller*, <mark>168 B.R. at 818</mark>. As stated earlier, the plaintiffs were granted derivative standing and stepped into the shoes of the Trustee. As such, actual knowledge is irrelevant. Constructive notice is also inapplicable because constructive notice has come to mean record notice. *Clay Props.*, <mark>604 A.2d at 895</mark> n.15. This leaves open the possibility of inquiry notice as a trustee may be held to such notice. *In re El-Erian*, <mark>512 B.R. at 396</mark> (citation omitted).

In its prior order, this Court raised the issue of whether Max Salas' physical possession of the property created inquiry notice based on case law from other

---

[4] As stated earlier, if a purchaser would be on inquiry notice, so would a judgment lien creditor. *In re Aumiller*, <mark>168 B.R. 811, 818-19</mark> (applying same analysis of constructive and inquiry notice under D.C. law to both a purchaser and a judgment lien creditor). *See also In re El-Erian*, <mark>512 B.R. at 397</mark> (citing *In re Aumiller*).

4

jurisdictions.[5]  Under D.C. law, inquiry notice is found when a purchaser is "aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed." *Clay Props.*, 604 A.2d at 895.

Max Salas asserts that the following undisputed facts would put a bona fide purchaser or a hypothetical judgment lienholder on inquiry notice:

1.  Max Salas lived in the Property.

2.  Max Salas was the only party who ever made mortgage payments on the Property.

3.  Max Salas signed the leases to rent portions of the Property.

4.  Max Salas collected the rent payments from the Property.

5.  Max Salas collected and distributed insurance proceeds after the Property was destroyed by fire.

6.  The plaintiffs recorded notice of their D.C. judgments against Max Salas and Len Salas with the D.C. Recorder of Deeds prior to the filing of Len Salas' bankruptcy petition in this Court and Max Salas' bankruptcy petition in the D.C. Court.

---

[5] *See Reinbold v. Thorpe (In re Thorpe)*, 546 B.R. 172, 185 (Bankr. C.D. Ill. 2016) ("actual physical possession and occupancy of the real estate is easily enough to trigger a duty of further inquiry"); *Osberg v. Fibison (In re Fibison)*, 474 B.R. 864, 870 (Bankr. W.D. Wis. 2011) (defendant's sole possession of the property would prompt further inquiry); *Fowler v. Rauso (In re Fowler)*, 425 B.R. 157, 198 (Bankr. E.D. Pa. 2010) ("[A] buyer of real property is *obliged* to *ask those* in *physical possession of property* (who are not also the current record titleholders) if they have some title to, or interest in, the occupied property that is adverse to the prospective buyer's title."); *Patel v. Rupp*, 195 B.R. 779, 784 (D. Utah 1996) (Actual physical possession by an individual with an unrecorded interest in the property satisfies the first prong of the analysis because the bona fide purchaser will learn of that potentially adverse claim upon inquiring of that person of their interest.).

5

Based on this last undisputed fact, Max Salas asserts that the recording of the judgment would have per se provided inquiry notice to any reasonable third party. *In re Hope*, 231 B.R. 403, 423-26 (Trustee was barred from pursuing 11 U.S.C. § 544(a) action because reasonable party would have been put on notice by recorded divorce judgment and was then charged with inquiring further about the terms of the divorce.). Max Salas argues that with any amount of due diligence, a third party would have discovered there existed a dispute about who owned the property as Len Salas had filed multiple pleadings in the underlying lawsuits asserting he was not the owner of the property. The fact that the judgments were not actually final and appealable when recorded might also be a factor in determining whether inquiry notice existed.

The plaintiffs, on the other hand, point to other undisputed facts in support of their assertion that inquiry notice did not exist:

1. Len Salas was the named owner on the title to the Property.

2. The mortgage on the Property was in Len Salas' name only.

3. The rental leases were signed by Max Salas on behalf of "CLR" rather than individually.

4. The recorded judgment showed Len Salas was held liable as the owner of the Property.

5. The recorded judgment showed Max Salas was held liable for mismanagement not ownership of the Property.

6

As stated earlier, in considering motions for summary judgment, the Court does not "'weigh the evidence and determine the truth of the matter but . . . determine[s] whether there is a genuine issue for trial.'" *Browning v. Levy*, 283 F.3d 761, 769 (citation omitted). *See also Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 523 (6th Cir. 2021) (court is not to weigh evidence or determine truth). In the present case, a determination of whether inquiry notice existed would require the weighing of evidence, and therefore, is not an appropriate matter for summary judgment. As such, the Court finds the cross-motions seeking summary judgment on the strong-arm avoidance claims under both 11 U.S.C. §§ 544(a)(1) and (3) must be denied.

### III. Claims Pursuant to 11 U.S.C §§ 544(b)(1) and 548(a)(1)(B)

In Counts IV and V of the amended complaint, the plaintiffs seek to invoke the Trustee's powers to avoid fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B). In denying the plaintiffs' original motion for summary judgment, this Court ruled that if the proof showed that Len Salas had only bare legal title, there would be no recoverable interest in the Property under the fraudulent conveyance provisions. This ruling was premised on the Supreme Court's decision in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n.8 (1983), and the many cases which have cited it for the proposition that where a debtor only holds bare legal title, and not equitable title to property, only the legal title becomes part of the debtor's bankruptcy estate. *See, e.g., Kapila v. Moodie (In re Moodie)*, 362 B.R. 554, 561 (Bankr. S.D. Fla. 2007) ("[A]n interest that is limited in the hands of the debtor is equally limited in the hands of the estate,

7

and therefore, where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest in the property."); *Geremia v. Dwyer (In re Dwyer)*, 250 B.R. 472, 474 (Bankr. D.R.I. 2000) (Bare legal title has no value to an estate, and a transfer of bare legal title cannot form the basis for a fraudulent transfer action); *Swanson v. Stoffregen (In re Stoffregen)*, 206 B.R. 939, 942 (Bankr. E.D. Wis. 1997) (Where the debtor owned only bare legal title to the property, a transfer of the property could not be recovered under 11 U.S.C. § 548.).

Pointing to the in-depth discussion of ownership found in the D.C. Court's Homestead Opinion, this Court offered the parties an opportunity to present arguments as to whether the D.C. Court already decided the issue of ownership and bare legal title. And if so, whether the D.C. Court's Homestead Opinion is entitled to preclusive or collateral effect in this proceeding. First, a review of the Homestead Opinion is required.

## A. D.C. Court's Homestead Exemption Opinion

In deciding that Max Salas was entitled to the District of Columbia homestead exemption, the D.C. Court reviewed the attempted transfer of the property from Len Salas to a "1610 Riggs Property Trust" in 2010. In doing so, the D.C. Court determined that the trust never existed and was a nullity *ab initio*. *In re Salas*, 2018 WL 4621930, *18. The D.C. Court then considered the impact of the invalid trust on the conveyance of the property. The D.C. Court held that although the trust was invalid, a resulting trust was not created because valuable consideration was given. *Id.* at *19. As such, the D.C. Court

8

held that legal and beneficial rights were conveyed to Max Salas, the intended beneficiary

of the conveyance.  *Id*.  Finally, the D.C. Court addressed the impact of the transfer never

being recorded:

> [T]here is the issue that Max failed to record the *Quitclaim Deed*. This,
> however, does not invalidate the transfer. A deed conveying property will be
> valid, even if that deed is never recorded as required by D.C. Code § 42-401,
> because that section "deals with acknowledgment, certification, and
> recordation as protections for 'creditors and subsequent bona fide
> purchasers,' . . . [t]hose requirements do not bar the operation of a signed,
> sealed, and delivered deed against parties and their assignees."

*Id.* at *20.  Accordingly, the D.C. Court determined "that under District of Columbia law,

the Property was conveyed to Max, and he holds both the legal and beneficial interests in

the Property."  *Id.*

## B. Application of Collateral Estoppel

Pursuant to D.C. law, the doctrine of collateral estoppel, also known as issue

preclusion, "'renders conclusive in the same or a subsequent action determination of an

issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid,

final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties

or their privies; (4) under circumstances where the determination was essential to the

judgment, and not merely dictum.'"  *In re Salas*, 2018 WL 4621930, *11 (quoting *Davis v.*

*Davis*, 663 A.2d 499, 501 (D.C. 1995)).  Stated differently, if there has been prior litigation,

issue preclusion applies if "(1) [it involves] the same claims or cause of action, (2) between

the same parties or their privies, and (3) there has been a final, valid judgment on the merits,

(4) by a court of competent jurisdiction." ***Peek v. SunTrust Bank, Inc.***, 313 F. Supp. 3d 201, 205 (D.D.C. 2018) (citation omitted).

"'[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" ***McLaughlin v. Bradlee***, 803 F.2d 1197, 1201 (D.C. Cir. 1986) (quoting ***Allen v. McCurry***, 449 U.S. 90, 94 (1980)). Therefore, the Court must consider whether the issue in question is identical to what was litigated in the D.C. Court. ***Merle v. U.S.***, 683 A.2d 755, 762 (D.C. 1996).

The issue of ownership interest was at the heart of the D.C. Court's decision to allow Max Salas to claim a homestead exemption, as it is in the present litigation with regards to the fraudulent conveyance claims. The D.C. Court determined Max Salas held both legal and beneficial rights to the Property despite Len Salas being the titled owner. Moreover, a determination of ownership was essential to the D.C. Court's decision that Max Salas was entitled to claim the homestead exemption. Specifically, if the D.C. Court had found that Len Salas was the actual owner, Max Salas would not have been entitled to claim the homestead exemption. In the present case, this Court has determined that the Property is only recoverable by the estate if Len Salas, the debtor in this case, held something more than bare legal title, making ownership an essential consideration. As such, the Court finds the first requirement of issue preclusion has been met.

10

The second requirement for issue preclusion is also met, as the prior decision is a valid, final judgment on the merits. The D.C. Court held an evidentiary hearing and entered a lengthy memorandum decision on the homestead exemption issue, and the judgment is final. [6]

The third requirement for issue preclusion is more complex. Once the first two requirements are met, the issue becomes whether the plaintiffs had "'a fair opportunity procedurally, substantively and evidentially to pursue [the] claim the first time.'" ***Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.***, 402 U.S. 313, 333 (1971) (citation omitted). In the D.C. Court, the plaintiffs represented themselves, whereas in this adversary proceeding, the plaintiffs have stepped into the shoes of the Trustee. However, that does not end the discussion as the question of privity must be decided.

"The term 'privity' signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon the others, although those others were not party to the lawsuit." ***Gill and Duffus Servs., Inc. v. A.M. Nural Islam***, 675 F.2d 404, 405 (D.C. Cir. 1982). As such, "'[a] privy is one [who is] so identified in interest with a party to the former litigation that he or she represents precisely

---

[6] The plaintiffs' appeal of the Homestead Opinion to the D.C. District Court was dismissed and remanded. ***Brekelmans v. Salas (In re Salas)***, No. 18-cv-2318, 2020 WL 32567 (D.D.C. Jan. 2, 2020). The plaintiffs then filed a motion for reconsideration in the D.C. Bankruptcy Court based on newly discovered evidence. This motion was denied, ***In re Salas***, No. 18-00260, 2020 WL 6054783 (Bankr. D.C. Oct. 13, 2020), and the D.C. District Court affirmed. ***Brekelmans v. Salas (In re Salas)***, No. 20-3091, 2022 WL 1154596 (D.D.C. April 19, 2022).

11

the same legal right in respect to the subject matter of the case.'" ***Herrion v. Children's Hosp. Nat'l Med. Ctr.***, 786 F. Supp. 2d 359, 371 (D.D.C. 2011) (quoting ***Smith v. Jenkins***, 562 A.2d 610, 615 (D.C. 1989)). ***See also EDCare Mgmt., Inc. v. DeLisi***, 50 A.3d 448, 451 (D.C. 2012) (citation omitted).

        The plaintiffs submitted the case of ***Kind Operations, Inc. v. Cadence Bank, N.A. f/k/a ALoStar Capital Fin. (In re PA Co-Man, Inc.)***, 644 B.R. 553 (Bankr. W.D. Pa. 2022), in support of their argument. As noted in ***Kind Operations***, normally a trustee or creditor acting as successor-in-interest to the trustee's interests is not bound by a state court judgment where the same creditor was acting in its individual capacity. ***Id.*** at 637. In that case, the creditor, acting as the trustee's assignee, pursued a myriad of civil actions against multiple defendants based on a private foreclosure sale of substantially all the debtor's assets prior to the debtor filing for bankruptcy protection. ***Id.*** at 567-568. As a result of the pre-petition sale, the debtor and its other creditors were essentially left with nothing. ***Id.*** Two of the defendants raised issues of res judicata and collateral estoppel, asserting that certain claims were barred because the creditor was also the plaintiff in state litigation pursued against them. ***Id.*** at 637. The court held that no privity existed because in the state court litigation, the creditor was representing its own self-interest. Whereas, in the bankruptcy adversary proceeding, the creditor was acting on behalf of the estate. ***Id.***[7]

---

[7] Additionally, the ***Kind Operations*** court noted that the state court actions were void because they were filed post-petition in violation of the automatic stay. ***Id.*** (citations omitted).

12

Unlike in **Kind Operations**, this case presents a unique set of circumstances. Here, the plaintiffs represent 99.8% of all allowed unsecured claims of the estate, making the estate's interests in this adversary virtually identical to the plaintiffs' interests in the D.C. litigation. Moreover, the plaintiffs, represented by the same attorney, fully and zealously litigated the issue of ownership in the D.C. Court. Thus, a finding of issue preclusion in this instance would not work some unfairness as "the losing party clearly [did not] lack[ ] any incentive to litigate the point" at issue in the earlier case. **Canonsburg Gen. Hosp. v. Sebelius**, 989 F. Supp. 2d 8, 19 (D.D.C. 2013) (citations omitted). Like the litigation now, the plaintiffs had every incentive to forcefully litigate the ownership issue as part of their objection to Max Salas' homestead exemption. If the plaintiffs had won on the issue of ownership in the D.C. bankruptcy litigation, Max Salas would not have been able to claim his homestead exemption. As a result, Len Salas would have been the owner of the Property, and that Property would have been part of his estate.

Moreover, there is no reason to believe the proceedings in the D.C. Court were defective. **Martin v. Dep't of Justice**, 488 F.3d 446, 455 (D.C. Cir. 2007) (quoting **Blonder-Tongue Labs., Inc.**, 402 U.S. at 333) (Courts evaluating the fairness of preclusion also consider whether the "'prior proceedings were seriously defective.'"). As stated earlier, the matter was rigorously litigated and affirmed on appeal.

For these reasons, the Court finds that the plaintiffs, acting on behalf of the Trustee, are collaterally estopped from relitigating the issue of ownership or bare legal title. But

13

even if collateral estoppel did not apply, the undisputed material facts support the same conclusion. Len Salas only lived at the Property for a brief time during which he paid rent to Max Salas. Len Salas never made any mortgage payments, paid any insurance premiums, or paid any property taxes. In fact, Len Salas never considered himself the owner of the property. While there are multiple discrepancies and contradictions throughout the voluminous record in this case, there is no dispute that Len Salas signed the mortgage and had his name on the title for the sole purpose of helping Max Salas keep his home. The same is true for Max Salas. The undisputed facts show Max Salas had multiple conversations with family and professionals regarding how to get Len Salas' name off the title and mortgage. He even had his other son generate documents to remove Len Salas' name from the Property. Max Salas' inability (or unwillingness) to take the necessary steps to remove Len Salas from the mortgage and title is the only reason Len Salas' name remained on the title. And based on the caselaw discussed above, the Court finds as a matter of law that Len Salas only holds bare legal title.

For all of these reasons, the Court finds that Max Salas is entitled to summary judgment on the fraudulent conveyance claims brought pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B).[8]

---

[8] Neither party sought summary judgment relief on the plaintiffs' claim of actual fraud pursuant to 11 U.S.C. § 548(a)(1)(A) and rightfully so. The existence of fraudulent intent is a question of fact, so summary judgment is rarely an appropriate remedy. *Renneker v. Wyman (In re Wyman)*, 626 B.R. 480, 499–500 (Bankr. S.D. Ohio 2021) (citations omitted).

14

## IV. 11 U.S.C. § 550

Count VI of the plaintiffs' amended complaint seeks relief pursuant to 11 U.S.C. § 550. Section 550(a) does not give rise to any affirmative relief on its own. Instead, it sets forth the available remedies if a transfer is avoided pursuant to 11 U.S.C. §§ 544, 545, 547, 548, 549, 553(b), or 724(a). *See Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*, 340 B.R. 829, 837-38 (Bankr. E.D. Mich. 2006). Because the Court finds that summary judgment should be denied as to the plaintiffs' strong-arm claims, summary judgment on Count VI is not appropriate at this time.

## V. Conclusion

Based on the Court's findings, neither side is entitled to summary judgment on Count I, II, and VI of the plaintiffs' amended complaint,[9] and Max Salas is entitled to summary judgment on Counts IV and V.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

---

[9] Count III of the plaintiffs' amended complaint requests relief pursuant to 11 U.S.C. § 544(a)(2), which provides that a trustee has the rights and powers of a hypothetical "creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time." The plaintiffs did not seek summary judgment on Count III in either their original motion or their supplemental brief. However, Max Salas has asserted that he is entitled to summary judgment on this claim based on inquiry notice. In making this argument, Max Salas provided no case law specifically addressing notice as it relates to 11 U.S.C. § 544(a)(2), nor was this Court able to find any. Accordingly, to the extent Max Salas is seeking summary judgment on Claim III of the amended complaint, the motion is denied.

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

15



Marian F. Harrison
US Bankruptcy Judge

Dated: 5/23/2023



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) **CASE NO. 318-02662** |
| **LEN SALAS,** | ) |
| | ) **JUDGE MARIAN F. HARRISON** |
| Debtor. | ) |
| | ) **CHAPTER 7** |
| **NICOLAAS BREKELMANS AND** | ) |
| **GAIL GREGORY BREKELMANS,** | ) |
| **CO-PERSONAL REPRESENTATIVES** | ) **ADV. NO. 320-90027** |
| **OF THE ESTATE OF NINA** | ) |
| **BREKELMANS,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **MICHAEL MCLOUGHLIN AND** | ) |
| **MARTHA JOHNSON, CO-PERSONAL** | ) |
| **REPRESENTATIVES OF THE** | ) |
| **ESTATE OF PATRICK** | ) |
| **MCLOUGHLIN,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| **v.** | ) |
| | ) |
| **MAX SALAS,** | ) |
| | ) |
| Defendant. | ) |

---

## ORDER

---

In accordance with the Memorandum Opinion filed contemporaneously with this Order, it is hereby **ORDERED** that the motions for summary judgment on Counts I, II, III, and VI of the plaintiffs' amended complaint are **DENIED**.

It is further **ORDERED** that Max Salas' motion for summary judgment on Counts IV and V of the plaintiffs' amended complaint is **GRANTED**.

**IT IS SO ORDERED.**

**This Order was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

1520

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS, et al | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

PLAINTIFFS' MOTION TO ALTER OR AMEND UNDER FED. R. BANKR. P. 9023

COME NOW the Plaintiffs herein, by and through their undersigned counsel and move this Court to reconsider its Order denying summary judgment on Counts I and II of their Amended Complaint and granting the Defendant's Motion for Summary Judgment on Counts IV and V of the Plaintiffs' Amended Complaint and in support of their Motion submit the following Memorandum of Points and Authorities:

**Introduction and Background**

1. On May 24, 2023 this Court entered an Order Denying all Summary Judgment

requests related to Counts I through III of the Plaintiffs' Complaint[1] and granting the Defendant's

Summary Judgment request as to Counts IV and V of the Complaint "the Summary Judgment

Decision"). The Court's Summary Judgment Decision is based upon the Court's Memorandum

also dated May 24, 2023 ("the Summary Judgment Memorandum") and followed the filing of

Memoranda by both parties on the Plaintiffs Motion for Summary Judgment, the Defendant's

Objections and Opposition to the Plaintiffs' Motion, and a hearing on November 8, 2022, at

which time the Court declined to grant Plaintiffs' Motion.

　　2. On January 5, 2023, this Court entered an Order seeking additional briefing from the

parties on two distinct issues, namely (paraphrasing): (1) whether the Defendant's actual

residence at the subject property in D.C. ("the Property") was sufficient to put a purchaser, or lien

creditor on notice that the Defendant was the actual owner of the Property thus establishing

inquiry notice that could defeat the Trustee's status as a "bona fide purchaser" and "judgment

lien creditor"; and (2) whether the Plaintiffs were precluded from pursuing the Trustee's causes

of action based upon the ruling of Judge Teel in the Defendant's D.C. bankruptcy proceeding on

the basis of collateral estoppel or issue preclusion.

　　3. The Defendant filed a Motion for Summary in Reply to the Court's January 5th Order

and Plaintiffs filed their Supplemental Memorandum in further support of their previous Motion

for Summary Judgment, both filed on February 21, 2023. On March 21, 2023 the Court held a

hearing and heard abbreviated argument from counsel for the parties. At the Court's suggestion,

the Plaintiffs filed their Second Supplemental Memorandum in support of the Plaintiffs' 16 for

---

[1]All references to the "Complaint" refer to the Amended Complaint filed herein on
February 16, 2021 (D-40).

Summary Judgment on March 26, 2023. The Court issued its Summary Judgment Memorandum and Summary Judgement Decision on May 24, 2023.

4. In its Summary Judgment Memorandum, this Court determined that summary judgment is not appropriate for Counts I through III (and VI) of the Complaint but determined that issue preclusion did apply to Counts IV and V and, therefore, granted the Defendant's Motion for Summary Judgment on those Counts to the Defendant.

5. While it is obvious the Court has spent a great deal of time considering the facts, background and arguments of the parties, the Plaintiffs, nevertheless, respectfully assert that the Court's decision is in error on several important points which the Plaintiffs believe should result in the grant of summary judgment in their favor on all Counts of the Complaint. The Plaintiffs assert, alternatively, at a minimum, the Court should reconsider and reverse its grant of summary judgment to the Defendant on Counts IV and V of the Complaint.

6. The Plaintiffs also assert that their Motion should be granted, in the sound discretion of this Court, in order to avoid manifest injustice and the possibility of two trials in the event the Court's interim ruling granting Summary Judgment on Counts IV and V of the Plaintiffs' Complaint is reversed and remanded on appeal.

**Argument**

7. The Plaintiffs respectfully submit that the Court did not consider, or did not properly consider, the following;

a. the Plaintiffs purchased the Trustee's causes of action at a court ordered auction in which the Defendant also participated. Order in Case No. 3:18-bk-02662, June 12, 2019, D-179, Trustee's Notice of Rescheduled Auction, Case No. 3:18-bk-02662, July 16, 2019,

-3-

D-187; See Trustee's Report of Sale in Case No. 3:18-bk-02662, August 14, 2019, D-191, to which the Trustee attached a document titled "Sale of Estate Property Free and Clear of Liens and Interests" which document confirmed the purchase by the Plaintiffs at the auction sale held on July 23, 2019 and reported to the Court in open Court on July 23, 2019; and

   b. This Court failed to consider in its decision that the Plaintiffs did not originally seek to pursue the Trustee's claims. It was only after the Trustee filed a Motion in this court attempting to sell his causes of action to the Defendant (through his son, Ron) that the Plaintiffs objected. This court ruled that the Trustee should hold an auction sale if any party offered the trustee more than the original offer by Ron Salas. The Plaintiffs made a qualifying, competing offer and the Trustee held an auction sale, pursuant to this Court's ruling, at which both the Defendant and the Plaintiffs had the opportunity to bid. Both did bid and the Plaintiffs were ultimately the successful bidders. The Plaintiffs represent two distinct claims against the Estate, in different amounts. The only similarities concerning the Plaintiffs' claims are that both children were killed in the same fire, both at the Property, and their two, different, wrongful death, cases, although filed separately, were consolidated by the D.C. Superior Court. See Amended Complaint, paragraph 12. See also Amended Complaint paragraphs 11 through 13.

   c. At the hearing on the Plaintiffs Objections to the Trustee's Motion to Sell the Trustee's causes of action to the Defendant (through his son, Ron), the Defendant's attorney, Phillip Young represented to this Court that the Defendant's purpose in offering to purchase the Trustee's causes of action was to prevent the Trustee from pursuing any such causes (to the potential detriment of all creditors, including the Plaintiffs); and

   d. Neither the Court, nor the Defendant produced any cases which deviate from

-4-

the well established and uniformly accepted maxim that the Trustee and the Debtor's Estate are the real parties in interest regarding the Trustee's causes of action and, therefore, in order for issue preclusion to apply, collateral estoppel, or *res judicata* must apply, in all respects, to the Trustee, or the Debtor's Estate. Neither the Trustee, nor the Debtor's Estate were parties to the D.C. Bankruptcy's Exemption Decision. Moreover, it is clear from Judge Teel's ruling, upon which this Court relied that the D.C. bankruptcy court considered the facts related to the Defendant's alleged "ownership" of the Property **only in the context of the Exemption Decision** and specifically **declined to determine the status of this Debtor's Estates potential avoidance and recovery claims.**

   e. In the Court's Summary Judgment Memorandum, the Court also failed to address the unrefuted fact that the Debtor and the Defendant were aware, as of at least June, 2011, that the Deed upon which they relied and which they both submitted to the D.C. Bankruptcy Court, was actually abandoned and not in existence, at any time. The actions of the Debtor and the Defendant, along with the Defendant's son, Ron, represent a scheme to defraud the creditors of this estate from recovering the Property which will provide the Plaintiffs some relief for the tragic loss of their children and at least a small recovery to provide them some sense of justice. Regardless, there is credible, consistent and unrefuted evidence that the Defendant and the Debtor sought to defraud creditors of this estate from recovering the Property, or its equity, in partial satisfaction of their claims. At a minimum, the unrefuted facts asserted by the Plaintiffs in their Motion and supporting Memoranda are more than sufficient to require a trial on the issue of actual fraud, another issue that was neither briefed, argued, presented, or decided in the D.C. Bankruptcy Case.

-5-

f.  The Plaintiffs paid over $150,000 into the estate for the ability to pursue the causes of action which the Court now states they cannot pursue.  The Court had Judge Teel's decision early in this case, including prior to the appointment of Mr. Gigandet as Trustee and, therefore, well prior to the auction sale which resulted in the Plaintiffs purchase, **from the estate** of the Trustee's causes of action.  **See,** for example, the Debtor's Disclosure Statement, filed in the Debtor's bankruptcy Case No. 02662, on November 9, 2018, D-83, at pp. 3-6, in which the Debtor set forth his arguments why these present causes were not viable:

> As discussed further herein, and as will be further analyzed in a response to the Motion to Convert, Dismiss or Appoint Trustee, the Debtor's position is that a trustee (as well as the Debtor in the capacity of Debtor-in-Possession with the rights and powers of a trustee) would be unsuccessful in avoiding such a transfer due to applicable law, and **the surrounding facts that have previously been litigated and decided in the DC Bankruptcy Case.**

*Id.*, at p. 4 (emphasis added).  The argument continued for another two pages.  *Id.*

g.  The Court also did not grant summary judgment on Counts I, II and II ofd the Complaint  asserting that there were competing facts in dispute and that summary judgment was not appropriate.  However, in its Summary Judgment  Memorandum, the Court appears to have not considered the case law precedent that establishes that when an owner deeds his property to another but remains in possession, his deed represents "notice to the world" that he is no longer the owner.  See discussion in Plaintiffs' Supplemental Memorandum, filed herein on February, 21, 2023, D-92, Section E, generally, and pp. 36-37, ¶¶ 85 -87 in particular.  The Plaintiffs assert that the case law discussed in Section E and particularly the *McKinley* case cited and discussed in paragraphs 86 and 87, along with the supporting cases cited in *McKinley*[2] require granting

---

[2]One of the cases cited by *McKinley* is the Maryland Court of Appeals (now Maryland Supreme Court) case of  *Wicklein v. Kidd*, 149 Md. 412, 131 A. 780. The common law of the

Summary Judgment to the Plaintiffs on Counts I and II of their Complaint based upon the following undisputed facts:

      i.  At all relevant times prior to approximately February, 2018, the Defendant hid his ownership of the Property (the Defendant produced no recorded or public record which showed the Defendant as the Owner.  Even the leases he signed in 2014 and 2015 showed the landlord as the CLR Trust (Plaintiffs' Supplemental Memorandum, filed February 21, 2023 (D-92) ("Supplemental Memorandum"), Exh A (D-92-1); and

      ii.  In 2016, during the period when the Defendant and the Debtor were being deposed in the D.C. Superior Court wrongful death case, the Defendant and the Debtor represented to Sun Trust, the holder of the deed of trust on the Property (in the Debtor's name), in a Loss Mitigation Statement,  that the Debtor was the owner of the Property; See Plaintiffs' Supplemental Memorandum, February 21, 2023 ("Supplemental Memorandum"), Exh. F; and

      iii.  All public notices regarding ownership of the Property were in the name of the Debtor, not the Defendant, until at least 2019  ( See, for example, Supplemental Memorandum, Exhs. G, H and I); and

      iv.  Neither the Debtor nor the Defendant had possession of an original deed after January, 2012 (Plaintiffs' Amended List of Undisputed Facts, August 1, 2022, D-74-1, Nos. 8 through 13.);

      v.  in June, 2011, less than a year after the purported execution of the July, 2010 Quitclaim Deed, Ron Salas, the Defendant's son and the Debtor's brother directed the

---

District of Columbia is based on the common law of Maryland at the time of cession unless modified by statute. See generally ***O'Connor v. United States***, <mark>399 A.2d 21, 25</mark> (D.C. 1979). ***Estate of Keough v. Keough***, 2019 D.C. Super. LEXIS 20, *27

Debtor and the Defendant to prepare a deed to convey the Property to the trust Ron created in July, 2010 (Amended Memorandum in Support of the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memorandum"), Exh G; and

vi.  No deed was created or signed by Len after July, 2010.

h.  The Defendant's Plan of Reorganization establishes that the Plaintiffs have the right to pursue the trustee's causes of action.  The only restriction contained in the Plan is to "defenses".  There is no mention or contemplation of preclusion which the Plaintiff assert is not a defense contemplated in the Defendant's Plan.  The Plaintiffs bargained for this language and withdrew their objections to the Defendant's plan in reliance on the Defendant's ability to only raise "defenses."  See argument in Plaintiffs' Second Supplemental Memorandum, filed on March 36, 2023, D-100, at p. 5, ¶10.

**Legal Analysis**

8.  A Motion to reconsider is governed by Fed. R. Bankr. P. ("FRBP") 9023 which incorporates Fed. R. Civ. P. ("FRCP") 59.  FRBP 9023 provides that a motion for reconsideration under FRCP 59 must be filed within 14 days of the entry of the subject judgment or order.

9.  FRCP 59 (a)(1)(B) provides that "The Court may, on motion, grant a new trial on all or some of the issues - and to any party - ... (B) after a non-jury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."

10.  In the case of ***Key Mech. Inc. v. BDC*** 56, LLC (In re: BDC 56, LLC), 330 F.3d 111 (2d cir. 2003) the Second Circuit stated that in order to grant a motion for reconsideration under FRCP 59(a) the movant must point to controlling decisions or data that the court overlooked.  In

-8-

the Sixth Circuit, the grounds for determining whether to grant a motion to reconsider under Fed.

R Civ. P. 59(e) are stated as follows:

> a motion to reconsider generally must be based on one of the grounds available for motions to alter or amend judgment or upon a showing that the court clearly overlooked material facts or controlling law that were presented by the movant in its prior motion and that would result in a different disposition. Id. The Court may grant a motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice. ***Id***. (citing ***United States v. Tennessee Walking Horse Breeders' and Exhibitors' Ass'n***., 263 F. Supp. 3d 679, 681 (M.D. Tenn. 2017)). As indicated above, a motion to reconsider may be based on these four grounds, or upon essentially a fifth or sixth ground: (5) that the court clearly overlooked material facts (or, in the case of an order on a Rule 12(b) motion, factual allegations from the complaint) that were presented by the movant in its prior motion and that would result in a different disposition; or (6) that the court clearly overlooked controlling law that was presented by the movant in its prior motion and that would result in a different disposition.

Quoted in ***O'Connor v. Lampo Grp., LLC***, No. 3:20-cv-00628, 2021 U.S. Dist. LEXIS 204079, at *3-4 (M.D. Tenn. Oct. 22, 2021).

11.  In the case of ***Al-Sadoon v. FISI*Madison Fin Corp.*** 188 F.Supp. 899, the District

Court for the Middle District of Tennessee stated that:

> This court generally will consider motions for reconsideration pursuant to the grounds available for motions to alter or amend under Rule 59(e) or upon a showing that the court clearly overlooked material facts or controlling law that were presented by the party in its prior motion and that would result in a different disposition.

***Id.,*** at 902.

12.  The decision whether to grant a motion for reconsideration, including an order

disposing of some, but not all of the Plaintiffs' claims, as here, is a matter within the discretion of

the trial judge.  ***Tolbert v. Potter***, 206 F. App'x 416, 417 (6th Cir. 2006)

13.  This District has recently emphasized that relief under Rule 59(e) is difficult and the

moving party is required to meet an exacting standard.  In the case of **_Memphis A. Phillip_**

**_Randolph Inst. v. Hargett_,** 485 F. Supp. 3d 1003, 1004 (M.D. Tenn. 2020), the Court stated:

> Generally, relief under Rule 59(e) is an "extraordinary remedy" restricted to those circumstances in which the moving party has set forth facts or law of a strongly convincing nature that indicate that the court's prior ruling should be reversed. **_Harris v. Perry_**, No. 2:12-cv-02668-STA-dkv, 2016 U.S. Dist. LEXIS 131942, 2016 WL 5396701, at *3 (W.D. Tenn. Sept. 27, 2016). The Sixth Circuit has made clear that the standard for manifest injustice is "an exacting standard" and that a successful Rule 59(e) motion must "clearly establish a manifest error of law." **_Heithcock v. Tenn. Dept. of Children's Servs._**, No. 3:14-CV-2377, 2015 U.S. Dist. LEXIS 139751, 2015 WL 5970894, at *1 (M.D. Tenn. Oct. 14, 2015).

14.  With all due respect to this Court's Memorandum and Order, the Plaintiffs assert that they clearly meet this District's standard for relief.

15.  The Plaintiffs assert that the Court's Summary Judgment Decisions failed to consider the matters, facts and law, argued above, and the following, each of which, alone, is grounds for modification of a portion of the Court's ruling and together are sufficient grounds for granting summary judgment for the Plaintiffs on all Counts of the Complaint, or at least preserving all issues for trial:

a.  The Court did not address the assertion, supported by unrefuted emails between the Salas family members, that there was no deed in effect related to the property after 2010.

b.  The Court did not address, or gave little importance to, the unrefuted case law showing that the Trustee and the Debtor's Estate are different entities than the creditors in previous proceedings and that in derivative actions, such as this, the Trustee and the Debtor's Estate are the real parties in interest for purposes of issue preclusion.

c.  The Court is stating in its opinion that the size of the Plaintiffs' claims, not their derivative standing, compels judgment in favor of the Defendant.  That is illogical and

-10-

defeats the whole purpose of derivative standing as cited in the Plaintiffs' Supplemental Memorandum, filed on February 21, 2023, D-92, particularly, Section C, ¶¶ 52 - 54, pp. 19-20. See also additional discussion and argument below.

       d. In this case, the Defendant sought to purchase the estate's claims against him, through his son, Ron, an attorney. The Plaintiffs did not seek to purchase the claims until the Trustee moved this court for permission to sell the estate's claims to Ron Salas, for his father, for the purpose of ***not pursuing the claims against Max.*** **See** Declaration of Philip McNutt attached hereto.

       e. The Court used the size of the Plaintiffs' claims as the deciding factor in determining that issue preclusion should apply. The Plaintiff has found no case law that supports that argument and the court also cited none. The status of the Trustee as the real party in interest is the sole determining factor which the court seems to have either not considered or given insufficient status and relevance. In the Plaintiffs' Second Supplemental Memorandum, D-100, the Plaintiffs set forth what they believe is the proper criteria:

       11. Numerous bankruptcy courts, and appellate courts, have consistently ruled that, for all purposes, including issue preclusion, the real party in interest is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." ***See, for example, Farrell Constr. Co. v. Jefferson Parish, La.***, 896 F.2d 136, 140 (5th Cir. 1990).

       12. This Court conclusively determined that the Plaintiffs met the 6th Circuit's "strict prerequisites for exercising derivative standing..." See, Memorandum Opinion, February 11, 2021 (D-38), at pp. 5-16. Thus, the Plaintiffs "stand in the shoes of the trustee" in the pending Complaint.

       13. Derivative standing, like that in the instant case, is a suit brought in the name of the debtor, or the debtor's estate. The Plaintiff steps "into the shoes of the debtor or trustee." ***Gecker v. Marathon Fin. Ins. Co. (In re Auto. Prof'ls,***

-11-

*Inc.)*, 389 B.R. 630, 634 (Bankr. N.D. Ill. 2008).

...

      17.  The court, in *Modiri v. 1341 Rest. Grp., Inc.*, 904 A.2d 391, 394-97 (D.C. 2006),  emphasized that "a privy is one so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." internal citation omitted. The legal rights asserted in the instant case are those solely belonging to the Trustee or the Debtor's Estate.  The Trustee is not privy to the debtor or to the debtor's estate when pursuing recovery or avoidance actions.  *In re Worldcom, Inc.*, 401 B.R. 637, 651 (Bankr. SD.N.Y.).  Because the Plaintiffs, as representatives of the Debtor's Estate, stand in the shoes of the Trustee, the real party in interest, and are not in privity with any party to the D.C. Exemption Decision, issue preclusion does not apply here.

Plaintiffs' Second Supplemental Memorandum, D-100, ¶¶ 1-13, pp. 6-7.

      f.  In the Plaintiffs Supplemental Memorandum, D-92, ¶58, at p.22, the Plaintiffs concluded their argument on issue preclusion as follows:

Finally, the family's consistent lies and misrepresentation [sic] regarding the status of the alleged 2010 transfer makes the Defendant ineligible for relief. Issue Preclusion, unlike Res Judicata, is subject to "equitable considerations." *American Forest Res. Council v. Shea*, 172F.Supp.2d 24, 30 (D.C.D.C. 2001).

      Under well established precedent, the consistent and continuing bad acts, misrepresentations and outright fabrications to both this Court and the D.C. Bankruptcy Court do not entitle the Defendant to any relief under the issue preclusion theory or any other theory since the Bankruptcy Court is a court of equity.

      g.  The Court failed to consider the substantial fact pattern after 2010 and, particularly after the commencement of the Superior Court Wrongful Death action, all carefully documented and set forth, in chronological detail in the Plaintiffs' supporting Memorandum and Statements of Uncontested Facts.  This fact pattern clearly shows fraudulent and deceitful

-12-

behavior by the Defendant and the Debtor which should bar relief on all issues, but, as argued herein, particularly on the issue of issue preclusion.

       h.  The Court uses the size of the Plaintiffs' claims against them as if the size of the judgment awarded in a jury trial should be held against the Plaintiffs.  However, the Court did not consider the fact that the reason the Debtor and the Defendant filed for bankruptcy protection was solely related to the Plaintiffs' Judgments.  To then limit the Plaintiffs remedies, clearly available under well established bankruptcy law and precedent, provides an unfair advantage to debtors like the Debtor and Defendant here, an advantage not set forth any where in the Bankruptcy Code and clearly inequitable to the Plaintiffs, in their status as representatives of the Estate.  The Debtor and the Defendant filed bankruptcy and should not  be able to manipulate the bankruptcy process to the detriment of the Plaintiffs, the legitimate purchasers of the Trustee's claims as a result of an auction independently ordered by this Court and held without undue influence or any inequitable or improper acts by the Plaintiffs.

       i.  The court failed to grant summary judgment on the issue of inquiry notice even though the case law makes it clear under the undisputed facts of this case that the transfer of the deed to his property from the Defendant to the Debtor eliminates the need for any further inquiry.  *See* discussion in the Plaintiffs' Supplemental Memorandum, filed on February 21, 2023, D-92, at ¶¶ 85-87, pp. 36-37. Thus, by following the case law the matter of inquiry notice should have been decided in favor of the Plaintiffs.

       j.  In its Summary Judgment Memorandum, the Court determined that the size of the Plaintiffs' claims changed their derivative status.  Neither the Defendant nor the Court cited any case law to support that position.  The Court did cite one case, ***Canonsburg Gen. Hosp. v.***

-13-

*Sebelius*, 989 F.Supp.2d 8, 19 (D.D.C. 2013 for the proposition that "issue preclusion in this instance would not work some unfairness as "the losing party clearly [did not] lack [] any incentive to litigate the point"... Memorandum Opinion at p. 13. However, that analysis seems to ignore three important points. The first is that consideration of "unfairness" is only one of the criteria upon which issue preclusion is determined. In this case the other criteria related to the previously litigated issues and the privity of the parties simply do not exist. The second is that the Plaintiffs did not, and could not, litigate the issue of the Trustee's avoidance and recovery powers because they were neither the trustee nor his representative nor standing in the shoes of the Trustee at the time. The third important distinction is that although the issue in the D.C. Bankruptcy Court was whether the Defendant had a sufficient interest in the Property to grant an exemption, that interest, however determined by the D.C. Bankruptcy Court, did not preclude the ability of this bankruptcy estate to pursue avoidance or recovery actions, as Judge Teel specifically stated several times in the Exemption hearing and in his 56 page Memorandum. In fact, at the hearing in the Defendant's D.C. bankruptcy case in August, 2018, Judge Teel stated: "It seems to me it's Len Salas' Chapter 7 Trustee who is going to have an incentive to avoid the transfers invoking Section 544." See Exemption Hearing Transcript, Vol 1, August 22, 2018, pp. 24-26 ("August 22 Excerpt"), attached as Exhibit 1 to the Plaintiffs' Second Supplemental Memorandum, at 24: 20-22. Also See discussion in the Plaintiffs' Second Supplemental Memorandum, D-100, at Section C which provided several references to statements findings and conclusions stated on the record by Judge Teel.

The Plaintiffs respectfully assert that the only fair reading of those sections is that Judge Teel did not intend to, and did not, in his decision, assert or imply any preclusive effect of

-14-

his decision on the Trustee's claims in this Debtor's Estate. See also discussion in the Plaintiffs' Second Supplemental Memorandum, at ¶¶ 6 through 9. If the Plaintiffs are correct, then they also assert, respectfully, that this Court has read something into Judge Teel's decision which is simply not there. Judge Teel made it clear that all claims of the Estate of Len Salas were beyond the scope of the Exemption Hearing and were never a part of the hearing or the D.C. Bankruptcy Court's determination.

Furthermore, the ***Canonsburg*** case bears little resemblance to the facts or circumstances of the instant case. First, ***Canonsburg*** involves a hospital's claim under the Administrative Procedures Act ("APA") against an agency of the U.S. Government. Second, the prior decision which was the basis of the issue preclusion in the case was based upon the same, exact claim, fully adjudicated between the exact same parties in another U.S. District Court. The only difference between the first case and ***Canonsburg*** was the location of the Courthouse. There is no issue of derivative standing in ***Canonsburg*** and the Plaintiff sought the same relief under the same statute in both cases. Here the Plaintiff is pursuing solely derivative claims specifically excluded from the prior proceeding, under a totally different statute and on behalf of the Debtor's Estate.

k. The Court approved the Trustee's report of sale and the Plaintiffs then became the successful joint bidders. If the Court's theory in granting summary judgment were to play out under the facts of this case then it would have been just as improper for the Defendant to buy the Trustee's claims as the Court now asserts, after the fact, that it was improper for the Plaintiffs to purchase the Trustee's claims. The Court also failed to consider the fact that the Plaintiffs represent two claims, not just a single claim. The Court seems to be punishing the Plaintiffs for

-15-

jointly pursuing these claims.  What if only one of them were doing so?  Should that make a

difference?  And suppose that there were dozens of creditors, each individually representing

substantial, but not substantially all of the, claims against the estate.  Should the fact the entire

group, or the substantial majority of the claims of creditors purchased the estate's claims  make a

difference?  Clearly Not.  However, the Court's ruling stands for the untenable proposition that if

a vast majority of creditors seek to acquire the estate's claims, they should be denied.  That result

is simply incongruous with the intent of the bankruptcy code and the Court should modify its

prior Order as a result.

16.  The Plaintiffs respectfully assert that they have identified several, material and

undisputed, facts which were not adequately considered by the Court which are sufficient

grounds for modification of the Court's Summary Judgment Order.  Those facts bear directly on

the Court's ruling related to issue preclusion and the issue of inquiry notice.

17.  At a minimum there are both facts in dispute and lack of precedent for the Court's

ruling which the Plaintiffs respectfully argue should require a trial on all issues, if not the grant of

summary judgment in favor of the Plaintiffs.

**Conclusion**

For the reasons stated herein, and those argued in the Plaintiffs' Motion for Summary

Judgment, and supporting Memoranda, the attached exhibits and the voluminous number of

undisputed facts set forth in the Plaintiffs' Motion and Opposition (to the Defendant's Motion),

the Plaintiffs assert that the Court should grant their motion to alter or amend, either granting the

Plaintiffs' motion for summary judgment in its entirety or reversing the Court's grant of

Summary Judgment to the Defendant and set all matters for trial. The Plaintiffs further request

-16-

any other or additional relief which is consistent with the foregoing.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt
 Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
 202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

Certificate of Service

I HEREBY CERTIFY THAT a copy of the foregoing Motion, was delivered electronically, on the 7th day of June, 2023 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt


230607 PLaintiffs' Motion to Reconsider.v3.wpd    -17-

Philip J. McNutt

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

In re: :

                         CHAPTER 11

  LEN SALAS                 : CASE No. 18-02662

                         JUDGE: HARRISON

        Debtor           :

--------------------------------------------------------------------------------

NICOLAAS BREKELMANS AND GAIL :
GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES :
OF THE ESTATE OF NINA
BREKELMANS, et al :

               Plaintiffs   :

    v.                    : Adversary Proceeding No. 3:20-ap-90027

MAX SALAS                :

               Defendant  :

AFFIDAVIT OF PHILIP J. McNUTT IN SUPPORT OF PLAINTIFFS'
MOTION TO ALTER OR AMEND UNDER FED. R. BANKR. P. 9023

I, PHILIP J. McNUTT, DO HEREBY DECLARE AND AFFIRM, UNDER PENALTY

OF PERJURY, as follows:

1. That I am over the age of 21 years and am competent to testify to the matters and facts

set forth herein, all of which are in my personal knowledge.

2. That I am an attorney licensed to practice in the District of Columbia, including the

United States Bankruptcy Court for the District of Columbia, and the Superior Court of the

District of Columbia, and all state and federal courts in the State of Maryland.

3. That I have been admitted to practice *pro hac vice* before this Court in the above

captioned case, including this adversary proceeding.

4. That I was present in Court during the argument on objections to the Trustee's Notice of Motion to Sell Property in the Len Salas Bankruptcy Case, Case No. 3:18-bk-02662, on or about May 21, 2019.

5. That at that hearing Phillip Young, attorney for the Defendant, advised the Court that the reason why his client, Max Salas, though his son, Ron, sought to purchase the Estate's claims against him was to prevent any creditor or party in interest from pursuing any of those claims.

6. That at the subsequent auction sale held by the Trustee, I appeared on behalf of both Plaintiffs in this adversary proceeding and Phillip Young appeared on behalf of purported purchaser, Ron Salas. No other persons or parties were physically present at the auction.

7. That at the commencement of the auction Ron Salas raised the Plaintiffs existing offer and each party made successive bids until the Plaintiffs jointly bid $156,000. Ron Salas conferred with his father after which he declined to bid further.

8. At various times during the auction I talked by phone with my clients and Ron Salas talked to his father, the Defendant, Max Salas.

I DECLARE, UNDER PENALTY OF PERJURY, that the foregoing matters and facts are true and correct.

June 6, 2023

_Philip J. McNutt_
Philip J. McNutt, Declarant

-2-

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

---

| | |
|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS, et al | : |
| Plaintiffs | : |
| v. | : Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : |
| Defendant | : |

---

**ORDER GRANTING PLAINTIFFS'
MOTION TO ALTER OR AMEND UNDER <mark>FED. R. BANKR. P. 9023</mark>**

---

UPON CONSIDERATION OF the Plaintiffs' Motion to Alter or Amend the Court's

Order of May 24, 2023, the Court having held a hearing thereon and overruled any Opposition

filed or argued by the Defendant, cause having been shown to alter the Court's Order of May 24,

2023 as provided in <mark>Fed. R. Civ. P. 59</mark>, as incorporated into bankruptcy Adversary Proceedings

by Fed. R. Bank. P. 9023, it is

ORDERED, that the Plaintiffs' Motion is HEREBY GRANTED; and it is further

ORDERED, that, for the reasons stated in the Plaintiffs' Motion, and those stated at the

hearing held on the Motion, Summary Judgment is GRANTED, to the Plaintiffs, on all Counts of

the Amended Complaint filed herein on February 16, 2021, D-40.

**IT IS SO ORDERED.**


**This Order was signed and entered electronically as indicated
at the top of the first page**

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| _____ | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO ALTER OR AMEND UNDER FED. R. BANKR. P. 9023

COMES NOW Defendant Max Salas (the "Defendant"), by and through counsel, and respectfully submits this response (the "Response") to the Plaintiffs' Motion to Alter or Amend under Fed. R. Bankr. P. 9023 (Doc. 104) (the "Motion") filed by Plaintiffs Nicolaas Breklmans and Gail Gregory Brekelmans, Co-Personal Representatives of the Estate of Nina Brekelmans, and Michael McLoughlin and Martha Johnson, Co-Personal

Representatives of the Estate of Michael Patrick McLoughlin (the "Plaintiffs"). In support thereof, the Defendant states as follows:

A party's disagreement with the outcome of a hearing, the Court's analysis of facts, and/or the Court's application of the law to those facts does not constitute grounds to alter or amend a judgment pursuant to Fed. R. Bankr. P. 9023 and Fed. R. Civ. P. 59. Rather, as correctly noted in the Plaintiffs' Motion, the movant must show that there is: a clear error of law; newly discovered evidence; a change in controlling law; a need to prevent manifest injustice; the court "clearly" overlooked material facts; or the court "clearly" overlooked controlling law. *O'Connor v. Lampo Grp., LLC,* 2021 U.S. Dist. LEXIS 204079, at *304 (M.D. Tenn. 2021). Again, as correctly noted by the Plaintiffs in the Motion, this is an "exacting standard" and an "extraordinary remedy restricted to those circumstances in which the moving party has set forth facts or law of a ***strongly convincing*** nature that indicate that the court's prior ruling should be reversed." *Memphis A. Phillip Randolph Inst. v. Hargett,* 485 F. Supp. 3d 1003, 1004 (M.D. Tenn. 2020) (emphasis added).

While the Plaintiffs cite the correct standard of review under Bankruptcy Rule 9023 and Rule 59, they then completely ignore that standard, choosing instead to once again summarize, over 18 pages, the exact same law and issues they have already argued at length before this Court and briefed over 150 collective pages in their briefs located at Docket Nos. 74, 79, 92, 95, and 100. The Plaintiffs' Motion does not cite to any particular element that they believe the Court "clearly overlooked"; instead, they restate their entire argument (including a host of completely irrelevant facts). In essence, the argument posited by the Plaintiffs in their Motion is, "Judge Harrison, you must have overlooked

every fact and legal argument we put forward or else you would have obviously ruled in our favor."

The Motion does not come close to stating a valid basis for altering or amending the Court's prior order[1] and should be denied without putting the Defendant through the time and expense of appearing for yet another extended hearing.  This case needs to be set for a trial instead of wasting the Court's resources on hearing a meritless motion to alter or amend.

WHEREFORE, for the above and foregoing reasons, the Defendant respectfully submits that this Court should summarily deny the Plaintiffs' Motion to Alter or Amend Under Fed. R. Bankr. P. 9023. The Defendant also respectfully requests for such other and further relief as the Court deems necessary and appropriate under the circumstances.

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel.    615.465.6000
Fax.    615.807.3048
Phillip@thompsonburton.com

Counsel for the Defendant

---

[1] The brevity of this Response is indicia of the lack of the Motion's basis; there is no response needed other than "see Defendant's other briefs in this case," which the Defendant hereby incorporates by reference. *See* Doc. Nos. 75, 91 and 94.

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served this 21st day of June, 2023, upon all parties of record requesting notice through the Court's electronic filing system, and by United States mail to:

Philip J. McNutt                                    Taylor A. Cates
Law Office of Philip J. McNutt, PLLC                Burch, Porter & Johnson, PLLC
11921 Freedom Drive, Suite 584                      130 North Court Avenue
Reston, VA  20190                                   Memphis, TN  38103


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

4



Marian F. Harrison
US Bankruptcy Judge

Dated: 8/16/2023

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| _____ | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLANITIFFS'
## MOTION TO ALTER OR AMEND UNDER FED. R. BANKR. P. 9023

This matter came before the Court for a hearing on the Plaintiffs' Motion to Alter or Amend

Under Fed. R. Bankr. P. 9023 (Doc. 104) (the "Motion") and the Defendant's Response thereto

(Doc. 107) (the "Response"); and appearances at the hearing having been made by Philip McNutt

on behalf of the Plaintiffs and by Phillip Young on behalf of the Defendant; and based upon the Motion, the Response, and arguments made by counsel at the hearing;

**IT IS HEREBY FOUND:**

A.    Pursuant to Federal Bankruptcy Rule 7052, the Court hereby incorporates and adopts the findings and conclusions stated orally in open court on August 15, 2023.

B.    The Plaintiffs have failed to meet the standards required to alter or amend the Court's prior order pursuant to Fed. R. Bankr. P. 9023 and F.R.C.P. 59.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.    The Motion is hereby DENIED.

---

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

---

Submitted for entry:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Counsel for Defendant

2

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

1548

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville, Tennessee

In re:                                          :

 LEN SALAS                              : Case No. 18-2662-MFH

             Debtor            :

---

NICOLAAS BREKELMANS AND GAIL    :
GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES         :
OF THE ESTATE OF NINA
BREKELMANS, et al                              :

      Plaintiffs-Appellants            :

          v.                              : Adversary Proceeding No. 3:20-ap-90027

MAX  SALAS                                        :

      Defendant-Appellee              :

---

MOTION OF PLAINTIFFS-APPELLANTS FOR LEAVE TO FILE
INTERLOCUTORY APPEAL FROM THE BANKRUPTCY COURT'S
ORDERS DENYING THE PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT, GRANTING, IN PART, THE
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING
THE PLAINTIFFS' MOTION TO ALTER OR AMEND THE BANKRUPTCY
COURT'S ORDER GRANTING AND DENYING SUMMARY JUDGMENT

COME NOW the Plaintiffs and Appellants herein, by and through their counsel of record

and Move for leave to file their Appeal from the Bankruptcy Court's Orders Denying the

Plaintiffs' Motion for Summary Judgment, Granting, in part, the Defendant's Motion for

Summary Judgment, and Denying the Plaintiffs' Motion to Alter or Amend the Bankruptcy

Court's Order Granting and Denying the parties' Motions for Summary Judgment and, in support

thereof, state as follows:

All references to docket entries ("D-__") shall refer to docket entries in the adversary proceeding captioned above. References to docket entries in the Debtor's Chapter 7 Case will be referred to as "Bankr. D-__".

**Background of the Case and Undisputed Facts**

This case essentially involves the question whether or not the Plaintiffs, standing in the shoes of the Chapter 7 Trustee of the Debtor, Len Salas, and representing the Debtor's Estate in a derivative proceeding, may avoid or recover the Debtor's alleged transfer, to the Defendant, of valuable property in the District of Columbia. The Debtor's estate seeks to avoid the alleged transfer under the Trustee's avoidance powers set forth in 11 U.S.C. § 544 (a) or, alternatively, as a fraudulent conveyance under 11 U.S.C. § 548 (a) and applicable state (D.C.) law.

The subject of the Plaintiffs' Complaint is the Defendant's alleged interest in a valuable, single-family residence (converted to a rental property) located at 1612 Riggs Place, NW, Washington, DC. ("the Property"). The Property was conveyed by the Defendant to his son, the Debtor herein, in 2007, by an unrestricted Deed. In July, 2010, the Debtor, the Defendant and Ron Salas, the Defendant's son and brother of the Debtor, a recently licensed Colorado attorney at the time ("Ron"), attempted a transfer of the Property by Quitclaim Deed through a Colorado trust, designated the 1612 Riggs Property Trust. The trust was created in Colorado under Colorado law even though the sole trust asset was the Property (in D.C.).

In June, 2011 there were a series of email communications among, Ron, the Debtor, the Defendant, and the Defendant's attorneys in the D.C. area, which clearly show that while the trust was registered (improperly) in Colorado in or about 2011, the Quitclaim Deed was no

2

longer in effect. In those eMails, Ron instructed his father, the Defendant, to obtain a deed in D.C. In the same time frame, through early 2012, there were a series of eMail communications among the Debtor, Len, the Defendant, and the Defendant's D.C. counsel about getting the Debtor's name off the title to the Property. No other communications have been discovered and the original Quitclaim Deed was lost, abandoned or destroyed in or about 2011.

After 2011 neither the Defendant nor his sons are/were aware of the location of the Quitclaim Deed and the Defendant did not attempt to find the Quitclaim Deed after 2011. However, both the Debtor and the Defendant acknowledge that the Debtor continuously sought to have his name taken off the Deed to the Property from 2011 through at early, 2015. The Defendant argued that the numerous communications between the Defendant and the Debtor related to refinancing the Property and not to removing the Debtor from the Deed but the wording of the communications is unequivocal that the Debtor was still on the Deed and wanted to get off the Deed. The Plaintiffs believe, and have asserted, that the reasons why the Debtor was never removed from the Deed related to claims, or potential claims, against the Defendant by the Internal Revenue Service ("the IRS"), and other taxing or regulatory authorities, or simply to avoid taxes or other obligations related to his potential ownership of the Property.

In June, 2015 a tragic fire, determined to be started through the negligence of the Debtor and the Defendant, swept through the Property. As a result of investigations by local authorities and fire investigators, it was determined that the Debtor and the Defendant were illegally renting out rooms at the Property without a proper license and in violation of the D.C. housing construction and safety requirements for rental properties. The lack of safety requirements was determined to be the cause of the deaths of Nina Brekelmans and Michael Patrick McLoughlin,

3

the children of the Plaintiffs, respectively.

The Plaintiffs filed separate lawsuits, represented by different law firms, in the D.C. Superior Court in the fall, 2015. During discovery, in or about March, 2016, the Defendant caused his son to file a loan mitigation application with the first trust lender on the Property. The Debtor was the sole obligor under the first deed of trust note and represented himself to be the sole owner of the Property as late as March, 2016.

In late 2017 when it appeared likely that a substantial judgment was going to be entered against the Defendant, he sought local (D.C.) bankruptcy counsel. The Defendant contacted and retained Marc Jordan, a long standing bankruptcy attorney and trustee in D.C. As a result of conversations the Defendant had with his D.C. bankruptcy counsel, the Defendant attempted to resurrect the defunct, abandoned or lost, Quitclaim Deed on the understanding that the Defendant might be able to claim ownership of the Property by virtue of the Deed and use that ownership to claim D.C.'s generous (100% of equity) homestead exemption.

The Debtor used the lost Quitclaim Deed as the basis for seeking summary judgment in the Superior Court case, contending that, due to the Quitclaim Deed, he was not owner of the Property and, therefore, not liable for the wrongful death of Nina and Michael. The Superior Court rejected that contention and the cases went to trial (consolidated) against both the Debtor and the Defendant. In early April, 2018, judgments were entered against both the Debtor and the Defendant, in favor of Nina ($7.2 Million) and Michael ($7.5 Million). On April 18, 2018, the Debtor and the Defendant filed separate Chapter 11 bankruptcies in Tennessee and D.C., respectively.

In September, 2018, the D.C. Bankruptcy Court (Teel, J.) filed a 56 page Memorandum

4

and Order concluding that, while the Quitclaim Deed and Trust could not be used by the Defendant to claim an ownership interest in the Property, the result of the failed trust and Quitclaim Deed were sufficient to create an interest resulting trust to make the Defendant the owner and thus, entitled to the D.C. Homestead Exemption. In Judge Teel's Memorandum he specifically excluded any claims of the Tennessee bankruptcy estate to recover the property and during the evidentiary hearing on the Plaintiffs' Objections to the Defendant's claim of exemption, Judge Teel predicted that his decision would have no legal effect in an avoidance action in Tennessee which might well "overrule" a decision (to allow the exemption).

In December, 2018, the Debtor's case was converted to a case under Chapter 7 of the United States Bankruptcy Code and a Trustee was appointed. After the appointment of the Trustee, the Plaintiffs had discussions with the Trustee about pursuing claims for avoidance and recovery of the Property from the Debtor. However, after apparently discussing the case with the Defendant's counsel, the Trustee switched his position and attempted to sell the bankruptcy estate's claims to the Defendant (through his son, Ron). This court ordered an auction sale of the estate's claims and the Plaintiffs were the successful bidders in a lengthy auction between the Defendant and the Plaintiffs.

The above statements of background facts are supported by the Plaintiffs' Amended List of Undisputed Facts, supplemented by the Plaintiffs' Supplemental List of Undisputed Facts and the Defendant's response which almost unanimously agreed with the Plaintiffs' Amended List. D-74-1, D-79-1, and D-81, respectively

**Procedural Background**

1. The adversary proceeding which is the subject of this Motion was commenced by the

Plaintiffs on or about March 2, 2020. After determination of two separate motions to dismiss by the Defendant, the Plaintiffs filed an Amended Complaint on February 16, 2021 (hereinafter referred to as "the Complaint"). (D-40)

2. The Plaintiffs' Complaint consists of six separate causes of action. The first three causes of action are under the Trustee's avoidance powers pursuant to 11 U.S.C. § 544 (a). The fourth cause of action is for avoidance of a fraudulent conveyance under 11 U.S.C. § 548 (a)(1). The fifth cause of action is also a fraudulent conveyance action, but pursuant to D.C. Code § 28-3104, *et seq*. The sixth cause of action is for recovery of an avoided transfer pursuant to 11 U.S.C. § 550. (D-40)

3. After a substantial period of discovery, the Plaintiffs filed their Motion herein seeking summary judgment on all counts of their Complaint. The Motion is dated July 29, 2022, (D-73). The Defendant opposed the Motion and the court held a hearing on the Plaintiffs' Motion on November 8, 2022. On November 8, 2022 the Bankruptcy Court denied the Plaintiffs' Motion (D-82).

4. On January 5, 2023 the Bankruptcy Court issued an Order and scheduled a hearing on two issues that the court determined may be dispositive of the Complaint (D-83)("the January, 2023 Order"). The issues are summarized as follows:

a. Did D.C. Bankruptcy Judge Teel's decision in August, 2018 on the Defendant's claim of a homestead exemption under D.C. law preclude these Plaintiffs from pursuing their claims in the captioned bankruptcy case of the Defendant's son, the Debtor herein?; and

b. Did the Defendant's possession of the subject D.C. property constituted notice

6

of his ownership such that the "inquiry notice" to the Plaintiffs' would defeat the trustee's avoiding powers under 11 U.S.C. § 544 (a)?

5.  In response to the January, 2023 Order, the Plaintiffs submitted a supplemental memorandum (D-92)  and the Defendant filed a Motion for Summary Judgment (D-89) along with a Memorandum in support (D-91), along with a Response to the Plaintiffs' Supplemental Memorandum (D-94).  The Plaintiffs' filed an Opposition to the Defendant's Motion (D-95).

6.  The Bankruptcy Court held a hearing on the issues set forth in the Court's January 5, 2023 Order on March 21, 2023.

7.  On May 24, 2023, the Bankruptcy Court filed its Opinion (D-101) and Order (D-102) denying the parties' motions for summary judgment on Counts I-III of the Complaint and partially granting the Defendant's Motion for Summary Judgment on Counts IV and V.[1]

8.  The Plaintiffs filed a Motion to Alter or Amend the Bankruptcy Court's Order of May 24, 2023 (D-102) on the basis that the Bankruptcy Court failed to give proper consideration to the manner in which the Plaintiffs' acquired their right to pursue the estate's claims on behalf of the estate and standing in the shoes of the Trustee; and that the Court failed to give proper consideration to the D.C. case of *McKinley v. Crawford*, 58 F.2d 528 (D.C.App. 1932) and cases from approximately 15 other jurisdictions which either support *McKinley*, or proceeded *McKinley* with the same legal conclusion.

**Argument**

_____

[1]In its Memorandum Opinion, the bankruptcy court noted (and reiterated at the hearing on August 15, 2023, 2023) that the court did not consider summary judgment on the actual fraud section of 11 U.S.C. § 548 (a)(1) since neither party requested summary judgment and the existence of actual fraud is a question of fact which generally precludes summary judgment. Memorandum Opinion, May 24, 2023 (D-101), at p. 14, n. 8.

7

9.  Interlocutory Appeals are governed by Fed. R. Bankr. P. ("FRBP") 8004 which states, in part, that the Motion seeking leave of court to file the Appeal must accompany the Notice of Appeal.  The Plaintiffs' Notice of Appeal is filed simultaneously herewith.

10.  FBRP 8004 (b) sets forth the necessary contents of a motion for leave to appeal pursuant to 28 U.S.C. § 158 (a)(3).  The Plaintiffs-Appellants are seeking leave to appeal to the 6th Circuit Bankruptcy Appellate Panel ("B.A.P.") established pursuant to 28 U.S.C. § 158 (b). The required contents include

> a.  the facts necessary to understand the question presented; and
>
> b.  the question itself; and
>
> c.  the relief sought; and
>
> d.  the reasons why leave to appeal should be granted; and
>
> e.  a copy of the interlocutory order or decree and any related opinion or

memorandum.

Fed. R. Bankr. P. 8004 (b)(1).

11.  Appellate courts considering review of interlocutory decisions of bankruptcy courts have applied the standards set forth in 28 U.S.C. § 1292 (b) pursuant to which an appellant must show:

> (1) the question involved is one of law; and (2) the question is controlling; and (3) there

is substantial ground for difference of opinion respecting the correctness of the bankruptcy court's decision; and (4) an immediate appeal would materially advance the ultimate termination of the litigation. *Vitols v. Citizens Banking Co.*, 984 F.2d 168, 170 (6th Cir. 1993. *See also, Cardwell v. Chesapeake & Ohio Ry. Co.*, 504 F.2d 444, 446 (6th Cir. 1974.  In accord, *Wicheff*

8

*v. Baumgart (In re Wicheff)*, 215 B.R. 839, 844 (B.A.P. 6th Cir. 1998), *Smith v. U.S. Bank Nat'l Ass'n (In re Smith)*, 2019 Bankr. LEXIS 2845, 2019 WL 4271977 (6th Cir. B.A.P. 2019).

12.  In *In re Trump*, 874 F.3d 948 (6th Cir. 2017), the Sixth Circuit granted a petition for leave to appeal an Order of the United States District Court partially denying the petitioners' motion to dismiss an action brought by protestors alleging incitement to riot under Kentucky law.  The sixth Circuit granted Mr. Trump's petition to appeal the order partially denying petitioners' motion on the basis that the sufficiency of the Complaint is a question of law. *Id.*, at 951.  **See also,** *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025 (6th Cir. 2001) (granting petition to hear interlocutory appeal based upon denial of a motion to dismiss and partial motion for summary judgment).

13.  The *Trump* Court further determined that the resolution of the question of the applicability of First Amendment rights "could materially affect the outcome of the case." *In re City of Memphis*, 293 F.3d 345, 351 (6th Cir. 2002).  See also *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992), citing *Arizona v. Ideal Basic Indus.*, 673 F.2d 1020, 1026 (9th Cir. 1981). In the instant case the resolutions of the questions presented could result in the grant of summary judgment in favor of the Plaintiffs and eliminate the necessity of a trial.

14.  A substantial ground for difference of opinion exists "where reasonable jurists might disagree on an issue's resolution, nor merely where they have already disagreed " *Trump*, 874 F.3d at 952, quoting *Reese v. BP Exploration, Inc.*, 643 F.3d 681, 688 (9th Cir. 2011).

> Stated another way, when novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent.

9

*Id*.

15.  Finally, granting this Motion "may materially advance the termination of the litigation" because, if the appellate panel finds that the Plaintiffs decided in favor of the Plaintiffs on either question raised, the litigation would end. ***Trump***, supra.

16.  The questions asserted for review by the Plaintiffs are questions of law.  The first relates to whether, as a matter of law, the inquiry notice question submitted by the court to the parties in the Bankruptcy Court's January 5, 2023 Order, is resolved by the body of case law, including controlling case law in the District of Columbia, which states that the Defendant's deed of the property to his son constitutes "notice to the world" that the Defendant is no longer the owner of the property despite his continued possession of the property after the deed to his son.  ***McKinley v. Crawford***, 58 F.2d 528 (D.C.App. 1932).   The Bankruptcy Court determined that the factual issues that the parties presented to the court prevented summary judgment.  See, Memorandum Opinion, (D-101), at p. 7.  However, the Defendant does not dispute that he delivered a deed to his son, without conditions, that transferred ownership to the son and the deed was never withdrawn, or modified.  The Plaintiffs-Appellants contend that delivering that deed, in the District of Columbia, requires the conclusion that, as a matter of law, the son is the record owner of the Property and, therefore, under the "inquiry notice" question presented by the Bankruptcy Court, the Plaintiffs are entitled to judgment *as a matter of law*.  ***See, McKinley, supra*** . ***See also Bloomer v. Henderson***, 8 Mich.398, 77 Am.Dec. 453; ***Van Keuren v. Central R. Co.***, 38 N.J. Law, 165; ***Strong v. Efficiency Apt. Corp.***, 159 Tenn. 337, 17 S.W.2d 1, 19 S.W.2d 273; ***Wicklein v.Kidd***, 149 Md. 412, 131 A. 780.

17.  The Plaintiffs'-Appellants further contend that the court's attention to the matters

10

which it deems disputed by the parties, and, therefore, not subject to summary judgment are matters that relate solely to the issue of whether the Defendant's "possession" of the subject property was "open, notorious and unequivocal."[2] That issue of fact is irrelevant to whether, under **McKinley** and the numerous cases which support the **McKinley** decision, the Plaintiffs are not subject to "inquiry notice" related to the Defendant's possession of the subject property, **as a matter of law**. If found correct, the Plaintiffs' position should result in summary judgment.

18. Likewise, the court's determination that the Defendant is entitled to summary judgment on the claims for constructive fraudulent conveyance, are determinable, under undisputed facts, as a matter of law. The Plaintiffs contend that the Bankruptcy Court erroneously distinguished the **Kind Operations** case by finding that because the Plaintiffs represented almost all the unsecured claims of the estate, they were bound by Judge Teel's determination in the Defendant's D.C. bankruptcy case, namely, that the Defendant was the owner of the property (by virtue of an alleged, unrecorded deed dated July, 2010) and, therefore, the Plaintiffs could not assert their claims for constructive fraud against the Defendant. The Bankruptcy Court made its decision, even though, the court both acknowledged, and determined that the Plaintiffs were acting solely on behalf of the bankruptcy estate and were "standing in the shoes" of the Debtor's Trustee, in a derivative action.

19. The Bankruptcy Court cited no case similar to the facts of this case in support of its decision, but merely determined, based upon general legal theories not consistent with the facts

---

[2] Although the bankruptcy court deemed it inappropriate to determine the issue of the Defendant's "possession" as "open", "notorious" of "unequivocal" the Plaintiffs contend that the undisputed facts show that the Defendant's possession was hidden and discreet, and, therefore, the inquiry notice case law proffered by the Court still favored the Plaintiffs.

11

of this case, that the size of the Plaintiffs' estate claims alone made the Plaintiffs' subject to collateral estoppel. The Bankruptcy Court concluded that issue preclusion applied to the Plaintiffs because it "would not work some unfairness..." Memorandum Opinion, D-101, ap p.

20. The Court's determination necessitates the conclusion that issue preclusion applied because the Trustee in this bankruptcy case is somehow in privity with the Plaintiffs in the D.C. Bankruptcy Case (assuming the D.C. Bankruptcy Court's exemption decision has any affect on the Trustee's avoiding powers in this case, regardless of who brings that claim and on whose behalf). See Memorandum Opinion, (D-101), at p. 1. Then the Bankruptcy Court determined that because the Plaintiffs represent more than 99.9% of all unsecured claims that makes the Trustee and the estates' interest "virtually identical". That determination would chill the ability of any estate to get interested parties to pursue claims on behalf of the estate. In this case, for example, more than $46,800 of administrative claims, including the Trustee and the U.S. Trustee were paid from the auction bid by the Plaintiffs, in addition to a priority claim of the IRS totaling $5,025.53. Recovery pursuant to the Plaintiffs' Complaint would result in additional fees to the Chapter 7 Trustee and other professionals (i.e. Accountants) hired by the Trustee, as well as substantial payments to 6 unsecured creditors of which the Plaintiffs are just two. See, for example, Summary of Trustee's Final Report, February 3, 2020 (Bankr. D-210). The Bankruptcy Court has also ignored that if there is any recovery, that recovery will go directly into the Debtor's Estate and will benefit the Estate directly, as well as all remaining creditors, not just the Plaintiffs.

21. There is simply no rational basis for placing the derivative status of the Plaintiffs, the parties "standing in the shoes of the trustee," in a different category solely due to the size of their

12

claims.  To decide otherwise would subject the Plaintiffs to disparate treatment in violation of the Fourteenth Amendment to the U.S. Constitution as well as penalize them for the size of their claims which is based solely on the harm caused them by the Debtor and the Defendant, something for which they should not be punished. ***See City of Cleburne v. Cleburne Living Ctr.,*** 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985), quoted and cited in ***Chambers v. Stengel***, 256 F.3d 397, 401 (6th Cir. 2001).  Parties are deemed to be similarly situated only when they are "in all relevant purposes alike" or do not "differ in several material respects." ***Nordlinger v. Hahn***, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); ***TriHealth, Inc. v. Bd. of Comm'rs***, 430 F.3d 783, 790 (6th Cir. 2005).

22.  The Bankruptcy Court also incorrectly determined that the Debtor held only "bare legal title."  However, a careful review of the case law on the issue shows that the Debtor held much more than "bare legal title."  There was a clear intent to transfer title from the Defendant to the Debtor without restriction and without return of title to the Defendant at some point in time.  And if, the Debtor held only "bare legal title" that could have been resolved any time between 2007 and 2018, but never was.  The only clear inference is that the intent of the Defendant was that the Debtor retain and maintain actual title to the Property and not the "bare legal title" which Congress intended would not provide a sufficient basis for ownership for purposes of the Bankruptcy Code.

23.  Equity also dictates reversal of the Bankruptcy Court's summary judgment order.  The obvious reason for the comparative size of the Plaintiffs' claims, in addition to the horrendous damages and suffering by the Plaintiffs and their children, is that the sole reason why the Debtor and the Defendant filed bankruptcy was to avoid the Plaintiffs' claims, not to

discharge any other significant debt. The attempts of the Debtor and the Defendant to escape the just payments awarded to the Plaintiffs should not be rewarded by a dismissal of the Complaint through the means of a faulty claim of collateral estoppel.

24. The Plaintiffs also assert that the decision of the Bankruptcy Court is at odds, not only with uniformly established case law precedent, but also with the court's own decisions concerning the instant complaint being derivative of estate's claims and the trustee's status as the real party in interest, thus violating the doctrine of *stare decisis*.

> The doctrine of stare decisis holds that a court, in the absence of any intervening change in the law, is to abide by a principle of law laid down in a past decision to a present case having substantially the same facts. ***In re Vargas***, 342 B.R. 762, 764 (Bankr. N.D.Ohio 2006). The doctrine of stare decisis, however, is not absolute, allowing courts the flexibility to reexamine their past decisions. Yet, **deviation from a legal holding set forth in a prior decision is always the strong exception, not the norm**, given the doctrine's strong policy underpinnings: it promotes evenhandedness and predictability, thereby contributing to the actual and perceived integrity of the judicial process. ***Id.*** at 764-65, citing ***Payne v. Tennessee***, 501 U.S. 808, 827-28, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In this way, the Supreme Court has stated that before a court should part from a rule of law set down in a past decision, a "special justification" is needed. ***Patterson v. McLean Credit Union***, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) .

Cited in ***Irby v. Preferred Credit (In re Irby)***, 359 B.R. 859, 861 (Bankr. N.D. Ohio 2007)(emphasis added).

25. The court authorized the sale of the estate's claims to the Defendant for the purpose of avoiding the estate's ability to pursue those claims. See Trustee's Notice and Motion to Sell, April 10, 2019, (Bankr. D-162) and the Bankruptcy Court's Order granting the Trustee's Motion, June 12, 2019 (Bankr. D-179). In its latest orders, from which the Plaintiffs are seeking to appeal, the Bankruptcy Court has asserted that its previous orders do not apply to this case, whether the approval of the auction sale, or the conclusion that the Plaintiffs stand in the shoes of

14

the Trustee.

26.  The Bankruptcy Court's Orders are defective in many respects and should be reversed, granting summary judgment to the Plaintiffs' based, *inter alia*, on the following uncontested facts:

a.  In the D.C. Bankruptcy Court's decision, Judge Teel clearly stated that the issue of recovery or avoidance by this estate's trustee, were independent from his decision and therefore, could not be used as issue preclusion in the son's estate.

b.  The D.C. Bankruptcy Court (Teel, J.) even predicted that his decision granting the Defendant an exemption to the subject property, would be irrelevant upon appropriate action by the trustee of the son's estate.  That calculation is based in part on the undisputed fact that the Quitclaim Deed relied upon by the Bankruptcy Court was never recorded.  The "ownership" created by Judge Teel's decision in the D.C. Exemption matter was based upon an unrecorded deed.  If that deed had been recorded within the two years prior to the Debtor's bankruptcy, then the Bankruptcy Court's argument that the D.C. Court's finding of ownership would be conclusive.  However, the D.C. Court determined only that a transfer had occurred, a transfer that was not perfected prior to the Debtor's bankruptcy filing.  Therefore, the D.C. Bankruptcy Court's determination regarding ownership affected the Defendant's ownership of the Property **for purposes of exemption only** and did not, and was not intended to, affect the recovery or avoidance of that "ownership" by the bankruptcy estate of the Debtor in Tennessee.

c.  The Plaintiffs' requested the trustee of the son's estate to pursue recovery actions on behalf of the estate but the trustee refused.  If the trustee had pursued those claims he would not have been bound by any issue preclusion doctrine.

15

d.  Instead of pursuing the estate causes of action against the Defendant the trustee, without any prior notice to the Plaintiffs, filed a motion in the Bankruptcy Court seeking to sell the estates claims against the Defendant to the Defendant himself (through his son, Ron, as straw man).

e.  The Plaintiffs objected to the sale of the estate's claims to the Defendant.  At the hearing on the objections the Defendant's lawyer, Mr. Young, appeared and asserted to the court that the purpose of purchasing the claims was to acquire the claims so no one would be able to pursue them on behalf of the estate.

f.  The Bankruptcy Court overruled the Plaintiffs' objections but did establish a procedure for the auction of the estate's claims.

g.  Plaintiffs' counsel appeared at the auction on behalf of the Plaintiffs.  The only other parties at the auction were the Defendant and his counsel, Mr. Young.  During the auction, the only parties bidding were Mr. Young, the Defendant's attorney, ostensibly on behalf of Ron Salas, the Defendant's son, and Plaintiffs' counsel representing the two decedent's estates

h.  The Plaintiffs were the successful bidders at the auction.  As a result of the auction, the Defendant's original purchase price, which only could be interpreted as "a sweetheart deal" with the trustee, an offer of $10,000, was increased to $156,000.

i.  The auction sale was approved by Order of the Bankruptcy Court.

j.  The auction sale resulted in increasing the estate's value from $0.00 to $156,000.

k.  As a result of the substantial income to the estate, the trustee substantially increased his compensation, both as trustee and as counsel to the trustee.  The estate also paid out

16

substantial claims of Debtor's counsel and the trustee's accountant, Chapter 11 administrative

expenses owed to the U.S. Trustee and the priority claim of the Internal Revenue Service.  All

those claims were paid in full.  The remainder of the estate was used to pay 5 unsecured claims,

pro rata, including the claims of the Plaintiffs.

l.  The claims of the Plaintiffs are two separate and distinct claims.  They were

consolidated for trial in the D.C. Superior Court because they involved the same circumstances

(the two decedents died in a tragic, preventable fire, and as a result of inadequate fire prevention

and fire escape facilities at the son's residence managed by the Defendant), and the same

witnesses.  However, the Superior Court entered two judgments, one for each of the Plaintiffs.

Additional pertinent facts:

m.  the basis of the Defendant's claim of "ownership" of the subject property

consists solely of an alleged "Quitclaim Deed" dated July, 2010 which was clearly abandoned by

the Defendant and the Debtor sometime in or about June, 2011 and which was lost or destroyed

in 2011.

n.  all public records of the District of Columbia, and all public notices regarding

the subject property were sent to, and in the name of, the Debtor and not the Defendant.

o.  the Deed of Trust on the property was in the sole name of the Defendant.

p.  Although the Defendant has claimed that he made all payments on the property

after 2007 (the date of the deed to his son), he did not acknowledge to any person or party that he

actually owned the property.  Even after the fire that caused the death of Michael Patrick

McLoughlin and Nina Brekelmans, in June, 2015, the Defendant had his son file a loan

mitigation application with the first trust lender asserting that his son was the owner of the

17

property.

q. No payments were made on the first deed of trust on the subject property since the fire with the sole exception of a single payment made from the insurance proceeds. The insurance policy was in the Defendant's name. Since June, 2015 the first payment on the property, other than the insurance proceeds payment was no earlier than November, 2019, 21 months after the Defendant and his son filed their separate Chapter 11 bankruptcies.[3]

27. The second question, also a matter of law, is whether an adverse decision to the Plaintiffs' in this case is binding on them in the present litigation in which the Plaintiffs are standing in the shoes of the Trustee in bankruptcy and are suing on behalf of the bankruptcy estate, the real party in interest. The second question is important in the context of bankruptcy cases since the trustee is often limited in his ability to pursue claims on behalf of the estate due to a lack of monetary and other resources.

28. These questions, for which leave to appeal is sought, are controlling since a decision in favor of the Appellants would yield judgment in favor of the Appellants on the first three counts of the Complaint which allege the right to recover under the Trustee's avoidance powers under 11 U.S.C. § 544 (a). In addition, with respect to the second question asserted above, related to whether issue preclusion applies to a third party suing on behalf of the estate, if this court determines the question in favor of the Appellants, the Appellants would be entitled to judgment on their fraudulent conveyance Counts (IV and V) of their Complaint since those counts, asserting constructive fraud are based upon undisputed facts.

---

[3] The son's bankruptcy, filed in this court, was converted to a Chapter 7 bankruptcy in December, 2018.

18

29. There is substantial ground for difference of opinion respecting the correctness of the Bankruptcy Court's decision since neither the Bankruptcy Court or the Defendant have cited any case which applies directly to the undisputed facts necessary to decide the two questions, *as a matter of law*, and the Plaintiffs assert that they have cited controlling law on both issues which the Bankruptcy Court appears to have ignored or overlooked. The Appellants have found no cases which counter the decision in ***McKinley*** a case decided by the D.C. Court of Appeals, and neither the Bankruptcy Court nor the Defendant have cited any case which states that the Trustee and the bankruptcy estate are the real parties in interest in derivative actions like the one at issue here.

30. An immediate appeal would clearly advance the termination of this litigation for two reasons: (1) if the Appellate Court reverses the Bankruptcy Court's summary judgment orders the case would then be settled at summary judgment without the need for a trial because deciding either question in favor of the Plaintiffs-Appellants would result in judgment upon reversal and remand; and (2) in the event leave is not granted and the Plaintiffs-Appellants lose at the trial, the Plaintiffs would still appeal the court's summary judgment order but, if that appeal is then successful, the parties would either have wasted their time and resources on an unnecessary trial, or would have to have a new trial on the same facts and with the same witnesses.

31. In addition to the factors asserted above and recognized in ***Vitols***, ***Trump***, and other cases cited hereinabove, the grant of the summary judgment which the Plaintiffs assert is appropriate under the undisputed facts and controlling law referenced above, would eliminate the need for a trial which would result in the necessity of significant travel by the parties, counsel and the witnesses, including Maryland (Martha Johnson and Michael McLoughlin), Florida (Gail

19

and Nico Brekelmans), D.C. (the Defendant), Murfreesboro, TN (the Debtor), Denver Colorado (Ron Salas), Memphis, TN (Cates) and Virginia (McNutt).

32. The Plaintiffs, through this Motion, are seeking leave to appeal the Bankruptcy Court's Order Denying the Plaintiffs' Motion for Summary Judgment and Granting the Defendant's Motion for Summary Judgment (as to Counts IV and V) of the Complaint, as well as the Bankruptcy Court's Order denying the Plaintiffs' Motion to Alter or Amend. Through the appeal sought, the Plaintiffs-Appellants are seeking reversal of the Bankruptcy Court's Orders of May 24, 2023 (D-101) and August 16, 2023 (D-109) and the entry of summary judgment in favor of the Plaintiffs on all Counts of their Complaint.

33. Attached to this Motion are the following documents:

      a. The Bankruptcy Court's Order dated January 5, 2023 setting hearing on summary judgment questions submitted by the court (D-83); and

      b. the Bankruptcy Court's Memorandum Opinion of May 24, 2023 (D-101); and

      c. the Bankruptcy Court's Order Denying the Plaintiffs' Motion for Summary Judgment and Granting the Defendant's Motion for Summary Judgment (D-102); and

      d. the Bankruptcy Court's Order Denying the Plaintiffs' Motion to Alter or Amend.

WHEREFORE, for the reasons set forth above, the Plaintiffs-Appellants pray for an Order granting their Motion seeking leave to appeal and for such other and further relief as is consistent with the allegations and arguments of the foregoing Motion.

Respectfully submitted,

BURCH PORTER & JOHNSON, PLLC

20

By: /s/ Taylor A. Cates
    Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By: /s/ Philip J. McNutt
    Philip J. McNutt
11921 Freedom Drive, Ste 588
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

<u>Certificate of Service</u>

    I HEREBY CERTIFY that a copy of the foregoing Notice of Appeal was delivered electronically through the Court's ecf noticing system to the United States Trustee, Phillip G. Young, Jr., attorney for the Defendant-Appellee, and all parties requesting notice, all on this 28th day of August, 2023.

    /s/ Philip J. McNutt
    Philip J. McNutt

21



Marian F. Harrison
US Bankruptcy Judge

Dated: 1/4/2023



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) CASE NO. 318-02662 |
| LEN SALAS, | ) |
| | ) JUDGE MARIAN F. HARRISON |
| Debtor. | ) |
| | ) CHAPTER 7 |
| NICOLAAS BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, | ) |
| CO-PERSONAL REPRESENTATIVES | ) ADV. NO. 320-90027 |
| OF THE ESTATE OF NINA | ) |
| BREKELMANS, | ) |
| | ) |
| and | ) |
| | ) |
| MICHAEL MCLOUGHLIN AND | ) |
| MARTHA JOHNSON, CO-PERSONAL | ) |
| REPRESENTATIVES OF THE | ) |
| ESTATE OF PATRICK | ) |
| MCLOUGHLIN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MAX SALAS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

---

## ORDER

---

On November 8, 2022, this matter was before the Court on the plaintiffs' motion for

summary judgment.  In court, the motion was denied and a pretrial conference was set for

January 24, 2023. In preparation for the upcoming pretrial conference, the Court has revisited the issues presented and has determined that the parties should be given time for additional briefing, specifically upon the effect of the District of Columbia Bankruptcy Court's ("D.C. Court") opinion on the plaintiffs' objection to the defendant's homestead exemption has on both the fraudulent conveyance claims under ==11 U.S.C. §§ 544(b)(1)== and ==548(a)(1)(B)==, and the strong arm claims under ==11 U.S.C. § 544(a)(3)== (bona fide purchaser) or ==11 U.S.C. § 544(a)(1)== (hypothetical judgment lien holder).

At the hearing, the Court ruled that if the debtor, Len Salas, only holds bare legal title to the property, the plaintiffs would not be entitled to relief. This statement is true as to the fraudulent conveyance claims (==11 U.S.C. §§ 544(b)(1)== and ==548(a)(1)(B)==). However, as discussed below, the issue of bare legal title has no bearing on the plaintiffs' other avoidance claims. Moreover, upon further review of the D.C. Court's opinion on the plaintiffs' objection to the defendant's homestead exemption, it appears the D.C. Court may have already determined this issue of ownership and bare legal title. If so, the question is whether the D.C. Court's homestead exemption opinion is entitled to preclusive or collateral estoppel effect.

Because this issue was neither raised nor considered at the previous hearing, the Court finds that the parties should be given an opportunity to brief whether the D.C. Court has already determined that Len Salas held bare legal title, and if so, whether the D.C.

Court's homestead exemption opinion is entitled to issue preclusive or collateral estoppel effect in this matter.

The issue of bare legal title has no bearing on the plaintiffs' strong-arm avoidance claims under 11 U.S.C § 544(a)(3) (bona fide purchaser) or 11 U.S.C. § 544(a)(1) (hypothetical judgment lien holder). In determining whether bona fide purchaser or hypothetical judgment lien holder status exists, this Court must look to state law. *Albert v. Green Tree Serv., LLC (In re El-Erian)*, 512 B.R. 391, 396 (Bankr. D.D.C. 2014) (citations omitted). Under District of Columbia law, a deed conveying an interest in real property is not effective against a subsequent bona fide purchaser without notice of said deed unless it is recorded. *Id.* (citations omitted). Such notice may be actual, constructive, or inquiry. *Clay Props., Inc. v. Washington Post Co.*, 604 A.2d 890, 895 (D.C. 1992). *See also Webster v. Hope (In re Hope)*, 231 B.R. 403, 424 (Bankr. D.D.C. 1999).

Actual knowledge is inapplicable because the trustee assumes the role of a bona fide purchaser without actual knowledge. *Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 818-819 (Bankr. D.D.C. 1994). In this case, the plaintiffs were granted derivative standing and stepped into the shoes of the Trustee. Additionally, constructive notice is not applicable because constructive notice has come to mean record notice. *Clay Props.*, 604 A.2d at 895 n.15. However, a Trustee may be held to inquiry notice. *In re El-Erian*, 512 B.R. at 396 (citation omitted). The same is true for both bona fide purchaser and hypothetical judgment lien creditor status. If a purchaser would be on inquiry or

3

constructive notice, so would a judgment lien creditor. *In re Aumiller*, 168 B.R. at 818-19 (applying same analysis of constructive and inquiry notice under D.C. law to both a purchaser and a judgment lien creditor). *See also In re El-Erian*, 512 B.R. at 397 (citing *In re Aumiller).*

Inquiry notice is found when a purchaser is "aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed." *Clay Props.*, 604 A.2d at 895.

Here, the question may be whether courts in the District of Columbia would find that physical possession is sufficient to place the Trustee on inquiry notice. While the Court was unable to find any District of Columbia cases with similar facts, other courts have so found: *Patel v. Rupp*, 195 B.R. 779, 784 (D. Utah 1996) (Actual physical possession by an individual with an unrecorded interest in the property satisfies the first prong of the analysis because the bona fide purchaser will learn of that potentially adverse claim upon inquiring of that person of their interest); *Reinhold v. Thorpe (In re Thorpe),* 546 B.R. 172, 185 (Bankr. C.D. Ill. 2016) ("actual physical possession and occupancy of the real estate is easily enough to trigger a duty of further inquiry"); *Osberg v. Fibison (In re Fibison)*, 474 B.R. 864, 870 (Bankr. W.D. Wis. 2011) (under Wisconsin law, defendant's sole possession of the property would prompt further inquiry); *LR Partners v.*

*Steiner (In re Steiner)*, 251 B.R. 137, 142 (Bankr. D. Ariz. 2000) (citations omitted) ("[I]t has long been recognized that where there is constructive notice effective as to the world of an interest in property, such as by physical possession of the property, no hypothetical bona fide purchaser could acquire rights superior to the rights that would have been learned upon reasonable inquiry, and consequently such constructive notice defeats the strong arm clause of § 544(a)(3)."); *Fowler v. Rauso (In re Fowler)*, 425 B.R. 157, 198 (Bankr. E.D. Pa. 2010) ("[A] buyer of real property is *obliged* to ask those in *physical possession of property* (who are not also the current record titleholders) if they have some title to, or interest in, the occupied property that is adverse to the prospective buyer's title.").

Proof may be required as to whether a reasonable purchaser would be on inquiry notice, and the D.C. Court opinion may or may not bear on the notice issue. The parties were not given a full opportunity to address this issue and whether it would entitle either party to summary judgment. As such, the Court finds that the parties should be given an opportunity to also brief the issue of inquiry notice.

**IT IS, THEREFORE, ORDERED** that the plaintiffs and/or the defendant may file motions for summary judgment and/or briefs on the issues outlined above. Such motions and/or briefs, if any, should be filed by *January 31, 2023*, and replies should be filed by *February 15, 2023*. If the parties wish the opportunity for oral argument, the hearing will be held on *February 21, 2023, at 9:30 a.m. (CST), via Zoom at* https://www.zoomgov.com/j/16029839352.

5

**IT IS FURTHER ORDERED** that if the parties determine that the issues outlined above are not ripe for summary judgment and no motions and/or briefs are filed, the Court's original ruling from the bench, denying the plaintiffs' motion for summary judgment, will stand. Under these circumstances, the pretrial conference, rather than a hearing on summary judgment, will be held on *February 21, 2023, at 1:15 (CST), via Zoom at* [*https://www.zoomgov.com/j/16029839352*](https://www.zoomgov.com/j/16029839352).

**IT IS SO ORDERED.**

**This Order was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.




Dated: 5/23/2023

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) CASE NO. 318-02662 |
| LEN SALAS, | ) |
| | ) JUDGE MARIAN F. HARRISON |
| Debtor. | ) |
| | ) CHAPTER 7 |
| NICOLAAS BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, | ) |
| CO-PERSONAL REPRESENTATIVES | ) ADV. NO. 320-90027 |
| OF THE ESTATE OF NINA | ) |
| BREKELMANS, | ) |
| | ) |
| and | ) |
| | ) |
| MICHAEL MCLOUGHLIN AND | ) |
| MARTHA JOHNSON, CO-PERSONAL | ) |
| REPRESENTATIVES OF THE | ) |
| ESTATE OF PATRICK | ) |
| MCLOUGHLIN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MAX SALAS, | ) |
| | ) |
| Defendant. | ) |

---

## MEMORANDUM OPINION

---

On March 21, 2023, this matter was before the Court on cross-motions for summary

judgment. Previously, the Court heard argument on a motion for summary judgment filed

by Nicolaas Brekelmans and Gail Gregory Brekelmans, Co-Personal Representatives of the Estate of Nina Brekelmans, and Michael McLoughlin and Martha Johnson, Co-Personal Representatives of the Estate of Patrick McLoughlin (collectively "plaintiffs").[1] The Court ruled from the bench that summary judgment was not appropriate in this case. After further consideration, the Court raised two specific issues and requested that the parties address them with respect to summary judgment:

1.  In relationship to the strong-arm avoidance claims under 11 U.S.C. § 544(a)(3) (a bona fide purchaser) and 11 U.S.C. § 544(a)(1) (a hypothetical judgment lienholder), whether it is appropriate to consider inquiry notice and if so, whether inquiry notice existed as a matter of law based on the undisputed facts.[2]

2.  In relationship to the fraudulent conveyance claims under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B), whether the District of Columbia Bankruptcy Court ("D.C. Court") already determined the issue of ownership and bare legal title in its homestead exemption opinion.[3]  If so, is the D.C. Court's Homestead Opinion entitled to preclusive or collateral effect in this proceeding.

_____

[1] The plaintiffs have been granted derivative standing to pursue these claims on behalf of the estate.

[2] If a purchaser would be on inquiry or constructive notice, so would a judgment lien creditor. *Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 818-819 (Bankr. D.D.C. 1994) (applying same analysis of constructive and inquiry notice under D.C. law to both a purchaser and a judgment lien creditor). *See also Albert v. Green Tree Serv., LLC (In re El-Erian)*, 512 B.R. 391, 397 (Bankr. D.D.C. 2014) (citing *In re Aumiller*).

[3] *In re Salas*, No. 18-00260, 2018 WL 4621930 (Bankr. D.D.C. Sept. 24, 2018) ("Homestead Opinion").

# I. Summary Judgment Standards

Pursuant to Federal Rule of Civil Procedure 56(a), as incorporated by Federal Rule of Bankruptcy Procedure 7056, an entry of summary judgment is mandated "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court "must view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (citation omitted). The Court does not "'weigh the evidence and determine the truth of the matter but . . . determine[s] whether there is a genuine issue for trial.'" *Id*. (citation omitted).

# II. Claims Pursuant to 11 U.S.C. §§ 544(a)(3) and 544(a)(1)

In Counts I and II of the amended complaint, the plaintiffs seek to avoid Max Salas' interest in property located at 1610 Riggs Place, NW, Washington, D.C. ("Property") pursuant to 11 U.S.C. § 544(a)(3) (as a bona fide purchaser) and 11 U.S.C. § 544(a)(1) (as a hypothetical judgment lienholder). To determine whether bona fide purchaser or hypothetical judgment lienholder status exists, this Court must look to state law. *In re El-Erian*, 512 B.R. 391, 396 (citations omitted). *See also Treinish v. Norwest Bank Minnesota, N.A. (In re Periandri)*, 266 B.R. 651, 655 (B.A.P. 6th Cir. 2001) (citation omitted).

Under District of Columbia ("D.C.") law, if a deed conveying an interest in real property is recorded, it is effective against a subsequent bona fide purchaser whether or not they had notice. In contrast, when a deed is unrecorded, the Court must determine whether

the subsequent bona fide purchaser had notice of said deed. *In re El-Erian*, 512 B.R. at 396 (citations omitted). In the present case, the deed was not recorded. Therefore, whether a subsequent bona fide purchaser would have had notice is the issue here. Under D.C. law, notice may be actual, constructive, or inquiry. *Clay Props., Inc. v. Washington Post Co.,* 604 A.2d 890, 895 (D.C. 1992). *See also Webster v. Hope (In re Hope),* 231 B.R. 403, 424 (Bankr. D.D.C. 1999).[4]

First, actual knowledge would be inapplicable because the trustee assumes the role of a bona fide purchaser *without* actual knowledge. *In re Aumiller*, 168 B.R. at 818. As stated earlier, the plaintiffs were granted derivative standing and stepped into the shoes of the Trustee. As such, actual knowledge is irrelevant. Constructive notice is also inapplicable because constructive notice has come to mean record notice. *Clay Props.*, 604 A.2d at 895 n.15. This leaves open the possibility of inquiry notice as a trustee may be held to such notice. *In re El-Erian*, 512 B.R. at 396 (citation omitted).

In its prior order, this Court raised the issue of whether Max Salas' physical possession of the property created inquiry notice based on case law from other

---

[4] As stated earlier, if a purchaser would be on inquiry notice, so would a judgment lien creditor. *In re Aumiller*, 168 B.R. 811, 818-19 (applying same analysis of constructive and inquiry notice under D.C. law to both a purchaser and a judgment lien creditor). *See also In re El-Erian*, 512 B.R. at 397 (citing *In re Aumiller*).

4

jurisdictions.[5]   Under D.C. law, inquiry notice is found when a purchaser is "aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed." *Clay Props.*, 604 A.2d at 895.

Max Salas asserts that the following undisputed facts would put a bona fide purchaser or a hypothetical judgment lienholder on inquiry notice:

1.   Max Salas lived in the Property.

2.   Max Salas was the only party who ever made mortgage payments on the Property.

3.   Max Salas signed the leases to rent portions of the Property.

4.   Max Salas collected the rent payments from the Property.

5.   Max Salas collected and distributed insurance proceeds after the Property was destroyed by fire.

6.   The plaintiffs recorded notice of their D.C. judgments against Max Salas and Len Salas with the D.C. Recorder of Deeds prior to the filing of Len Salas' bankruptcy petition in this Court and Max Salas' bankruptcy petition in the D.C. Court.

---

[5] *See Reinbold v. Thorpe* (*In re Thorpe), *546 B.R. 172, 185 (Bankr. C.D. Ill. 2016) ("actual physical possession and occupancy of the real estate is easily enough to trigger a duty of further inquiry"); *Osberg v. Fibison* (*In re Fibison)*, 474 B.R. 864, 870 (Bankr. W.D. Wis. 2011) (defendant's sole possession of the property would prompt further inquiry); *Fowler v. Rauso (In re Fowler)*, 425 B.R. 157, 198 (Bankr. E.D. Pa. 2010) ("[A] buyer of real property is *obliged* to *ask those* in *physical possession of property* (who are not also the current record titleholders) if they have some title to, or interest in, the occupied property that is adverse to the prospective buyer's title."); *Patel v. Rupp*, 195 B.R. 779, 784 (D. Utah 1996) (Actual physical possession by an individual with an unrecorded interest in the property satisfies the first prong of the analysis because the bona fide purchaser will learn of that potentially adverse claim upon inquiring of that person of their interest.).

5

Based on this last undisputed fact, Max Salas asserts that the recording of the judgment would have per se provided inquiry notice to any reasonable third party. *In re Hope*, 231 B.R. 403, 423-26 (Trustee was barred from pursuing 11 U.S.C. § 544(a) action because reasonable party would have been put on notice by recorded divorce judgment and was then charged with inquiring further about the terms of the divorce.). Max Salas argues that with any amount of due diligence, a third party would have discovered there existed a dispute about who owned the property as Len Salas had filed multiple pleadings in the underlying lawsuits asserting he was not the owner of the property. The fact that the judgments were not actually final and appealable when recorded might also be a factor in determining whether inquiry notice existed.

The plaintiffs, on the other hand, point to other undisputed facts in support of their assertion that inquiry notice did not exist:

1. Len Salas was the named owner on the title to the Property.

2. The mortgage on the Property was in Len Salas' name only.

3. The rental leases were signed by Max Salas on behalf of "CLR" rather than individually.

4. The recorded judgment showed Len Salas was held liable as the owner of the Property.

5. The recorded judgment showed Max Salas was held liable for mismanagement not ownership of the Property.

6

As stated earlier, in considering motions for summary judgment, the Court does not "'weigh the evidence and determine the truth of the matter but . . . determine[s] whether there is a genuine issue for trial.'" ***Browning v. Levy***, 283 F.3d 761, 769 (citation omitted). ***See also Thompson v. Fresh Prods., LLC***, 985 F.3d 509, 523 (6th Cir. 2021) (court is not to weigh evidence or determine truth). In the present case, a determination of whether inquiry notice existed would require the weighing of evidence, and therefore, is not an appropriate matter for summary judgment. As such, the Court finds the cross-motions seeking summary judgment on the strong-arm avoidance claims under both 11 U.S.C. §§ 544(a)(1) and (3) must be denied.

### III. Claims Pursuant to 11 U.S.C §§ 544(b)(1) and 548(a)(1)(B)

In Counts IV and V of the amended complaint, the plaintiffs seek to invoke the Trustee's powers to avoid fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B). In denying the plaintiffs' original motion for summary judgment, this Court ruled that if the proof showed that Len Salas had only bare legal title, there would be no recoverable interest in the Property under the fraudulent conveyance provisions. This ruling was premised on the Supreme Court's decision in ***United States v. Whiting Pools, Inc.***, 462 U.S. 198, 204 n.8 (1983), and the many cases which have cited it for the proposition that where a debtor only holds bare legal title, and not equitable title to property, only the legal title becomes part of the debtor's bankruptcy estate. ***See, e.g., Kapila v. Moodie (In re Moodie)***, 362 B.R. 554, 561 (Bankr. S.D. Fla. 2007) ("[A]n interest that is limited in the hands of the debtor is equally limited in the hands of the estate,

7

and therefore, where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest in the property."); ***Geremia v. Dwyer (In re Dwyer)***, 250 B.R. 472, 474 (Bankr. D.R.I. 2000) (Bare legal title has no value to an estate, and a transfer of bare legal title cannot form the basis for a fraudulent transfer action); ***Swanson v. Stoffregen (In re Stoffregen)***, 206 B.R. 939, 942 (Bankr. E.D. Wis. 1997) (Where the debtor owned only bare legal title to the property, a transfer of the property could not be recovered under 11 U.S.C. § 548.).

Pointing to the in-depth discussion of ownership found in the D.C. Court's Homestead Opinion, this Court offered the parties an opportunity to present arguments as to whether the D.C. Court already decided the issue of ownership and bare legal title. And if so, whether the D.C. Court's Homestead Opinion is entitled to preclusive or collateral effect in this proceeding. First, a review of the Homestead Opinion is required.

### A. D.C. Court's Homestead Exemption Opinion

In deciding that Max Salas was entitled to the District of Columbia homestead exemption, the D.C. Court reviewed the attempted transfer of the property from Len Salas to a "1610 Riggs Property Trust" in 2010. In doing so, the D.C. Court determined that the trust never existed and was a nullity *ab initio*. ***In re Salas***, 2018 WL 4621930, *18. The D.C. Court then considered the impact of the invalid trust on the conveyance of the property. The D.C. Court held that although the trust was invalid, a resulting trust was not created because valuable consideration was given. ***Id.*** at *19. As such, the D.C. Court

8

held that legal and beneficial rights were conveyed to Max Salas, the intended beneficiary

of the conveyance. *Id*. Finally, the D.C. Court addressed the impact of the transfer never

being recorded:

> [T]here is the issue that Max failed to record the *Quitclaim Deed*. This,
> however, does not invalidate the transfer. A deed conveying property will be
> valid, even if that deed is never recorded as required by D.C. Code § 42-401,
> because that section "deals with acknowledgment, certification, and
> recordation as protections for 'creditors and subsequent bona fide
> purchasers,' . . . [t]hose requirements do not bar the operation of a signed,
> sealed, and delivered deed against parties and their assignees."

*Id.* at *20. Accordingly, the D.C. Court determined "that under District of Columbia law,

the Property was conveyed to Max, and he holds both the legal and beneficial interests in

the Property." *Id.*


## B. Application of Collateral Estoppel

Pursuant to D.C. law, the doctrine of collateral estoppel, also known as issue

preclusion, "'renders conclusive in the same or a subsequent action determination of an

issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid,

final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties

or their privies; (4) under circumstances where the determination was essential to the

judgment, and not merely dictum.'" *In re Salas*, 2018 WL 4621930, *11 (quoting *Davis v.

Davis*, 663 A.2d 499, 501 (D.C. 1995)). Stated differently, if there has been prior litigation,

issue preclusion applies if "(1) [it involves] the same claims or cause of action, (2) between

the same parties or their privies, and (3) there has been a final, valid judgment on the merits,

(4) by a court of competent jurisdiction." ***Peek v. SunTrust Bank, Inc.***, 313 F. Supp. 3d 201, 205 (D.D.C. 2018) (citation omitted).

"'[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" ***McLaughlin v. Bradlee***, 803 F.2d 1197, 1201 (D.C. Cir. 1986) (quoting ***Allen v. McCurry***, 449 U.S. 90, 94 (1980)). Therefore, the Court must consider whether the issue in question is identical to what was litigated in the D.C. Court. ***Merle v. U.S.***, 683 A.2d 755, 762 (D.C. 1996).

The issue of ownership interest was at the heart of the D.C. Court's decision to allow Max Salas to claim a homestead exemption, as it is in the present litigation with regards to the fraudulent conveyance claims. The D.C. Court determined Max Salas held both legal and beneficial rights to the Property despite Len Salas being the titled owner. Moreover, a determination of ownership was essential to the D.C. Court's decision that Max Salas was entitled to claim the homestead exemption. Specifically, if the D.C. Court had found that Len Salas was the actual owner, Max Salas would not have been entitled to claim the homestead exemption. In the present case, this Court has determined that the Property is only recoverable by the estate if Len Salas, the debtor in this case, held something more than bare legal title, making ownership an essential consideration. As such, the Court finds the first requirement of issue preclusion has been met.

The second requirement for issue preclusion is also met, as the prior decision is a valid, final judgment on the merits. The D.C. Court held an evidentiary hearing and entered a lengthy memorandum decision on the homestead exemption issue, and the judgment is final.[6]

The third requirement for issue preclusion is more complex. Once the first two requirements are met, the issue becomes whether the plaintiffs had "'a fair opportunity procedurally, substantively and evidentially to pursue [the] claim the first time.'" ***Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.***, 402 U.S. 313, 333 (1971) (citation omitted). In the D.C. Court, the plaintiffs represented themselves, whereas in this adversary proceeding, the plaintiffs have stepped into the shoes of the Trustee. However, that does not end the discussion as the question of privity must be decided.

"The term 'privity' signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon the others, although those others were not party to the lawsuit." ***Gill and Duffus Servs., Inc. v. A.M. Nural Islam***, 675 F.2d 404, 405 (D.C. Cir. 1982). As such, "'[a] privy is one [who is] so identified in interest with a party to the former litigation that he or she represents precisely

---

[6] The plaintiffs' appeal of the Homestead Opinion to the D.C. District Court was dismissed and remanded. ***Brekelmans v. Salas (In re Salas)***, No. 18-cv-2318, 2020 WL 32567 (D.D.C. Jan. 2, 2020). The plaintiffs then filed a motion for reconsideration in the D.C. Bankruptcy Court based on newly discovered evidence. This motion was denied, ***In re Salas***, No. 18-00260, 2020 WL 6054783 (Bankr. D.C. Oct. 13, 2020), and the D.C. District Court affirmed. ***Brekelmans v. Salas (In re Salas)***, No. 20-3091, 2022 WL 1154596 (D.D.C. April 19, 2022).

11

the same legal right in respect to the subject matter of the case.'" ***Herrion v. Children's Hosp. Nat'l Med. Ctr.***, 786 F. Supp. 2d 359, 371 (D.D.C. 2011) (quoting ***Smith v. Jenkins***, 562 A.2d 610, 615 (D.C. 1989)). ***See also EDCare Mgmt., Inc. v. DeLisi***, 50 A.3d 448, 451 (D.C. 2012) (citation omitted).

The plaintiffs submitted the case of ***Kind Operations, Inc. v. Cadence Bank, N.A. f/k/a ALoStar Capital Fin. (In re PA Co-Man, Inc.)***, 644 B.R. 553 (Bankr. W.D. Pa. 2022), in support of their argument. As noted in ***Kind Operations***, normally a trustee or creditor acting as successor-in-interest to the trustee's interests is not bound by a state court judgment where the same creditor was acting in its individual capacity. ***Id.*** at 637. In that case, the creditor, acting as the trustee's assignee, pursued a myriad of civil actions against multiple defendants based on a private foreclosure sale of substantially all the debtor's assets prior to the debtor filing for bankruptcy protection. ***Id.*** at 567-568. As a result of the pre-petition sale, the debtor and its other creditors were essentially left with nothing. ***Id.*** Two of the defendants raised issues of res judicata and collateral estoppel, asserting that certain claims were barred because the creditor was also the plaintiff in state litigation pursued against them. ***Id.*** at 637. The court held that no privity existed because in the state court litigation, the creditor was representing its own self-interest. Whereas, in the bankruptcy adversary proceeding, the creditor was acting on behalf of the estate. ***Id.***[7]

---

[7] Additionally, the ***Kind Operations*** court noted that the state court actions were void because they were filed post-petition in violation of the automatic stay. ***Id.*** (citations omitted).

Unlike in **Kind Operations**, this case presents a unique set of circumstances. Here, the plaintiffs represent 99.8% of all allowed unsecured claims of the estate, making the estate's interests in this adversary virtually identical to the plaintiffs' interests in the D.C. litigation. Moreover, the plaintiffs, represented by the same attorney, fully and zealously litigated the issue of ownership in the D.C. Court. Thus, a finding of issue preclusion in this instance would not work some unfairness as "the losing party clearly [did not] lack[ ] any incentive to litigate the point" at issue in the earlier case. **Canonsburg Gen. Hosp. v. Sebelius**, 989 F. Supp. 2d 8, 19 (D.D.C. 2013) (citations omitted). Like the litigation now, the plaintiffs had every incentive to forcefully litigate the ownership issue as part of their objection to Max Salas' homestead exemption. If the plaintiffs had won on the issue of ownership in the D.C. bankruptcy litigation, Max Salas would not have been able to claim his homestead exemption. As a result, Len Salas would have been the owner of the Property, and that Property would have been part of his estate.

Moreover, there is no reason to believe the proceedings in the D.C. Court were defective. **Martin v. Dep't of Justice**, 488 F.3d 446, 455 (D.C. Cir. 2007) (quoting **Blonder-Tongue Labs., Inc.**, 402 U.S. at 333) (Courts evaluating the fairness of preclusion also consider whether the "'prior proceedings were seriously defective.'"). As stated earlier, the matter was rigorously litigated and affirmed on appeal.

For these reasons, the Court finds that the plaintiffs, acting on behalf of the Trustee, are collaterally estopped from relitigating the issue of ownership or bare legal title. But

even if collateral estoppel did not apply, the undisputed material facts support the same conclusion. Len Salas only lived at the Property for a brief time during which he paid rent to Max Salas. Len Salas never made any mortgage payments, paid any insurance premiums, or paid any property taxes. In fact, Len Salas never considered himself the owner of the property. While there are multiple discrepancies and contradictions throughout the voluminous record in this case, there is no dispute that Len Salas signed the mortgage and had his name on the title for the sole purpose of helping Max Salas keep his home. The same is true for Max Salas. The undisputed facts show Max Salas had multiple conversations with family and professionals regarding how to get Len Salas' name off the title and mortgage. He even had his other son generate documents to remove Len Salas' name from the Property. Max Salas' inability (or unwillingness) to take the necessary steps to remove Len Salas from the mortgage and title is the only reason Len Salas' name remained on the title. And based on the caselaw discussed above, the Court finds as a matter of law that Len Salas only holds bare legal title.

For all of these reasons, the Court finds that Max Salas is entitled to summary judgment on the fraudulent conveyance claims brought pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B).[8]

---

[8] Neither party sought summary judgment relief on the plaintiffs' claim of actual fraud pursuant to 11 U.S.C. § 548(a)(1)(A) and rightfully so. The existence of fraudulent intent is a question of fact, so summary judgment is rarely an appropriate remedy. *Renneker v. Wyman (In re Wyman)*, 626 B.R. 480, 499–500 (Bankr. S.D. Ohio 2021) (citations omitted).

14

## IV. 11 U.S.C. § 550

Count VI of the plaintiffs' amended complaint seeks relief pursuant to 11 U.S.C. § 550. Section 550(a) does not give rise to any affirmative relief on its own. Instead, it sets forth the available remedies if a transfer is avoided pursuant to 11 U.S.C. §§ 544, 545, 547, 548, 549, 553(b), or 724(a). *See Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*, 340 B.R. 829, 837-38 (Bankr. E.D. Mich. 2006). Because the Court finds that summary judgment should be denied as to the plaintiffs' strong-arm claims, summary judgment on Count VI is not appropriate at this time.

## V. Conclusion

Based on the Court's findings, neither side is entitled to summary judgment on Count I, II, and VI of the plaintiffs' amended complaint,[9] and Max Salas is entitled to summary judgment on Counts IV and V.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

---

[9] Count III of the plaintiffs' amended complaint requests relief pursuant to 11 U.S.C. § 544(a)(2), which provides that a trustee has the rights and powers of a hypothetical "creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time." The plaintiffs did not seek summary judgment on Count III in either their original motion or their supplemental brief. However, Max Salas has asserted that he is entitled to summary judgment on this claim based on inquiry notice. In making this argument, Max Salas provided no case law specifically addressing notice as it relates to 11 U.S.C. § 544(a)(2), nor was this Court able to find any. Accordingly, to the extent Max Salas is seeking summary judgment on Claim III of the amended complaint, the motion is denied.

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

15



Marian F. Harrison
US Bankruptcy Judge

Dated: 5/23/2023



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) CASE NO. 318-02662 |
| LEN SALAS, | ) |
| | ) JUDGE MARIAN F. HARRISON |
| Debtor. | ) |
| | ) CHAPTER 7 |
| NICOLAAS BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, | ) |
| CO-PERSONAL REPRESENTATIVES | ) ADV. NO. 320-90027 |
| OF THE ESTATE OF NINA | ) |
| BREKELMANS, | ) |
| | ) |
| and | ) |
| | ) |
| MICHAEL MCLOUGHLIN AND | ) |
| MARTHA JOHNSON, CO-PERSONAL | ) |
| REPRESENTATIVES OF THE | ) |
| ESTATE OF PATRICK | ) |
| MCLOUGHLIN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MAX SALAS, | ) |
| | ) |
| Defendant. | ) |

---

## ORDER

---

In accordance with the Memorandum Opinion filed contemporaneously with this Order, it is hereby **ORDERED** that the motions for summary judgment on Counts I, II, III, and VI of the plaintiffs' amended complaint are **DENIED**.

It is further **ORDERED** that Max Salas' motion for summary judgment on Counts IV and V of the plaintiffs' amended complaint is **GRANTED**.

**IT IS SO ORDERED.**

**This Order was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.




Marian F. Harrison
US Bankruptcy Judge

Dated: 8/16/2023



IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

In Re:                                          )
                                                )
Len Salas,                                      )      Case No. 3:18-bk-02662
                                                )      Chapter 7
        Debtor.                                 )      Judge Harrison
_____                 )
                                                )
Nicolaas Brekelmans and Gail Gregory            )
Brekelmans, Co-Personal Representatives         )
of the Estate of Nina Brekelmans                )
                                                )
and                                             )
                                                )
Michael McLoughlin and Martha                   )
Johnson, Co-Personal Representatives            )
of the Estate of Michael Patrick                )
McLoughlin,                                     )
                                                )
        Plaintiffs,                             )
                                                )
v.                                              )      Ad Pro No. 3:20-ap-90027
                                                )
Max Salas,                                      )
                                                )
        Defendant.                              )

## ORDER DENYING PLANITIFFS'
## MOTION TO ALTER OR AMEND UNDER FED. R. BANKR. P. 9023

This matter came before the Court for a hearing on the Plaintiffs' Motion to Alter or Amend

Under Fed. R. Bankr. P. 9023 (Doc. 104) (the "Motion") and the Defendant's Response thereto

(Doc. 107) (the "Response"); and appearances at the hearing having been made by Philip McNutt

on behalf of the Plaintiffs and by Phillip Young on behalf of the Defendant; and based upon the Motion, the Response, and arguments made by counsel at the hearing;

**IT IS HEREBY FOUND:**

A.　　Pursuant to Federal Bankruptcy Rule 7052, the Court hereby incorporates and adopts the findings and conclusions stated orally in open court on August 15, 2023.

B.　　The Plaintiffs have failed to meet the standards required to alter or amend the Court's prior order pursuant to Fed. R. Bankr. P. 9023 and F.R.C.P. 59.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.　　The Motion is hereby DENIED.

> **THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

Submitted for entry:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Counsel for Defendant

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.