Case No. 3:23-cv-00987

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville, Tennessee

| | | |
|---|---|---|
| In re: | : | |
| LEN SALAS | : | Case No. 18-2662-MFH |
| | | Chapter 7 |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS | : | |
| AND GAIL GREGORY | | |
| BREKELMANS, CO-PERSONAL | : | |
| REPRESENTATIVES | | |
| OF THE ESTATE OF NINA | : | |
| BREKELMANS, et al | | |
| | : | |
| Appellants and Cross-Appellees | | |
| | : | |
| v. | : | Appeal from the United States |
| | | Bankruptcy Court, Case No. 18- 2662 |
| | | (Harrison, J.) |
| MAX SALAS | : | Adversary Proceeding No. |
| | | 3:20-ap-90027 |
| Appellee and Cross-Appellant | : | |

**BRIEF OF APPELLANTS**

BURCH, PORTER & JOHNSON, PLLC

By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt
Philip J.McNutt
Admitted *pro hac vice*
11921 Freedom Drive, Ste 588
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

ATTORNEYS FOR THE APPELLANTS

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**I.    TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

    **A.  Cases** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

    **B.  Statutes and Rules** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

    **C.  Treatises and Other Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

**II.   JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**III.  ISSUES ON APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**IV.   FACTUAL AND PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . 3

    **A.    Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    **B.    The Tennessee Adversary Proceeding** . . . . . . . . . . . . . . . . . . . . . . . . 5

    **C.    Motion to Alter or Amend** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**V.    SUMMARY OF THE ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**VI.   ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    **A.    The Bankruptcy Court Failed to Consider
        Relevant, Undisputed, Facts and Controlling
        Law in Determining the Parties' Summary
        Judgment Motions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    **B.    The Debtor was the Owner of the Property
        for all Purposes After 2007** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    **C.    Issue Preclusion Does not Apply to the Plaintiffs'
        Claim in the Tennessee Bankruptcy Case** . . . . . . . . . . . . . . . . . . . 15

        **1.    The Plaintiffs are Acting on Behalf of
              the Debtor's Estate.  Therefore, Collateral
              Estoppel Cannot Apply to the Plaintiffs' Claims** . . . . . . . . . . . . 15

        **2.    The D.C. Bankruptcy Court did not Determine
              Issues Related to the Trustee's Causes of Action
              and Neither the Trustee nor the Debtor's Estate**

-ii-

Were Parties to the D.C. Exemption Hearing or
Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3.     The Plaintiffs' Derivative Status Precludes
the Application of Issue Preclusion; the
Trustee and the Debtor's Estate are the
Real Parties in Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4.     *Kind Operations* Supports the Plaintiffs'
Motion for Summary Judgment on the
Issue of Collateral Estoppel . . . . . . . . . . . . . . . . . . . . . . . . 20

D.     The Actions and Interactions Between the Debtor
and the Defendant Represent Substantially all
of the Badges of Fraud Set Forth in the Uniform
Fraudulent Transfer Act as Enacted in the
District of Columbia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E.     The Recorded Judgments on April 5, 2018, Even
if Applicable to the Issue of Inquiry Notice, Do
Not Show any Information Inconsistent with the
Title Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

F.     The Court Should Have Granted the Plaintiffs'
Summary Judgment on Counts I-III of the
Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

G.     The Court Erred When it Failed to Grant the
Plaintiffs' Motion to Alter or Amend
(Reconsideration) Under Well Established
6th Circuit Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

H.     As a Court of Equity, the Bankruptcy Court
Should Not Have Granted Relief to the
Defendant, or Relief that Benefitted the
Debtor or His Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.     The Doctrine of Unclean Hands Prevents this
Court From Granting any Relief to the Defendant . . . . . . . . . . . . . . . 34

J.     The Debtor's Interest in the Property is a
Sufficient Interest for the Exercise of the
Trustee's Avoidance and Recovery Powers . . . . . . . . . . . . . . . . . . . . . 41

-iii-

**VII.    CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

I.     **TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    **A. Cases** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

        *ABF Freight Sys. v. NLRB*, 510 U.S. 317, 323,
        114 S. Ct. 835, 839 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        *Bardes v. Hawarden Bank*, 178 U.S. 524, 534-536 (1900) . . . . . . . . . . . . . . . . . 33

        *Bash v. Laikin (In re Fair Fin. Co.)*, Nos. 10-50494,
        10-5043, 2013 Bankr. LEXIS 5663, at *54
        (Bankr. N.D. Ohio Oct. 24, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520,
        526 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        *Canonsburg Gen. Hosp. v. Sebelius*, 989 F.Supp.2d
        8, 19 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,17

        *Carmen v. Fox Film Corp.*, 269 F. 928, 932 (2nd Cir. 1920) . . . . . . . . . . . . . . . 40

        *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d
        659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (N.Y. 1990) . . . . . . . . . . . . . 22

        *Dunham v. Kisak*, 192 F.3d 1104 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 42, 43

        *Edwards v. Academy Pub. Corp.*, 562 N.E.2d 60, 61
        (Ind. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        *Farrell Constr. Co. v. Jefferson Parish, La.*,
        896 F.2d 136, 140 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        *Gaff v. FDIC*, 919 F.2d 384, 392 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 34

        *Gecker v. Marathon Fin. Ins. Co. (In re Auto.*
        *Prof'ls, Inc.)*, 389 B.R. 630, 634 (Bankr. N.D. Ill. 2008) . . . . . . . . . . . 19, 20

        *Granfinanciera v. Nordberg*, 492 U.S. 33, 81, 109 S. Ct.
        2782, 2811 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825
        (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hyundai Translead, Inc. v. Jackson Truck & Trailer*
    *Repair, Inc. (In re Trailer Source, Inc.),*
    555 F.3d 231, 242 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Indiana Mills & Mfg., Inc. v. Evenflo Co., Inc.*,
    No. 04-cv-540SEBVSS, 2005 U.S. Dist.
    LEXIS 31149, 2005 WL 3150164, at *7
    (S.D. Ind. Nov. 22, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Johnson v. Yellow Cab Co.*, 321 U.S. 383, 387 . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Juan C. v. Cortines*, 679 N.E.2d 1061, 1065 (N.Y. 1997) . . . . . . . . . . . . . . . . 21, 22

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 . . . . . . . . . . . 35

*Kind Operations, Inc. v. Cadence Bank (In re PA*
    *Co-Man, Inc.)*, 644 B.R. 553 (Bankr. W.D. Pa. 2022) . . . . . . . 20, 21, 22, 23

*Logan v. MGM Grand Detroit Casino*, 939 F.3d 824,
    836 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Loughran v. Loughran*, 292 U.S. 216, 229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Malone v. Iceberg Transp. S.A. (In re Gold &*
    *Appel Transfer S.A.)*, Nos. 05-00775, 05-10022, 2013
    Bankr. LEXIS 3695, at *1 (Bankr. D.D.C. Sep. 6, 2013) . . . . . . . . . . . 22, 23

*McKinley v. Crawford,* 58 F.2d 528 (D.C. App. 1932) . . . . . . . . . . . . . 7, 11, 28. 30

*Modiri v. 1341 Rest. Grp., Inc.*, 904 A.2d 391, 394-97 (D.C. 2006) . . . . . . . . . . . . .

*People v. Roselle*, 84 N.Y.2d 350, 618 N.Y.S.2d
    753, 643 N.E.2d 72 (N.Y. 1994)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Pepper v. Litton*, 308 U.S. 295, 303-05, 60 S. Ct. 238,
    244 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Richmond Health Facilities v. Nichols*, 811 F.3d 192, 201, n. 8 . . . . . . . . . . . . . . 41

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach.*
    *Co.*, 324 U.S. 806, 814-15, 65 S. Ct. 993, 997 (1945) . . . . . . . . . . . . . . . . . 35

*Scott v. C.I.R.*, 226 F.3d 871, 874 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*In re Tleel*, 876 F.2d 769, 771 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Tolz v. Miller*, 391 B.R. 504 (Bankr. M.D. Fla. 2008) . . . . . . . . . . . . . . . . . . . . 39, 40

*Tyler v. Cain*, 533 U.S. 656, 663 n.4, 121 S. Ct. 2478,
150 L. Ed. 2d 632 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Energy Resources Co., Inc.*, 495 U.S.
545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990) . . . . . . . . . . . . . 34

*In re Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309,
76 L.Ed.2d 515 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 43

*Wicklein v. Kidd*, 149 Md. 412, 131 A. 780 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Worldcom, Inc.*, 401 B.R. 637, 651 (Bankr. SD.N.Y.) . . . . . . . . . . . . . . . . . . 20

**B. Statutes and Rules** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

11 U.S.C. § 105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

11 U.S.C. § 543 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

11 U.S.C. § 544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 8, 17, 18

11 U.S.C. § 544 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11 U.S.C. § 544 (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

11 U.S.C. § 547(a)(i)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

11 U.S.C. § 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 42

11 U.S.C. § 548 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 42

11 U.S.C. § 548 (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

11 U.S.C. § 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D.C. Code, §§ 28-3104, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

D.C. Code § 28-3101(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D.C. Code §42-404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

### C. Treatises and Other Authorities

*Black's Law Dictionary*, (10th Ed. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Judging under the Constitution: Dicta about Dicta*,
      Pierre N. Leval, 81 N.Y.U. L. Rev. 1249, 1256 (2006) . . . . . . . . . . . . . . . . 41

*Pomeroy's Equity Jurisprudence* (3d. Ed.), Vol. 1 § 398. . . . . . . . . . . . . . . . . . . .40

## II. JURISDICTION

1. The Bankruptcy Court had jurisdiction over the Plaintiffs' Complaint under 28 U.S.C. § 1334 (b). The Complaint involved the trustee's causes of action purchased by the Plaintiffs from the Debtor's Estate.

2. This matter is a core matter involving the avoiding powers of the trustee pursuant to 11 U.S.C. § 544, *et seq.* (hereinafter, all references to the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* are cited as "Code, §"). ***See*** 28 U.S.C. §157 (b)(1) and §157(b)(2) (A)(F)(H) & (0).

3. Under 28 U.S.C. § 158, a district court has jurisdiction to hear a timely appeal from interlocutory orders with leave of court. Leave of court was granted by this Court's on July 17, 2024 (D-14).

4. The Appellants filed timely appeals of the Bankruptcy Court's Orders of May 24, 2023 and August 16, 2023 on August 28, 2024.

## III. ISSUES ON APPEAL

(1) whether the inquiry notice question submitted by the Bankruptcy Court to the parties in its January 5, 2023 Order (AP No. 83) may be resolved in favor of the Plaintiffs purely as a matter of law based on the undisputed facts;

(2) whether the Bankruptcy Court erred in determining that the decision of the D.C. Bankruptcy Court had any preclusive effect on the Plaintiffs' claims in their Complaint;

(3) whether the Bankruptcy Court erred as a matter of law in holding, in the alternative, that debtor Len Salas held only bare legal title to the Property;

(4) Whether the Bankruptcy Court erred in not granting the Plaintiffs' Motion for Summary Judgment on all Counts of the Complaint;

-1-

(5) Whether the Bankruptcy Court erred in granting the Defendant's Motion for Summary Judgment on the Plaintiffs' Counts asserting constructive fraud;

(6) whether the Bankruptcy Court erred in its determination that the size of the Plaintiffs' claims had any effect on their ability to pursue the Trustee's claims against the Defendant;

(8) whether the Bankruptcy Court erred in determining that a decision of the D.C. Bankruptcy Court regarding an alleged owner of exempt property in the District of Columbia has any preclusive effect on the avoidance and recovery claims of the trustee against the titled owner of the Property;

(9) Whether the Bankruptcy Court erred in determining that the Plaintiffs are not entitled to summary judgment based upon the undisputed facts of this case controlling law;

(10) Whether the Bankruptcy Court erred when it determined there are material issues of fact in dispute preventing the Court from granting the Plaintiffs' Summary Judgment on Counts I-III; and

(11) whether the Bankruptcy Court erred in denying Plaintiffs' Motion to Alter or Amend?

Because the Bankruptcy Court's decision appealed from was made on cross-motions for summary judgment, the Bankruptcy Court's findings and conclusions are reviewed "de novo" on appeal with all factual allegations considered in the light most favorable to the non-moving party.

## IV.    FACTUAL AND PROCEDURAL BACKGROUND

1. Except as specifically set forth herein, the Plaintiffs adopt the factual and procedural background set forth in the Court's Memorandum and Order granting leave to appeal 7/17/24. Section II (Dkt-12)[1]

---

[1]Bankruptcy Court docket entries are designated ("D-  ").  This Court's docket entries are designated ("Dkt-  ")

2.   The subject of the Plaintiffs' Complaint is the Defendant's alleged interest in a valuable, single-family residence, located at 1612 Riggs Place, NW, Washington, DC. ("the Property").   The Property was conveyed by the Defendant, Max Salas (hereinafter "the Defendant" or "Max") to the Debtor herein, Len Salas (Hereinafter, "Debtor" or "Len", in 2007, by an unrestricted Deed.   In July, 2010, the Len, Max and Ron Salas, Max's son and brother of Len, a recently licensed Colorado attorney ("Ron"), attempted a transfer of the Property by Quitclaim Deed through a Colorado trust, "the 1612 Riggs Property Trust."   Defendant's Responses to Plaintiff's List of Undisputed Facts, 8/12/22 (D-75-1) ("Defs. Responses"), ¶22, **Appx** 00778.

3.   In June, 2011 emails among Ron, Len, Max, and Max's attorneys, show that  the Quitclaim Deed was no longer in effect. Defs. Responses ¶¶25-30. **Appx** 00778-779.  In the eMails, Ron instructed Max to obtain a deed in D.C. Simultaneously, there were a series of eMails among Len, Max, and Max's counsel about getting the Debtor's name off the title to the Property. Defs. Response ¶¶27-28. **Appx** 00779. The original Quitclaim Deed was lost, abandoned or destroyed in 2011. Defs. Responses"), **Appx** 00775-776. Defendant's Supplement Responses to Plaintiffs' List of Undisputed Facts ("Defs Supplemental Responses"), 9/8/22, ¶11. **Appx** 00941.   Both the Len and Max acknowledge that the Len continuously sought to have his name taken off the Deed to the Property from 2011 through at least early, 2015. Defs. Responses, ¶¶ 25-32. **Appx** 00778-779; Defs Supplemental Responses, ¶30. **Appx** 00924. The communications are unequivocal that the Debtor was still on the Deed and wanted to get off the Deed. Defs. Responses ¶¶28-32 **Appx.,** at 00779-780.

4.   In June, 2015 a tragic fire, started through the negligence of the Debtor and the Defendant, swept through the Property.  Investigators determined that the Debtor and the Defendant

-3-

were illegally renting out rooms at the Property without a proper license and in violation of the D.C. housing construction and safety requirements. Amended Complaint, ¶11. **Appx** 00179.

5. The Plaintiffs filed separate lawsuits in the D.C. Superior Court in the fall, 2015 which were consolidated. During discovery, in or about March, 2016, the Defendant caused his son to file a loan mitigation application with the Property's first trust lender. Id., ¶12. **Appx** 00179. The Debtor was the sole obligor under the first deed of trust note and represented himself to be the sole owner of the Property. Id., ¶¶ 11, 14, 15 , **Appx** 00178-180.

6. In late 2017 when it appeared likely that a substantial judgment was going to be entered against him, the Defendant sought bankruptcy counsel. Id. , ¶33, 34. **Appx** 00182. As a result of conversations the Defendant had with his D.C. bankruptcy counsel, the Defendant attempted to resurrect the defunct, abandoned or lost, Quitclaim Deed understanding that the Defendant might be able to claim D.C. generous homestead exemption by virtue of the Deed. Id. ¶ 37 **(Appx** 00183), and use that ownership to claim D.C.'s generous homestead exemption. Id. **Appx** 00183

7. At all relevant times, all public documents related to the Property were in the name of the Debtor, not the Defendant and all leases managed by the Defendant, along with all lease payments, were in the name of the CLR Trust. Id. ¶¶ 17-20 (**Appx** 00180). M. Salas Affidavit, 8/12/2022,(D-75), ¶¶ 19-22. **Appx** 00807; Defs. Responses, ¶94. **Appx** 00795. See leases at **Appx** 01107-1114. The Trust was named after the Defendant's 3 sons, C̲hase, L̲en and R̲on. All payments of mortgage, insurance, etc. were paid by the Trust. Defs. Responses, ¶¶54- 57. **Appx** 00786, 00946.

8. The Debtor belatedly sought summary judgment in the Superior Court case, contending that, copy of the Quitclaim Deed, showed he was not the owner and, therefore, not liable. Dkt 12, p.

-4-

4. The Superior Court rejected that contention. Judgments were entered against both defendants and in favor of Nina ($7.2 Million) and Michael ($7.5 Million). Id.

### A.    Procedural Background

9.  On April 18, 2018, the Debtor and the Defendant filed separate Chapter 11 bankruptcies, Max in D.C. and Len in Tennessee.

10.  The Appellants objected to the Defendant's claim of a homestead exemption. In September, 2018, the D.C. Bankruptcy Court (Teel, J.) filed a Memorandum ("the D.C. Memorandum") concluding that, Quitclaim Deed was sufficient to create an interest in the Defendant as owner, entitling him to the exemption. **Appx** 00954. Judge Teel specifically excluded any claims of the Tennessee bankruptcy estate to recover the property. Judge Teel stated his decision would have no legal effect in an avoidance action in Tennessee which might well "overrule" a decision (to allow the exemption). See D.C. Memorandum, Section IV. **Appx** 01010.

11.  In December, 2018, the Debtor's case in Tennessee was converted to Chapter 7. A Trustee was appointed. The Plaintiffs asked to Trustee to pursue avoidance and recovery claims against the Defendant. The Plaintiffs understood the Trustee intended to pursue those claims, with the help of Plaintiffs' counsel. However, the Trustee changed his mind after talking with Defendant's counsel and attempted to sell the bankruptcy estate's claims to the Defendant's son, Ron. The Court ordered an auction sale of the estate's claims. Plaintiffs were the successful bidders in a lengthy auction with the Defendant. Memorandum, 2/11/21 (D-38), at p.4 **Appx** 00162.

### B.    The Tennessee Adversary Proceeding

12.  The Plaintiffs' adversary proceeding was commenced on March 2, 2020. The Plaintiffs filed an Amended Complaint on February 16, 2021 (hereafter "the Complaint"). (D-40) **Appx** 00176.

-5-

13. The Plaintiffs' Complaint consists of three Counts under the Trustee's avoidance powers, 11 U.S.C. § 544 (a), two fraudulent conveyance Counts and a sixth Count for recovery under 11 U.S.C. § 550. **Id.**.

14. On July 29, 2022, the Plaintiffs filed a Motion seeking summary judgment on all Counts (D-73) and a lengthy Memorandum in Support ("Plaintiff's Memorandum"). **Appx** 00397. The Bankruptcy Court denied the Plaintiffs' Motion.

15. On January 5, 2023 the Bankruptcy Court ordered a hearing on two issues, namely: (a.) Did Judge Teel's decision in August, 2018 on the Defendant's claim of a homestead exemption preclude these Plaintiffs from pursuing their derivative claims in the captioned bankruptcy case?; and (b.) Did the Defendant's possession of the Property constitute notice of his ownership such that the resulting"inquiry notice" to a prospective purchaser would defeat the trustee's avoiding powers under 11 U.S.C. § 544 (a)?

16. On May 24, 2023, the Bankruptcy Court filed its Memorandum Opinion ("Memorandum Opinion") (D-101) (**Appx** 01260) denying the parties' motions for summary judgment on Counts I-III of the Complaint and partially granting the Defendant's Motion for Summary Judgment on Counts IV and V.[2]

17. In its Opinion, the Court determined that summary judgment is not appropriate for Counts I through III (and VI) of the Complaint but determined that issue preclusion did apply to Counts IV and V and, therefore, granted the Defendant's Motion for Summary Judgment on those Counts. The Plaintiffs asserted the Court did not consider the relevant, undisputed facts, discussed

---

[2]In its Memorandum Opinion, the bankruptcy court noted that the court did not consider summary judgment on the actual fraud section of 11 U.S.C. § 548 (a)(1) since neither party requested summary judgment and the existence of actual fraud is a question of fact. Memorandum Opinion, at p. 14, n. 8. **Appx** 01273.

-6-

below and also failed to follow established law.

### C. Motion to Alter or Amend

18. The Plaintiffs-Appellants filed a Motion to Alter or Amend the May 24, 2023 Order (D-102) ("Motion to Alter") (**Appx** 01275) asserting that the Bankruptcy Court failed to give proper consideration to the manner in which the Plaintiffs' acquired their right to pursue the estate's claims on behalf of the estate; and that the Court also failed to give proper consideration to the D.C. case of *McKinley v. Crawford*, 58 F.2d 528 (D.C.App. 1932) and cases from approximately 15 other jurisdictions which follow or support *McKinley*, all of which supported the Plaintiff-Appellants position and required summary judgment in their favor.

19. The Plaintiffs timely appealed the Bankruptcy Court's decision on Summary Judgment and its denial of the Plaintiffs' Motion to Alter or Amend.

## V. SUMMARY OF THE ARGUMENT

The Plaintiffs-Appellants' assert the Debtor, Len Salas, was the owner of the subject Property until the day before his bankruptcy filing. He transferred his Property to his father, the Defendant, Max Salas when Len was insolvent. The Bankruptcy Court erroneously determined that the decision of the D.C. Bankruptcy Court in Max's bankruptcy (18-00260) regarding Max's claim of exemption, was binding on the Tennessee Bankruptcy Court although the D.C. decision clearly avoided determining the issues on appeal here and the Plaintiffs' are acting derivatively, standing in the shoes of the Trustee, and pursuing claims belonging to Len's estate. Neither the Trustee nor Len's Estate were parties to the D.C. decision. Well-established case law in the District of Columbia and recognized in the Sixth Circuit holds that Len Salas held more than "bare legal title."When  Max transferred his interest to his son by an unrestricted Deed, Max's possession was not sufficient to establish inquiry notice necessary to defeat a bona fide purchaser under the

-7-

avoiding powers of 11 U.S.C. § 544, et seq. Finally, Max is not entitled to any remedy in this Court due to the obvious and deliberate attempts to hide information, misrepresent the facts and circumstances of his alleged ownership of the Property. Under principles of equity and the "clean hands" doctrine, Max is not entitled to the relief granted.

The Plaintiffs contend that there is a legal basis, as cited below, based upon the undisputed facts of the adversary proceeding below, to reverse the Bankruptcy Court';s grant of summary judgment in favor of the Defendant-Cross-appellant, and to grant summary judgment on all Counts to the Plaintiffs.

## VI.    ARGUMENT

20.  The matters of which the Plaintiffs seek review were decided on Cross-Motions for Summary Judgment. The Plaintiffs are not going to repeat the criteria for determining matters at the summary judgment stage, all of which were fully briefed in the Parties' Memoranda filed below, are undisputed, and will not be repeated here.

### A.    The Bankruptcy Court Failed to Consider Relevant, Undisputed, Facts and Controlling Law in Determining the Parties' Summary Judgment Motions.

21.  In the Plaintiffs' Motion to Alter or Amend the Plaintiffs asserted that the Court, in its summary judgment decisions, failed to consider, or failed to give appropriate consideration, to the following:

a. the Plaintiffs purchased the Trustee's causes of action at a court ordered auction in which the Defendant also participated.  (**Appx** 000162-163 ) Order in Case No. 3:18-bk-02662, 6/12/19 (D-179) **Appx** 01327-1329; Trustee's Notice of Rescheduled Auction, Case No. 3:18-bk-02662, 7/16/19, (D-187), **Appx** 01332; Trustee's Report of Sale in Case No. 3:18-bk-02662, 8/14/19, (D-191) (Confirming the purchase by the Plaintiffs at the auction sale held on July 23,

-8-

2019. Complaint, Exh A. **Appx** 00197-00200; **Appx** 00162-163; **Appx** 01333-1336.

b.   This Court failed to consider in its decision that the Plaintiffs did not originally seek to pursue the Trustee's claims.  It was only after the Trustee filed a Motion in this court attempting to sell his causes of action to the Defendant (through his son, Ron) that the Plaintiffs acted.  The Plaintiffs made a qualifying, competing offer and the Trustee held an auction sale, pursuant to the Court's ruling, at which both the Defendant and the Plaintiffs both bid and the Plaintiffs were ultimately successful. 2021 Memorandum Opinion. **Appx** 00162; Facts in Support of Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment, 3/7/23 (D-95-1)("Opposition Facts), ¶2 (**Appx** 01200).

c.   The Plaintiffs represent two distinct claims against the Estate, in different amounts.  The only similarities concerning the Plaintiffs' claims are that both children were killed in the same fire, both at the Property, and their two, different, wrongful death, cases, although filed separately, were consolidated by the D.C. Superior Court.  See Amended Complaint, paragraph 12. See also Amended Complaint paragraphs 11 through 13.

d.   At the hearing on the Plaintiffs Objections to the Trustee's Motion to Sell the Trustee's causes of action to the Defendant (through his son, Ron), the Defendant's attorney, Phillip Young represented to this Court that the Defendant's purpose in offering to purchase the Trustee's causes of action was to prevent the Trustee from pursuing any such causes (to the potential detriment of all creditors, including the Plaintiffs); and

e.   Neither the Court, nor the Defendant produced any cases which deviate from the uniformly accepted maxim that the Trustee and the Debtor's Estate are the real parties in interest regarding the Trustee's causes of action.  Therefore, in order for issue preclusion to apply, collateral estoppel, or *res judicata* must apply, in all respects, to the Trustee, or the Debtor's Estate. Neither

-9-

were parties to the D.C. Bankruptcy's Exemption Decision. Moreover, it is clear from Judge Teel's ruling, upon which this Court relied, that the D.C. bankruptcy court considered the facts related to the Defendant's alleged "ownership" of the Property **only in the context of the Exemption Decision** and specifically **declined to determine the status of this Debtor's Estates potential avoidance and recovery claims.**

f. In the Court's Summary Judgment Memorandum, the Court also failed to address the unrefuted fact that the Debtor and the Defendant were aware, as of at least June, 2011, that the Deed which they both submitted to the D.C. Bankruptcy Court, was actually abandoned and not in existence. The actions of the Debtor and the Defendant, along with the Defendant's son, Ron, constitute a scheme to defraud the creditors of this estate from recovering the equity in the Property which will provide the Plaintiffs some relief for the tragic loss of their children and at least a small recovery to provide them some sense of justice. Regardless, there is credible, and unrefuted, evidence that the Defendant and the Debtor sought to defraud creditors of this estate. At a minimum, the unrefuted facts asserted by the Plaintiffs in their Memoranda in support of summary judgment below are more than sufficient to require a trial on the issue of actual fraud, an issue that was neither briefed, argued, presented, or decided in the Defendant's D.C. Bankruptcy Case.

g. The Plaintiffs paid over $150,000 into the estate for the ability to pursue the causes of action which the Court now states they cannot pursue. The Court had Judge Teel's decision early in this case, including prior to the appointment of Mr. Gigandet as Trustee and, therefore, well prior to the auction sale which resulted in the Plaintiffs purchase, **from the estate** of the Trustee's causes of action. **See,** for example, the Debtor's Disclosure Statement, filed in the Debtor's bankruptcy Case No. 02662, on November 9, 2018, D-83, at pp. 3-6, in which the Debtor set forth his arguments why these present causes were not viable:

-10-

As discussed further herein, and as will be further analyzed in a response to the Motion to Convert, Dismiss or Appoint Trustee, the Debtor's position is that a trustee (as well as the Debtor in the capacity of Debtor-in-Possession with the rights and powers of a trustee) would be unsuccessful in avoiding such a transfer due to applicable law, and **the surrounding facts that have previously been litigated and decided in the DC Bankruptcy Case.**

*Id.*, at p. 4 (emphasis added). The argument continued for another two pages. *Id.*

   h. The Court also did not grant summary judgment on Counts I - III of the Complaint asserting that there were competing facts in dispute and that summary judgment was not appropriate. However, in its Memorandum, the Court appears to have not considered the case law that establishes when an owner deeds his property to another but remains in possession, his deed constitutes "notice to the world" that he is no longer the owner. See discussion in Plaintiffs' Supplemental Memorandum, 2/21/23, (D-92), Section E, generally, and pp. 36-37, ¶¶ 85 -87 **(Appx 01102-1103)** in particular. The Plaintiffs assert that the case law discussed in Section E and particularly the *McKinley* case cited and discussed in paragraphs 86 and 87, along with the supporting cases cited in *McKinley*[3] require granting Summary Judgment to the Plaintiffs based upon the following undisputed facts:

   i. At all relevant times prior to approximately February, 2018, the Defendant hid his ownership of the Property (the Defendant produced no recorded document or public record which showed the Defendant as the Owner). Even the leases he signed in 2014 and 2015 showed the landlord as the CLR Trust (Plaintiffs' Supplemental Memorandum, filed February 21, 2023 (D-92) ("Supplemental Memorandum"), Exh A (D-92-1) **Appx.** 01107-1114; and

---

[3]One of the cases cited by *McKinley* is the Maryland Court of Appeals (now Maryland Supreme Court) case of *Wicklein v. Kidd*, 149 Md. 412, 131 A. 780. The common law of the District of Columbia is based on the common law of Maryland at the time of cession unless modified by statute. See generally *O'Connor v. United States*, 399 A.2d 21, 25 (D.C. 1979). *Estate of Keough v. Keough*, 2019 D.C. Super. LEXIS 20, *27

ii.  In 2016, during the period when the Defendant and the Debtor were being deposed in the D.C. Superior Court case, the Defendant and the Debtor represented to Sun Trust, the holder of the deed of trust on the Property (in the Debtor's name), in a Loss Mitigation Statement,  that the Debtor was the owner of the Property; See Plaintiffs' Supplemental Memorandum, February 21, 2023 ("Supplemental Memorandum"), Exh. F **Appx** 01144-1152; and

iii.  All public notices regarding ownership of the Property were in the name of the Debtor, not the Defendant, until at least 2019  ( See, for example, Supplemental Memorandum, Exhs. G, H and I. **(Appx** 01153-1164); and

iv.  Neither the Debtor nor the Defendant had possession of an original deed after January, 2012,  Defs. Responses, Nos. 8 through 13.**Appx** 00775-776;

v.  in June, 2011, less than a year after the purported execution of the July, 2010 Quitclaim Deed, Ron Salas, the Defendant's son and the Debtor's brother directed the Debtor and the Defendant to prepare a deed to convey the Property to the trust Ron created in July, 2010 (Plaintiffs' Supplemental Memorandum in Support of the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Supplemental Memorandum"), Exh G. **Appx.** )1153-1164; and

vi.  No deed was created or signed by Len after July, 2010.

i.  The Defendant's Plan of Reorganization establishes that the Plaintiffs have the right to pursue the trustee's causes of action.  The only restriction contained in the Plan is to "defenses".  There is no mention or contemplation of preclusion which the Plaintiff assert is not a defense contemplated in the Defendant's Plan.  The Plaintiffs bargained for this language and withdrew their objections to the Defendant's plan in reliance on the Defendant's ability to only raise "defenses."  See argument in Plaintiffs' Second Supplemental Memorandum, filed on March 36, 2023, (D-100) ("Second Supplemental Memo"), at p. 5, ¶10. **Appx** 0128.

-12-

The above deficiencies were not adequately considered, explained, or refuted, in the Court's decision on the Motion to Alter of Amend either thus giving the Appellants' an overwhelming factual background which, when applied to established law applicable to the transactions complained of, require reversal of the Court's summary judgment decision and granting summary judgment to the Defendants on Counts IV and V. The Appellants also have established, based upon the undisputed facts and controlling law in the District of Columbia, their entitlement to summary judgment on Counts I-III.

### B.    The Debtor was the Owner of the Property for all Purposes After 2007

22.   The Defendant asserted, in support of his Motion for Summary Judgment below, that he owned the subject property (1610 Riggs Place, NW, Washington, DC "the Property") and paid the mortgage.  In the Court's Summary Judgment Memorandum, the Court also failed to address the unrefuted facts that the Debtor and the Defendant were aware, as of at least June, 2011, that the Deed upon which they relied and produced (a copy) to the D.C. Bankruptcy Court, was actually abandoned and not in existence, after 2010. The Defendant's assertions and the Court's factual bases for summary judgment to the Defendant, are refuted by the following undisputed facts:

a.   After 2007 there was no deed created which purported to transfer the property to the Defendant. Defs. Responses and Defs. Supplemental Responses **Appx** 00773 and 00940.

b.   The 2010 Quitclaim Deed deeded the property to an invalid trust, not the Defendant. See D.C. Memorandum (D-90-1), Section III. **Appx** 00999-1005 .

c.   The Defendant produced no documents showing that he was the owner of the Property at any time after 2007.  In fact, the tenant leases produced by the Defendant show that he was acting as "trustee"  for an entity named "the CLR Trust."  **Appx** 00774-786. See Supplemental Memorandum, Exh. A, D-92-1 **Appx** 01107-1114.

-13-

d. The Defendant abandoned the Quitclaim Deed prior to June, 2011. Plaintiffs' Memorandum, Exh. 7, **Appx.** 00564-578. Defs Responses, ¶¶ 3, 9, 10, 13, 25-29, 56. **Appx.** 000774- 785. Defs. Supplemental Responses, ¶ 11, 12, 30, 57 **Appx** 00946.

e. The Defendant made only one mortgage payment after June, 2015. Defs. Supplemental Responses **Appx** 00946.

f. The Defendant used essentially all of the insurance proceeds from the fire damage to the property to upgrade and update the Property so he could get a license to rent. Defs. Supplemental Responses **Appx** 00946.

g. from June, 2015 through early, 2018, the Defendant did not live at the property. Defs, Responses, ¶3, **Appx** 00774.

23. The above facts are undisputed. See Defs. Responses **Appx** 00773; Defs. Supplement Responses, **Appx** 00940; the Exhibits attached to the Plaintiffs' Memorandum in Support of their Motion for Summary Judgment (D-74-2 -74-22) **Appx** 00479-747; the Exhibits attached to the Plaintiffs' Supplemental Memorandum (D-92-1 - 92-9) **Appx** 01107-1164; and the Plaintiffs' Statement of Undisputed Facts attached to its Opposition to the Defendant's Motion for Summary Judgment (D-95-1). **Appx** 01196-1205.

24. On the other hand, the Debtor, since 2007, was the open and notorious owner of the Property as evidenced by the Deed, Deed of Trust, Governmental Notices (Supplemental Memorandum, Exhs. G- I) **Appx** 01153-1164, the SunTrust Loss Mitigation Statement of February, 2016 (Supplemental Memorandum, Exh. F) **Appx** 01142-1152, and all other documents of ownership and title after 2007. **Appx** 01015.

-14-

**C.** **Issue Preclusion Does not Apply to the Plaintiffs' Claim in the Tennessee Bankruptcy Case**

    **1.** **The Plaintiffs are Acting on Behalf of the Debtor's Estate. Therefore, Collateral Estoppel Cannot Apply to the Plaintiffs' Claims.**

25. The Defendant argued below that collateral estoppel should apply to the Plaintiffs because they are acting in their own self interest. There is no case law to support that finding and other courts, like the Western District of Pennsylvania (***Kind***) do not support such a finding, as discussed below.

26. The Appellee argued, and the Bankruptcy Court found action in their own self-interest because the Plaintiffs represent the vast majority of creditors' claims. That suggests that if the trustee acted on his own, under the same circumstances, that action would somehow be improper because it would only, largely, benefit the Plaintiffs-appellants. That scenario would yield a ridiculous result. Moreover, it is axiomatic that when the trustee fails to pursue a cause of action and decides to sell it, the likely buyer is the creditor, or party, most likely to benefit. The Plaintiffs' purchase benefitted the estate by the purchase price (over $150,000) plus the result of any recovery.

27. Additionally, the Defendant bid at the auction and stated that his purpose was to buy the trustee's claims **so that they would not be pursued**, clearly acting in his own self-interest. Defendant chose not to bid higher than the Plaintiffs' $156,000 bid for the right to pursue the trustee's avoidance and recovery claims.

28. The Plaintiffs paid good consideration for the claims they are pursuing on behalf of the estate and they have borne all risk of loss, shielding the estate from unnecessary expense. The trustee, the estate, and all creditors, along with the Debtor's counsel, have all benefitted from the payment made into the estate by the Plaintiffs to purchase the estate's rights. Also, the estate's additional administrative expenses and fees will be paid before any future payments to the

-15-

Plaintiffs.

29. Finally, the Defendant repeatedly acknowledged the Plaintiffs' legitimate purchase of avoidance and recovery actions of the trustee subject only to the ordinary defenses available to parties defending those avoidance and recovery actions. See Discussion in Section B of the Plaintiff's Second Supplemental, ¶¶ 9-10. **Appx** 01217-1218. In the Defendant's Disclosure Statement, the Defendant asserted there is "pending litigation" including: avoidance action litigation to be brought by the Judgment Creditors in the U.S. Bankruptcy Court for the Middle District of Tennessee following the Judgment Creditors' purchase of those claims from the Len Salas Bankruptcy Estate (the "Tennessee Avoidance Actions")."Id.

30. The Plaintiffs' acceptance of the Defendant's Plan of Reorganization was expressly made in reliance on the recognition that the Plaintiffs had the right to pursue the trustee's claims in this estate. The Plaintiffs accepted the defenses available to the Defendant but the Defendant was required, and did, acknowledge the Plaintiffs were the rightful owners of this estate's avoidance and recovery claims and had standing to sue the Defendant. Id.

31. While the Court cited no case law to support its position that the size of the Plaintiffs' claims changed their derivative status. See Memorandum, 2/11/21 (D-38), **Appx** 00159-174; Defs. Responses (D-75), **Appx** 00774-775, the Court did cite one case, ***Canonsburg Gen. Hosp. v. Sebelius***, 989 F.Supp.2d 8, 19 (D.D.C. 2013) for the proposition that "issue preclusion in this instance would not work some unfairness as "the losing party clearly [did not] lack [] any incentive to litigate the point"... Memorandum Opinion at p. 13 **Appx** 01272. However, that analysis ignores three important points. The first is that consideration of "unfairness" is only one of the criteria upon which issue preclusion is determined. In this case, criteria related to the previously litigated issues and the privity of the parties simply do not exist. The second is that the Plaintiffs did not, and could

-16-

not, litigate the issue of the Trustee's avoidance and recovery powers because they were neither the trustee, nor his representative, nor standing in the shoes of the Trustee, **at the time**. The third important distinction is that although the issue in the D.C. Bankruptcy Court was whether the Defendant had a sufficient interest in the Property to grant an exemption, that interest, however determined by the D.C. Bankruptcy Court, did not preclude the ability of the Debtor's estate to pursue avoidance or recovery actions, as Judge Teel specifically stated several times in the Exemption hearing and in his Memorandum. In fact, at the Exemption Hearing, Judge Teel stated: "It seems to me it's Len Salas' Chapter 7 Trustee who is going to have an incentive to avoid the transfers invoking Section 544." See Exemption Hearing Transcript, Vol 1, August 22, 2018, Second Supplemental, Exhibit 1 (D-100-1) ("Exemption Trans. Vol. 1"), pp. 24-26 **Appx** 001240. Also See discussion in the Second Supplemental Memo, D-100, at Section C **Appx** 01219-1220.

32. *Canonsburg* bears little resemblance to the facts or circumstances of the instant case. First, *Canonsburg* involves a hospital's claim under the Administrative Procedures Act ("APA") against an agency of the U.S. Government. Second, the prior decision which was the basis of the issue preclusion in the case was based upon the exact same claim, fully adjudicated between the exact same parties, in another U.S. District Court. The only difference between the first case and *Canonsburg* was the location of the Courthouse. There is no issue of derivative standing in *Canonsburg* and the Plaintiff sought the same relief under the same statute in both cases. Here the Plaintiff is pursuing solely derivative claims specifically excluded from the prior proceeding, under a totally different statute, on behalf of the Debtor's Estate and its Trustee.

       **2.**       **The D.C. Bankruptcy Court did not Determine Issues Related to the Trustee's Causes of Action and Neither the Trustee nor the Debtor's Estate Were Parties to the D.C. Exemption Hearing or Decision**

33. The Defendant also argued, and the Bankruptcy Court found, that the D.C. Bankruptcy

Court specifically determined the issue of fraudulent conveyance.  In support of his claim, the

Defendant recited language in the D.C. Memorandum that did not reference a fraudulent

conveyance, or Section 548, and was not addressing or determining the rights of the Tennessee

Trustee.  The D.C. Bankruptcy Court stated:

> ...[Avoidance under Section 544] is an issue of fact that must be decided by the U.S.
> Bankruptcy Court for the Middle District of Tennessee.  How a judgment regarding
> the right of Len's estate to recover the Property under § 544 would affect Max's
> homestead exemption in this case is an issue for another day.

D.C. Memorandum, p. 59. **Appx.** 01010 - 1012.

34.  11 U.S.C. § 548 was neither mentioned, argued or determined in the D.C. Bankruptcy

Case.  See, for example, D.C. Memorandum, at *passim.* **Appx** 00954-1012. See also, Creditors'

Opposition to the Debtor's Claim of Exemption and the Debtor's Response, in the D.C Bankruptcy

Case, attached to the Plaintiffs' Supplemental Memorandum, D-92, as Exhibits D (D-92-4), and E

(D-92-5), respectively **Appx** 01122-1143.

35.  The D.C. Bankruptcy Court specifically deferred to this Court on all issues related to the

interest of this Debtor's estate.  See, D.C. Memorandum, pp. 48-59.  **Appx.** 01001-1012. On the

first day of the Exemption Hearing, August 22, 2018, Judge Teel stated: "It seems to me it's Len

Salas' Chapter 7 Trustee who is going to have an incentive to avoid the transfers invoking Section

544." Exemption Trans. Vol. 1, **Appx** 01240.

36.  At the commencement of the Exemption Hearing, Judge Teel stated:

> "So it seems to me we may be -we may be wasting our time going through this
> exercise when- maybe I'm wrong, but it seems to me inevitable that if exemption is upheld
> in this case, it'll be taken away by the trustee in the Len Salas case."

Exemption Trans. Vol. 1, at 26: 8-12. **Appx.** 01240.

37.  Judge Teel's statement is a clear indication that the D.C. Court did not intend to affect

-18-

the Tennessee Trustee's avoidance and recovery claims.

         3.    **The Plaintiffs' Derivative Status Precludes the Application of Issue Preclusion; the Trustee and the Debtor's Estate are the Real Parties in Interest**

38.  Reliance by the Court on Judge Teel's decision in the Defendant's bankruptcy is improper and a mis construction of Judge Teel's decision.

39.  Numerous bankruptcy courts, and appellate courts, have consistently ruled that, for all purposes, the real party in interest is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit..." ***See, for example, Farrell Constr. Co. v. Jefferson Parish, La.***, 896 F.2d 136, 140 (5th Cir. 1990). The person (or party) holding the substantive right in this case is the trustee, on behalf of the Debtor's estate.

40.  The Court conclusively determined that the Plaintiffs met the 6th Circuit's "strict prerequisites for exercising derivative standing..." See, 2021 Memorandum and Opinion at pp. 5-7. **Appx.** 00163-165 . Thus, the Plaintiffs "stand in the shoes of the trustee." Defs. Responses, ¶¶ 5, 6. **Appx** 00774-775 . ***Gecker v. Marathon Fin. Ins. Co. (In re Auto. Prof'ls, Inc.)***, 389 B.R. 630, 634 (Bankr. N.D. Ill. 2008).

41.  Discussing the history of suits brought by creditors and committees of bankruptcy estates on behalf of the estate, ***Gecker*** explained that in cases where derivative standing has been granted to creditors or committees, "a party is simply being permitted to step into the shoes of the party with standing." ***Id.***, at 635. The court concluded: "Thus, the committees or creditors given derivative standing were filling the empty shoes of the trustee, who clearly had standing to pursue ... [the trustee's causes of action]..." ***Id.***

42. In ***Gecker***, the Court declined to allow a committee to assist the Trustee in the Trustee's cause of action asserting that to allow a party to be added along side the Trustee is "to confer a type

-19-

of "helper" or "buddy" standing upon a party who is not asserting his own right... there is no unexercised right to sue that can be conveyed to the Committee on a derivative basis. *Id.*

43.   *Gecker* emphasized that the status of a committee attempting to join the trustee's cause of action, with the trustee as co-plaintiff, is far different from the situation, as in this case, when a creditor pursues a cause of action when the trustee fails, or refuses to act. *Id.*, at 634. Defs Responses (D-75), **Appx** 00774.   Moreover, the *Gecker* court suggested that, as to the "buddy system" which the trustee attempted to employ, there are other means to accomplish the same result. The trustee could hire the creditor's attorney, sell the trustee's claim, or otherwise gain assistance from the creditor without adding the creditor as another party to the trustee's cause of action.

44.   The court, in *Modiri v. 1341 Rest. Grp., Inc.*, 904 A.2d 391, 394-97 (D.C. 2006), emphasized that "a privy is one so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." Internal citation omitted. The legal rights asserted in the instant case are those solely belonging to the Trustee or the Debtor's Estate.  The Trustee is not privy to the debtor or to the debtor's estate when pursuing recovery or avoidance actions.  *In re Worldcom, Inc.*, 401 B.R. 637, 651 (Bankr. SD.N.Y.).  Because the Plaintiffs stand in the shoes of the Trustee they are not in privity with any party to the D.C. Exemption Decision.   Therefore, issue preclusion does not apply.

**4.**     *Kind Operations* **Supports the Plaintiffs' Motion for Summary Judgment on the Issue of Collateral Estoppel**

45.   The case of  *Kind Operations, Inc. v. Cadence Bank (In re PA Co-Man, Inc.)*, 644 B.R. 553 (Bankr. W.D. Pa. 2022) has remarkable similarities to this case.

46.   In *Kind Operations*  the Plaintiff, Kind Operations, Inc. ("Kind, Inc.") purchased the Chapter 7 Trustee's Avoidance and Recovery Claims. The purchase was made as part of an

-20-

agreement which included Kind, Inc. making a payment to the estate and an assignment of the estate's causes of action to Kind, Inc. so that Kind, Inc. could "investigate, prosecute, and fund the litigation of the estate's causes of action for the benefit of both the bankruptcy estate's creditors and Kind, Inc. pursuant to a sharing agreement." *Id.*, at 571-72. Kind, Inc. then filed, as assignee, three separate complaints against the secured lenders and the purchasers related to a pre-petition foreclosure sale of essentially all the Debtor's assets. *Id.*, at 572.

47. In response to motions to dismiss filed by the various defendants, the Plaintiff argued that "this case involves the principal of a debtor, [the] debtor's secured lenders and an eager, well-heeled purchaser conspiring to manufacture a fraudulent sale of all of the debtor's assets (and none of its liabilities) to the great detriment and harm of the debtor and its creditors." citation to the record omitted. The Plaintiff further argued that "[e]ach party to this secretive and improper arrangement had something to gain from it." Citation to the record omitted. *Id.*

48. In its Complaint, Kind, Inc. asserted 7 causes of action which consist of (*inter alia*): a claim for fraudulent concealment against the Debtor's President; and a claim for avoidance of fraudulent transfers against Debtor's President, the lenders and the purchasers.

49. In response to challenges by the Defendants, Kind, Inc. asserted that it was not suing in the same capacity and, therefore, collateral estoppel did not apply. The court found Kind, Inc.'s argument persuasive noting that New York courts have looked to whether parties, though arguably the same, appeared in the same capacity in both actions. *Juan C. v. Cortines*, 679 N.E.2d 1061, 1065 (N.Y. 1997). The Plaintiffs-appellants found no cases deviating from the holding or rationale of *Kind Operations*.

50. The *Kind Operations* Court discussed the requisites for the application of collateral estoppel (under New York law) as follows:

In general, "a nonparty to a prior litigation may be collaterally estopped by a determination in that litigation by having a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation[.]" ***Juan C. v. Cortines***, 679 N.E.2d 1061, 1065 (N.Y. 1997)  (quoting ***D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.***,76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (N.Y. 1990); see also, ***People v. Roselle***, 84 N.Y.2d 350, 618 N.Y.S.2d 753, 643 N.E.2d 72 (N.Y. 1994)).

The Court concluded that the bankruptcy estate had no representation in the State Court Litigation ...and the estate's claims are not derivative of those claims previously asserted by KIND in its individual capacity ...  Accordingly, the Court finds that neither res judicata nor collateral estoppel operate to bar the claims asserted in the instant pending adversary proceeding.

***Id.***, at 637.

51.  Analogous to the instant case, Kind, Inc.'s Complaint asserted three causes of action for fraud.  ***Kind Operations, supra***, at 604-05. Also, Kind was a party to a previous case against the Debtor's principal and lost although the reasons are not clear in the record.  Here, the Plaintiffs' "loss" in D.C. was not on the same issue and did not affect the derivative claims of the Debtor's trustee.

52.  The Plaintiffs assert that the long standing principles of collateral estoppel applied in D.C. and other jurisdictions prevent issue preclusion here.  The factual and procedural similarities between this case and ***Kind Operations*** give those principles a more direct application to the Plaintiffs' Complaint and explain clearly why issue preclusion is not applicable.

**D.    The Actions and Interactions Between the Debtor and the Defendant Represent Substantially all of the Badges of Fraud Set Forth in the Uniform Fraudulent Transfer Act as Enacted in the District of Columbia**.

53.  D.C. has adopted the Uniform Fraudulent Transfer Act (UFTA"). D.C. Code § 28-3104.

54.  Under D.C. Code § 28-3101(12), a "transfer" includes any parting with an asset or an interest in an asset. ***Malone v. Iceberg Transp. S.A. (In re Gold & Appel Transfer S.A.)***, Nos. 05-00775, 05-10022, 2013 Bankr. LEXIS 3695, at *1 (Bankr. D.D.C. Sep. 6, 2013).

-22-

55.  Judge Teel explained in *Malone* that the existence of the UFTA badges of fraud present a compelling and *prima facie* case for a finding of fraudulent intent requiring the avoidance and recovery of the subject transfer. *Malone v. Iceberg Transp. S.A. supra*, at *65-67.

56.  The so-called "badges of fraud" to be considered are as follows:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer...was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made...;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.*, at 66.  D.C. Code § 28-3104(b).  See also, *Kind Operations, supra*, at 608.

-23-

57. Paragraphs (6) and (11) are not applicable to the facts of this case. The other factors all support the finding of actual fraud:

(1) The transfer was made by the Debtor, Len, to an insider, his father, the Defendant;

(2) The Debtor retained ownership of the Deed and the SunTrust Deed of Trust obligation after the transfer (which took place on April 17, 2018); See, for example, Opposition Facts, Section 1, pp. 2-3; Plaintiffs' List of Undisputed Facts, D-74-1, ¶¶14 -17. **Appx** 01174-1175.

(3) The transfer was concealed from the Defendant's creditors, D.C. agencies and the lender; See, for example, Opposition Facts, Section 1, pp. 2-4 **Appx** 01174-1176;

(4) The Debtor had been sued in 2015 and judgments entered against him in April, 2018 just weeks before the transfer; See, Defs. Responses 8/12/22 (D-75-1) **Appx** 00775, (Defendant's Motion for Summary Judgment, Defendant's Statement of Undisputed Facts, Exhibit B (D-90-2)) **Appx** 01042-1044 ;

(5) The subject Property had estimated equity at the time of the debtor's bankruptcy of more than $1.2 Million. (Defendant's Schedules, Summary of Assets and Liabilities, Case No. 18-00260, D-12, p. 1 of 37). **Appx** The Debtor's other assets totaled $53,373.38 on April 18, 2018 (Debtor's Schedules, Summary of Assets and Liabilities, Case No. 18-2662, D-1, p. 12 of 56);

(7) The Debtor aided his father in concealing the fact that the Quitclaim Deed had been abandoned. See Plaintiffs' Memorandum, Exhibit 7 (2011-12 eMails) (D-74-8) **Appx** 00564-679.

-24-

(8) the Debtor received no consideration from his father for the transfer or at any time from 2007 through 2018. See Plaintiffs' Memorandum, Exh. 4, (D-74-5) (**Appx** 00529) and Exh. 5, (D-74-6) (**Appx** 00535) ;

(9) The Debtor's schedules, the parties' stipulations, admissions and the Defendant's Responses to the Plaintiffs' Statement of Undisputed Facts establish that at all times from 2010 through April, 2018, the Debtor was insolvent. See, for example, Defs. Responses, ¶¶ 19-21, 62-76 **Appx** 00777, 00787-790; and Defs. Supplemental Responses, ¶¶ 63, 65-67, **Appx** 00947. Moreover, the attempted transfer of the Property by Quitclaim Deed transferred the Debtor's only substantial asset but left the Debtor with the SunTrust Deed of Trust Note obligation which was at least $870,000 at all times. Defs. Responses, ¶¶ 19-21, **Appx** 00777. By April, 2018 the Note obligation exceeded $1 Million. By October, 2019, the Note obligation exceeded $1.2 Million.  Id.

(10) by operation of law, 11 U.S.C. 548 (d) and D.C.Code § 42-401, the transfer took place on April 17, 2018, just two weeks after judgments were entered against the Debtor and the Defendant totaling more than $15 Million.  See Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment, 2/21/23, D-90-2("Defendant's Facts"). **Appx** 00952-953, 01013-1014.

58.  In the Loss Mitigation Statement dated February 25, 2016 ("the Loss Mitigation"), Len signed "as borrower" on page 9. (D-92-6, p. 9 of 9) **Appx** 001152.  On the same page, above Len's signature the Loss Mitigation states: "knowingly submitting false information may violate Federal or other applicable law."  On page 6 of the Loss Mitigation (D-92-6, p. 6 of 9) Len stated "**I want to - Keep the Property**" and "The property is

-25-

currently - **My Primary Residence**" and "The property is currently - **Owner Occupied**."

**Appx** 01149. Those statements directly contradict the Debtor's position that he, Len, was not the owner in 2016. The date of the Loss Mitigation is also important because it is in the same time frame as the depositions of Len and Max taken in the Superior Court (February and March, 2016). Len's deposition was March 9, 2016, just two weeks after the date of the Loss Mitigation. See Plaintiffs' Memorandum, Exh. 11 (D-74-12) **Appx** 00623.

59. Additionally, in his testimony in the Exemption Hearing in Case No. 18-00260, Len testified that he did not bring up the 2010 Quitclaim Deed because he "simply forgot about it" as did all of his family members. See Len Salas testimony, August 22, 2018, Exemption Trans. Vol. 1 at pp. 135-139. **Appx** 01241-1245.

60. He further testified that he did not know the Deed needed to be recorded even though Ron's email of June 17, 2011, addressed to both Len and Max, states clearly that a new deed "will then need to be filed with the District/City." Plaintiffs' Memorandum, Exh. 7, D-74-8) **Appx** 00564-565.

61. This directly contradicts the emails which Len produced in this case, for the first time, in August, 2021, wherein he asked his father about getting his name off the deed in the time frame of June, 2011 through February, 2012, well after the signing of the 2010 Quitclaim Deed. **Appx** 00564-579. In the same emails both Ron and Max both reference the need to create a new, or different instrument, to remove Len's name from ownership of the Property. See Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, Filed herein on August 1, 2022, Exh. 7, (D-74-8), at pp. 1, 3, 5, 7, 11, 13 **Appx** 00565-579. On page 16 of Exh. 7, Max emailed his counsel, for the last time of which we

-26-

have a record, stating quite clearly that no progress had been made as of February 27, 2012, over 19 months since the creation of the 2010 Quitclaim Deed. **Appx** 00579.

62. Len also admitted that he made "multiple" attempts to get his name off the property through the Spring, 2015.  See Defs. Responses, ¶31. **Appx** 00780.

63. Len's testimony, when contrasted with the 2011-12 emails and the admission that he asked his father "multiple" times to get his name off the Property, plus other evidence, like the February, 2016 , Plaintiffs' Supplemental Memorandum, Exh. F (D-92-6) **Appx** 01144-1152., makes it clear that Len was simply not telling the truth about the Quitclaim Deed and that his family members only "remembered" the Deed after attorney Marc Albert told Max he could exempt the Property if he was the owner, but not if Len was. See discussion below.

64.  Len also testified at the Exemption Hearing that the Defendant set up a trust for the purpose of receiving the rent checks and paying the Property expenses. See Exemption Trans. Vol. 1 p. 149. **Appx** 01245 .

65.  The above referenced testimony is contradicted by the bank records produced by the Defendant.  See Supplemental Memorandum, Exhibit B (D-92-2), 1610 Riggs Property Trust Bank of America account records for account ending in 3184 **Appx.** 01115-1120. Those records clearly show that there was no bank account opened for the alleged 1610 Riggs Property Trust until October, 2017, just a few months after Max hired bankruptcy counsel, Marc Albert.  See for example, the Len's testimony at the Exemption Hearing

    20 I didn't remember them [the quitclaim deed and trust] until Max had
    21 told me that Albert had discovered them in his research,
    22 which was I don't know when. I'd totally forgotten about
    23 it. And then I was like, "Oh, yeah. I totally forgot."

Second Supplemental, 3/26/23,Exh. A, (D-100-1), Exemption Hearing Transcript (Vol. 1), 8/ 22/18, p. 154 **Appx** 01246.

66.   The record is replete with references to testimony of the entire Salas family seeking to resurrect a Deed that had been abandoned and discarded, **no later than June, 2011**.  See, for example, Plaintiff's Memorandum in Support of Summary Judgment, 8/1/22, (D-74-8) (Plaintiff's Memorandum"), Exh. 7 **Appx** 00564,  and Loss Mitigation, Supplemental Memorandum, 2/21/23, Exh. F. **Appx** 01144-1152.

**E.      The Recorded Judgments on April 5, 2018, Even if Applicable to the Issue of Inquiry Notice, Do Not Show any Information Inconsistent with the Title Record**

67.   On the issue of Inquiry Notice, the Defendant asserted that the recorded judgment liens (recorded on April 5, 2018) would have put a purchaser on notice and would have required further inquiry.  That does not follow the case law.  See *McKinley v. Crawford*, 58 F.2d 528 (D.C. Cir. 1932). The judgment was recorded against Len Salas, Owner, and Max Salas, Manager.  There is nothing in the docketed judgment which is inconsistent with the public record.  Moreover, a review of the Superior Court docket would show that the Superior Court specifically found that Len was the owner.  As Mr. Young stated in his argument at the hearing on March 22nd, (from counsel's notes): "You don't have to run down the final answer" when doing the reasonable inquiry required in D.C.

68.   The Defendant's so-called "ownership" of the Property was hidden and private. The only documents produced by the Defendant regarding the D.C. Property are the 2007 Deed from Max to Len, the 2010 Deed from Len to the Trust (a copy only, no original) Defs. Responses, 8/12/22, ¶¶ 8-10, **Appx** 00775, the 2010 Trust (which due diligence would have

-28-

determined was "*void ab initio*, and leases to the CLR Trust, with Max acting as trustee (Supplemental Memorandum, Exh. A (D-92-1)). **Appx.** 01107-1114. He did produce an insurance policy but no other documents related to his alleged interest in the Property. No records available to the public for review.

69. Len's ownership, however, is both open and notorious, recorded and otherwise of public record, including, but not limited to, the 2007 Deed, the 2007 Deed of Trust, the 2016 SunTrust Loss Mitigation Statement (prepared by the Defendant)(Supplemental Memorandum, Exh. F (D-92-6) **Appx** 01144-1152., all government and public records through December, 2019 (Supplemental Memorandum, Exhs G, H, and I (D-92-7, 92-8, 92-9, respectively). **Appx** 1153-1164.

70. The Defendant argued further that a purchaser would have had to make a call if for no other reason than "to obtain a pay off." That call would have been made to SunTrust which was Len's lender and recognized Len as the only obligor and only resident at the Property. See, for example, Defs. Responses, ¶¶16, 17, **Appx** 00776-777; Defs. Supplemental Responses, ¶16, **Appx** 00941.

71. The Defendant also argued that supporting case law showed that the recordation of a judgment lien was sufficient notice of an interest requiring additional inquiry. However, the cases cited by the Defendant only argue that a judgment lien which differs from the title record would require further inquiry. The judgment here was against the title owner of the Property, namely, the Debtor.

72. Moreover, it is clear from Judge Teel's ruling, that the D.C. bankruptcy court considered the facts related to the Defendant's alleged "ownership" of the Property **only in**

-29-

the context of the Exemption Decision and specifically **declined to determine the status of this Debtor's Estates potential avoidance and recovery claims.** Thus, the bankruptcy court's reliance on Judge Teel's decision in determining that the fraud counts should be dismissed, is clearly erroneous, not supported by the D.C. Memorandum, which, in fact supports the Plaintiffs' arguments below.

  **F. The Court Should Have Granted the Plaintiffs' Summary Judgment on Counts I-III of the Complaint.**

  73. The Court also did not grant summary judgment on Counts I, II and II of the Complaint asserting that there were competing facts in dispute and that summary judgment was not appropriate. However, in its Summary Judgment Memorandum, the Court appears to have not considered the case law precedent that establishes that when an owner deeds his property to another but remains in possession, his deed represents "notice to the world" that he is no longer the owner. See discussion in Plaintiffs' Supplemental Memorandum, filed herein on February, 21, 2023, D-92, Section E, generally, and pp. 36-37, ¶¶ 85 -87 in particular. The Plaintiffs assert that the case law discussed in Section E and particularly the *McKinley* case cited and discussed in paragraphs 86 and 87, along with the supporting cases cited in *McKinley*[4] require granting Summary Judgment to the Plaintiffs on Counts I and II of their Complaint based upon the following undisputed facts:

    i. At all relevant times prior to approximately February, 2018, the Defendant hid his ownership of the Property (the Defendant produced no recorded or public

---

[4]One of the cases cited by *McKinley* is the Maryland Court of Appeals (now Maryland Supreme Court) case of *Wicklein v. Kidd*, 149 Md. 412, 131 A. 780. The common law of the District of Columbia is based on the common law of Maryland at the time of cession unless modified by statute. See generally *O'Connor v. United States*, 399 A.2d 21, 25 (D.C. 1979). *Estate of Keough v. Keough*, 2019 D.C. Super. LEXIS 20, *27

record which showed the Defendant as the Owner. Even the leases he signed in 2014 and 2015 showed the landlord as the CLR Trust (Plaintiffs' Supplemental Memorandum, filed February 21, 2023 (D-92) ("Supplemental Memorandum"), Exh A (D-92-1); and

ii. In 2016, during the period when the Defendant and the Debtor were being deposed in the D.C. Superior Court wrongful death case, the Defendant and the Debtor represented to Sun Trust, the holder of the deed of trust on the Property (in the Debtor's name), in a Loss Mitigation Statement, that the Debtor was the owner of the Property; See Plaintiffs' Supplemental Memorandum, February 21, 2023 ("Supplemental Memorandum"), Exh. F; and

iii. All public notices regarding ownership of the Property were in the name of the Debtor, not the Defendant, until at least 2019 ( See, for example, Supplemental Memorandum, Exhs. G, H and I); and

iv. Neither the Debtor nor the Defendant had possession of an original deed after January, 2012 (Plaintiffs' Amended List of Undisputed Facts, August 1, 2022, D-74-1, Nos. 8 through 13.);

v. in June, 2011, less than a year after the purported execution of the July, 2010 Quitclaim Deed, Ron Salas, the Defendant's son and the Debtor's brother directed the Debtor and the Defendant to prepare a deed to convey the Property to the trust Ron created in July, 2010 Plaintiffs' Supplemental Memorandum, Exh G. **Appx** 01153-1164; and

vi. No deed was created or signed by Len after July, 2010.

h. The Defendant's Plan of Reorganization establishes that the Plaintiffs

have the right to pursue the trustee's causes of action.  The only restriction contained in the

Plan is to "defenses".  There is no mention or contemplation of preclusion which the

Plaintiff assert is not a defense contemplated in the Defendant's Plan.  The Plaintiffs

bargained for this language and withdrew their objections to the Defendant's plan in reliance

on the Defendant's ability to only  raise "defenses."  See argument in Second Supplemental

Memo, filed on March 36, 2023, D-100, at p. 5, ¶10.

> i.  The court failed to grant summary judgment on the issue of inquiry notice

even though the case law makes it clear under the undisputed facts of this case that the

transfer of the deed to his property from the Defendant to the Debtor eliminates the need for

any further inquiry. *See* discussion in the Plaintiffs' Supplemental Memorandum, D-92, at

¶¶ 85-87, pp. 36-37. **Appx** 01103-1104. Thus, by following the case law the matter of

inquiry notice, and summary judgment, should have been decided in favor of the Plaintiffs.

> **G.**  **The Court Erred When it Failed to Grant the Plaintiffs' Motion to Alter or Amend (Reconsideration) Under Well Established 6th Circuit Law**

74.  A Motion to reconsider is governed by Fed. R. Bankr. P. ("FRBP") 9023 which

incorporates Fed. R. Civ. P. ("FRCP") 59.  FRCP 59 (a)(1)(B) provides that "The Court

may, on motion, grant a new trial on all or some of the issues - and to any party - ... " for any

equitable reason.

75.  In the Sixth Circuit, grounds for granting a motion to reconsider under Fed. R

Civ. P. 59(e) are stated in *O'Connor v. Lampo Grp., LLC*, No. 3:20-cv-00628, 2021 U.S.

Dist. LEXIS 204079, at *3-4 (M.D. Tenn. Oct. 22, 2021) exist "if there is

> (1) a clear error of law; (2) newly discovered evidence; (3) an intervening
> change in controlling law; or (4) a need to prevent manifest injustice. *Id*.
> (citing *United States v. Tennessee Walking Horse Breeders' and
> Exhibitors' Ass'n*., 263 F. Supp. 3d 679, 681 (M.D. Tenn. 2017))... or (5)

-32-

that the court clearly overlooked material facts;... or (6) that the court clearly overlooked controlling law that was presented by the movant in its prior motion and that would result in a different disposition.

See also ***Al-Sadoon v. FISI Madison Fin. Corp.*** 188 F.Supp. 899, 902.

76. The Appellants assert that the court both overlooked material facts on the issues of issue preclusion, derivative status, ownership of the subject Property and controlling law, each of which, alone, and all of which, together, compel summary judgment on all Counts of the Complaint in favor of the Plaintiff.

### H. As a Court of Equity, the Bankruptcy Court Should Not Have Granted Relief to the Defendant, or Relief that Benefitted the Debtor or His Family

77. Under well established precedent, the consistent and continuing bad acts, misrepresentations and outright fabrications, to both this Court and the D.C. Bankruptcy Court do not entitle the Defendant to any relief under the issue preclusion theory or any other theory since the Bankruptcy Court is a court of equity. Issue preclusion is subject to equitable considerations. ***American Forest Res. Council v. Shea***, 172 F.Supp.2d 24, 30 (D.C.D.C. 2001).

g. The Court failed to consider the substantial fact pattern after 2010 and, particularly after the commencement of the Superior Court Wrongful Death action, all carefully documented and set forth in chronological detail, in the Plaintiffs' Memorandum and Lists of Uncontested Facts (D-74-1) and (D-79) (**Appx** 00451-477, 00847-858) and Plaintiffs' Opposition Facts (D-95-1) (**Appx** 01196-1205), showing fraudulent and deceitful behavior by the Defendant and the Debtor which should bar relief on all issues.

78. Bankruptcy courts have long been recognized as courts of equity since the 1898 Act. ***Bardes v. Hawarden Bank***, 178 U.S. 524, 534-536 (1900); ***Granfinanciera v.***

-33-

*Nordberg*, 492 U.S. 33, 81, 109 S. Ct. 2782, 2811 (1989), *Hyundai Translead, Inc. v.*

*Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.),* 555 F.3d 231, 242 (6th

Cir. 2009), *Gaff v. FDIC*, 919 F.2d 384, 392 (6th Cir. 1990). The bankruptcy courts have

exercised their equitable powers so that fraud will not prevail, substance will not give way to

form and technical considerations will not interfere with substantial justice. *Pepper v.*

*Litton*, 308 U.S. 295, 303-05, 60 S. Ct. 238, 244 (1939)

79. The equitable powers of Section 105(a) of the Bankruptcy Code, are in line with

"the traditional understanding that bankruptcy courts, as courts of equity, have broad

authority to modify creditor-debtor relationships." *United States v. Energy Resources Co.,*

*Inc.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990).

**I.     The Doctrine of Unclean Hands Prevents this Court From Granting any
         Relief to the Defendant**

80. In granting the Defendant's Motion for Summary Judgment on the fraud counts

of the Complaint (Counts IV and V), the Court relied upon issue preclusion analyses.  The

Appellants assert that the Court was wrong in its application of the issue preclusion doctrine

but, even more importantly, failed to recognize that the Defendant was not entitled to  issue

preclusion because of his failure to be honest with the Court. The Defendant not only lied,

and continued to lie, he also hid the truth from the Court, albeit, ultimately, not successfully.

His failure to be truthful prevents the use of issue preclusion for the Defendant's benefit.

81. "He who comes into the Bankruptcy Court seeking equity, must come with clean

hands. This is a self imposed tenet that closes the doors of a court of equity to one tainted

with inequitableness or bad faith relative to the matter in which,he seeks relief. That doctrine

is rooted in the historical concept of a court of equity as a vehicle for affirmatively enforcing

-34-

the requirements of conscience and good faith. Thus while "equity does not demand that its suitors shall have led blameless lives," ***Loughran v. Loughran***, 292 U.S. 216, 229, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. ***Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.***, 324 U.S. 806, 814-15, 65 S. Ct. 993, 997 (1945) citing ***Keystone Driller Co. v. General Excavator Co.***, 290 U.S. 240, 245; ***Johnson v. Yellow Cab Co.***, 321 U.S. 383, 387; 2 Pomeroy, *Equity Jurisprudence* (5th Ed.) §§ 379-399.

> Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

***Id***. at 997-98(internal citations omitted)

82.  The clean hands maxim is particularly applicable to false testimony.  False testimony in a formal proceeding is intolerable. ***ABF Freight Sys. v. NLRB***, 510 U.S. 317, 323, 114 S. Ct. 835, 839 (1994). The Defendant's consistent false testimony, in depositions and the affidavit referenced above, preclude any equitable relief, including, but not limited to, issue preclusion.

83.  The doctrine of unclean hands may also bar a defendant's equitable defenses including estoppel (i.e., issue preclusion). ***See Hot Wax, Inc. v. Turtle Wax, Inc.***, 191 F.3d 813, 825 (7th Cir. 1999) ("The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice.") (citing ***Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.***, 324 U.S. 814); ***In re Richardson***, 497 B.R. 546, 2013 WL 4498998, at *9 (Bankr. S.D. Ind. 2013) (same); see also ***Indiana Mills & Mfg., Inc. v. Evenflo Co., Inc.***, No. 04-cv-540SEBVSS, 2005 U.S. Dist. LEXIS 31149, 2005 WL 3150164, at *7 (S.D. Ind. Nov. 22, 2005) (holding unclean hands barred the defendant's equitable defenses); see also ***Edwards v. Academy Pub. Corp.***, 562 N.E.2d 60, 61

(Ind. Ct. App. 1990) (holding the trial court erred in failing to consider whether a defendant seeking equitable relief did so with unclean hands). Accord, ***Bash v. Laikin (In re Fair Fin. Co.)***, Nos. 10-50494, 10-5043, 2013 Bankr. LEXIS 5663, at *54 (Bankr. N.D. Ohio Oct. 24, 2013).

84. Under the well established doctrine of unclean hands, as outlined above, the Defendant is unable to assert, and estopped from asserting, that he had anything more than a caretaker interest in the property for either his son, the Debtor, or for the CLR Trust of which the Debtor was one of three beneficiaries with his two brothers, Chase and Ron. Pursuant to the discovery belatedly produced by Len in this case, it is clear that the Defendant, the Debtor and Ron Salas, another son of the Defendant and brother of the Debtor, all concocted a scheme to allow the father to falsely claim that he was the actual owner of the property when the communications among the family members and the Defendant's lawyers in 2011 and 2012 make it clear that the property was not transferred to the Defendant in 2010 as falsely asserted by Len, Ron and the Defendant in the D.C. Bankruptcy Court. See, for example, 8/ /18 testimony of Ron Salas at the D.C. Exemption Hearing, 209: 13-25 - 212:15, (D-74-13),**Appx** 00633 -636 and, further, that the alleged Quitclaim Deed was abandoned no later than June, 2011. Plaintiffs' Supplemental Memorandum, Exh G. **Appx** 01153-1164.

85. In addition to the misrepresentations made by the Debtor, the Defendant and Ron Salas in the D.C. bankruptcy case and, the misrepresentations of the Debtor and the Defendant in this case, the Defendant's August, 2022 affidavit declared, for the first time, that all transactions regarding the Property were made under the name of "the CLR Trust"and all rental receipts were made into the CLR Trust account. The Defendant does not offer any source for the payments that were made on the Deed of Trust Note, other than the CLR Trust account. See Max Salas Affidavit, August 10, 2022, (D-75-2), ¶¶ 19-21. **Appx** 00807. While Max attempts to "skirt" the issue related to Len's "interest" in the CLR Trust, Max has never refuted the testimony of Len in the Superior

Court case in which Len confirms that the CLR Trust was a trust set up for the benefit of Max's children, Chase, Len, and Ron ("that one I know."). Len's deposition testimony, March, 2016, (D-78-11), at p. 30. **Appx** 00625. See also Max's deposition in the Superior Court Case, Plaintiffs' Memorandum, Exh 1, **Appx** 00479

86. The Defendant's document production in this case includes statements for one account under the name of the 1610 Riggs Property Trust. The account was apparently opened on October 31, 2016 with a deposit of $6,429.44. The last statement is for the period ending April 30, 2018 and shows a balance of $6,429.44. Plaintiffs' Supplemental Memorandum, Exh B (D-92-2) **Appx** 01115-1120. There was no account activity shown on the statements from October 31, 2017 to April 30, 2018 other than the deposit of $6,429.44. A copy of the bank statements with the pages of banking activity for each month are attached hereto as Exhibit B. The Defendant produced no bank records for the alleged 1610 Riggs Property Trust prior to October, 2017 and no banking activity other than that one deposit. No tax return was ever filed for the 1610 Riggs Property Trust.

87. The Defendant was instructed by Ron in 2011 to open up a bank account in the name of the 1610 Riggs Property Trust. He has provided no evidence any account was opened in the name of the Trust until October, 2017, more than two years after the fire, two years after the Plaintiffs filed lawsuits against the Debtor and the Defendant, and only a few months after hiring the law firm of Stinson Leanard, et al, and Marc Albert, to represent the Defendant in his upcoming bankruptcy case. See, Defendant's Statement of Financial Affairs, filed in Case No. 18-00260, in the United States Bankruptcy Court for the District of Columbia, on May 2, 2018, (D-13) p. 7 of 10 (initial retainer of $2500 paid on May 2, 2017, payment of $6,339.69 on Novmber 9, 2017, total legal fees paid prior to Chapter 11 filing $68,349.69). A copy of the relevant page of the Defendant's Statement of Financial Affairs is attached as Exhibit C.

88. In his testimony at the Exemption Hearing in August, 2018, Ron testified, under oath, that he assumed the Quitclaim Deed had been recorded. He stated, in August, 2018 that "my assumption was that they were, but as of today I knew they, I know now that they were not." Testimony of Ron Salas, witness for the Debtor Max Salas, August 22, 2018, Exhibit 12, Exemption Trans. Vol 1, 211:7 - 212:14.

89. Ron Salas further testified that he did not know why neither his father, his brother, his brother's wife, or he thought to produce the Quitclaim Deed during the Superior Court litigation. Based upon the 2011 email exchange between Ron Salas and his father, it is obvious that the Quitclaim Deed Ron prepared could not be recorded and was, likely defective and, more importantly, he knew it. That is the only rational explanation for Ron stating to his father that a Deed needed to be prepared in 2011, a year after Ron's Quitclaim Deed. That is the only rational explanation for the continued efforts, through February, 2012 to obtain a Quitclaim Deed from Len. That is the only rational explanation for Ron, Len, Kendra (Len;s wife) and Max to conveniently forget about the Quitclaim Deed until the very eve of the Superior Court Trial, in February, 2018. Exhibit 6, Exemption Trans. Vol 3, 39:15-25.

90. The only deed referenced by Max or his counsel, allegedly entitling Max to an ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered, or even mentioned by the Salas family or by Max, specifically.

91. Unfortunately, it appears that Ron, his father and his brother hid from the D.C. Bankruptcy Court, and the Plaintiffs, the fact that the Quitclaim was defective, or otherwise unrecordable at the hearing in Max's case in 2018.

92. The Plaintiffs are unaware of the reason why the Quitclaim Deed was abandoned. However, there are clues. For example, in the Exemption Hearing in D.C., Ron Salas testified that

-38-

he was unaware of the requirements of Quitclaim Deeds in D.C. See, Ron Salas's testimony, Exhibit 12, 227:5 - 228:12. He stated that he was unaware that Deeds made to trusts had to be made in the name of the trustee. Id. Even in 2018, Ron was unaware whether the trust documents he created were valid under D.C. law. See, Ron Salas's testimony, Exhibit 12, 243:8. See D.C. Code §42-404, for formal requisites of a deed.

93. Max testified that he did not have the funds to record the deed. More importantly, it seems evident that he was unwilling to spend the money to record a deed. He spent hundreds of thousands of dollars from retirement savings and other funds in his bankruptcy, funds, at least a substantial portion of which, would have been available to Max if he wanted to record the Deed in 2010, or thereafter. See M Salas Third Amended Plan, Complaint, Exh B, Section 4.1,**Appx** 00214.

94. No deed was recorded prior to Len's bankruptcy filing. See Max's Second Amended Disclosure Statement filed in his bankruptcy case in the District of Columbia, Case No. 18-00260, December 5, 2019, (D-276) , Plaintiffs' Memorandum, Exhibit 2, pp. 4, 22, **Appx** 00483, 00501, and Max's Third Amended Plan of Reorganization, January 22, 2020, Complaint, Exh. D, Section 4.4. (**Appx** 00215)

95. Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust. He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust. Plaintiffs' Memorandum, Exhibit 1, 42:18 - 43:2. **Appx** 00479.

96. In his Objection to the Plaintiffs' Motion for Summary Judgment ("Defendant's Objection), Max cites the case of ***Tolz v. Miller***[5] for the proposition that the doctrine of unclean hands is not available to the Plaintiffs unless the doctrine seeks "active intervention by the Court."

_____

[5]391 B.R. 504 (Bankr. M.D. Fla. 2008)

Defendant's Objection, D-75), at p. 14. **Appx** 00761. However, the Defendant misreads the basis for the decision in ***Tolz***. In its determination that the doctrine of "unclean hands" does not apply the ***Tolz*** Court stated that "the problem here is not that the Millers acted in bad faith and have "unclean hands" it is that the Millers are not seeking active intervention by the Court." ***Id.***, at 510. The principle relied upon by the Court in ***Tolz*** is set forth in *Pomeroy's Equity Jurisprudence* (3d. Ed.), Vol. 1 § 398 which states, in part:

> ...while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscionable or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies.

***Tolz, supra***, at 510.

97. ***Tolz*** cites as its only case law authority, the case of ***Carmen v. Fox Film Corp.***, 269 F. 928, 932 (2nd Cir. 1920) a case in which the 2nd Circuit asserts the not so surprising position that a court "will refuse its aid in any manner to one seeking its active interposition if he has been guilty either of unlawful or inequitable conduct respecting the subject matter of the litigation." ***Id.***

98. ***Carmen*** was a case involving a contract dispute between the Plaintiff, an actress, and the Fox movie company. The Court found that the Plaintiff sought equitable relief but had not communicated honestly regarding the contracts she was attempting to repudiate so she could enter into a new contract with another movie maker at a much higher rate. The court held that "a contract dishonestly, or dishonorably obtained was a bar to relief in equity." ***Id.*** Because the Trustee has not acted in bad faith, dishonestly, or dishonorably, nor have the Plaintiffs, the doctrine of unclean hands is available to them against the Debtor and the Defendant.

-40-

**J.    The Debtor's Interest in the Property is a Sufficient Interest for the Exercise of the Trustee's Avoidance and Recovery Powers**

99.  The issue of whether only bare legal title is sufficient to establish a basis for recovery of a fraudulent conveyance was referenced, but not decided, in the Supreme Court case of *In re Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) which involved the determination of the status of an IRS lien on the debtor's property.  In a footnote, clearly *dicta*, the Supreme Court noted that Congress apparently did not intend that the trustee could recover transfers of property, title to which was limited to "bare legal title."  Bare legal title was neither explained or defined.

100.  The 6th Circuit has defined "*obiter dictum*" as "a judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision of the case and... not precedential." *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 201, n. 8, quoting *Black's Law Dictionary*, (10th Ed. 2014).

> "[i]f the court's judgment and the reasoning which supports it would remain unchanged, regardless of the proposition in question, that proposition plays no role in explaining why the judgment goes for the winner." Pierre N. Leval,  *Judging under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1256 (2006).

Cited and Quoted in *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 526 (6th Cir. 2020)

101.  If the language is not essential to the holding's reasoning, it is dicta and not binding. *See Tyler v. Cain*, 533 U.S. 656, 663 n.4, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001). Accord, *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 836 (6th Cir. 2019)

102.  In *Whiting Pools*, Justice Blackmun concluded that the issue decided by the Supreme Court is whether a secured party, such as the IRS, must turn over property seized prior to the bankruptcy case. The comment that a Trustee could not recover property in which the Debtor held only bare legal title, was mere *dicta*, limited to a footnote and unnecessary to the decision.

-41-

103.  The relevant part of the ***Whiting Pools*** is:

Section  541(a)(1) provides that the "estate is comprised of all the following property, wherever located: . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U. S. C. § 541(a)  (1) (1976 ed., Supp. V).  The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad.  Most important, in the context of this case, § 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code. See H. R. Rep. No. 95-595, p. 367 (1977). Several of these provisions bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.

462 U.S. at  204-05.  The subject footnote states:

See, e. g., §§ 543, 547, and 548. These sections permit the trustee to demand the turnover of property that is in the possession of others if that possession is due to a custodial arrangement, § 543, to a preferential transfer, § 547, or to a fraudulent transfer, § 548.

**We do not now decide the outer boundaries of the bankruptcy estate**. We note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition. See § 541(b); H. R. Rep. No. 95-595, p. 368 (1977); S. Rep. No. 95-989, p. 82 (1978). (emphasis added)

462 U.S. 205 n.10.  The Supreme Court specifically stated that it did not decide "the outer boundaries of the bankruptcy estate."  While the pronouncement in footnote 10 can be considered relevant, important or even persuasive, it is not binding.

104.  Under the plain meaning rule of statutory construction, 11 U.S.C. §§ 101, *et seq.* is not limiting and states a right to recover "an interest in property."  Legal title is clearly such an interest. ***In re Tleel***, 876 F.2d 769, 771 (9th Cir. 1989)(citing California law).

105.  The Defendant, in his Memoranda regarding summary judgment, cited a number of cases in which courts have determined that if the debtor holds only "bare legal title" the trustee is prohibited from recovering under 11 U.S.C. §548(a)(1)(B).  In most of the cases cited by the Defendant the court determined that the subject property belongs to the "equitable owner" under a resulting trust theory.  See, for example ***Dunham v. Kisak***, 192 F.3d 1104 (7th Cir. 1999).  Under

-42-

Illinois law, as asserted in ***Scott v. C.I.R.***, 226 F.3d 871, 874 (7th Cir. 2000), the intent to create a resulting trust must be demonstrated by clear and convincing evidence that is "unequivocal" as to its existence and its terms and conditions. ***Id.***

106.  Even if the ***Whiting Pools*** comment regarding "bare legal title" is relied upon by the Court, the interpretation of the phrase "bare legal title" in cases from other circuits is not clear and is not binding on this court.  There are no references in ***Whiting Pools***, or other cases reviewed by the Plaintiffs, which defines the scope, or limits of "bare legal title."

107.  Except where the "plain meaning" leads to an absurd result, this Court should look no further than the language of the Bankruptcy Code which clearly gives the Trustee the right to recover any **transfer of an interest in property** under §§ 544 (b)(1) and 547 (a)(1)(B).  Congress could have added "interest in property of the estate" rather than just "interest in property" but chose not to.

108.  It is not the Court's responsibility to add or subtract language from statutes:

> "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think … is the preferred result." ***United States v. Granderson***, 511 U.S. 39, 68, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (concurring opinion).

Cited and quoted in ***Lamie v. United States Trustee***, 540 U.S. 526, 542 (2004)

109.  Under any reasonable analysis, the Debtor in this case, Len Salas, held more than "bare" legal title.  He held an equitable and beneficial interest in the property as the result of the borrowing that he incurred for the property and his recognized interest in the property by all federal and state agencies.  He also retained a beneficial interest in the property by virtue of his interest in the CLR Trust which was the "actual" owner of the property and the entity used by the Defendant for the property.  The Debtor was also a necessary party to all refinance attempts. The Defendant did

not list himself as a co-borrower or participant in the attempt to obtain loss mitigation relief - an attempt made during the period the Defendant (Max) and the Debtor (Len) were deposed in the Superior Court litigation. **Appx** 01144.

110.  The Defendant's claimed interest in the Property is solely an equitable interest to which he is not entitled under the facts and circumstances of this case, and the history of lies and deceit perpetrated on the D.C. Bankruptcy Court and this court.

## VII.    CONCLUSION

For the reasons stated above and argued in the Plaintiffs' Motion for Summary Judgment, and supporting Memoranda, the undisputed facts set forth in the Plaintiffs' Motion and Opposition (to the Defendant's Motion), and the Plaintiffs' Motion to Alter or Amend, the Plaintiffs assert that the Court should reverse the Orders appealed from, and remand with instructions to grant summary judgment to the Plaintiffs on all Counts of the Complaint.

Respectfully submitted,


BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt
Philip J. McNutt
Admitted *pro hac vice*
11921 Freedom Drive, Ste 588
Reston, VA 20190

-44-

703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

## ATTORNEYS FOR THE APPELLANTS

CERTIFICATE OF COMPLIANCE UNDER FED. R. BANKR. P. 8015(a)(7)(C)

I HEREBY CERTIFY, under Fed R. Bankr. P. 8015 (a)(7)(C) that the foregoing Brief, including the Statement of the Case, contains 13,825 words in Times Roman, 12 point type.

/s/ Philip J. McNutt
Philip J. McNutt

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Brief and Appendix was served electronically through the Court's ecf service system, on this 16th day of August, 2024 on Phillip Young, counsel for the Appellee and Cross-appellant.

/s/ Taylor A. Cates
Taylor A. Cates

-45-