

Marian F. Harrison
US Bankruptcy Judge

Dated: 5/23/2023



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

IN RE:                                      )
                                           ) CASE NO. 318-02662
LEN SALAS,                                 )
                                           ) JUDGE MARIAN F. HARRISON
    Debtor.                              )
                                           ) CHAPTER 7
NICOLAAS BREKELMANS AND                    )
GAIL GREGORY BREKELMANS,                   )
CO-PERSONAL REPRESENTATIVES                ) ADV. NO. 320-90027
OF THE ESTATE OF NINA                      )
BREKELMANS,                                )
                                           )
and                                        )
                                           )
MICHAEL MCLOUGHLIN AND                     )
MARTHA JOHNSON, CO-PERSONAL                )
REPRESENTATIVES OF THE                     )
ESTATE OF PATRICK                          )
MCLOUGHLIN,                                )
                                           )
    Plaintiffs,                          )
                                           )
v.                                         )
                                           )
MAX SALAS,                                 )
                                           )
    Defendant.                           )

---

# ORDER

---

APPX00001

In accordance with the Memorandum Opinion filed contemporaneously with this Order, it is hereby **ORDERED** that the motions for summary judgment on Counts I, II, III, and VI of the plaintiffs' amended complaint are **DENIED**.

It is further **ORDERED** that Max Salas' motion for summary judgment on Counts IV and V of the plaintiffs' amended complaint is **GRANTED**.

**IT IS SO ORDERED.**

**This Order was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

APPX00002

```
                UNITED STATES BANKRUPTCY COURT
            MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

                                 .
IN RE:                           .  Case No. 18-02662
                                 .  Chapter 7
LEN SALAS,                       .
                                 .
            Debtor.              .
                                 .
. . . . . . . . . . . . . . .    .
NICOLAAS BREKELMANS, et al.,     .  Adv. No. 20-90027
                                 .
            Plaintiffs,          .
                                 .
v.                               .
                                 .  701 Broadway
MAX SALAS,                       .  Nashville, TN 37203
                                 .
            Defendants.   .  Tuesday, November 8, 2022
. . . . . . . . . . . . . . .  .  9:33 a.m.
```

    TRANSCRIPT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
    COUNTS I, II, IV, V, AND VI OF THE AMENDED COMPLAINT [73]
            BEFORE THE HONORABLE MARIAN F. HARRISON
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiffs:      Law Office of Philip J. McNutt PLLC
                         BY:  PHILIP JAMES MCNUTT, ESQ.
                         11921 Freedom Drive, Suite 584
                         Reston, VA 20190
                         (703) 904-4380

For the Defendants:      Thompson Burton PLLC
                         By:  PHILLIP G. YOUNG, ESQ.
                         6100 Tower Circle, Suite 200
                         Franklin, TN 37067
                         (615) 465-6008


Audio Operator:          Karen Harris, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

    Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPX00003

1              (Proceedings commence at 9:33 a.m.)

2                    THE COURT:  Good morning.

3                    THE CLERK:  Hold on, you're still muted, Your Honor.

4              The United States Bankruptcy Court for the Middle

5    District of Tennessee is now in session, the Honorable Marian

6    F. Harrison presiding.

7                    THE COURT:  Good morning.

8                    THE CLERK:  Good morning, Your Honor.

9                    MR. MCNUTT:  Good morning, Your Honor.

10                   MR. YOUNG:  Good morning.

11                   THE CLERK:  We have one matter set at 9:30, Case

12   Number 20-90027, Brekelmans v. Salas.

13                   MR. MCNUTT:  Good morning, Your Honor.  Phil McNutt,

14   I'm sorry, I muted myself and didn't realize it.

15                   MR. YOUNG:  Good morning, Your Honor.  Phillip Young

16   on behalf of the defendant, Max Salas.

17                   THE COURT:  Mr. Cates?

18                   MR. CATES:  I'm here on -- with Mr. McNutt.

19                   THE COURT:  All right.  So we have one motion for

20   summary judgment.  Is that correct?

21                   MR. MCNUTT:  Yes, Your Honor.

22                   THE COURT:  All right.  Go ahead, Mr. McNutt.

23                   MR. MCNUTT:  Thank you, Your Honor.  Your Honor, I

24   won't go into a lot of the background and detail because I'm

25   sure Your Honor is very familiar with it.

1          THE COURT:  Yeah.

2          MR. MCNUTT:  And I know that you've --

3          THE COURT:  Yeah, there's a threshold issue that I

4    think we need to address.  And that is the argument that the

5    son held bare legal title.  Let's talk about that in terms of

6    the motion for summary judgment first.  Because if there's only

7    bare legal title according what -- to Whiting Pools, there's no

8    fraudulent conveyance here.  But let's go ahead and talk about

9    that first, Mr. McNutt.

10         MR. MCNUTT:  Sure, Your Honor.  With respect to the

11   issue of bare legal title, first of all the argument that

12   there's bare legal title has already been determined against

13   the defendants in the superior court litigation, which would be

14   judicial or collateral estoppel to these parties.  Mr. Len

15   Salas, the debtor, was determined to be the owner of the

16   property for all purposes.  Also, Your Honor, with respect to

17   the admissions that were submitted as part of the -- the list

18   of undisputed facts, that is, rather, the undisputed facts show

19   that number one, Mr. Len Salas was the titled owner.  Number

20   two, that he held indicia of title and ownership.  Number

21   three, that he was the holder and the sole obligor under a deed

22   of trust to SunTrust bank in the amount of $870,000, which rose

23   before it was eventually turned over well after the bankruptcy

24   was filed to Mr. -- to the defendant, Max Salas.  Was turned

25   over to Max Salas in, I believe it was November of 2019.  At

1  that time, and to this day, I believe, Mr. Len Salas is still

2  obligated on that deed of trust, which in November of 2019 had

3  a balance of approximately $1,280,000.

4          With respect to all of the records of the District of

5  Columbia and the D.C. Recorder of Deeds, which is the entity in

6  D.C. that holds the titles and real estate interests of

7  parties, the only party listed with respect to this property

8  was Len Salas.  Your Honor, I would also say that my

9  understanding of the issue of bare legal title relates not to

10  whether or not the bare legal title makes this property of the

11  debtor's estate under Section 541, specifically 541(b), but the

12  issue here is whether or not the interest of the debtor can be

13  recovered under the recovery powers of the trustee under

14  Sections -- of the avoidance sections, Sections 544(a), or

15  as --

16          THE COURT:  Well, what -- under Whiting Pools -- I

17  think it's Whiting Pools, avoidance doesn't come into question

18  if there's only bare legal title transferred because there's no

19  -- it's worth zero.  Isn't that the way it goes?

20          MR. MCNUTT:  I don't believe so, Your Honor.  The

21  cases that I've looked at, and unfortunately I did not look at

22  Whiting Pools, so I have to -- I mean I'm familiar with the

23  name of the case.  You know, it's been around for a while.  But

24  I did not research that case, did not look at that case prior

25  to today's hearing.  But the case law that I have seen,

1   including cases in the Ninth Circuit, one of the cases which

2   actually criticizes one of the cases cited by Mr. Young.  And

3   according to cases in other circuits, there seems to be some

4   confusion with respect to the difference between whether the

5   property was a property of the estate, or whether an interest

6   in property, or that the debtor had could be avoided and or

7   recovered.  If you look at -- let me see if I can find the

8   case, Your Honor.  And this is the case of In re Anderson,

9   which is actually a case out of the Middle District of

10  Tennessee, 30 B.R. 995.

11          THE COURT:  Okay.

12          MR. MCNUTT:  That case said that Section 541(b) poses

13  no barrier to avoidance and recovery by the trustee.  The case

14  states that parties considering this issue need to read

15  Sections 541, 544, 550, and 551 together to determine whether

16  or not property that can be recovered is property of the

17  bankruptcy estate.  I believe the confusion relates to the fact

18  that if there is no property interest at the beginning of the

19  case, then there's the -- then there -- some cases have said

20  that there is no interest of the debtor which can be avoided.

21  However, Sections 550 and 551 make it clear that property that

22  is avoided or preserved for the benefit of the case -- for --

23  I'm sorry, for the benefit of the estate under the Bankruptcy

24  Code in the bankruptcy proceeding, becomes proceeding becomes

25  property of the estate, and therefore has value to the

1    creditors.

2            THE COURT:  Okay.

3            MR. MCNUTT:  In the case of Anderson --

4            THE COURT:  Wait just a second.  Let me tell you what

5    Whiting Pools is.  It's a Supreme Court opinion decided in

6    1983.  If -- and it basically says where the debtor holds only

7    bare legal title and not equitable title to property, only the

8    legal title becomes part of the debtor's bankruptcy estate.  It

9    also says that bare legal title has no value to an estate, and

10   that a transfer of bare legal tile cannot form the basis for a

11   fraudulent transfer action.  It's a United States Supreme Court

12   case, so we need to focus on bare legal title first.

13           MR. MCNUTT:  Okay.  Just one other thing I might say,

14   Your Honor.  In the Anderson case, it cites the Bankruptcy

15   Commission's Report from -- in 1978, I believe, is the date of

16   the Commission Report.  The Commission Report says property of

17   the estate includes recoveries under the avoidance sections of

18   the Act.  And that's cited on Page 1010 of the Anderson

19   decision.  But with respect to the issue of -- and also, Your

20   Honor, there is the Tleel decision of the Ninth Circuit which

21   states that bare legal title is an interest in property which

22   can be recovered for the benefit of the estate.  Those are all

23   after the Whiting Pools decision, so I'm not sure how they get

24   around Whiting Pools.  But in these decisions, the Whiting

25   Pools case is not discussed as far as I know, as far as I read.

APPX00008

1   And these -- you know, I read this based on the cases that were

2   cited by Mr. Young.  And my conclusion was that the cases that

3   he cited that seemed to say that bare legal title was

4   insufficient essentially misread the Bankruptcy Code, and read

5   only Section 541(b) and did not focus on the fact that property

6   of the estate includes recoveries.  And a property interest is

7   different from property of the estate.  Therefore, if a

8   property interest, or an interest in property of the debtor --

9   and that's what Sections 550 and 551 say -- are recovered, they

10  become -- if they're recovered for the benefit of the estate,

11  or if they're preserved for the benefit of the estate, they

12  become estate property.  I did not notice any criticisms of

13  those cases.  Like I said, there are other cases, mostly lower

14  case -- lower court decisions which do conflict with those.

15  However --

16          THE COURT:  Did those cases talk about bare legal

17  title?

18          MR. MCNUTT:  Yes, at least two of them did for sure,

19  Anderson and the Tleel case of the -- which is in the -- which

20  is in my response.  There's also a Kayfirst Corp. case, decided

21  in the District of Columbia in 1993, that's cited at 813

22  F.Supp. 67.  And at Page 72 of that decision, Your Honor, it

23  says that the claim that the plaintiff held only bare legal

24  title does not defeat plaintiff's bona fide purchaser status.

25  The case of In re Tleel, which is Ninth Circuit, 876 Fed. 2d

1  769, at page 771, it says that legal title is plainly an

2  interest in property.  Didn't say it was property of the

3  estate, but said it was an interest in property.  And I think

4  that's the difference, Your Honor.  If it is -- if we're

5  talking about property of the estate under Section 541, the

6  interest that the debtor held is only a bare legal interest,

7  which I contend it is not, would not be part of the bankruptcy

8  estate.  However, if it is an interest that can be recovered

9  under Section 544, 547, 548, 549, then it is -- becomes part of

10  the estate pursuant to Sections 550 and Section 551.

11       Again, Your Honor, with respect to the issue of

12  whether there was bare legal title, the Superior Court has

13  already -- the Superior Court of the District of Columbia has

14  already decided that Mr. Len Salas was the owner of the

15  property for all purposes and upheld a judgment against him

16  that was not appealed. The judgment was dated April 4, 2018,

17  and that judgment became final and is binding on the parties,

18  and determined that Mr. Len Salas was liable as an owner -- as

19  the owner of the property.  Mr. Max Salas was liable as the

20  manager of the property.

21       In addition, Your Honor, during the period that we're

22  talking about, from 2010 when the property was supposedly

23  transferred to the date of the bankruptcy filing, Mr. Max Salas

24  was also not the owner of the property.  So that leaves only

25  Len Salas as the owner of the property.  Mr. Max Salas, even in

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

APPX00010

1  his affidavit filed in this case, stated that he was operating

2  the property for the benefit of a CLR Trust.  The CLR Trust,

3  according to Len and Max -- according to Len, that is, was a

4  trust created for the benefit of Max's children, which would

5  include Len.  So not only did Len have an ownership interest,

6  but he had a beneficial interest as a beneficiary of the CLR

7  Trust.  In addition, Your Honor, as Max Salas has admitted, all

8  of the indicia of ownership relative to the property were held

9  by Len Salas for the entire period of 2007 through 2018.

10       THE COURT:  What are the indicia of ownership?

11       MR. MCNUTT:  All of the tax bills, all of the D.C.

12  housing and recording requirements, housing code violations.

13  All those records with respect to who owned the property, who

14  was required to pay the taxes, who was required to pay the real

15  property taxes, all of those were issued in the name of

16  Len Salas, Your Honor.

17       THE COURT:  But they were all --

18       MR. MCNUTT:  Every single one of them.

19       THE COURT:  -- paid, to the extent they were paid, by

20  Max Salas, weren't they?

21       MR. MCNUTT:  No, Your Honor.  They were paid by the

22  CLR Trust, according to Mr. Salas -- according to

23  Mr. Max Salas.  He didn't pay them, only the CLR Trust paid

24  them, the Trust that --

25       THE COURT:  So are you saying --

1          MR. MCNUTT:  -- Len --

2          THE COURT:  -- that if there are two kids, you're

3     saying that -- are you saying that because of the trust, Len

4     Salas owned half of the property?  That's the indicia?

5          MR. MCNUTT:  No, Your Honor.  The indicia of

6     ownership is record ownership.  And the records with respect to

7     who owns the property, and who is obligated for the property

8     that are among the records of the District of Columbia, they

9     have been produced as exhibits in the bankruptcy case in D.C.,

10    in the superior court case in D.C., and are referenced in -- I

11    can try to find the exact admission.  But one of the lists of

12    -- one of the undisputed facts states specifically that

13    Len Salas held all indicia of ownership.  That's among the

14    undisputed facts that are admitted by Mr. Max Salas.  All

15    indicia of ownership, that's not just bare legal title, Your

16    Honor.

17         THE COURT:  All right.  Go ahead.  Are you finished

18    talking about bare legal title, or do you want -- I'd like to

19    hear from your opponent if you're finished talking about bare

20    legal title.  I'm just trying to parse through this.

21         MR. MCNUTT:  Sure.  I understand, Your Honor.  And

22    obviously I'd like to help you as much as I can.  I'm not sure

23    what else I can say other than I'm a little confused about the

24    Whiting Pools decision because it doesn't seem to come up in

25    these later cases, and I think it would if it was still an

1    issue of whether or not it prevented a recovery.  I don't

2    believe it does.  I think it's pretty clear from cases cited in

3    the District of Columbia, U.S. District Court, in this

4    District, the Sixth Circuit, the Middle District of Tennessee,

5    the Anderson case, and in the Ninth Circuit, that bare legal

6    title is sufficient.

7            But in this case, I'm telling Your Honor that we

8    already have this issue decided by the Superior Court of the

9    District of Columbia in a final determination that Len Salas

10   was the owner of the property as of April 4, 2018.  Nothing

11   changed between April 4, 2018, and April 18, 2018, except that

12   Max Salas and Len Salas came up with this basically scheme.  I

13   think that's the only way to really describe it, to try to

14   create an exemption by making up a story about the existence of

15   the infamous quitclaim deed.  Now, the quitclaim deed, which

16   was supposed to transfer property from Len to Max was

17   introduced as part of the superior court case in 2018, and was

18   rejected by the Superior Court.  And the Superior Court

19   determined that -- and the jury determined that Len was liable

20   as owner of the property.  That's in addition to the fact that

21   all indicia of ownership, as admitted by the defendant, were

22   held by Len Salas at all times subsequent to 2007.

23           THE COURT:  All right.  Let me hear from Mr. Salas's

24   attorney.

25           MR. YOUNG:  Thank you, Your Honor.  Phillip Young on

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2225)

APPX000013

1  behalf of Max Salas.  I'm going to start by clarifying a few

2  things that I believe are substantial misstatements.  The Court

3  can look at the record for itself, obviously.  First of all,

4  the D.C. Court did not decide the issue of bare legal title.

5  What the D.C. Court decided was that Len Salas was the record

6  property owner, and there's no dispute about that, that he's

7  the record property owner.  And then if the Court will recall,

8  the D.C. Court deferred to this Court to decide whether there

9  were issues about whether or not transfers could be set aside.

10 So that issue has not been decided.  There is no binding

11 decision on this Court.  Also, for clarity, the Court will

12 recall that what the D.C. Court found was that there was no

13 trust.  There may have been an attempt to create a trust, but

14 there was no trust.  So -- and that's why the Court found that

15 Max Salas owned a homestead exemption in the home, because

16 there was no trust.  So I wanted to -- those are a couple of

17 things that I wanted to clarify.

18         I also want to clarify that there absolutely was not

19 an admission that all indicia was -- all indicia to property

20 was in Len Salas's name.  There -- I'm -- there were admissions

21 about that the property was titled in his name, and the tax

22 records were sent to his name, that's all true.  But it is not

23 true that all indicia of ownership was in Len Salas's name.

24 That's categorically untrue.  In fact, Your Honor, the debtor,

25 Len Salas, never owned anything more than bare legal title to

1   the property in question.  The undisputed fact as presented by

2   the plaintiffs themselves clearly demonstrate that.  While the

3   property was titled in the name of the debtor, as I just

4   mentioned, it's undisputed that the debtor paid nothing for the

5   property.  It had previously been in the names of Max Salas and

6   his ex-wife.  It's undisputed that it was transferred into the

7   debtor's name prior to 2010 so that Max Salas could refinance

8   the property into his own name.  Again, all of those are

9   undisputed facts.  It's also undisputed that Max Salas paid all

10  mortgage payments.  He paid all taxes on the property, he lived

11  there.  The debtor never lived there.  He was the one who

12  rented the rooms out.  All the renters, including the

13  plaintiffs, dealt only with Max Salas.  They sent payments to

14  him, he collected the rents, he was the one that oversaw and

15  paid for reconstruction of the property after the fire.  All

16  those facts are undisputed by the plaintiffs, and in fact

17  they're included in their own statement of undisputed facts

18  that the Court can review on its own.  In short, the debtor

19  never owned any interest in this property other than being the

20  record holder, and this is the quintessential definition of

21  bare legal title.

22          In our brief, we cite to and summarize case after

23  case after case from all over the country that hold that in

24  cases just like this, a bankruptcy estate has no interest in

25  the property because the debtor only held bare legal title.

1   Those cases state that in situations just like this, because a

2   bare legal title interest is not property of the estate under

3   541, a transfer of the property is unavoidable by the transfer

4   -- by the trustee, whether under 544, 547, 548, 549, or state

5   fraudulent conveyance law.  In this instance, the plaintiffs

6   are stepping into the shoes of the trustee, because the trustee

7   decided to sell this cause of action instead of pursuing it

8   himself, likely because he realized these exact problems with

9   attempting to recover the transfer of property in which an

10  estate owns only bare legal title.

11          We believe that the multitude of cases cited in our

12  briefs speak for themselves, and I know that the Court has

13  reviewed the briefs, so I'm not going to walk through those one

14  by one.  Instead, I'll just state that case after case cited in

15  our brief have facts almost identical to this one.  Instead of

16  going through all those cases one by one, what I'd like to do

17  is use my few minutes this morning to respond to arguments made

18  in the plaintiffs' brief about why this Court should not adopt

19  the reasoning of this myriad of cases from multiple courts

20  throughout the country.

21          First, they try to argue some kind of unclean hand

22  theory.  It's not exactly clear.  They say that Max Salas

23  transferred the property to the debtor as part of divorce

24  planning, and they even make some unsubstantiated and highly

25  disputed claims that Max Salas transferred this property to the

1   debtor as some scheme to defraud the IRS.  Therefore, the

2   plaintiffs say Max Salas shouldn't be allowed to defend these

3   claims due to unclean hands.  However, the cases cited in our

4   brief make clear that even if the plaintiffs' claims about Max

5   Salas were absolutely true, unclean hands would not bar him

6   from defending this action.  The cases make clear that unclean

7   hands prevent a party from asking a court to grant affirmative

8   rights, but it doesn't prevent a party from defending his

9   rights to a property.  So unclean hands is inapplicable here.

10          The plaintiffs also argue that even though the debtor

11  had nothing more than bare legal title to the property, Section

12  544 somehow trumps Max Salas's resulting trust in the property.

13  And you just heard Mr. McNutt talk about the 1983 decision of

14  In re Anderson from Judge Paine's courtroom.  And they rely

15  heavily on this in their response.  And the reasoning behind --

16  but as the Court knows, the reasoning behind Judge Paine's 1983

17  decision was undercut by a 1988 decision of the United States

18  Supreme Court in U.S. v. Whiting Pools, which is cited in our

19  brief.  And in that later Whiting Pools case, the highest court

20  in the land noted that if a debtor held only bare legal title

21  to the property, it can't be property of the estate under 541,

22  and we quote the Supreme Court's decision on Page 22.  The

23  Court's already referenced that this morning.  So the Supreme

24  Court has conclusively decided that bare legal title can't be

25  recoverable.  And if property is never property of the estate,

1  then it can't be recoverable whether under 544, 547, 548, state

2  law, transfer of whatever, regardless of the trustee's long arm

3  powers.  A trustee can only recover property of the estate.  He

4  can't expand property of the estate.  If it was never property

5  of the estate, he can't recover it.

6          But I want to talk for just a minute, because I think

7  this is important.  Even if the plaintiffs were right about

8  this, that the strong arm powers of 544 allow a trustee to

9  recover property that was never property of the debtor in the

10  first instance, they'd still lose the summary judgment motion

11  because the hypothetical judgment lien holder, or the purchaser

12  in good faith under 544 would have had inquiry notice as of the

13  date of the bankruptcy.  The plaintiffs recorded a lien lis

14  pendens before the filing of the debtor's bankruptcy petition.

15  Therefore, as of the date of the bankruptcy, any good faith

16  purchaser or any lien creditor would have been on notice of the

17  lawsuit against the debtor and Max Salas, and under state law

18  would have been required to do due diligence into the

19  situation.  Any inquiry whatsoever would have uncovered that

20  Max Salas, and not the debtor, had exercised clear control and

21  dominion over the property throughout the time that Max Salas

22  was the bare record holder of the title.  Because creditors

23  were on inquiry notice as of the petition date, any

24  hypothetical judgment lien holder or purchaser in good faith

25  could not have, in good faith, asserted any kind of a lien

1    against the debtor's interest in real property.  Thus, even if

2    they're right about 544 expanding the estate under 541, the

3    plaintiffs' summary judgment motion would still fail because

4    under 544 you have to look what a good faith purchaser would

5    have been put on notice of.  And there was definitely inquiry

6    notice in this case.

7           Finally, I just want to briefly mention that the

8    plaintiffs incorrectly argue, despite all of this, that this

9    property can still be recovered under state fraudulent

10   conveyance law, even if it can't be recovered under 544 or 548.

11   Again, the cases that we cited in our brief uniformly deny a

12   trustee's attempts to avoid transfer of property in which the

13   estate owned only bare legal title under both 548 and state

14   fraudulent transfer law.  And the reasoning for that is simple.

15   First, if the debtor never owned an interest in the property,

16   then there can't be a transfer, either under federal law or

17   state law.  But secondly, even if a transfer had occurred under

18   state law, courts have found that the value of a debtor's bare

19   legal title is zero.  So there can be no transfer for less than

20   reasonably equivalent value.  A transfer of property with no

21   value for no consideration is a reasonably equivalent transfer.

22   We think that the overwhelming majority of case law as applied

23   to the undisputed facts of this case make very clear that the

24   debtor owned nothing more than bare legal title to the

25   property.  If the Court agrees with this conclusion, then I

APPX00019

1 think there's no legal theory upon which the plaintiffs can

2 proceed.  Indeed, frankly, if we had known all the facts that

3 the plaintiffs were going to admit in their undisputed facts,

4 we would have filed our own motion for summary judgment.  We

5 didn't, because we expected the plaintiffs to dispute a few

6 facts that they've admitted in their statement of undisputed

7 facts.

8        So we think the Court has two options today.  One, if

9 the Court agrees that the undisputed facts establish that the

10 debtor owned nothing more than bare legal title, which we

11 strongly feel that all the case law indicates that, then we

12 think the Court should deny the plaintiffs' motion for summary

13 judgment, and then enter a judgment in favor of the defendant

14 because there's no legal theory upon which the plaintiffs can

15 prevail.  We think that's the appropriate outcome here.  But if

16 the Court thinks there might be some room to argue whether or

17 not the debtor owns something more than that bare legal title,

18 then the Court should deny summary judgment and set the matter

19 for trial.  After all, as we pointed out --

20        THE COURT:  Well, I mean, back -- let me back you up

21 just a minute.  He cited not only the <u>Anderson</u> case, but a

22 Ninth Circuit case.  What's your position on that?

23        MR. YOUNG:  Not controlling, and the Supreme Court

24 case is.  That's my position on that, Your Honor.

25        THE COURT:  Yeah.

ACCESS TRANSCRIPTS, LLC    1-855-USE-ACCESS (873-2225)

1         MR. YOUNG:  The Supreme Court case has definitively

2    decided, and stated very clearly, that bare legal title can't

3    be recovered in a transfer action, in an avoidance action.  And

4    that is binding on this Court, and the Ninth Circuit is not.

5    And Judge Paine's decision would be instructive, but for the

6    fact that it came before Whiting Pools, and so I don't even

7    think it's instructive here.  So I think there's no doubt under

8    Whiting Pools, under all the other cases that we cited.  And,

9    Your Honor, I'm sorry if I burdened the Court with summary

10   after summary, but I wanted to give the Court a flavor of cases

11   across this country with facts very, very similar to this one

12   that all decided there's nothing to recover under 544, under

13   547, under 548, under 549, under state law fraudulent transfer,

14   because bare legal title is not an interest of property in the

15   estate.  So I think the Court --

16        THE COURT:  I know -- I know at one point in a very

17   small court case there was a question of whether or not --

18   whether the husband or the wife owned the car, and the husband

19   had the title to it, but the wife paid all the payments.  And I

20   believe I held the wife had the equitable interest, but I need

21   to look back on that.

22        MR. YOUNG:  And that would made sense, obviously,

23   under this case law that the Court would have held that the

24   wife held an equitable interest, whether in a resulting trust,

25   or some other kind of constructive trust.  But even if the

 1 | Court finds that, you know, you're not sure whether the debtor
 2 | owned anything more than bare legal title, then this thing
 3 | needs to be set for trial because then there are other issues.
 4 | We didn't brief the other issues because frankly, we think this
 5 | is controlling.  We think the bare legal title begins and ends
 6 | the inquiry, and begins and ends this case.

 7 |         But if the Court disagrees, then there are other
 8 | problems that the plaintiffs haven't addressed to date.  They
 9 | haven't identified -- or they've gone back and forth about the
10 | date that the transfer actually occurred.  And then they'd have
11 | to prove the insolvency of the debtor on that date.  Then
12 | they're going to have to prove what creditors existed as of
13 | that date.  And then they're going to have to show whether or
14 | not Max Salas intended to defraud the creditors.  And then
15 | they're -- then they've got to address whether the plaintiff's
16 | actual knowledge of the ownership bars the recovery.  And as
17 | mentioned before, we've still got inquiry notice problems under
18 | 544.  So none of that matters, of course, if the Court agrees
19 | that the debtor owned nothing more than bare legal title, which
20 | we think the facts clearly establish when you apply --

21 |         THE COURT:  I remember in that car case, it was a
22 | matter of intent about who owned the property.  And, you know,
23 | both Max Salas and Len Salas listed the property on their
24 | schedules.  And so I don't know that I can even rule on that
25 | right now without hearing -- having a trial on whether or not,

APPX00022

1   in addition to everything else, a trial on intent.

2           MR. YOUNG:  And I understand that, Your Honor.

3   Frankly, some of those -- we didn't file a motion for summary

4   judgment because we thought there were some questions around

5   the very edges of this.  You know, the fact is, I think both

6   Max and Len testified that they intended that this was going to

7   always belong to Max, and that it was only parked there to get

8   him, you know, to refinance the property.  And there are all

9   sorts of undisputed facts that he attempted to refinance, and

10  couldn't refinance.  And it's undisputed that there was a

11  signed quitclaim deed, that's -- you know, it was never

12  recorded, and that's undisputed.  So to the extent there's a

13  trial on this matter, I think it's going to be very brief

14  because I think almost all the facts here are undisputed.

15  After having looked at the plaintiffs' statement of undisputed

16  facts, I don't think there's going to be very much dispute

17  here.

18          THE COURT:  Well, even --

19          MR. YOUNG:  It may be that the Court --

20          THE COURT:  Yeah, even the petitions in both cases, I

21  mean they kind of raise a question since they both list the

22  property.

23          MR. YOUNG:  And I understand that, Your Honor.  And I

24  understand why the Court would say, you know, you want to hear

25  testimony on it.  I understand that.  And I'm certainly, as

1  I've said, I'm certainly not saying that I think the Court must

2  rule one way or the other today.  I think the Court could rule

3  in favor of the defendant.  But what is before the Court is a

4  motion for summary judgment in favor of the plaintiffs, and

5  that's absolutely inappropriate, Your Honor.  I'm happy to

6  take --

7          THE COURT:  Well, let's go back to -- there was one

8  thing made -- one point made by -- that the superior -- was it

9  the Superior Court that issued the opinion, or that had the

10  jury trial and, Mr. McNutt, is -- was it the Superior Court

11  rather than the Bankruptcy Court that issued the opinion on who

12  was responsible for the deaths of these kids?

13          MR. MCNUTT:  Yes, Your Honor.  I think Mr. Young

14  mistakenly said that it was the Bankruptcy Court, but -- and I

15  may have confused the issue.  But I was talking about the

16  Superior Court that determined that Len was the owner of the

17  property, not just bare legal title, but the owner of the

18  property for all purposes related to that case, and therefore

19  responsible for -- co-responsible for the deaths of the -- of

20  Nina and -- Nina Brekelmans and Michael McLoughlin.  Your

21  Honor, I do want to --

22          THE COURT:  Who had the insurance on the property?

23          MR. MCNUTT:  Max Salas --

24          THE COURT:  I'm assuming there was insurance

25  available?

1          MR. MCNUTT:  It was Max Salas, Your Honor.

2          THE COURT:  Okay.  And I assume insurance paid

3    something, at least for the destruction of the property.  Is

4    that right?

5          MR. MCNUTT:  Yes, it did, Your Honor.

6          THE COURT:  Did -- was there any payment made to the

7    parents of the kids by the insurance company?

8          MR. MCNUTT:  Ultimately what happened, Your Honor, is

9    that in the bankruptcy case -- all of the matters related to

10   the superior court case were stayed, pending the outcome of the

11   two bankruptcy cases.  At the end of the Max Salas bankruptcy

12   case, the insurance company that had the insurance on the

13   property paid, I believe it was approximately -- well, I think

14   the total amount was $500,000, and I'm not sure how much of

15   that was paid to the estates of the two children.  But because

16   of the size of the claim, you can see how liable it was.

17         THE COURT:  Yeah.  Well, that's probably not in the

18   record, but I'd -- just curious about the insurance.  But

19   trying to figure this all out.

20         MR. MCNUTT:  Your Honor -- if I may, Your Honor, I

21   need to make a correction.  When I said that there was

22   admission that Len Salas had all the indicia of ownership, that

23   was actually an allegation in the complaint, and not part of

24   the admissions.

25         THE COURT:  Okay.

1         MR. MCNUTT:  So I apologize.

2         THE COURT:  You --

3         MR. MCNUTT:  Mr. Young was correct, and I caused a

4 furor, which I deserved, but it was inadvertent.  There's so

5 many --

6         THE COURT:  That's fine, Mr. McNutt.

7         MR. YOUNG:  Your Honor, I don't get furious about

8 cases.

9         MR. MCNUTT:  Well, I didn't say you were furious, I

10 just said there was fury.  So -- I understand.

11         THE COURT:  Mr. McNutt, he's argued about the

12 fraudulent conveyance statute.  You want to argue about that

13 now?

14         MR. MCNUTT:  Okay.  You're talking about the --

15         THE COURT:  Because I kind of cut -- I kind of cut

16 you short on -- in terms of your argument because I got fixated

17 on this bare legal title thing.

18         MR. MCNUTT:  No, Your Honor, just maybe one other

19 point that I think bears on this -- well, bad choice of words,

20 but relates to the bare legal title issue.  And that is that

21 Mr. Young would have the Court believe, and I understand the

22 argument, that Len had no involvement with this property.  But

23 for a period of years, and this is in the admissions, for a

24 period of years, Len was trying to get his name off the

25 property, and Max wouldn't do it.  Max tried to get

Case 3:23-cv-00887   Document 141   Filed 10/01/24   Page 26 of 796 PageID #: 3644
ACCESS TRANSCRIPTS, LLC                  1-855-USE-ACCESS (873-2225)
APPX000026

refinancing, and that refinancing always required the
participation of Len.  So the refinancing in order to get Len's
name off the property required Len's participation.  So I think
that's another indication that he was much more than just the
holder of bare legal title.  Also, Your Honor, I want to
emphasize that during the period of time that Mr. Max Salas was
supposed to be "paying everything," in quotes, first of all, he
provided -- there's no evidence that he made any payments.
None.  All of the payments were made, that he admitted, were
made the CLR Trust.  And that's even in his affidavit, which is
attached to his -- to Mr. Young's objection to our motion for
summary judgment.  In addition to that -- I've lost my train of
thought.

          In addition to that, Your Honor, Mr. Len Salas was
heavily involved in the superior court litigation, and as I
said, found liable as owner of the property, and participated
in the attempt to transfer the property to his father that was
unsuccessful in 2010.

          So Mr. Young raised a number of issues with respect
to the fraudulent conveyance statutes.  And putting aside, and
I understand that it's important to the Court.  I just don't
think there's an issue with respect to this bare legal title
argument.  But obviously the Court may believe otherwise.
That's, of course, up to the Court.  But with respect to the
other elements of fraudulent conveyance, Mr. Young stated there

1  was no confusion as to when the property was transferred.  I

2  don't think we stated any confusion, or alluded to any

3  confusion.  The date the property is transferred, both under

4  D.C. law and under bankruptcy law, under Section 548(b)(1), the

5  date is the immediately before the bankruptcy was filed.

6  That's April 17, 2018.  Now with respect to the insolvency of

7  the debtor, Len Salas, it is undisputed that Mr. Salas --

8  Mr. Len Salas had judgments against him of over $15 million as

9  of April 4, 2018.

10          With respect to the SunTrust loan, it is undisputed

11  that Mr. Len Salas was still an obligor, the only obligor under

12  that note.  Although -- and although Max Salas claims that he

13  promised his son that he would make the payments, there was

14  nothing in writing to indicate that Max Salas accepted any

15  responsibility for any of the payments to SunTrust.  And during

16  the period the loan was in effect, the balance on the loan,

17  which was an interest-only loan for ten years, the balance on

18  the loan went from $870,000 in 2007 to $1,036,000 as of

19  April 18, 2018.  And then even after the bankruptcy was filed

20  by Mr. Max Salas, he still continued to make no payments on

21  that deed of trust note.  The balance in October of 2019 went

22  up to $1,208,000, all of which the only party that was legally

23  responsible for that was Len Salas.  So he incurred all this

24  liability, all this liability on his credit.  He was not just a

25  bare legal title owner.

1          Now, with respect to the insolvency, we talked about

2    the two judgments that the schedules showed that --

3    Mr. Len Salas's schedule showed that on April 18, 2018,

4    Mr. Len Salas had assets.  I believe the schedules showed

5    approximately $50,000.  It was definitely under $100,000.  And

6    the liabilities, as we know, including SunTrust, the IRS, the

7    estates that I represent, total over $16 million.  So clearly

8    he was insolvent at the time of that transfer.  In the

9    admissions, and I believe I'm correct.  I won't -- I don't

10   think it matters, but there are a number of admissions related

11   to the insolvency of Mr. Len Salas as early as 2010.  And even

12   if Mr. Young is arguing that the transfer took place in 2010,

13   Mr. Len Salas's testimony is that his only major asset in 2010,

14   and from 2010 to 2018, was the property.  Once the property was

15   transferred, whenever it was transferred, we assert without

16   question it's April 17, 2018.  Whenever it was transferred,

17   Mr. Len Salas would have been insolvent because he would have

18   lost the collateral for the loan while still being primarily

19   obligated on the loan.  And as we've noted, and as is admitted

20   by Mr. Max Salas, the amount of the loan that didn't decrease

21   during the time that Max Salas was supposed to be making the

22   payments.  It substantially increased by almost 40 percent

23   during the period of 2007 to 2019.

24          Also, on the issue of consideration, there are

25   admissions that were made that -- and even in Max Salas's

1 affidavit he indicates that he paid nothing to his son in 2010.

2 That he paid nothing to his son on behalf of the deed of trust

3 note from the period of 2010 to 2018. Len Salas testified, and

4 again it's one of the undisputed facts, that he received

5 nothing of value from his father, whether property or money, in

6 the period of 2010 through 2018. I think maybe there's one

7 slight exception to that because I understand it's not in the

8 filings, but I understand that Mr. Max Salas paid a part of

9 Mr. Len Salas's legal fees for the superior court litigation

10 because Mr. Len Salas could not afford to pay that.

11 Mr. Len Salas's legal fees were paid by his father and his

12 brother, and that was during the period of 2015 through 2018,

13 which is another indication of the inability of Mr. Len Salas

14 to pay his debts as they became due.

15         I've added that, Your Honor, it's not part of the

16 admissions, but it is part of the testimony of Len Salas and

17 Max Salas in this case. So I think that I can argue it because

18 it's clearly the case that -- and I'm not even sure it's

19 necessary at this point to point that out in addition to

20 everything else. But clearly during the period of 2015 through

21 2018, and during the period of 2018 up until the time of the

22 bankruptcy filing, Mr. Len Salas was insolvent.

23         Mr. Len Salas received no compensation for the

24 transfer of the property, whether it be on April 17, 2018, or

25 any time earlier than that. So we've got a transfer without

1  consideration at a time when Mr. Len Salas was obligated to pay

2  debts of over $16 million. I think under the complaint section

3  -- under the complaints Counts 4 and 5, which I believe are the

4  fraudulent conveyance counts, it's clearly a fraudulent

5  conveyance under Section 548.  The D.C. Code Section 28-3104,

6  the transfer is fraudulent as to the creditor or the debtor if

7  the transfer -- debtors made the transfer if actual intent to

8  hinder, delay, or defraud any creditor, or the debtor did not

9  receive a reasonably equivalent value in exchange for the

10  transfer, and the debtor incurred debts beyond the debtor's

11  ability to pay.

12  		And the D.C. Code actually spells out factors to be

13  determined to determine if there was actual intent, and the

14  factors include the following.  Transfer was made to an

15  insider.  In this case, the transfer was made from Len to his

16  father Max.  And insider, as you know, Your Honor, as defined

17  by the Bankruptcy Code, clearly Max Salas is an insider of the

18  debtor.  Sorry, Your Honor, do you need a break?  Do we need to

19  take a break?

20  		THE COURT:  I think I need a break.  My leg is

21  cramping up here.  I'll be right back.

22  		MR. MCNUTT:  Oh, sorry.  Sure.

23  		THE COURT:  Be right back.

24  	(Recess taken at 10:23 a.m.)

25  	(Proceedings resumed at 10:24 a.m.)

1          THE COURT:  I apologize.  Old age is setting in, I'm

2    afraid.

3          MR. MCNUTT:  Your Honor, should I continue?

4          THE COURT:  Yes, please.  I'm sorry.

5          MR. MCNUTT:  No problem.  I've sure been there, so no

6    problem, Your Honor.

7          THE COURT:  Thank you for recognizing I was in pain.

8          MR. MCNUTT:  Unfortunately, I'm too familiar with the

9    look, Your Honor.  I was talking about the factors in

10   determining actual intent.  And I realize actual intent here

11   might be a stretch because of the requirement to prove intent.

12   But if you look at the facts and circumstances that are

13   identified in our motion with respect to the way the quitclaim

14   deed was prepared in 2010, and then the emails between and

15   among D.C. Counsel, Max Salas, Ron Salas, the son and attorney

16   in Colorado, and Len Salas, you can see that the deed that Max

17   and Ron and Len attempted to use to try to show a transfer of

18   the property to the father for purposes of the superior court

19   case and the bankruptcy case, was -- the deed was abandoned

20   some time shortly after July of 2010.  The emails that were

21   produced for the first time by Len Salas as part of the

22   discovery in this case were not produced in the superior court

23   case or in the D.C. Bankruptcy Court case.  Those emails show

24   that in 2011 and 2012, not only did Ron Salas instruct his

25   father to obtain a deed, to have a local attorney in D.C.

1    prepare a deed.  But also to have that -- to make sure -- I'm

2    sorry.  But also Max is instructing his D.C. lawyers to help

3    him get Len's name off the property.

4          This happened in 2011, approximately January of 2011

5    through February of 2012, and then there is no communication,

6    dead silence after that until 2018 when Max Salas discusses his

7    potential bankruptcy with his attorney, Max -- Marc Albert.

8    And by the way, this was actually testimony in the superior --

9    the D.C. Bankruptcy Court case.  So this is not privileged

10   communication as Mr. Young is claiming, I don't believe anyway.

11   But regardless of that, we're talking about clearly the

12   quitclaim deed that is at issue here was abandoned in 2011 --

13   no later than 2011.  It was resurrected in 2018, attempted to

14   effect a transfer when there was no original of the quitclaim

15   deed.  The parties, Max alone, did not where the original was.

16   There was some testimony that Ron Salas may have had the

17   original, but that was clarified in a communication between

18   Ron Salas and Mr. Albert, the attorney in D.C., that Ron Salas

19   only had a copy.

20          So if you look at the circ -- facts and circumstances

21   that occurred between 2010 and 2018, it seems clear to me that

22   Ron and Len and Max made up a story, tried to use a quitclaim

23   deed that was no longer in effect and could not be found to

24   create the ability of Max to gain an exemption in the

25   Bankruptcy Court.  And in the Bankruptcy Court, they all

1  claimed that they forgot about the quitclaim deed.  Yet these

2  emails make it pretty clear that the quitclaim deed was not

3  forgotten.  It was abandoned, it was not effected for whatever

4  reason.  There were two attorneys involved.  It was Ron Salas

5  in Colorado, and there was Stan -- I'm sorry three attorneys

6  involved.  There was Ron Salas in Colorado; and there was Max

7  Salas's D.C. attorney -- D.C.-area attorney, they were actually

8  in suburban Maryland; Mr. Stan Goldstein and Mr. -- Ms. -- I

9  can't think of her name, but a French-sounding name, Boyeaux

10  (phonetic 10:29:31*) I think was her last name, Linda

11  (phonetic*) I think it was.  But anyway, those were the

12  attorneys that Max was communicating with to get the property

13  out of his son's name.  And that was as late as February 2012,

14  despite the fact that they testified in the D.C. Bankruptcy

15  Court that the deed was in effect and they just forgot about

16  it.

17        Those facts, some of which are admitted, all of which

18  are alleged, and all of which are part of testimony of Max and

19  Len in this case, would indicate that there was clearly fraud

20  here.  I'm not sure if Your Honor is could determine fraud

21  today.  I will -- I would grant you that.  There may be issues

22  of fact, and because it's intent, I think fairly that intent

23  probably needs an evidentiary hearing.  But I believe that this

24  is -- rises to the level of at least fraud, if not more.

25        In addition, Your Honor, Mr. Young argued that

1  inquiry notice would have prevented a bona fide purchaser

2  status to overcome the transfer.  But let's assume that's the

3  case, and I believe in D.C. -- first of all, the cases that

4  I've read indicate that inquiry notice is really nothing more

5  than a part of constructive notice.  In the District of

6  Columbia, and I think in many jurisdictions, I believe

7  Tennessee as well, constructive notice means record notice.

8  And if there is not --

9         THE COURT:  I thought he was talking about actual

10 notice, not inquiry notice.  I'm not sure.

11        MR. MCNUTT:  Well, the notice he's talking about, I

12 believe what he was saying is that because the judgments are

13 recorded prior to the bankruptcy filing by Len and Max, that

14 Len's trustee would therefore have notice on the date of the

15 bankruptcy filing that there was a judgment against Len, and

16 that would somehow provide him the obligation to provide -- not

17 to provide -- would obligate the trustee to make a

18 determination whether there was something in the title that

19 would prevent the trustee's recovery as a bona fide purchaser.

20 But even if all that's true, and I don't believe it is because

21 there's nothing in the record that would indicate anything

22 other than there's a judgment.  I don't believe -- and the

23 judgment was not -- there is -- I want to make sure I say this

24 right.  There is nothing before Your Honor that indicates that

25 the judgment is in the chain of title as of the date the

ACCESS TRANSCRIPTS, LLC      1-855-USE-ACCESS (873-2223)

1  bankruptcy is filed.  That may have been, but I'm not sure it

2  was, and I'm pretty sure Mr. Young does not know either.

3          But even if it is, and even if that would somehow

4  require the trustee to inquire further, it would go back to the

5  superior court case and determine that the property was owned

6  by Len, and that there was no transfer.  That's what the result

7  of the superior court case was, that Len was the owner of the

8  property.  So there's nothing in the superior court case that

9  would help Mr. Young's argument that inquiry notice would show

10  that there's a defect in the title, and therefore the trustee

11  would not have -- the trustee's bona fide purchaser status

12  would not be superior to the interest, whatever it is, that Max

13  may have had in the property as of the date of Len's bankruptcy

14  filing in April of 2018.

15          Your Honor, there are many other facts and arguments

16  related to this that it looks like we're going to have to have

17  a trial on it.  But as far as the bare legal title is

18  concerned, which Your Honor is very concerned about, and I

19  understand that.  I believe that the bare legal title issue is

20  one that will not be affected, that Len had substantially more

21  than bare legal title, that he had an economic interest in the

22  property, he had an ownership in the property.  He had a

23  judgment because of his ownership in the property.  The records

24  of the District of Columbia, and all records related to the

25  property were in Len's name.  That was part of the case in the

1   superior court, and it was part of the -- part of why the court

2   and the jury determined that Len was responsible, was owner of

3   the property, and that alone will be binding on Max as a party

4   to that case.

5           THE COURT:  All right.  Mr. Young, you want to say

6   anything further?

7           MR. YOUNG:  Just very briefly, Your Honor.  Just a

8   few clarifications from things because a number of issues

9   raised by Mr. McNutt as sort of things supporting his case have

10  actually already been addressed by numerous other courts.  So

11  for example, he raised the (audio interference) you know, there

12  was no agreement in writing.  Resulting trusts do not have to

13  be in writing, and the myriad of case law that we cited made

14  clear of that.

15          He raised several times, well, the property was in --

16  was recorded in Len's name, and the Superior Court found that

17  he was the title owner of the property.  Again, all those

18  cases, it's the same thing.  All the cases cited the actual

19  recorded title was in the debtor's name, and the courts found

20  that the estate -- nevertheless, the estate had no interest in

21  it.

22          He said, well, but the mortgage was in the debtor's

23  name.  Again, there's a number of cases that we cited where the

24  mortgage was in the debtor's name, but because a third party

25  made the mortgage payments, the third party had the equitable

interest, and the debtor had only bare legal title.  And then

he made a point, well, the defendant didn't make all the

mortgage payments.  That doesn't matter, respectfully.  What

matters is that Len Salas, the debtor, made no payments.  And

so that's what is important here.

One other thing on the 544 issue, there was a lien

lis pendens recorded, and we can show that.  I think that was

admitted.  There was a lien lis pendens recorded prior to the

bankruptcy.  The importance of that is it would put any bona

fide purchaser on inquiry notice of the resulting trust.  It

would put them on inquiry notice that Len Salas owned only bare

legal title because any inquiry into the facts and

circumstances of the superior court case would show that Max --

all the facts that we've already talked about this morning.

That Max Salas lived there and rented it out, and made the

payments, and collected rent, and all those things that would

put somebody on inquiry notice that perhaps Len Salas owned

only bare legal title.  So that's the importance of that issue.

And if the Court sets this for trial, I'm happy to brief that

issue prior to trial if that would help the Court.  And one

final thing, if the Court does set this for trial, this is just

sort of a -- I guess a suggestion, that maybe the Court set it

out far enough to allow the parties to get together and try to

stipulate to a number of these facts.  This is one of these

cases where, you know, it could take five days to try it, but

Case 23-cv-00987  Document 11-1  Filed 10/25/24  Page 38 of 796  PageID #: 3456

APPX00038

1   it looks like to me that the actual relevant facts, there are

2   very few that are disputed actual relevant facts.  And so I

3   would suggest that the Court set it out long enough, and

4   especially given intervening holidays, I know that can be an

5   issue, that we can sit down and stipulate to facts to try to

6   make this a one-day trial instead of a five-day trial.  Because

7   I actually think that the number of relevant facts that are

8   disputed are relatively few.  And those are my only comments,

9   Your Honor.

10        MR. MCNUTT:  Your Honor, if I may, just one thing?

11   With respect to the resulting trust argument Mr. Young made,

12   the resulting trust was not determined until September of 2018.

13        THE COURT:  I'm sorry, I didn't understand what you

14   said.

15        MR. MCNUTT:  The -- Mr. Young talked about the Court

16   determining a -- that there was a resulting trust.  A

17   bankruptcy court determined that there is a resulting trust,

18   even though a resulting trust was not argued or -- was not

19   argued in the superior court case, it was not presented as an

20   argument in the Bankruptcy Court case.  In the Bankruptcy Court

21   case, as in the superior court case, Max Salas and Len Salas

22   argued that the trust that was created by Ron Salas in Colorado

23   was a valid trust that terminated because of the fact that Max

24   Salas was both the trustee and the sole beneficiary.  The

25   argument was that when -- which is correct as far as it goes,

1    that when you have a trust and the trustee becomes the sole

2    beneficiary, the trust terminates.  In this case, the problem

3    was that the trust never existed because under D.C. law and

4    Colorado law both, in fact the law in almost every jurisdiction

5    in the country.  If you create a trust and you are the trustee

6    and the sole beneficiary, the trust does not exist.

7    Judge Mannes in his decision in the Bankruptcy Court determined

8    that that -- our argument that the trust never existed is

9    accurate, and the argument that Mr. Salas was making that the

10   trust terminated, and therefore he was the owner of the trust -

11   - he was owner of the trust property -- I'm sorry, I'm making

12   this confusing.  But the Bankruptcy Court determined that the

13   trust never existed.

14          MR. YOUNG:  Your Honor, maybe I can clarify because I

15   think I've muddied the waters there, and I didn't mean to --

16          THE COURT:  Yeah, I'm sorry.

17          MR. YOUNG:  Yeah, yeah.  What I was saying is not

18   that it put them -- it put a bona fide purchaser on inquiry

19   notice that a court had already determined there was a

20   resulting trust.  That's not what I was trying to intimate.

21   What I was saying is that the lien lis pendens, with any due

22   diligence, would have put a bona fide purchaser on notice of

23   all these other facts that would lead a court to determine that

24   Len Salas was only the bare legal title owner.  All that came

25   out in the lower court about who made the payments, and who

```
 1    lived in the house, and who made the tax payments, and who had

 2    the insurance policy, and all those sorts of things.  And I was

 3    not -- Mr. McNutt, I apologize if I made that confusing.  I was

 4    not trying to say that it would put a reasonable purchaser on

 5    notice that a court had already determined a resulting trust.

 6    Rather, that it would lead a bona fide purchaser to all these

 7    facts that would establish that Max Salas is actually on the --

 8    is the equitable owner.  That's what I was trying to say.  I

 9    apologize if I muddied the water there.

10              MR. MCNUTT:  Oh, I think I can declare that I made it

11    much more confusing than you did, sir.  I think I won that one.

12              THE COURT:  Well, starting with the bare legal

13    argument, and the fact that both Max Salas and Len Salas claim

14    they owned in their petitions the property, and I'm not sure

15    that I can even grant a summary judgment one way or the other

16    on this matter.  I think it's a question of fact, and we're

17    going to need some proof on that, either by stipulation or

18    whatever.  I can't make a decision on that today, so I'm going

19    to deny the motion for summary judgment.  And all of the issues

20    will be tried -- I don't have a book.

21              Mr. Keimer, thank you.  We're going to have a

22    pretrial conference --

23              THE CLERK:  You're going to need a 23.

24              THE COURT:  Okay.  I'm going to need a 23,

25    absolutely.
```

```
 1          We're going to have a pretrial conference, after

 2   y'all tried your hand at stipulations, on -- pretrial

 3   conferences are now on Tuesday afternoons.  How long do you

 4   think it will take you all to stipulate facts?

 5          MR. YOUNG:  Your Honor, that's a good question.  I'm

 6   not sure.  There are a lot of facts here, that's the only

 7   reason that I have said, you know, let's leave enough time

 8   because there are a lot of facts here.  I think Mr. McNutt

 9   might have more facts than me that thinks these are relevant.

10   So, you know, with the intervening holidays, I would say, you

11   know, maybe we could have a pretrial conference early January?

12   I don't know about how Mr. McNutt --

13          THE COURT:  With -- you have already stipulated early

14   -- by early January?

15          MR. YOUNG:  I feel like we can.  I feel like we can

16   trade some, you know, some proposed stipulations back and forth

17   over the next several weeks.  And again, I would like to think

18   that would happen in 30 days, but because of the holidays, I

19   want to make sure we allow additional time.  I know I'm doing

20   some traveling, so I would think early January would be fine.

21          THE COURT:  I've got some problems, and they're not

22   on here.

23          MR. MCNUTT:  I agree with Mr. Young, by the way, Your

24   Honor.

25          THE COURT:  Ms. Beers, will you get the calendar for
```

ACCESS TRANSCRIPTS, LLC    1-855-USE-ACCESS (873-2225)

APPX00042

1    January so I can look at it?  Okay.

2              THE CLERK:  (Indiscernible 10:45:19*).

3              THE COURT:  Okay.  Never mind, 11 through 17.  You

4    know, I don't need it.

5              THE CLERK:  You can do 10 (indiscernible*).

6              THE COURT:  Let's do the pretrial conference at 1:30

7    on Tuesday, the 24th.

8              THE CLERK:  At 1:15?

9              THE COURT:  At 1:15, I'm sorry.  And then let's plan

10   on trying the case -- I'll need to double-check this.  I'd love

11   to have a trial on stipulations, but I worry because there's

12   some fuzziness in the undisputed facts from both sides, so I

13   realize there's going to need to be some testimony probably.

14   On --

15             MR. MCNUTT:  Is that January 24th you were talking

16   about, Your Honor?

17             THE COURT:  Yeah, uh-huh.

18             MR. MCNUTT:  Or December --

19             THE COURT:  Uh-huh.  January.  Do I have a docket on

20   March 1st?

21             THE CLERK:  Yes.

22             THE COURT:  Okay.  Do I have a docket on March 8th?

23             THE CLERK:  (No audible response.)

24             THE COURT:  Let's get the trial for Wednesday,

25   March 8th and March 9th.  Hopefully that'll do it, and we'll

1  have to go into the 10th if we need to.  Is that okay with

2  y'all?

3          MR. YOUNG:  That looks fine to me, Your Honor.

4          THE COURT:  Mr. McNutt?

5          MR. MCNUTT:  I'm going to have to reschedule the

6  clock repairman, but other than that, I'm fine.

7          THE COURT:  You're going to have to reschedule what?

8          MR. MCNUTT:  The clock repairman.

9          MR. YOUNG:  Mr. McNutt, how far out is the clock

10  repairman put his schedule?  Goodness.

11          MR. MCNUTT:  Two years, actually.  Two years.

12          THE COURT:  Oh, my, my.

13          MR. MCNUTT:  I think I can work around that, Your

14  Honor.

15          THE COURT:  All right.  Thank you.  All right.

16  Hopefully the clock repairman will get there earlier.  Okay.

17  Well, thank you all, good arguments, and I look forward to

18  seeing --

19          MR. YOUNG:  Is the Court going to prepare --  I'm

20  sorry.  Is the Court going to prepare the order, or do you need

21  me to prepare the order?

22          THE COURT:  I'd like for you to prepare the order.

23          MR. YOUNG:  Thank you.

24          THE COURT:  And there are just too many facts in this

25  case for me to grant summary judgment.  All right.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2225)

APPX000044

```
1                   MR. YOUNG:  Thank you, Your Honor.

2                   MR. MCNUTT:  Thank you, Your Honor.

3                   THE COURT:  All right.

4                   UNIDENTIFIED:  Thanks, Your Honor.

5                   THE COURT:  We'll be adjourned.

6               (Proceeding concluded at 10:48 a.m.)

7                             * * * * *

8

9

10

11

12

13

14                    C E R T I F I C A T I O N

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17     certify that the foregoing is a correct transcript from the

18     official electronic sound recording of the proceedings in the

19     above-entitled matter.

20

21

22

23     _____

24     ALICIA JARRETT, AAERT NO. 428     DATE: November 6, 2023

25     ACCESS TRANSCRIPTS, LLC
```

```
                   UNITED STATES BANKRUPTCY COURT
                  MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

                                    .
IN RE:                              .  Case No. 18-02662
                                    .  Chapter 7
LEN SALAS,                          .
                                    .
               Debtor.              .
                                    .
. . . . . . . . . . . . . . . . .   .
NICOLAAS BREKELMANS, et al.,        .  Adv. No. 20-90027
                                    .
               Plaintiffs,          .
                                    .
v.                                  .
                                    .  701 Broadway
MAX SALAS,                          .  Nashville, TN 37203
                                    .
               Defendants.          .  Tuesday, March 21, 2023
. . . . . . . . . . . . . . . . .   .  9:32 a.m.

          TRANSCRIPT OF CROSS MOTIONS FOR SUMMARY JUDGMENT
             BEFORE THE HONORABLE MARIAN F. HARRISON
               UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiffs:        Law Office of Philip J. McNutt PLLC
                           BY:  PHILIP JAMES MCNUTT, ESQ.
                           11921 Freedom Drive, Suite 584
                           Reston, VA 20190
                           (703) 904-4380

For the Defendants:        Thompson Burton PLLC
                           By:  PHILLIP G. YOUNG, ESQ.
                           6100 Tower Circle, Suite 200
                           Franklin, TN 37067
                           (615) 465-6008


Audio Operator:            Autumn McNeese, ECR

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

1        (Proceedings commence at 9:32 a.m.)

2            THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Middle District of Tennessee is now in session,

4   the Honorable Marian F. Harrison presiding.

5            THE COURT:  Be seated, please.  All right.

6            THE CLERK:  Your Honor, we're here on Case Number 20-

7   90027, Brekelmans v. Salas.

8            THE COURT:  All right.  What I want to do first is

9   talk about 548, Whiting Pools, et cetera.

10           Mr. McNutt, you want to start?

11           MR. MCNUTT:  I'm sorry, I didn't -- I heard 548, I

12  didn't hear the rest of what you said, Your Honor.

13           THE COURT:  I want to talk about 548 first.

14           MR. MCNUTT:  Okay.  Thank you, Your Honor.  When

15  we're talking about 548, I believe what Your Honor's previous

16  ruling was is that if Mr. Len Salas, the debtor in this case,

17  held only bare legal title, that the -- that he would not be

18  able -- that the plaintiffs in their derivative standings for

19  the bankruptcy estate would not be able to recover on the

20  constructive fraud.  It wasn't clear to me if you were talking

21  about all of the 540 -- Section 548 actions or just the

22  constructive fraud.  But the specific citation, as I understood

23  it in your order, was only to the constructive fraud section of

24  Section 548.  Nevertheless, regardless, Your Honor, I think the

25  issue is whether or not Mr. Len Salas here has only bare legal

1  title.

2          And with respect to the phrasing and the definition

3  of bare legal title, there is not much to go by with respect to

4  the first three citations, if you will, for that.  The first

5  two are the House Report and the Senate Report on the

6  legislation that was enacted in 1978.  And I'm old enough to go

7  back further than that, so I know that time period.  The

8  Bankruptcy Reform Act was enacted in 1978, went into effect in

9  1979.  And the House and Senate Reports said they would expect

10  in the trustee's certain recovery actions that there was no

11  intent that the Bankruptcy Code would allow recovery for bare

12  legal title.  That's not in the statute, that's in the House

13  and Senate Reports, so that's number one.

14          Number two, as Mr. Young stated in his argument

15  before Your Honor the last time we were before you, Whiting --

16  the Whiting Pools case cited in dicta, but did cite to the

17  House Report, and said that there is no intent that bare legal

18  title will allow the trustee to recover.  Now, as Your Honor

19  knows, the Whiting Pools case is a case involving an attempt to

20  overcome or recover a -- an IRS lien, if I recall correctly,

21  that it was the Internal Revenue Service that was claiming in

22  Whiting Pools.  It was not an attempt of the trustee to recover

23  property.  So my contention is that Whiting Pools is merely

24  dicta, and therefore is not controlling.

25          Even, however, if it is controlling, Your Honor, and

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2225)

APPX000048

1    I've actually changed my position on this after reading through

2    these cases.  Even if Whiting Pools is controlling, or even if

3    the issue of bare legal title is controlling here, and I think

4    there's a discussion of the relationship between Section 541(d)

5    of the Bankruptcy Code, and the trustee's recovery and

6    avoidance powers that they claim different language, and I

7    believe one does not apply to the other.  For example, as Your

8    Honor knows, property of the estate includes property that is

9    recovered by a trustee in bankruptcy (indiscernible), and in

10   this case by the party who's acting derivatively for the

11   trustee in bankruptcy.

12           But in addition to all that, as I've argued in the --

13   in my supplemental memorandum, and in my opposition to Mr.

14   Young or to defendant's motion for summary judgment, there's

15   the issue of what constitutes bare legal title.  And as I

16   review this, I'm -- I've noticed it several times.  I guess,

17   again, I'm old enough to notice this, so maybe that's good,

18   maybe it's bad.  But often times -- not often times, but

19   occasionally I'd see where cases have been developed over a

20   long period of time, and I'm reminded of the judge in the

21   Bishop of Maryland that -- well, maybe 15 years ago was talking

22   about a provision in the Chapter 11 of the Bankruptcy Code, and

23   he said that this provision started out as a very simple

24   premise.  I don't want to go into the details, it had to do

25   with the debtor's ability to retain property in a Chapter 11

1  case if all the creditors are not paid in full.  It had to do

2  with the idea of the debtor being able to produce consideration

3  in the Chapter 11 canon that would allow him to retain

4  property.  And the judge said that --

5         THE COURT:  Wait just a minute.  Do we have a court

6  reporter online?

7         THE CLERK:  Yes, we do, Your Honor.

8         THE COURT:  Okay.  Just -- suddenly got worried.  Go

9  ahead.  I'm listening, but I looked over just then.

10        MR. MCNUTT:  Well, Your Honor, depending on how well

11  my argument goes, I'm not sure I would rather a court reporter

12  be here or not.  But hopefully, hopefully I'm doing all right.

13        And so, anyway, I don't want to make this too long.

14  But the judge said, I've looked at this case and went back to

15  the beginning.  And I found out that over a period of 20, 30

16  years, maybe more, that the original meaning has been changed.

17  And it's been changed because of the particular facts of a

18  case, or because somebody takes something out of context from

19  the original cases and then applies it, and it gets adopted and

20  adopted and adopted.  And I think where these cases that talk

21  about bare legal title and go beyond what I would call simply

22  bare legal title, I believe that's what's happened.  And in

23  particular, the Patel case that Your Honor has cited in her --

24  the -- in her most recent order, the January order, that case

25  cited one case that cited another case, which went back to a

Case 3:23-cv-00987   Document 14-1   Filed 10/02/24   Page 50 of 796 PageID #: 3468
ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)
APPX00050

1   case in the, I believe it was the Middle District of Florida.

2   And it turns out that that case in the Middle District of

3   Florida, although it contained the phrase quoted to the courts

4   over the years, it didn't actually have the same facts

5   regarding quote/unquote "bare legal title."

6            I contend that bare legal title means what it means

7   in the Geremia case that I cited in my opposition.  And, Your

8   Honor, the Geremia case is widowed mother who bought property

9   with her own funds and a bank loan to her.  Now notice that the

10  facts in Geremia are that the widowed mother bought the

11  property with her own funds.  That's not true here.  The funds

12  were borrowed by Len Salas.  And bank loan to her only in the

13  Geremia case.  Here, you have a bank loan to the son, to Len,

14  the debtor in this case.  It is not stated in the record, the

15  mother put her young son under 18 years old on the deed.  I'm

16  getting a phone icon here.  Can you hear me, Your Honor?

17           THE COURT:  Yes, I can.

18           MR. MCNUTT:  Okay.  Sorry.  She paid all the expenses

19  and, all notices regarding the property was sent to her as the

20  publicly advertised owner.  Also not the facts of this case.

21  All of the public notices were addressed to the debtor, Len

22  Salas, not Max Salas.  She paid all expenses.  Now, that's

23  arguable here that Max Salas paid at least some of the

24  expenses.  But you'll note it as in our supplemental

25  memorandum, Your Honor, that during the period that Max Salas

1  was in the property, from 2007 until 2015, and not from 2015 to

2  2018, but from 2018 forward, that Mr. Max Salas allowed the

3  mortgage balance to increase by over $300,000.  Even in the

4  course of his bankruptcy case, Mr. Max Salas -- and Mr. Max

5  Salas's bankruptcy case was filed on the same day as Len

6  Salas's case in this Court.  Mr. Max Salas did not pay a single

7  mortgage payment from the commencement of his bankruptcy case,

8  so from 2015 to 2018, Mr. Max Salas, according to his own

9  testimony, paid -- made one payment on the mortgage.  Now, it

10  was a substantial payment, but it did not bring the mortgage

11  current.  One payment only.  From the start of his bankruptcy

12  case until November of 2019, he made exactly no payments, and

13  paid no money for the mortgage to the property.

14          So Geremia is a case that I think is typical of the

15  cases that properly and correctly decide what bare legal title

16  means.  It means a title that was granted for a purpose other

17  than intending to convey ownership.  It's not like a deed to an

18  individual.  Now, I'm going to get into the McKinley case,

19  which I'm sure Your Honor has seen.  But with respect to the

20  issue of bare legal title, we're talking about Len Salas, who

21  obtained the loan to purchase the property so that Mr. Salas

22  could pay his ex-wife.  So that's the first indication of more

23  than bare legal title.  Unlike in Geremia, the deed and deed of

24  trust were issued in the name of Mr. Len Salas solely, not to,

25  in the case of Geremia the widowed mother and her son.  And by

1    the way, the son was not of age at the time he was put on the

2    deed. Mr. Len Salas was of age. Mr. Len Salas then obtained a

3    deed of trust with the loan. The loan was in his name only.

4    There was no agreement, as both Len Salas and Max Salas admit,

5    there was no agreement for Max Salas to make any payments to

6    his son, or to notify SunTrust, the lender, that he was

7    obligated on the loan. There was no attempt by Max Salas to

8    indicate that he was the owner in any public record. In fact,

9    it is very obvious from the record in this case that Mr. Max

10    Salas hid his ownership of the property. And that also goes to

11    the issue of whether he had open and notorious possession, one

12    of the other issues Your Honor raised.

13          So for those reasons, and the reasons that are cited

14    in the supplemental memorandum and the opposition to the

15    defendant's motion, I believe that with respect to the issue of

16    bare legal title, we're talking about something that is far

17    more limited than the facts of this case. And therefore, the

18    debtor, Len Salas, is the owner for all purposes and intents,

19    has sufficient ownership for the recovery of property under

20    Section 548. Neither the actual fraud or the constructive

21    fraud section of Section 548. And with respect to the cause of

22    action from Section 548, because it has been established that

23    there is -- that the property was conveyed on April 17, 2018,

24    when Len Salas was clearly insolvent, as indicated by the

25    schedules and indicated in the documents we provided, and his

APPX00053

1   testimony concerning his income over the period of time from

2   2015 to 2018, and it was not insolvent at the time of the

3   transaction.  The transaction clearly made him insolvent

4   because as he testified, his only -- and as the records show,

5   his only major asset was the property.  Once the property was

6   conveyed, then the value of the property was no longer his.

7   But he was still not only obligated on the SunTrust loan, he

8   was also obligated for the judgments that my clients obtained

9   on April 4th, 2018.  And he had other smaller obligations that

10  were not being paid, including tax obligations.  So with

11  respect to the requirements of Section 548, that's a different

12  subsection, but it's well-known, and I'm not going to bother to

13  try to find it because I know Your Honor knows it.  But with

14  respect to the constructive fraud section, I think we have

15  clearly shown that there is -- that the facts -- the undisputed

16  facts of this case show that my clients are entitled to

17  judgment on the fraudulent conveyance count.  That's both the

18  bankruptcy fraudulent conveyance count and the state court

19  count which I believe is -- I think it's 4 and 5, Counts 4 and

20  5, I believe of the complaint.

21          THE COURT:  Are you alleging actual --

22          MR. MCNUTT:  (Indiscernible) the complaint --

23          THE COURT:  Excuse me.  Are you alleging actual fraud

24  in addition to constructive fraud?

25          MR. MCNUTT:  Yes, Your Honor.

1        THE COURT:  And the basis for actual fraud is what?

2        MR. MCNUTT:  The basis for actual fraud is all of the

3   lies and deception that existed from 2010 to 2018, including

4   the lies and misstatements and deceit regarding whether or not

5   there was actual deed on the property.  The facts stated by Mr.

6   Salas, or relied upon by Mr. Salas is that in July of 2010, he

7   went to Colorado where his son was a newly barred attorney.

8   And had his son, or his son offered, I'm not sure which, to

9   prepare a trust and a quitclaim deed to the trust.  And before

10  I forget, Your Honor, I believe that it is improper, although I

11  will say that I haven't found a specific case, but  I haven't

12  found any cases which show that a deed can be made in the

13  District of Columbia to a trust.  The trust can be the

14  beneficial owner of the property, but the trustee is the party

15  in whose name the deed should be entered.  So I think that was

16  one problem with the deed, as I'll get into in a minute.

17       The other problem with the deed is I don't believe it

18  was created in a -- in the manner required under D.C. law for

19  verification and identification.  But whatever the facts are,

20  if you look at the emails that are contained at Exhibit 7 of

21  the plaintiff's supplemental memorandum, these are emails that

22  started in mid-2011, and went through February of 2012.  Now,

23  keep in mind that the quitclaim deed that Mr. Salas is --

24  actually, Mr. Max Salas -- well, Len and Max Salas are

25  referencing here, was created in July of 2010, and it was

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

APPX000055

1  created by Ron Salas, the attorney in Colorado.  In June of

2  2011, as Exhibit 7 makes absolutely clear, Ron Salas is telling

3  his brother, Len, the debtor, and his father, Max, that

4  somebody in D.C. needs to create a deed.  There's already a

5  deed that was quote/unquote "created" in July of 2010.  Now,

6  it's not an indicator as to why that deed is no longer in

7  effect.  But it is clear from the emails, there is no question

8  about this, there is no way that a different inference could be

9  reasonably asserted that the deed was no longer in effect.

10  There is constant communication during that period, and later,

11  between Len and Max, and between Max and counsel in D.C.,

12  wherein the parties -- wherein Max is asserting, and Len is

13  asserting that Len is still the owner, and he wants his father

14  to get him off the title to the property.

15        Max is saying there -- one of the emails says

16  specifically there are two things we need to do.  One is to get

17  Len's name off the property, and I'm paraphrasing here, but

18  that's the sense of the wording.  The second thing is we need

19  to get the deed recorded so we can try to refinance the

20  property, or get the deed so we can refinance the property.

21  Those are specifically related in the emails, those emails are

22  not in dispute.  Those emails were produced in August of 2021

23  by Len.  They were never produced in any of the litigation to

24  date by Max, by the defendant, even though they should have

25  been produced in the D.C. Bankruptcy Court case.

1    After 2011, Your Honor, Max Salas, and Len Salas, and

2  Ron Salas have all either testified, or by email communications

3  that have been verified have stated that they do not have the

4  original deed.  There is no original deed.  Now, regardless of

5  whether a deed could be created to transfer property to a

6  trust, what is also important here is that there is no deed in

7  existence, and has not been since 2007 that was delivered to

8  Max Salas that identifies a conveyance to Max Salas.  And, Your

9  Honor --

10    THE COURT:  Okay.  What I want to know is where the -

11  - just succinctly, where the actual fraud comes in here.  Where

12  is the actual fraud?

13    MR. MCNUTT:  Sure, Your Honor.  So the period

14  starting with the Superior Court litigation in 2016 through

15  2018, through August of 2018, which is the date -- dates of the

16  exemption period in the D.C. Bankruptcy Court.  Ron Salas, Len

17  Salas, and Max Salas all testified, stated and testified

18  numerous times, and they're all in the record, Your Honor.

19  They're all in the documents that were produced as part of the

20  supplemental memorandum, and they've been identified in more

21  than one instance both in deposition testimony and in hearing

22  testimony by those three parties that the quitclaim deed was

23  still in existence, and they forgot about it.  And said this

24  over and over and over again, when they knew that the quitclaim

25  deed had been abandoned, was not in existence, and in fact they

Case 3:23-cv-00987 · Document 14-1 · Filed 10/26/24 · Page 57 of 796 PageID #: 3675
ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2225)

APPX00057

1  couldn't even find it if it was in existence, or even -- they

2  could not even find it.  Mr. Salas testified that he didn't

3  know where the original was after 2011.  He admitted in his --

4  I believe it's in his admissions in this case, that he

5  understood that the deed may have been given to his attorney,

6  Mr. Goldstein, or to the real estate agent, Sylvia Jones, but

7  that he never attempted to find out if Sylvia Jones had a copy

8  of the deed.  And although he contacted Mr. Goldstein regarding

9  whether he had a copy of the deed, Mr. Goldstein did not

10 respond, and Mr. Salas did not follow up.  So in --

11         THE COURT:  How is that all fraudulent?  How is that

12 all a fraudulent transfer?  An actual fraudulent transfer?

13         MR. MCNUTT:  It's a transfer based on fraud, Your

14 Honor, because there was no deed in existence in April of 2018,

15 or in April of 2017, or at any time.  And the debtor testified

16 that in 2017 -- I'm sorry.  The defendant testified in 2017

17 that after he found out from his attorney, Marc Albert, that he

18 could exempt the property if he could obtain the deed, he went

19 back and, quote/unquote "found the deed."  At that time, he had

20 stated categorically in the Superior Court case that the only

21 trust that existed was the CLR Trust.  He mentioned different

22 trusts, never the 1610 Riggs Property Trust.  But he mentions

23 in his testimony several different trusts, but the only one

24 that he could specifically identify was the CLR Trust.

25         In Len's testimony, at the same time, Len testified

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2225)

1  that he didn't know anything about these other trusts that his
2  father was talking about.  But he did know, "I know that one,"
3  was his exact testimony.  "I know that one."  He was aware of
4  the CLR Trust, which was a trust that was created for the
5  benefit of Len and his two brothers, Chase and Ron.  CLR,
6  Chase, Len, and Ron.  That was in 2016.  The depositions of
7  these two parties in 2016 took place in February of 2016 and
8  March of 2016.  In February of 2016, between the depositions of
9  Len and Max, Len Salas prepared -- I believe it was actually
10 prepared by Max, but it was signed by Len, a loss mitigation
11 statement which was sent to SunTrust to attempt to prevent
12 SunTrust from foreclosing on the property that's in question
13 now.  And in that loss mitigation statement, which is attached
14 as an exhibit to the supplemental memorandum, in that loss
15 mitigation statement, Mr. Len Salas identifies himself as the
16 owner of the property two different times.
17           THE COURT:  He said what?
18           MR. MCNUTT:  He said that he was -- he stated under
19 oath that he -- I'm sorry, under penalty of perjury, he stated
20 that he was the owner of the property.
21           THE COURT:  That Len was the owner?
22           MR. MCNUTT:  This was the loss --
23           THE COURT:  Okay.
24           MR. MCNUTT:  I'm sorry, Your Honor?
25           THE COURT:  That Len was the owner?

1    MR. MCNUTT:  I'm sorry, I still didn't hear you, Your

2   Honor, sorry.

3    THE COURT:  Len Salas stated under oath that he was

4   the owner of the property.  Is that what you're saying?

5    MR. MCNUTT:  That's correct, Your Honor.  And that's

6   in the loss mitigation statement, which I believe is Exhibit F

7   to the supplemental memorandum.  Let me see here.  Yes, it's

8   Exhibit F to the supplemental memorandum, Your Honor.

9    THE COURT:  All right.

10   MR. MCNUTT:  It's dated February 18, 2016.

11   THE COURT:  Okay.

12   MR. MCNUTT:  Also, Your Honor, with respect to the

13   issue of fraud, or at least I believe is based on the issue of

14   fraud, the Bankruptcy Court in D.C. found that there was

15   consideration.  The consideration was $10 paid at the time of

16   the quitclaim deed.  Len Salas has testified on two different

17   occasions, once in December of 2013 in front of Your Honor, and

18   a second time on April 1, 2019, at his continued meeting of

19   creditors, that Max Salas at no time, including 2007 or 2010,

20   paid him any money or gave him anything of value for the deed

21   or deed of trust or transfer of the quitclaim deed that

22   allegedly occurred in 2010.  It's also confirmed in Max Salas's

23   affidavit where he said that he never paid anything to his son

24   at any time related to the property.  Let me make sure I got

25   that right.  Yeah -- no, I'm sorry, I'm misstating that back.

1 | Max Salas stated in his affidavit -- let me turn this around.
2 | Max Salas stated in his affidavit that Len Salas received no
3 | proceeds from the loan, nor did he pay anything in exchange for
4 | the quitclaim deed.  I'm not sure why he would pay anything in
5 | exchange for the quitclaim deed, but --
6 | THE COURT:  I thought one of them -- one of the
7 | things referred to $100 and one of the things referred to $10?
8 | MR. MCNUTT:  The deed itself has a recitation of $10,
9 | you know, the standard language for --
10 | THE COURT:  Okay.
11 | MR. MCNUTT:  -- $10 paid, receipt of which is
12 | acknowledged, et cetera, and that was in there.  Now, Your
13 | Honor, this is somewhat important because the bankruptcy judge
14 | in D.C. found that even though the trust failed, the deed,
15 | which the Court deemed valid based on the testimony of Ron,
16 | Len, and Max, still created a resulting trust because there was
17 | an intent for -- of Len to deliver the deed to Max, which of
18 | course never happened.  It was delivered to a trust, not to
19 | Max.
20 | MR. MCNUTT:  Well, I thought that the -- based on
21 | D.C. law -- the judge in Washington said that under D.C. law, a
22 | -- if the trust doesn't exist, then it goes to the beneficiary
23 | for -- it goes to the individual if consideration was given.
24 | MR. MCNUTT:  Well, yes and no.  I mean, what the
25 | Court said is that the defendant argued that the trust that was

1    created in 2010, and I believe was created in 2010, because the

2    trust named Max Salas as both the trustee and the beneficiary,

3    that the trust collapsed after it was created.  And therefore

4    Max was the owner of the property because the property would

5    pass to the beneficiary.

6              THE COURT:  Yeah.

7              MR. MCNUTT:  The D.C. Bankruptcy Court said no, and

8    we argued that that was not the law in D.C., or in Colorado, or

9    in fact almost any other place in the country.  Apparently,

10   there are a few jurisdictions that don't hold that, but in D.C.

11   and Colorado, and Judge Teel found this, that there was not --

12   there never was a trust in existence.  Because if the trust was

13   created with the same trustee and beneficiary, and there are no

14   other beneficiaries, as was the case here, then the trust was a

15   nullity and was void ab initio.  The Court said, however, I was

16   doing fine until then.  Court said however, I believe that

17   there was a resulting trust.  And in order to have a resulting

18   trust, even if there was appropriate intent and the other

19   conditions of a resulting trust existed, in order to have a

20   resulting trust there had to be consideration.  And there was

21   no consideration as admitted and testified to on several

22   occasions by both Max and Len.

23             THE COURT:  Here's what I read in here.  "Bankruptcy

24   test determined that the trust never existed under either

25   Colorado or District of Columbia law and was a nullity.  The

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2225)

1  D.C. Bankruptcy Court then considered the impact of the invalid

2  trust on the conveyance of the property.  Under D.C. law, the

3  conveyance of property through an invalid trust results in a

4  resulting trust unless there is consideration, in which case

5  the legal and beneficial rights are conveyed to the intended

6  beneficiary of the conveyance."  And so he found that there was

7  consideration.

8           MR. MCNUTT:  Correct.

9           THE COURT:  So it's no -- there's not a resulting

10  trust.

11           MR. MCNUTT:  He found that there was a --

12           THE COURT:  Unless there is consideration, in which

13  case -- "the conveyance of property through an invalid trust

14  results in a resulting trust, unless there is consideration, in

15  which case, the legal and beneficial rights are conveyed to the

16  intended beneficiary of the conveyance."  So there's no

17  resulting trust because, he said, because there was

18  consideration.  It goes -- went to Max.

19           MR. MCNUTT:  But that's -- that's fair, Your Honor, I

20  may have paid too much attention to the resulting trust there

21  in my confusion to why I lost that case, Your Honor.  So I

22  apologize, I didn't intentionally misstate that, but it sounds

23  like what you're reading, and I remember that.  So I think

24  you've got it right.  I just focused on the resulting trust.

25           THE COURT:  Okay.

ACCESS TRANSCRIPTS, LLC                     1-855-USE-ACCESS (873-2225)

1           MR. MCNUTT:  In any event, Your Honor, that does not

2    change the facts that there was no consideration.  Now, Your

3    Honor, keep in mind, as I'm sure we'll get to this, that --

4           THE COURT:  What do I do with his finding that there

5    was consideration?

6           MR. MCNUTT:  What do you do with it?  Is that what

7    you're saying?

8           THE COURT:  What do I do with his finding that there

9    was consideration?  The judge in D.C. found there was

10   consideration.

11          MR. MCNUTT:  If there actually -- well, first of all,

12   the decision of the D.C. bankruptcy judge does not -- is not

13   binding on this Court, as I'm sure Your Honor knows.

14          THE COURT:  Well, I don't know that.  Why?  Maybe

15   that's what we need to get into.

16          MR. MCNUTT:  Yes, Your Honor.

17          THE COURT:  I mean I've read -- I read your brief,

18   but I have some problems.  So tell me about it.

19          MR. MCNUTT:  Okay.  Sure, Your Honor.  Let me start

20   with this.  The Worldcom case is a case that I cited in our

21   brief.

22          THE COURT:  Yeah.

23          MR. MCNUTT:  It says the trustee in bankruptcy is the

24   successor in interest to the debtor, but for purposes of

25   avoidance and recovery actions he is not in privity.  Now,

Case 3:23-cv-00887   Document 14-1   Filed 10/06/24   Page 64 of 796 PageID #: 3482
ACCESS TRANSCRIPTS, LLC            855-USE-ACCESS (873-2225)

APPX00064
64

1  that's not the facts of our case, but that goes to the point of

2  whether or not the trustee in bankruptcy has privity with any

3  party to the case below.  I -- after filing the opposition, I

4  kept looking for cases because I was hoping to find a case that

5  was generally on point with the facts of this case.  And the

6  facts, of course, are that the plaintiffs filed an objection to

7  the debtor's exemption in D.C., and the plaintiffs were --

8  their objection was overruled.  And then the plaintiffs came to

9  this court and purchased the trustee's claims.  And the

10  trustee's claims, we assert, are not subject to res judicata or

11  collateral estoppel in this court because the trustee has

12  different rights and different interests.

13          But in any event, I did find a case called Kind

14  Operations, Inc. v. Cadence Bank, N A, it's In re Pa Co-Man,

15  Inc.  It's a bankruptcy case out of the Western District of

16  Pennsylvania, I believe, Pittsburgh.  It's a 2022 case, it's a

17  very recent case.  The citation is 644 B.R. 553 at 636-37.  And

18  the facts are that Kind had filed a lawsuit against the

19  debtor's principal, president, or CEO, I can't remember which,

20  in state court, and lost.  Apparently lost, that's what the

21  record shows.  Then the case went into bankruptcy and the --

22  and Kind purchased or obtained the rights to the trustee's

23  cause of action.  It appears much like the plaintiffs did in

24  this case.  The ruling in Kind is that Kind Operations, Inc's

25  capacity by (indiscernible) of the trustee is different from

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2225)

1   its capacity as party to a state court action.  And therefore,

2   in its current capacity, Kind is not barred by the judgments

3   entered against it in state court.

4           Your Honor, as -- and as I argued in both the

5   supplemental memorandum and the opposition, the trustee's, the

6   status of the plaintiffs in this case is a derivative status,

7   as Your Honor found in its February 21st, 2021, ruling -- I

8   believe it was, February 11th, 2021, ruling, that's at Docket

9   Number 38, where Your Honor approved the purchase -- I'm sorry.

10  Where Your Honor approved the filing of the derivative lawsuit

11  against the defendant.  So the plaintiff's status in this case

12  is truly that in derivation of the, I think that's the right

13  way to say it, of the trustee.  And there are a number of cases

14  which Your Honor cited in her ruling and previously ruled upon

15  in the Seventh Circuit and the Second Circuit.  And the case --

16  one of the cases that I cited in the memorandum is Gecker v.

17  Marathon,  I forget what the rest of the name is, but Gecker,

18  G-E-C-K-E-R v. Marathon, that's cited at 389 B.R. 630, 633 and

19  4 [sic].  That's a case out of the Northern District of

20  Illinois.  And that case stands for the proposition that a

21  creditor has derivative standing if the trustee refuses to

22  pursue estate claims.  And I believe that's exactly what Your

23  Honor found in its ruling on the February 11, 2021.

24          And there are a number of other cases which we have

25  cited in the memoranda which indicate that the status of a

1   creditor, creditors' committee, a party that purchases the

2   trustee's claims, they are not the real party in interest.  The

3   real party in interest is the trustee.  There are cases like In

4   re Eddy, that's a District of Massachusetts case cited at 304

5   B.R.  Case of Corzin v. Forou, F-O-R-O-U.  Corzin is C-O-R-Z-I-

6   N, in re -- Fordu, I think it is, that's how I -- maybe I can't

7   read my writing.  That's a Sixth Circuit case, 201 Fed. 3d 693

8   at 705.  All these cases indicate that the trustee's position

9   is successive to the debtor or the debtor in possession.  In

10  this case, it would be the debtor in possession because this

11  was a Chapter 11 converted to a Chapter 7, and that any party

12  that is suing on behalf of the estate is suing on behalf of the

13  trustee or the estate, either one, which is a different

14  capacity.

15          There's a Fifth Circuit case called Ferrall

16  Construction, F-A-R-R-E-L-L Construction, v. Jefferson Parish,

17  obviously Louisiana.  That's at 896 Fed. 2d 136, 140 (1990).

18  It says the real party in interest is the person holding the

19  substantive right and not necessarily the person who will

20  ultimately benefit from the recovery.  And I believe, Your

21  Honor, that is consistent.  But I could find no case that

22  indicates that in the circumstances that we have in this case

23  that the real party in interest is the plaintiffs or that the

24  plaintiffs would be bound by decision of a prior court in which

25  the estate and/or the trustee were not a party and did not meet

1    the criterion in the Supreme Court case of Taylor v. Sturgell.

2              The Taylor v. Sturgell case, Your Honor, is a case

3    cited by Judge Ginsburg, and the case there involved an attempt

4    by a federal agency, the FAA, to urge that prior litigation by

5    other parties was binding on the subsequent court by virtue of

6    the doctrine of virtual representation.  The Supreme Court, and

7    this is a -- it's a 2008 case, I believe, Your Honor.  I don't

8    have that written down here.  But Judge Ginsburg for the Court

9    said that there were three reasons why the so-called virtual

10   representation doctrine is not favored and did not apply.  The

11   first is our discussions I'm reading from the Court's decision.

12   It says we reject this argument for virtual representation for

13   three reasons.  One, our decisions emphasize the fundamental

14   nature of the general rule that a litigant is not bound by a

15   judgment to which she was not a party.  And it cites another

16   Supreme Court case called Richards, which is 517 U.S. at 798-

17   799 and Martin, 490 U.S. at 761-762.  The Court says that our

18   second reason for rejecting a broad doctrine of virtual

19   representation rests on limitations attending nonparty

20   preclusion based on adequate representation.  A party's

21   representation of a nonparty is adequate for preclusion

22   purposes only if at a minimum the interests of the nonparty and

23   her representative are aligned, citing the Hansberry case at

24   311 U.S. at 43, and either the party understood herself to be

25   acting in a representative capacity or the original court took

1   care to protect the interests of the nonparty.

2          So that would mean that the trustee in this case

3   would have had to understand that it was being represented in a

4   representative capacity, which is kind of absurd since the

5   trustee did not exist until, I believe, certainly 2019, after

6   the hearing on the exemption.  And also the D.C. Court

7   specifically decided that it couldn't decide the issues of the

8   trustee's claims in this case and deferred those to this Court.

9   Judge Ginsburg goes on to say that in addition, adequate

10  representation sometimes requires notice of the original suit

11  to the persons alleged to have been represented.  Obviously,

12  there was no notice here because the trustee did not have --

13  the trustee was not in place until after the exemption hearing.

14  The exemption hearing took place in August of 2018.  And --

15          THE COURT:  Well, the -- wait a minute.  The trustee

16  -- let's forget you for the moment.  The trustee did exist at

17  the time this case was converted to Chapter 7.

18          MR. MCNUTT:  Correct, Your Honor.

19          THE COURT:  Actually, the trustee existed at the time

20  the 11 was filed, because the debtor in possession acts as the

21  trustee.

22          MR. MCNUTT:  That's correct, Your Honor.  And it's

23  also correct that if the debtor, as debtor in possession, takes

24  certain actions, that those actions, if otherwise legal and

25  proper, the trustee would be bound by them when he is appointed

1 after the conversion of the Chapter 11 to Chapter 7. But we're

2 also talking -- situation where we've got a debtor that is the

3 son of the defendant in this case. And you may recall, Your

4 Honor, that one of the -- when this debtor, Len, filed his

5 Chapter 11 plan, one of the provisions of the Chapter 11 plan

6 was to deed this property to his father. That was part of his

7 proposed plan that was heard in this court in mid-December

8 2018. And Your Honor converted the case, I believe I'm

9 correct, that the basis was that the debtor didn't understand

10 what the plan was, or what it meant, or his responsibility --

11      THE COURT: Well, he was incapable of proceeding as

12 the debtor in possession is what I found.

13      MR. MCNUTT: Okay. That -- I may have paraphrased it

14 wrong, but I think that's consistent with my understanding.

15 I'll certainly take that. And one of the issues is, at the

16 time of that hearing, we're talking about a plan that says I,

17 as the debtor, am the only party obligated to pay a loan that

18 at the time had a balance of over a million dollars. My only

19 substantial asset is the property, and my plan intends to, and

20 would have conveyed the property to my father for no

21 consideration. That was what the plan said. That was in

22 December of 2018. Okay. Now, and as I said, if the dates are

23 important, I don't remember the date the trustee was appointed.

24 It probably was in December of 2018. It might have been in

25 very early January 2019. And the debtor in possession did not

Case 3:23-cv-00987 Document 14-11 Filed 10/05/24 Page 70 of 796 PageID #: 34788

1   take any action, was not a party to the case in D.C., was a --

2   the debtor was a witness.  The debtor appears a witness in that

3   case, but was not a party to that case.  Clearly, the debtor's

4   interests are -- were adverse to the interests of his father.

5           Your Honor, the third reason discussed by Judge

6   Ginsburg is a diffuse balancing approach to nonparty preclusion

7   would likely create more headaches than it relieves.  And that

8   goes into a discussion of the procedural issues and the

9   possibility of litigation over procedural issues as opposed to

10  substantive issues, which would bog down courts.  I consider

11  that a less substantive reason.  But that's the Taylor v.

12  Sturgell case, the opinion of Judge Ginsburg.  And I apologize,

13  but I don't -- maybe I do but it's in -- it was.  I'm sorry, I

14  do have it.  The citation is 553 U.S. 880, 894.  And they're

15  all on 894?  No, I'm sorry, this is on Pages 880 -- 898 through

16  901.  It is a 2008 case, Your Honor.

17          THE COURT:  All right.

18          MR. MCNUTT:  In reading the decision of Kind, which

19  is -- it's actually an interesting case, although it's more

20  like bedtime reading, it's 81 pages long.  I won't read the

21  whole case.

22          THE COURT:  Good.

23          MR. MCNUTT:  Don't worry.  The pertinent sections are

24  as follows, though, and I believe I've cited these in the -- in

25  my opposition.  No, maybe I haven't.  No, I don't think so,

1 │ because this is a pretty new case.  "In general, a nonparty to

2 │ a prior litigation may be collaterally estopped by a

3 │ determination in that litigation by having a relationship with

4 │ a party to the prior litigation such that his own rights or

5 │ obligations in the subsequent proceeding are conditioned in one

6 │ way or another on, or derivative of, the rights of the party to

7 │ the prior litigation."  And that -- and then cites -- this is

8 │ under New York law, Your Honor, but I don't believe there's any

9 │ difference between New York law and D.C. law, at least in this

10 │ area.  "In due consideration of these standards, it is

11 │ abundantly clear that the bankruptcy estate had no

12 │ representation in the state court litigation.  It is also clear

13 │ that the bankruptcy estate's claims against the defendants in

14 │ this adversary proceeding are not derivative of those claims

15 │ previously served by Kind in its individual capacity in the

16 │ state court litigation.  Thus, it is equally clear that Kind

17 │ did not appear in the same capacity in both actions; here

18 │ before this Court, Kind is acting in its capacity as the

19 │ assignee of the trustee's interests, and in the state court

20 │ litigation, Kind was pursuing its own self interest."

21 │     Now, the causes of action in Kind include fraud and

22 │ fraudulent conveyance.  To give you an idea of at least how

23 │ complicated the decision is, there are 61 headnotes, but

24 │ Headnote 39 is labeled fraudulent transfers.

25 │     THE COURT:  All right.

1          MR. MCNUTT:  And part of the (audio interference) in

2    this case were recovery under a fraudulent conveyance theory.

3          THE COURT:  All right.  Anything else on 544?

4          MR. MCNUTT:  No, Your Honor.  I would

5    (indiscernible) --

6          THE COURT:  548, I'm sorry.  I started with 548, I'm

7    sorry.

8          MR. MCNUTT:  That's okay.  When you start talking

9    about numbers, it can get very confusing, I know.  I've never

10   done it before myself with numbers more than a few thousand

11   times.  Okay.

12         I'm a little concerned that I thought this was very

13   clear, so I'm a little concerned about Your Honor's assertion

14   that you had problems with the capacity of the plaintiffs to

15   pursue these causes of action in this case.  But it is very

16   abundantly clear, and there are numerous cases, some of which

17   are cited in our pleadings and our filings (indiscernible) that

18   the trustee's -- the trustee is not in privity with the

19   creditors, it is not in privity with the debtor when it comes

20   to recovery actions.  And that was the Worldcom case I cited to

21   Your Honor.  That's from the Southern District of New York.  I

22   don't have the date here, but it's 401 B.R. 637 at page 651

23   specifically, and that Worldcom is cited in, I believe, the

24   opposition.  But that case makes it clear, and I found no cases

25   which decide that issue differently, that for purposes of

1   avoidance and recovery actions, the trustee is not in privity

2   with the debtor.  So even if the debtor were a party to the

3   prior case, which he was not, Worldcom, if correct, and I

4   believe it is, indicates that the trustee, and therefore the

5   trustee's claims, would not put the trustee in privity to the

6   debtor.

7          Now, there's a difference here when you're talking

8   about the debtor in possession's estate and then the trustee

9   coming in as the successor entity.  But that's not what we have

10  here.  We don't have a situation where the debtor's estate has

11  entered into a contract or claim was filed against it or

12  anything that would be binding on the successor trustee.  If

13  there were, for example, if there was -- a simple example would

14  be let's say there was a fee application in the -- during the

15  debtor in possession case.  The subsequent trustee would be

16  bound by that unless he had some basis for revisiting.

17  Basically, he'd be bound by that.  If the debtor in possession

18  entered into a contract to sell property.  Let's say he decided

19  he was going to sell his house, he did during the debtor in

20  possession status.  Of course, that's governed by -- that's

21  subject to court approval and creditor approval, notice, and

22  all that kind of stuff.  But if that happened the trustee

23  couldn't come back in this case in Chapter 7 and say no, I was

24  not a party to that and therefore I can't -- I don't want that,

25  and I'm going to revisit that.  Can't do that.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

```
 1          But here we're talking about not anything that
 2  happened in the debtor in possession part of the case.  We're
 3  talking about a decision of the D.C. Bankruptcy Court in 2018
 4  while this estate was -- while the Chapter 11 estate was
 5  pending, but before the Chapter 7 trustee was appointed.  And
 6  again, I apologize for not having the date, but it's in the
 7  record.  I think it was in late December 2018 that Mr. Juganda
 8  (phonetic) was actually appointed the Chapter 7 trustee.
 9          THE COURT:  All right.
10          MR. MCNUTT:  Do you want me to go on to the open
11  possession issue, Your Honor?
12          THE COURT:  I don't think so.  I think you've covered
13  your thoughts about privity and so forth.  Anything further
14  after that?
15          MR. MCNUTT:  Yes, Your Honor, I want to refer you to
16  the, which you've probably already seen, but I wanted to refer
17  you to the facts that are in evidence in this case.  I'm sorry,
18  part of the record in this case -- I don't have them, sorry --
19  and those include the following, and I'm going to go by memory
20  here:  We have the facts stated in the plaintiffs' -- I'm sorry
21  in the parties' joint -- amended joint pretrial statement.  We
22  have the facts that are admitted in the defendant's response to
23  the plaintiff's request for admissions.  They are an exhibit to
24  the supplemental -- to the motion for summary judgment.  We
25  have the defendant's responses to discovery, interrogatories,
```

 1  and requests for production.  We have the defendant's I'm sure

 2  I'm missing a few things.  We have the defendant's responses to

 3  the plaintiffs' list of undisputed facts and supplemental list

 4  of undisputed facts that are attached to the plaintiffs' motion

 5  for summary judgment.  And I've also -- and of course we have

 6  the exhibits to the motion for summary judgment and the

 7  supplemental memorandum, which include things like the loss

 8  mitigation statement.

 9          There's also a bank statement of the 1610 Riggs

10  Property Trust which shows that the bank account was opened in

11  October of 2017.  So prior to 2017, even though in 2011 Ron

12  Salas told his father to open a bank account in the name of the

13  trust, he did not -- Max Salas did not do so.  At least there's

14  no record of it.  The only record of any bank account in the

15  name of the 1610 Riggs Property Trust, the trust that the

16  defendant is relying on starts in October of 2018, goes through

17  April of 2000 -- I'm sorry, I don't think I said that right.

18  October of 2017 through April of 2018.  And the bank records

19  show a single transaction, one deposit, nothing else.  No

20  banking transactions at all.

21          On the other hand, there is a bank account in the

22  name of the CLR Trust.  That's the trust that Len testified to,

23  saying that one I know.  That's the trust for the benefit of

24  Chase, Len, and Ron, the three sons.  The three brothers, sons

25  of the defendant.  And then there's Max Salas's affidavit,

1 | which spells out that all of the rent for the property went

2 | into not the 1610 Riggs Property Trust, but the CLR Trust.

3 |        THE COURT: All right.

4 |        MR. MCNUTT: And attached to the opposition -- the

5 | opposition, let's see. Attached to the opposition, Your Honor,

6 | is a list of facts taken from all of the -- and it's not

7 | intended to be -- to include everything. But it is intended to

8 | be facts that bear on -- maybe I shouldn't say bear, but that

9 | relate to the issues that Your Honor asked us to brief in your

10 | January 2023 order. Bare legal title, open possession, and in

11 | addition to that inquiry notice -- and in addition to that,

12 | Your Honor, you know that I stated that as a court of equity, I

13 | believe that the defendant's behavior has been wholly

14 | inequitable, including false testimony. And as a result, I

15 | believe that with respect to any equitable relief that the

16 | defendant might otherwise be entitled to, that this Court

17 | should not grant that relief given the lies and deception and

18 | the fact that Mr. Max Salas has hid his interest in this

19 | property since 2010 and even throughout his bankruptcy case in

20 | 2018 and 2019, when there was no notice, no public record,

21 | nothing related to his ownership of the property. Only related

22 | to -- I mean, look he's claiming it in the bankruptcy

23 | documents, but he never changed the public records is what I'm

24 | saying. I'm not saying this clearly.

25 |        THE COURT: What false testimony --

Case 3:23-cv-00987 Document 14-1 Filed 10/05/24 Page 77 of 796 PageID #: 3685
ACCESS TRANSCRIPTS, LLC     1-855-USE-ACCESS (873-2225)

APPX000077

1          MR. MCNUTT:  Even after he filed the bankruptcy --

2          THE COURT:  Excuse me.  Let me back up.  What false

3    testimony has he given in this case?

4          MR. MCNUTT:  He gave false testimony that the

5    quitclaim deed was in existence and it had not been abandoned,

6    and that the quitclaim deed was intended to give him ownership

7    of the property.  And if you look at all of the testimony and

8    all of the documents of these parties for a period of 2010

9    through 2016, that's well into the superior court litigation,

10   you see that both Len and Max are hiding the fact that Len was

11   still considered the owner for all purposes.  All public

12   records, all public notices, the -- all title documents, the

13   deed of trust.  But at the same time, Len was telling his

14   father will you please get me off the title to the property?

15   His father is telling the attorneys in 2011 and 2012.  Please,

16   one of the first things we need to do, and I'm paraphrasing

17   again, is to get Len off the title to the property.  Max Salas

18   testified that that's not true.  What he meant was get loan --

19   get Len off the loan to the property.  But his own words and

20   his own testimony and his own emails show that that is not the

21   case.  Throughout the D.C. bankruptcy court litigation, all

22   three of the Salas family members who testified, Ron, Len, and

23   Max, asserted that the quitclaim deed was in effect, had not

24   been abandoned, and that the parties forgot that it existed

25   until coincidentally and conveniently after Mr. Albert told Mr.

1   Salas, Mr. Max Salas, that he may be able to exempt the

2   property if he can resurrect, and I use the word resurrect

3   intentionally, that he could resurrect -- I'm not saying Mr.

4   Albert said this.  But what happened was they resurrected a

5   deed that was invalid, did not exist, had been abandoned, and

6   the parties had no intention of using it for any purpose.

7            THE COURT:  All right.  You -- are you done on 548?

8            MR. MCNUTT:  I think so, Your Honor.

9            THE COURT:  All right.  Let me talk to Mr. Young.

10           MR. YOUNG:  Thank you, Your Honor.  Philip Young on

11  behalf of the defendant Max Salas.  I'm going to try to use

12  some restraint --

13           THE COURT:  Perhaps we should start with collateral

14  estoppel --

15           MR. YOUNG:  Sure.

16           THE COURT:  -- and your position on that.  And then

17  we'll back up and go to the other parts.

18           MR. YOUNG:  Well, Your Honor, I think none of this

19  matters.  And I would love to argue some of these other issues,

20  because I think there -- that Mr. McNutt is arguing with the

21  D.C. court is what he's arguing with.  He's trying to litigate

22  for at least a third time, and maybe a fourth time, things that

23  he's lost two or three other times.  And while I'm happy to

24  replow that ground, I'm going to try to stick to the issues

25  that the Court raised in its January 5th order.  Those issues,

1   as I take it, at least as it relates to 548, are two things.

2   One, whether the D.C. Court has decided already who the owner

3   of the property was, and it has, even though the plaintiffs

4   don't like the answer, it has decided that, and the District

5   Court has affirmed that decision.  And then the second thing is

6   whether or not that decision is binding on these parties

7   through collateral estoppel.

8           Let me very briefly address the first issue.  On Page

9   57 of a 59-page homestead exemption opinion, and where the

10  critical issue was whether Max Salas owned sufficient interest

11  in the property in order to claim a D.C. homestead exemption,

12  the D.C. Bankruptcy Court made this finding, and I'm going to

13  quote, on Page 57 accordingly, after 57 pages of factual

14  findings and analysis, page 57 says, "Accordingly, the Court

15  finds that under District of Columbia law, the property was

16  conveyed to Max, and he holds both the legal and beneficial

17  interest in this property," period.  That statement wasn't mere

18  dicta, as the plaintiffs seem to want to argue.  It was the

19  central finding that underpinned the conclusion that Max Salas

20  owned a sufficient interest in the property in order to claim

21  homestead exemption.  Again, there's 57 pages of factual

22  findings and analysis that can -- the Court can look at for

23  itself.  This was not some naked conclusion.  This was highly

24  litigated about who the owner of that property was.  The D.C.

25  Bankruptcy Court, applying D.C. property law, has already made

1    a finding that Max Salas and not Len Salas was both the legal

2    and the equitable owner of the property.  There's no escaping

3    that.

4              So that then takes us to the second question, whether

5    that finding is somehow binding in this matter on this Court

6    and on these parties.  That brings us to the doctrine of issue

7    preclusion or collateral estoppel, which bars successive

8    litigation of an issue of fact or law that was actually

9    litigated and resolved in a valid court determination essential

10   to the prior judgment.  That's a direct quote from the Angelex

11   case out of the D.C. Court -- Circuit Court, which is cited in

12   our brief.

13             The D.C. Courts have developed a three-pronged test

14   that's really essentially I mean, it's identical to the Sixth

15   Circuit's test for issue preclusion.  Those three prongs are as

16   follows.  One, whether the same issue now being raised was

17   contested by the parties and submitted for judicial

18   determination in that prior case.  Two, whether the issue was

19   actually and necessarily determined by a court of competent

20   jurisdiction in the prior case.  And three, whether preclusion

21   would work any basic unfairness.  Applying this test to the

22   facts of this case, we see that the D.C. Court has already

23   decided an issue that is central to this matter, who owns the

24   property.  That issue was central to the D.C. homestead

25   exemption hearing, and it's central to determining whether

1   there can be any fraudulent transfer here.  It was necessary

2   for the D.C. Court to decide that issue in that case.  It's

3   necessary in this case.  There is no defect in the prior case

4   that would cause a court to say that the outcome was unfair.

5   In fact, that judgment was upheld on appeal.

6           So the only issue in deciding whether issue

7   preclusion applies here, then, is whether the parties were the

8   same in the prior matter and in the present matter.  Now, the

9   plaintiffs raise a clever argument.  They say in the prior

10  matter, we were acting on behalf of ourselves, and in this

11  matter we're acting derivatively.  So we step into the shoes of

12  the trustee and we're cleansed of any issue preclusion.  It

13  really is a clever argument, because they're right that a

14  trustee is not normally bound by issue preclusion.  As this

15  Court knows, I represent a lot of trustees in this district, so

16  I'm very familiar with this general rule.  However, issue

17  preclusion does not require that the parties be exactly the

18  same in the first suit and in the second suit.  Rather, they

19  must be either the same parties or parties that are in privity

20  to the private -- to the prior parties.  And I direct the Court

21  to the Cramer case out of the Supreme Court and the Peake case

22  from the D.C. Circuit, both cited on Page 4 of our second brief

23  for the proposition that a party or their privy may be bound by

24  issued preclusion.

25          So the question is whether these plaintiffs, in their

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2225)

1  current capacity are in privity with the same plaintiffs in the

2  D.C. Bankruptcy case, acting in the capacity they were acting

3  in that case.  The Sixth Circuit defines a privy as a successor

4  in interest to the party, one who controlled the earlier

5  action, or one whose interests were adequately represented.

6  That or means that any of those relationships causes a party to

7  be in privity.  In this case, the plaintiffs satisfy all three

8  elements.  They're a successor in interest, they controlled the

9  earlier action, and their interests were adequately

10  represented.

11          THE COURT:  How are they a successor?

12          MR. YOUNG:  On --

13          THE COURT:  Let's back up.  How are they a successor

14  in interest?

15          MR. YOUNG:  Sure.  Well, because, Your Honor, well, I

16  guess they're not a successor -- they are the same party.  It's

17  not a successor in interest so much as the exact same parties.

18  I would say that the interest that they're representing here is

19  identical to the interest they were representing in the prior

20  case.  Because, and I'm going to get to this in just a moment,

21  it can't be ignored that the plaintiffs hold 99.5 percent of

22  the claims in this case.  There is no different interest.  It's

23  not like they're a 30 percent owner and they owe a fiduciary

24  duty to the other 70 percent.  They are the claimant in this

25  case.  So I would say that the interest that they were arguing

1    for in the prior case is the exact same interest they're

2    arguing for in this case.  That is their own self-interest.

3    And on Pages 6 through 7 of our second brief, our supplemental

4    brief, we cite to a number of D.C. cases that establish what

5    privity between two parties looks like.  One example was the

6    parent of a wholly-owned subsidiary.  Another example was a

7    company and its directors, officers, and owners.  A third

8    example was a union and its union members.  So it doesn't have

9    to be even the same identical parties as long as the control

10   was the same and the interests protected were the same.

11          And when you review all the facts of this case, and I

12   made this point in our brief, it becomes clear that the

13   question of whether a subsequent party is a privy to a former

14   party and thus bound by issue preclusion comes down really to

15   three things, control, decision-making authority, and adequate

16   representation.  Those are really the three things that the

17   cases sort of hone in on.  And this is why a trustee is not

18   normally bound by an adverse decision against a debtor.

19   Control over the lawsuit is different.  There's a different

20   decision maker and there's different representation.  When a

21   trustee takes over a matter, she normally retains new counsel.

22   She's calling the decisions instead of the debtor, and she's

23   applying a different standard in making those decisions because

24   she's acting in a fiduciary capacity.

25          But all those things are absent in this case.  In

1  this case, we have the exact same parties, the same people are

2  making litigation decisions in this case as in the last case.

3  In fact, they hired the exact same lawyers who are even making

4  the exact same arguments before this Court that they made

5  before the D.C. Court.  And even though they are pursuing this

6  to look derivatively, like I mentioned before, the plaintiffs

7  hold 99.5 percent of the claims.  So they're acting in the same

8  capacity.  They're acting in their own self-interest.  This

9  isn't a situation where they're a fiduciary.

10         So summarizing the defendant's position as to the

11  fraudulent transfer causes of action, the D.C. Court has

12  already decided that Max Salas owned both the legal and

13  equitable interest in this property.  That means that the most

14  Len Salas could have possibly owned was bare legal title.

15  Moreover, this Court must apply the same finding in this case

16  because the parties are bound by issues of claim preclusion.

17  As this Court's already noted, if Len Salas owned only bare

18  legal title to the property, then the plaintiff's fraudulent

19  transfer claims have to fail.

20         I did want to sort of address just two sort of side

21  issues that Mr. McNutt raised.  One, it's important to realize,

22  and I want to make this distinction because this was sort of

23  incorrectly stated in the brief, and then he incorrectly stated

24  this just now.  The D.C. Court did not defer the 548 actions to

25  this Court.  The D.C. Court deferred the 544 actions to this

APPX000085

1   Court, and there's a clear reason why that is.  The D.C. Court

2   decided the issue of ownership, and it knew that would decide

3   the 548 issues in this Court.  However, it did not decide the

4   issue of inquiry notice because that wasn't necessary to get to

5   the homestead exemption.  The issue of ownership was necessary

6   to get to the homestead exemption.  The issue of inquiry notice

7   was not.  And so, essentially, the D.C. Court passed the buck

8   to this Court on the issue of inquiry notice, which we'll -- I

9   know we're going to talk about in just a moment.

10          THE COURT:  I can't --

11          MR. YOUNG:  The other thing that I'd like --

12          THE COURT:  Whoa, whoa, whoa.  I can't remember.  So

13  he specifically cited 544, but not 548?

14          MR. YOUNG:  Correct, Your Honor.  That's on -- I

15  believe it's on Page 57 of the order, and if you'll give me

16  just a moment here, I'm going to pull up the order --

17          THE COURT:  No, that's okay.

18          MR. YOUNG:  -- and make sure that I'm --

19          THE COURT:  I just -- it's a long opinion, and I've

20  read it about 15 times, but I couldn't remember.

21          MR. YOUNG:  Right.  I will represent to the Court

22  that he specifically says 544 is for another day.  But the

23  Court will recall that one of the decisions he was asked to

24  make was a fraudulent transfer decision.  That's why he had to

25  decide who the owner was, because that was one of the issues

APPX000086

1  that was sort of an outside issue of that homestead exemption,

2  was a 548 issue. But he specifically passed only the 544 issue

3  to this Court, and for good reason. As I said, it wouldn't

4  have come up in a Homestead exemption about inquiry notice.

5  And so there's a good reason that Judge Teel passed that on to

6  this Court, because that didn't come up.

7       The other thing I'll note is I've not read the Kind

8  Operations case that Mr. McNutt cited for the first time here

9  this morning. He didn't cite it in his brief, so I've not had

10  a chance to look at it. But when he was quoting that, and that

11  was the case that he cited for the proposition that a plaintiff

12  who buys a trustee's action isn't bound by a former decision

13  against that plaintiff. I picked up when he was reading parts

14  of that decision, though, into the record here, I picked up on

15  the fact that there was a comment there that said, well, the

16  difference is before they were acting in their own self-

17  interest, and now they're acting derivatively, you know, on

18  behalf of the estate. Again, I've not read that case. I would

19  be very surprised if the facts of that case demonstrated that

20  Kind Operations was a 99.5 percent claim holder in that case.

21  And that makes this very distinguishable. In this situation,

22  the plaintiffs are pursuing their own self-interest. That's

23  what's going on here. And that's why I think that that is

24  likely a different outcome.

25       But just to sort of wrap this up on the 548 issue,

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2225)

1  because the D.C. Court has already considered ownership and

2  already decided ownership, and because that finding, whether

3  the plaintiffs like it or not, is binding on the parties to

4  this, the Court must grant summary judgment in favor of the

5  defendant on both fraudulent transfer claims.

6         Unless the Court has further questions of me, that's

7  all I've got on the 548 issue.

8         THE COURT:  Does Whiting Pools -- just out of

9  curiosity, does Whiting Pools limit both actual fraud cases and

10 constructive fraud cases?

11        MR. YOUNG:  I don't recall, Your Honor, I really

12 don't.  I don't recall whether that was only constructive fraud

13 or both.  I will say here, I understand the constructive fraud

14 argument in this case.  I get it.  If Len Salas had owned

15 something more than bare legal title and transferred it, I

16 understand the constructive fraud.  Frankly, and I've read all

17 the papers that the plaintiffs have submitted, and I've heard

18 all the arguments, and I still don't see where the actual fraud

19 allegation even exists here.  And to the extent that it does

20 exist, I think it's already been heard and decided by the D.C.

21 Court and rejected.  So I don't know if the answer to the

22 Court's question, or I don't recall, I'm happy to look at that

23 if the Court would like me to look at that.  I don't recall as

24 I sit here, but I'm not sure that it matters because this is a

25 constructive fraud case, no matter how the plaintiffs would

1  like to slice it.

2          THE COURT:  Okay.  Is there anything else you want to

3  say about 548?

4          MR. YOUNG:  No, Your Honor.  That's all I've got

5  unless the Court has questions for me.  Well, the one other

6  thing is I'll just point out to the extent, because I know the

7  Court had heard some stuff about unclean hands.  And I'll just

8  point to our last brief when the Court denied the plaintiff's

9  motion for summary judgment back in November, one of the issues

10 that they raised there was unclean hands.  And I'm not even

11 going to get into, just for time's sake, I'm not even going to

12 get into why all of those allegations are incorrect.  What I'll

13 say is it doesn't even matter because as we cited in our former

14 brief, and I think the Court relied upon in making the decision

15 back in November, unclean hands is only applicable when a party

16 is seeking affirmative relief.  When it's defending an action,

17 unclean hands doesn't even come into play.  So that -- the

18 unclean hands argument that keeps coming up over and over is

19 misapplied.

20         THE COURT:  All right.  Mr. McNutt, I have a

21 question.  What's the --

22         MR. MCNUTT:  Yes, Your Honor.

23         THE COURT:  Tell me again what the Kind Operations

24 case cite is.

25         MR. MCNUTT:  (Indiscernible), yes, Your Honor.

1          THE COURT:  Somehow I missed that.  I'd like to read

2     it.

3          MR. MCNUTT:  You better set aside a lot of time.

4     It's a long case.

5          THE COURT:  I understand.

6          MR. MCNUTT:  It's 644 B.R. 553, and again, it's a

7     2022 case out of the bankruptcy court for the Western District

8     of Pennsylvania.

9          THE COURT:  All right.  I have one more question.  Do

10    you agree that the D.C. Court only referred 544 questions to

11    this Court?

12         MR. MCNUTT:  No, I don't, Your Honor.  In its

13    decision, the D.C. Court raised 544, which it didn't need to.

14    It's not a part of the decision.  It is clearly an advisory

15    opinion, which the Court did not need to do because it had

16    nothing to do with the Court's decision regarding the result of

17    the resulting trust, I'll call it because, as Your Honor

18    pointed out, because of the issue of consideration, as the

19    Court found, although incorrectly, I believe.  Well, it

20    certainly is incorrect.  But in any event, it wasn't there.

21    And I don't -- I haven't looked at this, but there is nothing

22    in that opinion that relates to any other provisions of the

23    Bankruptcy Code, so clearly -- and when Mr. Young says that the

24    Court clearly decided that, Mr. Young is very clever, I'll give

25    him a lot of credit for that.  But what he said was issues that

1  might be tangential to Section 548 may have been alluded to by

2  the Court or decided by the Court.  But the Court did not

3  decide anything in the context of Section 548 because just like

4  Section 544, those would not be causes of action that are

5  available to the trustee of Max Salas's estate.  Like the

6  Section 544 argument, they would be causes of action that are

7  available only -- or were available only to the debtor in

8  possession of the trustee in this case.

9       And no matter how much Mr. Young argues that there's

10 somehow privity here, or there's somehow -- you know, because

11 these creditors are large creditors, that has nothing to do

12 with this bankruptcy estate.  The bankruptcy estate is a

13 different party, different cause of action, not in privity with

14 a debtor, the debtor possession, or the creditors.  And as Kind

15 so correctly stated, and it's not the only case that says that,

16 when a party comes in and buys the estate's claims, it is

17 pursuing those claims in derivative status.  And I might remind

18 Your Honor that when we had asked the trustee to pursue these

19 claims on behalf of the estate, and Mr. Juganda had originally

20 said that he would, but after talking to Mr. Young he decided

21 to -- that he -- I think he decided that he could make more

22 money by selling the asset to Mr. Young's client, Mr. Max

23 Salas, through his son Ron.  And at the hearing regarding the

24 propriety of the sale to Mr. Salas, Mr. Young argued, and I

25 believe the Court accepted the fact that the reason that Max

1  Salas was attempting to buy the claim was so that nobody would

2  pursue it.  So that's a different kind of self-interest for

3  acquiring the assets.  And Mr. Young thought, and the debtor --

4  and the defendant thought that was proper.  But it's not proper

5  for a creditor to purchase a claim that the estate has and the

6  estate is unwilling to pursue it.

7         And I would remind Your Honor that my clients paid I

8  believe $150,000 or so for the claims.  That money went into

9  the estate, and that money went to pay taxes.  It went to pay

10  the trustee, it went to pay administrative expenses.  It went

11  to pay the debtor's counsel.  If this recovery is made, it will

12  also go into the bankruptcy estate, and it will be paid to the

13  administrative expenses of the estate by any other claims.

14  There may be claims for attorneys' fees by the plaintiffs, and

15  the trustee's commission will be paid out of that and then only

16  the remainder will be paid to the creditors, of which my

17  clients represent substantially all the creditors.  I agree

18  with that.  But it's not a matter of percentage.  It's a matter

19  of whether the process is correct.  And the standing is

20  derivative in both cases.  That's correct.  It is a -- the

21  process was correct.  It was ordered by Your Honor.  There was

22  bidding.  Mr. Salas had the opportunity, Ron or Max on the same

23  thing.  They had an opportunity to bid.  They stopped bidding

24  at some point and the plaintiffs purchased the claims.  At that

25  point they held derivative status only.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1      Your Honor, and this is a minor thing, but the -- Mr.

2  Young said that the appeal, that when the exemption decision

3  was appealed, that the District Court upheld the exemption.

4  That's not technically correct.  What happened was the District

5  Court dismissed the appeal, and at that point, there was no

6  decision made on the merits of the appeal.  So while the

7  Bankruptcy Court's decision stands --

8      THE COURT:  Why did the District Court dismiss the

9  appeal?

10      MR. MCNUTT:  Your Honor, we asked -- we filed an

11  appeal, filed our brief and found out that the issue of

12  consideration was not as stated by the Bankruptcy Court in

13  information that was provided to us by Len. Information that I

14  alluded to before that was testified to by Len both in the

15  December confirmation, December 2018 confirmation hearing, and

16  in the continued meeting of creditors of Len Salas in this case

17  on April 1, 2019.  When we found that out, we asked the

18  District Court alternatively, because the appeal had already

19  been pending for more than a year, asked the District Court to

20  alternatively allow us to go back to the bankruptcy court and

21  ask the Bankruptcy Court to reconsider its decision on the

22  basis that there was new information.  There was new

23  information that -- I'm sorry, I just got a little screen that

24  said an order came in another case, I was distracted, sorry to

25  say.  And I'm sure the order is against me, so now I have to

1  step back a little bit.

2          THE COURT:  I'm sorry.  Not good.

3          MR. MCNUTT:  It was expected, Your Honor.  Your

4  Honor, I forgot my train of thought.  So -- about the District

5  Court.

6          THE COURT:  So what -- so the District Court just

7  dismissed it willy-nilly?  I don't understand.  Or was it

8  because of something you did or didn't do?

9          MR. MCNUTT:  Well, it may have been something I did.

10 The Court said that it could, at our request, dismiss the

11 appeal voluntarily, even though we didn't ask for the appeal to

12 be dismissed.  It dismissed the appeal and remanded to the

13 Bankruptcy Court.  The Bankruptcy Court --

14         THE COURT:  So then what did the Bankruptcy Court do

15 when it got the information?

16         MR. MCNUTT:  It decided that it couldn't reconsider

17 and didn't want to reconsider and then said that we also could

18 not appeal.  So we dropped the case at that point because it

19 was clear that we were not going to get relief from any court

20 in D.C.

21         THE COURT:  Well, did you ask the District Court to

22 consider allowing you to appeal?

23         MR. MCNUTT:  We did, and the District Court summarily

24 denied that.

25         THE COURT:  Okay.  All right.  Just checking.

APPX00094

```
 1            MR. YOUNG:  Your Honor.

 2            THE COURT:  All right.  I want to --

 3            MR. YOUNG:  Your Honor, if I --

 4            THE COURT:  Yeah.

 5            MR. YOUNG:  Your Honor, I'm sorry.  If I may, Your

 6   Honor, I was just going to point the Court to the section of

 7   the order because I have it here, just a second to look for it,

 8   that I was referring to.  It's page 59 --

 9            THE COURT:  Okay.

10            MR. YOUNG:  -- of the D.C. homestead exemption.  It

11   reads like this.  It says, "There is thus an issue of fact as

12   to whether a hypothetical purchaser of the property would have

13   inquiry notice of Max's ownership of the property.  However,

14   that is an issue of fact that must be decided by the U.S.

15   Bankruptcy Court for the Middle District of Tennessee.  How a

16   judgment regarding the right of Len's estate to recover the

17   property under 544 would affect Max's homestead exemption in

18   this case is an issue for another day."  That was what I was

19   referring to, Your Honor.

20            THE COURT:  Okay.

21            MR. MCNUTT:  Your Honor, in -- a couple of points.

22   I'll make this quick.  I'm sorry to be so long.  But during the

23   exemption hearing, Judge Teel specifically stated that --

24   specifically asked the parties, and it's part of the

25   transcript, I don't have the cite, but I can find it, might
```

APPX00095

1  take me a few minutes but I could find the cite.  But I read it

2  yesterday.  The Court said it's not clear to me, and I'm

3  paraphrasing now, it's not clear to me whether they should be

4  deciding the exemption because it'll all be moot if the

5  Tennessee Trustee can recover the property, which would moot

6  the exemption.  That was not a finding of the judge, it was a

7  comment by the judge.  I want to make that clear, but that was

8  during the trial or the evidentiary hearing, and I believe it

9  was on the third day in Volume 3.

10        Also, Your Honor, I have a note here to refer Your

11  Honor to a case under Tab 10, so let me do that, if I may.  On

12  Page 7 of the -- what did I do (indiscernible) -- of our

13  opposition to the defendant's motion for summary judgment, we

14  cite the Modiri case.  That's a D.C. case that discusses the

15  fairness doctrine in relation to the use of collateral

16  estoppel.  And that case states that, "A privy is once so

17  identified in interest with a party to the former litigation

18  that he or she represents precisely the same legal right in

19  respect to the subject matter of the case."  And I emphasize

20  the words, "precisely the same legal right."  The claims in

21  this case are not the same legal right as an exemption to the

22  debtors, -- there's a -- I was going to say it backwards -- as

23  an objection to the debtor's exemption.  And that cites the

24  case of Smith.  It only says Smith, I don't know the full site,

25  but the citation is 562 A.2d at 615.  And it's quoted in the

APPX000096

1   Modiri case, which is cited on Page 7 of our opposition, that's

2   document 95.  The Modiri case is a 2006 District of Columbia

3   case.

4           THE COURT:  Okay.

5           MR. MCNUTT:  I'm sure Your Honor has read.  And even

6   though I believe it is D.C. law that applies, I also cited the

7   GMAC Mortgage case out of the Sixth Circuit, which I believe is

8   to the same effect.

9           THE COURT:  All right.  Let's move on to 544.  You

10  want to talk about -- which of you wants to start on 544?

11          MR. MCNUTT:  Well --

12          MR. YOUNG:  Your Honor.  Either way is fine with me,

13  Your Honor.

14          MR. MCNUTT:  Yeah, it's up to you, Your Honor.

15          THE COURT:  Mr. McNutt, start it.

16          MR. MCNUTT:  Why do I always have to start?

17          THE COURT:  Well, we'll have --

18          MR. MCNUTT:  Okay.  I --

19          THE COURT:  -- it's -- all right.  We'll have Mr.

20  Young start.  We'll have Mr. Young start.

21          MR. YOUNG:  No problem, Your Honor.  And again, I'll

22  try to be relatively brief here.  I think the question that the

23  Court posed in its January 5 order that relates to 544 is

24  whether a reasonable third party would have had inquiry notice

25  of Max Salas's ownership of the property.  And indeed, that's

1    the question that the D.C. Court kind of punted to this Court,

2    as we just read.  Why would it have punted?  Like I mentioned

3    before, unlike ownership, notice was just not an issue for the

4    D.C. Court to consider in reaching its exemption decision, so

5    the D.C. Court left that issue to this Court.

6              This Court raised the question of whether Max Salas's

7    physical possession of the property would have put a reasonable

8    third party on notice of his ownership of the property.  And

9    indeed, there are a lot of uncontested facts that establish

10   that Max Salas's possession was very open, very obvious, and

11   notorious.  He lived in the property, Len Salas did not.  He

12   was the only one who ever made mortgage payments.  He was the

13   only one who ever made tax payments.  He was the only one who

14   ever made utility payments for the property.  He signed all the

15   leases for the property, he collected all the rent from the

16   property, he collected the insurance proceeds.  Well, first he

17   paid for the insurance and then he collected the insurance

18   proceeds from the fire, and he was the one who oversaw the

19   reconstruction of the property.  So it would have been obvious

20   to any third party that Max Salas, and not Len Salas, was the

21   owner of the property.  In its January 5 order, this Court

22   cited a number of cases from other jurisdictions that held that

23   open and obvious signs of possession, such as the ones I just

24   cited to, would be sufficient to give a reasonable third party

25   inquiry notice.

 1          Now, the only case that I could really locate from
 2  D.C. that was very on point on this topic was the Clay
 3  Properties case, which was cited in our brief.  That case held
 4  that under D.C. Law, a reasonable third party had inquiry
 5  notice where, and this is a quote, "such possession is
 6  sufficiently distinct and unequivocal so as to put the
 7  purchaser on his guard."  Unfortunately, there aren't any other
 8  D.C. cases that tell us what sufficiently distinct and
 9  unequivocal means.  And so we're just sort of left with that
10  hanging chad, so to speak.  And we do believe that Max Salas's
11  open and notorious possession of this property was distinct and
12  it was unequivocal.  And we think the Court could find, just
13  based on the undisputed facts, that any reasonable third party
14  would have been on inquiry notice of his ownership based on his
15  possession.

16          However, we don't think the Court even needs to get
17  to that because there's a much more obvious marker that would
18  have put any reasonable third party purchaser on inquiry
19  notice.  That is, just one week prior to the filing of this
20  bankruptcy, the plaintiffs themselves reported a judgment lien
21  against this property.  We attached a copy of the filed lien to
22  our brief, and we even attached a full title search showing
23  that any title insurance company would have picked up on this
24  lien in their search.

25          On Page 12 of our first brief, filed back a month or

1  so ago, we quote case law that establishes what inquiry notice

2  means.  But basically it means anything that a purchaser of any

3  reasonable prudence would have to inquire further about.  And

4  on Pages 13 and 14 of that first brief, we cite to a number of

5  D.C. cases that flesh that out a bit.  But perhaps the most

6  notable was the Webster v. Hope case, again cited in our brief,

7  where the D.C. District Court found that a recorded divorce

8  judgment would have put any reasonable purchaser on notice to

9  inquire further, and that had they inquired further into the

10  divorce, they would have discovered a marital dissolution

11  agreement that addressed the property.  But in that case, in

12  the Webster case, the court barred a trustee from pursuing a

13  544 action as a result of a recorded judgment that would have

14  put any reasonable party on inquiry notice to further inquire

15  on, the balance of that judgment.

16          THE COURT:  How does that -- I have to ask how that

17  helps you, since the judgment itself, even though it wasn't

18  final, that's another question.  But since the judgment itself

19  says Max is the manager and Len is the owner.

20          MR. YOUNG:  Well, Your Honor, I think the question is

21  would it have -- the issue is would it have raised questions?

22  h That's what inquiry notice means.  Would it have raised

23  questions?  Would it have caused a reasonable purchaser to hit

24  pause?  And that's why I think it matters for this case, is it

25  would have caused further inquiry, and further inquiry would

1  have shown that, you know, there was a dispute about who the

2  owner was that kept -- that was ongoing.  And so that's why I

3  think it's relevant.  Again, you know, this is -- there are two

4  ways that we get the inquiry notice, and you put them together,

5  and they're certainly problematic when you have one person

6  exercising all the control, living in it, paying the rent,

7  paying the taxes.  And then there is this judgment lien that

8  evidences that there's a dispute over this exact issue.  It

9  would have given inquiry notice.  And certainly any reasonable

10 party who was purchasing a million dollar-plus property or

11 making a loan on a million dollar-plus property would have done

12 a title search.  And then the title search would have uncovered

13 that the judgment was against Max Salas and Len Salas.  And

14 then the question is, what would the purchaser have done next?

15 And out of necessity, they would have had to have picked up the

16 phone if for no other reason than to get a payoff, which would

17 have greatly exceeded the property.  And that step, having to

18 pick up the phone, talk to counsel about the details of the

19 lien, find out if there was a dispute about who the owner was.

20 That's the very definition of inquiry notice.

21        So as of the petition date, any reasonable party

22 would have been on inquiry notice of Max Salas's ownership of

23 the property, both because of his open and obvious possession

24 of the property and because of the filed judgment lien that

25 appeared in the chain of title, and courts have universally

1   held that inquiry notice defeats a trustee's 544 claims.  And

2   so it must be here, too.  And therefore all the 544 causes of

3   actions must fail because any reasonable party would have been

4   on inquiry notice to inquire further about the relationship of

5   Max Salas to this property.

6           THE COURT:  Even though the judgment wasn't final?

7           MR. YOUNG:  Yes, Your Honor.  Because it's not a

8   matter of sort of whether it had been determined, it's a matter

9   of would it have caused a party to further inquire.  And

10  certainly the fact that that was a disputed issue would have

11  caused any reasonable party to hit pause and further inquire.

12  And that's sort of the definition of inquiry notice.  It's not

13  that you have to run down the absolute answer or the final

14  answer.  It's would it have caused a party to inquire further

15  about another party's ownership interest?  And certainly his

16  possession would have done that, and the fact that there's this

17  recorded judgment lien, both of those things -- and when you

18  put them in conjunction with one another, it absolutely would

19  have caused any reasonable party to have inquired further about

20  the status of this property.

21          THE COURT:  Why don't I need expert opinion from

22  either a title searcher, maybe some trustees, or Mr. Juganda

23  himself?

24          MR. YOUNG:  Well, Your Honor, I mean, certainly

25  that's within the Court's discretion.  And you know, there's a

1 │ question about whether, you know, I had a question even as we

2 │ were working on this, whether the Court would want testimony on

3 │ just how open and obvious the possession was. And I'm not

4 │ going to dispute if the Court says that's what I think I need.

5 │ I'm not going to dispute that, Your Honor. Just respectfully.

6 │ That that could be how the Court comes down. What I would say

7 │ is, I think the fact that you have a recorded lien, and the

8 │ fact that there are undisputed facts that show that Max Salas

9 │ was the only person exercising authority and control over this

10 │ property is enough for the Court to grant summary judgment.

11 │ That's my opinion. Those two facts combined, because there is

12 │ no dispute that -- you know, whether Len Salas lived in the

13 │ property. There is no dispute about whether Len Salas ever

14 │ made a tax payment or whether he ever made a mortgage payment,

15 │ or whether he was the one signing leases, or whether he was the

16 │ one collecting rent personally. That -- those issues aren't in

17 │ dispute. All those are undisputed facts that establish that

18 │ Max Salas was the only person exercising authority and dominion

19 │ over this property, and the only person that was in possession

20 │ of this property.

21 │      So I think you don't need expert opinion on any of

22 │ that, Your Honor, because that -- those are undisputed. As far

23 │ as the recorded lien, I mean the Judge -- the Court could take

24 │ judicial notice of that. It's a file-marked lien. And so that

25 │ just is what it is. Now, if the Court has questions about, you

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2225)

1   know, wants expert opinion about what would that have caused a

2   party to do, I'll defer to the Court on that. I think the

3   fact, again, it's a pretty low bar. Inquiry notice is a pretty

4   low bar. It's what would cause a party to inquire further.

5   And I think certainly a file-marked lien -- and in fact, we

6   cite some cases that say file-marked judgment lien should cause

7   a party to inquire further as a matter of law.

8         And so I don't think -- and I've given a lot of

9   thought to this. I don't think we need further expert opinion

10   or further testimony, but I will acknowledge that it is a

11   fairly close call, and I -- you know, just being frank with the

12   Court. And if the Court says, no, I think I need that, I would

13   not dispute that conclusion. But I think that when you combine

14   these facts, when you combine the possession, and you combine

15   the fact that there was a file-marked lien, and then you look

16   at the case law that deals with judgment liens and the impact

17   of judgment liens. I think that's enough for this Court to

18   grant summary judgment today on the 544 issue.

19         THE COURT: All right. Mr. McNutt?

20         MR. MCNUTT: Yes. Thank you, Your Honor. I didn't

21   hear Mr. Young talk about the McKinley case or all of the cases

22   that are cited by McKinley, including a case out of the Supreme

23   Court of Tennessee. The Strong -- I think I've got that right

24   -- the Strong case? Yeah, this is a case out of Supreme Court

25   of Tennessee. I'm not saying that D.C. law controls here, and

1  that's the McKinley case, that we cited in our brief.  And the
2  McKinley case says quite clearly that while possession can put
3  a party on inquiry notice where the possession is the vendor or
4  the seller of the property who has created and filed a deed to
5  another party and remains in possession of the property that is
6  not inconsistent with the record title because he is the one
7  who has actually caused the deed to be filed.  It is his
8  voluntary act.  And that's publication to the world that he has
9  conveyed the property to another person.  And the McKinley case
10  and the Tennessee case, which I cited, Strong v. Efficiency
11  Apartment Corp. --
12          THE COURT:  I can't hear you when you move away from
13  the mic.
14          MR. MCNUTT:  I'm sorry, Your Honor.  I apologize.
15  The Strong case is a Tennessee case.  And the Strong case
16  cites, let me see, cites a case called Curry v. Williams.  And
17  it says specifically an exception is recognized to the general
18  rule that the possession of land is notice of the possessor's
19  title or claim of title where a vendor remains for a time in
20  possession after giving a few simple deed with full covenants
21  which he permits to be duly recorded.  There are a number of
22  cases that follow that decision.  But the main case we've cited
23  is the McKinley case, which is -- I'm sorry -- which is a
24  District of Columbia case.  That case makes it very clear that
25  once you see that the person in possession has deeded the

1    property to a third party, that is all the inquiry that is

2    necessary.

3         And that makes perfect sense because if you have --

4    the sense of the McKinley case and all these other cases is

5    that the objective here is not to overcome what the seller did,

6    it's to protect other parties.  The seller has voluntarily

7    deeded the property.  So if the seller is now trying to claim

8    that that deed is no longer in effect, that's basically the

9    seller's problem.  The courts are not here to basically correct

10   a problem caused by the seller.  That's what the McKinley case

11   says, and I can cite that provision to you.  Sorry, I moved

12   away again.  Sorry, Your Honor.  I can cite that provision to

13   you.  In the McKinley case, I believe this is quoted in our

14   brief, but --

15        THE COURT:  I think it is.

16        MR. MCNUTT:  -- it says, "another reason for this

17   exception to the rule is the equitable maxim that, where one of

18   two innocent persons must suffer by the acts of a third, he who

19   has enabled such third person to occasion of the loss must

20   sustain it."  And that is also cited, that same rule provision

21   is cited in the Curry case, which is, again, cited by the -- I

22   forgot the name, by the case in Tennessee, the Supreme Court

23   case in Tennessee, the Strong v. Efficiency Apartment Corp.

24   case.

25        Now, Your Honor, Mr. Young told the Court that Mr.

1    Salas's possession was open and notorious.  I agree with half

2    of that.  It was clearly notorious, but it wasn't very open.

3    Let's examine this.  Mr. Young said that Mr. Salas paid the

4    mortgage.  No, he didn't.  He didn't pay the mortgage.  His own

5    affidavit says that --

6            THE COURT:  He paid some of the mortgage.  He paid

7    some of the mortgage.  He didn't -- Len didn't --

8            MR. MCNUTT:  Not according to his affidavit.

9            THE COURT:  Len didn't pay any.  He paid a few

10   payments.

11           MR. MCNUTT:  No, he didn't, Your Honor.  CLR Trust

12   did.  That's -- I'm looking at his affidavit, but maybe I

13   misstated it.  Let me make sure.  Let me make sure I got this

14   right.  This is Max Salas's affidavit, which is Docket Entry

15   75-2.  It was filed by Mr. Salas -- Mr. Max Salas, as part of

16   his objection to the -- let me make sure I got that right.  As

17   part of his objection to the original motion for summary

18   judgment filed by the plaintiffs.  And I'm reading from Page 3,

19   starting with Paragraph 19 of Mr. Salas's affidavit.  Let's

20   see.  "I rented out rooms in the property through an entity

21   known as the CLR Trust."  And if you recall, Your Honor, the

22   leases that were provided by the defendant in the D.C.

23   bankruptcy case and our Exhibit A to the supplemental

24   memorandum are all in the name of the CLR Trust, with Mr. Salas

25   signing as trustee.  Not as owner, as trustee.  Trustee of CLR

1  or the CLR Trust.  "I rented out rooms in the property through

2  an entity known as the CLR Trust," Paragraph 19.  Paragraph 20,

3  "Len Salas had no involvement with the CLR Trust."  Well, we

4  know that's wrong because both Max -- I'm sorry.  Len stated

5  categorically that he knew the trust to be a trust created by

6  his father for the benefit of Len and his two brothers, and CLR

7  stands for Chase, Len, and Ron, who are the three sons of Max

8  and the debtor and his two brothers.  "I dealt with tenants,

9  signed leases, and accepted rent payments on behalf of CLR

10  Trust.  I deposited all rent checks into an account in the name

11  of the CLR Trust for which I was a signatory."  Okay.  So to

12  make clear, he stops there and doesn't say what he did with the

13  money, but he does say, "I deposited all rent checks into an

14  account in the name of CLR Trust for which I was signatory."

15          Now there is -- we also filed as part of the

16  supplemental memorandum -- I think it is, let me make sure of

17  that.  Yeah, Exhibit B, I think it is, which is Docket Entry

18  92-2.  This is an attachment exhibit to the supplemental

19  memorandum.  Oh, I'm sorry, that's the wrong exhibit.  Let me

20  see where I have this.  I will -- I apologize, Your Honor.

21  With the Court's indulgence, let me see if I can find this

22  document.

23          THE COURT:  All right.  Who were the rent checks

24  payable to?

25          MR. MCNUTT:  According to Max Salas they were paid to

1  the CLR Trust.  There's been no document that has been provided

2  to the plaintiffs on either the superior court case, the D.C.

3  Bankruptcy Court or this case that indicates that indicates

4  that any party other than CLR Trust received rent payments.

5  And as I said before, Your Honor, there is a CLR Trust bank

6  account that goes back prior to 2017.  There is -- oh, here it

7  is.  The document I'm looking for, Your Honor, is Paragraph --

8  sorry.  Is attached to the plaintiff's response to the

9  defendant's objection to the plaintiff's motion for summary

10  judgment.

11          THE COURT:  Okay.

12          MR. MCNUTT:  And it's in -- it's a document provided

13  in discovery by Mr. Max Salas to Mr. Young, and it represents

14  to be the 2015 tax return of Mr. Salas.  It is filed as

15  document as Docket Number 76-1, and it's the 2015 tax return to

16  Mr. Salas, and it does not indicate any rental income to him.

17  You recall, Your Honor, that 2015 was the year in which the

18  fire occurred, and the -- Nina Brekelmans and Michael

19  McLoughlin were both tenants at the property in 2015 and signed

20  leases and paid rents.  Nina -- we have a copy of a portion of

21  Nina Brekelmans's lease, I believe the whole thing, which

22  indicates that her lease was with CLR Trust.

23          THE COURT:  Okay.

24          MR. MCNUTT:  And again, no rental payments were made

25  to Mr. Max Salas in 2015.  Now, after the fire, obviously there

Case 3:23-cv-00987  Document 141  Filed 10/07/24  Page 109 of 196 PageID #: 3527
Case 3:23-cv-00987  Document 141  Filed 10/07/24  Page 109 of 196 PageID #: 3527
ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)
APPX00109

1   was no rental income, but the fire was in June.  So from

2   January to June -- Sorry, Your Honor.

3            THE COURT:  Okay.

4            MR. MCNUTT:  Should I continue?  I'm sorry, Your

5   Honor, should I continue?  Oh, sorry.

6            THE COURT:  Anything further, Mr. Young?

7            MR. YOUNG:  Nothing from me, Your Honor.

8            THE COURT:  All right.  All right.  I'm going to take

9   this all under advisement, and after the hearing, hopefully we

10  can get to some resolution.  I'm kind of thinking that at

11  minimum, we're going to need to have a hearing on the 544

12  issues in terms of proof, but that's as far as I'm going to go

13  right now.  That's what I'm thinking.

14           MR. MCNUTT:  (Indiscernible).

15           THE COURT:  Now, await my -- my opinion, but it's

16  time for us to get this show on the road, as I say, one way or

17  the other.

18           MR. YOUNG:  Thank you, Your Honor.

19           THE COURT:  All right.

20           MR. MCNUTT:  Thank you, Your Honor.  Take your time.

21           THE COURT:  All right.  We'll be adjourned.  If

22  anybody wants to file anything in the next week, I think I've

23  got enough.  But if anybody wants to file anything else, do so

24  within five days.  All right.

25           MR. MCNUTT:  Thank you, Your Honor.

1            THE CLERK:  All rise.

2            THE COURT:  We'll be adjourned.

3        (Proceedings concluded at 11:39 a.m.)

4                        *  *  *  *  *

5

6

7

8

9

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16        I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428     DATE: November 7, 2023

25   ACCESS TRANSCRIPTS, LLC

```
                  UNITED STATES BANKRUPTCY COURT
               MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)


                                      .
IN RE:                                .  Case No. 18-02662
                                      .  Chapter 7
LEN SALAS,                            .
                                      .
                                      .
              Debtor.                 .
                                      .
. . . . . . . . . . . . . . . . .     .
NICOLAAS BREKELMANS, et al.,          .  Adv. No. 20-90027
                                      .
                 Plaintiffs,          .
                                      .
v.                                    .
                                      .  701 Broadway
MAX SALAS,                            .  Nashville, TN 37203
                                      .
              Defendants.     .  Tuesday, August 15, 2023
. . . . . . . . . . . . . . . .  .  9:13 a.m.


     TRANSCRIPT OF PLAINTIFFS' MOTION TO ALTER OR AMEND [104]
            BEFORE THE HONORABLE MARIAN F. HARRISON
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiffs:         Law Office of Philip J. McNutt PLLC
                            BY:  PHILIP JAMES MCNUTT, ESQ.
                            11921 Freedom Drive, Suite 584
                            Reston, VA 20190
                            (703) 904-4380

For the Defendants:         Thompson Burton PLLC
                            By:  PHILLIP G. YOUNG, ESQ.
                            6100 Tower Circle, Suite 200
                            Franklin, TN 37067
                            (615) 465-6008


Audio Operator:             Autumn McNeese, ECR

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

1          (Proceedings commence at 9:13 a.m.)

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Middle District of Tennessee is now in session.

4   The Honorable Marian F. Harrison presiding.

5          THE COURT:  Good morning, folks.

6          MR. MCNUTT:  Good morning, Your Honor.

7          THE COURT:  One second.  I want to get situated here.

8          THE CLERK:  Sure.

9          THE COURT:  All right.  Mr. McNutt?

10         MR. MCNUTT:  Thank you, Your Honor.  First of all, I

11   apologize for the technical foul up.  I was actually at the

12   court site but some reason I didn't hit the right button to

13   join in to the hearing, and so I apologize for that.

14         THE COURT:  No problem.

15         MR. MCNUTT:  Your Honor, this is, obviously, a motion

16   to reconsider which is, you know, a delicate motion to present

17   to a judge who clearly is attempting to do the right thing and

18   I think you understand that I'm not -- certainly not quarreling

19   with the Court's abilities or the consciousness or anything

20   like that, but I do want to say that I think based on Your

21   Honor's decision that there are issues that were raised and are

22   not disputed.

23         And there is case law that -- there's controlling

24   case law that with respect to the two issues decided by

25   Your Honor, we, respectfully, assert should have required a

1  judgment in favor of the plaintiffs.

2          THE COURT:  Let me make one statement and maybe I

3  wasn't clear, but in Footnote 8 of our opinion we didn't grant

4  summary judgment in the plaintiff's claim of actual fraud

5  pursuant to 548(a)(1)(A).  So just so there's no confusion, we

6  didn't grant summary judgment as to actual fraud.

7          MR. MCNUTT:  Okay.  I think I understand, Your Honor.

8  And I'm glad you made that point because that did confuse me a

9  little bit, but, respectfully, Your Honor, I still don't think

10  that changes the gravamen of the motion that we filed.

11          THE COURT:  I understand.

12          MR. MCNUTT:  As Your Honor knows, motions to

13  reconsider are very strictly limited.  And I understand that in

14  our motion we cited several cases in the Sixth Circuit, but all

15  of which -- I believe all of which were District Court cases.

16  I'm not sure why they were limited to District Court cases, but

17  they're consistent so I think they're controlling.

18          And, essentially, the argument we're making,

19  Your Honor, is that with respect to the two main points in Your

20  Honor's memorandum that in effect did not decide the motions in

21  our favor that under the controlling law we believe there was

22  sufficient evidence and material facts not in dispute that were

23  asserted in our motion documents and our briefing.  And those

24  factors and law we believe under the -- under rulings of the

25  Sixth Circuit are controlling to the point where if there were

1  -- the phrasing of the cases is properly considered, and I'm

2  not suggesting that Your Honor improperly considered them, I

3  just am asserting that I don't believe they were given the

4  consideration that they should have been in light of the

5  factual background and the procedural background of this case.

6  And, Your Honor, it starts with this -- as Your Honor knows,

7  obviously, the circumstances of this adversary proceeding arose

8  when the trustee attempted to sell the estate's interest and

9  that the trustees avoiding any recovery claims to the

10 defendant, Mr. Salas.

11        Now, the actual party asserted was Mr. Ron Salas, the

12 defendant's son, but in all proceedings Mr. Ron Salas was

13 represented by Mr. Young, who, also, obviously, represented the

14 defendant, Max Salas.  And with respect to the actual auction

15 that occurred, it was Max Salas who was clearly in charge of

16 the bidding and telling his son, or at least consulting with

17 his son as to what the bid could be.  And that's necessarily

18 been my -- in my declaration which was attached to our motion

19 to alter or to mend --

20        THE COURT:  Amend.

21        MR. MCNUTT:  -- or amend.  That auction, again, was

22 not the result of any request by the plaintiffs; it was by the

23 request of the defendant or the defendant's son representing

24 the defendant, and the Court allowed the sale to go forward.

25 And, also, Your Honor ordered the procedures by which the

1   estate's asset was to be sold.  The result was that my clients,

2   the plaintiffs, paid $150,000 towards the estate's -- toward

3   the rights of the estate to pursue Mr. Max Salas under the

4   theories that are set forth in the complaint; the trustee's

5   avoiding powers, and the fraudulent advance actions that are

6   available under both bankruptcy and state law.

7           Your Honor -- in Your Honor's ruling, Your Honor

8   relied substantially on the decision of Judge Teel in the

9   United States Bankruptcy Court for the District of Columbia

10  which was a ruling on -- not on any avoiding powers or on

11  fraudulent advance, but was based upon a determination of

12  whether or not under D.C. law, Mr. Max Salas had a sufficient

13  interest in the property that he could claim an exemption.  And

14  as Your Honor probably knows that's important in the District

15  of Columbia if he has a homestead exemption to a residence in

16  which the debtor is presently residing at the time of the

17  bankruptcy case is unlimited.  Therefore, if the debtor

18  obtained his exemption, then he had an unlimited exemption and

19  the property remains outside the reach of creditors at least as

20  to -- as far as the estate of Max Salas is concerned.  What

21  Judge Teel did not determine is in the effect of his ruling

22  that Max Salas had an interest in the property on the trustee's

23  avoiding powers or, although not specifically mentioned,

24  clearly he did not say anything, state anything in his opinion

25  nor could he, I don't believe, Your Honor, regarding the

Case 3:23-cv-00987  Document 14-1  Filed 10/05/24  Page 116 of 796 PageID #: 3234
ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

APPX00116

1  trustee's -- this trustee's ability to recover the property on

2  the basis of a fraudulent conveyance.

3       And the reason I think -- there's an important

4  distinction here, Your Honor, and the distinction is that with

5  respect to the debtor's residence in the Max Salas case that

6  was determined without reference to when the transfer occurred.

7  And you'll recall that in our papers, Your Honor, we cited

8  several statements made by Judge Teel both in the context of

9  the contested matter related to the debtor's exemption and the

10  actual evidentiary hearing where Judge Teel commented -- in his

11  actual decision, rather, where Judge Teel commented that this

12  all might be upended by the actions of the trustee in the

13  Tennessee case which was also pending at the time that's this

14  case where Ron Salas was the debtor.

15       And, most importantly, there's the date -- the

16  effective date that the transferred occurred.  And there's no

17  dispute that for purposes of Section 548 -- I always get these

18  mixed up, but I think it's 548, the (indiscernible) statute,

19  that for those purposes the transfer, even though it was

20  alleged to have occurred in 2010, for purposes of a fraudulent

21  conveyance was not perfected, and, therefore, was not in effect

22  until the day before the bankruptcy proceeding.

23       So while that didn't change necessarily the ability

24  of the debtor in that case, Max Salas, to claim the homestead

25  exemption, it did certainly open up his claim -- or open up his

 1  interest to a claim of a fraudulent conveyance since there was

 2  no perfection of a transfer until the eve of the bankruptcy

 3  case.

 4          Now, Mr. Young has argued previously that the

 5  effective date of the transfer was as early as 2010, but there

 6  is no factual support or case law support for that.  The

 7  statute in D.C. and the statute -- and the federal statute both

 8  make it very clear that the effective date for purposes of

 9  determining whether a transfer took place is the date of the

10  transfer was perfected or if not perfected, then the day

11  immediately prior to the bankruptcy case so that was April 17,

12  2018.  And we contend, Your Honor, that that is an important

13  distinction that the counters which Your Honor has suggested is

14  the effect -- not suggested, sorry -- has determined is the

15  effect of Judge Teel's decision.

16          We also believe, Your Honor, that there are several

17  other important facts that should have been considered and we

18  don't believe, based on Your Honor's memorandum opinion, that

19  they were considered or at least, on the face of it, it doesn't

20  appear that they were reconsidered.  I've already stated that

21  --

22          THE COURT:  I'm sorry.  Go ahead.  Go ahead.

23          MR. MCNUTT:  I'm sorry.

24          THE COURT:  Go ahead.  Go ahead.

25          MR. MCNUTT:  I'm sorry, Your Honor.  First, Your

1  Honor, and this relates to the decision to Your Honor's ruling

2  that distinguishes the <u>Kind Inc.</u> -- <u>Kind Operations Inc.</u>

3  (indiscernible) case.  That's the case out of Western District

4  of Pennsylvania in which the court determined that a creditor

5  that had previously lost in a state court proceeding could

6  pursue the same claim as a representative of the bankruptcy

7  estate after having been assigned a purchase -- I think it was

8  purchased, actually, or assigned the claim from the trustee in

9  bankruptcy.

10         And since I'm on that point, I will say, Your Honor,

11  that one the concerns that I think the parties have with

12  respect to the import of your decision is that it's hard to

13  determine where to draw the line.  Your Honor was impressed, if

14  that's the right word, with the fact that my clients

15  represented, substantially, all of the unsecured claims in this

16  estate and that's accurate.  My client's claims are over $15

17  million in total, but they represent not one creditor but two

18  creditors, Your Honor, and there's no -- and each of those

19  creditors represent less than 50 percent of the unsecured

20  claims in this case.

21         THE COURT:  Well, but -- go ahead.  Go ahead.

22         MR. MCNUTT:  Secondly, Your Honor, they are not the

23  only claims in this estate.  As I read the trustee's final

24  report, there were actually 12 claimants that received payments

25  of this estate including six administrative claims.  The

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2227)

1    Internal Revenue Service, all seven of which now were paid in

2    full.  So as a result of the payments of my clients into the

3    estate, the estate gained $150,000 fair consideration because

4    it was a bid -- fair consideration to the trustee's funds in a

5    circumstance where my clients did not even present the purchase

6    to the trustee, it was this defendant who did it.  We didn't

7    ask for the trustee to assign the claims to us.  My clients did

8    not ask for that.  It was asked by Mr. Salas or by his son,

9    Ron, who is an attorney in Colorado, as Your Honor probably

10   knew of this, but -- and it was a court process -- I'm sorry --

11   a sale process that Your Honor approved and ordered to go to go

12   forward which we complied with.  So we are the bona fide

13   purchasers of the trustee's on the estate's claims by virtue of

14   an open auction in which the competing party was the defendant.

15          And although Your Honor has made an important point

16   about the size of my client's claims, keep in mind that the

17   reason, as my declaration declares and as Mr. Young asserted in

18   open court, the purpose of Mr. Salas buying the claims was to

19   prevent any party from going after his assets, was to prevent

20   my clients or any other creditor from pursuing a claim or those

21   claims who -- the avoidance and recovery claims against

22   Mr. Max Salas.

23          So you have this situation where Your -- which Your

24   Honor was concerned about in your memorandum opinion, but my

25   clients represented substantially all of the unsecured claims

1    in the case and yet the Court ordered the purchase which was

2    authored by Mr. Max Salas or on his behalf where he represented

3    substantially all of the assets of the estate by virtue of

4    having a property that was worth, at the time that he filed his

5    bankruptcy, he said approximately $2.4 million with less than

6    half that in actual mortgage claims or other claims against the

7    property.

8              So we have a circumstance where my clients

9    represented substantially all of the unsecured debt where

10   Mr. Salas represented -- Mr. Max Salas represented all of the

11   assets of the estate, in fact, the only assets of the estate.

12             THE COURT:  I think you just froze.  Mr. McNutt, I

13   think you just froze.  You may want to -- if you can -- can you

14   hear me?  No.  You may want to go back out and come back in.  I

15   don't know what to do.

16             Jeremy, do you have an idea here?  You should call

17   him, I think.

18             THE CLERK:  I think he -- looks like he's --

19             THE COURT:  He's doing that.

20             THE CLERK:  Yep.  I think he's reentering.

21             THE COURT:  Sorry to call you Jeremy.  It just came

22   out.  I was befuzzled by the freezing.

23        (Pause)

24             THE CLERK:  I'm concerned.  (Indiscernible).

25             THE COURT:  Maybe you better call him.  Let's take a

1   break.

2        (Recess taken at 9:34 a.m.)

3        (Proceedings resumed at 9:35 a.m.)

4        THE COURT:  I hope he's not still talking thinking --

5        (Pause)

6        MR. YOUNG:  Judge, I tried to call Mr. McNutt just

7   now but it went straight to his voicemail.  I just left a

8   message telling him that we're in recess waiting for him to

9   sign back on just so that -- to make sure he knew that he got

10  kicked off.

11       THE COURT:  Thank you.

12       (Pause)

13       THE CLERK:  It looks like he's back, Your Honor.

14       THE COURT:  We lost you, Mr. McNutt.

15       MR. MCNUTT:  Yeah.  I think, Your Honor, the server

16  here at the office went down because I had no phone service or

17  anything so I apologize.  I assure you it was not -- well,

18  maybe it was my fault but nothing I did that I know of.

19       THE COURT:  I understand totally.  I have similar

20  frustrations from time to time.

21       MR. MCNUTT:  Yes.  Technology is wonderful when it

22  works but when it doesn't it gets frustrating especially when

23  you're not in tune.  You got to be under 40 I think to be in

24  good shape for that.  So, in any event, should I continue, Your

25  Honor?  I --

Case 3:23-cv-00987  Document 141  Filed 10/30/24  Page 122 of 796 PageID #: 3540

APPX00122

```
 1              THE COURT:  Yes, yes.

 2              MR. MCNUTT:  -- again, I apologize.

 3              I think I've, basically, gone through the discussion

 4   regarding Judge Teel's decision.  When I was -- I was also

 5   talking about the money that went into the estate and the

 6   benefits of the estate, and, basically, the consideration that

 7   was paid for those causes of action.

 8              And the next point I wanted to make, Your Honor, is

 9   that if you recall when Your Honor ruled on Mr. Young's motion

10   to dismiss -- or made the motions to dismiss, the final one,

11   the Court determined, among other things, that for purposes of

12   this complaint, the plaintiffs were standing in the shoes of

13   the trustee.  They were not acting on their own behalf; they

14   were acting through the trustee and for the benefit of the

15   estate.

16              And I had found no cases which indicate, Your Honor,

17   that in a circumstance like this or in any other circumstance

18   where the real party in interest is the trustee in bankruptcy

19   or the bankruptcy estate which is -- I think it's actually the

20   same thing -- that the status of the claims related to the

21   plaintiffs in this case by virtue of Judge Teel's decision

22   would be binding on the bankruptcy estate or the trustee in

23   bankruptcy whose position is in privity only with the debtor,

24   in certain cases -- instances, and not with any creditor.  And

25   we cited case law to that effect.  I don't actually have that
```

APPX00123

```
 1    right in front of me but I can certainly find it as we go

 2    through this.

 3              And I believe, Your Honor, that -- I believe Your

 4    Honor has put too much emphasis on the fact that my clients

 5    have such large claims.  Would, Your Honor -- the question I

 6    raise, I guess somewhat rhetorical is, would Your Honor's

 7    decision had been the same if my clients represented -- if my

 8    clients had two claims which were $10,000?  Let's say they were

 9    $10,000 and having claims of $20,000 would have been more than

10    40 percent of the listed unsecured claims in the case.  Or

11    suppose their claims which totaled $100,000 that would have

12    been substantially the bulk of the claims against the estate.

13              The fact that my clients have substantial claims is a

14    result of the actions of the defendant and the debtor, not

15    anything that my clients have done.  It's not -- my clients

16    have not manufactured these claims.  These claims resulted from

17    a prolific debt that was caused by the negligence of the debtor

18    and the defendant.  My clients should not be punished for that,

19    Your Honor.  It's -- and I believe that's what your decision

20    does.  And I believe, with all due respect, Your Honor, and I

21    have the utmost respect for this Court, I think you understand

22    that, always have.  The fact that my clients have large claims

23    does not enter into whether they had the ability to assert

24    those claims on behalf of this estate.  And even though many of

25    the claims -- obviously, this estate have been paid by virtue
```

1  of the purchase of my clients -- by my clients over $150,000.

2  There are claims that still remain to be paid which would be

3  paid out of any judgment whether that results from this case.

4        When I said before, Your Honor, and I'll make this

5  point quickly, I believe that if this decision stands it will

6  create precedent for the next situation down the road where a

7  Kind-like -- a Kind Operations Inc.-like situation arises and a

8  creditor with a substantial claim against the estate that holds

9  the case decided in another court assumes for the benefit of

10 the estate.  It could be claims for the benefit of all of the

11 parties to the estate and that's exactly what you are doing.

12        It just so happens -- and I understand, it just so

13 happens that my clients represent the -- almost all of the

14 claims of the estate because of the extreme -- because of the

15 amount of the judgment that was entered in their favor.  But

16 the reason why the judgment was entered in that amount is

17 because my clients or the estates of the two youngsters that

18 were killed in that fire were only 24 years old.  So if they

19 were 40 or 45 years old, the claims wouldn't have been and the

20 judgment wouldn't have been nearly as high, but they were young

21 with their whole lives ahead of them.  Unfortunately, that --

22 their lives were snuffed out, but they had that earning power

23 and because of that earning power, the judgment claims were

24 substantially higher.  They were high.

25        Your Honor, with respect to the privity issues, hold

1    on -- in the Sixth Circuit in the case of <u>Sanders Confectionary</u>

2    <u>Products</u>, it states that a trustee stands in privy to the

3    debtor and not any creditors.  Therefore, my client's claims,

4    as asserted on behalf of the trustee in the bankruptcy estate,

5    are in privity only with the debtor, not with any creditor.

6    And if Your Honor needs that citation I believe I sent it

7    before but if not, it's 973 F.2d 474, and the specific language

8    is on Pages 480 and 481, and, as I said, that's a Sixth Circuit

9    case of 1992.

10          In the <u>Kind</u> case, the case that Your Honor did redo,

11   it states that the capacity of the plaintiff as assignee of the

12   trustee is different from its capacity as party to its prior

13   state court action.  That's what the <u>Kind</u> case states.  That's

14   the Western District of Pennsylvania.

15          And Your Honor distinguished that only because my

16   clients had such extensive claims and don't I think that's a

17   distinguishing factor.  I don't think that's an appropriate

18   distinguishing factor.  I understand that it's psychologically

19   important or at least psychologically considered important, but

20   it psychologically comes to mind, but that is not a legal basis

21   or a factual basis to change the rules regarding privity, real

22   party in interest, and the fact that these parties are standing

23   in the shoes of the estate and the trustee, not in the shoes of

24   any creditor including the plaintiffs in this case.

25          The <u>Kind</u> decision that I just mentioned, Your Honor,

1  is consistent with the substantial body of  case law which

2  asserts that in a derivative action like the instant case, and

3  I'm quoting now, "the person holding the substantive right

4  sought to be enforced and not necessarily the person who will

5  ultimately benefit from the recovery is the real party in

6  interest."  And that's actually from the Farrell Construction

7  Company v. Jefferson Parish, Louisiana, Fifth Circuit case,

8  1990, and that's cited at 896 F.2d 136, and, specifically, on

9  Page 140.  And the quote that is a real party in interest is,

10  "the person holding the substantive right sought to be enforced

11  and not necessarily the person who will ultimately benefit from

12  the recovery."

13        That, also, Your Honor, states quite clearly that

14  when determining the rights of the parties with respect to

15  items like res judicata and collateral estoppel that the real

16  party in interest is the party that the Court should focus on

17  and that is the trustee and the trustee's claims.  The trustee

18  was not a party to the exemption decision nor could it be, nor

19  could it have been.  Even if the trustee chose somehow to

20  intervene, the trustee would not intervening in the exemption

21  decision could it have, there was no trustee appointed at the

22  time that the exemption decision was determined.  The trustee

23  is not appointed until months later.

24        The next part of this, Your Honor, is the -- I want

25  to focus on -- and I'm almost done here.  I want to focus on

1  the McKinley case.  That's the case that was cited in my motion

2  papers.  It's McKinley v. Crawford, and that's a case cited at

3  58 F.2d 528 and specifically on Page 529 and 530 is where my

4  discussion comes from.  And this is a D.C. Court of Appeals

5  case from 1932, and I believe the reason that it's in the

6  federal court order is because of the jurisdiction -- federal

7  jurisdiction over the D.C. -- over D.C. and the D.C. Courts

8  back in 1932.  So I believe the D.C. -- the appellate

9  decisions, even though they were not from the United State

10  District Court or recorded in the federal court, I'm not

11  certain, but I believe that's correct.

12      The McKinley case wasn't cited in your memorandum

13  opinion, Your Honor, and I've been told that it was considered,

14  but we argue that with respect to the undisputed facts of the

15  case that it is clear that even if everything else -- well,

16  it's clear that in 2007 Max Salas deeded the property.  The

17  property was deed, if you recall, from Max Salas and his wife

18  to Max Salas, and then from Max Salas to his son, Ron Salas,

19  and Ron Salas remained the only title owner on the property and

20  the only owner of record without any intervening title

21  documents asserted.

22      So Your Honor cited the general rule in asking for

23  the hearing in March on the motions for summary judgment.

24  Your Honor cited the general rule that where there was -- and I

25  think I've got it here.  The general rule is that the actual

```
 1  visible and unequivocal possession of real estate inconsistent
 2  with the record title and under an apparent claim of ownership
 3  is notice to purchasers of an adverse interest in the property
 4  to be purchased.  That, as I understand it, is the basis of
 5  Your Honor's decision or at least reluctance to grant summary
 6  judgment to the plaintiffs on the issue of inquiry notice, and
 7  that is the accepted general rule.  However, Your Honor,
 8  McKinley and many other cases including the cases throughout
 9  Tennessee --
10          THE COURT:  Wait just a second.  Wait one -- I'm
11  sorry.
12          MR. MCNUTT:  -- state that there is --
13          THE COURT:  I'm on mute.  Hang on a minute.
14          MR. MCNUTT:  -- an exception to the general rules.
15          THE COURT:  Wait just one second.
16          MR. MCNUTT:  I'll hang on.
17          THE COURT:  One second.  I'm assuming you're talking
18  about -- I didn't grant summary judgment on 544(a)(3) and
19  544(a)(1).
20          MR. MCNUTT:  You did not, Your Honor.  My -- and my
21  argument was that I believe you should have granted us summary
22  judgment, not that you granted summary judgment to the other
23  side --
24          THE COURT:  Okay.
25          MR. MCNUTT:  -- but that I -- you should have granted
```

1  summary judgment to us.  I'm being very selfish here but that's

2  what I believe.

3           THE COURT:  All right.  You can argue what you need.

4  It's no offense to me.

5           MR. MCNUTT:  I appreciate it, Your Honor.

6           Your Honor, my point of this is that Your Honor cited

7  in your memorandum of opinion, and, hopefully, I can find it

8  fairly quickly here.  You cited, basically, some competing

9  undisputed facts.  And the undisputed facts that you cited that

10  the plaintiffs asserted were that Len Salas was the named owner

11  under titles of the property, the mortgage on the property was

12  in Len Salas's name only, rental leases were signed by Max

13  Salas on behalf of CLR, rather than individually, and, I might

14  add, Your Honor, we're always in the name of trust.  Under the

15  name of CLR there was no indication of any entity other than

16  Mr. Max Salas acting as a trustee or a trust under the name of

17  CLR.

18           And two more important factors, one is that the

19  recorded judgment showed Len Salas was held liable as the owner

20  of the property and that Max Salas was held liable for

21  mismanagement, not owner of the property.

22           Those facts, Your Honor, I believe into the framework

23  of the McKinley decision which, as I said, is not only valid

24  law in the District of Columbia which is all that's really

25  important, but it is a recognized law in many jurisdictions.

1    At the time of the _Strong_ decision which I cited in

2  support of _McKinley_ there were -- let's see if I can find this

3  here.  And that case was decided in 1929.  At the time of the

4  _Strong_ decision which is two years prior to _McKinley_, according

5  to the _Strong_ decision, and that's again 159 Tenn. 337, which

6  is 1929, as I said, the Supreme Court of Tennessee, and it

7  relies heavily on two citations.  One was a Michigan case,

8  _Bloomer v. Henderson_, and that appears on Page 344 of the

9  _Strong_ decision.  And _Curry v. Williams_, which is a Tennessee

10 case.

11    And I'm quoting here from -- this is a quote from the

12 _Curry v. Williams_ case which is cited in _Strong_ and it states:

13 "The propriety execution delivers to another a solemn deed or a

14 conveyance of the land itself and suffers bad seed to go upon

15 record.  He sends to rule the world," colon, quote: "Whatever

16 right I have or may claim to have in this land, I have conveyed

17 to my grantee and, though I am yet in possession, it is for a

18 temporary purpose without claim or right and merely as a tenant

19 at sufferance to my grantee."

20    Later, on the _Strong_ court case, "all presumption of

21 right or claim of right is rebutted by his own act and deed

22 that is after the grantor."  One of the main objects of the

23 registry law would be disputed by any other rule.  And, again,

24 cites _Curry v. Williams_ in support of that proposition.  I

25 believe that's the end of it.  There's a quote in there I

1    believe it's from -- it appears to be from Curry v. Williams.

2        In the McKinley case -- well, it says there's an

3    exception to the general rule where a vendor remains for a time

4    in possession after given a simple deed reconveyance since he

5    permits to be recorded.  And then the Court states, and I'm

6    emphasizing this, Your Honor, the object of the general rule is

7    to protect one in possession.  Remember, the general rule is if

8    you're in an active and open possession, then that's notice to

9    the world that you -- that you have to require further as to

10   ownership.

11       This exception is referenced as follows:  "The object

12   of the general rule is to protect one in possession from acts

13   of others who do not derive their title from him, from the

14   grantor, not to protect the grantor against his own acts and

15   especially against his own deed."  And that's cited at Page 530

16   of the McKinley decision.

17       Let me see if I have overlooked anything that I

18   outlined.  I think that's my argument.

19       And the point of that is, Your Honor, while I believe

20   there are -- none of it is determined back -- this is an issue

21   not right for summary judgment and I assert that based on the

22   undisputed facts of the title of the property being in the name

23   of Len Salas at the hand of Max Salas that the McKinley case

24   controls and the McKinley case is the law in the District of

25   Columbia, and it is, apparently, the law in many other

1    jurisdictions including Tennessee.

2         Your Honor, I stated in our motion the law here with

3    respect in motions for your consideration, and I won't go over

4    that any more except to say that in the case of Harris v. Perry

5    which is in the Western District of Tennessee.  It's a Lexus

6    cite as 13 -- it's a 2016 Lexus -- U.S. District Lexus 139942,

7    26 -- 2016 Westlaw 5396701.  Essentially, this emphasizes I

8    think what is consistent with the law cited and in these other

9    cases, but it says basically that relief Rule 5090, that's the

10   federal rule that is part of Rule 9023, I think it is, the

11   bankruptcy court rule, the relief Rule 5090 is available and

12   appropriate in those cases in which the movant has set forth

13   facts or law of a strongly convincing nature that show the

14   Court's prior ruling should be reversed.

15        Your Honor, that's my argument.  Thank you very much.

16        THE COURT:  All right.  Just -- Mr. McNutt, just so

17   you know it doesn't bother me that somebody asks to reconsider

18   because I've been wrong and I may be wrong in this case, but

19   I've been wrong before so just so you know.

20        Mr. Young --

21        MR. MCNUTT:  I say this by all due respect, Your

22   Honor, nothing more.

23        THE COURT:  I agree wholeheartedly.

24        Mr. Young?

25        MR. YOUNG:  Good morning, Your Honor.  Phillip Young

1  on behalf of the Defendant, Max Salas.  I'm going to try to be

2  very brief.

3         The plaintiff's motion is not really a motion to

4  alter or amend at all.  It's, essentially, an appeal without

5  filing a notice of appeal, but this is filed as a Rule 59

6  motion which is disfavored and has to be considered as such.

7  To succeed on a Rule 59 motion, a movant must show that there

8  is one of the following:  A clear error of law, newly

9  discovered evidence, a change in controlling law, a need

10 prevent manifest injustice, the court clearly overlooked

11 material facts, the court clearly overlooked controlling law.

12 The plaintiffs have shown none of this.

13        The courts have noticed that Rule 59 is an exacting

14 standard and an extraordinary remedy restricted to those

15 circumstances of which the moving party has set forth specific

16 facts or specific law of a -- and this is the word that's used

17 -- strongly convincing nature that indicate that the court's

18 prior ruling should be reversed.  The plaintiffs, respectfully,

19 have not come close to meeting this standard.  Rather they

20 simply restated their entire argument on every single issue.

21 This Court has already considered all of these arguments

22 ad nauseam and reached its conclusion.

23        If the plaintiffs disagree with this Court's

24 conclusion, and they're certainly entitled to, they should seek

25 permission to file an interlocutory appeal, otherwise, we need

1    to set this matter for trial.

2              And, Judge, I'm going to resist the urge to restate

3    my client's position on every single issue, but I do find it

4    necessary to at least clarify a few things that were said this

5    morning.

6              I think this Court found preclusion as to a

7    conclusion by the D.C. Court.  For a conclusion -- for a

8    preclusion to apply, and this is an important point, it doesn't

9    have to be the exact same party; it just has to be a party that

10   somehow is standing in privity with the former party.  And we

11   cited to a number of cases in our briefs, plural, where a

12   subsequent party was precluded even though they weren't the

13   same party.  We understand that it's not the exact same party.

14   I represent trustees all the time.  I understand the difference

15   between a trustee and a creditor.  But there are lots of cases

16   that say if the former party appropriately represented the same

17   interest as the current party then preclusion applies.  That's

18   definitely the case here.

19             As the courts -- as Mr. McNutt has talked about this

20   morning, the dollar amount is one indicia of that.  They

21   represent -- I don't remember the number, 98 percent, 99

22   percent of the client pool.  They had the exact same interest

23   in this matter as they did in the prior matter.  They're even

24   represented by the same counsel in this case and the same

25   decision maker.  That's what makes this different than other

1    cases.  It is in that degree -- that full degree of alignment

2    means that they are in privity.

3              And I'd be remiss if I didn't point out that

4    Mr. McNutt said that the Court is punishing his client.  This

5    isn't a matter of punishment.  I think the Court understands

6    that.  It's a matter of whether these issues have already been

7    fully tried and decided and they have, and now maybe two times

8    and working on three times.  They've been fully tried and

9    decided.

10             I said I was going to be brief.  I'm going to stop

11   there unless the Court has other questions for me.

12             THE COURT:  I don't.

13             Mr. McNutt, do you want to say anything else?

14             MR. MCNUTT:  Yeah.  I don't want to revisit

15   everything I've said.  I'm sure Your Honor understands my

16   position.

17             I'm a little troubled by this assertion by Mr. Young

18   that privity stands in the way of my clients -- of the estate's

19   ability to -- of my clients ability to cover for the estate.

20   My recollection is that none of the cases cited by Mr. Young

21   involve an assertion of a trustee having privity for a creditor

22   in a case in which the trustee was not even appointed at the

23   time that the original case was argued -- was presented and

24   decided.  I don't believe any of the cases were trustee cases

25   but I could be wrong on that, but I'm sure they do not fit the

1   facts of this case.

2           And I do agree with Mr. Young on one other thing that

3   if Your Honor does not agree with us and determines not to

4   reconsider your decision, then I think we do have -- I think

5   it's necessary, and I hope that Your Honor agrees, I don't want

6   to have two trials.  I don't want to be in court twice, once on

7   the issues that Your Honor has not yet decided, and again on

8   the issues that have been decided in this motion, so I believe

9   that this is a matter that's right for an interlocutory appeal

10  so that we don't have the issue of having potentially two

11  trials in the event that we loss on the issues that are left

12  after Your Honor's decision.  So I don't want to have to try

13  this case twice.

14          And almost all of the facts and all of the witnesses

15  would be the same if Your Honor decides not to reconsider and

16  that decision is overturned on appeal so we would literally be

17  having two trials on the same -- on, essentially, the same

18  issues of the same parties just very technical arguments that

19  may be decided on appeal.

20          THE COURT:  Just so you know, Mr. McNutt, it's not my

21  decision whether you have an opportunity to appeal assuming

22  what -- I do want to take a break in a minute, but I don't have

23  a dog in that fight.  So let me take about a five-minute break.

24          THE CLERK:  All rise.

25          (Recess taken at 10:08 a.m.)

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2225)

1          (Proceedings resume at 10:16 a.m.)

2          THE CLERK:  All rise.

3          THE COURT:  All right.  I appreciate your position,

4    Mr. McNutt.  This is a hard case and it was a hard case from

5    the very beginning when you were in state court, and I do have

6    sympathy for those folks.  It's not my intention to punish

7    anybody.  But I don't believe, based on your papers and the

8    argument, that you met the standard under rule -- Bankruptcy

9    Rule 9023, and Federal Rule Civil Procedure 59 for a motion to

10   alter or amend.

11         The arguments made here today were the same arguments

12   made previously before we entered our lengthy opinion.  And I

13   agree with you that leave to appeal is something you should

14   strongly consider.  Just bear in mind that you have 14 days

15   from the date of whatever order comes down on this denying the

16   motion to alter or amend.

17         I call your attention to Rule 8004 which is how you

18   do it.  Bankruptcy Rule 8004 and Bankruptcy Rule 8005.  They're

19   two different steps.  If you want to appeal you got to -- from

20   an interlocutory order you got to file it in time and be

21   accompanied by a motion for a leave to appeal prepared in

22   accordance with that rule and the contents of the motion have

23   to be looked at and in accordance with Rule 8004.

24         If you want to appeal to the District Court in

25   addition to whatever you do under 8004, you have to make an

1    election to have it heard by the District Court rather than our

2    Bankruptcy Appellate Panel and that's under Rule 8005.  I don't

3    know what you want but just be aware of Rule 8004 and 8005,

4    and, again, 14 days to appeal from the date of the order.

5              And I'm going to deny the motion.  I'm interested in

6    what happens after if you do file a motion for leave to appeal

7    either for the District Court or the Bankruptcy Appellate

8    Panel.  And I will await a decision in that matter before we

9    set this case for trial.

10             Is that what you want, Mr. McNutt?

11             MR. MCNUTT:  It is, Your Honor.  And I appreciate

12   your patience and consideration particularly with my

13   technological issues -- technology issue this morning.

14             THE COURT:  No problem at all.  By the way --

15             MR. MCNUTT:  And that --

16             THE COURT:  -- after September the 15th or so, we're

17   going to have to go to -- in arguments and in trials,

18   obviously, we're going to have to go to in person, so luckily

19   you got this under the Covid rules but we've got to change

20   these -- the judicial conference in D.C. has said we got to go

21   back to in person for the most part.

22             MR. MCNUTT:  I was hoping that was a major

23   consideration, your granting my motion today so you wouldn't

24   have to see me anymore, but I guess -- I guess that's not going

25   to work.

1          THE COURT:  You are welcomed here anytime,

2   Mr. McNutt.

3          Mr. Young, will you draw the order?

4          MR. YOUNG:  Yes, Judge.  I just wanted to add just as

5   a housekeeping matter.  If 14 days passes and no appeal is

6   filed, I'll file a motion to set a pre-trial conference to

7   bring that to the Court's attention, otherwise, I think we'll

8   just wait, you know, until the conclusion of the appeal if an

9   appeal is granted.

10          THE COURT:  All right.  Let me -- Mr. McNutt, I just

11   want to make sure and imprint upon your brain, Rule 8004 and

12   Rule 8005 of the Bankruptcy Rules of Civil Procedure.

13          All right.  We'll be adjourned.

14          THE CLERK:  All rise.

15          THE COURT:  Take care.

16          MR. MCNUTT:  Thank you, Your Honor.

17          MR. YOUNG:  Thank you, Your Honor.

18      (Proceedings concluded at 10:20 a.m.)

19                         *  *  *  *  *

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428     DATE: November 7, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

APPX00141




Marian F. Harrison
US Bankruptcy Judge

Dated: 8/16/2023



IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| ——————————————— | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER DENYING PLANITIFFS'</u>
## <u>MOTION TO ALTER OR AMEND UNDER FED. R. BANKR. P. 9023</u>

This matter came before the Court for a hearing on the Plaintiffs' Motion to Alter or Amend

Under Fed. R. Bankr. P. 9023 (Doc. 104) (the "Motion") and the Defendant's Response thereto

(Doc. 107) (the "Response"); and appearances at the hearing having been made by Philip McNutt

APPX00142

on behalf of the Plaintiffs and by Phillip Young on behalf of the Defendant; and based upon the Motion, the Response, and arguments made by counsel at the hearing;

**IT IS HEREBY FOUND:**

A.  Pursuant to Federal Bankruptcy Rule 7052, the Court hereby incorporates and adopts the findings and conclusions stated orally in open court on August 15, 2023.

B.  The Plaintiffs have failed to meet the standards required to alter or amend the Court's prior order pursuant to Fed. R. Bankr. P. 9023 and F.R.C.P. 59.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.  The Motion is hereby DENIED.

> **THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

Submitted for entry:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Counsel for Defendant

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

APPX00143



Marian F. Harrison
US Bankruptcy Judge

Dated: 2/11/2021



## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) CASE NO. 318-02662 |
| LEN SALAS, | ) |
| | ) JUDGE MARIAN F. HARRISON |
| Debtor. | ) |
| | ) CHAPTER 7 |
| NICOLAAS BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, | ) |
| CO-PERSONAL REPRESENTATIVES | ) ADV. NO. 320-90027 |
| OF THE ESTATE OF NINA | ) |
| BREKELMANS, | ) |
| | ) |
| and | ) |
| | ) |
| MICHAEL MCLOUGHLIN AND | ) |
| MARTHA JOHNSON, CO-PERSONAL | ) |
| REPRESENTATIVES OF THE | ) |
| ESTATE OF PATRICK | ) |
| MCLOUGHLIN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MAX SALAS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

---

## MEMORANDUM OPINION

---

APPX00159

This matter is before the Court on the motion for derivative standing and amended complaint filed by Nicolaas Brekelmans and Gail Gregory Brekelmans, Co-Personal Representatives of the Estate of Nina Brekelmans, and Michael McLoughlin and Martha Johnson, Co-Personal Representatives of the Estate of Patrick McLoughlin (collectively "plaintiffs"). For the following reasons, the Court finds that the motion should be granted in part.

## I. FACTS

In 2015, a fire occurred at 1610 Riggs Place, NW, Washington, D.C. ("Property"). Nina Brekelmans and Patrick McLoughlin perished in the fire, and Max Salas was seriously injured. On October 20, 2015, the plaintiffs filed two separate wrongful death actions against Max Salas and his son, Len Salas, in the Superior Court for the District of Columbia ("Superior Court"). The Superior Court trial began on March 26, 2018. Less than a month prior to the trial, Len Salas filed a motion for summary judgment, producing for the first time a copy of a 2010 trust and quitclaim deed ("2010 Quitclaim") and seeking to exclude Len Salas from the litigation by asserting Max Salas was the real owner of the Property. The request was denied, but the plaintiffs were put on notice of the July 2010 transfer at that time. The matters continued to trial, and the plaintiffs were awarded a collective judgment of $15.2 million against Len and Max Salas, jointly and severally, in April 2018. Shortly after entry of the judgment, Max Salas filed for bankruptcy protection in the District of Columbia, and Len Salas filed his petition in this Court on April 18, 2018.

Case 3:20-ap-90027   Document 38   Filed 02/18/2021   Entered 02/18/2021 14:04:28   Desc Main
Case 3:20-ap-90027   Document 38   Filed 02/18/21   Page 2 of 17   Desc Main
Document     Page 2 of 17

APPX00160

Len Salas' case was converted from Chapter 11 to Chapter 7 on December 26, 2018, and the Chapter 7 Trustee ("Trustee") was appointed.

Len Salas was the record owner of the Property from 2007 until July 2010. In July 2010, Len Salas executed the 2010 Quitclaim by which he transferred his interest in the Property to a trust formed by and for Max Salas. The 2010 Quitclaim was not recorded. On September 25, 2018, the District of Columbia Bankruptcy Court ("D.C. Court"), in the context of Max Salas' Chapter 11 case, ruled that the Property belonged to Max Salas by virtue of the 2010 Quitclaim and that he was entitled to claim the District of Columbia's unlimited homestead exemption in the Property. *In re Salas*, No. 18-00260, 2018 WL 4621930 (Bankr. D.C. Sept. 24, 2018) ("Homestead Opinion"). The D.C. Court held that failure to record the 2010 Quitclaim did not invalidate the transfer under District of Columbia law. *Id.* at *20. While D.C. Code § 42-401 requires recordation, "that section deals with acknowledgment, certification, and recordation as protections for creditors and subsequent bona fide purchasers . . . [and t]hose requirements do not bar the operation of a signed, sealed, and delivered deed against parties and their assignees." *Id.* (citations and internal quotations omitted). Accordingly, the D.C. Court held that the 2010 Quitclaim gave Max Salas both legal and beneficial interests in the property. *Id.* The D.C. Court did not rule on whether the transfer could be avoided in this bankruptcy case, stating that "whether a hypothetical purchaser of the Property would have inquiry notice of Max's

3

Case 3:20-cv-00027   Document 38   Filed 02/18/20   Entered 02/11/24 14:42   Desc Main

APPX00161

ownership of the Property must be decided by the U.S. Bankruptcy Court for the Middle District of Tennessee." *Id.* at *21.[1]

On April 10, 2019, the Trustee filed a motion to sell any actions related to the Property to Ron Salas ("Ron"), Max Salas' other son. The plaintiffs and the U.S. Trustee objected[2] but did not raise either the standing question or whether the Trustee could sell his right to bring avoidance actions. After a hearing, the Court approved the sale on June 12, 2019, instructing the Trustee to give notice of the sale to all interested parties and potential buyers. If alternative bids were received, the Trustee was to conduct an auction, which he did. The plaintiffs were the highest and best bidders. In exchange for $156,000, the Trustee sold to the plaintiffs the estate's interest in "[a]ny potential avoidance actions against Max Salas and/or his bankruptcy estate under 11 U.S.C. Sections 544, 545, 547, 548, 549, and 553" as related to the Property. After administrative claims were paid, the Trustee distributed the remaining funds from the sale ($126,769.43) pro rata to unsecured creditors. The plaintiffs represent 99.8% of the unsecured claims.

---

[1] The plaintiffs appealed the Homestead Opinion to the District Court for the District of Columbia. On January 13, 2020, the District Court denied the plaintiffs' motion to supplement the record on appeal and dismissed the appeal after construing the plaintiffs' alternative motion to remand as a motion to voluntarily dismiss. The plaintiffs then filed a motion to reconsider the Homestead Opinion in the bankruptcy court. The motion to reconsider was denied on October 13, 2020, and the plaintiffs filed a notice of appeal on October 26, 2020.

[2] In their objection, the plaintiffs asserted that the sale to Ron was not in the best interest of the estate. The U.S. Trustee objected because the motion did not present adequate proof that the sale to an insider was in the best interest of the estate.

4

APPX00162

The plaintiffs filed a complaint against Max Salas on March 2, 2020, seeking to avoid the 2010 Quitclaim conveyance of the Property. In response to the complaint, Max Salas filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), made applicable by Federal Rule of Bankruptcy Procedure 7012. The Court agreed that the plaintiffs did not have standing to pursue their complaint but allowed the plaintiffs 10 days to file a motion requesting derivative standing.

The plaintiffs timely filed a motion for derivative standing with an amended complaint attached. Max Salas opposes the motion, asserting that there are no colorable claims based on the relevant statutes of limitations. The matter was heard on January 19, 2021.

## II. DISCUSSION

### A. Derivative Standing Standards

In *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.),* 555 F.3d 231, 244-45 (6th Cir. 2009), the Sixth Circuit reiterated its earlier strict prerequisites for exercising derivative standing set forth in *Canadian Pac. Forest Prod. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)* 66 F.3d 1436 (6th Cir. 1995). As held in *Gibson Group*:

> [A] creditor or creditors' committee may have derivative standing to initiate an avoidance action where: 1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit

5

APPX00163

analysis performed by the court, and 4) the inaction is an abuse of discretion ("unjustified") in light of the debtor-in-possession's duties in a Chapter 11 case. A creditor has met its burden to show standing to file an avoidance action if it has fulfilled the first three requirements and the trustee or debtor-in-possession declined to take action without stating a reason. The burden then shifts to the debtor-in-possession to establish, by a preponderance of the evidence, that its reason for not acting is justified.

*Id.* at 1446.  In setting forth these requirements, the ***Gibson Group*** Court recognized that the creditor seeking derivative standing has the initial burden to allege facts showing that the refusal to file suit is "unjustified."  ***Id.*** at 1438-39.  However, the debtor-in-possession (or trustee) must rebut the presumption if the creditor carries its initial burden.  ***Id.*** at 1439.

In order to determine whether the amended complaint states a colorable claim, the Court must evaluate the amended complaint on its face.  ***Trailer Source***, 555 F.3d at 245 (citing ***Gibson Group***).  The amended complaint must be evaluated as the Court would evaluate a motion to dismiss; only if the claims could survive a motion to dismiss is it deemed to be a colorable claim.  ***In re Thomas***, No. 16-27850-K, 2018 WL 10323389, at *3 (Bankr. W.D. Tenn. Aug. 24, 2018).  Only if a claim is deemed colorable may this Court presume that the Trustee's failure to pursue the action was unjustified.  ***Gibson Group***, 66 F.3d at 1439.

There is no dispute that a demand was made upon the Trustee and that he declined to take any action.  The relevant issue is whether the amended complaint presents a colorable cause of action.  Max Salas asserts that there are no colorable claims because the

6

APPX00164

relevant statutes of limitations bar them and that is why the Trustee refused to pursue the claims. If there are no colorable claims, then the Trustee was justified in taking no action, and the adversary proceeding must be dismissed.

## B. Colorable Claims

Like the original complaint, the amended complaint includes seven theories for avoiding the conveyance of the Property from the debtor to the defendant: I. The Trustee's avoidance powers based upon the bona fide purchaser status conferred by 11 U.S.C. § 544(a)(3); II. The Trustee's avoidance powers based upon the hypothetical judgment lien holder status conferred by 11 U.S.C. § 544(a)(1); III. The Trustee's avoidance powers based upon the hypothetical judgment creditor execution status conferred by 11 U.S.C. § 544(a)(2); IV. The Trustee's fraudulent transfer avoidance rights pursuant to 11 U.S.C. § 548(a); V. The Trustee's state court fraudulent transfer avoidance rights pursuant to 11 U.S.C. § 544(b)(1); VI. The Trustee's post-petition transaction avoidance rights pursuant to 11 U.S.C. § 549; and VII. The Trustee's recovery rights pursuant to 11 U.S.C. § 550. The Court must look at each count to determine whether a colorable claim has been presented.

Case 3:20-ap-90027   Doc 38   Filed 02/18/16   Entered 02/11/20 14:04:28   Desc Main
Document      Page 7 of 17

APPX00165

### 1. 11 U.S.C. § 544 Causes of Action

Four of the plaintiffs' causes of action are based on the provisions of 11 U.S.C. § 544: Count I (11 U.S.C. § 544(a)(3)); Count II (11 U.S.C. § 544(a)(1)); Count III (11 U.S.C. § 544(a)(2)); and Count V (11 U.S.C. § 544(b)(1)). Section 544 is known as "the 'strong arm' clause," *Sovran Bank/DC Nat'l v. United States (In re Aumiller)*, 168 B.R. 811, 817 (Bankr. D.C. 1994), and "'gives a bankruptcy trustee the rights and powers of a judicial lien creditor or a bona fide purchaser of real property and allows the trustee to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a judicial lien creditor or a bona fide purchaser of real property.'" *Drown v. Wells Fargo Bank, N.A. (In re Scott)*, 424 B.R. 315, 327 (Bankr. S.D. Ohio 2010) (quoting *Craig v. Seymour (In re Crabtree)*, 871 F.2d 36, 37 (6th Cir. 1989)). The scope of these powers is governed by the substantive laws of the state in which the property is located, in this case, the District of Columbia. *Midlantic Nat'l Bank v. Bridge (In re Bridge)*, 18 F.3d 195, 200 (3d Cir. 1994) (citations omitted).

### a. 11 U.S.C. § 544(a)

First, the Court reviews the powers granted under 11 U.S.C. § 544(a). Section 544(a)(1) grants a trustee "the status of a hypothetical lien creditor who is deemed to have perfected his interest as of the date of the filing of the bankruptcy petition." *Rogan v. Bank One, N.A. (In re Cook)*, 457 F.3d 561, 564 (6th Cir. 2006). Of course, a perfected mortgage is superior to a later-recorded judicial lien. *Id.* at 565. Under 11 U.S.C.

Case 3:20-ap-00027    Document 38    Filed 02/08/21    Entered 02/11/21 04:28    Desc Main
Document    Page 8 of 17

APPX00166

§ 544(a)(2), a trustee has the rights and powers of an unsatisfied execution creditor, a hypothetical "creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time." 11 U.S.C. § 544(a)(2). Finally, under 11 U.S.C. § 544(a)(3), a trustee has the status of "a bona fide purchaser of real property . . . from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists." In other words, a "trustee hypothetically purchases the debtor's property at the commencement of the bankruptcy case, then determines whether [the property] is subject to any valid prior interests." *Gregory v. Ocwen Fed. Bank (In re Biggs)*, 377 F.3d 515, 517 (6th Cir. 2004).

In spite of its wide scope, this strong-arm power "'does not clothe a trustee with [the] protective mantle'" of a bona fide purchaser if it was impossible "'under the applicable state law, that anyone could attain the status of a bona fide purchaser.'" *Treinish v. Norwest Bank Minnesota, N.A. (In re Periandri)*, 266 B.R. 651, 655 (B.A.P. 6th Cir. 2001) (citation omitted). *See also Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 864 (5th Cir. 2000) (citations omitted) ("[A]lthough section 544 provides that a trustee's actual knowledge is not relevant, a trustee is still bound by the state law regarding recordation and constructive notice, as well as other state law limitations upon bona fide third party purchaser status.").

9

APPX00167

In the amended complaint, the plaintiffs rely on the definition of a fraudulent transfer found in D.C. Code § 28-3105(b):

A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Pursuant to D.C. Code § 28-3109(3), a fraudulent transfer cause of action under D.C. Code § 28-3105(b) "is extinguished unless action is brought . . . within 1 year after the transfer was made or the obligation was incurred." When real property is transferred, D.C. Code § 28-3106(1)(A) provides that the transfer is made when it "is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee."

The D.C. Court determined that the transfer of real property occurred in July 2010, but all parties agree that the transfer has never been recorded, and thus, never perfected. As stated, under District of Columbia law, a transfer is not "so far perfected that a good-faith purchaser" could not "acquire an interest in the asset that [was] superior to the interest of the transferee." D.C. Code § 28-3106(1)(A). The 2010 Quitclaim was never recorded, so the District of Columbia's statute of limitations did not start to toll prior to the filing of Len Salas' bankruptcy petition on April 18, 2018. Because the underlying state law avoidance claim was not time-barred as of the commencement of Len Salas' case, this

APPX00168

claim could have been brought by the Trustee provided the complaint was filed within the time periods prescribed in 11 U.S.C. § 546(a).  *See UMB Bank, N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down, LLC)*, 610 B.R. 779, 785 (Bankr. D. Del. 2020) (If "underlying state law avoidance claim is not time-barred as of the commencement of a bankruptcy case, a section 544(b)(1) claim may be brought provided that it is commenced within the time periods prescribed by section 546(a)."); *Tabor v. Davis (In re Davis)*, No. 05-15794-L, 2016 WL 11696269, at *13 (Bankr. W.D. Tenn. June 15, 2016) ("The reachback period for avoiding fraudulent transfers that could have been avoided by a creditor but for the filing of a bankruptcy case is measured from the entry of the order for relief.").


Pursuant to 11 U.S.C. § 546(a)(1), an action under 11 U.S.C. § 544 must be commenced the *later* of two years after the entry of the order of relief[3] or one year after the appointment of the Trustee.  Len Salas filed his bankruptcy petition on April 18, 2018, and the Trustee was appointed on December 26, 2018.  The plaintiffs filed their original complaint on March 3, 2020, well before the expiration of the two-year limitation set forth in 11 U.S.C. § 546(a)(1).  As a result, the claims under 11 U.S.C. § 544(a) are colorable, and the plaintiffs are granted derivative standing to pursue Counts I, II, and III.

---

[3] "The commencement of a voluntary case under a chapter of this title constitutes an order for relief." 11 U.S.C. § 301(b).

APPX00169

### b. 11 U.S.C. § 544(b)(1)

The same is true for the plaintiffs' claim under 11 U.S.C. § 544(b)(1). Pursuant to 11 U.S.C. § 544(b)(1), a trustee is authorized to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." This provision "permits a trustee to step into the shoes of an ***actual creditor*** who has a fraudulent transfer remedy under other 'applicable law' (i.e. a state fraudulent transfer statute) and exercise that creditor's remedies on behalf of the bankruptcy estate." ***McClarty v. Hatchett (In re Hatchett)***, 588 B.R. 472, 477 (Bankr. E.D. Mich. 2018) (emphasis added). Because the Trustee stands in the shoes of an actual creditor, "the Trustee is 'subject to the same procedural limitations affecting their right to avoid a particular transfer under the applicable law.'" ***Paris v. Walker (In re Walker)***, 566 B.R. 503, 534 (Bankr. E.D. Tenn. 2017) (citation omitted).

A deed conveying real property in the District of Columbia is not valid against a subsequent bona fide purchaser without notice until the deed is recorded. D.C. Code § 42-401. "A bona fide purchaser is one 'who acquires an interest in property for a valuable consideration and without notice of any outstanding claims which are held against the property by third parties.'" ***Clay Props., Inc. v. Wash. Post Co.***, 604 A.2d 890, 894 (D.C. 1992) (citation omitted). Under District of Columbia law, a bona fide purchaser is subject to three types of notice: actual, constructive, and inquiry. ***Id.*** at 895 (citation omitted). "A

12

APPX00170

purchaser is held to be on inquiry notice where he or she is aware of circumstances which generate enough uncertainty about the state of a title that a person of ordinary prudence would inquire further about those circumstances." *Id.*

The record reflects that the plaintiffs ("actual creditors") were put on notice of the 2010 Quitclaim when Len Salas filed his emergency motion for summary judgment in the Superior Court on March 19, 2018. The plaintiffs acknowledge this fact in the amended complaint, stating that the 2010 Quitclaim was produced in early 2018.

Under 11 U.S.C. § 544(b), the Trustee steps into the shoes of the plaintiffs. *Kelley v. Opportunity Fin., LLC (In re Petters Co., Inc.,)* 561 B.R. 738, 746 (Bankr. D. Minn. 2016) (citation omitted) ("Section 544(b) empowers a trustee to step into the shoes of an actual unsecured creditor and utilize whatever state or nonbankruptcy federal law remedies that particular creditor may have."). Thus, if the plaintiffs' claims were barred by the applicable state law statute of limitations, then the Trustee would also be barred.

The plaintiffs had notice of the 2010 Quitclaim on March 19, 2018. As such, the one-year statute of limitations in D.C. Code § 28-3109(3) would not have expired prior to the filing of the bankruptcy petition on April 18, 2018. Again, because the relevant District of Columbia statute of limitations had not expired on the petition date, the Trustee could

APPX00171

have brought this claim within the limitations period set forth in 11 U.S.C. § 546(a).  ***See***

***Rund v. Bank of Am. Corp. (In re EPD Invest. Co., LLC)***, 523 B.R. 680, 692 (B.A.P. 9th

Cir. 2015).  Len Salas filed his bankruptcy petition on April 18, 2018, and the plaintiffs

filed their original complaint on March 3, 2020, before the expiration of the two years.  As

a result, the claim under 11 U.S.C. § 544(b)(1) is colorable, and the plaintiffs are granted

derivative standing to pursue Count V.


### 2.  11 U.S.C. § 548(a)

Count IV of the Complaint seeks relief pursuant to 11 U.S.C. § 548(a)(1), which

provides:

> The trustee may avoid any transfer (including any transfer to or for the
> benefit of an insider under an employment contract) of an interest of the
> debtor in property, or any obligation (including any obligation to or for the
> benefit of an insider under an employment contract) incurred by the debtor,
> that was made or incurred on or within 2 years before the date of the filing
> of the petition.

Because the petition in this case was filed on April 18, 2018, the two-year look back

date under 11 U.S.C. § 548 would be April 18, 2016.  Section 548(d)(1) also provides:

> For purposes of this section, a transfer is made when such transfer is so
> perfected that a bona fide purchaser from the debtor against whom applicable
> law permits such transfer to be perfected cannot acquire an interest in the
> property transferred that is superior to the interest in such property of the
> transferee, ***but if such transfer is not so perfected before the commencement
> of the case, such transfer is made immediately before the date of the filing
> of the petition.***

APPX00172

(Emphasis added). Accordingly, for purposes of 11 U.S.C. § 548, the transfer date would be April 17, 2018, because the 2010 Quitclaim was never recorded. The original complaint was filed on March 3, 2020, which was within two years of the order for relief. *See* 11 U.S.C. § 546(a)(1)(A).

Max Salas argues that the relevant date is when the plaintiffs were made aware of the transfer. Even if this was the relevant date, it would not bar the 11 U.S.C. § 548 cause of action. As discussed earlier, the plaintiffs became aware of the 2010 Quitclaim on March 19, 2018. Pursuant to District of Columbia law, this would be considered the transfer date as to the plaintiffs. *See* D.C. Code § 28-3106(1)(A). Even a look-back date of March 19, 2018, was well within two years of the petition date.

Accordingly, the Court finds that the plaintiffs have presented a colorable claim under 11 U.S.C. § 548, and the plaintiffs are granted derivative standing to pursue Count IV.

### 3. 11 U.S.C. § 549

Although not barred by a statute of limitations, the plaintiffs' cause of action pursuant to 11 U.S.C. § 549, Count VI, is not a colorable claim. Section 549 allows the avoidance of post-petition transfers of estate property. Nothing in the amended complaint

APPX00173

refers to a post-petition transfer. Accordingly, on its face, the amended complaint fails to state a colorable claim for this cause of action, and derivative standing to pursue Count VI is denied.

### 4. 11 U.S.C. § 550(a)

Before a "trustee may recover, for the benefit of the estate," a transfer must be avoided, at least in part, under 11 U.S.C. §§ 544, 545, 547, 548, 549, 553(b), or 724(a). 11 U.S.C. § 550(a). In short, 11 U.S.C. § 550(a) does not give rise to any affirmative relief on its own. Instead, it sets forth the available remedies if a transfer is avoided. *See Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*, 340 B.R. 829, 837-38 (Bankr. E.D. Mich. 2006). Because the plaintiffs have colorable claims under 11 U.S.C. §§ 544 and 548, the remedy set forth in Count VII is available.

### III. CONCLUSION

For the reasons stated, the Court finds that derivative standing should be granted to pursue Counts I, II, III, IV, V, and VII of the proposed amended complaint. Derivative standing to pursue Count VI should be denied and dismissed.

An appropriate order will enter.

APPX00174

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

APPX00175

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In re: | : | |
| LEN SALAS | : | Case No. 18-02662-MH3-7 |
| Debtor | : | |
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS | : : : | |
| and | : | |
| MICHAEL MCLOUGHLIN AND MARTHA JOHNSON, CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF MICHAEL PATRICK MCLOUGHLIN | : : : | |
| In their capacity as authorized representatives of the Estate of Len Salas | : : | |
| Plaintiffs | : | |
| v. | : : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS 1610 Riggs Place, NW Washington, DC | : : | |
| Defendant | : : | |

AMENDED COMPLAINT TO AVOID TRANSFERS AND RECOVER PROPERTY

COME NOW THE Plaintiffs herein, Nicolaas Brekelmans and Gail Gregory Brekelmans,

Co-personal Representatives Of the Estate of Nina Brekelmans ("Nina")("the Brekelmans

APPX00176

Estate") and Michael Mcloughlin and Martha Johnson, Co-personal Representatives of The Estate of Michael Patrick Mcloughlin ("Michael") ("the McLoughlin Estate") ("the Brekelmans Estate and the Mcloughlin Estate are hereinafter collectively sometimes referred to as "the Estates"), suing in their derivative capacity on behalf of the Estate of Len Salas, acting by and through their undersigned counsel and for their Complaint against the Defendant, Max Salas, allege as follows:

**Jurisdiction and Venue**

1. This Court has jurisdiction under 28 U.S.C. § 1334 (b). This matter involves causes of action under the trustee's avoiding powers purchased by the Plaintiffs from the Debtor's Estate.

2. Venue lies in this court under 28 U.S.C. §1409 (a)(c) & (d).

3. This matter involves property of the estate and claims of creditors of the Debtor's estate.

4. This matter is a core matter involving Avoiding Powers of the trustee pursuant to 11 U.S.C. § 544, *et seq.* (hereinafter, all references to the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* are cited as "Code, §"). ***See** inter alia*, 28 U.S.C. §157 (b)(1) and §157(b)(2) (A)(F)(H) & (0).

5. The Plaintiffs have standing to pursue the causes asserted in this Complaint as the authorized representatives of the bankruptcy estate of Len Salas.

**Parties**

6. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans and Michael Patrick McLoughlin, respectively. Nina and Michael were tragically killed in a fire at a residence in Washington, DC ("the Fire") which residence was owned by the Debtor, Len Salas and occupied and managed by his father, the Defendant, Max Salas. The Plaintiffs herein, the

Estates, were the successful bidders at an auction sale of this bankruptcy estate's interest in the trustee's avoidance and recovery actions under Code, §§544, *et seq*. A copy of the Trustee's Report of Sale of those actions is attached hereto as Exhibit A.

7. The Defendant Max Salas, is the Debtor in Case No. 18-00260, in the United States Bankruptcy Court for the District of Columbia (hereinafter "Max"). Max filed a voluntary petition, under Chapter 11 of the Code in April, 2018.

7. Len Salas (hereinafter "Len"), is the Debtor is Case No. 3:18-bk-02662, filed in the United States Bankruptcy Court for the Middle District of Tennessee (Nashville) ("Len's Bankruptcy") on or about May 2, 2018. Len's Bankruptcy was converted from a Chapter 11 to a Chapter 7 bankruptcy on or about December 12, 2018.

8. This matter involves the recovery of property located at 1610 Riggs Place, NW, Washington, DC ("the Property") at which the Defendant, Max, presently resides. Alternatively, the Plaintiffs are seeking a fair market sale of the Property to recover its value, believed to be in excess of $1 Million above all prior and/or secured claims.

9. The Plaintiffs are seeking the relief sought, and the benefit resulting from the causes of action asserted in this Complaint through and on behalf of, the Len Salas bankruptcy estate ("the Estate").

10. Michael Gigandet, the Court appointed Trustee of the Estate, has declined to pursue the causes asserted herein and has also declined to join in this action. This Complaint is brought as a derivative action on behalf of the Estate of Len Salas.

**Background for All Counts**

11. In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). The Judgment resulted from a fire at the Property which,

at the time, Max used as rental property and rented to tenants including Nina and Michael. Through the gross negligence of Max and his deliberate failure to make required safety improvements to the Property, Nina and Michael tragically lost their lives in a horrific and traumatic manner. Len was named a Defendant since he was, at all times, the owner of the Property, including at the time of the fire (June, 2015).

12. The Estates filed separate lawsuits against Max and Len in 2015. After a lengthy period of discovery and pre-trial matters, the case was tried in late March, 2018 resulting in the Judgment. Although Max and Len both appealed the Judgment, there has been no prosecution of the appeal and no stay entered in the appeal. On January 28, 2019, the Bankruptcy Court for the District of Columbia entered an Order Confirming Max's Third Amended Plan of Reorganization ("the Confirmed Plan"). Under the terms of the Confirmed Plan, entered in Max's Bankruptcy on or about January 31, 2020, Max is withdrawing his appeal of the Judgment(s). *See*, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 9, ¶3.6. A copy of the Confirmed Plan and Order Confirming the Third Amended Plan are attached collectively as Exhibit B.

13. Shortly after the entry of the Judgment Max and Len filed separate bankruptcies, Max in the District of Columbia (Case No. 18-00260)("Max's Bankruptcy") and Len in this Court (Case No. 18-02662) ("Len's Bankruptcy").

14. At the time of the bankruptcy filings by Len and Max, Len was, and still is, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property"). The Property was purchased by Len in 2007 after his father, Max, and Max's then wife, divorced. In order to purchase the Property, Max deeded the Property to Len ("the 2007 Deed"). Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan"). The

4

proceeds of the Sun Trust Loan were paid to Max's wife as part of the divorce settlement.

15.   From 2007 through the present, Len has remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". ***See***, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.

16.   At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property.  In addition, Max had a tax evasion conviction on his record.  Those and other credit and tax issues continued through Max's Bankruptcy.  Max has consistently attempted to hide assets from the IRS and other taxing authorities, including his potential interest in the Property.

17.   According to Max, he tried to refinance the Property several times after 2007, all to no avail.  In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor.

18.   From sometime after 2007 through the date of the fire, Max rented out rooms at the Property.  The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee.  According to Len, the CLR Trust, was a trust created by Max for the benefit of his three sons, Chase, Len and Ron.

19.   According to Max, the lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property.

20.   Through the date of the fire and at all times prior to the bankruptcy filings, all governmental notices and tax bills and notices regarding the Property were in Len's name.

21.   Consistent with his history of attempting to dodge tax liability, Max did not want the

5

Case 3:20-ap-90027   Document   Page 5 of 21

APPX00180

Property, or any matters related to the Property, in his name so he could avoid any taxes or publicly recorded or confirmed ownership interest.

22.  Similarly, Max did not want to record any income in his name from the leasing of the Property.  As a result, he deposited all of the income from the leases into the "CLR Trust" bank account.

23.  According to Max and Len, in July, 2010, Max and Len traveled to Colorado in July 2010 to visit Ron, one of Max's sons.  Ron was a recent law school graduate and admitted to practice law in Colorado.

24.  While in Colorado, Len and Max executed a very simple trust agreement which Ron stated he prepared using a Colorado form even though the alleged trust property, the Property, was located in D.C.  Ron also prepared a form "Quitclaim Deed," which Len also signed ("the Quitclaim Deed").

25.  Max asserts that Len, who is very unsophisticated in business and legal transactions, deeded the Property to his father while Len remained the sole obligor on the Sun Trust Deed of Trust Note ("the Note").

26.  Max and Ron clearly took advantage of Len and convinced Len to deed the Property to his father despite the fact that by that deed, Len would have lost all collateral for his $870,000 loan obligation to Sun Trust.

27.  The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank.

28.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property.  At all relevant times, Len worked only part time and had limited income and assets.  At all times following the transfer in 2010, Len was insolvent.  His liabilities

6

APPX00181

exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

29. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15 Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee filed objections to the Plaintiffs' claims filed in Len's bankruptcy. In addition Len was solely obligated on the Sun Trust Deed of Trust on the Property which, according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018.

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed.

31. Max asserts that he intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. The Quitclaim Deed has never been recorded and Len remains the titled owner of the Property.

32. Neither Max nor Len are aware of the present location of the original Quitclaim Deed or whether it even exists. Regardless, there has been no attempt to record the Quitclaim Deed since 2010.

33. Toward the end of the Superior Court litigation with the Plaintiffs, which resulted in the Judgment, Max concocted a scheme to attempt to keep the Property for himself in the face of a pending substantial judgment award to the Plaintiffs.

34. In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments. These conversations took place in late 2017 and early 2018.

APPX00182

35. Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

36. Because Len was not residing in the Property he could not claim the benefit of the D.C. homestead exemption.

37. In early 2018, less than a month prior to the Superior Court trial, Max and Len, for the first time, alleged and produced a copy of the 2010 trust ("the Trust") and quitclaim deed ("the Quitclaim Deed") and sought to exclude Len from the Superior Court litigation by asserting Max was the real owner of the Property. The Superior Court summarily denied Max's attempt and the trial continued, resulting in the Judgment. The Judgment is now final and binding on all parties as a result of the pending final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy.

38. The fire occurred in June, 2015. From that time, until February or March, 2018, no one resided in the Property. During that time, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment made by Max from the insurance proceeds he received as a result of the fire damage.

39. According to the schedules filed in Max's bankruptcy, as of the commencement of his bankruptcy case, the only lien creditors were (IRS secured claim - $ 6,768.66) and Sun Trust Mortgage ($1,030,825.86). The balance of the Sun Trust Note as of October 26, 2018 was $1,141,021.14. Although Max claims he was the sole party responsible for all payments on the Sun Trust Loan, and made all loan payments, no payments have been made since prior to 2018

8

APPX00183

(with the exception of one payment from insurance proceeds) and the current balance owned on the Property increased at the rate of at least $7800 from some time in 2017 through October, 2019. Sun Trust sold its Note, in 2019, to U.S. Bank National Association/Select Portfolio Servicing, Inc. ("U.S. Bank"). Pursuant to an agreement reached with U.S. Bank in Max's bankruptcy case, Max is required to make monthly payments of approximately $8,300. Upon information and belief, Max has been making the required payments since approximately November, 2019. *See*, Exhibit B, Confirmed Plan, p. 8, ¶ 3.3.

40. On September 25, 2018, the Bankruptcy Court for the District of Columbia (Teel, J.)("the DC Bankruptcy Court") entered a Memorandum and Order overruling the Estates' Objections to the Debtor's claim of Exemption ("the Exemption Ruling"). The Estates timely appealed to the United States District Court for the District of Columbia ("the District Court").

41. On or about January 2, 2020, the District Court issued an order remanding the appeal to the Bankruptcy Court "the Remand Order" for determination of issues raised by the Plaintiffs in a Motion seeking to add to the appellate record or, alternatively, to remand ("the District Court Motion").

42. On October 13, 2020, the DC Bankruptcy Court denied the Plaintiffs' Motion to Reconsider. The Plaintiffs timely appealed and that appeal is now pending in the United States District Court for the District of Columbia (Civil No. 1:20-cv-3091-KBJ)

43. In the Exemption Ruling, the D.C. Bankruptcy Court ruled that Max was the owner of the Property by virtue of the 2010 Quitclaim Deed. The Court also determined, however, that the trustee's avoiding powers (11 U.S.C. §§ 544, *et seq.*) could result in the recovery of the Property for the benefit of the creditors of the Len's estate and, therefore, that those avoiding powers could result in a recovery of the Property, or its value, for the benefit of creditors whether

9

or not Max's exemption is upheld on appeal. The Court made no final determination of the effect of the trustee's avoiding powers leaving that to the trustee of Len's bankruptcy estate.

44. No deed has been recorded naming Max as Trustee or owner. However, as discussed above, the Confirmed Plan provides that the Confirmation Order constitutes a recordable order conveying the Property to the defendant, Max Salas. Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed or recorded related to the Property.

45. Whether the Trust or Quitclaim Deed was ever in effect, or was abandoned after 2010, all indicia of ownership of the Property were held by Len though the date of Max's bankruptcy and there are no records in the D.C. Recorder of Deeds Office, or in any other public record, that Max is the owner of the Property.

46. Pursuant to an Order of this Court dated June 12, 2019 ("the Tennessee Order"), the Trustee in Len's Bankruptcy was authorized to sell the Estate's interest in the Trustee's avoidance and recovery rights under, *inter alia*, 11 U.S.C. §§ 544 through 551. A copy of the Tennessee Order is attached hereto as Exhibit C.

47. On July 23, 2019 the Trustee in Len Salas' case, pursuant to the Tennessee Order, held an auction sale to auction the bankruptcy estate's interest in the available avoidance and recovery actions pursuant to 11 U.S.C. §§544 through 553. The Plaintiffs herein, the Estates, were the successful bidders. *See* Exhibit A, Trustee's Report of Sale.

48. No payments or other value were transferred from, or by, Max to Len related to the transfer of the Property, either in 2010, or at any other time. According to Len, he has never received any compensation, remuneration, property or anything else of value related to the Property, the Quitclaim Deed, or the Sun Trust Loan.

10

APPX00185

49. Max valued the Property at $2.5 Million on the Schedules filed in Max's Bankruptcy in or about May, 2018. The Property was appraised in or about August, 2019, for approximately$2.4 Million.

50. At the time of the transfer in 2010, the Property was worth in excess of $1.5 Million and the debt to Sun Trust, owed by Len was at least $800,000.

51. According to 11 U.S.C. § 548 (d)(1) a transfer of real estate is not perfected until the transfer is so perfected such that a bona fide purchaser from the debtor cannot acquire an interest in the property superior to that of the transferee. There was no such transfer prior to the filing of the Max Salas bankruptcy case (April 18, 2018). Therefore, pursuant to 11 U.S.C. § 548 (d)(1) the transfer is deemed to have been made immediately before the date of the filing of the Debtor's petition on April 18, 2020.

52. Under the law of the District of Columbia, a transfer of real property is made when the transfer is "so far perfected that a [hypothetical] good-faith purchaser of the asset from the debtor…cannot acquire an interest in the asset that is superior to the interest of the transferee. D.C. Code § 28-3106.

53. At all times from 2010 through Len's bankruptcy filing, he was insolvent by virtue of the Sun Trust Deed of Trust obligation and the Estates' judgments (as of April, 2018).

54. The Estates filed proofs of claim in both Len's and Max's bankruptcy cases and no objections were filed to the Estates' claims, totaling more than $15 Million, in either case.

55. In accordance with Max's confirmed Plan of reorganization, the Plaintiffs' allowed claims exceed $15 Million.

56. Pursuant to the confirmed Plan in Max's case, the Estates are the owners of the recovery and avoidance claims set forth in this Complaint and are entitled to pursue those claims.

Case 3:20-cv-90027   Document 40   Filed 02/08/21   Entered 02/16/21 13:19:41   Desc Main
Document     Page 11 of 21                                                    APPX00186

57. Pursuant to this Court's Order of February 11, 2020, the Plaintiffs have authority to sue on behalf of the Debtor's Estate.

## COUNT I

### (Declaratory Judgment Regarding Plaintiffs' Bona Fide Purchaser Status)

58. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 57 hereof, the same as if those paragraphs were restated in full, hereat.

59. Pursuant to 11 U.S.C. § 544 (a), the Plaintiffs, as purchasers of the Trustee's avoidance and recovery powers have the status, as of the date of the Len Salas bankruptcy petition, namely, May 2, 2018, of a bona fide purchaser of real property from the debtor and a judicial lien holder.

60. Under Code § 544 (a)(3) the trustee's bona fide purchaser status gives the Plaintiffs priority over subsequently recorded interests in the Property.

61. Under D.C. Code, § 42-401:

> Any deed conveying real property in the District, or interest therein, ...shall be held to take effect from the date of the delivery thereof, except that **as to creditors and subsequent bona fide purchasers** and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

62. As a result, the Plaintiffs have a superior and priority interest in the Property ahead of any interest acquired by Max Salas and, therefore, the Property should be turned over to the Plaintiffs, or sold to recover the net equity for the benefit of the unsecured creditors of Len Salas' bankruptcy estate.

WHEREFORE, as to Count I, the Plaintiffs pray for a declaratory judgment in their

12

APPX00187

favor, declaring as follows:

1. That the Plaintiffs are the owners of the Property located at 1610 Riggs Place, NW, Washington, DC;

2. That the Plaintiffs are entitled to immediate possession of the Property; or, alternatively,

3. That the Plaintiff are entitled to sell the Property and to retain the net proceeds from such a sale for distribution to the creditors of the bankruptcy estate of Len Salas as directed by further order of this Court;

4. That Len and Max are directed to take all actions, sign all documents and perform all acts necessary to transfer or sell the Property as set forth above; and

5. For such other and further relief as may be just and proper.

## COUNT II

### (Declaratory Judgment Regarding Plaintiffs' Judicial Lienholder Status)

63. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 62 hereof, the same as if those paragraphs were restated in full, hereat.

64. As of the commencement of this case, April 18, 2018, the trustee has, without regard to any knowledge of the trustee or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien, whether or not such creditor exists. Code §544 (a)(1).

65. The Plaintiffs are the authorized representatives for prosecution of all of the

13

APPX00188

Trustee's rights and powers under Code §§ 544, *et seq.*

66. A judicial lien creditor, under the laws of the District of Columbia, has a superior interest to the Property than that of a competing creditor or owner who has not recorded an interest in the Property.

WHEREFORE, as to Count II, the Plaintiffs pray for a declaratory judgment in their favor, as follows:

1. Declaring and establishing that the Plaintiffs, as the authorized representatives of the bankruptcy estate of Len Salas, have a judgment lien against the Property located at 1610 Riggs Place, NW, Washington, DC, as of April 18, 2018 in the amounts of $7.5 Million (Brekelmans) and $7.7 Million (McLoughlin), respectively; and

2. Entering a judgment or order confirming the Plaintiffs' judgment liens against the Property totaling $15.2 Million; and

3. Directing, declaring and confirming that the Plaintiffs are entitled to immediately execute on their judgment lien against the Property; and

4. That the Plaintiffs are entitled to sell the Property and to retain the net proceeds from such sale for distribution to the creditors of the bankruptcy estate of Len Salas as directed by further order of this Court

5. For such other and further relief as may be just and proper.


**COUNT III**

**Declaratory Judgment Regarding Plaintiffs' Status as Trustee as Creditor with Unsatisfied Execution**

67. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including,

Case 3:20-ap-00027   Document Filed 02/16/21   Entered 02/16/21 11:39:41   Page 14 of 21
Document     Page 14 of 21

APPX00189

but not limited to, paragraphs 1 through 66 hereof, the same as if those paragraphs were restated in full, hereat.

68. The Plaintiffs, as purchasers of the avoidance and recovery powers of the Trustee of Len's Bankruptcy, have the status, as of the commencement of Len's Bankruptcy, by virtue of 11 USCS § 544(a)(2), of all of the rights and powers of a creditor that had delivered a writ of execution against Len's interest in the Property, which execution was returned unsatisfied.

69. The Plaintiffs assert that the trustee's status as a creditor under Code § 544 (a)(2) gives him a superior interest in the Property such that the Plaintiffs are entitled to recover the Property, or its equity, for the benefit of the unsecured creditors of the bankruptcy estate of Len Salas.

WHEREFORE, as to Count III, the Plaintiffs pray for a declaratory judgment in their favor, as follows:

1. Declaring and establishing that the Plaintiffs, as the authorized representatives of the bankruptcy estate of Len Salas, have a superior claim to the Defendant's Property located at 1610 Riggs Place, NW, Washington, DC, as of April 18, 2018 in the amounts of $7.5 Million (Brekelmans) and $7.7 Million (McLoughlin), respectively; and

2. Directing, declaring and confirming that the Plaintiffs are entitled to the sale of the Property to satisfy the claims of all unsecured creditors of the Len Salas bankruptcy estate; and

3. For such other and further relief as may be just and proper.

## COUNT IV

### (Fraudulent Conveyance - Code § 548 (a))

70. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 69 hereof, the same as if those paragraphs were restated

15

APPX00190

in full, hereat.

71. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors of Len Salas, including Sun Trust Bank, by transferring the Property to Max without permission.

72. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors including all parties having claims related to the Property, including the Plaintiffs.

73. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because, by transferring the only major asset of Len to his father, the transfer was likely to, and did, make Len insolvent and unable to pay his mortgage obligations to Sun Trust Bank.

74. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors, including those having claims related to the Property, such as taxing authorities, utilities, and renters, such as Nina and Michael and, therefore, the Estates.

75. The transfer was a fraudulent conveyance pursuant to Code § 548 because the alleged transfer was made for less than reasonably equivalent value. Len received no compensation or property of value and gave up property worth in excess of $2 Million while remaining solely obligated on a Deed of Trust Note to Sun Trust bank that was in default at the time of the alleged transfer.

76. Len was either insolvent at the time of the transfer, or the transfer made him insolvent since the Property was his only significant asset and he still remained liable on the Sun Trust Loan after the alleged transfer.

77. The transfer of the Property in 2010 by Quitclaim Deed was made after two years

APPX00191

prior to Max's Bankruptcy because pursuant to Code § 548 (d)(1) the transfer of real property is deemed perfected when the deed is recorded or, if not recorded prior to the bankruptcy filing, the date immediately prior to the bankruptcy filing, namely April 18, 2018.

WHEREFORE, as to Count IV , the Plaintiffs pray for judgment as follows:

1.    That the attempted transfer of the Property from Len to Max is a fraudulent conveyance under Code § 548 (a); and

2.    That the conveyance is recovered or avoided so that the Property is owned and controlled by the Plaintiffs, for the benefit of the unsecured creditors or the bankruptcy estate of Len Salas, pursuant to their purchase of the Trustee's avoidance and recovery rights in Len's Bankruptcy; and

3.    That any further transfer or disposition of the Property is enjoined; and

4.    That the Property be sold at public auction and the proceeds, after payment of closing costs and priority secured claims shall be paid to the Plaintiffs, for distribution to unsecured creditors pursuant to further order(s) of this court; and

5.    For such other and further relief as may be just and proper.

### COUNT V

### (Fraudulent Conveyance - D.C.)

78. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 77 hereof, the same as if those paragraphs were restated in full, hereat.

79.  The Plaintiffs, as the holders of the rights and claims of the Trustee, may avoid any transfer that is voidable under applicable law pursuant to Code § 544 (b) (1).

80.  Under the law of the District of Columbia, the transfer of the Property alleged herein,

17

Case 3:20-ap-90027   Document 40   Filed 02/08/21   Entered 02/08/21 17:04   Page 17 of 21
Case 3:20-cv-00802   Document 4   Filed 02/16/21   Page 171 of 794   PageID# 8705
Document     Page 17 of 21

APPX00192

is a fraudulent conveyance because the transfer was performed with fraudulent intent as to existing creditors, such as the IRS, other taxing authorities, Sun Trust Bank, and others, including the Plaintiffs and was made for less than reasonably equivalent value, all as specifically prohibited by D.C. Code § 28-3104, *et seq.*

81. A transfer made is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. D.C. Code § 28-3105

82. A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

83. In the District of Columbia, a transfer is made:

(A) With respect to an asset that is real property other than a fixture, including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee.

D.C. Code § 28-3106

84. In an action for relief against a transfer or obligation under D.C. law, a creditor may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee...;
(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

Case 3:20-cv-90027   Document 40   Filed 02/08/16   Entered 02/16/21 13:19:41   Page 18 of 21   Desc Main Document   Page 18 of 21
APPX00193

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) Any other relief the circumstances may require.

D.C. Code § 28-3107

WHEREFORE, as to Count V, the Plaintiffs pray for an order:

1. Avoiding the transfer or attempted transfer of the Property; and

2. Providing for an attachment against the Property on such terms as the Court may order; and

3. Enjoining any further disposition of the Property or allowing the placement of any other liens or encumbrances against the Property pending sale or other disposition approved by the Court; and

4. Such other and further relief as may be just and proper.

## COUNT VI

### (Liability of Transferee)

85 . The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 84 hereof, the same as if those paragraphs were restated in full, hereat.

86. The Defendant, Max Salas, is the transferee of the alleged transfer which is the subject of this Complaint.

87. Under Code § 550 (a) the trustee may recover, for the benefit of the estate, the property transferred or, upon court order, the value of the property.

WHEREFORE, as to Count VI, the Plaintiffs pray for an Order:

APPX00194

1. To turn over the Property; or, alternatively,

2. To sell the property, by auction or other public sale, upon reasonable notice, and to turn over the net proceeds of such sale, subject to court approval of the amount of such proceeds, to the Plaintiffs; and

3. to authorize and direct the Plaintiffs to retain the property and proceeds for distribution to the unsecured creditors of the bankruptcy estate of Len Salas in accordance with further order(s) of this Court;

3. For such other and further relief as may be just and proper.

LAW OFFICE OF PHILIP J. MCNUTT, PLLC


By:  /s/ Philip J. McNutt
Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)

Pmcnutt@mcnuttlawllc.com

BUTCH, PORTER & JOHNSON, PLLC

By:  /s/ Taylor A. Cates
Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)

Tacates@bpjlaw.com

ATTORNEYS FOR THE PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Amended Complaint was served on Philip Young, Counsel for the Defendant, through the Court's ecf noticing service, on the 16th day of February, 2021.

 /s/ Philip J. McNutt
Philip J. McNutt

APPX00196

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

IN RE:                                         CASE NO. 18-02662-MH3-7
LEN SALAS,                              CHAPTER 7
                                             JUDGE MARIAN HARRISON
        Debtor.

## TRUSTEE'S REPORT OF SALE

The trustee, Michael Gigandet, makes the following report of sale of the debtor's potential causes of action concerning the real estate located at 1610 Riggs Place, NW, Washington, D.C, in the above public auction on July 23, 2019.  Notice of this sale was provided to all creditors and parties in interest by Trustee's Notice of Motion to Sell Property mailed on April 10, 2019, and a supplemental notice of auction was mailed on June 27, 2019.  A notice of rescheduled auction was filed on July 16, 2019.  By signature below, the trustee hereby certifies that the objections to the sale were overruled.  The order authorizing the sale was entered on June 12, 2019.

The property sold for $156,000.00. The bill of sale is attached.

The debtor is not entitled to an exemption from the sale of this property.

Respectfully submitted,

**LAW OFFICE OF MICHAEL GIGANDET**
**/s/ Michael Gigandet**
_____
Michael Gigandet, Trustee #11498
208 Centre Street
Pleasant View, TN 37146
615-746-4949
Fax: 615-746-4950
michael@mgigandet.com

APPX00197

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Trustee's Report of Sale has been forwarded to the U. S. Trustee, 318 Customs House, 701 Broadway, Nashville, TN 37203, on this the 14th day of August, 2019.

**/s/Michael Gigandet**
_____

Michael Gigandet

APPX00198

UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
at Nashville

In re:                                              :

LEN SALAS                                   : Case No. 3:18-bk-02662
                                                         Chapter 7

         Debtor                        :

SALE OF ESTATE PROPERTY
FREE AND CLEAR OF LIENS AND INTERESTS

        IN ACCORDANCE WITH the Trustee's Motion and Notice of Sale of Property dated April 10, 2019, this Court's Order of June 12 , 2019 (D-179) approving bidding procedures and the Trustee's sale, the Trustee's Supplemental Notice of Auction dated June 27, 2019 and the Trustee's Notice of Rescheduled Auction dated July 16, 2019, the Trustee having conducted a public auction sale of certain property of the Debtor's estate, on July 23, 2019,  upon notice to all creditors and parties in interest, the Trustee having reported the results of the auction sale at a hearing held herein on July 23, 2019, the Trustee hereby confirms the sale of property of the above captioned estate, as follows:

        1. <u>Property conveyed</u>.  All of the Trustee's and the Len Salas Estate's right, title and interest in and to each and every claim and recovery action to which the Trustee or this estate may have, under the provisions of 11 U.S.C. §§ 544 through 553, as applicable, related to the property located at 1610 Riggs Place, NW, Washington, DC ("the DC Property") .

        2. <u>Purchaser</u>. the Trustee hereby transfers and conveys all property rights and interests conveyed hereby to the Estate of Michael Patrick McLoughlin and the Estate of Nina Brekelmans, by and through their trustees and representatives, for and in consideration of the total sum of $156,000, receipt of which is hereby acknowledged.

        3. The Property is conveyed free and clear of all interests, claims and rights of all creditors and parties.

July 31, 2019                          For the Seller:

                    MICHAEL GIGANDET, TRUSTEE

                    By:
                        Michael Gigandet

SIGNATURES CONTINUE ON NEXT PAGE

Case 3:20-cv-00827 Document 1-1 Filed 09/16/21 Entered 09/16/21 08:43:40 Desc Main
Exhibit A - Trustee Report of Sale of Page 3 of 4

APPX00199

July 31, 2019

For the Purchaser:

THE ESTATE OF MICHAEL PATRICK
MCLOUGHLIN AND THE ESTATE OF NINA
BREKELMANS

By: _Philip J. McNutt_

      Philip J. McNutt, attorney for the Estate of
      Michael Patrick Mcloughlin and the Estate
      of Nina Brekelmans

Case 3:20-cv-00027 Document 41-1 Filed 09/16/21 Entered 02/05/21 23:45:40 Desc Main
Exhibit A - Trustees Report of Sale Page 4 of 4

APPX00200

The order below is hereby signed.

Signed: January 28 2020



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                        )
                             )
MAX E. SALAS,                )    Case No. 18-00260
                             )    (Chapter 11)
          Debtor.            )

ORDER CONFIRMING DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

At the confirmation hearing of January 22, 2020, the court approved modifications of the then-pending proposed plan that are not adverse to any creditors, and the debtor later that day filed the _Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020_ (Dkt. No. 301) incorporating those modifications. The court having determined after hearing on notice (the confirmation hearing of January 22, 2020) that the requirements for confirmation set forth in 11 U.S.C. § 1129(a) and 1129(b) have been satisfied with respect to the then-pending plan as thus modified, it is

ORDERED that:

Case 3:20-cv-00027   Document 24-1   Filed 09/02/21   Page 186 of 163   PageID #: 8804
List of 20 Largest Creditors B Confirmation Order and Plan   Page 1 of 163
Exhibit B  Order Confirming Debtor's Third Amended Plan
APPX00201

1.   <u>Confirmation of Plan</u>.  The *Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020* (Dkt. No. 301) filed on January 22, 2020, a copy of which is attached hereto, is confirmed.

2.   <u>Plan's Injunction</u>.  Although the confirmed plan's § 4.7 ("Discharge of Debtor and Injunction") provides for an injunction, that injunction is not against conduct not otherwise enjoined under the Bankruptcy Code and shall not be construed as enjoining conduct not otherwise enjoined under the Bankruptcy Code.

3.   <u>Plan's Release of Claims</u>.  Although the confirmed plan's § 4.7 ("Discharge of Debtor and Injunction") provides for a release of the debtor from all claims, that release shall not be construed as providing any greater release of claims than the release of claims arising from the debtor's discharge and from the binding effect of the plan regarding the rights of creditors and administrative claimants.

4.   <u>Recordation of Order to Confirm Title Ownership in Property</u>.  The debtor is hereby authorized and directed to take any and all actions necessary or appropriate to confirm the debtor's title ownership interest in the real property located at 1610 Riggs Place NW, Washington, DC 20009 within the land records of the District of Columbia, in conformance with the provisions of this Order and the Plan, subject to the limitations and

2

Case 23-39-00000027 Document 24-1 Filed 08/02/16 Entered 02/26/21 16:57:49 Desc
List of 20 Largest Creditors & Confirmation Order and Plan   Page 2 of 163
Exhibit B - Order Confirming Debtor's Third Amended Plan   Page 2 of 163
APPX00202

reservation of rights described therein.

5. <u>Immediate Effectiveness of Order</u>.  This Order shall be effective immediately upon entry pursuant to Fed. R. Bankr. P. 7062 and 9014, and no automatic stay of execution, pursuant to Fed. R. Civ. P. 62(a), applies with respect to this Order.

6. <u>Transmission of Order to Creditors</u>.  Within 7 days of entry of this order, the debtor's counsel shall file a certificate of mailing a copy of this Order, with the attached copy of the *Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020*, to all entities required to be included on the list required under Fed. R. Bankr. P. 1007(a)(1) and all known administrative claimants in the case (except for entities previously sent a copy of the *Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020* via electronic transmission in the court's Case Management/Electronic Case Filing system or via other authorized means of service).

<div align="right">[Signed and dated above.]</div>

Copies to: All recipients of e-notification of orders.

3

APPX00203

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18-00260 |
| MAX E. SALAS, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
**DATED JANUARY 22, 2020**

Max E. Salas, ("**Debtor**"), an individual, as debtor and debtor-in-possession proposes this Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code (the "**Plan**").

**ARTICLE I**

**DEFINITIONS**

In addition to such other terms as are defined elsewhere in the Plan, the following terms (which appear in the Plan as capitalized terms) have the following meanings as used in the Plan.

1.1    **Administrative Claim** means any Claim for an administrative expense of the kind described in section 503(b) of the Bankruptcy Code, including, without limitation, the actual and necessary costs and expenses of preserving the Estate of the Debtor incurred after the Petition Date, Claims for fees and expenses pursuant to Sections 330 and 331 of the Bankruptcy Code (covering the period through the Effective Date) fees, if any, due to the United States Trustee under 28 U.S.C. § 1930(a)(6), and any cure payments to holders of assumed executory contracts.

1.2    **Allowed Claim** means a Claim (whether a Secured Claim, Administrative Claim, Priority Claim or Unsecured Claim) or any portion thereof (a) as to which no objection to allowance or request for estimation has been interposed on or before the expiration of such applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or the Bankruptcy Court; (b) as to which any objection to its allowance has been settled, waived through payment or withdrawn, or has been denied pursuant to a Final Order; (c) that has been allowed pursuant to a Final Order; (d) as to which the liability of the Debtor and the amount thereof are determined by Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (e) that is expressly allowed in the Plan or Confirmation Order; or (f) that is not subject to disallowance under Code section 502(d).  Unless otherwise specified in the Plan or in the Final Order allowing such Claim, or if such Claim is over-secured under § 506(b), an Allowed Claim shall not include interest on the amount of such Claim maturing or accruing from and after the Commencement Date, or any punitive or exemplary damages, or any fine, penalty or forfeiture.  An "**Allowed Secured Claim**" is an Allowed Claim that is a Secured Claim; an "**Allowed Administrative Claim**" is an Allowed Claim that is an Administrative Claim; an

Case 3:19-cv-00827-D Doc 24-1 Filed 03/02/21 Entered 03/02/21 16:17:44 Desc
Case 3:19-cv-00827 Document 16 Filed 09/02/20 Entered 03/02/21 16:17:44 Desc
List of 20 Largest Creditors & Confirmation Order and Plan   Page 4 of 163
Exhibit B - Order Confirming Debtor's Third Amended Plan   Page 4 of 163

"**Allowed Priority Claim**" is an Allowed Claim that is a Priority Claim; and an "**Allowed Unsecured Claim**" is an Allowed Claim that is an Unsecured Claim.

1.3    **Assets** means all assets of the Debtor as of the Effective Date.

1.4    **Avoidance Actions** means the claims for relief available to the Debtor or the Estate under sections 544-550 of the Bankruptcy Code.

1.5    **Bankruptcy Case** or **Case** means the above-captioned case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date.

1.6    **Bankruptcy Code** or **Code** means the Bankruptcy Reform Act of 1978, as amended, as set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended.

1.7    **Bankruptcy Court** means the United States Bankruptcy Court for the District of Columbia or such other court as may have jurisdiction over the Bankruptcy Case.

1.8    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together with the local rules of the Bankruptcy Court.

1.9    **Bar Date** means the date fixed as the last day for filing proofs of claim in the Bankruptcy Case by the Bankruptcy Court: August 31, 2018 for non-governmental claims (October 15, 2018 for governmental claims).

1.10    **Business Day** means any day other than a Saturday, a Sunday or "legal holiday," as defined in Bankruptcy Rule 9006(a).

1.11    **Cash** means legal tender accepted in the United States of America for the payment of public and private debts, currently United States Dollars.

1.12    **Claim** means a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtor that is either a Secured Claim, Administrative Claim, Priority Claim or Unsecured Claim.

1.13    **Claims Objections** means the objections to claims that have been or may be filed against the holders (or purported holders) of Claims.

1.14    **Class** means a class of Claims established pursuant to Article II of the Plan.

1.15    **Confirmation** means the confirmation of the Plan pursuant to the Confirmation Order.

1.16    **Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

2

Case 23-19-00280-27 Doc 20-24   Filed 09/02/16 / 24 Entered 09/06/24 19:57 48 ID 2808
List of 20 Largest Creditors B Confirmation Order and Plan   Page 5 of 163
Exhibit B   Order Confirming Debtor's Third Amended Plan   Page 5 of 163      APPX00205

1.17 **Confirmation Hearing** means the hearing conducted by the Court to determine whether to confirm the Plan.

1.18 **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan.

1.19 **Creditor** means any Entity that holds on the Effective Date a Claim against the Debtor that arose or is deemed to have arisen before the Effective Date, including a Claim against the Debtor of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

1.20 **Disclosure Statement** means the Disclosure Statement for the Plan (and all exhibits and schedules annexed thereto or referred to therein) as approved by the Bankruptcy Court.

1.21 **Disputed Claim** means any Claim (including, but not limited to Administrative and Priority Claims) not otherwise an Allowed Claim or paid pursuant to the Plan or an order of the Bankruptcy Court (a) which has been or hereafter is listed on the Debtor's Schedules as unliquidated, contingent or disputed, and which has not been resolved by written agreement of the parties or a Final Order of the Bankruptcy Court; (b) proof of which was required to be Filed by the Plan or by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly Filed; (c) proof of which was timely and properly Filed and which has been or hereafter is listed on the Schedules as unliquidated, contingent or disputed; (d) that is disputed in accordance with the provisions of this Plan; (e) as to which a party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and any orders of the Bankruptcy Court, or is otherwise disputed by a party in interest in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; or noted for an objection in the Disclosure Statement. Any portion of a Claim which is not disputed by a party in interest shall, for purposes of receiving distributions under the Plan, be deemed to be an Allowed Claim. A Claim may be a Disputed Claim regardless of whether such Claim is classified.

1.22 **Distribution Agent** means Stinson, LLP, Debtor's counsel in this Chapter 11 Case. Stinson, LLP, as Distribution Agent, shall be responsible for making all distributions under the Plan.

1.23 **Effective Date** The first Business Day that is 30 days after the later of the Confirmation Order becoming a Final Order, or the date of delivery of $225,000 by the Debtor to the Plan Fund, provided that no order staying consummation of the Plan has been entered prior thereto and the Confirmation Order has become a Final Order. If an order staying consummation of the Plan has been entered, then Effective Date shall mean the earlier of the first Business Day following the date upon which (a) the Confirmation Order has become a Final Order or (b) any stay of consummation of the Plan is no longer effective, provided that such latter date is at least 30 days after the Confirmation Date. Nothing herein shall prevent the Debtor from waiving the 30 day delay.

3

Case 23-19-00260-2707 Doc303ur2406-24- Filed 03/02/21 4-Filed 02/26/21 16:53:40 Desc809
Exhibit 20 Largest Creditors B Confirmation Order and Plan   Page 6 of 163
List of 20 Largest Creditors B Confirming Debtors Third Amended Plan   Page 6 of 163   APPX00206

1.24 __Entity__ means an individual, corporation (of any type), limited liability company, partnership (of any type), association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, governmental unit, official or unofficial committee of creditors or equity holders or other entity.

1.25 __Estate__ means the estate created by the commencement of the Bankruptcy Case under section 541 of the Bankruptcy Code.

1.26 __Extended Tax Payments__ means those monthly payments to be made by the Debtor though the Plan for payment of tax claims (Classes 2, 4, and 5) extended through April 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C).

1.27 __File__ or __Filed__ means to file or to have filed with the Clerk of the Bankruptcy Court in the Bankruptcy Case.

1.28 __Final Order__ means an order or judgment of any court, administrative agency or other tribunal as to which (a) the time has expired within which a proceeding for review (whether by way of rehearing, appeal, certiorari or otherwise, but not pursuant to Bankruptcy Code section 1144 or Bankruptcy Rule 9024) may be commenced, without any such proceeding having been commenced, or (b) if such a proceeding has been timely commenced, such order or judgment has been affirmed by the highest tribunal in which review is sought or such proceeding for review was otherwise terminated without modification of such order or judgment, and the time has expired within which any further proceeding for review may be commenced.

1.29 __Fusion Judgment__ means the judgment in favor of the Debtor against Fusion Contracting Group LLC in the amount of $79,287.17 in damages and attorney's fees with postjudgment interest entered by the Bankruptcy Court on July 30, 2019 in Adversary proceeding No. 19-10002.

1.30 __Homestead Appeal__ means the appeal of the Homestead Opinion initiated by the Judgment Creditors and currently pending before the United States District Court for the District of Columbia as Case No. 1:18-cv-02318-KBJ.

1.31 __Homestead Opinion__ means the *Memorandum Decision and Order re Homestead Exemption* entered in the Bankruptcy Case on September 25, 2018 as ECF Dkt No. 108 and attached for reference as Exhibit A to the Disclosure Statement.

1.32 __Insurance Proceeds__ means the liability insurance proceeds available under the Debtor's insurance policy with Encompass Ins. Co. of America related to the Property and the fire that occurred there in 2015 and totaling $500,000.

1.33 __Judgment Creditors__ means the decedent estates of Patrick McLoughlin Nina Brekelmans and the holders of claims filed in the case as Proof of Claim Nos. 3-1 and 4-1 in the respective amounts of $7.7 Million and $7.5 million associated with Judgments rendered in D.C. Superior Court as Case Numbers 2015 CA 008054 B and 2015 CA 008061 B.

4

APPX00207

1.34 **Len Salas Bankruptcy Case** means the bankruptcy case of the Debtor's son, Len Salas, pending before the United States Bankruptcy Court for the Middle District of Tennessee as Case No. 3:18-bk-02662.

1.35 **Lien** has the meaning given in section 101(37) of the Bankruptcy Code.

1.36 **Petition Date** means April 18, 2018.

1.37 **Plan** means this Plan, including the exhibits and schedules hereto, either in its present form or as it may be amended, supplemented or modified from time to time in accordance with the provisions of the Plan, the Bankruptcy Code and the Bankruptcy Rules.

1.38 **Plan Fund** means the fund to be established on or before the Effective Date to consisting of the Debtor's non-exempt assets existing as of the Confirmation Date, and an additional $225,000 in cash from the Debtor secured by his exempt retirement account to be delivered to the Plan.

1.39 **Priority Claim** means any Claim, other than an Administrative Claim, to the extent such Claim is entitled to priority under section 507(a) of the Bankruptcy Code.

1.40 **Property** means the real property located at 1610 Riggs place, NW, Washington D.C. 2009 and used by the debtor as his residence.

1.41 **Scheduled** means set forth on the Schedules.

1.42 **Schedules** means the schedules of assets and liabilities Filed by the Debtor, as the same may be amended from time to time prior to the Effective Date.

1.43 **Secured Claim** means any Claim of a Creditor that is secured by a Lien on property of the Debtor or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined (or determinable) pursuant to section 506(a) of the Bankruptcy Code.

1.44 **Tennessee Avoidance Actions** means the avoidance actions previously purchased by the Judgment Creditors from the Len Salas Bankruptcy Case and includes each and every claim and recovery action to which the Len Salas Bankrupcy Case Trustee or the Len Salas Bankruptcy Case estate may have under the provisions of 11 U.S.C. § § 544 through 553, as applicable, related to the Property, and an resultant litigation thereto.

1.45 **Unsecured Claim** means a Claim other than a Secured Claim, Administrative Claim, or Priority Claim.

## ARTICLE II

## CLASSIFICATION OF CLAIMS

2.1 <u>General</u>.

5

Case 23-49-00057-627   Doc 246-24-1 Filed 09/10/24-24   Entered 03/26/21-24 15:34:30   Desc
Exhibit B - List of 20 Largest Creditors B Confirmation Order and Plan   Page 8 of 163
APPX00208

The following is a designation of each Class of Claims under the Plan.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent that any remainder of the Claim qualifies within the description of such other Class or Classes.  Each "Class" (e.g., Class 3A versus Class 3B) is separate and distinct from all other Classes for all purposes.

2.2     Classification.

Claims are classified for all purposes, including voting, confirmation and distribution pursuant to the Plan, as follows:

**Class 1:**      All administrative claims including for professional fees, United States Trustee Quarterly fees and administrative taxes.  This class consists of fees and expenses for Stinson LLP, fees and expenses for Thompson Burton PLLC, fees and expenses for McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.,  fees and expenses of Art Lander CPA PC, any other professional fees that may be incurred by the Debtor, and the United States Trustee's quarterly fees. (Unimpaired).

**Class 2**:      All Priority Claims including those arising pursuant to Bankruptcy Code Section 507(a)(8). (Impaired).

**Class 3**:      U.S. Bank National Association/ Select Portfolio Servicing, Inc. Secured Claim against Property (Impaired).

**Class 4**:      Allowed Secured Claim of IRS (Impaired).

**Class 5**:      District of Columbia Transfer & Recordation Tax Claim (Claim 5) (Impaired)

**Class 6**:      Unsecured Claims of Judgment Creditors (Claim No. 3 – McLoughlin; Claim No. 4 - Brekelmans) (Impaired).

**Class 7**:      All Remaining Allowed Unsecured Non-Priority Claims. (Impaired).

**Class 8**:      Allowed Unsecured Penalty Claim of the District of Columbia (Impaired).

**Class 9**:      Paid Hyundai Lease Titling Trust Lease claim (Unimpaired)

**Class 10**:      Contribution Claim of Len Salas listed on Schedules associated with U.S. Bank/SPS Arrearages (Unimpaired)

6

# ARTICLE III
# TREATMENT OF CLAIMS

3.1    <u>Administrative Claims</u>.

    3.1.1   <u>Class 1 Administrative Claims</u>

       The Debtor shall assume and pay to each holder of an Allowed Administrative Claim, on account of the Administrative Claim and in full satisfaction thereof, Cash equal to the allowed amount of such Administrative Claim, unless the holder agrees or shall have agreed to other less favorable treatment of such Claim. Debtor anticipates that some form of agreement concerning payment of fees will need to be reached with his legal counsel and accountants in order to preserve desired amounts for payment to additional creditors. Administrative Claims are expected to exceed $175,000, but payment of Administrative Claims from the Plan Fund shall not exceed and be capped at $175,000.

    3.1.2   <u>Statutory Fees and Continuing Duties to the Office of the United States Trustee</u>

       All fees payable pursuant to 28 U.S.C. § 1930, shall be paid by the Debtor in Cash in an amount equal to the amount of such Administrative Claim.

       Until such time as the case is closed, dismissed or converted, the Debtor shall continue to report its disbursements each calendar quarter to the U.S. Trustee and shall timely pay all fees due under 28 U.S.C. § 1930(a)(6).

    3.1.3   <u>Treatment and Payment of Administrative Claims</u>.

       After the Effective Date, all professional or others requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 503(b) and 1103 for services rendered before the Effective Date shall file an application for final allowance of compensation and reimbursement of expenses.  Applications need not be filed with respect to fees and expenses previously applied for by Court approved professionals (including applications previously approved by and/or previously paid pursuant to an order of the Court).  Fees and expenses of professionals shall be paid in Cash in full (a) immediately before the Effective Date, to the extent allowed by the Court as of such date (such payments to be made by the Debtor) or as agreed by the Parties if a lesser amount, but not to exceed an aggregate amount of $175,000.00 from the Plan Fund, and (b) on or before the tenth (10th) day after entry of an order allowing any such fees and expenses, to the extent such fees and expenses were not allowed as of the Effective Date, or upon such payment schedule as agreed between the Parties.

3.2    <u>Classes 2 (Priority Claims):</u>

       The only known Priority Claim consists of a certain portion of the claim filed by the Internal Revenue Service in the amount of $13,196.78 (Claim 2-2). Unless the applicable taxing agency or any other priority claim holders that may be established agree to less favorable treatment, each holder of an Allowed Priority Claim to the extent their claim is allowable and

<div align="center">7</div>

entitled to priority under Bankruptcy Code section 507(a), shall be paid by the Debtor in regular monthly installment payments totaling the full amount of the claim plus interest pursuant to 11 U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to generate sufficient funds from his future rental income from the Property and other monthly income received, Debtor will deliver payment on the Class 2 claims from funds held in his exempt retirement account if necessary. This class is impaired.

3.3    <u>Class 3: U.S. Bank National Association/ Select Portfolio Servicing, Inc. Secured Claim against Property</u>

Class 3 consists of the secured lien currently in the name on Len Salas possessed by U.S. Bank National Association/ Select Portfolio Servicing, Inc. and secured by the Property (the U.S. Bank Claim). Based on Debtor's ownership in the Property established through the Homestead Opinion, the Debtor has entered into a Stipulation for Plan Treatment with U.S. Bank National Association/ Select Portfolio Servicing, Inc. to establish terms for Debtor's payment toward the US Bank Claim and address current arrearages owed. Full terms of the U.S. Bank Stipulation for Plan Treatment are attached as Exhibit C to the Disclosure Statement. Under the stipulation, beginning November 1, 2019, the Debtor is to begin making adequate protection payments on the U.S. Bank Claim in the amount of $8,329.19 per month until approval of the U.S. Bank agreement through conformation of the Plan and the Plan's Effective Date, after which time the Debtor shall make payments following re-amortization by U.S. Bank following Confirmation based on an approximate balance of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037. This class is impaired.

3.4.    <u>Class 4: Allowed Secured Claim of IRS..</u>

Class 4 consists of the Allowed Secured Claim of the IRS consisting of that $6,768.66 portion of the claim they have filed in the Case (Claim 2-2). Unless the holder of this claim agrees to less favorable treatment, to the extent the claim is allowed, payment on Class 4 claims, is to be paid by the Debtor in regular monthly installment payments totaling the full amount of the claim plus interest pursuant to 11 U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to generate sufficient funds from his future rental income from the Property and other monthly income received, Debtor will deliver payment on the Class 4 claims from funds held in his exempt retirement account if necessary. The IRS shall retain its lien until paid in full. This class is impaired.

3.5.    <u>Class 5: District of Columbia Transfer & Recordation Tax Claim</u>

Class 5 consists of that portion claimed as owing for Transfer & Recordation Taxes and Interest on Deficiency in the amount of $75,252.37 claimed on Claim 5 filed by the District of Columbia. The District has claimed this amount associated with the August 4, 2010 date of transfer from Len Salas to Max Salas described in the Homestead Opinion. The Debtor believes the District is not entitled to claim this amount due to the fact that no deed was recorded at that time and any future recording confirming of Max Salas's ownership in the Property is to be

8

enacted through this Plan and exempt from such taxes pursuant to 11 U.S.C. § 1146(a). Debtor
intends to object to the District's Claim prior to Confirmation of the Plan. Nevertheless, payment
to the District, to the extent their claim is allowable, is to be paid by the Debtor in regular
monthly installment payments totaling the full amount of the claim plus interest pursuant to 11
U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan
and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). Class 5 is impaired.

    3.6.    <u>Class 6: Allowed Unsecured Claims of Judgment Creditors (Claim No. 3 –
McLoughlin; Claim No. 4 - Brekelmans)</u>

        Class 6 consists of the two claims of the Judgment Creditors in the total amount of $15.2
million (Claim No. 3 – McLoughlin $7.7 million; Claim No. 4 – Brekelmans; $7.5 million).
Debtor's plan provides that payment on the Class 6 Claims will be made pro-rata, along with the
Class 7 remaining allowed unsecured non-priority claims, from a Plan Fund funded by the
minimal amounts of the existing non-exempt assets of the Debtor consisting of non-exempt cash
assets existing in Debtor's DIP account at the time of Confirmation, plus an additional influx of
$225,000 of funds secured by Debtor's exempt retirement account. Administrative Claims are
expected to exceed $175,000, but payment from the Plan Fund towards Administrative Claims
shall be capped at $175,000, leaving at least $50,000 of the remaining funds from the additional
$225,000 cash infusion for distribution to Class 6 and Class 7 Claims. The Plan further provides
for distribution of any amounts collected by the Debtor from the Fusion Judgment and
assignment of any remaining amounts of the Fusion Judgment on the Effective Date jointly to
both Judgment Creditors. As of the date of this Third Amended Plan, no amounts have been
collected by the Debtor from the Fusion Judgment and the balance of the Fusion Judgment is
$79,287.17 plus all post-judgment interest accruing since entry of the Fusion Judgment by the
Bankruptcy Court on July 30, 2019. The Debtor will provide the Judgment Creditors with all
documents and information reasonably requested to assist with their collection efforts for the
Fusion Judgment upon assignment. The Debtor will not oppose efforts and provide reasonable
assistance to the Judgment Creditors' efforts to collect available Insurance Proceeds from
Encompass associated with their judgments. Upon receipt of discharge, the Debtor will take
steps to withdraw his appeal of the Judgment Creditor Judgments in the DC Superior Court to
further resolve that issue. Judgment Creditor Claims are being given separate Class treatment
based on the fact that they may also collect on the amounts owed to them from available
Insurance Proceeds (See Motion for Relief from Stay Order; ECF Dkt. No. 74), and based on the
fact that they possess the right to prosecute the Tennessee Avoidance Actions regarding the
Property purchased from the Len Salas Bankruptcy Case.  Upon Confirmation, the Debtor's
listing of the Class 6 Claims as Disputed Claims shall be withdrawn without any further notice or
order of the Court and the Class 6 Claims shall be treated as Allowed Claims to allow for
distribution under the Plan as contemplated herein. Such withdrawal of the Class 6 Claims as
disputed, however, shall in no way limit or otherwise affect any defenses the Debtor may have to
the Tennessee Avoidance Actions, any challenge to the validity of the Homestead Opinion,
whether by appeal, action upon remand to the Bankruptcy Court, and or any subsequent or
resulting litigation. Any and all defenses of the Debtor to the Tennessee Avoidance Actions, any
challenge to the Homestead Opinion, or other action that may challenge the Debtor's ownership
interest to the Property shall be preserved in full. The Class 6 and Class 7 claims listed on
Debtor's Schedules have been valued at $15,239,769.40, 99.7% percent ($15.2 million) of which

<div align="center">9</div>

Case 23-20-00200-27 Doc 40 24- Filed 09/02/20 - Entered 02/26/20 16:53:43 Desc 815
List of 20 Largest Creditors B Confirming Debtors third Amended Plan   Page 12 of 163

APPX00212

is possessed by the Judgment Creditors. It is anticipated therefore that 99.7% percent of distributions from the Plan Fund will be distributed to Class 6 Claims.

The payment will be made thirty (30) days after the later of (i) the payment of all Administrative Claims; and (ii) the Effective Date. This Class is Impaired.

3.7.    Class 7:  Remaining Allowed Unsecured Non-Priority Claims

All Class 7 Claims, consisting of all remaining allowed unsecured non-priority claims will receive a one-time pro-rata distribution following the Effective Date from remaining amounts in the Plan Fund following payment to those possessing claims of a higher priority. Administrative Claims are expected to exceed $175,000, but payment from the Plan Fund towards Administrative Claims shall be capped at $175,000, leaving at least $50,000 of remaining funds from the additional $225,000 cash infusion for distribution towards other creditors. The Class 6 and Class 7 claims listed on Debtor's Schedules have been valued at $15,239,769.40, 0.3% percent ($39,769.40) of which is possessed by the Class 7 Claimants. It is anticipated therefore that 0.3% percent of distributions from the Plan Fund will be distributed to Class 7 Claims. The payment will be made thirty (30) days after the later of (i) the payment of Administrative Claims from the Plan Fund; and (ii) the Effective Date. This class is impaired.

3.8.    Class 8:  Allowed Unsecured Penalty Claim of the District of Columbia.

Class 8 consists of that portion of the Claim filed by the District of Columbia in the amount of $8,708.05 representing a non-filing penalty associated with other aspects of Claim 5, to the extent such claim is an allowed unsecured penalty claim. Assuming funds remain available in the Plan Fund, Class 8 claims will receive a one-time pro-rata distribution following the Effective Date from remaining amounts in the Plan Fund following payment to those possessing claims of a higher priority. However, based on the large amount of claims in Class 6 and Class 7, no distribution is expected to be made on Class 8 claims. To the extent a payment is made, the payment will be made thirty (30) days after the later of (i) the payment of all higher priority Claims to be made from the Plan Fund; and (ii) the Effective Date.  This class is impaired.

3.9.    Class 9:  Allowed Paid Hyundai Lease Titling Trust Lease Claim

Class 9 consists of the lease claim filed by Hyundai Titling Trust filed on May 3, 2018 as Claim 1 associated with the lease of a vehicle by the Debtor at the time of the Petition Date. Following the Petition Date, Debtor continued to make lease payments due for the vehicle until the lease terminated in January 2019. No further payments are owed under the Hyundai lease and the Debtor has surrendered the Vehicle. No further payments are therefore contemplated for this claim. This class has been paid in full and is unimpaired.

3.10.    Class 10:  Contribution Claim of Len Salas listed on Schedules associated with
         U.S. Bank/SPS Arrearages (Unimpaired)

Class 10 consists of the claim of Len Salas listed on the Debtor's Schedule E/F at 4.14 in the amount of $428,614.90. This claim solely represents arrearages existing on the U.S. Bank

10

Case 3:19-cv-00827    Document 24-1    Filed 03/10/21    Entered 02/26/21 16:57:40    Desc
Exhibit B - Order Confirming Debtor's Third Amended Plan    Page 13 of 163

APPX00213

Claim existing on the Petition Date. Because the deed of trust and underlying note for the Property were in the name of Len Salas, but the Debtor was responsible for making payments for the Property pursuant to his ownership interest later established in the Homestead Opinion, the Debtor included this claim to Len Salas representing amounts ultimately owed as arrearages for the lien on the Property. Len Salas having received his discharge and the Debtor having reached agreement with U.S. Bank/SPS regarding the U.S. Bank Claim described in the Stipulation for Plan Treatment no further treatment or payment to Len Salas (for forwarding to U.S. Bank) is warranted by the Debtor and will not occur under Debtor's Plan. Class 10 is Unimpaired.

## ARTICLE IV
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

4.1   Plan Description and Means Funding of Plan.

This Plan seeks modification of the existing secured debt on the Property through the Stipulation for Plan Treatment with U.S. Bank. All continuing payments under the Plan, including pre- and post-confirmation monthly payments to U.S. Bank per the Stipulation for Plan Treatment, and for the Extended Tax Payments are expected to be derived wholly from the Debtor's future exempt earnings consisting of monthly deposits from social security, disability payments, and Airbnb and other rental earnings from the Property. A Projection of the Debtor's future income generated from these exempt sources is attached as Exhibit D to the Disclosure Statement. Further with respect to the Extended Tax Payments of the IRS, if Debtor's future income is insufficient to make these payments, Debtor will make payment on these claims from funds held in his exempt retirement account if necessary. The Debtor will further submit all available non-exempt assets for the benefit of creditors under the Plan at the time of Confirmation consisting of the Fusion Judgment and existing non-exempt cash assets existing in Debtor's DIP account at the time of Confirmation, but not including any value associated with the non-exempt portion of Debtor's home furnishings, equipment, or clothes. The non-exempt portion of such home furnishings, equipment, and clothes are believed to be de minimus, especially when compared to the additional exempt Plan funding being supplied by the Debtor and the cost of ascertaining value of the exempt portion. With the exception of the Fusion Judgment, further non-exempt assets of the Debtor are expected to be minimal.

Following delivery of the existing non-exempt assets, the Plan will be further funded through delivery of $225,000 towards the Plan Fund from either a loan to be received by the Debtor for funds 100% secured by the Debtor's exempt retirement account, or if the Debtor was unable to receive such a loan, from delivery of $225,000 directly withdrawn from this exempt account by the Debtor within forty-five (45) days after Confirmation. Direct withdrawal of funds from Debtor's account will cause the Debtor to incur additional tax consequences, making a loan preferable. Nevertheless, Debtor's retirement account contains sufficient funds to cover tax liability associated with a withdrawal of these funds. From this new value, payment towards Administrative Claims from the Plan Fund would be capped at $175,000, allowing for payment of at least $50,000 from the new value added into the Plan Fund for distribution to other claimants.

4.2   Executory Contracts and Unexpired Leases

11

Case 23-10006-SMT   Doc 24-1   Filed 03/10/23   Entered 03/10/23 16:15:48   Desc
Exhibit B - Latest Confirming Debtors thru Amended Plan   Page 14 of 163

APPX00214

The Debtor shall assume all unexpired leases and executory contracts that have not previously been rejected in this bankruptcy case. Debtor's Plan further proposes that it shall have no effect on the post-petition lease of the Debtor's vehicle approved by the Court at ECF Dkt. Entry 159, and the post-petition tenant lease entered into by the Debtor for the renting of the basement unit at the Property.

### 4.3     Post Confirmation Date Litigation.

#### 4.3.1     Homestead Appeal and Tennessee Avoidance Actions

On or after the Confirmation Date, the Debtor shall be entitled to continue with defense of the Homestead Appeal, and shall be entitled to fully defend any claim or action brought pursuant to the Tennessee Avoidance Actions or any resultant litigation.

#### 4.3.2     Review of and Objections to Claims and Administrative Claims.

On and after the Confirmation Date, the Debtor shall be entitled to initiate and prosecute the Claims Objections on behalf of the Estate, including, but not limited to objection to the District of Columbia's claim for transfer and recordation taxes and for potential refund of vacant real property taxes previous assessed by the District of Columbia Office of Tax and Revenue.

### 4.4     Confirmation Order as Recordable Order Conveying Property to Max Salas

Upon Confirmation, the Confirmation Order, or a separate order as needed, shall contain terms that will constitute an Order conveying the Property to Max Salas based on the ownership interest of the Debtor to the Property established through the Homestead Opinion and that such order may be recorded with the land records of the District of Columbia in lieu of a deed. If the District of Columbia shall later refuse to honor the Confirmation Order as a document properly conveying the Property to the Debtor, the Debtor reserves the right to obtain an appropriate deed to the Property signed by the trustee in the Len Salas Bankruptcy Case, or if such trustee refuses, to seek the appointment of an escrow agent in Debtor's Bankruptcy Case to sign such deed for recording purposes. The recording of any document to reflect the transfer of record title of the Property to the Debtor shall not limit and shall remain subject to the Judgment Creditors' rights under the Tennessee Avoidance Actions and the Judgment Creditors pending challenge to the Homestead Opinion establishing Debtor's ownership interest in the Property, and all rights, claims, and defenses of the Debtor and the Judgment Creditors shall be preserved.

### 4.5     Recordation and Other Taxes Covered by Section 1146(a)

Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of an instrument of transfer under the Plan (including the proposed recordation of the Confirmation Order or other Order as necessary to confirm Debtor's interest in the Property pursuant to the Homestead Opinion as described in Plan Section 4.4) will not be subject to any stamp tax, real estate transfer, mortgage recording, or any other similar tax.

### 4.6     Distribution of Property Under the Plan.

DB02/804722 0002/6981717.1
CORE/3502869.0005/157293039.1

4.6.1    <u>Disputed Claims</u>.

Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of any Disputed Claim until such Claim becomes an Allowed Claim, and then only to the extent that it becomes an Allowed Claim and in accordance with the Plan.

As soon as practicable after the date on which a Disputed Claim becomes an Allowed Claim and, in any event, within thirty (30) days after the Effective Date, the Debtor shall distribute to the holder of such Claim any Cash that would have been distributable to such holder if such Claim had been an Allowed Claim on the Effective Date.

4.6.2    <u>Manner of Payment Under the Plan</u>.

Cash payments made by the Debtor pursuant to the Plan shall be in U.S. dollars by checks drawn on a domestic bank selected by the Debtor. All payments shall be made from the Plan Fund within 30 days from the Effective Date.

4.6.3    <u>Undeliverable Distributions and Distributions of less than $5</u>.

(1)    <u>Holding and Investment of Undeliverable Distributions</u>.

If the distribution to the holder of a Claim is returned to the Debtor as undeliverable, no further distribution shall be made to such holder unless and until the Debtor is notified in writing of such holder's then current address. Subject to Section 5.6.3(2) hereof, undeliverable distributions ("**Unclaimed Cash**") shall remain in the possession of the Debtor pursuant to Section 5.6.3(2) until such times as a distribution becomes deliverable.

There is no restriction on where the Debtor may hold Unclaimed Cash.

(2)    <u>Failure to Claim Undelivered Distributions</u>.

Any holder of an Allowed Claim who does not assert a claim for an undeliverable distribution held by the Debtor within six months after the date such distribution was made shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any further distributions under the Plan. In such cases any property held for distribution on account of such Allowed Claims, including any Unclaimed Cash relating to such Claims, shall be retained by the Debtor for the purposes of making another distribution to creditors under the Plan. Nothing contained in the Plan shall require the Debtor to attempt to locate any holder of an Allowed Claim.

(3)    <u>Distributions of less than $5</u>.

No payment shall be made to any creditor when the distribution is in an amount less than $5. Any payment not distributed to a creditor shall be treated in the same manner as Undelivered Distributions.

4.6.4    <u>Rounding Of Distributions</u>. Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down

13

Case 3:20-cv-00027-DLH-ARZ    Doc No. 24-1    Filed 03/02/21    Entered 03/02/21 16:17:34    Desc
List of 20 Largest Creditors B Confirming Debtors Third Amended Plan    Page 16 of 163
APPX00216

to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Cash under the Plan.

### 4.6.5    Compliance With Tax Requirements.

In connection with the Plan, to the extent applicable, the Debtor shall comply with all withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Debtor may withhold the entire distribution due to any holder of an Allowed Claim until such time as such holder eliminates or satisfies the need for any applicable withholding by providing information to establish that withholding is not required, or by providing cash for the payment of applicable withholding.  Any property withheld will then be paid to the appropriate taxing authority.  A holder's failure to provide the necessary information or payments shall render the distribution undeliverable. Any tax liabilities or withholding of funds imposed upon the Debtor by any governmental unit, including any tax consequences associated with Debtor providing the necessary $225,000.00 to the Plan Fund, shall be borne by the Debtor and shall not affect or diminish the payments and transfers to be made under the Plan.

### 4.6.6    Application of Distributions.

If the distributions of property and interests in property hereunder on account of any Allowed Claim are less than the aggregate amount of principal and accrued but unpaid interest payable under the agreement governing, instrument evidencing or other document relating to such Allowed Claim, such distributions shall be applied first to principal and then to accrued but unpaid interest.

### 4.7    Discharge of Debtor and Injunction.

Except as otherwise provided in this Plan, the rights afforded in the Plan and the treatment of all Claims herein shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor.  Except as otherwise provided in the Plan or the Confirmation Order:  (i) on the earlier of the date that is (a) six (6) months after the Effective Date, or (b) once all Plan distributions from the Plan Fund have been confirmed as received upon notification to the Court by the Debtor, not including future payments to US Bank/SPS pursuant to the Stipulation for Plan Treatment, the Extended Tax Payments through the Plan pursuant to § 1146(a), any future payment of Administrative Claims beyond the $175,000 Plan Fund cap on payment of those claims, and the Judgment Creditors' rights to pursue the Tennessee Avoidance Actions and/or continue their litigation challenging the Homestead Opinion through appeal, or remand, if available; the Debtor shall be deemed discharged pursuant to the provisions of 11 U.S.C. 1141(d)(5) and released from all Claims, including, but not limited to, debts, demands, liabilities, and Claims that arose before the Petition Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not:  (a) a proof of claim or proof of interest based on such Claim is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) such Claim is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of such Claim has accepted the

14

Case 3:19-cv-00827 Document 24-1 Filed 03/02/21 Entered 03/02/21 14:57:44 Desc
Exhibit B - Order Confirming Debtors Third Amended Plan    Page 17 of 163    APPX00217

Plan; and (ii) *all Entities shall be precluded from asserting against the  Debtor these and any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date.*  Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order shall (effective upon completion of all payments as contemplated above) act as a discharge of any and all Claims against and any and all debts and liabilities of the Debtor and such discharge shall void any judgment against the Debtor at any time obtained to the extent that it relates to a Claim discharged.

*Except as otherwise provided in the Plan or the Confirmation Order, on and after the date of Discharge, all Entities who have held, currently hold or may hold a debt or Claim that arose prior to the Petition Date are permanently enjoined from taking any of the following actions on account of any such discharged debt or Claim: (1) commencing or continuing in any manner any action or other proceeding against the Debtor, its successors or their respective property; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, its successors or their respective property; (3) creating, perfecting or enforcing any lien or encumbrance against the Debtor, its successors or their respective property; (4) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due to the Debtor, its successors or their respective property; and (5) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Discharge of the Debtor shall not affect the Judgment Creditors' rights to pursue the Tennessee Avoidance Actions or continue with their challenge of the Homestead Opinion through appeal or remand, if available. Nothing contained in this section or any other section in the Plan shall serve to limit the Debtor's defenses or rights to the Judgment Creditor actions.*

    4.8    <u>Other Documents and Actions</u>.

    The Debtor may execute such documents and take such other actions as are necessary to effectuate the transactions provided for in the Plan.

    4.9    <u>Authorized Actions</u>.

    The approval and adoption of all matters under the Plan involving the Debtor shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the Debtor.

## ARTICLE V

## CONFIRMATION

    5.1    <u>Confirmation</u>.

    The Debtor requests Confirmation of the Plan under section 1129(a) and section 1129(b) of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan, to the extent required or permitted by applicable law.

15

APPX00218

# ARTICLE VI

## EFFECTIVE DATE CONDITIONS

6.1     Conditions to Effective Date.

The Plan shall not be consummated and the Effective Date shall not occur unless and until each of the following conditions has been satisfied or duly waived as specified below:

6.1.1   The Clerk of the Bankruptcy Court has entered the Confirmation Order, in form and substance satisfactory to the Debtor, and such order shall have become a Final Order.

6.1.2   The Debtor has delivered $225,000 to the Plan Fund.

6.1.3   Thirty days shall have passed from the occurrence of the later to occur of the conditions in Sections 6.1.1 and 6.1.2.

6.2     Waiver of Conditions to the Effective Date.

The Debtor may waive any of the conditions to the Effective Date.

# ARTICLE VII

## RETENTION OF JURISDICTION

7.1     Retention Of Jurisdiction.  Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case and any of the proceedings arising from, or relating to, the Case pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

7.1.1   to hear and determine any and all objections to the allowance, or requests for estimation, of Claims or the establishment of reserves pending the resolution of Disputed Claims;

7.1.2   to consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, the Debtor or its Estate;

7.1.3   to enter such orders as may be necessary or appropriate in connection with the recovery of the Debtor's assets wherever located;

7.1.4   to hear and determine any and all applications for allowance of compensation and reimbursement of expenses;

16

Case 23-19-00827   Doc 24-1   Filed 03/02/20   Entered 03/02/20 16:57:49   Desc
Exhibit B - Debtor Confirming Debtors Third Amended Plan      Page 19 of 163
APPX00219

7.1.5    to hear and determine any and all controversies, suits and disputes arising under or in connection with the interpretation, implementation or enforcement of the Plan and any of the documents intended to implement the provisions of the Plan or any other matters to be resolved by the Bankruptcy Court under the terms of the Plan;

7.1.6    to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar and related matters with respect to the Debtor arising prior to the Effective Date or relating to the administration of the Case, including, without limitation, matters involving federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

7.1.7    to hear and determine any and all applications, adversary proceedings and contested matters pending on the Effective Date;

7.1.8    to hear and determine any and all Avoidance Actions of the Debtor that are commenced in accordance with the Plan after the Effective Date;

7.1.9    to effectuate distributions under and performance of the provisions of the Plan;

7.1.10   to hear and determine any applications to modify provisions of the Plan to the full extent permitted by the Plan, Bankruptcy Code and Bankruptcy Rules;

7.1.11   to correct any defect, cure any omission or reconcile any inconsistency in the Plan, documents entered into in order to implement the Plan, the Exhibits to the Plan and annexes thereto, or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

7.1.12   to determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

7.1.13   to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Case or the Plan;

7.1.14   to enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7.1.15   to determine any other matter not inconsistent with the Bankruptcy Code or the Plan; and

7.1.16   to resolve any disputes regarding fees and expenses of professionals employed by the Debtor.

Case 23-10257-ELG    Doc 24-1    Filed 09/02/24    Entered 02/05/24 16:13:49    Desc
Exhibit B - Debtor Confirming Debtor's Thru Amended Plan    Page 20 of 163

APPX00220

# ARTICLE VIII

## MISCELLANEOUS PROVISIONS

8.1     Exemption from Transfer Taxes.

To the maximum extent provided by 11 U.S.C. § 1146(a), transfers are exempt from transfer and recordation taxes.

8.2     Modification of the Plan.

Subject to the restrictions on modifications to the Plan set forth in the Plan, the Bankruptcy Code and the Bankruptcy Rules, the Debtor may alter, amend or modify the Plan before its substantial consummation.

8.3     Withdrawal of the Plan.

The Debtor reserves the right to withdraw the Plan prior to the Confirmation Date.  If the Plan is withdrawn, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan shall: (1) constitute a waiver or release of any Claims by or against the Debtor; (2) constitute an admission of any fact or legal conclusion by the Debtor, or any other Entity; or (3) prejudice in any manner the rights of the Debtor, or any other Entity in any further proceedings involving the Debtor, or any other Entity.

8.4     Successors and Assigns.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

8.5     Saturday, Sunday or Legal Holiday.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

8.6     Post-Effective Date Effect of Evidences of Claims.

Except as otherwise expressly provided in the Plan, notes, bonds, and other evidences of Claims against the Debtor shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan, except that nothing contained in this section shall limit the Judgment Creditors' rights to pursue or to use any available evidence to prosecute the Tennessee Avoidance Actions or challenge to the Homestead Opinion on appeal or remand, if available.

DB02/804722 0002/6981717.1
CORE/3502869.0005/157293039.1

Case 23-19-00227 Doc 24-1 Filed 03/06/24 Entered 03/06/24 15:53:49 Desc
Exhibit B - Order Confirming Debtors Third Amended Plan    Page 21 of 163

APPX00221

8.7    <u>Governing Law</u>.

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the District of Columbia without giving effect to the principles of conflict of laws thereof.

8.8    <u>No Admissions</u>.

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by the Debtor with respect to any matter set forth herein, including liability on any Claim.

8.9    <u>Severability Of Plan Provisions</u>.  If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtor, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

8.10    <u>Rules of Interpretation</u>.  For the purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified in a particular reference, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (e) the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; (f) whenever the words "include," "includes" or "including" are used in the Plan, they shall be deemed to be followed by the words "without limitation;" (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be part of or to affect the interpretations of the Plan; and (h) any term used in the Plan that is not defined in the Plan, either in this Article I or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, and the rules of construction set forth in Bankruptcy Code section 102 shall apply.

APPX00222

8.11    <u>Time</u>.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  Unless expressly prohibited under the Plan, all time periods and deadlines set forth herein shall be subject to enlargement in accordance with Bankruptcy Rule 9006(b), and may be reduced in accordance with Bankruptcy Rule 9006(c).

Dated: January 22, 2020          By:     /s/ Max E. Salas
                                         Max E. Salas, Debtor and Debtor-In-Possession


                                         /s/ Joshua W. Cox
                                         Marc E. Albert, No. 345181
                                         Joshua W. Cox, No. 1033283
                                         STINSON LLP
                                         1775 Pennsylvania Ave., N.W., Suite 800
                                         Washington, DC 20006
                                         Tel. (202) 785-3020
                                         Fax (202) 572-9999
                                         marc.albert@stinson.com
                                         joshua.cox@stinson.com
                                         *Attorneys for*
                                         *Max E. Salas, Appellee and Debtor and Debtor-In-Possession*

20

Case 3:19-cv-00827   Document 24-1   Filed 03/02/21   Entered 03/02/21 14:15:34   Desc
Exhibit B - Qsest Confirming Debtors Third Amended Plan    Page 23 of 163
APPX00223

Marian F. Harrison
US Bankruptcy Judge

Dated: 6/12/2019

# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE

IN RE:                          )
                                )   **CASE NO.   318-02662**
**LEN SALAS,**                  )
                                )   **JUDGE MARIAN F. HARRISON**
     **Debtor.**              )
                                )   **CHAPTER 7**
                                )
                                )

_____

## ORDER
_____

    This matter came before the Court on the Trustee's motion to sell, the objection of Creditors, Nicolaas J. Brekelmans and Gail Gregory Brekelmans, Co-personal Representatives of the Estate of Nina Brekelmans and Michael McLoughlin and Martha Johnson, Co-personal Representatives of the Estate of Michael Patrick McLoughlin (collectively "Estates Creditors"), and the objection of the U.S. Trustee, which was withdrawn at the end of the hearing.   Based on the oral findings on the record, which are incorporated in this Order:

    **IT IS ORDERED** that the motion to sell any potential avoidance actions against Max Salas and/or his bankruptcy estate under 11 U.S.C. §§ 544, 545, 547, 548, 549, and 553, as related to the real property located at 1610 Riggs Place, NW, Washington, D.C., is **GRANTED**, and the Estates Creditors' objection to the sale is **OVERRULED**.

Case 3:20-00082 Doc 40-3 Filed 08/10/21 Entered 02/20/21 13:45:40 Desc
Exhibit C - Order to Sell Trustees Interest in Avoiding Powers 06/12/19 Page 1 of 3

APPX00364

**IT IS FURTHER ORDERED** that the Trustee shall draft a new notice of sale and file it with the Court. The new notice shall clearly state that the Trustee is selling any potential avoidance actions against Max Salas and/or his bankruptcy estate under 11 U.S.C. §§ 544, 545, 547, 548, 549, and 553, as related to the real property located at 1610 Riggs Place, NW, Washington, D.C.

**IT IS FURTHER ORDERED** that the Estates Creditors and the U.S. Trustee shall have until close of business on June 21, 2019, to provide the names, addresses, email addresses, and telephone numbers of any potential buyers.

**IT IS FURTHER ORDERED** that the Trustee shall provide the notice to all interested parties, the potential buyers that were identified by the Trustee, and the additional persons and/or entities, if any, provided by the Estates Creditors or the U.S. Trustee by June 28, 2019.

**IT IS FURTHER ORDERED** that any party interested in purchasing the property shall submit to the Trustee an offer, in writing, in an amount equal to or higher than $11,000, by close of business, on Tuesday, July 9, 2019.

**IT IS FURTHER ORDERED** that if no alternative bids are received, the Trustee shall notify the Court and submit an order approving the sale to Ron Salas for $10,000 in cash.

2

APPX00365

**IT IS FURTHER ORDERD** that if alternative bids are received, the Trustee shall conduct an auction on Tuesday, July 16, 2019, at 9:00 a.m., outside Courtroom 3, Customs House, 701 Broadway, Nashville, TN 37203, and report the results of the auction in open court that same date.

**IT IS SO ORDERED.**

**This Order was signed and entered electronically as indicated at the top of the first page.**

3

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In re: | : | |
| LEN SALAS | : | Case No. 18-02662-MH3-7 |
| Debtor | : | |
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS | : : | |
| | : | |
| and | : | |
| MICHAEL MCLOUGHLIN AND MARTHA JOHNSON, CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF MICHAEL PATRICK MCLOUGHLIN | : : : | |
| In their capacity as authorized representatives of the Estate of Len Salas | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| | : | |
| MAX SALAS 1610 Riggs Place, NW Washington, DC | : | |
| | : | |
| Defendant | : | |
| | : | |

AMENDED COMPLAINT TO AVOID TRANSFERS AND RECOVER PROPERTY

COME NOW THE Plaintiffs herein, Nicolaas Brekelmans and Gail Gregory Brekelmans,

Co-personal Representatives Of the Estate of Nina Brekelmans ("Nina")("the Brekelmans

APPX00367

Estate") and Michael Mcloughlin and Martha Johnson, Co-personal Representatives of The Estate of Michael Patrick Mcloughlin ("Michael") ("the McLoughlin Estate") ("the Brekelmans Estate and the Mcloughlin Estate are hereinafter collectively sometimes referred to as "the Estates"), suing in their derivative capacity on behalf of the Estate of Len Salas, acting by and through their undersigned counsel and for their Complaint against the Defendant, Max Salas, allege as follows:

**Jurisdiction and Venue**

1. This Court has jurisdiction under 28 U.S.C. § 1334 (b). This matter involves causes of action under the trustee's avoiding powers purchased by the Plaintiffs from the Debtor's Estate.

2. Venue lies in this court under 28 U.S.C. §1409 (a)(c) & (d).

3. This matter involves property of the estate and claims of creditors of the Debtor's estate.

4. This matter is a core matter involving Avoiding Powers of the trustee pursuant to 11 U.S.C. § 544, *et seq.* (hereinafter, all references to the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* are cited as "Code, §"). ***See*** *inter alia*, 28 U.S.C. §157 (b)(1) and §157(b)(2) (A)(F)(H) & (0).

5. The Plaintiffs have standing to pursue the causes asserted in this Complaint as the authorized representatives of the bankruptcy estate of Len Salas.

**Parties**

6. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans and Michael Patrick McLoughlin, respectively. Nina and Michael were tragically killed in a fire at a residence in Washington, DC ("the Fire") which residence was owned by the Debtor, Len Salas and occupied and managed by his father, the Defendant, Max Salas. The Plaintiffs herein, the

Estates, were the successful bidders at an auction sale of this bankruptcy estate's interest in the trustee's avoidance and recovery actions under Code, §§544, *et seq*. A copy of the Trustee's Report of Sale of those actions is attached hereto as Exhibit A.

7.  The Defendant Max Salas, is the Debtor in Case No. 18-00260, in the United States Bankruptcy Court for the District of Columbia (hereinafter "Max"). Max filed a voluntary petition, under Chapter 11 of the Code in April, 2018.

7.  Len Salas (hereinafter "Len"), is the Debtor is Case No. 3:18-bk-02662, filed in the United States Bankruptcy Court for the Middle District of Tennessee (Nashville) ("Len's Bankruptcy") on or about May 2, 2018. Len's Bankruptcy was converted from a Chapter 11 to a Chapter 7 bankruptcy on or about December 12, 2018.

8.  This matter involves the recovery of property located at 1610 Riggs Place, NW, Washington, DC ("the Property") at which the Defendant, Max, presently resides. Alternatively, the Plaintiffs are seeking a fair market sale of the Property to recover its value, believed to be in excess of $1 Million above all prior and/or secured claims.

9.  The Plaintiffs are seeking the relief sought, and the benefit resulting from the causes of action asserted in this Complaint through and on behalf of, the Len Salas bankruptcy estate ("the Estate").

10.  Michael Gigandet, the Court appointed Trustee of the Estate, has declined to pursue the causes asserted herein and has also declined to join in this action. This Complaint is brought as a derivative action on behalf of the Estate of Len Salas.

**Background for All Counts**

11.  In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). The Judgment resulted from a fire at the Property which,

3

APPX00369

at the time, Max used as rental property and rented to tenants including Nina and Michael. Through the gross negligence of Max and his deliberate failure to make required safety improvements to the Property, Nina and Michael tragically lost their lives in a horrific and traumatic manner. Len was named a Defendant since he was, at all times, the owner of the Property, including at the time of the fire (June, 2015).

12. The Estates filed separate lawsuits against Max and Len in 2015. After a lengthy period of discovery and pre-trial matters, the case was tried in late March, 2018 resulting in the Judgment. Although Max and Len both appealed the Judgment, there has been no prosecution of the appeal and no stay entered in the appeal. On January 28, 2019, the Bankruptcy Court for the District of Columbia entered an Order Confirming Max's Third Amended Plan of Reorganization ("the Confirmed Plan"). Under the terms of the Confirmed Plan, entered in Max's Bankruptcy on or about January 31, 2020, Max is withdrawing his appeal of the Judgment(s). *See*, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 9, ¶3.6. A copy of the Confirmed Plan and Order Confirming the Third Amended Plan are attached collectively as Exhibit B.

13. Shortly after the entry of the Judgment Max and Len filed separate bankruptcies, Max in the District of Columbia (Case No. 18-00260)("Max's Bankruptcy") and Len in this Court (Case No. 18-02662) ("Len's Bankruptcy").

14. At the time of the bankruptcy filings by Len and Max, Len was, and still is, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property"). The Property was purchased by Len in 2007 after his father, Max, and Max's then wife, divorced. In order to purchase the Property, Max deeded the Property to Len ("the 2007 Deed"). Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan"). The

APPX00370

proceeds of the Sun Trust Loan were paid to Max's wife as part of the divorce settlement.

15. From 2007 through the present, Len has remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". ***See***, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.

16. At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. In addition, Max had a tax evasion conviction on his record. Those and other credit and tax issues continued through Max's Bankruptcy. Max has consistently attempted to hide assets from the IRS and other taxing authorities, including his potential interest in the Property.

17. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor.

18. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee. According to Len, the CLR Trust, was a trust created by Max for the benefit of his three sons, Chase, Len and Ron.

19. According to Max, the lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property.

20. Through the date of the fire and at all times prior to the bankruptcy filings, all governmental notices and tax bills and notices regarding the Property were in Len's name.

21. Consistent with his history of attempting to dodge tax liability, Max did not want the

5

Property, or any matters related to the Property, in his name so he could avoid any taxes or publicly recorded or confirmed ownership interest.

22. Similarly, Max did not want to record any income in his name from the leasing of the Property. As a result, he deposited all of the income from the leases into the "CLR Trust" bank account.

23. According to Max and Len, in July, 2010, Max and Len traveled to Colorado in July 2010 to visit Ron, one of Max's sons. Ron was a recent law school graduate and admitted to practice law in Colorado.

24. While in Colorado, Len and Max executed a very simple trust agreement which Ron stated he prepared using a Colorado form even though the alleged trust property, the Property, was located in D.C. Ron also prepared a form "Quitclaim Deed," which Len also signed ("the Quitclaim Deed").

25. Max asserts that Len, who is very unsophisticated in business and legal transactions, deeded the Property to his father while Len remained the sole obligor on the Sun Trust Deed of Trust Note ("the Note").

26. Max and Ron clearly took advantage of Len and convinced Len to deed the Property to his father despite the fact that by that deed, Len would have lost all collateral for his $870,000 loan obligation to Sun Trust.

27. The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank.

28. At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property. At all relevant times, Len worked only part time and had limited income and assets. At all times following the transfer in 2010, Len was insolvent. His liabilities

Case 23-20-00090-27-Doc 40-44-1 Filed 02/16/21 Entered 02/16/21 13:61 7 Page 4 el D es 835
Case 23-20-00090-27 Doc 40-44-1 Filed 02/16/21 Entered 02/16/21 13:61 7 Page 4 el D es 835
Exhibit D Redline of Amended Complaint to Original    Page 6 of 21
APPX00372

exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

29. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15 Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee filed objections to the Plaintiffs' claims filed in Len's bankruptcy. In addition Len was solely obligated on the Sun Trust Deed of Trust on the Property which, according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018.

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed.

31. Max asserts that he intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. The Quitclaim Deed has never been recorded and Len remains the titled owner of the Property.

32. Neither Max nor Len are aware of the present location of the original Quitclaim Deed or whether it even exists. Regardless, there has been no attempt to record the Quitclaim Deed since 2010.

33. Toward the end of the Superior Court litigation with the Plaintiffs, which resulted in the Judgment, Max concocted a scheme to attempt to keep the Property for himself in the face of a pending substantial judgment award to the Plaintiffs.

34. In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments. These conversations took place in late 2017 and early 2018.

35. Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

36. Because Len was not residing in the Property he could not claim the benefit of the D.C. homestead exemption.

37. In early 2018, less than a month prior to the Superior Court trial, Max and Len, for the first time, alleged and produced a copy of the 2010 trust ("the Trust") and quitclaim deed ("the Quitclaim Deed") and sought to exclude Len from the Superior Court litigation by asserting Max was the real owner of the Property. The Superior Court summarily denied Max's attempt and the trial continued, resulting in the Judgment. The Judgment is now final and binding on all parties as a result of the pending final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy.

38. The fire occurred in June, 2015. From that time, until February or March, 2018, no one resided in the Property. During that time, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment made by Max from the insurance proceeds he received as a result of the fire damage.

39. According to the schedules filed in Max's bankruptcy, as of the commencement of his bankruptcy case, the only lien creditors were (IRS secured claim - $ 6,768.66) and Sun Trust Mortgage ($1,030,825.86). The balance of the Sun Trust Note as of October 26, 2018 was $1,141,021.14. Although Max claims he was the sole party responsible for all payments on the Sun Trust Loan, and made all loan payments, no payments have been made since prior to 2018

(with the exception of one payment from insurance proceeds) and the current balance owned on the Property increased at the rate of at least $7800 from some time in 2017 through October, 2019. Sun Trust sold its Note, in 2019, to U.S. Bank National Association/Select Portfolio Servicing, Inc. ("U.S. Bank"). Pursuant to an agreement reached with U.S. Bank in Max's bankruptcy case, Max is required to make monthly payments of approximately $8,300. Upon information and belief, Max has been making the required payments since approximately November, 2019. *See*, Exhibit B, Confirmed Plan, p. 8, ¶ 3.3.

40. On September 25, 2018, the Bankruptcy Court for the District of Columbia (Teel, J.)("the DC Bankruptcy Court") entered a Memorandum and Order overruling the Estates' Objections to the Debtor's claim of Exemption ("the Exemption Ruling"). The Estates timely appealed to the United States District Court for the District of Columbia ("the District Court").

41. On or about January 2, 2020, the District Court issued an order remanding the appeal to the Bankruptcy Court "the Remand Order" for determination of issues raised by the Plaintiffs in a Motion seeking to add to the appellate record or, alternatively, to remand ("the District Court Motion").

42. On October 13, 2020, the DC Bankruptcy Court denied the Plaintiffs' Motion to Reconsider. The Plaintiffs timely appealed and that appeal is now pending in the United States District Court for the District of Columbia (Civil No. 1:20-cv-3091-KBJ)

43. In the Exemption Ruling, the D.C. Bankruptcy Court ruled that Max was the owner of the Property by virtue of the 2010 Quitclaim Deed. The Court also determined, however, that the trustee's avoiding powers (11 U.S.C. §§ 544, *et seq.*) could result in the recovery of the Property for the benefit of the creditors of the Len's estate and, therefore, that those avoiding powers could result in a recovery of the Property, or its value, for the benefit of creditors whether

9

APPX00375

or not Max's exemption is upheld on appeal. The Court made no final determination of the effect of the trustee's avoiding powers leaving that to the trustee of Len's bankruptcy estate.

44. No deed has been recorded naming Max as Trustee or owner. However, as discussed above, the Confirmed Plan provides that the Confirmation Order constitutes a recordable order conveying the Property to the defendant, Max Salas. Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed or recorded related to the Property.

45. Whether the Trust or Quitclaim Deed was ever in effect, or was abandoned after 2010, all indicia of ownership of the Property were held by Len though the date of Max's bankruptcy and there are no records in the D.C. Recorder of Deeds Office, or in any other public record, that Max is the owner of the Property.

46. Pursuant to an Order of this Court dated June 12, 2019 ("the Tennessee Order"), the Trustee in Len's Bankruptcy was authorized to sell the Estate's interest in the Trustee's avoidance and recovery rights under, *inter alia*, 11 U.S.C. §§ 544 through 551. A copy of the Tennessee Order is attached hereto as Exhibit C.

47. On July 23, 2019 the Trustee in Len Salas' case, pursuant to the Tennessee Order, held an auction sale to auction the bankruptcy estate's interest in the available avoidance and recovery actions pursuant to 11 U.S.C. §§544 through 553. The Plaintiffs herein, the Estates, were the successful bidders. ***See*** Exhibit A, Trustee's Report of Sale.

48. No payments or other value were transferred from, or by, Max to Len related to the transfer of the Property, either in 2010, or at any other time. According to Len, he has never received any compensation, remuneration, property or anything else of value related to the Property, the Quitclaim Deed, or the Sun Trust Loan.

49. Max valued the Property at $2.5 Million on the Schedules filed in Max's Bankruptcy in or about May, 2018. The Property was appraised in or about August, 2019, for approximately$2.4 Million.

50. At the time of the transfer in 2010, the Property was worth in excess of $1.5 Million and the debt to Sun Trust, owed by Len was at least $800,000.

51. According to 11 U.S.C. § 548 (d)(1) a transfer of real estate is not perfected until the transfer is so perfected such that a bona fide purchaser from the debtor cannot acquire an interest in the property superior to that of the transferee. There was no such transfer prior to the filing of the Max Salas bankruptcy case (April 18, 2018). Therefore, pursuant to 11 U.S.C. § 548 (d)(1) the transfer is deemed to have been made immediately before the date of the filing of the Debtor's petition on April 18, 2020.

52. Under the law of the District of Columbia, a transfer of real property is made when the transfer is "so far perfected that a [hypothetical] good-faith purchaser of the asset from the debtor…cannot acquire an interest in the asset that is superior to the interest of the transferee. D.C. Code § 28-3106.

53. At all times from 2010 through Len's bankruptcy filing, he was insolvent by virtue of the Sun Trust Deed of Trust obligation and the Estates' judgments (as of April, 2018).

54. The Estates filed proofs of claim in both Len's and Max's bankruptcy cases and no objections were filed to the Estates' claims, totaling more than $15 Million, in either case.

55. In accordance with Max's confirmed Plan of reorganization, the Plaintiffs' allowed claims exceed $15 Million.

56. Pursuant to the confirmed Plan in Max's case, the Estates are the owners of the recovery and avoidance claims set forth in this Complaint and are entitled to pursue those claims.

11

APPX00377

57. Pursuant to this Court's Order of February 11, 2020, the Plaintiffs have authority to sue on behalf of the Debtor's Estate.

## COUNT I

### (Declaratory Judgment Regarding Plaintiffs' Bona Fide Purchaser Status)

58. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 57 hereof, the same as if those paragraphs were restated in full, hereat.

59. Pursuant to 11 U.S.C. § 544 (a), the Plaintiffs, as purchasers of the Trustee's avoidance and recovery powers have the status, as of the date of the Len Salas bankruptcy petition, namely, May 2, 2018, of a bona fide purchaser of real property from the debtor and a judicial lien holder.

60. Under Code § 544 (a)(3) the trustee's bona fide purchaser status gives the Plaintiffs priority over subsequently recorded interests in the Property.

61. Under D.C. Code, § 42-401:

Any deed conveying real property in the District, or interest therein, ...shall be held to take effect from the date of the delivery thereof, except that **as to creditors and subsequent bona fide purchasers** and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

62. As a result, the Plaintiffs have a superior and priority interest in the Property ahead of any interest acquired by Max Salas and, therefore, the Property should be turned over to the Plaintiffs, or sold to recover the net equity for the benefit of the unsecured creditors of Len Salas' bankruptcy estate.

WHEREFORE, as to Count I, the Plaintiffs pray for a declaratory judgment in their

Case 23-20-ap-00027 Doc 40-4 Filed 02/16/21 Entered 02/26/21 13:17 Page 12 of 21 Desc
Case 3:20-ap-09007 Doc 44-1 Filed 02/16/21 Entered 02/26/21 13:17 Page ID Des 841
Exhibit D Redline of Amended Complaint to Original    Page 12 of 21

APPX00378

favor, declaring as follows:

1. That the Plaintiffs are the owners of the Property located at 1610 Riggs Place, NW, Washington, DC;

2. That the Plaintiffs are entitled to immediate possession of the Property; or, alternatively,

3. That the Plaintiff are entitled to sell the Property and to retain the net proceeds from such a sale for distribution to the creditors of the bankruptcy estate of Len Salas as directed by further order of this Court;

4. That Len and Max are directed to take all actions, sign all documents and perform all acts necessary to transfer or sell the Property as set forth above; and

5. For such other and further relief as may be just and proper.

## COUNT II

### (Declaratory Judgment Regarding Plaintiffs' Judicial Lienholder Status)

63. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 62 hereof, the same as if those paragraphs were restated in full, hereat.

64. As of the commencement of this case, April 18, 2018, the trustee has, without regard to any knowledge of the trustee or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien, whether or not such a creditor exists. Code §544 (a)(1).

65. The Plaintiffs are the authorized representatives for prosecution of all of the

13

Trustee's rights and powers under Code §§ 544, *et seq.*

66. A judicial lien creditor, under the laws of the District of Columbia, has a superior interest to the Property than that of a competing creditor or owner who has not recorded an interest in the Property.

WHEREFORE, as to Count II, the Plaintiffs pray for a declaratory judgment in their favor, as follows:

1. Declaring and establishing that the Plaintiffs, as the authorized representatives of the bankruptcy estate of Len Salas, have a judgment lien against the Property located at 1610 Riggs Place, NW, Washington, DC, as of April 18, 2018 in the amounts of $7.5 Million (Brekelmans) and $7.7 Million (McLoughlin), respectively; and

2. Entering a judgment or order confirming the Plaintiffs' judgment liens against the Property totaling $15.2 Million; and

3. Directing, declaring and confirming that the Plaintiffs are entitled to immediately execute on their judgment lien against the Property; and

4. That the Plaintiffs are entitled to sell the Property and to retain the net proceeds from such sale for distribution to the creditors of the bankruptcy estate of Len Salas as directed by further order of this Court

5. For such other and further relief as may be just and proper.


## COUNT III

## Declaratory Judgment Regarding Plaintiffs' Status as Trustee as Creditor with Unsatisfied Execution

67. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including,

Case 3:20-ap-00027 Doc 40-4 Filed 02/16/24 Entered 02/16/24 13:17:41 Desc
Case 3:20-ap-00027 Doc 44 Filed 02/16/24 Entered 02/26/21 13:17 Page 14 of 21
Exhibit D Redline of Amended Complaint to Original    Page 14 of 21

APPX00380

but not limited to, paragraphs 1 through 66 hereof, the same as if those paragraphs were restated in full, hereat.

68. The Plaintiffs, as purchasers of the avoidance and recovery powers of the Trustee of Len's Bankruptcy, have the status, as of the commencement of Len's Bankruptcy, by virtue of 11 USCS § 544(a)(2), of all of the rights and powers of a creditor that had delivered a writ of execution against Len's interest in the Property, which execution was returned unsatisfied.

69. The Plaintiffs assert that the trustee's status as a creditor under Code § 544 (a)(2) gives him a superior interest in the Property such that the Plaintiffs are entitled to recover the Property, or its equity, for the benefit of the unsecured creditors of the bankruptcy estate of Len Salas.

WHEREFORE, as to Count III, the Plaintiffs pray for a declaratory judgment in their favor, as follows:

1. Declaring and establishing that the Plaintiffs, as the authorized representatives of the bankruptcy estate of Len Salas, have a superior claim to the Defendant's Property located at 1610 Riggs Place, NW, Washington, DC, as of April 18, 2018 in the amounts of $7.5 Million (Brekelmans) and $7.7 Million (McLoughlin), respectively; and

2. Directing, declaring and confirming that the Plaintiffs are entitled to the sale of the Property to satisfy the claims of all unsecured creditors of the Len Salas bankruptcy estate; and

3. For such other and further relief as may be just and proper.

## COUNT IV

### (Fraudulent Conveyance - Code § 548 (a))

70. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 69 hereof, the same as if those paragraphs were restated

Case 23-20-00990027 Doc 40 44 Filed 02/16/21 Entered 02/26/21 13:61:74 Desc
Exhibit D Redline of Amended Complaint to Original    Page 15 of 21
APPX00381

in full, hereat.

71.  The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors of Len Salas, including Sun Trust Bank, by transferring the Property to Max without permission.

72.  The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors including all parties having claims related to the Property, including the Plaintiffs.

73.  The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because, by transferring the only major asset of Len to his father, the transfer was likely to, and did, make Len insolvent and unable to pay his mortgage obligations to Sun Trust Bank.

74.  The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors, including those having claims related to the Property, such as taxing authorities, utilities, and renters, such as Nina and Michael and, therefore, the Estates.

75.  The transfer was a fraudulent conveyance pursuant to Code § 548 because the alleged transfer was made for less than reasonably equivalent value.   Len received no compensation or property of value and gave up property worth in excess of $2 Million while remaining solely obligated on a Deed of Trust Note to Sun Trust bank that was in default at the time of the alleged transfer.

76.  Len was either insolvent at the time of the transfer, or the transfer made him insolvent since the Property was his only significant asset and he still remained liable on the Sun Trust Loan after the alleged transfer.

77.  The transfer of the Property in 2010 by Quitclaim Deed was made after two years

prior to Max's Bankruptcy because pursuant to Code § 548 (d)(1) the transfer of real property is deemed perfected when the deed is recorded or, if not recorded prior to the bankruptcy filing, the date immediately prior to the bankruptcy filing, namely April 18, 2018.

WHEREFORE, as to Count IV , the Plaintiffs pray for judgment as follows:

1. That the attempted transfer of the Property from Len to Max is a fraudulent conveyance under Code § 548 (a); and

2. That the conveyance is recovered or avoided so that the Property is owned and controlled by the Plaintiffs, for the benefit of the unsecured creditors or the bankruptcy estate of Len Salas, pursuant to their purchase of the Trustee's avoidance and recovery rights in Len's Bankruptcy; and

3. That any further transfer or disposition of the Property is enjoined; and

4. That the Property be sold at public auction and the proceeds, after payment of closing costs and priority secured claims shall be paid to the Plaintiffs, for distribution to unsecured creditors pursuant to further order(s) of this court; and

5. For such other and further relief as may be just and proper.

## COUNT V

## (Fraudulent Conveyance - D.C.)

78. The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 77 hereof, the same as if those paragraphs were restated in full, hereat.

79. The Plaintiffs, as the holders of the rights and claims of the Trustee, may avoid any transfer that is voidable under applicable law pursuant to Code § 544 (b) (1).

80. Under the law of the District of Columbia, the transfer of the Property alleged herein,

17

APPX00383

is a fraudulent conveyance because the transfer was performed with fraudulent intent as to existing creditors, such as the IRS, other taxing authorities, Sun Trust Bank, and others, including the Plaintiffs and was made for less than reasonably equivalent value, all as specifically prohibited by D.C. Code § 28-3104, *et seq.*

81.   A transfer made is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. D.C. Code § 28-3105

82.   A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

83.   In the District of Columbia, a transfer is made:

(A) With respect to an asset that is real property other than a fixture, including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee.

D.C. Code § 28-3106

84. In an action for relief against a transfer or obligation under D.C. law, a creditor may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee...;
(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) Any other relief the circumstances may require.

D.C. Code § 28-3107

WHEREFORE, as to Count V, the Plaintiffs pray for an order:

1. Avoiding the transfer or attempted transfer of the Property; and

2. Providing for an attachment against the Property on such terms as the Court may order; and

3. Enjoining any further disposition of the Property or allowing the placement of any other liens or encumbrances against the Property pending sale or other disposition approved by the Court; and

4. Such other and further relief as may be just and proper.

## COUNT VI

### (Liability of Transferee)

85 . The Plaintiffs reallege the allegations of all paragraphs of this Complaint, including, but not limited to, paragraphs 1 through 84 hereof, the same as if those paragraphs were restated in full, hereat.

86. The Defendant, Max Salas, is the transferee of the alleged transfer which is the subject of this Complaint.

87. Under Code § 550 (a) the trustee may recover, for the benefit of the estate, the property transferred or, upon court order, the value of the property.

WHEREFORE, as to Count VI, the Plaintiffs pray for an Order:

19

1. To turn over the Property; or, alternatively,

2. To sell the property, by auction or other public sale, upon reasonable notice, and to turn over the net proceeds of such sale, subject to court approval of the amount of such proceeds, to the Plaintiffs; and

3. to authorize and direct the Plaintiffs to retain the property and proceeds for distribution to the unsecured creditors of the bankruptcy estate of Len Salas in accordance with further order(s) of this Court;

3. For such other and further relief as may be just and proper.

LAW OFFICE OF PHILIP J. MCNUTT, PLLC

By: /s/ Philip J. McNutt
Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)

Pmcnutt@mcnuttlawllc.com

BUTCH, PORTER & JOHNSON, PLLC

By: /s/ Taylor A. Cates
Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)

Tacates@bpjlaw.com

ATTORNEYS FOR THE PLAINTIFFS

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Amended Complaint was served on Philip Young, Counsel for the Defendant, through the Court's ecf noticing service, on the 16th day of February, 2021.

APPX00386

/s/ Philip J. McNutt
Philip J. McNutt

Case 3:20-ap-00027 Doc 40-4 Filed 02/16/21 Entered 02/16/21 13:17:41 Desc
Exhibit D Redline of Amended Complaint to Original    Page 21 of 21
APPX00387

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Len Salas, | ) | Case No. 3:18-bk-02662 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Harrison |
| _____ | ) | |
| | ) | |
| Nicolaas Brekelmans and Gail Gregory | ) | |
| Brekelmans, Co-Personal Representatives | ) | |
| of the Estate of Nina Brekelmans | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael McLoughlin and Martha | ) | |
| Johnson, Co-Personal Representatives | ) | |
| of the Estate of Michael Patrick | ) | |
| McLoughlin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ad Pro No. 3:20-ap-90027 |
| | ) | |
| Max Salas, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT TO AVOID TRANSFERS AND RECOVER PROPERTY

COMES NOW Defendant Max Salas (the "Defendant"), by and through counsel, and hereby files this Answer and Affirmative Defenses to the Amended Complaint to Avoid Transfers and Recover Property (the "Complaint") filed herein. The Defendant answers the individually numbered paragraphs as follows:

1. The allegations as stated in Paragraph 1 of the Complaint are admitted.

2. The allegations as stated in Paragraph 2 of the Complaint are admitted.

APPX00388

3. The allegations as stated in Paragraph 3 of the Complaint are denied.

4. The allegations as stated in Paragraph 4 of the Complaint are admitted.

5. The allegations as stated in Paragraph 5 of the Complaint are denied.

6. The allegations as stated in Paragraph 6 of the Complaint are denied.

7. The allegations as stated in Paragraph 7 of the Complaint are admitted.

7. The allegations as stated in Paragraph 7 of the Complaint are admitted.[1]

8. Paragraph 8 contains a narrative summary of Plaintiffs' allegations in the Complaint. As such, no response is required. To the extent a response is required, the Defendant denies all allegations contained in Paragraph 8.

9. Paragraph 9 contains a narrative summary of Plaintiffs' allegations in the Complaint. As such, no response is required. To the extent a response is required, the Defendant denies all allegations contained in Paragraph 9.

10. The allegations as stated in Paragraph 10 of the Complaint are admitted.

11. The allegations as stated in Paragraph 11 of the Complaint are denied.

12. The allegations as stated in Paragraph 12 of the Complaint are denied.

13. The allegations as stated in Paragraph 13 of the Complaint are admitted.

14. The allegations as stated in Paragraph 14 of the Complaint are denied.

15. The allegations as stated in Paragraph 15 of the Complaint are denied.

16. The allegations as stated in Paragraph 16 of the Complaint are denied.

17. The allegations as stated in Paragraph 17 of the Complaint are admitted.

18. The allegations as stated in Paragraph 18 of the Complaint are admitted.

19. The allegations as stated in Paragraph 19 of the Complaint are admitted.

---

[1] The Complaint contains two paragraphs numbered "7".

APPX00389

20.   The allegations as stated in Paragraph 20 of the Complaint are admitted.

21.   The allegations as stated in Paragraph 21 of the Complaint are denied.

22.   The allegations as stated in Paragraph 22 of the Complaint are denied.

23.   The allegations as stated in Paragraph 23 of the Complaint are admitted.

24.   The allegations as stated in Paragraph 24 of the Complaint are admitted.

25.   The allegations as stated in Paragraph 25 of the Complaint are denied.

26.   The allegations as stated in Paragraph 26 of the Complaint are denied.

27.   The Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 27 of the Complaint, therefore the Defendant denies the same.

28.   The allegations as stated in Paragraph 28 of the Complaint are denied.

29.   The allegations as stated in Paragraph 29 of the Complaint are denied.

30.   The allegations as stated in Paragraph 30 of the Complaint are denied.

31.   The allegations as stated in Paragraph 31 of the Complaint are denied.

32.   The allegations as stated in Paragraph 32 of the Complaint are denied.

33.   The allegations as stated in Paragraph 33 of the Complaint are denied.

34.   The allegations as stated in Paragraph 34 of the Complaint are denied.

35.   The allegations as stated in Paragraph 35 of the Complaint are denied.

36.   The allegations as stated in Paragraph 36 of the Complaint are admitted.

37.   The allegations as stated in Paragraph 37 of the Complaint are admitted.

38.   The allegations as stated in Paragraph 38 of the Complaint are admitted.

39.   The allegations as stated in Paragraph 39 of the Complaint are admitted.

40.   The allegations as stated in Paragraph 40 of the Complaint are admitted.

APPX00390

41. In response to the allegations of Paragraph 41 of the Complaint, the Defendant states that the District Court's Order speaks for itself. To the extent an allegation is made in Paragraph 41, all such allegations are denied.

42. The allegations as stated in Paragraph 42 of the Complaint are admitted.

43. In response to the allegations of Paragraph 43 of the Complaint, the Defendant states that the Exemption Ruling speaks for itself. To the extent an allegation is made in Paragraph 43, all such allegations are denied.

44. The allegations as stated in Paragraph 44 of the Complaint are denied.

45. The allegations as stated in Paragraph 45 of the Complaint are denied.

46. The allegations as stated in Paragraph 46 of the Complaint are admitted.

47. The allegations as stated in Paragraph 47 of the Complaint are admitted.

48. The allegations as stated in Paragraph 48 of the Complaint are denied.

49. The allegations as stated in Paragraph 49 of the Complaint are admitted.

50. The allegations as stated in Paragraph 50 of the Complaint are denied.

51. In response to the allegations of Paragraph 51 of the Complaint, the Defendant states that 11 U.S.C. §548(d)(1) speaks for itself. To the extent an allegation is made in Paragraph 51, all such allegations are denied.

52. In response to the allegations of Paragraph 52 of the Complaint, the Defendant states that D.C. Code §28-3196 speaks for itself. To the extent an allegation is made in Paragraph 52, all such allegations are denied.

53. The allegations as stated in Paragraph 53 of the Complaint are denied.

54. The allegations as stated in Paragraph 54 of the Complaint are admitted.

55. The allegations as stated in Paragraph 55 of the Complaint are admitted.

APPX00391

56. In response to the allegations of Paragraph 56 of the Complaint, the Defendant states that the Plan speaks for itself. To the extent an allegation is made in Paragraph 56, all such allegations are denied.

57. In response to the allegations of Paragraph 57 of the Complaint, the Defendant states that this Court's Order speaks for itself. To the extent an allegation is made in Paragraph 57, all such allegations are denied.

58. No response is required to Paragraph 58. To the extent a response is required, the Defendant denies all allegations contained in Paragraph 58.

59. In response to the allegations of Paragraph 59 of the Complaint, the Defendant states that 11 U.S.C. §544(a) speaks for itself. To the extent an allegation is made in Paragraph 59, all such allegations are denied.

60. In response to the allegations of Paragraph 60 of the Complaint, the Defendant states that 11 U.S.C. §544(a)(3) speaks for itself. To the extent an allegation is made in Paragraph 60, all such allegations are denied.

61. In response to the allegations of Paragraph 61 of the Complaint, the Defendant states that D.C. Code §42-401 speaks for itself. To the extent an allegation is made in Paragraph 61, all such allegations are denied.

62. The allegations as stated in Paragraph 62 of the Complaint are denied.[2]

63. No response is required to Paragraph 63. To the extent a response is required, the Defendant denies all allegations contained in Paragraph 63.

---

[2] The Complaint contains a prayer for relief in unnumbered paragraphs following Paragraph 62. To the extent these are considered allegations, all such allegations are denied.

64.   In response to the allegations of Paragraph 64 of the Complaint, the Defendant states that 11 U.S.C. §544(a)(1) speaks for itself.  To the extent an allegation is made in Paragraph 64, all such allegations are denied.

65.   In response to the allegations of Paragraph 65 of the Complaint, the Defendant states that 11 U.S.C. §544 speaks for itself.  To the extent an allegation is made in Paragraph 65, all such allegations are denied.

66.   In response to the allegations of Paragraph 66 of the Complaint, the Defendant states that "the laws of the District of Columbia" speaks for themselves.  To the extent an allegation is made in Paragraph 66, all such allegations are denied. [3]

67.   No response is required to Paragraph 67.  To the extent a response is required, the Defendant denies all allegations contained in Paragraph 67.

68.   In response to the allegations of Paragraph 68 of the Complaint, the Defendant states that 11 U.S.C. §544(a)(2) speaks for itself.  To the extent an allegation is made in Paragraph 68, all such allegations are denied.

69.   The allegations as stated in Paragraph 69 of the Complaint are denied.[4]

70.   No response is required to Paragraph 70.  To the extent a response is required, the Defendant denies all allegations contained in Paragraph 70.

71.   The allegations as stated in Paragraph 71 of the Complaint are denied.

72.   The allegations as stated in Paragraph 72 of the Complaint are denied.

---

[3] The Complaint contains a prayer for relief in unnumbered paragraphs following Paragraph 66.  To the extent these are considered allegations, all such allegations are denied.

[4] The Complaint contains a prayer for relief in unnumbered paragraphs following Paragraph 69.  To the extent these are considered allegations, all such allegations are denied.

APPX00393

73. The allegations as stated in Paragraph 73 of the Complaint are denied.

74. The allegations as stated in Paragraph 74 of the Complaint are denied.

75. The allegations as stated in Paragraph 75 of the Complaint are denied.

76. The allegations as stated in Paragraph 76 of the Complaint are denied.

77. The allegations as stated in Paragraph 77 of the Complaint are denied. [5]

78. No response is required to Paragraph 78. To the extent a response is required, the Defendant denies all allegations contained in Paragraph 78.

79. In response to the allegations of Paragraph 79 of the Complaint, the Defendant states that 11 U.S.C. §544(b)(1) speaks for itself. To the extent an allegation is made in Paragraph 79, all such allegations are denied.

80. In response to the allegations of Paragraph 80 of the Complaint, the Defendant states that "the law of the District of Columbia" and D.C. Code §28-3104 speak for themselves. To the extent an allegation is made in Paragraph 80, all such allegations are denied.

81. In response to the allegations of Paragraph 81 of the Complaint, the Defendant states that D.C. Code §28-3105 speaks for itself. To the extent an allegation is made in Paragraph 81, all such allegations are denied.

82. The allegations as stated in Paragraph 82 of the Complaint are admitted.

83. In response to the allegations of Paragraph 83 of the Complaint, the Defendant states that D.C. Code §28-3106 speaks for itself. To the extent an allegation is made in Paragraph 83, all such allegations are denied.

---

[5] The Complaint contains a prayer for relief in unnumbered paragraphs following Paragraph 77. To the extent these are considered allegations, all such allegations are denied.

APPX00394

84. In response to the allegations of Paragraph 84 of the Complaint, the Defendant states that D.C. Code §28-3107 speaks for itself. To the extent an allegation is made in Paragraph 84, all such allegations are denied. [6]

85. No response is required to Paragraph 85. To the extent a response is required, the Defendant denies all allegations contained in Paragraph 85.

86. The allegations as stated in Paragraph 86 of the Complaint are denied.

87. In response to the allegations of Paragraph 87 of the Complaint, the Defendant states that 11 U.S.C. §550 speaks for itself. To the extent an allegation is made in Paragraph 87, all such allegations are denied. [7]

## AFFIRMATIVE DEFENSES

Having fully answered all allegations of the Complaint, the Defendant asserts his Affirmative Defenses to the Complaint as follows:

1. The Complaint fails to state a claim upon which relief can be granted.

2. The Plaintiff is barred from asserting the claims alleged in the Complaint because they violate the applicable statutes of limitation.

2. The Plaintiff lacks standing to assert the claims alleged in the Complaint. .

3. The Plaintiff is estopped from asserting the claims alleged in the Complaint.

4. The Plaintiff is barred from asserting the claims alleged in the Complaint by the doctrine of laches.

---

[6] The Complaint contains a prayer for relief in unnumbered paragraphs following Paragraph 84. To the extent these are considered allegations, all such allegations are denied.

[7] The Complaint contains a prayer for relief in unnumbered paragraphs following Paragraph 87. To the extent these are considered allegations, all such allegations are denied.

6.     The Plaintiff is barred from asserting the claims alleged in the Complaint because of waiver.

7.     The Plaintiff is barred from asserting the claims alleged in the Complaint by the statute of frauds.

8.     The Trustee reserves his right to assert counterclaims or other affirmative defenses as facts are revealed through discovery.

WHEREFORE, the Defendant respectfully requests that the Court enter an Order dismissing the Complaint, including each and every claim set forth therein, with prejudice, and denying any of the relief sought in the Complaint, or that judgment be rendered in favor of the Defendant and against the Plaintiff with respects to all matters before this Court, and that the Defendant be granted such other and further relief as the Court deems just, equitable, and proper.

Dated this 9th day of March, 2021.

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel.     615.465.6000
Fax.    615.807.3048
Phillip@thompsonburton.com

Counsel for the Defendant

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES | : | |
| OF THE ESTATE OF NINA BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

AMENDED MEMORANDUM IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs herein, by and through their undersigned counsel and, in

support of their Motion for Summary Judgment, submit the following Amended Memorandum

of facts, points and authorities.

I.  **INTRODUCTION**

Through this Motion, the Plaintiffs are seeking summary judgment on Counts I, II, IV, V

and VI of the Complaint[1].  The Motion will focus largely on the recovery of the Property at issue

---

[1]For purposes of this Motion for Summary Judgment and Memorandum, all references to
"Complaint" or "the Complaint" refer to the Amended Complaint filed herein on February 16,
2021 D-40.

APPX00397

here, located at 1610 Riggs Place, NW, Washington, DC ("The Property"), under the statutory provisions of the United States Bankruptcy Code, 11 U.S.C. ("Bankruptcy Code" or "Code") §550, asserting a right to recovery under Code § 548(A)(1)(B) and Code") and the D.C. Code §§ 28-3104 and 28-3105 concerning recovery of fraudulent conveyances. The Defendant along with the Debtor, Len, engaged in a scheme intended to remove the Property from Len's bankruptcy while allowing Max to exempt the Property in his bankruptcy. As argued below, although this scheme constitutes actual fraud, the constructive fraud which is spelled out in 11 U.S.C. § 548 (a)(1)(B) is clearly shown by the record in this case and those documents, filings and testimony referenced in this Motion. Therefore, while the Plaintiffs assert the case for recovery based upon actual fraud is unusually strong at this Summary Judgment stage, because of the element of intent, although obvious here, and the need to explore a series of facts over a period of time, the insolvency standard of Code § 548(a)(1)(B) is an easier target.

As discussed below, none of the material facts necessary to show fraud or insolvency under the standards of 11 U.S.C. § 548 (a)(1)(B) are in dispute. Because the Plaintiffs meet the standardized test of the statute, they are entitled to judgment on their fraudulent conveyance claim, Count IV, of the Complaint. Additionally, since the criteria for recovery of a fraudulent conveyance under D.C. law tracks the language of 11 U.S.C. § 548, and the Plaintiffs have also clearly met their burden under that statute, the Plaintiffs are also entitled to judgment on their state law fraudulent conveyance claim, Count V.

Furthermore, the Trustee's interests in the Property pursuant to 11 U.S.C. § 544 as a judgment lien creditor and successor to the rights of creditors and purchasers as a bona fide purchaser, without knowledge, are superior to those of the defendant, if any, and also allow the

-2-

APPX00398

Debtor's estate to recover the Property or its value for distribution to creditors pursuant to 11 U.S.C. § 550 (a).

The attempted conveyance of the Property in 2010 from the Debtor, Len Salas, to his father, Max Salas, was never completed and was, in fact abandoned by the parties. In order to attempt to avoid liability in the D.C. Superior Court, wrongful death, litigation commenced by the Plaintiffs 2015, the Salas family including at least, the Defendant, Max Salas and his son Ron, with the assistance of the Debtor, Len Salas, concocted a scheme which involved using an abandoned, stale, and defective quitclaim deed to attempt to remove Len Salas from the Superior Court case and, by so doing, allowing Max to claim an exemption of the Property in his planned bankruptcy which was filed shortly after the Plaintiffs' obtained their judgments.

The scheme involved resurrecting an invalid trust ("the 1610 Riggs Place Trust") prepared by Ron on July 6, 2010, under Colorado law, accompanied by an equally infirm quitclaim deed ("the Quitclaim Deed") purporting to transfer the Property from Len to the trust. The Quitclaim Deed was never recorded and, according to communications between and among family members and local (D.C. area) counsel, Len Salas ("Len" or "the Debtor") and Max Salas ("Max" of "the Defendant") abandoned the Quitclaim Deed. While the reasons for this are not clear there are some obvious reasons which may have caused the family to abandon the Quitclaim Deed, as discussed below. Regardless, it is clear that as soon as June, 2011 Max and Ron had no intention of using or recording the Quitclaim Deed.

During the course of Max's bankruptcy case (Case no. 18-00260 in the United States Bankruptcy Court for the District of Columbia) and in preparation for the hearing on the Plaintiffs' objection to Max's claimed exemption of the Plaintiffs conducted discovery which

-3-

APPX00399

consisted of the deposition of Ron Salas and Interrogatories and a Request for Production of Documents propounded to the Defendant, Max Salas. Neither Ron Salas, nor his father, Max, mentioned or referred to a series of email communications in 2011 and 2012, months following the July, 2010 quitclaim deeed, which clearly state that a deed needed to be created to transfer the Property from Len to Max.and that all family members, including, at at a minimum, Max, Len and Ron, were still attempting to obtain a deed or other means to remove Len's name from the title to the Property. It is clear from the emails that Ron and Max both knew that the quitclaim deed was ineffective and no longer valid or enforceable to transfer the Property. See emails between and among Max, Ron, Len, Stan Goldstein and Lynn Boileau, between June 17, 2011 and February 27, 2012, Exhibit 7, Bates Nos. LenSalas 000016 - LenSalas000034. The eMails are attached to this Memorandum as Exhibit 7.

At the very least, these eMails show that Ron, Len and Max made significant misrepresentations to the D.C. bankruptcy court, and likely this court, regarding the existence and usefulness of the Quitclaim Deed.

These misrepresentations and the scheme concocted by the Salas family represent actual fraud within the meaning of 11 U.S.C. § 548. However, the Plaintiffs' claim for recovery under Code, § 548 (a)(1)(B) is much more straightforward.

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed on April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary

-4-

APPX00400

Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021 (D-40).

All references to Case No. 20-90027 refer to the Adversary Proceeding captioned above in which the Plaintiffs Motion for Summary Judgment and this Memorandum are being filed.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Motion for Summary Judgment unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

The words "Code" or "the Code", except as expressly stated otherwise, refer to the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*. as amended.

For ease of reference to members of the Salas family, who are discussed throughout this Memorandum, Max Salas, the Defendant, will sometimes be referred to as "Max" or "the Defendant", Len Salas will sometimes be referred to as "Len" or "the Debtor" and Ron Salas will sometimes be referred to as "Ron."

II.   **BACKGROUND OF THE CASE**

1. The Plaintiffs' Complaint was filed on behalf of the Estate of Len Salas in accordance with this Court's Order entered on February 11, 2021. The Complaint seeks a declaratory judgment that under the Trustee's avoiding powers, the Plaintiffs have a superior interest in the Property and are entitled to recovery of the Property, or its value, under 11 U.S.C. §550.

2. The Plaintiffs assert that they have a superior interest in the Property whether under the Trustee's avoiding powers, pursuant to 11 U.S.C. §§ 544, et seq, or as an actual creditor, pursuant to 11 U.S.C. §§ 548 and D.C. Code §§ 28-3104 and 28-3105.

3. The Plaintiffs' Complaint seeks recovery of the Property, or its value. The Plaintiffs assert they are entitled to recovery under the Trustee's avoiding powers pursuant to a sale conducted by the Trustee under Court authority (Order of June 12, 2019 (D-179) in Case no. 18-

2662) and a sale to the Plaintiffs approved by this Court and evidenced by the Trustee's Report

of Sale dated August 14, 2019 in Case No. 18-2662 (D-191).

      4.  Because the trustee, Mr. Gigandet, declined to pursue the causes of action set forth in

the Complaint despite Plaintiffs' request that he do so, facts admitted by the Defendant, the

Plaintiffs have derivative standing to pursue each count of the Complaint as determined by this

Court's Order of February 11, 2021 in Adversary No. 20-90027(D-39). Because the effective

date of transfer of the Property is April 17, 2018 under both bankruptcy and D.C. law, the

Complaint was timely filed and is not subject to a claim of limitations.

      5.  The Plaintiffs reserve the right, under bankruptcy law and procedure and D.C. law to

invoke remedies intended to protect the property and preserve its value for the Debtor's Estate.

      6. The Plaintiffs' Complaint contains six counts, three seeking recovery under Code §

544, one under Code § 548, one under D.C. Code §§ 28-3104 and 28-3105 and one under Code

§550.  The Plaintiffs are seeking summary judgment on all counts except Count III.

      7.  As a result of this Court's Memorandum Opinion and Order of February 11, 2021 (D-

38 and D-39, respectively, in Adversary No. 20-90027), the Plaintiffs assert that the affirmative

defenses of violation of the applicable statutes of limitations have been overruled and finally

determined for purposes of the Complaint. There are no disputed facts which could change the

Court's legal conclusions and the Court's conclusions are based upon well established and

longstanding statutory language and supporting case law.

III.    **BACKGROUND FACTS FOR MOTION FOR SUMMARY JUDGMENT**

    **A.**    **Background Facts**

      8. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans

and Michael Patrick McLoughlin, respectively (collectively, "the Decedents' Estates"), creditors of the Estate of Len Salas and suing for the benefit of the Estate of Len Salas. Nina and Michael were tragically killed in a fire at a residence in Washington, DC ("the Fire") which residence was owned by the Debtor, Len Salas and occupied and managed by his father, the Defendant, Max Salas. The Plaintiffs herein, the Estates, were the successful bidders at an auction sale of this bankruptcy estate's interest in the trustee's avoidance and recovery actions under Code, §§544, *et seq*. A copy of the Trustee's Report of Sale of those actions is attached to the Plaintiffs' Complaint as Exhibit A. For purposes of this Motion, all references to the Plaintiffs' Complaint refer to the Amended Complaint docketed at D-40, filed on February 16, 2021.

9. The Defendant Max Salas, is the Debtor in Case No. 18-00260, in the United States Bankruptcy Court for the District of Columbia (hereinafter "Max's Bankruptcy"). Max filed a voluntary petition, under Chapter 11 of the Code on April 18, 2018.

10. Len Salas (hereinafter "Len"), is the Debtor is Case No. 3:18-bk-02662, filed in the United States Bankruptcy Court for the Middle District of Tennessee (Nashville) ("Len's Bankruptcy") on or about April 18, 2018. Len's Bankruptcy was converted from a Chapter 11 to a Chapter 7 bankruptcy on or about December 12, 2018.

11. Michael Gigandet was appointed Chapter 7 Trustee and administered Len's Chapter 7 Estate.

12. The Complaint was timely filed.

13. The parties have completed their discovery and there are no disputed facts which

-7-

bear on the issues presented in this Motion.

14. The Plaintiffs' Complaint seeks the recovery of property located at 1610 Riggs Place, NW, Washington, DC ("the Property") at which the Defendant, Max, presently resides. Alternatively, the Plaintiffs are seeking a fair market sale of the Property to recover its value, believed to be in excess of $1 Million above all prior and/or secured claims.

15. The Plaintiffs are pursuing this matter through, and on behalf of, Len's Estate. The Plaintiffs made requests to the Court appointed trustee, Michael Gigandet ("the Trustee"), in early April, 2019, to pursue the causes of action set forth herein. The Trustee declined to do so. See Memorandum Decision entered on February 15, 2021 in Adversary No. 20-90027 (D-38), p.6.

16. All relief sought through or by the Complaint, as amended, is sought on behalf of the Estate and its creditors. See Complaint at ¶ 9.

17. On or about September 18, 2020, the Plaintiffs again contacted the Trustee asking that the Trustee take over, or join, in the avoidance actions and other claims asserted herein, for the benefit of all creditors. The Trustee declined, once again, asserting that by selling the claims he intended that they and any benefit from them, would inure solely to the purchasers (the Plaintiffs). The Trustee also indicated that if the Actions benefitted Len's Estate, he would take appropriate action to receive and distribute any recovered property or proceeds.

18. In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). The Judgment resulted from a fire at the Property which, at the time, Max had rented rooms to renters including Nina Brekelmans and

-8-

APPX00404

Michael McLoughlin. Through the gross negligence of Max and his deliberate failure to make safety improvements to the Property required by law, Nina and Michael tragically lost their lives in a horrific and traumatic manner from a fire in June, 2015. Len was named a Defendant since he was, at all times, the owner of the Property, including at the time of the fire.

19. The Estates filed separate lawsuits against Max and Len in 2015. After a lengthy period of discovery and pre-trial matters, the case was tried in late March, 2018 and early April, 2018, resulting in Judgments for the Plaintiffs in the amounts of $7.5 Million and $7.7 Million respectively ("the Judgments").

20. The Judgments are allowed claims in the bankruptcy cases of both Len and Max. Through Max's confirmed Chapter 11 Plan and distributions from Len's Estate, the Plaintiffs have received minor payments against their claims - payments of less than $700,000.

21. Shortly after the entry of the Judgments Max and Len filed separate bankruptcies, Max in the District of Columbia (Case No. 18-00260)("Max's Bankruptcy") and Len in this Court (Case No. 18-02662) ("Len's Bankruptcy").

22. The Defendant's approved Amended Disclosure Statement, December 5, 2019 (D-276) and his confirmed Plan of Reorganization (Max Salas's Third Amended Plan of Reorganization), (D-298), January 22, 2020, specifically reference the Plaintiffs as the purchasers of the avoidance actions which are included in the Complaint, as amended.

23. The Defendant's Confirmed Plan provides that the Plaintiffs "possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len

APPX00405

Salas Bankruptcy Case." Confirmed Plan, Section 3.6, p. 9.

24. At the time of the bankruptcy filings by Len and Max, Len was, and was, at the time of the Debtor's bankruptcy filing in April, 2018, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property").

25. According to Max and Len, in July, 2010, Max and Len traveled to Colorado in July 2010 to visit Ron, one of Max's sons. Ron was a recent law school graduate and admitted to practice law in Colorado.

26. While in Colorado, Len and Max executed a very simple trust agreement which Ron stated he prepared using a Colorado form even though the alleged trust property, the Property, was located in D.C. Ron also prepared a form "Quitclaim Deed," which Len also signed ("the Quitclaim Deed").

27. Max asserts that Len, who is unsophisticated in business and legal transactions, deeded the Property to his father while Len remained the sole obligor on the Sun Trust Deed of Trust Note ("the Note").

28. Max and Ron convinced Len to deed the Property to his father despite the fact that by that deed, Len would have lost all collateral for his $870,000 loan obligation to Sun Trust.

29. The attempted transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7.

30. At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property. At all relevant times, Len worked only part time and had limited

-10-

APPX00406

income and assets.  At all times following the transfer in 2010, Len was insolvent.  His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

31.  At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in  July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed.  Exemption Trans. Vol 3, (attached hereto as Exhibit 6) 139:15 - 140:2; Len Salas testimony, Plan Confirmation Hearing, United States Bankruptcy Court for the Middle District of Tennessee, December 13, 2018 ("L Salas Conf. Hrg. Trans."), 68:22 - 69:2. Those pages of Len's testimony in December, 2018 are attached hereto as Exhibit 4.

32.  Max asserts that he intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes.  The Quitclaim Deed has never been recorded and Len remained the titled owner of the Property through the date of his bankruptcy filing in April, 2018.

33.  Max also testified at the Exemption Hearing that he delivered the original Quitclaim Deed to Mr. Goldstein's office and did not recall that Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

34. Later in the same testimony Mr. Salas testified that he told his counsel, Mr. Albert and his associate, Mr. Cox what he did with the Quitclaim Deed and left it up to them to obtain the original from Mr. Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

35.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

APPX00407

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13

36.  In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed,

executed on July 6, 2010, as follows:

"Q And I believe you said, but I want to
clarify this, that between the time of 2012,
roughly, and I realize you said, I think, a year
or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came in my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind
I don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.
He didn't live in the District, he
never- he didn't live in the house, and I- so
that's the only logical reason I could make that
he would be involved, that it was never done. And
until that point, I did not even know that it had
not been done. I assumed at some point that he
came up with the money and did it. But he didn't,
as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the

District of Columbia, Case No. 18-00260, August 8, 2018,  ("R Salas Trans"), 73:15 - 74:21

(emphasis in original).[2]  Attached hereto as Exhibit 8.

---

[2]Mr. Albert was acting as counsel for Max Salas in his bankruptcy and attended the
deposition on behalf of Max.  Ron Salas appeared without counsel.

-12-

37. Toward the end of the Superior Court litigation with the Plaintiffs, which resulted in the Judgment, Max, apparently with the cooperation and participation of Ron and Len, concocted a scheme to attempt to keep the Property for himself in the face of a pending substantial judgment award to the Plaintiffs.

38. In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments. See D.C. Code § 15-501 (a)(14) (exemption is available only to property in which the owner resides). These conversations took place in early 2018. See Exemption Trans. Vol. 3, Exhibit 6, 119:19 - 122:9; See also Albert-R Salas eMails, 2/14 - 3/7/18, attached hereto as Exhibit 19; Exemption Trans. Vol 1, Exhibit 20, 145:22 - 147:20.

39. Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

40. Because Len was not residing in the Property, he could not claim the benefit of the D.C. homestead exemption.

41. In early 2018, less than a month prior to the Superior Court trial, Max and Len, for the first time, alleged and produced a copy of the 2010 trust ("the Trust") and quitclaim deed ("the Quitclaim Deed") and sought to exclude Len from the Superior Court litigation by asserting Max was the real owner of the Property. The Superior Court summarily denied Max's attempt and the trial continued, resulting in the Judgment.

42. The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee,

-13-

APPX00409

Docket Entries ("D- ") D-209 (Trustee's Final Report) and 220, Trustee's Final Account, and 222 (Final Decree).

43. Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

44. On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max. This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property. A copy of Ron's email, dated June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022. These emails were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Max, Ron and Len all testified at that hearing and all asserted, or supported the lie that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

45. Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Number: LenSalas000016 - 17.

46. On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein. In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..." Exhibit 7, Bates Number LenSalas000016.

47. In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are **two different** requests. One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supllied) Exhibit 7, Bates Number LenSalas000023.

-14-

APPX00410

48.  On February 24, 2012 Len sent an email to Max asking "Where are we on this?"
Max's response is "Still working on this...,,I am in Miami will be back soon."  Exhibit 7,
Bates Number LenSalas000029.

49.  Max Salas testified that he is unaware that the attorneys he contacted in the D.C.
area respecting the Trust's ownership of the Property ever created a deed to convey the
Property into the Trust.  M Salas Trans. , Exhibit 10, 64:16 - 74:2.  He further testified that he
does not recall any further communications with counsel about the 1610 Riggs Place
documents after February 27, 2012. M Salas Trans. 72:12-18.  When asked whether he
contacted the attorneys to determine if they had a copy of a deed for the Property, Max
testified as follows:

> Q.  Have you contacted Ms. Boileau or
> Mr. Goldstein to determine if they
> have a copy of any deed that might
> have been created?
>
> **A.  I did try to contact them. I
> did try to contact them actually
> recently.  And I -- but I didn't -- I
> mean, they were trying -- they
> were -- no. I mean, we worked on
> something and then they said it couldn't go
> any further and depends on what you
> were going to do. So I don't -- I guess --
> I can't guess. I don't know.**

M Salas Trans. 73:13-23

50.  There was some confusion in the Salas family testimony concerning whether there
was more than one original of the Quitclaim Deed and whether Len may have had an original.
That issue seems to be cleared up by an email string provided by Max Salas as part of the
discovery and trial in the Exemption dispute.  Regardless, the Defendant has produced no
evidence that anyone other than Max Salas had an original of the deed after July 6, 2010 and
Max does not know where the original is or when he last had it.  See, for example, M Salas

-15-

APPX00411

Trans., Exhibit 10, 77:2 - 82:23; Max speculated at the Exemption Hearing that the original of the Quitclaim Deed may be at the office of the title attorney, Stan Goldstein. Exemption Trans. Vol. 3, (August 24, 2018), Exhibit 6, 55:7 - 57:19. However, in his most recent testimony he testified that he recently contacted Mr. Goldstein's office and was unable to obtain the Quitclaim Deed. See above, Exhibit 10, M Salas Trans. 73:13-23.

51. In his testimony at the Exemption Hearing in August, 2018, Ron testified, under oath, that he assumed the Quitclaim Deed had been recorded. He stated, in August, 2018 that "my assumption was that they were, but as of today I knew they, I know now that they were not." Testimony of Ron Salas, witness for the Debtor Max Salas, August 22, 2018, Exemption Trans. Vol 1, 211:7 - 212:14. Ron Salas's complete testimony at the Exemption Hearing, Exemption Trans. Vol. 1, 206:8 - 246:16, is attached as Exhibit 12.

52. Ron Salas further testified that he did not know why neither his father, his brother, his brother's wife, or he did not think to produce the Quitclaim Deed during the Superior Court litigation. Based upon the 2011 email exchange between Ron Salas and his father, it is obvious that the Quitclaim Deed Ron prepared could not be recorded and was, likely defective. That is the only rational explanation for Ron stating to his father that a Deed needed to be prepared in 2011, a year after Ron's Quitclaim Deed. That is the only rational explanation for the continued efforts, through February, 2012 to obtain a Quitclaim Deed from Len. That is the only rational explanation for Ron, Len, Kendra (Len;s wife) and Max to conveniently forget about the Quitclaim Deed until the very eve of the Superior Court Trial, in February, 2018. Exemption Trans. Vol 3, 39:15-25.

53. The only deed referenced by Max or his counsel, allegedly entitling Max to an

-16-

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been

proffered, or even mentioned by the Salas family or by Max, specifically.

54. Unfortunately, it appears that Ron, his father and his brother hid the fact that the

Quitclaim was defective, or otherwise unrecordable at the hearing in Max's case in 2018.

55. The Plaintiffs are unaware of the reason why the Quitclaim Deed was abandoned.

However, there are clues. For example, in the Exemption Hearing in D.C., Ron Salas testified

that he was unaware of the requirements of Quitclaim Deeds in D.C. See, Ron Salas's testimony,

Exhibit 12, 227:5 - 228:12. He stated that he was unaware that Deeds made to trusts had to be

made in the name of the trustee. Id. Even in 2018, Ron was unaware whether the trust

documents he created were valid under D.C. law. See, Ron Salas's testimony, Exhibit 12, 243:8-

56. Max testified that he did not have the funds to record the deed. More importantly, it

seems evident that he was unwilling to spend the money to record the deed. He spent hundreds

of thousands of dollars from retirement savings and other funds in his bankruptcy, funds, at least

a substantial portion of which, would have been available to Max if he wanted to record the Deed

in 2010, or thereafter. See, for example, excerpts from Max Salas' schedules of assets, filed

April 18, 2018 in Case No. 18-00260, (D-1), attached hereto as Exhibit 9. See also M Salas

Third Amended Plan, Complaint, Exhibit B, at p. 11, Section 4.1.

57. No deed was recorded prior to Len's bankruptcy filing. See Max's Second Amended

Disclosure Statement filed in his bankruptcy case in the District of Columbia, Case No. 18-

00260, December 5, 2019, (D-276) , attached hereto as Exhibit 2, pp. 4, 22.

58. Max testified in his deposition in the Superior Court case in February, 2016 that there

was one trust, the CLR Trust. He confirmed that when he mentioned "the 1610 Salas Trust" he

APPX00413

was referring to the same trust, namely, the CLR Trust.  Max Salas testimony at the Exemption Hearing, Exemption Trans. Vol 2, August 23, 2018 ("Exemption Trans. Vol. 2"), Exhibit 3, 33:23 - 50:25, Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), 42:18 - 43:2. Excerpts from the M Salas Sup Ct Depo are attached hereto as Exhibit 1.

59.  Len Salas is not aware of the location of any of the wet ink signature originals of the July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas Trans."), Exhibit 13, 15:4-9.  Len testified in his deposition that he provided an original "wet ink" original of the Quitclaim Deed, or a copy,  to his lawyer on the eve of the Superior Court trial in March, 2018. L Salas Trans, Exhibit 13,  16:6-24, 19:11-25 - 21:18.  Regardless, Len testified that the document he produced on the eve of the Superior Court trial, which commenced on March 26, 2018, was kept in his possession at all known times between July, 2010 and March, 2018.  Id. Len's wife, Kendra, testified that she "had a pdf of it" (the July, 2010 Quitclaim Deed) and that she thought it was "the same as what Len had " I thought it was the same thing as what Len had, but I'm not sure."  K Rowe Trans. , Exhibit 14, 30:13-20.

60.  At all relevant times Len's liabilities exceeded his assets when the value of the Property is not included.  The attempted transfer, or actual transfer, of the Property made Len insolvent.

61.  On July 6, 2010, the date of the alleged Quitclaim Deed, Len's primary asset was the home at 1610 Riggs Place, the Property at issue here.  His most substantial liability was his obligation to Sun Trust Bank in 2007 for which Len remained liable through October 2020.  In

-18-

APPX00414

November, 2020 Sun Trust entered into a new agreement with Max Salas which eliminated Len's

obligation on the Property as part of Max's Chapter 11 Plan. Therefore, on July 6, 2010, and at

all times after, through October, 2020, Len's most substantial liability, by far, except for the

Plaintiffs' judgments, consisted of his obligation to Sun Trust Bank.

62.  The obligation to Sun Trust Bank was $870,000 in 2007.  No payments were made to

reduce the principal owed to Sun Trust Bank through the date of Len's Bankruptcy in April,

2018.

63.  There were no agreements between Len and Max regarding responsibility for

payment of the Sun Trust Note or any other obligations related to the Property.  L Salas Trans.

28:9 - 29:4; Exemption Trans. Vol I, Exhibit 20, 40:25 - 41:18.  Max's testimony at his most

recent deposition in March, 2022 confirms that there was no note or other written document

making Max primarily, or secondarily liable on the SunTrust Note:

Q. Okay. Let's go to number 19,
Mr. Salas. Request for admission in 19 asks you
to admit or deny that Max Salas did not notify
Sun Trust or the D.C. government that he was an
obligor under the Sun Trust deed of trust. Your
response was denied. Max Salas notified Sun
Trust that he was obligated under the deed of
trust. I read that correctly, didn't I?

**A. You read it correctly, yes, sir.**

Q. When you notified Sun Trust that you
were obligated, did you sign a note?

**A. No. I didn't sign.**

Q. Did you sign a guaranty?

**A. Huh?**

Q. Did you sign a guaranty?

-19-

Case 3:22-cv-00027   Document 74   Filed 08/28/23   Page 19 of 53
Case 3:20-ap-90027   Doc 74   Filed 08/22/15   Entered 08/01/22 15:56:31   Page 3 of 8878
Document      Page 19 of 53

APPX00415

**A. I was -- well, the loan was --
actually it was a modification. It was a
modification and a way to get -- to get
Lenny's -- Lenny wanted the house off of his
name, and I kept trying to do that. That's
what happened. I don't blame him. I promised
him I would do that right away back when he
first did it. Well, I'm just going on too
far. So I don't remember, sir.**

Q. Okay. I need to give you a timeframe
here, so I apologize.
Prior to your bankruptcy filing, okay,
prior to your bankruptcy filing, did you notify
Sun Trust that you were obligated under the deed
of trust?

**A. I don't remember.**

Q. Did you ever provide, again, prior to
your bankruptcy filing, did you ever provide Sun
Trust with a note that you signed as an obligor
under the deed of trust note?

**A. Same answer.**

Q. Do you have any documents that would
indicate that you did sign such a note?

**A. I can't remember. You know, I don't
know. It's just -- it's almost like -- I
don't know. I don't remember.**

Q. Do you remember if you provided Sun
Trust with a guaranty of the note obligation
that Len was obligated for?

**A. Did I provide them a guaranty to
what, sir?**

Q. Did you provide Sun Trust with a
guaranty of the deed of trust note obligation?

**A. Did I provide Sun Trust a deed?**

Q. A guaranty.

-20-

**A. A guaranty. You know, Mr. McNutt, I may have. I don't remember. I just can't remember right. It just doesn't -- it's not there.**

Q. If there was a note obligation or a guaranty, would those documents have been provided to the plaintiff's in this case?

**A. I don't know what -- if there was what would have happened. I don't know.**

Q. You haven't provided any documents related to a note obligation or a guaranty that you provided the Sun Trust Bank prior to your bankruptcy filing though, correct?

**A. That's not correct. I don't know what I've done. I don't know. I may have. I may have. Maybe I didn't. I don't know.**

Transcript of the Deposition of Max Salas on March 22, 2022 ("M Salas Depo Trans"), Exhibit 10, 85:5 -

87:20.

64.    While the Defendant seems to be confused or perhaps reluctant to testify directly on this

issue, it is undisputed that there are no documents indicating that Max was liable on the SunTrust loan at

any time and Max never entered into any agreement or understanding with Len that Max was liable or

responsible.  Moreover, and most importantly there is no document raised, proffered or produced by Max

indicating that Len was not the sole party responsible for the Deed of Trust payments until at least

November, 2019.[3]

---

[3]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did finally reach an agreement with Max for him to make the payments under the Deed of Trust from and after November, 2019.  However, there is no indication in the agreement reached between Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not in effect.  Therefore, Len is still liable for the entire balance under the SunTrust Note which, as of September 29, 2019, was $1,208,720.40.  See Max Salas Stipulation with U.S. Bank (Stipulation for Plan Treatment of First Lien Secured by Real Property at 1610 Riggs Place NW, Washington, DC 20009), filed in Case No. 18000260 (D-266-1) on November 20, 2019, attached

-21-

APPX00417

65. Len Salas was fairly straightforward in his testimony. However in response to the question whether Len executed more than one Quitclaim Deed, he not only couldn't remember whether he signed any other document but answered "I don't know" to the question "if you would have executed any other agreement [quitclaim deed], you would have kept a copy of it; correct?" L Salas Trans. Exhibit 13, 40:1-20. Regardless of Len's faulty memory or evasiveness, it is clear from his testimony that he is not aware of any documents related to the alleged conveyance of the Property other than the trust and quitclaim deed both dated July 6, 2010.

66. Len had several conversations with his father regarding getting his name off the loan and deed after 2010. L Salas Trans., Exhibit 10, 71:25 - 74:16; Exemption Trans.,Vol 1., Exhibit 20,158:13 - 163:10; Deposition Transcript of the Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

67. Max Salas confirmed in his testimony at the Exemption Hearing that Len was attempting to get Max to get Len "off of the deed to the property" shortly after the original deed to Len in 2007 and **continuing all the way into 2018**. Exemption Trans. Vol. 1,Exhibit 20, 42:20 - 43:8. Later in his testimony Max claimed that Len only asked Max to take Len off the loan, not off the title asserting that "he'd already taken his name off the property" in 2010. Exemption Trans. Vol. 1, Exhibit 20, 44:1-10. That was just another misrepresentation, however. During Len's deposition in the Superior Court litigation, Len testified in March, 2016, that the last time Len talked to his father about **transferring ownership of the property, not the loan**, out of Len's name, was the spring of 2015, the year of the tragic fire that took the lives of Nina and Michael. See Exemption Trans. Vol. 1, Exhibit 20, 47:11 - 49:11. The emails

hereto as Exhibit 15.

APPX00418

between Len and his father in the time frame of 2011 -2012, well after the July, 2010 Quitclaim Deed, confirm and corroborate Len's testimony in his 2016 Deposition.  See Exhibit 7.

68.  The emails of 2011 - 2012 among Ron, Len, Max and Max's counsel, produced, for the first time, by Len in this litigation, show that Max's statements are direct contradictions of his testimony in 2018 at the Exemption Hearing.  Moreover, the testimony of both Ron and Max in 2018 directly contradicts their email communications in 2011 and 2012. Their testimony in 2018 was under oath and was used to try to support Max's claim that he was the owner of the Property in April, 2018 for purposes of his exemption claim.  Now that testimony appears to be largely, if not completely, fabricated for the sole purpose of advancing the false claim that there was an effective Deed after 2010.  See emails between and among Max, Ron, Len, Stan Goldstein and Lynn Boileau, between June 17, 2011 and February 27, 2012, Exhibit 7.

69.  The Sun Trust Note was in default during the period 2010 - 2018.  L Salas Trans., Exhibit 13,  55:11-20.

70.  Len Salas was involved in more than one attempt to refinance the Property in the time frame of 2010 through 2013 and all such attempts failed. L Salas Trans. 83:23 - 84:4.  The clear inference from Len's emails to/from his father and the refinancing attempts is that Len was the recognized owner of the Property and was, therefore, necessary for any refinancing. Therefore, again, Despite the existence, in July, 2010 of a Quitclaim Deed, that deed was not recorded, likely could not be recorded, and was abandoned by Max and Len.  See, for example, Ron's email of June 17, 2011, Bates Nos., LenSalas000016-17,attached hereto as part of Exhibit 7.

71.  Len did not have sufficient funds to pay his attorneys in the Superior Court litigation.

-23-

APPX00419

He lives "paycheck to paycheck." L Salas Trans. Exhibit 13,76:20 - 77:2

72. At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans., Exhibit 13, 61:1 - 63:2.

73. Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, April 27, 2018, D-10, at page 3 of 10.

74. During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them. See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

75. On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41. Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

76. Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust." Exemption Trans. Vol 1, Exhibit 20, 148:1 - 152:24. In Len's Deposition Testimony in the Superior Court Litigation, Len testified, on March 9, 2016, that he had no knowledge of "the 1610 Salas Trust" asserted by his father but he did know about "CLR Trust", "A. Yes, that one I know." Len Salas Deposition Testimony,

-24-

Case 3:20-ap-00027   Document 74   Filed 08/28/20   Entered 08/28/20 15:56:31   Page 23 of 30
Case 3:22-cv-90027   Document 74-1   Filed 08/01/22   Page 24 of 53
Document      Page 24 of 53

APPX00420

March 9, 2016 in the Superior Court Litigation, attached as Exhibit 11, 29:14 - 30:14

77. Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2 - 150:21.

78. The fire occurred in June, 2015. From that time, until February or March, 2018, no one resided in the Property. During that time, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he received as a result of the fire damage.

79. Although Max claims he was the sole party responsible for all payments on the Sun Trust Loan, and made all loan payments, no payments have been made since prior to 2018 (with the exception of one payment from insurance proceeds) and the current balance was increasing at the rate of approximately $7770 month as of October, 2019. Sun Trust sold its Note, in 2019, to U.S. Bank National Association/Select Portfolio Servicing, Inc. ("U.S. Bank"). Pursuant to an agreement reached with U.S. Bank, Max is required to make monthly payments of approximately $8,300. Upon information and belief, Max has been making the required payments since approximately November, 2019. *See*, Exhibit B, Confirmed Plan, p. 8, ¶ 3.3.

80. Through October, 2019, Len remained solely responsible under the SunTrust Note, although Max asserts he was responsible and "made all payments." However, according to the SunTrust Motion for Relief from Stay, filed in Case No. 18-2662 on November 2, 2018, the arrearage owed to SunTrust under the Note, as of April, 2018 was $374,282.18. As the sole obligor on the Note, Len was responsible for payment of the arrearage.

81. On the effective date of the attempted transfer of the Property from Len to Max,

April 17, 2018, Len's assets were approximately $53,000 plus the value of the Property. Len's

liabilities at the same time included the Plaintiffs' Judgments, attorney fees owed ot his litigation

counsel for the Superior Court Litigation, the SunTrust arrearage, the SunTrust Note balance of

at least $1.03 Million and some taxes and credit card obligations.

82. On the effective date of the attempted transfer, Len was required to pay the credit

cards, taxes, attorney fees, SunTrust arrearage and the Plaintiffs' Judgments.


B. **Facts Related to the Plaintiffs' Acquisition of the Trustee's Avoiding and Recovery Actions**

83. The Court held a hearing on the Trustee's Motion to sell in June, 2019. Mr. Young,

counsel for the Defendant, appeared at the hearing representing Mr. Ron Salas and the

Defendant. Mr. Young had entered his appearance in this case on behalf of the Defendant. At all

relevant times, Mr. Young represented both Ron Salas and the Defendant. Mr. Young

represented his clients' support for the sale at the Court hearing.

84. After the hearing in June, 2019, this Court entered an order on June 12, 2019

authorizing the sale and also setting forth the bidding and sale procedures which the Trustee

followed. The Defendant supported the sale and requested that the Court authorize the sale,

which it did pursuant to its order of June 12, 2019 (D- 179) ("the Sale Order").

85. Thereafter, in accordance with the Sale Order, the Trustee conducted an auction sale.

The sale took place on July 23, 2019. At the end of the auction, the Plaintiffs were the successful

bidders. The Trustee's Report of Sale was filed herein on August 14, 2019 (D-191) ("Report of

Sale").

-26-

APPX00422

86. The Defendant filed no objections or opposition to the proposed sale, this Court's Order of June 12, 2019, or the Report of Sale.

87. No party appealed the Sale Order and no party sought any additional review or modification of that Order, the Report of Sale or the accompanying Bill of Sale (D-191, pp. 3-4).

88. In the Defendant's confirmed Plan of Reorganization in his Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Columbia, Case No. 18-00260 ("the D.C. Bankruptcy"), filed simultaneously with this case, the Defendant acknowledges that the Plaintiffs were the successful bidders for the Trustee's avoidance and recovery actions. Although the Defendant's Plan and court approved Disclosure Statement specifically state that the Defendant has reserved all defenses and objections to the subject avoidance and recovery actions, at no time did the Defendant assert that the Plaintiffs were not the rightful owners of the causes of action set forth in this Complaint or lacked standing to pursue those causes of action. In fact, the Defendant's approved Disclosure Statement (the D.C. Bankruptcy, Case No. Docket No. 276) the Defendant states specifically that "...[the Plaintiffs] possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len Salas Bankruptcy Case." ***See***, M Salas Second Amended Disclosure Statement, Exhibit 2, at p. 17. The Plaintiffs reached agreement with the Defendant to withdraw their objections to the Defendant's proposed plan of reorganization based upon the representations made in the Disclosure Statement and proposed Plan of Reorganization, including the representation that the Plaintiffs were the rightful owners of the causes of action which form the bulk of this Complaint.

89. The Defendant filed his proposed Chapter 11 Plan of Reorganization on August 1, 2019. In response to objections and events unrelated to this Complaint, the Debtor filed an

-27-

APPX00423

Amended Disclosure Statement and Plan, followed by a Third Amended Plan, which was eventually confirmed by the D.C. bankruptcy court. The Defendant's disclosure statements and proposed plans specifically referenced the sale of the avoidance actions at issue here, but did not raise any objections or deficiencies regarding the sale. While the Defendant reserved his right to defend the prospective avoidance actions, he did not raise any issues regarding the Plaintiffs rightful ownership of those actions. *See* above discussion.

      C.    **Plaintiffs' List of Uncontested Facts**

90. In accordance with the local rules of this Court, the Plaintiffs have attached to this Memorandum a List of Undisputed Facts which support the Plaintiffs' Motion, along with citations to the documents, pleadings, filings, depositions and testimony which support those Facts.

IV.    <u>**ARGUMENT**</u>

    A.    <u>**The Plaintiffs are Entitled to Summary Judgment in Accordance with Fed. R. Civ. P. 56**</u>

91. Summary Judgment in bankruptcy cases, adversary proceedings and contested matters, is governed by Fed. R. Civ. P. ("FRCP") 56 which is incorporated into this adversary proceeding pursuant to Fed. R. Bankr. P. 7056 (with only minor changes)(unless stated specifically to the contrary, all references to summary judgment rules wqill refere to the language of FRCP 56.

92. This court should grant summary judgment to the Plaintiffs if the record before the court is sufficient to show that there is no genuine dispute as to any material fact and the Plaintiffs are entitled to judgment as a matter of law. *Beard v. Banks*, 548 U.S. 521, 529

APPX00424

(2006).  Rule 56 mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's defense. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

93.  In order to obtain summary judgment the Plaintiffs' burden is to show the absence of a genuine, material dispute and an entitlement to judgment under applicable law.  *Id., at* 323.

94.  Because this case is not a jury trial, most of the facts of the case are accepted and not disputed and judgment is based upon the specific language of the Bankruptcy Code and D.C. Code, the Plaintiffs, the facts to establish entitlement are straightforward.  Furthermore, entitlement to a judgment at this stage, after completion of discovery, is governed by long standing statutory provisions that are the subject of significant court review and approval. Nevertheless, the Plaintiffs are required in this Motion to show that the evidence is not subject to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). *See also, Limor v. Anderson (In re Scarbrough)* , 2019 Bankr. LEXIS 933 (BAP 6th Cir. 2019) in which the 6th Circuit's Bankruptcy Appellate Panel explained:

> perhaps a better way to describe the summary judgment analysis in bankruptcy proceedings is to say that when the moving party bears the burden of proof at trial, she must make a prima facie case strong enough to justify depriving the other party of her day in court. Depending on who bears the burden of proof on a material issue, the moving party can make this showing by using deposition testimony and affidavits; offering documentary evidence that would be admissible at trial; and/or pointing the court to facts in the record that otherwise preclude judgment for the non-moving party.

*Id.* at *4.

95. A genuine dispute exists, such that the Plaintiffs Motion should be denied, only when

-29-

APPX00425

a rational fact finder, considered the evidence in the summary judgment record could find in favor of the non-moving party. ***Ricci v. DeStefano***, 557 U.S. 557, 586 (2009); ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242 , 247-252 (1986).

96.  A genuine dispute is not created by a mere scintilla of evidence or evidence which is only "colorable' or insufficiently probative. ***Id.*** Additionally, summary judgment will not be defeated if the claim or defense asserted by the non-moving party is based upon a factual scenario that is plainly contradicted by the summary judgment record. ***Scott v. Harris***, 550 U.S. 272, 280 (2007); ***Coble v. City of White House***, 634 F.3d 865, 868-9 (6th Cir. 2011) (the principle declared in ***Scott***, that is, that the court need not credit "visible fiction", applies to all types of objectively conflicting evidence).

97.  According to the 6th Circuit, in ***Coble***, construing the facts on summary judgment in the light most favorable to the non-moving party usually means adopting the plaintiff's version of the facts. ***Id.***, at 868, citing ***Scott,*** 550 U.S. at 378. However, as the 6th Circuit acknowledged, the Supreme Court clarified in **Scott** that facts must be viewed in the light most favorable to the non-moving party "only if there is a 'genuine' dispute as to those facts." ***Coble, supra***, citing ***Scott,*** 550 U.S. at 380(quoting Fed. R. Civ. P. 56(c)).

98.  In the context of a motion for summary judgment courts should not accept that which is so utterly discredited by the record that no reasonable trier of fact could have believed it. ***United States v. Hughes***, 606 F.3d 311, 319 (6th Cir.2010)(quoting ***Scott***, 550 U.S. at 379-81)(cited and quoted in ***Coble***, 634 F.3d, at 868.

99.  In a trio of summary judgment cases all decided in 1986, the Supreme Court put its stamp of approval on summary judgment motions as a means to eliminate unnecessary trials.

-30-

APPX00426

The Supreme Court has analogized a motion for summary judgment to a motion for directed verdict, because both remove the trial of factual questions from the finder of fact. If the movant under Rule 56 presents evidence that, if not controverted at trial, would entitle the movant to a Rule 50 judgment as a matter of law, that evidence must be accepted as true in a summary judgment motion, when the party opposing the motion does not offer counter-affidavits or other evidentiary material showing that a genuine issue remains to be tried, or that she is unable to present facts justifying opposition to the motion under Rule 56(d). Celotex, 477 U.S. at 323, 106 S. Ct. at 2552; Liberty Lobby, 477 U.S. at 250, 106 S. Ct. at 2511 (standard for granting summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a)).

*Limor, supra,* 2019 Bankr. LEXIS 933, at *5.

100.  The Plaintiffs assert that they are entitled to Summary Judgment on Counts I, II, IV, V, and VI of the Complaint because the Plaintiffs claims fit squarely with the language of 11 U.S.C. §§ 544 (a) and 548(a)(1)(A) and (B) and D.C. Code §§ 28-3104 and 28-3105 and there are no disputed material facts, within the meaning of Rule 56, which would create a genuine, or colorable issue preventing judgment at this time.

B.    **The Plaintiffs Have Standing to Pursue The Causes of Action Stated in the Complaint**

101. Pursuant to the confirmed Plan in Max's case, which specifically recognizes the Plaintiffs' standing to pursue the Complaint's causes of action for the benefit of Len's bankruptcy estate, and the Trustee's sale of his avoidance and recovery actions to the Plaintiffs in Case No. 18-2662, as confirmed by this court, the Plaintiffs the owners of the recovery and avoidance claims set forth in this Complaint and have standing to pursue those claims. ***See Jefferson County Bd. Of County Comm'rs v. Voinovich (In re V Cos.)***, 292 B.R. 290, 294, 298 (B.A.P. 6th Cir. 2003) (following ***Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group)***, 66 F.3d 1436, 1438 (6th Cir. 1995).

-31-

APPX00427

C. **The Plaintiffs are Entitled to Recovery under Count IV of Their Complaint (Fraudulent Conveyance Under 11 U.SC. § 548)**

102.  The purpose of avoidance of preferential transfers under 11 USCS § 547 and fraudulent transfers under 11 USCS § 548 is to prevent a debtor from diminishing, to the detriment of some or all of his creditors, funds or property that would, except for the transfer, be generally available for distribution to creditors.  Consequently, any funds or property under the control of the debtor, regardless of source, are deemed property of debtor and cannot be transferred if such transfer diminishes the estate. *In re Chase & Sanborn Corp.*, Bankr. L. Rep. (CCH) ¶ 1753, 813 F.2d 1177 (11th Cir. 1987).

103.  Purpose of statute is to recover for estate assets that could be distributed to unsecured creditors, equity secured creditors, or to debtor as exempt property, and to rectify prepetition depletion of debtor's estate. *Ryker v. Current (In re Ryker)*, 272 B.R. 602, Bankr. L. Rep. (CCH) P78605,  (Bankr. D.N.J. 2002), rev'd, remanded, 301 B.R. 156, 2003 U.S. Dist. LEXIS 20515 (D.N.J. 2003).

1. Actual Fraud - 548 (a)(1)(A)

104.    The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors of Len Salas, including Sun Trust Bank, the Plaintiffs and the other creditors of the bankruptcy estate of Len Salas by transferring the Property to Max without permission and by fabricating the facts and circumstances of the alleged Quitclaim .

105.  The Defendant and the Debtor executed a Trust and Quitclaim Deed in July, 2010 at the Colorado office of Ron Salas, the Debtor's brother and the Defendant's son. Ron was a

-32-

APPX00428

fledging Colorado attorney at the time who, by his own admission, had limited knowledge of trusts and no knowledge about creating an effective trust or deed to property in the District of Columbia. He confirmed as much in his deposition on August 10, 2018 (Exhibit 8) and his testimony at the Exemption Hearing in August, 2018 in Case No. 18-260 (Exhibits 6 and 20).

106. The purpose of the Deed was to "remove Len" from the title to the Property. The Deed was never recorded and the location of the original deed is unknown.

107. In 2011, by virtue of emails addressed from Ron to the defendant and the debtor, and addressed from Max to his real estate attorneys at the time (Exhibit 7), it is clear that Len and Max had long since abandoned the Quitclaim Deed. Ron's direction to Max to have a D.C. attorney prepare a deed show that the deed Ron created must not have been defective and could not be recorded.

108. From 2011 through 2017 Len continually asked Max to remove him (Len) from the title to the Property, a clear indication that the deed was ineffective and not recordable.

109. In October, 2015, Max and Len were sued in the D.C. Superior Court by the Plaintiffs for damages resulted from the gross negligene of Len and Max and the horrific deaths of Nina Brekelmans and Michael McLoughlin from a fire at the Property in June, 2015.

110. In October, 2015, Len, Max, Ron and Len's wife, Kendra, all knew that the only reason Len was sued was because his name remained on the title to the Property. They also knew that if Len could be proven not to be the owner of the Property he could be dismissed from the lawsuit.

111. Ron Salas testified in 2018 that he knew that the July, 2010 Deed could not have been recorded because Len was named a defendant in the lawsuit. He testified as if the Deed was

still in effect even though he knew it was not valid, could not have been recorded and no longer existed.

112.  The Superior Court case eventually went to trial in late March, 2018.  In early April, 2018 the Plaintiffs obtained their judgments.

113.  From October, 2015 until February, 2018, a month before the Superior Court trial was to begin, none of the Salas' produced an original or copy of the Quitclaim Deed.

114.  Max had the only original of the Deed.  He testified that he gave the original to his real estate counsel and was not sure if he ever got it back.  Based upon the communications among the Salas's and Max's counsel in 2011 and 2012 it appears certain that the Deed was left at the offices of Max's counsel and likely thrown out as useless.  Regardless, Max did not retain the original or, if he did, it may have been destroyed in the fire.  It is likely that Max's real estate attorney knows the answer.

115.  By late 2017, with the trial looming, it was obvious to Len and Max that they were facing substantial judgments from the Superior Court Litigation. Still no one produced the Deed or a copy.

116.  It was only after Max learned from his bankruptcy counsel, just weeks before trial, that the long lost deed could give him an opportunity to exempt the Property from the judgments he was facing.  Max and Len learned that Len could not exempt the Property because he was not residing in the Property which meant if Max could somehow be deemed the owner, then he could exempt the Property under D.C.'s very generous homestead exemption.  D.C. Code § 15-501(a)(14).

117.  Armed with the knowledge of what they needed to do, from Max's bankruptcy

-34-

APPX00430

counsel, Ron, Len and Max concocted the scheme whereby they would now claim they forgot about the deed for all these years and magically produced it so that Max could claim the exemption he eventually got under, to say the least, false pretenses.

118.  The schemers involved in this fraud include, at a minimum, Len, Max and Ron.

119.  The purpose of the fraud was to transfer the Property from non-exempt to exempt status to thwart the Plaintiffs' collection of their judgments.

120.  The fraud scheme was developed and initiated in or about February, 2018 and continues to this day.

121.  In February, 2018 Len (and Max) was facing a substantial judgment.  On the effective date of the transfer, April 17, 2018, Len (and Max) owed more than $15 Million to creditors including Len's attorneys, the IRS and the Plaintiffs.

### 2.  Fraudulent Conveyance - § 548 (a)(1)(B)

122. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because, by transferring the only major asset of Len to his father, the transfer was likely to, and did, make Len insolvent and unable to pay his mortgage obligations to Sun Trust Bank. Moreover, at the time of the transfer, and at all times from 2007 through 2018, Max gave no consideration, made no payments and gave or transferred no property to Len.  Max has produced no evidence of consideration for the transfer and Len has testified repeatedly, that Max gave Len no money or property of value at any time from 2007 through 2018.

123.  In addition, at the time of the transfer under 548(d)(1), April 17, 2018, Len was clearly insolvent since he was unable to pay his attorneys and the IRS, among other creditors, and he had a recent unsatisfied judgment recorded against him totaling in excess of $15 Million.

-35-

APPX00431

124.  Len received no compensation or property of value and gave up property worth in excess of $2 Million while remaining solely obligated on a Deed of Trust Note to Sun Trust bank that was in default at the time of the alleged transfer. The arrearage alone, on the SunTrust Note was more than $374,000.

125.  The transfer of the Property in 2010 by Quitclaim Deed was made after two years prior to Max's Bankruptcy because pursuant to Code § 548 (d)(1) the transfer of real property is deemed perfected when the deed is recorded or, if not recorded prior to the bankruptcy filing, the date immediately prior to the bankruptcy filing, namely April 18, 2018.  Therefore, the effective date of the transfer is April 17, 2018.

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition.

§548 (A)(1).

126.  Section 548(d)(l) also provides:

> For purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

Accordingly, for purposes of 11 U.S.C. § 548, the transfer date would be April 1 7, 2018, because the Quitclaim Deed was not recorded at the time of Len's bankruptcy filing..

127.  A transfer under Code §548 (a)(1)(B)(2) if:

-36-

Case 3:20-ap-90027   Doc 74   Filed 08/28/16   Entered 08/01/22 15:56:31   Page 36 of 53
Case 3:20-ap-90027   Document   Page 36 of 53
APPX00432

2.  The debtor received less than a reasonably equivalent value in exchange for such transfer or obligation; and

   a.  The Debtor was insolvent at the time of the transfer; or

   b.  the Debtor became insolvent as a result of such transfer or obligation; or

   c.  the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such Debts matured.

128.  The Plaintiffs assert that there is no dispute regarding any facts relevant to the Plaintiffs ability to recover the Property as a fraudulent conveyance under the provisions of 11 U.S.C. §548 (a)(1)(B)(2) and the documents and testimony of the Salas family members confirm that the "transfer" of the Property pursuant to the Quitclaim Deed was a fraudulent conveyance based upon the following:

   a.  The Salas family members hid the emails and communications between and among Ron, Len, Max, and the Goldstein firm (Stan Goldstein and Lynn Boileau), during the period 2011-2012 which clearly shows that the Quitclaim Deed was abandoned by Max and Len; and

   b.  Both Len and Max testified that Len was attempting to get his name off the Property, not the loan, in the period after 2010 at least through the year of the tragic fire at the Property (2015); and

   c.  None of the Salas family members could confirm the existence, or identify the location of the original Quitclaim Deed after 2012; and

   d.  The 1610 Riggs Place Trust filed no tax returns for any period; and

   e. Len testified that Max made no payments to Len at the time of the alleged transfer in 2010; and

   f.  Max made no payments of any kind related to the Propery to Len in or after 2007; and

-37-

APPX00433

g. Max gave no consideration of a non-monetary kind to Len, at any time, 2007 through 2018; and

h. The obligation under the Sun Trust Deed of Trust increased from $870,000 in 2007 to at least $1,030,825.85 as of the filing of Max Salas's bankruptcy case on April 18, 2018. See Max Salas Schedules A/B-J, May 2, 2018 (D-12) Case No. 18-00260, United States Bankruptcy Court for the District of Columbia. A copy of the Schedules page (p. 19 of 37) of Docket Entry 12 is attached hereto as Exhibit 18. According to a Stipulation filed by the Defendant/Debtor and U.S. Bank (successor in interest to SunTrust) the balance of the Sun Trust Deed of Trust as of September 29, 2019 was $1,208,720.40. See Stipulation filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, a copy of which is attached hereto as Exhibit 15; and

i. The Property represented, by far, the only major asset owned by Len; and

j. When the Property was transferred on April 17, 2018, Len was still obligated on the SunTrust loan for at least $1,030,825.85; and

k. When the Property was transferred, Len was obligated to the Estates in the amount of $15.2 Million, plus interest; and

l. According to Len's schedules his assets as of April 18 2018 totaled $53,373.38. His liabilities totaled $16,307,795.41. Len Salas Schedules, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, (D-1), p. 12 of 56; and

127. In an analogous case, ***Rameker v. Peterson (In re Associated Enters., Inc)***, 234 B.R. 718, the Wisconsin bankrupt court held that an attempted transfer of real estate into a defective trust was a fraudulent conveyance recoverable for the benefit of the debtor's estate. The court entered judgment in favor of the bankruptcy trustee finding:

> Because the trust fails, so does this argument. The transfers were made to an insider within one year before the petition was filed. The defendant is the president of the debtor corporation and a consummate insider. All relevant transfers took place in 1998 and the petition was filed in October 1998. The debtor was insolvent at the time of the transfers or the transfers caused the debtor to become insolvent. The debtor's bankruptcy schedules list total assets of about $ 14,000 and liabilities of almost $ 23,000 less than six months after the transfers took place. Finally, the debtor received no consideration for the

-38-

APPX00434

transfers. This is obviously less than reasonably equivalent value.

***Rameker v. Peterson (In re Associated Enters., Inc.)***, 234 B.R. 718, 724 (Bankr. W.D. Wis. 1999).  Although the trust at issue here is defective for a different reason, it was, nonetheless, a defective trust, void ab initio, as in ***Rameker***.  Additionally, as here, in ***Rameker*** found that the debtor's liabilities exceeded its assets at the time of the transfer determining that the debtor was either insolvent at the time of the transfer or the transfer caused the debtor to become insolvent.  The debtor, in ***Rameker***, received no consideration for the transfer and neither did Len. And, finally, no deed of any kind was recorded to effect the attempted transfer.

128.  In another case similar to this one, the bankruptcy court for the Middle District of Florida determined that the trustee could avoid, pursuant to 11 U.S.C.S. § 548, a transfer of real property which the Debtor deeded to her former husband and son and to recover the property for the benefit of the estate. The court found that the initial transfer of debtor's real property took place on the date that the deed was recorded, which was less than one year before the petition date (the limitations period prior to 2005). In addition, debtor was insolvent at the time of the initial transfer and the initial transfer was made without consideration. It was undisputed that debtor was not residing on the property at the time of the initial or subsequent transfers, and could not have claimed the property as her homestead. Thus, the necessary statutory elements were established and the transfers were subject to avoidance by the bankruptcy trustee under 11 U.S.C.S. § 548(a)(2).

***Cohen v. Bellamy (In re Shannis)***, 237 B.R. 862, 862 (Bankr. M.D. Fla. 1999).

129.  In its decision, the ***Shannis*** court noted that, "other then the effective date of the

-39-

Case 3:20-ap-90027   Doc 74  Filed 08/28/16  Entered 08/28/16 15:56:31  Page 39 of 53
Case 3:20-cv-00027   Document 74-1  Filed 08/01/22   Page 43 of 58   PageID #: 3808
Document      Page 39 of 53

APPX00435

transfer, the facts are not in dispute." *Id.* Here, the material facts are not in dispute, except the effective date of the transfer (the Defendant continues to assert the transfer took place in July, 2010). Max has consistently testified that he was the party responsible for paying the SunTrust loan, from 2007 through the commencement of Max's bankruptcy case. He paid no consideration for the original SunTrust loan of 2007 and the loan balance increased from 2007 to September, 2019 by more than $300,000. The Quitclaim Deed was not recorded as of the commencement of Max's bankruptcy case on April 18, 2018. Len was insolvent on April 18, 2018 and the Property was Len's only asset of more than a few thousand dollars. During the period 2010 through 2018, Len's income was limited and he was unable to pay his obligation including the SunTrust Mortgage during that time.

130. Applicable Florida law appears to be more restrictive than D.C. law regarding the rights of a subsequent purchaser for value. *See*, Fla. Stat. § 695.01. *Cohen v. Bellamy (In re Shannis)*, 229 B.R. 234, 237 (Bankr. M.D.Fla. 1999)( depends upon interpretation of Florida's provision which states "without notice"). However, under the analogous (to this case) facts of the *Shannis* decisions above, the court determined that the trustee can avoid the attempted transfer to relatives since that transfer occurred within 1 year (under pre-2005 language of § 548 (a)) even though the date of the deed was more than one year prior to the bankruptcy because the deed was not recorded until the period within one year of the bankruptcy filing.

131. Standard of proof required under 11 USCS § 548 is preponderance of evidence. *Dahar v. Jackson (In re Jackson)*, 2004 BNH 26, 318 B.R. 5, 2004 Bankr. LEXIS 1917 (Bankr. D.N.H. 2004). By that standard, the record in this case and the plain language of the statute, § 548(a)(1)(B) the Plaintiffs are entitled to summary judgment under Count IV of the Complaint.

-40-

Case 3:20-ap-90027   Document 74   Filed 08/12/21   Entered 08/12/21 15:56:31   Page 43 of 56
Case 3:22-cv-00027   Document 74   Filed 08/28/20   Page 40 of 53
Document      Page 40 of 53
APPX00436

**D.** **The Plaintiffs are Entitled to Recover Under Count V of Their Complaint (Fraudulent Conveyance Under D.C. Law)**

132.  The Plaintiffs, as the holders of the rights and claims of the Trustee, may avoid any transfer that is voidable under applicable law pursuant to Code § 544 (b) (1).

133.  Under the law of the District of Columbia, the transfer of the Property alleged herein, is a fraudulent conveyance because the transfer was performed with fraudulent intent as to existing creditors, such as the IRS, other taxing authorities, Sun Trust Bank, and others, including the Plaintiffs, and was made for less than reasonably equivalent value, all as specifically prohibited by D.C. Code § 28-3104, *et seq.*

134.  A transfer made is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. D.C. Code § 28-3105.

135.  Here the transfer was to the Debtor's father on the eve of bankruptcy less than two weeks after the entry of judgments against the Debtor in an amount in excess of $15,000,000. Moreover, the Defendant not only knew Len could not pay the judgment balances, he also knew that the Debtor was unable to pay his attorneys in the Superior Court case.  The Defendant's bankruptcy schedules show a payment of $2,000 from Max to Len's attorneys prior to the Defendant's bankruptcy filing.

136.  A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in

-41-

APPX00437

exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> In the District of Columbia, a transfer of real property is made:
> (A) With respect to an asset that is real property other than a fixture, including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee.

D.C. Code § 28-3106. Therefore, under D.C. law the alleged 2010 transfer, even if this Court determines that the Quitclaim Deed is valid, was not perfected at the time of Max's bankruptcy filing and is recoverable under D.C. law.

137. In an action for relief against a transfer or obligation under D.C. law, a creditor may obtain:

> (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
>
> (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee...;
>
> (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
>
>> (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
>>
>> (B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
>>
>> (C) Any other relief the circumstances may require.

D.C. Code § 28-3107

APPX00438

138. The date of transfer according to the law in the District of Columbia, for purposes of creditors and bona fide purchasers without notice, is the date the deed is recorded, in this case, no earlier than April 17, 2018.

> Any deed conveying real property in the District, or interest therein, or declaring or limiting any use or trust thereof, executed and acknowledged and certified as provided in §§ *42-101*, *42-121* to 42-123 [repealed],*42-306*, and *42-602* and delivered to the person in whose favor the same is executed, shall be held to take effect from the date of the delivery thereof, except that as to creditors and subsequent bona fide purchasers and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

D.C. Code §42-401. ***Sovran Bank v. United States (In re: Aumiller)***, 168 B.R. 811 (Bankr. D.D.C. 1994).

139. As this court has already noted, because the underlying state law avoidance claim was not time-barred as of the commencement of Len Salas' case, this claim could have been brought by the Trustee provided the complaint was filed within the time periods prescribed in 11 U.S.C. § 546(a). ***See UMB Bank , N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down, LLC***), 610 B.R. 779, 785 (Bankr. D. Del. 2020). (If "underlying state law avoidance claim is not time-barred as of the commencement of a bankruptcy case, a section 544(b)(l) claim may be brought provided that it is commenced within the time periods prescribed by section 546(a)."); ***Tabor v. Davis***, No. 05-15794-L, 2016 WL 11696269, at *13 (Bankr. W.D. Tenn. June 15, 2016) ("The reachback period for avoiding fraudulent transfers that could have been avoided by a creditor but for the filing of a bankruptcy case is measured from the entry of the order for relief.").

140. All of the arguments set forth in the section on recovery under §548(a)(1)(B)(2),

-43-

particularly those involving the circumstances of the transfer of the Property and the insolvency of the Debtor apply here. The Plaintiffs assert they are entitled to judgment under the D.C. fraudulent conveyance statute.

    E.    **The Trustee's Status as a Bona Fida Purchaser Gives the Trustee a Superior Interest in the Property Than the Defendant's**

141. ***Aumiller, supra*** explained that Section 544(a) of the Bankruptcy Code, the "strong arm" clause, bestows upon the trustee the rights of a hypothetical judgment lien creditor and the rights of a bona fide purchaser for value as of the date of the filing of the bankruptcy petition. Although the trustee's strong arm powers arise under federal law, the scope of these powers is governed by the substantive laws of the state in which the property is located, in this case, the District of Columbia. ***In re Bridge***, 18 F.3d 195, 200 (3d Cir. 1994). Therefore, the relevant inquiry in this case is whether the trustee, clothed with the rights bestowed upon him as a bona fide purchaser or judgment lien creditor pursuant to D.C. law, prevails over whatever equitable or legal rights the Defendant has.

142. Pursuant to District of Columbia law, a deed conveying an interest in real property is not effective against a subsequent bona fide purchaser or creditor without notice unless it is recorded. D.C. Code § 45-801 (1990); 3 ***Manogue v. Bryant***, 15 App. D.C. 245 (1899) (purpose of statute is to protect judgment creditors as well as purchasers against claims of which they had no notice). Because the equitable lien in this case was not recorded, it would not be effective against a bona fide purchaser or judgment creditor who acquired an interest in the property without notice of that equitable lien.

143. Pursuant to 11 U.S.C. § 544 (a), the Trustee has as of the date of the Len Salas

Case 3:20-ap-00027   Doc 74   Filed 08/28/23   Entered 08/28/23 15:56:31   Desc Main
Document      Page 44 of 53

Case 3:20-cv-00800   Document 4-1   Filed 07/01/22   Page 43 of 53   Page ID #800

APPX00440

bankruptcy petition, namely, May 2, 2018, the status of a bona fide purchaser of real property from the debtor, without notice.

144. Under Code § 544 (a)(3) the trustee's bona fide purchaser status gives the Plaintiffs priority over subsequently recorded interests in the Property.

145. Under D.C. Code, § 42-401:

Any deed conveying real property in the District, or interest therein, ...shall be held to take effect from the date of the delivery thereof, except that **as to creditors and subsequent bona fide purchasers** and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

146. As a result, the Plaintiffs have a superior and priority interest in the Property ahead of any interest acquired by Max Salas and, therefore, the Property should be turned over to the Plaintiffs, or sold to recover the net equity for the benefit of the unsecured creditors of Len Salas' bankruptcy estate.

147. Section 544 is known as the Trustee's "the 'strong arm' clause," *Aumiller, supra*, 168 B.R. at 817, and "'gives a bankruptcy trustee the rights and powers of a judicial lien creditor or a bona fide purchaser of real property and allows the trustee to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a judicial lien creditor or a bona fide purchaser of real property.'" *Drown v. Wells Fargo Bank, N.A. (In re Scott)*, 424 B.R. 315,327 (Bankr. S.D. Ohio 2010) (quoting *Craig v. Seymour (In re Crabtree)*, 871 F.2d 36, 37 (6th Cir. 1989)).

148. The scope of these powers is governed by the substantive laws of the state in which the property is located, in this case, the District of Columbia. *Midlantic Nat'l Bank v. Bridge (In re Bridge)*, 18 F.3d 195, 200 (3d Cir. 1994) (citations omitted).

-45-

APPX00441

149. Historically, the bankruptcy code has been hostile to secret liens such as the Quitclaim Deed at issue here. ***Bridges, supra***, at 199.

> "While an equitable lien . . . may be enforceable against . . . subsequent purchasers and incumbrancers with notice, it may not be enforced against prior incumbrancers or subsequent incumbrancers without notice. The trustee belongs to the latter class." ***Hayes v. Gibson***, 279 F. 812, 814 (3d Cir. 1922) (internal citations omitted)

***In re Bridge, supra***, 18 F.3d at 199 n.3.

150. The trustee's status under section 544(a) is governed by the state substantive law defining that notice. See, e.g., ***In re Probasco***, 839 F.2d 1352 (9th Cir. 1988) (debtor in possession could not avoid partner's interest in real property as a hypothetical bona fide purchaser under section 544(a)(3) because it had constructive notice under California law of the partner's interest in the property); ***Angeles Real Estate Co. v. Kerxton***, 737 F.2d 416, 420 (4th Cir. 1984) (trustee's rights under section 544(a) as judgment lien creditor are subject to prior equitable interests under Maryland law); ***McCannon v. Marston***, 679 F.2d 13 (3d Cir. 1982) (where possession of property by claimed purchaser put trustee on constructive notice of purchaser's interest under Pennsylvania law, trustee could not avoid purchase of the property under section 544(a)(3)); ***In re Roman Crest Fruit, Inc.***, 35 Bankr. 939 (Bankr. S.D.N.Y. 1983) (where reasonable inquiry would have revealed existence of agreement between debtor and assignee for the sale of debtor's interest in store leases, and knowledge of such agreement was of sufficient magnitude to require hypothetical purchaser to inquire further, assignee's equitable lien could not be avoided by bankruptcy trustee under section 544(a)).

151. Pursuant to District of Columbia law, a bona fide purchaser or judgment creditor is subject to actual, constructive or inquiry notice. ***Clay Properties, Inc. v. The Washington Post***,

-46-

APPX00442

604 A.2d 890, 894 (D.C. App. 1992) (subsequent bona fide purchaser can be held to inquiry notice); *Kayfirst Corp. v. Washington Terminal Co.*, 813 F. Supp. 67, 72 (D.D.C. 1993) (same); *Manoque*, 15 App. D.C. at 261-62 (judgment lien creditor that was held to inquiry notice of the mortgagee's equitable rights took subject to those rights); *Hume*, 12 App. D.C. at 368-69 (failure to record or acknowledge deed does not deprive it of priority over judgment creditor having notice of its existence); *Groome*, 13 App. D.C. at 470 (equitable lien has priority over a subsequent judgment lien creditor who had notice of equitable claim). See also *Harris v. Maryland National Bank*, 165 B.R. 729 (Bankr. D.D.C. 1994) (recorded Deed of Trust is sufficient notice, (despite misindexing at the Recorder of Deeds) under D.C. statute which states that Deed is perfected when presented to the Recorder of Deeds for recording).

152.  Actual notice is not relevant in the context of section 544(a) as the trustee assumes the role of a bona fide purchaser or judgment creditor without actual knowledge. *McCannon*, 679 F.2d at 16-17 (statute's language renders trustee's actual knowledge irrelevant but trustee may be held to constructive or inquiry notice). *See also, In re Sandy Ridge Oil Co.,* 807 F.2d 1332 (7ᵗʰ Cir. 1986)*, S. Bank and Trust Co. v. Alexander (In re Alexander)*, 524 B.R. 82 (E.D. Va. 2014)(trustee took title to half-interest in property despite existence of an unrecorded deed); *Hardesty v. Horn (In re Horn)*, 606 B.R. 747, 67 BCD 212 (Bankr. S.D. Ohio 2019). In *Hardesty,* the debtors had transferred the subject property by an unrecorded deed to the father prior to filing their petition and at the time of the filing the father was merely the holder of an unrecorded deed. The bankruptcy court granted summary judgment in favor of the trustee. The Court determined the fact that the father had previously transferred the title to the debtors so they could obtain financing did not matter, nor did the fact that the county auditor's office had

-47-

APPX00443

approved the conveyance back to the father because such approval was insufficient under Ohio Rev. Code Ann. § 5301.25 to put the trustee on constructive notice of the transfer. *Id.*, 606 B.R. 747, 748 (Bankr. S.D.).

153. Constructive notice, which has generally come to mean record notice, could not exist in this case because the equitable lien was not recorded. *Clay*, 604 A.2d at 895 n.15. See also, *Sandy Ridge Oil* and *Hardesty, supra.* Compare *Treinish v. Norwest Bank Minn., N.A. (In re Periandri)*, 266 B.R. 651 (B.A.P. 6th Cir. 2001)(Pending foreclosure, which operated as a lis pendens under Ohio law was constructive notice which defeated the trustee's bona fide purchaser status). Here, the trustee had no notice of any recorded document which could defeat his interest as of Len's bankruptcy filing on April 18, 2018. *Sovran Bank v. United States (In re Aumiller*), 168 B.R. 811, 817-19 (Bankr. D.D.C. 1994)

154. Under well established law interpreting the subject D.C. statute, and other, similar state statutes, the conveyance, for purposes of avoidance or recovery is the date the subject deed is recorded or, if unrecorded, the day before the Debtor's bankruptcy petition, here - April 17, 2018. As a result, the avoidance and recovery actions set forth in the Complaint are well within the limitations periods established by 11 U.S.C. §546 (a), or any other applicable limitations period. *See, for example, Williams v. Marlar*, 252 B.R. 743, 758 (8th Cir BAP 2000)(Arkansas Law); *Southern Bank & Trust Co. v. Alexander (In re Alexander)*, 2014 Bankr. LEXIS 3048, *21(Bankr. E.D. Va. 2014) *Health Science Prods. v. Taylor (In re Health Science Prods.)*, 183 B.R. 903, 919 (Bankr. N.D. Ala. 1995);

155. The record of an instrument that is not permitted by law to be recorded, or that is not proved for record as required by law, is constructive notice to no one. *Clark v. Harmer*,

-48-

1895 U.S. App. LEXIS 3533 (D.C. Cir. 1895)

156.  Since the "transfer" at issue here, occurred, by statute, on April 17, 2018 and was an unrecorded transfer of real property, at best, the Trustee's status as a bona fide purchaser and judgment lien creditor, as of the date of the Debtor's bankruptcy filing, is superior to whatever interest the Defendant may have as of the same date.

F.      **The Trustee's Status as Hypothetical Judgment Lien Holder Gives the Trustee a Superior Interest in the Property**

157.  As of the commencement of this case, April 18, 2018, the trustee has, without regard to any knowledge of the trustee or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien, whether or not such creditor exists. Code §544 (a)(1).

158.  The Plaintiffs are the authorized representatives for prosecution of all of the Trustee's rights and powers under Code §§ 544, *et seq.*

159.  A judicial lien creditor, under the laws of the District of Columbia, has a superior interest in the Property than that of a competing creditor or owner who has not recorded an interest in the Property.  Thus, as discussed below, the Trustee's interest is superior to the unrecorded interest of the Defendant.

160.  Section 544( a)( 1) grants a trustee "the status of a hypothetical lien creditor who

-49-

is deemed to have perfected his interest as of the date of the filing of the bankruptcy petition."

***Rogan v. Bank One, N.S. (In re Cook)***, 457 F .3d 561, 564 ( 6th Cir. 2006).

161.  The difference between a bona fide purchaser and a judgment creditor, for

purposes of the Trustee's Avoiding Powers, is explained as follows:

> a judgment creditor is not in the position of a bona fide purchaser, and his
> claim is subject to prior, undisclosed equities. "He is neither in fact nor in law
> a bona fide purchaser, and must stand or fall by the real, and not the apparent
> rights of the defendant in the judgment."' ***Kolker v. Gorn***, 193 Md. 391, 398,
> and cases cited.

***E. Shore Bldg. & Loan Corp. v. Bank of Somerset***, 253 Md. 525, 530, 253 A.2d 367, 370

(1969).  Therefore, unlike a bona fide purchaser, a judgment creditor is subject to any

existing equitable claims, regardless of notice.  Here, however, there are no equities that

could defeat the Trustee's lien since the Quitclaim Deed, at best, constituted a secret lien.

Moreover, the facts and circumstances of the resurrection of the Quitclaim Deed in February,

2018, as described above hardly favor the Defendant.

162.  As the uncontested facts in this case show:

> a.  The Defendant failed to record the Quitclaim Deed despite his obligation to
> do so; and

> b.  Less than 6 months after the execution of the Quitclaim Deed Len and Max
> were instructed by Ron, the creator of the Quitclaim Deed, that a new Deed
> needed to be created by someone in D.C. See Exhibit 7.

> c.  Ron Salas acknowledged that he knew the only reason Len could be a
> defendant was if the Quitclaim Deed had not been recorded; and

> d.  Neither Max, Len, Ron or Kendra produced a copy of the Quitclaim Deed
> during the Superior Court litigation, until February, 2018, even though they all
> knew of its existence and they all also knew that the only reason Len was a
> defendant in the Superior Court litigation was if Len was a titled owner of the

-50-

APPX00446

Property; and

e.  As of February, 2018 no Salas family member had an original Quitclaim Deed; and

f.  As of February, 2018 no Salas family member was aware of the existence of an original Quitclaim or, if it existed, its location.

g.  Len produced a copy of the Quitclaim Deed in or about February, 2018 only after Max (and Len) learned from Marc Albert that the 1610 Riggs Property Trust and the Quitclaim Deed could be used to exempt the Property in Max's future bankruptcy.

h.  Both Ron and Max testified that the Quitclaim Deed was still in effect in 2018, when their own email communications in 2011 and 2012 tell a complete contradictory story.

163.  A perfected mortgage is superior to a later-recorded judicial lien. *Id.* at 565. That would apply to the SunTrust Deed of Trust but not to the Quitclaim Deed, even if it is in effect as of April 17, 2018.

164.  Much of the argument in previous Section, applied to the Trustee's status as a bona fide purchaser for value and without notice, also applies to the Trustee's status as a hypothetical, judicial lien holder but is not repeated here to avoid unnecessary duplication.

165.  Based upon the undisputed facts of this case and the express provisions of Code, § 544(a)(1) the Plaintiffs are entitled to judgment on their supeiror claim to the Property due to the Trustee's status as a judgment lien creditor.

G.    **The Plaintiffs May Recover, for the Benefit of the Debtor's Estate, the Property or its Value**

166.  Under Code § 550 (a) the trustee may recover, for the benefit of the estate, the property transferred or, upon court order, the value of the property.  Here the Plaintiffs are seeking

the equity in the Property, either through payment of the agreed amount of the equity (approximately $1.3 Million), or through the proceeds of a court ordered sale of the Property. *See,* for example, *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 162 (S.D.Tex. 2009)(court has discretion); *In re Vedaa*, 49 B.R. 409, 411 (Bankr. N.D. 1985); *In re: Beck*, 25 B.R. 947 (Bankr. N.D.Ohio 1982).

## V.     **CONCLUSION**

For the reasons set forth in the foregoing Memorandum, the Plaintiffs assert that they are entitled to summary judgment on Counts I, II, IV, V, VI of their Complaint and seek a judgment declaring and adjudging that the Plaintiffs, on behalf of the Debtor's Estate are the owners of the Property and are entitled to recover the Property or its value for the benefit of the Debtor's Estate and for such other and further relief as is consistent with the Plaintiffs' Complaint and the relief sought therein.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt
        Philip J. McNutt
        11921 Freedom Drive, Ste 584
        Reston, VA 20190
        703-904-4380

-52-

APPX00448

202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

Certificate of Service

I HEREBY CERTIFY THAT a copy of the foregoing Amended Memorandum, List of Uncontested Facts and Exhibits was delivered electronically, on the 1st day of August, 2022 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com

/s/ Philip J McNutt
Philip J. McNutt

-53-

APPX00449

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL | : | |
| GREGORY BREKELMANS, | | |
| CO-PERSONAL REPRESENTATIVES | : | |
| OF THE ESTATE OF NINA | | |
| BREKELMANS, et al | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX  SALAS | : | |
| Defendant | : | |

## PLAINTIFFS' AMENDED LIST OF UNDISPUTED FACTS, PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 7056-1 of the rules of this Court, the Plaintiffs submit the

following facts in support of their Motion for Summary Judgment.  The Plaintiffs assert that these

facts are either stipulated by the parties, supported by the Summary Judgment Record herein, or

otherwise undisputed.

## PLAINTIFFS' LIST OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed on
April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee, Case
No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Motion for Summary Judgment unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

1. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans and Michael Patrick McLoughlin, respectively. Joint Stipulation of Uncontested Facts, Joint Pretrial Statement, June 22, 2020 (D-14) ("Stip"), No. 1.

**RESPONSE:**

2. Nina Brekelmans and Michael Patrick McLoughlin were tragically killed in a fire at a residence in Washington, DC (the "Fire") located at 1610 Riggs Place, NW, Washington, DC (the "Property"). Stip. No. 2

**RESPONSE:**

3. Defendant resided in the Property from approximately 2007 through early June, 2015 and then commenced residing in the Property again in early 2018. Stip No. 3, Exemption Trans. Vol. 3, 62:11 - 63:17.

**RESPONSE:**

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement.

-2-

5. Michael Gigandet, the Court appointed Trustee of the Estate, has declined to pursue the causes asserted herein and has also declined to join in this action. Court's Memorandum Opinion dated February 11, 2021 (D-38)("L Salas Memorandum Opinion"), at p. 6-7.

**RESPONSE:**

6. The Complaint is brought as a derivative action on behalf of the Estate of Len Salas. L Salas Memorandum Opinion dated February 11, 2021, in Case No. 20-90027 (D-38).

**RESPONSE:**

7. In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). Joint Statement of Stipulated Facts, Joint Pre-trial Statement dated June 22, 2020 (D-14), Stipulation No. ("Stip. No.") 6.

**RESPONSE:**

8. The Defendant, Max Salas does not have the original of the Quitclaim Deed and the 1610 Riggs Property Trust, dated July 6, 2010. Defendant's Amended Responses to the Plaintiffs Request for Admissions, dated November 11, 2021 ("Amended Responses-RFP"), Exhibit 17, Resp No. 2, p.3. Amended Responses-RFA, Request No. 1., p. 2.

**RESPONSE:**

9. Len Salas does not remember seeing a "wet ink" original of the Quitclaim Deed after July 6, 2010. L Salas Trans. 140:13-23.

**RESPONSE:**

10. The Defendant does not have the original Quitclaim Deed created in July, 2010. Defendant's Amended Responses to the Plaintiffs' Request for Admissions ("RFA"), Req. 1

-3-

**RESPONSE:**

11. That the Defendant is unaware of the location of the original Quitclaim Deed after 2012.

**RESPONSE:**

12. Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max Salas and only kept a copy.

**RESPONSE:**

13. The Defendant did not attempt to record the Quitclaim Deed after 2010.         RFA, Req. 3.

**RESPONSE:**

14. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.  RFA 16.

**RESPONSE:**

15. Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation. RFA 17.

**RESPONSE:**

16. Neither Len Salas nor Max Salas informed SunTrust in writing that Max was responsible for the SunTrust Deed of Trust Note payments.

**RESPONSE:**

17. Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note. RFA 18.

**RESPONSE:**

-4-

APPX00453

18. Max Salas did not contact Ms. Sylvia Jones, a real estate broker acquaintance, regarding the location or existence of the original Quitclaim Deed since June, 2015. RFA 41

**RESPONSE:**

19. That the Note balance as of April, 2007 totaled approximately $870,000. RFA 44

**RESPONSE:**

20. That the Note balance as of the commencement of the Salas bankruptcy case (April 18, 2018) totaled more than $1,030,825.86. RFA 47

**RESPONSE:**

21. That the Note Balance as of September 29, 2019 totaled $1,208,720.40. Stipulation filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, Motion to Approve Settlement with U.S. Bank, Exhibit 15.

**RESPONSE:**

22. That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim Deed purporting to transfer the Property from Len to Max.

**RESPONSE:**

23. That the foresaid Trust and Deed were prepared and executed in Colorado.

**RESPONSE:**

24. That the Trust was registered in Colorado by Ron Salas in 2011 even though the

-5-

Case 23-20-00997 Doc 74-1 Filed 08/01/22 Entered 08/01/22 15:56:61 Desc
Exhibit Plaintiffs Amended List of Uncontested Facts    Page 5 of 29

APPX00454

Property was located in D.C. Email dated June 17, 2011 from Ron to Max, Exhibit 7.

   **RESPONSE:**

   25.  That the Defendant made at least two attempts to obtain a new or different Quitclaim

Deed from the Law Firm of Stan Goldstein in 2011 and 2012.  Emails between Max Salas and the

Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

   **RESPONSE:**


   26.  That on June 17, 2011, Ron Salas sent an email to his father, the Defendant, stating

that the "next step" was for his father to obtain counsel to prepare a Quitclaim Deed for Len to

sign.  Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012,

Exhibit 7.

   **RESPONSE:**


   27.  That on June 21, 2011 the Defendant forwarded Ron Salas's email of June 17, 2011 to

Stanley Goldstein requesting Mr. Goldstein to assist the Defendant to transfer the Property from

Len to Max.   Emails between Max Salas and the Goldstein Firm, June, 2011 through February,

2012, Exhibit 7.

   **RESPONSE:**


   28.  On January 17, 2012, more than six months later, the Defendant sent another email to

Lynn Boileau, an associate of Mr. Goldstein requesting that she "get Lenny's name off of the

property." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012,

Case 3:20-ap-00027 Doc 74-14 Filed 08/26/24 Entered 08/01/22 15:56:31 Desc
Exhibit Plaintiffs Amended List of Uncontested Facts    Page 6 of 29          APPX00455

Exhibit 7.

**RESPONSE:**


29.  On February 24, 2012, Len sent his father an email asking for the status of removing Len from the property title.  Max responded on February 24, 2012 that he is "still working on this..." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7 .

**RESPONSE:**


30.  There were no further communications regarding the creation or recording of a Deed for the transfer of the Property from Len to Max after February, 2012. L Salas Trans. _____ .

**RESPONSE:**

31.  From 2010 through early 2015 Len had numerous communications with Max asking Max to remove his name from the Property. L Salas Trans. 70:18 - 74:16

**RESPONSE:**

32.  Len had several conversations with his father regarding getting his name off the loan and deed after 2010.  L Salas Trans. 71:25 - 74:16; Transcript of Len Salas's testimony at the hearing on Objections to the Claim of Exemption (of the Property) by the Debtor, Max Salas, in case no. 18-00260 in the United States Bankruptcy Court for the District of Maryland, Trial Transcript ("Exemption Trans."),Vol 1., Exhibit 20, 158:13 - 163:10; Deposition Transcript of the Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

**RESPONSE:**

-7-

Case 3:20-ap-00027  Doc 74-14  Filed 08/01/22  Entered 08/01/22 15:56:31  Desc
Exhibit Plaintiffs Amended List of Uncontested Facts    Page 7 of 29

APPX00456

33. The Sun Trust Note was in default during the period 2010 - 2018. L Salas Trans., Exhibit 13, 55:11-20.

**RESPONSE:**

34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns.

**RESPONSE:**

35. The Plaintiffs are the holders of undisputed and accepted claims totaling $15.2 Million. Of that amount, the claim of the Brekelmans estate represents $7.5 Million and the claim of the McLoughlin Estate represents $7.7 Million. Stip. No. 6

**RESPONSE:**

36. According to the Debtor's schedules and the Trustee's Final Report (D-209), in Case No. 18-2662, the Plaintiffs represent 99.8% of all allowed unsecured claims of the estate.

**RESPONSE:**

37. The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's).

**RESPONSE:**

38. The Plaintiffs received distributions on account of their claims from both estates.

**RESPONSE:**

39. The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018.

**RESPONSE:**

40. On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in

-8-

the Middle District of Tennessee and the District of Columbia, respectively.

**RESPONSE:**

41. At the time of the bankruptcy filings by Len and Max, Len was, and continued to be, until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property").

**RESPONSE:**

42. In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then wife, divorced.

**RESPONSE:**

43. Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan").

**RESPONSE:**

44. The proceeds of the Sun Trust Loan were paid to Max's wife as part of the divorce settlement. Exemption Trans. Vol. 3, Exhibit 6, 70:2-17.

**RESPONSE:**

45. Len received no part of the $870,000.

**RESPONSE:**

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.

**RESPONSE:**

APPX00458

47.  At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. Exemption Trans. Vol. 3, 71:9 - 72:23.

**RESPONSE:**


48.     At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in  July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed.  Exemption Trans. Vol 3, Exhibit 6, 139:15 - 140:2; Len Salas testimony, Plan Confirmation Hearing, United States Bankruptcy Court for the Middle District of Tennessee, December 13, 2018 ("L Salas Conf. Hrg. Trans."), 68:22 - 69:2. Exhibit 4.

**RESPONSE:**


49.     Max delivered the original Quitclaim Deed to Mr. Goldstein's office but did not recall whether Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

50. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor.

**RESPONSE:**

51.  There are no documents indicating that Max was liable on the SunTrust loan at any time and Max never entered into any agreement or understanding with Len that Max was liable or

-10-

APPX00459

responsible.

**RESPONSE:**

52.  There is no document raised, proffered or produced by Max indicating that Len was not the sole party responsible for the Deed of Trust payments until at least November, 2019.[1]

**RESPONSE:**

53.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that, when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas testimony at the Exemption Hearing, Exemption Trans. Vol. 2, August 23, 2018 ("Exemption Trans. Vol. 2"),Exhibit 3, 33:23 - 50:25, Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 1, 42:18 - 43:2.

**RESPONSE:**

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee.

**RESPONSE:**

_____

[1]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did finally reach an agreement with Max for him to make the payments under the Deed of Trust from and after November, 2019.  However, there is no indication in the agreement reached between Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not in effect.  Therefore, Len is still liable for the entire balance under the SunTrust Note which, as of September 29, 2019, was $1,208,720.40.  See Max Salas Stipulation with U.S. Bank attached hereto as Exhibit 15.

-11-

Case 3:20-ap-00027 Doc 74-14 Filed 08/26/24 Entered 08/05/22 15:56:01 Desc Exhibit Plaintiffs Amended List of Uncontested Facts    Page 11 of 29

APPX00460

55.  According to Len, the CLR Trust, was a trust created by Max for the benefit of his three sons, Chase, Len and Ron. Len Salas, Sup. Ct. Depo, Exhibit 11, 30:5-14.

**RESPONSE:**

56.  Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust." L Salas Trans. 148:1-13. In Len's Deposition Testimony in the Superior Court Litigation, Len testified, on March 9, 2016, that he had no knowledge a trust other then the CLR Trust. Len Salas Deposition Testimony, March 9, 2016 in the Superior Court Litigation, Exhibit 11, 29:14 - 30:14

**RESPONSE:**


57.  The lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property.

**RESPONSE:**

58.  Max did not want the rents deposited into his personal account.  Exemption Trans. Vol 3., Exhibit 6,  222:12 - 16

**RESPONSE:**

59.  Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2 - 150:21.

**RESPONSE:**

60.  During the period 2015 through 2018, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note")  with the exception of one payment of made by Max from the insurance proceeds he

-12-

Case 23-20-00990027 DoDoc 74-14 Filed 08/01/26/24 Entered 08/05/22 15:56:31 Desc 924
Exhibit Plaintiffs Amended List of Uncontested Facts    Page 12 of 29

APPX00461

received as a result of the fire damage.

**RESPONSE:**


61.  As of October, 2018, the deficiency on the SunTrust Note was $420,928.34.  Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

62. As of April, 2018, the deficiency on the SunTrust Note was $374,282.18.  Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

63.  As of April, 2018, Len remained the sole obligor on the SunTrust Note.

**RESPONSE:**

64.  The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7, 152:3 - 153:10.  See SunTrust Deed of Trust, dated April 16, 2007, Exhibit A to SunTrust Motion for Relief from Stay ("SunTrust Motion"), filed in Case No. 18-2662 on November 2, 2018 (D-79-1), Exhibit 15.

**RESPONSE:**


65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property.

**RESPONSE:**

66.  At all relevant times, Len worked only part time and had limited income and assets.

**RESPONSE:**

-13-

67. At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

**RESPONSE:**

68. Len did not have sufficient funds to pay his attorneys in the Superior Court litigation. He lives "paycheck to paycheck." L Salas Trans. 76:20 - 77:2

**RESPONSE:**

69. At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans. 61:1 - 63:2.

**RESPONSE:**

70. In 2016, Len's income was a total of $15,151. L Salas Statement of Financial Affairs, filed April 18, 2018 in Case No. 18-2662, (D-1), Exhibit 16, p 38.

**RESPONSE:**

71. In 2017 Len's total income was $30,408. Exhibit 16, p. 38.

**RESPONSE:**

72. In 2018, through April 17, 2018 Len's total income was $6,720. Exhibit 16, p. 38.

**RESPONSE:**

73. During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them. See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District

-14-

Case 3:20-ap-09027 Doc 74-14 Filed 08/01/22 Entered 08/01/22 15:56:31 Desc
APPX00463

of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

**RESPONSE:**

74.  Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, filed April 27, 2018 in Case No. 18-2662, D-10, at page 3 of 10.

**RESPONSE:**

75.  On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41.  Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

**RESPONSE:**

76.  Len received no income, payments or property from Max in 2007 or 2010. L Salas Mtg Trans., 4/1/19, Exhibit 5, 5:22 - 7:15.

**RESPONSE:**

77.  Len repeatedly attempted to get Max to remove Len's name from the Property after 2010. L Salas Depo. Testimony, Exhibit 13, 70:18 - 74:16

**RESPONSE:**

-15-

78.  Mr. Salas told his counsel, Mr. Albert and his associate, Mr. Cox, in 2018,  what Max did with the Quitclaim Deed and left it up to his counsel to obtain the original from Mr. Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

**RESPONSE:**


79.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed. Exemption Trans. Vol 3, 58:9-13.

**RESPONSE:**


80.  In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed, executed on July 6, 2010, as follows:

"Q And I believe you said, but I want to
clarify this, that between the time of 2012,
roughly, and I realize you said, I think, a year
or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came** in **my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind**
I **don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.**

-16-

APPX00465

**He didn't live in the District, he
never- he didn't live in the house, and I- so
that's the only logical reason I could make that
he would be involved, that it was never done. And
until that point, I did not even know that it had
not been done. I assumed at some point that he
came up with the money and did it. But he didn't,
as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the

District of Columbia, Case No. 18-00260, August 8, 2018, excerpts attached hereto as

Exhibit 8, ("R Salas Trans"), 73:15 - 74:21 (emphasis in original).[2]

      **RESPONSE:**


      81. The Plaintiffs Judgments are now final and binding on all parties as a result of the final

distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's

Bankruptcy.  M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for

the District of Columbia, Docket Entries  D-298 and 303; L Salas Chapter 7, Case No. 18-002662

in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries  D-

209 (Trustee's Final Report) and D-220, Trustee's Final Account, and D-222 (Final Decree).

      **RESPONSE:**


      82.  Max has not produced, and is currently unaware of the location of, the original

Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas,

March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

      **RESPONSE:**


      83.  On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust

---

      [2]Mr. Albert was acting as counsel for Max Salas in his bankruptcy and attended the
deposition on behalf of Max.  Ron Salas appeared without counsel.

APPX00466

had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max. This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property. A copy of Ron's email, dated June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022.

**RESPONSE:**

84. These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Debtor's Responses to Movants' First Set Request for Production of Documents, served on August 6, 2018, in Case No. 18-260, Exhibit 21.

**RESPONSE:**

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

**RESPONSE:**

86. Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Nos.: LenSalas000016-17.

**RESPONSE:**

87. On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein. In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..." Exhibit 7, Bates Number LenSalas000016.

-18-

APPX00467

**RESPONSE:**

88.  In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are **two different** requests.  One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supllied) Exhibit 7, Bates Number LenSalas000023.

**RESPONSE:**

89.  On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon."  Exhibit ___ , Bates Number LenSalas000029.

**RESPONSE:**

90.  Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust.  M Salas Trans. , Exhibit 10, 64:16 -74:2.

**RESPONSE:**

91.  Max also testified that he does not recall any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18.

**RESPONSE:**

92.  When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

> **Q.  Have you contacted Ms. Boileau or**
> Mr. Goldstein to determine if they have
> a copy of any deed that might have
> been created?

-19-

**A. I did try to contact them. I
did try to contact them actually
recently. And I -- but I didn't -- I
mean, they were trying -- they
were -- no. I mean, we worked on
something and then they said it couldn't go
any further and depends on what you
were going to do. So I don't -- I guess -- I
can't guess. I don't know.**

M Salas Trans. 73:13-23

**RESPONSE:**

93.  Only Max Salas had an original of the Quitclaim Deed after July 6, 2010 and Max

does not know where the original is or when he last had it.  Exhibit 10, M Salas Trans. 73:13-23,

77:2 - 82:23.

**RESPONSE:**

94.  Max testified in his deposition in the Superior Court case in February, 2016 that there

was one trust, the CLR Trust.  He confirmed that when he mentioned "the 1610 Salas Trust" he

was referring to the same trust, namely, the CLR Trust.  Max Salas Deposition in Superior Court

Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the

"Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 19, 42:18 -

43:2.

**RESPONSE:**

95.  Len Salas is not aware of the location of any of the wet ink signature originals of the

July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas

Trans."), 15:4-9.  Len testified in his deposition that he provided an original "wet ink" original of

-20-

APPX00469

the Quitclaim Deed, or a copy, to his lawyer on the eve of the Superior Court trial which resulted in the judgment against Len and his father. L Salas Trans, 16:6-24, 19:11-25 - 21:18. Regardless, Len testified that the document he produced on the eve of the Superior Court trial, which commenced on March 26, 2018, was kept in his possession at all known times between July, 2010 and March, 2018. Id. Len's wife, Kendra, testified that she "had a pdf of it (the July, 2010 Quitclaim Deed) and that she thought it was the same as what Len had " I thought it was the same thing as what Len had, but I'm not sure." K Rowe Trans. 30:13-20.

 **RESPONSE:**


96. Ron Salas stated that he was unaware the Quitclaim Deed had not been recorded until he found out that Len had been sued in the Superior Court (in October, 2015. Transcript of the Deposition of Ron Salas, August 8, 2018, Exhibit 8, 65:21 - 66:21

 **RESPONSE:**


97. Ron Salas was unaware of the requirements of Quitclaim Deeds in D.C. Ron Salas's testimony, Exhibit 12, at pp.227:5 - 228:12.

 **RESPONSE:**


98. Ron stated he was unaware whether the trust documents he created were valid under D.C. law in August, 2018. Ron Salas's testimony, Exhibit 12, 243:8-15.

 **RESPONSE:**

99.  The only deed referenced by Max or his counsel, allegedly entitling Max to an

ownership interest in the Property, is the 2010 Quitclaim Deed.  No other deed has been proffered, or even mentioned by the Salas family or by Max, specifically.

RESPONSE:


100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15 Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee filed objections to the Plaintiffs' claims filed in Len's bankruptcy.

RESPONSE:


101.  In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.

On April 5, 2018 Max was a creditor of Len's.  He owed Len, at the very least, his contribution for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least $1,035,000 approx) per his consistent promise that he would pay that amount and his consistent assertion that he was responsible for payment of the SunTrust Note which was, at all relevant times, in Len's name.

RESPONSE:


102.  The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy.  M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-

-22-

Case 23-00990 Doc 74-14 Filed 08/26/24 Entered 08/26/24 15:56:31 Desc
Exhibit Plaintiffs Amended List of Uncontested Facts    Page 22 of 29

APPX00471

002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket

Entries ("D- ") D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and 222

(Final Decree).

**RESPONSE:**

103.  Len was solely obligated on the Sun Trust Deed of Trust on the Property which,

according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018. M Salas

Schedules, Case No. 18-260 (D-12), p. 19 of 37, attached as Exhibit __ .

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July,

2010, did Max make any payments to Len and Len received no property or other value from Max

related to the Trust or Quitclaim Deed. Transcript of Confirmation Hearing in Case No. 18-02662,

December 13, 2018 at pp. 68-69, excerpts attached as Exhibit 4.  See also, Transcript of the

Chapter 7 Meeting of Creditors of Len Salas, April 1, 2019 (L Salas Mtg. Trans.), Exhibit 5,  5:22

- 7:15.

**RESPONSE:**


104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office.  He does recall

that Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**


105.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13

APPX00472

**RESPONSE:**


106.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments.  D.C. Code § 15-501 (a)(14). These conversations took place in early 2018.  Exemption Trans. Vol. 3, Exhibit 6, 119:9 - 122:9; Albert-R Salas eMails, 2/14 - 3/7/18, Exhibit 19, Exemption Trans. Vol 1, Exhibit 20, 145:22 - 147:20.

**RESPONSE:**


107.  Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

**RESPONSE:**


108.  Mr. Albert confirmed that no original was found after 2010 at the Exemption Hearing through Ron Salas' "rebuttal" testimony on August 24, 2018. Rebuttal Testimony of Ron Salas, at the Exemption Evidentiary Hearing, August 24, 2018. Exemption Trans., Vol 3, 4:10 - 5:16.  See also, Exemption Trans. 5:19 - 6:3, 7:18 - 12:8, 13:17 - 15:24

**RESPONSE:**


-24-

APPX00473

108.  At the time of Ron Salas' conversation with Mr. Albert regarding copies of the trust documents, Ron Salas understood that Mr. Albert was representing Max regarding a potential bankruptcy filing after the Superior Court trial.  Exemption Trans. 12:12 - 13:14

**RESPONSE:**


109. Max Salas valued the Property at $2.5 Million on his schedules in or about May 2018, and the Property was appraised for approximately $2.4 Million in or about August 2019. Stip. No. 50.

**RESPONSE:**


110.  Pursuant to an order of this Court dated June 12, 2019, the trustee in this case was authorized to sell the estate's interest in the Trustee's avoidance and recovery rights under 11 U.S.C. §§ 544 through 551.  Stip. No. 47

**RESPONSE:**


111.   On July 23, 2019, the trustee in Len Salas' case held an auction sale to sell the bankruptcy estate's interest in the avoidance and recovery actions pursuant to 11 U.S.C. §§ 544 through 553. Stip. No. 48

**RESPONSE:**


112. The Plaintiffs were the successful bidders at the Trustee's auction sale. Stip No. 49

**RESPONSE:**

-25-

113.  The D.C. Bankruptcy Court made no final determination of the effect of the trustee's avoiding powers asserting that effect was up to Len Salas' bankruptcy estate. Stip. No. 44

**RESPONSE:**


114.  No deed was recorded naming Max Salas as trustee or owner of the Property prior to Len Salas' bankruptcy filing. Stip. No. 45

**RESPONSE:**


115.  Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed related to the Property as of June 6, 2022. Stip. No. 46

**RESPONSE:**


116.  From the time of the Fire until February or March 2018, no one resided in the Property. Stip. No. 35.

**RESPONSE:**


117. During that time, and until November 2019, no payments were made on the SunTrust Loan with the exception of one payment made by Max Salas from the insurance proceeds he received as a result of the fire damage. Stip No. 36

**RESPONSE:**


118. According to the schedules filed in Max Salas' bankruptcy, as of the

Case 23-20-00990027 Doc 74-14 Filed 08/01/22/24 Entered 08/21/22 15:56:01 Desc Exhibit Plaintiffs Amended List of Uncontested Facts    Page 26 of 29

APPX00475

commencement of his bankruptcy case, in April, 2018, the only lien creditors were the IRS ($6,768.66 claim) and SunTrust Mortgage ($1,030,825.86). Stip. No. 37

**RESPONSE:**

119. The balance of the SunTrust Loan as of October 26, 2018 was $1,141,021.14. Stip. No. 38

**RESPONSE:**

120. Max Salas has been making the required payments on the Property since November 2019, as of June 22, 2020. Stip. No. 39

**RESPONSE:**

121. At all relevant times, Len Salas had limited income and assets, other than the Property. Stip. No. 28.

**RESPONSE:**

122. Max Salas intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. Stip. No. 29.

**RESPONSE:**

123. The Quitclaim Deed has never been recorded. Stip. No. 30

**RESPONSE:**

-27-

Case 23-20-00900027-DoDocu 74-14-1 Filed 08/0018/226/24 Entered 08/21/22 15:56:31 Des 2939
Exhibit Plaintiffs Amended List of Uncontested Facts    Page 27 of 29

APPX00476

124.  As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had any intent to use or record it.  Emails dated June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**


125. While in Colorado, Len Salas and Max Salas executed a trust agreement which Ron Salas prepared using a Colorado form even though the purported trust property, the Property, was located in D.C. Stip. No. 25.

**RESPONSE:**


126. The Defendant's Second Amended Disclosure Statement and Third Amended Plan of Reorganization, as confirmed by the D.C. bankruptcy court, recognize that the Plaintiffs are the owners of, and have the right to pursue, the avoidance actions which are alleged in the Complaint, as amended. Exhibit 2, Complaint Exhibit B, M Salas Second Amended Disclosure Statement, Exhibit 2, at p. 17.

**RESPONSE:**


Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

-28-

Case 3:20-ap-00027   Doc 74-14   Filed 08/26/24   Entered 08/26/22 15:56:01   Desc
Exhibit Plaintiffs Amended List of Uncontested Facts    Page 28 of 29

APPX00477

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By: _/s/ Philip J. McNutt___
       Philip J. McNutt
       11921 Freedom Drive, Ste 584
       Reston, VA 20190
       703-904-4380
       202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

-29-

APPX00478

41

1  believe the owner to be a trust known as 1610 Salas
2  Trust; is that correct?
3      A    That may be what it says, but that's not
4  what I know.
5      Q    Then in your similar answer to
6  interrogatory 3 in the Brekelmans set, you contend
7  some other person is the owner of the property in
8  question and you believe that to be the trust known
9  as 1610 Salas Trust?
10     A    Are you asking are these two different
11 answers to the same question?
12     Q    I am asking if I have correctly
13 identified your sworn answer to those two questions.
14     A    My smart answer?
15     Q    Sworn.
16     A    Oh, my sworn.  Are you asking if that's
17 the same question and I have answered different
18 ways?
19         MR. BARNES:  No, he's not he's asking if
20 that was your answer to both of those questions.
21     A    The answer is here and I signed it.  If
22 it means something that I thought it meant at the

42

1  time, I can tell you that nobody owns that property
2  but me.
3      Q    You are not the legal owner of the
4  property, are you?
5      A    Yes, I am, sir.
6      Q    Are you identified in any record in the
7  District of Columbia as the owner of the property?
8      A    I don't know but I know I own it.
9      Q    Are you identified on any document of any
10 governmental authority identifying you as the owner
11 of the property?
12     A    I don't know that, sir, but I know I own
13 it.
14     Q    You know that the records identify your
15 son Len Salas as the owner; isn't that true?
16     A    I don't know that, sir, but I now I own
17 it.
18     Q    Who is the 1610 Salas Trust?  What is it?
19     A    I don't know -- I mean it's a trust
20 that -- there's a trust called CLR, CLR Trust, it's
21 our trust.
22     Q    You say our trust.  Who is "our"?  Whose

43

1  trust is it?
2      A    I believe it's my son's and mine.
3      Q    I'm going to come to CLR in a minute
4  that's not what the answer says, and I'm going to
5  ask you what is the 1610 Salas Trust.  Why did you
6  identify it here?
7      A    Okay.  So because when people paid their
8  rent, they made the rent out to CLR --
9      Q    I didn't ask you who CLR is, sir.  I am
10 going to come to that.
11     A    Do you understand did I just tell you CLR
12 Trust?
13     Q    But both answers identify 1610 Salas
14 Trust so I'm asking you is there such an entity.
15     A    So this is wrong.
16     Q    There is no 1610 Salas Trust?
17     A    There is a 1610 Trust doing business as
18 CLR.
19     Q    When was the trust created?
20     A    I don't recall.
21     Q    Who created the trust?  In other words,
22 who is the seller who transferred the properties to

44

1  the trustee?
2      A    I don't know the answer to who is the
3  trustee.
4      Q    That is the person who was holding the
5  property for the beneficiary?
6      A    I believe I am, but I'm not sure.
7      Q    Who is the beneficiary of the trust
8  that's the person for whose benefit the property is
9  being held?
10     A    Isn't that the same question?
11     Q    No.  I asked you who was the trustee that
12 is the person holding the property for the benefit
13 of a beneficiary and you said you thought it was you
14 but you are not sure, correct?
15     A    So what's the other question?
16     Q    The other question is who is the
17 beneficiary, for whose benefit is the property being
18 held?
19     A    I mean I don't know.  I mean I know what
20 I think but I don't know.
21     Q    What do you think?
22     A    I think it's my property.

Case 3:20-cv-00027-DoDoc 34-31 Filed 08/01/22 Page 61 of 92 Page ID 2942
Exhibit 1 M Salas Superior Ct Depo Transcript (2-24-16)Excerpt    Page 1 of 1
APPX00479

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
In re:                                      )
                                            )       Case No. 18-00260
MAX E. SALAS,                               )       Chapter 11
                                            )
                    Debtor.                 )
_____     )

**SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF
REORGANIZATION DATED DECEMBER 5, 2019**

COMES NOW Max E. Salas, the Debtor and Debtor-in-Possession ("Debtor"), and

hereby presents this Disclosure Statement pursuant to the provisions of Chapter 11 of Title 11 of

the United States Code.

# I. **INTRODUCTION**

The Debtor provides this Disclosure Statement in order to disclose the information

believed to be material for creditors to arrive at a reasonably informed decision in exercising the

right to vote on acceptance of the Plan of Reorganization Under Chapter 11 of the United States

Bankruptcy Code Proposed by the Debtor (the "Plan").

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED**

**BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE**

**STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE**

**ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE NOT CONTAINED IN**

**THIS STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR AND**

**SHOULD BE REPORTED TO THE OFFICE OF THE UNITED STATE TRUSTEE.**

**INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN**

DB02/804722 0002/6981750.2
CORE/3502869.0005/156430962.1

Case 23-20-00990027 Doc 74-34-1 Filed 08/01/22/24 Entered 08/25/22 19:56:31 Desc
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19   Page 1 of 27

APPX00480

SUBJECT TO A CERTIFIED AUDIT.  CONSEQUENTLY, THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.

## II.  VOTING ON THE PLAN AND CONFIRMATION

Voting on acceptance or rejection of the Plan is governed by provisions of the Bankruptcy Code.  Each voting creditor will be supplied with an Official Ballot, in a form prescribed by the Bankruptcy Rules.  Creditors may vote to accept or reject the Plan by filing a completed ballot with counsel for the Debtor, within the time prescribed for voting.  A class of creditors will be considered to have accepted the Plan (i) if it is accepted by creditors holding at least two-thirds in amount and more than one half in number of the allowed claims of such class that have voted, or (ii) if the class is unimpaired within the meaning of the Bankruptcy Code.

The Bankruptcy Court will conduct a hearing and rule on confirmation of the Plan in accordance with the Bankruptcy Code at the United States Bankruptcy Court for the District of Columbia, Bankruptcy Court's Courtroom, United States Courthouse, 3rd and Constitution Avenues, NW, Washington, DC 20001.  You will receive a separate notice of that hearing.

## III.  CONFIRMATION UNDER ALTERNATE STANDARDS

If all requirements for confirmation of the Plan under the Bankruptcy Code are otherwise satisfied, the Debtor will ask the Bankruptcy Court to confirm the Plan without the unanimous acceptance of classes of creditors assuming the Court finds that the Plan does not discriminate unfairly against, and is fair and equitable (within the meaning of the Bankruptcy Code) with respect to, any class of holders of claims that has or is deemed to have rejected the Plan.

## IV.  HISTORY AND BACKGROUND OF THE DEBTOR
## AND REASONS FOR FILING BANKRUPTCY

The debtor in this case is an individual residing in the District of Columbia at 1610 Riggs Place, NW, Washington, DC 20009 (the "Property"). During the night of June 3, 2015, a fire occurred at the Property. Tragically, two roomers living in the main part of the home, Nina Brekelmans and Michael Patrick McLoughlin, were not able to escape and died in the blaze. As a result of the fire, the Property was nearly completely destroyed. Max Salas was also present at the time of the fire, where, along with his visiting grandson, he was forced to jump from the second story of the building. As a result, Max sustained serious injuries including burns and a broken ankle that required hospitalization for a period of six weeks. Following his release from the hospital Max further was in convalescence as a result of his injuries and due to an infection he contracted, was required to receive drip antibiotics for three months and was heavily sedated during this time. During this time, Max lived at an apartment provided to him through the insurance policy he had previously obtained in his name for the Property.

On October 20, 2015, the parents of Nina Brekelmans and Michael Patrick Mcloughlin initiated wrongful death actions against both Max Salas and Len Salas in D.C. Superior Court as Case Numbers 2015 CA 008054 B and 2015 CA 008061 B (the "Superior Court Litigation"). One of the Debtor's sons, Len Salas, was included in the action due his appearing as the last recorded interest in the Property with the D.C. Recorder of Deeds. The two cases brought by each family were later consolidated into a single action.

Following a jury verdict at the trial against Len and Max, Len, as record owner of the Property, was found jointly liable with Max to the McLoughlin Estate and the Brekelmans Estate (together, the "Judgment Creditors") in the respective amounts of $7.7 million and $7.5 million

Case 23-20-00990027 Doc 74-34-1 Filed 08/01/22/26 Entered 08/01/22 19:56:31 ID Desc945
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19   Page 3 of 27          APPX00482

(together, the "D.C. Superior Court Judgments"). These judgments prompted Max Salas and Len Salas to each file a Chapter 11 bankruptcy case on April 18, 2018. Len Salas's bankruptcy case was later converted to chapter 7 and is currently pending before the United States Bankruptcy Court for the Middle District of Tennessee as Case No. 3:18-bk-02662 (the "Len Salas Bankruptcy Case").

## V.    SIGNIFICANT EVENTS DURING THE DEBTOR'S CHAPTER 11 CASE

A.    Confirmation of the Debtor's Ownership Interest in the Property and Ability to Claim the District of Columbia's Homestead Exemption for the Property

Max Salas's status as sole legal and equitable owner of the Property had previously been called into question through the course of the Superior Court Litigation based on the fact that DC Land Records displays Len Salas as possessing the last recoded deeded interest in the Property. Questions concerning who possessed the proper ownership interest in the Property were further complicated by the existence of a Trust Agreement previously signed by Len Salas and Max Salas and a Quitclaim Deed that was not recorded with the DC Recorder of Deeds. With the bankruptcy, Debtor claimed full ownership of the Property and claimed an exemption in this interest in the Property pursuant to the District of Columbia's homestead exemption found in D.C. Code § 15-501(a)(14). The Debtor's claim to ownership of the Property and to the homestead exemption were objected to by the Judgment Creditors. Following a three-day trial on the matter, on September 25, 2018, the Bankruptcy Court issued a fifty-nine page opinion (the "Homestead Opinion") [ECF Dkt. No. 108] detailing Max Salas's history with the Property. The Homestead Opinion confirmed that Max Salas possessed the full legal and equitable interest to the Property and overruled the Judgment Creditors' objection to the Debtor's claim of the

Case 23-20-00990027 Doc 74-14 Filed 08/018/226/24 Entered 08/08/18/22 19:356:31 IDesc1946
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19    Page 4 of 27
APPX00483

homestead exemption in the Property. A copy of the Homestead Opinion, which details Max

Salas's full ownership history of the Property is attached to this Disclosure Statement for

reference as Exhibit A.

The Judgment Creditors timely appealed the Homestead Opinion and that appeal is

currently pending before the United States District Court for the District of Columbia as Case

No. 1:18-cv-02318-KBJ (the "Homestead Appeal"). Although the Homestead Opinion is on

appeal, no stay has been issued concerning the Homestead Opinion and it currently remains an

enforceable order of the Court.

B.    <u>Judgment Creditors Purchase of Avoidance Claims from the Len Salas Bankruptcy Estate</u>

The Len Salas Bankruptcy Case was converted to chapter 7 on December 26, 2018, and a

chapter 7 trustee has been appointed to that case. Following the conversion, another of Debtor's

sons, Ron Salas, sought to purchase any potential avoidance rights concerning transfer of the

property from Len Salas to Max Salas described in the Homestead Opinion in order to help his

father with reducing further contingencies and uncertainties in his bankruptcy case concerning

the Property. Following an auction conducted by the trustee in the Len Salas Bankruptcy Case,

the Judgment Creditors purchased "each and every claim and recovery action to which the

Trustee or the [Len Salas bankruptcy] estate may have under the provisions of 11 U.S.C. § § 544

through 553, as applicable, related to" the Property for the purchase price of $156,000.00. As

evidenced by a *Trustee's Report of Sale* filed by the Trustee in the Len Salas Bankruptcy Case on

August 14, 2019 and a *Sale of Estate Property Free and Clear of Liens and Interests* attached to

that report, Payment was delivered by the Judgment Creditors and their purchase of the

avoidance actions from the Len Salas bankruptcy estate was competed on July 31, 2019. To date,

Case 23-20-00990027 ToDoc 74-34-1 Filed F08/01/226/24nterFed08/01/22 15:56:31 IDDesc3947
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19   Page 5 of 27         APPX00484

no avoidance actions have yet been initiated by the Judgment Creditors based on these claims,

although on October 11, 2019, the Judgment Creditors did file a Motion for Relief from the

Automatic Stay in the Debtor's bankruptcy case seeking authority to file such claim. [ECF Dkt.

No. 252]. This motion is currently pending before the Court and is scheduled for hearing on

November 14, 2019.

C.    Debtor Obtaining a Conditional Certificate of Occupancy and Licensing to Rent Rooms
      at the Property through Short-Tem Rentals

      Following the issuance of the Homestead Opinion, the Debtor was able to secure a

Certificate of Occupancy and licensing to begin renting rooms at the Property though the short-

term rental site, Airbnb. A copy of the Debtor's Certificate of Occupancy and associated

licensing is attached as Exhibit B. Debtor's Certificate of Occupancy in his name is conditioned

upon Debtor's continued status as owner of the Property and would be revoked should that status

be overturned through an adverse ruling in the Homestead Appeal or through an adverse ruling

in a potential avoidance action that could be brought by the Judgment Creditors based on their

purchase of those claims from the trustee in the Len Salas Bankruptcy Case. Since beginning to

rent the rooms on a short-term basis through Airbnb beginning in April 2019, the Debtor has

earned $62,041.42 in rental payouts for the period of April 1, 2019 through September 30, 2019.

Additionally, the Debtor has secured a lease for the basement unit at the property for the monthly

rental amount of $4,500.00.

D.    Fusion Contracting Default Judgment

      On February 8, 2019, the Debtor filed a Complaint initiating Adversary Proceeding No.

19-10002 against Fusion Contracting Group, LLC (the "Fusion Adversary Proceeding") based on

breach contract claims stemming from unfinished and faulty work performed by a contractor

contracted to perform renovation work to the Property after the fire that occurred in 2015. Following a default by the defendant in that action, Judgment for the Debtor was entered on July 30, 2019, in the amount of $79,287.17 in damages and attorney's fees, with post-judgment interest on that judgment award as provide by 28 U.S.C. § 1961. The Debtor has not yet performed any post-judgment discovery regarding the Fusion Judgment and makes no representations regarding its collectability.

E.       Deed of Trust Stipulation for Plan Treatment & New Funding for the Plan

        Through the Plan the Debtor is seeking approval of a Stipulation Regarding Plan Treatment reached between the Debtor and U.S. Bank/Select Portfolio Servicing for the existing Deed of Trust on the Property. Under the terms of the proposed agreement, the Debtor will assume payments of $8,329.19 per month toward the Deed of Trust for the Property as adequate protection until Plan confirmation. Following approval of confirmation of the Plan, the Debtor shall make payments following re-amortization by U.S. Bank following Confirmation based on an approximate balance of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037. The full stipulation between the Debtor and U.S. Bank, subject to approval of the Bankruptcy Court of the Debtor's Plan, is attached hereto as Exhibit C.

        In addition to the agreement reached between the Debtor and U.S. Bank/Select Portfolio Servicing, the Debtor will deliver all non-exempt assets, primarily consisting of the Fusion Judgment, towards funding of the Plan. Debtor additionally, will provide $225,000.00 in additional new value into the Plan, in funds guaranteed and secured by funds contained in the Debtor's exempt retirement account.

F.    Post-Petition Employment of Professionals

The Debtor has been represented in this Chapter 11 proceeding by Stinson LLP as his

general bankruptcy counsel, Phillip G. Young, Jr. of Thompson Burton, PLLC as local counsel

for representation in the Len Salas Bankruptcy Case[1], and Justin Fasano and Janet Nesse of

McNamee Hosea as conflicts counsel for matters concerning U.S. Bank. The Debtor's

accountant is Arthur Lander, CPA PC.  The Debtor will continue to use these professionals post-

confirmation as necessary until the bankruptcy case is closed.

## VI.  OVERVIEW OF ASSETS AND MAJOR CLAIMS

The Debtor's primary Asset, as declared in the Homestead Opinion, is the real property

located at 1610 Riggs Place, NW, Washington, DC 20009 and serves both as the primary

residence of the Debtor and source of rental income through the renting of rooms through short-

term rental site Airbnb. Debtor has scheduled the value of this property on his Schedules as $2.5

million. The recent appraised value of the real property is $2.45 million. Although not

specifically a secured claim of the Debtor, the Property is subject to a Note and Deed of Trust

made by Len Salas originally in favor of U.S. Bank National Association as Trustee for the

holders of Bank of America Funding Corporation Mortgage pass-Through Certificates, Series

2007-6 and originally serviced by SunTrust Mortgage, Inc. On April 8, 2019, Select Portfolio

Servicing, Inc. filed a Transfer of Claim Other than for Security in the Len Salas Bankruptcy

Case indicating that they now serve as servicer on the Note and Deed of Trust on the Property.

---

[1] The Debtor has also employed Roderick K. Barnes of Rollins, Smalkin, Richards & Mackie, LLC ("Barnes") as special counsel for matters concerning the Superior Court Litigation. Payment to Barnes is covered by the insurance policy the debtor possessed at the time of the Property fire and no attorney fees are expected to be owed from debtor's bankruptcy estate.

Case 23-20-00027 Doc 74-34 Filed 08/01/22 Entered 08/02/22 15:56:01 Desc
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19    Page 8 of 27

APPX00487

This claim is treated as Class 3 in the Plan. The Debtor has negotiated with U.S. Bank/Select

Portfolio Servicing and has arrived at terms for adequate protection payments to U.S. Bank while

confirmation of the debtor's plan is sought and for modification of the secured loan upon

approval of the plan, pursuant to the Stipulation for Plan Treatment attached as Exhibit C.

Debtor's interest in the property has been fully exempted pursuant to the Homestead Opinion and

DC Code § 15-501(a)(14).

From Debtor's exempt Property he generates rental income through the leasing of the

basement unit at the Property, and through short-term rentals of two individual room in the

Property through the web/rental service Airbnb. These rental monies received are themselves

exempt as fruits of the Debtor's exempt asset and are further detailed in the income projection

attached as Exhibit D. Airbnb records of demonstrating the rental history for the Property is

attached as Exhibit E.

A second significant asset of the estate includes the recently entered Judgment against

Fusion Contracting Group, LLC in the amount of $79,287.17. The likely collectability of the

Fusion Judgment is unknown at this time.

Although not an asset of the estate, the Debtor possesses an exempt retirement account.

From this exempt account, the Debtor is proposing in his plan to offer $225,000 to further fund

his Plan through funds backed by this exempt retirement account. Debtor plans to accomplish

this either by receiving a loan 100 percent guaranteed and secured by the exempt retirement

assets, or a direct withdrawal from his retirement account of these funds for delivery into a Plan

Fund for distribution to claimants. Debtor's exempt retirement account contains funds of

approximately $500,000 and is sufficient to cover direct withdrawal of the proposed $225,000,

and any additional tax liabilities incurred based on a withdrawal of the this amount, and any payments toward extended tax payments under the Plan if necessary.

Other significant claims of the estate include those of the Judgment Creditors in the respective amounts of $7.5 million (Brekelmans) and $7.7 million (McLoughlin). The Debtor listed these claims as disputed in his bankruptcy Schedules based on the fact that the Debtor had timely filed appeals of each judgment and on the fact that the judgements were not based on final orders of the Superior Court pursuant to D.C. Sup. Ct. R. Civ. P Rule 54(b). Nevertheless, the Debtor has provided for treatment of the Judgment Creditor claims within the Plan.

Based on the findings of fact stated in the Homestead Opinion, the District of Columbia filed a Proof of Claim asserting a $83,960.42 associated with unpaid transfer and recordation taxes associated with transfer of the Property from Len Salas to Max Salas in 2010, including $34,832.19 in recordation and transfer taxes due based on the transfer of the property occurring in July 6, 2010 and which is listed as a secured by the Property, a non-filing penalty of $8,708.05 (25%) (unsecured), and interest on the supposed deficiency in the amount of $40,420.18 (claimed as secured).

Debtor's Plan contains definitions, a procedure for claims objections and a provision for post-confirmation jurisdiction. Readers should refer to the Plan for a complete discussion of these provisions.

## VII. SUMMARY OF THE PLAN

### A. Classification and Treatment of Claims Under the Plan:

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN. THIS SUMMARY SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. CREDITORS ARE URGED

TO READ THE ENTIRE PLAN.  A COPY OF THE PLAN IS BEING SENT TO YOU WITH

THIS DISCLOSURE STATEMENT.  THE PLAN REPRESENTS A PROPOSED LEGALLY

BINDING AGREEMENT BY AND BETWEEN THE DEBTOR AND ITS CREDITORS.  ALL

CREDITORS WILL BE BOUND BY THE PLAN.

      1.     **Classification - Summary**

The following is a designation of each Class of Claims and Interests under the Plan.  A

Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest

qualifies within the description of that Class, and is classified in another Class or Classes to the

extent that any remainder of the Claim or Interest qualifies within the description of such other

Class or Classes.  Each "Class" (e.g., Class 2A versus Class 2B and Class 2A versus Class 2B) is

separate and distinct from all other Classes for all purposes.

      2.     **Classification - Specifics**

Claims and Interests are classified for all purposes, including voting, confirmation and

distribution pursuant to the Plan, as follows:

| | |
|---|---|
| **Class 1:** | All administrative claims including for professional fees, United States Trustee Quarterly fees and administrative taxes.  This class consists of fees and expenses for Stinson LLP, fees and expenses for Thompson Burton PLLC, fees and expenses for McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.,  fees and expenses of Art Lander CPA PC, any other professional fees that may be incurred by the Debtor, and the United States Trustee's quarterly fees. (Unimpaired). |
| **Class 2**: | All Priority Claims including those arising pursuant to Bankruptcy Code Section 507(a)(8). (Impaired). |
| **Class 3:** | U.S. Bank National Association/ Select Portfolio Servicing, Inc. Secured Claim against Property (Impaired). |

Case 23-20-00990027 Doc 74-34-1 Filed 08/01/22/24 Entered 08/05/22 19:55:56 Qel ID Des 2953
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19    Page 11 of 27    APPX00490

Class **4**:        Allowed Secured Claim of IRS (Impaired).

**Class 5:**        District of Columbia Transfer & Recordation Tax Claim (Claim 5)
(Impaired)

Class **6**:        Unsecured Claims of Judgment Creditors (Claim No. 3 –
McLoughlin; Claim No. 4 - Brekelmans) (Impaired).

**Class 7:**        All Remaining Allowed Unsecured Non-Priority Claims.
(Impaired).

Class **8**:        Allowed Unsecured Penalty Claim of the District of Columbia
(Impaired).

Class **9**:        Paid Hyundai Lease Titling Trust Lease claim (Unimpaired)

**Class 10:**       Contribution Claim of Len Salas listed on Schedules associated
with U.S. Bank/SPS Arrearages (Unimpaired)

3.        **Treatment of Claims and Interests**

A.        <u>Administrative Claims</u>

1.        <u>Class 1 Administrative Claims</u>

The Debtor shall assume and pay to each holder of an Allowed Administrative Claim, on

account of the Administrative Claim and in full satisfaction thereof, Cash equal to the allowed

amount of such Administrative Claim, unless the holder agrees or shall have agreed to other less

favorable treatment of such Claim. Debtor anticipates that some form of agreement concerning

payment of fees will need to be reached with his legal counsel and accountant in order to

preserve desired amounts for payment to additional creditors. Administrative Claims are

expected to exceed $175,000, but payment of Administrative Claims from the Plan Fund shall

not exceed and be capped at $175,000.

2.        <u>Statutory Fees and Continuing Duties to the Office of the United
States Trustee</u>

Case 23-20-00990027 Doc 74-34-1 Filed 08/01/8226/24 Entered 08/08/06/22 19:55:06:01 IDDesc954
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19   Page 12 of 27          APPX00491

All fees payable pursuant to 28 U.S.C. § 1930, shall be paid by the Debtor in Cash in an amount equal to the amount of such Administrative Claim.

Until such time as the case is closed, dismissed or converted, the Debtor shall continue to report its disbursements each calendar quarter to the U.S. Trustee and shall timely pay all fees due under 28 U.S.C. § 1930(a)(6).

3.    Treatment and Payment of Administrative Claims.

After the Effective Date, all professional or others requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 503(b) and 1103 for services rendered before the Effective Date shall file an application for final allowance of compensation and reimbursement of expenses. Applications need not be filed with respect to fees and expenses previously applied for by Court approved professionals (including applications previously approved by and/or previously paid pursuant to an order of the Court). Fees and expenses of professionals shall be paid in Cash in full (a) immediately before the Effective Date, to the extent allowed by the Court as of such date (such payments to be made by the Debtor) or as agreed by the Parties if a lesser amount, but not to exceed an aggregate amount of $175,000.00 from the Plan Fund, and (b) on or before the tenth (10th) day after entry of an order allowing any such fees and expenses, to the extent such fees and expenses were not allowed as of the Effective Date, or upon such payment schedule as agreed between the Parties.

B.    Class 2:  Priority Claims

The only known Priority Claim consists of a certain portion of the claim filed by the Internal Revenue Service in the amount of $13,196.78 (Claim 2-2). Unless the applicable taxing agency or any other priority claim holders that may be established agree to less favorable

treatment, each holder of an Allowed Priority Claim to the extent their claim is allowable and entitled to priority under Bankruptcy Code section 507(a), shall be paid by the Debtor in regular monthly installment payments totaling the full amount of the claim plus interest pursuant to 11 U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to generate sufficient funds from his future rental income from the Property and other monthly income received, Debtor will deliver payment on the Class 2 claims from funds held in his exempt retirement account if necessary. This class is impaired.

      C.     <u>Class 3: U.S. Bank National Association/ Select Portfolio Servicing, Inc.
Secured Claim against Property</u>

Class 3 consists of the secured lien currently in the name on Len Salas possessed by U.S. Bank National Association/ Select Portfolio Servicing, Inc. and secured by the Property (the U.S. Bank Claim).  Based on Debtor's ownership in the Property established through the Homestead Opinion, the Debtor has entered into a Stipulation for Plan Treatment with U.S. Bank National Association/ Select Portfolio Servicing, Inc. to establish terms for Debtor's payment toward the US Bank Claim and address current arrearages owed. Full terms of the U.S. Bank Stipulation for Plan Treatment are attached as Exhibit C. Under the stipulation, beginning November 1, 2019, the Debtor is to begin making adequate protection payments on the U.S. Bank Claim in the amount of $8,329.19 per month until approval of the U.S. Bank agreement through confirmation of the Plan and the Plan's Effective Date, after which time the Debtor shall make payments following re-amortization by U.S. Bank following Confirmation based on an approximate balance of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037. U.S. Bank's

claim is an *in rem* claim attaching to the Property, and the Debtor shall not be liability under the underlying Deed of Trust and Note hall be limited to Debtor's interest in the Property, with no personal liability. Debtor further intends to seek a refund of vacant real property taxes previously erroneously assessed against the Debtor and paid pre-petition by U.S. Bank (at the time serviced through SunTrust Bank) to the District of Columbia. If the Debtor were to be successful in receiving a refund of tax payments previously paid, they are to be delivered in full to U.S. Bank/SPS for payment of the existing escrow balance on the U.S. Bank Claim. This class is impaired.

          D.       <u>Class 4: Allowed Secured Claim of IRS.</u>

Class 4 consists of the Allowed Secured Claim of the IRS consisting of that $6,768.66 portion of the claim they have filed in the Case (Claim 2-2). Unless the holder of this claim agrees to less favorable treatment, to the extent the claim is allowed, payment on Class 4 claims, is to be paid by the Debtor in regular monthly installment payments totaling the full amount of the claim plus interest pursuant to 11 U.S.C. § 511 beginning on the first day of the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11 U.S.C. § 1129(a)(9)(C). If Debtor is unable to generate sufficient funds from his future rental income from the Property and other monthly income received, Debtor will deliver payment on the Class 4 claims from funds held in his exempt retirement account if necessary. The IRS shall retain its lien until paid in full. This class is Impaired.

          E.       <u>Class 5: District of Columbia Transfer & Recordation Tax Claim</u>

Class 5 consists of that portion claimed as owing for Transfer & Recordation Taxes and Interest on Deficiency in the amount of $75,252.37 claimed on Claim 5 filed by the District of

Case 23-20-00990027 Doc 74-34 Filed 08/01/22 Entered 08/01/22 15:56:01 Desc
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19    Page 15 of 27    APPX00494

Columbia. The District has claimed this amount associated with the August 4, 2010 date of

transfer from Len Salas to Max Salas described in the Homestead Opinion. The Debtor believes

the District is not entitled to claim this amount due to the fact that no deed was recorded at that

time and any future recording confirming of Max Salas's ownership in the Property is to be

enacted through this Plan and exempt from such taxes pursuant to 11 U.S.C. § 1146(a). Debtor

intends to object to the District's Claim prior to Confirmation of the Plan. Nevertheless, payment

to the District, to the extent their claim is allowable, is to be paid by the Debtor in regular

monthly installment payments totaling the full amount of the claim beginning on the first day of

the month following the Effective Date of the Plan and lasting until April 1, 2023 pursuant to 11

U.S.C. § 1129(a)(9)(C). Class 5 is impaired.

      F.      Class 6: Allowed Unsecured Claims of Judgment Creditors (Claim No. 3 –
              McLoughlin; Claim No. 4 - Brekelmans)

      Class 6 consists of the two claims of the Judgment Creditors in the total amount of $15.2

million (Claim No. 3 – McLoughlin $7.7 million; Claim No. 4 – Brekelmans; $7.5 million).

Debtor's plan provides that payment on the Class 6 Claims will be made pro-rata, along with the

Class 7 remaining allowed unsecured non-priority claims, from a Plan Fund funded by the

minimal amounts of the existing non-exempt assets of the Debtor consisting of non-exempt cash

assets existing in Debtor's DIP account at the time of Confirmation, plus an additional influx of

$225,000 of funds secured by Debtor's exempt retirement account. Administrative Claims are

expected to exceed $175,000, but payment from the Plan Fund towards Administrative Claims

shall be capped at $175,000, leaving at least $50,000 of remaining funds from the additional

$225,000 cash infusion for distribution to Class 6 and Class 7 Claims. The Plan further provides

assignment of any uncollected amounts of the Fusion Judgment on the Effective Date jointly to

both Judgment Creditors. The Debtor will not oppose efforts and provide reasonable assistance to the Judgment Creditors' efforts to collect available Insurance Proceeds from Encompass associated with their judgments. Upon receipt of discharge, the Debtor will take steps to withdraw his appeal of the Judgment Creditor Judgments in the DC Superior Court to further resolve that issue. Judgment Creditor Claims are being given separate Class treatment based on the fact that they may also collect on the amounts owed to them from available Insurance Proceeds (See Motion for Relief from Stay Order; ECF Dkt. No. 74), and based on the fact that they possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len Salas Bankruptcy Case.  The Class 6 and Class 7 claims listed on Debtor's Schedules have been valued at $15,239,769.40, 99.7% percent ($15.2 million) of which is possessed by the Judgment Creditors. It is anticipated therefore that 99.7% percent of distributions from the Plan Fund will be distributed to Class 6 Claims.

The payment will be made thirty (30) days after the later of (i) the payment of all Administrative Claims; and (ii) the Effective Date. This Class is Impaired.

G.     Class 7:  Remaining Allowed Unsecured Non-Priority Claims.

All Class 7 Claims, consisting of all remaining allowed unsecured non-priority claims will receive a one-time pro-rata distribution following the Effective Date from remaining amounts in the Plan Fund following payment to those possessing claims of a higher priority. Administrative Claims are expected to exceed $175,000, but payment from the Plan Fund towards Administrative Claims shall be capped at $175,000, leaving at least $50,000 of remaining funds from the additional $225,000 cash infusion for distribution towards other creditors. The Class 6 and Class 7 claims listed on Debtor's Schedules have been valued at

$15,239,769.40, 0.3% percent ($39,769.40) of which is possessed by the Class 7 Claimants. It is anticipated therefore that 0.3% percent of distributions from the Plan Fund will be distributed to Class 7 Claims. The payment will be made thirty (30) days after the later of (i) the payment of Administrative Claims from the Plan Fund; and (ii) the Effective Date. This class is impaired.

        H.    <u>Class 8:  Allowed Unsecured Penalty Claim of the District of Columbia</u>

Class 8 consists of that portion of the Claim filed by the District of Columbia in the amount of $8,708.05 representing a non-filing penalty associated with other aspects of Claim 5, to the extent such claim is an allowed unsecured penalty claim. Assuming funds remain available in the Plan Fund, Class 8 claims will receive a one-time pro-rata distribution following the Effective Date from remaining amounts in the Plan Fund following payment to those possessing claims of a higher priority. However, based on the large amount of claims in Class 6 and Class 7, no distribution is expected to be made on Class 8 claims. To the extent a payment is made, the payment will be made thirty (30) days after the later of (i) the payment of all higher priority Claims to be made from the Plan Fund; and (ii) the Effective Date.  This class is impaired.

        I.    <u>Class 9:  Allowed Paid Hyundai Lease Titling Trust Lease Claim</u>

Class 9 consists of the lease claim filed by Hyundai Titling Trust filed on May 3, 2018 as Claim 1 associated with the lease of a vehicle by the Debtor at the time of the Petition Date. Following the Petition Date, Debtor continued to make lease payments due for the vehicle until the lease terminated in January 2019. No further payments are owed under the Hyundai lease and the Debtor has surrendered the Vehicle. No further payments are therefore contemplated for this claim. This class has been paid in full and is unimpaired.

        J.    <u>Class 10:  Contribution Claim of Len Salas listed on Schedules associated with U.S. Bank/SPS Arrearages (Unimpaired)</u>

Class 10 consists of the claim of Len Salas listed on the Debtor's Schedule E/F at 4.14 in the amount of $428,614.90. This claim solely represents arrearages existing on the U.S. Bank/SPS Claim existing on the Petition Date. Because the deed of trust and underlying note for the Property were in the name of Len Salas, but the Debtor was responsible for making payments for the Property pursuant to his ownership interest later established in the Homestead Opinion, the Debtor included this claim to Len Salas representing amounts ultimately owed as arrearages for the lien on the Property. Len Salas having received his discharge and the Debtor having reached agreement with U.S. Bank/SPS regarding the U.S. Bank Claim described in the Stipulation for Plan Treatment, no further treatment or payment to Len Salas (for forwarding to U.S. Bank) is warranted by the Debtor and will not occur under Debtor's Plan. Class 10 is Unimpaired.

### 4.  Means of Funding the Plan.

Debtor's Plan seeks modification of the existing secured debt on the Property through the Stipulation for Plan Treatment with U.S. Bank. All continuing payments under the Plan, including pre- and post-confirmation monthly payments to U.S. Bank per the Stipulation for Plan Treatment, and for the Extended Tax Payments are expected to be derived wholly from the Debtor's future exempt earnings consisting of monthly deposits from social security, disability payments, and Airbnb and other rental earnings from the Property. A Projection of the Debtor's future income generated from these exempt sources is attached as Exhibit D. Further with respect to the Extended Tax Payments of the IRS, if Debtor's future income is insufficient to make these payments, Debtor will make payment on these claims from funds held in his exempt retirement account if necessary.  The Debtor will further submit all available non-exempt assets for the

Case 23-20-00990027  Doc 74-34-1  Filed 08/01/226/24  Entered 08/13/22 15:53:01  Desc
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19   Page 19 of 27      APPX00498

benefit of creditors under the Plan at the time of Confirmation consisting of the Fusion Judgment and existing non-exempt cash assets existing in Debtor's DIP account at the time of Confirmation, but not including any value associated with the non-exempt portion of Debtor's home furnishings, equipment, or clothes. The non-exempt portion of such home furnishings, equipment, and clothes are believed to be *de minimus*, especially when compared to the additional exempt Plan funding being supplied by the Debtor and the cost of ascertaining value of the exempt portion. With the exception of the Fusion Judgment, further non-exempt assets of the Debtor are expected to be minimal.

Following delivery of the existing non-exempt assets, the Plan will be further funded through delivery of $225,000 towards the Plan Fund from either a loan to be received by the Debtor for funds 100% secured by the Debtor's exempt retirement account, or if the Debtor was unable to receive such a loan, from delivery of $225,000 directly withdrawn from this exempt account by the Debtor within forty-five (45) days after Confirmation. Direct withdrawal of funds from Debtor's account will cause the Debtor to incur additional tax consequences, making a loan preferable. Nevertheless, Debtor's retirement account contains sufficient funds to cover tax liability associated with a withdrawal of these funds. From this new value, payment towards Administrative Claims from the Plan Fund would be capped at $175,000, allowing for payment of at least $50,000 from the new value added into the Plan Fund for distribution to other claimants. It is assumed that confirmation of the Debtor's Plan would require cramdown of the Judgment Creditor's claims pursuant to 11 U.S.C. § 1129(b).

## 5. Executory Contracts and Unexpired Leases.

The Plan proposes to assume all unexpired leases and executory contracts that have not previously been rejected in this bankruptcy case. Debtor's Plan further proposes that it shall have no effect on the post-petition lease of the Debtor's vehicle approved by the Court at ECF Dkt. Entry 159, and the post-petition tenant lease entered into by the Debtor for the renting of the basement unit at the Property.

### 6. Pending Litigation.

Debtor intends to object to the claim of the District of Columbia that asserts Debtor owes transfer and recordation taxes, penalties, and interests associated with the creation of the 2010 Quitclaim Deed from Len Salas for the Property and cited in the Homestead Opinion. Debtor further intends to seek a refund of vacant real property taxes previously erroneously assessed against the Debtor and paid pre-petition by U.S. Bank for the Deed of Trust for the Property (at the time serviced through SunTrust Bank). Any refunded tax payments would be delivered to US Bank/SPS to reduce the a outstanding escrow balance on the Property account associated with the previous payment. Other pending litigation includes the appeal of the Homestead Opinion, which has been fully briefed for the United State District Court for the District of Columbia, as well as avoidance action litigation to be brought by the Judgment Creditors in the U.S. Bankruptcy Court for the Middle District of Tennessee following the Judgment Creditors' purchase of those claims from the Len Salas Bankruptcy Estate (the "Tennessee Avoidance Actions"). Other pending litigation includes the outstanding appeal of the Judgment Creditor Judgments in the DC Superior Court brought by the Debtor prior to filing bankruptcy. This appeal is currently stayed and would be withdrawn/dismissed by the Debtor upon discharge of debts owed to the Judgement Creditors contemplated in the Plan. Additional litigation may also

Case 23-20-00900027   Doc 74-34-1   Filed 08/01/22/26/24   Entered 08/15/22 15:56:31   Desc
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19    Page 21 of 27          APPX00500

be brought to resolve the additional action against 1610 Riggs Place Trust contemplated

previously by the Superior Court and/or an action to reduce the judgments in favor of the

Judgment Creditors to final judgments pursuant to DC Superior Court Rule of Civil Procedure

Rule 54(b). *See Order on Motion to Lift Automatic Stay With Respect to Finalization of Superior*

*Court Judgments and Judgment Creditors' Recovery of Insurance Proceeds,* ECF Dkt. NO. 74.

With Plan Confirmation, the Debtor would not oppose steps taken by the Judgment Creditors to

resolve these issues or to claim insurance proceeds available under Debtor's Encompass

Insurance Policy.

### 7. Confirmation Order as Recordable Order Conveying Property to Max Salas.

The Plan provides that, upon Confirmation, the Confirmation Order, or a separate order

as needed, shall contain terms that will constitute an Order conveying the Property to Max Salas

based on the ownership interest of the Debtor to the Property established through the Homestead

Opinion and that such order may be recorded with the land records of the District of Columbia in

lieu of a deed. If the District of Columbia shall later refuse to honor the Confirmation Order as a

document properly conveying the Property to the Debtor, the Debtor reserves the right to obtain

an appropriate deed to th Property signed by the trustee in the Len Salas Bankruptcy Case, or if

such trustee refuses, to seek the appointment of an escrow agent in Debtor's Bankruptcy Case to

sign such deed for recording purposes.

### 8. Recordation and Other Taxes Covered by Section 1146(a).

Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of an

instrument of transfer under the Plan (including the proposed recordation of the Confirmation

Order or other Order as necessary to confirm Debtor's interest in the Property pursuant to the

Case 3:20-ap-00027 Doc 74-34 Filed 08/08/22 Entered 08/08/22 15:56:01 Desc
Case 23:20-ap-00027 Doc 74-34 Filed 08/08/22 Entered 08/08/22 15:56:01 Desc
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19    Page 22 of 27

APPX00501

Homestead Opinion) will not be subject to any stamp tax, real estate transfer, mortgage

recording, or any other similar tax.

**9. Discharge Following Distribution on the Effective Date of the Plan Pursuant to 11 U.S.C. § 1141(d)(5)(B).**

Debtor's Plan provides for a discharge of debts upon the Effective Date of the Plan and

distribution of funds from the Plan Fund. Because Debtor's Plan provides for payment of tax

debts through April 2023, payments under the Plan will not be completed until that time. Cause

is warranted to grant a discharge of debts instead upon the Effective Date pursuant to 11 U.S.C.

1141(d)(5)(B), because unsecured creditors are to receive distribution of funds from the Plan

Fund at that time, which will be of a greater value than they would receive if the estate were to

be liquidated under chapter 7. Additionally, following the required monthly payments to U.S.

Bank and for the extended tax payments, Debtor is unlikely to have any additional disposable

income for distribution to his other creditors following the initial distributions of the Plan Fund.

Finally, cause is warranted to grant the Debtor a discharge upon the Effective Date of the Plan

instead of upon completion of all payments because doing so will allow the Debtor to take steps

(and the Debtor will take such steps) to withdraw the appeal of the Judgment Creditor Judgments

in the DC Superior Court to further resolve that issue.

## VIII. <u>CHAPTER 7 LIQUIDATION ANALYSIS</u>

A comparison of the amounts to be paid under the Plan and the amounts that would be

available for distribution to creditors in the event of a liquidation under Chapter 7 indicates that

the Plan is fair and equitable and in the best interest of the creditors. The Homestead Opinion has

confirmed that the Debtor's primary asset is fully exempt pursuant to D.C. Code § 15-501(a)(14)

and any sale of the Property in Chapter 7 would not generate funds for payment to the estate

Case 23-20-00990027  Doc 74-34-1  Filed 08/01/22/24  Entered 08/01/22 15:56:01  Desc
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19    Page 23 of 27         APPX00502

creditors. The Debtor maintains that income generated from the Property (including all Airbnb and other rental income) is similarly exempt as income generated from an exempt asset. At least two creditors (the Judgment Creditors) have questioned whether it is clear that such business income derived from renting of parts of the Property may be treated as exempt. The Court has not issued a ruling on this issue in this case. The Debtor possesses no other assets, other than the Fusion Judgment, likely to generate any significant value to the estate. The Debtor is not aware of any recovery or avoidance actions and does not believe any such actions exist. In addition, a Chapter 7 trustee would hire his own attorneys and would charge a commission on any distributions he did realize. Here, the Debtor is offering to use his exempt Property to fund a Plan of Reorganization, which after reaching agreement with the primary secured lienholder for the Property regarding continued payments for the Property, offers anticipated amounts of $225,000 in new value for payment towards the Debtor's creditors and claimants. For these reasons, a conversion to Chapter 7 would not necessarily result in a greater distribution to unsecured and penalty claimants and would result in delay of the creditor distributions.

## IX.  POTENTIAL RECOVERIES FROM VOIDABLE TRANSFERS

The Debtor has not fully analyzed the potential recoveries from voidable transfers, but does not believe any voidable transfers exist that would be beneficial to pursue. The Debtor does not anticipate pursuing any avoidance actions.

## X.  TAX CONSEQUENCES OF PLAN

To the extent creditors have written off any accounts receivable on their tax returns, ordinary income may be recognized from any distributions received under this Plan.

THE DISCUSSION OF FEDERAL INCOME TAX CONSEQUENCES SET OUT HEREIN IS LIMITED TO THE GENERAL TAX CONSEQUENCES AFFECTING CREDITORS AS A RESULT OF THE DISCHARGE OF INDEBTEDNESS WITHOUT PAYMENT UNDER THE PLAN.  THE TAX CONSEQUENCES APPLICABLE TO A CREDITOR WILL BE ENTIRELY DEPENDENT UPON THE TAX STATUS OF THAT ENTITY OR INDIVIDUAL.  EACH CREDITOR SHOULD CONSULT THEIR OWN TAX ADVISOR TO DETERMINE THE TREATMENT AFFORDED THEIR RESPECTIVE CLAIMS BY THE PLAN UNDER FEDERAL TAX LAW, THE TAX LAW OF THE VARIOUS STATES AND LOCAL JURISDICTIONS OF THE UNITED STATES AND THE LAW OF FOREIGN JURISDICTIONS.

BECAUSE OF CONTINUAL CHANGES BY THE CONGRESS, THE TREASURY DEPARTMENT, AND THE COURTS WITH RESPECT TO THE TAX LAWS, NO ASSURANCES CAN BE GIVEN REGARDING INTERPRETATIONS OF THE TAX LAWS, REPRESENTATIONS WITH RESPECT THERETO OR ANY OTHER MATTER ASSOCIATED THEREWITH.

NO STATEMENT IN THIS DISCLOSURE STATEMENT IS TO BE CONSTRUED AS TAX ADVICE OR LEGAL ADVICE TO ANY CREDITOR.  THE DEBTOR AND ITS COUNSEL AND ACCOUNTANTS ASSUME NO RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES A CREDITOR MAY SUSTAIN AS A RESULT OF THE TREATMENT AFFORDED THEIR CLAIM UNDER THE PLAN.

# XI.  RISK FACTORS/FEASIBILITY

While there are risk factors with certain individual aspects of the Debtor's Plan, including securing a loan backed by the Debtor's retirement funds for proposed Plan funding, the Debtor believes that his Plan provides for adequate contingency measures in each instance and that the Plan overall provides minimal risk factors or feasibility issues. Other risk factors include the potential that Debtor's interest in the Property will be overturned either though reversal of the Homestead Opinion on appeal or through loss of a potential avoidance action that may be brought by the Judgment Creditors based on the claims they have purchased from the Len Salas Bankruptcy Case. Reversal of the Debtor's claim to ownership in the Property would affect Debtor's ability to make his continuing payments for tax payments extended under the Plan (which would not be discharged) and for the secured loan for the Property (which would remain as an *in rem* lien on the Property), but would not likely affect other aspects of payment to Debtor's other creditors from the additional Plan funding supplied by the Debtor. The Debtor and his counsel have reviewed the merits of both of these litigation risks associated with the Debtor's ownership in in the Property being lost and believe that they will prevail both on the Appeal and in any potential avoidance action that could be brought through the Tennessee Avoidance Actions. Because Debtor's Airbnb income is subject to market forces, there is also the risk that he will not be as successful generating income from this source for payments under the U.S. Bank Stipulation for Plan Treatment and the Extended Tax Payments. In this instance, however, U.S. Bank would be protected by the default provisions under the Stipulation for Plan Treatment. Tax claimants are similarly protected because their debts are not subject to discharge. For these reasons, therefore, the Debtor submits that there is minimal risk under this Chapter 11 Plan.

Case 23-20-00990027 DocDoc 74-34-1 Filed 08/01/22226/22ntered Fued 08/01/22 19:556:31 Desc968
Exhibit 2 M Salas Second Amended Disclosure Statement 12-5-19   Page 26 of 27          APPX00505

## XII.  <u>CONCLUSION</u>

For all the reasons described above, the Debtor urges you to vote to accept the Plan of

Reorganization.  Any questions regarding this Disclosure Statement may be directed to the

undersigned.


Dated: December 5, 2019         By:     /s/ Max E. Salas
                                        Max E. Salas, Debtor and Debtor-In-Possession



                                        /s/ Joshua W. Cox
                                        Marc E. Albert, No. 345181
                                        Joshua W. Cox, No. 1033283
                                        STINSON LLP
                                        1775 Pennsylvania Ave., N.W., Suite 800
                                        Washington, DC 20006
                                        Tel. (202) 785-3020
                                        Fax (202) 572-9999
                                        marc.albert@stinson.com
                                        joshua.cox@stinson.com
                                        *Attorneys for*
                                        *Max E. Salas, Appellee and Debtor and Debtor-In-*
                                        *Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .    Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .    Washington, D.C.
                 Debtor.        .    August 24, 2018
                                .
. . . . . . . . . . . . . . .   .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 3 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:

For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020


For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380


Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

# TABLE OF CONTENTS

WITNESSES:                                          PAGE:
RON SALAS
Direct examination continued by Mr. Albert          4
Cross-examination by Mr. McNutt                     6
Redirect examination by Mr. Albert                  16
Recross-examination by Mr. McNutt                   19
Redirect examination by Mr. Albert                  24

MAX SALAS
Direct examination by Mr. McNutt continued          29

MAX SALAS
Direct examination by Mr. Albert                    61
Cross-examination by Mr. McNutt                     137
Redirect examination by Mr. Albert                  207
Recross-examination by Mr. McNutt                   215
Redirect examination by Mr. Albert                  227

CLOSING ARGUMENT:                                   PAGE:
By Mr. McNutt                                       232
By Mr. Albert                                       266
By Mr. McNutt                                       281
By Mr. Albert                                       294

EXHIBITS:                                 MARKED: RECEIVED:
DEBTOR'S
L.  DCRA corporation document             227      227

CREDITOR'S
14. M.Salas Deposition Transcript         *        296
     dated 2/14/16
44. 4/3/2018 transcript of hearing        155      --
45. Excerpt of document production        216  Reject-218

*Exhibits marked on previous days of trial.
**Transcriptionist's note: The notations of
"(unintelligible)" in this transcript are due to the audio
recording levels being turned up too high, or individuals
speaking outside of the vocal capture range of the
microphone.

1  Mr. McNutt has been kind enough to permit me, subject to
2  the Court's okay, to call him now if that's all right.
3          THE COURT:  That's fine.
4    RON SALAS, DEBTOR'S REBUTTAL WITNESS, PREVIOUSLY SWORN
5          THE COURT:  Go ahead, Mr. Albert.
6          MR. ALBERT:  Thank you.
7                      DIRECT EXAMINATION
8          BY MR. ALBERT:
9      Q.   Good morning.
10          I just wanted to clarify again, because I heard
11  yesterday something that seemed inconsistent with what you
12  had told the Court and me earlier this week.  When you and
13  I spoke and you and I exchanged emails, there was a
14  discussion regarding the trust agreement and the quit-claim
15  deed, correct?
16     A.   Yes.
17     Q.   And tell the Court and me again what we discussed
18  and what you did.
19          MR. McNUTT:  Objection.  Your Honor, this is not
20  rebuttal testimony.  He's asking him to state again what he
21  testified to earlier.  It's not rebuttal.
22          THE COURT:  Overruled.
23          THE WITNESS:  So in regards to the email where I
24  said I sent you originals, or I had the originals, I had
25  spoke with my brother.  He told me he had the original.  I

1  said, "Send them to me.  Mr. Albert is asking for them."

2          MR. McNUTT:  Objection.  Hearsay, Your Honor.

3          THE COURT:  I'll not receive it for the truth of

4  the contents.

5          THE WITNESS:  When he told me he had them, I told

6  you had originals.  When they arrived in my office I

7  contacted you immediately and said, "Well, these are not

8  the originals.  The originals" -- so the only original

9  would have been to Max.  The reason I knew they were not

10  the originals is because I, as I testified earlier, scan

11  all my documents for preservation, and I know there was

12  blue ink on at least the notary as I recall, and the

13  documents I received were all blank ink, which indicated to

14  me they were copies not originals.  So I let you know at

15  that point.

16          MR. ALBERT:  Thank you.

17          THE WITNESS:  Uh-huh.

18          MR. ALBERT:  Your witness.

19          THE COURT:  You said you got them from your son.

20  Do you mean from your --

21          THE WITNESS:  From my brother.  If I said son, I

22  apologize.

23          THE COURT:  Your brother.  Okay.

24          THE WITNESS:  Yes, my brother Len had them, mailed

25  them to me.  I was going to mail them to you, but they were

```
 1    A.   So couldn't assert nothing --

 2    Q.   -- but can you answer --

 3    A.   -- couldn't assert anything about that.

 4    Q.   Can you answer my question, please?

 5    A.   What's the question?

 6         I think I answered it.

 7    Q.   The question is did you produce all documents related

 8  -- did you produce all documents related to your ownership of

 9  the property that you claimed during the Superior Court

10  litigation?

11    A.   I don't -- I guess I don't know the difference --

12  well, I don't know.  Did we submit them?

13         Yeah, we submitted them, but weren't, one of them

14  weren't -- this document wasn't allowed.

15    Q.   When you say "this document," you mean what's been

16  marked --

17    A.   The deed --

18    Q.   -- as Exhibit 30, the quit-claim deed and the trust

19  documents, correct?

20    A.   That's what I'm talking about, yeah.

21    Q.   All right.

22         And those were submitted, as you put it, on or after

23  March 12, 2018, correct?

24    A.   Yeah -- yeah, uh -- yes, sir.  It was like, like a

25  couple of weeks before the trial.
```

1   Salas?

2       A.   Because I bought -- because I paid for the policy I

3   guess.  I don't know.

4       Q.   Okay.  Fair enough.

5            Any other reason that you're aware of?

6       A.   No, I -- I don't know.  I have no idea.

7       Q.   You also testified earlier that, in the corrections

8   that you told Judge Teel about, you also testified that the

9   original of the document may be at the title attorney's office,

10  right?

11      A.   That just came to me -- that just came to me as I was

12  sitting over there.  I never -- I never told Mr. Albert about

13  it because I can't talk to him about my testimony, but I just

14  thought about it, and it's -- and it's possible because I don't

15  know if they mailed it back to me.  I don't remember that.  All

16  the papers that I had in my house were burned, so I -- and I

17  didn't recover it from there.  So I couldn't have recovered it

18  there.  But it's, you know, it's possible that it's still at

19  his office because I don't remember -- I don't remember him

20  mailing it back to me, and I don't remember -- but, there's a

21  lot of things I don't remember.

22      Q.   Well, when did you, and I'm assuming because you were

23  attempting to get the quit-claim deed recorded that you gave

24  these documents to Mr. Goldstein shortly after you signed the

25  trust documents in July of 2010; is that fair?

1    A.   Yeah, so what -- so I had this realtor.  Her name is

2  in here, Sylvia Jones, and she told me what she had done --

3            MR. McNUTT:  Your Honor, I'm going to object.

4            THE WITNESS:  Well, I'm trying to answer your

5  question because --

6            MR. McNUTT:  You can't answer --

7            THE WITNESS:  -- that has to tell --

8            MR. McNUTT:  This is more hearsay, Your Honor.

9            THE COURT:  Overruled.

10            THE WITNESS:  So I talked to her.  She told me how

11  she had put her house in a trust because she had three

12  daughters, and so I said I formed a trust, and I've got the,

13  and I quit-claim -- my son quit-claimed the deed over to me,

14  and I want to now register the trust.  And I said, "How do you

15  do that?"  She said, "Well, you got to go to a title company."

16  I said, "Well, who is that?"  She said call Goldstein, Maryland

17  Title Company or something, and she gave me the number to them.

18  And so I called them up and they said, "Send us the

19  information."  So I sent them the information, and about a week

20  later I called them back and they called -- or they called me

21  and they told me what the situation was.

22            So I don't know if I answered your question there or

23  not.

24            BY MR. McNUTT:

25    Q.   I can guarantee you didn't answer the question.

1  A. I'm sorry.  What's the question?

2  Q. I'll leave it at that.

3  A. All right.

4  Q. So as you sit here today, you're not really sure what

5 happened to the original quit-claim deed after you gave it to

6 Mr. Goldstein, right?

7    MR. ALBERT:  That was asked and answered.

8    THE WITNESS:  I just told you, I don't know if it was

9 in my house or it's in his office, but I -- I don't know.

10    MR. McNUTT:  Okay.

11    THE COURT:  The objection is overruled.

12    BY MR. McNUTT:

13  Q. And if it was in Mr. Goldstein's office, then you

14 could have gotten it by just simply calling him, right?

15  A. I -- I -- I could -- I told -- I guess -- I told

16 Mister -- I told my attorney what I did, and so I -- that's his

17 job I guess.  I relied on him.

18  Q. Which one is that?

19  A. Mr. Albert and Mr. Cox.

20  Q. Okay.

21    You don't have a copy of the original quit-claim deed

22 with you today, do you?

23  A. No.

24  Q. Are you aware of at any time after you gave it to Mr.

25 Goldstein that you were in possession of the original of the

1   quit-claim deed?

2       A.   Any time after that?

3       Q.   Yes, sir.

4       A.   No.  I --

5       Q.   Up until obviously February of 2018.

6       A.   No, sir.

7       Q.   Okay.

8       A.   I don't remember.

9       Q.   Did you ever try to record the quit-claim deed after

10  the time that you gave it to Mr. Goldstein?

11      A.   No.

12      Q.   Did you ever make another attempt?

13      A.   No.  No, sir.

14      Q.   What activities did you undertake as trustee of the

15  1610 Riggs Property Trust after July 6, 2010?

16      A.   What activities?

17      Q.   Yes, sir.  Did you undertake as trustee?  What

18  activities?

19      A.   I answered that.  Do you want me to do it again?

20      Q.   Yes, sir.

21      A.   I thought I answered it.  I called them and -- I mean

22  after I called Mr. Goldstein and asked him to register it, and

23  then he told me that it was going to cost me $50,000, did I do

24  anything after that?

25      Q.   Yes, sir.

```
 1              Well, you said that you had to pay the mortgage,
 2    but your testimony is that prior to approximately January
 3    of 2015 CLR Trust paid the mortgage.
 4         A.   No, I testified that I paid the mortgage.
 5         Q.   Well, I don't think so, Mr. Salas.  Let's try to
 6    look at this one more time.
 7              Look at your deposition transcript.  This is Tab
 8    14.
 9         A.   Okay.
10              I mean, you already asked the question and I
11    already answered it.  I know the question you're going to
12    ask.
13              THE COURT:  Don't speculate.
14              Go ahead, Mr. McNutt.
15              THE WITNESS:  Sorry.
16              BY MR. McNUTT:
17         Q.   Look at page 216.  This is page 54 of the
18    transcript.
19         A.   I'm at page 54.
20         Q.   Okay.
21              Look at page 216?
22         A.   Okay, I'm there.
23         Q.   I'm sorry.  Page 215.  The page above that.
24         A.   Right.
25         Q.   Last line, 22:
```

1          "Okay.  You would get payments from

2          the tenants made payable to CLR, is that

3          right?  If I understand your testimony.

4          Your answer:

5              "Right."

6          So you didn't disagree, correct?

7    A.    Correct.

8    Q.        "Question:  And you would deposit

9          those payments either in your own account

10         or a CLR account.  Is that fair to say?"

11   A.    Yes.

12   Q.        "Answer:  Yes.  So in the beginning,

13         well, for years they just went into the

14         CLR account, and then the CLR account made

15         the mortgage payments."

16         Did I read that correctly?

17   A.    Yes.

18   Q.        "After a while or at the very end of

19         this whole thing I just made the payments.

20         I put the money into my personal account

21         and made the personal account, made the

22         payments out of my personal account.

23             Question:  Do you know when you made

24         that change approximately?

25             Answer:  Do I know?  Yes.  Probably

Case 23-20-ap-00027 Doc 74-4 Filed 08/01/22 Entered 08/01/22 19:36:31 Desc
Case 23-20-ap-00027 Doc 74-4-1 Filed 08/01/22 Entered 08/01/22 19:36:31 Desc Exhibit 3 Page 11 of 22 Page ID Des 2980 000375
Exhibit 3 Exemption Hearing in Case No. 18-260 (D.C.) Vol 2 Excerpts    Page 11 of 22
APPX00517

1          December, January of 2015."

2          Did I read that correctly?

3     A.   You read it correctly.

4     Q.   All right.

5          So your testimony was that the money went into the

6     CLR account and was used to pay the mortgage payments from

7     the CLR account until December of 2014 or January of 2015,

8     approximately five months prior to the fire, correct?

9          And subsequent to the fire from 2015 until early

10    this year, I believe April of this year, you did not live

11    at the residence; you actually lived at an apartment that

12    was provided for you by the insurance company, correct?

13    A.   Right.  So what happened, what actually happened

14    is that --

15    Q.   There's no question --

16    A.   -- lots of times --

17    Q.   There's no question pending.

18    A.   -- there wasn't enough money --

19    Q.   Mr. Salas, there's no question pending.

20    A.   -- in the CLR Trust account, and so -- I'm trying

21    to answer your question, sir.  So --

22    Q.   You answered my question.

23         THE COURT:  Let him answer.

24         Go ahead, Mr. Salas.

25         MR. McNUTT:  All right.

1          Go ahead.

2          THE WITNESS:  So lots of times there wasn't enough

3    money in the CLR account, so I would take money out of my

4    personal account to add it to the CLR account to make the

5    payments.

6          BY MR. McNUTT:

7          Q.   Tell me where --

8          A.   But at the same time it didn't matter if the

9    payments to the CLR -- if there wasn't enough money in the

10   CLR account I had to put personal money, my other personal

11   -- well, I had to add money to the CLR account to make sure

12   the payments were made.

13         Q.   Is that the money that you did not use to pay the

14   taxes that were owed?

15         A.   What do you mean, the taxes that were owed?

16              What taxes are you talking about?

17         Q.   During the period of time from 2010 to 2015 you

18   had substantial tax obligations that you did not pay,

19   correct?

20         A.   From what now?

21         Q.   2010 to 2015 you had substantial tax obligations

22   that you did not pay, correct?

23         A.   (No verbal response).

24              MR. McNUTT:  Your Honor, I'd like to have this

25   document marked as Exhibit, I think we're on 42.  This is

```
 1        A.    Monthly payments.
 2        Q.    What -- I don't think you answered my question
 3   exactly.  She gets the money; who got the house?
 4        A.    Oh, I got the house.
 5        Q.    All right.
 6              So you took title to the house in your name at that
 7   time?
 8        A.    Yeah, for a day or two.
 9        Q.    Okay.
10              Explain the circumstances behind that.
11        A.    Well, I -- I tried to get a loan.  I couldn't.  I
12   went to SunTrust Bank.  They said there's enough equity in the
13   house to get a loan to pay your wife off, but unfortunately you
14   can't get a loan.  So my, so Len, who had a very good
15   relationship with my ex-wife and myself, we both went to Len
16   and asked him if he would sign for a loan to get Vicki paid
17   off, and he -- and he did.  So that -- so we got a loan so we
18   could pay her, so I could pay her off and she could move back
19   to Tennessee.
20        Q.    Was it necessary to get the loan that the title would
21   have to go in Len's name?
22        A.    Yes, it --
23              MR. McNUTT:  Objection.
24              THE WITNESS:  Yes, it was.
25              MR. McNUTT:  He's not only leading the questions,
```

Case 3:20-ap-00027-DoC   Doc 74-4   Filed 08/18/22   Entered 08/18/22 15:56:01   Desc
Exhibit 3 Exemption Hearing in Case No. 18-260 (D.C.) Vol 2 Excerpts    Page 14 of 22

APPX00520

 1 | he's also asking for a legal conclusion.

 2 | THE COURT:  The objection is sustained.  Rephrase the

 3 | question.

 4 | MR. ALBERT:  Of course, Your Honor.

 5 | BY MR. ALBERT:

 6 | Q.  Who -- so the property was put in your name then when

 7 | you got the loan?

 8 | A.  No, it wasn't.

 9 | Q.  Whose name was it put in?

10 | A.  Put in my son's name, Len.

11 | Q.  Why?

12 | A.  Because the loan was made by SunTrust, and his credit

13 | -- that was kind of like the peak of the housing market and the

14 | loan was made out to him.  He didn't have any -- he had good

15 | credit, and they were giving loans to just about anybody at

16 | that point in time, and there was enough equity in the house to

17 | get it.

18 | Q.  But they wouldn't give you credit -- excuse me.

19 | They wouldn't lend you the money because?

20 | A.  Because I had liens from, tax liens from years eighty

21 | -- uh -- '97, '98, and '99.  Yeah.

22 | Q.  Okay.

23 | A.  I owed money to the IRS.

24 | Q.  I see.

25 | Now, you owe money to the IRS today, correct?

1      A.   Yes, I do.

2      Q.   All right.

3           And you heard yesterday in the questioning by Mr.

4  McNutt, you owe a certain amount of money, the IRS has filed a

5  claim in this case?

6      A.   Yes.

7      Q.   How much did -- are they claiming?

8      A.   I think about $25,000.

9      Q.   How much is the house worth today if you remember?

10     A.   So it's about 2.4, 2.3, 2.4 million.

11     Q.   And how do you know that, sir?

12     A.   We had a guy, an appraiser, a real estate appraiser

13  do an -- do an appraisal.

14     Q.   Thank you.

15          So, is the property recorded in Len's name?

16     A.   Yes.

17     Q.   Has it ever been recorded in your name or any trust

18  as far as you know?  Recorded?

19     A.   Well, I --

20     Q.   Recorded?

21          THE COURT:  In the land records, Mr. Salas.

22          BY MR. ALBERT:

23     Q.   In the land records.

24     A.   In the land records?  I think it was recorded by name

25  for a day until it was -- until it was -- then I quit-claimed

1  it back over to Len until, so he could file the -- so, yeah.

2  One day I think.  The day that the transaction happened.

3       Q.   And Lenny also signed a deed of trust?

4       A.   Yes.

5       Q.   And he signed the note?

6       A.   Yes.

7       Q.   In connection with the loan?

8       A.   Yes.

9       Q.   And Lenny I suppose has been paying everything since

10  that time?

11       A.   Lenny has never paid any -- Lenny has never paid a

12  penny, a penny towards the loan of the house.

13       Q.   No down payment, no monthly payments?

14       A.   No.

15       Q.   No loan?

16       A.   No.  Nothing.

17       Q.   Besides this accommodation, this help that Lenny gave

18  you, did he have any responsibility with respect to 1610 Riggs

19  Place Northwest?

20       A.   No.

21       Q.   Who was handling any and everything about the

22  property?

23       A.   All my responsibility.  Me.  I was doing it all.

24       Q.   Okay.

25            Even before the divorce from Vicki who was paying all

```
 1              THE COURT:  Ask a question.

 2              BY MR. ALBERT:

 3         Q.   Do you know what -- what are -- explain the

 4    circumstances to the Court regarding finding the trust document

 5    and the quit-claim deed.

 6         A.   So you asked me, "You keep talking about this trust

 7    in your deposition.  I read your deposition and you keep

 8    talking about" --

 9         Q.   Who are you talking about?  Are you talking about me?

10         A.   Yes.

11         Q.   When you say "you"?

12         A.   Yes.  You -- you talked to me about, "You keep

13    talking about this trust through your whole deposition.  I've

14    read the whole thing.  What trust are you talking about?"  And

15    I said, "The trust."  I said what -- and he said, you said to

16    me, "Who put this trust together for you?  Was there a lawyer

17    involved?"  And I said, "Yes."  I (sic) said, "Which lawyer?"

18    "My son."  I (sic) said, "Your son is a lawyer?"  "Yes."

19    "Where is he at?"  "Colorado."  I  said, "Colorado."  He says,

20    "Do you -- does he have a copy of the trust?"  I said -- no you

21    asked me, "Do you have a copy of the trust?"  I said, "No."

22    "Where is it?"  I said, "It burned in the fire.  I don't have

23    any" -- he says, "Well, do you think your son has a copy of the

24    trust?"  I said, "Well, he should.  I guess, yeah, he might --

25    he should."  I don't remember what I said.  "But I can call
```

1  him."

2      So I called him.  You said, "May I talk to him?"  I

3  said, "Yes."  You said, "Will you call him and tell him that

4  I'm going to call him?"  I said, "Yes."

5      So I called him, told him, asked him if he had a copy

6  and he said yes.  And so you -- you called him and you got a

7  copy of that, of the doc -- you got a copy of the trust and the

8  quit-claim deed.

9      Q.  Thank you.

10     Can you think of any reason why that document wasn't

11  obtained earlier than that time?

12     A.  No, I can't think of any reason why it was -- I --

13  you know, I -- I don't understand why Mr. Barnes didn't ask for

14  that before.  I just, I can't understand why he didn't ask for

15  that before but -- and I can't -- there's a lot of things I

16  look at now and I don't understand why Mr. Barnes didn't get

17  any witnesses to the trial, like people that saw the windows

18  open, people that --

19     THE COURT:  It's not --

20     THE WITNESS:  No --

21     THE COURT:  -- pertinent to the question.

22     THE WITNESS:  Yes, sir.  I'm sorry.

23     So did I answer your question?

24     BY MR. ALBERT:

25     Q.  Thank you.

1  of the money to Vicki.  So we got a loan for $800,000 but that

2  was to pay the old loan off.

3      Q.   Right.

4      A.   And then the rest of the loan, the rest of the money

5  was to pay her for her half of the equity in the house.

6      Q.   So my question is, did you ever pay your son back for

7  the money that he borrowed that you used to pay your wife?

8      A.   I didn't borrow any money from my son.

9      Q.   I'm sorry.  I missed that.

10      A.   I didn't borrow any money from my son.

11      Q.   So the answer is you didn't pay any of this money

12  back to your son, right?

13      A.   I didn't borrow any money from my son.

14      Q.   Okay.

15          After -- let me try it this way.  After April --

16  yeah.  After April 2007, I think it was April 16th when the

17  deed of trust was recorded?

18      A.   Uh-huh.

19      Q.   Does that sound about right?

20      A.   Yes, sir.

21      Q.   And that's, there were the three deeds and then the

22  deed of trust, right?

23      A.   Right.

24      Q.   After April of 2010 did you pay any money to your son

25  Len with respect to any of the money that you paid your wife,

1  your ex-wife Vicki?

2      A.   I never paid Lenny any money.

3      Q.   Okay, fair enough.

4           Now, you also said that you tried to refinance.  When

5  did you try to refinance the property, and I think you said it

6  was with SunTrust.  When was that?

7      A.   So lots of times.  I mean, I continually tried.  At

8  least twice a year.

9      Q.   At least twice a year?

10     A.   Since -- since we borrowed the money from SunTrust.

11     Q.   Okay.

12          And was that always with SunTrust?  The attempts to

13  refinance, were they always with SunTrust?

14     A.   I -- I think so.  I mean, we looked at other sources.

15  I think one time we tried Capital One, but always the -- our

16  best chances were with SunTrust because we had a track record

17  with them.  We kept paying the loan to them.  Up until the

18  fire, and then we fell behind on the mortgage.

19     Q.   All right.

20          And none of those efforts were successful in

21  obtaining a new loan, right?

22     A.   No.

23     Q.   Okay.

24          And your son Len was part of the application process,

25  is that right?

1  separate?

2          THE WITNESS:  Well, because -- because of, the

3  individual account of Cornet was -- was my personal income,

4  and the other account for CLR was different.  And the

5  intentions were originally is to, CLR was to be -- give

6  that account to my sons, but that never happened.  Because

7  it never made any money.

8          THE COURT:  What never made any money?

9          THE WITNESS:  CLR.  It just became a way to

10  separate income and meet the bills and pay for the mortgage

11  and -- and the ability to pay for the house.

12          THE COURT:  This may have been answered already.

13  Why use the CLR account for your rents?

14          THE WITNESS:  Because I didn't want to put the

15  rent money into my personal account, into my -- my -- my

16  personal account because -- see, in the very beginning,

17  from the very beginning from when Vicki and I owned, well,

18  when the house was in Vicki's name, and we always had the

19  basement rented even when she and I -- when she and I were

20  together we rented the basement, and that wasn't my money.

21  That really wasn't -- I didn't consider that my money.

22  That was just money to pay the mortgage.  And so I would

23  put the money into the CLR account and then I would

24  supplement that money from CLR from my personal account,

25  from the Bank of America -- or I mean from -- yeah, Bank of

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

|  |  |  |
|---|---|---|
|  | . | Case No. 18-02662 |
| IN RE: | . |  |
|  | . | Chapter 11 |
| LEN SALAS, | . |  |
|  | . | 701 Broadway |
|  | . | Nashville, TN 37203 |
| Debtor. | . |  |
|  | . | Thursday, December 13, 2018 |
| . . . . . . . . . . . . . . | . | 9:25 a.m. |

PARTIAL TRANSCRIPT OF MOTION TO CONVERT CHAPTER 11 CASE
TO CHAPTER 7 UNDER SECTION 1112(a), FEE AMOUNT $15.00,
ALTERNATIVELY TO APPOINT A CHAPTER 11 TRUSTEE
IF TIMELY RESPONSE
**BEFORE THE HONORABLE MARIAN F. HARRISON
UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Debtor:            Niarhos & Waldron, PLC
                          By:  TIMOTHY G. NIARHOS, ESQ.
                               DENIS GRAHAM WALDRON, ESQ.
                          1106 18th Avenue South
                          Nashville, TN 37212
                          (615) 320-1101


APPEARANCES CONTINUED


Audio Operator:           Lauren Langston, ECR


Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Max Salas:                    Thompson Burton PLLC
                                  By:  PHILLIP G. YOUNG, ESQ.
                                  One Franklin Park
                                  6100 Tower Circle, Suite 200
                                  Franklin, TN 37067
                                  (615) 465-6008

                                  Stinson Leonard Street LLP
                                  By:  MARC ALBERT, ESQ.
                                       JOSHUA COX, ESQ.
                                  1775 Pennsylvania Avenue Northwest
                                  Suite 800
                                  Washington, DC 20006
                                  (202) 785-9100

For Gail Brekelmans,              Burch Porter & Johnson, PLLC
Michael McLoughlin, Jr.,          By:  LANI LESTER, ESQ.
Nicolaas Brekelmans,              130 North Court Avenue
and Martha Johnson:               Memphis, TN 38103
                                  (901) 524-5166

                                  Law Office of Philip J. McNutt, PLLC
                                  By:  PHILIP JAMES MCNUTT, ESQ.
                                  11921 Freedom Drive, Suite 584
                                  Reston, VA 20190
                                  (703) 904-4380

For the United                    U.S. Department of Justice
States Trustee:                   Office of the United States Trustee
                                  By:  MEGAN REED SELIBER, ESQ.
                                  701 Broadway, Suite 318
                                  Nashville, TN 37203
                                  (615) 742-6273

3

I N D E X
12/13/18

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Len Salas | 4 | 72 | -- | -- |

| EXHIBITS: | | Marked | Admitted |
|-----------|--|--------|----------|
| Exhibit 1014 | Deposition of Max Salas | 36 | -- |
| Exhibit 1015 | 3/9/2016 Deposition Excerpts | 25 | -- |
| Exhibit 1019 | Deed of Trust | 6 | -- |
| Exhibit 1036 | Schedules of Max Salas | 62 | -- |
| Exhibit 1040 | SunTrust Motion for Relief from Automatic Stay | 13 | -- |
| Exhibit 1041 | Fixed Rate Note | 10 | -- |

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case 23-20-00990027-DoDoc 74-54-1 Filed 08/018/226/24 Entered 08/06/22 15:56:01 Desc 994
Exhibit 4 L Salas Confirmation Hrg Transcript in Case No. 18-2662 12-13-18   Page 3 of 6
APPX00531

L. Salas – Direct                                    68

1  Q    All right.  Are you aware, personally, between 2010 and

2  today whether there have been any attempts to file, record, or

3  otherwise formalize the quitclaim deed that you signed in July

4  of 2010?

5  A    I don't know.

6  Q    Are you aware of any provisions in your plan that provide

7  for the payment of the deed of trust note currently due

8  SunTrust Bank?

9  A    No.

10 Q    Do you have any source, whether your own money or someone

11 else's, to pay off the SunTrust balance that is approximately

12 $1.14 million?

13 A    What was the question again?

14 Q    Are you aware of any source that's available to you,

15 whether it's yours or someone else's, to pay off the SunTrust

16 mortgage balance of $1.14 million?

17 A    No.

18 Q    Do you know if you have provided any additional collateral

19 or benefit to SunTrust Bank in exchange for deeding the

20 property under your plan to your father?

21 A    No.

22 Q    When you -- when your brother created the trust documents,

23 did your father pay any money to you?

24 A    No.

25 Q    Did he give you any other consideration?  Did he give you

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

Case 23-20-00990027 Doc 74-5-1 Filed 08/01/2226/24 Entered 08/01/22 15:56:01 ID es 1995
Exhibit 4 L Salas Confirmation Hrg Transcript in Case No. 18-2662 12-13-18   Page 4 of 6
APPX00532

                              L. Salas – Direct                        69

1  any property, any personal property, or anything like that?

2  A    No.

3       (Pause)

4  Q    Are you aware of any income or assets that your father has

5  that would enable him to pay down or pay off the SunTrust deed

6  of trust note?

7  A    No.

8  Q    Are you aware of any other source he may have, if not

9  himself then someone else or some other party, to pay off the

10 SunTrust deed of trust note?

11 A    No.

12 Q    Have you had any discussions with your father prior to

13 filing your plan of reorganization of how the SunTrust note

14 would be paid off?

15 A    No.

16 Q    Other than the $570 -- I believe that's the number in

17 your -- whatever the number is in your plan, other than the

18 $570 per month under your plan, do you have any other resources

19 or income that could be used to pay your creditors?

20 A    No.

21 Q    And you don't intend to use any of your exempt assets to

22 pay creditors, correct?

23 A    I don't know.

24 Q    And you don't intend to use any of your wife's income

25 other than what's provided in the plan, because I know it's


Case 23-20-00990027   Doc 74-54-1   Filed 08/01/226/24   Entered 08/08/22 19:56:09   Desc
Exhibit 4 L Salas Confirmation Hrg Transcript in Case No. 18-2662 12-13-18   Page 5 of 6

80

**C E R T I F I C A T I O N**

1

2

3       I, Alicia Jarrett, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9

10

11   ALICIA JARRETT, AAERT NO. 428     DATE:  February 11, 2019

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE


- - - - - - - - - - x
IN RE:                 :
LEN SALAS              : Case 3:18-bk-02662
        Debtor         :
- - - - - - - - - - - x

April 1, 2019
Nashville, Tennessee

CONTINUED FIRST MEETING OF CREDITORS

Pursuant to Section 341 of the U.S.
Bankruptcy Code.

APPEARANCES:  MICHAEL GIGANDET, ESQUIRE
Trustee


PHILIP J. McNUTT, ESQUIRE
On behalf of the Decedents



Also Present:  Mr. Naras, Esquire

_____

SUBURBAN REPORTING SERVICE
5303 Strathmore Avenue
Kensington, Maryland 20895

(240) 920-6886

9ba0808e-5ecf-42ad-a495-4bbf5b694301

# C O N T E N T S

LEN SALAS                                              Page
        Examination by Mr. McNutt                        4
        Examination by Mr. Gigandet                      8

SUBURBAN REPORTING SERVICE        (240) 920-6886

```
 1                P R O C E E D I N G S

 2              MR. GIGANDET:  Our next case is

 3      going to be Len Salas, 18-02662.  Come on up,

 4      Mr. Salas.

 5              MR. SALAS:  (Complying.)

 6              MR. GIGANDET:  Remain standing and

 7      raise your right hand.

 8      Whereupon,

 9                      LEN SALAS

10      was called as a witness, and, having first been

11      duly sworn by the Trustee, was examined and

12      testified as follows:

13              MR. GIGANDET:  You can have a seat.

14      You've been here before, we've already had a

15      preliminary Meeting of Creditors.  We continued

16      the case, resolved some administrative issues

17      and we're here for your Continued Meeting of

18      Creditors.

19              At this time I want to take

20      appearances, identify who you are and who you

21      represent.

22              MR. McNUTT:  Philip McNutt on behalf
```

Suburban Reporting Service                          240-920-6886
Case 23-20-00990027DoDoc 74-6-1 Filed 08/01/226/21ntered 08/01/221 56:36 ag Desk DD0esk000
Exhibit 5 K Salas Chapter 7 Meeting Transcript 4-1-19   Page 3 of 9

APPX00537
9ba0808e-5ecf-42ad-a495-4bbf5b694301

 1    of the Estates of the Mcloughlyn and Reclamams

 2    decedents.

 3              MR. GIGANDET:  All right.  You may

 4    proceed, Mr. McNutt.

 5              MR. McNUTT:  Thank you.

 6       EXAMINATION BY COUNSEL FOR THE DECEDENTS

 7              BY MR. McNUTT:

 8       Q.    I just have a couple of short --

 9    well, they may not be short, but quick

10    questions, Mr. Salas.

11              I want to give you a document that

12    as entered in your father's proceeding that I

13    know you've seen before.

14              It's identified as Document 66-1 in

15    Case 18-00260 and it is also identified at the

16    bottom there as Creditor's Exhibit No. 3.

17              I will represent to you that this is

18    the revocable trust and quit claim deed that

19    you and your father executed in July of 2010.

20              Do you recognize those documents?

21    The quit claim deed is actually on the last

22    page, if you want to review that.

1     A.     (Reviewing document.)  Yes, I

2   recognize this.

3     Q.     You know that we've talked about

4   this many times before, so I'm not going to try

5   to go over old ground, but I do want to cover a

6   couple of things that I don't think that we

7   know specifically.

8           This transaction by which you became

9   the owner of the deed-of-trust of the property

10  in D.C., the Briggs Place property, do you

11  remember that property?

12    A.     Yes.

13    Q.     Your father's property, right?

14    A.     Yes, I know that property.

15    Q.     You obtained the deed-of-trust for

16  that in approximately 2007, correct?

17          MR. GIGANDET:  That's not that

18  document.

19          THE WITNESS:  It's not that

20  document?  I don't -- yes.

21          BY MR. McNUTT:

22    Q.     You have the original deed-of-trust

Suburban Reporting Service                              240-920-6886
Case 3:20-ap-00027-DoDoc 74-64-1 Filed 08/01/226/24 Entered 08/01/22 15:56:01 Desc
Exhibit 5 K Salas Chapter 7 Meeting Transcript 4-1-19    Page 5 of 9         APPX00539

9ba0808e-5ecf-42ad-a495-4bbf5b694301

1   on the property through Sun Trust Bank,

2   correct?

3       **A.    Yes.**

4       Q.    And that was in approximately 2007,

5   correct?

6       **A.    Yes.**

7       Q.    At the time that you obtained the

8   deed-of-trust on that property did your father

9   make any payments to you?

10      **A.    No.**

11      Q.    Did he give you any property that

12  you're aware of?

13      **A.    No.**

14      Q.    All right.  Skipping forward to the

15  date of the trust and quit claim deed, which

16  was in July of 2010, did your father make any

17  payments to you at that time?

18      **A.    No.**

19      Q.    Did he give you any property at that

20  time?

21      **A.    No.**

22      Q.    Did he give you anything of value in

1    or about july of 2010, at the time of the

2    irrevocable trust?

3         **A.    No.**

4         Q.    Since 2010, since the date of the

5    irrevocable trust, has your father made any

6    payments to you with respect to the deed-of-

7    trust on the property on Briggs Place in

8    Washington, D.C.?

9         **A.    No.**

10            MR. GIGANDET:  You mean directly to

11   him, right?  As opposed to payments to the

12   bank?

13            MR. McNUTT:  Directly to Len?

14            MR. GIGANDET:  Yes.

15            MR. McNUTT:  Yes.

16            MR. GIGANDET:  Okay.

17            BY MR. McNUTT:

18        Q.    Do you know if your father has made

19   all of the payments on the deed-of-trust since

20   2007?

21        **A.    I don't know.**

22        Q.    Do you know if the indebtedness on

Suburban Reporting Service                          240-920-6886
Case 3:20-ap-00027-Doc 74-6 Filed 08/18/22 Entered 08/06/22 15:56:30 Desc
Exhibit 5 K Salas Chapter 7 Meeting Transcript 4-1-19    Page 7 of 9

APPX00541

9ba0808e-5ecf-42ad-a495-4bbf5b694301

1    the deed-of-trust is greater today than it was

2    in 2007?

3          **A.    I don't know.**

4                MR. McNUTT:  That's fine, that's all

5    I have.

6          `    MR. GIGANDET:  All right.  Mr. Naras

7    (phonetic) do you have any questions?

8                MR. NARAS:  I do not.

9                EXAMINATION BY THE TRUSTEE

10               BY M R. GIGANDET:

11        Q.

12        Mr. Salas, has anything changed in your

13   petition between the last time you were here

14   and now?  I mean anything that you found that

15   was incorrect that you need to correct.

16        **A.    I don't think so.**

17        Q.    All right.  Very good.  Then if

18   there's nothing further, I'm going to conclude

19   the Meeting of Creditors now.

20               (Whereupon, the Continued 341

21   Meeting of Creditors was concluded)

22

Case 3:20-ap-00027-DoDoc 74-6 4-1 Filed 08/01/8226/24 Entered 08/01/22 15:56:30 Desc
Exhibit 5 K Salas Chapter 7 Meeting Transcript 4-1-19    Page 8 of 9
APPX00542
9ba0808e-5ecf-42ad-a495-4bbf5b694301

CERTIFICATE OF REPORTER

```
- - - - - - - - - - - x
IN RE:              :
LEN SALAS           : Case 3:18-bk-02662
     Debtor         :
- - - - - - - - - - - x
```

I, Martin S. Scheinberg, Notary Public, do hereby certify that the witness whose testimony appears in the foregoing pages was duly affirmed; that the testimony of said witness was recorded by the Trustee and thereafter reduced to typewritten form by me; that said transcript is a true record of the testimony given by said witness to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this Rule 341 Meeting of Creditors was taken; and, further, that I am not a relative of or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Martin S. Scheinberg
Notary Public in and for
the State of Maryland

My Commission expires:
September 1, 2022

SUBURBAN REPORTING SERVICE    (240) 920-6886

Suburban Reporting Service                                      240-920-6886
Case 3:20-ap-00027 Doc 74-6 Filed 08/01/22 Entered 08/01/22 15:56:16 Desc
Exhibit 5 K Salas Chapter 7 Meeting Transcript 4-1-19    Page 9 of 9

APPX00543

9ba0808e-5ecf-42ad-a495-4bbf5b694301

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                        .    Case No. 18-00260-smt
                              .
MAX E. SALAS,                 .
                              .    Washington, D.C.
            Debtor.           .    August 24, 2018
                              .
. . . . . . . . . . . . . . . .


         TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
                    VOLUME 3 OF 3
          BEFORE THE HONORABLE S. MARTIN TEEL, JR.
          TRANSCRIPT ORDERED BY:   PHILIP J. McNUTT


APPEARANCES:
For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020


For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380


Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

Case 3:20-ap-00027-Doc 74-14 Filed 08/01/22 Entered 08/01/22 15:56:31 Desc
Exhibit 6 Exemption Hearing in Case No. 18-260 (D.C.) Vol 3 Excerpts 8-24-18   Page 1 of 20

TABLE OF CONTENTS

WITNESSES:                                            PAGE:
RON SALAS
Direct examination continued by Mr. Albert      4
Cross-examination by Mr. McNutt                 6
Redirect examination by Mr. Albert             16
Recross-examination by Mr. McNutt              19
Redirect examination by Mr. Albert             24

MAX SALAS
Direct examination by Mr. McNutt continued     29

MAX SALAS
Direct examination by Mr. Albert               61
Cross-examination by Mr. McNutt               137
Redirect examination by Mr. Albert            207
Recross-examination by Mr. McNutt             215
Redirect examination by Mr. Albert            227

CLOSING ARGUMENT:                                     PAGE:
By Mr. McNutt                                  232
By Mr. Albert                                  266
By Mr. McNutt                                  281
By Mr. Albert                                  294

EXHIBITS:                                  MARKED: RECEIVED:
DEBTOR'S
L.  DCRA corporation document              227     227

CREDITOR'S
14. M.Salas Deposition Transcript           *       296
     dated 2/14/16
44. 4/3/2018 transcript of hearing         155      --
45. Excerpt of document production         216  Reject-218

*Exhibits marked on previous days of trial.
**Transcriptionist's note: The notations of
"(unintelligible)" in this transcript are due to the audio
recording levels being turned up too high, or individuals
speaking outside of the vocal capture range of the
microphone.

1  Mr. McNutt has been kind enough to permit me, subject to
2  the Court's okay, to call him now if that's all right.
3          THE COURT:  That's fine.
4    RON SALAS, DEBTOR'S REBUTTAL WITNESS, PREVIOUSLY SWORN
5          THE COURT:  Go ahead, Mr. Albert.
6          MR. ALBERT:  Thank you.
7                    DIRECT EXAMINATION
8          BY MR. ALBERT:
9      Q.   Good morning.
10          I just wanted to clarify again, because I heard
11  yesterday something that seemed inconsistent with what you
12  had told the Court and me earlier this week.  When you and
13  I spoke and you and I exchanged emails, there was a
14  discussion regarding the trust agreement and the quit-claim
15  deed, correct?
16      A.   Yes.
17      Q.   And tell the Court and me again what we discussed
18  and what you did.
19          MR. McNUTT:  Objection.  Your Honor, this is not
20  rebuttal testimony.  He's asking him to state again what he
21  testified to earlier.  It's not rebuttal.
22          THE COURT:  Overruled.
23          THE WITNESS:  So in regards to the email where I
24  said I sent you originals, or I had the originals, I had
25  spoke with my brother.  He told me he had the original.  I

1    said, "Send them to me.  Mr. Albert is asking for them."

2            MR. McNUTT:  Objection.  Hearsay, Your Honor.

3            THE COURT:  I'll not receive it for the truth of

4    the contents.

5            THE WITNESS:  When he told me he had them, I told

6    you had originals.  When they arrived in my office I

7    contacted you immediately and said, "Well, these are not

8    the originals.  The originals" -- so the only original

9    would have been to Max.  The reason I knew they were not

10   the originals is because I, as I testified earlier, scan

11   all my documents for preservation, and I know there was

12   blue ink on at least the notary as I recall, and the

13   documents I received were all blank ink, which indicated to

14   me they were copies not originals.  So I let you know at

15   that point.

16           MR. ALBERT:  Thank you.

17           THE WITNESS:  Uh-huh.

18           MR. ALBERT:  Your witness.

19           THE COURT:  You said you got them from your son.

20   Do you mean from your --

21           THE WITNESS:  From my brother.  If I said son, I

22   apologize.

23           THE COURT:  Your brother.  Okay.

24           THE WITNESS:  Yes, my brother Len had them, mailed

25   them to me.  I was going to mail them to you, but they were

1    A.    So couldn't assert nothing --

2    Q.    -- but can you answer --

3    A.    -- couldn't assert anything about that.

4    Q.    Can you answer my question, please?

5    A.    What's the question?

6          I think I answered it.

7    Q.    The question is did you produce all documents related

8    -- did you produce all documents related to your ownership of

9    the property that you claimed during the Superior Court

10   litigation?

11   A.    I don't -- I guess I don't know the difference --

12   well, I don't know.  Did we submit them?

13         Yeah, we submitted them, but weren't, one of them

14   weren't -- this document wasn't allowed.

15   Q.    When you say "this document," you mean what's been

16   marked --

17   A.    The deed --

18   Q.    -- as Exhibit 30, the quit-claim deed and the trust

19   documents, correct?

20   A.    That's what I'm talking about, yeah.

21   Q.    All right.

22         And those were submitted, as you put it, on or after

23   March 12, 2018, correct?

24   A.    Yeah -- yeah, uh -- yes, sir.  It was like, like a

25   couple of weeks before the trial.

1   Salas?

2      A.   Because I bought -- because I paid for the policy I

3   guess.  I don't know.

4      Q.   Okay.  Fair enough.

5          Any other reason that you're aware of?

6      A.   No, I -- I don't know.  I have no idea.

7      Q.   You also testified earlier that, in the corrections

8   that you told Judge Teel about, you also testified that the

9   original of the document may be at the title attorney's office,

10   right?

11      A.   That just came to me -- that just came to me as I was

12   sitting over there.  I never -- I never told Mr. Albert about

13   it because I can't talk to him about my testimony, but I just

14   thought about it, and it's -- and it's possible because I don't

15   know if they mailed it back to me.  I don't remember that.  All

16   the papers that I had in my house were burned, so I -- and I

17   didn't recover it from there.  So I couldn't have recovered it

18   there.  But it's, you know, it's possible that it's still at

19   his office because I don't remember -- I don't remember him

20   mailing it back to me, and I don't remember -- but, there's a

21   lot of things I don't remember.

22      Q.   Well, when did you, and I'm assuming because you were

23   attempting to get the quit-claim deed recorded that you gave

24   these documents to Mr. Goldstein shortly after you signed the

25   trust documents in July of 2010; is that fair?

1    A.   Yeah, so what -- so I had this realtor.  Her name is

2  in here, Sylvia Jones, and she told me what she had done --

3           MR. McNUTT:  Your Honor, I'm going to object.

4           THE WITNESS:  Well, I'm trying to answer your

5  question because --

6           MR. McNUTT:  You can't answer --

7           THE WITNESS:  -- that has to tell --

8           MR. McNUTT:  This is more hearsay, Your Honor.

9           THE COURT:  Overruled.

10          THE WITNESS:  So I talked to her.  She told me how

11  she had put her house in a trust because she had three

12  daughters, and so I said I formed a trust, and I've got the,

13  and I quit-claim -- my son quit-claimed the deed over to me,

14  and I want to now register the trust.  And I said, "How do you

15  do that?"  She said, "Well, you got to go to a title company."

16  I said, "Well, who is that?"  She said call Goldstein, Maryland

17  Title Company or something, and she gave me the number to them.

18  And so I called them up and they said, "Send us the

19  information."  So I sent them the information, and about a week

20  later I called them back and they called -- or they called me

21  and they told me what the situation was.

22          So I don't know if I answered your question there or

23  not.

24          BY MR. McNUTT:

25    Q.   I can guarantee you didn't answer the question.

1    A.   I'm sorry.  What's the question?

2    Q.   I'll leave it at that.

3    A.   All right.

4    Q.   So as you sit here today, you're not really sure what

5    happened to the original quit-claim deed after you gave it to

6    Mr. Goldstein, right?

7         MR. ALBERT:  That was asked and answered.

8         THE WITNESS:  I just told you, I don't know if it was

9    in my house or it's in his office, but I -- I don't know.

10        MR. McNUTT:  Okay.

11        THE COURT:  The objection is overruled.

12        BY MR. McNUTT:

13   Q.   And if it was in Mr. Goldstein's office, then you

14   could have gotten it by just simply calling him, right?

15   A.   I -- I -- I could -- I told -- I guess -- I told

16   Mister -- I told my attorney what I did, and so I -- that's his

17   job I guess.  I relied on him.

18   Q.   Which one is that?

19   A.   Mr. Albert and Mr. Cox.

20   Q.   Okay.

21        You don't have a copy of the original quit-claim deed

22   with you today, do you?

23   A.   No.

24   Q.   Are you aware of at any time after you gave it to Mr.

25   Goldstein that you were in possession of the original of the

1  quit-claim deed?

2      A.    Any time after that?

3      Q.    Yes, sir.

4      A.    No.  I --

5      Q.    Up until obviously February of 2018.

6      A.    No, sir.

7      Q.    Okay.

8      A.    I don't remember.

9      Q.    Did you ever try to record the quit-claim deed after

10 the time that you gave it to Mr. Goldstein?

11     A.    No.

12     Q.    Did you ever make another attempt?

13     A.    No.  No, sir.

14     Q.    What activities did you undertake as trustee of the

15 1610 Riggs Property Trust after July 6, 2010?

16     A.    What activities?

17     Q.    Yes, sir.  Did you undertake as trustee?  What

18 activities?

19     A.    I answered that.  Do you want me to do it again?

20     Q.    Yes, sir.

21     A.    I thought I answered it.  I called them and -- I mean

22 after I called Mr. Goldstein and asked him to register it, and

23 then he told me that it was going to cost me $50,000, did I do

24 anything after that?

25     Q.    Yes, sir.

1     A.   Monthly payments.

2     Q.   What -- I don't think you answered my question

3 exactly.  She gets the money; who got the house?

4     A.   Oh, I got the house.

5     Q.   All right.

6          So you took title to the house in your name at that

7 time?

8     A.   Yeah, for a day or two.

9     Q.   Okay.

10          Explain the circumstances behind that.

11     A.   Well, I -- I tried to get a loan.  I couldn't.  I

12 went to SunTrust Bank.  They said there's enough equity in the

13 house to get a loan to pay your wife off, but unfortunately you

14 can't get a loan.  So my, so Len, who had a very good

15 relationship with my ex-wife and myself, we both went to Len

16 and asked him if he would sign for a loan to get Vicki paid

17 off, and he -- and he did.  So that -- so we got a loan so we

18 could pay her, so I could pay her off and she could move back

19 to Tennessee.

20     Q.   Was it necessary to get the loan that the title would

21 have to go in Len's name?

22     A.   Yes, it --

23          MR. McNUTT:  Objection.

24          THE WITNESS:  Yes, it was.

25          MR. McNUTT:  He's not only leading the questions,

 1   he's also asking for a legal conclusion.

 2          THE COURT:  The objection is sustained.  Rephrase the

 3   question.

 4          MR. ALBERT:  Of course, Your Honor.

 5          BY MR. ALBERT:

 6   Q.   Who -- so the property was put in your name then when

 7   you got the loan?

 8   A.   No, it wasn't.

 9   Q.   Whose name was it put in?

10   A.   Put in my son's name, Len.

11   Q.   Why?

12   A.   Because the loan was made by SunTrust, and his credit

13   -- that was kind of like the peak of the housing market and the

14   loan was made out to him.  He didn't have any -- he had good

15   credit, and they were giving loans to just about anybody at

16   that point in time, and there was enough equity in the house to

17   get it.

18   Q.   But they wouldn't give you credit -- excuse me.

19        They wouldn't lend you the money because?

20   A.   Because I had liens from, tax liens from years eighty

21   -- uh -- '97, '98, and '99.  Yeah.

22   Q.   Okay.

23   A.   I owed money to the IRS.

24   Q.   I see.

25        Now, you owe money to the IRS today, correct?

```
 1        A.   Yes, I do.

 2        Q.   All right.

 3             And you heard yesterday in the questioning by Mr.

 4   McNutt, you owe a certain amount of money, the IRS has filed a

 5   claim in this case?

 6        A.   Yes.

 7        Q.   How much did -- are they claiming?

 8        A.   I think about $25,000.

 9        Q.   How much is the house worth today if you remember?

10        A.   So it's about 2.4, 2.3, 2.4 million.

11        Q.   And how do you know that, sir?

12        A.   We had a guy, an appraiser, a real estate appraiser

13   do an -- do an appraisal.

14        Q.   Thank you.

15             So, is the property recorded in Len's name?

16        A.   Yes.

17        Q.   Has it ever been recorded in your name or any trust

18   as far as you know?  Recorded?

19        A.   Well, I --

20        Q.   Recorded?

21             THE COURT:  In the land records, Mr. Salas.

22             BY MR. ALBERT:

23        Q.   In the land records.

24        A.   In the land records?  I think it was recorded by name

25   for a day until it was -- until it was -- then I quit-claimed
```

```
 1  it back over to Len until, so he could file the -- so, yeah.
 2  One day I think.  The day that the transaction happened.
 3      Q.   And Lenny also signed a deed of trust?
 4      A.   Yes.
 5      Q.   And he signed the note?
 6      A.   Yes.
 7      Q.   In connection with the loan?
 8      A.   Yes.
 9      Q.   And Lenny I suppose has been paying everything since
10  that time?
11      A.   Lenny has never paid any -- Lenny has never paid a
12  penny, a penny towards the loan of the house.
13      Q.   No down payment, no monthly payments?
14      A.   No.
15      Q.   No loan?
16      A.   No.  Nothing.
17      Q.   Besides this accommodation, this help that Lenny gave
18  you, did he have any responsibility with respect to 1610 Riggs
19  Place Northwest?
20      A.   No.
21      Q.   Who was handling any and everything about the
22  property?
23      A.   All my responsibility.  Me.  I was doing it all.
24      Q.   Okay.
25           Even before the divorce from Vicki who was paying all
```

1          Do you see that?

2     A.   The bottom?

3     Q.   On page 219?

4     A.   Line which one?  What line?

5     Q.   Oh, line 17.  I'm sorry, sir.

6     A.   Okay.  Yeah.

7               "No, there's one trust, so no, they are

8          not different, they are the same, I think."

9     Q.   And then read the question and the next answer.

10    A.        "Did you ever formally set up a trust?"

11             "Yes."

12    Q.   Okay, and read the answer.

13    A.        "Okay.  Do you agree if it's called CLR?"

14             "Yes, sir."

15    Q.   And is that correct, it was called CLR?

16    A.   The trust?  No.

17    Q.   Because that -- all right, thank you.

18         Okay.

19         Can you explain when you brought to my attention

20    the trust document and quit-claim deed?

21    A.   Can I explain when I brought the trust to your

22    attention?

23    Q.   Approximately when did you --

24    A.   Yeah.  So after we had, after the judgment came,

25    after the trial where Mr. Barnes defended, represented me, you

1    -- so I was talking to you and you asked me --

2        Q.    Did you say after the trial or during the trial?

3            MR. McNUTT:  Objection.

4            THE WITNESS:  After, well, I think it was after the

5    trial.  After the trial.  I don't know when it was.

6            MR. McNUTT:  Your Honor, that was a blatant attempt -

7    -

8            THE WITNESS:  Oh no --

9            MR. McNUTT:  -- to lead the witness.

10           THE WITNESS:  -- before the trial.  So, I don't -- I

11   don't remember when, but I talked with you, and you asked me --

12           MR. McNUTT:  Your Honor, I ask that this answer be

13   stricken.

14           THE COURT:  He can answer it now.  He's not honing it

15   down to a specific time.

16           MR. McNUTT:  Your Honor, that was a blatant attempt

17   to lead him and correct him.

18           THE WITNESS:  Okay.

19           MR. McNUTT:  That's highly improper.

20           THE COURT:  The question was when did this occur, and

21   he can't remember at this moment.  It's been answered

22   previously during the trial.

23           We're covering a lot of ground all over again.

24           MR. ALBERT:  I understand, Judge, but Mr. McNutt took

25   approximately six hours with --

```
 1              THE COURT:  Ask a question.
 2              BY MR. ALBERT:
 3        Q.   Do you know what -- what are -- explain the
 4   circumstances to the Court regarding finding the trust document
 5   and the quit-claim deed.
 6        A.   So you asked me, "You keep talking about this trust
 7   in your deposition.  I read your deposition and you keep
 8   talking about" --
 9        Q.   Who are you talking about?  Are you talking about me?
10        A.   Yes.
11        Q.   When you say "you"?
12        A.   Yes.  You -- you talked to me about, "You keep
13   talking about this trust through your whole deposition.  I've
14   read the whole thing.  What trust are you talking about?"  And
15   I said, "The trust."  I said what -- and he said, you said to
16   me, "Who put this trust together for you?  Was there a lawyer
17   involved?"  And I said, "Yes."  I (sic) said, "Which lawyer?"
18   "My son."  I (sic) said, "Your son is a lawyer?"  "Yes."
19   "Where is he at?"  "Colorado."  I said, "Colorado."  He says,
20   "Do you -- does he have a copy of the trust?"  I said -- no you
21   asked me, "Do you have a copy of the trust?"  I said, "No."
22   "Where is it?"  I said, "It burned in the fire.  I don't have
23   any" -- he says, "Well, do you think your son has a copy of the
24   trust?"  I said, "Well, he should.  I guess, yeah, he might --
25   he should."  I don't remember what I said.  "But I can call
```

 1  him."

 2          So I called him.  You said, "May I talk to him?"  I

 3  said, "Yes."  You said, "Will you call him and tell him that

 4  I'm going to call him?"  I said, "Yes."

 5          So I called him, told him, asked him if he had a copy

 6  and he said yes.  And so you -- you called him and you got a

 7  copy of that, of the doc -- you got a copy of the trust and the

 8  quit-claim deed.

 9      Q.  Thank you.

10          Can you think of any reason why that document wasn't

11  obtained earlier than that time?

12      A.  No, I can't think of any reason why it was -- I --

13  you know, I -- I don't understand why Mr. Barnes didn't ask for

14  that before.  I just, I can't understand why he didn't ask for

15  that before but -- and I can't -- there's a lot of things I

16  look at now and I don't understand why Mr. Barnes didn't get

17  any witnesses to the trial, like people that saw the windows

18  open, people that --

19          THE COURT:  It's not --

20          THE WITNESS:  No --

21          THE COURT:  -- pertinent to the question.

22          THE WITNESS:  Yes, sir.  I'm sorry.

23          So did I answer your question?

24          BY MR. ALBERT:

25      Q.  Thank you.

1  of the money to Vicki. So we got a loan for $800,000 but that
2  was to pay the old loan off.

3      Q.   Right.

4      A.   And then the rest of the loan, the rest of the money
5  was to pay her for her half of the equity in the house.

6      Q.   So my question is, did you ever pay your son back for
7  the money that he borrowed that you used to pay your wife?

8      A.   I didn't borrow any money from my son.

9      Q.   I'm sorry. I missed that.

10     A.   I didn't borrow any money from my son.

11     Q.   So the answer is you didn't pay any of this money
12  back to your son, right?

13     A.   I didn't borrow any money from my son.

14     Q.   Okay.

15          After -- let me try it this way. After April --
16  yeah. After April 2007, I think it was April 16th when the
17  deed of trust was recorded?

18     A.   Uh-huh.

19     Q.   Does that sound about right?

20     A.   Yes, sir.

21     Q.   And that's, there were the three deeds and then the
22  deed of trust, right?

23     A.   Right.

24     Q.   After April of 2010 did you pay any money to your son
25  Len with respect to any of the money that you paid your wife,

1  your ex-wife Vicki?

2      A.   I never paid Lenny any money.

3      Q.   Okay, fair enough.

4           Now, you also said that you tried to refinance.  When

5  did you try to refinance the property, and I think you said it

6  was with SunTrust.  When was that?

7      A.   So lots of times.  I mean, I continually tried.  At

8  least twice a year.

9      Q.   At least twice a year?

10     A.   Since -- since we borrowed the money from SunTrust.

11     Q.   Okay.

12          And was that always with SunTrust?  The attempts to

13 refinance, were they always with SunTrust?

14     A.   I -- I think so.  I mean, we looked at other sources.

15 I think one time we tried Capital One, but always the -- our

16 best chances were with SunTrust because we had a track record

17 with them.  We kept paying the loan to them.  Up until the

18 fire, and then we fell behind on the mortgage.

19     Q.   All right.

20          And none of those efforts were successful in

21 obtaining a new loan, right?

22     A.   No.

23     Q.   Okay.

24          And your son Len was part of the application process,

25 is that right?

1 | separate?

2 | THE WITNESS: Well, because -- because of, the

3 | individual account of Cornet was -- was my personal income,

4 | and the other account for CLR was different. And the

5 | intentions were originally is to, CLR was to be -- give

6 | that account to my sons, but that never happened. Because

7 | it never made any money.

8 | THE COURT: What never made any money?

9 | THE WITNESS: CLR. It just became a way to

10 | separate income and meet the bills and pay for the mortgage

11 | and -- and the ability to pay for the house.

12 | THE COURT: This may have been answered already.

13 | Why use the CLR account for your rents?

14 | THE WITNESS: Because I didn't want to put the

15 | rent money into my personal account, into my -- my -- my

16 | personal account because -- see, in the very beginning,

17 | from the very beginning from when Vicki and I owned, well,

18 | when the house was in Vicki's name, and we always had the

19 | basement rented even when she and I -- when she and I were

20 | together we rented the basement, and that wasn't my money.

21 | That really wasn't -- I didn't consider that my money.

22 | That was just money to pay the mortgage. And so I would

23 | put the money into the CLR account and then I would

24 | supplement that money from CLR from my personal account,

25 | from the Bank of America -- or I mean from -- yeah, Bank of

 Gmail

**Len Salas <lensalas77@gmail.com>**

---

## RE: Trust
1 message

---

**Stanley Goldstein** <SGoldstein@capitoltitle.com>                    Wed, Jun 22, 2011 at 8:50 AM
To: "MaxSalas@aol.com" <MaxSalas@aol.com>
Cc: "lensalas77@gmail.com" <lensalas77@gmail.com>, "ronsalas@salaslegal.com" <ronsalas@salaslegal.com>, Lynne
Boileau <LBoileau@capitoltitle.com>

> Max-
>
> By copy of this email, I am sending your email to Lynne Boileau, Esq. who will contact you.
>
> Thanks,
>
> Stan

---

**From:** MaxSalas@aol.com [MaxSalas@aol.com]
**Sent:** Tuesday, June 21, 2011 12:05 PM
**To:** Stanley Goldstein
**Cc:** lensalas77@gmail.com; ronsalas@salaslegal.com
**Subject:** Fwd: Trust

I sent it to the wrong e mail before

> From: MaxSalas@aol.com
> To: s.goldstein@capitoltitle.com
> CC: lensalas77@gmail.com, ronsalas@salaslegal.com
> Sent: 6/21/2011 11:51:54 A.M. Eastern Daylight Time
> Subj: Fwd: Trust
>
> Stan-
>
> As per our conversation I am sending you the e-mail from my son prepared to documents Ron also my other
> son, Len is the gentleman who will quick claim deed to the trust.
> I am the trustee other information for the documents can be requested from Ron Salas , who was copied on this
> e-mail.  Please let me know what you need me next.  I will also send you over a in a different e-mail.  Tax
> identification for the trust,
>
> At the end of the day.  We need to have done is have Lenny sign a quick claim deed into the trust, which has
> been extend lives by my son, Ron, in Colorado
>
> Hope this is not too confusing
>
> Thank you,
> sincerely yours,
>
> Max Salas
>
> > From: ronsalas@salaslegal.com
> > To: MaxSalas@aol.com, lensalas77@gmail.com
> > Sent: 6/17/2011 2:45:54 P.M. Eastern Daylight Time
> > Subj: Trust
> >
> > Gentlemen –

Case 23-20-00990 Doc 74-1 Filed 08/01/22 Entered 08/01/22 15:56:38 Desc
Case 23-20-00027 Doc 74-8 Filed 03/28/24 Entered 03/28/22 15:56:38 Desc
Exhibit 7 eMails 6-17-11 2-27-12 Page 16 of 156

https://mail.google.com/mail/u/0?ik=3a2aff... view1... 1...  ...137...  ...160f156%7Cmsg-f%3A13723246618...

APPX00584

The 1610 Riggs Property Trust has been registered with the State of Colorado and the IRS. The attached document is the Trust's EIN. The number is to be used as the Trust's "Social Security Number". A bank account should be opened using this number. The name and number should also be used to finance the property. Please note that Income Taxes on the Trust must be filed annually.

The next step is for someone in DC to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len. In some "states" both parties may need to sign so check with the drafter of the deed. The deed will then need to be filed with the District/City. Let me know if you have any other questions.

By the way Happy Birthday, Len and Happy Father's Day, Dad.

Ron

Ron Salas, Esq.

5205 S. College Ave, Suite B

Fort Collins, CO 80525

Phone (970) 232-3330

Fax (877) 667-2860

ronsalas@salaslegal.com

www.thesalaslawfirm.com



**CONFIDENTIALITY NOTICE:** This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

Case 3:20-ap-00027 Doc 74-8 Filed 08/26/24 Entered 08/26/24 15:56:36 Desc
Exhibit 7 e-Mails 6-17-11 Page 3 of 3
Case 3:20-cv-00027 Doc 74-8-1 Filed 08/12/21 Page 3 of 168 APX00586

 Gmail

**Len Salas <lensalas77@gmail.com>**

---

## Re: trust #
1 message

---

**maxsalas@aol.com** <maxsalas@aol.com>                    Wed, Jun 22, 2011 at 3:19 PM
To: Len Salas <lensalas77@gmail.com>

NO

Max Salas 202  271 2800

----- Reply message -----
From: "Len Salas" <lensalas77@gmail.com>
Date: Wed, Jun 22, 2011 3:47 pm
Subject: trust #
To: "maxsalas@aol.com" <maxsalas@aol.com>

Yeah, I saw that. But that is not what I asked. I asked if you used this EIN # to set up a bank acct with a bank either BB&T
or bank of america or Suntrust.

Sent from my iPhone

On Jun 22, 2011, at 12:09 PM, "maxsalas@aol.com" <maxsalas@aol.com> wrote:

> I sent you a copy of the email yesterday
>
> Max Salas 202  271 2800
>
>
> ----- Reply message -----
> From: "Len Salas" <lensalas77@gmail.com>
> Date: Wed, Jun 22, 2011 10:58 am
> Subject: trust #
> To: "MaxSalas@aol.com" <MaxSalas@aol.com>
>
> Have you contacted a bank to set up an acct for the trust?
>
> Sent from my iPhone
>
> On Jun 21, 2011, at 12:04 PM, MaxSalas@aol.com wrote:
>
>> please see the attached,
>>
>> <EINNumber trust.pdf>
>
> =

APPX005671

 Gmail

**Len Salas <lensalas77@gmail.com>**

## trust paper work
1 message

**Max Salas** <m.salas@cornet.com>                      Tue, Jan 17, 2012 at 5:02 PM
To: "ljboileau@goldsteinandlevey.com" <ljboileau@goldsteinandlevey.com>
Cc: Ron Salas <ronsalas@salaslegal.com>, Len Salas <lensalas77@gmail.com>

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901




**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology, Inc**

**6800 Versar Center**  , Suite 216

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

---

 **trust information.pdf**
8801K

 Gmail

**Len Salas <lensalas77@gmail.com>**

---

## trust paper work
1 message

---

**Max Salas** <m.salas@cornet.com>                                    Tue, Jan 17, 2012 at 5:23 PM
To: "ljboileau@goldsteinandlevey.com" <ljboileau@goldsteinandlevey.com>
Cc: Ron Salas <ronsalas@salaslegal.com>, Len Salas <lensalas77@gmail.com>

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901




**Max Salas,**



**Senior VP Corporate Development**

**Cornet Technology, Inc.**

AFPX00570

**6800 Versar Center**  , Suite 216

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

---


**trust information.pdf**
8801K

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

## Re: trust paper work
1 message

**Len Salas** <lensalas77@gmail.com>                                    Fri, Feb 24, 2012 at 7:22 PM
To: Max Salas <m.salas@cornet.com>

Where are we on this?

Len Salas
lensalas77@gmail.com
202-246-4901 (mobile)

On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,

As per our conversation, today please find the trust paper work information.  If you need
additional information let me know what need.  I have copied both my sons on this email  Ron
Salas is in Colorado,  He is the attorney that did the trust work.

Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.

There are two different requests:

One is to get Lenny's name off of the property. (want to do this asap)

The second request is to refinance the property under the name of the trust.

Please feel free to contact either Ron or Len for any clarification.

Ron phone # is  970 214 6356

Len phone  # is 202 246 4901

APPX00572

**Max Salas,**

**Senior VP Corporate Development**

**Cornet Technology , Inc.**

**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

Case 3:23-cv-00027 Document 74-84 Filed 08/26/24 Page 10 of 16
Case 3:20-ap-09027 Doc 74-8-1 Filed 08/18/22 Entered 08/18/22 15:56:01 Desc
Exhibit 7 - eMails 1-27-11 Page 10 of 16

APPX005773

000028

 Gmail

**Len Salas <lensalas77@gmail.com>**

---

## Re: trust paper work
1 message

---

**Maxs** <m.salas@cornet.com>                                      Fri, Feb 24, 2012 at 9:04 PM
To: Len Salas <lensalas77@gmail.com>

Still working on this ..,,Iam in Miami will be back soon

Max Salas 202-271-2800

On Feb 24, 2012, at 8:22 PM, Len Salas <lensalas77@gmail.com> wrote:

Where are we on this?

Len Salas
lensalas77@gmail.com
202-246-4901 (mobile)

On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

> Dear Lynn,
>
>
> As per our conversation, today please find the trust paper work information.  If you
> need additional information let me know what need.  I have copied both my sons on
> this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.
>
>
> Len Salas was also copied on this e-mail is who quit claimed the property over to the
> trust.
>
>
> There are two different requests:
>
>
> One is to get Lenny's name off of the property. (want to do this asap)
>
>
> The second request is to refinance the property under the name of the trust.
>
>
> Please feel free to contact either Ron or Len for any clarification.
>
>
> Ron phone # is  970 214 6356

Len phone # is 202 246 4901

**Max Salas,**

**Senior VP Corporate Development**

**Cornet Technology , Inc.**

**6800 Versar Center , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

 **Gmail**

**Len Salas <lensalas77@gmail.com>**

---

## RE: trust paper work
1 message

---

**Max Salas** <m.salas@cornet.com>
To: Len Salas <lensalas77@gmail.com>

Mon, Feb 27, 2012 at 10:08 AM

Len,

can you send over the original e-mail I will check with Lynn again and try to move this thing along.
Thanks

Max Salas,

Senior VP Corporate Development

Cornet Technology , Inc.

6800 Versar Center  , Suite 216

Springfield Virginia 22151

Direct phone 703-658-6163

Mobile phone 202-271-2800

M.Salas@cornet.com

---

**From:** Len Salas [mailto:lensalas77@gmail.com]
**Sent:** Friday, February 24, 2012 8:23 PM
**To:** Max Salas
**Subject:** Re: trust paper work

Where are we on this?

Len Salas
lensalas77@gmail.com

APFX00576

202-246-4901 (mobile)


On Tue, Jan 17, 2012 at 6:23 PM, Max Salas <m.salas@cornet.com> wrote:

Dear Lynn,


As per our conversation, today please find the trust paper work information.  If you need additional information let me know what need.  I have copied both my sons on this email  Ron Salas is in Colorado,  He is the attorney that did the trust work.


Len Salas was also copied on this e-mail is who quit claimed the property over to the trust.


There are two different requests:


One is to get Lenny's name off of the property. (want to do this asap)


The second request is to refinance the property under the name of the trust.


Please feel free to contact either Ron or Len for any clarification.


Ron phone # is  970 214 6356


Len phone  # is 202 246 4901




**Max Salas,**


**Senior VP Corporate Development**

**Cornet Technology , Inc.**


**6800 Versar Center  , Suite 216**

**Springfield** Virginia 22151

**Direct phone 703-658-6163**

**Mobile phone 202-271-2800**

**M.Salas@cornet.com**

 Gmail

**Len Salas <lensalas77@gmail.com>**

# Getting house changed over into trust name
1 message

**Max** <maxsalas@aol.com>                                    Mon, Feb 27, 2012 at 7:42 PM
To: "lboileau@capitoltitle.com" <lboileau@capitoltitle.com>
Cc: Len Salas <lensalas77@gmail.com>, Ron Salas <ronsalas@salaslegal.com>

Hi Lynn, about a month and a half back I sent you information in reference to documents of the house 1610 Riggs. NW

please let me know when it be convenient for you.

My son and I are anxious and would like to close on this as soon as possible please let us know what the next that are from our side

We look forward to working with you what are the next steps?

Thanking you in advance

Sincerely yours

Max Salas 202-271-2800



# Transcript of Ron Salas

**Date:** August 10, 2018
**Case:** Max E. Salas, In Re:

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Case 23-20-00990027 Doc 74-94-1 Filed 08/08/26/24 Entered 08/05/22 15:56:31 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 1 of 22      APPX00580

**1**

```
1        IN THE UNITED STATES BANKRUPTCY COURT
2           FOR THE DISTRICT OF COLUMBIA
3   ----------------------------X
    In re:                      :
4                               :Case No. 18-00260
    MAX E. SALAS,               :Chapter 11
5                               :
       Debtor In Possession.    :
6   ----------------------------:
    NICOLAAS J. BREKELMANS AND   :
7   GAIL GREGORY                 :
    BREKELMANS, PERSONAL         :
8   REPRESENTATIVES OF THE ESTATE :
    OF NINA BREKELMANS           :
9                               :
    And                         :
10                              :
    MICHAEL McLOUGHLIN, JR. AND  :
11  MARTHA JOHNSON, PERSONAL     :
    REPRESENTATIVES OF THE ESTATE :
12  OF MICHAEL PATRICK McLOUGHLIN,:
       Movants,                 :
13  v.                          :
                                :
14  MAX E. SALAS,               :
       Respondent.              :
15  ----------------------------X
16        Deposition of RON SALAS
17           Washington, DC
18      Friday, August 10, 2018
19            1:30 p.m.
20  Job No.: 202529
21  Pages: 1 - 83
22  Reported by: Sydney Crawford
```

**2**

```
1        Deposition of RON SALAS, held at the offices
2   of:
3
4
5       STINSON LEONARD STREET LLP
6       1775 Pennsylvania Avenue, NW
7       Suite 800
8       Washington, DC
9
10
11
12
13
14       Pursuant to agreement, before Sydney
15  Crawford, Notary Public in and for the District of
16  Columbia.
17
18
19
20
21
22
```

**3**

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF MOVANTS, NICOLAAS J. BREKELMANS,
4   ET. AL.:
5       PHILIP J. MCNUTT, ESQUIRE
6       LAW OFFICE OF PHILIP J. MCNUTT, PLLC
7       11921 Freedom Drive
8       Suite 584
9       Reston, Virginia 20148
10
11  ON BEHALF OF RESPONDENT, MAX E. SALAS:
12      MARC E. ALBERT, ESQUIRE
13      STINSON LEONARD STREET LLP
14      1775 Pennsylvania Avenue
15      Suite 800
16      Washington, DC 20006
17
18
19
20
21
22
```

**4**

```
1              I N D E X
2
3   EXAMINATION BY                    PAGE
4       Mr. McNutt              6
5       Mr. Albert              77
6
7
8   SALAS EXHIBIT    DESCRIPTION        PAGE
9   1     Notice of Deposition       17
10  2     Deed, 27th April 1993      17
11  3     Deed, 16th April 2007      20
12  4     Deed, 16th April 2007      24
13  5     Deed of Trust             24
14  6     Corporate Assignment of Deed Trust  25
15  7     Irrevocable Trust Agreement   26
16  8     Quickclaim Deed           26
17
18
19
20
21
22
```

Case 3:20-ap-09027 Doc 74-4 Filed 08/01/22 Entered 08/01/22 15:56:01 Desc
Case 3:20-cv-00990 Document 4-4 Filed 08/01/22 Entered 08/01/22 15:56:01 Page ID #044
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 2 of 22
APPX00581

5

1      P R O C E E D I N G S

2   WHEREUPON,

3          RON SALAS,

4    having duly been sworn to tell the truth, the

5   whole truth and nothing but the truth, testifies

6   as follows:

7

8          EXAMINATION BY COUNSEL FOR THE MOVANTS

9   BY MR. MCNUTT:

10    Q   Mr. Salas, can you please state your

11   full name and current residence for the record?

12    A   Yes. Ron Salas, S-A-L-A-S, 7111 Diamond

13   Tail, T-A-I-L, Drive, Fort Collins, Colorado

14   80525.

15    Q   And I understand you're a practicing

16   attorney; is that correct, Mr. Salas?

17    A   Yes.

18    Q   And can you tell me what your -- where

19   your office is?

20    A   My office is in Fort Collins. I have

21   two offices: one in Fort Collins, Colorado, the

22   address is 323 West Drake, Suite 116, ZIP is

6

1   80526. I also have one in Greeley, Colorado, and

2   I don't know what the address is. It's in the

3   Bank of the West building on 10th Street in

4   Greeley, Colorado. It's a satellite I use once a

5   week.

6    Q   Okay. Is that -- is that an official

7   office of your firm, though?

8    A   Yes.

9    Q   And what's the name of your firm?

10    A   The Salas Law Firm.

11    Q   Okay. And are you the only attorney in

12   the firm or are there others?

13    A   I have one associate attorney, Cody

14   Knebel, that works for me at this point.

15    Q   Can you spell the name for the reporter?

16    A   Yes, K-N-E-B-E-L.

17    Q   And are there any other professionals

18   that work for you, paralegals or paraprofessionals

19   of any kind?

20    A   No. I have a legal assistant, but

21   she -- she's not a certified paralegal so no.

22    Q   Okay. Can you tell me what type of law

7

1   you practice? Do you have any specialties?

2    A   You know, I do probably 60 percent

3   bankruptcy work. I do 30 percent domestic:

4   divorce, family law, custody. I do some wills and

5   trusts, small percentage. I'm fluent in Spanish,

6   so I do take traffic cases for individuals that

7   don't speak English. Not my specialty.

8        I did work -- I interned in the district

9   attorney's office, so I'm familiar with it, don't

10   like it, but I help folks that need help so I do a

11   little bit of that.

12    Q   Do you hold yourself out to be a

13   specialist in any given area?

14    A   I wouldn't say a specialist, but I'd say

15   my primary focus is bankruptcy, and that's where

16   I'm most familiar.

17    Q   And when you say "bankruptcy," what

18   types of bankruptcy do you focus on, if any?

19    A   Mostly Chapter 7, so currently, I

20   probably have 30 open Chapter 7 cases and 25

21   Chapter 13s that are somewhere within the filing

22   and -- and --

8

1    Q   How many did you say? I'm sorry. 13s?

2    A   13, I probably have 25 open cases

3   currently.

4    Q   Sorry. I didn't mean to interrupt.

5        That's in Chapter 13, I think you said?

6    A   Yes, that are in 13.

7    Q   What about Chapter 11; do you ever

8   handle Chapter 11 cases?

9    A   I have not done a Chapter 11 case.

10    Q   And I know you've probably been through

11   this before as an attorney, but just in case,

12   because everybody violates this rule including --

13   including the people on both sides of the table,

14   so please try to wait until I finish my question

15   before you answer, and I will try to do the same.

16        Meaning, that we'll try to -- I don't

17   think that's quite the right thing to say. I will

18   try to wait until you're finished before I begin

19   the next question.

20        At any time you feel that I've -- well,

21   if at any time I've interrupted you or you think

22   I've interrupted you -- it's your perception, I

Case 23-20-00990027 DoDocu74-94 Filed 08/01/226/24 Entered 08/01/22 15:56:36 Pg D Desc 045
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 3 of 22

APPX00582

**9**

1 guess -- please tell me so you can finish your
2 answer.
3     Subject to your attorney's instructions
4 or, well, I guess, Mr. Albert's not representing
5 you here, but subject to any objections that
6 Mr. Albert raises, in the event that you feel you
7 need to clarify or restate something that you've
8 said earlier in the deposition at any time, let me
9 know.  I'll be happy to let you add to, correct,
10 or change the record.  Okay?
11     Have you ever been deposed before?
12     **A   I have not.**
13     Q    Well, this is your first big experience.
14     **A   Yeah.**
15     Q    Have you ever attended depositions
16 before?
17     **A   I have.**
18     Q    And you know why we're here today;
19 right?  We're here related to the objection to the
20 claim of your father.  That's Max Salas; right?
21     **A   Yes.**
22     Q    He's your father; right?

**10**

1     **A   He's my father.**
2     Q    We're in the objection to your father's
3 claim of a homestead exemption.
4         Being a bankruptcy attorney, do you
5 generally understand or do you generally have an
6 understanding what a homestead exemption is?
7     **A   I do.**
8     Q    And my understanding is that you may be
9 called as a witness in the case that's scheduled
10 for hearing on the 22nd?
11     **A   Yes.**
12     Q    All right.  What -- what will you
13 testify to?
14         MR. ALBERT:  Objection.
15     **A   I don't know.  Sorry.**
16     Q    Okay.  At any time, have you formally
17 represented your father in any legal matter?
18     **A   Formally represented him --**
19         MR. ALBERT:  I would have to object to
20 the question, form of the question.
21     Q    You don't have to.  You can if you want.
22         You're hesitant.  You're not sure how to

**11**

1 answer that?
2     **A   I'm not sure how to answer that**
3 **question, so --**
4     Q    Do you believe that you've acted as an
5 attorney and represented your father at any time
6 in the past?
7         MR. ALBERT:  Objection as to the form of
8 the question.
9     **A   I have prepared documents for him, and**
10 **this is where I don't know if I prepared them for**
11 **my brother or if I prepared them for my father, so**
12 **the answer is I do not know.**
13     Q    And the documents you -- what documents
14 are you referring to?
15     **A   I'm referring to -- I prepared a trust**
16 **document and a quitclaim deed document for my**
17 **brother and my father in 2010.**
18     Q    Okay.  Have you ever entered into a
19 retainer agreement with your father or your
20 brother on any matter?
21     **A   No.**
22     Q    Do you normally enter into retainer

**12**

1 agreements with your clients?
2     **A   I do.**
3     Q    Now, you said that part of your
4 practice, I believe you said 30 percent, correct
5 me if I'm wrong, was in estates and trusts; is
6 that --
7     **A   I'd say it's more like 10 percent.**
8     Q    10 percent; okay.
9     **A   Yeah.**
10     Q    And how often would you say that you
11 prepare wills or trusts for clients on an annual
12 basis?
13     **A   I do maybe three trusts a year.  I**
14 **probably do three to four wills a month.**
15     Q    And when you do these, are you acting as
16 a Colorado attorney or do you do them for people
17 in other states?
18     **A   Just a Colorado attorney.**
19     Q    Have you ever prepared a trust
20 agreement, and excluding the document we're going
21 to get to, the -- which is one of the subject
22 matters of our hearing.

Case 3:20-ap-00027 Doc 74-4 Filed 08/01/22 Entered 08/01/22 15:53:01 Desc
Case 3:20-ap-00027 Doc 74-4 Filed 08/01/22 Entered 08/01/22 15:56:01 Page 4 of 46
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 4 of 22
APPX00583

13

1　　　Excluding the one that you prepared in
2　2010 for your father and/or your brother, have you
3　ever prepared a trust agreement for a person or
4　entities in the District of Columbia?
5　　A　I have not.
6　　Q　Okay.  Well, have you ever lived in the
7　District of Columbia?
8　　A　I have.
9　　Q　Okay.  During what period of time?
10　　A　I lived here for three months in the
11　summer of '95.  That's my best recollection.
12　Somewhere between '94 and '96, I spent a summer
13　here, and I can't exactly recall exactly what
14　summer.
15　　Q　And -- and where did you live when you
16　stayed here?
17　　A　I lived in an apartment with my father
18　on R Street.  I don't know the address.
19　　Q　Okay.  Are you familiar with the
20　litigation that occurred in the Superior Court of
21　the District of Columbia in which your brother and
22　your father were named defendants in a personal

14

1　injury and wrongful death case?
2　　A　I am.
3　　Q　And can you tell me how you're familiar
4　with it?
5　　A　I attended the hearing in support of my
6　brother and my father.  My -- my son was involved
7　in the incident.  So, you know, I knew what
8　happened.  So --
9　　Q　Have you ever visited the house on Riggs
10　Place?
11　　A　Yes.
12　　Q　Can you tell me if you visited the house
13　on Riggs Place after 2010?
14　　A　I don't know for a fact, but I'm pretty
15　sure.
16　　Q　Okay.  You don't have a specific
17　recollection that you did that?
18　　A　I visited that house 25 times over the
19　last 25 years, and I don't recall specifically
20　after 2010, but it's likely.  I don't recall.
21　　Q　Okay.  Now, in the litigation in the
22　superior court, did you represent or are you

15

1　representing either your brother or your father?
2　　A　In the superior court here?
3　　Q　Yes.
4　　A　No.
5　　Q　With respect to Mr. Lynn Salas'
6　bankruptcy case in the Middle District of
7　Tennessee, are you familiar with that?
8　　A　I am.
9　　Q　Are you representing him in any capacity
10　in that case?
11　　A　I am not.
12　　Q　Okay.  With respect to Max Salas, who is
13　the debtor in this case, 00260 in the United
14　States Bankruptcy Court for the District of
15　Columbia, are you representing him in any capacity
16　in his current bankruptcy case?
17　　A　No.
18　　Q　All right.  Are you representing either
19　your brother or your father in any capacity that
20　you're aware of at the present time?
21　　A　No.
22　　Q　Okay.  So you're appearing here today as

16

1　son and witness.  Does that sound right?
2　　A　Yes.
3　　Q　And I'm not trying to pin you down.
4　　　　MR. ALBERT:  He's appearing here today
5　because he's been summoned as a witness pursuant
6　to a notice to take deposition.
7　　A　Right.  Correct.  I'm not here
8　voluntarily.
9　　　　MR. MCNUTT:  Well, you made me do that,
10　though.
11　　Q　Okay.  Now, what I'd like to get into
12　now, Mr. Salas, is how it came about that you
13　prepared the documents that we're eventually going
14　to get to here.
15　　　　The trust, which in my mind started with
16　the irrevocable trust agreement that was in 2010.
17　Do you remember when you were first -- do you
18　remember your first communication with either your
19　brother or your father about that?
20　　A　The first?  Not really.
21　　Q　I'm assuming it would have been -- well,
22　I tell you what, why don't we do this:  Why don't

Case 3:20-ap-00027 Doc 74-4 Filed 08/01/22 Entered 08/01/22 15:36:01 Desc
Case 3:20-ap-00027 Doc 74-4 Filed 08/01/22 Entered 08/01/22 15:36:01 Page 4047
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 5 of 22
APPX00584

17

1 we go through the documents. I'll get to the
2 trust and then we can have it sit in front of you
3 and not confuse the court reporter anymore.
4          (Exhibit 1 was marked for
5 identification.)
6          The first document I have here is marked
7 Exhibit 1 is titled "Notice of Deposition," and I
8 ask you if you can review that and tell me if
9 you're here today testifying pursuant to that
10 notice.
11 **A   I am.**
12          (Exhibit 2 was marked for
13 identification.)
14 Q   Okay. The document I have is titled --
15 it's got three exhibit stickers on it, the one for
16 this purpose is Exhibit 2, and it appears to be a
17 deed dated April 27, 1995, by and between David
18 Wilhelm -- and I can't read the second first name,
19 but it's another Wilhelm -- tenants by the
20 entireties, and Vicky L. Buff, a single person,
21 party of the second part.
22          Can you tell me if you've ever seen that

18

1 document before?
2 **A   I don't believe I have, no.**
3 Q   Okay. Do you recognize the name, Buff?
4 **A   I do.**
5 Q   All right. And can you tell me who that
6 is?
7 **A   Yes. That was my father's third wife.**
8 Q   Okay.
9 **A   My stepmother.**
10 Q   And that is his most recent wife that
11 you're aware of?
12 **A   He's now been married since, yes, that's**
13 **correct. That I know of.**
14 Q   To the best of your knowledge?
15 **A   Sure.**
16 Q   All right. And you don't think you've
17 seen that document before?
18 **A   I do not. I was -- no.**
19 Q   Okay. Let me take --
20          MR. ALBERT: Well, other than -- this
21 was a booklet of documents that were put
22 together, and so I had the booklet you're

19

1 actually showing him now, and I showed it to him
2 this morning. I'm not sure he focused in on
3 that, but it was part of the group of documents.
4 **A   Right. I mean, let me clarify that.**
5 Q   But you're not testifying for him;
6 right?
7          MR. ALBERT: No. No, but I'm just
8 trying -- I want to just clarify things. I don't
9 want --
10 **A   I do want to clarify that I was sent a**
11 **group of documents prior to this deposition. I**
12 **looked them over. I don't recall that one in**
13 **particular. Just for clarification.**
14 Q   Okay. And as long as we're on that,
15 then, prior to the documents that Mr. Albert, I
16 guess, gave you to review, do you recall seeing
17 any of the documents that we've now produced, the
18 Exhibit 2, which is the --
19 **A   I definitely read Exhibit 2 --**
20 **Exhibit 1. 2, I did not. My understanding was I**
21 **was here to talk about what I had prepared, and**
22 **that's the document I've looked at.**

20

1 Q   Fair enough. Let me show you what's
2 been marked as Exhibit 3.
3          (Exhibit 3 was marked for
4 identification.)
5 Q   This again is a document titled "Deed."
6 It's dated April 16, 2007 between Vicky L. Buff,
7 Sole Owner, and Max E. Salas, sole owner.
8          And let me ask you if you've ever seen
9 that document before.
10 **A   Again, I saw it in the documents that**
11 **were sent to me, I presume, but not before that,**
12 **not before two days ago.**
13 Q   Okay. And that answers my next
14 question. You've received some documents from
15 Mr. -- from Mr. Albert a couple days ago?
16 **A   They were actually, I believe, from**
17 **Mr. Cox.**
18 Q   Mr. Cox, okay.
19 **A   And I did not review them, I don't**
20 **think, until I was on the plane yesterday, but**
21 **yes, I did.**
22 Q   Can you tell me what documents you have

Case 3:20-ap-00027   Doc 74-4   Filed 08/01/22   Entered 08/01/22 15:56:31   Desc
Case 3:20-ap-00027   Doc 74-4   Filed 08/01/22   Entered 08/01/22 15:56:31   Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 6 of 22

APPX00585

|  | 21 |
|---|---|
| 1 | reviewed, then? |
| 2 | **A  Whatever was in the packet I looked at.** |
| 3 | **I read in detail the objection, your objection.  I** |
| 4 | **read in detail the response.** |
| 5 | Q  My objection was pretty good, wasn't it. |
| 6 | **A  Yeah.  I might use some of it.  And then** |
| 7 | **I -- and then I reviewed the document.  Anyhow, I** |
| 8 | **looked at the document that I prepared.  I have** |
| 9 | **actually seen it quite a bit.  So I didn't -- just** |
| 10 | **checked to see if there was anything in there that** |
| 11 | **I didn't -- was not familiar with, and because I** |
| 12 | **knew I was here on that document, I left it alone.** |
| 13 | Q  Okay. |
| 14 | **A  I didn't spend a lot of time.** |
| 15 | Q  Other than -- other than the trust |
| 16 | agreement, the objection to exemption, and the |
| 17 | opposition filed by Mr. Albert on your dad's |
| 18 | behalf, are there any other documents that you |
| 19 | reviewed in preparation for your deposition this |
| 20 | morning -- this afternoon? |
| 21 | **A  Not that I can recall, no.  There's —** |
| 22 | **it's —** |

|  | 22 |
|---|---|
| 1 | Q  Okay.  So when you say you reviewed the |
| 2 | documents, do you know if you reviewed all of the |
| 3 | exhibits or -- let me start with this. |
| 4 | Do you know if the exhibits that Mr. -- |
| 5 | that were attached to the opposition were part of |
| 6 | the packet that you were sent? |
| 7 | **A  I did not see any, so I — I — that I** |
| 8 | **recall, because I kind of looked.  It says there** |
| 9 | **were some attachments, and I didn't see them.** |
| 10 | **What they sent me for this, there were** |
| 11 | **attachments, and I did look at those.** |
| 12 | Q  Okay.  That's what I'm talking about. |
| 13 | Okay.  So you did see everything that Mr. Albert |
| 14 | filed on behalf -- |
| 15 | **A  Yeah, I looked at them.** |
| 16 | MR. ALBERT:  Well, wait a minute.  You |
| 17 | don't know that.  What he said was he saw |
| 18 | documents I gave him this morning, but you don't |
| 19 | know they were the same documents that were |
| 20 | provided and filed with the court. |
| 21 | MR. MCNUTT:  I do know, however, the |
| 22 | question I asked the witness, and I do know what |

|  | 23 |
|---|---|
| 1 | the witness gave as an answer.  I do know that. |
| 2 | MR. ALBERT:  Okay. |
| 3 | THE WITNESS:  So -- |
| 4 | MR. ALBERT:  But you characterized it a |
| 5 | little differently, that's all I'm trying to say. |
| 6 | He looked at the documents that we're -- we're |
| 7 | looking at right now, but there might have been |
| 8 | other documents that were attached.  I don't now. |
| 9 | MR. MCNUTT:  Again, my understanding of |
| 10 | the way the deposition works is that the witness |
| 11 | is the person who testifies, not the counsel that |
| 12 | is sitting -- |
| 13 | MR. ALBERT:  Absolutely. |
| 14 | MR. MCNUTT:  -- by his side. |
| 15 | MR. ALBERT:  Absolutely.  So can we keep |
| 16 | it that way? |
| 17 | MR. MCNUTT:  Of course, but we're not |
| 18 | going to have you characterize something for the |
| 19 | record that's not correct. |
| 20 | MR. ALBERT:  You're -- |
| 21 | MR. MCNUTT:  Although I didn't notice an |
| 22 | objection, you're certainly entitled to state an |

|  | 24 |
|---|---|
| 1 | objection.  And I have no objection to your doing |
| 2 | so. |
| 3 | MR. ALBERT:  That -- that's fine. |
| 4 | MR. MCNUTT:  I don't want you -- you |
| 5 | know, this is not an informal proceeding where |
| 6 | you get to lead the witness or suggest answers to |
| 7 | the witness, and I'm not suggesting you're doing |
| 8 | that.  But it's my questions and his answers, and |
| 9 | you certainly have the right to object. |
| 10 | MR. ALBERT:  That's right, it's your |
| 11 | questions, his answers, but not your |
| 12 | characterization.  But I'm not leading the |
| 13 | witness.  Thank you. |
| 14 | Q  All right.  Let me -- take a look at |
| 15 | what's been marked as Exhibit 4, Mr. Salas, and |
| 16 | tell me if you've ever seen that document before. |
| 17 | (Exhibits 4 and 5 was marked for |
| 18 | identification.) |
| 19 | **A  Again, I may have seen it in the** |
| 20 | **documents that were sent to me.  I don't recall it** |
| 21 | **specifically.** |
| 22 | Q  Okay.  When you -- strike that. |

Case 3:20-ap-00027 Doc 74-1 Filed 08/01/22 Entered 08/01/22 15:56:31 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 7 of 22

APPX00586

**25**

1      Let me just go through the rest of
2  these.  Let me show you what we've marked as
3  Exhibit 5.  And this is a document that is titled
4  the "Deed of Trust."  It identifies a security
5  interest, and the borrower as Lynn Salas, lender
6  as SunTrust Mortgage, Inc., and it is
7  approximately -- I think it is approximately 16
8  pages.
9      Have you ever seen that document before?
10     **A   Again, if it was in the packet, I**
11 **probably glanced through it.  I've not read**
12 **through it.  I don't know for a fact that it was**
13 **in there.**
14     (Exhibit 6 was marked for
15 identification.)
16     Q    Okay.  Let me show you what's been
17 marked as Exhibit 6.  This is a document
18 titled "Corporate Assignment of Deed of Trust."
19     It appears to be dated -- let me see
20 here -- appears to be dated April of 2015, and
21 I'll ask you if you've ever seen that document?
22     **A   Yeah.  Same -- same answer as before.  I**

**26**

1  **received a packet of information.  If it was in**
2  **there, I glanced at it, I have not read it, and I**
3  **don't know that it's the same one that I saw**
4  **before.  Didn't pay much attention.**
5      (Exhibit 7 was marked for
6  identification.)
7      Q    Okay.  Here's a document that's been
8  marked as Exhibit 7.  This is a document
9  titled "Irrevocable Trust Agreement."  It has the
10 markings of a filing of Exhibit A, Bankruptcy
11 Court for the District of Columbia in case number
12 18-00260 and again title, "Irrevocable Trust
13 Agreement."
14     On the third-to-last page, it has the
15 signatures that are stated as Lynn Salas, Max
16 Salas, and others.
17     The second-to-last page appears to have
18 notary -- I'm sorry, appears to have an Exhibit A,
19 which is -- looks like the real property address
20 of the trust.
21     I didn't say that correctly.  Real
22 estate property that is identified in the trust.

**27**

1      And the final page appears to be two
2  notary journal entries which referenced the names
3  of Lynn Salas and Max Salas.
4      And I'll show that to you.
5      Tell me if you recognize that document.
6      **A   I do.**
7      Q    And is that a document that you
8  prepared?
9      **A   It is.**
10     Q    All right.  And we were talking about
11 this briefly before I interrupted with the -- with
12 the succession of documents, but do you remember
13 when it is that you were first con -- well, let me
14 put it this way:
15     Do you recall having a communication
16 with either your brother or your father with
17 respect to the creation of a trust or any other
18 document related to the Riggs Place property?
19     And, again, I'm talking about the time
20 frame of 2010.
21     **A   Yeah.  I don't recall any specific**
22 **conversations.  I recall several conversations**

**28**

1  **regarding creating something to get the residence**
2  **from my brother's name into my father's name.**
3      **And those were specifically with my**
4  **father, Max.  I do not recall any with my brother**
5  **other than he wanted to make sure that the house**
6  **was not in his name anymore.**
7      Q    All right.  And -- all right.  So when
8  did you have those communications with your
9  brother?
10     **A   Sometime in 2007, '8, '9.  It was a**
11 **contentious thing between my brother and my**
12 **father, and I remember having discussions with**
13 **both of them.  I don't recall specific times.  I**
14 **just recall it was an issue.**
15     Q    Okay.  And obviously it became a much
16 greater issue after the fire in 2015; right?
17     **A   I don't think it became a greater issue**
18 **because it's the same amount of issue.**
19     Q    Well, isn't it your understanding that
20 the reason why your brother Lynn is involved in
21 the litigation in the Superior Court and this
22 current bankruptcy because of his --

Case 3:20-ap-00027 Doc 74-14 Filed 08/01/22 Entered 08/01/22 15:56:01 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 8 of 22

APPX00587

---

29

1    MR. ALBERT: Can you speak louder?
2    Q    -- because of his title ownership of the
3 property at Riggs Place?
4    A    I understand that that's why he's in it,
5 yes.
6    Q    And if he was not, as you sit here
7 today, if he was not an owner of the property, are
8 you aware of any liability he would have had with
9 respect to the property fire?
10    MR. ALBERT: Objection.
11    A    Your question was is it any more so
12 after the fire originally, and I'm telling you
13 that he didn't want to be part of it then, and it
14 didn't get bigger after the fire. He never wanted
15 to be part of this house. He was doing it for his
16 father back then. He was angry with his father
17 for years because he wouldn't get it out of his
18 name, and it did not increase because of where we
19 are today.
20        The anger has been the same anger about
21 the same issue for a long time. He's married, and
22 his wife is very upset about it and was very upset

30

1 about it previously.
2        And if you're married, you'll understand
3 that when your wife is upset, it makes you upset.
4 So again, back to the original where we started,
5 did it increase? It did not. He's been angry
6 about this for a long time.
7    Q    Are you aware of any liabilities that
8 your brother expressed to you regarding the house
9 prior to the fire in June of 2015?
10    A    Any liabilities?
11    Q    Yes.
12    A    No. I don't think he -- I mean, he --
13 he was always afraid that -- he just didn't want
14 it, responsibility. He never -- he expressed to
15 me he didn't want responsibility.
16    Q    Now, when you had this conversation with
17 your brother, what was -- what was your side of
18 the conversation?
19    A    I said I a hundred percent agree. I
20 said I wouldn't want the responsibility either.
21 It's all, you know --
22    Q    Did you make any recommendations to him?

31

1    A    I said we should get it out of your name
2 and put it back in Max's name.
3    Q    And did you give him any recommendations
4 regarding how to do that?
5    A    Yeah. I think we've set up this
6 agreement.
7    Q    Did you -- did you tell him that he
8 could have deeded the property to his father?
9    A    Did I tell him that he could have deeded
10 the property to his father? No.
11    Q    Are you aware of any reason why he
12 couldn't have deeded the property to his father
13 back in 2010?
14    A    On his side, no.
15    Q    Okay. What about on -- you said "on his
16 side"; what about on your father's side?
17    A    At the time, as I recall, my father had
18 some tax issues that he was dealing with, and was
19 unable to gain any financing on it. And so, I
20 guess, so, you know, there were issues with my
21 father, not necessarily my brother.
22    Q    Issues meaning that his father was the

32

1 titled owner of the property at the --
2    MR. ALBERT: I can't hear you.
3    Q    Issues that if his father was the titled
4 owner of the property, that might have caused your
5 father problems?
6    A    Correct.
7    Q    And that included tax issues?
8    A    To the best of my recollection, that's
9 correct.
10    Q    And do you know what period of time
11 we're talking about?
12    A    No. My father's had tax issues since
13 1991.
14    Q    Okay.
15    A    So I don't know when those ended or what
16 that period was. There was two divorces, I mean,
17 so, no, I -- I don't know.
18    Q    Do you know what the status was in 2010
19 with respect to these tax issues?
20    A    I don't know for -- no.
21    Q    Okay. Did you have any reason to
22 believe in 2010 that the tax issues had been

Case 3:20-cv-00027-DoD Doc # 94-1 Filed 08/03/22 Entered 08/03/22 15:56:01 Desc
Case 3:20-ap-90027 Doc 74-4 Filed 08/03/22 Page 9 of 22 PageID # 4051
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 9 of 22
APPX00588

---

33

1  resolved?
2  **A    I don't -- I don't recall.**
3     Q    Okay.  Now, the date of the irrevocable
4  trust agreement, this is Exhibit -- I forgot the
5  number.
6        MR. ALBERT:  7.
7        MR. MCNUTT:  7.  Okay.
8     Q    Did you -- when did you prepare that, do
9  you know?
10  **A    I don't know for a fact.  My guess is**
11  **it -- the day that it was signed or the day before**
12  **would be my best guess.**
13     Q    Well, being as best you can remember, at
14  whose request did you prepare this document?
15  **A    I don't recall.  You know, it's a, it's**
16  **July 6th is when this thing was signed.  My**
17  **recollection, you know, I don't know.  I'd be**
18  **guessing, but I'd say --**
19        MR. ALBERT:  You don't want to guess.
20  **A    Sorry.  I don't know.**
21        MR. MCNUTT:  Again, he's not your
22  client.

---

34

1        MR. ALBERT:  I understand, but he's
2  supposed to answer --
3        MR. MCNUTT:  So raise an objection.
4        MR. ALBERT:  That is an objection.
5        MR. MCNUTT:  No, it's not.  You raised
6  no objection.
7        MR. ALBERT:  Objection.  The witness was
8  about to guess.
9        MR. MCNUTT:  Which is -- he can guess
10  all he wants.  If you want to object to it, then
11  you can object.
12        MR. ALBERT:  Okay.  I'm not telling him
13  not to answer, I'm just objecting.
14  **A    So --**
15     Q    What did you understand the effect of
16  this document to be?
17  **A    Transferring -- transferring the**
18  **property from my brother to my father.**
19     Q    All right.  And how did you understand
20  that was to occur?  How did you understand this
21  would have affected the transfer of the property?
22  **A    That the -- we set up a trust so that it**

---

35

1  would get transferred to a -- basically a
2  self-settled trust, which Max would be the owner
3  of, and that the property would transfer from my
4  brother to my father as a sole owner of this
5  trust.
6     Q    All right.
7  **A    Owner and beneficiary.**
8     Q    Okay.  And there was a quitclaim deed
9  that you prepared; correct?
10  **A    That's right.**
11     Q    And who were the -- who were the parties
12  to the deed?  It's not here.
13  **A    Lynn Salas was a party of the deed, and**
14  **giving it to Max Salas, who was the settlor of the**
15  **trust.  I believe both parties signed, although --**
16        MR. ALBERT:  Did you want him to see the
17  document or do you want him to guess?  I mean,
18  wouldn't it be helpful to put the document in
19  front of him?
20        MR. MCNUTT:  Sure.  I don't have it.  Do
21  you have it?
22        MR. ALBERT:  Oh, I probably do have it.

---

36

1  May I show him the document?
2        MR. MCNUTT:  As long as we're going to
3  talk about it, we probably should have it marked,
4  don't you think?
5        (Off the record.)
6        (Exhibit 8 was marked for
7  identification.)
8     Q    Mr. Salas, you've been handed the
9  exhibit which Mr. Albert has been gracious enough
10  to copy for us, and it's your Exhibit 8, and the
11  title at the top is "quitclaim deed."
12        Can you identify that document for me,
13  please?
14  **A    Yes.  It's a quitclaim deed that I**
15  **prepared for my brother and my father, July 6th,**
16  **2010.**
17     Q    And what was your understanding of the
18  purpose of the quitclaim deed?
19  **A    It was to transfer the property from my**
20  **brother to the Riggs property trust.**
21     Q    Okay.  And who did you understand the
22  trust -- the transferee to be?

---

Case 2:20-ap-00027-DPC  Doc 74-4  Filed 08/01/22  Entered 08/01/22 15:56:01  Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 10 of 22

APPX00589

37

1    A    The transferee was the trust.
2    Q    And who was the trustee of the trust?
3    A    My father, Max Salas.
4    Q    Was he the only trustee?
5    A    He was.
6    Q    Did that ever change between 2010 to
7  2015 that you're aware of?
8    A    Not that I'm aware of.
9    Q    Has it changed since 2015?
10   A    Not that I'm aware of.
11   Q    Okay.  Who was the beneficiary of the
12 trust in 2010 when you created it?
13   A    The same, Max Salas, my father.
14   Q    Okay.  Are you aware of whether that
15 changed at any time between 2010 to 2014?
16   A    Not that I'm aware of.
17   Q    All right.  What about after 2015?
18   A    Not that I'm aware of.
19   Q    You mentioned that you appeared -- that
20 you attended a deposition in the superior court
21 litigation --
22        MR. ALBERT:  Objection.

38

1    Q    -- is that correct?
2        MR. ALBERT:  Objection.  I'll explain to
3  you why I'm objecting if you'd like me to.
4  But -- he said he attended the hearing.
5    A    I think, yeah.
6        MR. ALBERT:  He never said anything
7  about attending depositions.
8    A    I never attended any --
9        MR. ALBERT:  Again, I won't tell you
10 that because you don't want me to.  I'm just
11 objecting.
12        MR. MCNUTT:  He just told me that.
13        MR. ALBERT:  Oh, I thought you wanted me
14 to clarify that for you.
15   A    I never went to a deposition.
16   Q    Never went to a deposition.
17   A    For any of the parties.  I was at the
18 hearing.
19   Q    Do you know if -- how many brothers do
20 you have?
21   A    I have three.  Three brothers.  Well,
22 half brothers, I have two half brothers and a full

39

1  brother.
2    Q    And who is -- who is Chase?
3    A    Chase is my youngest brother.
4    Q    Okay.  And you said there was one other
5  brother?
6    A    Yes.  Lynn is my younger brother, the
7  oldest one from my mother.  Chase is my baby
8  brother who is from my father's second wife and my
9  father, and then I have a brother whose name is
10 Joe, who is my mother's youngest son.
11   Q    Okay.  When did you first become aware
12 of the lawsuit in the superior court lawsuit?
13   A    When?
14   Q    Yes.
15   A    I don't recall.
16   Q    Would it have been shortly after the
17 lawsuit was filed in 2015?
18        MR. ALBERT:  Objection.
19   A    My guess is probably -- my guess --
20        MR. ALBERT:  Objection.
21        MR. MCNUTT:  You already objected.
22        MR. ALBERT:  That's true.  Sorry.  He

40

1  said he didn't recall and then you -- you then
2  started to lead him to what it would probably
3  have been.  I don't know.  If he doesn't know, he
4  doesn't know.
5    Q    Okay.  Do you know if it was in 2015?
6    A    I don't know.
7    Q    Did you -- were you kept abreast of the
8  status of the litigation in the superior court
9  between 2015 and April of 2018?
10   A    My brother and my father both contacted
11 me regarding issues several times over the years.
12 I don't know when, but, of course, they called me.
13   Q    Okay.  Were you generally familiar with
14 the allegations that were made in the lawsuit?
15   A    I was — understood that there was a
16 charge of negligence.
17   Q    All right.  Did you understand who the
18 charge of negligence was made against?
19   A    Yes.  Both my father and my brother.
20   Q    Did you understand why your brother was
21 being accused of being negligent?
22   A    Because his name was on the deed;

Case 2:20-ap-00027-DoDoc 74-4  Filed 08/02/24  Entered 08/05/22 15:56:01  Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 11 of 22

APPX00590

41

1 correct. Yes.

2    Q   Okay. Now, it's your understanding that

3 the quitclaim deed was prepared and signed on or

4 about -- well, not on or about -- it was signed on

5 July 6th, 2010.

6      Do you know if this quitclaim deed was

7 ever recorded?

8    A   I knew that at one point it was not

9 recorded.

10    Q   And what were you told as to why it was

11 not recorded?

12    A   My father contacted me -- I -- I don't

13 recall who contacted me, either my brother or my

14 father contacted me and stated it was not going to

15 be recorded because it was a $30,000 -- or a

16 substantial amount of money for a transfer charge

17 to -- to record the deed, and no one had the

18 money.

19    Q   Okay. And we also had the issue of the

20 tax problems; right?

21    A   I don't know if that had anything to do

22 with it.

42

1    Q   I'm sorry?

2    A   There was a tax issue. I don't know

3 when that ended and I don't know if that had

4 anything to do with whether it was done or not.

5 My understanding.

6      MR. ALBERT: Whether it was what? I'm

7 sorry.

8    A   Whether it was recorded or not. My

9 understanding of why it was not recorded was

10 because they couldn't afford to pay the tax.

11    Q   Okay.

12    A   I have no recollection of any of the

13 income tax having to do with it. It was the

14 transfer tax, to be clear.

15    Q   Okay. With respect to the -- what was

16 the approximate time frame of this communication

17 you had with either your son or your father?

18      MR. ALBERT: "With your son," did you

19 say?

20    A   Yeah, my father or my brother.

21    Q   I'm sorry, your brother and your father.

22    A   Which communications?

43

1    Q   Regarding the subject we were just

2 talking about, which is the inability or --

3 inability to record the quitclaim deed?

4    A   I don't recall. Sometime after we

5 prepared it, within the first two years, but I

6 don't know the exact date.

7    Q   Have you had any subsequent

8 communications with your brother or your father

9 after 2011, 2012 regarding the -- the quitclaim

10 deed or the recording of the deed?

11    A   No.

12    Q   Did you have any discussions with your

13 brother or your father regarding your brother's

14 ownership of the property after the commencement

15 of the superior court litigation?

16    A   Did we discuss the deed was the

17 question? Can you repeat the question? I'm

18 sorry.

19    Q   Regarding your brother's ownership of

20 the property after the commencement of the

21 superior court litigation.

22    A   Did we have discussions? Yes.

44

1    Q   Okay. And when did you have those

2 discussions?

3    A   From after they were served until and

4 through the hearing, the trial.

5    Q   Okay. Now, you said that you attended

6 the hearings, I believe was your statement.

7      Which hearings did you attend?

8    A   If I said that, I misspoke, I attended

9 the trial in the two days -- two, maybe three days

10 of the trial.

11    Q   That was -- and when you say "the

12 trial," you're talking about the trial that

13 occurred in late March and early April of this

14 year?

15    A   Yes. It sounds about right. I don't

16 remember the dates.

17    Q   And why were you there?

18    A   Just to give them support. My brother

19 and my father. To keep them from beating each

20 other up, really.

21    Q   Okay. Why would they beat each other

22 up, you think?

Case 3:20-ap-90027  Doc 74-1  Filed 08/01/22  Entered 08/01/22 15:56:01  Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 12 of 22

Case 3:20-ap-90027 Doc 74-1 Filed 08/01/22 Entered 08/01/22 15:56:01 Page 1054

APPX00591

---

45

1     A   Because of this issue, I mean, my
2 brother thought that he had given the property
3 back and didn't believe that he should be involved
4 in this. And he was still angry, as I said
5 before, since back in two -- before the documents
6 were made, and they didn't get along very well.
7     Q   Now, do you know this document, the
8 document titled "Irrevocable Trust Agreement,"
9 this is Exhibit 7; do you know where this -- do
10 you know if you produced this copy for your father
11 or your brother during the superior court
12 litigation?
13     A   No. I did not, that I recall.
14     Q   Okay. Did you ever bring up the
15 existence of this trust agreement that's marked as
16 Exhibit 7?
17     A   Did I bring it up?
18     Q   Yes.
19     A   I don't think I did, no.
20     Q   So you knew that your brother was mad
21 because he was still the owner of the property as
22 early as --

---

46

1         MR. ALBERT: Objection.
2     Q   -- 2010; correct?
3         MR. ALBERT: Objection.
4     A   I didn't know why my brother was mad.
5 But he was upset.
6     Q   Well, you told me that your brother
7 wanted his name off the property; right?
8     A   Yes.
9     Q   You were aware that prior to 2000 --
10 prior to this irrevocable trust agreement in 2010;
11 correct?
12     A   Yes.
13     Q   You knew that the quitclaim deed had not
14 been recorded, so you knew it was still an issue,
15 at least as of 2012; correct?
16     A   Yes.
17     Q   All right. And you had no information
18 that the quitclaim deed had been delivered or
19 recorded subsequent to 2012; correct?
20         MR. ALBERT: Objection.
21     A   What was the question?
22     Q   You had no information that the

---

47

1 quitclaim deed had been recorded after 2012;
2 correct?
3     A   I didn't know if it had or had not;
4 that's accurate.
5     Q   Okay. So as of the time that you first
6 learned about the superior court litigation, you
7 were not aware that your brother was not the title
8 owner of the property; correct?
9         MR. ALBERT: Objection.
10     A   I didn't know anything, no.
11     Q   You didn't know that the quitclaim deed
12 had been recorded?
13     A   I didn't have knowledge of what was
14 going on with the deed, no.
15     Q   All right. And your father never said
16 it was recorded; did he?
17     A   No. Not that I recall.
18     Q   And your brother never said it was
19 recorded; did he?
20     A   Didn't tell me that I recall.
21     Q   And the biggest issue to your brother
22 during the litigation was the fact that he was the

---

48

1 title owner of the property; wasn't he?
2         MR. ALBERT: Objection.
3     A   I don't know.
4     Q   When you discussed it with him,
5 wasn't -- wasn't that his biggest concern?
6         MR. ALBERT: Objection.
7     A   What was the question?
8     Q   When you discussed the litigation with
9 your brother, wasn't his biggest concern that he
10 was still the title owner of the property?
11         MR. ALBERT: Objection.
12     A   I don't know what his biggest concern
13 was.
14     Q   What did he tell you?
15     A   I don't recall.
16     Q   You don't recall him mentioning that he
17 was concerned that he was still the title owner of
18 the property?
19     A   My brother would not say anything about
20 title owner of anything, he's not that
21 sophisticated. My brother was upset because he
22 was involved in anything.

---

Case 3:20-cv-00027-DoDocu74-4 Fileto 08/01/22 Entere08/01/22 19:56:6Page ID De.1055
Case 2:20-ap-00990 Doc 74-4 Filed 12/26/24 Entered 08/01/22 15:56:01 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18 Page 13 of 22

APPX00592

49

1    Q    And your understanding of the reason why
2  he was involved in anything, in this case being
3  the superior court litigation, is because he was
4  the title owner of the property --
5       MR. ALBERT:  Objection.
6    Q    -- at the time of the fire; right?
7       MR. ALBERT:  Objection.
8    Q    That's what you just said.
9    A    That's not what I just said.  I said
10 that he --
11   Q    That is what you said.
12   A    He said -- he was upset because he was
13 being sued.  I don't know why he was being sued.
14 I don't know that he knows why he was being sued.
15 He didn't tell me why he was being sued.  He
16 didn't understand anything that he was being sued.
17   Q    Okay.
18   A    He was mad that he was being sued and
19 had to deal with something that he didn't think he
20 needed to have to deal with.  That's why he was
21 upset.
22   Q    And why?  Why did he tell you he was

50

1  upset?
2    A    I can't answer why he was upset, other
3  than what I just told you.  He was involved in
4  litigation that he did not feel he should have to
5  be in.  Because all he was trying to do was help
6  his father years ago, and he doesn't under -- he
7  didn't understand why he was in it today.
8    Q    And when you say he was trying to help
9  his father years ago, you're talking about the
10 time when he became the title owner of the
11 property in 2007; correct?
12   A    Correct.
13   Q    Okay.  Now, at the time that you
14 prepared the trust agreement, were you aware that
15 the property, the property that we're talking
16 about, 1610 Riggs Place, Northwest Washington,
17 DC -- when I say "property," we can agree that
18 that's what I'm talking about; right?
19   A    Yes.
20   Q    Okay.  Have the same understanding.
21 When you prepared the trust in 2010, were you
22 aware that there was an encumbrance on the

51

1  property, a deed of trust in favor of SunTrust?
2  Do you know what that is?
3    A    No.  I did not.
4    Q    Did you know whether the property was
5  held by your brother free and clear of liens?
6    A    No.  I did not.
7    Q    Did you do a title search?
8    A    No.  I did not.
9    Q    Did you ask your brother if there were
10 any encumbrances on the property?
11   A    No.  I did not.
12   Q    You just prepared the trust, nothing
13 else?
14   A    Yes.
15   Q    Okay.
16       MR. ALBERT:  By the way, objection.
17       MR. MCNUTT:  Okay.  I don't know if you
18 can "by the way" object, but okay.  Fair enough.
19       MR. ALBERT:  The answer's not complete.
20 You asked him whether the only thing he did was
21 prepare the trust.  He's also testified that he
22 prepared the deed.

52

1       MR. MCNUTT:  Again, the witness is
2  capable of testifying.  If you want to testify
3  for him, we can put you under oath.
4       MR. ALBERT:  I do not want to testify.
5  I thought you wanted --
6       MR. MCNUTT:  Maybe we should do that.
7  Madam Reporter, would you please put Mr. Albert
8  under oath so he -- he wants to testify --
9       MR. ALBERT:  I do not want to testify.
10      MR. MCNUTT:  Let's put him under oath so
11 he can testify.
12      MR. ALBERT:  I wanted to clarify.  I
13 wanted --
14      MR. MCNUTT:  That way he can be --
15      MR. ALBERT:  I wanted to clarify your
16 response to his answer.
17      MR. MCNUTT:  See, here's the way it
18 works:  If you would like to ask the witness
19 questions --
20      MR. ALBERT:  I will ask him --
21      MR. MCNUTT:  -- then you can do that.
22      MR. ALBERT:  Of course I will.

Case 1:23-cv-00027   Document 74-1   Filed 08/01/24   Page 438 of 796   PageID #: 4056
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 14 of 22

APPX00593

---

**53**

1     MR. MCNUTT: Okay.

2     MR. ALBERT: Thank you. I'm sorry to

3  interrupt. Please continue.

4     MR. MCNUTT: Thank you.

5     Q   Now, when you prepared the quitclaim

6  deed, Mr. Salas, can you tell me what the source

7  was of the language that you used in the quitclaim

8  deed?

9     A   Yes. I believe it was a standard

10  Colorado language from a group of, you know,

11  standard form language from the -- I have an

12  Orange book, Colorado, that gives us templates of

13  proper language, and I took it from there.

14     Q   And what about the irrevocable trust

15  agreement; where did you get that language?

16     A   I do not recall for a fact, but -- I

17  don't know.

18     Q   Do you know if prior to 2010, you

19  prepared an irrevocable trust agreement?

20     A   I had not.

21     Q   Okay. So you were not aware that you

22  had any language in documents in your office that

---

**54**

1  would have been usable for the irrevocable trust

2  agreement that we're looking at as Exhibit 7; is

3  that what you're telling me?

4     A   I think that is accurate, yes.

5     Q   Okay. Now, do you have any

6  understanding of what law would apply to this

7  trust agreement and this quitclaim deed?

8     MR. ALBERT: Objection. Are you

9   deposing him as an expert today or as a fact

10  witness?

11     MR. MCNUTT: As a fact witness.

12     MR. ALBERT: Okay. Objection.

13     Q   Do you have an understanding, any

14  understanding?

15     A   Do I have any --

16     Q   Yes.

17     A   Repeat the question.

18     Q   Do you have any understanding of the law

19  that would be applied to determine the terms and

20  validity of the trust agreement?

21     MR. ALBERT: Objection.

22     Q   And the quitclaim deed?

---

**55**

1     A   I don't know. I don't understand the

2  question.

3     Q   Well, let me ask it this way: If you're

4  dealing with a trust, the trust that you

5  previously created, from today going back, in

6  Colorado, what law would you -- would you have an

7  understanding of the law that would apply?

8     A   I would have used Colorado law in

9  anything I prepared.

10     Q   And why is that?

11     A   Because I'm a Colorado lawyer.

12     Q   Did you have any understanding that DC

13  law would apply to the documents that you created?

14     A   Objection.

15     Q   And when I say documents you created, I

16  mean the irrevocable trust agreement and the

17  quitclaim deed.

18     MR. ALBERT: Objection.

19     A   At the time, the intent was to establish

20  the trust in Colorado, hence why I used Colorado

21  law.

22     Q   Okay.

---

**56**

1     A   The deed --

2     Q   Go ahead.

3     A   -- was, again, I used Colorado law and

4  probably should have looked at DC law because it's

5  probably not the same, although fairly similar,

6  but -- so at the time, I did not. I would do

7  things differently today with the experience I

8  have today.

9     Q   Okay. I'm not sure that answered my

10  question, but --

11     MR. ALBERT: I can't hear you.

12     What did you say before?

13     MR. MCNUTT: I said I don't think that

14  answered my question, but, okay.

15     MR. ALBERT: Thank you.

16     Q   Let me direct your attention to the

17  trust. If you would look at Exhibit 7 in

18  paragraph 3, it contains a paragraph that is

19  titled "Dispositive Provisions."

20     Do you see that? That's on the first

21  page?

22     A   I do.

---

Case 3:20-ap-00027 Doc 74-4 Filed 08/03/22 Entered 08/03/22 15:56:31 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 15 of 22

APPX00594

57

1    Q    All right.  And it says under -- it
2  says, "The trustees shall hold the property for
3  the primary benefit of Max E. Salas."
4         Did I read that correctly?
5    A    Yes.
6    Q    And Max E. Salas is the person -- that's
7  your father, of course; right?
8    A    Yes.
9    Q    And that is the only person that is a
10 beneficiary of this trust; correct?
11   A    Yes.
12   Q    There are no other beneficiaries?
13   A    Correct.
14   Q    In paragraph B of that same numbered
15 paragraph, 3B, it says, "If any of the beneficiary
16 shall die, the trust for his or her benefit shall
17 cease, and the corpus, together with any
18 undistributed income, shall be paid over
19 absolutely to the issue of the beneficiary then
20 living per stirpes; but if there be no issue, then
21 to the other beneficiaries if living, either
22 outright, or if the other beneficiary shall not

58

1  have then attained the age of 18 years, in trust,
2  to be added to, held, administered and distributed
3  as part of the trust for the other beneficiary."
4         I'm not going to go on.
5         Did I read that correctly so far?
6    A    Yes.
7    Q    In this case, however, there was only
8  one beneficiary; correct?
9    A    Yes.
10   Q    And that was your father?
11   A    Yes.
12   Q    And that was the case on July 6th, 2010;
13 correct?
14   A    Yes.
15   Q    And there was never an intent that this
16 document be prepared for the benefit of anyone
17 other than your father; correct?
18        MR. ALBERT:  Objection.
19   A    I don't know.
20   Q    Well, you prepared it; did you intend to
21 prepare this for --
22        MR. ALBERT:  Objection.

59

1    Q    -- somebody else's benefit?
2    A    I guess define "benefit."
3    Q    Well, okay.  Fair enough.
4         For any other beneficiary of the
5  property?
6    A    For any other beneficiary, living --
7  well, I think his children benefited from it upon
8  passing, so I think there were more beneficiaries
9  other than himself potentially.
10   Q    All right.  Are there any other named
11 beneficiaries in this trust document?
12   A    Named beneficiaries?  No.
13   Q    Are there any other trustees in this
14 trust document other than your father and Max E.
15 Salas?
16   A    I don't think so.
17   Q    Now, during the course of the superior
18 court litigation, did your brother ever ask you
19 for a copy of the trust agreement?
20   A    No.  Not that I recall.
21   Q    Did your father ask you for a copy of
22 the trust agreement?

60

1    A    Not that I recall.
2    Q    All right.  Are you aware of a trust by
3  the name of CLR Trust?
4    A    I am not.
5    Q    Have you ever heard that name before?
6    A    CLR trust?  No, I have not.
7    Q    Okay.
8    A    I take that back.  I've heard it in the
9  last couple of days, but not prior to that.
10   Q    Okay.
11   A    And I read it, actually to be very
12 clear, I read about it in some of the documents.
13 I've not heard of it other than that.
14   Q    Okay.  You're not aware, then, that you
15 are or may be the beneficiary of a trust titled
16 the CLR Trust?
17   A    No.  That would be news to me.
18   Q    Okay.  Are you aware of any other trust
19 related to your immediate family members?  And by
20 that, I'm referring to Chase, Lynn, you, and your
21 father?
22   A    No.

Case 2:20-ap-00027-DocDoc 74-4 Filed 08/01/22 Entered 08/01/22 15:56:31 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 16 of 22

APPX00595

61

1    Q   Have you created any other trust
2 documents for family members -- well, not for
3 family members, for your father, Max, or your
4 brother Lynn?
5    A   I have not, no.
6    Q   Okay.  Would you take a look at
7 Exhibit 7 again.
8        And I'm specifically looking at the
9 signature page of the trust document, which I
10 believe is page 4.
11        MR. ALBERT:  Can you -- I'm sorry, could
12 she just read back the last questions and
13 answers?  Just the last two, if that's possible.
14        (Record read.)
15    Q   Do you have the signature page there,
16 Mr. Salas?
17    A   I do.
18    Q   Okay.  And at the top, it looks to have
19 signature lines for your brother Lynn, and your
20 father, Max.  Do you recognize those signatures?
21    A   I do.
22    Q   Do you recognize those as the

62

1 signatures, the left-hand signature being that of
2 your brother?
3    A   Yes.
4    Q   And the right-hand signature being that
5 of your father?
6    A   Yes.
7    Q   Were you there when this was signed?
8    A   I was.
9    Q   Was this signed in your presence?
10    A   Yes.  I signed myself.
11    Q   Okay.  All right.  When you say you
12 signed yourself --
13    A   "Witness to" is my signature.
14    Q   Let's go off the record for a second.
15        (Off the record.)
16    Q   Back on the record.  All right.  And I
17 believe the second -- the first witness signature
18 is Mr. Lynn Salas' wife, Kendra; is that fair?
19    A   Yes.
20    Q   And do you recognize that as her
21 signature?
22    A   No.  I -- I mean, this is the only time

63

1 I've ever seen it.  I recall her being there.
2    Q   Okay.
3    A   I've seen my brother's and my father's
4 several times, so I recognize it clearly.
5        Looks like Kendra Rowe to me.  I don't
6 know for a fact that's her signature, but I was
7 there, so I have to say it was.
8    Q   So these, other than the notary, these
9 were the only people, were these the only people
10 present at the time?  You, your brother, his wife
11 and your father?
12    A   Yes.
13    Q   Okay.  Was there anybody else present,
14 any other family members?
15    A   No.
16    Q   Where does this -- where did this take
17 place, the signing of this document?
18    A   In my office.
19    Q   Okay.  And that's the one in Fort
20 Collins?
21    A   It is in Fort Collins.  It was a
22 different office.

64

1    Q   Okay.  But still in Fort Collins at the
2 time?
3    A   Yes.
4    Q   And Lori King, I understand she is --
5 works in another law office; is that right?
6    A   Currently, my understanding is she does
7 work in another law office; yes.
8    Q   But you recognize this as her signature
9 and her notary stamp.  And this was placed on the
10 document on July 6th, 2010?  Is that correct?
11    A   Yes, she notarized hundreds of
12 documents.  Quite a few.
13    Q   All right.  And the next page after the
14 signature page is the description of the real
15 property; correct?
16    A   Yes.
17    Q   And that's the 1610 Riggs Place
18 Northwest property in Washington, DC; correct?
19    A   Yes.
20    Q   You understood that at the time to be
21 the property that was titled in your brother's
22 name and occupied by your father; correct?

Case 3:20-ap-00027 Doc 74-1 Filed 08/01/22 Entered 08/01/22 15:56:01 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 17 of 22

APPX00596

65

1    A    Yes.
2    Q    And on the last page, tell me what the
3 last page is. It looks to have two notary journal
4 entries.
5    A    Yes. That's the first time -- well,
6 second time. I saw it the other day -- I've seen
7 it, but it's what it appears to be.
8    Q    Do you understand what these are?
9    A    Well, reading them, it says they're
10 notary journal entries with my father's signature
11 and my brother's signature. So that, I recognize,
12 it says "Client of Ron Salas," so I can guess what
13 they are, but I don't know for a fact what they
14 are.
15    Q    Okay.
16    A    So I don't know. Like I said, it's the
17 first time I've seen them.
18        MR. ALBERT: I could answer the question
19 if you like.
20        MR. MCNUTT: You've testified enough.
21    Q    All right. Let me go back to the
22 quitclaim deed. This -- again, this is Exhibit 8.

66

1        Do you have that have there?
2    A    Yes.
3    Q    And this was also dated July 6th, 2010;
4 correct?
5    A    Yes.
6    Q    And again it references the Riggs Place
7 address, and that's the property that was intended
8 to be deeded from your brother Lynn to your
9 father, Max E. Salas, trustee of the 1610 Riggs
10 Property Trust on July 6th, 2010. Is that
11 accurate?
12    A    I think it actually was deeded, I don't
13 think there was intent. Was it was filed is
14 another issue. So --
15        MR. ALBERT: What's that? Was it what?
16    A    He said it was the intent to deed -- to
17 deed it. I think the deed speaks for itself.
18        MR. ALBERT: You said deeded. Okay.
19 Thank you. That's what I thought you said.
20    A    I don't think it was recorded. I don't
21 know that it was recorded.
22        MR. ALBERT: Thank you.

67

1    Q    During the course of the lawsuit in the
2 District of Columbia, the superior court
3 litigation that your father and your brother were
4 involved in, did you ever offer to provide your
5 brother or your father a copy of the trust
6 document?
7    A    I did not.
8    Q    Did you have any discussions with your
9 brother or your father regarding the trust
10 document?
11    A    I wish I had. I assumed, falsely, I
12 suppose, that both of them had it, they both had
13 competent attorneys, and that their attorneys
14 would ask for them and they would provide them.
15 Had I known and had I had the gumption to jump
16 into somebody else's case, I wish to God that I
17 would have given it to them then. And I didn't
18 know, and I didn't, and I believed my brother and
19 my father had the sense to do that, and I believed
20 that their attorneys were competent enough to ask
21 the questions.
22        And I beat myself up that I didn't. But

68

1 the answer's no.
2        MR. ALBERT: We're talking about the
3 attorneys in the superior court litigation?
4    A    Correct. Mr. Barns and Mr. Forester. I
5 don't understand why they didn't.
6        MR. MCNUTT: Again, for the record, I
7 sure wish Mr. Albert would stop testifying, and
8 we never did put him under oath so I can't --
9        MR. ALBERT: I apologize. I just
10 thought I'd clarify that.
11    Q    Mr. Salas, I'm going to ask you a couple
12 of questions regarding the SunTrust mortgage that
13 I understand you may not be able to answer. But
14 I'm prefacing this by saying that I would like you
15 to answer them, and I'll try to direct your answer
16 to two time frames: one being the time frame of
17 the trust agreement in 2010, and then the second
18 time frame being today, present time.
19        First question is: Let's go back to
20 the -- let's go back to the deed of trust?
21    A    Exhibit 5.
22    Q    I don't believe so, yes. This is the

Case 3:20-ap-00027 Doc 74-4 Filed 08/01/22 Entered 08/01/22 15:56:31 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 18 of 22

Case 3:20-ap-00027 Doc 74-1 Filed 08/01/22 Entered 08/01/22 15:56:31 Desc Ex 1060

APPX00597

---

**69**

1 document that, at the top, has the name "SunTrust
2 Mortgage, Inc.," on it, and gives a Richmond,
3 Virginia, address. And then it's titled, toward
4 the middle of the page, "Deed of Trust."
5     Do you have that in front of you?
6     A   Yes.
7     Q   You said that you've never seen this
8 document before; is that correct?
9     A   That's correct.
10     Q   And it was never given to you in the
11 context of the 2010, I'll call it "transaction,"
12 and I mean the creation of the trust document?
13     A   Correct.
14     Q   And you did not ask whether there was
15 any encumbrances on the property; is that correct?
16     A   That's correct.
17     Q   So, that as of -- as of July of -- no.
18 As of -- let me get the date right.
19     As of July 6th, 2010, you did not know
20 that there were any encumbrances on the property
21 that would have -- let me try to ask a better
22 question.

**70**

1     You were not aware of any restrictions
2 on the transfer of the property from your son to
3 your father?
4     A   From my brother to my father.
5     Q   I'm sorry. I keep saying son. I don't
6 know why. I apologize.
7     A   No problem.
8     Q   From your brother to your father.
9     A   What was the question? Sorry.
10     Q   That was my fault. I threw you off.
11     You're not aware of any restrictions in
12 July of 2010 on the transfer of the Riggs Place
13 property from your brother to your father?
14     A   I was not aware of any restrictions.
15     Q   Did you ask if there were any?
16     A   No.
17     Q   Did your father or your brother talk to
18 you about any restrictions?
19     A   No.
20     Q   Did one of them mention at any time that
21 you're aware of prior to today that there was or
22 is an encumbrance on the property by SunTrust

**71**

1 mortgage or any other mortgage entity?
2     A   My father told me that there's a
3 mortgage and he pays it every month. I didn't
4 know that it was SunTrust.
5     Q   So you didn't know -- did you know that
6 your father was paying the mortgage in 2010?
7     A   Did I know in -- yes, I did.
8     Q   Okay. Did you ask your father whether
9 there was any restriction on the transfer as a
10 result of the transfer documents that you were
11 preparing, the trust and the quitclaim deed?
12     A   No.
13     Q   Did he tell you there were any?
14     A   No.
15     Q   Other than the tax issues that you
16 testified to previously and the recording costs,
17 are you aware of any other reason why the
18 quitclaim deed that you prepared in July of 2010
19 was not recorded?
20     MR. ALBERT: Objection.
21     A   To clarify, the only reason I knew was
22 because of the tax, was because of the transfer

**72**

1 tax issue. I had no idea about the income tax
2 issue. They called me and said we cannot afford
3 to do this. My dad called me and said I cannot --
4 I went down to do this deed, they told me it was,
5 I thought $30,000, but I don't recall, maybe more.
6 I don't know.
7     And they said -- and your brother will
8 not talk to me because I can't get it done, will
9 you talk to him because I can't afford it and I
10 don't know what to do.
11     I called my brother, I said he went to
12 do it, they told him what it cost, he doesn't have
13 the money. I said don't hold your kids away from
14 him.
15     MR. ALBERT: Oh, hold your kids --
16     A   His grandkids. He won't let my dad see
17 his grandkids because he didn't transfer it, and
18 he wouldn't pay the money.
19     MR. ALBERT: Well, wait a minute.
20     A   He wouldn't pay the transfer -- he
21 wouldn't pay the transfer fee, or didn't have the
22 money to pay the transfer fee. It upset my

---

Case 3:20-ap-00027 Doc 74-1 Filed 08/03/22 Entered 08/03/22 15:56:31 Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 19 of 22

APPX00598

73

1 brother.

2 So that is the conversation I had,

3 related only to the transfer that I recall, not to

4 the income tax issue, or any other issue other

5 than the cost to transfer, which was news to me

6 because they don't have such a thing in Colorado.

7 Shocking to me. I didn't know. But I don't

8 practice in DC.

9 Q And they have such a thing, you're

10 talking about the transfer tax?

11 A The transfer tax, yes.

12 Q Now --

13 A I think that's what it's called. I

14 don't even know that for a fact.

15 Q And I believe you said, but I want to

16 clarify this, that between the time of 2012,

17 roughly, and I realize you said, I think, a year

18 or two after the transaction, so I'm not trying to

19 pin it down, but say roughly 2012, which would be

20 two years later, until today, are you aware of any

21 other reasons why the deed, the quitclaim deed

22 that you prepared would not have been or could not

74

1 have been recorded?

2 A I don't know of any reason and I did not

3 know that it was not recorded until the lawsuit

4 came in my brother's name.

5 Q And what is it about the lawsuit that

6 came in your brother's name that made you believe

7 the quitclaim deed had not been recorded?

8 A The only reason my brother would be

9 involved was because his name had to still be on

10 the title is the assumption I've made in my mind.

11 I don't know that that is factually correct, but

12 that is my assumption, that it must not have been

13 filed or he wouldn't be in this situation.

14 He didn't live in the District, he

15 never -- he didn't live in the house, and I -- so

16 that's the only logical reason I could make that

17 he would be involved, that it was never done. And

18 until that point, I did not even know that it had

19 not been done. I assumed at some point that he

20 came up with the money and did it. But he didn't,

21 as we sit here today we all know.

22 Q Okay. On July 7th, 2010, did you have

75

1 an understanding of who the Riggs Place property

2 belonged to?

3 MR. ALBERT: Objection.

4 A Max Salas. I mean, it was deeded on the

5 6th, so. Not Max. The trust, Max Salas.

6 Q Okay. Did you have any supporting role

7 in the litigation either financially or otherwise?

8 A Which litigation?

9 Q The -- I'm sorry, good question. The

10 superior court litigation.

11 MR. ALBERT: What was the question,

12 please?

13 Q Did you have any supporting role,

14 financially or otherwise, in the superior court

15 litigation?

16 A I was not involved at all, financially

17 or in an advisory role.

18 MR. ALBERT: And I object to the

19 question, by the way.

20 MR. MCNUTT: But at least you didn't

21 answer it.

22 MR. ALBERT: I didn't. I would answer

76

1 it.

2 MR. MCNUTT: That's a step in the right

3 direction.

4 MR. ALBERT: I think the question's

5 unclear.

6 Q Are you aware of whether any other

7 family members contributed to the litigation cost?

8 A Which litigation? To be clear.

9 Q Of your brother Lynn.

10 A No. I mean, he still owes his attorney

11 some money and I'm paying him some money, so

12 let -- I want to be clear about that.

13 Q So you're paying him some money?

14 A I'm paying Mr. Forester money that my

15 brother owes him. Prior to, I believe was your

16 question before, I had no contribution. Post, I

17 have.

18 Q When you say "post," I'm not sure what

19 you're referring to?

20 A Once the verdict was entered and an

21 outstanding balance was still remaining,

22 Mr. Forester contacted me and said in order to

Case 3:20-ap-00027 Doc 74-1 Filed 08/01/22 Entered 08/01/22 15:56:01 Desc
Case 3:23-cv-00990 Document 4-4 Filed 10/03/24 Page 20 of 22 PageID #: 1062
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18 Page 20 of 22

APPX00599

77

1  continue with the appeal, he needed some money.
2  So I gave him some money.
3      Q    Just so we're clear, prior to the
4  judgment, you made no financial contribution to
5  the representation of either your father or your
6  brother --
7      A    Correct.
8      Q    -- in the superior court litigation?
9      A    Correct.
10         MR. MCNUTT: All right. I think that's
11  all I have.
12         MR. ALBERT: May I ask some questions?
13         MR. MCNUTT: It's not up to me. Can I
14  answer them for you?
15         MR. ALBERT: Of course.
16         MR. MCNUTT: Just to be fair.
17         EXAMINATION BY COUNSEL FOR THE RESPONDENT
18  BY MR. ALBERT:
19      Q    Of course. Mr. Salas, you're licensed
20  to practice law in the State of Colorado?
21      A    Yes. I am.
22      Q    And your -- your license is in good

78

1  standing?
2      A    Yes.
3      Q    Both your father and brother know you
4  are an attorney?
5      A    Yes.
6      Q    Looking at Exhibit 8 and the quitclaim
7  deed --
8      A    Yes.
9      Q    -- you were present when both your
10  father and brother signed these documents?
11      A    Yes.
12      Q    And Ms. King was in the room as well
13  when they signed them?
14      A    Yes.
15      Q    And you witnessed her notarize them?
16      A    I did.
17      Q    And you witnessed your brother actually
18  handing the deed to your father as trustee at the
19  time?
20      A    I did, and I recall he was very
21  relieved.
22      Q    Thank you. Okay.

79

1          Looking at this deed, Exhibit 8, and I
2  recognize you're not an attorney in the District
3  of Columbia; however, you are an attorney in the
4  District -- excuse me -- in the State of Colorado,
5  is there anything in this deed that suggests to
6  you that it's not a proper document for purposes
7  of transferring property, DC real estate?
8          MR. MCNUTT: Objection.
9      A    No.
10         MR. ALBERT: What is the basis of your
11  objection, please?
12         MR. MCNUTT: That he's not, you didn't
13  call him as an expert and he's not a DC lawyer,
14  so how the hell would he know? How the heck
15  would he know? That's what I meant to say, how
16  the heck would he know?
17      Q    Looking at -- at the irrevocable trust
18  agreement, paragraph 14, could you tell me what
19  that says, please?
20      A    It says, "This trust has been executed
21  and delivered in the State of Colorado and shall
22  be construed and administered according to the

80

1  laws of Colorado. In witness, whereof the grantor
2  the trustees have executed this agreement in
3  Colorado."
4      Q    And both your father and brother
5  executed the documents in the State of Colorado;
6  is that correct?
7      A    They did.
8      Q    Both the trust and the deed?
9      A    Yes. Correct.
10         MR. MCNUTT: Just for the record, he did
11  say "wherefore." It says "whereof." Not a big
12  deal, but --
13      A    Sorry. Thank you.
14         MR. ALBERT: You may answer.
15         MR. MCNUTT: Minor correction.
16      Q    And could you also look at paragraph 8,
17  please, and read that?
18      A    "The grantor reserves" -- "Additional
19  Properties" heading, "The grantor reserves the
20  right to himself or to any other person at any
21  time, by deed or will, to add to the corpus of
22  either both of the trusts, and any property added

Case 3:20-ap-00027  Doc 74-1  Filed 08/01/22  Entered 08/01/22 15:56:01  Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18    Page 21 of 22

APPX00600

81

1  shall be held, administered, and distributed as
2  part of the trust or trusts."
3        MR. ALBERT:  I have no further
4  questions.  Thank you very much.
5        MR. MCNUTT:  You may not know this
6  because you're not involved in a bunch of
7  depositions, but the court reporter will ask you,
8  you have the right to read this and sign it.
9        The court reporter will give you the
10 directions on that, but I just want you to be
11 aware that you have the right to read it and
12 correct anything you think that was taken down in
13 error.  But that's up to the court reporter and
14 you.
15       THE WITNESS:  Great.
16       MR. MCNUTT:  Because neither one of us
17 represent you.
18       THE WITNESS:  Thank you.
19       MR. ALBERT:  Thank you.
20       THE WITNESS:  I do want to read it.
21       MR. ALBERT:  I will order a copy of
22 this.

82

1        MR. MCNUTT:  We will take the original.
2        (Off the record at 3:05 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

83

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2
3        I, Sydney Crawford, the officer
4  before whom the foregoing deposition was taken, do
5  hereby certify that the foregoing transcript is a
6  true and correct record of the testimony given;
7  that said testimony was taken by me
8  stenographically and thereafter reduced to
9  typewriting under my direction; that reading and
10 signing was requested; and that I am neither
11 counsel for related to, nor employed by any of the
12 parties to this case and have no interest,
13 financial or otherwise, in its outcome.
14        IN WITNESS WHEREOF, I have hereunto set
15 hand and affixed my notarial seal this 16th day of
16 August, 2018.
17
18
19
20
21 *Sydney R. Crawford*
22 My commission expires: May 15, 2024

Case 2:20-ap-00027-DPC  Doc 74-4  Filed 08/01/22  Entered 08/01/22 15:56:01  Desc
Exhibit R Salas Deposiiton Transcript in Case No. 18-260 8-8-18   Page 22 of 22

APPX00601

**Fill in this information to identify your case and this filing:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse, if filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | **18-00260** |

☐ Check if this is an amended filing

## Official Form 106A/B
# Schedule A/B: Property
**12/15**

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:**  Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☑ Yes. Where is the property?

1.1
**1610 Riggs Place, NW**
Street address, if available, or other description

**Washington**      **DC**      **20009-0000**
City            State      ZIP Code

County

**What is the property?** Check all that apply
☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one
☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed
trust collapsed on creation through merger to convey property to debtor
DC Records displays owner as Len Salas
Contains furnished basement that is possible to be rented as a seperate unit, but which debtor currently is using as part of personal residence with remainder of property**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

Current value of the entire property?
**$2,500,000.00**

Current value of the portion you own?
**$2,500,000.00**

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.
**Owner**

☐ Check if this is community property (see instructions)

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here...........................................................................=>**

**$2,500,000.00**

**Part 2:**  Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

APPX00602

Debtor 1    **Max E. Salas**                                                                          Case number *(if known)*    **18-00260**

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☑ No
☐ Yes

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☑ No
☐ Yes

5  Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for
   pages you have attached for Part 2. Write that number here...........................................................=>     | **$0.00** |

| **Part 3:** | Describe Your Personal and  Household Items |
|---|---|

| Do you own or have any legal or equitable interest in any of the following items? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ☑ Yes.  Describe.....

| **See Attached List** | $14,000.00 |
|---|---|

| Previously damaged and restored personal property being held in storage by Columbia Restoration **See attached list for property description** | $2,000.00 |
|---|---|

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
   ☐ No
   ☑ Yes.  Describe.....

| HP Laptop 18 in. MacBook Pro 13 in. IPad 10 In. IPhone 6 | $200.00 |
|---|---|

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☑ No
   ☐ Yes.  Describe.....

9. **Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ☐ No
   ☑ Yes.  Describe.....

| 1 set Taylor-Made Golf Clubs and Bag 1 set Titleist Golf Clubs and Bag | $300.00 |
|---|---|

| 1 Precor home treadmill | $1,500.00 |
|---|---|

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                                    Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                                          Case number *(if known)*    **18-00260**

---

10. **Firearms**
    *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
    ☑ No
    ☐ Yes. Describe.....

11. **Clothes**
    *Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
    ☐ No
    ☑ Yes. Describe.....

| | |
|---|---|
| **11 suits, 2 tuxedos, 7 pairs of shoes, and 15-20 business shirts, 7-8 pairs of pants, various golf wearing apparel and other wearing apparel.** | $500.00 |

12. **Jewelry**
    *Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
    ☐ No
    ☑ Yes. Describe.....

| | |
|---|---|
| **Timex watch** | $25.00 |
| **Gold costume jewelry ring** | $20.00 |

13. **Non-farm animals**
    *Examples:* Dogs, cats, birds, horses
    ☑ No
    ☐ Yes. Describe.....

14. **Any other personal and household items you did not already list, including any health aids you did not list**
    ☐ No
    ☑ Yes. Give specific information.....

| | |
|---|---|
| **Hearing aides** | $300.00 |
| **Framed Family Pictures** | $100.00 |

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here ...........................................................................**

| |
|---|
| $18,945.00 |

**Part 4:    Describe Your Financial Assets**

Do you own or have any legal or equitable interest in any of the following?

Current value of the portion you own?
Do not deduct secured claims or exemptions.

16. **Cash**
    *Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
    ☐ No
    ☑ Yes..................................................................................

|  | |
|---|---|
| Cash on hand | $200.00 |

17. **Deposits of money**
    *Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
    ☐ No
    ☑ Yes........................                              Institution name:

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                          Best Case Bankruptcy

Debtor 1   **Max E. Salas**                                      Case number (if known)   18-00260

| | | | |
|---|---|---|---|
| 17.1. | **Checking** | **Bank of America Core checking account** | $1,779.24 |
| 17.2. | **Checking** | **Bank of America Interest Checking (in name of 1610 Riggs Property Trust, Max Salas Trtee)** | $334.96 |
| 17.3. | **Other financial account** | **BB&T bank account x5086 (CLR, Inc.)** | $29,624.97 |
| 17.4. | **Other financial account** | **BB&T bank account x1095 (CLR, Inc. - Construction Account)** | $39.68 |
| 17.5. | **Other financial account** | **BB&T bank account (1610 Riggs Property Trust)** | $6,429.44 |

18. **Bonds, mutual funds, or publicly traded stocks**
   *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
   ☑ No
   ☐ Yes.................   Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
   ☑ No
   ☐ Yes.  Give specific information about them...................
                  Name of entity:                          % of ownership:

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
   *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
   *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
   ☑ No
   ☐ Yes. Give specific information about them
                  Issuer name:

21. **Retirement or pension accounts**
   *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
   ☐ No
   ☑ Yes. List each account separately.
           Type of account:           Institution name:

   | **401(k)** | **T. Rowe Price/Cornet, Inc. 401(k)** | $505,435.72 |
   |---|---|---|

22. **Security deposits and prepayments**
   Your share of all unused deposits you have made so that you may continue service or use from a company
   *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
   ☑ No
   ☐ Yes. ....................   Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
   ☑ No
   ☐ Yes.............   Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
   26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
   ☑ No
   ☐ Yes.............   Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
   ☐ No
   ☑ Yes.  Give specific information about them...

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

Case 23-20-00027 Doc 4-11 Filed 06/03/24 Entered 04/01/27 15:56:34 Desc
Exhibit 9 M Salas Schedules in Case No. 18-260 5-2-18 Excerpts   Page 4 of 9

APPX00605

| Debtor 1 | **Max E. Salas** | Case number *(if known)* | 18-00260 |

| Interest in 1610 Riggs Property Trust -<br>Establishes Debtor as sole-trustee and sole-beneficiary<br>Trust terminated through merger to grant ownership of trust<br>property to debtor | $0.00 |

**26. Patents, copyrights, trademarks, trade secrets, and other intellectual property**
   *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
☑ No
☐ Yes.  Give specific information about them...

**27. Licenses, franchises, and other general intangibles**
   *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
☑ No
☐ Yes.  Give specific information about them...

| Money or property owed to you? | Current value of the portion you own?<br>Do not deduct secured claims or exemptions. |

**28. Tax refunds owed to you**
☑ No
☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

**29. Family support**
   *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
☑ No
☐ Yes. Give specific information......

**30. Other amounts someone owes you**
   *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else
☑ No
☐ Yes.  Give specific information..

**31. Interests in insurance policies**
   *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
☐ No
☑ Yes. Name the insurance company of each policy and list its value.

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| Interest in Life Insurance Policy through employer Cornet Technology, Inc.<br>Interest to terminate upon full retirement on May 3, 2018<br>$0.00 refund value | Ron Salas | $0.00 |
| Interest in health, vision, and dental insurance policies through employer Cornet Technology, Inc.<br>$0.00 cash value | | $0.00 |
| Interest in Casualty Insurance - Progressive<br>$0.00 cash value | | $0.00 |

Case 23-10-a0-90027 Doc 44 104-1 Filed 06/03/24 Entered 04/01/27 95:56:34 ID Des069
Exhibit 9 M Salas Schedules in Case No. 18-260 5-2-18 Excerpts    Page 5 of 9
APPX00606

Debtor 1    **Max E. Salas**                                                Case number *(if known)*   **18-00260**

---

**32. Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.

☑ No
☐ Yes. Give specific information..

**33. Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue
☐ No
☑ Yes. Describe each claim.........

| | |
|---|---|
| Potential claim against Encompass Insurance for unpaid insurance funds due under policy | Unknown |
| Contract claim against Fusion Contracting Group for deficient and unperformed renovation work | Unknown |

**34. Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
☑ No
☐ Yes. Describe each claim.........

**35. Any financial assets you did not already list**
☑ No
☐ Yes. Give specific information..

**36.** Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here.................................................................................................

| $543,844.01 |
|---|

**Part 5:**  Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

**37. Do you own or have any legal or equitable interest in any business-related property?**
☑ No. Go to Part 6.
☐ Yes. Go to line 38.

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

**38. Accounts receivable or commissions you already earned**
☑ No
☐ Yes. Describe.....

**39. Office equipment, furnishings, and supplies**
*Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices
☑ No
☐ Yes. Describe.....

**40. Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**
☑ No
☐ Yes. Describe.....

**41. Inventory**
☑ No
☐ Yes. Describe.....

**42. Interests in partnerships or joint ventures**
☐ No
☑ Yes. Give specific information about them...................
Name of entity:                                    % of ownership:

---

| | | | |
|---|---|---|---|
| **1610 Riggs Property Trust a/k/a CLR, Inc. (Collapsing trust with full ownership vesting in Max Salas of all trust property)** | **100%** | % | **Unknown** |

**43.  Customer lists, mailing lists, or other compilations**

☑ No.

☐ **Do your lists include personally identifiable information** (as defined in 11 U.S.C. § 101(41A))?

☑ No

☐ Yes.  Describe.....

**44.  Any business-related property you did not already list**

☑ No

☐ Yes. Give specific information.........

**45.** Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached for Part 5. Write that number here........................................................................................................

$0.00

| **Part 6:** | **Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.** |
|---|---|
| | If you own or have an interest in farmland, list it in Part 1. |

**46.  Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**

☑ No. Go to Part 7.

☐ Yes.  Go to line 47.

| **Part 7:** | **Describe All Property You Own or Have an Interest in That You Did Not List Above** |
|---|---|

**53.  Do you have other property of any kind you did not already list?**

*Examples:* Season tickets, country club membership

☐ No

☑ Yes. Give specific information.........

| | |
|---|---|
| Washington Nationals MLB season tickets | $10,000.00 |
| Washington Wizards NBA season basketball tickets | $5,940.00 |
| Policy holder for potential insurance payout to third parties for liability from 2015 house fire - Encompass Insurance | Unknown |

**54.  Add the dollar value of all of your entries from Part 7. Write that number here  ...................................**

$15,940.00

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

Debtor 1   **Max E. Salas**                                Case number *(if known)*   **18-00260**

| Part 8: | List the Totals of Each Part of this Form |
|---|---|

| | | |
|---|---|---|
| 55. | **Part 1: Total real estate, line 2** ........................................................................................ | **$2,500,000.00** |
| 56. | **Part 2: Total vehicles, line 5** | $0.00 |
| 57. | **Part 3: Total personal and household items, line 15** | $18,945.00 |
| 58. | **Part 4: Total financial assets, line 36** | $543,844.01 |
| 59. | **Part 5: Total business-related property, line 45** | $0.00 |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | $0.00 |
| 61. | **Part 7: Total other property not listed, line 54** | + $15,940.00 |
| 62. | **Total personal property.** Add lines 56 through 61... | $578,729.01   Copy personal property total   $578,729.01 |
| 63. | **Total of all property on Schedule A/B.** Add line 55 + line 62 | $3,078,729.01 |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

Case 23-20-90027 Doc 74-1 Filed 06/03/24 Entered 06/03/24 22:45:56 Desc
Exhibit 9 M Salas Schedules in Case No. 18-260 5-2-18 Excerpts   Page 8 of 9
APPX00609

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name    Middle Name    Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number (if known) | **18-00260** |

☐ Check if this is an amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt
4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

### Part 1:   Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ■ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **1610 Riggs Place, NW Washington, DC 20009**<br>**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**<br>**trust collapsed on creation through merger to convey property to debtor DC Records displays owner as Len Salas**<br>**Contains**<br>Line from *Schedule A/B*: **1.1** | $2,500,000.00 | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(14)** |
| **\*\*See Attached List\*\***<br>Line from *Schedule A/B*: **6.1** | $14,000.00 | ■ $8,621.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |
| **Previously damaged and restored personal property being held in storage by Columbia Restoration \*\*See attached list for property description\*\***<br>Line from *Schedule A/B*: **6.2** | $2,000.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

**41**

```
1   IN THE UNITED STATES BANKRUPTCY COURT FOR THE
            MIDDLE DISTRICT OF TENNESSEE
2                   AT NASHVILLE
    ---------------------------------------x
3   IN RE:
                        Case No: 3:18-bk-02662
4   Len Salas          Chapter 7
                        Judge Harrison
5       Debtor
    _____
6   Nicolass Brekelmans and Gail Gregory
    Brekelmans, Co-Personal Representatives
7   of the Estate of Nina Brekelmans

8   and

9   Michael McLoughlin and Martha Johnson,
    Co-Personal Representatives of the
10  Estate of Michael Patrick McLoughlin,

11  In their capacity as authorized representatives
    of the Estate of Len Salas
12
                Plaintiffs
13
            -v-
14
    Max Salas,
15                  Ad Pro No.3:20-ap-90027

16          Defendant.

17  ---------------------------------------x
18          March 8, 2022
            10:30
19  Videoconference

20      DEPOSITION of the Defendant MAX SALAS, taken

21  by Plaintiff, before Christine Cutrone, a Notary

22  Public.

23

24

25
```

**42**

```
1   A P P E A R A N C E S :

2

3   LAW OFFICE OF PHILIP J. MCNUTT, P.C.
    Attorney for Plaintiff
4       Two fountain Square
        11921 Freedom Drive,
5       Suite 584
        Reston Virginia 20190
6
    BY:  PHILLIP MCNUTT, ESQ.
7

8
    THOMPSON BURTON, PLLC
9   Attorney for Defendant
        6100 Tower Circle
10      Suite 200
        Franklin, Tennessee 37067
11
    BY:  PHILIP G. YOUNG, ESQ.
12
    MS. DEBORAH LUNN (court clerk)
13

14  Also present:  Ethan Rex
                    (Planet Depos Tech)
15                  Nico and Gail Brekelmans
                    Mindy Johnson
16

17

18

19

20

21

22

23

24

25
```

**43**

```
1       IT IS HEREBY STIPULATED AND AGREED by and

2   between the attorneys for the respective parties

3   herein, that filing and sealing be and the same are

4   hereby waived.

5       IT IS FURTHER STIPULATED AND AGREED that all

6   objections, except as to the form of the question,

7   shall be reserved to the time of the trial.

8       IT IS FURTHER STIPULATED AND AGREED that the

9   within deposition may be sworn to and signed before

10  any officer authorized to administer an oath, with

11  the same force and effect as if signed and sworn to

12  before the Court.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**44**

```
1   REPORTER:  Will counsel please
2   stipulate that in lieu of formally swearing in the
3   witness, the reporter will instead ask the witness to
4   acknowledge that their testimony will be true under
5   the penalties of perjury, that counsel will not
6   object to the admissibility of the transcript based
7   on proceeding in this way, and that the witness has
8   verified that MAX SALAS is in fact the name of the
9   witness. All counsel agree?
10      MR. MCNUTT:  I do.
11      MR. YOUNG:  Yes.  Thank you.
12      REPORTER:  Do you hereby acknowledge
13  that your testimony will be true under the
14  penalties of perjury.
15      THE WITNESS:  I will.
16      MR. MCNUTT:  Thank you, madam
17  reporter.
18      First, just a brief statement,
19  Mr. Salas, and all involved.  This is a
20  continuation of a deposition that was started in
21  September of last year.  The deposition was
22  adjourned and continued to an indefinite date
23  by agreement of the parties.  We have a member
24  of the court present here to monitor the
25  deposition.
```

Case 3:20-ap-90027 Doc 114-1 Filed 08/23/24 Entered 08/23/24 15:56:34 Desc
Exhibit M Salas Deposition Transcript in Case No. 20-90027 3-8-22 Excerpts    Page 1 of 12
EPX00611

49

1  what other documents might be around that. I
2  have no idea.
3     Q.   Not other copies.
4        Do you know if there are any other
5  trust agreements that you executed regarding the
6  property?
7     A.   I don't know. I don't know. There
8  may be.
9     Q.   Okay. Are you aware of any?
10    A.   There was a lot of documents handed
11 back and forth for a long time for three days
12 in a row, and I just don't remember what I
13 saw, sir, so I can't answer that question.
14 So, I guess, I can't answer it. I don't know
15 or I don't remember.
16    Q.   Would you go to the fifth page, the
17 next page of that document.
18    A.   Yeah.
19    Q.   No. The next page. I think it's the
20 next page we're looking at.
21    A.   The notarized signature you mean, is
22 that what you're talking about?
23    Q.   I'm looking for the Quitclaim Deed.
24 Can you scroll up to the top of that page, Mr.
25 Salas, the top of the previous page. I'm sorry,

50

1  I gave you the wrong direction. Can you scroll
2  to the last page, 6 of 6. There we go, right
3  there.
4        Do you recognize that document, which
5  is titled Quitclaim Deed also dated July 6,
6  2010?
7     A.   Again, it's the same answer as the
8  last.
9     Q.   Do you recognize it?
10    A.   It's a copy -- yes, a Quitclaim Deed,
11 that's correct.
12    Q.   That's the deed that you executed
13 between your son and you in July of 2010; is
14 that correct?
15    A.   No, I don't know that.
16    Q.   You don't know that. Can you scroll
17 down to the signatures. Right there.
18        Is that your signature at the bottom?
19    A.   Yes, it is.
20    Q.   That's dated July 6, 2010?
21    A.   Yes, it is.
22    Q.   This is the Quitclaim Deed that
23 resulted in the deed of the property at 1610
24 Riggs Place from your son to the trust; is that
25 accurate?

51

1     A.   Repeat that please?
2     Q.   Yes. This is the deed that you're
3  asserting transferred the property at 1610 Riggs
4  Place from your son Len to you as trustee of the
5  1610 Riggs Property Trust?
6     A.   It's a copy of that, yes, sir. Is
7  that what you want? That's the transfer. I
8  don't know if there's any other ones. I don't
9  know.
10    Q.   Do you know where the original of this
11 document is?
12    A.   I don't.
13    Q.   Do you know if you received an original
14 of this document on or about July 6, 2010?
15    A.   2010. You know, I don't know. So I
16 really can't say that I do. My -- my
17 attorneys may have it. I don't have it. The
18 only paperwork that I knew that I had, burned
19 in the fire, sir.
20    Q.   When is the last time --
21        JUDGE HARRISON: Let me interrupt here
22 for just a minute. I'm sorry I was a little
23 late, but we had a little technical difficulty.
24        I'm just here to monitor. Mr. Salas,
25 not answering will not do you any favors.

52

1  Mr. McNutt, any rowdiness will not do you any
2  favors. So let's just get this done. I know you
3  already started, but go ahead.
4        MR. MCNUTT: Thank you, your Honor.
5        THE WITNESS: Thank you. Sorry.
6     Q.   Mr. Salas, when is the last time you
7  remember having the original of the Quitclaim
8  Deed?
9     A.   I remember having the file right
10 before the fire, I guess. I remember -- I
11 remember I saw -- I didn't see it then, but I
12 would have had it. Again, it was destroyed in
13 the fire. Was that the question?
14    Q.   So you believe that the original was
15 destroyed in the fire that took place in, I
16 think, it was June of 2015; is that accurate?
17    A.   Mr. McNutt that's possible. You
18 know, yes, maybe it is, but I don't remember.
19 I mean, I can't say for sure. So I rather be
20 safe than smart.
21    Q.   Fine. That's fine.
22        Mr. Salas, do you recall at any time
23 after June of 2015 that you saw or had in your
24 possession the original of this document, the
25 Quitclaim Deed?

Case 3:23-cv-00987    Document 14-1    Filed 08/16/24    Page 457 of 796 PageID #: 4075

APPX00612

---

**57**

1 name and number should also be used to finance
2 the property. Please note that income taxes on
3 the trust must be filed annually.
4      Did I read that correctly?
5 **A.    Yes, sir.**
6 Q.    This is your son sending an e-mail to
7 you and your other son Len?
8 **A.    Yes. Yes, sir.**
9 Q.    Do you recognize
10 LenSalas77@Gmail.com --
11 **A.    Yes, sir.**
12 Q.    -- was that your son Len's e-mail
13 address at the time?
14 **A.    Yes.**
15 Q.    Now, it says the name and number should
16 also be used to finance the property. And by
17 property, he's referring to 1610 Riggs Place,
18 correct?
19 **A.    Yes. Correct. Wait, wait ask me**
20 **that again, please?**
21 Q.    He says, the name and number should
22 also be used to finance the property. And by
23 the property, he's referring to the 1610 Riggs
24 Place property, correct?
25 **A.    Right. Yes.**

---

**58**

1 Q.    He says, please note the income taxes
2 on the trust must be filed annually.
3 **A.    Yes, sir.**
4 Q.    But you didn't file income taxes for
5 the trust for any year, did you?
6 **A.    So -- no, I don't -- I don't -- I**
7 **don't know how to file income taxes. I don't**
8 **file them today.**
9 Q.    You didn't file any annual income tax
10 returns for the trust, did you?
11 **A.    I don't know, sir.**
12 Q.    You haven't produced any. If you had
13 them, you would have produced them, correct?
14 **A.    If I was asked to and I had them,**
15 **yes, of course.**
16 Q.    In the next paragraph, let me read a
17 portion of this to you, Mr. Salas. The next
18 step is for someone in D.C. to draft a Quitclaim
19 Deed in order to move the property from the
20 possession of Len to the trust. Did I read that
21 correctly?
22 **A.    Yes, sir.**
23 Q.    Okay. Do you know why your son was
24 asking for someone to draft a Quitclaim Deed on
25 June 17, 2011?

---

**59**

1 **A.    I don't know. I mean, I don't know**
2 **-- I don't know why.**
3 Q.    Do you think he just forgot that there
4 was one signing in July of 2010?
5 **A.    Give me that again?**
6 Q.    Do you think that your son, Ron, may
7 have forgotten that you signed a Quitclaim Deed
8 in July of 2010?
9 **A.    I don't know. I can't remember.**
10 Q.    Do you know if in response to this
11 e-mail, Mr. Salas, did you attempt to obtain
12 someone to draft a Quitclaim Deed?
13 **A.    I don't remember. No, I don't -- I**
14 **didn't get anybody to -- no, I don't think so,**
15 **sir.**
16 Q.    Okay. Now it says, the deed will then
17 need to be filed with the district/city. And
18 then, let me know if you have any other
19 questions.
20      But no deed was filed with the District
21 City as far as you know, correct?
22 **A.    I don't -- again, Mr. McNutt, I don't**
23 **remember.**
24 Q.    Would you turn to the next document.
25 This is an e-mail that I think it's the e-mail

---

**60**

1 dated June 21, 2011 at 10:51 a.m. Right there.
2 Go to the top. It appears to be an e-mail from
3 you to S.Goldstein@capitoltitle.com.
4 **A.    Yes. Yes. I remember that.**
5 Q.    Mr. Goldstein, is he an attorney, do
6 you know?
7 **A.    I don't know what he is. Real estate**
8 **company. He owns like a title company or a**
9 **closing company. I'm not sure what it is,**
10 **sir. I'm sorry, I can't tell you.**
11 Q.    Would you go to the top of that page.
12 **A.    This one?**
13 Q.    Yes, right there.
14 **A.    Oh, yeah, okay.**
15 Q.    Actually I think it's the next one up.
16 Scroll up. Not down. Scroll up. Right there.
17 **A.    Right to this e-mail, right here?**
18 Q.    Let's do the one before that.
19 **A.    That's this one here, correct?**
20      MR. MCNUTT: Ethan, I'm wondering if it
21 might be better that I have control of the
22 document, and I can direct Mr. Salas more easily.
23      MR. YOUNG: I was going to suggest
24 that, Mr. McNutt. That might be easier to put it
25 on the page that you're asking about.

---

61

1    THE WITNESS: Thank you.
2    THE TECH: You should have control of
3  the screen now.
4    MR. MCNUTT: Now, I'm sorry, I was
5  trying to do something better. That's my fault.
6  **A.    Just so you know, I'm a little bit**
7  **limited in computer -- my computer skills at**
8  **my age.**
9  Q.    That's fine and understandable,
10  Mr. Salas. I have confused you and I apologize.
11  I didn't mean to.
12    On this page, which is, again, an
13  e-mail that your son provided in his document
14  production, and it's dated June 21, 2011, at
15  10:51 a.m. It's addressed from you to
16  Mr. Goldstein, and your sons are copied. It
17  says, Stan, and that's Mr. Goldstein, right, is
18  his name Stan?
19  **A.    Yes. I believe, yeah.**
20  Q.    It says, as per our conversation, I am
21  sending you the e-mail from my son prepared to
22  documents. Ron, also my other son, Len, is the
23  gentleman who will Quitclaim Deed to the trust.
24  I read that correctly, didn't I?
25  **A.    Yes, sir.**

62

1  Q.    When it says, Quitclaim Deed to the
2  trust, at the end of that sentence, it's
3  referring to the 1610 Riggs Property Trust,
4  correct?
5  **A.    I mean, yes. I believe there's only**
6  **one trust, I guess. No, I don't know. I**
7  **mean, I can't remember, but...**
8  Q.    Well, let me try this -- I'm sorry, are
9  you finished, Mr. Salas?
10  **A.    No, it's just -- you know,**
11  **Mr. McNutt, I've seen so many documents so**
12  **many different times. And lots of times, I**
13  **just don't -- you said this or did this, and I**
14  **just don't -- I don't remember. I just don't.**
15  **I'm not trying to evade the question. I'm not**
16  **trying to -- I'm under oath and I want to tell**
17  **the truth, but if I don't know, I don't know.**
18  Q.    I understand. But with respect to this
19  sentence though, it says, whatever the trust is,
20  it's talking about a Quitclaim Deed to the
21  trust. So whatever trust it is, someone,
22  according to this sentence, Len is supposed to
23  provide a Quitclaim Deed to the trust, whatever
24  the trust is; is that fair?
25  **A.    Well, we're assuming that Len has the**

63

1  **trust here. I can't answer for him. I could**
2  **answer that this -- I understand -- I could**
3  **answer, but I don't know what trust we're**
4  **talking about. And I don't know what Len is**
5  **talking -- I mean, I wrote the e-mail in 2011.**
6  **Ten years ago. I don't remember.**
7  Q.    The second paragraph, Mr. Salas, says,
8  at the end of the day, we need to have done is
9  have Lenny sign a Quitclaim Deed into the trust,
10  which has been extend lives my son, Ron, in
11  Colorado.
12    Now, that's a little awkward, but I
13  think you're saying that the trust is a Colorado
14  trust; is that fair?
15  **A.    Mr. McNutt, I can't agree with**
16  **anything you think of me. You said, I think**
17  **you mean. I don't know what you mean. I**
18  **mean, you read the sentence as best as you**
19  **could, yes, sir.**
20  Q.    Do you know if it refers to a trust
21  that was created in Colorado?
22  **A.    I thought I answered that. Yeah, I**
23  **don't know. I don't remember.**
24  Q.    Other than the trust that you executed
25  on July 6, 2010, are you aware of any other

64

1  trust created in Colorado for you or your son?
2  **A.    I don't remember.**
3  Q.    Okay.
4  **A.    So there's the one sentence in there**
5  **that says, hope this is not too confusing.**
6  **It's very confusing to me what I wrote.**
7  Q.    We all have lots of e-mails we like to
8  take back, so I'm sympathetic.
9    Let me go down to this next page. We
10  don't think need to worry about that. I don't
11  think we need to worry about this one either.
12  **A.    We already did this one, right?**
13  Q.    Yes, sir. It's just a string of
14  e-mails which has the same e-mail in it, so not
15  a problem.
16    Let's go to this one. This is an
17  e-mail dated June 22, 2011, at 8:50 a.m. This is
18  from Stanley Goldstein. It appears to be the
19  Stan at Capitol Title. It's addressed to you at
20  your AOL address with copies to your sons, and
21  to, apparently, an attorney by the name of
22  Lynne, I'll say, Boileau. That's the way I
23  pronounce it.
24    Do you see that e-mail?
25  **A.    Yes, sir, I see the e-mail.**

69

1  7:22 p.m. This is an e-mail from your son, Len,
2  to you at your work e-mail address; is that
3  correct?
4  **A.    Yeah.**
5  Q.    And it says, where are we on this? It
6  appears to be referring to your most recent
7  e-mail to Lynne Boileau, which is right
8  underneath. Is that how you read it?
9  **A.    That's what it says.**
10  Q.    This appears to be a response to Len's
11  previous e-mail that we just mentioned. This is
12  an e-mail dated February 24, 2012 at 9:04 p.m.
13  Your response to Len is, still working on this.
14  I am in Miami. Will be back soon. I read that
15  correctly, didn't I?
16  **A.    Yes, sir.**
17  Q.    So as of February 24, 2012, it does not
18  appear that anything has been finalized with
19  respect to a Quitclaim Deed; is that correct?
20  **A.    I don't know that, sir.**
21  Q.    Is that what these e-mails seem to be
22  saying?
23  **A.    Well, they seem to be saying a lot of**
24  **stuff. I just don't, you know -- you're**
25  **asking me to look back 12 years, I guess, or**

70

1  **how many years was it? I don't remember.**
2  Q.    Ten years. Okay. So with the phrase,
3  still working on this, do you know what the this
4  is, what you were still working on?
5  **A.    No, I don't, sir.**
6  Q.    You don't. Okay. Other than the
7  Quitclaim Deed on the property, are you aware of
8  any other reason why you would be communicating
9  with Len Salas about what you're working on?
10  **A.    I worked with Len for a long time on**
11  **a lot of different things. So I worked on a**
12  **whole lot of different things. Getting him a**
13  **new job. Going through different things.**
14  **Whatever you talk to about your son when he's**
15  **that age. So I don't know what this is.**
16  Q.    Okay.
17  **A.    If you're asking me to predict**
18  **something, I can't do that.**
19  Q.    I don't want you to guess.
20      Mr. Salas, the next e-mail is dated
21  February 27, 2012. It's at 10:08 a.m. It's
22  addressed from you from your work e-mail to your
23  son, Len, at his personal account, I guess, that
24  is, right?
25  **A.    Right.**

71

1  Q.    It says, Len -- this is from you to
2  Len. Len, can you send over the original
3  e-mail. I will check with Lynne again and try
4  to move this thing along. Thanks. I read that
5  correctly, didn't I?
6  **A.    Yes, sir, you read it correctly.**
7  Q.    Again, you're not sure what this refers
8  to, what thing you're trying to move along; is
9  that accurate?
10  **A.    That's -- this is in 2012,**
11  **February 27th. This is different than the one**
12  **we had before, right, a different e-mail?**
13  Q.    Yes, sir.
14  **A.    So this is what this e-mail says,**
15  **yeah. I get what you mean. I mean, you don't**
16  **know really what this is. I'm sorry.**
17  Q.    Let's take a look at this e-mail. This
18  one is dated February 27, 2012 at 7:42 p.m.
19  It's addressed from you at your personal account
20  to Ms. Boileau at Capitol Title. And it looks
21  like you copied both of your sons, Len and Ron;
22  am I correct so far?
23  **A.    That's what it looks like, sir.**
24  Q.    Then it says, Hi, Lynne, about a month
25  and a half back, I sent you information in

72

1  reference to documents of the house, 1610 Riggs
2  Northwest. Please let me know when it would be
3  convenient for you. My son and I are anxious
4  and would like to close on this as soon as
5  possible. Please let us know what the next
6  that are from our side. We look forward to
7  working with you. What are the next steps? Did
8  I read that correctly?
9  **A.    Again, another badly written e-mail**
10  **that's pretty confusing, but you read it**
11  **correctly. I don't know what it means.**
12  Q.    Do you know if you received any
13  instructions as to next steps from Ms. Boileau?
14  **A.    No. Not according to this e-mail.**
15  Q.    Are you aware of any further
16  communications that you had after February 27,
17  2012, where Ms. Boileau, concerning the
18  documents related to 1610 Riggs Place?
19  **A.    So there's -- I can't remember for**
20  **sure. I mean, I can't remember. It's**
21  **possible, but I can't remember. I mean...**
22  Q.    Are you aware of any deed that was
23  created after February 27, 2012 with respect to
24  the property at 1610 Riggs Place Northwest?
25  **A.    Any other deed that was created?**

73

1    Q.    Yes.
2    **A.    I don't know. I mean, I am not aware**
3    **of any, no.**
4    Q.    If I make it more specific, are you
5    aware of any Quitclaim Deed that was created
6    after February 27, 2012 related to the 1610
7    Riggs Place property?
8    **A.    I don't remember.**
9    Q.    Okay. You don't have any such deed in
10   your possession, correct?
11   **A.    Mr. McNutt, I've answered that**
12   **question three times.**
13   Q.    Have you contacted Ms. Boileau or
14   Mr. Goldstein to determine if they have a copy
15   of any deed that might have been created?
16   **A.    I did try to contact them. I did try**
17   **to contact them actually recently. And I --**
18   **but I didn't -- I mean, they were trying --**
19   **they were -- no. I mean, we worked on**
20   **something and then they said it couldn't go**
21   **any further and depends on what you were going**
22   **to do. So I don't -- I guess -- I can't**
23   **guess. I don't know.**
24   Q.    But when you contacted them most
25   recently, did they provide you with any

74

1    documents related to the property?
2    **A.    No, they didn't take my call.**
3          MR. MCNUTT: Ethan, can we go to
4    Exhibit 22, please.
5          THE TECH: You still have control of
6    the document, counsel.
7          MR. MCNUTT: Thank you.
8    Q.    This is Exhibit number 22 in the
9    premarked exhibits for this deposition,
10   Mr. Salas.
11         I'll represent to you that these are
12   e-mails that you provided that appear to be from
13   Joshua Cox. Joshua Cox is an associate, partner
14   of Marc Albert. They were your attorneys or are
15   your attorneys, I guess, in the bankruptcy case
16   that you filed in the District of Columbia; is
17   that accurate so far?
18   **A.    Yes, sir.**
19   Q.    And these appear to be a series of
20   e-mails, string of e-mails between or among your
21   attorneys and your son, Ron Salas.
22         The first page at the top is
23   February 14, 2018 at 3:48 p.m. It says, it's
24   from Ron Salas, and that is his office e-mail
25   address, is it not? Is that your son's office

75

1    e-mail address, Mr. Salas, do you know, at the
2    very top?
3          MR. YOUNG: It looks like Mr. Salas may
4    be on mute.
5    **A.    I'm sorry, I hear it now. I'm was on**
6    **mute there. Sorry about that.**
7    Q.    I was asking if you recognize your
8    son's office e-mail address at the top of that
9    page?
10   **A.    Yeah, sir. I thought I answered that**
11   **one.**
12   Q.    He states there, this is to Mr. Albert,
13   and this is Ron, Ron's e-mail, it says, my
14   apologies for the delay. I have the originals.
15   I read that correctly, did I not?
16   **A.    Yes.**
17   Q.    If you go to the next page. Again,
18   this appears to be an e-mail from Mr. Cox's
19   computer. It says from Marc Albert at the top
20   to Rod Barnes with a copy to Max Salas, and the
21   subject says, signed trust; do you see that?
22   **A.    Yes, sir.**
23   Q.    It's dated March 7, 2018 at 11:11 a.m.
24         That's approximately two weeks prior to
25   the Superior Court trial, right?

76

1    **A.    Sir, I don't know when the Superior**
2    **Court Trial was. I can't understand -- so**
3    **part of the questions -- so, no, I don't -- I**
4    **don't know. I remember the subject, yes.**
5    Q.    Okay. Do you recall that your
6    bankruptcy was filed, I believe, on May 2nd,
7    2018? Do you recall that, Mr. Salas?
8    **A.    Give me a minute here. I'm thinking.**
9    **Okay.**
10   **A.    You said when? May 7th or --**
11   Q.    May 2nd, 2018.
12   **A.    I don't -- I would remember that**
13   **date. My birthday is May 3rd. No, I can't**
14   **remember that, sir.**
15   Q.    Actually, I'm in there as well, but it
16   was in that timeframe I believe. That's okay.
17         You don't remember when the Superior
18   Court trial took place though?
19   **A.    Sorry, could you repeat?**
20   Q.    Well, do you know when the Superior
21   Court trial took place, the actual trial?
22   **A.    No, I don't.**
23   Q.    Do you remember if it was in 2018?
24   **A.    I really don't. That sounds right,**
25   **but I couldn't -- I can't swear, so I'm going**

77

1  to say I don't remember.
2  Q.   Now, if you look at the bottom of this
3  page, this is the same e-mail that I just read
4  to you. It says, from Ron to Mr. Albert. My
5  apologies for the delay. I have the originals;
6  do you see that?
7  A.   I see that.
8  Q.   And the response from Marc Albert to
9  Mr. Barnes and to you, with a copy to Mr. Cox,
10 subject, forward, signed trust. It says,
11 clarification, I spoke to Rod Barnes this
12 morning. He indicated he misspoke in his
13 e-mail. He gave the originals to his father so
14 they could be recorded in D.C. He only retained
15 a copy of the signed documents. Did I read that
16 correctly?
17 A.   You read it correctly.
18 Q.   Then just to clarify, there's an e-mail
19 from Mr. Cox addressed to Mr. Albert that says,
20 I think you meant Ron Salas. Not Rod Barnes.
21 And Mr. Albert makes that correction in his
22 e-mail to Mr. Barnes and a copy to you on
23 March 7, 2018, at 11:11 a.m.; am I correct so
24 far?
25 A.   You read it correct.

78

1  Q.   Do you know what this refers to with
2  respect to the originals?
3  A.   So, Mr. McNutt, I can't remember --
4  if you ask me -- if you read something, I can
5  tell you whether you read it or not. You ask
6  me to remember something, I don't remember. I
7  just don't remember.
8  Q.   The subject references signed trust.
9      Isn't that a reference to the 1610
10 Riggs Property Trust?
11 A.   I don't know what it is, sir.
12 Q.   Could it be any other trust that you're
13 aware of?
14 A.   I don't know that it could of. I
15 don't know -- I don't know what it was. I
16 don't want to...
17     MR. MCNUTT: Okay. Can you pull up
18 Exhibit 39, Max Salas number 39.
19 Q.   Mr. Salas, Exhibit number 39 is a
20 document titled, amended responses to request
21 for admissions to the defendant. And it says,
22 comes now, Defendant, Max Salas and for his
23 amended responses to requests for admissions to
24 the Defendant states as follows. And then
25 proceeds to state objections and responses. We

79

1  go to the signature page here.
2      These were submitted by your attorney,
3  Philip Young, on your behalf, is that accurate
4  so far, Mr. Salas?
5  A.   Okay. It took quite a while for you
6  to ask that question. It was a long question.
7  Can you cut it down --
8  Q.   Sure.
9  A.   -- by sections one and two, and I can
10 answer that, because I don't know remember the
11 first question, the first part of the question
12 was.
13 Q.   Sure. What I'm asking you, Mr. Salas,
14 is if you can identify this document as the
15 response that your attorney provided for you
16 with respect to the plaintiff's request for
17 admissions.
18 A.   I don't know how to answer that
19 question.
20 Q.   Do you recall in viewing the request
21 for admissions, the first five of which, for
22 example, appear on the page in front of you?
23 A.   No, I don't recall reviewing any of
24 that.
25 Q.   Do you recall providing information to

80

1  your attorney so that he could fill out the
2  response to these requests?
3  A.   So sometimes I get documents from Rod
4  Barnes. Sometimes I get them from, you know,
5  from different people, Ron included, and I'll
6  skim over them really, and I didn't understand
7  them. So I just sent them on to whoever was
8  helping me with that subject, with that issue.
9  So, you know, you're asking me if I remember.
10 No, I can't -- can I say this is the document?
11 I can't.
12 Q.   Okay. Just so the record is clear, who
13 is Mr. Barnes, Mr. Salas?
14 A.   That was my original attorney. The
15 attorney for the criminal or -- the fire
16 attorney. The criminal thing or whatever the
17 -- not the civil judge. My attorney.
18 Q.   He was your attorney or one of your
19 attorneys in the Superior Court litigation,
20 right?
21 A.   Yes, sir.
22     MR. YOUNG: Mr. McNutt, the responses
23 to the request for admission, we'll stipulate
24 that they are.
25     MR. MCNUTT: I understand.

81

1    MR. YOUNG:  I know you're probably
2  going to ask if he remembers this, and I know
3  that's a different question, but if you're asking
4  if this is what it is, that is what it is, we'll
5  stipulate to that.
6    MR. MCNUTT:  I understand and I
7  appreciate that.
8    Q.  Mr. Salas, I like to read for you the
9  request and response for number 2.  It says,
10 that the defendant --
11   **A.  Oh, I'm sorry.  Maybe you should ask**
12 **Mr. Albert, that was him.  Go ahead.**
13   Q.  Tell him I'd love to talk to him.
14   **A.  I bet you would.**
15   Q.  Number 2, that the defendant is unaware
16 of the location of the original Quitclaim Deed.
17 Response, denied.  Ron Salas has an original
18 copy.  I read that correctly, didn't I?
19   **A.  You read it correctly, yes, sir.**
20   Q.  Now, your answer says that Ron Salas
21 has an original copy.  But I showed you the
22 e-mail exchanged between your son, Ron, and
23 Mr. Albert, which is Exhibit 22.  And I'll read
24 it again for you.  If you want me to pull it up,
25 I will.  Mr. Albert, says, on March 7, 2018,

82

1  clarification, I spoke to Ron Barnes -- we know
2  Ron Barnes means Ron Salas.  It's a mistake --
3  this morning.  He indicated that he misspoke in
4  his e-mail.  He gave the originals to his
5  father, so they can be recorded in D.C.  He only
6  retained a copy of the signed documents.
7    **A.  Yeah.**
8    Q.  That indicates that your son, Ron, does
9  not have an original copy of the Quitclaim Deed;
10 isn't that correct?
11   **A.  That's what that indicates, but well,**
12 **that's what that indicates.**
13   Q.  Okay.
14   **A.  But I think that he did have or he**
15 **later found an original copy of it.  An**
16 **original copy of it.**
17   Q.  Do you know where that original copy
18 is?
19   **A.  No.**
20   Q.  Do you know if you've ever produced the
21 original in this litigation or in the D.C.
22 Bankruptcy Court litigation?
23   **A.  I don't -- I don't recall.**
24   Q.  In number 7, Mr. Salas, it says, that
25 the defendant, that's you, made no attempts to

83

1  refinance the D.C. property after 2012.  And
2  your response is denied.  That indicates to me
3  that you did make attempts to refinance the D.C.
4  property after 2012.  Is that accurate, that you
5  made attempts to refinance after 2012?
6    **A.  No, that's not accurate.  That was --**
7  **that's not accurate.  I have tried to -- I**
8  **have in fact tried to refinance a lot of**
9  **different times, you know, yes.**
10   Q.  Okay.
11   **A.  That was denied.  That's wrong, I'm**
12 **sorry.  I could tell you that it's a mistake.**
13 **Or maybe I didn't remember, but I knew -- so**
14 **this is really clear, as the defendant makes**
15 **no attempts to refinance the D.C. property**
16 **after 2012.  That's not right.  I don't**
17 **understand how -- I said this, right?**
18   Q.  You denied it. That's correct.  You
19 denied it.
20   **A.  Okay. I don't understand it. Maybe I**
21 **need a break.**
22   Q.  Do you need a break?
23   **A.  I'm okay.**
24   Q.  Okay. I'm hoping I don't have a lot
25 more to go over, Mr. Salas, but I haven't gone

84

1  through everything yet, so I can't give you an
2  accurate appraisal.  But if you need a break at
3  any time, short or longer, just let me know,
4  okay?
5    **A.  Understood.  Thank you, sir.**
6    Q.  I apologize if I confused you that you
7  denied that you didn't make any attempts to
8  refinance.
9    My question to you though is, the
10 attempts that you did make after 2012, all of
11 them were unsuccessful, correct, you were unable
12 to refinance?
13   **A.  Right.  No, I wasn't -- I was unable**
14 **to refinance, that's correct.**
15   Q.  Is it correct, Mr. Salas, that when you
16 did attempt to refinance, that your son, Len,
17 was a borrower or co-borrower in every attempt?
18   **A.  No.  No. So the whole point -- the**
19 **whole point -- I don't -- Len was -- Len kept**
20 **trying to get me to finance the house and get**
21 **-- so get him off the loan basically, that's**
22 **what he wanted.  Get him off -- he was on me**
23 **and I wanted to do it for him.  I kept working**
24 **on it and I couldn't get it done.**
25   Q.  The banks or institutions where you

85

1  attempted to refinance required Len to be a
2  borrower?
3      **A.   I didn't attempt to get any loans for**
4  **Len anywhere that I can possibly remember.**
5      Q.    Okay. Let's go to number 19,
6  Mr. Salas. Request for admission in 19 asks you
7  to admit or deny that Max Salas did not notify
8  Sun Trust or the D.C. government that he was an
9  obligor under the Sun Trust deed of trust. Your
10 response was denied. Max Salas notified Sun
11 Trust that he was obligated under the deed of
12 trust. I read that correctly, didn't I?
13     **A.    You read it correctly, yes, sir.**
14     Q.    When you notified Sun Trust that you
15 were obligated, did you sign a note?
16     **A.    No. I didn't sign.**
17     Q.    Did you sign a guaranty?
18     **A.    Huh?**
19     Q.    Did you sign a guaranty?
20     **A.    I was -- well, the loan was --**
21 **actually it was a modification. It was a**
22 **modification and a way to get -- to get**
23 **Lenny's -- Lenny wanted the house off of his**
24 **name, and I kept trying to do that. That's**
25 **what happened. I don't blame him. I promised**

86

1  **him I would do that right away back when he**
2  **first did it. Well, I'm just going on too**
3  **far. So I don't remember, sir.**
4      Q.    Okay. I need to give you a timeframe
5  here, so I apologize.
6          Prior to your bankruptcy filing, okay,
7  prior to your bankruptcy filing, did you notify
8  Sun Trust that you were obligated under the deed
9  of trust?
10     **A.    I don't remember.**
11     Q.    Did you ever provide, again, prior to
12 your bankruptcy filing, did you ever provide Sun
13 Trust with a note that you signed as an obligor
14 under the deed of trust note?
15     **A.    Same answer.**
16     Q.    Do you have any documents that would
17 indicate that you did sign such a note?
18     **A.    I can't remember. You know, I don't**
19 **know. It's just -- it's almost like -- I**
20 **don't know. I don't remember.**
21     Q.    Do you remember if you provided Sun
22 Trust with a guaranty of the note obligation
23 that Len was obligated for?
24     **A.    Did I provide them a guaranty to**
25 **what, sir?**

87

1      Q.    Did you provide Sun Trust with a
2  guaranty of the deed of trust note obligation?
3      **A.    Did I provide Sun Trust a deed?**
4      Q.    A guaranty.
5      **A.    A guaranty. You know, Mr. McNutt, I**
6  **may have. I don't remember. I just can't**
7  **remember right. It just doesn't -- it's not**
8  **there.**
9      Q.    If there was a note obligation or a
10 guaranty, would those documents have been
11 provided to the plaintiffs in this case?
12     **A.    I don't know what -- if there was**
13 **what would have happened. I don't know.**
14     Q.    You haven't provided any documents
15 related to a note obligation or a guaranty that
16 you provided the Sun Trust Bank prior to your
17 bankruptcy filing though, correct?
18     **A.    That's not correct. I don't know**
19 **what I've done. I don't know. I may have. I**
20 **may have. Maybe I didn't. I don't know.**
21     Q.    Let's go to number 20, Mr. Salas. The
22 request for admission asks that you admit or
23 deny that Max Salas did not notify D.C. or any
24 taxing authority that he was the owner of the
25 D.C. property. Your response is denied. Max

88

1  Salas has recorded the D.C. Bankruptcy Court
2  order, which declares him the owner. Max Salas
3  also filed the homestead exemption with the
4  Register of Deeds in December 2012. I read that
5  correctly, right?
6      **A.    Yeah, I did. I did file a -- I got a**
7  **note at the house that I was eligible for**
8  **signing. So I went down and tried to -- tried**
9  **to get the homestead exemption, and I made my**
10 **application. And I don't remember the last**
11 **part of that. Max also filed a homestead**
12 **exemption within the register of deeds in**
13 **2012. As you -- I mean, you could read these**
14 **things and, yes, could understand what they**
15 **said. Obviously I didn't write them. But...**
16     Q.    Do you have --
17     **A.    Yes, I remember doing a homestead**
18 **exemption. I don't know -- I provided -- I**
19 **don't know what I provided the court. And the**
20 **court order says that it's my property, agrees**
21 **with me.**
22     Q.    Do you have a copy of the homestead
23 exemption that you filed, Mr. Salas?
24     **A.    I don't, but you can get it,**
25 **Mr. McNutt. All you have to do is call the**

89

1  D.C. government and they have it there. Yep.
2  Q.    So you don't have a copy?  Is that what
3  you're telling me, you don't have a copy?
4  A.    I'm thinking.  I can't remember where
5  it's at if I have it.  No, I probably don't
6  have it.  So what happened is, Mr. McNutt, is
7  you go there and you apply.  You pay your
8  money.  And then they e-mail you your
9  homestead exemption letter and number,
10  whatever it is.  So that's what happens.
11  That's the way they do it in D.C.
12  Q.    Subsequent to 2015, did you seek to
13  obtain a copy of the homestead exemption?
14  A.    I had years before, right after my
15  divorce.  I believe -- I explained to them
16  that the house was mine, but it was -- title
17  was in my son's name, and they said, well, you
18  can't get it.
19  Q.    Okay.
20  A.    So that was right there -- so that
21  would be 12, 15 years ago.  And then the last
22  time was in 28 [sic] -- whenever it was.  You
23  know, I can't be tied down to dates, because I
24  don't know. I really don't.
25  Q.    You and me both, Mr. Salas.  I

90

1  understand.
2       MR. MCNUTT:  Tell you what, why don't
3  we take a short break, maybe 10 or 15 minutes.
4  I'm going to review my notes and documents to see
5  how much more I have if any.  If we can reconvene
6  at 12:05, if that's okay with everybody.
7       MR. YOUNG:  That works for me. Just for
8  clarification that's 11:05 central, correct?
9       MR. MCNUTT:  Right. 12:05 my time.
10       (Whereupon, a short break was taken.)
11       MR. MCNUTT: Mr. Salas, you will be
12  happy to know that I just have a few more
13  questions.
14       Ethan, can we bring back Exhibit 39
15  please.
16  Q.    Mr. Salas, one more question on this
17  exhibit.  It relates to response to request
18  number 30.  If I can pull that up.  Number 30,
19  the request to admit or deny says that on and
20  after July 6, 2010, you were aware that you had
21  received the only signed original Quitclaim
22  Deed.  Your response is denied.  Defendant later
23  became aware of other signed original copies of
24  the quitclaim deed existed.
25       Now, with respect to this response,

91

1  Mr. Salas, my question is, whether you became
2  aware of other signed original copies of the
3  Quitclaim Deed other than what Ron Salas told
4  Mr. Albert?
5  A.    So what is this exhibit from?  I know
6  we worked on it a little while ago -- I mean,
7  before, but I don't remember what we went back
8  to now.
9  Q.    These are the requests for admissions.
10  A.    From who to who?
11  Q.    These are your responses to the
12  plaintiff's request for admissions that your
13  counsel prepared and served on or about
14  November 9, 2002.
15  A.    Okay.
16  Q.    And that's the title right there.  Then
17  I'm asking you about request number 30.  Maybe I
18  could make this simpler.
19       Other than your son, Ron, were you
20  aware of any other party that had an original of
21  the Quitclaim Deed?
22  A.    Well, you know, I think there were
23  four copies when we signed them, or at least
24  three I remember.  So Ron got one of them.
25  Len got one of them.  I got one of them.  I

92

1  don't remember who got the other or if there
2  was a fourth really.
3  Q.    Okay.
4       (Technical issue.)
5  A.    Are you there?  Yeah.  So I don't
6  remember.
7  Q.    Now, I think you said there were three
8  originals, and you got one of them, and your
9  sons had the other two.
10       Are you talking about originals or are
11  you talking about copies of the original?
12  A.    No.  So these were -- when we went,
13  we signed, we did this.  There were three
14  original copies.  Wow -- no, I can't remember
15  that for sure.  I think there were more than
16  one copy.  I thought Len had an original, and
17  I thought Ron had an original, and I had an
18  original.  So, yeah.  Am I aware that more
19  than three?  No.  Do I think there were at
20  latest three?  I think, yes.
21  Q.    But other than you and your two sons,
22  you're not aware of anyone that would have had
23  an original of the Quitclaim Deed; is that fair?
24  A.    I'm not -- I'm sorry.  I'm not aware.
25       MR. MCNUTT:  Ethan, can we pull up

93

1  Exhibit number 40?
2  Q.    Mr. Salas, I'll represent to you that
3  these are the amended responses to plaintiff's
4  first request to the defendant, Max Salas, for
5  the production of documents.
6      So these are your written responses to
7  my client's request for production of documents.
8  And these were amended pursuant to Judge
9  Harrison's order that required additional
10 responses.  These are also prepared and provided
11 by your counsel on or about November 9, 2021.  I
12 just have a couple of questions regarding these
13 responses.
14      This is request number one, Mr. Salas;
15 do you see that?
16 **A.    Yeah.  Yes, sir, I'm sorry.**
17 Q.    It asks for, all federal and state
18 income tax returns for the following persons and
19 entities for the period of 2015 through the
20 present.  Those are the entities.  It says, any
21 other entity in which you were a member, owner,
22 partner, officer or shareholder.  And then it
23 says, any other account on which you were
24 an authorized signatory or in which you
25 deposited funds from which you withdrew funds.

94

1      Your attorney prepared an objection.
2  And then said, notwithstanding these objections.
3  I'm reading from response paragraph.
4  Notwithstanding these objections and subject to
5  the provision of the discovery order, as Judge
6  Harrison's order, Salas has attached his
7  personal income tax returns for 2014, 2015,
8  2016, 2017 and 2018 hereto.  I read that
9  correctly so far, haven't I?
10 **A.    Yes, sir.**
11 Q.    Then the last sentence says, Salas
12 states that CLR Trust, CLR Inc., CLR Corp. and
13 CLR, LLC did not file tax returns for any year
14 from 2014 to 2018.  I read that correctly,
15 didn't I?
16 **A.    Yeah, you read it correctly.  Yes,**
17 **but I'm not sure I'm agreeing with the**
18 **response.  The first time I'm seeing it, but,**
19 **yeah, go ahead.**
20 Q.    And that was my first question, is that
21 statement correct that --
22 **A.    That's what you read, yes.**
23 Q.    Pardon me?
24 **A.    That's what you read, yes, sir.**
25 Q.    Is the statement correct though, did

95

1  CLR Trust file any tax returns from 2014 to
2  2018?
3  **A.    I can't remember that.  I don't know.**
4  Q.    You're not aware of any?
5  **A.    I'm not -- I'm not aware of any.**
6  **Sounds like CLR, LLC -- it's probably not.**
7  **You know, I don't know, that's it.  I just**
8  **don't know.  I'm guessing now, and I don't**
9  **want to guess.**
10 Q.    Do you know if you provided this
11 information to your attorney?
12 **A.    I don't remember providing any of**
13 **this to my attorney.**
14 Q.    Okay.  Well, you don't believe your
15 attorney made this up, do you?
16 **A.    No, I don't believe he made it up.**
17 **You're asking me if this is -- am I aware?**
18 **No, I don't think -- I don't even know which**
19 **attorney it was.  But I don't -- sir, you**
20 **know, I'm not trying to be cute really.**
21 Q.    I understand.
22 **A.    I don't -- I don't...**
23 Q.    Unless there's something else you want
24 to say, let me let that go.
25 **A.    Okay. That's it.**

96

1  Q.    But if there's something that you want
2  to say, go ahead.
3  **A.    You can ask shorter questions.  You**
4  **know, sometimes I think you ask three**
5  **questions in one question, so it confuses me.**
6  **I'm a simple guy.  You know, I just need a yes**
7  **or no.  Past ten words, it's a little**
8  **difficult for me.**
9  Q.    I apologize.  I'm doing my best.
10 **A.    I understand, sir.**
11 Q.    Let me ask you this.  The main reason
12 why I went over this is, you did not mention in
13 your answer the 1610 Riggs Property Trust.
14 Previously, I believe you said that you were not
15 aware that the trust had filed a tax return.
16 But I want to make sure that is correct, and
17 that from the period of 2014 through 2018, 1610
18 Riggs Property Trust did not file a federal or
19 state income tax return?
20 **A.    Again, yeah, that sounds right.  Yes,**
21 **sir, that sounds right, but, you know, I can't**
22 **-- I'll be guessing if I knew that it**
23 **happened.  You know, I didn't -- I don't**
24 **remember saying that.  I don't -- see the**
25 **thing is, I don't remember even seeing this**

101

1  don't know.
2  Q.    Have you asked them whether they have
3  e-mails, such as the e-mails that we've reviewed
4  today between you and Ms. Boileau?
5  A.    No.
6  Q.    Now, Mr. Salas, your insurance company,
7  which I believe was Encompass, does that sound
8  right?
9  A.    Yes.
10 Q.    Did you receive or they awarded you,
11 whatever the correct wording is, proceeds that
12 you used to reconstruct or rebuild your home at
13 1610 Riggs Place, right?
14 A.    Yes. Yes, sir.
15 Q.    I'm assuming that you received
16 insurance proceeds from time to time for that
17 renovation or reconstruction?
18 A.    I can't remember what -- how it did.
19 So there was a guy that was managing that
20 project -- was managing that. Some guy called
21 an adjustment professional or something. So
22 I, you know...
23 Q.    Insurance adjuster or somebody like
24 that?
25 A.    That's it. There you go. Insurance

102

1  adjuster. No, it wasn't an adjuster.
2  Investigator or something. I don't know what
3  it was. It was somebody else that was -- in
4  other words, he...
5  Q.    You're saying that somebody on behalf
6  of the insurance company was monitoring the
7  renovation reconstruction and providing you with
8  payments for contractors and that sort of thing,
9  does that sound right?
10 A.    That sounds right. But, you know,
11 it's just one of those questions that is hard
12 for me to answer yes or no.
13 Q.    Okay.
14 A.    Maybe some. I don't know. I don't
15 remember.
16 Q.    Let me tell you what I'm trying to get
17 at. I'm trying to figure out the insurance
18 proceeds that you got for the rebuilding of the
19 house, what account they were put in? Was that
20 the CLR Construction account?
21 A.    Was there -- I don't -- was there a
22 CLR Construction account?
23 Q.    Yes, sir.
24 A.    Yeah, that sounds like that, but I
25 don't remember. This is a -- so that account

103

1  -- yeah, I mean, CLR Construction account,
2  yes, that sounds familiar, but, yeah.
3  Q.    None of those proceeds went into the
4  1610 Riggs Property Trust account, did they?
5  A.    The account or the property?
6  Q.    Well, maybe I confused you. Let me
7  backup.
8      Looking through your accounts, it does
9  not appear that any of the insurance proceeds
10 were deposited into an account under the name
11 1610 Riggs Property Trust; is that correct?
12 A.    That sounds correct, yes, sir.
13     MR. MCNUTT: Mr. Salas, I think that's
14 all I have.
15     THE WITNESS: Thank you.
16     MR. YOUNG: I have no questions.
17     (Court reporter asks for order.)
18     MR. MCNUTT: Electronic.
19     MR. YOUNG: Yes, ma'am, please.
20     THE TECH: Would you both like exhibits
21 attached on that?
22     MR. MCNUTT: Yes. Please.
23     Instructions about reading and signing,
24 you want to mention that?
25     MR. YOUNG: Max, you're allowed to read

104

1  your deposition transcript and make sure that
2  it's accurate and signoff on it before it becomes
3  official, if you want to. Or you're welcome to
4  waive that right. Do you want to review it
5  beforehand or waive that right?
6      THE WITNESS: Yeah, I like to review
7  it. I like to review it.
8      MR. YOUNG: We'll review it.
9      (Time noted: 12:29 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



# PLANET DEPOS®
## We make it » *happen.*™

Transcript of **Len Salas**

**Date:** March 9, 2016

**Case:** Brekelmans, et al. -v- Salas, et al.

Planet Depos, LLC
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: <www.planetdepos.com>

Worldwide Court Reporting | Interpretation | Trial Services



**EXHIBIT**
Creditors 15

SALAS_PX00623

**1**

1  SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
   CIVIL DIVISION
2
   - - - - - - - - - - - - - -x
3
   MICHAEL MCLOUGHLIN, JR.,  :
4  et al.,                   :
5  and            :   Case Nos.:
              : 2015 CA 8054 B and
6  NICOLAAS J. BREKELMANS,    : 2015 CA 8061 B
   et al,         : (consolidated)
7              : Calendar 12
         Plaintiffs,  :   Judge Brian F.
8              :   Holeman
      vs.      :
9              :
   LEN SALAS, et al.    :
10
         Defendants.  :
11              :
   - - - - - - - - - - - - - -x
12
13
14        Videotaped Deposition of LEN SALAS
15             Washington, D.C.
16           Wednesday, March 9, 2016
17               9:08 a.m.
18
19  Job No. 105983
20  Pages 1 - 127
21  Reported by: Paula J. Eastes
22  Videographer: Bangaly Cisse

**2**

1        Videotaped Deposition of LEN SALAS, held at
2  the offices of:
3
4       STEIN, MITCHELL, CIPOLLONE, BEATO &
5            MISSNER, LLP
6         1100 Connecticut Avenue, N.W.
7            Suite 1100
8         Washington, D.C.  20036
9            (202) 737-7777
10
11
12
13
14
15
16
17        Pursuant to agreement, before Paula J.
18  Eastes, Court Reporter and Notary Public in and for
19  the District of Columbia.
20
21
22

**3**

1        A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFFS MICHAEL MCLOUGHLIN,
4  MARTHA JOHNSON AND ESTATE OF MICHAEL PATRICK
5       MCLOUGHLIN:
6     RICHARD A. BUSSEY, ESQUIRE
7     STEIN, MITCHELL, CIPOLLONE, BEATO &
8       MISSNER, LLP
9     1100 Connecticut Avenue, N.W.
10    Suite 1100
11    Washington, D.C.  20036
12    (202) 737-7777
13
14  ON BEHALF OF THE PLAINTIFFS NICOLAAS J.
15  BREKELMANS AND THE ESTATE OF NINA BREKELMANS:
16    PAUL CORNONI, ESQUIRE
17    REGAN, ZAMBRI & LONG, PLLC
18    1919 M Street, N.W.
19    Suite 350
20    Washington, D.C.  20036
21    (202) 463-3030
22

**4**

1        A P P E A R A N C E S
2
3  ON BEHALF OF THE DEFENDANT LEN SALAS:
4
5     MICHAEL C. FORSTER, ESQUIRE
6     FORSTER LAW FIRM, PLLC
7     2007 Vermont Avenue, N.W.
8     Washington, D.C. 20001
9     (202) 400-2489
10
11  ON BEHALF OF THE DEFENDANT MAX SALAS:
12
13    RODERICK R. BARNES, ESQUIRE
14    ROLLINS, SMALKIN, RICHARDS & MACKIE, L.L.C.
15    401 North Charles Street
16    Baltimore, Maryland  21201
17    (410) 727-2443
18
19
20  ALSO PRESENT:  MAX SALAS
21
22

Case 23-90027 Document 483-11 Filed in TXSB on 08/17/25 Page 2 of 3
Exhibit 11 L Salas Deposition Transcript in Superior Court Litigation 3-9-16 Exc   Page 2 of 3
PX00823
PX00624

---

**29**

1    A   No.

2    Q   Did you identify rental income from Riggs

3    Place on any income tax returns?

4    A   No.

5    Q   Have you taken deductions for expenses

6    associated with rental of the property on any of your

7    income tax returns?

8    A   No.

9    Q   What do you know about 1610 Salas Trust?

10   A   Not much.  It is an account.

11   Q   What does that mean?

12   A   It is some kind of account I guess.  I

13   don't really know really.  It is just a Trust.

14   Q   Do you have any personal knowledge

15   regarding 1610 Salas Trust?

16   A   No actually.

17       I mean what I found out the other day from

18   your deposition of my father is what I know.

19   Q   Apart from what your father testified to at

20   his deposition had you ever heard of the 1610 Salas

21   Trust?

22   A   No.

---

**30**

1    Q   Do you have any personal knowledge of the

2    CLR Trust?

3    A   Yes.  That one I know.

4    Q   All right.

5        And what is the CLR Trust?

6    A   It is a Trust that I assume my dad set up

7    for when he died that he would split up the assets

8    equally among his three sons.

9    Q   And CLR are the initials of the first names

10   of the three sons?

11   A   Correct.

12   Q   Do you have any other information regarding

13   the CLR Trust?

14   A   No.

15   Q   Have you executed a deed transferring legal

16   title to the property to the 1610 Salas Trust?

17   A   No.

18   Q   Have you executed a deed transferring legal

19   title to the property to the CLR Trust?

20   A   No.

21   Q   To your knowledge has the 1610 Salas Trust

22   ever been identified as owner of the property in any

---

**31**

1    District of Columbia land records or other records?

2    A   I don't know.

3    Q   To your knowledge has the CLR Trust ever

4    been identified as owner of the property in any of the

5    District of Columbia's land records or other records?

6    A   I don't know.

7    Q   There was a memorandum filed by your

8    counsel in support of a motion by you to dismiss the

9    claim against you in which it talks about a verbal

10   agreement that you had with your father regarding the

11   property.

12   A   Correct.

13   Q   Had you had an opportunity to review the

14   contents of that memorandum?

15   A   No.

16   Q   It indicates that as part of that verbal

17   agreement he was going to live in some of the house or

18   some of the space and that he would rent out some of

19   the other rooms.

20   A   Correct.

21   Q   So part of the verbal agreement you had

22   with your father was that he would rent out some of

---

**32**

1    the rooms in the building?

2    A   Yes.

3    Q   Was it your understanding that he would use

4    the rental income to pay the monthly mortgage

5    obligation on the property?

6    A   Yes.  I guess.  Yes.

7    Q   Were you aware that he had rented rooms to

8    tenants after you took legal title to the property in

9    April of 2007?

10   A   At that time it was I assume the basement.

11   Q   I am taking you from April 2007 up through

12   June 3, 2015.

13   A   Right.

14   Q   During that time were you aware that from

15   time to time he had rented rooms to tenants after you

16   took legal title to the property?

17   A   Yes.

18   Q   And as of June 3, 2015 were you aware that

19   there were tenants living in the building?

20   A   Repeat your question.

21   Q   As of June 3, 2015 were you aware that

22   there were tenants living in the building?

---

Case 3:20-cv-00027 Document 98-1 Filed 02/21/24 Page 95 of 34 PageID #: 4688
Exhibit 11 L Salas Deposition Transcript in Superior Court Litigation 3-9-16 Exc    Page 3 of 3

PX00625

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                        .    Case No. 18-00260-smt
                              .
MAX E. SALAS,                 .
                              .    Washington, D.C.
            Debtor.           .    August 22, 2018
                              .
. . . . . . . . . . . . . . . .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 1 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:
For the Debtor:           Stinson Leonard Street, LLP
                          By: MARC E. ALBERT
                              JOSHUA W. COX
                          1775 Pennsylvania Avenue, NW
                          Suite 800
                          Washington, D.C., 20036
                          (202) 728-3020

For the Creditors:        By: PHILIP J. McNUTT
                          11921 Freedom Drive
                          Suite 584
                          Reston, Virginia  20190
                          (703) 904-4380

Court Recorder:           THE CLERK

Transcribed By:           MS. KRISTEN SHANKLETON




Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

Case 23-10095 Doc 74-1 Filed 06/03/24 Entered 06/03/24 15:56:34 Desc
Case 1:20-cv-00927 Doc 4-1 Filed 06/25/24 Page 09/01/22 Page 1 of 48
Exhibit 12 R Salas Testimony at Exemption Hearing 8-22-18    Page 1 of 48
APPX00626

TABLE OF CONTENTS

OPENING STATEMENTS:                           PAGE:
By Mr. McNutt                                 10
By Mr. Albert                                 27


WITNESSES:                                    PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt              37

LEN SALAS
Direct examination by Mr. Albert              98
Cross-examination by Mr. McNutt               116
Redirect examination by Mr. Albert            187
Recross-examination by Mr. McNutt             199


RON SALAS
Direct examination by Mr. Albert              206
Cross-examination by Mr. McNutt               219
Redirect examination by Mr. Albert            245

EXHIBITS:                               MARKED:  RECEIVED:


DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)         *        9
B.  4/16/07 deed of trust                  *        9
       (L.Salas/SunTrust) with 7/8/15
       Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement     *        9
D.  7/6/10 L.King journal entries          *        9
E.  Encomass insurance policy              *        9
F.  1610 lease documents                   *        9
G   Email chain beginning 2/14/18          *        --
       R.Salas to insurance counsel
H.  3/19/18 emergency motion for           *        9
       summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules *        9
J.  M.Salas Answer to Interrogatories      *        9
       (Brekelmans case)
K.  M.Salas Answer to Interrogatories      *        9
       (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S | | |
| 1.  Trial Transcript, 3/26/18, pp.1-19 | * | 8 |
| 2.  Joint pretrial statement, 7/18/17 | * | 8 |
| 3.  Pretrial order, 12/29/17 | * | 8 |
| 4.  Amended joint pretrial statement, 2/15/18 | * | 8 |
| 5.  McLoughlin Complaint, 10/20/15 | * | 8 |
| 6.  Brekelmans Complaint, 10/20/15 | * | 8 |
| 7.  L. Salas Answer (Brekelmans Complaint) 11/13/15 | * | 8 |
| 8.  L. Salas Answer (McLoughlin Complaint) 11/13/15 | * | 8 |
| 9.  M.Salas Answer (McLoughlin Complaint) | * | 8 |
| 10. M.Salas Answer (Brekelmans Complaint) | * | 8 |
| 11. Memorandum in support of L.Salas motion to dismiss | * | 8 |
| 12. M.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 13. L.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 14. M.Salas Deposition Transcript dated 2/14/16 | * | -- |
| 15. L.Salas Deposition, 3/9/16 pages 117-120 | * | 54 |
| 16. 4/27/95 deed (Wilhelm/Bruff) | * | 8 |
| 17. 4/16/07 deed (Bruff/M.Salas) | * | 8 |
| 18. 4/16/07 deed (M.Salas/L.Salas) | * | 8 |
| 19. Deed of trust (L.Salas/Sun Mortgage) | * | 8 |
| 20. Property request report for 1610 Riggs Place Northwest | * | 8 |
| 21. D.C. notice of infraction | * | 8 |
| 22. DCRA notice of immediate abatement | * | 8 |
| 23. Memorandum in Support of L. Salas' Emergency Motion for Summary Judgment | * | 8 |
| 24  8/10/18 R.Salas deposition excerpts | * | -- |
| 25. Lease, 10/1/14 - Tamasco | * | 8 |
| 26. Lease, 6/2/14 (first page) | * | 8 |
| 27. Lease, 17th of 2014 to Brekelmans | * | 8 |
| 28. Lease, 8/17/14 to Brekelmans | * | 8 |
| 29. Lease, 11/1/14 to Mecham | * | 8 |

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S (continued) | | |
| 30. Irrevocable Trust, 7/6/10 | * | 8 |
| 31. Cornet letter, 5/19/17 | * | 8 |
| 32. Debtor's report, excerpts, 4/5/18 | * | 8 |
| 33. Debtor's report, excerpts, 6/8 | * | 8 |
| 34. Excerpts, L.Salas, first Meeting of creditors, 5/24/18 | * | -- |
| 35. M.Salas Answers to Interrogatories, 8/6/18 | * | 8 |
| 36. Debtor's schedules A/B, C-J, 5/2/18 | * | 8 |
| 37. Debtor's responses, 8/6/18 | * | 8 |
| 38. Debtor's statement of financial affairs(D-13), 5/2/18 | * | 8 |
| 39. Debtor's amended statement of financial affairs(D-50), 6/27/18 | * | 8 |
| 40. Debtor's amended petition | * | 8 |
| 41. R.Salas email (trust documents) | 231 | -- |

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of "(unintelligible)" in this transcript are due to the audio recording levels being turned up too high, or individuals speaking outside of the vocal capture range of the microphone.

1    Court.  We'll have to discuss that once we're finished.

2              RON SALAS, DEBTOR'S WITNESS, SWORN

3              THE CLERK:  Please have a seat and state your name

4    for the record.

5              THE WITNESS:  Ron Salas.  S-a-l-a-s.

6                        DIRECT EXAMINATION

7              BY MR. ALBERT:

8         Q.   Thank you for traveling all the way from Denver.

9    We appreciate it.

10        A.   You bet.

11        Q.   What is the relationship with the Debtor, Max

12   Salas, please?

13        A.   I'm his eldest son.

14        Q.   Where do you live, please?

15        A.   I live in Fort Collins, Colorado.

16        Q.   And what is your occupation?

17        A.   I am an attorney.

18        Q.   And when were you admitted to practice and in what

19   state?

20        A.   In the state of Colorado, 2009.

21        Q.   Are you familiar with the property located at 1610

22   Riggs Place Northwest?

23        A.   I am.

24        Q.   And what is your familiarity with the property?

25        A.   It's my father's home.  Lived there since '95 or

1  '96.

2      Q.  Do you know if the D.C. records display the

3  property as being your father's name?

4      A.  My current knowledge is that it is the official --

5  it is -- the recorded deed is in my brother's name, but

6  there was a quit-claim deed signed years ago that

7  transferred it from my brother to a trust and my father.

8      Q.  Do you know why the property was transferred to

9  your brother at some point?

10     A.  Yes.  So originally it was in my step-mother's

11 name, my father's second wife.  They divorced.  When they

12 did so the house needed to be refinanced so that she could

13 get her marital portion of the property.  My father was

14 unable to refinance it at that point in time.  And my step-

15 mother, Vicki Bruff, and my father asked my brother to see

16 if he could refinance it in his name.  And so, you know, so

17 that she could get the buyout with the intent of my father

18 getting a loan thereafter and doing it, so that's what --

19     Q.  Doing what?

20         I'm sorry.  I couldn't hear you.

21     A.  Yeah, the intent was that my father would

22 refinance the loan when his credit, when his

23 creditworthiness met that so that he could do so, and then

24 refinance it and keep it in his name; keep his house.

25     Q.  Who do you consider to be the owner of the

1   property?

2       A.   My father.

3           MR. McNUTT:  Objection.  No foundation for who he

4   considers --

5           THE COURT:  Overruled.  It's not received as

6   anything other than his understanding.  It's not going to

7   determine the title.

8           BY MR. ALBERT:

9       Q.   Why do you say your father?

10      A.   Because my father has lived in the home as I said

11  since '94, '95, '96; in that area.  He purchase the home,

12  he remodeled the home -- bless you, Your Honor -- he

13  remodeled the home several times.  He lived there with my

14  step-mother.  To my knowledge he, you know, paid all the

15  bills and no one else did.  So it's his home.  I visited

16  there over the years a multitude of times with my children

17  and had holidays there.  It's his home.

18      Q.   What was Len's role in connection with this

19  property?

20      A.   Len lived there briefly before the divorce, and

21  then he lived there briefly after the divorce with his I

22  think then girlfriend and now wife.  But that was less than

23  a year is my recollection back in, I don't know, mid-

24  nineties.  Other than that, that's the only relationship I

25  know.  Well, I know that he was, besides the loan that I

1    spoke of earlier.

2         Q.   The loan was in his name, correct?

3         A.   The records that I've seen recently in depositions

4    and such indicate that yes, the loan was in his name until,

5    I guess the loan is still in his name.  I don't know that,

6    though.

7         Q.   Did you ever help your father and Len do anything

8    to further confirm the property was Max's?

9         A.   Yes.  So, you know, after my -- so one of the

10   reasons my sister-in-law and brother moved out is they

11   didn't get along.  My sister-in-law didn't get along with

12   Max, and it was a bone of contention that the home was

13   still in his name, and he wanted to get it off.  My brother

14   and my father asked me to do a, set up a trust or set up a

15   document to transfer the home out of my brother's name and

16   put it back into his name because it was his home.

17        Q.   Who's name?

18        A.   Into Max's name, my father, because it was a

19   stress on my brother's marriage, and it was a stress on my

20   brother.  And so shortly after, you know, I graduated from

21   law school I prepared those documents for them per their

22   request.  We prepared a quit-claim deed, we prepared a

23   trust.  I had them at my office to sign those documents,

24   and --

25        Q.   Can I interrupt for a minute?

1    A.   Yes.

2    Q.   You said put it in your father's name, but then

3  you switched to a trust.  Can you --

4    A.   It was a trust document that we set up rather than

5  directly into his name.  So it was a trust with him as the

6  sole beneficiary of the trust, and he as the trustee of the

7  trust.  So, but yes.  That was the plan.  The plan was to

8  get it out of my brother's name.

9    Q.   Okay.

10   A.   That was the intent.

11   Q.   Thank you.

12        And so let's look at that Exhibit Number C

13  document in the little, I think it's the little book.  Yes.

14  Would you look at that document, or documents please?

15   A.   That's C as in Charlie?

16   Q.   Yes.

17   A.   Yes.

18   Q.   What's the title of the first page, please?

19   A.   It's Irrevocable Trust Agreement.

20   Q.   Okay.  And if you go to the back, the end, what's

21  the title of that document, the last page?

22   A.   The last page is a quit-claim deed.

23   Q.   All right.  And have you seen these documents

24  before?

25   A.   I have, yes.

1     Q.   Who prepared these documents?

2     A.   I prepared them.

3     Q.   All right.

4          And did you have your brother and your father in

5     your office with respect to these documents?

6     A.   I did.

7     Q.   And what happened at that time?

8     A.   At that time myself, my father, my brother, and

9     his wife were present.  We signed the trust documents.  I

10    as a witness, my sister-in-law as a witness.  It was a

11    notary present.  We signed the trust agreement.  We signed

12    the quit-claim -- well, I did not sign the quit-claim.  The

13    quit-claim deed was signed by my brother Len and Max, and

14    the deed was given to, from Len to Max, the original to be

15    filed.  And a copy was given to my brother for his records,

16    and I kept a copy.

17    Q.   Okay.

18         And these documents were notarized also, correct?

19    A.   They were, yes, that's correct.

20    Q.   And who notarized them?

21    A.   Lori King.  She worked in my office at that point

22    for several years and she notarized -- well, it was a

23    shared office.  She worked in the office as a receptionist.

24    She notarized documents for the attorneys in the office.

25    Q.   Okay.

1            And you witnessed the other people, including the
2    notary signing, were appropriate?
3        A.   I did.
4        Q.   You saw your brother sign, you saw your father
5    sign?
6        A.   Yes.
7        Q.   Did you review these documents with them before
8    they signed them?
9        A.   Yes, I did.
10       Q.   And do you know whether these documents were ever
11   recorded?
12       A.   I know today that they were not recorded.  My
13   assumption was that they were, but as of today I knew they,
14   I know now that they were not.
15       Q.   Okay.
16            Did there come a time you knew your father and
17   brother were involved in litigation involving the deaths
18   that occurred from a fire in 2015?
19       A.   Yes.
20       Q.   What did you, who did you learn about this
21   litigation from and what did you learn?
22       A.   I learned that they were both named in a lawsuit.
23   I don't recall who contacted me first, whether it was my
24   brother or my father.  I know they both at some point did.
25   Both sent me copies of the summons or petition, summons I

```
 1  guess at that point.  I don't recall what it was.  I know
 2  that I spoke to my brother and he was upset.  But so
 3  sometime after the accident or incident a year or so later,
 4  nine months, I don't recall exactly, after the fire.
 5       Q.   There was a lawsuit filed?
 6       A.   There was a lawsuit filed.
 7       Q.   You're not sure you remember when?
 8       A.   Right.  I don't remember exactly, no.
 9       Q.   What did you think of Len being involved in the
10  litigation?
11            MR. McNUTT:  Objection.
12            THE COURT:  Overruled.
13            THE WITNESS:  At that point I was a bit surprised.
14  I did not -- we prepared the documents previously.  I
15  didn't think that my brother had any ownership interest at
16  that point.  I don't even know if he was still living in
17  the district.  He may have been.  And I asked him why, and
18  we looked at it, and it said that he was the registered
19  owner of it, or the deeds showed that he was indicated.  I
20  said, "Wow, that's not good."  I said, "You probably need
21  to get an attorney and make sure that they understand that
22  you don't even own the property."
23            BY MR. ALBERT:
24       Q.   Did your brother get an attorney?
25       A.   He did later get an attorney, yes.
```

1    Q.   And what was his name, do you remember?

2    A.   Michael Forester I believe was his attorney at the

3 trial.  I don't know if that was the attorney for the

4 entire period.  I don't know.

5    Q.   There's -- there's going to be a lot of questions

6 I'm sure after I finish about whether or not you provided

7 the trust documents to your brother and your father, their

8 lawyers, opposing counsel?

9    A.   I didn't.  I didn't provide them.  I assumed they

10 had them.  Honestly I didn't think about it a lot.  I knew

11 what we had done, but I didn't think about providing the

12 documents.  I was never asked for them.  They had

13 attorneys.  I assumed if they needed them and if they were

14 being properly vetted by an attorney that they would search

15 for those documents, they'd ask for those documents if they

16 needed them.  I, you know, I don't practice in the

17 district.  I don't -- you know, as an attorney I don't like

18 when other attorneys from family members get involved in my

19 cases, so I kept my distance.  I didn't think it was

20 appropriate for me to do that.  I don't do insurance

21 defense, so I didn't get involved.

22    Q.   Did there come a time that you did provide the

23 trust documents and the quit-claim deed?

24    A.   I did.  Once it was getting close to trial time, I

25 know I told my father that if it were to happen that he

1  needed to contact a bankruptcy attorney, because that's
2  what I do, and I provided him some names, and I believe he
3  hired you.  I know he did.  And then you contacted me after
4  your interview with him and asked if -- because he
5  mentioned to you there was a trust document.  And he said,
6  "You know, Mr. Albert asked me about the trust, the copy
7  that I had, burned.  And I need one.  Do you have one?"  I
8  said, "Yeah, I have it."  And so that was shortly before
9  the trial I provided it to you.
10      Q.   We spoke on the phone?
11      A.   Yes, you called me a couple of times.  And I
12  finally was able to locate it and get it to you.
13      Q.   And then what happened at that point?
14      A.   I provided it to you.  I believe you provided it,
15  or Max provided it to his attorney in the civil litigation.
16  However, because of the late date had passed and the Judge
17  in that case barred that information from coming in due to
18  disclosure deadlines being missed --
19          THE COURT:  What did you retain, a photocopy or a
20  scanned copy?
21          THE WITNESS:  A scanned copy.
22          THE COURT:  Back in July of 2010 you created a
23  scanned copy and retained that electronic copy?
24          THE WITNESS:  That's correct, Your Honor.  That's
25  my process.  I scan every document and keep it in a e-file.

1   Soft copy.

2           THE COURT:  And so that's what you sent to Mr.

3   Albert?

4           THE WITNESS:  I sent to Mr. Albert, yeah, I have a

5   scanned copy --

6           THE COURT:  Well, you sent to somebody at Mr.

7   Albert's request?

8           THE WITNESS:  It was Mr. Albert directly spoke to

9   me.  He asked me if I had it.  I said I have it somewhere

10  in my scanned documents.  I found it and I emailed the PDF

11  copy to him.

12          THE COURT:  All right, thank you.

13          THE WITNESS:  Yes, sir.

14          BY MR. ALBERT:

15      Q.  Do you know of any reason why you, your brother,

16  or your father would purposely keep this trust document,

17  quit-claim deed away from their own lawyers or the opposing

18  parties in the litigation?

19      A.   No.  I mean I assumed they had it; they were

20  working their case, they knew what was going on.  You know,

21  had I known, I wish I would have provided these documents

22  immediately, but I ignorantly at this point thought that

23  they would come up.  My brother had a copy, my father had a

24  copy, and that they were working towards that.  I just, you

25  know, hindsight now, I wish I'd have been more involved,

1    but I'm, you know, 3,000 miles away.  I have, at the time

2    two teenagers.  My son was involved in the fire and was

3    going through issues because of it.  You know, I just, I --

4    I didn't think about it.

5         Q.   And at the time of the trial, a little before

6    that, did you have some other personal events that caused

7    you to focus on other issues?

8         A.   Yeah.  You know, three months before my son was

9    murdered, and, you know, it was a grieving time for the

10   family, and I just -- you know, I was thinking about my

11   wife and my daughter.

12        Q.   I'm sorry.

13        A.   No, it's okay.

14        Q.   Just a couple other questions.

15        A.   Sure.

16        Q.   The fire took place in June, was it June of 2015?

17        A.   Three years, yes.

18        Q.   Was your father injured in the fire?

19        A.   Yes.  My father and my son escaped the fire.  He

20   jumped from a second story window.  My father broke his

21   ankle I believe.  He had --

22             MR. McNUTT:  Your Honor, I'm going to object

23   because this is information that's not personal knowledge,

24   not first-hand knowledge of this witness.

25             THE COURT:  It's cumulative, too, Mr. Albert.

1  Sustained.

2          MR. ALBERT:  It is, but can I, just a couple

3  questions on it?

4          I understand it's cumulative.  May I just ask a

5  couple questions or no?

6          THE COURT:  Well, he learned of that information.

7  He learned of that information.  That's obvious.

8          MR. ALBERT:  Well, I was going to ask him what his

9  condition of his father was after the fire, if he could

10  tell the Court.

11          THE COURT:  All right.

12          BY MR. ALBERT:

13  Q.  How was your father physically and mentally doing

14  after the accident?

15  A.  My father had a tough time.  He had to see

16  therapists.  He was under medication for pain for his

17  breaks.  He had a difficult time --

18          MR. McNUTT:  Objection again, Your Honor.  This is

19  second or third-hand information.  Mr. Max Salas may be

20  able to testify to this, but I don't understand how his son

21  can.  There's been no establishment of any foundation for

22  the information that this witness would know in his

23  personal first-hand information.

24          THE COURT:  Sustained.

25          MR. ALBERT:  Judge, I have no further questions.

1          Thank you.

2          THE COURT:  The answer to the question is

3    stricken.

4          MR. ALBERT:  I'm sorry, Judge?

5          THE COURT:  The partial answer to the question is

6    stricken.

7          MR. ALBERT:  Yes, sir.  Thank you.

8                    CROSS-EXAMINATION

9          BY MR. McNUTT:

10    Q.   Good afternoon, Mr. Salas.

11    A.   Good afternoon.

12    Q.   I have to tell you, this is the first time I heard

13    about your son, and I am, you know, as a parent myself, I

14    can't imagine what that's like or what you may even be

15    going through now.  So I apologize for you to have to be

16    here and go through this, but I really do sincerely --

17    A.   Thank you.

18    Q.   I mean, this is a tough case obviously for the

19    reasons that my clients' family have gone through as well.

20    So we have to carry on as they say.

21    A.   Yes.

22    Q.   I have just a couple of questions, a few questions

23    I should say, based on your testimony.

24          You said in your testimony that in July of 2010

25    your intent was to create a document that would get the

1     property out of your brother's name.  Is that a fair

2     characterization of your testimony?

3         A.   Yes.

4         Q.   Now, you also said at the time I believe that you

5     were a fairly young attorney, is that right?

6         A.   That's correct.

7         Q.   How long after you had passed the bar?

8         A.   Six, eight months.

9         Q.   And I believe when I took your deposition I

10    believe you said that your primary focus for your practice

11    is in the area of bankruptcy and then some estates and

12    trusts.  I think you also did a smattering of minor

13    criminal matters and immigration matters.  Is that fair?

14        A.   Majority is bankruptcy, probably 70 percent.  I do

15    20 percent family law, divorce.

16        Q.   Okay.

17        A.   And then a smattering of the other issues.

18        Q.   Not much in the way of estates and trusts?

19        A.   No.

20        Q.   And no real estate practice?

21        A.   None.

22        Q.   Now I would think that as an attorney talking

23    about transfer of property that the first thing that would

24    come to mind would be a deed.  And you did prepare a quit-

25    claim deed?

1    A.    Yes.

2    Q.    Why was there no quit-claim deed?  Why was there a

3  need for a trust?  Why wasn't the property just deeded from

4  Ron -- from your brother to your father?

5    A.    Because at the time my father had some outstanding

6  tax issues, and there was fear that if it was placed

7  directly in his name it would be easier to lien the

8  property.

9    Q.    All right, and I believe -- that's fair.

10    And in your testimony I believe you said that your

11  father has had continuous tax problems for a long period of

12  time?

13    A.    He's had tax problems since the late '90s.

14    Q.    All right, so --

15    A.    Or early '90s.  Excuse me.

16    Q.    So it was important for this transaction that the

17  property not be in your father's name.  Is that accurate?

18    A.    Directly in his name, that's accurate.

19    Q.    Okay.

20    Because if the property was in his name there was

21  a possibility that these tax issues or tax liens I guess

22  they were, would have attached to your father's property,

23  correct?

24    A.    Correct.

25    Q.    Now, you said that after the transaction you said

1    that you kept a copy electronically.  You gave a copy to

2    your father -- I'm sorry.  Did you say you gave the

3    original or a copy to your father?

4         A.   My father had an original.

5         Q.   All right.

6              And you said that your brother had a copy.  Do you

7    know if there were any other copies?  Do you know if your

8    brother and sister had a copy?

9              MR. ALBERT:  Brother and sister?

10             MR. McNUTT:  Oh, I'm sorry.  What did I say?

11             Thank you for mentioning that.

12             BY MR. McNUTT:

13        Q.   I'm sorry.  Your brother's wife I meant obviously.

14   I don't know where -- and I keep calling you the brother,

15   the son; I don't know.

16        A.   That's all right.  No problem.

17        Q.   I apologize.

18        A.   She may have.  I don't know for a fact, but now

19   that you say that, I kind of remember that she may have

20   wanted to have a copy of her own, but I don't recall with

21   certainty.

22        Q.   But she was there, so she certainly knew that this

23   had taken place?

24        A.   That is correct.

25        Q.   And I heard you say I think in your response to

1   Mr. Albert's questioning that you explained the documents

2   to your father and your brother.  Was your brother's wife

3   there at the time you explained it as well?

4       A.   She was.

5       Q.   So all those parties knew what the purpose of the

6   document was and what the effect was, and you told them

7   that the effect of the document was that the property would

8   no longer be owned by your brother; it would be out of his

9   name?  Is that fair?

10       A.   Yes.

11       Q.   Okay.

12       And that never happened because the deed was never

13   recorded.  Is that also fair?

14       MR. ALBERT:  Objection.  He says it never

15   happened.  That's not true.

16       THE COURT:  Sustained.  It involves a conclusion

17   of law.

18       BY MR. McNUTT:

19       Q.   Well, let me ask you what your understanding was

20   then, because the deed was, as you now understand because

21   the deed was never recorded, do you know what affect that -

22   - do you have an understanding of what the effect was on

23   the ownership of the property?

24       MR. ALBERT:  Objection.  Is Mr. Salas an expert

25   witness today?

Exhibit 12 R Salas Testimony at Exemption Hearing 8-22-18   Page 22 of 48        APPX00647

```
 1          THE COURT:  The objection is sustained.
 2          MR. McNUTT:  Thank you, Your Honor.
 3          THE COURT:  What were you trying to accomplish by
 4  having title transferred to a trust of which Max Salas was
 5  the beneficiary?
 6          THE WITNESS:  To get the house back in control of
 7  my father because it was his house.
 8          MR. McNUTT:  All right.
 9          THE COURT:  What was the purpose of having him
10  have control of the house?
11          THE WITNESS:  To relieve my brother from any
12  responsibility because his name happened to be on it, and
13  he had no interest in it.
14          THE COURT:  What kind of responsibility?
15          THE WITNESS:  I thought he had minimal
16  responsibility.  His wife disagreed and didn't want any
17  ties to my father and the home whatsoever.  And, there was
18  a loan and the point was to get it refinanced because there
19  was still the loan in my brother's name which he didn't
20  want responsibility for should my father default on that
21  loan because my father had been paying the mortgage.  And
22  my brother had no knowledge of if he was paying or if he
23  was not paying.
24          THE COURT:  Did you have discussions about
25  refinancing of the loan?
```

```
 1            THE WITNESS:  No.  I mean, other than my brother
 2   wanted my father to do it, but I didn't have any
 3   discussions in who should be doing it or what needed to
 4   take place.
 5            THE COURT:  Go ahead, Mr. McNutt.
 6            MR. McNUTT:  Thank you, Your Honor.
 7            BY MR. McNUTT:
 8       Q.  Mr. Salas, the quit-claim deed that you prepared,
 9   and I think you were looking at the Debtor's book, so let's
10   use that.  I think it's Exhibit C?
11       A.  Yes.
12       Q.  And specifically as you look at the quit-claim
13   deed, in the first paragraph it states the parties to the
14   deed, and the person conveying is Len Salas in the first
15   line.  Do you see that?
16       A.  Yes.
17       Q.  And then the recipient of the property, the quit-
18   claim deed to is named 1611 Riggs Property Trust.  Do you
19   see that?
20       A.  Yes.
21       Q.  Do you know what the 1611 Riggs Property Trust is?
22       A.  It's a typo is my guess.  I don't know the -- the
23   trust was the 1610 Riggs Property Trust.  The common
24   address in the real property is 1610 Riggs Place, and the
25   house is 1610 Riggs Place, so.
```

1    Q.   Okay.

2    A.   I think I just made an error typing it.

3    Q.   Okay.

4         So tell me, did you prepare a corrected deed?

5    A.   No.

6    Q.   So this is the only deed that you prepared with

7    respect to the purport transfer of the property from Len

8    Salas to his father as trustee, is that accurate?

9    A.   I believe that is correct.  I do not recall any

10   other one.

11   Q.   All right.

12        Now, do you know -- let's just take what your

13   knowledge is in Colorado.  I'm assuming that you have a

14   deed to your property there?

15   A.   I do.

16   Q.   Have you ever seen other deeds in the performance

17   of your practice as an attorney?

18   A.   I have.

19   Q.   All right.

20        With respect to estates and trusts and those sorts

21   of things did you see deeds from time to time?

22   A.   I see them -- not really.  I see more quit-claim

23   deeds in my divorce work.  When one party leaves a

24   marriage, we typically quit-claim it over to the other

25   party so that they can refinance that debt and pay off the

 1   other spouse, so.

 2       Q.   Okay.

 3       A.   I see it more in that context.

 4       Q.   All right.

 5            This deed states that the property is being quit-

 6   claimed to the 1611, and I understand that's a typo, but

 7   the 1611 Riggs Property Trust.  Do you know if the deed can

 8   be recorded in the name of the Riggs Property Trust, or

 9   does it have to be recorded in the name of the trustee, Max

10   Salas?

11       A.   In Colorado we can transfer it to the trust.  I

12   don't know in D.C.

13       Q.   All right.

14            If I told you in D.C. the property would have to

15   be titled in the name of Max Salas as trustee would that

16   affect your plan to quit-claim the property without putting

17   it in your father's name?

18       A.   I think the plan would have been the same.  The

19   plan was to transfer it to them.  If that is required in

20   D.C. and I made an error, then I -- I don't know.  Didn't

21   change the plan, sir.

22       Q.   Well, and you told me in your deposition, did you

23   not, that you didn't look at D.C. law to determine what was

24   required with respect to either the trust or the quit-claim

25   deed, correct?

1  A.  That's correct.

2  Q.  In fact, you used a Colorado form book --

3  A.  That's correct.

4  Q.  -- to prepare both documents, correct?

5  A.  Yes.

6  Q.  So as you sit here today you still don't know

7 whether or not a deed that states it's being deeded,

8 property is deeded to 1611 Riggs Property Trust, which

9 admittedly is a typo but that's what it says, could be

10 deeded in the name of the trust or would have to be deeded

11 in the name of the trustee, Max Salas?

12  A.  I don't know.

13  Q.  You don't know?

14  A.  That's correct.

15  Q.  All right.

16    And if it was Max Salas, that would create the

17 same problem with respect to the taxes or other obligations

18 of your father, correct?

19  A.  As trustee I don't know.

20  Q.  It would be under the name of Max Salas, trustee.

21 So his name would be on the deed.  That would present a

22 problem if he had tax issues, right?

23  A.  I don't know.

24  Q.  Okay.  You don't know.  Fair enough.

25    THE COURT:  His name would show up in the land

Exhibit 12 R Salas Testimony at Exemption Hearing 8-22-18    Page 27 of 48
APPX00652

1    records as having some sort of interest in the property,
2    whereas if it were recorded in the name of the trust he
3    wouldn't show up in the land records necessarily, correct?
4            THE WITNESS:  I agree with that, yes, Your Honor.
5    What threw me with the question is Max Salas, trustee.  I
6    don't know if -- if the trustee portion would skew it or
7    not.
8            THE COURT:  If the IRS started looking at land
9    recorded they'd see Max Salas, that it had been recorded in
10   the name of Max Salas, trustee, and they might start
11   investigating what the trust said, correct?
12           THE WITNESS:  That's fair.  Yes, Your Honor.
13           THE COURT:  All right.
14           BY MR. McNUTT:
15       Q.   Now, Mr. Salas, would you take a look at what's
16   been introduced in evidence, and these actually appear in
17   both books, but this is Tab F in the smaller binder.  These
18   are a series of lease documents.  It looks like there are
19   one, two, three, four, five lease documents.  Would you
20   look at those, please, each of the five documents and tell
21   me when you've had a chance to look at them?
22       (At 4:57 p.m., brief pause as witness reviews
23       documents.)
24           THE WITNESS:  Okay.
25           BY MR. McNUTT:

1     Q.   If you look at the first one, the one that has the
2 exhibit stamp on it, or did -- I'm sorry.  Exhibit sticker
3 on it?
4     A.   Yes.
5     Q.   It looks like it's dated the first day of
6 November, 2014.  The tenant is John Mechum, and the
7 landlord it says is Max Salas CLR.  Do you see that?
8     A.   I do.
9     Q.   Do you know what CLR is?
10    A.   No.
11    Q.   Okay.
12         It also says, if you look down, I guess it's maybe
13 the third paragraph where it says, "Payment of rent will be
14 made to."  Do you see that?
15         Same page.  "Payment of rent will be made to."  Do
16 you see that?
17    A.   Which number?  Oh, yes.  Yes.
18    Q.   Right above number 1?
19    A.   Yes.  I see, yes.
20    Q.   Okay.
21         And it also says, "Max Salas CLR."  Do you have
22 any recollection what CLR is?
23    A.   I've heard CLR years ago, but I don't know exactly
24 what type of entity it is.  I don't know what it is.  I've
25 heard the initials, acronym.

Case 2:20-ap-90027 Doc 74-1 Filed 06/03/24 Entered 06/01/27 15:56:34 Desc
Exhibit 12 R Salas Testimony at Exemption Hearing 8-22-18    Page 29 of 48

APPX00654

1    Q.   Okay.  And you know obviously that the initials

2  CLR stand for, could stand for at least, Chase, Len, and

3  Ron, right?

4    A.   I've heard them in that context.  I don't know

5  what it is.

6         MR. McNUTT:  Okay.

7         Now, Your Honor, I'd like to offer a document that

8  I have not put in the book yet.  This is Exhibit 41.

9         THE COURT:  Forty-one.

10        MR. McNUTT:  I made copies before I put the

11 exhibit sticker on it, but I do have the exhibit sticker on

12 the original at least.  I apologize for that.

13        I have two copies for the Court, Your Honor.

14     (At 5:00 p.m., Creditor Exhibit 41 marked.)

15        MR. ALBERT:  Judge, I think we were supposed to

16 submit all of our exhibits by date certain.

17        MR. McNUTT:  This is an impeachment document, Your

18 Honor.

19        MR. ALBERT:  I suggest this relates to the

20 documents that he was objecting to in my exhibit book.

21 This is one page out of a series of pages.  I would suggest

22 that we have to include all the documents that --

23        MR. McNUTT:  Well, Your Honor, the reason I have

24 this document is because we objected, as you recall to

25 Exhibit G, and the reason we objected to it is because it

1    had that hearsay statement by Mr. Albert actually.

2              This document represents the actual email, an

3    actual email sent by Mr. Ron Salas to Mr. Albert with the

4    trust document that is at issue here.  And I believe it's

5    admissible because it is a statement against interest, and

6    it impeaches the witness' prior testimony that he gave

7    copies, that he gave the original to his father.

8              MR. ALBERT:  Judge, I think if you look at the

9    whole series of emails it explains that that was a mistake,

10   and so we might as well have all the documents --

11             MR. McNUTT:  This --

12             MR. ALBERT:  It was quickly corrected that he

13   indicated, "No, it wasn't the originals.  It was a copy."

14             MR. McNUTT:  That -- Your Honor, you can look at

15   Exhibit G.  What Exhibit G says --

16             THE COURT:  The objection to the exhibits is

17   overruled.  You may ask the witness about it.

18             MR. ALBERT:  I'm sorry, Judge?

19             THE COURT:  The objection is overruled.  He may

20   ask the witness about it.

21             MR. McNUTT:  All right.

22             So Exhibit G is in evidence then, Your Honor?

23             THE COURT:  It's not in evidence yet.  It hasn't

24   been authenticated yet.

25             MR. McNUTT:  Okay.  All right.

 1          If you would turn in the -- it's still in the
 2   book, right?
 3          MR. ALBERT:  I'm sorry?
 4          MR. McNUTT:  It's still in the book, right?
 5          MR. ALBERT:  In my book.
 6          BY MR. McNUTT:
 7     Q.   If you would look at Exhibit G?
 8     A.   Yes.
 9          THE COURT:  Well, Exhibit 41 is what I was ruling
10   upon.
11          MR. McNUTT:  Oh, I'm sorry.  Oh, I'm sorry.  I
12   apologize, Your Honor.
13          Then don't look at Exhibit G.
14          THE WITNESS:  Okay.
15          MR. McNUTT:  I haven't handed this to the witness.
16   May I approach?
17          I apologize, Your Honor.  I misunderstood.
18          BY MR. McNUTT:
19     Q.   Can you identify that exhibit, please?
20     A.   It looks like an email that I sent to Mr. Cox.
21          BY MR. McNUTT:
22     Q.   All right.
23          And that email, you attached to that email the
24   trust documents that you created in July 6, 2010, correct?
25     A.   Yes.

1    Q.   And your email says that you are sending to Mr.

2    Albert the originals, right?

3    A.   No.   It says:

4                "My apologies for the delay.   I have

5         the originals."

6    Q.   Okay.   So it says that you have the original of

7    the documents that you created in July of 2010, right?

8    A.   That's what this email says, yes.

9    Q.   Okay.

10        Now, Mr. Albert contends that they weren't the

11   originals but they were only copies?

12   A.   He's accurate.

13   Q.   Okay.

14        Did you ever correct your statement that those

15   were not the originals, they were copies?

16   A.   I did speak to them.   So if I can explain?

17   Q.   Did you ever correct your email?

18   A.   Did I send an email?   No, I -- I don't know.   I

19   may.   I don't know.

20   Q.   You stated that your father was supposed to record

21   the original, right?

22   A.   Yes.

23   Q.   The original was never recorded?

24   A.   Correct.

25   Q.   As you sit here today, you have no idea where the

Case 3:20-ap-90027 Doc 74-1 Filed 08/01/25 Entered 08/01/25 15:56:34 Desc
Exhibit 12 R Salas Testimony at Exemption Hearing 8-22-18    Page 33 of 48

APPX00658

1  original is, do you?

2       A.   I suspect it burned in the fire.

3       Q.   Do you know?

4       A.   But no, I do not know.

5       Q.   Okay.

6            Do you know if there was ever an intent to record

7  any document?

8       A.   I do know there was an intent to record a

9  document, yes.

10      Q.   But no document was ever recorded changing the

11  title of the property from your brother to your father,

12  correct?

13      A.   To my knowledge at this point, that is correct.

14      Q.   Okay.

15           Now, would you take a look at, in the white book,

16  sir, this would be Exhibit 24.

17      A.   Before we get into this, for the record I never

18  did get to -- received a copy of this, nor have I been able

19  to review it, and I did ask for it.

20      Q.   Well, there's a copy right there.

21      A.   It's a little late now, but I -- just so that you

22  understand.  I just want it on the record.

23      Q.   Well, if there's any part of this that you believe

24  is incorrect you can certainly say so.

25           What I would like you to look at is, and I do

1  apologize because not all of the pages of your transcript
2  are actually in here because I didn't deem them relevant to
3  the case today.  But I would like you to take a look at
4  page 17 of the transcript.  This is transcript pages 65 to
5  68.  Do you have that, sir?
6      A.   Yes.
7      Q.   All right.
8           And are you looking at or can you look at page 67
9  of the transcript?
10     A.   Yes.
11     Q.   It starts:
12          "Question:  During the course of the
13          lawsuit in the District of Columbia."
14          Do you see that?
15     A.   Yes.
16     Q.   All right.
17          "Question:  During the course of the
18          lawsuit in the District of Columbia, the
19          Superior Court litigation that your father
20          and your brother were involved in, did you
21          ever offer to provide your brother or your
22          father a copy of the trust document?
23              Answer:  I did not.
24              Question:  Did you have any
25          discussions with your brother or your

```
 1              father regarding the trust document?
 2                   Answer:  I wish I had.  I assumed
 3              falsely, I suppose, that both of them had
 4              it.  They both had competent attorneys,
 5              and that their attorneys would ask for
 6              them and they would provide them.  Had I
 7              known and had I had the gumption to jump
 8              into somebody else's case, I wish to God
 9              that I would have given it to them then.
10              And I didn't know, and I didn't, and I
11              believed my brother and my father had the
12              sense to do that, and I believe that their
13              attorneys were competent enough to ask the
14              questions, and I beat myself up that I
15              didn't, but the answer is no."
16              I read that correctly, didn't I?
17     A.    Yes.
18     Q.    Okay.
19              So during the entire course of the litigation,
20     even though you knew how important the trust documents
21     would be to absolve your brother from any responsibility,
22     you never talked to your brother or your father about them?
23     Never gave them to the attorneys?  Never talked to the
24     attorneys about them?  That's your testimony, right?
25     A.    Yeah.
```

1    Q.   Okay.

2         And during the course of that litigation, your

3    father had the same issue.  You said in your deposition,

4    and I can quote it here if I need to, I'm sure I don't, in

5    your deposition that you knew that your, the relationship

6    between your brother and your father had been strained for

7    years because your brother was still on the property at

8    1610 Riggs Place, right?

9    A.   Yes.

10   Q.   And despite your knowledge of that -- and you also

11   knew that the reason that he was being sued was because he

12   was a titled owner of the property.  You already said that

13   in response to Mr. Albert's questions, right?

14   A.   Yes.

15   Q.   And yet for the entire period of time that you

16   were aware of the litigation, which was starting when, in

17   2015?

18   A.   I -- yeah.  I don't know the date that it

19   happened, but shortly after they were filed, so.

20   Q.   Okay.

21   A.   So that was 2015, then yes.

22   Q.   So for almost three years you never brought it up?

23   A.   No.

24   Q.   And despite the fact that your brother, your

25   father, and your sister-in-law also knew about the

1    transaction, apparently they never brought it up either?

2         A.    That's accurate.   That's correct.

3         Q.    All right.

4              Now, the reason for that wasn't the fact that your

5    father had all kinds of issues with respect to taxes and

6    other obligations, was it?

7         A.    The reason for what?

8         Q.    Not bringing the trust documents up?

9         A.    I have no idea why he didn't bring 'em up.   Like I

10   said, I assumed he would have.   I don't know why he didn't

11   --

12        Q.    Right, I think -- right.   I think everybody would.

13   Sure.   But you never talked to him about it?

14             Never said, "Hey, did you guys bring up the

15   trust?"

16        A.    No.

17        Q.    "Hey, Len, remember that trust?"   You never said

18   that?

19        A.    No, I didn't.

20             THE COURT:   You remembered the trust, clearly,

21   when your brother called you --

22             THE WITNESS:   No.

23             THE COURT:   -- and said, "I've been sued?"

24             THE WITNESS:   No, actually when he first called me

25   did I remember the trust?   I didn't.   I mean, I -- you

1    know, I didn't until later on and I remembered.  I don't --
2    yeah, I don't remember how I remembered.  I mean, I -- I
3    don't know.  I wish I'd have known.  I, you know, I -- I
4    don't know.

5         You know, what I can tell you is I do too many
6    cases.  I do -- I'm dealing with my son that had drug
7    issues.  I'm dealing with my daughter and my wife, and to
8    be frank, you know, I can't babysit the entire world,
9    especially my own family.  I'm not babysitting my family.
10   So should I have done it?  Yeah.  Like I said, I beat
11   myself up that my brother's in this spot and my father's in
12   this spot.  I didn't do it.  What I did was took care of my
13   family the best I could to try to keep my son out of jail
14   and off drugs, tried to keep my practice afloat.  And no, I
15   didn't do it, sir.

16        THE COURT:  So when Mr. Albert called you and
17   said, "Max Salas says that you prepared a trust document,"
18   did that jog your memory?

19        THE WITNESS:  Yes.  I said, "Yeah, we did.  Let me
20   find it."

21        THE COURT:  But you didn't remember it when Len
22   Salas called you and said, "I've been sued"?

23        THE WITNESS:  I didn't put two and two together
24   about it.  I mean, like I said, I thought they had it.  I
25   didn't have it.  I didn't think about it.  I just didn't --

1  no, I mean --

2          THE COURT:  All right.

3          THE WITNESS:  -- I don't know.  No.

4          BY MR. McNUTT:

5      Q.   Mr. Salas, if I recall correctly, you just

6  testified in response to a question by Mr. Albert that you

7  were surprised at Len's involvement in the lawsuit because

8  you knew about the trust, and that occurred --

9      A.   I knew --

10     Q.   -- shortly after the case was filed?

11     A.   Yeah, I mean I knew that he had the deal.  I knew

12  that -- I was surprised.  I was surprised.

13     Q.   So you did know and you didn't bring it up?

14     A.   I guess.  I knew there was a document at some

15  point.  I didn't -- I didn't know where it was.  They had

16  copies.  I didn't do any digging.  I was lazy.  I just

17  waited.  You know, I waited for them to tell me, for the

18  attorneys to ask for it.  I just didn't go digging.  I

19  didn't -- I didn't get into the case.

20     Q.   You knew that there was a reason your father

21  didn't want the trust documents known, didn't you?

22     A.   No, I didn't.

23     Q.   Okay.

24          Well, I don't see any other explanation, do you?

25     A.   Explanation --

Case 2:20-ap-90027 Doc 74-1 Filed 06/03/25 Entered 08/01/22 15:56:34 Desc
Exhibit 12 R Salas Testimony at Exemption Hearing 8-22-18    Page 40 of 48

APPX00665

1    Q.   I didn't think so.

2    A.   -- for what?

3         I didn't understand the question.

4    Q.   Let me ask you this, Mr. Salas, do you know where

5    your father lived in July of 2010?

6    A.   1610 Riggs Place.

7    Q.   And do you know where your brother lived in 2010?

8    In July of 2010?

9    A.   No, I don't.

10   Q.   Did he live in the District of Columbia?

11   A.   In 2010 I believe he did, yes.  Yes, he did.  Yes.

12   Q.   All right.

13        So I'm assuming that mail service works well from

14   your office in Colorado, right?

15   A.   Yes.

16   Q.   And I'm assuming back in 2010 that the internet

17   worked reasonably well from your office in Colorado?

18   A.   Yes.

19   Q.   Okay.

20        So you could have sent the trust documents and the

21   quit-claim deed to your brother or your father, and they

22   could have signed them in D.C., right?

23   A.   They could have.

24   Q.   But instead you chose, or one of them chose to

25   have it done in Colorado?

1    A.   I believe we did that because they were there for

2   the holiday.  It was July 6th.  I think they were there for

3   the holiday weekend and everybody was together, so that's

4   how we did it, but yes, that's true.

5    Q.   Was there something about Colorado law that you

6   thought would protect either party more?

7    A.   No.

8    Q.   In fact, you didn't even know what the difference

9   was, if any, between Colorado law and D.C. law, right?

10    A.   That's accurate.

11    Q.   Yeah.

12         Are you aware as you sit here today whether or not

13   this trust document, the documents that you've prepared,

14   created a valid trust under D.C. law?

15    A.   As of today I don't know.

16    Q.   Are you aware as of today whether that trust

17   document created a valid trust under Colorado law?

18    A.   I don't know.

19    Q.   All right.

20         When you prepared it in July of 2010, were you

21   aware of whether or not the trust documents created a valid

22   trust under Colorado law?

23    A.   I believe at the time it did, yes.

24    Q.   What makes you say that?

25    A.   I pulled the form from stock form in Colorado.  I

1  assumed it was accurate.

2       Q.   In the form that you pulled did it say anything

3  about naming a trust with the same trustee and beneficiary?

4       A.   I don't recall that, no.

5       Q.   Yeah.

6            And you didn't know at the time that you created

7  the trust whether the trust was valid under D.C. law

8  either, right?

9       A.   I think I answered that.  I did not know.

10       Q.   Well, I apologize, but I think I asked you as of

11  today rather than as of July of 2010, so --

12       A.   So no.

13       Q.   -- I wanted to go back and cover both things.

14       A.   Understood.  My apologies.

15       Q.   Now, as you described the transactions and the

16  purpose of the transactions, as you sit here today you're

17  not aware whether your father at any time could have

18  obtained a mortgage, deed of trust, or even a deed to the

19  property in his own name without the help of your brother

20  Len, correct?

21       A.   Do I know if he could have?

22       Q.   Yeah, do you know?

23       A.   No, I don't.

24       Q.   Okay.

25            In fact, you're not aware at any time of your

     1   father's ability to obtain property or a mortgage or deed
     2   of trust on property in his own name, right?
     3        A.   I don't know.
     4             MR. McNUTT:  I think that's all I have, Your
     5   Honor.
     6             MR. ALBERT:  Briefly, Your Honor.
     7                       REDIRECT EXAMINATION
     8             BY MR. ALBERT:
     9        Q.   Why would it be to your father's advantage not to
    10   tell people about the trust?
    11             MR. McNUTT:  Objection.
    12             THE COURT:  It's overruled.
    13             THE WITNESS:  I don't know.
    14             BY MR. ALBERT:
    15        Q.   Can you think of any reason?
    16        A.   Not at all.
    17             MR. McNUTT:  Objection.  If he said he doesn't
    18   know, he doesn't know.
    19             THE COURT:  Sustained.  That answer is stricken.
    20             BY MR. ALBERT:
    21        Q.   Do you -- you mentioned your father had some tax
    22   problems.  Do you know whether those tax problems were
    23   eventually resolved?
    24        A.   I don't know.
    25        Q.   Okay.

1          And look at Exhibit C, please.  And that's the

2    trust document.  Look at paragraph 14 on the third page.

3          A.   Yes.

4          Q.   Could you read that to me, please?

5          A.   Yes.

6               "The trust has been executed and

7               delivered in the State of Colorado and

8               shall be instructed and administered

9               according to the laws of Colorado.  In

10              witness whereof Grantor and Trustee have

11              executed the agreement in Colorado."

12              MR. ALBERT:  No further questions, Your Honor.

13              THE COURT:  Anything else of this witness?

14              MR. McNUTT:  No, Your Honor.

15              THE COURT:  May this witness be excused?

16         (No verbal response).

17              THE COURT:  You're excused.  Mr. Salas, thank you

18   for coming from Colorado.

19              THE WITNESS:  Yes, Your Honor.  Thank you.

20         (At 5:18 p.m., witness excused.)

21              MR. McNUTT:  Your Honor, if I may, it's now

22   approaching 5:30.  Rather than get started on another line

23   of questioning, would this be a good time to break since

24   we're going to have to come back anyway?

25              THE COURT:  Tell me what you're going to do.

Case 23-10907 Doc 74-1 Filed 06/03/24 Entered 06/03/24 15:56:34 Desc
Case 3:20-ap-90027 Doc 4-14 Filed 08/25/22 Page 34 of 33  APPX000305
Exhibit 12 R Salas Testimony at Exemption Hearing 8-22-18    Page 45 of 48    APPX00670

1  You're going to re-call Max Salas as your --

2         MR. McNUTT:  Yes, Your Honor, and I --

3         THE COURT:  -- next step?

4         MR. McNUTT:  I told Mr. Albert that I probably

5  have another hour with Mr. Max Salas.

6         THE COURT:  Then who else do you have as

7  witnesses?

8         MR. McNUTT:  That's it.  That would be just --

9         THE COURT:  And who else do you have as witnesses?

10        MR. ALBERT:  Judge, I would probably put Max on

11 again on direct testimony.

12        THE COURT:  And that's it you think?

13        MR. ALBERT:  That would be it.  Yes, sir.

14        THE COURT:  So what time do you want to resume

15 tomorrow?

16        MR. ALBERT:  Judge, I have those business cases

17 Martini and TK at 341 at 1:00 tomorrow.

18        THE COURT:  So do you want to start early tomorrow

19 morning?

20        MR. ALBERT:  I have a, one of my Creditor's

21 committee counsel, I have a 9:00 meeting by phone that

22 should last about 15 minutes.  Besides that I'm good in the

23 morning.

24        MR. McNUTT:  I'm free all day tomorrow, Your

25 Honor.

```
1              THE COURT:  So do you think we can start at 10:00
2  --
3              MR. McNUTT:  I could do morning, afternoon.
4              THE COURT:  -- and finish it up in time enough for
5  Mr. Albert to make a 1:00 341?
6              MR. ALBERT:  It's just downstairs, yeah.
7              MR. McNUTT:  I would hope.
8              THE COURT:  We can start at 9:30 if you'd like.  I
9  -- if you think we can finish in two hours.
10             MR. McNUTT:  I think we can, Your Honor.  I
11 hesitate only because I'm terrible at predicting this.  I
12 always take longer than I think, but we've got a lot in,
13 and I would think that I need no more than an hour, which I
14 think would probably mean that two hours or so would do it.
15 I would prefer not to try to -- I live a long way away,
16 Your Honor.  I would prefer not to try to come in at 9:30
17 if at all possible.
18             THE COURT:  If he wanted -- then we'll start at
19 10:00 or 10:30 depending upon what the parties agree upon.
20             MR. ALBERT:  I don't have to, you know, take a
21 lunch break, Judge.  I can go straight through to 1:00.
22             MR. McNUTT:  Yeah, I can as well.
23             MR. ALBERT:  But of course that's up to your
24 deputy and your --
25             THE COURT:  So Mr. McNutt, you tell me, 10:00 or
```

1  | 10:30?

2  |         MR. McNUTT:  10:00 is fine, Your Honor.

3  |         THE COURT:  This matter is continued until

4  | tomorrow morning at 10:00 a.m.

5  |         Thank you.

6  |         MR. McNUTT:  Thank you, Your Honor.

7  |         MR. ALBERT:  Thank you, Judge.

8  |         Thank you, Phil.

9  |         THE CLERK:  All rise.

10 |         Court stands in recess.

11 |         THE COURT:  You're excused

12 |     (At 5:21 p.m., proceedings adjourned to resume the

13 |     following day, August 23, 2018 at 10:00 a.m.; off the

14 |     record.)



# Transcript of Len Salas

**Date:** August 27, 2021
**Case:** Brekelmans, et al. -v- Salas

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
1        IN THE UNITED STATES BANKRUPTCY COURT
2        FOR THE MIDDLE DISTRICT OF TENNESSEE
3              Nashville, Tennessee
4   - - - - - - - - - - - - - - -x
5   IN RE:               :
6   LEN SALAS,           :  CHAPTER 7
7   Debtor-in-possession :  CASE NO:  18-02662
8                        :  JUDGE:  HARRISON
9                        :
10  (Caption continued on next page)
11  - - - - - - - - - - - - - - -x
12
13
14           Deposition of LEN SALAS
15             Conducted Virtually
16           Friday, August 27, 2021
17               11:13 a.m. EST
18
19
20
21
22
23  Job No.: 393647
24  Pages: 1 - 199
25  Reported By: Cynthia A. Whyte
```

**2**

```
1   (Caption continued from previous page)
2
3   NICOLAAS BREKELMANS    :
4   AND GAIL GREGORY       :  ADVERSARY PROCEEDING NO.
5   BREKELMANS,            :  3:20-ap-90027
6   CO-PERSONAL            :
7   REPRESENTATIVES OF     :
8   THE ESTATE OF NINA     :
9   BREKELMANS, et al.,    :
10  In their capacity as   :
11  authorized             :
12  representatives of     :
13  the Estate of Len      :
14  Salas,                 :
15           Plaintiffs,   :
16  v.                     :
17  MAX SALAS,             :
18           Defendant     :
19
20
21      Deposition of LEN SALAS, conducted virtually
22
23
24  Pursuant to notice, before Cynthia A. Whyte,
25  Notary Public in and for the State of Maryland.
```

**3**

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFFS:
4      PHILIP J. McNUTT, ESQUIRE
5      LAW OFFICE OF PHILIP J. McNUTT, PLLC
6      11921 Freedom Drive, Suite 584
7      Reston, Virginia 20190
8      (703) 904-4380
9
10  ON BEHALF OF DEFENDANT:
11     PHILLIP G. YOUNG, JR., ESQUIRE
12     THOMPSON BURTON, PLLC
13     One Franklin Park
14     6100 Tower Circle, Suite 200
15     Franklin, Tennessee  37067
16     (615) 465-6000
17
18  ALSO PRESENT:
19     JUSTIN WOODWARD, AV Technician
20     MINDY JOHNSON
21     GAIL BREKELMANS
22     NICOLAAS BREKELMANS
23     KENDRA ROWE SALAS
24
25
```

**4**

```
1              C O N T E N T S
2   EXAMINATION OF LEN SALAS           PAGE
3   By Mr. McNutt                        7
4   By Mr. Young                       170
5   By Mr. McNutt                      188
6
7              E X H I B I T S
8          (Attached to the Transcript)
9   LEN SALAS DEPOSITION EXHIBITS      PAGE
10  Exhibit 1    Subpoena               12
11  Exhibit 2    Irrevocable Trust Agreement  33
12  Exhibit 3    Document to Max Salas from
13               IRS                    41
14  Exhibit 5    E-mail chain, LenSalas000009
15               to LenSalas000010      43
16  Exhibit 6    E-mail chain, LenSalas000011
17               to LenSalas000012      48
18  Exhibit 36   Motion for Relief from
19               Automatic Stay         51
20  Exhibit 24   Len Salas Bankruptcy
21               Schedules, 4/18/18     57
22  Exhibit 7    E-mail, 6/21/11, to Mr.
23               Goldstein from Max Salas,
24               LenSalas000013         69
25
```

**5**

E X H I B I T S   C O N T I N U E D

(Attached to the Transcript)

| LEN SALAS DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 12 | E-mail chain, LenSalas 000021 | 80 |
| Exhibit 13 | E-mail chain, LenSalas 000022 | 81 |
| Exhibit 19 | E-mail, 2/27/12, to Ms. Boileau from Max Salas, LenSalas000034 | 82 |
| Exhibit 20 | List of personal property, LenSalas000035 | 86 |
| Exhibit 21 | List of household property, LenSalas000036 to 000037 | 89 |
| Exhibit 32 | 2015 Income Tax Return | 98 |
| Exhibit 33 | 2016 Income Tax Return | 102 |
| Exhibit 28 | SunTrust Loss Mitigation Form, 3/18/16, Salas002271 to Salas002292 | 103 |
| Exhibit 34 | 2017 Income Tax Return | 118 |
| Exhibit 25 | Statement of Financial Affairs, 4/18/18 | 120 |
| Exhibit 23 | Trust Registration Statement | 127 |
| Exhibit 30 | Len Salas transcript, 3/9/16 | 137 |

**6**

E X H I B I T S   C O N T I N U E D

(Attached to the Transcript)

| LEN SALAS DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 8 | E-mail chain, LenSalas 000014 to 000015 | 161 |
| Exhibit 9 | E-mail chain, LenSalas 000016 to 000018 | 161 |
| Exhibit 10 | E-mail, 6/22/11, to Max Salas from Len Salas, LenSalas000019 | 162 |
| Exhibit 11 | E-mail, 6/22/11, to Len Salas from Max Salas, LenSalas000020 | 163 |
| Exhibit 14 | E-mail, 1/17/12, to Ms. Boileau from Max Salas, LenSalas000023 to 000024 | 166 |

**7**

P R O C E E D I N G S

LEN SALAS

Having been duly sworn, testified as follows:

BY MR. McNUTT:

Q    Mr. Salas, this is Phil McNutt.  We've met before.  You know that I represent the Brekelmans estate and the McLoughlin estate with respect to their claims in your bankruptcy proceeding and that of your father, Max Salas, which is currently underway in the District of Columbia.

Do you understand that so far?

A    Yeah.  Yes.

Q    All right.  And you are here for a deposition.  I know that you have been deposed before, but can you tell me the last time that you remember being deposed?

A    I don't.

Q    Were you deposed in the Superior Court case in the District of Columbia involving the death of Nina Brekelmans and Michael McLoughlin?

A    Yes.

Q    And that was in March of 2016.  Does that sound correct?

A    Sure.  I don't know.

**8**

Q    Okay.  Tell me your full name and your present address, Mr. Salas.

A    Len Salas, 1018 Vince Court.

Q    And that's in Murfreesboro, Tennessee; correct?

A    Yes.

Q    Is that where you are now?

A    Yes.

Q    And are you in a specific room in your house?

A    Yes.

Q    Are you alone in the room?

A    No.

Q    Who else is in the room with you?

A    My wife.

Q    And you're sitting in front of a computer; is that correct?

A    Yes.

Q    Is it a laptop or a desktop?

A    Laptop.

Q    Are you the only one that has access to it?

A    No.

Q    Right now are you the only one who has access to it?

13

1    A  Yes.
2    Q  Okay.  And let me go through the requests
3  and ask you to give me a little bit of
4  information.
5        With respect to Item No. 1:  "All email
6  or other communications between Len Salas, and Ron
7  Salas, or Max Salas, for the period 2010 through
8  the present regarding the property at 1610 Riggs
9  Place, NW, Washington DC, the sale or refinancing
10  of that property, the Sun Trust Deed of Trust on
11  that property or attempts to sell, convey or
12  otherwise dispose of, that property."
13        Did I read that correctly?
14    A  Yes.
15    Q  Okay.  Can you tell me what efforts you
16  made to obtain any documents related to Request
17  No. 1?
18    A  I looked through my e-mail.
19    Q  Did you do anything else?
20    A  No.
21    Q  Okay.  And you did produce some documents
22  which I'll get into later.  Are you confident that
23  you found every e-mail that you believe fits the
24  description in No. 1?
25    A  Yes.

14

1    Q  Let's go to No. 2:  "The originals and
2  all copies of the Quitclaim Deed executed in
3  Colorado in July, 2010."
4        AV TECHNICIAN:  You wanted me to go to
5  Exhibit 2; correct?
6        MR. McNUTT:  No, no, no.  It's still on
7  the same exhibit.  No. 2 is just the item on that
8  page.  Thank you.
9        AV TECHNICIAN:  Sorry about that.
10        MR. McNUTT:  That's all right.
11    Q  Mr. Salas, do you see that No. 2, "The
12  originals and all copies of the Quitclaim Deed
13  executed in Colorado in July, 2010"?
14    A  Yes.
15    Q  What did you do to obtain those
16  documents?
17    A  I looked through my Dropbox and submitted
18  what I had.
19    Q  So what you submitted to me was an
20  electronic copy?
21    A  Yes.
22    Q  Of the quitclaim deed?
23    A  Yes.
24    Q  Are you aware of the existence of any
25  original wet ink signature originals of that

15

1  quitclaim deed?
2    A  Yes, they are -- yes, I'm aware of them.
3  What was your question?  I'm sorry.
4    Q  That was it, whether you're aware of any
5  wet ink signature originals of the quitclaim deed.
6    A  Yes.
7    Q  And do you know where they're presently
8  located?
9    A  I do not know.
10    Q  When is the last time that you saw a wet
11  ink signature original of the quitclaim deed?
12    A  When I gave it to my lawyer shortly
13  before the trial.
14    Q  Okay.  And that was a wet ink original
15  you're saying --
16    A  Yes.
17    Q  -- or was that a copy?
18    A  I believe mine was an original.
19    Q  Okay.  So --
20    A  Which did not get admitted into evidence.
21    Q  I'm sorry?
22    A  Which did not get admitted into evidence
23  during the trial.
24    Q  Do you know where that wet ink signature
25  copy is right now?

16

1    A  No.
2    Q  And you said your attorneys.  You mean be
3  your attorneys in the Superior Court case?
4    A  Yes.  The one in D.C., that one I guess,
5  yeah.
6    Q  Do you recall how you obtained that wet
7  ink signature original with respect to the
8  Superior Court trial?
9    A  Yes.
10    Q  Okay.  How?
11    A  I found it.
12    Q  And where did you find it?
13    A  In a filing cabinet.
14    Q  At your home?
15    A  I don't know.  I don't remember.
16    Q  Well, you said you found it in a file
17  cabinet.  Was it your file cabinet?
18    A  Yes.
19    Q  In other words, it wasn't located
20  anywhere else but where you live; correct?
21    A  I don't remember.
22    Q  Was it in a file cabinet that you believe
23  belonged to someone other than you?
24    A  No.
25    Q  Okay.  Other than the original that you

17

1  just described, when is the last time that you saw
2  a wet ink signature original of the quitclaim deed
3  executed in July of 2010?
4      **A  Probably July of 2010.**
5      Q  Okay.  And just to be clear, when you say
6  that you found it in a file cabinet, I think you
7  said before the trial but I want to make sure I'm
8  not misstating your testimony.
9      **A  Oh, I'm sorry; maybe I misunderstood the**
10 **question.**
11     Q  I'm sorry?
12     **A  Maybe I misunderstood the previous**
13 **question.**
14     Q  Well, all right.  And what are you saying
15 you may have misunderstood?
16     **A  What was the previous question?**
17     Q  The previous question was -- I don't know
18 the exact words, but rather than have the court
19 reporter read it back, I'll just paraphrase it for
20 you -- was the last time you saw a wet ink
21 signature original of the quitclaim deed, and I
22 believe your answer was you found one in a file
23 cabinet that either belonged to you or was at or
24 near your residence.  And I'm trying to find out
25 what time frame that was.

18

1      **A  Oh, okay.**
2      Q  Can you tell me what time frame?
3      **A  Shortly before the trial, somewhere in**
4  **the trial, between, you know -- I don't know.**
5  **Shortly before the trial.**
6      Q  Okay.  And the trial, I will represent to
7  you that the first day of the trial was
8  approximately March 27, 2018.  Are you saying that
9  it was sometime immediately prior to that date,
10 March 27, 2018?
11     **A  Yes.**
12     Q  Now, to be fair, your attorneys filed on
13 your behalf a motion I believe in February of 2018
14 that related to the existence of the quitclaim
15 deed.  Do you remember that?
16     **A  No, I don't know.  I do not.**
17     Q  Okay.  Do you know if prior to your
18 attorneys filing a motion in or about February of
19 2018 that you found this wet ink original
20 document?
21     **A  I'm sorry; state your question again.**
22     Q  Yeah.  Do you know if you found the wet
23 ink signature original that you have just
24 testified to before or after your attorneys filed
25 the motion, I believe it was a motion for summary

19

1  judgment --
2      **A  I assume --**
3          THE COURT REPORTER:  If you can wait
4  until the question is finished because I didn't
5  hear the very end.
6          THE WITNESS:  Sorry about that.
7          (The court reporter read the last
8  question.)
9      Q  In the Superior Court case, that was the
10 question.
11         Maybe the best way to ask it is this:  I
12 will represent to you that your attorneys filed a
13 motion with a copy of the proposed quitclaim --
14 well, I say proposed -- of the quitclaim deed in
15 approximately February of 2018.  Do you know if
16 what they had was the original, the wet ink
17 signature, or just a photocopy?
18     **A  I don't know.  I don't remember exactly,**
19 **but I -- I don't know what they found.  But I**
20 **think I found that -- I must have found that wet**
21 **ink copy before that filing.  That's what I assume**
22 **set that motion in file and I gave it to the**
23 **lawyers and they moved forward.  How they -- they**
24 **proceeded with due diligence, I assume.**
25     Q  Sure.  And between July of 2010 and

20

1  approximately February of 2018 you're not aware of
2  the existence of any other wet ink original of the
3  quitclaim deed; is that accurate?
4      **A  I remember the day we signed it.  I don't**
5  **know.  I assume -- I don't remember.  We were in**
6  **Ron's office, I signed a copy -- I signed**
7  **something -- I signed a copy, Kendra signed a**
8  **copy, Max signed a copy, Ron saw it.  You know, I**
9  **don't remember.  That's the -- I filed it away.**
10 **After that I filed it away and forgot about it and**
11 **that's all.  You can refer back to my subpoena**
12 **from the previous deposition about that.  I don't**
13 **remember what I said so I don't want to say**
14 **something that I didn't say that I said back then.**
15 **So you can read that transcript because I have**
16 **answered that question before.**
17     Q  Yeah.  I'm not trying to trap you; I'm
18 just trying to get as clear as I can.
19         So you believe that the document that you
20 found in your file cabinet was the original that
21 you signed in your brother's office in Colorado in
22 2010; is that accurate?
23     **A  Again, I don't know.**
24     Q  Well, you didn't sign any other original
25 of the quitclaim deed between 2010 and 2018, did

21

1  you?
2  **A   I signed that copy -- I signed a piece of**
3  **paper that day.  I don't know if I got a copy.  I**
4  **don't know if I got an original.  So I don't know.**
5     Q    So you don't know if you had an original
6  on that day, but you do know that you found an
7  original in February of 2018; is that correct?
8  **A   I guess.  I don't know.  I don't know**
9  **what I found.  I found -- I don't know if I found**
10  **a copy.  I don't know if I found an original.  I**
11  **found what I found.**
12     Q    Okay.  Well, are you now telling me
13  you're not sure whether what you found was a wet
14  ink original of the quitclaim deed?
15  **A   Now you've put that in my mind, I don't**
16  **know.**
17     Q    Because you're not sure?
18  **A   I don't know now.**
19     Q    Okay.  What about let's go to still this
20  first Exhibit, same page, No. 3:  "All documents,
21  invoices, receipts, purchase orders, deeds,
22  titles, or other documents of" -- that's a
23  spelling error; sorry -- or other documents
24  "regarding your assets and liabilities during the
25  period, 2010 through 2018."

22

1        Did you look for any of these documents?
2  **A   Yes.**
3     Q    Did you find any?
4  **A   No.**
5     Q    Okay.  So with respect to whatever assets
6  and liabilities you had or incurred from the
7  period 2010 through 2018, you have no documents,
8  invoices, receipts, purchase orders, deeds,
9  titles, or other documents of any kind; is that
10  what you're saying?
11  **A   I guess documents regarding your assets**
12  **and liabilities, for my subsequent -- because of**
13  **the trial and because of my subsequent bankruptcy,**
14  **I did list a set of assets and liabilities for**
15  **that that I had to submit for the bankruptcy.  I**
16  **believe I submitted that.  That's what I found so**
17  **that's what I submitted.**
18     Q    Okay.  Well, let me ask you this:  During
19  the period of 2010 through 2018 did you acquire
20  any assets or purchase any assets that you believe
21  were major assets in nature?
22  **A   No.**
23     Q    Do you believe that you acquired or
24  purchased any assets during that period valued
25  more than a thousand dollars?

23

1     **A   Oh, I guess my -- more than a thousand**
2  **dollars.  I guess -- I guess the house, my house.**
3  **I bought my house.  I don't know.  No?  No, no,**
4  **unh-unh.**
5     Q    I know you looked to your wife then.
6  What you're saying is that the house you live in
7  now is owned by your wife; correct?
8  **A   Correct.**
9     Q    And it has always been owned in your
10  wife's name only; correct?
11  **A   Yes.**
12     Q    Okay.  Okay.  Thank you.  No. 5 on still
13  the same exhibit, it's:  "All documents and
14  records related to the sale, conveyance or
15  disposition of any asset or property held by
16  you..."  Other than the property in D.C. at 1610
17  Riggs Place Northwest -- that's the home that your
18  father presently lives in.  You're aware of that;
19  correct?
20  **A   Yes.**
21     Q    Okay -- other than that asset, did you
22  sell, transfer, or dispose of any asset worth more
23  than a thousand dollars during the period 2010 to
24  2018?
25  **A   No.**

24

1     Q    Okay.
2  **A   I don't know.  I'm going to say I don't**
3  **know because I don't remember.  I don't remember.**
4     Q    Now, in response to this No. 5, did you
5  provide any documents in your document production?
6  **A   I don't remember.**
7     Q    All right.  Well, let's see what we have
8  here.  I have a list of your document production,
9  Mr. Salas, and I'm looking at the list, and you
10  have the trust documents, the trust EIN form; SSN
11  from the Internal Revenue Service; and then you
12  have e-mails, mostly either to or from your father
13  or from your father to Mr. Goldstein or persons in
14  his office for the period of approximately 2011
15  through early 2012 --
16  **A   Oh.**
17     Q    -- then you provided the list of personal
18  property that you mentioned previously, and that
19  looks to be the same list that you filed in your
20  bankruptcy.  Do you know if that's correct?
21  **A   Yes.**
22     Q    Okay.  And then you provided a list of
23  household property.  And I will represent to you
24  that I compared that to your bankruptcy list of
25  property and it differs, although it's similar.

25

1  Do you know what I'm talking about, the list of
2  household goods that you provided me?
3      A  I believe so, yeah, approximately.
4      Q  Okay.  And that was approximately three
5  or four pages; correct?
6      A  I don't remember.
7      Q  It was just a list of property, though,
8  nothing else, no documents of title, no e-mails,
9  no correspondence, just a list of the property;
10  correct?
11      A  I don't know.
12      Q  Okay.  And then you provided a trust
13  registration statement that I believe you obtained
14  from your brother Ron.  And that's the extent.  So
15  I don't see any documents related to the sale,
16  conveyance, or the disposition of any asset or
17  property held by you.  Do you think you provided
18  any, any such documents?
19      A  I provided what I had, what I could find.
20      Q  And you looked for these documents and
21  this is all you could provide; correct?
22      A  Yes.
23      Q  Okay.  And when you looked for these
24  documents, did you make a thorough look?  What did
25  you look through to try to attempt to find

26

1  documents in response to No. 5?
2      A  I looked through my e-mail and I looked
3  through my filing cabinet.
4      Q  Okay.  Does your wife have any files
5  related to assets or property held by you?
6      A  I don't know.  I don't remember.  I don't
7  think so.
8      Q  You didn't look for them, in any event;
9  correct?  You didn't look through any of your
10  wife's documents?
11      A  I looked what I looked at, I found what I
12  found, and I submitted what I had.
13      Q  I understand.  But I'm just trying to
14  make sure that I have the full breadth of where
15  you looked.  So you didn't look in any documents
16  your wife may have had, you only looked through
17  the documents that you had in your filing cabinet;
18  is that accurate?
19      A  Her documents are my documents at this
20  point.
21      Q  Is that a yes?
22      A  It's the same filing cabinet.  It's a
23  little cabinet and a drawer, that's it.  That's
24  what we have and that's what we keep it in.  We
25  don't keep any receipts anymore.  We don't --

27

1      Q  Okay.  So you --
2      A  We have what we have.  Everything is
3  digital now.  So I don't know.  No.  There is no
4  need to keep them.  We don't want to waste paper.
5  We are very conscious of that so we don't keep a
6  lot of paper documents around.  So...
7      Q  Okay.  So you're saying that whatever
8  documents you may have had from 2010 through 2018
9  that you did not provide may have been lost or
10  thrown away or discarded in some fashion?
11      A  If they were paper, they were recycled.
12      Q  Meaning you put them in a recycle bin and
13  somebody else took care of them, trashed them?
14      A  I don't -- if it was paper, I recycled
15  it.  I don't know I guess is the best answer.  I
16  don't know.
17      Q  All right.  What about No. 6, Mr. Salas:
18  "All agreements between you and any other person
19  or entity, respecting the payment of the SunTrust
20  Deed of Trust obligation, representing the first
21  Deed of Trust obligation on the property at Riggs
22  Place, NW, Washington, DC from 2007 through April,
23  2018"; what did you do to find any agreements that
24  would be responsive to No. 6?
25      A  I looked through my filing cabinet, my

28

1  filing system, and I found what I found, submitted
2  what I submitted.
3      Q  Did you ask your father for any documents
4  he may have had?
5      A  No.
6      Q  Did you contact SunTrust to determine if
7  SunTrust had any documents responsive to No. 6?
8      A  No.
9      Q  Okay.  Did you have any written
10  agreements between you and your father with
11  respect to the payment of the SunTrust Deed of
12  Trust or other obligations related to the property
13  in D.C.?
14      A  I don't remember any.
15      Q  Okay.  If there would have been one, you
16  would have kept it, though, I'm assuming; right?
17      A  If.
18      Q  All right.  And you did look for
19  documents in response to No. 6, didn't you?
20      A  Yes.
21      Q  All right.  You didn't find any.
22      A  Yes.
23      Q  And you would agree with me that any such
24  document would have been kept either in paper copy
25  or digitally by you --

29

1    A   Yes.
2    Q   -- is that fair?  Okay.
3        You didn't find any; right?
4    A   Right, yes.
5    Q   Okay.  Thank you.
6        Now, with respect to No. 7:  "All
7    financial statements which you prepared, or
8    provided to any person or party, respecting
9    your" -- well, it says "your," it's supposed to be
10   "you" -- "or your and your wife's financial
11   condition during the period 2010 through 2018,"
12   you do indicate that you provided documents.  You
13   say "See attached."  I'm not sure which documents
14   you believe were responsive.
15   A   Oh, that was the -- that -- the thing
16   that I provided for the bankruptcy prior to --
17   Q   The list of personal --
18   A   Yeah, I prepared that.
19   Q   Okay.  The list of personal property?
20   A   Yes.
21   Q   What about the list of household
22   property?
23   A   Yeah.  It was both.  They were both --
24   they were both required for the bankruptcy.
25   Q   Okay.  So other than those -- I'm sorry.

30

1        THE COURT REPORTER:  I'm sorry, sir.
2    A   Again, that's what I found so that's what
3    I submitted.
4    Q   And you attempted to find any documents
5    that you believe were responsive to No. 7;
6    correct?
7    A   Yes.
8    Q   And what you provided was the list of
9    personal property from your bankruptcy proceeding
10   and a list of household property that you and your
11   wife prepared; is that correct?
12   A   Yes.  It was also required for the
13   bankruptcy.
14   Q   Okay.  But that's not the same list that
15   was filed in your bankruptcy; correct?
16   A   I don't remember at this time.
17   Q   Did your wife help you fill it out?
18   A   I assume.  I don't know.  I don't
19   remember.
20   Q   The document that you provided, the list
21   of household property, do you know when that was
22   prepared?
23   A   Before my bankruptcy.
24   Q   Okay.  You did not prepare any document
25   like that subsequent to your bankruptcy filing in

31

1    April of 2018?
2    A   I don't remember.
3    Q   But you looked for one and you didn't
4    find any; correct?
5    A   Yes.
6    Q   Going down to No. 8, 8 says:  "All
7    records of payments, transfers or property, of any
8    nature, paid, transferred or given to you by your
9    father Max, or on his behalf, during the period
10   2007 through 2018."  And your answer is that there
11   were none to produce.  Am I correct on that?
12   A   Yes.  That's what the paper says.
13   Q   And that's what you determined after a
14   thorough review of all of the records that you
15   believe you had access to; correct?
16   A   Yes.
17   Q   All right.  Going on to No. 10, it looks
18   like there wasn't a 9 --
19       MR. McNUTT:  Can we get that exhibit
20   pulled up so we can see No. 10.  You can pull it
21   all the way up.
22       AV TECHNICIAN:  Exhibit what was that
23   again, counsel?
24       MR. McNUTT:  Same exhibit, same page, so
25   we can see the bottom of the page.

32

1        AV TECHNICIAN:  Okay.
2        MR. McNUTT:  There you go.  Thank you.
3    Q   There is No. 9 so that there's no
4    confusion on the record.  No. 10 is:  "All written
5    or recorded communications between you and your
6    D.C. Superior Court litigation counsel during the
7    period 2015 through April 2018 regarding your
8    ownership of the Riggs Place property.  And you
9    declined to answer that asserting an
10   attorney/client privilege.  Have I got that right?
11   A   Yes.
12   Q   And you're not waiving that privilege;
13   correct?
14   A   I don't understand.
15   Q   Well, it's your privilege, you can waive
16   it if you want to.  What I'm trying to establish
17   is that by your answer you do not waive that
18   attorney/client privilege and you are not willing
19   to divulge any written or recorded communication
20   between you and your D.C. Superior Court counsel.
21   Is that accurate?
22   A   Yes.
23   Q   All right.  And the same is true with
24   respect to No. 11; correct?
25   A   Yes.

APPX00681

37

1 the trustee is "Max E Salas." Do you see that?
2 **A No. Oh, yeah. Yes.**
3 Q Okay. And that's your father; correct?
4 **A Yes.**
5 Q And your understanding is that when you
6 signed this irrevocable trust agreement, you were
7 signing it with the intent that your father be the
8 trustee of this trust; correct?
9 **A Yes.**
10 Q Now, in 2010 do you know where your
11 father lived?
12 **A I believe he lived at 1610 Riggs Place.**
13 Q In Washington, D.C.; correct?
14 **A Uh-huh, yes.**
15 Q To your knowledge did he ever have a
16 residence at 155 East Boardwalk, Suite 300, Fort
17 Collins, Colorado 80525?
18 **A No.**
19 Q Was Mr. Salas ever a resident, to your
20 knowledge, in the State of Colorado?
21 **A Yes.**
22 Q Your father?
23 **A Yes.**
24 Q Okay. Do you know when?
25 **A He was born there and I don't -- he lived**

38

1 **there off and on. You have to ask him. I don't**
2 **know. I know he lived there.**
3 Q Subsequent to 2007 did you ever
4 communicate with your father at an address in
5 Colorado that you understood was his residence?
6 **A I don't know. I don't remember.**
7 Q Do you remember any time?
8 **A No.**
9 Q He was living at 1610 Riggs Place,
10 Northwest, in Washington, D.C., in 2007; correct?
11 **A Yes.**
12 Q In fact, I believe you were as well;
13 right?
14 **A Yeah.**
15 Q Or at least part of that year?
16 **A I think so, yeah.**
17 Q I'm sorry; say it again, please.
18 **A Yes, I think so.**
19 Q And are you aware between the period 2007
20 through 2018 that your father had a different
21 residence address than 1610 Riggs Place,
22 Northwest, Washington, D.C.?
23 **A I don't know.**
24 Q You're not aware of any, are you?
25 **A I don't know.**

39

1 Q Well, can you tell me any address other
2 than 1610 Riggs Place that you believe your father
3 may have resided between the period 2010 and 2018
4 other than Washington, D.C.?
5 **A No.**
6 Q And I just realized I gave you sort of a
7 trick question. I understand that your father did
8 not live at the Riggs Place property for some
9 period of time after June of 2015, but he always
10 lived in the District of Columbia; isn't that
11 correct?
12 **A As far as I know.**
13 Q Say that again.
14 **A As far as I know. I don't know. People**
15 **have secret lives, you know, people have two**
16 **families. I don't know what he's up to. You'd**
17 **have to ask him.**
18 Q Sure, and I will. I'm just trying to get
19 what knowledge you have, that's all.
20 **A But I don't know.**
21 Q Now, Mr. Salas, are you aware of any
22 other trust agreement that you executed or
23 delivered to your father at any time between 2007
24 and 2018?
25 **A I don't remember.**

40

1 Q Do you recall any other trust agreement
2 that your brother prepared for you to sign than
3 this one between the period of January 1, 2010,
4 and 2018?
5 **A I don't remember.**
6 Q Okay. Do you recall any other quitclaim
7 deed that you executed other than this one that is
8 I think starting on Page 6 of this document
9 between the period January 1, 2010, and 2018?
10 **A I don't remember.**
11 Q If you would have executed any other
12 agreement, you would have kept a copy of it;
13 correct?
14 **A I don't know.**
15 Q You don't know if you would have kept a
16 copy of a trust agreement that you executed?
17 **A Yes.**
18 Q In the ordinary course of keeping records
19 you would have kept such a document, wouldn't you?
20 **A I don't know.**
21 Q You don't know. Okay. All right.
22 MR. McNUTT: Justin, let's go on to
23 Exhibit 3, I think it is.
24 (A discussion was held off the record.)
25 AV TECHNICIAN: Counsel, this is going to

53

1    PURSUANT TO SECTION 404 OF THE DISTRICT OF
2    COLUMBIA THEFT AND WHITE COLOR CRIMES ACT OF 1982,
3    EFFECTIVE DECEMBER 1, 1982 (DC LAW 4-164; DC CODE
4    22-2514), THAT THE REAL PROPERTY DESCRIBED WITHIN
5    IS EITHER CLASS 1 PROPERTY OR CLASS 2 PROPERTY, AS
6    THOSE CLASSES OF PROPERTY ARE ESTABLISHED PURSUANT
7    TO SECTION 412A OF THE DISTRICT OF COLUMBIA REAL
8    PROPERTY TAX REVISION ACT OF 1974, APPROVED
9    SEPTEMBER 3, 1984 (88 STAT. 1051; DC CODE 47-813),
10   WITH 5 OR FEWER UNITS."
11        And that's your signature; correct?
12   A   Yes.
13   Q   And it is notarized by it looks like
14   Antuanette Requejo, I believe, on the 16th day of
15   April 2007. Do you see that?
16   A   No.
17   Q   You said no? Look below that where it
18   says "STATE OF MARYLAND, COUNTY OF MONTGOMERY,"
19   and then it has under that a paragraph that says
20   that: "I...DO HEREBY CERTIFY THAT LEN SALAS, WHO
21   EXECUTED THE FOREGOING ATTACHED DEED OF TRUST,
22   BEARING THE DATE OF THE 16 DAY OF APRIL, 2007,
23   PERSONALLY APPEARED BEFORE ME," et cetera. Do you
24   see that?
25   A   Yes.

54

1    Q   And that's signed by Ms. Requejo, I think
2    is how you pronounce it, first name Antuanette,
3    and her notary seal appears. Do you see that?
4    A   No.
5    Q   You don't see that. You don't see the
6    notary seal at the bottom?
7    A   Oh, I do now.
8    Q   Sorry; my fault. So that's a document
9    that you signed on April 16, 2007. And on neither
10   of those two pages is there a signature of any
11   other party; correct?
12   A   Correct.
13   Q   And you've already said that you made no
14   agreement, written agreement anyway, with your
15   father with respect to his responsibility for the
16   SunTrust loan payments; correct?
17   A   We had a -- as I said, we had like a
18   gentlemen's agreement again, so...
19   Q   I understand.
20   A   Which I testified before in the previous
21   deposition so you can --
22   Q   Right, gentlemen's agreement. And that's
23   something you discussed with your brother last
24   week; correct?
25   A   No.

55

1    Q   You didn't, okay.
2        Okay. And you produced no written
3    document that indicates that your father is the
4    only one responsible for payments of the SunTrust
5    Deed of Trust note; correct?
6    A   Correct, I think.
7    Q   Do you know that during the period 2010
8    to 2018 that at any time the SunTrust monthly Deed
9    of Trust payments were in default?
10   A   Say again.
11   Q   Do you know whether or not the SunTrust
12   Deed of Trust monthly payments were in default
13   during the period 2010 through 2018 at any time?
14   A   Yes.
15   Q   Do you know how many times?
16   A   No.
17   Q   Do you know if it was months?
18   A   I don't -- I don't --
19   Q   Was it years?
20   A   I don't remember.
21   Q   Okay. Do you remember the original
22   amount of the note?
23   A   No. You stated a number earlier. That
24   sounded about right.
25   Q   Let's see what we have here. Look at

56

1    Page 23 of that document. According to this
2    document, in Paragraph 1 it states that the
3    original amount of the note was $870,000. Do you
4    agree with that number?
5    A   Yes.
6    Q   And let's take a look at the signatures
7    under the note. It looks like that's on Page 25.
8    And whose name do you see there?
9    A   That's mine.
10   Q   Do you see your father's name anywhere?
11   A   No.
12   Q   Anyone else?
13   A   Tamar Hill, officer.
14   Q   Okay. She was a member of SunTrust;
15   correct?
16   A   I don't know.
17   Q   It says "SUNTRUST MORTGAGE, INC." Above
18   her name; correct?
19   A   Yes.
20   Q   All right. She wasn't obligated under
21   the note, as far as you know, was she?
22   A   I don't know.
23   Q   Do you know if anyone else other than you
24   was obligated under the note?
25   A   No, I don't know.

Case 3:20-cv-90027  Document 114-1  Filed on 08/21/24 in TXSD  Page 46
Case 3:20-cv-90027  Document 114-1  Filed 08/15/24  Entered 08/21/22 15:56:34  Desc
Exhibit 13 L Salas Deposition Transcript in Case No. 20-90027 Excerpts  Page 10 of 17
APPX00683

61

1  Q  And "Part 1" says: "List All Secured
2  Claims," and the first two you list are the
3  "Estate of Michael Patrick McLoughlin" and the
4  "Estate of Nina Brekelmans." Do you see that?
5  A  Yes.
6  Q  Now, do you know if in your bankruptcy
7  you filed any objections to those claims?
8  A  I don't remember.
9  Q  Do you know if those claims were allowed
10 in your bankruptcy case?
11 A  I don't know.
12 Q  Do you know whether or not judgments were
13 obtained on behalf of those two estates in April
14 of 2018?
15 A  I don't know.
16 Q  You don't know. You don't know there
17 were judgments entered against you?
18 A  What are you -- I don't understand the
19 question, I guess. I don't know. That's why I
20 said I don't know.
21 Q  Do you know if you became obligated
22 sometime in April of 2018 to pay the estate of
23 Michael McLoughlin, Jr., $7,700,000?
24 A  Oh, yes.
25 Q  Do you know --

62

1      THE COURT REPORTER:  I'm sorry, sir; I
2  didn't hear you.
3      THE WITNESS:  Which sir?
4      THE COURT REPORTER:  I heard you say yes.
5  I didn't hear what you said after that.
6      THE WITNESS:  I said -- I don't remember
7  what I said actually. I said I assume -- I said
8  that's why it's on the bankruptcy, I guess, is
9  what I think I said.
10 Q  And at the same time a judgment of
11 $7,500,000 was entered against you in favor of the
12 estate of Nina Brekelmans; correct?
13 A  Yes.
14 Q  Now, those claims are listed as
15 contingent and disputed on your bankruptcy
16 schedules, but you never objected to their claims
17 in your bankruptcy as far as you know; right?
18 A  I don't remember.
19 Q  Do you know whether or not the assets
20 obtained by your trustee were paid in part to the
21 two estates that I just mentioned?
22 A  I remember something -- I remember you
23 said that something was paid, some -- everybody
24 got percentages of something. I don't know what
25 the final -- I don't remember what the final

63

1  outcome of who got what, so you would have to ask
2  him I guess.
3      Q  I'm looking at the "Sun Trust Mortgage"
4  below that. Do you see that? This is under 2.3
5  on the left. Do you see the numbers 2.3, same
6  page?
7      A  No, I do not.
8          MR. McNUTT:  You have to go down, Justin,
9  go down a little bit. Some more. Next page I
10 guess it is.
11     Stop there. Yeah, there we go.
12 Q  Do you see 2.3, "Sun Trust Mortgage"?
13 A  Yes.
14 Q  All right. And you listed the balance
15 owed as $868,754.73. Can you tell me where you
16 got that number?
17 A  No.
18 Q  Do you know if that was the actual amount
19 owed to SunTrust mortgage at the time that you
20 filed your bankruptcy in April of 2018?
21 A  I don't know.
22 Q  Do you know whether your father listed a
23 different amount on his bankruptcy schedules?
24 A  No.
25 Q  Between you and your father, who would

64

1  you believe had the better knowledge of what the
2  current amount due SunTrust was as of April 18,
3  2018?
4  A  Him.
5  Q  Okay. And do you have any reason to
6  disagree with the number that your father stated
7  on his schedules in 2018, in April of 2018?
8  A  No.
9      MR. McNUTT:  Justin, let's go back to
10 Exhibit 6.
11     AV TECHNICIAN:  Okay. One moment.
12 Q  This is, again, the e-mail from your
13 father, Max Salas, to Mr. Goldstein on June 21,
14 2011. You have produced no document that I'm
15 aware of related to any communications between
16 your father and anyone else related to the
17 quitclaim deed since July 6, 2010. Are you aware
18 of any document that exists between the period of
19 July 6, 2010, to June 21, 2011, related to the
20 recording of the quitclaim deed?
21 A  No.
22 Q  And with respect to your own records and
23 documents, you looked at everything you thought
24 was available to you and could not find any
25 documents between July 6, 2010, and June 2011; is

---

**69**

1    AV TECHNICIAN: One moment.
2    This is Exhibit 7. Is this what you're
3  looking for?
4    MR. McNUTT: Yes, sir.
5    AV TECHNICIAN: Okay.
6    Q  Mr. Salas, would you look at what has
7  been -- well, it hasn't been marked, but I guess
8  it's Exhibit 7. It looks like it's going to be
9  marked pretty soon. And it is so marked.
10    (Len Salas Deposition Exhibit 7 marked
11  for identification and is attached to the
12  transcript.)
13    Q  This is another e-mail that you produced
14  back on I believe it was the 23rd of August. And
15  it is an e-mail that the title of the e-mail is
16  "trust #" and then it says Max Salas to
17  Mr. Goldstein, it looks like, with a copy to you
18  and a copy to your brother and it looks like the
19  "EINNumber" is attached dated June 21, 2011. Do
20  you see that?
21    A  Yes.
22    Q  All right. And you got a copy of this
23  e-mail. So you're aware that there was this
24  communication between your father and
25  Mr. Goldstein on June 21, 2011; correct?

---

**70**

1    A  Yes.
2    Q  And there were a series of communications
3  between your father and Mr. Goldstein's office. I
4  believe the attorney's name was Lynne, I will
5  pronounce it, Boileau, B-O-I-L-E-A-U, between
6  approximately this time and early 2017, and the
7  reason I know that is because they're in the
8  e-mails that you produced.
9    After February of 2017 are you aware of
10  any activity with respect to the recordation of
11  the quitclaim deed?
12    A  I don't remember any.
13    Q  Okay. Are you aware of any conversations
14  or communications you had with your father
15  regarding the recordation of the quitclaim deed
16  after February of 2012?
17    A  I don't remember.
18    Q  In your previous testimony in your
19  bankruptcy case you indicated that you had
20  numerous conversations with your father through
21  early 2015 about getting your name off the title
22  to the property. Do you recall that?
23    A  Yeah. If that's what you meant, sure,
24  yeah. I told him multiple times. Is that what
25  you mean?

---

**71**

1    Q  Right.
2    A  Yeah, I mean, I told him multiple times
3  to get it off my name -- to get my name off of it,
4  to get my name off the loan, yes.
5    Q  Not off the title.
6    A  That was a different question.
7    Q  Are you saying get your name off the loan
8  or your name off the title?
9    A  I wanted both. Well, I wanted both. And
10  I guess I didn't remember about the trust and so
11  then it was the question of the loan at that
12  point.
13    Q  All right. Now --
14    A  Maybe. I don't know. I don't remember
15  that much about it. This is ten years ago. You
16  know, I don't even remember.
17    Q  You didn't review your prior testimony in
18  your bankruptcy case before this deposition, did
19  you?
20    A  No.
21    Q  You didn't review your testimony in your
22  father's bankruptcy case in August of 2018 before
23  your deposition today; right?
24    A  No.
25    Q  You made several communications every

---

**72**

1  year since 2010 asking your father for an update
2  on getting your name off the loan and the title.
3  That was your previous testimony. Is that still
4  accurate?
5    A  Sure, yes. I mean, yeah, I said that. I
6  remember saying that.
7    Q  And that's true; correct?
8    A  Yes.
9    Q  Did you do this in 2010 after July 6?
10    A  I don't remember when I started to ask.
11    Q  If you were so concerned about getting
12  your name off the loan and the title, I would
13  think after months went by after July of 2010 you
14  would have been asking your father what's up with
15  this and --
16    A  I remember now, okay. Yes, because I
17  wasn't able -- yes. This sounds about right,
18  2010, 2011, because I wanted -- I had been -- I
19  got married in 2010 and we wanted to buy a house
20  together in my name -- in our joint names, and I
21  wasn't able to. So that was the precipice of all
22  of the e-mails to get the -- I couldn't qualify
23  for a loan for my house so we had to just -- so my
24  wife bought -- so it's not -- so I don't even have
25  any, so, that was the precipice. That's when

---

73

1  the communication started and that's when I
2  started haggling him about getting me off the loan
3  so I could thus qualify to get my name on my house
4  and that loan.
5       So that house was always in my wife's
6  name. And all of our houses are in her name
7  because -- well, I guess they're not our houses,
8  they're her houses. So that was the precipice.
9  So that's probably when the communications
10 started. And there were various on and off and I
11 would, you know, bug him for a while and I would
12 get no answer and then I would start again and --
13 I don't know. I guess it was like that until this
14 whole thing happened.
15     Q   And that happened in every year, 2011,
16 2012, 2013, 2014, and 2015; right?
17     A   Probably. I can't -- I don't remember
18 specific dates.
19     Q   You said that you started and stopped.
20 So maybe a few months would go by and then you
21 would bug him again; is that fair?
22     A   Something like that.
23     Q   Was there ever a period of time more than
24 a year where you think you didn't bug him, just
25 let it go?

74

1      A   Yeah, I guess. I don't know.
2      Q   You don't know, do you?
3      A   No. I probably --
4      Q   Do you know at what period of time --
5      A   I don't remember how often --
6      Q   I'm sorry; go ahead finish your answer.
7  Go ahead. Sorry.
8      A   I don't remember how often I bugged him
9  about it is the answer.
10     Q   Well, you told me before every year. Is
11 that inaccurate?
12     A   Right. But -- yes, every year. But like
13 I don't know if it was once a year, I don't know
14 if it was twice a year, I don't know if it was 12
15 times a year, I don't know if it was 24 times a
16 year. I don't know. That's the part --
17     Q   Fair enough. Fair enough. So at what
18 point did you start forgetting that there was a
19 quitclaim deed?
20     A   How would I -- how could I remember when
21 I forgot?
22         MR. YOUNG: Object as to form.
23     Q   You said that you forgot about it. And
24 I'm asking during all of these attempts to get
25 your father to take your name off the title, at

75

1  what point in time did you start to forget that
2  there was a quitclaim deed?
3      A   I don't know.
4      Q   2011? 2012?
5      A   I think it wasn't the deed at that point;
6  I think it was the loan.
7      Q   Okay. So at some point your discussions
8  changed from getting the deed recorded to get your
9  name off the property to getting the property
10 refinanced?
11     A   Yes.
12     Q   And you just forgot about the deed.
13     A   Yes.
14     Q   Okay. So after this point in time,
15 whenever it was, 2013, 2014, did your father ever
16 bring up the subject of the quitclaim deed?
17     A   I don't remember.
18     Q   Did he ever discuss with you the
19 importance of getting the quitclaim deed recorded?
20     A   I don't remember.
21     Q   Did he ever discuss with you his
22 inability to get the quitclaim deed recorded?
23     A   I don't remember.
24     Q   When were you served with the papers in
25 the Superior Court litigation from the estates of

76

1  Ms. Brekelmans and Mr. McLoughlin?
2      A   After the fire and before the trial. I
3  don't remember exact date.
4      Q   The lawsuits were filed in October of
5  2015. Do you know if you were served in 2015?
6      A   October of 2015 sounds about right.
7      Q   When you were served with the papers, who
8  did you discuss that with, the lawsuit?
9      A   Multiple people.
10     Q   Did you discuss it with your father?
11     A   Yes.
12     Q   Did you discuss it with your wife?
13     A   Yes.
14     Q   Did you discuss it with your brother?
15     A   Yes.
16     Q   Okay. Do you recall what you discussed
17 with your brother, what the subject matter was?
18     A   In October of 2015 and this is 2021, six
19 years ago? No, I don't remember.
20     Q   Now, do you know whether you had enough
21 money to pay the attorneys to defend the case
22 against you in the lawsuit?
23     A   Yes.
24     Q   Did you have the money to do that?
25     A   No.

77

1    Q   Okay.  Why not?
2    **A   Because I live paycheck to paycheck.**
3    Q   Okay.  And did you then borrow the money
4  to pay your lawyers?
5    **A   No.  They were paid.**
6    Q   I'm sorry?
7    **A   Excuse me?  No, I didn't.  No.  The**
8  **answer is no.**
9    Q   Okay.  You didn't borrow it.  Where did
10 you get the money from then?
11   **A   I didn't get the money.**
12   Q   You didn't get the money.  So your
13 lawyers worked for nothing?
14   **A   No.  Oh, how did I get the -- oh, well.**
15 **Oh, how did I get the money.  I guess Max paid**
16 **them because I told him I wasn't going to put**
17 **any -- if you want me to have a lawyer, you're**
18 **going to have to pay for it.  So Max paid for it.**
19   Q   So Max paid it.  Did Ron pay any of the
20 money for the legal fees?
21   **A   Yeah, I guess.  I don't know actually.**
22   Q   Okay.  Do you know who paid the retainer
23 for your bankruptcy lawyer?
24   **A   That was Ron.**
25   Q   Did he pay the filing fees as well?

78

1        THE COURT REPORTER:  I'm sorry, sir; I
2  didn't hear you.
3        THE WITNESS:  Which sir?
4    **A   I said I don't know -- I didn't know if**
5  **you were talking about the litigation or the trial**
6  **when you asked your question.**
7    Q   So there is no confusion, let's do it
8  this way:  With respect to the Superior Court
9  litigation, do you know if your brother paid any
10 portion of your legal fees?
11   **A   I don't know.**
12   Q   With respect to the appeal of the
13 Superior Court litigation, do you know if your
14 brother paid any portion of the litigation fees
15 for the appeal?
16   **A   No, I don't know.**
17   Q   Did you pay them?
18   **A   No.**
19   Q   Did you pay any legal fees?
20   **A   No.**
21   Q   So those legal fees were paid by your
22 father, your brother, or someone else?
23   **A   Yes.**
24   Q   Not by you; correct?
25   **A   Yes.**

79

1    Q   And not by your wife?
2    **A   Correct.**
3    Q   And it was because you couldn't afford to
4  pay them in the first place; correct?
5    **A   Yes.**
6    Q   And that goes from the time that the case
7  was commenced in approximately October 2015 to the
8  time of the appeal, which was in April of 2018;
9  correct?
10   **A   Yes.**
11   Q   And then on April 18, 2018, you filed
12 bankruptcy and your brother paid for that?
13   **A   Somebody paid for it.  I don't know if it**
14 **was him.**
15   Q   Well, your bankruptcy schedules actually
16 say that.
17   **A   Okay.**
18   Q   You paid Mr. --
19   **A   Well, all I can tell you is I didn't pay.**
20 **So I don't know.**
21   Q   Fine.
22   **A   If you want the truth, that's the truth.**
23 **I don't know.**
24   Q   I do want the truth.
25   **A   Right.  That's what I'm telling you.  I**

80

1  **don't -- I can tell you for sure that I didn't pay**
2  **them.**
3    Q   Okay.  At least that part I believe.
4        MR. McNUTT:  Justin, let's go to Exhibit
5  12, please.
6        AV TECHNICIAN:  Okay.  One moment.
7        (Len Salas Deposition Exhibit 12 marked
8  for identification and is attached to the
9  transcript.)
10   Q   Exhibit 12, Mr. Salas, is a document that
11 has the reference "trust #."  It's dated June 22,
12 2011, one day later than our previous e-mail, and
13 it is addressed from you to your father.  And it
14 is actually in response to your father's e-mail
15 responding to your prior e-mail asking your
16 father:  "Have you contacted a bank to set up an
17 acct for the trust?"
18   **A   Uh-huh.**
19   Q   And your response is:  "Yeah, I saw that.
20 But that is not what I asked.  I asked if you used
21 this EIN # to set up a bank acct with a bank
22 either BB&T or bank of america or SunTrust."
23        Did I read that correctly?
24   **A   Yes.**
25        MR. McNUTT:  Let's go to the next e-mail.

81

1  This is Exhibit 13, Justin.
2      AV TECHNICIAN:  Yes.  One moment.
3      (Len Salas Deposition Exhibit 13 marked
4  for identification and is attached to the
5  transcript.)
6  Q   That e-mail, this is Exhibit 13, e-mail
7  dated -- well, at the top e-mail dated -- June 22,
8  2011, at 3:19 p.m. from Max Salas to you.  That's
9  in response to the previous e-mail that I just
10 recited and Max' response is "NO."  So I would
11 recognize that as an answer with emphasis.  That's
12 how you read it?
13 **A   Well, no, not really.  Sure, he said no.**
14 Q   No?  How did you read it?
15 **A   No.  He probably -- my assumption was he**
16 **texted -- or he used his phone to answer that**
17 **and -- to answer that e-mail and he's not the most**
18 **technical savvy person that I know so he probably**
19 **left the caps on or whatever.  I don't know.  But**
20 **I don't know if it was emphasis.  That's his**
21 **answer.**
22 Q   Okay.  But his answer was clearly no,
23 wasn't it?
24 **A   Yeah.**
25 Q   Okay.

82

1      MR. McNUTT:  Let me see if we can skip a
2  little bit here.  Okay.  Yeah, let's go to Exhibit
3  19, Justin.
4      (Len Salas Deposition Exhibit 19 marked
5  for identification and is attached to the
6  transcript.)
7  Q   Mr. Salas, this is your Exhibit 19.  It's
8  dated February 27, 2012.  It's an e-mail with a
9  reference "Getting house changed over into trust
10 name."  So this is February of 2012.  This is now
11 more than a year and a half after the quitclaim
12 deed was signed and nothing has happened.  You
13 received this e-mail, didn't you?
14 **A   Yes.**
15 Q   Is this one of the times when you
16 contacted your father and insisted that he do
17 something to get your name off the title?
18 **A   I guess that's what precipitated this**
19 **e-mail, but I'm not sure.  I couldn't tell you for**
20 **sure.**
21 Q   Okay.  As you read it, it says:  "Hi
22 Lynn, about a month and a half back I sent you
23 information in reference to documents of the house
24 1610 Riggs, NW.  Please let me know when it be
25 convenient for you" -- and "it would be" obviously

83

1  -- "My son and I are anxious and would like to
2  close on this as soon as possible please let us
3  know what the next" -- I think it's supposed to
4  mean steps -- "that are from our side."
5      Do you know if anything happened as a
6  result of Mr. Salas' communications with Ms.
7  Boileau, if I pronounced her name right, the
8  attorney at Capitol Title?
9  **A   I don't know.**
10 Q   This is the last e-mail regarding
11 changing the name of the owner of the house into
12 the trust.  Were there no more attempts after
13 February 2012?
14 **A   I don't know.**
15 Q   There were no more communications between
16 you and your father related to the status of this?
17 **A   Probably.**
18 Q   Probably there were?
19 **A   Yeah.**
20 Q   Do you know?
21 **A   I don't know for a fact.  I'm going -- I**
22 **don't remember.**
23 Q   It's true, is it not, Mr. Salas, that in
24 the time frame of 2010 through at least 2012 or
25 '13 that you were involved in more than one

84

1  attempt to refinance the property?
2  **A   Yes.**
3  Q   And all of those failed?
4  **A   Yes.**
5  Q   In fact, weren't you told or your father
6  told that because of the type of loan it couldn't
7  be refinanced?
8  **A   I remember something to that fact.**
9  Q   Do you know when that was?
10 **A   No.**
11     **Can we take five?**
12 Q   I'm sorry?
13 **A   I need to take five.**
14     MR. McNUTT:  Sure.  Let's take a break.
15     (A recess was taken.)
16 BY MR. McNUTT:
17 Q   Let's get back to Exhibit 19 we were
18 looking at.  And I just want to be clear,
19 Mr. Salas, that you found no e-mails or other
20 notes or documents related to any communications
21 with your father after this date with respect to
22 the recordation of the quitclaim deed; is that
23 accurate?
24 **A   Yes.**
25 Q   And you found no written communications

APPX00688

141

1    A    I believe three.

2    Q    At least three?

3    A    I think.

4    Q    Why would you want three originals of a

5 trust document and a quitclaim deed?

6    A    One for each of us. One for the lawyer,

7 which is Ron; one for Max, who signed it; and one

8 for me, who signed it. I --

9    Q    Why do you -- are you done? I'm sorry;

10 are you done?

11    A    No. That's -- well, I think. I'm not

12 sure I am right, but that's what I think.

13    Q    Okay. Why would you need an original

14 rather than a photocopy?

15    A    I don't know.

16    Q    I don't either. Do you have any idea why

17 you would need one?

18    A    No. I mean, I just assumed that's -- I

19 guess what I'm saying is -- yeah, I don't know who

20 kept them. I don't know. Maybe I got a copy of

21 the wet that day. I don't remember. I don't know

22 who kept the original. I assume Ron did, I guess.

23 Now I assume that, but I don't know.

24    Q    Why would Ron have the original if the

25 quitclaim deed had to be recorded by your father

142

1 in the District of Columbia?

2    A    I don't know. That's just a guess.

3    Q    On July 5, 2010, you were the owner of

4 the property at 1610 Riggs Place Northwest; right?

5    A    I was not an owner. I owned the loan.

6 My name was on the loan. I did not own -- I don't

7 believe I owned the property.

8    Q    So your name was not on the deed?

9    A    I don't know how to answer that.

10    Q    Well, you can answer it from what you

11 know.

12    A    I guess when we referred back to that

13 thing, I mean, from our earlier conversation.

14    Q    I have no idea what you're saying. Try

15 to explain it to me.

16    A    You asked me this earlier, so just take

17 my answer from earlier this morning.

18    Q    Well, that might be just as confusing as

19 what you just told me, so I'm trying to clarify

20 it.

21    A    I don't want to -- yeah, I don't want to

22 muddy the waters, so just refer back to that

23 answer.

24    Q    Let me try it this way: You understand

25 that a deed is a document that shows the ownership

143

1 of in this case a piece of property; right?

2    A    I understand that, yes.

3    Q    And the purpose of the quitclaim deed was

4 to allow your father to record a deed showing that

5 he was the owner of the property; correct?

6    A    Yes.

7    Q    Okay.

8    A    Okay. So as of 2007 -- or July 2010 he

9 owned the property. Okay. If that's your

10 reasoning, sure, he owned the property.

11    Q    Okay. But if you had an original

12 quitclaim deed, you could have recorded that deed,

13 too?

14    A    I guess.

15    Q    Because you have an original. Your

16 brother could have recorded one because he had the

17 original.

18    A    Right.

19    Q    And anybody who came into possession --

20 are you still there, Len?

21    A    Yeah, I'm still here. Go ahead. Sorry;

22 I just have --

23    Q    We can't see your face now.

24    A    So I just have to move rooms. Go ahead.

25    Q    So anyone who had a copy of the quitclaim

144

1 deed could have reported that deed and would be

2 the title owner of the property?

3    A    I guess. I don't know how that works.

4    Q    Are you there, Len?

5    A    Yeah, I'm here. Go ahead.

6    Q    Okay. Enough of that.

7        MR. McNUTT:  Let's go to Exhibit 36,

8 Justin, please.

9        AV TECHNICIAN:  The exhibit is on the

10 screen.

11        MR. McNUTT:  Yes, I see it. Thanks.

12 Let's go to Page 15 of 29.

13    Q    Do you see that in front of you,

14 Mr. Salas?

15    A    Yeah.

16    Q    All right. Would you look at Paragraph

17 18, please. By the way, do you recognize this

18 document as the Deed of Trust that you executed in

19 2007?

20    A    I don't know. I mean, not from this

21 paragraph, no, I don't.

22    Q    Well, we reviewed it before. But why

23 don't you --

24        MR. McNUTT:  Justin if you could.

25    Q    -- take a look at Page 18.

APPX00689

145

1    MR. McNUTT:  Maybe make that page a
2  little smaller.  Yeah.
3    A  Okay.
4    Q  Do you recognize that as the document
5  that you signed on April 16, 2007?
6    A  Yeah; now.
7    Q  And if you look at Page 5 --
8    MR. McNUTT:  Justin, please.
9    Q  -- this is the Deed of Trust that you
10  signed in April 2007.
11   A  Okay.
12   MR. McNUTT:  Now, Justin, if you go back
13  to Page 15, please.
14   Q  Paragraph 18, do you see that there,
15  Mr. Salas?
16   A  I do now.
17   Q  Paragraph 18 reads:  "Transfer of the
18  Property or a Beneficial Interest in Borrower.  As
19  use in this Section 18, 'Interest in the Property'
20  means any legal or beneficial interest in the
21  Property, including, but not limited to, those
22  beneficial interests transferred in a bond for
23  deed, contract for deed, installment sales
24  contract or escrow agreement, the intent of which
25  is the transfer of title by Borrower at a future

146

1  date to a purchaser.
2    "If all or any part of the Property or
3  any Interest in the Property is sold or
4  transferred (or if Borrower is not a natural
5  person and a beneficial interest in Borrower is
6  sold or transferred) without Lender's prior
7  written consent, Lender may require immediate
8  payment in full of all sums secured by this
9  Security Instrument."
10   Did I read that correctly?
11   A  Yes.
12   Q  Is it your understanding from the second
13  paragraph of Section 18 that the bank had the
14  right to accelerate the entirety of the Deed of
15  Trust indebtedness upon the transfer of the
16  property from you to your father?
17   A  I don't know.
18   Q  Did you refer to this section to
19  determine whether or not you created any problems
20  with SunTrust by virtue of the quitclaim deed to
21  your father?
22   A  I don't remember.
23   Q  Did you discuss it with your brother?
24   A  I don't remember.  (Indecipherable).
25   Q  Your brother was a lawyer at the time;

147

1  right?
2    A  Yeah.
3    Q  And he prepared both of these documents?
4  He prepared the trust and the quitclaim deed;
5  correct?
6    A  Yes.
7    Q  And you signed them in his office.
8    A  Yes.
9    Q  Did you ask your brother whether there
10  were any consequences of doing this, bad
11  consequences, of having the quitclaim deed
12  recorded?
13   A  Not that I remember.
14   Q  Do you think a competent attorney would
15  have told you that there might be such
16  consequences?
17   A  I don't know.
18   Q  Did you attempt to find out or ask anyone
19  if there were consequences of you executing the
20  quitclaim deed?
21   A  I don't remember.
22   Q  Did you notify SunTrust at any time that
23  you were no longer the owner of the property?
24   A  Not that I can recall.
25   Q  Are you aware of any time that your

148

1  father notified SunTrust that he was the owner of
2  the property?
3    A  No, I couldn't attest to that.
4    Q  Well, you don't know of any time; right?
5    A  Yeah, I don't know.  You know, I don't
6  know if that's something that he would do.  How
7  would I know something...
8    Q  The lawsuit was filed in 2015 and your
9  deposition was taken in 2016 in March, correct,
10  March 9 --
11   A  I think so.
12   Q  -- to be exact?
13   And on March 8 your testimony is that
14  your father prepared a loss mitigation statement
15  attempting to modify the terms of the loan
16  documents because of your inability to pay the
17  loan payments; correct?
18   A  No.
19   Q  Yes, I think so, because it was all based
20  on your inability to make the monthly payments,
21  you lost your job and you had no money to pay it.
22   A  Okay.
23   Q  Isn't that right?
24   A  I don't know.  I guess.
25   Q  It is also true that the house was burned



# Transcript of Kendra Coral Rowe Salas

**Date:** August 27, 2021
**Case:** Brekelmans, et al. -v- Salas

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Case 3:20-ap-90027 Doc 74-14 Filed 08/13/24 Entered 08/01/27 95:56:34 Desc 54
Case 3:20-ap-90027 Doc 74-14 Filed 08/13/24 Entered 08/01/27 95:56:34 Desc
Exhibit 14 Kendra (Salas) Rowe Deposition Transcript in Case No. 20-90027 8-27-2    Page 1 of 4
APPX00691

## Page 1

1    IN THE UNITED STATES BANKRUPTCY COURT
2    FOR THE MIDDLE DISTRICT OF TENNESSEE
3    Nashville, Tennessee
4    - - - - - - - - - - - - - -x
5    IN RE:    :
6    LEN SALAS,    :  CHAPTER 7
7    Debtor-in-possession  :  CASE NO: 18-02662
8    :  JUDGE: HARRISON
9    :
10   (Caption continued on next page)
11   - - - - - - - - - - - - - - -x
12
13
14   Deposition of KENDRA CORAL ROWE SALAS
15   Conducted Virtually
16   Friday, August 27, 2021
17   2:50 p.m. EST
18
19
20
21
22
23   Job No.: 393647
24   Pages: 1 - 35
25   Reported By: Cynthia A. Whyte

## Page 2

1    (Caption continued from previous page)
2
3    NICOLAAS BREKELMANS    :
4    AND GAIL GREGORY    :  ADVERSARY PROCEEDING NO.
5    BREKELMANS,    :  3:20-ap-90027
6    CO-PERSONAL    :
7    REPRESENTATIVES OF    :
8    THE ESTATE OF NINA    :
9    BREKELMANS, et al.,    :
10   In their capacity as    :
11   authorized    :
12   representatives of    :
13   the Estate of Len    :
14   Salas,    :
15   Plaintiffs,    :
16   v.    :
17   MAX SALAS,    :
18   Defendant    :
19
20   Deposition of KENDRA CORAL ROWE SALAS,
21   conducted virtually
22
23
24   Pursuant to notice, before Cynthia A. Whyte,
25   Notary Public in and for the State of Maryland.

## Page 3

1    A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFFS:
4    PHILIP J. McNUTT, ESQUIRE
5    LAW OFFICE OF PHILIP J. McNUTT, PLLC
6    11921 Freedom Drive, Suite 584
7    Reston, Virginia 20190
8    (703) 904-4380
9
10   ON BEHALF OF DEFENDANT:
11   PHILLIP G. YOUNG, JR., ESQUIRE
12   THOMPSON BURTON, PLLC
13   One Franklin Park
14   6100 Tower Circle, Suite 200
15   Franklin, Tennessee 37067
16   (615) 465-6000
17
18   ALSO PRESENT:
19   JUSTIN WOODWARD, AV Technician
20
21
22
23
24
25

## Page 4

1    C O N T E N T S
2    EXAMINATION OF KENDRA CORAL ROWE SALAS    PAGE
3    By Mr. McNutt    5
4
5
6
7
8    E X H I B I T S
9    (Attached to the Transcript)
10   KENDRA SALAS DEPOSITION EXHIBITS    PAGE
11   Exhibit 4    Len Salas Bankruptcy
12   Schedules, 4/18/18    7
13   Exhibit 1    Subpoena    10
14
15
16
17
18
19
20
21
22
23
24
25

Case 3:23-cv-00987    Document 14-1    Filed 08/16/24    Page 537 of 796 PageID #: 4155
APPX00692

13

1    Q   Anyone else?
2    A   My cousin --
3    Q   Okay.
4    A   -- was --
5    Q   What about Ron Salas? I'm sorry; did I
6  cut off your answer?
7    A   Oh, I said my cousin was visiting. It's
8  irrelevant. But I remember her being there so I
9  told her about it.
10    And as far as Ron, I'm sure we discussed
11  it at family gatherings. I don't recall dates or
12  content of those conversations.
13    Q   Okay. And what about your father-in-law,
14  Max Salas?
15    A   I'm sure we also had communication with
16  him about this. I don't recall dates or
17  specifics.
18    Q   Did you understand at any time after your
19  husband was sued that the reason he was sued was
20  because he was the titled owner of the property?
21    A   Yes, that's -- well, yes.
22    Q   Okay.
23    A   I mean, technically. I don't -- none of
24  us consider him the owner of the home. But, yes,
25  I know what you mean, that it was in his name.

14

1    Q   And when you say "none of us consider him
2  the owner of the home," what do you mean by that?
3    A   That that house is Max', that we
4  always -- you know, that Max lived there and took
5  care of the home and that was Max' house.
6    Q   Okay. But you were aware that your
7  husband was obligated to pay the mortgage at least
8  in the event that Max Salas did not pay it; right?
9    A   No.
10    Q   You were not aware of that?
11    A   No, because Max took care of the home,
12  including the mortgage.
13    Q   Were you aware that your husband was on
14  the note to SunTrust for the entire mortgage
15  balance?
16    A   Yes.
17    Q   Had you ever seen the SunTrust loan
18  documents prior to today?
19    A   Not that I remember.
20    Q   Okay. Were you aware that your husband
21  was the only borrower on the SunTrust loan
22  documents?
23    A   Not that I remember. I don't know if I
24  thought Max was on it as well. I'm aware now that
25  Len's name's on it. I don't know if at the time I

15

1  was aware of Max not being on that at that time.
2    Q   Okay. Now, you were present in July of
3  2010 when the infamous trust and the quitclaim
4  deed were executed at Ron's office; right?
5    A   Yes.
6    Q   And when you were there, what did you
7  understand those documents to mean?
8    A   I thought it meant Len's name was going
9  to get off of the house officially and that it
10  would be put into the trust.
11    Q   Okay. Did you have any discussion with
12  Ron, your husband, or Max concerning how that was
13  going to happen?
14    A   Not that I recall. I thought that Max or
15  Ron was going to file it right away and that it
16  was going to be put in place.
17    Q   All right. Do you know whether or not --
18    A   So that's what I assumed.
19    Q   Sorry. Do you know whether or not there
20  were attempts to file the quitclaim deed at any
21  time after July 6, 2010?
22    A   I don't know. Like I said, I thought it
23  had been done already.
24    Q   Did you have any discussions with your
25  husband regarding any issues concerning the

16

1  recordation of the quitclaim deed?
2    A   I don't remember.
3    Q   As you sit there today, do you have an
4  understanding?
5    A   Of what? I'm sorry.
6    Q   Do you have an understanding of any
7  issues with respect to the recording of the
8  quitclaim deed?
9    A   I understand that it did not get put
10  through like it was supposed to or recorded, I
11  guess, as it was supposed to.
12    Q   All right. Do you recall any
13  communications after 2012 concerning the quitclaim
14  deed at all?
15    A   I don't know about the quitclaim deed
16  specifically. I do know Len would -- I don't know
17  how often, but every -- more than once a year
18  would call his father and ask the status of
19  getting his name off of everything. I don't know
20  if that was specific to the quitclaim deed or the
21  mortgage.
22    Q   And when you say "everything," you're
23  talking about the mortgage loan and the deed --
24    A   Yes.
25    Q   -- right?

29

1  sole purpose -- not the sole purpose, but for at
2  least the partial purpose -- of taking Len's name
3  off the property, that all four people, including
4  the people that discussed it, created it,
5  registered it in Colorado forgot completely about
6  the quitclaim deed?  Doesn't that seem unusual to
7  you?
8      A   Do I think it's unusual?
9      Q   Yes.
10     A   No.  I think it's unfortunate.  That's
11  five years.  That's a long time for a document
12  that, like I said, I thought it had been filed or
13  recorded.  So to me it's just unfortunate.  I
14  can --
15     Q   If you had a document that stated that
16  you were the titled owner of a piece of property
17  and somebody challenged that like in a lawsuit,
18  wouldn't you remember to pull up that document and
19  make sure everybody knew that you were the actual
20  owner of the property?
21     A   I would hope so.  That would be great;
22  right?
23     Q   Yeah.
24     A   Like I said, we are all unhappy with
25  ourselves that we forgot that document.

30

1      Q   Oh, yeah, yeah, I'm sure you're all
2  unhappy.  I think my clients are unhappy, too.
3          MR. McNUTT:  All right, Kendra, I
4  appreciate your bearing with me on this.  Let me
5  just make sure I don't need anything else.
6      Q   Oh, one other thing.  Other than July 6,
7  2010, have you ever seen a wet ink original of the
8  quitclaim deed?
9      A   I don't know.  I mean, I saw it when he
10  signed it.  I don't know if I saw an original or a
11  copy after that.  I don't know if what we had was
12  a copy or the original.  I'm not sure.
13     Q   Well, the copy that your husband said he
14  found in the file cabinet, is that the same copy
15  that you produced --
16     A   I had a --
17     Q   -- or is that a different version?
18     A   I had a pdf of it, which I think is the
19  same thing -- I thought it was the same thing as
20  what Len had, but I'm not sure.
21     Q   And Len said approximately February of
22  2018, I'll even pin it down, but approximately
23  February of 2018 is when he found the document in
24  the file cabinet.  That was not an original, that
25  was a copy; correct?

31

1      A   I don't know.
2      Q   You haven't seen an original, though?
3      A   I don't know.  I don't recall if the
4  document he found was an original or a copy.  I
5  don't know.
6      Q   As you sit here today, you can't remember
7  seeing an original of the quitclaim deed on or
8  about February of 2018?
9      A   I'm not sure how else to answer this.  I
10  have said I don't know.  I'm not trying to be
11  rude.  I don't know.  I do not remember if the
12  document was the original or a copy.  I did not
13  think at the time, four years ago, to look at the
14  copy or the original and note if it was a wet
15  signature or if it was a copy of it.  So I don't
16  know what else to tell you on that.  I don't know.
17  I wish I knew and I wish I had a better memory for
18  you, but I do not know.
19         MR. McNUTT:  Kendra, that's all I have.
20  And I, again, appreciate your time and your
21  patience.
22         Madam Court Reporter, do you need to tell
23  the witness about reading and signing and all of
24  that.
25         MR. YOUNG:  Just a moment.  Let me go on

32

1  the record.  This is Phillip Young.
2          MR. McNUTT:  Oh, I'm sorry, Phillip.
3          MR. YOUNG:  I represent Max Salas.  I
4  have no questions for this witness.  Thank you.
5          MR. McNUTT:  Okay.  Okay.  Sorry; I
6  should have asked.
7          Madam Reporter?
8          THE COURT REPORTER:  It's up to you guys
9  about reading and signing.  I don't say anything
10  about that.
11         MR. McNUTT:  Okay.  Kendra, just for the
12  sake of being professional about this, you are
13  entitled to read the transcript that the court
14  reporter provides or you can waive the reading.
15  If you waive the reading, then you accept whatever
16  the court reporter has put down.  The court
17  reporters are pretty good, but sometimes they hear
18  things different than it was said or from the
19  pronunciation have the wrong words or things like
20  that.  So if you're concerned about that, then you
21  would ask to read and sign, which means that the
22  court reporter can provide you with a copy and you
23  have a period of time, I think it's 30 days, to
24  review it and make any corrections that you
25  should be in the record, and then that

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

In re: ) Case No.  18-00260-SMT
)
MAX E. SALAS )
FDBA CLR INC. ) Chapter 11
AKA ERNIE M. SALAS, )
)
Debtor. ) **STIPULATION FOR PLAN TREATMENT**
) **ON FIRST LIEN SECURED BY REAL**
) **PROPERTY AT 1610 RIGGS PLACE NW,**
) **WASHINGTON, DC 20009**
)
)
)
)
_____ )

U.S. Bank National Association as Trustee for the holders of Banc of America Funding Corporation Mortgage Pass-through Certificates, Series 2007-6, its assignees and/or successors, by and through its servicing agent Select Portfolio Servicing, Inc. ("Secured Creditor" herein) and Debtor, Max E. Salas ("Debtor" herein), by and through their attorneys of record, now enter into the below stipulation to resolve and agree to plan treatment of the real property commonly known as 1610 Riggs Place NW, Washington, DC 20009.

**RECITALS**

A.  On April 16, 2007, Len Salas, for valuable consideration, made, executed and delivered a Note secured by a First Deed of Trust (the "Loan Documents") both in the amount of $870,000.00 on the property commonly known as on the property commonly known as 1610 Riggs Place NW, Washington, DC 20009 (the "Subject Property").

B.  On or about 4/18/2018, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Columbia.

C.  As of the date of September 29, 2019 the total amount of Secured Creditor's claim with regard to the Subject Property was approximately $1,208,720.40.

1

APPX00695

D.  The parties have conferred and agreed upon the treatment of Secured Creditor's first lien secured by the Subject Property for purposes of Debtor's Chapter 11 Plan and those terms are reflected below.

**THE PARTIES HERETO STIPULATE AND AGREE AS FOLLOWS:**

1. The value of the Subject Property is in excess of the amount owed in the amount of $1,208,720.40 for the purposes of this instant Chapter 11 case.

2. Secured Creditor will have a fully secured claim.

3. Debtor agrees to pay the secured claim in the approximate amount of $1,208,720.40 at a 5.25% fixed interest rate with payments calculated at a 360 month amortization schedule, with all amounts due upon the maturity date May 1, 2037.

4. All amounts still outstanding upon the maturity date under this agreement, will be due and owing in full on the maturity date May 1, 2037.   There will be deferred interest due upon maturity.

5. The principal and interest payment ("P&I" herein) under these agreed terms is approximately $6,682.26 per month. This amount is approximate, and the formal re-amortization under this agreement will be completed by Secured Creditor after successful confirmation of the Plan of Reorganization that incorporates same.

6. The loan will remain impounded for taxes and insurance on the Subject Property in accordance with the terms of the deed of trust and note.  The current amounts due are taxes at $1,188.43 per month and insurance at $458.50 per month.  Debtor is aware these amounts may fluctuate.  Secured Creditor may exercise its remedies as described in the deed of trust and note.  Debtor also agrees to provide proof of insurance to Secured Creditor within 30 days upon request.

7. The first payment under this agreement is due November 1, 2019 in the amount of $8,329.19 per month (principal and interest in the amount of $6682.26 plus taxes in the amount of $1,188.43 and insurance in the amount of $458.50). Debtor agrees to make payments in this amount until the permanent loan adjustments are made and post

2

Case 3:20-ap-90027 Doc 74-16 Filed 06/03/24 Entered 08/01/27 15:54:21 Desc
Exhibit 15 M Salas-U.S. Bank Stipulation in Case No. 18-260 11-20-19    Page 2 of 5    APPX00696

confirmation mortgage statement is sent out reflecting the new loan terms and monthly payment amount.  Debtor agrees to pay the amounts reflected in those statements.

8. Payments shall be made directly to Secured Creditor at Attn: Remittance Processing, P.O. Box 65450, Salt Lake City, UT 84165-0450, with reference to the last four digits of the Loan Number 3844, or as otherwise directed.

9. All post petition escrow advances will remain due and owing on the loan and will be included in the total principal balance due upon maturity.  The payment required under this stipulation prior to confirmation does not include any amounts needed to fund the escrow payment per RESPA.  If funding is needed, the escrow shortage if applicable will be calculated and added to the monthly payment after the permanent loan adjustments are made and post confirmation mortgage statement is sent out reflecting the new loan terms and monthly payment amount.

10. The parties agree that this loan may be refinanced postpetition as part of a plan to pay unsecured creditor or liens junior to this lien.  If the property is refinanced with a new lender, Secured Creditor will be entitled to full payoff prior to any fees or payments to junior lienholder.  The parties also agree that the reamortization of the loan per this Agreement post confirmation will give credit, and/or the total debt will be reduced by any amounts credited for any escrow now due on the loan.

11. All other terms of the Loan Documents not directly altered by this agreement will remain in full force and effect.

12. Secured Creditor has relief from the automatic stay as to the Subject Property upon confirmation of Debtor's Chapter 11 Plan.

13. In the event of a default on payments to Secured Creditor under the terms of this stipulation prior to the entry of the confirmation order, Secured Creditor shall notify Debtor and Debtor's counsel of the default by CM/ECF.  Debtor shall have ten (10) calendar days from the date of the written notification to cure the default, and Debtor agrees to pay an additional $100.00 for attorney fees for each default occurrence.  If Debtor fails to cure the default, Secured Creditor may lodge a declaration of default and order terminating the automatic stay and include that the 14-day stay as provided in

Stipulation for Plan Treatment, Case No. 18-00260-SMT
File No. DC-19-157592

FRBP 4001(a)(3) is waived.  Upon entry of the order the automatic stay shall be terminated and extinguished for purposes of allowing Secured Creditor to notice, proceed with, and hold a trustee's sale of the Subject Property, pursuant to applicable state law and without further Court Order or proceeding being necessary, including any action necessary to obtain complete possession of the Subject Property, including unlawful detainer.

14. In the event of a default on payments to Secured Creditor under the terms of this stipulation after the entry of the confirmation order, Secured Creditor shall may proceed pursuant to the terms of the underlying Loan Documents, and state and federal law, to obtain complete possession of the Subject Property, including unlawful detainer, without further court order or proceeding being necessary.  Any and all default provisions included in Debtor's Chapter 11 plan are not applicable to Secured Creditor with regard to the Subject Property, and Secured Creditor is only bound by the terms included in this stipulation.

15. Debtor agrees to incorporate the above agreed terms of lien treatment into any and all existing and future proposed Chapter 11 Plans through either exact language or by attaching this stipulation as an exhibit to the plan, and if any terms in Debtor's Chapter 11 Plan conflict with the terms of this stipulation the terms of this stipulation will control. In the event that Debtor's Chapter 11 Plan does not reflect the language of this stipulation, Debtor agrees) that the stipulation terms will be incorporated into the confirmation order through exact language, attachment of the stipulation as an exhibit to the confirmation order, or by reference in the confirmation order of the stipulation by document number.

16. Secured Creditor agrees to vote for Debtor's Chapter 11 Plan provided that Debtor has complied with all provisions of this stipulation.

17. If this instant Chapter 11 bankruptcy petition is dismissed and/or converted to another chapter under title 11, Secured Creditor's lien shall remain a valid secured lien for the full amount due under the original Promissory Note and all payments received under this

4

Stipulation for Plan Treatment, Case No. 18-00260-SMT
File No. DC-19-157592

APPX00698

1  agreement will be applied contractually under the original terms of the Deed of Trust and

2  original Promissory Note.

3

4    IT IS SO STIPULATED:

5

6  /s/ Leah Freedman                          /s/ Justin P. Fasano
   Leah Freedman, Esq., MD Fed. Bar No. 18950  Justin P. Fasano
7  BWW Law Group, LLC                          McNamee, Hosea, Jernigan, Kim,
   6003 Executive Blvd, Suite 101              Greenan & Lynch, P.A.
8  Rockville, MD 20852                         Janet M. Nesse (Bar No. 358514)
   P: 301-961-6555, F:301-961-6545             Justin P. Fasano (Bar No. MD21201)
9  bankruptcy@bww-law.com                      6411 Ivy Lane, Suite 200
   *Counsel for the Movant*                     Greenbelt, MD 20770
10                                             Phone: 301-441-2420
11                                             jnesse@mhlawyers.com
                                               jfasano@mhlawyers.com
12                                             *Proposed Conflicts Counsel for Debtor*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

| Debtor 1 | **Max E. Salas** | Case number *(if known)* | **18-00260** |
|---|---|---|---|

7. **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

☐ No
■ Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|
| **Len Salas**<br>**1018 Vince Court**<br>**Mufreesboro, TN 37128** | **4/6/2017, 5/3/2017, 12/11/2017, 2/27/2018, 4/5/2018** | **$1,656.66** | **Unknown** | **Reimbursement of travel an other expenses associated with Superior Court trials.** |

8. **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
Include payments on debts guaranteed or cosigned by an insider.

☐ No
■ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment<br>Include creditor's name |
|---|---|---|---|---|
| **Len Salas**<br>**1018 Vince Court**<br>**Mufreesboro, TN 37128** | **3/26/2018** | **$2,000.00** | **Unknown** | **Payment of attorney fees associated with DC Superior Court Cases**<br>**Paid to:**<br>**Michael C. Forster, Esq.**<br>**Forster Law Firm**<br>**2007 Vermont Ave., NW**<br>**Washington, DC 20001** |

**Part 4:** Identify Legal Actions, Repossessions, and Foreclosures

9. **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

☐ No
■ Yes. Fill in the details.

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Michael McLoughlin, Jr. et al. v. Len Salas, et al.**<br>**2015 CA 0008054 B** | **wrongful death and survival actions** | **DC Superior Court**<br>**500 Indiana Ave., NW**<br>**Washington, DC 20001** | ☐ Pending<br>■ On appeal<br>☐ Concluded |
| **Nina Brekelmans, et al. v. Len Salas, et al.**<br>**2015 CA 0008061 B** | **wrongful death and survival actions** | **DC Superior Court**<br>**500 Indiana Ave., NW**<br>**Washington, DC 20001** | ☐ Pending<br>■ On appeal<br>☐ Concluded |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                        Case number *(if known)*    **18-00260**

24. Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

25. Have you notified any governmental unit of any release of hazardous material?

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

■ No
☐ Yes. Fill in the details.

| Case Title<br>Case Number | Court or agency<br>Name<br>**Address** (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|

**Part 11:**    Give Details About Your Business or Connections to Any Business

27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?

   ■ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

   ☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

   ☐ A partner in a partnership

   ☐ An officer, director, or managing executive of a corporation

   ☐ An owner of at least 5% of the voting or equity securities of a corporation

   ☐ No. None of the above applies.  Go to Part 12.

   ■ Yes. Check all that apply above and fill in the details below for each business.

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br><br>Name of accountant or bookkeeper | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| CLR Inc.<br>1610 Riggs Place, NW<br>Washington, DC 20009 | Revoked DC Corporatin with interests reverting to Debtor.<br>Name of business used by debtor following revokation. | EIN:    52-2080620<br><br>From-To   1995 - 2009 |

28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.

■ No
☐ Yes. Fill in the details below.

| Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                                Best Case Bankruptcy

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor-in-possession | : | |

| | |
|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS, et al | : |
| | : |
| In their capacity as authorized representatives of the Estate of Len Salas | : |
| | : |
| Plaintiffs | |
| v. | : Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : |
| Defendant | : |

## AMENDED RESPONSES TO REQUESTS
## FOR ADMISSIONS TO THE DEFENDANT

Comes Now, Defendant, Max Salas ("Defendant"), and for his Amended Responses to Requests for Admissions to the Defendant (the "Discovery")[1], states as follows:

## GENERAL OBJECTIONS

1.     Defendant's Responses to the Discovery shall not constitute a waiver of his objections as to admissibility.

2.     Defendant objects to the Discovery to the extent it exceeds the scope of permissible discovery.

3.     Defendant objects to the Discovery to the extent that the information sought is protected from discovery by the attorney-client privilege or the attorney work-product doctrine.

4.     Defendant objects to the Discovery to the extent that the information and documents sought are not in his possession, custody or control.

5.     Defendant objects to the Discovery to the extent that the information sought is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6.     Defendant objects to the Discovery to the extent that the information sought is equally available to Plaintiff as to Defendant.

7.     Defendant objects to the definitions and instructions to the extent Plaintiff seeks to impose any requirement in excess of those imposed by the Federal Rules of Civil Procedure. Additionally, Defendant is not required by the Federal Rules of Civil Procedure to adopt, follow or utilize Plaintiff's definitions and instructions, and Defendant's Responses are based upon the governing provisions of the applicable Rules, laws and the ordinary and usual meaning of the words used, except as otherwise noted in the Responses.

8.     Defendant reserves the right to supplement his Responses to the Discovery based upon subsequently acquired information as permitted by the Federal Rules of Civil Procedure.

## REQUESTS FOR ADMISSION

1.  That the Defendant does not have the original Quitclaim Deed allegedly created in July, 2010.
    **Response:**  Admitted.

2.  That the Defendant is unaware of the location of the original Quitclaim Deed.
    **Response:**  Denied.  Ron Salas has an original copy.

3.  That the Defendant did not attempt to record the Quitclaim Deed after 2010.
    **Response:**  Admitted.

4.  That the Defendant is unaware that the original Quitclaim Deed exists.
    **Response:**  Denied.  Ron Salas has an original copy.

Defendant to refinance the D.C. Property.
>    **Response:** Admitted.

6.  That the Defendant tried to obtain refinancing after July, 2010 but was unsuccessful in doing so.
>    **Response:** Admitted.

7.  That the Defendant made no attempts to refinance the D.C. Property after 2012.
>    **Response:** Denied.

8.  That all D.C. notices regarding the Property, after 2007, were addressed to Len Salas as owner of the Property.
>    **Response:** Admitted.

9.  That the Defendant did not want the Property in his name after 2010 so that he could avoid any tax or other obligations in his name.
>    **Response:** Denied. Titling the Property in Len Salas' name had nothing to do with tax obligations or any other obligations.

10.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
>    **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information. Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

11.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid D.C. property taxes owed against the Property.
>    **Response:** Denied. Property taxes were paid from 2008 – 2018.

12.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid local utilities' obligations owed against the Property.
>    **Response:** Denied. Utilities were paid from 2008-2018.

13.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid fines for violations of D.C. ordinances against the Property.
>    **Response:** Denied. Defendant is aware of no unpaid fines from 2008-2018.

14.  That during the period, 2008 through March, 2018, there were outstanding, overdue, unpaid federal income taxes owed by you.
>    **Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information. Notwithstanding that objection, and pursuant to the Court's Discovery Order, Defendant admits that there were outstanding, overdue, unpaid federal income taxes owed by him during the time period 2015-2018.

15.  That the Defendant was aware, in 2016 that his son Ron Salas and his son Len Salas, both had, or should have had, copies of the 2010 Quitclaim Deed.
>    **Response:** Denied. Defendant was unaware in 2016 that Ron Salas or Len Salas

Case 23-04-90027 Doc 94-1 Filed 08/02/24 Entered 08/02/24 15:56:34 Desc
Case 23-cv-00002 Document 41-1 Filed 06/03/25 Page 3 of 22 Page ID #:67
Exhibit 17 M Salas Amended Responses to Plaintiffs Requests for Admission in Cas    Page 3 of 8
X-0704

16.  That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.
   **Response:**  Admitted.

17.  That Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation.
   **Response:**  Admitted.

18.  That Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note.
   **Response:**  Admitted.

19.  That Max Salas did not notify Sun Trust or the D.C. government that he was an obligor under the Sun Trust Deed of Trust.
   **Response:**  Denied.  Max Salas notified SunTrust that he was obligated under the Deed of Trust.

20.  That Max Salas did not notify D.C. or any taxing authority that he was the owner of the DC Property.
   **Response:**  Denied.  Max Salas has recorded the DC Bankruptcy Court order which declares him the owner.  Max Salas also filed a homestead exemption with the Register of Deeds in 2012.

21.  That the document attached as Exhibit B to the Amended Complaint filed herein is a true and correct copy of the Order Confirming Debtor's Third Amended Plan of Reorganization and The Third Amended Chapter 11 Plan of Reorganization Dated January 22, 2020.
   **Response:**  Admitted.

22.  That the transcript of your testimony in the bankruptcy case of Len Salas, Case No. 3:18-bk-02662 "the Len Salas Case"), dated December 12, 2018 is a true and correct copy of your testimony on December 12, 2018 in Nashville, Tennessee.
   **Response:**  Admitted.

23.  That you were present at all times, during the hearing on the attempted confirmation of the Debtor's proposed Chapter 11 Plan, the Len Salas Case, on December 12 and 13, 2018.
   **Response:**  Admitted.

24.  That you were represented by counsel at that hearing, including Mr. Cox, Mr. Albert and Mr. Young.
   **Response:**  Admitted.

25.  That on or about July 6, 2010 you visited your son, Ron, at his residence in Colorado along with your son, Len, and his wife.
   **Response:**  Admitted.

26.  That all lease payments for rental income from the rental of all or part of the DC Property from the period May, 2007 through April, 2018 were deposited into an account in the

A0705

**Response:** Denied as stated. Some, but not all, lease payments for rental income from the DC Property from May 2007 through Aprils 2018 were deposited into a CLR Trust bank account.

27. That there was no active bank account in the name of "CLR" other than the CLR Trust during the period between July, 2010 and April, 2018.
**Response:** Defendant can neither admit nor deny this Request as he does not understand the question as stated.

28. That you did not provide copies of bank statements, canceled checks, or other bank records related to any bank account on which you were a signatory, or in which you deposited funds as part of your document production to the Plaintiffs in the matter of their objection to your claim of exemption in the Salas Bankruptcy.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

29. That as of June 1, 2015 you had a copy of the signed Quitclaim Deed in your possession.
**Response:** Admitted.

30. That on and after July 6, 2010 you were aware that you had received the only signed, original Quitclaim Deed.
**Response:** Denied. Defendant later became aware that other signed, original copies of the Quitclaim Deed existed.

31. That the sole purpose of the Quitclaim Deed was to allow you the opportunity to refinance the Property so that your son would no longer have Deed of Trust obligation to Sun Trust Bank, or any other lender associated with the Property.
**Response:** Denied. Another purpose of the Quitclaim Deed was to secure a mortgage with a lower interest rate than the SunTrust Deed of Trust carried.

32. That the source of the funds to be used by your son, Ron, to purchase the Trustee's Avoiding and Recovery Powers from Mr. Gigandet in the L Salas Bankruptcy was funds owned and controlled by you.
**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

33. That all at times after commencement of the Superior Court Litigation you were aware of the existence of the Quitclaim Deed and the Riggs Property Trust.
**Response:** Denied.

34. That, at all times after commencement of the Superior Court Litigation you were aware that your sons, Ron and Len, had copies of the Quitclaim Deed.
**Response:** Denied.

35. That your son, Ron Salas, a Colorado lawyer was aware of the pendency of the Superior Court Litigation almost immediately after its commencement in 2015.
**Response:** Defendant objects to this Request on the grounds that it is

Case 23-04001-JMM Doc 27 Filed 04/11/24 Entered 08/01/22 15:56:34 Desc 69
Exhibit 17 M Salas Amended Responses to Plaintiffs Requests for Admission in Cas    Page 5 of 8

36. That your son, Ron, was aware that the only reason your other son, Len, was a defendant in the Superior Court Litigation is because he was the titled owner of the Property.

**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information. Defendant further objects on the grounds that the Request seeks information from Defendant regarding the mental impressions of a third party.

37. You were aware, prior to 2016, that the only reason your son, Len, was a Defendant in the Superior Court Litigation was because he was the titled owner of the Property.

**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

38. That your son, Len, was physically present at your deposition in the Superior Court Litigation held on February 24, 2016.

**Response:** Admitted.

39. That you were physically present at Len's deposition in the Superior Court Litigation held on March 9, 2016.

**Response:** Admitted.

40. That you were unaware of the possibility that the Property could be exempted in a bankruptcy proceeding by you until after you spoke to Mr. Marc Albert in early 2018.

**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information. Defendant further objects on the grounds that the Request seeks information that is protected by the attorney-client privilege.

41. That you have not contacted Ms. Sylvia Jones regarding the location or existence of the original Quitclaim Deed since June, 2015.

**Response:** Admitted.

42. That you have not contacted Stan Goldstein or Capitol Title regarding the location or existence of the original Quitclaim Deed since June, 2015.

**Response:** Denied.

43. That you made no payments against the Sun Trust Deed of Trust Note during the period June 1, 2015 through October, 2019.

**Response:** Denied.

44. That the Note balance as of April, 2007 totaled approximately $870,000.

**Response:** Admitted.

45. That the Note balance as of June, 2010 totaled more than $870,000.

**Response:** Defendant is without sufficient knowledge to admit or deny this Request.

46. That the Note balance as of July, 2010 totaled more than $870,000.

**Response:** Defendant is without sufficient knowledge to admit or deny this Request.

than $1,030,825.86.
>**Response:** Admitted.

48, That the Note balance as of October 23, 2019 was $1,208,720.40.
>**Response:** Admitted.

49. That the Proof of Claim filed by the Internal Revenue Service ("the IRS Claim") in your bankruptcy case on December 16, 2018 (C-2-1) is a true and correct copy of the IRS claim which was allowed under your Confirmed Plan.
>**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

50. That you did not object to the IRS Claim and it remains an allowed secured and priority claim allowed in the Salas Bankruptcy.
>**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

51. That from the period 2008 through May, 2015 you rented multiple rooms at the Property, from time to time.
>**Response:** Admitted.

52. That from the period 2008 through 2018 you did not declare the income from the rentals of rooms at the Property as income on your Federal or D.C. Income Tax Returns.
>**Response:** Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

53. That from 2008 through the present, all notices from the District of Columbia and all tax forms related to the Property were addressed to Len Salas.
>**Response:** Defendant objects to this Request on the grounds that it is duplicative.

54. That the Complaint is made by the Plaintiffs on behalf of the bankruptcy estate of Len Salas.
>**Response:** Admitted.

55. That Salas had no communications with the Trustee concerning the Quitclaim Deed or the Riggs Property Trust until sometime after March, 2019.
>**Response:** Denied. Defendant's first communications with the Trustee concerning the Quitclaim Deed and the Riggs Property Trust occurred in December 2018.

56. That neither Salas nor Len produced a copy of the Quitclaim Deed or the Riggs Property Trust in their document production as part of the Superior Court Litigation.
>**Response:** Admitted.

57. That neither Salas nor Len provided the original or a copy of the Quitclaim Deed or Riggs Property Trust to Plaintiffs or their counsel (in the Superior Court Litigation) until after February 15, 2018.
>**Response:** While Defendant cannot admit to an exact date, Defendant admits that it was sometime after this general timeframe.

Case 23-10027 Doc 74-1 Filed 06/03/25 Entered 06/03/25 15:56:34 Desc
Case 3:20-ap-90027 Doc 44-1 Filed 08/13/24 Page 553 of 796 Page ID Desc
Exhibit 17 M Salas Amended Responses to Plaintiffs Requests for Admission in Cas   Page 7 of 8
APPX0708

58.  That the intent of the attempted Quitclaim Deed in July, 2010 was to remove Len Salas from any liability related to the DC Property.
>    **Response:**  Defendant denies that this was the only reason for the Quitclaim Deed, as explained in other responses herein.

59.  That the intent of the Riggs Property Trust was to avoid having the property in the name of Max Salas.
>    **Response:**  Admitted, but the transfer to the trust was only done to aid in refinancing the note.

60.  That the intent of the Riggs Property Trust was to avoid income tax liability of, or by, Max Salas.
>    **Response:**  Denied.

61.  That Salas was unaware he could exempt his alleged interest in the DC Property until after 2017.
>    **Response:**  Defendant objects to this Request on the grounds that it is irrelevant and unlikely to lead to any discoverable information.

62.  That Salas did not attempt to locate a copy of the Quitclaim Deed or Riggs Property Trust until 2018.
>    **Response:**  Admitted.

63.  That Salas was unaware of any assets owned or controlled by Len over the value of $25,000 in July, 2010.
>    **Response:**  Admitted, because Defendant had little knowledge of Len Salas' assets in July 2010.

64.  That Salas had more than one conversation with Len after 2010 about removing Len from the title to the DC Property.
>    **Response:**  Admitted.

65.  That Salas had more than one conversation with Len after 2010 about eliminating Len as an obligor on obligation(s) secured by the DC Property.
>    **Response:**  Admitted.


Respectfully submitted,

/s/ Phillip G. Young
Phillip G. Young (TN 021087)
THOMPSON BURTON, PLLC
6100 TOWER CIRCLE, SUITE 200
FRANKLIN, TENNESSEE 37067
(615)-465-6008
phillip@thompsonburton.com

*Attorneys for Defendant*

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name   Middle Name   Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name   Middle Name   Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | **18-00260** |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 106D
## Schedule D: Creditors Who Have Claims Secured by Property
12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

■ Yes. Fill in all of the information below.

**Part 1:   List All Secured Claims**

2. List all secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | Column A | Column B | Column C |
|---|---|---|---|---|
| | | Amount of claim | Value of collateral that supports this claim | Unsecured portion |
| | | Do not deduct the value of collateral. | | If any |

**2.1  Internal Revenue Service**
Creditor's Name

**Cental Insolvency Operation
PO Box 7346
Philadelphia, PA
19101-7346**
Number, Street, City, State & Zip Code

**Who owes the debt?** Check one.
■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

Date debt was incurred   **2009, 2010, 2011**

**Describe the property that secures the claim:**

**All property**

**As of the date you file, the claim is:** Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Nature of lien.** Check all that apply.
☐ An agreement you made (such as mortgage or secured car loan)
■ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset)   **IRS Tax Lien**

Last 4 digits of account number   **2714**

Column A: **$6,766.92**   Column B: **Unknown**   Column C: **$0.00**

**2.2  SunTrust Mortgage, Inc.**
Creditor's Name

**ATTN: Client Services - RVW 30
P.O. Box 26149
Richmond, VA
23260-6149**
Number, Street, City, State & Zip Code

**Who owes the debt?** Check one.
☐ Debtor 1 only
☐ Debtor 2 only

**Describe the property that secures the claim:**

**1610 Riggs Place, NW Washington, DC 20009
Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed
trust collapsed on creation through merger to convey property to debtor
DC Records displays owner as Len**

**As of the date you file, the claim is:** Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Nature of lien.** Check all that apply.
☐ An agreement you made (such as mortgage or secured car loan)

Column A: **$1,030,825.86**   Column B: **$2,500,000.00**   Column C: **$0.00**

Official Form 106D   Schedule D: Creditors Who Have Claims Secured by Property   page 1 of 2

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com   Best Case Bankruptcy

APPX00710

## Cox, Joshua W.

| | |
|---|---|
| **From:** | Ron Salas <ronsalas@salaslegal.com> |
| **Sent:** | Wednesday, February 14, 2018 3:48 PM |
| **To:** | Albert, Marc |
| **Cc:** | maxsalas@aol.com; m.salas1953@gmail.com |
| **Subject:** | Signed Trust |
| **Attachments:** | Trust Doc.pdf |

My apologies for the delay. I have the originals.

Regards,
Ron

Ron Salas, Esq.

ronsalas@salaslegal.com
Office (970) 232.3330
Fax (877) 667-2860

**Fort Collins**
323 W Drake Road, Suite 116
Fort Collins, CO 80526

**Greeley**
4290 West 10th Street, Suite 110
Greeley, CO 80634

www.thesalaslawfirm.com

**CONFIDENTIALITY NOTICE:** This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

 Virus-free. www.avg.com

**Cox, Joshua W.**

| | |
|---|---|
| **From:** | Albert, Marc |
| **Sent:** | Wednesday, March 07, 2018 11:11 AM |
| **To:** | 'Rod R. Barnes' |
| **Cc:** | 'Max Salas' |
| **Subject:** | RE: Signed Trust |

Sorry I meant Ron Salas.

**From:** Cox, Joshua W.
**Sent:** Wednesday, March 07, 2018 11:04 AM
**To:** Albert, Marc
**Subject:** RE: Signed Trust

I think you meant Ron Salas.

Joshua W. Cox
Attorney
Washington
202.728.3023
x63023

**From:** Albert, Marc
**Sent:** Wednesday, March 07, 2018 11:03 AM
**To:** Rod R. Barnes; Max Salas
**Cc:** Cox, Joshua W.
**Subject:** FW: Signed Trust

Clarification. I spoke to Ron Barnes this morning. He indicated he misspoke in his email. He gave the originals to his father so they could be recorded in DC. He only retained a copy of the signed documents.

Marc E. Albert
Partner
Washington
202.728.3020
x63020

**From:** Ron Salas [mailto:ronsalas@salaslegal.com]
**Sent:** Wednesday, February 14, 2018 3:48 PM
**To:** Albert, Marc
**Cc:** maxsalas@aol.com; m.salas1953@gmail.com
**Subject:** Signed Trust

My apologies for the delay. I have the originals.

Regards,
Ron

Ron Salas, Esq.

ronsalas@salaslegal.com
Office (970) 232.3330
Fax (877) 667-2860

**Fort Collins**
323 W Drake Road, Suite 116
Fort Collins, CO 80526

**Greeley**
4290 West 10th Street, Suite 110
Greeley, CO 80634

www.thesalaslawfirm.com

**CONFIDENTIALITY NOTICE**: This e-mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and attorney-client or attorney-work-product privileged. This information is intended only for the use of the recipient named above and any other person who has been specifically authorized herein to receive it, and the referenced legal privileges are not waived by virtue of the information having been sent by e-mail. If you are not the intended recipient, you are hereby notified that any use, disclosure, distribution, copying, or action taken in reliance upon the contents of the information contained in this e-mail is strictly prohibited. If you have received this e-mail in error, or if any problems occur with the transmission, please immediately notify the sender. Thank you.

 Virus-free. www.avg.com

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                              .    Case No. 18-00260-smt
                                    .
MAX E. SALAS,                       .
                                    .    Washington, D.C.
                 Debtor.            .    August 22, 2018
                                    .
. . . . . . . . . . . . . . .

            TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
                           VOLUME 1 OF 3
                BEFORE THE HONORABLE S. MARTIN TEEL, JR.
                TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT

APPEARANCES:
For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020

For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380

Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

OPENING STATEMENTS:                                          PAGE:
By Mr. McNutt                                                10
By Mr. Albert                                                27


WITNESSES:                                                   PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt                             37

LEN SALAS
Direct examination by Mr. Albert                             98
Cross-examination by Mr. McNutt                              116
Redirect examination by Mr. Albert                           187
Recross-examination by Mr. McNutt                            199

RON SALAS
Direct examination by Mr. Albert                             206
Cross-examination by Mr. McNutt                              219
Redirect examination by Mr. Albert                           245

EXHIBITS:                                         MARKED:  RECEIVED:

DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)                  *         9
B.  4/16/07 deed of trust                           *         9
    (L.Salas/SunTrust) with 7/8/15
    Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement              *         9
D.  7/6/10 L.King journal entries                   *         9
E.  Encomass insurance policy                       *         9
F.  1610 lease documents                            *         9
G   Email chain beginning 2/14/18                   *         --
    R.Salas to insurance counsel
H.  3/19/18 emergency motion for                    *         9
    summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules *                  9
J.  M.Salas Answer to Interrogatories               *         9
    (Brekelmans case)
K.  M.Salas Answer to Interrogatories               *         9
    (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S | | |
| 1. Trial Transcript, 3/26/18, pp.1-19 | * | 8 |
| 2. Joint pretrial statement, 7/18/17 | * | 8 |
| 3. Pretrial order, 12/29/17 | * | 8 |
| 4. Amended joint pretrial statement, 2/15/18 | * | 8 |
| 5. McLoughlin Complaint, 10/20/15 | * | 8 |
| 6. Brekelmans Complaint, 10/20/15 | * | 8 |
| 7. L. Salas Answer (Brekelmans Complaint) 11/13/15 | * | 8 |
| 8. L. Salas Answer (McLoughlin Complaint) 11/13/15 | * | 8 |
| 9. M.Salas Answer (McLoughlin Complaint) | * | 8 |
| 10. M.Salas Answer (Brekelmans Complaint) | * | 8 |
| 11. Memorandum in support of L.Salas motion to dismiss | * | 8 |
| 12. M.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 13. L.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 14. M.Salas Deposition Transcript dated 2/14/16 | * | -- |
| 15. L.Salas Deposition, 3/9/16 pages 117-120 | * | 54 |
| 16. 4/27/95 deed (Wilhelm/Bruff) | * | 8 |
| 17. 4/16/07 deed (Bruff/M.Salas) | * | 8 |
| 18. 4/16/07 deed (M.Salas/L.Salas) | * | 8 |
| 19. Deed of trust (L.Salas/Sun Mortgage) | * | 8 |
| 20. Property request report for 1610 Riggs Place Northwest | * | 8 |
| 21. D.C. notice of infraction | * | 8 |
| 22. DCRA notice of immediate abatement | * | 8 |
| 23. Memorandum in Support of L. Salas' Emergency Motion for Summary Judgment | * | 8 |
| 24 8/10/18 R.Salas deposition excerpts | * | -- |
| 25. Lease, 10/1/14 - Tamasco | * | 8 |
| 26. Lease, 6/2/14 (first page) | * | 8 |
| 27. Lease, 17th of 2014 to Brekelmans | * | 8 |
| 28. Lease, 8/17/14 to Brekelmans | * | 8 |
| 29. Lease, 11/1/14 to Mecham | * | 8 |

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S (continued) | | |
| 30. Irrevocable Trust, 7/6/10 | * | 8 |
| 31. Cornet letter, 5/19/17 | * | 8 |
| 32. Debtor's report, excerpts, 4/5/18 | * | 8 |
| 33. Debtor's report, excerpts, 6/8 | * | 8 |
| 34. Excerpts, L.Salas, first Meeting of creditors, 5/24/18 | * | -- |
| 35. M.Salas Answers to Interrogatories, 8/6/18 | * | 8 |
| 36. Debtor's schedules A/B, C-J, 5/2/18 | * | 8 |
| 37. Debtor's responses, 8/6/18 | * | 8 |
| 38. Debtor's statement of financial affairs(D-13), 5/2/18 | * | 8 |
| 39. Debtor's amended statement of financial affairs(D-50), 6/27/18 | * | 8 |
| 40. Debtor's amended petition | * | 8 |
| 41. R.Salas email (trust documents) | 231 | -- |

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of "(unintelligible)" in this transcript are due to the audio recording levels being turned up too high, or individuals speaking outside of the vocal capture range of the microphone.

```
 1   she signed it back over to me, right?
 2        Q.   I'm sorry?
 3        A.   She -- what do you mean?  Can you ask the question
 4   -- what does convey mean for sure?
 5             I'm -- she signed it back over to me?
 6        Q.   Did you understand that she signed the property
 7   back over to you, in your words, in April of 2007?
 8        A.   Yes.
 9        Q.   All right.
10             And the purpose of that was to allow you to live
11   in the property and to also obtain funds to pay her as part
12   of the divorce settlement, correct?
13        A.   Well, I lived in the property since 1995 when we
14   bought the property together.
15        Q.   I understand that, but what was the purpose -- let
16   me try it this way.
17             In April 2007 you conveyed the property to your
18   son, correct?
19        A.   What do you mean by convey?  Can you tell me that?
20        Q.   Did you sign a deed --
21        A.   Yes.
22        Q.   -- of the property to your son Len?
23        A.   Yes.
24        Q.   Okay.
25             And the purpose of that was so that he could
```

1   obtain a deed of trust on the property to pay your ex-wife,

2   correct?

3       A.   Well, I signed it over to him so we could get a

4   loan to pay my ex-wife for her half of the settlement in

5   the divorce.

6       Q.   Okay.

7            And you son agreed to do that, correct?

8       A.   Yes.

9       Q.   All right.

10           And when you say "we obtained a loan," were you on

11  the loan?

12      A.   I promised my son that I would pay for the loan,

13  yes.

14      Q.   Is that in writing?

15      A.   I promised my -- I know it was my word to my son.

16      Q.   What was that -- that wasn't my question.  My

17  question is was that promise in writing?

18      A.   No.

19      Q.   Okay.

20           Now, at the time in 2007 there was a deed of trust

21  taken out on the property through SunTrust Mortgage,

22  correct?

23      A.   Yes, sir.

24      Q.   And that deed of trust and the loan was taken out

25  by your son Len Salas, correct?

1     A.   Yes, sir.

2     Q.   And he was the only person obligated on that loan,

3   correct?

4     A.   Technically, yes.  Yes, sir.

5     Q.   Technically, legally on paper, all of that,

6   correct?

7     A.   Well, I promised him that he wouldn't have to pay

8   for the loan, that I would pay for the loan.

9     Q.   I understand, but who was responsible for paying

10  the loan according to the loan documents as you understood

11  them?

12    A.   I was responsible for paying the loan.

13    Q.   Under the loan documents as you understood them

14  you were responsible to make the payments on the loan?

15    A.   Yes.  I've made every payment on every -- on that

16  loan since 1995 to today.

17    Q.   Did you sign the promissory note to SunTrust?

18    A.   I didn't sign a promissory note to SunTrust.

19    Q.   Okay.

20         Now, during the course of -- let's go back to the

21  period subsequent to 2007 when these deeds transferring the

22  property from Ms. Bruff to you, and from you to your son,

23  were created.  Do you remember that timeframe?

24    A.   Yes, sir.

25    Q.   All right.

1          And it's true that shortly after that timeframe

2     your son started asking you to undertake to get him off of

3     the deed to the property, is that correct?

4          A.   Yes.

5          Q.   And that was something that he was consistently

6     asking you to do even through 2018, correct?

7          A.   Yes, every opportunity he could every -- yes.  He

8     wanted off the loan.

9          Q.   Okay.

10          And what efforts did you undertake to get him off

11     the loan between, well, let's start with the period between

12     2007 and July of 2010?

13          And the reason I'm using July of 2010 is because

14     that was the month in which the alleged trust -- and I'm

15     saying alleged trust, you might believe it's a trust I

16     understand, was created in Colorado -- during that period

17     of time, how many times would you say your son contacted

18     you with respect to getting his name off the property, the

19     Riggs Place Property?

20          A.   So let me make sure I understand your question.

21     From 2010 to 2007 -- from 2007 to 2010, three years?

22          Q.   Yes, sir.

23          A.   I would say at least three times or four times a

24     year, so that would be twelve times.

25          Q.   Okay.

1    Now, did your son talk to you about taking his
2  name off the deed after July of 2010?
3    A.   Yes.  Well -- yes.  No, he -- he talked to me
4  about taking his name off the loan.
5    Q.   Did he talk to you about taking his name off the
6  property?
7    A.   No, he'd already taken his name off the property.
8    Q.   When did he do that?
9    A.   He signed it over to me, he signed it over to my
10  trust on 2010, July 6th of 2010.
11    Q.   So after July of 2010 it's your position that your
12  son was no longer on the property, no longer an owner of
13  the property, is that correct?
14    A.   That's correct, sir.
15    Q.   Okay.
16    Now, during the course of the Superior Court
17  litigation in the District of Columbia, there were
18  depositions taken of you and your son in 2016.  Do you
19  remember that?
20    A.   Repeat the question, please.
21    Q.   Yes.
22    Do you remember the depositions that were taken of
23  you and your son in the Superior Court case, and when I say
24  Superior Court case I'm talking about the personal injury
25  and wrongful death litigation --

```
 1              THE COURT:

 2              BY MR. McNUTT:

 3       Q.   Let me refer you to page 113 of the same

 4    deposition, Mr. Salas.

 5              MR. ALBERT:  Judge, did he -- you took the whole

 6    transcript into evidence, right?

 7              THE COURT:  I took pages 117 through 120.

 8              MR. ALBERT:  Not the whole thing.  Okay.

 9              THE COURT:  Into evidence.

10              BY MR. McNUTT:

11       Q.   Are you with me, Mr. Salas?  Page 113?

12       A.   Yes, sir.

13       Q.   All right.

14              Starting on line 7 of page 113, the question,

15    again I believe this is Mr. Curnonni?

16       A.   Yes, sir.

17       Q.        "Did you, after you got the mortgage

18              in the years prior to the fire, did you

19              ever have a discussion with your father

20              with regards to transferring ownership of

21              the property to him?"

22              Did I read that correctly?

23       A.   Yes, sir.

24       Q.   And his answer is, "Yes," on line 11, correct?

25       A.   Yes, sir.
```

```
 1   Murfreesboro.  It went from the truck to the garage.  It's
 2   always been in the garage since.  Whenever we moved to the
 3   Murfreesboro, whatever date that was.
 4              THE COURT:  All right.
 5              THE WITNESS:  December of 2016 -- well -- right?
 6              THE COURT:  Okay.
 7              December of 2017, a few months before the trial?
 8              THE WITNESS:  I guess the filing cabinet at --
 9   yeah.  What -- no.  So I'd been -- yeah, I guess it'd been
10   in there for a year.
11              THE COURT:  Thank you.
12              THE WITNESS:  Or a year --
13              THE COURT:  That clears that up.  Thank you.
14              THE WITNESS:  A year and some change.  But it was
15   stuck in the corner with a whole bunch of stuff in front of
16   it, so I never looked in it.  Hardly ever.
17              MR. McNUTT:  All right.
18              May I continue, Your Honor?
19              THE COURT:  Yes.
20              MR. McNUTT:  Thank you.
21              BY MR. McNUTT:
22       Q.   I just want to be clear, prior to sometime in the
23   weeks before trial you never talked to your brother about
24   produce, your brother Ron, about producing a copy of the
25   trust document, is that correct?
```

Case 3:20-cv-00027 Document 74-1 Filed 08/01/24 Page 569 of 796 PageID #: 18087
Case 3:20-cv-00027 Document 74-1 Filed 08/01/24 Page 569 of 796 PageID #: 18087
Exhibit 20 Exemption Hearing in Case No. 18-260 Transcript Vol 1 8-22-18 Excerpt   Page 11 of 28

1    A.    When?  What was the timeframe?  What was your --

2    Q.    Prior to, let's say prior to March of 2018.

3    A.    No.

4    Q.    Okay.

5    A.    I guess --

6          THE COURT:  Did you know he had a copy?

7          THE WITNESS:  No, I didn't -- I mean in retrospect

8    I thought all, you know, the day we signed it he put a copy

9    in it, but I didn't think about that at the time, and, that

10   he kept an electronic copy.  So I don't know.  And then I

11   don't know when he and Marc got together and decided, and

12   said, "Send me the files."  I don't know when that

13   happened.

14         BY MR. McNUTT:

15   Q.    Do you know if your father Max ever requested a

16   copy of the trust documents from your brother prior to

17   March of 2018?

18   A.    I don't know if he requested a copy.  I assume he

19   got a copy like I did the day we signed it, but I don't

20   know if he requested a copy.

21   Q.    Do you know if your wife requested a copy from

22   your brother?

23   A.    Yeah, the day we signed it.  Yeah, I guess.  I

24   mean --

25   Q.    And what about during the timeframe after the

1  signature in July of 2015 through March of -- through
2  February of 2018?
3      A.   Uh --
4      Q.   Did your wife ask for a copy?
5      A.   No, I assume she forgot it just like I did.
6      Q.   So --
7      A.   And then, you know.
8      Q.   So the important issue with respect to your
9  liability was your ownership of the property, and you knew
10  that from the date that the lawsuits were filed in October
11  of 2015 yet -- and your brother had knowledge of the
12  lawsuit, your wife had knowledge of the lawsuit, your
13  father had knowledge of the lawsuit, and you had knowledge
14  of the lawsuit, and none of the four of you thought to come
15  up with a copy of the trust document that you claim deeded
16  the property from you to your father which would have
17  absolved you from liability of the lawsuit, none of you
18  thought to obtain a copy of that from your brother through
19  February of 2018?  That's what you're telling me?
20      A.   Yeah.  We all forgot about it.  Which is --
21      Q.   Okay, now is that the only trust that you're aware
22  of with respect to the family?
23      A.   There's a -- no.
24      Q.   Sorry?
25      A.   Yes.

```
 1    Q.   It's not the only one?

 2    A.   There's a CLR Trust or something.  I don't know.

 3    Q.   Okay.

 4         What do you know about the CLR Trust?

 5    A.   That it exists.  That's about it.  I have no idea.

 6    Q.   Have you ever seen a copy of the trust documents?

 7    A.   No.

 8    Q.   Did you ever ask your brother for a copy of the

 9  trust documents?

10    A.   No.

11    Q.   Did you ever ask your father for a copy of the

12  trust documents?

13    A.   No.

14    Q.   All right.

15         In your deposition, would you look at paragraph --

16  I'm sorry.  Would you look at document 15 again in the

17  white binder?

18         That's your deposition transcript.

19    A.   What page again?

20    Q.   This would be on page 8.  And it refers to

21  transcript pages 29 through 32.

22    A.   Uh-huh.

23    Q.   Do you see that?

24         I'm looking specifically at page 29, starting at

25  line 9.
```

1    A.   Yes.

2    Q.   Okay.  And you were asked the question:

3           "What do you know about the 1610

4    Salas Trust?"

5    A.   Yeah.

6    Q.   All right.

7         Do you know what the reference to the 1610 Salas

8 Trust is?

9    A.   Oh, no, I mean, no.  Uhm -- actually, no.  Not

10 quite.  See, it says not much.  It's an account.  I thought

11 it was an account.

12    Q.   And what made you think it was an account?

13    A.   Because he, when I got that call from SunTrust

14 saying that the mortgage hadn't been paid, I said what

15 happened.  He says, "Well, I've set up this account for

16 1610 so all the rent checks go into there, and then I pay

17 that."  And I guess one check didn't clear before they

18 pulled my check.  I -- something.  I got some kind of

19 answer like that.  Something to that effect.

20    Q.   And that's what your father told you?

21    A.   So that's what I thought, that's what I referred

22 to.

23    Q.   But that's what your father told you, right?

24    A.   Correct.

25    Q.   Is that what you're saying?

1    Okay. And he filled you in on an account in the
2 name the Salas Trust?
3    A.   Yeah.
4    Q.   Okay.
5    A.   But I don't --
6    Q.   And that's --
7    A.   I don't --
8    Q.   And that's where the rents were paid?
9    A.   Excuse me?
10    I don't know if -- I couldn't --
11    Q.   And that's where the rents were paid?
12    A.   I think.
13    Q.   Okay.
14    A.   I assume. I don't know. That's what he's told
15 me, so I don't know.
16    Q.   Okay.
17    And that's what he told you. When did he tell you
18 that?
19    A.   I don't know. I don't remember.
20    Q.   Sometime prior to the fire?
21    A.   Yes.
22    Q.   Okay.
23    And he, did he tell you what the purpose of the
24 account was?
25    A.   To pay the rent I guess, or to pay the mortgage.

1    Q.   Okay.  All right.

2         Continuing, you say, you say in answer to the

3    question what do you know about the 16 Salas Trust (sic),

4    you say, starting in line 10:

5              "Not much.  It is an account.

6              Question:  What does that mean?

7              Answer:  It is some kind of account,

8         I guess. I don't really know.  I don't

9         really know, really.  It is just the

10        trust."

11   A.   Uh-huh.

12   Q.   Continuing:

13             "Question:  Do you have any personal

14        knowledge regarding 1610 Salas Trust?

15             Answer:  No, actually, I mean what I

16        found out the other day from your

17        deposition of my father is what I know."

18   A.   Right.

19   Q.   So do I understand from that testimony that the

20   first time you heard of the 1610 Salas Trust is at the

21   deposition of your father in the Superior Court case?

22   A.   I guess.  Well, I -- sorry.  There -- I -- yeah.

23   He -- I'm not sure, to tell you the truth.

24        What was the question?  I'm sorry.

25   Q.   The question is whether you had any knowledge of

```
 1   the 1610 Salas Trust outside of the testimony of your
 2   father in his deposition in the Superior Court case?
 3        A.   Uh --
 4             THE COURT:  Whether he had knowledge as of what
 5   point, Mr. McNutt?
 6             MR. McNUTT:  This would have been at the time of
 7   the depositions which were in February and March of 2018.
 8             THE COURT:  So rephrase the question to be precise
 9   --
10             MR. McNUTT:  Sure.
11             THE COURT:  -- as to the time of the state of his
12   knowledge.
13             MR. McNUTT:  Sure.  Thank you, Your Honor.
14             BY MR. McNUTT:
15        Q.   Is it your understanding, is it -- am I correct
16   based on your answer that I've just read that as of
17   approximately March 9, 2016 the only knowledge you had
18   concerning the 1610 Salas Trust was knowledge obtained from
19   the testimony of your father at his deposition in February
20   of that same year?
21        A.   I don't know.
22        Q.   Are you aware of any other information or
23   knowledge that you had regarding the 1610 Salas Trust?
24        A.   I don't know.  I don't remember.  I don't know.
25        Q.   Okay.
```

```
 1  think it's supposed to mean:
 2              "Why did your wife want to transfer
 3          ownership?
 4              Answer:  Because she didn't want that
 5          in my name.  Same thing for the reason I
 6          guess."
 7          That was your answer, correct?
 8      A.  Uh-huh.  For the --
 9      Q.  All right.
10          Would you turn then to page 116?  That's
11  on the same typed page, but transcript page 116.
12      A.  Yes, I have it.
13      Q.  All right.
14          Starting on line 13, the question is:
15              "How many conversations did you have
16          with your father about potentially
17          transferring ownership of the building to
18          him?
19              Answer:  Multiple.
20              Question:  When was the last time you
21          had such a conversation prior to the fire?
22              Answer:  That spring since we were in
23          that summer."
24          Did I read that correctly?
25      A.  You read it correctly, yes.
```

1    Q.  All right.

2        So in 2015, five years after you executed the

3  trust documents and five years after you believe that you

4  deeded the property to your father, you're still asking the

5  father to transfer ownership of the property to him?

6    A.  The mortgage is what I was talking about.

7    Q.  It doesn't say mortgage here, does it?

8    A.  Yeah, but that's what I was referring to.

9    Q.  Well, you were referring to ownership in the

10  property, weren't you?

11    A.  No, because it said the mortgage because I said I

12  want to buy my house.  The reason I couldn't buy my, well,

13  the house that I live in that was currently my wife's, is

14  because I couldn't because of my credit that was on the

15  1610 Riggs Place.  So I couldn't buy, I quote/unquote

16  "couldn't buy" my house or have my house, my name on my

17  house because my credit wasn't good enough to get, to have

18  two houses.

19    Q.  Okay, let's try this again.

20        If you look on page 113, please?

21    A.  Uh-huh.

22    Q.  The question is, starting in line 8:

23          "Did you ever have a discussion with

24          your father with regards to transferring

25          ownership of the property to him?"

 1          And your answer was:

 2               "Yes."

 3     A.   Where does --

 4     Q.   It doesn't ask you --

 5     A.   -- it say that?

 6     Q.   -- about a mortgage.  It asks about transferring

 7   ownership of the property, right?

 8     A.   Line 7, "Do you...did you do...you got the

 9   mortgage in the years..."  So I thought when he said

10   mortgage, I assumed he was talking about the mortgage.

11   Line 7 on page 13.

12     Q.   So you read the:

13               "Did you, after you got the mortgage

14               in the years prior to the fire, did you

15               ever have a discussion with your father

16               with regards to transferring ownership of

17               the property to him?"

18          You read that to mean transferring the mortgage to

19   him?

20     A.   Yes.

21     Q.   Okay.

22          And page 116, paragraph, starting on line 13 it

23   says:

24               "How many conversations did you have

25               with your father about potentially

1             transferring ownership of the building to

2             him?"

3             Doesn't say anything about a mortgage, does it?

4        A.   Well, I guess I misunderstood the question because

5   I mean, I thought he was speaking of mortgage, and I said

6   multiple times.  I said multiple.

7        Q.   Does it say mortgage there or note?

8        A.   I thought he was referring to mortgage.

9        Q.   All right.

10            Let's go to page 117 then.  I think we have to

11   start at the last page, 116 on line 22.  Do you see page

12   116 at the very end of the, Mr. Salas?

13            A.   Uh-huh.

14            Q.   All right.

15                 It ways:

16                 "What was the catalyst..."

17            And this is referring to the conversation that you

18   had in the spring or summer of 2015, okay?

19            A.   Uh-huh.

20            Q.       "What was the catalyst for that specific

21                 conversation?

22                     Answer:  I don't know.  It was always

23                 in my mind to get it off of my name.

24                     Question:  Do you remember why it

25                 occurred that spring before the fire?  Was

```
 1            there anything going on in your life or

 2            your father's life which was the catalyst

 3            for that conversation?

 4                Answer:  No, I don't think so.  Maybe

 5            I knew that I was going to be a father

 6            again and that prompted me.  I don't know."

 7            Correct?

 8   A.   Correct.

 9   Q.   All right.

10                "Okay.  What did your father say

11            during that conversation?

12                Answer:  'I'm trying.'"

13            I read that correctly, didn't I?

14   A.   Correct.

15   Q.   All right.

16            And then the next question is:

17                "And what did you understand that to

18            mean?

19                Answer:  That he was looking to get

20            it repackaged or remortgaged or

21            something."

22   A.   Uh-huh.

23   Q.   I read that correctly, didn't I?

24   A.   Right.

25   Q.   So you were hoping that your father was trying to
```

```
 1   get the home refinanced so you could be taken off the
 2   mortgage?
 3        A.   Correct.
 4        Q.   Okay.
 5             And the question is:
 6                  "Who was he trying to get the house
 7             re-mortgaged with?
 8                  Answer:  SunTrust."
 9             Right?
10        A.   Correct.
11        Q.   Line 20?
12        A.   Yes.
13        Q.   All right.
14             And then I believe this is, I'm not sure who was
15   asking the questions here, but counsel for one of the
16   estates is asking you about whether you saw any documents
17   related to the refinancing that you were talking about.
18        A.   Uh-huh.
19        Q.   And on page 118 starting at line 20, the question
20   is:
21                  "What documents did you see that led
22             you to believe that that process had
23             started?
24                  Answer:  Refinancing documents."
25             Right?
```

1    A.    When, at -- when I'm asking him to get --

2    Q.    In 2015.

3    A.    For, in 2007 in the original or?  Or in the --

4    Q.    In the context of your answers here, which I

5    believe are in the spring or summer of 2015.

6    A.    So what was the question again then?

7    Q.    The question is why are you filling out

8    applications with your income and credit information if

9    your father is trying to refinance the property and get you

10   off the mortgage?

11   A.    I -- I don't know.

12   Q.    Are you aware of any refinancing that your father

13   requested that did not have your financial information and

14   credit information attached to it at any time?

15   A.    Excuse me?

16   Q.    At any time after 2007 are you aware of any

17   refinancing sought by your father in which your credit

18   information and income were not a part of the application?

19   A.    I don't know.  I don't.

20   Q.    So as we sit here today, your father has not been

21   able to refinance the property or take your name off the

22   property since 2007?  That's accurate, isn't it?

23   A.    I don't know.

24   Q.    Okay.

25         Are you aware of whether your father up until the

```
1      Q.   Who prepared these documents?

2      A.   I prepared them.

3      Q.   All right.

4           And did you have your brother and your father in

5   your office with respect to these documents?

6      A.   I did.

7      Q.   And what happened at that time?

8      A.   At that time myself, my father, my brother, and

9   his wife were present.  We signed the trust documents.  I

10  as a witness, my sister-in-law as a witness.  It was a

11  notary present.  We signed the trust agreement.  We signed

12  the quit-claim -- well, I did not sign the quit-claim.  The

13  quit-claim deed was signed by my brother Len and Max, and

14  the deed was given to, from Len to Max, the original to be

15  filed.  And a copy was given to my brother for his records,

16  and I kept a copy.

17     Q.   Okay.

18          And these documents were notarized also, correct?

19     A.   They were, yes, that's correct.

20     Q.   And who notarized them?

21     A.   Lori King.  She worked in my office at that point

22  for several years and she notarized -- well, it was a

23  shared office.  She worked in the office as a receptionist.

24  She notarized documents for the attorneys in the office.

25     Q.   Okay.
```

1  And you witnessed the other people, including the

2  notary signing, were appropriate?

3  A.  I did.

4  Q.  You saw your brother sign, you saw your father

5  sign?

6  A.  Yes.

7  Q.  Did you review these documents with them before

8  they signed them?

9  A.  Yes, I did.

10  Q.  And do you know whether these documents were ever

11  recorded?

12  A.  I know today that they were not recorded.  My

13  assumption was that they were, but as of today I knew they,

14  I know now that they were not.

15  Q.  Okay.

16  Did there come a time you knew your father and

17  brother were involved in litigation involving the deaths

18  that occurred from a fire in 2015?

19  A.  Yes.

20  Q.  What did you, who did you learn about this

21  litigation from and what did you learn?

22  A.  I learned that they were both named in a lawsuit.

23  I don't recall who contacted me first, whether it was my

24  brother or my father.  I know they both at some point did.

25  Both sent me copies of the summons or petition, summons I

1

2

3

4

5

6   I certify that the foregoing is a correct transcript from

7   the electronic sound recording of the proceedings in the

8   above-entitled matter.

9

10  /s/Kristen Shankleton, CER-6785      Dated: 10/27/18

APPX 000309
APPX 000741

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18-00260 |
| MAX E. SALAS, | ) | Chapter 11 |
| | ) | |
| Debtor In Possession. | ) | |
| | ) | |
| NICOLAAS J. BREKELMANS AND GAIL | ) | |
| GREGORY BREKELMANS, TRUSTEES OF | ) | |
| THE ESTATE OF NINA BREKELMANS; | ) | |
| And | ) | |
| | ) | |
| MICHAEL McLOUGHLIN AND | ) | |
| MARTHA JOHNSON, TRUSTEES OF | ) | |
| THE ESTATE OF PATRICK | ) | |
| McLOUGHLIN | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MAX E. SALAS | ) | |
| | ) | |
| Respondent. | ) | |

## DEBTOR'S RESPONSES TO MOVANTS' FIRST SET REQUEST FOR PRODUCTION OF DOCUMENTS RE: THE MOVANTS' OBJECTION TO TH DEBTOR'S CLAIM OF EXEMPTIONS TO HIS RESIDENCE AND THE MOVANTS MOTION TO DISMISS OR CONVERT

TO:     Philip McNutt, Esq. Law Office of Philip J. McNutt, PLLC, 11921 Freedom Drive, Suite 584, Reston, VA 20190

Pursuant to Bankruptcy Rules 7033 and 7026-1(B), and Rule 33 of the Federal Rules of

Civil Procedure, Max E. Salas, the debtor and debtor-in-possession ("Debtor") in this Chapter 11

case hereby responds to the July 3, 2018 First Request for Production of Documents served by

Movant's Nicolaas J. Brekelmans and Gail Gregory Brekelmans, Trustees for the Estate of Nina

---

1.     CORE/3502869.0005/141727844.1

APPX00742

Brekelmans ("Brekelmans Estate") and Michael McLoughlin and Martha Johnson, Trustees for the Estate of Patrick McLoughlin ("McLoughlin Estate," and collectively with the Brekelmans Estate, the "Estates"). .

## GENERAL OBJECTIONS

The Debtor objects to each of the Estates' request for production of documents to the extent that each broadens the scope of a permissible interrogatory or is otherwise inconsistent with the Federal Rules of Civil Procedure or Federal Bankruptcy Rules. The Debtor further objects to each interrogatory to the extent that it calls for the disclosure of privileged information.

### RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** All documents which are identified in your answers to the Interrogatories propounded by the Movants herein.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 2:** All documents which concern, or relate to, your answers to the Interrogatories propounded by the Movants herein.

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 3:** All documents which relate to all known or anticipated sources of income to the Debtor, including any known or anticipated source of funding for a proposed Plan of Reorganization.

Case 23-20-90027 Doc 74-224-1 Filed 06/08/23/24 Entered 08/01/27 15:56:34 Desc 206
Exhibit 21 M Salas Responses to Objecting Creditors Requests for Productio    Page 2 of 6
PPX00743

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 4:** All documents which concern, or relate to, the Trust, including all drafts of trust documents, all deeds, deeds of trust and related documents and all communications regarding the Trust.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 5:** All Documents regarding communications you had with your sons, or any other party, concerning the Trust.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 6:** All Documents related to your travel to Colorado and lodging at or about the time of your execution of the Trust documents.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 7:** All Documents related to your income, and expenses for the period January, 2017 through the present, including all correspondence with creditors or claimants and all documents related to payments you made to creditors for the same period.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 8:** All Documents related to your 401k loan and repayments.

Case 23-20-00927 Doc 74-21 Filed 08/01/24 Entered 08/01/24 15:56:34 Desc
Exhibit 21 M Salas Responses to Objecting Creditors Requests for Productio    Page 3 of 4
APPX00744

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 9:** All Documents related to the claim of Len Salas identified in Schedule E/F

of your schedules filed herein.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 10:** All Documents related to communications with your sons, Len, Ron and

Chris, related to the Superior Court litigation, the Trust, your bankruptcy filing or Len's

bankruptcy filing, from the period, January, 2017 through the present.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 11:** All Documents which relate to the Objection to your Exemption or the

Motion to Dismiss filed herein by the Movants or your responses and/or oppositions to the

Objection and Motion to Dismiss.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

**REQUEST NO. 12:** All Documents which you provided to any Expert whom you intend to

callas a witness in this matter.

**ANSWER:** Subject to the general objections, the Trustee will produce for inspection and copying any documents responsive to this request, in his possession, custody and control, if any.

CORE/3502869.0005/141727844.1

Case 23-20-90027 Doc 74-1 Filed 08/13/24 Entered 08/01/27 15:56:34 Desc
Exhibit 21 M Salas Responses to Objecting Creditors Requests for Productio    Page 4 of 6    APPX00745

**REQUEST NO. 13:** All Documents which any Expert you intend to use as a witness in any

hearing in this Case has provided to you, including all reports and drafts of reports you intend to

use at trial and all documents set forth in Fed. R. Civ. P. 26 (a)(2)(B) and (C), as incorporated

into these proceedings by Fed. R. Bankr. P. 7026, and 9014 (c).

> **ANSWER:** Subject to the general objections, the Trustee will produce for inspection and
> copying any documents responsive to this request, in his possession, custody and control, if
> any.

/s/ Joshua W. Cox
/s/ Joshua W. Cox
Marc E. Albert, No. 345181
Joshua W. Cox, No. 1033283
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
joshua.cox@stinson.com
*Attorneys for*
*Max E. Salas, Debtor and Debtor-In-Possession*

Dated: August 6, 2018

Case 23-10-p-90027 Doc 74-24-1 Filed 06/03/25 Entered 08/01/27 15:56:34 Desc 209
Exhibit 21 M Salas Responses to Objecting Creditors Requests for Productio    Page 5 of  PPX00746

## CERTIFICATE OF SERVICE

I hereby certify that I did serve a copy of the foregoing Responses to Movant's First Set of Interrogatories on August 6, 2018, electronically via the Court's ECF system, and by electronic mail upon the following:

Philip J. McNutt, Esquire
Law Office of Philip J. McNutt, PLLC
11921 Freedom Drive
Suite 584
Reston, VA 20190

/s/ Joshua W. Cox
Joshua W. Cox

CORE/3502869.0005/141727844.1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LEN SALAS | ) | CASE NO. 3:18-BK-02662 |
| | ) | CHAPTER 11 |
| DEBTOR. | ) | JUDGE HARRISON |
| | ) | |
| NICOLAAS BREKELMANS AND | ) | |
| GAIL GREGORY BREKELMANS, | ) | |
| CO-PERSONAL REPRESENTATIVES OF | ) | |
| THE ESTATE OF NINA BREKELMANS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL MCLOUGHLIN AND | ) | |
| MARTHA JOHNSON, CO-PERSONAL | ) | |
| REPRESENTATIVES OF THE ESTATE | ) | |
| OF MICHAEL PATTRICK MCLOUGHLIN, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 3:20-ap-90027 |
| | ) | |
| MAX SALAS, | ) | |
| | ) | |
| DEFENDANT. | ) | |

**DEFENDANT'S OBJECTION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

**This matter is set to be heard on September 13, 2022 at 9:30 a.m.
Courtroom Three, US Customs House, 701 Broadway, Nashville, Tennessee**

---

APPX00748

Comes now Max Salas, Defendant herein ("Salas" or "Defendant"), and for his objection to the Plaintiffs' Motion for Summary Judgment (the "Motion") (Doc. 73)[1], states as follows:

## INTRODUCTION

The Plaintiffs are not entitled to summary judgment. The Motion contains fatal procedural and substantive flaws which the Court cannot overlook and which necessitate the denial of the Motion.

Procedurally, the Plaintiffs have failed to comply with Rule 7056 of the Federal Rules of Bankruptcy Procedure, Rule 56(c) of the Federal Rules of Civil Procedure, and Rule 7056-1(a) of the Local Rules of Court for the United States Bankruptcy Court for the Middle District of Tennessee. Opinions from across the country, including one from the Sixth Circuit Bankruptcy Appellate Panel that upheld a decision of this Court, have held that failure to abide by Rule 56(c) and its companion local rule must result in the Court's denial of any motion based upon the defective statement of undisputed facts.

Substantively, the Plaintiffs have put the cart before the horse. While the Plaintiffs spend fifty-two (52) pages discussing an alleged fraudulent transfer of certain real property, they have failed to demonstrate any undisputed facts that establish that the real property in question was ever property of the Debtor or of the estate, over which the Trustee and/or the Plaintiffs have any authority. In fact, the real property in question was always owned

---

[1] In addition to the Motion, the Plaintiffs late-filed an amended motion for summary judgment (Doc. 74) after the deadline of July 29, 2022. The Defendant believes that the only amendment was the attachment of certain exhibits that the Plaintiffs' counsel could not upload on July 29, 2022. The Defendant has no objection to the Court's consideration of those late-filed exhibits. However, to the extent that the amended motion contained substantive alterations to the facts and/or law presented, the Defendant objects to the consideration of the amendments. This Objection addresses the Motion, supporting brief, and supporting statement of undisputed facts filed on July 29, 2022, along with all exhibits filed on July 29, 2022 and August 1, 2022.

by the Defendant, with the Debtor and this estate holding nothing but bare legal title. Case law is clear that, on facts similar to these, the estate has no authority to avoid a transfer of property in which the Debtor held only bare legal title. Whether the Debtor ever owned anything other than bare legal title to the real property is a disputed question of fact that must be decided by the Court at a trial of this matter.

## FACTS

The facts show quite clearly that the Debtor owned nothing more than bare legal title to the real property in question and, as such, the Plaintiffs have no valid cause of action against the Defendant.[2] The Defendant and his wife owned real property located at 1610 Riggs Place, NW, Washington, D.C. (the "Property"), as husband and wife, until 2007. Affidavit of Max Salas ("Salas Aff."), attached hereto as Exhibit 2, ¶ 2. In 2007, Defendant and his wife divorced, and Defendant was ordered to pay wife a portion of the equity in the Property. Salas Aff, ¶ 3. The Defendant, who wished to stay in his home, determined that he would take out a loan against the Property in order to fund the payment to his ex-wife. Id, ¶ 4. However, upon seeking financing for the payment, he learned that he was not credit worthy to borrow the funds. Id, ¶ 5. To facilitate this transaction, he quitclaimed the Property to his son, the Debtor in this matter, who then borrowed $870,000 against the Property. Id, ¶ 6. The Defendant's ex-wife received the proceeds of the loan. Id, ¶ 7. The Debtor received no proceeds from the loan nor did he pay anything in exchange for the quitclaim deed. Id, ¶ 8.

---

[2] The Defendant attaches hereto, as Exhibit 1, his Response to Plaintiffs' Amended List of Undisputed Facts, Pursuant to Local Rule 7056-1 in Support of the Plaintiffs' Motion for Summary Judgment (the "Response")

At the time that the Property was quitclaimed to the Debtor, the Defendant promised to refinance the loan and remove the Debtor's name from both the loan and the title to the Property as soon as possible. Id, ¶ 9. The Defendant made multiple attempts to refinance the Property over a number of years but found each time that he was unable to qualify for a loan. Id, ¶ 10. In 2010, with the assistance of his son Ron Salas, who was an attorney in Colorado, the Defendant determined to have the Property quitclaimed from the Debtor to a trust, in hopes that the trust could then borrow the funds to remove the Debtor from the loan and the title to the Property. Id, ¶ 11. In furtherance of that plan, the Debtor executed a quitclaim deed (the "2010 Quitclaim Deed") to the 1610 Riggs Place Trust (the "Trust") in July 2010.[3] Id, ¶ 12. Attempts to refinance the Property in the name of the Trust were ultimately unsuccessful and the 2010 Quitclaim Deed was never recorded. Id, ¶ 13.

Despite the Debtor's name remaining on the formal title to the Property, the Property was never the Debtor's primary residence. Id, ¶ 14. Despite the mortgage being in the name of the Debtor, the Debtor never made a single mortgage payment. Id, ¶ 15. The Debtor never paid any property taxes on the Property. Id, ¶ 16. The Debtor never paid for any upkeep on the Property. Id, ¶ 17. In fact, after the fire that gives rise to the Plaintiffs' involvement in this matter, it was exclusively the Defendant, not the Debtor, who oversaw and paid for the renovation and rebuilding of the structure on the Property. Id, ¶ 18.

---

[3] The United States Bankruptcy Court for the District of Columbia subsequently ruled that the 1610 Riggs Place Trust was never properly formed, and that any transfer to the Trust was in fact a transfer to the Defendant. *In re Max E. Salas,* Case No. 18-00260-ELG, Bankr. D.C., Doc. 108.

The Defendant rented out rooms in the Property through an entity known as the "CLR Trust". Id, ¶ 19. The Debtor had no involvement with the CLR Trust. Id, ¶ 20. The Defendant dealt with tenants, signed leases, and accepted rent payments on behalf of CLR Trust. Id, ¶ 21. The Defendant deposited all rent checks into an account in the name of CLR Trust, for which the Defendant was a signatory. Id, ¶ 22. The Debtor was never involved in the leasing of the Property, nor did he receive any portion of the rents paid for rooms in the Property. Id, ¶ 23.

Importantly, the Plaintiffs had *actual knowledge* of the Defendant's ownership of the Property well before the Petition Date. The Plaintiffs in this case had actual knowledge that the Defendant lived in the Property, signed leases for the Property, accepted rent for the Property, and that Len Salas had quitclaimed his interest in the Property in July 2010. Id, ¶ 24. Therefore, it is no necessary to consider whether they had constructive or inquiry notice.

Based upon these facts, neither the Debtor nor the bankruptcy estate ever owned anything more than bare legal title in the Property. As such, under well-established case law, the Plaintiffs cannot avoid the transfer of the Property back to the Defendant, nor can the Plaintiffs seek turnover of the Property.

## STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment on a matter only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P 56(a)*. Fed. R. Civ. P. 56 is made applicable in these proceedings pursuant to Fed. R. Bankr. P. 7056. Moreover, "[a] party asserting that a fact cannot be . . . disputed must support the assertion by citing to particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. *Fed. R. Civ. P 56(c)*. The Local Rules of this Court reiterate and further this requirement, mandating that:

> To assist the court in ascertaining whether there are material facts in dispute, any motion for summary judgment made pursuant to FED. R. BANKR. P. 7056 shall be accompanied by a separate, concise statement of the material facts which the moving party contends are not disputed. Each fact shall be stated in a separate, numbered paragraph. Each fact shall be supported by specific citation to the record. After each paragraph, the word "response" shall be inserted and a blank space shall be provided reasonably calculated to enable the nonmoving party to respond to the assertion that the fact is undisputed.

Local Rules of the United States Bankruptcy Court for the Middle District of Tennessee, Rule 7056-1(a).

At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Hargrave v. Radbill*, 2013 Bankr. LEXIS 2883 (Bankr. N.J. 2013) (citing *Knauss v. Dwek,* 289 F. Supp. 2d 546, 549 (D.N.J. 2003). An issue of fact is "genuine" if a reasonable juror could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

## **APPLICATION**

The Plaintiffs' Motion contains two fatal flaws:  (1) its Statement of Undisputed Facts do not comply with Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, nor Local Rule 7056-1; and (2) the Motion fails to demonstrate undisputed facts to establish that the Debtor owned anything more than bare legal title to the Property, thus calling into question the Plaintiffs' standing to pursue these causes of action on behalf of an estate that never owned the Property.

**A. The Plaintiffs' Statement of Undisputed Facts Must Be Stricken For Non-Compliance with Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1.**

The requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1 are clear and unambiguous: a party moving for summary judgment bears the burden of presenting undisputed facts in separate paragraphs and, for each such fact, there must be a *specific* citation to the record that establishes the fact. Where the movant fails to provide a specific citation to the record establishing the alleged undisputed facts, court have uniformly held that the proposed fact must be stricken. *See, e.g., Langley v. Tulare Police Dep't,* 2017 U.S. Dist. LEXIS 21572, *5-7 (E.D. Cal. 2017) (denying plaintiff's motion for summary judgment where the plaintiff did not support allegedly undisputed facts with record citations); *Moore v. Sacramento County Sheriff's Dep't,* 2015 U.S. Dist. LEXIS 19986, *11-13 (E.D. Cal. 2015) (denying plaintiff's motion for summary judgment where "plaintiff has often failed to cite to specific parts of the record or evidence submitted in support of his purported statement of undisputed facts"); *Gipbsin v. Kernan,* 2015 U.S. Dist. LEXIS 25090, *3-5 (E.D. Cal. 2015) (denying summary judgment where plaintiff's statement of undisputed facts failed to cite to the record); *Beaudreault v. Delfarno,* 2014 U.S. Dist. LEXIS 73332, *12-14 (D.R.I. 2014) (striking paragraphs from the statement of undisputed facts that contained no citations to the record and, thus, denying the movant's motion for summary judgment).

The Sixth Circuit Bankruptcy Appellate Panel has previously considered and ruled on a case from this Court that addressed this very issue, albeit in the context of a respondent who failed to identify specific citations to the record in support of his denial of alleged undisputed facts. In *Hadley v. Harrison*, 2022 Bankr. LEXIS 483 (6th Cir. BAP 2022), the

APPX00754

Bankruptcy Appellate Panel was asked to review Judge Walker's granting of summary judgment in favor of the movant. In addressing what facts it would consider, the BAP considered allegedly undisputed facts to be true where the respondent simply denied the undisputed facts (or stated that he lacked knowledge about the facts), rather than citing to specific portions of the record as required by the Bankruptcy Rules, the Rules of Federal Civil Procedure and the Local Rules. *Id* at *5-8. The *Hadley* court noted, "in response to Hadley PLLC's motion for summary judgment, which was supported by 166 statements of material fact not in dispute, each of which included citations to the record, Harrison was required to prove that there were genuine disputes of material fact for trial. In so doing, he was not entitled to rely solely on allegations or denials in the pleadings." *Id* at *6.

In this case, the Plaintiffs rely upon approximately thirty-two (32) allegedly undisputed facts for which they provide no factual support, i.e. no reference to the record whatsoever. *See* Plaintiffs' List of Undisputed Facts, Pursuant to Local Rule 7056-1 in Support of the Plaintiffs' Motion for Summary Judgment (the "Statement of Undisputed Facts"), Doc. 73-2, Paragraph Nos. 4, 11, 12, 16, 22, 23, 34, 37, 38, 39, 40, 41, 42, 43, 45, 50, 51, 52, 54, 55, 57, 60, 63, 65, 66, 67, 84, 85, 99, 100, 101, and 107. The Plaintiffs also rely on at least two allegedly undisputed facts for which they provide only general, not *specific*, citations to the record. *See* Statement of Undisputed Facts, Doc. 73-2, Paragraph Nos. 30 and 124. Based upon the caselaw cited herein, the Court should not consider any of the facts alleged in these thirty-four (34) paragraphs in determining this Motion. Because of the sheer volume of the Plaintiff's Statement of Undisputed Facts that do not comply with Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, nor Local Rule 7056-1, the Defendant suggests that the Court should simply deny the Motion rather than

attempting to parse through the properly-alleged undisputed facts to determine whether they support the relief sought. *See Moore v. Sacramento County Sheriff's Dep't,* 2015 U.S. Dist. LEXIS 19986, *11-13 (E.D. Cal. 2015) (where the court denied the plaintiff's motion for summary judgment where he "often" failed to support facts with citations to the record). It is a movant's duty to appropriately present undisputed facts to support its motion; it is not this Court's duty to try to "hunt and peck" through the allegations to determine what is property supported and what is not. *Hadley v. Harrison*, 2022 Bankr. LEXIS 483, *6 (6th Cir. BAP 2022).

### B. The Plaintiffs Have Failed To Assert Undisputed Facts Demonstrating That The Debtor Owned Anything More Than Bare Legal Title To The Property.

Even if the Court were to consider all of the allegedly undisputed facts presented in the Plaintiffs' Statement of Undisputed Facts, even those without a scintilla of support from the record, the Plaintiffs' Motion would still fail because the Plaintiffs have failed to present undisputed facts showing that the Debtor held anything but bare legal title to the Property. Without a showing that the Debtor owned something more than bare legal title, the Plaintiffs (and their predecessor, the Trustee) have no standing to pursue any avoidance actions that seek a recovery of the Property because the Property was never "property of the estate" according to § 541 of the Bankruptcy Code. Alternatively, even if bare legal title to the Property was "property of the estate", it had no value such that there can be no recovery.

When faced with facts similar to those at issue in this matter, courts throughout the nation have been remarkably consistent in finding that the debtor held only bare legal title, rather than possessing full ownership to property. Those courts have likewise been

APPX00756

consistent in denying trustees' recovery efforts, whether under § 547, § 548, § 544, or state fraudulent transfer laws. For example:

- In *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021), the court granted a motion for summary judgment in favor of the defendant on a § 544 action, finding that the debtor held the properties in constructive trust for the defendant and that the debtor herself held only bare legal title. The defendant (who was the debtor's brother) purchased two parcels of real property with his own funds, and maintained both parcels as rental properties. One of the properties was rented to the debtor and the debtor paid rent to the defendant. When the defendant separated from his wife, the defendant conveyed both properties to the debtor for no value as part of pre-divorce planning. Despite being the record owner of the property, the debtor continued paying rent to the defendant and the defendant paid all taxes, insurance, and repair costs. Defendant continued collecting rent from the properties, and addressing tenant issues, even while the debtor was the record owner. Less than a year prior to her bankruptcy filing, the debtor transferred the properties back to the defendant for no value. On these facts, the court held that the debtor owned only bare legal title to the property and held it in constructive trust for the defendant while she was the record owner of the property. As such, when the debtor transferred the property back to the defendant, it was not a transfer of property of the estate such that could be avoided under §544. The court also rejected the trustee's argument that the defendant should be barred from defending the action by the doctrine of

APPX00757

unclean hands, on account of the defendant having transferred the property to the debtor in the first place in an attempt to avoid certain outcomes in divorce court. The court found that the unclean hands doctrine was not a bar to the defendant's defense, even if the property had been transferred for a questionable purpose.

- In *Geremia v. Dwyer (In re Dwyer)*, 250 B.R. 472 (Bankr. D.R.I. 2000), the court granted the defendant's motion for summary judgment in a fraudulent transfer action brought by a trustee. In *Dwyer*, the defendant purchased a home in 1978 and put her eldest son, the debtor, on the deed to the property. The defendant lived in the property for a number of years; paid all mortgage and tax obligations on the property; paid for all utilities and repairs; and later collected all rents from the property. When the debtor began experiencing marital difficulties, the defendant asked him to quitclaim the property back to his mother as the sole owner. He filed bankruptcy approximately six months later. On these facts, the court found that the debtor owned only bare legal title to the property. It further found that bare legal title has no value to an estate and that a transfer of bare legal title cannot form the basis for a fraudulent transfer action.

- In *Dunham v. Kiask,* 192 F.3d 1104 (7th Cir. 1999), the Seventh Circuit affirmed the bankruptcy court's denial of a trustee's § 548 action. In this case, a home was built on an unimproved lot and titled in the name of parents, their son (the debtor), and the debtor's wife. The parents alone lived in the home, paid the taxes, paid the insurance, and paid for all upkeep.

APPX00758

The debtor and his wife executed a quitclaim deed to remove their names from the title to his parents' home ten months prior to his bankruptcy filing, and while he was embroiled in litigation. The bankruptcy court concluded that the debtor held nothing more than bare legal title to his parents' home or that, alternatively, he held it in constructive trust for his parents. The district court tweaked the bankruptcy court's finding, holding that the debtor was the trustee of a resulting, rather than constructive, trust for his parents – but the end result was the same. The Seventh Circuit found that the debtor merely held the property in trust for his parents (even as a record owner of the property) and, as such, the transfer was not a transfer of property of the estate. Like the case now before this Court, the Seventh Circuit noted: "What the trustee has overlooked, however, is that section 548(a)(1) requires proof of circumstances in addition to the debtor's transfer of a property interest before a transfer can be deemed fraudulent and set aside." *Id* at 1109. The court noted that property held in trust for another is not property of the estate, so the trustee's complaint fails.

- In *In re Gillman*, 120 B.R. 219 (Bankr. M.D. Fla. 1990), the bankruptcy court denied the trustee's motion for summary judgment on an adversary proceeding for fraudulent transfer, finding that the debtor owned nothing but bare legal title to the property in question. In that case, the debtor and his mother were joint tenants of a residential lot. The mother paid for the lot, paid to build a house on the lot, made all mortgage payments, paid all insurance premiums, and paid all real estate taxes. The debtor quit claimed

his interest in the property to his mother less than a year prior to his bankruptcy. The court found that the debtor's interest in the property had no economic value, thus it could not have been fraudulently conveyed back to his mother.

- In *Lovesac Corp. v. Cox (In re Lovesac Corp.),* 422 B.R. 478 (Bankr. D. Del. 2010), a corporation transferred a ski resort to another party for the purpose of attempting to get financing through the third party. The third party, the debtor corporation, transferred the property back to its original owner prior to the bankruptcy. The trustee moved for summary judgment in a fraudulent transfer adversary proceeding, which was denied by the court. The Delaware bankruptcy court found that the property was held by the debtor in a resulting trust for its original owner. In so finding, the court noted, "in factual situations analogous to the case at bar, where one entity transferred the title to property to another entity for purposes of obtaining financing, courts routinely impose a trust on the parties, even in the absence of a written trust agreement." *Id* at 488.

- In *In re Torrez,* 827 F.2d 1299 (9th Cir. 1987), parents purchased 120 acres in California but had the property deeded to their son and his wife. The sole reason for deeding the property to their son and his wife was to gain access to federally subsidized irrigation water, because the parents had exceeded their maximum allotment. The parents made all mortgage payments, all tax payments, improved the property, and operated a farm on the property. When the debtors became financially troubled, they deeded the property to

APPX00760

the parents and their bankruptcy ensued less than a year later. On these facts, the Ninth Circuit found that the real property was never property of the estate, as the debtors held only bare legal title. It found that the property was always held in a resulting trust in favor of the parents. The Ninth Circuit also rejected the trustee's argument that the parents' unclean hands prevented them from asserting the equitable trust.

- In *Tolz v. Miller (In re Todd)*, 391 B.R. 504 (Bankr. S.D. Fla. 2008), the court granted summary judgment in favor of the defendant in a fraudulent transfer action pursuant to § 548 and state law. In 2005, the defendants transferred a parcel of real property to the debtor for no value in an attempt to lower the loan to value ratio of one of the defendants, in hopes that she would be able to qualify for a loan to purchase a business. In 2006, after the loan transaction had been completed, the debtor transferred the property back to the defendants for no value. The debtor filed bankruptcy less than a year later. There was no dispute that the debtor was insolvent at the time of the transfer of the property to the defendants, and no dispute that the sole reason for the transfer to the debtor in the first place was to assist with bank financing. On these facts, the court found that the debtor held the property in a resulting trust for the defendants and that the debtor herself possessed only bare legal title to the property. The court likewise denied the trustee's unclean hands argument. While it found that the defendants "parked" the property in the debtor's name and in doing so acted in bad faith, it noted

that unclean hands only bars a litigant from seeking "active intervention by the Court". *Id* at 510.

- In *Swanson v. Stoffregen (In re Stoffregen)*, 206 B.R. 939 (Bankr. E.D. Wis. 1997), the court granted the defendants' motion for summary judgment in a § 548 action, finding that the debtor held only bare legal title to the property in question. In that case, parents purchased a parcel of unimproved property and added their minor children's name to the deed. The mother, a defendant, and her deceased husband built a house on the property and paid all taxes, insurance, HOA fees, repairs, and upkeep expenses. Neither the debtor, one of the children on the deed, nor his brother financially contributed to the property. Just sixteen days before filing bankruptcy, the debtor deeded his interest in the property to his mother and brother, the defendants. The trustee sought to set aside the transfer under § 548. The court found that the debtor owned only bare legal title to the property and, as such, a transfer of that property could not be recovered for the estate under § 548.

- In *Kapila v. Moodie (In re Moodie)*, 362 B.R. 554 (Bankr. S.D. Fla. 2007), the court denied the trustee's complaint to avoid the transfer of real property pursuant to § 548 and state fraudulent transfer laws. The defendant, debtor's mother, purchased a parcel of real property and added the debtor, her daughter, to the deed. The defendant provided all of the funds used to purchase the property and paid all expenses of ownership. While both the debtor and the defendant were on the mortgage, the debtor never contributed

Case 3:20-ap-90027   Doc 75   Filed 08/12/22   Entered 08/12/22 17:29:27   Desc Main
Document      Page 15 of 25
APPX00762

to the mortgage payment. The debtor was never involved in owning the property in any way, other than appearing on the deed and the mortgage. In the year prior to the bankruptcy, the debtor transferred her interest in the property to the defendant for no value. The debtor and the defendant both testified that the purpose of the transfer was to avoid the property being "tied up" in the bankruptcy. On these facts, the court found that there was a resulting trust in favor of the defendant and that the debtor owned nothing more than bare legal title to the property. The court further found that, when a debtor holds only bare legal title to property, there can be no transfer of that interest for "less than reasonably equivalent value".

- In *In re Penney*, 632 B.R. 181 (Bankr. E.D. Ark. 2021), the court denied a trustee's motion for summary judgment pursuant to § 548. In *Penney,* the debtor and his daughter acquired title to real property as joint tenants. Prior to the petition date, the debtor transferred all of his interest in the property to his daughter, the defendant, for no value. The defendant paid the entire purchase price for the property. There was no encumbrance upon the property. The defendant lived on the property and made substantial renovations thereto. The defendant always held herself out as the owner of the property, even when it was jointly owned with the debtor, and the debtor never held himself out as the owner of the property despite being on the deed. Based on these facts, the court found that the debtor might hold only bare legal title to the property, and ordered a trial be conducted in order to weigh the evidence and determine the truthfulness of certain assertions. The

APPX00763

court noted that, if the debtor held only bare legal title to the property, then it might have no value to the estate; therefore, a transfer for no value would be a transfer for reasonably equivalent value.

- In *Swinson v. Fritz (In re Lytle)*, 2010 Bankr. LEXIS 4337 (Bankr. N.D. Okl. 2010), the court dismissed an adversary proceeding that sought to recover real property pursuant to §§ 548 and 544. The debtor and the defendant were both listed on the deed to a parcel of unimproved property, though the purchase price was paid entirely by the defendant. The debtor was to build a home for the defendant's parents on the property but ran into financial problems before the home was constructed. The debtor quitclaimed the property back to the defendant prior to bankruptcy so that he could find another builder to build a home on the lot, and the debtor subsequently filed bankruptcy. The debtor built a home for his parents on the lot. The trustee sought to recover the property (with improvements) under § 548 and/or § 544. The court found that the debtor owned only bare legal title to the property and that the property was subject to a resulting trust in favor of the defendant; thus a § 548 action could not be instituted. Since there had been a transfer of the property which constituted constructive notice, the court found that § 544 was ineffective.

The consistency of these opinions and their application to the facts of the case at hand are equally obvious. Like the facts of the cases summarized above, the Debtor had no involvement in the true ownership of the Property. The Property was deeded to the Debtor exclusively for the purpose of obtaining financing, as was the situation in several

Case 3:20-ap-90027   Doc 75  Filed 08/12/22  Entered 08/12/22 17:39:27   Desc Main
Document      Page 17 of 25
APPX00764

of the cases cited above. The Debtor did not purchase the Property, did not live in the Property, made no payments on the mortgage, made no tax payments, did not pay for maintenance of the Property, did not sign leases on the Property, did not collect rent on the Property, and was not the person who oversaw the refurbishment of the Property after the fire. It is clear, based upon these facts and applying the case law cited above, that the Debtor owned nothing more than bare legal title to the Property. When a debtor owns bare legal title to a property, courts consistently find that the trustee is not entitled to avoid the transfer of that property.

While the outcomes of these cases are all very consistent, the manner by which they reach that outcome differs slightly. Some courts find that § 544 and § 548 cases fail when a debtor has only bare legal title because the property never became property of the estate. *See, e.g., Dunham v. Kiask,* 192 F.3d 1104 (7th Cir. 1999); *In re Torrez,* 827 F.2d 1299 (9th Cir. 1987); *Kelley v. Haar (In re Haar),* 634 B.R. 429 (Bankr. M.D. Ga. 2021); *Lovesac Corp. v. Cox (In re Lovesac Corp.),* 422 B.R. 478 (Bankr. D. Del. 2010); *Swinson v. Fritz (In re Lytle)*, 2010 Bankr. LEXIS 4337 (Bankr. N.D. Okl. 2010); *Tolz v. Miller (In re Todd)*, 391 B.R. 504 (Bankr. S.D. Fla. 2008). Others rule in favor of the defendants because, even if bare legal title to property constitutes an asset of the estate, it has no value and, thus, can never be transferred for less than reasonably equivalent value. *See. e.g., In re Penney*, 632 B.R. 181 (Bankr. E.D. Ark. 2021); *Kapila v. Moodie (In re Moodie)*, 362 B.R. 554 (Bankr. S.D. Fla. 2007); *Geremia v. Dwyer (In re Dwyer)*, 250 B.R. 472 (Bankr. D.R.I. 2000); *Swanson v. Stoffregen (In re Stoffregen)*, 206 B.R. 939 (Bankr. E.D. Wis. 1997); *In re Gillman*, 120 B.R. 219 (Bankr. M.D. Fla. 1990). Most of these courts also generally

impress an equitable trust upon the property in favor of the defendants, whether a resulting trust or a constructive trust.

One thing about which these courts uniformly agree is that it is state law, not bankruptcy law, that determines the extent and nature of the property (including whether an equitable trust is created) and that bankruptcy law merely applies the state law property rights. "A debtor's interest in property under 11 U.S.C. § 541(a)(1) is defined by state law at the time of the commencement of the case unless altered by applicable federal law or a countervailing federal interest." *Haar*, 634 B.R. at 435 (citing *Butner v. United States,* 440 U.S. 48, 55 (1979)). In this case, because the Property is located in the District of Columbia, it is D.C. property law that governs this matter**.** *See. e.g., Lovesac Corp.,* 422 B.R. at 487 (Delaware bankruptcy court applying Utah law where the property in question was located in Utah). The District of Columbia recognizes both constructive trusts and resulting trusts. *See, e.g., Zanders v. Baker,* 207 A.3d 1129 (D.C. Ct. App. 2019) (discussing both resulting and constructive trusts as they exist under D.C. law); *Dennis v. Edwards,* 831 A.2d 1006 (D.C. Ct. App. 2003) (discussing constructive trusts); *Leeks v. Leeks,* 570 A.2d 271 (D.C. Ct. App. 1989) (discussing resulting trusts under D.C. law); *Save Immaculata/Dunblame, Inc. v. Immaculata Preparatory School, Inc.,* 514 A.2d 1152, 1157 (D.C. Ct. App. 1986) (discussing resulting trusts); *Gray v. Gray*, 412 A.2d 1208 (D.C. Ct. App. 1980) (impressing a constructive trust in favor of mother despite daughter's name appearing on deed); *Hertz v. Klavan,* 374 A.2d 871 (D.C. Ct. App. 1977) (impressing a constructive trust on property to avoid unjust enrichment); *Woodruff v. Coleman,* 98 A.2d 22 (D.C. Ct. App. 1953) (discussing both resulting and constructive trusts under D.C. law, and explaining the differences between the two).

Under D.C. law, the Property is impressed with a resulting trust in favor of the Defendant. *See Save Immaculata/Dunblame, Inc. v. Immaculata Preparatory School, Inc.,* 514 A.2d 1152, 1157 (D.C. Ct. App. 1986) (a resulting trust "is a property relationship designed to effectuate the parties' intent when one party takes title to property for which another has furnished the consideration", quoting *Edwards v. Woods,* 385 A.2d 780, 783(D.C. Ct. App. 1978)).  The Defendant deeded the property to the Debtor solely for the purpose of obtaining refinancing, the Defendant provided all consideration for and operation of the property, and there was a clear understanding (as evidenced by both emails and testimony) that the Debtor was to transfer the Property back to the Defendant as soon as alternate financing was obtained.  This is the quintessential case for the imposition of a resulting trust.

Because the Debtor never possessed anything more than bare legal title to the Property and he held it in a resulting trust for the Defendant, the Property was never a part of the bankruptcy estate and cannot be recovered under § 548 or state fraudulent transfer law.  Similarly, if the Property was never part of the bankruptcy estate, then a trustee would have no right to recover the Property on behalf of creditors pursuant to § 544.[4]  *Markair, Inc. v. Markair Express, Inc.,* 172 B.R. 638, 642 (9th Cir. BAP 1994) ("A resulting trust can defeat the trustee's strongarm powers under § 544.  The resulting trust having been determined by law to exist, the trustee has no equitable rights in the trust, and the *res* is not property of the estate pursuant to § 541."); *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021).  Even if the Court were to find that the Debtor's bare legal title to the Property was nonetheless an asset of the estate, the Plaintiffs' fraudulent transfer claims

---

[4] It is axiomatic that the filing of a bankruptcy preserves assets of the estate; it does not create assets where no estate assets ever existed.

Case 3:20-ap-90027   Doc 75   Filed 08/12/22   Entered 08/12/22 17:29:12   Desc Main

APPX00767

and its § 544 claims still fail because the Property would be impressed with an equitable trust in favor of the Defendant. Since the Defendant's trust attached to the Property upon its transfer to him in 2007, no creditor's claims can eclipse the Defendant's interest in the Property.

Finally, the Plaintiffs' fraudulent transfer causes of action fail because the Plaintiffs have not, and cannot, show that the Debtor received less than reasonably equivalent value for the transfer of the Property via the 2010 quitclaim deed. Courts have repeatedly noted that bare legal title to property has no value. *See. e.g., Geremia v. Dwyer (In re Dwyer)*, 250 B.R. 472 (Bankr. D.R.I. 2000); *In re Gillman*, 120 B.R. 219 (Bankr. M.D. Fla. 1990); *Swanson v. Stoffregen (In re Stoffregen)*, 206 B.R. 939 (Bankr. E.D. Wis. 1997); *Kapila v. Moodie (In re Moodie)*, 362 B.R. 554 (Bankr. S.D. Fla. 2007); *In re Penney*, 632 B.R. 181 (Bankr. E.D. Ark. 2021). If the Debtor's bare legal title to the Property had no value, then receiving no value for its transfer was reasonably equivalent value.

The Plaintiffs seem to argue two counterpoints to avoid the outcome that is necessitated by a finding that the Debtor owned nothing more than bare legal title. First, they insinuate that the Defendant has "unclean hands" based upon his transfer of the Property to the Defendant to gain bank financing and/or the unsubstantiated claims that he transferred the Property as some sort of a scheme to defraud the Internal Revenue Service. With regard to the tax claims, the Plaintiffs have presented no evidence (much less uncontroverted evidence) to demonstrate that the transfer of the Property was related to tax evasion, so that matter can be easily dispensed. With regard to his admission that the transfer of the Property was done in order to obtain financing, other cases have refused to permit the unclean hands defense on similar, or much worse, fact patterns. *Lovesac Corp.*

*v. Cox (In re Lovesac Corp.),* 422 B.R. 478 (Bankr. D. Del. 2010) (property deeded in order to obtain financing); *Tolz v. Miller (In re Todd)*, 391 B.R. 504 (Bankr. S.D. Fla. 2008) (property deeded to obtain financing); *In re Torrez,* 827 F.2d 1299 (9th Cir. 1987) (property deeded to obtain federally subsidized irrigation to which the actual property owner was not entitled); *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021) (property deeded to avoid inclusion in divorce case). In fact, as explained by all of the courts that examine the unclean hands defense in resulting trust cases, unclean hands prevents a party from proactively claiming an equitable title to property where it does not otherwise exist, but it does not prevent a party from defending its title to property under a trust theory. Therefore, unclean hands is inapplicable to this case.

Second, the Plaintiffs seem to argue § 544 allows them to step into the shoes of a hypothetical lien holder and avoid the transfer of the Property to the Defendant, irrespective of the Defendant's ownership rights as the beneficiary of a resulting trust. There are multiple problems with the Plaintiffs' theory. First, courts have found that § 544 cannot be used to avoid a transfer of property in which the Debtor had only bare legal title because the property was never property of the estate under § 541. *See, e.g., Markair, Inc. v. Markair Express, Inc.,* 172 B.R. 638, 642 (9th Cir. BAP 1994); *Kelley v. Haar (In re Haar)*, 634 B.R. 429 (Bankr. M.D. Ga. 2021). This is only sensible; a bankruptcy trustee cannot create a property right for the estate where none existed. The United States Supreme Court has adopted this general theory, noting: "The legislative history [of § 541(a)(1)] indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interests such as a lien or bare legal title." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 (1988). Second, the Plaintffs are barred from pursuing a § 544

APPX00769

action because they had *actual* notice of the 2010 quitclaim deed prior to the petition date. By their own admission, the Plaintiffs will be the only beneficiary of an avoidance of the Property, since they hold approximately 99.8% of the debt. Therefore, their actual knowledge of the transfer is highly relevant in this, a court of equity. Finally, even if the Court were to ignore that this action benefits the Plaintiffs and only the Plaintiffs, there are no undisputed facts that illustrate that any other party would not have been on reasonable inquiry notice of the Defendant's interest in this Property. The Defendant lived there, paid the mortgage, paid the taxes, contracted for and paid for all renovations, signed leases for the Property, and accepted rent on the Property. Prior to the petition date, the Plaintiffs themselves filed a lien lis pendens on the Property, which would require further inquiry from a hypothetical purchaser. The Court needs to conduct a trial to determine whether a reasonable creditor would have been on inquiry notice of the Defendant's equitable interest in the Property. Thus, summary judgment is inappropriate.

### C. The Defendant Has Other Meritorious Defenses Which Are The Subject Of Disputed Facts.

Other disputed facts exist with regard to the substance of the Plaintiffs' claims that work to defeat their motion for summary judgment. For example:

- The Plaintiffs cannot offer undisputed facts to establish when the transfer of the Property actually occurred, much less do they offer facts to prove the insolvency of the Debtor as of the date of that transfer.

- The Plaintiffs offer no undisputed facts to establish that creditors existed on the date of the transfer, a necessary element to their § 544 and § 548 claims.

- The Plaintiffs offer no undisputed facts that demonstrate that the Debtor intended to defraud his creditors in 2010 when he executed the quitclaim

APPX00770

deed in favor of the Defendant, an element necessary for their §
548(a)(1)(A) claim.[5]

Any of these issues, standing alone, would warrant the denial of this Motion. However, due to the strength and conclusive nature of the legal argument concerning the Debtor's bare legal title ownership, and the fatal procedural flaws of the Plaintiffs' Motion, the Defendant will reserve further discussion of these issues for the trial of this matter.

## **CONCLUSION**

This matter cannot be decided on a motion for summary judgment; to determine the true nature and value of the Debtor's ownership interest in the Property, the Court must hear and weight the probative value of evidence on what was done, when, for what reasons, and what was known by the Plaintiffs. *See In re Penney*, 632 B.R. 181, 191 (Bankr. E.D. Ark. 2021). For the reasons set forth herein, the Defendant prays that this Court deny the Plaintiffs' Motion and grant any other further relief that the Court deems equitable and appropriate under the circumstances.

Dated this 12th day of August, 2022

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr. (Tn. Bar No. 21078)
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Phone: 615-465-6015
phillip@thompsonburton.com

Attorneys for Max Salas

---

[5] At most, they have alleged *disputed* facts that establish fraudulent intent at the time of *perfection* of the transfer in 2018, not the *initiation* of the transfer in 2010. The Defendant vehemently denies any allegation of fraudulent intent.

## Certificate of Service

The undersigned hereby certifies that a true and exact copy of the foregoing has been served via electronic notice/ECF on all parties having made an appearance herein, including counsel for the Plaintiffs.

This 12th day of August, 2022.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE:

LEN SALAS

    DEBTOR.

NICOLAAS BREKELMANS AND
GAIL GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES OF
THE ESTATE OF NINA BREKELMANS

and

MICHAEL MCLOUGHLIN AND
MARTHA JOHNSON, CO-PERSONAL
REPRESENTATIVES OF THE ESTATE
OF MICHAEL PATTRICK MCLOUGHLIN,

    PLAINTIFFS,

v.

MAX SALAS,

    DEFENDANT.

CASE NO. 3:18-BK-02662
CHAPTER 11
JUDGE HARRISON

Adv. Pro. No. 3:20-ap-90027

## DEFENDANTS' RESPONSE TO PLAINTIFFS' AMENDED LIST OF UNDISPUTED FACTS, PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Max Salas (the "Defendant"), by and through counsel, and submits

the following responses to the statement of undisputed facts (Doc. 74-1) (the "Plaintiffs' Statement of

Undisputed Facts") submitted by the Plaintiffs:

1. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans

and Michael Patrick McLoughlin, respectively. Joint Stipulation of Uncontested Facts, Joint

Pretrial Statement, June 22, 2020 (D-14) ("Stip"), No. 1.

**RESPONSE:**

APPX00773

Admitted

2. Nina Brekelmans and Michael Patrick McLoughlin were tragically killed in a fire at a residence in Washington, DC (the "Fire") located at 1610 Riggs Place, NW, Washington, DC (the "Property"). Stip. No. 2

**RESPONSE:**

Admitted

3. Defendant resided in the Property from approximately 2007 through early June, 2015 and then commenced residing in the Property again in early 2018. Stip No. 3, Exemption Trans. Vol. 3, 62:11 - 63:17.

**RESPONSE:**

Admitted

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

5. Michael Gigandet, the Court appointed Trustee of the Estate, has declined to pursue the causes asserted herein and has also declined to join in this action. Court's Memorandum Opinion dated February 11, 2021 (D-38)("L Salas Memorandum Opinion"), at p. 6-7.

**RESPONSE:**

Admitted

6. The Complaint is brought as a derivative action on behalf of the Estate of Len Salas. L Salas Memorandum Opinion dated February 11, 2021, in Case No. 20-90027 (D-38).

APPX00774

**RESPONSE:**

Admitted

    7.  In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). Joint Statement of Stipulated Facts, Joint Pre-trial Statement dated June 22, 2020 (D-14), Stipulation No. ("Stip. No.") 6.

**RESPONSE:**

Admitted

    8.  The Defendant, Max Salas does not have the original of the Quitclaim Deed and the 1610 Riggs Property Trust, dated July 6, 2010. Defendant's Amended Responses to the Plaintiffs Request for Admissions, dated November 11, 2021 ("Amended Responses-RFP"), Exhibit 17, Resp No. 2, p.3. Amended Responses-RFA, Request No. 1., p. 2.

**RESPONSE:**

Admitted

    9.  Len Salas does not remember seeing a "wet ink" original of the Quitclaim Deed after July 6, 2010. L Salas Trans. 140:13-23.

**RESPONSE:**

Admitted

    10.    The Defendant does not have the original Quitclaim Deed created in July, 2010. Defendant's Amended Responses to the Plaintiffs' Request for Admissions ("RFA"), Req. 1

**RESPONSE:**

Admitted

APPX00775

11.     That the Defendant is unaware of the location of the original Quitclaim Deed after 2012.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

12.  Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max Salas and only kept a copy.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

13.  The Defendant did not attempt to record the Quitclaim Deed after 2010.     RFA, Req. 3.

**RESPONSE:**

Admitted

14. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.  RFA 16.

**RESPONSE:**

Admitted

15. Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation. RFA 17.

**RESPONSE:**

Admitted

16.  Neither Len Salas nor Max Salas informed SunTrust in writing that Max was

responsible for the SunTrust Deed of Trust Note payments.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

17. Max Salas was not a listed or added obligor or guarantor under the SunTrust

Deed of Trust obligation or Note. RFA 18.

**RESPONSE:**

Admitted

18.  Max Salas did not contact Ms. Sylvia Jones, a real estate broker acquaintance,

regarding the location or existence of the original Quitclaim Deed since June, 2015. RFA 41

**RESPONSE:**

Admitted

19. That the Note balance as of April, 2007 totaled approximately $870,000. RFA 44

**RESPONSE:**

Admitted

20. That the Note balance as of the commencement of the Salas bankruptcy case (April 18,

2018) totaled more than $1,030,825.86. RFA 47

**RESPONSE:**

Admitted

21.  That the Note Balance as of September 29, 2019 totaled $1,208,720.40.  Stipulation

filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, Motion to Approve Settlement

with U.S. Bank, Exhibit 15.

**RESPONSE:**

APPX00777

Admitted

22. That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim Deed purporting to transfer the Property from Len to Max.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

23. That the foresaid Trust and Deed were prepared and executed in Colorado.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

24. That the Trust was registered in Colorado by Ron Salas in 2011 even though the Property was located in D.C. Email dated June 17, 2011 from Ron to Max, Exhibit 7.

**RESPONSE:**

Admitted

25. That the Defendant made at least two attempts to obtain a new or different Quitclaim Deed from the Law Firm of Stan Goldstein in 2011 and 2012. Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**

Admitted

26. That on June 17, 2011, Ron Salas sent an email to his father, the Defendant, stating that the "next step" was for his father to obtain counsel to prepare a Quitclaim Deed for Len to sign. Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012,

APPX00778

Exhibit 7.

    **RESPONSE:**

    Admitted

    27.  That on June 21, 2011 the Defendant forwarded Ron Salas's email of June 17, 2011 to Stanley Goldstein requesting Mr. Goldstein to assist the Defendant to transfer the Property from Len to Max.  Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

    **RESPONSE:**

    Admitted

    28.  On January 17, 2012, more than six months later, the Defendant sent another email to Lynn Boileau, an associate of Mr. Goldstein requesting that she "get Lenny's name off of the property." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

    **RESPONSE:**

    Admitted

    29.  On February 24, 2012, Len sent his father an email asking for the status of removing Len from the property title.  Max responded on February 24, 2012 that he is "still working on this..." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7 .

    **RESPONSE:**

    Admitted

    30.  There were no further communications regarding the creation or recording of a Deed

for the transfer of the Property from Len to Max after February, 2012. L Salas Trans. _____.

    **RESPONSE:**

      This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

    31.  From 2010 through early 2015 Len had numerous communications with Max asking Max to remove his name from the Property. L Salas Trans. 70:18 - 74:16

    **RESPONSE:**

    Admitted

    32.  Len had several conversations with his father regarding getting his name off the loan and deed after 2010.  L Salas Trans. 71:25 - 74:16; Transcript of Len Salas's testimony at the hearing on Objections to the Claim of Exemption (of the Property) by the Debtor, Max Salas, in case no. 18-00260 in the United States Bankruptcy Court for the District of Maryland, Trial Transcript ("Exemption Trans."),Vol 1., Exhibit 20, 158:13 - 163:10; Deposition Transcript of the Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

    **RESPONSE:**

    Admitted

    33.  The Sun Trust Note was in default during the period 2010 - 2018.  L Salas Trans., Exhibit 13,  55:11-20.

    **RESPONSE:**

    Admitted

    34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns.

    **RESPONSE:**

APPX00780

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

35. The Plaintiffs are the holders of undisputed and accepted claims totaling $15.2 Million. Of that amount, the claim of the Brekelmans estate represents $7.5 Million and the claim of the McLoughlin Estate represents $7.7 Million. Stip. No. 6

**RESPONSE:**

Admitted

36. According to the Debtor's schedules and the Trustee's Final Report (D-209), in Case No. 18-2662, the Plaintiffs represent 99.8% of all allowed unsecured claims of the estate.

**RESPONSE:**

Admitted

37. The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's).

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

38. The Plaintiffs received distributions on account of their claims from both estates.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

39. The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018.

**RESPONSE:**

APPX00781

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

40. On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in

the Middle District of Tennessee and the District of Columbia, respectively.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

41. At the time of the bankruptcy filings by Len and Max, Len was, and continued to be,

until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C.

("the Property").

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

42. In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then

wife, divorced.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

43. Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust

Loan").

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

44. The proceeds of the Sun Trust Loan were paid to Max's wife as part of the divorce

settlement. Exemption Trans. Vol. 3, Exhibit 6, 70:2-17.

**RESPONSE:**

Admitted

45.  Len received no part of the $870,000.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property.

Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the

Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case

No. 18-00260) (D-298), p. 12, ¶ 4.4.

**RESPONSE:**

The wording of the Plan is admitted.  The remainder of the statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.  To the extent a response is required, the remainder of the statement is denied.  The facts contained in Paragraphs 1-24 of the Max Salas Affidavit, attached to the Response to Motion for Summary Judgment, illustrate that Len Salas held nothing but bare legal title to the Property.

47.  At the time of Len's purchase of the Property in 2007, Max had tax liens and other

obligations which made it impossible for Max to obtain a loan on the Property. Exemption Trans.

Vol. 3, 71:9 - 72:23.

**RESPONSE:**

Admitted

48.      At no time, since 2007, including, but not limited to, the time of the Quitclaim

Deed in  July, 2010, did Max make any payments to Len and Len received no property or other

value from Max related to the Trust or Quitclaim Deed.  Exemption Trans. Vol 3, Exhibit 6,

139:15 - 140:2; Len Salas testimony, Plan Confirmation Hearing, United States Bankruptcy Court

APPX00783

for the Middle District of Tennessee, December 13, 2018 ("L Salas Conf. Hrg. Trans."), 68:22 -

69:2. Exhibit 4.

RESPONSE:

Admitted

49.    Max delivered the original Quitclaim Deed to Mr. Goldstein's office but did not

recall whether Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

RESPONSE:

Admitted

50. According to Max, he tried to refinance the Property several times after 2007, all to no

avail. In fact, at least through 2015 every attempt to refinance the Property required the

participation of Len as a co-signer or co-obligor.

RESPONSE:

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule
of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

51.  There are no documents indicating that Max was liable on the SunTrust loan at any

time and Max never entered into any agreement or understanding with Len that Max was liable or

responsible.

RESPONSE:

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule
of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

52.  There is no document raised, proffered or produced by Max indicating that Len was

not the sole party responsible for the Deed of Trust payments until at least November, 2019.[1]

RESPONSE:

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule

of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

53.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that, when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas testimony at the Exemption Hearing, Exemption Trans. Vol. 2, August 23, 2018 ("Exemption Trans. Vol. 2"),Exhibit 3, 33:23 - 50:25, Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 1, 42:18 - 43:2.

    **RESPONSE:**

    Admitted

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee.

    **RESPONSE:**

    This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

55.  According to Len, the CLR Trust, was a trust created by Max for the benefit of his three sons, Chase, Len and Ron. Len Salas, Sup. Ct. Depo, Exhibit 11, 30:5-14.

    **RESPONSE:**

    Admitted.

56.  Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust." L Salas Trans. 148:1-13. In Len's Deposition Testimony in the Superior Court Litigation, Len testified, on March 9, 2016, that he

had no knowledge a trust other then the CLR Trust. Len Salas Deposition Testimony, March 9, 2016 in the Superior Court Litigation, Exhibit 11, 29:14 - 30:14

**RESPONSE:**

Admitted

57. The lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

58. Max did not want the rents deposited into his personal account. Exemption Trans. Vol 3., Exhibit 6, 222:12 - 16

**RESPONSE:**

Admitted for purposes of this motion only.

59. Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2 - 150:21.

**RESPONSE:**

Admitted

60. During the period 2015 through 2018, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he received as a result of the fire damage.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

APPX00786

61. As of October, 2018, the deficiency on the SunTrust Note was $420,928.34. Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

Admitted

62. As of April, 2018, the deficiency on the SunTrust Note was $374,282.18. Sun Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

Admitted

63. As of April, 2018, Len remained the sole obligor on the SunTrust Note.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

64. The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7, 152:3 - 153:10. See SunTrust Deed of Trust, dated April 16, 2007, Exhibit A to SunTrust Motion for Relief from Stay ("SunTrust Motion"), filed in Case No. 18-2662 on November 2, 2018 (D-79-1), Exhibit 15.

**RESPONSE:**

Admitted for purposes of this motion only.

65. At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

APPX00787

66. At all relevant times, Len worked only part time and had limited income and assets.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

67. At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

68. Len did not have sufficient funds to pay his attorneys in the Superior Court litigation. He lives "paycheck to paycheck." L Salas Trans. 76:20 - 77:2

**RESPONSE:**

Admitted

69. At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans. 61:1 - 63:2.

**RESPONSE:**

Admitted

70. In 2016, Len's income was a total of $15,151. L Salas Statement of Financial Affairs, filed April 18, 2018 in Case No. 18-2662, (D-1), Exhibit 16, p 38.

**RESPONSE:**

Admitted

71. In 2017 Len's total income was $30,408. Exhibit 16, p. 38.

**RESPONSE:**

Admitted

72.  In 2018, through April 17, 2018 Len's total income was $6,720.  Exhibit 16, p. 38.

**RESPONSE:**

Admitted

73.  During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them.  See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District

of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

**RESPONSE:**

Admitted

74.  Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, filed April 27, 2018 in Case No. 18-2662, D-10, at page 3 of 10.

**RESPONSE:**

Admitted

75.  On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41.  Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

APPX00789

**RESPONSE:**

Admitted

76. Len received no income, payments or property from Max in 2007 or 2010. L Salas

Mtg Trans., 4/1/19, Exhibit 5, 5:22 - 7:15.

**RESPONSE:**

Admitted

77. Len repeatedly attempted to get Max to remove Len's name from the Property after

2010. L Salas Depo. Testimony, Exhibit 13, 70:18 - 74:16

**RESPONSE:**

Admitted

78. Mr. Salas told his counsel, Mr. Albert and his associate, Mr. Cox, in 2018, what Max

did with the Quitclaim Deed and left it up to his counsel to obtain the original from Mr.

Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

**RESPONSE:**

Admitted

79. After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

emails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13.

**RESPONSE:**

Admitted for purposes of this Motion only.

80. In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed,

executed on July 6, 2010, as follows:

APPX00790

"Q And I believe you said, but I want to
clarify this, that between the time of 2012,
roughly, and I realize you said, I think, a year
or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came in my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind
I don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.**

**He didn't live in the District, he
never- he didn't live in the house, and I- so
that's the only logical reason I could make that
he would be involved, that it was never done. And
until that point, I did not even know that it had
not been done. I assumed at some point that he
came up with the money and did it. But he didn't,
as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the

District of Columbia, Case No. 18-00260, August 8, 2018, excerpts attached hereto as

Exhibit 8, ("R Salas Trans"), 73:15 - 74:21 (emphasis in original).[2]

   RESPONSE:

   Admitted

   81. The Plaintiffs Judgments are now final and binding on all parties as a result of the final

distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's

Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for

the District of Columbia, Docket Entries D-298 and 303; L Salas Chapter 7, Case No. 18-002662

in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and D-222 (Final Decree).

**RESPONSE:**

Admitted

82. Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

**RESPONSE:**

Admitted

83. On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max. This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property. A copy of Ron's email, dated June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022.

**RESPONSE:**

The Defendant denies that the Quitclaim Deed is his only proof of ownership of the Property. Otherwise, the statement is admitted.

84. These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Debtor's Responses to Movants' First Set Request for Production of Documents, served on August 6, 2018, in Case No. 18-260, Exhibit 21.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim

APPX00792

that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

86. Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Nos.: LenSalas000016-17.

**RESPONSE:**

Admitted

87. On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein. In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..." Exhibit 7, Bates Number LenSalas000016.

**RESPONSE:**

Admitted

88. In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are **two different** requests. One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supplied) Exhibit 7, Bates Number LenSalas000023.

**RESPONSE:**

Admitted

89. On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon." Exhibit ____, Bates Number LenSalas000029.

APPX00793

**RESPONSE:**

Admitted

90.  Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust.  M Salas Trans. , Exhibit 10, 64:16 -74:2.

**RESPONSE:**

Admitted.

91.  Max also testified that he does not recall any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18.

**RESPONSE:**

Admitted

92.  When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

**Q.  Have you contacted Ms. Boileau or**
Mr. Goldstein to determine if they have
a copy of any deed that might have
been created?

**A.  I did try to contact them.  I**
**did try to contact them actually**
**recently.  And I -- but I didn't -- I**
**mean, they were trying -- they**
**were -- no. I mean, we worked on**
**something and then they said it couldn't go**
**any further and depends on what you**
**were going to do.  So I don't -- I guess -- I**
**can't guess.  I don't know.**

M Salas Trans. 73:13-23

**RESPONSE:**

Admitted

APPX00794

93. Only Max Salas had an original of the Quitclaim Deed after July 6, 2010 and Max does not know where the original is or when he last had it.  Exhibit 10, M Salas Trans. 73:13-23, 77:2 - 82:23.

**RESPONSE:**

Admitted for purposes of this Motion only.

94. Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 19, 42:18 - 43:2.

**RESPONSE:**

Admitted

95. Len Salas is not aware of the location of any of the wet ink signature originals of the July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas Trans."), 15:4-9.  Len testified in his deposition that he provided an original "wet ink" original of the Quitclaim Deed, or a copy,  to his lawyer on the eve of the Superior Court trial which resulted in the judgment against Len and his father. L Salas Trans, 16:6-24, 19:11-25 - 21:18.  Regardless, Len testified that the document he produced on the eve of the Superior Court trial, which commenced on March 26, 2018, was kept in his possession at all known times between July, 2010 and March, 2018.  Id. Len's wife, Kendra, testified that she "had a pdf of it (the July, 2010 Quitclaim Deed) and that she thought it was the same as what Len had " I thought it was the same thing as what Len had, but I'm not sure." K Rowe Trans. 30:13-20.

Case 3:20-ap-90027 Doc 75-14 Filed 08/12/22 Entered 08/12/22 19:23:37 Dest
Case 23-90090 Document 75-1 Filed in TXSB on 08/28/24 Page 23 of 32
Exhibit 1    Page 23 of 32

APPX00795

**RESPONSE:**

Admitted

96. Ron Salas stated that he was unaware the Quitclaim Deed had not been recorded

until he found out that Len had been sued in the Superior Court (in October, 2015. Transcript

of the Deposition of Ron Salas, August 8, 2018, Exhibit 8, 65:21 - 66:21

**RESPONSE:**

Admitted

97. Ron Salas was unaware of the requirements of Quitclaim Deeds in D.C. Ron Salas's

testimony, Exhibit 12, at pp.227:5 - 228:12.

**RESPONSE:**

Admitted

98. Ron stated he was unaware whether the trust documents he created were valid under

D.C. law in August, 2018. Ron Salas's testimony, Exhibit 12, 243:8-15.

**RESPONSE:**

Admitted

99. The only deed referenced by Max or his counsel, allegedly entitling Max to an

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered,

or even mentioned by the Salas family or by Max, specifically.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule
of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15

Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee

filed objections to the Plaintiffs' claims filed in Len's bankruptcy.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

101. In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len listed total monthly income of $4977.75 and total monthly expenses of $4,407.14. On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least $1,035,000 approx) per his consistent promise that he would pay that amount and his consistent assertion that he was responsible for payment of the SunTrust Note which was, at all relevant times, in Len's name.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

102. The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries ("D- ") D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and 222 (Final Decree).

**RESPONSE:**

Admitted

103. Len was solely obligated on the Sun Trust Deed of Trust on the Property which, according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018. M Salas Schedules, Case No. 18-260 (D-12), p. 19 of 37, attached as Exhibit ___.

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed. Transcript of Confirmation Hearing in Case No. 18-02662, December 13, 2018 at pp. 68-69, excerpts attached as Exhibit 4.  See also, Transcript of the Chapter 7 Meeting of Creditors of Len Salas, April 1, 2019 (L Salas Mtg. Trans.), Exhibit 5,  5:22 - 7:15.

**RESPONSE:**

Admitted

104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office.  He does recall that Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

Admitted

105.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See emails attached as Exhibit 7) Max did not make any further attempts to record the Deed. Exemption Trans. Vol 3, 58:9-13

**RESPONSE:**

Admitted

106.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be

APPX00798

exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments. D.C. Code § 15-501 (a)(14). These conversations took place in early 2018. Exemption Trans. Vol. 3, Exhibit 6, 119:9 - 122:9; Albert-R Salas emails, 2/14 - 3/7/18, Exhibit 19, Exemption Trans. Vol 1, Exhibit 20, 145:22 - 147:20.

    **RESPONSE:**

Admitted for purposes of this Motion only, and such admission is made without waiving the attorney-client privilege.

107. Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

    **RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.

108. Mr. Albert confirmed that no original was found after 2010 at the Exemption Hearing through Ron Salas' "rebuttal" testimony on August 24, 2018. Rebuttal Testimony of Ron Salas, at the Exemption Evidentiary Hearing, August 24, 2018. Exemption Trans., Vol 3, 4:10 - 5:16. See also, Exemption Trans. 5:19 - 6:3, 7:18 - 12:8, 13:17 - 15:24

    **RESPONSE:**

Admitted

108. At the time of Ron Salas' conversation with Mr. Albert regarding copies of the trust documents, Ron Salas understood that Mr. Albert was representing Max regarding a potential bankruptcy filing after the Superior Court trial. Exemption Trans. 12:12 - 13:14

**RESPONSE:**

Admitted

109. Max Salas valued the Property at $2.5 Million on his schedules in or about May 2018, and the Property was appraised for approximately $2.4 Million in or about August 2019. Stip. No. 50.

**RESPONSE:**

Admitted

110. Pursuant to an order of this Court dated June 12, 2019, the trustee in this case was authorized to sell the estate's interest in the Trustee's avoidance and recovery rights under 11 U.S.C. §§ 544 through 551. Stip. No. 47

**RESPONSE:**

Admitted

111. On July 23, 2019, the trustee in Len Salas' case held an auction sale to sell the bankruptcy estate's interest in the avoidance and recovery actions pursuant to 11 U.S.C. §§ 544 through 553. Stip. No. 48

**RESPONSE:**

Admitted

112. The Plaintiffs were the successful bidders at the Trustee's auction sale. Stip No. 49

**RESPONSE:**

Admitted

113. The D.C. Bankruptcy Court made no final determination of the effect of the trustee's avoiding powers asserting that effect was up to Len Salas' bankruptcy estate. Stip. No. 44

APPX00800

**RESPONSE:**

Admitted

114. No deed was recorded naming Max Salas as trustee or owner of the Property prior to Len Salas' bankruptcy filing. Stip. No. 45

**RESPONSE:**

Admitted

115. Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed related to the Property as of June 6, 2022. Stip. No. 46

**RESPONSE:**

Admitted

116. From the time of the Fire until February or March 2018, no one resided in the Property. Stip. No. 35.

**RESPONSE:**

Admitted

117. During that time, and until November 2019, no payments were made on the SunTrust Loan with the exception of one payment made by Max Salas from the insurance proceeds he received as a result of the fire damage. Stip No. 36

**RESPONSE:**

Admitted

118. According to the schedules filed in Max Salas' bankruptcy, as of the commencement of his bankruptcy case, in April, 2018, the only lien creditors were the IRS ($6,768.66 claim) and SunTrust Mortgage ($1,030,825.86). Stip. No. 37

**RESPONSE:**

APPX00801

Admitted

119. The balance of the SunTrust Loan as of October 26, 2018 was $1,141,021.14. Stip. No. 38

**RESPONSE:**

Admitted

120. Max Salas has been making the required payments on the Property since November 2019, as of June 22, 2020. Stip. No. 39.

**RESPONSE:**

Admitted

121. At all relevant times, Len Salas had limited income and assets, other than the Property. Stip. No. 28.

**RESPONSE:**

Admitted

122. Max Salas intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. Stip. No. 29.

**RESPONSE:**

Admitted

123. The Quitclaim Deed has never been recorded. Stip. No. 30

**RESPONSE:**

Admitted

124. As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had

APPX00802

any intent to use or record it.  Emails dated June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**

This statement fails to comply with the requirements of Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1; therefore, no response is required.  To the extent a response is required, the Defendant denies that the referenced emails establish this alleged fact and would request that the Plaintiffs identify a specific email upon which they rely.

125. While in Colorado, Len Salas and Max Salas executed a trust agreement which Ron Salas prepared using a Colorado form even though the purported trust property, the Property, was located in D.C. Stip. No. 25.

**RESPONSE:**

Admitted

126. The Defendant's Second Amended Disclosure Statement and Third Amended Plan of Reorganization, as confirmed by the D.C. bankruptcy court, recognize that the Plaintiffs are the owners of, and have the right to pursue, the avoidance actions which are alleged in the Complaint, as amended. Exhibit 2, Complaint Exhibit B, M Salas Second Amended Disclosure Statement, Exhibit 2, at p. 17.

**RESPONSE:**

Admitted

APPX00803

Dated: August 12, 2022

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel:    615.465.6008
Fax:    615.807.3048
Email: phillip@thompsonburton.com

Attorneys for Defendant

**Certificate of Service**

The undersigned hereby certifies that a true and exact copy of the foregoing has been served

via electronic notice/ECF on all parties having made an appearance herein, including counsel for the

Plaintiffs.

This 12th day of August, 2022.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

APPX00804

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| LEN SALAS | ) CASE NO. 3:18-BK-02662 |
| | ) CHAPTER 11 |
| DEBTOR. | ) JUDGE HARRISON |
| | ) |
| NICOLAAS BREKELMANS AND | ) |
| GAIL GREGORY BREKELMANS, | ) |
| CO-PERSONAL REPRESENTATIVES OF | ) |
| THE ESTATE OF NINA BREKELMANS | ) |
| | ) |
| and | ) |
| | ) |
| MICHAEL MCLOUGHLIN AND | ) |
| MARTHA JOHNSON, CO-PERSONAL | ) |
| REPRESENTATIVES OF THE ESTATE | ) |
| OF MICHAEL PATTRICK MCLOUGHLIN, | ) |
| | ) |
| PLAINTIFFS, | ) |
| | ) |
| v. | ) Adv. Pro. No. 3:20-ap-90027 |
| | ) |
| MAX SALAS, | ) |
| | ) |
| DEFENDANT. | ) |

**AFFIDAVIT OF MAX SALAS**

DISTRICT OF COLUMBIA          )

I, Max Salas, hereby state under oath that the following statements are true and correct:

1.    I am over the age of 18 and competent to testify.  I have personal knowledge

of all facts contained in this affidavit.

2.    I owned the real property located at 1610 Riggs Place, NW, Washington,

D.C. (the "Property") with my former wife, as husband and wife, until 2007.

APPX00805

3. In 2007, my wife and I divorced, and I was ordered to pay my ex-wife a portion of the equity in the Property.

4. I wanted to stay in my home, so I decided that I would take out a loan against the Property in order to fund the payment to my ex-wife.

5. Upon seeking financing for the payment, I learned that I was not credit worthy to borrow the funds.

6. To facilitate this transaction, I quitclaimed the Property to my son, Len Salas, who then borrowed $870,000 against the Property.

7. My ex-wife received the proceeds of the loan.

8. Len Salas received no proceeds from the loan nor did he pay anything in exchange for the quitclaim deed.

9. At the time that the Property was quitclaimed to Len Salas, I promised to refinance the loan and remove his name from both the loan and the title to the Property as soon as possible.

10. I made multiple attempts to refinance the Property over a number of years but found each time that I was unable to qualify for a loan.

11. In 2010, with the assistance of my son Ron Salas, who was an attorney in Colorado, I decided to have the Property quitclaimed from Len Salas to a trust, in hopes that the trust could then borrow the funds to remove Len Salas from the loan and the title to the Property.

12. Len Salas executed a quitclaim deed (the "2010 Quitclaim Deed") to the 1610 Riggs Place Trust (the "Trust") in July 2010.

2

APPX00806

13. Attempts to refinance the Property in the name of the Trust were ultimately unsuccessful and the 2010 Quitclaim Deed was never recorded.

14. The Property was never Len Salas' primary residence.

15. Len Salas never made a single mortgage payment on the Property.

16. Len Salas never paid any property taxes on the Property.

17. Len Salas never paid for any upkeep on the Property.

18. After the fire, I exclusively oversaw and paid for the renovation and rebuilding of the structure on the Property.

19. I rented out rooms in the Property through an entity known as the "CLR Trust".

20. Len Salas had no involvement with the CLR Trust.

21. I dealt with tenants, signed leases, and accepted rent payments on behalf of CLR Trust.

22. I deposited all rent checks into an account in the name of CLR Trust, for which I was a signatory.

23. Len Salas was never involved in the leasing of the Property, nor did he receive any portion of the rents paid for rooms in the Property.

24. Prior to the filing of the petition in Len Salas' bankruptcy case, the Plaintiffs in this case had actual knowledge that I lived in the Property, signed leases for the Property, accepted rent for the Property, and that Len Salas had quitclaimed his interest in the Property in July 2010.

APPX00807

FURTHER AFFIANT SAYETH NOT

_____
MAX SALAS

DISTRICT OF COLUMBIA          )

Subscribed and sworn to before me this 10th day
of August, 2022.

_____
Notary Public

My Commission Expires: 07/31/2027

**Endurance N. Arinze**
**Notary** Public, District of Columbia
**My Commission** Expires 07/31/2027

District of Columbia
Signed and sworn to (or affirmed) before me
on 08/10/22 by Endurance Arinze
   Date       Name(s) of Individual(s) making Statement

_____
Signature of Notarial Officer

BANKER
Title of Office

My commission expires: 07/31/2027

4

APPX00808

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### Nashville Division

In Re:                                                 :

  LEN SALAS                                   :      CASE NO. 3:18-BK-02662
                                       CHAPTER 11
                 DEBTOR        :      JUDGE HARRISON

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

NICOLAAS BREKELMANS AND                              :
GAIL GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES OF                       :
THE ESTATE OF NINA BREKELMANS
                                            :
    and                                           :

MICHAEL MCLOUGHLIN AND
MARTHA JOHNSON, CO-PERSONAL                          :
REPRESENTATIVES OF THE ESTATE
OF MICHAEL PATTRICK MCLOUGHLIN                       :

               PLAINTIFFS                  :

    v.                                            : Adv. Pro. No. 3:20-ap-90027

MAX SALAS                                            :

              DEFENDANT                    :

---

## PLAINTIFFS' RESPONSE TO THE DEFENDANT'S
## OBJECTION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

**This matter is set to be heard on September 13, 2022 at 9:30 a.m.**
**Courtroom Three, US Customs House, 701 Broadway, Nashville, Tennessee**

---

COME NOW, the Plaintiffs herein, Nicolaas Brekelmans and Gail Gregory Brekelmans,

Co-personal Representatives of the Estate of Nina Brekelmans and Michael McLoughlin and

Martha Johnson, Co-personal Representatives of the Estate of Michael Pattrick McLoughlin

("the Estates"), by and through their counsel and, for their response to the Defendants'

APPX00809

Objections to the Plaintiffs' Motion for Summary Judgment state as follows:

## I. INTRODUCTION

1. As a threshold matter, the Defendant did not file an opposition to the Motion for Summary Judgment and offered no undisputed facts in support of his "Objections." Although the Defendant makes the general statement that he has other meritorious defenses to the Plaintiffs' Complaint, he fails to explain them in any detail, fails to assert any undisputed facts in support and those "defenses" do not impact the right of the Trustee to avoid and recovery the subject Property in D.C. from the Defendant. The Defendant did file an Affidavit of the Defendant but the Defendant stated in his Opposition that the purpose of the Affidavit was to show that the Debtor had no interest in the Property. From the Plaintiffs' perspective, the Affidavit supports the Plaintiffs' Motion, as discussed below.

2. The Plaintiffs assert that the Defendant has conceded that the undisputed facts support the Plaintiffs' entitlement to Summary Judgment, except for the single "objection" that the Debtor's "bare legal title" is an insufficient basis for the use of the Trustee's "strong arm" remedies under 11 U.S.C. § 544 (a). That argument is completely without merit and not even supported by cases cited by the Defendant. In addition, the Defendant has offered no argument against the state law claim in Complaint, Count V (Fraudulent Conveyance - D.C.). Therefore, the Plaintiffs assert that, at a minimum, they are entitled to judgment on Count V. See D.C. Code §§ 28-3104, *et seq.*, 42-401 and ***Clay Properties, Inc. v. Washington Post Co.*** 604 A.2d 890, 894 (D.C. 1992). Furthermore, the Defendant's Affidavit, filed in support of his "Objections" confirm facts which not only support the Plaintiffs' allegations and right to relief but also show that Defendant was not the owner of the Property, at least since sometime before 2015 and that

the "trust" to which the Quitclaim Deed of July 2010 was purportedly transferred did not exist and, in fact, the CLR Trust was the actual owner of the subject Property, not the Defendant.

3. The Plaintiffs are emphasizing that they are entitled to judgment on the basis of actual fraud, bad faith, misrepresentations which border on perjury, and other factors that do not allow the Defendant to obtain the equitable relief he seeks in this court. However, for purposes of this Motion the Plaintiffs are asserting that they are entitled to summary judgment on the counts of the Complaint alleging fraudulent conveyances, namely, Counts IV and V, and avoidance of the transfer from the Debtor to the Defendant on April 17, 2018 pursuant to 11 U.S.C. § 544 (a)(3) ("bona fide purchaser"). The Plaintiffs are also asserting that they are entitled to the recovery of the property at 1610 Riggs Place, N.W., Washington, DC ("the Property"), or its value upon sale of the Property, under Count VI, all for the benefit of the Debtor's bankruptcy estate.

4. In his Objection, the Defendant does not offer any direct evidence that refutes the allegations of the Plaintiffs' Motion, but does offer two "Objections" related to compliance with Fed. R. Civ. P. ("FRCP") 56 (c) and Local Rule 7056-1 and the misguided theory that the Debtor's interest is just that of "bare legal title." Therefore, the Trustee is not entitled to use his "strong arm" powers to avoid the alleged transfer and recover the Property for the benefit of the Debtor's Estate. As argued below, neither of these objections are valid and the lack of an appropriate opposition requires this Court to grant summary judgment.

5. The Defendant asserts that he has other meritorious defenses which are the subject of disputed facts but does not elaborate in his Opposition and has cited no facts in support of those arguments.

-3-

## II.   ARGUMENT

### A.   The Applicable Provisions of Fed. R. Civ. P. 56 and Local Rule 7056-1 Do Not Constitute an Impediment to Summary Judgment

6.   The Defendant's threshold argument is that the summary judgment rule (Fed. R. Civ. P. 56 (c), as modified by this Court's Local Rule 7056-1 (L.R. 7056-1) requires that each of the Plaintiffs' listed items of undisputed facts must be supported by a direct reference to the record, including depositions, admissions, etc., citing several cases from the Eastern District of California and a recent case of the 6th Circuit Bankruptcy Appellate Panel, **Hadley v. Harrison**, 2022 Bankr. LEXIS 483 (6th Cir. BAP).

7. The lead case asserted by the Defendant is the case of **Langley v. Tulare Police Dept.**, in which Langley's "Motion for Summary Judgment" consisted of the following letter sent to the Court:

> September 22, 2016 an AdmissionRequest [sic] was served on counsel for defendants, Jose Colegio [sic] and Tulare Police Department. A copy was also filed with the United States Courts, Eastern District of California received and dated 09/26/2016.
>
> Counsel for the defendants acknowledges receipt, and dates receipt as 09/26/2016. Counsels failure to respond to Admissions Request demonstrates [they're] conceding my allegations are true and correct. Counsels [sic] claim of "No Proof of Service" does not solidify actions in "Failure" to contest the admissions of fact. Enclosed is letter from counsel acknowledging receipt.
>
> Counsel's failure to respond, contests allegations supports my claims, and therefore there is no need for trial as there is no dispute in fact making summary of judgement appropriate."

**Langley v. Tulare Police Dep't**, No. 1:16-cv-00336-DAD-SKO, 2017 U.S. Dist. LEXIS 21572, at *4-5 (E.D. Cal. Feb. 15, 2017).  The "motion" filed in **Langley** bears no resemblance or possible comparison to the Plaintiffs' motion in this case.

-4-

8.  The Defendant seems to believe that relying on inmate, or criminal defendants' *pro se* cases are relevant to the facts and circumstances of the pending motion.  The Plaintiffs' would like to think that their Motion and the 90+ admitted Statements of Fact which accompany their Motion, rise to a justiciable level a little above, that of ***Langley*** and the other cases cited by the Defendant.

9.  Like ***Langley***, ***Moore v. Sacramento Sheriff's Dep't***, 2015 U.S. Dist. LEXIS 19986 is a case in which the Plaintiff, a state prisoner, is acting *pro se*. ***Id.***, at *1.  The relevant facts in ***Moore*** are that the Plaintiff filed six motions for summary judgment, all confusing and duplicative, prompting the court to advise the Plaintiff "that improper and superfluous filings by the parties impede the progress of civil action and the court's handling of the case." ***Id.***, at *10-11.  The court provided an example of the Plaintiff's failure to provide citations to the record as required by the court's local rule, which rule appears to be similar to Rule 56 but, unlike Local Rule 7056-1, the California rule allows citations to any supporting document. Local Rule 260(a), United States District Court for the Eastern District of California (E.D. L.R. 260(a)).  The Eastern District stated in ***Moore***: "plaintiff notes in his motion for summary judgment against defendants Jennings and Carriger that his motion is supported by "Exhibit (A) not attached so not to burden this court with excessive paper work..." ***Id.***, at *12.  The court also noted that the Movant's  apparent attempt to provide the required Statement of Undisputed Facts through a defective and improper affidavit was not in compliance with Rule 56, or E. D. L.R. 260(a).

10.  The Eastern District of California denied the inmate Plaintiff's Motion for Summary but, despite the significant deficiencies noted above, did so without prejudice. ***Id.***, at *13

11. In the instant case, the Plaintiffs' concede that most, but not all, of the 32 Statements

APPX00813

of which the Defendant complains do not contain citations to the record as required under FRCP 56 and Local Rule 7056-1. However, that leaves over 90 Statements which are admitted and at least two Statements which the Plaintiffs contend are supported by proper record citations, but to which the Defendant does not counter and, therefore, those Statements are also deemed undisputed.

12. In ***Harrison, supra***, the Plaintiff stated 166 statements of fact each of which including citations to the record. In response, the Defendant, Harrison, was required to prove that there were genuine disputes of material fact to defeat the Plaintiff's motion. ***See***, Salas Objections, at p. 8 of 25. Harrison failed to sufficiently deny any of the allegations which Hadley submitted and therefore the motion for summary judgment was granted. The ***Harrison*** court implied that the Defendant failed to respond correctly to any of the Statements of Facts properly presented by the Plaintiff. Unlike in the cases cited by the Defendant, in the instant case, the Plaintiffs have provided more than 90 Statements of Fact supported by record citations and admitted by the Defendant. See Defendant's Response to Plaintiffs' Amended List of Undisputed Facts ("Defendant's Response") filed on August 12, 2022 (D-75-2). Moreover, most of the Statements objected to are covered, completely, or to a very large extent, by other Statements which the Defendant did admit.

13. Of the 32 Statements of Fact to which the Defendant objected, some are obvious facts which are not in dispute (but admittedly do not contain direct references to the record), like for example, Statement No. 4. : "In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement." However, compare Statement No. 4 to the Defendant's Affidavit, (D-75-2) which states:

"3.  In 2007, my wife and I divorced, and I was ordered to pay my ex-wife a portion of the equity in the Property.

...

5. ...I learned that I was not credit worthy to borrow the funds.

6.  To facilitate this transaction, I quitclaimed the Property to my son,, Len Salas, who then borrowed $870,000 against the Property.

7.  My wife received the proceeds of the loan.

8.  Len Salas received no proceeds from the loan nor did he pay anything in exchange for the quitclaim deed."

14.  In addition, Plaintiffs' List of Undisputed Facts ("Plaintiffs' List") No. 19. States: "That the Note balance as of April, 2007 totaled approximately $870,000."  Defendant admits that Statement. See Defendant's Response to Plaintiffs' Amended List of Undisputed Facts (D-75-1), August 12, 2022 ("Defendant's Response"), at p. 5 of 32.

15.  Defendant also objects to Statement No. 11, which reads: "That the Defendant is unaware of the location of the original Quitclaim Deed."  However, Plaintiffs' List, Statement No. 82 states: "Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is (sic), or if it even exists." (Citations omitted).  The Defendant admits Statement No. 82.  See Defendant's Response, at p. 20 of 32.

16.  Defendant has also objected to Plaintiffs' List, Statements Nos. 22 and 23.  These are particularly surprising to the Plaintiffs. While the Plaintiffs admit they did not provide a direct citation to the record, the facts recited by Statements 22 and 23 (and related "facts") were first advanced by the Defendant as early as April, 2018.  See, for example, Defendant's Schedule A

-7-

APPX00815

attached hereto as part of Exhibit 9, pp 1, 5, and 9; Exhibit 18; M Salas Affidavit attached to the

Defendant's Objections (D-75-2), at ¶¶ 11 & 12.  In addition, Statement No. 24, which the

Defendant admits, states: "That the Trust was registered in Colorado by Ron Salas in 2011 even

though the Property was located in D.C."  See Defendant's Response, Statement No. 24, at p. 6

of 32.

17.  The Defendant objects to the Plaintiffs' List, Statement No. 57, despite the fact that

Defendant's own affidavit recites nearly identical facts.  See Max Salas Affidavit dated August

10, 2022 (D-75-2), at ¶¶ 19, 21-22.

18.  Defendant also objects to Plaintiffs' List, Statement No. 84 which reads: "These

emails attached as Exhibit 7 were within the scope of the document production requested from

Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's

bankruptcy in D.C.  This statement bears two citations, one to Exhibit 7, which is the emails

produced by Len Salas at the time of his deposition in this adversary proceeding (August, 2021)

case but also Exhibit 21, attached to the Plaintiffs' Memorandum.  Plaintiffs assert that the

Defendant's objection should be overruled and Statement No. 84 should be deemed undisputed.

FRCP 56 (e)(2).

19.  The above makes it very clear that the Defendant's objection is based upon nothing

more than the hope the technical failure to support a relatively small minority of the Statements

on the Plaintiffs' List is sufficient to establish a road block to the inevitable judgment in this

case.  While the Plaintiffs concede that in these few cases, 30 out of 126 Statements, the

Statements do not comply with the requirements of FRCP 56 (c)(1)(A), that technical failure

does not preclude this Court's consideration of the remaining 94 Statements which do comply

-8-

APPX00816

with the rules and to which the Defendant did not object, or seek to counter. Of those 94 Statements, the Defendant admitted, either without reservation or limited to the pending Motion, 92 Statements. The Defendant only partially admitted Statement No. 46 and did object to Statement No. 124 but also answered stating that he "denies the referenced emails establish this alleged fact." The Defendant, however, offers no counter fact or citation to the record in his denial. FRCP 56 (c)(1)(A). The Plaintiffs submit that Statement No. 124 should be deemed undisputed. FRCP 56 (e)(2).

20. It is curious that the Defendant provided no response to any of the Statements to which he objected, with the sole exception of Statement No. 124. Statement No. 124 references the statements in the emails among the Salas family members (Ron, Max and Len) and Max's real estate attorneys in the time frame of June, 2011 through February, 2012 (Memorandum, Exhibit 7) in which emails the parties, including Len and Max make clear that they have either abandoned the July, 2010 Quitclaim Deed or determined that the Deed was defective, or ineffective to transfer the D.C. Property at issue here.

21. This Court's Local Rule (L.R.) 7056-1 requires the presentation of undisputed facts in a particular manner, described in L.R. 7056-1 (a). In every case, the defective Statements, even if stricken or ignored by the Court, will not defeat the Plaintiffs' claim for Summary Judgment.

22. L.R. 7056-1 does not provide a specific remedy for failure to comply with paragraph (a) of the Local Rule. However, FRCP 56, which is incorporated into Fed R. Bankr. P. 7056 without any modification relevant to this case, does provide some direction. In addition to Rule 56 (c)(1)(A)'s requirement of citation to parts of the record, which includes the broad category of

-9-

APPX00817

"other materials," FRCP 56 (c)(1)(B) allows a party asserting a fact in support of his motion or opposition to show, alternatively, "that the materials cited do establish the absence or presence of a genuine dispute...

23. FRCP § 56 (c)(3) further states that while "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). ***Bateman v. Driggett***, No. 11-13142, 2012 U.S. Dist. LEXIS 91221, at *16-17 (E.D. Mich. July 2, 2012).

24. Ultimately the court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party," ***Hager v. Pike County Bd. Of Education***, 286 F.3d 366, 370 (6th Cir. 2002).

25. The remedies for failure to comply with FRCP 56 (a) are set forth in FRCP 56(e) which states that the court may:

"(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

***Bateman, supra***. Since this Court's Local Rules do not specify the remedy for non-compliance, the Plaintiffs assert that FRCP 56 (e) applies and the court is well within its discretion to grant summary judgment to the Plaintiffs. Most importantly, even without the Statements of Fact to which the Defendant objects, considering the remaining Statement of Facts, and the failure of the Defendant to offer any counter facts, the Plaintiffs assert they are entitled to summary judgment. The Plaintiffs' believe, and therefore assert, that such a judgment on Counts III, IV, V and VI is

-10-

compelled by the overwhelming factual evidence in support, the lack of disputed facts material to the recovery under the Trustee's strong arm powers, and the statutory and case law which uniformly supports the Plaintiffs' theory of this case.

26.  The Defendant has attempted to paint a picture of a wholly unsupported motion with numerous, necessary material facts unsupported by the record.  That is hardly the case.  As argued above, most of the contested facts are stated elsewhere in Plaintiffs' List and supported by both record citations and the admission of the Defendant.  In some instances, while relevant to the matters before the court, the defective Statements are not necessary to support the pending Motion.  In other instances, the contested facts are supported by parts of the record which are readily available to the court, including for example, the Defendant's Affidavit attached to his Objections (D-75-2).

27.  Neither FRCP 56, Local Rule 7056-1 nor the cases cited by the Defendant conclude that the court must ignore the Statements presented by the Plaintiffs that do contain references to the record.  Rule 56 (c)(3) allows this Court to also consider other materials in the record such as the Debtor's bankruptcy filings, schedules and statement of financial affairs, the Complaint, the Defendant's answer to the Complaint, deposition transcripts, Complaint exhibits, deposition exhibits and other documents that are in the record.  Rule 56 (c)(3).

**B.  Defendant's Response is Defective and Certain Statements Objected to Should be Deemed Undisputed**

28.  The Defendant has objected to several statements of fact that contain references to the Motion Exhibit which supports the statement of fact.  See, for example, Defendant's Response to Plaintiff's Amended List of Undisputed Facts, ¶¶84, 101, 124.  These facts should

-11-

APPX00819

be deemed admitted under the Defendant's own arguments regarding the requirement for citations to the record by both the moving **and the non-moving party**.

29.  In almost every case, the stated fact objected to by the Defendant is an uncontroversial statement that the Defendant has either admitted in his answer to the Plaintiff's (Amended) Complaint, admitted in discovery or admitted in prior hearings in this matter.

30.  In almost every case, where the Defendant has objected to one of the listed facts, the same or very similar fact or facts are supported by another Statement of Fact, submitted with specific citations to the record and admitted by the Defendant.

31.  The Defendant objected to Statement No. 34.  The Plaintiff is satisfied with the statements made in the Defendant's affidavit regarding the fact that all of the rental income from the Property was deposited into an account in the name of "CLR Trust." *See*, Affidavit of Max Salas, attached as an exhibit to the Defendant's "Objections" ("Salas Affidavit"), at ¶¶ 19-22 ("I dealt with tenants, signed leases, and accepted rent payments on behalf of CLR Trust." ¶21; and, "I deposited all rent checks into an account in the name of CLR Trust, for which I was signatory. ¶22") Later, the Defendant admits, in response to Statement No. 55 that the Debtor understood the CLR Trust was a trust created by the Defendant for the benefit of his sons, Chase, Len and Ron.

32.  Among the documents produced by the Defendant pursuant to the Plaintiffs' Motion to Compel, were the Defendant's individual federal and state income tax returns for the years 2014 through 2018.  Although the Defendant's 2014 tax return shows rental income, the 2015 return shows no rental income despite the acknowledged fact that the Defendant had at least two tenants paying rent in 2015, namely the deceased children of the Plaintiff Estates.  A copy of the

-12-

Defendant's 2015 federal tax return, undated and unsigned, is attached hereto as an Exhibit to this Response. Notably, the Defendant's 2014 and 2016 returns show preparation by a tax preparation service while no tax preparation service is identified in the 2015 return. The date the tax return was signed, if at all, was presumably after April 15, 2016 because attached to the return is an Application for an Automatic Extension of the 2015 return which would have been due on or about April 15, 2016.

33. The Defendant also objected to Statement of Fact No. 37. which stated "the Plaintiff's judgments were allowed claims in both bankruptcy estates." The Plaintiff admittedly failed to cite to the record regarding this statement. However, again, this is a non-controversial statement which is already supported by the Defendant's admission of Statements Nos. 35 and 36

34. The Defendant objected to, and did not respond to Statement No. 101. However, the first sentence of that Statement is clearly supported by the reference to "Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35." Therefore, the Defendant's objection to that part of No. 101 should be overruled and that statement should be deemed admitted.

35. Statement No. 107, to which the Defendant also objected, is a continuation of Statement No. 106 which contains several references to materials in the record.

36. Max denies that the Quitclaim Deed is Max's only proof of ownership. Defendant's Response, Statement No. 83, at p. 20. However, the Defendant provides no facts to support that claim. Without a citation to the record, Statement No 83 should be deemed undisputed in its entirety.

-13-

APPX00821

### C. Legal Title is an Obvious Interest in Property Which Brings the Property Under the Trustee's Avoiding Powers

#### 1. The Debtor had more than Bare Legal Title

37. At all times prior to the Debtor's bankruptcy petition on April 18, 2018, he was the acknowledged owner of the Property for all purposes.

38. It should be noted that, although the Debtor apparently did not pay anything in exchange for the quitclaim deed, he did obligate himself solely for the entire balance of the SunTrust Mortgage which, as of the date of the Debtor's bankruptcy in April, 2018 had a balance of more than $1.037 Million per the Defendant's schedules attached as Exhibit 18 to the Plaintiffs' Motion. See also Defendant's Response, at p. 5 of 32, Statement No. 20.

39. Furthermore, all of the notices regarding the Property were sent in Len's name as owner. In addition, the Defendant has admitted that he was unable to obtained refinancing for the Property and all efforts to obtain refinancing required the participation of Len and a co-borrower and co-obligor. See Complaint, ¶17 (admitted per Defendant's Answer of March 9, 2021 (D-42), at p. 4 of 9.

40. The Debtor, at all times prior to November, 2019, was solely obligated under the SunTrust Deed of Trust. Plaintiffs' List, Statement 103, admitted by the Defendant. See Defendant's Response, Statement 103, at p. 26.

41. The Debtor was found liable for the damages suffered by the Plaintiffs in the Superior Court's April, 2018 decision from which the judgments totaling $15.2 Million were rendered.

-14-

APPX00822

2. The Evidence is Overwhelming and Unrefuted that There is No Deed in Existence Transferring the Property from the Debtor to the Defendant prior to April 18, 2018

41. According to the Defendant, he had no deed to record in 2011 or 2012 and he made no attempt to acquire such a deed after 2012. See discussion above.

42. Neither the Debtor nor the Defendant are aware of the existence of an original of the Quitclaim Deed after 2010.

43. The Debtor was not the owner of the Property. CLR Trust was. See, for example, Defendant's Affidavit (D-75-2). There is no evidence offered by the Defendant that he was the owner of the property on April 17, 2018, but the Defendant and the Debtor have now provided irrefutable evidence that, if any "trust" owned the property after 2010, it was the CLR Trust. The Debtor has been consistent on that issue since 2015. He is now corroborated by the Defendant's affidavit.

**D. The Trustee is Entitled to Avoid and Recovery the D.C. Property Pursuant to His Avoidance and Recovery Authority in 11 U.S.C. §§ 544, *et seq.***

44. The Defendant asserts in his "Objections" that the Debtor's interest in the property was a bare legal title and appears to argue, therefore, that such an interest cannot be property of the estate for purposes of application of the Trustee's avoiding powers. The cases cited by the Defendant do not support this contention and numerous cases, including in the 6th Circuit, support the Plaintiff's claims and, therefore, the summary judgment sought in the pending Motion.

-15-

APPX00823

45. ***Ransel v. Libertyville Bank & Tr. Co. (In re Holco Capital Grp., Inc.)***, 2013 Bankr. LEXIS 4068, at *30-32 (Bankr. N.D. Ind. 2013) provides a partial explanation of the relationship between what is property of the estate and the trustee's avoiding powers.

> The Code provides a sweeping definition of "property of the estate" in § 541(a), and it normally includes "property fraudulently or improperly transferred by the debtor before bankruptcy." ***Koch Refining v. Farmers Union Central Exchange,*** 831 F.2d 1339, 1343 (7th Cir. 1987). The Supreme Court and Seventh Circuit have made clear that "'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." ***Begier v. I.R.S.***, 496 U.S. 53, 58, 110 S. Ct. 2258, 110 L.Ed.2d 46 (1990); accord, ***Warsco v. Preferred Technical Group***, 258 F.3d 557, 564 (7th Cir. 2001); ***Homann v. R.I.H. Acquisitions IN, LLC (In re Lewinski)***, 410 B.R. 828, 833 (Bankr. N.D. Ind. 2008). The Fourth Circuit applied that analysis to § 548. ***See French v. Liebmann (In re French)***, 440 F.3d 145, 151-52 (4th Cir.), cert. denied, 549 U.S. 815, 127 S. Ct. 72, 166 L. Ed. 2d 25 (2006) ("§ 548 plainly allows a trustee to avoid any transfer of property that would have been 'property of the estate' prior to the transfer in question – as defined by § 541 – even if that property is not 'property of the estate' now.") (citing ***Begier)***.

46. In ***Ransel***, the defendants asserted that the Funds accounts at issue were not property of the estate because "[t]he transfer of a property interest that the debtor holds in trust for another person will not qualify" as a transfer of an interest of the debtor in property. (Internal citations omitted) (quoting ***Dunham v. Kisak***, 192 F.3d 1104, 1109 (7th Cir. 1999)). They cited § 541(d) of the Bankruptcy Code and contended that, in a trust arrangement like this one, Holco's interest in the Funds was purely a legal interest, not an equitable one. Without an equitable interest, they insisted, as a matter of law the Funds could not constitute property of the debtor.

47. In ***Ransel v. Libertyville Bank & Tr. Co. (In re Holco Capital Grp., Inc.***), Nos. 10-30006 HCD, 12-3023, 2013 Bankr. LEXIS 4068, at *25-26 (Bankr. N.D. Ind. Sep. 25, 2013) the court explained that the 7th Circuit's ***Dunham*** decision made no determination as to the

-16-

Case 3:20-ap-90027   Document   Page 16 of 25
Case 3:20-cv-00027-RLM-MGG   Document 76   Filed 08/28/21 Filed 08/23/21 15:49:53   Page 43 of 67
Case 3:20-cv-00027   Document 76   Filed 08/28/21   Page 16 of 25

ability of the Trustee to avoid the subject deed issued prior to bankruptcy, but not recorded. In

*Ransel*, the court explained:

> The Seventh Circuit, in **Dunham**, did state that general principle, but only in dictum. It declined to "confront the question of whether the 1995 deed amounted to a 'transfer of an interest of the debtor in property'" under § 548(a)(1), because the trustee forfeited the issue by failing to challenge the bankruptcy court's specific findings that there was no evidence that the debtor intended to hinder, delay, or defraud his creditors; that the debtor was insolvent when the transfer was made; or that the transfer rendered him insolvent. **Dunham**, 192 F.3d at 1110.

***Ransel v. Libertyville Bank & Tr. Co., supra,*** at *26 n.12.

48. Likewise, the Defendant totally misstates the effect of the case of ***In re Torrez***, also

relied upon in the Defendant's Objections.

> At oral argument, Chbat relied on ***In re Matter of Torrez***, 63 Bankr. 751 (9th Cir. BAP 1986), aff'd on other grounds, 827 F.2d 1299 (9th Cir. 1987). ***Torrez*** held that the "strong arm" power of section 544 could not make the corpus of the valid resulting trust in that case property of a bankruptcy estate. ***Id.*** at 754. Chbat argues that ***Torrez*** should be extended to the constructive trust in this case. This extension of ***Torrez*** is unwarranted. ***Torrez*** did not hold that section 544 was inapplicable in general to resulting trusts or any other kind of trust. Rather, the BAP, applying section 544(a)(3), held that the debtor-in-possession in that case did not qualify as a bona fide purchaser for value without notice under California law and therefore could not invoke the avoidance power of section 544(a)(3). ***Id.*** ***Torrez*** leaves open, rather than forecloses, the possibility that under certain circumstances the corpus of a valid resulting trust may become estate property upon exercise of section 544(a)(3)'s avoidance powers. Neither ***Torrez***, nor Chbat, presents any reason why we should not apply this reasoning to a constructive trust.

*In re Tleel*, 876 F.2d 769, 772 (9th Cir. 1989)

49. The Defendant is apparently arguing that his alleged equitable interest in the D.C.

Property trumps the Trustee's 11 U.S.C. § 544(a)(1) powers. Courts, including in the Sixth

Circuit, have ruled, however, that the Trustee can still use his 11 U.S.C. § 544(a) powers to

preempt 11 U.S.C. § 541(d). ***See In re Elin***, 20 Bankr. 1012 (D.C.N.J. 1982) aff'd without

-17-

APPX00825

opinion 707 F.2d 1400 ( 3rd Cir. 1983); *In re Dlott*, 43 Bankr. 789 (Bankr. D. Mass. 1983); *In re Anderson*, 30 Bankr. 995 (Bankr. M.D.Tenn.1983); *In re Tleel, supra*. These decisions demonstrate that the Trustee can bring any property into the bankruptcy estate which he could have reached with his 11 U.S.C. § 544(a) strong arm powers. *See also, Dutch Miller Chevrolet, Inc. v. Tri-State Mech. Servs., Inc.*, 141 B.R. 488, 495 (Bankr. W.D. Pa. 1992) (Plaintiff's constructive trust, which was unperfected at the time of the Debtor's bankruptcy filing could be avoided and recovered for the benefit of creditors pursuant to 11 U.S.C. §§ 544, 550 and 551).

50. In *In re Anderson*, a decision of this District Court, Judge Paine noted that

"a reading and comparison of § 541(d) and § 544 leads to the inescapable conclusion that § 541(d) does not represent a general limitation on the trustee's avoidance powers under § 544. Section 541(d) qualifies the trustee's right under § 541(a) to succeed to certain property interests possessed by the debtor at the time of the filing of his bankruptcy petition. In contrast, § 544(a) arms the trustee at the time of the filing of the debtor's bankruptcy petition with all the rights and powers of various creditors and transferees of the debtor so as to avoid incomplete or improperly perfected transfers of the debtor and thereby insure an equality of distribution among the debtor's general unsecured creditors. See, e.g., 4 L. KING, COLLIER ON BANKRUPTCY para. 541.01, 541-5 to 541-9 and para. 544.01, 544-2 to 544-4 (15th ed. 1982); 2 W. NORTON, BANKRUPTCY LAW AND PRACTICE §§ 29.01 and 30.01 (1982). Section 544(a) in fact contemplates that the debtor has no remaining interest in the property which is the subject of the avoided transaction. The trustee is thus given the ability to bring into the estate, in addition to the debtor's property as defined by § 541(a) and limited by § 541(d), any property which he can obtain through his avoidance powers under the Bankruptcy Code, including his ability to invalidate certain transfers by the debtor under § 544(a). See 11 U.S.C.A. §§ 541(a)(3), 550, 551 (West 1979).

*In re Anderson*, 30 B.R. 995, 1009-10 (M.D. Tenn. 1983)

51. Judge Paine offered as support for his decision an analysis of the two provisions of the bankruptcy code referenced above by Judge Debevoise in the case of *Elin v. Busche*, 20 Bankr. 1012, 1016-1017 (D. N.J. 1982). As Judge Debevoise explained:

-18-

APPX00826

"The fallacy of plaintiff's position [that § 541(d) restricts the application of § 544(a)(3)] lies in a misreading of § 541. Three sections of the Act must be read together -- § 541, § 551 and § 544. Granted that the bare language of these sections may appear to be elliptical, the meaning which emerges is that assets recoverable by a trustee pursuant to § 544 become property of the estate notwithstanding the provisions of § 541(d). In other words, if a person other than the debtor holds an equitable interest in assets subject to recovery under § 544, the provisions of § 541(d) upon which plaintiff relies do not prevent the trustee from recovering those assets.

Section 541(a)(4) provides that an estate is comprised of "any interest in property preserved for the benefit of or ordered transferred to the estate under section . . . . 551. " § 551 provides that 'any transfer avoided under section . . . . 544 . . . . is preserved for the benefit of the estate but only with respect to property of the estate. ' Thus, § 541, and § 551 which is incorporated therein by reference, bring within the debtor's estate property recoverable pursuant to § 544.

*Id.*, cited and quoted in *In re Anderson*, 30 B.R. at 1010.

52.  The Ninth Circuit has held that a constructive trust or equitable lien is subject to the bankruptcy trustee's section 544 "strong arm" powers and may be voided to the extent voidable by a bona fide purchaser under state law. *National Bank of Alaska v. Erickson (In re Seaway Express Corp.)*, 912 F.2d 1125, 1128-29 (9th Cir. 1990) *Chbat v. Tleel (In re Tleel)*, 876 F.2d 769, 770 (9th Cir. 1989).  *See also, Bank of Alex Brown v. Goldberg (In re Goldberg)*, 158 B.R. 188, 196-97 (Bankr. E.D. Cal. 1993) (Bank's constructive trust was not perfected prior to the Debtor's  bankruptcy filing, thus Bank's interest may be avoided pursuant to section 544).

53.  Thus, even if the Debtor held just "bare legal title" that clearly constitutes an interest in property under the umbrella of the Trustee's avoidance and recovery powers.

**E.**     **The Plaintiffs are Entitled to Summary Judgment, on Behalf of the Estate Under the Bankruptcy Code and D.C. Fraudulent Conveyance Act**

54.  In order to establish a right to recovery as a fraudulent conveyance in Counts IV and V of the Complaint, the Plaintiffs must show that the Debtor (1) transferred an interest in

-19-

APPX00827

property; (2) for less than reasonably equivalent value; and the debtor was either (3) insolvent on the date the transfer was made, or became insolvent as a result of the transfer. 11 U.S.C. § 548 (a)(1)(B). *See also, Dunham v. Kisak*, 192 F.3d 1104, 1109 (7th Cir. 1999); *Limor v. Anderson In re Scarbrough)*, 2019 Bankr. LEXIS 933 (6th Cir. BAP 2019), at *9.

55. D.C. Code §28-3105 (a) tracks 11 U.S.C. § 548 (a)(1)(B) except for the addition of the requirement that the transfer is "fraudulent as to a creditor whose claim arose before the transfer was made..." D.C. Code §28-3105(a).

56. The Debtor held a recorded deed and was the maker of a Deed of Trust on the Property as of April 17, 2018.

57. That Deed was more than just an accommodation as the Debtor was required to assist the Defendant in his attempts to obtain refinancing and continued to be obligated under the SunTrust Deed of Trust. The Debtor was also listed as the owner on all notices from the D.C. government and was liable, as owner, for any damages sustained at the property as evidenced by the final judgment in the D.C. Superior Court case in April, 2018.

58. The Property was the subject of an alleged Quitclaim Deed dated July 6, 2010.

59. The Quitclaim Deed was not recorded as of the Debtor's bankruptcy filing on April 18, 2018.

60. By statute, the Deed was, therefor, deemed recorded on April 17, 2018.

61. At the time of the transfer, the Debtor had obligations which exceeded $16 Million just with the SunTrust Note and the Plaintiffs' judgments. Plaintiffs' List, Statements Nos. 75, 81.

-20-

APPX00828

62. At the moment before the transfer, the Debtor's assets included the Property, worth approximately $2.5 Million, and approximately $53,000. Plaintiffs' List, Statement No. 75.

63. At no time did the Defendant pay any money or transfer anything of value to the Debtor related to the D.C. Property. Defendant's Affidavit (D-75-2); Plaintiffs' List, Statement No. 103; Plaintiffs' Memorandum, Exhibits 4 and 5.

64. Immediately following the transfer of the Property on April 17, 2018, the Debtor's assets were approximately $53,000 and his liabilities exceeded $16 Million. Debtor's Schedules of Asset and Liabilities filed herein on April 18, 2018; Statement No. 75.

65. In accordance with the above stated facts all of which are undisputed and admitted by the Defendant, the Plaintiffs have met their burden to prove undisputed facts showing entitlement to judgment on their fraudulent conveyance claims under Counts IV and V of the Complaint. The Debtor transferred his interest in the subject Property to the Defendant on April 17, 2018. At the time of the transfer the Debtor was insolvent and the transfer made him even more insolvent by removing his only major asset, the Property. The transfer was not for valid consideration since the Defendant paid no money and transferred nothing of value to the Debtor at the time.

66. For the purposes of § 548, the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" 11 U.S.C. § 548(d)(2)(A); see also *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 319 B.R. 134, 138 (Bankr. E.D. Ky. 2004) (defining "value" as "that which provides an economic benefit, either direct or indirect, to the debtor."). Courts generally compare the value of the property transferred with the value of what the debtor received to ascertain whether there was a reasonably equivalent

-21-

APPX00829

value, although a dollar-for-dollar equivalent is not required. ***Corzin v. Fordu (In re Fordu)***, 201 F.3d 693, 707 (6th Cir. 1999); ***Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.)***, 6 F.3d 1119, 1125-26 (5th Cir. 1993); see also ***Allard v. Flamingo Hilton (In re Chomakos)***, 69 F.3d 769, 771 (6th Cir. 1995) (holding that "the contractual right to receive payment in the event that it turns out well is obviously worth something.").

67. The value of the Property at the time of transfer, excluding liens, was $2.5 Million. Plaintiffs' List, Statement No. 109. It's present value is estimated to be more than $2.4 Million. Id.

68. The original Sun Trust loan balance was $870,000. The balance in October, 2018 was $1,114,021.14. Statement No. 119.

69. The SunTrust Note deficiency was $374,282.18 as of April, 2018. Statement No. 62. No payments were made on the SunTrust loan from 2015 through 2018 except one, only from insurance proceeds. Statement No. 116.

70. The Defendant has stated in previous testimony that he "promised" to pay the SunTrust Note obligation. Obviously, by failing to keep up with the payments and the necessary upkeep on the Property (reference: the fire), he wholly failed in that "promise." Regardless, that promise cannot be used as "consideration" or "value." See ***In re Palermini***, 113 B.R. 380, 384 (Bankr. S.D. Ohio 1990) and ***Whitlock v. Hause (In re Hause)***, 13 Bankr. 75, 79 (Bankr. D. Mass. 1981), aff'd, 694 F.2d 861 (1st Cir. 1982).

APPX00830

**F.     The Plaintiffs are Entitled to Summary Judgment on Counts I (Bona Fide Purchaser) and II (Judicial Lienholder) of the Amended Complaint**

71.   The Plaintiffs are entitled to summary judgment on Count I of the Complaint because the undisputed facts show that the subject Deed was not recorded and there is no other recorded interest in the records of the District of Columbia that would provide the Trustee with actual or constructive notice of the Defendant's alleged interest on the date of the bankruptcy filing.  A deed conveying real property in the District of Columbia is not valid against a subsequent bona fide purchaser without notice **until the deed is recorded**.  D.C. Code §42-401.

72.   Likewise, the Plaintiffs are entitled to summary judgment on Count II of the Complaint because the Quitclaim Deed, if ever valid, was not recorded prior to April 18, 2018, the date of which the Trustee, as a hypothetical lien creditor, is deemed to have perfected his interest.  See ***Rogan v. Bank One, N.A. (In re Cook)***, 457 F.3d 561, 564 (6th Cir. 2006).

**G.     The Defendant's "Other Meritorious Defenses" Claim is Not Supported by any Statements of Fact**

73.   Finally, the Defendant asserts that he has other "meritorious defenses" which would thwart the Plaintiffs' right to summary judgment.  See, Defendant's Objections, pp. 23 and 24.  These claims contain nothing but bare arguments without reference to the record and without reference to any facts.  Fatal to these arguments by the Defendant is his failure to support any of these "meritorious defenses" with facts supported by citations to the record.  See Defendant's discussion at Section A. starting on page 7 of his Objection (D-75).

-23-

**CONCLUSION**

For the reasons set forth above and in the Plaintiffs' Memorandum filed in support of their Motion for Summary Judgment, the Plaintiffs assert that they are entitled to summary judgment on Counts I, II, IV, V and VI of the Amended Complaint.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By: _/s/ Philip J. McNutt_____
Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

Certificate of Service

I HEREBY CERTIFY THAT a copy of the foregoing Motion, along with the Plaintiffs Memorandum and accompanying exhibits, was delivered electronically, on the 23th day of August, 2022 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067

-24-

APPX00832

615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt
Philip J. McNutt

-25-

APPX00833

Form **8879**

## IRS e-file Signature Authorization

OMB No. 1545-0074

Department of the Treasury
Internal Revenue Service

▶ Do not send to the IRS. This is not a tax return.
▶ Keep this form for your records.
▶ Information about Form 8879 and its instructions is at *www.irs.gov/form8879.*

**2015**

Submission Identification Number (SID) ▶

| Taxpayer's name | Social security number |
|---|---|
| Max E Salas | |
| Spouse's name | Spouse's social security number |

| Part I | Tax Return Information—Tax Year Ending December 31, 2015 (Whole Dollars Only) | | |
|---|---|---|---|
| 1 | Adjusted gross income (Form 1040, line 38; Form 1040A, line 22; Form 1040EZ, line 4) | 1 | 70,722 |
| 2 | Total tax (Form 1040, line 63; Form 1040A, line 39; Form 1040EZ, line 12) | 2 | 10,900 |
| 3 | Federal income tax withheld (Form 1040, line 64; Form 1040A, line 40; Form 1040EZ, line 7) | 3 | 6,352 |
| 4 | Refund (Form 1040, line 76a; Form 1040A, line 48a; Form 1040EZ, line 13a; Form 1040-SS, Part I, line 13a) | 4 | |
| 5 | Amount you owe (Form 1040, line 78; Form 1040A, line 50; Form 1040EZ, line 14) | 5 | 4,548 |

| Part II | Taxpayer Declaration and Signature Authorization (Be sure you get and keep a copy of your return) |
|---|---|

Under penalties of perjury, I declare that I have examined a copy of my electronic individual income tax return and accompanying schedules and statements for the tax year ending December 31, 2015, and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts from my electronic income tax return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send my return to the IRS and to receive from the IRS (a) an acknowledgement of receipt or reason for rejection of the transmission, (b) the reason for any delay in processing the return or refund, and (c) the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an ACH electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of my federal taxes owed on this return and/or a payment of estimated tax, and the financial institution to debit the entry to this account. This authorization is to remain in full force and effect until I notify the U.S. Treasury Financial Agent to terminate the authorization. To revoke (cancel) a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537. Payment cancellation requests must be received no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I further acknowledge that the personal identification number (PIN) below is my signature for my electronic income tax return and, if applicable, my Electronic Funds Withdrawal Consent.

**Taxpayer's PIN: check one box only**

☐ I authorize _____ to enter or generate my PIN | 12121
ERO firm name

**Enter five digits, but do not enter all zeros**

as my signature on my tax year 2015 electronically filed income tax return.

☐ I will enter my PIN as my signature on my tax year 2015 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Your signature ▶ _____ Date ▶ _____

**Spouse's PIN: check one box only**

☐ I authorize _____ to enter or generate my PIN
ERO firm name

**Enter five digits, but do not enter all zeros**

as my signature on my tax year 2015 electronically filed income tax return.

☐ I will enter my PIN as my signature on my tax year 2015 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Spouse's signature ▶ _____ Date ▶ _____

## Practitioner PIN Method Returns Only—continue below

| Part III | Certification and Authentication—Practitioner PIN Method Only |
|---|---|

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN. | 12121

**Do not enter all zeros**

I certify that the above numeric entry is my PIN, which is my signature for the tax year 2015 electronically filed income tax return for the taxpayer(s) indicated above. I confirm that I am submitting this return in accordance with the requirements of the Practitioner PIN method and **Publication 1345,** Handbook for Authorized IRS *e-file* Providers of Individual Income Tax Returns.

ERO's signature ▶ _____ Date ▶ _____

## ERO Must Retain This Form — See Instructions
## Do Not Submit This Form to the IRS Unless Requested To Do So

For Paperwork Reduction Act Notice, see your tax return instructions.

Form **8879** (2015)

HTA

Government of the
District of Columbia

# 2015 D-40E SUB
## District of Columbia Individual Income Tax
## Declaration for Electronic Filing

Tax period ending  1215

IRS Declaration Control Number (DCN)

| Your First name and initial | Last name | Social Security Number |
|---|---|---|
| MAX E | SALAS | |

| Spouse's/Domestic partner's First name and initial | Last name | Spouse's Social Security Number |
|---|---|---|

| Present Home Address (number, street and suite/apartment number if applicable) | | Federal Filing Status |
|---|---|---|
| 777 7 STREET NW | | SINGLE |

| City, Town, and State | Zip Code + 4 | District of Columbia Filing Status |
|---|---|---|
| WASHINGTON DC | 20001 | SINGLE |

## PART I - TAX RETURN INFORMATION

PLEASE ENTER WHOLE DOLLAR AMOUNTS

| | |
|---|---|
| 1.  District of Columbia Adjusted Gross Income, Form D-40, Line 14 or D-40EZ, Line 3 | 69955.00 |
| 2.  District of Columbia Tax, Form D-40, Line 21 or D-40EZ, Line 6 | 3853.00 |
| 3.  DC Income Tax Withheld, Form D-40, Line 30 or D-40EZ, Line 11 | 4236.00 |
| 4.  District of Columbia Refund Net, Form D-40, Line 40 or D-40EZ, Line 19 | 383.00 |
| 5.  District of Columbia Total Amount Due, Form D-40, Line 45 or D-40EZ, Line 18 | .00 |

## PART II - REFUND METHOD

Direct Deposit          Refund Card          Paper Check

*For Direct Deposit or Direct Debit enter the following information:*

6.  Routing Number*          *Routing Number must be nine digits and the first two must be 01 through 12 or 21 through 32.

7.  Account Number

8.  Type of Account          Checking          Savings

## PART III - DECLARATION OF TAXPAYER

Under penalties of perjury, I/we declare that I/we have examined a copy of my/our electronic individual income tax return and accompanying schedules and statements for the 2015 tax year, and to the best of my knowledge and belief, it is true, correct and complete. I/we further declare that the amounts in Part I above are the amounts from my/our electronic income tax return. I consent to allow my/our intermediate service provider, transmitter, or electronic return originator (ERO) to send my/our return to the District of Columbia (DC). I/we authorize DC and its designated financial institution to initiate an ACH electronic funds withdrawal (direct debit). Refunds cannot be direct deposited and payments cannot be transmitted from a financial institution.

| Your Signature | Date | Spouse's Signature | Date |
|---|---|---|---|

## PART IV - DECLARATION OF ELECTRONIC RETURN ORIGINATOR (ERO) AND PAID PREPARER

I declare that I have reviewed the individual income tax return and that the entries on D40-E are complete and correct to the best of my knowledge. The taxpayer will have signed this form before I submit the return. I will give the taxpayer a copy of all forms and information to be filed with DC. If I am also the Paid Preparer, under penalties of perjury, I declare that I have examined the above individual income tax return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct and complete. Declaration of preparer is based on all information of which the preparer has any knowledge.

| ERO's Signature | Date | SSN, EIN, or PTIN |
|---|---|---|

| Paid Preparer's Signature | Date | SSN, EIN, or PTIN |
|---|---|---|

## PLEASE KEEP FOR YOUR RECORDS. DO NOT MAIL.

2015 D-40E  SUB

▼ **Detach Here and Mail With Your Payment and Return** ▼

| Department of the Treasury<br>**Internal Revenue Service** | **2015** | **Form 1040-V Payment Voucher** |
|---|---|---|

| Amount you are paying<br>by check or money order ▶ | Dollars<br>4,548 |
|---|---|

1833

● Use this voucher when making a payment with Form 1040
● Do not staple this voucher or your payment to Form 1040
● Make your check or money order payable to the "United States Treasury"
● Write your Social Security Number (SSN) on your check or money order

MAX E SALAS
777 7 STREET, NW, APT 216
WASHINGTON, DC 20001

Internal Revenue Service
P.O. Box 37008
Hartford, CT 06176-7008

K0 SALA 30 0 201512 610


Case 3:20-ap-00027 Doc 76-14 Filed 08/23/22 Entered 08/23/22 15:48:59 Desc
Exhibit Max Salas 2015 IRS Tax Return    Page 3 of 13

APPX00836

▼ DETACH HERE ▼

1833

**Form 4868**

Department of the Treasury
Internal Revenue Service (99)

# Application for Automatic Extension of Time To File U.S. Individual Income Tax Return

For calendar year 2015, or other tax year beginning , 2015, ending ,

OMB No. 1545-0074

**2015**

| Part I | Identification |
|---|---|
| **1** Your name(s) (see instructions) | |
| Max E Salas | |
| Address (see instructions) | |
| 777 7 Street, NW, Apt 216 | |

| City, town, or post office | State | ZIP Code |
|---|---|---|
| Washington | DC | 20001 |

| **2** Your social security number | **3** Spouse's social security number |
|---|---|
| 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 | |

| Part II | Individual Income Tax | | |
|---|---|---|---|
| **4** Estimate of total tax liability for 2015 . . . | $ | | 10,900 |
| **5** Total 2015 payments . . . . . . . . . | | | 6,352 |
| **6** **Balance due.** Subtract line 5 from line 4 (see instructions) . . . . . . . . . . | | | 4,548 |
| **7** Amount you are paying (see instructions) . ▶ | | | 4,548 |
| **8** Check here if you are "out of the country" and a U.S. citizen or resident (see instructions) . . . . . . . . ▶ | | | ☐ |
| **9** Check here if you file Form 1040NR or 1040NR-EZ and did not receive wages as an employee subject to U.S. income tax withholding . . . . . . . . . . . ▶ | | | ☐ |

KO SALA 30 0 201512 670

APPX00837

Form **1040**
Department of the Treasury—Internal Revenue Service   (99)
**U.S. Individual Income Tax Return**  **2015**  OMB No. 1545-0074  IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2015, or other tax year beginning     , ending        See separate instructions.

| Your first name | M.I. | Last name | Suffix | Your social security number |
|---|---|---|---|---|
| Max | E | Salas | | |

If a joint return, spouse's first name   M.I.   Last name   Suffix         Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions.    Apt. no.
777 7 Street, NW      216

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
Washington      DC     20001

▲ Make sure the SSN(s) above and on line 6c are correct.

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|
| | | |

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.   ☐ You   ☐ Spouse

**Filing Status**
Check only one box.

1. ☒ Single
2. ☐ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, **do not** check box 6a . . . . . .
b ☐ Spouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

d Total number of exemptions claimed . . . . . . . . . . . . . . . . . . . .

Boxes checked on 6a and 6b   1
No. of children on 6c who:
● lived with you
● did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers on lines above ▶   1

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . . . . | 7 | 69,955 |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . . . . . . | 8a | |
| b | Tax-exempt interest. **Do not** include on line 8a . . . | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . . . . . . | 9a | |
| b | Qualified dividends . . . . . . . . . . | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes . . . . . . | 10 | 767 |
| 11 | Alimony received . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . . . . . . . | 14 | |
| 15a | IRA distributions . . . . . . | 15a | | b Taxable amount . . . | 15b | |
| 16a | Pensions and annuities . . . . | 16a | | b Taxable amount . . . | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . . . . . . . . . . . | 19 | |
| 20a | Social security benefits . . . . | 20a | | b Taxable amount . . . | 20b | |
| 21 | Other income. List type and amount | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 70,722 |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses . . . . . . . . . . . . . | 23 | | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ . . . . | 24 | | |
| 25 | Health savings account deduction. Attach Form 8889 . . | 25 | | |
| 26 | Moving expenses. Attach Form 3903 . . . . . . . | 26 | | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . | 27 | | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . . . . | 28 | | |
| 29 | Self-employed health insurance deduction . . . . . . | 29 | | |
| 30 | Penalty on early withdrawal of savings . . . . . . . | 30 | | |
| 31a | Alimony paid   b Recipient's SSN ▶ | 31a | | |
| 32 | IRA deduction . . . . . . . . . . . . . . | 32 | | |
| 33 | Student loan interest deduction . . . . . . . . . | 33 | | |
| 34 | Tuition and fees. Attach Form 8917 . . . . . . . . | 34 | | |
| 35 | Domestic production activities deduction. Attach Form 8903 . | 35 | | |
| 36 | Add lines 23 through 35 . . . . . . . . . . . . . . . . . . . . . . | 36 | | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . . ▶ | 37 | 70,722 |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.
HTA

Form **1040** (2015)

| | | | | | |
|---|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) . . . . . . . . . . . . | | 38 | 70,722 |

39a    Check   ☐ **You** were born before January 2, 1951,   ☐ Blind.    **Total boxes**
if:    ☐ **Spouse** was born before January 2, 1951,   ☐ Blind.    checked ▶ 39a ☐

   b   If your spouse itemizes on a separate return or you were a dual-status alien, check here . . ▶ 39b ☐

**Standard Deduction for—**

• People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions.

• All others:

Single or Married filing separately, $6,300

Married filing jointly or Qualifying widow(er), $12,000

Head of household, $9,250

| | | | |
|---|---|---|---|
| 40 | **Itemized deductions** (from Schedule A) or your **standard deduction** (see left margin) | 40 | 6,300 |
| 41 | Subtract line 40 from line 38 . . . . . . . . . . . . . . . . . | 41 | 64,422 |
| 42 | **Exemptions.** If line 38 is $154,950 or less, multiply $4,000 by the number on line 6d. Otherwise, see instructions | 42 | 4,000 |
| 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . | 43 | 60,422 |
| 44 | **Tax** (see instructions). Check if any from:   **a** ☐ Form(s) 8814   **b** ☐ Form 4972   **c** ☐ | 44 | 10,900 |
| 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 . . . . . . | 45 | |
| 46 | Excess advance premium tax credit repayment. Attach Form 8962 . . . . . | 46 | |
| 47 | Add lines 44, 45, and 46 . . . . . . . . . . . . . . . . . . ▶ | 47 | 10,900 |

| | | | | |
|---|---|---|---|---|
| 48 | Foreign tax credit. Attach Form 1116 if required . . . . . . | 48 | | |
| 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | | |
| 50 | Education credits from Form 8863, line 19 . . . . . . . | 50 | | |
| 51 | Retirement savings contributions credit. Attach Form 8880 . | 51 | | |
| 52 | Child tax credit. Attach Schedule 8812, if required . . . . | 52 | | |
| 53 | Residential energy credits. Attach Form 5695 . . . . . | 53 | | |
| 54 | Other credits from Form:   **a** ☐ 3800   **b** ☐ 8801   **c** ☐ | 54 | | |
| 55 | Add lines 48 through 54. These are your **total credits** . . . . . . . . . . | | 55 | |
| 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- . . . . . ▶ | | 56 | 10,900 |

| **Other Taxes** | | | | |
|---|---|---|---|---|
| | 57 | Self-employment tax. Attach Schedule SE . . . . . . . . . . . . . | 57 | |
| | 58 | Unreported social security and Medicare tax from Form:   **a** ☐ 4137   **b** ☐ 8919 . . | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| | 60a | Household employment taxes from Schedule H . . . . . . . . . . . . | 60a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required . . . . . . | 60b | |
| | 61 | Health care: individual responsibility (see instructions)    Full-year coverage ☐ | 61 | |
| | 62 | Taxes from:   **a** ☐ Form 8959   **b** ☐ Form 8960   **c** ☐ Instructions; enter code(s) | 62 | |
| | 63 | Add lines 56 through 62. This is your **total tax** . . . . . . . . . . . . ▶ | 63 | 10,900 |

| **Payments** | | | | | |
|---|---|---|---|---|---|
| | 64 | Federal income tax withheld from Forms W-2 and 1099 . | 64 | 6,352 | |
| If you have a qualifying child, attach Schedule EIC. | 65 | 2015 estimated tax payments and amount applied from 2014 return | 65 | | |
| | 66a | **Earned income credit (EIC)** . . . . . . . . . . | 66a | | |
| | b | Nontaxable combat pay election . . . . | 66b | | |
| | 67 | Additional child tax credit. Attach Schedule 8812 . . . | 67 | | |
| | 68 | American opportunity credit from Form 8863, line 8 . . | 68 | | |
| | 69 | Net premium tax credit. Attach Form 8962 . . . . . | 69 | | |
| | 70 | Amount paid with request for extension to file . . . . | 70 | | |
| | 71 | Excess social security and tier 1 RRTA tax withheld . . | 71 | | |
| | 72 | Credit for federal tax on fuels. Attach Form 4136 . . . | 72 | | |
| | 73 | Credits from Form:   **a** ☐ 2439   **b** ☐ Reserved   **c** ☐ 8885   **d** ☐ | 73 | | |
| | 74 | Add lines 64, 65, 66a, and 67 through 73. These are your total payments . . . . . . ▶ | | 74 | 6,352 |

| **Refund** | | | | |
|---|---|---|---|---|
| | 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you **overpaid** . | 75 | |
| Direct deposit? See instructions. | 76a | Amount of line 75 you want refunded to you. If Form 8888 is attached, check here . . . . ▶ ☐ | 76a | |
| ▶ | b | Routing number _____   ▶ **c** Type: ☐ Checking ☐ Savings | | |
| | d | Account number _____ | | |
| | 77 | Amount of line 75 you want applied to your 2016 estimated tax . . . ▶ | 77 | |

| **Amount You Owe** | | | | |
|---|---|---|---|---|
| | 78 | **Amount you owe.** Subtract line 74 from line 63. For details on how to pay, see instructions . . . . . ▶ | 78 | 4,548 |
| | 79 | Estimated tax penalty (see instructions) . . . . . . | 79 | |

| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)?   ☒ **Yes. Complete below.**   ☐ **No** |
|---|---|

Designee's name ▶ Preparer    Phone no. ▶ (202) 387-1798    Personal identification number (PIN) ▶ 12121

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

| Your signature | Date | Your occupation | Daytime phone number |
|---|---|---|---|
| | | Director of Business Dev | (202) 271-2800 |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

Case 23-20-00027 Doc 76-14 Filed 08/23/22 Entered 08/23/22 15:43:50 Desc Exhibit Max Salas 2015 IRS Tax Return    Page 6 of 13     APPX00839

**SCHEDULE E**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

# Supplemental Income and Loss

(From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.)

▶ Attach to Form 1040, 1040NR, or Form 1041.

▶ Information about Schedule E and its separate instructions is at *www.irs.gov/schedule*.

OMB No. 1545-0074

**2015**

Attachment
Sequence No. **13**

Name(s) shown on return

Max E Salas

Your social security number

| Part I | Income or Loss From Rental Real Estate and Royalties  Note: If you are in the business of renting personal property, use **Schedule C or C-EZ** (see instructions). If you are an individual, report farm rental income or loss from **Form 4835** on page 2, line 40. |
|---|---|

**A** Did you make any payments in 2015 that would require you to file Form(s) 1099? (see instructions) ☐ Yes ☐ No

**B** If "Yes," did you or will you file required Forms 1099? ☐ Yes ☐ No

| 1a | Physical address of each property (street, city, state, ZIP code) |
|---|---|
| A | 1610 Riggs Place NW Washington, DC 20009 |
| B | |
| C | |

| 1b | Type of Property (from list below) | 2 | For each rental real estate property listed above, report the number of fair rental and personal use days. Check the QJV box only if you meet the requirements to file as a qualified joint venture. See instructions. | | Fair Rental Days | Personal Use Days | QJV |
|---|---|---|---|---|---|---|---|
| A | 2 | | | A | | | ☐ |
| B | | | | B | | | ☐ |
| C | | | | C | | | ☐ |

**Type of Property:**

1  Single Family Residence
2  Multi-Family Residence
3  Vacation/Short-Term Rental
4  Commercial
5  Land
6  Royalties
7  Self-Rental
8  Other (describe)

| Income: | | Properties: | A | B | C |
|---|---|---|---|---|---|
| **3** | Rents received . . . . . . . . . . . . . . . | 3 | | | |
| **4** | Royalties received . . . . . . . . . . . . . | 4 | | | |
| **Expenses:** | | | | | |
| **5** | Advertising . . . . . . . . . . . . . | 5 | | | |
| **6** | Auto and travel (see instructions) . . . . . . | 6 | | | |
| **7** | Cleaning and maintenance . . . . . . . . . | 7 | | | |
| **8** | Commissions . . . . . . . . . . . . | 8 | | | |
| **9** | Insurance . . . . . . . . . . . . . | 9 | | | |
| **10** | Legal and other professional fees . . . . . . | 10 | | | |
| **11** | Management fees . . . . . . . . . . . | 11 | | | |
| **12** | Mortgage interest paid to banks, etc. (see instructions) . . | 12 | | | |
| **13** | Other interest . . . . . . . . . . . . | 13 | | | |
| **14** | Repairs . . . . . . . . . . . . . | 14 | | | |
| **15** | Supplies . . . . . . . . . . . . . | 15 | | | |
| **16** | Taxes . . . . . . . . . . . . . . | 16 | | | |
| **17** | Utilities . . . . . . . . . . . . . | 17 | | | |
| **18** | Depreciation expense or depletion . . . . . . | 18 | | | |
| **19** | Other (list) ▶ | 19 | | | |
| **20** | Total expenses. Add lines 5 through 19 . . . . . | 20 | | | |
| **21** | Subtract line 20 from line 3 (rents) and/or 4 (royalties). If result is a (loss), see instructions to find out if you must file **Form 6198** . . . . . . . . . . . . . | 21 | | | |
| **22** | Deductible rental real estate loss after limitation, if any, on **Form 8582** (see instructions) . . . . . . . | 22 | ( ) | ( ) | ( ) |

| 23 a | Total of all amounts reported on line 3 for all rental properties . . . . . . . . . | 23a | | |
| b | Total of all amounts reported on line 4 for all royalty properties . . . . . . . . . | 23b | | |
| c | Total of all amounts reported on line 12 for all properties . . . . . . . . . | 23c | | |
| d | Total of all amounts reported on line 18 for all properties . . . . . . . . . | 23d | | |
| e | Total of all amounts reported on line 20 for all properties . . . . . . . . . | 23e | | |
| **24** | **Income.** Add positive amounts shown on line 21. **Do not** include any losses . . . . . . . . | 24 | |
| **25** | **Losses.** Add royalty losses from line 21 and rental real estate losses from line 22. Enter total losses here . . | 25 | ( 0 ) |
| **26** | **Total rental real estate and royalty income or (loss).** Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Form 1040, line 17, or Form 1040NR, line 18. Otherwise, include this amount in the total on line 41 on page 2 . . . . . . . | 26 | |

For Paperwork Reduction Act Notice, see the separate instructions.

Schedule E (Form 1040) 2015

HTA

Case 1:20-cv-00027 Document 76-14 Filed 08/23/22 Entered 08/23/22 15:43:50 Desc Exhibit Max Salas 2015 IRS Tax Return    Page 7 of 13

APPX00840

Form **6251**

Department of the Treasury
Internal Revenue Service (99)

# Alternative Minimum Tax—Individuals

▶ Information about Form 6251 and its separate instructions is at *www.irs.gov/form6251*.

▶ Attach to Form 1040 or Form 1040NR.

OMB No. 1545-0074

**2015**

Attachment
Sequence No. **32**

Name(s) shown on Form 1040 or Form 1040NR

Max E Salas

Your social security number

## Part I — Alternative Minimum Taxable Income (See instructions for how to complete each line.)

| | | | |
|---|---|---|---|
| 1 | If filing Schedule A (Form 1040), enter the amount from Form 1040, line 41, and go to line 2. Otherwise, enter the amount from Form 1040, line 38. (If less than zero, enter as a negative amount.) | 1 | 70,722 |
| 2 | Medical and dental. If you or your spouse was 65 or older, enter the **smaller** of Schedule A (Form 1040), line 4, **or** 2.5% (.025) of Form 1040, line 38. If zero or less, enter -0- | 2 | |
| 3 | Taxes from Schedule A (Form 1040), line 9 | 3 | |
| 4 | Enter the home mortgage interest adjustment, if any, from line 6 of the worksheet in the instructions for this line. | 4 | |
| 5 | Miscellaneous deductions from Schedule A (Form 1040), line 27 | 5 | |
| 6 | If Form 1040, line 38, is $154,950 or less, enter -0-. Otherwise, see instructions | 6 | ( ) |
| 7 | Tax refund from Form 1040, line 10 or line 21 | 7 | 767 |
| 8 | Investment interest expense (difference between regular tax and AMT) | 8 | |
| 9 | Depletion (difference between regular tax and AMT) | 9 | |
| 10 | Net operating loss deduction from Form 1040, line 21. Enter as a positive amount | 10 | |
| 11 | Alternative tax net operating loss deduction | 11 | ( ) |
| 12 | Interest from specified private activity bonds exempt from the regular tax | 12 | |
| 13 | Qualified small business stock, see instructions | 13 | |
| 14 | Exercise of incentive stock options (excess of AMT income over regular tax income) | 14 | |
| 15 | Estates and trusts (amount from Schedule K-1 (Form 1041), box 12, code A) | 15 | |
| 16 | Electing large partnerships (amount from Schedule K-1 (Form 1065-B), box 6) | 16 | |
| 17 | Disposition of property (difference between AMT and regular tax gain or loss) | 17 | |
| 18 | Depreciation on assets placed in service after 1986 (difference between regular tax and AMT) | 18 | |
| 19 | Passive activities (difference between AMT and regular tax income or loss) | 19 | |
| 20 | Loss limitations (difference between AMT and regular tax income or loss) | 20 | |
| 21 | Circulation costs (difference between regular tax and AMT) | 21 | |
| 22 | Long-term contracts (difference between AMT and regular tax income) | 22 | |
| 23 | Mining costs (difference between regular tax and AMT) | 23 | |
| 24 | Research and experimental costs (difference between regular tax and AMT) | 24 | |
| 25 | Income from certain installment sales before January 1, 1987 | 25 | ( ) |
| 26 | Intangible drilling costs preference | 26 | |
| 27 | Other adjustments, including income-based related adjustments | 27 | |
| 28 | **Alternative minimum taxable income.** Combine lines 1 through 27. (If married filing separately and line 28 is more than $246,250, see instructions.) | 28 | 69,955 |

## Part II — Alternative Minimum Tax (AMT)

| | | | |
|---|---|---|---|
| 29 | Exemption. (If you were under age 24 at the end of 2015, see instructions.) | | |

| IF your filing status is . . . | AND line 28 is not over . . . | THEN enter on line 29 . . . | | |
|---|---|---|---|---|
| Single or head of household | $119,200 | $53,600 | | |
| Married filing jointly or qualifying widow(er) | 158,900 | 83,400 | 29 | 53,600 |
| Married filing separately | 79,450 | 41,700 | | |

If line 28 is **over** the amount shown above for your filing status, see instructions.

| | | | |
|---|---|---|---|
| 30 | Subtract line 29 from line 28. If more than zero, go to line 31. If zero or less, enter -0- here and on lines 31, 33, and 35, and go to line 34 | 30 | 16,355 |
| 31 | • If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter.<br>• If you reported capital gain distributions directly on Form 1040, line 13; you reported qualified dividends on Form 1040, line 9b; or you had a gain on both lines 15 and 16 of Schedule D (Form 1040) (as refigured for the AMT, if necessary), complete Part III on the back and enter the amount from line 64 here.<br>• **All others:** If line 30 is $185,400 or less ($92,700 or less if married filing separately), multiply line 30 by 26% (.26). Otherwise, multiply line 30 by 28% (.28) and subtract $3,708 ($1,854 if married filing separately) from the result. | 31 | 4,252 |
| 32 | Alternative minimum tax foreign tax credit (see instructions) | 32 | |
| 33 | Tentative minimum tax. Subtract line 32 from line 31 | 33 | 4,252 |
| 34 | Add Form 1040, line 44 (minus any tax from Form 4972), and Form 1040, line 46. Subtract from the result any foreign tax credit from Form 1040, line 48. If you used Schedule J to figure your tax on Form 1040, line 44, refigure that tax without using Schedule J before completing this line (see instructions) | 34 | 10,900 |
| 35 | **AMT.** Subtract line 34 from line 33. If zero or less, enter -0-. Enter here and on Form 1040, line 45 | 35 | |

For Paperwork Reduction Act Notice, see your tax return instructions.

HTA

Form **6251** (2015)

Case 23-20-00990027 Doc 76-14 Filed 08/23/22 Entered 08/23/22 15:48:50 Desc
Exhibit Max Salas 2015 IRS Tax Return    Page 8 of 13

APPX00841

Form **2106-EZ**

Department of the Treasury
Internal Revenue Service (99)

# Unreimbursed Employee Business Expenses

▶ **Attach to Form 1040 or Form 1040NR.**

▶ Information about Form 2106 and its separate instructions is available at *www.irs.gov/form2106.*

OMB No. 1545-0074

**2015**

Attachment
Sequence No. **129A**

| Your name | Occupation in which you incurred expenses | Social security number |
|---|---|---|
| Max E Salas | Director of Business Dev | |

**You Can Use This Form Only if All of the Following Apply.**

- You are an employee deducting ordinary and necessary expenses attributable to your job. An ordinary expense is one that is common and accepted in your field of trade, business, or profession. A necessary expense is one that is helpful and appropriate for your business. An expense does not have to be required to be considered necessary.
- You **do not** get reimbursed by your employer for any expenses (amounts your employer included in box 1 of your Form W-2 are not considered reimbursements for this purpose).
- If you are claiming vehicle expense, you are using the standard mileage rate for 2015.

**Caution:** *You can use the standard mileage rate for 2015 only if: (a) you owned the vehicle and used the standard mileage rate for the first year you placed the vehicle in service, or (b) you leased the vehicle and used the standard mileage rate for the portion of the lease period after 1997.*

## Part I    Figure Your Expenses

| | | | |
|---|---|---|---|
| 1 | Complete Part II. Multiply line 8a by 57.5¢ (.575). Enter the result here . . . . . . . . | **1** | |
| 2 | Parking fees, tolls, and transportation, including train, bus, etc., that **did not** involve overnight travel or commuting to and from work . . . . . . . . . . . . . . . | **2** | |
| 3 | Travel expense while away from home overnight, including lodging, airplane, car rental, etc. **Do not** include meals and entertainment . . . . . . . . . . . . . . | **3** | |
| 4 | Business expenses not included on lines 1 through 3. **Do not** include meals and entertainment . . . . . . . . . . . . . . . . . . . . . . . . | **4** | |
| 5 | Meals and entertainment expenses: $ _____ x  50% (.50). (Employees subject to Department of Transportation (DOT) hours of service limits: Multiply meal expenses incurred while away from home on business by 80% (.80) instead of 50%. For details, see instructions.) . . | **5** | |
| 6 | **Total expenses.** Add lines 1 through 5. Enter here and on **Schedule A (Form 1040), line 21** (or on **Schedule A (Form 1040NR), line 7**). (Armed Forces reservists, fee-basis state or local government officials, qualified performing artists, and individuals with disabilities: See the instructions for special rules on where to enter this amount.) . . . . . . . . . | **6** | |

## Part II    Information on Your Vehicle. Complete this part **only** if you are claiming vehicle expense on line 1.

7  When did you place your vehicle in service for business use? (month, day, year)  ▶ --------------------------------

8  Of the total number of miles you drove your vehicle during 2015, enter the number of miles you used your vehicle for:

    **a** Business --------------------  **b** Commuting (see instructions) --------------------  **c** Other --------------------

| | | | |
|---|---|---|---|
| 9 | Was your vehicle available for personal use during off-duty hours? . . . . . . . . . | ☐ Yes | ☐ No |
| 10 | Do you (or your spouse) have another vehicle available for personal use? . . . . . . | ☐ Yes | ☐ No |
| 11 a | Do you have evidence to support your deduction? . . . . . . . . . . . . | ☐ Yes | ☐ No |
| **b** | If "Yes," is the evidence written? . . . . . . . . . . . . . . . . . | ☐ Yes | ☐ No |

**For Paperwork Reduction Act Notice, see your tax return instructions.**

HTA

Form **2106-EZ** (2015)

# 2015 D-40 SUB Individual
# Income Tax Return



```
1  5  0  4  0  0  4  1  1  8  3  3
```

Tax period ending

## Personal information

Your telephone number  2022712800

☐ Mark if  Amended return

☐ Mark if  Filing for a deceased taxpayer

SOFTWARE DEVELOPER USE ONLY
VENDOR ID#  1833

Your social security number (SSN)  and Date of Birth (MMDDYYYY)

Spouse's/registered domestic partner's SSN  and Date of Birth (MMDDYYYY)

Your first name  MAX  M.I.  E  Last name  SALAS

Spouse's/registered domestic partner's first name  M.I.  Last name

Home address (number, street and suite/apartment number if applicable)
777 7 STREET NW
216

City  WASHINGTON  State  DC  ZIP Code + 4  20001

## Filing Status

1  Mark only one:  **X**  Single  ☐ Married filing jointly  ☐ Married filing separately  ☐ Dependent claimed by someone else
☐ Married filing separately on same return  Enter combined amounts for lines 4 - 42. See instructions.
☐ Registered domestic partners filing jointly or  ☐ filing separately on same return
☐ Head of household  Enter qualifying dependent and/or non-dependent information on Schedule S.
☐ Qualifying widow(er) with dependent child. Enter qualifying dependent information on Schedule S.

2  Mark if you are:  ☐ Part-year resident in DC from  (month) to  (month) # of months in DC  See instructions.

*Complete your federal return first -- Enter your dependents' information on DC Schedule S*

## Income Information

a  Wages, salaries, unemployment compensation and/or tips, see instructions.  a  $ 69955.00
b  Business income or loss, see instructions.  ☐ Mark if loss  b  $ .00
c  Capital gain (or loss).  ☐ Mark if loss  c  $ .00
d  Rental real estate, royalties, partnerships, etc.  ☐ Mark if loss  d  $ .00

## Computation of DC Gross and Adjusted Gross Income

3  Federal adjusted gross income. From adjusted gross income lines on federal Forms 1040, 1040A, 1040EZ, 1040NR or 1040NR-EZ.  ☐ Mark if loss  3  $ 70722.00

## Additions to DC Income

4  Franchise tax deducted on federal forms, see instructions.  4  $ .00
5  Other additions from DC Schedule I, Calculation A, Line 8.  5  $ .00
6  Add Lines 3, 4 and 5.  ☐ Mark if loss  6  $ 70722.00

## Subtractions from DC Income

7  Part year residents, enter income received during period of nonresidence, see instructions.  7  $ .00
8  Taxable refunds, credits or offsets of state and local income tax.  8  $ 767.00
9  Taxable amount of social security and tier 1 railroad retirement.  9  $ .00
10  Income reported and taxed this year on a DC franchise or fiduciary return.  10  $ .00
11  DC and federal government survivor benefits, see instructions.  11  $ .00
12  Other subtractions from DC Schedule I, Calculation B, Line 16.  12  $ .00
13  Total subtractions from DC income, Lines 7 - 12.  13  $ 767.00
14  DC adjusted gross income, Line 6 minus Line 13.  ☐ Mark if loss  14  $ 69955.00

Case 23-20-00900027 Doc 76-14 Filed 08/23/22 Entered 08/23/22 19:48:50 Desc
Exhibit Max Salas 2015 IRS Tax Return  Page 10 of 13

APPX00843



`1 5 0 4 0 0 4 2 1 8 3 3`

| | | | | | |
|---|---|---|---|---|---|
| 15 | **Deduction type**  Take the same type of deduction you took on your federal return. | | | | |
| | Mark which type:  **X** Standard    Itemized  See instructions for amount to enter on Line 16. | | | | |
| 16 | **DC deduction amount.** Do not copy from federal return. For amount to enter, see instructions. | | 16 | $ | 5200.00 |
| 17 | Number of exemptions  If more than 1 (more than 2 if filed jointly), or if you or your | 17 | 1 | | |
| 18 | spouse/domestic partner are over 65 or blind, attach a completed Calculation G, Schedule S.  **Exemption amount.** Multiply $1,775 by number on Line 17. Part-year DC residents see Cal E. | | 18 | $ | 1775.00 |
| | * If AGI is greater than $150,000, see instructions on page 25. | | | | |
| 19 | Add Lines 16 and 18. | | 19 | $ | 6975.00 |
| 20 | **DC Taxable income**  Subtract Line 19 from Line 14. Enter result.  Mark if loss | | 20 | $ | 62980.00 |

**DC tax, credits and payments**

| | | | | | |
|---|---|---|---|---|---|
| 21 | Tax  If Line 20 is $100,000 or less, use tax tables. If more, use Calculation I | | 21 | $ | 3853.00 |
| | Mark  if filing separately on same return. Complete Calculation J on Schedule S. | | | | |
| 22 | Credit for child and dependent care expenses  $ .00  x .32  Enter result > | | 22 | | .00 |
| | From federal Form 2441; if part-year DC resident, from Line 5, DC Form D-2441. | | | | |
| 23 | Non-refundable credits from DC Schedule U, Part 1a, Line 7  Attach DC Schedule U. | | 23 | $ | .00 |
| 24 | DC Low Income Credit  Use Calc. LIC/EITC to see if LIC or EITC is a greater benefit. See instructions, | | 24 | $ | .00 |
| 24a | Enter the number of exemptions claimed on your federal return.  1 | | | | |
| 25 | Total non-refundable credits. Add Lines 22, 23 and 24. | | 25 | $ | .00 |
| 26 | Total tax. Subtract Line 25 from Line 21. If Line 21 is less than Line 25, leave Line 26 blank. | | 26 | $ | 3853.00 |
| 27 | **DC Earned Income Tax Credit**  Leave blank if you took Line 24 DC Low Income Credit (LIC) | | | | |
| 27a | Enter the number of qualified EITC children. | 27b Enter earned income amount | 27b | $ | .00 |
| 27c | For filers **with** qualifying children.  Enter federal EITC $ .00  x .40  Enter result > | | 27d | $ | .00 |
| 27e | For filers **without** qualifying children. See instructions for special calculations.  Enter result > | | 27e | $ | .00 |
| 28 | Property Tax Credit. From your DC Schedule H; attach a copy. | | 28 | $ | .00 |
| 29 | Refundable credits from DC Schedule U, Part 1b, Line 3  Attach DC Schedule U. | | 29 | $ | .00 |
| 30 | DC income tax withheld shown on Forms W-2 and 1099. Attach these forms. | | 30 | $ | 4236.00 |
| 31 | 2015 estimated income tax payments and amount applied from 2014 return. | | 31 | $ | .00 |
| 32 | Tax paid with extension of time to file or with original return if this is an amended return. | | 32 | $ | .00 |
| 33 | Total payments and refundable credits. Add Lines 27d and 27e and 28 - 32. | | 33 | $ | 4236.00 |

**Refund**  Complete if Line 33 is _more_ than Line 26.

| | | | | |
|---|---|---|---|---|
| 34 | Amount you overpaid | 34 | $ | 383.00 |
| | Subtract Line 26 from Line 33 | | | |
| 35 | Amount to be applied to your 2016 estimated tax | 35 | $ | .00 |
| 36 | Penalty See instructions | 36 | $ | .00 |
| | Mark if Form D-2210 is attached | | | |
| 37 | Underpayment Interest | 37 | $ | .00 |
| 38 | Refund Subtract sum of Lines 35, 36 and 37 from Line 34. | 38 | $ | 383.00 |
| 39 | Contribution amount from Sched. U, Part II, Line 5 | 39 | $ | .00 |
| | Can not exceed refund amt on Line 38  Put additional amt on Line 42. | | | |
| 40 | Net refund | 40 | $ | 383.00 |
| | Subtract Line 39 from Line 38 | | | |

**Amount owed**  Complete if Line 33 is _equal to or less_ than Line 26.

| | | | | |
|---|---|---|---|---|
| 41 | Tax due | 41 | $ | .00 |
| | Subtract Line 33 from Line 26 | | | |
| 42 | Contribution amount from Schedule U, Part II, Line 6 | 42 | $ | .00 |
| 43a | Penalty | $ | .00 | |
| 43b | Interest | $ | .00 | |
| | Enter total P & I. | 43 | $ | .00 |
| | Mark if Form D-2210 is attached | | | |
| 44 | Underpayment Interest | 44 | $ | .00 |
| 45 | Total amount due | 45 | $ | .00 |
| | Add Lines 41- 44 | | | |

Will this refund request or amount owed go to or come from an account outside the U.S.?  Yes    No    See instructions

**Refund Options:** For information on the tax refund card and program limitations, see instructions or visit our website: otr.dc.gov/refundprepaidcards.
Make one refund choice    Direct deposit    Tax refund card    Paper check

**Direct Deposit**  To have your refund deposited into your    checking OR    savings account, mark X and enter bank routing and account numbers.
Routing Number _____  Account Number _____

**Third Party Designee** To authorize another person to discuss this return with the OTR, mark here  **X**  and enter the name and phone number of that person
Designee's name PREPARER    Phone number 2023871798

**Signature** Under penalties of law, I declare that I have examined this return and, to the best of my knowledge, it is correct. Declaration of paid preparer is based on information available to the preparer.

| Your signature | Date | Preparer's signature | Date |
|---|---|---|---|
| | | | |
| Spouse's/registered domestic partner's signature if filing jointly | Date | Preparer's Tax Identification Number (PTIN) | PTIN telephone number |

2015 D-40 SUB P2

Government of the
District of Columbia

# 2015 SCHEDULE I SUB
## Additions to and Subtractions from
## Federal Adjusted Gross Income

*Make entries using black ink. Attach to your D-40.*

`1 5 0 4 0 0 4 8 1 8 3 3`

SOFTWARE DEVELOPER USE ONLY

VENDOR ID# 1833

Enter your last name
**SALAS**

Social Security Number

**Calculation A** Additions to federal adjusted gross income. *Fill in only those that apply.*

| | | | |
|---|---|---|---|
| 1 | Part-year DC resident - enter the portion of adjustments (from Federal Form 1040, 1040A or 1040NR) that relate to the time you resided outside DC. *For Lines 2 - 7 below include only the amounts related to the time you resided in DC.* | 1 | $ |
| 2 | Income distributions eligible for income averaging on your federal tax return *(from federal Form 4972).* | 2 | $ |
| 3 | 30% or 50% federal bonus depreciation and/or extra IRC § 179 expenses claimed on federal return. | 3 | $ |
| 4 | Any part of a discrimination award subject to income averaging. | 4 | $ |
| 5 | Deductions for S Corporations from Schedule K-1, form 1120 S. | 5 | $ |
| 6 | Other pass through losses from DC unincorporated businesses that exceed the $12,000 threshold (reported as a loss on federal 1040 return) | 6 | $ |
| 7 | Other (see instructions) | 7 | $ |
| 8 | Total additions Add entries on Lines 1-7. *Enter the total here and on D-40, Line 5.* | 8 | $ |

**Calculation B** Subtractions from federal adjusted gross income. *Fill in only those that apply.*

| | | | |
|---|---|---|---|
| 1 | Taxable interest from US Treasury bonds and other obligations. *(See instructions.)* | 1 | $ |
| 2 | Disability income exclusion from DC Form D-2440, Line 10 *(See instructions.)* | 2 | $ |
| 3 | Interest and dividend income of a child from Federal Form 8814*. | 3 | $ |
| 4 | Awards, other than front and back pay, received due to unlawful employment discrimination. | 4 | $ |
| 5 | Excess of DC allowable depreciation over federal allowable depreciation. *See instructions.* | 5 | $ |
| 6 | Amount paid (or carried over) to DC College Savings plan in 2015 (maximum $4,000 per person, $8,000 for joint filers if each is an account owner). *Part year residents, see instructions.* | 6 | $ |
| 7a | Exclusion of up to $10,000 for DC residents (certified by the Social Security Admin. as disabled) with adjusted annual household income of less than $100,000. *See instructions.* | 7a | $ |
| 7b | Annual household adjusted gross income. *See instructions.* 7b $ | | |
| 8 | Expenditures by DC teachers for necessary classroom teaching materials, $500 annual limit per person. *See instructions.* | 8 | $ |
| 9 | Expenditures by DC teachers for certain tuition and fees, $1,500 annual limit per person. *See instructions.* | 9 | $ |
| 10 | Loan repayment awards received by health-care professionals from DC government. *See instructions.* | 10 | $ |
| 11 | Health-care insurance premiums paid by an employer for an employee's registered domestic partner or same sex spouse. *Make no entry if the premium was deducted on your federal return, see instructions* | 11 | $ |
| 12 | DC Poverty Lawyer Loan Assistance. *See instructions.* | 12 | $ |
| 13 | Other (see instructions) | 13 | $ |
| 14 | Military Spouse Residency Relief Act. *See instructions.* | 14 | $ |
| 15 | RESERVED | 15 | $ |
| 16 | Total subtractions. Add entries on Lines 1-7a and 8-15. *Enter the total here and on D-40, Line 12.* | 16 | $ |

*Note: Since income reported on Federal Form 8814, Parents' Election to Report Child's Interest and Dividends, and included in the parents' federal return income is subtracted above on Line 3 of Calculation B, the child must file a separate DC return reporting this income.

2015 SCHEDULE I SUB

## 2015 D-2220 Underpayment of Estimated Franchise Tax By Businesses

VENDOR ID # 1833

**IMPORTANT: Please read the instructions before completing this form.**

Business name (from your D-20 or D-30 return).

MAX E SALAS

Federal Employer Identification Number (FEIN) or

Person to contact if there are questions

Social Security Number (SSN)

Daytime telephone number

---

## No underpayment interest is due and this form should not be filed if:

A. Your tax liability on taxable income after deducting your DC applicable credits and estimated tax payments is less than $1001, or

B. You have made the required periodic DC estimated franchise tax payments and the total is equal to or more than 110% of last year's taxes or 90% of current year's taxes. Note: In order to use the prior year 110% exception, you must have filed a DC franchise tax return last year and you must have been in business in DC for the entire year.

---

### Computation of Underpayment Interest

| | | | |
|---|---|---|---|
| 1 | 2015 DC franchise tax liability *from Forms D-20 or D-30.* | $ | 0 |
| 2 | Multiply the amount on Line 1 by 90% (.90). | $ | 0 |
| 3 | 2014 DC franchise tax liability *from Forms D-20 or D-30 X 110%.* | $ | |
| 4 | Minimum estimated tax requirement for tax year 2015 *(lesser of Lines 2 and 3).* | $ | 0 |
| 5 | Multiply the amount on Line 4 by 25% (.25). | $ | 0 |

*Note: If your income was not evenly received over 4 periods, see instructions on the "Annualized Income" method.*

| | | Due date of Payments | | |
|---|---|---|---|---|
| Due dates shown are for calendar year; for fiscal year, use the 15th day of the 4th, 6th, 9th and 12th months after the end of the fiscal year. | 1st Period 4/15/15 | 2nd Period 06/15/15 | 3rd Period 09/15/15 | 4th Period 12/15/15 |
| 6 Enter the amount from Line 5 or the annualized income amount in each period *(The 2nd period includes the 1st period amount, 3rd period includes the 1st and 2nd period amounts, the 4th period includes all period amounts).* Check here ☐ if you are using "Annualized Income" method. | 0 | 0 | 0 | 0 |
| 7 DC estimated taxes paid each period *(The 2nd period includes the 1st period amount, 3rd period includes the 1st and 2nd period amounts, the 4th period includes all period amounts).* | 0 | 0 | 0 | 0 |
| 8 Underpayment each period *(Line 6 minus Line 7).* | 0 | 0 | 0 | 0 |
| 9 Underpayment Interest Factors. | .0175 | .0265 | .0262 | .0348 |
| 10 Line 8 multiplied by Line 9. | 0 | 0 | 0 | 0 |
| 11 Underpayment Interest – Total of amounts from Line 10. Pay this amount. *(See instructions)* | | | $ | 0 |

*Make check or money order payable to: DC Treasurer*

D-2220 SUB

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL | : | |
| GREGORY BREKELMANS, | | |
| CO-PERSONAL REPRESENTATIVES | : | |
| OF THE ESTATE OF NINA | | |
| BREKELMANS, et al | : | |
| | | |
| Plaintiffs | : | |
| | | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| | | |
| MAX  SALAS | : | |
| | | |
| Defendant | : | |

### PLAINTIFFS' SUPPLEMENTAL  LIST OF UNDISPUTED FACTS,
### PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF
### THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 7056-1 of the rules of this Court, and this Court's Order of

September 12, 2022, the Plaintiffs submit the following facts in support of their Motion for

Summary Judgment and citations, or additional citations to the record.  This supplemental list is

intended to supplement and support the Amended List of Undisputed Facts filed herein and only

addresses those facts listed previously by the Plaintiff to which the Defendant objected.  To the

extent necessary, except as stated herein, the Plaintiffs adopts and incorporates their Amended

List filed herein.

APPX00847

**Plaintiffs' Citations, or Additional Citations
to Their List of Undisputed Facts
In Support of Their Motion for Summary Judgment**

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed on April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, as amended, unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

The numbered listed facts refers to the numbers set forth in the Plaintiffs Amended List of Undisputed Facts filed herein.

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement. Amended Joint Pre-trial Statement filed herein on March 29, 2021, Parties Joint Statement of Uncontested Facts, (D-43, pp. 3-10) ("Joint Statement"), Nos. 12 and 13.

**RESPONSE:**

11. That the Defendant is unaware of the location of the original Quitclaim Deed after 2012. Exh. 3, Exemption Hrg Trans. Vol. 2, 55:7 - 58:13; Joint Statement No. 33.

-2-

APPX00848

**RESPONSE:**


12.  Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max

Salas and only kept a copy.  Exh. 4, L Salas Confirmation Hearing Transcript, 12/13/18, in Case

No. 3:18-2662 ("L Salas Conf. Trans."), 22:8-20; 53: 3-24. Exhibit 19 (Ron Salas - M Albert

eMail chain, "Bates" No. salassm7-16-18 00557)

**RESPONSE:**


16.  Neither Len Salas nor Max Salas informed SunTrust in writing that Max was

responsible for the SunTrust Deed of Trust Note payments.  Exh. 4, L Salas Conf. Trans. 67:13-

25; Exh. 13, L Salas Depo Trans. 22:22 - 23:7;

**RESPONSE:**


22.  That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law

in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim

Deed purporting to transfer the Property from Len to Max.  Joint Statement Nos. 24, 25, 26; Exh.

7.

**RESPONSE:**


23.  That the foresaid Trust and Deed were prepared and executed in Colorado. Joint

Statement Nos. 24, 25, 26; Exh. 7.

**RESPONSE:**

APPX00849

30. There were no further communications regarding the creation or recording of a Deed for the transfer of the Property from Len to Max after February, 2012. Exh. 13, L Salas Depo Trans. 70:2-17.

**RESPONSE:**

34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns. Salas 2015 Federal Tax Return, Exh A to Plaintiffs' Response (D-76-1).

**RESPONSE:**

37. The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's). Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220 (Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

38. The Plaintiffs received distributions on account of their claims from both estates. Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220 (Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

-4-

APPX00850

39.  The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018. Plaintiffs' Proofs of Claim filed herein at claims C-5-1 and C-6-1, filed August 7, 2018, at pp. 4-9 of 9, respectively.

**RESPONSE:**


40.  On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in the Middle District of Tennessee and the District of Columbia, respectively.  Joint Statement No. 5, Case No. 18-2662 (D-1), Case No. 18-260 (D-1).

**RESPONSE:**


41.  At the time of the bankruptcy filings by Len and Max, Len was, and continued to be, until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property"). Joint Statement Nos. 7 and 23, Complaint Exhibit B, Defendant's Third Amended Plan (D-40-2), p. 19 of 37, Exh. 6, Exemption Hrg Trans. Vol 3, 40:2 - 46:16.

**RESPONSE:**


42.  In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then wife, divorced. Joint State Nos. 11-13

**RESPONSE:**


43.  Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan"). Joint Statement No. 12.

-5-

APPX00851

**RESPONSE:**


45.  Len received no part of the $870,000.  M. Salas Affidavit attached as an Exhibit to the Defendant's Opposition in Case No. 20-9007 (D-75-2)("M Salas Aff."); Exh. 5, L Salas Mtg of Creds Trans, at p. 6.

**RESPONSE:**


46. From 2007 through January 27, 2020, Len remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.; Joint Statement Nos. 7 and 23; Exh. 4, L Salas Conf Hrg Trans, 67:13-25; Exh. 6, Exemption Hrg Trans, Vol. 3, 43:25 - 44:24

**RESPONSE:**


47.  At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. Exh. 6, Exemption Hrg Trans, Vol. 3, 71:9 - 72:23.

**RESPONSE:**


50. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor. Joint Statement Nos. 17, 18.

-6-

APPX00852

**RESPONSE:**


51.  There are no documents indicating that Max was liable on the SunTrust loan at any time and Max never entered into any agreement or understanding with Len that Max was liable or responsible. Exh. 22, M Salas Document Production, 8/17/18, for Exemption Hearing, August 22-24, 2018, Docket No.  84, pp. 4-7; M Salas Aff.; Exh. 15, Motion to Approve U.S. Bank Settlement; Defendant's Amended Answers to Plaintiffs' Request for Admissions ("RFA"), 17; Exh. 23, Court Proceeding Memo in Case No. 18-00260 (D-96), 8/28/18 ("Proceeding Memo"), Exhibits Lists.

**RESPONSE:**


52.  There is no document raised, proffered or produced by Max indicating that Len was not the sole party responsible for the Deed of Trust payments until at least November, 2019.[1] Exh. 22, M Salas Document Production, Exemption Hearing, August 22-24, 2018, Docket No. 84, pp. 4-7; Exh. 15, Motion to Approve Settlement with U.S. Bank; Defendant's Document Production in Case No. 3:20-90027; RFA 16, 18-20, Exh. 23, Proceeding Memo, Exhibits Lists.

**RESPONSE:**

---

[1]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did finally reach an agreement with Max for him to make the payments under the Deed of Trust from and after November, 2019.  However, there is no indication in the agreement reached between Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not in effect.  Therefore, Len is still liable for the entire balance under the SunTrust Note which, as of September 29, 2019, was $1,208,720.40.  See Max Salas Stipulation with U.S. Bank attached hereto as Exhibit 15.

-7-

APPX00853

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee. M Salas Aff. Exh. 1 (M Salas Depo Trans) 42:18 - 43:2, 43:13-18; Joint Statement. Nos. 19-20; RFA 51.

**RESPONSE:**

57. The lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property. M Salas Aff.; Joint Statement. Nos. 19-22; RFA 26.

**RESPONSE:**

60. During the period 2015 through 2018, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he received as a result of the fire damage. Joint Statement. No. 39.

**RESPONSE:**

63. As of April, 2018, Len remained the sole obligor on the SunTrust Note. RFA 16.

**RESPONSE:**

-8-

APPX00854

65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant

asset was the Property. Joint Statement. No. 28.

**RESPONSE:**


66.  At all relevant times, Len worked only part time and had limited income and assets.

Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21; Joint Statement No. 28.

**RESPONSE:**

67.  At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded

his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of

Trust Note payments. Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21, Joint

Statement Nos. 28 - 30.

**RESPONSE:**


84.  These emails attached as Exhibit 7 were within the scope of the document production

requested from Max as part of the discovery requests in the Exemption Hearing adversary

proceeding in Max's bankruptcy in D.C.  Exh. 21, Debtor's Responses to Movants' First Set

Request for Production of Documents, in Case No. 18-260, served on August 6, 2018,  Request

No. 10.

**RESPONSE:**


85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim

Case 3:20-ap-90027   Document Filed 09/18/22   Entered 09/19/22 14:25:25   Desc Main
APPX00855

that the Quitclaim Deed of July 6, 2010 was in effect in 2018. Exhibits 3, 6, 20, Exemption Hrg

Trans, Vols 1-3.

RESPONSE:


99.     The only deed referenced by Max or his counsel, allegedly entitling Max to an

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered,

or even mentioned by the Salas family or by Max, specifically. Exhibit 13, L Salas Depo Trans,

39:21 - 40:20, Exemption Hearing Transcripts Vols 1-3.

RESPONSE:


100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15

Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee

filed objections to the Plaintiffs' claims filed in Len's bankruptcy. Exh. 13, L Salas Depo Trans,

61:12 - 62:13, Proofs of Claim Nos. C-5 and C-6,

RESPONSE:


101.  In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len

listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.

On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution

for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least

$1,035,000 approx) per his consistent promise that he would pay that amount and his consistent

APPX00856

assertion that he was responsible for payment of the SunTrust Note which was, at all relevant

times, in Len's name.  Exh. 9, M Salas Schedules filed in Case No. 18-00260 in the United States

Bankruptcy Court for the District of Columbia, 5/2/18, (D-12), ("M Salas Scheds"), Schedule

A/B, p. 3 of 37, Schedule D, pp. 19-20 of 37, Schedule F, p. 27 of 37.

**RESPONSE:**

104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office.  He does _not_

recall that Mr. Goldstein mailed it back to Mr. Salas.  Exh. 6, Exemption Trans. Vol. 3, 55:7 -

56:21.

**RESPONSE:**

107.  Max also learned from Albert that if Max could claim he is the actual owner of the

Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to

D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as

exempt from execution by the Plaintiffs.  Exh. 6, Exemption Hrg Trans. Vol 3, 121:3 - 122:1

**RESPONSE:**

124.  As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had

-11-

APPX00857

any intent to use or record it.  Exh. 7, eMails dated June, 2011 through February, 2012; Exh. 13, L

Salas Depo Trans. 68:13 - 70:17.

**RESPONSE:**


Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates

Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt

Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

-12-

APPX00858

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .    Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .    Washington, D.C.
            Debtor.             .    August 23, 2018
                                .
. . . . . . . . . . . . . . .


TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 2 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:

For the Debtor:           Stinson Leonard Street, LLP
                          By: MARC E. ALBERT
                              JOSHUA W. COX
                          1775 Pennsylvania Avenue, NW
                          Suite 800
                          Washington, D.C., 20036
                          (202) 728-3020


For the Creditors:        By: PHILIP J. McNUTT
                          11921 Freedom Drive
                          Suite 584
                          Reston, Virginia  20190
                          (703) 904-4380


Court Recorder:           THE CLERK

Transcribed By:           MS. KRISTEN SHANKLETON


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

WITNESSES:                                              PAGE:

MAX E. SALAS
Direct examination continued by Mr. McNutt             4


EXHIBITS:                                  MARKED: RECEIVED:

CREDITOR'S
15. L. Salas Deposition (full deposition)  *         88
24. 8/10/18 R.Salas full deposition        *         88
34. Transcript: L.Salas, first meeting     *     Rejected-88
    of creditors
41. R.Salas 2/14/18 email                  *         87
42. IRS amended proof of claim             69        87
43. Transcript of hearing                  82        87

*Exhibits marked on first day of trial.

1  attorney involved in CLR?

2      A.    That's correct.

3      Q.    All right.

4            So did you contact him to determine if he had the

5  trust documents for the CLR Trust?

6      A.    I knew that -- I knew that Mr. Fernandez had not

7  put together the trust.

8      Q.    So --

9      A.    I knew that he had put together CLR, but not the

10  trust.

11     Q.    Okay.

12           CLR the entity --

13     A.    The corp.

14     Q.    -- that you acted as trustee for with respect to

15  all of the leases that were generated for the property at

16  1610 Riggs Place, right?

17     A.    Repeat the question.

18     Q.    CLR Trust was the entity that you acted as trustee

19  for with respect to all of the leases for the property at

20  1610 Riggs Place through January of 2015, right?

21     A.    Mr. McNutt, there is no CLR Trust.  There never

22  has been a CLR Trust.

23     Q.    All right.

24           So you're now saying that suddenly at some point

25  when you talked to Mr. Albert that you came up with this

1  idea about the trust?

2       A.   It's not an idea, sir.  It was -- it's not an

3  idea.  It's not sudden, suddenly.  It didn't even cross my

4  mind.  I'd totally forgot about it.  Mr. Albert says, "I

5  read your testimony," or, "I read your transcript," and he

6  says, "You keep talking about a trust.  Who put together -

7  - do you have a copy of the trust?  Where is it?"  I said,

8  "It burned; all my documents burned in the fire."  He said,

9  "Who formed the trust for you?"  He said -- I told him, "My

10 son did."  And he says, "Does he have a copy of the trust?"

11 I said, "He must."  And I -- he said, "Can I talk to him?"

12 And I said, "Yes."  I says, "Call him."

13      Q.   So --

14      A.   And so I gave him my son's number, and he called

15 Ron for the trust and asked him about the trust.

16      Q.   So what's your --

17      A.   This was not sudden, sir.  This was -- it was not

18 suddenly.  It was not planned.  It was discovered by Mr.

19 Albert.  That's one thing that Mr. Barnes, these people

20 from Baltimore that were my insurance attorneys, did a poor

21 job of, and they never asked me for that.  They were at the

22 deposition.  They never asked me for it, "Who was this

23 trust -- who put it together?"  They should have, and --

24 they didn't prepare well and -- and they should have.  And

25 I should have known.  I've got an eighth grade education.

```
 1   I look like I know what I'm doing, but I don't.  I look
 2   like I know about corporations and I know about trusts and
 3   I know about the law and I know about writing leases, and I
 4   -- but I don't.
 5        Q.   Mr. Salas, have you ever operated a business that
 6   you owed?
 7        A.   I did.  I did.
 8        Q.   How many?
 9        A.   Several.  Well, two.
10        Q.   For what period of time?
11        A.   So, from the time I was 15 years old 'til the time
12   I was -- to the time I was 45.  And I didn't do very good
13   at that.  I did good enough to have me underreport my
14   income, and have me put in jail for underreporting taxes.
15   So I am not very good.  I am good enough to get in trouble,
16   but I'm not good enough to stay out of trouble.
17        Q.   You ever sign business agreements on behalf of the
18   businesses that you represented and worked for and owned?
19        A.   I -- yes, I have.
20        Q.   You ever sign sales agreements on behalf of Cornet
21   Technologies?
22        A.   No, I haven't.
23        Q.   None?  Ever?
24        A.   Sales agreements?
25        Q.   Yes, sir.
```

```
 1        A.   No.  I turned -- I got -- I'm a salesman.  That's
 2   all I do.  I put people together.  I find deals.  I turn
 3   them over to administrative, and they sign contracts.  I
 4   never do.
 5        Q.   What kind of deals did you put together for
 6   Cornet?
 7        A.   Federal contracts.
 8        Q.   What kind of contracts?  For what services?
 9        A.   IT services.
10        Q.   Okay.
11             You negotiated those with federal contract
12   officers?
13        A.   I didn't negotiate 'em.
14        Q.   You didn't?
15        A.   I've -- no.  I found the deals, I turned them over
16   to contracts, they put the deals together.
17        Q.   In order to find the deals you had to pursue
18   solicitations and requests for bids and those sorts of
19   things from federal agencies, correct?
20        A.   Right.
21        Q.   All right.
22             And you know how to read those and respond to
23   them, correct?
24        A.   Sir, I'm a salesman.  I am a business development.
25   I am good at being able to talk to people and put people
```

APPX00864
000366

```
1   together.  Once they start negotiations, once they start
2   really the doc -- the work, the best thing to do, for me,
3   is to get out of the way.  Because I can screw up a deal as
4   fast as I can get it.  I've learned that much.
5        Q.   Mr. Salas, you've now spent quite a bit of time
6   talking about the fact that the CLR Trust and the 1610
7   Salas Trust that you testified to in your deposition never
8   existed, and that the information that you set forth in
9   your Answers to Interrogatories and the deposition was
10  inaccurate.  That's what you've testified to, correct?
11       A.   I did the best I could; yes, sir, that's correct.
12       Q.   Okay.
13            And you never corrected that testimony, you never
14  corrected your Interrogatory Answers, you never provided
15  any documents relative to any trust to opposing counsel or
16  to the Brekelmans Estate or to the McLoughlin Estate until
17  sometime after you hired Mr. Albert, right?
18       A.   That's correct.
19       Q.   When did you hire Mr. Albert?
20            Was it in 2018?
21       A.   No, it was -- I think it was '17.  When I -- I
22  hired Mr. Albert when we started to do mediation for, with
23  the Brekelmans and the McLoughlins.  And it was clear that
24  the attorneys that were representing me in terms of the
25  insurance, for the insurance were representing the
```

```
 1  insurance and they really weren't representing me, my best
 2  interests I thought, and in fact the attorneys that were
 3  representing the insurance said that I really should get my
 4  personal attorney.  That's what they said.  And as I did in
 5  sales and I did as -- and I did in my businesses, I knew
 6  that I didn't know what I was doing, and I knew that I --
 7  that I was way over my head.  So just like in a business
 8  meeting when I know I can put a deal together, but when it
 9  comes to details, I -- I don't know what I'm doing.  I --
10  and so I can cause more trouble than I can do good.  So I
11  knew I needed some help.
12      Q.   So you hired Mr. Albert to be your personal
13  attorney?
14      A.   Yes.
15      Q.   All right.
16           Representing you in the Superior Court case?
17      A.   To advise me through the mediation and through the
18  Spirit court case to help guide me and give me advice as to
19  what I should -- what I -- what I should do.
20      Q.   All right.
21           You were here when your son Ron testified
22  yesterday, correct?
23      A.   Yes.
24      Q.   You sat through all his testimony, right?
25      A.   Yes, sir.
```

1

2

3

4

5

6   I certify that the foregoing is a correct transcript from

7   the electronic sound recording of the proceedings in the

8   above-entitled matter.

9

10   /s/Kristen Shankleton, CER-6785      Dated: 10/28/18

APPX00867

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 18-02662 |
|  | . |  |
|  | . | Chapter 11 |
| LEN SALAS, | . |  |
|  | . | 701 Broadway |
|  | . | Nashville, TN 37203 |
| Debtor. | . |  |
|  | . | Thursday, December 13, 2018 |
| . . . . . . . . . . . . . . | . | 9:25 a.m. |

PARTIAL TRANSCRIPT OF MOTION TO CONVERT CHAPTER 11 CASE
TO CHAPTER 7 UNDER SECTION 1112(a), FEE AMOUNT $15.00,
ALTERNATIVELY TO APPOINT A CHAPTER 11 TRUSTEE
IF TIMELY RESPONSE
**BEFORE THE HONORABLE MARIAN F. HARRISON**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Debtor:                Niarhos & Waldron, PLC
                               By:  TIMOTHY G. NIARHOS, ESQ.
                                    DENIS GRAHAM WALDRON, ESQ.
                               1106 18th Avenue South
                               Nashville, TN 37212
                               (615) 320-1101

APPEARANCES CONTINUED

Audio Operator:                Lauren Langston, ECR

Transcription Company:         Access Transcripts, LLC
                               10110 Youngwood Lane
                               Fishers, IN 46038
                               (855) 873-2223
                               www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Max Salas:                 Thompson Burton PLLC
                               By:  PHILLIP G. YOUNG, ESQ.
                               One Franklin Park
                               6100 Tower Circle, Suite 200
                               Franklin, TN 37067
                               (615) 465-6008

                               Stinson Leonard Street LLP
                               By:  MARC ALBERT, ESQ.
                                    JOSHUA COX, ESQ.
                               1775 Pennsylvania Avenue Northwest
                               Suite 800
                               Washington, DC 20006
                               (202) 785-9100

For Gail Brekelmans,           Burch Porter & Johnson, PLLC
Michael McLoughlin, Jr.,       By:  LANI LESTER, ESQ.
Nicolaas Brekelmans,           130 North Court Avenue
and Martha Johnson:            Memphis, TN 38103
                               (901) 524-5166

                               Law Office of Philip J. McNutt, PLLC
                               By:  PHILIP JAMES MCNUTT, ESQ.
                               11921 Freedom Drive, Suite 584
                               Reston, VA 20190
                               (703) 904-4380

For the United                 U.S. Department of Justice
States Trustee:                Office of the United States Trustee
                               By:  MEGAN REED SELIBER, ESQ.
                               701 Broadway, Suite 318
                               Nashville, TN 37203
                               (615) 742-6273

ACCESS TRANSCRIPTS, LLC                1-855-USE-ACCESS (873-2223)

3

I N D E X
12/13/18

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Len Salas | 4 | 72 | -- | -- |

| EXHIBITS: | | Marked | Admitted |
|-----------|--|--------|----------|
| Exhibit 1014 | Deposition of Max Salas | 36 | -- |
| Exhibit 1015 | 3/9/2016 Deposition Excerpts | 25 | -- |
| Exhibit 1019 | Deed of Trust | 6 | -- |
| Exhibit 1036 | Schedules of Max Salas | 62 | -- |
| Exhibit 1040 | SunTrust Motion for Relief from Automatic Stay | 13 | -- |
| Exhibit 1041 | Fixed Rate Note | 10 | -- |

Case 23-20-00900-027 Doc 79-1-1 Filed 09/19/22/21 Entered 09/19/22 19625-25 ID Desc 333
Exhibit Amended Exh. 4   L Salas COnfirmation Hearing Transcript-12-13-18   Page 3 of 9
APPX00870

L. Salas – Direct                                        22

1  Q    Were you aware at the time that your father had credit and

2  tax issues that prevented him from being the title owner of the

3  property?

4  A    Yes.  I mean, that -- yes.

5  Q    Okay.  And that was the reason why the trust was created

6  in the first place, right?

7  A    I assume.  I don't know.

8  Q    All right.  Now, after the trust document was signed, do

9  you know what happened to the copies -- well, do you know how

10  many -- do you know how many -- or I asked your father this

11  question yesterday -- do you know how many originals of the

12  trust and quitclaim deed were executed in July of 2010?

13  A    Excuse me.  I just remember signing the one, and I --

14  that's all.  And I got a copy, I think -- and I got a copy.

15  Q    Okay.

16  A    I -- yeah --

17  Q    Have you --

18  A    -- I think.  Yeah.

19  Q    Yeah.  Are you finished?

20  A    Yes.

21  Q    Okay.

22      After I think it was July 6th -- was that the date of the

23  trust?  Let me see.

24  A    I believe so.

25          MR. WALDRON:  Your Honor, we can stipulate and it's



ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

L. Salas – Direct                                                        53

1            MR. MCNUTT:  That's my understanding.

2   BY MR. MCNUTT:

3   Q    Now, Mr. Salas, you knew that, your brother knew that.

4   Your brother created the trust documents, right?

5   A    Yes.

6   Q    And, in fact, he produced copies to your father, I

7   believe, right?  Do you know that?  Do you know whether or not

8   your brother was the one who produced copies of the trust to

9   your father or your father's counsel during the superior court

10  litigation?

11  A    Which trust?

12  Q    The 2010 Trust.

13  A    The July 6th one.

14  Q    Yes, sir.

15  A    Okay.

16  Q    Yes, sir.  Do you know that?

17  A    Yes, he provided -- say -- what was your question, again?

18  So -- sorry.

19  Q    Whether you knew if it was your brother.  I was just

20  trying to establish who it was that actually produced the copy

21  that has now been circulated in this case.

22  A    Yes.

23  Q    It was your brother.

24  A    Yes.  He's -- he found them in his files, apparently.

25  Q    Okay.  And you're saying that -- and your wife was also



L. Salas – Direct                                    67

1          THE COURT:  Sustained.

2  BY MR. MCNUTT:

3  Q    Are there any government authorities that you have

4  contacted and explained that you are no longer the owner of the

5  property?

6          MR. WALDRON:  Same objection, Your Honor.  He's said

7  that relative to Washington, D.C., would be the only government

8  authority here that is relevant.  He said that he doesn't aware

9  because he believed he wasn't the owner and wouldn't have a

10  purpose of telling them that.

11          THE COURT:  Sustained.

12  BY MR. MCNUTT:

13  Q    Are there any other parties that you have notified since

14  2010 that you are not the owner of the property?

15  A    No.

16  Q    All right.  Do you know if your father has notified any

17  government authorities that you are no longer the owner of the

18  property?  And I'm talking about the period prior to your

19  bankruptcy.

20  A    I don't know.

21  Q    Do you know if he has identified any lender, such as

22  SunTrust, that you are no longer the owner of the property?

23  A    I don't know.

24  Q    Okay.  Any other parties?

25  A    I don't know.

L. Salas – Direct                                    68

1   Q    All right.  Are you aware, personally, between 2010 and

2   today whether there have been any attempts to file, record, or

3   otherwise formalize the quitclaim deed that you signed in July

4   of 2010?

5   A    I don't know.

6   Q    Are you aware of any provisions in your plan that provide

7   for the payment of the deed of trust note currently due

8   SunTrust Bank?

9   A    No.

10  Q    Do you have any source, whether your own money or someone

11  else's, to pay off the SunTrust balance that is approximately

12  $1.14 million?

13  A    What was the question again?

14  Q    Are you aware of any source that's available to you,

15  whether it's yours or someone else's, to pay off the SunTrust

16  mortgage balance of $1.14 million?

17  A    No.

18  Q    Do you know if you have provided any additional collateral

19  or benefit to SunTrust Bank in exchange for deeding the

20  property under your plan to your father?

21  A    No.

22  Q    When you -- when your brother created the trust documents,

23  did your father pay any money to you?

24  A    No.

25  Q    Did he give you any other consideration?  Did he give you



ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

L. Salas – Direct                                          69

1   any property, any personal property, or anything like that?

2   A     No.

3         (Pause)

4   Q     Are you aware of any income or assets that your father has

5   that would enable him to pay down or pay off the SunTrust deed

6   of trust note?

7   A     No.

8   Q     Are you aware of any other source he may have, if not

9   himself then someone else or some other party, to pay off the

10  SunTrust deed of trust note?

11  A     No.

12  Q     Have you had any discussions with your father prior to

13  filing your plan of reorganization of how the SunTrust note

14  would be paid off?

15  A     No.

16  Q     Other than the $570 -- I believe that's the number in

17  your -- whatever the number is in your plan, other than the

18  $570 per month under your plan, do you have any other resources

19  or income that could be used to pay your creditors?

20  A     No.

21  Q     And you don't intend to use any of your exempt assets to

22  pay creditors, correct?

23  A     I don't know.

24  Q     And you don't intend to use any of your wife's income

25  other than what's provided in the plan, because I know it's

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

80

1               **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE:  February 11, 2019

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

APPX00876

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                          .      Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .      Washington, D.C.
            Debtor.             .      August 24, 2018
                                .
. . . . . . . . . . . . . . .

        TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
                    VOLUME 3 OF 3
          BEFORE THE HONORABLE S. MARTIN TEEL, JR.
          TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT

APPEARANCES:
For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020

For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380

Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

## TABLE OF CONTENTS

WITNESSES:                                              PAGE:
RON SALAS
Direct examination continued by Mr. Albert              4
Cross-examination by Mr. McNutt                         6
Redirect examination by Mr. Albert                      16
Recross-examination by Mr. McNutt                       19
Redirect examination by Mr. Albert                      24

MAX SALAS
Direct examination by Mr. McNutt continued              29

MAX SALAS
Direct examination by Mr. Albert                        61
Cross-examination by Mr. McNutt                         137
Redirect examination by Mr. Albert                      207
Recross-examination by Mr. McNutt                       215
Redirect examination by Mr. Albert                      227

CLOSING ARGUMENT:                                       PAGE:
By Mr. McNutt                                           232
By Mr. Albert                                           266
By Mr. McNutt                                           281
By Mr. Albert                                           294

EXHIBITS:                                       MARKED: RECEIVED:
DEBTOR'S
L.  DCRA corporation document                   227     227

CREDITOR'S
14. M.Salas Deposition Transcript               *       296
    dated 2/14/16
44. 4/3/2018 transcript of hearing              155     --
45. Excerpt of document production              216  Reject-218

*Exhibits marked on previous days of trial.
**Transcriptionist's note: The notations of
"(unintelligible)" in this transcript are due to the audio
recording levels being turned up too high, or individuals
speaking outside of the vocal capture range of the
microphone.

1  Mr. McNutt has been kind enough to permit me, subject to

2  the Court's okay, to call him now if that's all right.

3          THE COURT:  That's fine.

4    RON SALAS, DEBTOR'S REBUTTAL WITNESS, PREVIOUSLY SWORN

5          THE COURT:  Go ahead, Mr. Albert.

6          MR. ALBERT:  Thank you.

7                    DIRECT EXAMINATION

8          BY MR. ALBERT:

9      Q.   Good morning.

10         I just wanted to clarify again, because I heard

11  yesterday something that seemed inconsistent with what you

12  had told the Court and me earlier this week.  When you and

13  I spoke and you and I exchanged emails, there was a

14  discussion regarding the trust agreement and the quit-claim

15  deed, correct?

16     A.   Yes.

17     Q.   And tell the Court and me again what we discussed

18  and what you did.

19         MR. McNUTT:  Objection.  Your Honor, this is not

20  rebuttal testimony.  He's asking him to state again what he

21  testified to earlier.  It's not rebuttal.

22         THE COURT:  Overruled.

23         THE WITNESS:  So in regards to the email where I

24  said I sent you originals, or I had the originals, I had

25  spoke with my brother.  He told me he had the original.  I

1    said, "Send them to me.  Mr. Albert is asking for them."

2            MR. McNUTT:  Objection.  Hearsay, Your Honor.

3            THE COURT:  I'll not receive it for the truth of

4    the contents.

5            THE WITNESS:  When he told me he had them, I told

6    you had originals.  When they arrived in my office I

7    contacted you immediately and said, "Well, these are not

8    the originals.  The originals" -- so the only original

9    would have been to Max.  The reason I knew they were not

10   the originals is because I, as I testified earlier, scan

11   all my documents for preservation, and I know there was

12   blue ink on at least the notary as I recall, and the

13   documents I received were all blank ink, which indicated to

14   me they were copies not originals.  So I let you know at

15   that point.

16           MR. ALBERT:  Thank you.

17           THE WITNESS:  Uh-huh.

18           MR. ALBERT:  Your witness.

19           THE COURT:  You said you got them from your son.

20   Do you mean from your --

21           THE WITNESS:  From my brother.  If I said son, I

22   apologize.

23           THE COURT:  Your brother.  Okay.

24           THE WITNESS:  Yes, my brother Len had them, mailed

25   them to me.  I was going to mail them to you, but they were

APPX00880

1    A.    So couldn't assert nothing --

2    Q.    -- but can you answer --

3    A.    -- couldn't assert anything about that.

4    Q.    Can you answer my question, please?

5    A.    What's the question?

6          I think I answered it.

7    Q.    The question is did you produce all documents related

8    -- did you produce all documents related to your ownership of

9    the property that you claimed during the Superior Court

10   litigation?

11   A.    I don't -- I guess I don't know the difference --

12   well, I don't know.  Did we submit them?

13         Yeah, we submitted them, but weren't, one of them

14   weren't -- this document wasn't allowed.

15   Q.    When you say "this document," you mean what's been

16   marked --

17   A.    The deed --

18   Q.    -- as Exhibit 30, the quit-claim deed and the trust

19   documents, correct?

20   A.    That's what I'm talking about, yeah.

21   Q.    All right.

22         And those were submitted, as you put it, on or after

23   March 12, 2018, correct?

24   A.    Yeah -- yeah, uh -- yes, sir.  It was like, like a

25   couple of weeks before the trial.

1    Q.    Okay.

2          Take a look at what's been -- well, take a look at

3    Tab 20 in the white book.  This is a document that has been

4    entered, that has been admitted into evidence in this case, and

5    it was also admitted as Plaintiff's Exhibit Number 7 in the

6    Superior Court litigation.

7    A.    Yeah.

8    Q.    And this is a D.C. property request report for the

9    property at 1610 Riggs Place Northwest dated Wednesday, June

10   17, 2015.  So that's approximately two weeks after the fire,

11   right?

12   A.    Yes, sir, that sounds right.  Yes.

13   Q.    And if you look at the second page of that document?

14   A.    Right.

15   Q.    About a third of the way down the page --

16   A.    Uh-huh.

17   Q.    -- it has, listing owner, and it says Len Salas.

18   A.    Right.

19   Q.    Take a look at Number 21 if you would, please?

20   A.    Yes, sir.

21   Q.    This is a document, the first page of which is

22   titled, Certificate of Service Related to a Notice of

23   Infraction.  This notice of infraction was sent I believe on

24   November 6, 2015.  Do you see that?

25   A.    No, uh -- no -- yeah, the notice of infraction.  I

1  see that, yes, sir.

2      Q.   Okay.

3           This was sent to Len Salas at his address on Otis

4  Street, correct?

5      A.   That's correct.

6      Q.   And that's because he was listed as the owner of the

7  property at 1610 Riggs Place, right?

8      A.   That's correct.

9      Q.   All right.

10          Here's a document.  Look at Tab 22, please.

11     A.   Yes, sir.

12     Q.   This is a document, and all of these were introduced

13 in your trial in the Superior Court.  This is a document that

14 titled, Notice of Immediate Abatement Issued by the Department

15 of Consumer and Regulatory Affairs?

16     A.   Right.

17     Q.   And it says the address of the violation is 1610

18 Riggs Place Northwest?

19     A.   Right.

20     Q.   And then underneath that is says, Responsible Party:

21 Len Salas.  Correct?

22          Do you see that on the left hand side of the page,

23 sir?

24     A.   Uh --

25     Q.   If you look at the --

1     A.   What was the -- compliance enforcement?  Is that the
2  one dated June 17?
3          "Dear Property Owner," is that -- am I on the right
4  document here?
5     Q.   Number 22, sir.
6     A.   Oh.  Number 22, Notice of Infraction.  And then the
7  next page?
8     Q.   All right.
9          Number 22 is a document titled, Notice of Immediate
10  Abatement.  Do you see that?
11     A.   Yes, I see it.
12     Q.   Okay.
13          And then the first page on that document it lists the
14  address as 1610 Riggs Place Northwest?
15     A.   Right.
16     Q.   Responsible Party --
17     A.   Right.
18     Q.   -- Len Salas?
19     A.   Right.
20     Q.   Same address, correct?
21     A.   Yes, sir.
22     Q.   Okay.
23          And if you turn to the third page?
24     A.   Third page of?
25     Q.   Of that document.

1     A.   Yep.

2     Q.   At the top right it says, DCRA Special Assessment

3 Bill?

4     A.   Right.

5     Q.   Care of Office of Tax and Revenue.  Correct?

6     A.   Right.

7     Q.   It identifies the property address as 1610 Riggs

8 Place Northwest, correct?

9     A.   Yes.

10    Q.   It identifies the responsible person as Len Salas at

11 1610 Riggs Place Northwest, Washington, D.C.?

12    A.   I don't see where it says responsible, but it says

13 Len Salas.

14    Q.   It's addressed to Mr. Salas.

15    A.   I know, but I can tell you that I paid every one of

16 these bills.  Personally.  Including the fine and all of that.

17 I -- every one of these things.  None of these did Len pay

18 because he wasn't the guy that broke -- that caused the

19 problem.  I paid 'em all.  Every of 'em.

20    Q.   Did you receive a copy of this special assessment

21 bill then?

22    A.   Yes.

23    Q.   Did you hand it over to your son?

24    A.   No.

25    Q.   Did you contact DCRA and tell them that your son

1  wasn't responsible, you were?

2      A.   Yes.

3      Q.   Do you have that in writing?

4      A.   I went over and paid the bill.

5      Q.   Do you have that in writing was my question.

6      A.   Do I have that in writing from DCRA?

7      Q.   Do you have it in writing that you told DCRA that you

8  were responsible for the bill?

9      A.   I paid 'em and they gave me a receipt.

10     Q.   Did you provide anything in writing to DCRA

11 indicating that you were the responsible party, not your son?

12     A.   Sir, I just answered that.

13     Q.   No, you didn't.

14     A.   Okay, so I gave them a check --

15     Q.   The answer is a yes or no.

16     A.   -- and they said your issue is taken care of.

17     Q.   Mr. Salas, you can answer that question yes or no.

18 If you want to say yes or no with an explanation, I'm happy to

19 hear your explanation, but I'd like an answer --

20     A.   No with an explanation.

21     Q.   -- to it.

22     A.   I don't have it in writing, sir.  I said, "I am

23 responsible for this bill, here is my check," and I paid it,

24 and they said, "Okay, you're done here."

25     Q.   Take a look at the next page.

1    A.    Okay.

2    Q.    We're now on page 4.

3    A.    What's the title?

4    Q.    At the top it's got a recording set of numbers.  It

5    says, Filed and Recorded 6/17/2015 at 12:38 p.m.  Do you see

6    that?

7          The document is titled, Government of the District of

8    Columbia, Department of Consumer and Regulatory Affairs,

9    Housing Regulation Administration.

10   A.    Right.  I got that.

11   Q.    Okay.

12         And it says, Certificate of Delinquent Costs for

13   Correction of Wrongful Housing Conditions.

14   A.    Yes, sir.

15   Q.    Did I read that correctly?

16   A.    Yes.

17   Q.    All right.

18         And it states the complainant is the District of

19   Columbia, right?

20   A.    Yes, sir.

21   Q.    And it says the respondent is Len Salas, your son,

22   correct?

23   A.    That's right.

24   Q.    Okay.

25         Now would you take a look at the next page?

```
 1        A.   Yes, sir.

 2        Q.   This is a document titled, Government of the

 3   dischargeable offense, Division of Enforcement and Legislative

 4   Affairs?

 5        A.   Yes.

 6        Q.   It says, Cost Assessment Summary, Cost Sheet for

 7   Abatement of Nuisance Properties.

 8        A.   Yes, sir.

 9        Q.   Did I read that correctly?

10        A.   Yes, sir.

11        Q.   The address of the property location is 610 (sic)

12   Riggs Place Northwest, correct?

13        A.   Yes, sir.

14        Q.   It identifies the owner just below that, Owner of

15   Record, Owner: Len Salas.  Correct?

16        A.   Yes, sir.

17        Q.   All right.

18             Now, Mr. Salas, we've talked about the trust and the

19   quit-claim deed.  Do you have any documents in your exhibits in

20   the smaller binder that state that you are the titled owner of

21   the property or that the District of Columbia is to look to you

22   for assessments regarding infractions and the like?

23             Do you have any documents like that in your exhibits?

24        A.   In this -- this exhibit?

25        Q.   In your exhibits, sir.
```

1    A.   This is --

2    Q.   You have exhibits in the small --

3    A.   I don't know if this is my exhibit or not.

4    Q.   In the small binder.

5         I'm sorry?

6    A.   I don't know.  The answer is I don't know.

7    Q.   Okay.

8         Have you looked?

9         Are you familiar with your exhibits?  Have you looked

10   at them?

11   A.   This is the black binder?

12   Q.   Yes, sir.

13   A.   I -- I've looked at them, sir.  I'm not a

14   sophisticated man and -- with the law.  I mean I -- I don't

15   know what's in there.  I mean I -- I -- so the question is have

16   I looked at it?  Yes, with an explanation.  I don't know -- I

17   don't know.  I mean I don't know what's in there.  I couldn't -

18   - I really couldn't tell you.

19        I'm not trying to be cute and I'm not trying to be

20   fancy.  I just don't know.

21   Q.   Okay.

22        But as you sit here today you're not aware of any

23   documents that you have introduced in this case that indicate

24   that you have paid any amounts respecting the property at 1610

25   Riggs Place Northwest, right?

PPX00453
PPX00889

1          THE COURT:  Any amounts regarding what?

2          MR. McNUTT:  Yeah, that was a bad question.  Let me

3   withdraw it.

4          THE WITNESS:  Yeah.

5          BY MR. McNUTT:

6     Q.   As you sit here today, Mr. Salas, with respect to the

7   documents that you have offered into evidence, none of these

8   documents relate to any payments that you've made with respect

9   to your alleged ownership of the property at 1610 Riggs Place

10  Northwest, do they?

11    A.   Sir, I've made every payment in every expense in any

12  way and in every way.  There's nobody, absolutely nobody, not

13  Vicki, not Lenny, not Ron, not Chase, not anyone has made any

14  payments towards that house for any expenses but myself since

15  1995.  I have made every payment.

16    Q.   You and CLR Trust?

17    A.   Me.

18    Q.   CLR Trust, right?

19    A.   Sir, I don't -- you know, technically I don't know

20  what that -- I -- I don't know what you mean, so.

21    Q.   So Mr. Salas, let me ask you this: if you made all

22  these payments and you claim that by making those payments --

23    A.   Not if, sir; I did.

24    Q.   -- you're the owner of the property --

25    A.   I'm trying -- I don't know how many times I gotta

1   tell you, I did it.  It's my money.  I made the payments, I've

2   been responsible.  I've paid 'em.  I don't know what -- I mean

3   --

4       Q.   All right.

5       A.   I don't know what you're trying to say.  I made every

6   payment.

7       Q.   Take a look at your exhibits.

8       A.   Which one?

9       Q.   Just calm down.  Take a look at the exhibits.

10      A.   These exhibits?

11      Q.   Take a look at your book of exhibits.

12      A.   Yeah.

13      Q.   And show me the documents that show that you've made

14  all these payments.

15      A.   So, what I'm trying to -- what I'm saying is if

16  there's any exhibits in here -- there's nobody else that made

17  any payments except me.

18      Q.   If you made the payments, you would have proof of the

19  payment, wouldn't you?

20           You'd have a canceled check, you'd have a bank

21  statement, you'd have --

22      A.   If there's somebody else that made the payments can

23  you bring them forward?

24      Q.   That's not my job, Mr. Salas.

25      A.   Okay.

1  Salas?

2       A.    Because I bought -- because I paid for the policy I

3  guess.  I don't know.

4       Q.    Okay.  Fair enough.

5             Any other reason that you're aware of?

6       A.    No, I -- I don't know.  I have no idea.

7       Q.    You also testified earlier that, in the corrections

8  that you told Judge Teel about, you also testified that the

9  original of the document may be at the title attorney's office,

10 right?

11      A.    That just came to me -- that just came to me as I was

12 sitting over there.  I never -- I never told Mr. Albert about

13 it because I can't talk to him about my testimony, but I just

14 thought about it, and it's -- and it's possible because I don't

15 know if they mailed it back to me.  I don't remember that.  All

16 the papers that I had in my house were burned, so I -- and I

17 didn't recover it from there.  So I couldn't have recovered it

18 there.  But it's, you know, it's possible that it's still at

19 his office because I don't remember -- I don't remember him

20 mailing it back to me, and I don't remember -- but, there's a

21 lot of things I don't remember.

22      Q.    Well, when did you, and I'm assuming because you were

23 attempting to get the quit-claim deed recorded that you gave

24 these documents to Mr. Goldstein shortly after you signed the

25 trust documents in July of 2010; is that fair?

1    A.   Yeah, so what -- so I had this realtor.  Her name is

2   in here, Sylvia Jones, and she told me what she had done --

3              MR. McNUTT:  Your Honor, I'm going to object.

4              THE WITNESS:  Well, I'm trying to answer your

5   question because --

6              MR. McNUTT:  You can't answer --

7              THE WITNESS:  -- that has to tell --

8              MR. McNUTT:  This is more hearsay, Your Honor.

9              THE COURT:  Overruled.

10             THE WITNESS:  So I talked to her.  She told me how

11  she had put her house in a trust because she had three

12  daughters, and so I said I formed a trust, and I've got the,

13  and I quit-claim -- my son quit-claimed the deed over to me,

14  and I want to now register the trust.  And I said, "How do you

15  do that?"  She said, "Well, you got to go to a title company."

16  I said, "Well, who is that?"  She said call Goldstein, Maryland

17  Title Company or something, and she gave me the number to them.

18  And so I called them up and they said, "Send us the

19  information."  So I sent them the information, and about a week

20  later I called them back and they called -- or they called me

21  and they told me what the situation was.

22             So I don't know if I answered your question there or

23  not.

24             BY MR. McNUTT:

25   Q.   I can guarantee you didn't answer the question.

1      A.   I'm sorry.  What's the question?

2      Q.   I'll leave it at that.

3      A.   All right.

4      Q.   So as you sit here today, you're not really sure what

5 happened to the original quit-claim deed after you gave it to

6 Mr. Goldstein, right?

7           MR. ALBERT:  That was asked and answered.

8           THE WITNESS:  I just told you, I don't know if it was

9 in my house or it's in his office, but I -- I don't know.

10          MR. McNUTT:  Okay.

11          THE COURT:  The objection is overruled.

12          BY MR. McNUTT:

13     Q.   And if it was in Mr. Goldstein's office, then you

14 could have gotten it by just simply calling him, right?

15     A.   I -- I -- I could -- I told -- I guess -- I told

16 Mister -- I told my attorney what I did, and so I -- that's his

17 job I guess.  I relied on him.

18     Q.   Which one is that?

19     A.   Mr. Albert and Mr. Cox.

20     Q.   Okay.

21          You don't have a copy of the original quit-claim deed

22 with you today, do you?

23     A.   No.

24     Q.   Are you aware of at any time after you gave it to Mr.

25 Goldstein that you were in possession of the original of the

1  quit-claim deed?

2       A.   Any time after that?

3       Q.   Yes, sir.

4       A.   No.  I --

5       Q.   Up until obviously February of 2018.

6       A.   No, sir.

7       Q.   Okay.

8       A.   I don't remember.

9       Q.   Did you ever try to record the quit-claim deed after

10 the time that you gave it to Mr. Goldstein?

11      A.   No.

12      Q.   Did you ever make another attempt?

13      A.   No.  No, sir.

14      Q.   What activities did you undertake as trustee of the

15 1610 Riggs Property Trust after July 6, 2010?

16      A.   What activities?

17      Q.   Yes, sir.  Did you undertake as trustee?  What

18 activities?

19      A.   I answered that.  Do you want me to do it again?

20      Q.   Yes, sir.

21      A.   I thought I answered it.  I called them and -- I mean

22 after I called Mr. Goldstein and asked him to register it, and

23 then he told me that it was going to cost me $50,000, did I do

24 anything after that?

25      Q.   Yes, sir.

```
1        A.    Monthly payments.

2        Q.    What -- I don't think you answered my question

3   exactly.  She gets the money; who got the house?

4        A.    Oh, I got the house.

5        Q.    All right.

6              So you took title to the house in your name at that

7   time?

8        A.    Yeah, for a day or two.

9        Q.    Okay.

10             Explain the circumstances behind that.

11       A.    Well, I -- I tried to get a loan.  I couldn't.  I

12  went to SunTrust Bank.  They said there's enough equity in the

13  house to get a loan to pay your wife off, but unfortunately you

14  can't get a loan.  So my, so Len, who had a very good

15  relationship with my ex-wife and myself, we both went to Len

16  and asked him if he would sign for a loan to get Vicki paid

17  off, and he -- and he did.  So that -- so we got a loan so we

18  could pay her, so I could pay her off and she could move back

19  to Tennessee.

20       Q.    Was it necessary to get the loan that the title would

21  have to go in Len's name?

22       A.    Yes, it --

23             MR. McNUTT:  Objection.

24             THE WITNESS:  Yes, it was.

25             MR. McNUTT:  He's not only leading the questions,
```

1    he's also asking for a legal conclusion.

2         THE COURT:  The objection is sustained.  Rephrase the

3    question.

4         MR. ALBERT:  Of course, Your Honor.

5         BY MR. ALBERT:

6    Q.   Who -- so the property was put in your name then when

7    you got the loan?

8    A.   No, it wasn't.

9    Q.   Whose name was it put in?

10   A.   Put in my son's name, Len.

11   Q.   Why?

12   A.   Because the loan was made by SunTrust, and his credit

13   -- that was kind of like the peak of the housing market and the

14   loan was made out to him.  He didn't have any -- he had good

15   credit, and they were giving loans to just about anybody at

16   that point in time, and there was enough equity in the house to

17   get it.

18   Q.   But they wouldn't give you credit -- excuse me.

19        They wouldn't lend you the money because?

20   A.   Because I had liens from, tax liens from years eighty

21   -- uh -- '97, '98, and '99.  Yeah.

22   Q.   Okay.

23   A.   I owed money to the IRS.

24   Q.   I see.

25        Now, you owe money to the IRS today, correct?

```
 1      A.    Yes, I do.

 2      Q.    All right.

 3            And you heard yesterday in the questioning by Mr.

 4   McNutt, you owe a certain amount of money, the IRS has filed a

 5   claim in this case?

 6      A.    Yes.

 7      Q.    How much did -- are they claiming?

 8      A.    I think about $25,000.

 9      Q.    How much is the house worth today if you remember?

10      A.    So it's about 2.4, 2.3, 2.4 million.

11      Q.    And how do you know that, sir?

12      A.    We had a guy, an appraiser, a real estate appraiser

13   do an -- do an appraisal.

14      Q.    Thank you.

15            So, is the property recorded in Len's name?

16      A.    Yes.

17      Q.    Has it ever been recorded in your name or any trust

18   as far as you know?  Recorded?

19      A.    Well, I --

20      Q.    Recorded?

21            THE COURT:  In the land records, Mr. Salas.

22            BY MR. ALBERT:

23      Q.    In the land records.

24      A.    In the land records?  I think it was recorded by name

25   for a day until it was -- until it was -- then I quit-claimed
```

1 it back over to Len until, so he could file the -- so, yeah.

2 One day I think.  The day that the transaction happened.

3   Q.   And Lenny also signed a deed of trust?

4   A.   Yes.

5   Q.   And he signed the note?

6   A.   Yes.

7   Q.   In connection with the loan?

8   A.   Yes.

9   Q.   And Lenny I suppose has been paying everything since

10 that time?

11   A.   Lenny has never paid any -- Lenny has never paid a

12 penny, a penny towards the loan of the house.

13   Q.   No down payment, no monthly payments?

14   A.   No.

15   Q.   No loan?

16   A.   No.  Nothing.

17   Q.   Besides this accommodation, this help that Lenny gave

18 you, did he have any responsibility with respect to 1610 Riggs

19 Place Northwest?

20   A.   No.

21   Q.   Who was handling any and everything about the

22 property?

23   A.   All my responsibility.  Me.  I was doing it all.

24   Q.   Okay.

25     Even before the divorce from Vicki who was paying all

```
 1              Do you see that?
 2         A.   The bottom?
 3         Q.   On page 219?
 4         A.   Line which one?  What line?
 5         Q.   Oh, line 17.  I'm sorry, sir.
 6         A.   Okay.  Yeah.
 7                   "No, there's one trust, so no, they are
 8              not different, they are the same, I think."
 9         Q.   And then read the question and the next answer.
10         A.        "Did you ever formally set up a trust?"
11              "Yes."
12         Q.   Okay, and read the answer.
13         A.        "Okay.  Do you agree if it's called CLR?"
14              "Yes, sir."
15         Q.   And is that correct, it was called CLR?
16         A.   The trust?  No.
17         Q.   Because that -- all right, thank you.
18              Okay.
19              Can you explain when you brought to my attention
20    the trust document and quit-claim deed?
21         A.   Can I explain when I brought the trust to your
22    attention?
23         Q.   Approximately when did you --
24         A.   Yeah.  So after we had, after the judgment came,
25    after the trial where Mr. Barnes defended, represented me, you
```

1    -- so I was talking to you and you asked me --

2        Q.    Did you say after the trial or during the trial?

3            MR. McNUTT:  Objection.

4            THE WITNESS:  After, well, I think it was after the

5    trial.  After the trial.  I don't know when it was.

6            MR. McNUTT:  Your Honor, that was a blatant attempt -

7    -

8            THE WITNESS:  Oh no --

9            MR. McNUTT:  -- to lead the witness.

10           THE WITNESS:  -- before the trial.  So, I don't -- I

11   don't remember when, but I talked with you, and you asked me --

12           MR. McNUTT:  Your Honor, I ask that this answer be

13   stricken.

14           THE COURT:  He can answer it now.  He's not honing it

15   down to a specific time.

16           MR. McNUTT:  Your Honor, that was a blatant attempt

17   to lead him and correct him.

18           THE WITNESS:  Okay.

19           MR. McNUTT:  That's highly improper.

20           THE COURT:  The question was when did this occur, and

21   he can't remember at this moment.  It's been answered

22   previously during the trial.

23           We're covering a lot of ground all over again.

24           MR. ALBERT:  I understand, Judge, but Mr. McNutt took

25   approximately six hours with --

1          THE COURT:  Ask a question.

2          BY MR. ALBERT:

3      Q.   Do you know what -- what are -- explain the

4  circumstances to the Court regarding finding the trust document

5  and the quit-claim deed.

6      A.   So you asked me, "You keep talking about this trust

7  in your deposition.  I read your deposition and you keep

8  talking about" --

9      Q.   Who are you talking about?  Are you talking about me?

10     A.   Yes.

11     Q.   When you say "you"?

12     A.   Yes.  You -- you talked to me about, "You keep

13  talking about this trust through your whole deposition.  I've

14  read the whole thing.  What trust are you talking about?"  And

15  I said, "The trust."  I said what -- and he said, you said to

16  me, "Who put this trust together for you?  Was there a lawyer

17  involved?"  And I said, "Yes."  I (sic) said, "Which lawyer?"

18  "My son."  I (sic) said, "Your son is a lawyer?"  "Yes."

19  "Where is he at?"  "Colorado."  I said, "Colorado."  He says,

20  "Do you -- does he have a copy of the trust?"  I said -- no you

21  asked me, "Do you have a copy of the trust?"  I said, "No."

22  "Where is it?"  I said, "It burned in the fire.  I don't have

23  any" -- he says, "Well, do you think your son has a copy of the

24  trust?"  I said, "Well, he should.  I guess, yeah, he might --

25  he should."  I don't remember what I said.  "But I can call

1  him."

2     So I called him. You said, "May I talk to him?" I

3  said, "Yes." You said, "Will you call him and tell him that

4  I'm going to call him?" I said, "Yes."

5     So I called him, told him, asked him if he had a copy

6  and he said yes. And so you -- you called him and you got a

7  copy of that, of the doc -- you got a copy of the trust and the

8  quit-claim deed.

9    Q. Thank you.

10     Can you think of any reason why that document wasn't

11  obtained earlier than that time?

12    A. No, I can't think of any reason why it was -- I --

13  you know, I -- I don't understand why Mr. Barnes didn't ask for

14  that before. I just, I can't understand why he didn't ask for

15  that before but -- and I can't -- there's a lot of things I

16  look at now and I don't understand why Mr. Barnes didn't get

17  any witnesses to the trial, like people that saw the windows

18  open, people that --

19     THE COURT: It's not --

20     THE WITNESS: No --

21     THE COURT: -- pertinent to the question.

22     THE WITNESS: Yes, sir. I'm sorry.

23     So did I answer your question?

24     BY MR. ALBERT:

25    Q. Thank you.

1  of the money to Vicki.  So we got a loan for $800,000 but that

2  was to pay the old loan off.

3  　　Q.　Right.

4  　　A.　And then the rest of the loan, the rest of the money

5  was to pay her for her half of the equity in the house.

6  　　Q.　So my question is, did you ever pay your son back for

7  the money that he borrowed that you used to pay your wife?

8  　　A.　I didn't borrow any money from my son.

9  　　Q.　I'm sorry.  I missed that.

10  　　A.　I didn't borrow any money from my son.

11  　　Q.　So the answer is you didn't pay any of this money

12  back to your son, right?

13  　　A.　I didn't borrow any money from my son.

14  　　Q.　Okay.

15  　　　　After -- let me try it this way.  After April --

16  yeah.  After April 2007, I think it was April 16th when the

17  deed of trust was recorded?

18  　　A.　Uh-huh.

19  　　Q.　Does that sound about right?

20  　　A.　Yes, sir.

21  　　Q.　And that's, there were the three deeds and then the

22  deed of trust, right?

23  　　A.　Right.

24  　　Q.　After April of 2010 did you pay any money to your son

25  Len with respect to any of the money that you paid your wife,

1  your ex-wife Vicki?

2       A.   I never paid Lenny any money.

3       Q.   Okay, fair enough.

4            Now, you also said that you tried to refinance.  When

5  did you try to refinance the property, and I think you said it

6  was with SunTrust.  When was that?

7       A.   So lots of times.  I mean, I continually tried.  At

8  least twice a year.

9       Q.   At least twice a year?

10      A.   Since -- since we borrowed the money from SunTrust.

11      Q.   Okay.

12           And was that always with SunTrust?  The attempts to

13  refinance, were they always with SunTrust?

14      A.   I -- I think so.  I mean, we looked at other sources.

15  I think one time we tried Capital One, but always the -- our

16  best chances were with SunTrust because we had a track record

17  with them.  We kept paying the loan to them.  Up until the

18  fire, and then we fell behind on the mortgage.

19      Q.   All right.

20           And none of those efforts were successful in

21  obtaining a new loan, right?

22      A.   No.

23      Q.   Okay.

24           And your son Len was part of the application process,

25  is that right?

1  separate?

2          THE WITNESS:  Well, because -- because of, the

3  individual account of Cornet was -- was my personal income,

4  and the other account for CLR was different.  And the

5  intentions were originally is to, CLR was to be -- give

6  that account to my sons, but that never happened.  Because

7  it never made any money.

8          THE COURT:  What never made any money?

9          THE WITNESS:  CLR.  It just became a way to

10  separate income and meet the bills and pay for the mortgage

11  and -- and the ability to pay for the house.

12          THE COURT:  This may have been answered already.

13  Why use the CLR account for your rents?

14          THE WITNESS:  Because I didn't want to put the

15  rent money into my personal account, into my -- my -- my

16  personal account because -- see, in the very beginning,

17  from the very beginning from when Vicki and I owned, well,

18  when the house was in Vicki's name, and we always had the

19  basement rented even when she and I -- when she and I were

20  together we rented the basement, and that wasn't my money.

21  That really wasn't -- I didn't consider that my money.

22  That was just money to pay the mortgage.  And so I would

23  put the money into the CLR account and then I would

24  supplement that money from CLR from my personal account,

25  from the Bank of America -- or I mean from -- yeah, Bank of

**Fill in this information to identify your case and this filing:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name___Middle Name___Last Name |
| Debtor 2 | |
| (Spouse, if filing) | First Name___Middle Name___Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | **18-00260** |

☐ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:** Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☑ Yes. Where is the property?

1.1

**1610 Riggs Place, NW**
Street address, if available, or other description

**Washington**     **DC**     **20009-0000**
City          State    ZIP Code

County

**What is the property?** Check all that apply
☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one
☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$2,500,000.00** | **$2,500,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**Owner**

☐ Check if this is community property (see instructions)

Other information you wish to add about this item, such as local property identification number:

**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**
**trust collapsed on creation through merger to convey property to debtor**
**DC Records displays owner as Len Salas**
**Contains furnished basement that is possible to be rented as a seperate unit, but which debtor currently is using as part of personal residence with remainder of property**

2. Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here...........................................................=>

**$2,500,000.00**

**Part 2:** Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                          Case number *(if known)*    **18-00260**

---

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☑ No
☐ Yes

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☑ No
☐ Yes

5  Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here.............................................................=>    | **$0.00** |

| **Part 3:** | Describe Your Personal and  Household Items |
|---|---|

| Do you own or have any legal or equitable interest in any of the following items? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ☑ Yes.  Describe.....

| **See Attached List** | $14,000.00 |
|---|---|

| Previously damaged and restored personal property being held in storage by Columbia Restoration **See attached list for property description** | $2,000.00 |
|---|---|

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
   ☐ No
   ☑ Yes.  Describe.....

| HP Laptop 18 in. MacBook Pro 13 in. IPad 10 In. IPhone 6 | $200.00 |
|---|---|

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☑ No
   ☐ Yes.  Describe.....

9. **Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ☐ No
   ☑ Yes.  Describe.....

| 1 set Taylor-Made Golf Clubs and Bag 1 set Titleist Golf Clubs and Bag | $300.00 |
|---|---|

| 1 Precor home treadmill | $1,500.00 |
|---|---|

Case 23-20-00907    Doc 79-1    Filed 09/08/22    Entered 09/19/22 19:35:25    Desc
Exhibit Amended Exh. 9   M Salas Schedules-Excerpts    Page 2 of 12

APPX00908

10. **Firearms**
   *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
   ☑ No
   ☐ Yes. Describe.....

11. **Clothes**
   *Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
   ☐ No
   ☑ Yes. Describe.....

| | |
|---|---|
| 11 suits, 2 tuxedos, 7 pairs of shoes, and 15-20 business shirts, 7-8 pairs of pants, various golf wearing apparel and other wearing apparel. | $500.00 |

12. **Jewelry**
   *Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
   ☐ No
   ☑ Yes. Describe.....

| | |
|---|---|
| Timex watch | $25.00 |
| Gold costume jewelry ring | $20.00 |

13. **Non-farm animals**
   *Examples:* Dogs, cats, birds, horses
   ☑ No
   ☐ Yes. Describe.....

14. **Any other personal and household items you did not already list, including any health aids you did not list**
   ☐ No
   ☑ Yes. Give specific information.....

| | |
|---|---|
| Hearing aides | $300.00 |
| Framed Family Pictures | $100.00 |

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** ............................................................................

$18,945.00

**Part 4:**   Describe Your Financial Assets

Do you own or have any legal or equitable interest in any of the following?

Current value of the portion you own?
Do not deduct secured claims or exemptions.

16. **Cash**
   *Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
   ☐ No
   ☑ Yes.................................................................................................

Cash on hand   $200.00

17. **Deposits of money**
   *Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
   ☐ No
   ☑ Yes.......................   Institution name:

Official Form 106A/B   Schedule A/B: Property   page 3
Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com   Best Case Bankruptcy

Case 3:20-ap-00027 Doc 79-1 Filed 09/19/22 Entered 09/19/22 19:25:26 Desc372
Exhibit Amended Exh. 9   M Salas Schedules-Excerpts   Page 3 of 12
APPX00909

| | | | |
|---|---|---|---|
| 17.1. | **Checking** | **Bank of America Core checking account** | $1,779.24 |
| 17.2. | **Checking** | **Bank of America Interest Checking**<br>**(in name of 1610 Riggs Property Trust, Max**<br>**Salas Trtee)** | $334.96 |
| 17.3. | **Other financial account** | **BB&T bank account x5086**<br>**(CLR, Inc.)** | $29,624.97 |
| 17.4. | **Other financial account** | **BB&T bank account x1095**<br>**(CLR, Inc. - Construction Account)** | $39.68 |
| 17.5. | **Other financial account** | **BB&T bank account**<br>**(1610 Riggs Property Trust)** | $6,429.44 |

18. **Bonds, mutual funds, or publicly traded stocks**
   *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
   ☑ No
   ☐ Yes.................    Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
   ☑ No
   ☐ Yes.  Give specific information about them...................
       Name of entity:    % of ownership:

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
   *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
   *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
   ☑ No
   ☐ Yes. Give specific information about them
       Issuer name:

21. **Retirement or pension accounts**
   *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
   ☐ No
   ☑ Yes. List each account separately.
       Type of account:    Institution name:

   | | | |
   |---|---|---|
   | **401(k)** | **T. Rowe Price/Cornet, Inc. 401(k)** | $505,435.72 |

22. **Security deposits and prepayments**
   Your share of all unused deposits you have made so that you may continue service or use from a company
   *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
   ☑ No
   ☐ Yes. ....................    Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
   ☑ No
   ☐ Yes.............    Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
   26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
   ☑ No
   ☐ Yes.............    Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
   ☐ No
   ☑ Yes.  Give specific information about them...

Case 23-20-00900027   Doc 79-44-1   Filed 09/19/22/24   Entered 09/19/22 19:25:25   ID Desc373
Exhibit Amended Exh. 9   M Salas Schedules-Excerpts    Page 4 of 12
APPX00910

| | |
|---|---|
| **Interest in 1610 Riggs Property Trust -**<br>**Establishes Debtor as sole-trustee and sole-beneficiary**<br>**Trust terminated through merger to grant ownership of trust**<br>**property to debtor** | **$0.00** |

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
   *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
   ☑ No
   ☐ Yes.  Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
   *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
   ☑ No
   ☐ Yes.  Give specific information about them...

| Money or property owed to you? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

28. **Tax refunds owed to you**
   ☑ No
   ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
   *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
   ☑ No
   ☐ Yes. Give specific information......

30. **Other amounts someone owes you**
   *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else
   ☑ No
   ☐ Yes.  Give specific information..

31. **Interests in insurance policies**
   *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
   ☐ No
   ☑ Yes. Name the insurance company of each policy and list its value.

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| **Interest in Life Insurance Policy through employer Cornet Technology, Inc.**<br>**Interest to terminate upon full retirement on May 3, 2018**<br>**$0.00 refund value** | **Ron Salas** | **$0.00** |
| **Interest in health, vision, and dental insurance policies through employer Cornet Technology, Inc.**<br>**$0.00 cash value** | | **$0.00** |
| **Interest in Casualty Insurance - Progressive**<br>**$0.00 cash value** | | **$0.00** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                        Best Case Bankruptcy

Debtor 1    **Max E. Salas**                                                    Case number *(if known)*    18-00260

**32. Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
☑ No
☐ Yes.  Give specific information..

**33. Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue
☐ No
☑ Yes.  Describe each claim.........

| | |
|---|---|
| **Potential claim against Encompass Insurance for unpaid insurance funds due under policy** | Unknown |
| **Contract claim against Fusion Contracting Group for deficient and unperformed renovation work** | Unknown |

**34. Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
☑ No
☐ Yes.  Describe each claim.........

**35. Any financial assets you did not already list**
☑ No
☐ Yes.  Give specific information..

**36.** Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached
for Part 4. Write that number here.................................................................................................................

| |
|---|
| $543,844.01 |

**Part 5:**    Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

**37. Do you own or have any legal or equitable interest in any business-related property?**
☑ No. Go to Part 6.
☐ Yes.  Go to line 38.

> **Current value of the portion you own?**
> Do not deduct secured claims or exemptions.

**38. Accounts receivable or commissions you already earned**
☑ No
☐ Yes.  Describe.....

**39. Office equipment, furnishings, and supplies**
*Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices
☑ No
☐ Yes.  Describe.....

**40. Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**
☑ No
☐ Yes.  Describe.....

**41. Inventory**
☑ No
☐ Yes.  Describe.....

**42. Interests in partnerships or joint ventures**
☐ No
☑ Yes.  Give specific information about them...................
Name of entity:                                      % of ownership:

Official Form 106A/B                          Schedule A/B: Property                                    page 6

**1610 Riggs Property Trust a/k/a CLR, Inc.
(Collapsing trust with full ownership vesting in
Max Salas of all trust property)**          **100%**    %                **Unknown**

43.  **Customer lists, mailing lists, or other compilations**
☑ No.
☐ **Do your lists include personally identifiable information** (as defined in 11 U.S.C. § 101(41A))?

☑ No
☐ Yes.  Describe.....

44.  **Any business-related property you did not already list**
☑ No
☐ Yes. Give specific information.........

45.  **Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached
for Part 5. Write that number here.................................................................................................**    **$0.00**

**Part 6:**   **Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.**
If you own or have an interest in farmland, list it in Part 1.

46.  **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
☑ No. Go to Part 7.
☐ Yes.  Go to line 47.

**Part 7:**   **Describe All Property You Own or Have an Interest in That You Did Not List Above**

53.  **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
☐ No
☑ Yes. Give specific information.........

| Washington Nationals MLB season tickets | $10,000.00 |

| Washington Wizards NBA season basketball tickets | $5,940.00 |

| Policy holder for potential insurance payout to third parties for liability from 2015 house fire - Encompass Insurance | Unknown |

54.  **Add the dollar value of all of your entries from Part 7. Write that number here  ....................................**    **$15,940.00**

Debtor 1    **Max E. Salas**                                                Case number *(if known)*    **18-00260**

| Part 8: | List the Totals of Each Part of this Form |
|---|---|

| | | |
|---|---|---|
| 55. | **Part 1: Total real estate, line 2** ................................................................................ | **$2,500,000.00** |
| 56. | **Part 2: Total vehicles, line 5** | $0.00 |
| 57. | **Part 3: Total personal and household items, line 15** | $18,945.00 |
| 58. | **Part 4: Total financial assets, line 36** | $543,844.01 |
| 59. | **Part 5: Total business-related property, line 45** | $0.00 |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | $0.00 |
| 61. | **Part 7: Total other property not listed, line 54** + | $15,940.00 |
| 62. | **Total personal property.** Add lines 56 through 61... | $578,729.01    Copy personal property total    **$578,729.01** |
| 63. | **Total of all property on Schedule A/B.** Add line 55 + line 62 | $3,078,729.01 |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

APPX00914

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Max E. Salas** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA |
| Case number | **18-00260** |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt                    4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

### Part 1:    Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ■ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **1610 Riggs Place, NW Washington, DC 20009**<br>**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed**<br>**trust collapsed on creation through merger to convey property to debtor DC Records displays owner as Len Salas**<br>**Contains**<br>Line from *Schedule A/B*: **1.1** | $2,500,000.00 | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(14)** |
| **\*\*See Attached List\*\***<br>Line from *Schedule A/B*: **6.1** | $14,000.00 | ■ $8,621.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |
| **Previously damaged and restored personal property being held in storage by Columbia Restoration**<br>**\*\*See attached list for property description\*\***<br>Line from *Schedule A/B*: **6.2** | $2,000.00 | ■ $1.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **D.C. Code Ann. § 15-501(a)(2)** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Max E. Salas** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DISTRICT OF COLUMBIA | | |
| Case number (if known) | **18-00260** | | |

☐ Check if this is an amended filing

Official Form 106D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

■ Yes. Fill in all of the information below.

| **Part 1:** | **List All Secured Claims** | | | | |
|---|---|---|---|---|---|

2. List all secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim | Column C<br>Unsecured portion If any |
|---|---|---|---|---|
| **2.1** **Internal Revenue Service**<br>Creditor's Name<br>**Cental Insolvency Operation**<br>**PO Box 7346**<br>**Philadelphia, PA 19101-7346**<br>Number, Street, City, State & Zip Code | Describe the property that secures the claim:<br>**All property**<br><br>As of the date you file, the claim is: Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$6,766.92** | **Unknown** | **$0.00** |

Who owes the debt? Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

Nature of lien. Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
■ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
■ Other (including a right to offset)   **IRS Tax Lien**

| Date debt was incurred | **2009, 2010, 2011** | Last 4 digits of account number | **2714** |
|---|---|---|---|

| **2.2** **SunTrust Mortgage, Inc.**<br>Creditor's Name<br><br><br>**ATTN: Client Services - RVW 30**<br>**P.O. Box 26149**<br>**Richmond, VA 23260-6149**<br>Number, Street, City, State & Zip Code | Describe the property that secures the claim:<br>**1610 Riggs Place, NW Washington, DC 20009**<br>**Property held in name of 1610 Riggs Property Trust through unrecorded 2010 Quitclaim Deed trust collapsed on creation through merger to convey property to debtor DC Records displays owner as Len**<br>As of the date you file, the claim is: Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$1,030,825.86** | **$2,500,000.00** | **$0.00** |

Who owes the debt? Check one.

☐ Debtor 1 only
☐ Debtor 2 only

Nature of lien. Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)

Official Form 106D

Schedule D: Creditors Who Have Claims Secured by Property

page 1 of 2

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                      Best Case Bankruptcy

APPX00916

Debtor 1  **Max E. Salas**
First Name        Middle Name             Last Name

Case number (if know)  **18-00260**

☐ Debtor 1 and Debtor 2 only
☑ At least one of the debtors and another
☐ Check if this claim relates to a
   community debt

☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☑ Other (including a right to offset)

**Deed of Trust and Note held in name of Len Salas. Debtor
not personally liable**

Date debt was incurred  **2007**

Last 4 digits of account number  **9438**

| | |
|---|---|
| Add the dollar value of your entries in Column A on this page. Write that number here: | **$1,037,592.78** |
| If this is the last page of your form, add the dollar value totals from all pages. Write that number here: | **$1,037,592.78** |

**Part 2:**   List Others to Be Notified for a Debt That You Already Listed

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

Official Form 106D        Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**        page 2 of 2

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com        Best Case Bankruptcy

Case 3:20-ap-00027   Doc 79-14   Filed 09/19/22   Entered 09/19/22 19:25:25   Desc
Exhibit Amended Exh. 9   M Salas Schedules-Excerpts   Page 11 of 12

APPX00917

Debtor 1    **Max E. Salas**    Case number (if know)    **18-00260**

---

**4.1**
**3**

**Len Salas**
Nonpriority Creditor's Name
**1018 Vince Court**
**Mufreesboro, TN 37128**
Number Street City State Zip Code
Who incurred the debt? Check one.

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim is for a community debt
Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number _____    **$428,614.90**

When was the debt incurred?    _____

As of the date you file, the claim is: Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
Type of NONPRIORITY unsecured claim:
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
☑ Other. Specify    **Claim for unpaid mortgage payments for note and Deed of Trust held by Len Salas with SunTrust but owed by Debtor due to ownership interest in property**

---

**4.1**
**4**

**Marty Sullivan, Esq.**
Nonpriority Creditor's Name
**1909 M St., NW**
**Suite 200**
**Washington, DC 20007**
Number Street City State Zip Code
Who incurred the debt? Check one.

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim is for a community debt
Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number _____    **$4,000.00**

When was the debt incurred?    **Dec 2017**

As of the date you file, the claim is: Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
Type of NONPRIORITY unsecured claim:
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
☑ Other. Specify    **Legal fees - land use attorney**

---

**4.1**
**5**

**MediCredit, Inc.**
Nonpriority Creditor's Name
**PO Box 1629**
**Maryland Heights, MO 63043-0629**
Number Street City State Zip Code
Who incurred the debt? Check one.

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim is for a community debt
Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number    **2827;8331;0 809**    **$60.00**

When was the debt incurred?    **2014**

As of the date you file, the claim is: Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
Type of NONPRIORITY unsecured claim:
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
☑ Other. Specify    **Unpaid medical debt**

---

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 18-00260 |
| MAX E. SALAS, | ) | Chapter 11 |
| | ) | |
| Debtor In Possession. | ) | |
| | ) | |
| | ) | |
| NICOLAAS J. BREKELMANS AND GAIL | ) | |
| GREGORY BREKELMANS, TRUSTEES OF | ) | |
| THE ESTATE OF NINA BREKELMANS; | ) | |
| And | ) | |
| | ) | |
| MICHAEL McLOUGHLIN AND | ) | |
| MARTHA JOHNSON, TRUSTEES OF | ) | **Hearing Date: August 22, 2018** |
| THE ESTATE OF PATRICK | ) | **Time: 10:30 a.m.** |
| McLOUGHLIN | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MAX E. SALAS | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

MOVANTS' OBJECTION TO CLAIM OF EXEMPTIONS
**DEBTOR'S EXHIBIT LIST AND DESIGNATION OF DEPOSITIONS**

| Date Aug. 22, 2018 | Case or Adv. Proc. No. 18-00260 | Operator* | Page Number 1 |
|---|---|---|---|

| Exhibit Number | Description | ID* | Date Admitted* |
|---|---|---|---|
| A | April 16, 2007 Deed – Max Salas to Len Salas | | |
| B | April 16, 2007 Deed of Trust – Len Salas and SunTrust Mortgage, Inc. with July 8, 2015 Corporate Assignment of Deed of Trust | | |

Case 23-20-00990027 Doc 79-54 Filed 09/19/22 Entered 09/19/22 19:25:25 Desc
Exhibit 22    M Salas Exhibit List for Exemption Hearing in Case No. 18-00260    Page 1 of 4

APX00919

| | Date | Case or Adv. Proc. No. | Operator* | Page Number |
|---|---|---|---|---|
| | Aug. 22, 2018 | 18-00260 | | 2 |

| Exhibit Number | Description | ID* | Date Admitted* |
|---|---|---|---|
| C | July 6, 2010 Irrevocable Trust Agreement and Quitclaim Deed | | |
| D | July 6, 2010 Notary Journal Entries of Lori King regarding Trust Documents | | |
| E | Encompass Ins. Co. of America Insurance Policy with Max Salas - Renewal for Policy Period 4/20/2015 to 4/20/2016 | | |
| F | 1610 Riggs Place NW leases<br><br>- Nov. 1, 2014 - Mecham<br><br>-Aug. 17, 2014 - Brekelmans<br><br>-May 17, 2014 - Brekelmans<br><br>-June 2, 2014 - Tamasco<br><br>-Oct. 1, 2014 - Tamasco | | |
| G | E-mail chain beginning Feb 14, 2018 providing Trust Documents from Ron Salas and delivery to insurance counsel | | |
| H | March 19, 2018 Emergency Motion for Summary Judgment filed by Len Salas in the DC Superior Court Litigation | | |

2

APX00920

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>3 |
| --- | --- | --- | --- |

| | | | |
| --- | --- | --- | --- |
| I | April 18, 2018 Len Salas Ch. 11 Voluntary Petition and Schedules and Statements; U.S. Bankr. Court Middle Dist. Tenn.<br><br>Case No. 3:18-bk-02662 | | |
| J | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - Brekelmans | | |
| K | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - McLoughlin | | |

\* For Court Use

**Designation of Deposition Testimony**

1.  February 24, 2016 Deposition of Max Salas; Case: Brekelmans, et al. v. Salas, et al.

Dated:  August 17, 2018

Respectfully submitted,

/s/ Joshua W. Cox
Marc E. Albert, No. 345181
Joshua W. Cox, No. 1033283
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
joshua.cox@stinson.com
Attorneys for
Max E. Salas, Debtor and Debtor-In-Possession

3

## CERTIFICATE OF SERVICE

I hereby certify that I did serve a copy of the foregoing Exhibit List on August 17, 2018, electronically via the Court's ECF system, and by electronic mail, upon the following:

Philip J. McNutt, Esquire
Law Office of Philip J. McNutt, PLLC
11921 Freedom Drive
Suite 584
Reston, VA 20190
pmcnutt@mcnuttlawoffice.com

4

APPX00922

CASE HEARING SUMMARY
**(This is NOT an ORDER)**

Date: 08/24/2018   Time: 10:00

**FILED**

AUG 2 4 2018

Clerk, U.S. District and
Bankruptcy Courts

**CASE: 18-00260-SMT Max E. Salas : CHAPTER 11**

Joshua W. Cox and Marc Elliott Albert and Roderick R. Barnes
representing Max E. Salas (Debtor In Possession)

Joseph A. Guzinski representing U. S. Trustee for Region Four (U.S.
Trustee)

Trial- Day 3 ( Trial Concluded)

[44] Objection to Homestead Exemption *as to Property at 1610 Riggs
Place, NW* Filed by Nicolaas Brekelmans, Michael McLoughlin.
(Attachments: # 1 Exhibit Notice of Objection and Opportunity to Respond
# 2 Proposed Order Granting Objection to Debtor's Claim of Exemption)

**MOVANT** : Nicolaas Brekelmans Michael McLoughlin BY P McNutt; P McNutt;

DE# _____ _____   DE# _____ _____

DE# _____ _____   DE# _____ _____

DE# _____ _____   DE# _____ _____

DE# _____ _____   DE# _____ _____

DISPOSITIONS:
Granted_____   Sustained_____   Denied_____
Overruled_____   Withdrawn_____   Under Adv.___
Moot_____   Consent_____   Dismissed_____
Continued to: _____Thrs_____ 9/6 , 20 18 , AT 10 : 30 A .M.
Proposed Order To Be Submitted By ___/___/___
By [ ]Court [ ]Movant [ ]Opposing Party [ ]Trustee [ ]Jointly

DECISION:   for decision

[ ] Signed by Court   [ ] Filed by Counsel
[ ] To be prepared by:
    [ ] Movant's counsel   [ ] Court
    [ ] Respondent's counsel   [ ] Other _____

NOTES:

_____

_____

_____

_____

_____

**18-00260-SMT: 1 of 2**

APPX00923

S. Martin Teel, Jr. , United States Bankruptcy Judge

APPX00924

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | : | |
| MAX E. SALAS | : | Case No. 18-00260 |
| | | (Chapter 11) |
| Debtor-in-possession | : | |

| | |
|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS | : |
| | : |
| and | : |
| MICHAEL McLOUGHLIN AND MARTHA JOHNSON, | : |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF MICHAEL PATRICK McLOUGHLIN | : |
| | : |
| Creditors | : |
| v. | : |
| MAX E. SALAS | : |
| Debtor | : |

CREDITORS' WITNESS LIST AND EXHIBIT RECORD
FOR THE HEARING ON CREDITORS OBJECTION TO
DEBTOR'S HOMESTEAD EXEMPTION SCHEDULED FOR AUGUST 22, 2018

COME NOW the Creditors captioned above and submit the following Witness and

Exhibit lists for the evidentiary hearing on their objection to the Debtor's claim of a Homestead

Exemption:

    A. <u>The Creditors' List of Witnesses:</u>

Case 23-20-00900027 Doc 79-64-1 Filed 09/19/22/24 Entered 09/19/22 19:25:25 ID Desc388
Exhibit 23    Courts Proceeding Memo for 3rd day of Exemption Hearing in Cas    Page 3 of 17

APPX00925

| Date | Case No. | Operator | Page Number |
|---|---|---|---|
| August 22, 2018 | 18-0260 | | 1 |

| Name of Witness | Brief Description of Testimony | Estimated Time of Examination | Date Called |
|---|---|---|---|
| Max E. Salas | Mr. Salas will be called as an adverse witness. He will primarily testify concerning the facts and circumstances of his homestead and the basis for his claim of exemption and the creation of the trust referenced in the Debtor's Schedules. He will also testify concerning matters and facts which he asserted in the Superior Court litigation and his current prosecution of his Chapter 11 bankruptcy | 2 hours | 8/22/18 |
| Len Salas | Len Salas will be called as an adverse witness. He will primarily testify concerning his ownership of the Riggs Place Property, attempts to remove his name from ownership of the Property and his lack of knowledge of the 1610 Riggs Property Trust and his current prosecution of his bankruptcy proceeding | 1 hour | |
| Ron Salas (Deposition Transcript) | The Creditors intend to offer portions of the deposition testimony of Ron Salas transcribed on August 10, 2018, related primarily to his knowledge of the ownership status of the Property from approximately 2007 through the present, his knowledge of efforts to remove his brother, Len, from the title and his knowledge of the creation of the trust known as the "1610 Riggs Property Trust." | | |

-2-

APX00926

The Creditors may also call one or more rebuttal witnesses.

The Creditors reserve the right to call as a witness any person on the Debtor's Witness List.

**THE REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK**

-3-

APPX00927

B. <u>The Creditors' List of Exhibits, not including rebuttal exhibits</u>

| EXH. NO. | DESCRIPTION | ID | DATE ADMITTED |
|---|---|---|---|
| 1 | Trial Transcript Case Nos. 2015 CA 8054 B and 2015 CA 8061 B (Consolidated), March 26, 2018, pp. 1-19 | | 8\|22\|18 |
| 2 | Joint Pretrial Statement in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 7/18/2017 | 8\|24\|16 | 8\|22\|18 |
| 3 | Pretrial Order in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 12/29/2017 | | 8\|22\|18 |
| 4 | Amended Joint Pretrial Statement in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 2/15/18 | 8\|24\|18 | 8\|22\|18 |
| 5 | McLoughlin Complaint 2015 CA 8054 B - 10/20/15 | 8\|22\|18 | 8\|22\|18 |
| 6 | Brekelmans Complaint 2015 CA 8061 B - 10/20/15 | 8\|22\|18 | 8\|22\|18 |
| 7 | Len Salas' Answer to Brekelmans Complaint - 11/13/2015 | 8\|22\|18 | 8\|22\|18 |
| 8 | Len Salas' Answer to McLoughlin Complaint - 11/13/2015 | 8\|24\|18 | 8\|22\|18 |
| 9 | Max Salas' Answer to McLoughlin Complaint - 11/9/2015 | 8\|22\|18 | 8\|22\|18 |
| 10 | Max Salas' Answer to Brekelmans Complaint - 11/2/2015 | | 8\|22\|18 |
| 11 | Memorandum in Support of Len Salas' Motion to Dismiss in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B | 8\|24\|18 | 8\|22\|18 |
| 12 | Max Salas Answers to Interrogatories in Case No. 2015 CA 8061 B 11/17/15 | 8\|23\|18 | 8\|22\|18 |
| 13 | Len Salas Answers to Interrogatories in Case No. 2015 CA 8061 B 11/30/15 | 8\|24\|18 | 8\|22\|18 |
| 14 | Max E. Salas' Deposition Transcript in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 2/24/2016 | 8\|23\|18 | 8\|23\|18 |
| 15 | Len Salas' Deposition Transcript in Case Nos. 2015 CA 8054 B and 2015 CA 8061 B - 3/9/2016 | 8\|23\|18 | 8\|23\|18 |
| 16 | Deed from Wilhelm to Bruff - 4/27/95 (Trial Exh. 2) | 8\|22\|18 | 8\|22\|18 |
| 17 | Deed from Bruff to Salas - 4/16/07 (Trial Exh. 3) | 8\|22\|18 | 8\|22\|18 |
| 18 | Deed from Max Salas to Len Salas- 4/16/07 (Trial Exh. 4) | 8\|22\|18 | 8\|22\|18 |

-4-

APX00928

| 19 | Deed of Trust from Len Salas to Sun Trust Mortgage - 4/16/07 (Trial Exh. 5) | 8\23\18 | 8\22\18 |
| 20 | DCPropertyQuest Report for 1610 Riggs Place, NW - 6/17/2015 (Trial Exh. 7) | 8\22\18 | 8\22\18 |
| 21 | DC Notice of Infraction - 11/16/2015 (Trial Exh. 18) | | 8\22\18 |
| 22 | DCRA Notice of Immediate Abatement - 6/3/2015 (Trial Exh. 19) | 8\24\18 | 8\22\18 |
| 23 | Memorandum in Support of Len Salas' Emergency Motion for Summary Judgment - 3/19/18 | 8\22\18 | 8\22\18 |
| 24 | Ron Salas Deposition Transcript Excerpts (See designations below) August 10, 2018 | 8\22\18 | 8\23\18 |
| 25 | Lease dated 10/1/14 - Tamasco | 8\23\18 | 8\22\18 |
| 26 | Lease dated 6/2/14 (first page) | 8\23\18 | 8\22\18 |
| 27 | Lease dated 17th of 2014 to Brekelmans (first page) | 8\23\18 | 8\22\18 |
| 28 | Lease dated 8/17/2014 to Brekelmans | 8\23\18 | 8\22\18 |
| 29 | Lease to Mecham, 11/1/2014 | 8\23\18 | 8\22\18 |
| 30 | Irrevocable Trust Agreement dated July 6, 2010 | 8\22\18 | 8\22\18 |
| 31 | Cornet Technologies Letter of 5/19/2017 | | 8\22\18 |
| 32 | Debtor's Monthly Report for 4-5/18 (Excerpts) | | 8\22\18 |
| 33 | Debtor's Monthly Report for 6/18 (Excerpts) | | 8\22\18 |
| 34 | Transcript Excerpts from the Len Salas First Meeting of Creditors, May 24, 2018, Case no. 3:18-bk-02662 in the Bankruptcy Court for the Middle District of Tennessee | | |
| 35 | Max Salas Answers to Interrogatories in Case No. 18-00260 8/6/2018 | 8\24\18 | 8\22\18 |
| 36 | Debtor's Schedules A/B and C-J (D-12) - May 2, 2018 | 8\24\18 | 8\22\18 |
| 37 | Debtor's Responses to Movants First Set Request for Documents - 8/6/18 | | 8\22\18 |
| 38 | Debtor's Statement of Financial Affairs (D-13) 5/2/18 | | 8\22\18 |

-5-

Case 23-20-00027 Doc 79-6 Filed 09/19/22 Entered 09/19/22 19:25:25 Desc Exhibit 23   Courts Proceeding Memo for 3rd day of Exemption Hearing in Cas   Page 7 of 17

APPX00929

| 39 | Debtor's Amended Statement of Financial Affairs (D-50) - 6/27/18 | | 8\22\18 |
| 40 | Debtor's Amended Petition (D-48) - 6/27/18 | | 8\22\18 |
| 41 | 2\14\18 email | 8\21\18 | 8\23\18 |
| 42 | IRS proof of claim | 8\23\18 | 8\23\18 |
| 43 | transcript | 8\23\18 | 8\23\18 |
| 44 | transcript | 8\24\18 | 8\24\18 |
| 45 | | 8\24\18 | 8\24\18 |

The Creditors reserve the right to use as an exhibit, and introduce into evidence any exhibit on the Debtor's Exhibit List.

The Creditors reserve the right to produce additional exhibits for impeachment purposes and for rebuttal

The Creditors reserve the right to use as an exhibit, and introduce, matters and documents of which the Court can take judicial notice.

C. The Creditors designate the following Deposition and Hearing Transcript Sections for testimony at the hearing (All references are to Page:Line(s)):

1. The First Meeting of Creditors of Len Salas (May 24, 2018, United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:18-bk-02662):

31:19-22
32: 1-22
33:1-22
34:1-6
35:1-9
40:3-6
42:19-22
43:1-22
44:1-22
45:1-22
46:1-22
47:1-8
47:11-22
48:1-5
49:19-22

-6-

50:18-22
51:3-22
52:1-2

2. The Deposition Testimony of Len Salas in Case Nos. 2015 CA 8054 B and 2015 CA

8061 B (Consolidated) in the Superior Court of the District of Columbia, March 9, 2016:

10:15-22
11:1-6
12:3-21
17:1-22
18:1-20
19:5-12
20:11-13
29:9-22
30:1-22
31:1-6
31:21-22
32:1-6
113:7-22
114:1-11
116:9-22
117:7-22
118:12-22
119:1-22
120:1
121:1-22
122:1-6

3. The Deposition Testimony of Max E. Salas in Case Nos. 2015 CA 8054 B and 2015

CA 8061 B (Consolidated) in the Superior Court of the District of Columbia, February 24, 2016:

39:1-19
39:20-22
40:1-4
41:21-22
42:1-22
43:1-22
44:12-22
45:1-22

-7-

46:1-9
84:12-22
85:1-7
85:14-19
88:14-22
89:1-13
95:1-22
96:1-3
101:21-22
102:1-9
102:21-22
103:21-22
201:8-16
204:9-22
205:1-13
212:16-22
213:1-17
214:20-22
215:1-5
215:22
216:1-17
216:18-22
217:1-3
217:17-22
218:1
218:19-22
219:1-11
220:1-19

   4.  Ron Salas' Deposition Testimony, August 10, 2018, in In re Max E. Salas, Case No.
18-00260:

6:22
7:1-22
13:1-5
16:15-20
27:15-22
28:1-22
29:1-22
30:1-6
31:1-22
32:1-22
33:1-22

-8-

AAFX00932

34:1-2
34:15-22
35:1-15
36:8-22
37:1-18
39:11-22
40:1-22
41:1-22
42:1-5
43:7-22
44:1-4
45:7-19
46:6-22
47:1-22
48:1-22
49:22
50:1-22
51:1-14
53:5-22
54:1-4
57:1-13
58:1-14
59:17-22
60:1
67:1-7
67:8-22
68:1
73:15-22

5.  In addition to the above, Creditors reserve the right to produce any available

transcribed testimony for purposes of impeachment and/or rebuttal.

6.  The Creditors also reserve the right to counter designate portions of any transcripts

offered by the Debtor.

RESPECTFULLY SUBMITTED

LAW OFFICES OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt

-9-

Case 23-20-00900027  Doc 79-6-4  Filed 09/19/22/24  Entered 09/19/22 19:25:25  Desc
Exhibit 23   Courts Proceeding Memo for 3rd day of Exemption Hearing in Cas   Page 11 of 17

AAFX00933

Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
202-379-9217 (fax)
Pmcnutt@mcnuttlawoffice.com

COUNSEL FOR THE CREDITORS

### Certificate of Service

I HEREBY CERTIFY, that a copy of the foregoing Witness and Exhibit Record was was served electronically, this 17th day of August, 2018 through the Court's ecf filing system on Counsel for the Debtor, Marc E. Albert and Joshua Cox, Esquire at Marc.albert@stinson.com and Joshua.cox@stinson.com . In addition, copies of all listed trial exhibits were simultaneously transmitted electronically to Debtor's forementioned counsel by agreement of counsel.

/s/ Philip J. McNutt
Philip J. McNutt

-10-

AHFX00934

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>MAX E. SALAS,<br><br>       Debtor In Possession.<br><br>NICOLAAS J. BREKELMANS AND GAIL GREGORY BREKELMANS, TRUSTEES OF THE ESTATE OF NINA BREKELMANS; And<br><br>MICHAEL McLOUGHLIN AND MARTHA JOHNSON, TRUSTEES OF THE ESTATE OF PATRICK McLOUGHLIN<br><br>       Movants,<br><br>vs.<br><br>MAX E. SALAS,<br><br>       Respondent. | Case No. 18-00260<br>Chapter 11<br><br><br><br><br><br><br><br>**Hearing Date: August 22, 2018**<br>**Time: 10:30 a.m.** |

**MOVANTS' OBJECTION TO CLAIM OF EXEMPTIONS**
**DEBTOR'S WITNESS LIST**

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>1 |
|---|---|---|---|

| Name of Witness | Brief Description of Testimony to be Elicited | Estimated Time to Elicit Testimony | Date Called* |
|---|---|---|---|
| Max E. Salas | Debtor – Debtor's involvement and history with the Property, creation of the Trust Documents, and the DC Superior Court Litigation | 35 min | 8\22\18 |

CORE/3502869.0005/141951166 1

AMFX00935

| Date Aug. 22, 2018 | Case or Adv. Proc. No. 18-00260 | Operator* | Page Number 2 |
|---|---|---|---|

| Name of Witness | Brief Description of Testimony to be Elicited | Estimated Time to Elicit Testimony | Date Called* |
|---|---|---|---|
| Ron Salas 7111 Diamond Tail Drive Fort Collins, CO 80525 (970) 797-3731 | Creation and signing of the trust documents and the extent of Debtor and Len Salas's history and respective involvement with the Property | 15 min. | 8\22\18 |
| Len Salas 1018 Vince Ct. Murfresboro, TN 37128-6417 (202) 246-4901 | Creation and signing of the trust documents and the extent of Debtor and Len Salas's history and respective involvement with the Property and the DC Superior Court Litigation | 10 min. | 8\22\18 |

* For Court Use

   Max E. Salas, Debtor and Debtor-In-Possession ("Movant") reserves the right to call any

witnesses on the witness lists of the Movants and to call additional witnesses whose testimony

would be offered for rebuttal purposes only.

Dated:  August 17, 2018                    Respectfully submitted,

/s/ Joshua W. Cox
Marc E. Albert, No. 345181
Joshua W. Cox, No. 1033283
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
joshua.cox@stinson.com
*Attorneys for*
*Max E. Salas, Debtor and Debtor-In-Possession*

2

CORE/3502869.0005/141951166.1

Case 23-20-00990027-DoDocu79-64-1FiledFUe8/10/8/26/24nterfed09/89/22 19635a25eIDDest399
Exhibit 23   Courts Proceeding Memo for 3rd day of Exemption Hearing in Cas   Page 14 of 17 A17X00936

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18-00260 |
| MAX E. SALAS, | ) | Chapter 11 |
| | ) | |
| Debtor In Possession. | ) | |
| | ) | |
| | ) | |
| NICOLAAS J. BREKELMANS AND GAIL | ) | |
| GREGORY BREKELMANS, TRUSTEES OF | ) | |
| THE ESTATE OF NINA BREKELMANS; | ) | |
| And | ) | |
| | ) | |
| MICHAEL McLOUGHLIN AND | ) | |
| MARTHA JOHNSON, TRUSTEES OF | ) | **Hearing Date: August 22, 2018** |
| THE ESTATE OF PATRICK | ) | **Time: 10:30 a.m.** |
| McLOUGHLIN | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MAX E. SALAS | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

MOVANTS' OBJECTION TO CLAIM OF EXEMPTIONS
**DEBTOR'S EXHIBIT LIST AND DESIGNATION OF DEPOSITIONS**

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>1 |
|---|---|---|---|

| Exhibit Number | Description | ID* | Date Admitted* |
|---|---|---|---|
| A | April 16, 2007 Deed – Max Salas to Len Salas | | 8\22\18 |
| B | April 16, 2007 Deed of Trust – Len Salas and SunTrust Mortgage, Inc. with July 8, 2015 Corporate Assignment of Deed of Trust | | 8\22\18 |

CORE/3502869.0005/141953257.1

Case 23-20-00990027 Doc 79-6-1 Filed 09/19/226/24 Entered 09/89/22 19635a26 IDDes t400
Exhibit 23   Courts Proceeding Memo for 3rd day of Exemption Hearing in Cas   Page 15 of 17
AAFX00937

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>2 |
|---|---|---|---|

| Exhibit Number | Description | ID* | Date Admitted* |
|---|---|---|---|
| C | July 6, 2010 Irrevocable Trust Agreement and Quitclaim Deed | 8\|22\|18 | 8\|22\|18 |
| D | July 6, 2010 Notary Journal Entries of Lori King regarding Trust Documents | | 8\|22\|18 |
| E | Encompass Ins. Co. of America Insurance Policy with Max Salas - Renewal for Policy Period 4/20/2015 to 4/20/2016 | 8\|24\|18 | 8\|22\|18 |
| F | 1610 Riggs Place NW leases<br><br>- Nov. 1, 2014 - Mecham<br><br>-Aug. 17, 2014 - Brekelmans<br><br>-May 17, 2014 - Brekelmans<br><br>-June 2, 2014 - Tamasco<br><br>-Oct. 1, 2014 - Tamasco | 8\|22\|18 | 8\|22\|18 |
| G | E-mail chain beginning Feb 14, 2018 providing Trust Documents from Ron Salas and delivery to insurance counsel | | |
| H | March 19, 2018 Emergency Motion for Summary Judgment filed by Len Salas in the DC Superior Court Litigation | | 8\|22\|18 |

2

CORE/3502869.0005/141953257.1

Case 23-20-00900027  Doc 79-64-1  Filed 09/19/22/24  Entered 09/19/22 19:35:25  Desc Main
Exhibit 23    Courts Proceeding Memo for 3rd day of Exemption Hearing in Cas    Page 16 of 17

FX00938

| Date<br>Aug. 22, 2018 | Case or Adv. Proc. No.<br>18-00260 | Operator* | Page Number<br>3 |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| I | April 18, 2018 Len Salas Ch. 11 Voluntary Petition and Schedules and Statements; U.S. Bankr. Court Middle Dist. Tenn.<br><br>Case No. 3:18-bk-02662 | | 8\|24\|18 | 8\|22\|18 |
| J | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - Brekelmans | | | 8\|22\|18 |
| K | Max E. Salas's Answers to Interrogatories in the DC Superior Court Litigation - McLoughlin | | | 8\|22\|18 |
| L | DCRA record | | 8\|24\|18 | 8\|24\|18 |

* For Court Use

**Designation of Deposition Testimony**

 1.    February 24, 2016 Deposition of Max Salas; Case: *Brekelmans, et al. v. Salas, et al.*


Dated:  August 17, 2018                    Respectfully submitted,

                                           /s/ Joshua W. Cox
                                           Marc E. Albert, No. 345181
                                           Joshua W. Cox, No. 1033283
                                           STINSON LEONARD STREET LLP
                                           1775 Pennsylvania Ave., N.W., Suite 800
                                           Washington, DC 20006
                                           Tel. (202) 785-3020
                                           Fax (202) 572-9999
                                           marc.albert@stinson.com
                                           joshua.cox@stinson.com
                                           *Attorneys for*
                                           *Max E. Salas, Debtor and Debtor-In-Possession*

3

CORE/3502869.0005/141953257.1

Case 23-20-00990027  Doc 79-64-1  Filed 09/10/22/24  Entered 09/18/22 19:35:25  Desc402
Exhibit 23   Courts Proceeding Memo for 3rd day of Exemption Hearing in Cas   Page 17 of 17

FX00939

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE:

LEN SALAS

    DEBTOR.

NICOLAAS BREKELMANS AND
GAIL GREGORY BREKELMANS,
CO-PERSONAL REPRESENTATIVES OF
THE ESTATE OF NINA BREKELMANS

and

MICHAEL MCLOUGHLIN AND
MARTHA JOHNSON, CO-PERSONAL
REPRESENTATIVES OF THE ESTATE
OF MICHAEL PATTRICK MCLOUGHLIN,

    PLAINTIFFS,

v.

MAX SALAS,

    DEFENDANT.

CASE NO. 3:18-BK-02662
CHAPTER 11
JUDGE HARRISON

Adv. Pro. No. 3:20-ap-90027

DEFENDANTS' RESPONSE TO PLAINTIFFS'
SUPPLEMENTAL LIST OF UNDISPUTED FACTS,
PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Max Salas (the "Defendant"), by and through counsel, and submits

the following responses to the supplemental statement of undisputed facts (Doc. 79-1) (the "Plaintiffs'

Statement of Undisputed Facts") submitted by the Plaintiffs:

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed

$500,000 in a divorce settlement. Amended Joint Pre-trial Statement filed herein on March 29,

2021, Parties Joint Statement of Uncontested Facts, (D-43, pp. 3-10) ("Joint Statement"), Nos. 12

and 13.

APPX00940

**RESPONSE:**

Admitted.

11. That the Defendant is unaware of the location of the original Quitclaim Deed after 2012. Exh. 3, Exemption Hrg Trans. Vol. 2, 55:7 - 58:13; Joint Statement No. 33.

**RESPONSE:**

Admitted.

12. Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max Salas and only kept a copy. Exh. 4, L Salas Confirmation Hearing Transcript, 12/13/18, in Case No. 3:18-2662 ("L Salas Conf. Trans."), 22:8-20; 53: 3-24. Exhibit 19 (Ron Salas - M Albert eMail chain, "Bates" No. salassm7-16-18 00557)

**RESPONSE:**

Admitted.

16. Neither Len Salas nor Max Salas informed SunTrust in writing that Max was responsible for the SunTrust Deed of Trust Note payments. Exh. 4, L Salas Conf. Trans. 67:13-25; Exh. 13, L Salas Depo Trans. 22:22 - 23:7;

**RESPONSE:**

Admitted that neither Len Salas nor Max Salas notified SunTrust in writing that Max Salas was "responsible" for the SunTrust Deed of Trust, but denied to the extent that there is an implication that SunTrust was not made aware of Max Salas' involvement in the payment of the note. All payments were made by Max Salas and Len Salas had signed a document authorizing SunTrust to speak directly to Max Salas about the loan, so SunTrust had notice of Max Salas' involvement.

22. That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim Deed purporting to transfer the Property from Len to Max. Joint Statement Nos. 24, 25, 26; Exh.

APPX00941

7.

**RESPONSE:**

Admitted.

23.  That the foresaid Trust and Deed were prepared and executed in Colorado. Joint

Statement Nos. 24, 25, 26; Exh. 7.

**RESPONSE:**

Admitted.

30.  There were no further communications regarding the creation or recording of a Deed

for the transfer of the Property from Len to Max after February, 2012. Exh. 13, L Salas Depo

Trans. 70:2-17.

**RESPONSE:**

Admitted.

34. That from the period 2010 through 2018 the Defendant did not declare the income

from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns.

Salas 2015 Federal Tax Return, Exh A to Plaintiffs' Response (D-76-1).

**RESPONSE:**

The Defendant objects to this statement on the basis that it is irrelevant.  The Court has already
determined that these tax issues are irrelevant to this matter.

37.  The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and

Max's).  Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220

(Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

Admitted.

APPX00942

38. The Plaintiffs received distributions on account of their claims from both estates. Trustee's Final Reports and Distribution, 18-2662, D-209 (Trustee's Final Report), 220 (Trustee's Final Account) and 222 (Final Decree).

**RESPONSE:**

Admitted.

39. The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018. Plaintiffs' Proofs of Claim filed herein at claims C-5-1 and C-6-1, filed August 7, 2018, at pp. 4-9 of 9, respectively.

**RESPONSE:**

Admitted.

40. On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in the Middle District of Tennessee and the District of Columbia, respectively. Joint Statement No. 5, Case No. 18-2662 (D-1), Case No. 18-260 (D-1).

**RESPONSE:**

Admitted.

41. At the time of the bankruptcy filings by Len and Max, Len was, and continued to be, until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property"). Joint Statement Nos. 7 and 23, Complaint Exhibit B, Defendant's Third Amended Plan (D-40-2), p. 19 of 37, Exh. 6, Exemption Hrg Trans. Vol 3, 40:2 - 46:16.

**RESPONSE:**

Admitted that Lex Salas was the "owner" of the property listed on the deed to the property, but denied that he held anything other than bare legal title.

42. In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then

APPX00943

wife, divorced. Joint State Nos. 11-13

**RESPONSE:**

Admitted.

43.  Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust

Loan"). Joint Statement No. 12.

**RESPONSE:**

Admitted.

45.  Len received no part of the $870,000.  M. Salas Affidavit attached as an Exhibit to the

Defendant's Opposition in Case No. 20-9007 (D-75-2)("M Salas Aff."); Exh. 5, L Salas Mtg of

Creds Trans, at p. 6.

**RESPONSE:**

Admitted.

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property.

Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the

Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case

No. 18-00260) (D-298), p. 12, ¶ 4.4.; Joint Statement Nos. 7 and 23; Exh. 4, L Salas Conf Hrg

Trans, 67:13-25; Exh. 6, Exemption Hrg Trans, Vol. 3, 43:25 - 44:24

**RESPONSE:**

Admitted that Lex Salas was the "owner" of the property listed on the deed to the property, but
denied that he held anything other than bare legal title.

47.  At the time of Len's purchase of the Property in 2007, Max had tax liens and other

obligations which made it impossible for Max to obtain a loan on the Property. Exh. 6, Exemption

Hrg Trans, Vol. 3, 71:9 - 72:23.

APPX00944

**RESPONSE:**

Admitted.

50. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor. Joint Statement Nos. 17, 18.

**RESPONSE:**

Admitted.

51. There are no documents indicating that Max was liable on the SunTrust loan at any time and Max never entered into any agreement or understanding with Len that Max was liable or responsible. Exh. 22, M Salas Document Production, 8/17/18, for Exemption Hearing, August 22-24, 2018, Docket No. 84, pp. 4-7; M Salas Aff.; Exh. 15, Motion to Approve U.S. Bank Settlement; Defendant's Amended Answers to Plaintiffs' Request for Admissions ("RFA"), 17; Exh. 23, Court Proceeding Memo in Case No. 18-00260 (D-96), 8/28/18 ("Proceeding Memo"), Exhibits Lists.

**RESPONSE:**

Admitted that Max Salas never entered into any written agreement with Len Salas, but denied that he never had an oral agreement or understanding that Max Salas would be responsible for the loan. Both Max Salas and Len Salas have testified multiple times that there was an oral agreement to that effect. Also denied that there are "no documents indicating that Max was liable on the SunTrust loan." All payments were made by Max Salas and Len Salas had signed a document authorizing SunTrust to speak directly to Max Salas about the loan, so SunTrust was on notice of Max Salas' involvement in the loan repayment.

52. There is no document raised, proffered or produced by Max indicating that Len was not the sole party responsible for the Deed of Trust payments until at least November, 2019.

Exh. 22, M Salas Document Production, Exemption Hearing, August 22-24, 2018, Docket No.

APPX00945

84, pp. 4-7; Exh. 15, Motion to Approve Settlement with U.S. Bank; Defendant's Document

Production in Case No. 3:20-90027; RFA 16, 18-20, Exh. 23, Proceeding Memo, Exhibits Lists.

**RESPONSE:**

Denied.  All payments were made to SunTrust by Max Salas and Len Salas had signed a document authorizing SunTrust to speak directly to Max Salas about the loan.  Documents evidencing this have been produced by Max Salas to the Plaintiffs.

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the

Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR

Trust" and Max signed each lease as Trustee. M Salas Aff. Exh. 1 (M Salas Depo Trans) 42:18 -

43:2, 43:13-18; Joint Statement. Nos. 19-20; RFA 51.

**RESPONSE:**

Admitted.

57.  The lease payments were put into an account in the name of the CLR Trust and were

used to pay for the Deed of Trust obligations and other expenses associated with the Property. M

Salas Aff.; Joint Statement. Nos. 19-22; RFA 26.

**RESPONSE:**

Admitted.

60.  During the period 2015 through 2018, and continuing after Max's Bankruptcy filing

until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun

Trust Note")  with the exception of one payment of made by Max from the insurance proceeds he

received as a result of the fire damage.  Joint Statement. No. 39.

**RESPONSE:**

Admitted.

APPX00946

63.  As of April, 2018, Len remained the sole obligor on the SunTrust Note.  RFA 16.

**RESPONSE:**

Admitted.

65.  At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property. Joint Statement. No. 28.

**RESPONSE:**

Admitted.

66.  At all relevant times, Len worked only part time and had limited income and assets. Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21; Joint Statement No. 28.

**RESPONSE:**

Admitted.

67.  At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments. Exh. 13, L Salas Depo Trans, 22:18 - 23:25, 76:20 - 77:2, 87:6 - 21, Joint Statement Nos. 28 - 30.

**RESPONSE:**

Admitted.

84.  These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C.  Exh. 21, Debtor's Responses to Movants' First Set Request for Production of Documents, in Case No. 18-260, served on August 6, 2018,  Request No. 10.

APPX00947

**RESPONSE:**

The Defendant objects to the relevance of this statement. The scope of the discovery requests in the D.C. bankruptcy is irrelevant to this matter.

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim

that the Quitclaim Deed of July 6, 2010 was in effect in 2018. Exhibits 3, 6, 20, Exemption Hrg

Trans, Vols 1-3.

**RESPONSE:**

Admitted.

99. The only deed referenced by Max or his counsel, allegedly entitling Max to an

ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered,

or even mentioned by the Salas family or by Max, specifically. Exhibit 13, L Salas Depo Trans,

39:21 - 40:20, Exemption Hearing Transcripts Vols 1-3.

**RESPONSE:**

Admitted.

100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15

Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee

filed objections to the Plaintiffs' claims filed in Len's bankruptcy. Exh. 13, L Salas Depo Trans,

61:12 - 62:13, Proofs of Claim Nos. C-5 and C-6,

**RESPONSE:**

Admitted

101. In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len

listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.

On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution

APPX00948

for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least

$1,035,000 approx) per his consistent promise that he would pay that amount and his consistent

assertion that he was responsible for payment of the SunTrust Note which was, at all relevant

times, in Len's name. Exh. 9, M Salas Schedules filed in Case No. 18-00260 in the United States

Bankruptcy Court for the District of Columbia, 5/2/18, (D-12), ("M Salas Scheds"), Schedule

A/B, p. 3 of 37, Schedule D, pp. 19-20 of 37, Schedule F, p. 27 of 37.

**RESPONSE:**

The Defendant objects to the compound nature of this statement. Notwithstanding that objection, the Defendant answers as follows.
The Defendant admits the statement concerning the contents of Len Salas' Schedule J (the first sentence of Paragraph 101).
The Defendant denies that he was a creditor of Len Salas', as he never filed a claim and was not listed as a creditor (the second sentence of Paragraph 101).
The Defendant denies that he owed Len Salas contribution, as no such demand was ever made, but he admits that he owed the balance of the SunTrust Note pursuant to his promise to pay that note (the third sentence of Paragraph 101).


104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office. He does _not_

recall that Mr. Goldstein mailed it back to Mr. Salas. Exh. 6, Exemption Trans. Vol. 3, 55:7 -

56:21.

**RESPONSE:**

Admitted.


107. Max also learned from Albert that if Max could claim he is the actual owner of the

Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to

D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as

exempt from execution by the Plaintiffs. Exh. 6, Exemption Hrg Trans. Vol 3, 121:3 - 122:1

**RESPONSE:**

APPX00949

The Defendant objects to this request on the grounds that it seeks information that is subject to the attorney/client privilege. The citations provided by the Plaintiffs do not support the statements made in Paragraph 107.

124. As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had any intent to use or record it. Exh. 7, eMails dated June, 2011 through February, 2012; Exh. 13, L Salas Depo Trans. 68:13 - 70:17.

**RESPONSE:**

The Defendant denies this statement. The emails cited by the Plaintiffs show that Len Salas and Max Salas continued their attempt to record the Quitclaim Deed, and the deposition transcript cited by the Plaintiffs simply reflects that Len Salas could not recall what conversations occurred when.

Dated: September 28, 2022

Respectfully Submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel:    615.465.6008
Fax:    615.807.3048
Email: phillip@thompsonburton.com

Attorneys for Defendant

**Certificate of Service**

The undersigned hereby certifies that a true and exact copy of the foregoing has been served via electronic notice/ECF on all parties having made an appearance herein, including counsel for the Plaintiffs.

This 28th day of September, 2022.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

APPX00951